Nos. 23-2882, 23-2886, 23-3146

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

CENTER FOR BIOLOGICAL DIVERSITY, et al.,
*Plaintiffs-Appellees/Plaintiffs-Appellants*,

and

ALLIANCE FOR THE WILD ROCKIES, et al.,
*Plaintiffs-Appellees/Plaintiffs*,

v.

UNITED STATES FOREST SERVICE, et al.,
*Defendants-Appellants/Defendants/Defendants-Appellees*,

and

KOOTENAI TRIBE OF IDAHO,
*Intervenor-Defendant/Intervenor-Defendant-Appellant/
Intervenor Defendant-Appellee.*

Appeal from the United States District Court for the District of Montana
No. 9:22-cv-114 (Hon. Donald W. Molloy)

**FEDERAL DEFENDANTS-APPELLANTS' FIRST CROSS-APPEAL BRIEF**

Of Counsel:

ELISE FOSTER
*Attorney*
U.S. Dep't of Agriculture

KATHRYN L. WILLIAMS-SHUCK
SARAH E. MCLAIN
*Attorneys*
U.S. Dep't of the Interior

TODD KIM
*Assistant Attorney General*

THEKLA HANSEN-YOUNG
HAYLEY A. CARPENTER
ERIKA A. FURLONG
JOHN P. TUSTIN
JACOB D. ECKER
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 305-0466
jacob.ecker@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................iii

INTRODUCTION ..........................................................................................1

STATEMENT OF JURISDICTION ....................................................................2

STATEMENT OF THE ISSUES .......................................................................3

PERTINENT STATUTES AND REGULATIONS .................................................4

STATEMENT OF THE CASE ...........................................................................4

      A.     Statutory and Regulatory Background .................................................4

            1.     Endangered Species Act...................................................4

            2.     National Forest Management Act and Access Standard 2 ...............................................................5

            3.     National Environmental Policy Act ..................................8

      B.     Factual Background ..........................................................................9

      C.     Proceedings Below.........................................................................15

SUMMARY OF ARGUMENT........................................................................18

STANDARD OF REVIEW .............................................................................23

ARGUMENT ...............................................................................................24

I.     The biological opinion's population estimates satisfy the ESA's best available science requirement. ............................................................24

      A.     The Fish and Wildlife Service's determination on what sources constitute the best available science for estimating population size was reasonable and is entitled to deference....................25

      B.     The Forest Service's reliance on the biological opinion was not arbitrary and capricious..........................................................31

II.    The Forest Service's determination that the project is consistent
       with Access Standard 2 satisfies NFMA and the APA. ...........................................32

       A.    The Forest Service satisfied NFMA regulations' procedural
             requirement to document consistency with Forest Plan
             standards. ................................................................................................32

       B.    The Forest Service's conclusion that the project complies
             with Access Standard 2 was reasonable. ........................................................37

III.   The environmental assessment satisfies NEPA and the APA. ..........................42

       A.    The environmental assessment reasonably describes its
             methodology. ................................................................................................43

       B.    The environmental assessment reasonably discusses
             unauthorized motorized use. ........................................................................48

CONCLUSION ..................................................................................................................56

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*All. for the Wild Rockies v. Bradford,*
   856 F.3d 1238 (9th Cir. 2017) ................................................................38

*All. for the Wild Rockies v. Marten (Marten I),*
   464 F. Supp. 3d 1169 (D. Mont. 2020) .............................12, 40, 41

*All. for Wild Rockies v. Probert,*
   412 F. Supp. 3d 1188 (D. Mont. 2019) .............................12, 40, 41

*Alliance for the Wild Rockies v. Marten (Marten II),*
   --- F. Supp. ----, 2023 WL 4977712 (D. Mont. Aug. 3, 2023) ..............................40, 41

*Cal. Pac. Bank v. Fed. Deposit Ins. Corp.,*
   885 F.3d 560 (9th Cir. 2018) ................................................................24

*Center for Biological Diversity v. U.S. Forest Service (Knotty Pine),*
   670 F. Supp. 3d 1121 (D. Mont. 2023) ...............................40, 41

*Corrigan v. Haaland,*
   12 F.4th 901 (9th Cir. 2021) .............................................23, 24

*Earth Island Inst. v. U.S. Forest Serv.,*
   351 F.3d 1291 (9th Cir. 2003) ..........................................48, 53

*Ecology Ctr. v. Castaneda,*
   574 F.3d 652 (9th Cir. 2009) ............................................29, 38

*Great Basin Res. Watch v. Bureau of Land Mgmt.,*
   844 F.3d 1095 (9th Cir. 2016) ......................................9, 46, 49

*Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci,*
   857 F.2d 505 (9th Cir. 1988) ..............................................9, 46

*Idaho Farm Bureau Fed'n v. Babbitt,*
   58 F.3d 1392 (9th Cir. 1995) ................................................................46

*Idaho Sporting Cong., Inc. v. Rittenhouse,*
   305 F.3d 957 (9th Cir. 2002) ................................................................50

*Idaho Wool Growers Ass'n v. Vilsack,*
    816 F.3d 1095 (9th Cir. 2016) .................................................................46

*Kern Cnty. Farm Bureau v. Allen,*
    450 F.3d 1072 (9th Cir. 2006) ..................................... 19, 25, 26, 30

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) .............................................................. 24, 29

*N. Alaska Env't Ctr. v. Kempthorne,*
    457 F.3d 969 (9th Cir. 2006) .................................................................48

*National Wildlife Federation v. National Marine Fisheries Service,*
    524 F.3d 917 (9th Cir. 2008) .................................................................24

*Native Ecosystems Council v. U.S. Forest Serv.,*
    418 F.3d 953 (9th Cir. 2005) ............................................................ 50, 51

*Native Ecosystems Council v. Weldon,*
    697 F.3d 1043 (9th Cir. 2012) .................................... 5, 21, 32, 37

*Neighbors of Cuddy Mtn. v. U.S. Forest Service,*
    137 F.3d 1059 (9th Cir. 1998) ........................................................ 9, 48

*Ohio Forestry Ass'n, Inc. v. Sierra Club,*
    523 U.S. 726 (1998) .................................................................................5

*Oregon Nat. Desert Ass'n v. United States Forest Serv.,*
    957 F.3d 1024 (9th Cir. 2020) ....................................................... 37, 40

*Protect Our Cmtys. Found. v. Jewell,*
    825 F.3d 571 (9th Cir. 2016) .................................................................50

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy,*
    898 F.2d 1410 (9th Cir. 1990) ...............................................................31

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
    747 F.3d 581 (9th Cir. 2014) ...................19, 20, 23, 26, 29, 30, 41, 49, 52, 55

*The Lands Council v. McNair,*
    537 F.3d 981 (9th Cir. 2008) .................................................................40

*Westlands Water District v. Department of the Interior*,
376 F.3d 853 (9th Cir. 2004) ...........................................................................24

## Statutes

Endangered Species Act, 16 U.S.C. § 1531 et seq. ...........................................2
16 U.S.C. § 1536(a)(2) ...................................................................................4

16 U.S.C. § 1536 ..............................................................................................4

Forest and Rangeland Renewable Resource Planning Act, 16 U.S.C. § 1600 et seq. .....2
16 U.S.C. §§ 1600-1614 .................................................................................5

Judicial Procedure Act, 28 U.S.C. § 1291 et seq.
28 U.S.C. § 1291 ..............................................................................................3

28 U.S.C. § 1331 ..............................................................................................2

National Environmental Policy Act, 42 U.S.C. § 4321 et seq. ...........................2
42 U.S.C. §§ 4321-4370m-12 .........................................................................8

42 U.S.C. § 4332(C) .........................................................................................8

42 U.S.C. § 4332(C)(i) ...................................................................................48

Administrative Procedure Act, 5 U.S.C. § 701 et seq. .......................................2
5 U.S.C. § 706(2)(A) ......................................................................................24

Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, § 321 (2023) ................8

## Rules

Federal Rule of Appellate Procedure 4(a)(1)(B) ..............................................3

## Regulations

36 C.F.R. § 219.15(d) ........................................................ 20, 22, 32, 35, 36, 37

40 C.F.R. Part 1500 (2018) ...............................................................................8
40 C.F.R. § 1502.21 (2018) ...........................................................................45

40 C.F.R. § 1502.24 (2018) ............................................... 9, 22, 43, 44

40 C.F.R. § 1506.13 (2021) ...................................................................8

40 C.F.R. § 1508.13 ...............................................................................8

40 C.F.R. § 1508.9 (2018) .....................................................................8

40 C.F.R. § 1508.9(a)(1) ........................................................................8

50 C.F.R. § 402.02 ..........................................................................24, 47

50 C.F.R. § 402.14 ..................................................................................4

50 C.F.R. § 402.14(a) .............................................................................4

50 C.F.R. § 402.14(g)(2) ........................................................................4

50 C.F.R. § 402.14(g)(4) ..................................................................4, 47

84 Fed. Reg. 44,976 (Aug. 27, 2019)...................................................24

National Environmental Policy Act Implementing Regulations Revisions,
   87 Fed. Reg. 23,453 (Apr. 20, 2022) ...............................................8

National Forest System Land Management Planning,
   77 Fed. Reg. 21,162 (Apr. 9, 2012) .............................................32-33

Update to the Regulations Implementing the Procedural Provisions of the
National Environmental Policy Act,
   85 Fed. Reg. 43,304 (2020).................................................................8

# INTRODUCTION

This consolidated action involves the U.S. Forest Service's approval of a vegetation management project in the Kootenai National Forest whose purposes include promoting grizzly bear forage habitat and reducing the potential for high intensity wildfires. Two sets of plaintiff environmental groups raise challenges under the Endangered Species Act ("ESA"), the National Forest Management Act ("NFMA"), and the National Environmental Policy Act ("NEPA") to the Forest Service's approval of the project and the Fish and Wildlife Service's related finding that it would not jeopardize grizzly bears. The district court ruled for plaintiffs on some claims and for the agencies on others. We appeal the district court's judgment on three specific issues. The district court's overarching error across all three was its failure to defer to the expert agencies' judgment on scientific and factual matters.

The first issue presented for appeal relates to the district court's rulings under the ESA that (1) Fish and Wildlife did not rely on the best available science for its grizzly population size estimates in issuing its biological opinion, and (2) the Forest Service acted arbitrarily in relying on the biological opinion. Fish and Wildlife relied on a comprehensive study of grizzly population size and a well-accepted statistical method for projecting that population size forward. It also explained why the data plaintiffs and the district court relied on was "an over-simplification of population biology." That satisfies the best available science requirement, and the district court

improperly failed to defer to that scientific judgment. For the same reasons, it was not arbitrary for the Forest Service to rely on Fish and Wildlife's biological opinion.

The second and third issues appealed by the agencies involve NFMA and NEPA claims relating to road density in the project area. The Forest Service complied with NFMA's requirement that the project be consistent with its Forest Plan. The Forest Service explained at length how the project met, or improved upon, existing metrics relating to road density designed to ensure sufficient core habitat for grizzly bears. It directly addressed the issue of possible illegal use of motor vehicles in the forest, and explained why that use does not typically affect its metrics. That explanation was sufficient under NFMA. This same discussion satisfies NEPA's procedural requirements that the Forest Service identify its methodology and use a reasonable method to establish a baseline for its NEPA analysis. The district court erred by weighing plaintiffs' allegations of unauthorized motorized use more heavily than the Forest Service's own assessment and investigation of unauthorized use.

For these reasons, this Court should reverse the district court's judgment on the foregoing claims.

## STATEMENT OF JURISDICTION

(a)    The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because plaintiffs' claims arise under federal law. *See* 5 U.S.C. § 701 et seq.; 16 U.S.C. § 1531 et seq.; 42 U.S.C. § 4321 et seq.; 16 U.S.C. § 1600 et seq.; 1-ER-6.

(b)     This Court has jurisdiction under 28 U.S.C. § 1291 because the district court entered a final judgment resolving all parties' claims against all defendants. 1-ER-3-4.

(c)     The judgment was entered on August 17, 2023. 1-ER-3-4. We filed a notice of appeal on October 11, 2023. 10-ER-2264-66. The appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(B).

## STATEMENT OF THE ISSUES

1.     Whether the district court erred in concluding that Fish and Wildlife violated the ESA's best-available-science requirement in its evaluation of the present population size of grizzly bears in its biological opinion; and relatedly, whether the district court erred in concluding that the Forest Service acted arbitrarily in relying on the biological opinion in approving the project.

2.     Whether the district court erred in concluding that the Forest Service violated NFMA in its analysis of compliance with applicable road density requirements related to preserving core habitat for grizzly bears.

3.     Whether the district court erred in concluding that the Forest Service's discussion of how the project satisfied road density requirements was insufficient under NEPA where the Forest Service adequately described in the project's environmental assessment both the agency's (1) methodology for complying with road density requirements, and (2) approach to unauthorized motorized use, including the agency's response to information submitted by plaintiffs.

3

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are set forth in the Addendum following this brief.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

### 1.    Endangered Species Act

ESA Section 7(a)(2) requires a federal agency to ensure that any action authorized, funded, or carried out by that agency "is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). The agency undertaking the action is required to formally consult with the appropriate wildlife agency—here, the Fish and Wildlife Service—whenever the action "may affect" a threatened or endangered species. 16 U.S.C. § 1536; 50 C.F.R. § 402.14(a). During formal consultation, Fish and Wildlife evaluates an action's impacts by "[a]dd[ing] the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat." 50 C.F.R. § 402.14(g)(4). The Fish and Wildlife Service must publish a biological opinion that uses "the best scientific and commercial data available" to determine whether the action will jeopardize the survival and recovery of a protected species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14. A biological opinion must include information on the current status and environmental baseline of the affected listed species. 50 C.F.R. § 402.14(g)(2).

### 2. National Forest Management Act and Access Standard 2

The National Forest Management Act ("NFMA") provides the framework for the Forest Service's management, under principles of multiple use, of National Forests. *See* 16 U.S.C. §§ 1600-1614; *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 728 (1998). "NFMA and its implementing regulations provide for forest planning and management by the Forest Service on two levels: (1) forest level and (2) individual project level." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012). The Forest Service first develops a forest plan containing "broad, long-term plans and objectives for the entire forest." *Id.* The agency then implements the forest plan through site-specific projects that must be consistent with the governing forest plan. *Weldon,* 697 F.3d at 1056. "[T]he Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference." *Id.*

The 2015 Revision for the Kootenai National Forest Land Management Plan ("Forest Plan") provides "guidance for project and activity level decision-making on the [Kootenai National Forest] for approximately the next 15 years." 6-ER-1325. The Forest Plan also "describe[s] an overall desired condition the Forest will strive to achieve." 6-ER-1325. The Forest Plan "is a strategic, programmatic document and does not make project-level decisions or irreversible or irretrievable commitments of resources." 6-ER-1326. The Forest Plan standard relevant to this appeal, Standard FW-STD-WL-02 in the 2015 Forest Plan (referred to herein as "Access Standard 2"),

incorporates the Forest Service's existing approach for motorized access in grizzly bear recovery zones first promulgated in 2011. 6-ER-1329; 7-ER-1459, 1472-78.[1] The approach recognizes the negative impacts that roads have on grizzly bears because bears tend to avoid roads, creating fragmentation and loss of habitat. 5-ER-930-32.

Thus, Access Standard 2 places limits on road access for each bear management unit in the Cabinet-Yaak Ecosystem (which includes Kootenai National Forest) that provides sufficient, connected grizzly bear habitat. 5-ER-984 (noting that access standards, including Access Standard 2, "were designed to favor occupancy and reproduction of female grizzly bears within the [r]ecovery [z]ones"); 7-ER-1472-73; 5-ER-891 (describing Cabinet-Yaak Ecosystem). Bear management units are "[a]reas established for use in grizzly bear analysis." 7-ER-1432. The units do not represent actual grizzly bear use; rather, they "approximate female home range size." *Id.*

Access Standard 2 places a maximum on the percentage of each bear management unit that can have over one mile of "open" roads or over two miles of "total" roads per square mile, and requires a minimum percentage of "core area" for each bear management unit. 5-ER-993; 7-ER-1472-54; 8-ER-1859. Roads count as "open" when there are no restrictions on public access, the road does not meet all criteria for a restricted or obliterated road, or qualify as an open motorized trail (paths

---

[1] Access Standard 2 was first promulgated as part of the "Access Amendment" to the previous forest plan. 6-ER-1329. The district court's references to the Access Amendment refer to Access Standard 2.

fit only for all-terrain vehicles or motorcycles). 7-ER-1440; 5-ER-930, 1038-39. The

"total" route density metric includes all routes in the "open" category plus restricted

roads and roads not considered "reclaimed."[2] 7-ER-1448; *see also* 5-ER-910 (explaining

"spatial analysis of road density distribution" for open motorized density and total

motorized density). Core areas are those areas where "no motorized travel routes or

high use non-motorized trails" exist. 7-ER-1436. These are areas that (1) are at least

0.31 miles, or 500 meters, from an open road or motorized trail, (2) experience no

motorized use of roads or trails during the period when grizzlies are out of their dens,

and (3) contain "[n]o roads or trails that receive non-motorized, high intensity use," 5-

ER-1039-40, 7-ER-1436, 1440, 1448.

Relevant here, the Forest Plan sets a maximum of 31% for open routes and

26% for total routes, and a minimum of 55% of core habitat area for bear

management unit 14. 7-ER-1473. The limits in bear management unit 15 are the same,

except that the maximum for open routes is 33%. *Id.* The standard prohibits activities

that do not meet any of these three metrics on a permanent basis. 8-ER-1806; *see* 7-

ER-1540. Temporary exceedances are allowed for open route density and total route

density, so long as the baseline is restored post-project. *See* 7-ER-1540. The standard

---

[2] "[R]eclaimed/obliterated road[s]" are routes "managed with the longer term intent
for no motorized use" that "ha[ve] been treated in such a manner so as to no longer
function as a road." 5-ER-1038.

also allows for in-kind replacement of core habitat concurrently or prior to any loss caused by a project. 7-ER-1474.

### 3. National Environmental Policy Act

NEPA, 42 U.S.C. §§ 4321-4370m-12, requires agencies to prepare an environmental impact statement for all "major Federal actions significantly affecting the quality of the human environment."42 U.S.C. § 4332(C). An agency may prepare an environmental assessment to ascertain whether a proposed federal action will have significant impacts. 40 C.F.R. § 1508.9 (2018).[3] If the agency concludes in the environmental assessment that there are no significant impacts, the agency issues a finding of no significant impact in lieu of preparing an environmental impact statement. *Id.* at (a)(1); *id.* § 1508.13.

---

[3] All citations to the Council on Environmental Quality's regulations in this brief refer to those regulations as codified at 40 C.F.R. Part 1500 (2018). Those regulations have been amended several times in recent years. *See* National Environmental Policy Act Implementing Regulations Revisions, 87 Fed. Reg. 23,453 (Apr. 20, 2022); Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (2020). These updated regulations apply only to "NEPA process[es] begun after September 14, 2020," while agencies "*may* apply" the updated regulations to NEPA processes initiated earlier. 40 C.F.R. § 1506.13 (2021) (emphasis added). The NEPA process for the project began with a scoping notice in 2018, 8-ER-1731, and two draft environmental assessments were prepared in 2019, *see* 8-ER-1732-33.

NEPA itself was also recently amended. *See* Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, § 321 (2023). The amendments are not material to the issues on appeal.

An agency must take a "hard look" at the environmental effects of its action, providing "a reasonably thorough discussion of the significant aspects of probable environmental consequences." *Neighbors of Cuddy Mtn. v. U.S. Forest Service*, 137 F.3d 1059, 1376 (9th Cir. 1998) (cleaned up). Existing conditions that are not a part of the agency's action may be discussed as part of the environmental baseline for a NEPA analysis. *See Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988). Establishing a baseline for a NEPA analysis is a practical requirement that calls only for some "reasonable method." *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016) (citation omitted). Separately, agencies "shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement." 40 C.F.R. § 1502.24.

## B. Factual Background

The Forest Service proposed the Black Ram project as part of its goal to "move the existing resource conditions in this [P]roject area toward the desired conditions" provided in the 2015 Forest Plan. 7-ER-1633. The project area encompasses 95,412 acres. 8-ER-1729. The project will involve vegetation management on about 13% of the 91,647 acres in the project area that are on the Forest. 8-ER-1729. The purposes of the project include promoting resilient vegetation, promoting forage opportunities for bears and other species, and reducing the potential for high intensity wildfires. 7-ER-1633-34. In addition to various treatments, including commercial and

9

precommercial thinning, the creation of fuel breaks, and prescribed burns, the project will decommission and store a total of 52 miles of roads, create 3.3 miles of permanent non-public roads for access to treatment areas and 0.2 miles of temporary roads, and reconstruct or maintain 90.3 miles of existing timber haul routes. 7-ER-1640, 1644.

Before approving the project, the Forest Service prepared a 435-page environmental assessment (598 pages with appendices). 8-ER-1718-41. The Forest Service published draft environmental assessments for public comment in July and December 2019, 8-ER-1732-33, and a final environmental assessment in June 2022, 8-ER-1718. The environmental assessment analyzes a no-action alternative and two action alternatives. 7-ER-1639, 1643. The alternative the Forest Service ultimately chose will treat "the landscape to promote resilient vegetation conditions, create big game forage opportunities, provide wood products, and reduce the potential for high intensity wildfires, therefore promoting the Forest Plan desired conditions" most effectively among the alternatives. 7-ER-1641.

With respect to forage, the environmental assessment explains that "[f]orage and huckleberry production," prime food sources for grizzlies, is "stagnant due to canopy closure, tree encroachment into brush fields, and/or lack of fire" in many locations within the project area. 7-ER-1665-70; *see also* 8-ER-1784-87. Accordingly, many of the project's proposed fire treatments are designed to "[e]nhance natural openings, create new openings, and stimulate the growth and production of fire-

adapted forage/browse species for a variety of wildlife, including conditions suitable for huckleberry production within Core habitat to benefit grizzly bear recovery efforts." 7-ER-1665-70; *see also* 8-ER-1784-87.

Among the numerous issues considered by the Forest Service in more than 400 pages of analysis in the environmental assessment, the Forest Service documented the project's impacts on the grizzly bear. 8-ER-1762-82. The environmental assessment describes existing conditions of the Cabinet-Yaak grizzly bear population where the project is located. 8-ER-1757-82. The environmental assessment explains that Access Standard 2's "parameters of core, [open route density], and [total route density] . . . will be the resource indicators for measuring change to" the quantity of secure, roadless grizzly habitat and road densities. 8-ER-1757. The project will occur within bear management units 14 and 15, which both require a minimum of 55% core and a maximum of 26% total routes. 7-ER-1473. Bear management unit 14 allows up to 31% for open routes while unit 15 allows up to 33%. *Id.* The environmental assessment describes existing conditions, including road impacts and the present status of core, open route density, and total route density metrics. 8-ER-1760-61. It then describes the project's impacts on Access Standard 2's metrics. 8-ER-1767-81. Nearly 70 roads would be affected by the project, with some new routes eliminating core habitat to be offset by closing existing routes as in-kind replacement of core habitat. 7-ER-1686-92. Overall, the project will have temporary impacts to open and

11

total route densities, but no permanent impacts to either, and no reduction in core habitat in either bear management unit. 8-ER-1769-72.

The environmental assessment addressed the issue of unauthorized motorized use on Forest Service roads in the project area in this context. In general, unauthorized motorized use—that is, unlawful use of roads or other areas on which the Forest Service does not permit motorized access—is not counted against Access Standard 2's core, open route density, and total route density metrics. *Compare* 8-ER-1806 ("The routes used to establish the permanent condition are those that are authorized routes") *with* 5-ER-1130 (designating one road in project area as open despite unauthorized use, because of "strong patterns of use" and "historic unauthorized use" on that road); *see also All. for Wild Rockies v. Probert*, 412 F. Supp. 3d 1188, 1205 (D. Mont. 2019) ("isolated instance[s]" of "an ineffective barrier" need not be included in road density metrics); *All. for the Wild Rockies v. Marten* (*Marten I*), 464 F. Supp. 3d 1169, 1176 (D. Mont. 2020) (concluding that "the mere possibility that planned road closures will be ineffective" does not render the agency's analysis arbitrary). As the environmental assessment explains, the Forest Plan requires annual monitoring, "and in this monitoring, we report motorized access effects against [Access Standard 2] metrics." 8-ER-1762. The environmental assessment goes on to explain that the Forest Service has "[i]n the past . . . noted unauthorized use of restricted roads, and occasionally an unauthorized, user-created road." *Id.* Where observed, the Forest Service "has made repairs for any such breaches as quickly as

12

possible after discovery." 8-ER-1762. The agency also "[m]onitor[s] . . . road closures . . . daily or weekly," and organizes an "annual Adopt-A-Road event" to help identify roads and barriers needing repair. 8-ER-1762. By doing so, the Forest Service explains that it "continue[s] to maintain . . . standards for core and motorized route densities" under Access Standard 2. 8-ER-1762.

In the context of the ESA, Fish and Wildlife also assessed the impacts of unauthorized motorized use both at the forest-plan level and in the project biological opinion. A 2020 biological opinion on the Forest Plan also deals with unauthorized motorized use. *See* 5-ER-880-1028. That biological opinion explains that "[a] private entity's non-compliance with the Forest's access management is an illegal activity" that is not authorized by the Forest Service. 5-ER-921. That illegal use generally does not change baseline metrics under Access Standard 2 because it typically results in only temporary, minimal effects. *Id.* That is because the Forest Service corrects the situation by repairing broken road closures and illegal use is "spatially disparate and temporary." *Id.* When illegal use is reported by Forest Service employees or the public, closure devices are repaired as soon as possible and generally within the same bear year. 7-ER-1529.[4]

---

[4] "Bear year" refers to the time when bears are active, which in the Cabinet-Yaak Ecosystem is April 1 through November 30. 2-ER-246.

13

On the project at issue here, the Forest Service prepared a biological assessment in which it analyzed the project's effects on the grizzly bear. 7-ER-1508-1630. Fish and Wildlife then prepared a biological opinion concluding that the project would not jeopardize the continued existence of the grizzly bear. 2-ER-296. In that analysis, Fish and Wildlife first thoroughly considered the environmental baseline of the project. As relevant here, Fish and Wildlife evaluated the size and growth trends for grizzly bears in the Cabinet-Yaak Ecosystem. Fish and Wildlife specifically determined that "the conglomerate of the best available science suggests an improving trend in the population of grizzly bears in the [Cabinet-Yaak Ecosystem]." 2-ER-251. Using a statistical analysis designed to "smooth[] the data over time" given the small sample size, and create "a more conservative estimate of population trend," 4-ER-771, the study Fish and Wildlife relied on—Kasworm et al. (2021)—determined that "there is a 67 percent probability that the population is stable or increasing," while there is a "33 percent probability that the population is decreasing." 2-ER-251. Based on computer modelling that ran a grizzly-bear-specific growth rate equation under 5,000 scenarios, Kasworm et al. (2021) identified the rate at which the population was likely increasing. 2-ER-250. Fish and Wildlife then used this rate of increase to determine that the present population at the time of the biological opinion was approximately 60 bears in the Cabinet-Yaak Ecosystem. 2-ER-249-50.

The project biological opinion contains extensive discussion of the issue of grizzly bear habitat, and how both authorized and unauthorized motorized use affects

14

grizzly habitat. As Fish and Wildlife makes clear, unauthorized uses generally do not affect Access Standard 2's core, open route density, and total route density metrics. 2-ER-263. That is because Access Standard 2's metrics relate to permanent conditions, whereas "[d]uring the timeframe in which the Black Ram project is proposed, [Fish and Wildlife] anticipate[s] illegal motorized use will continue to be spatially disparate and temporary." 2-ER-263; *see also* 8-ER-1806 ("The routes used to establish the 'permanent' condition are those that are authorized routes. Unauthorized use features are not. That is, any user-created routes or access, as well as breaches . . . are not considered part of the existing condition."). Even though "some Forest users have, and will likely continue to break the law and drive motorized vehicles where such use is illegal," most "illegal use was not concentrated in any given area," "was not chronic," and "when road breaches have occurred in the past," the Forest Service promptly makes repairs. 2-ER-263.

Based on all of the foregoing analyses, the Forest Service issued a decision notice approving the project in June 2022. 7-ER-1638-41.

## C. Proceedings Below

Center for Biological Diversity, Yaak Valley Forest Council, and Wildearth Guardians ("CBD") sued to challenge the project's approval in June 2022. 1-ER-11. In January 2023, Alliance for the Wild Rockies and Native Ecosystems Council ("Alliance") separately challenged the project, and the district court consolidated the two suits. 1-ER-11. The Kootenai Tribe of Idaho moved to intervene in the case,

15

asserting its interest "in defending the [p]roject, which is located in its aboriginal territory, because the [p]roject is consistent with the Tribe's holistic and proactive approach towards management within Kootenai Territory and with the Tribe's mission to guard and keep the land forever." ECF Nos. 23, 42, 3:22-cv-114. The district court granted the Tribe's intervention. ECF Nos. 26, 44, 3:22-cv-114.

CBD's amended complaint set out seven claims, and Alliance's complaint set out five. 1-ER-11-12. These 12 claims asserted the Forest Service's approval of the project violated NEPA, NFMA, and the ESA, and that Fish and Wildlife's biological opinion concluding the project would not jeopardize the grizzly violated the ESA. 1-ER-11-12. In total, the case below presented six NEPA claims (CBD's claims one and two, and Alliance's claims two, three, four, and five), one NFMA claim (CBD's claim three), one claim purporting to assert violations of both NEPA and NFMA (Alliance's claim one), and four ESA claims (CBD's claims four, five, six, and seven). 1-ER-11-12. On cross-motions for summary judgment, the district court ruled for CBD and Alliance on seven claims and for the agencies on five.[5]

As relevant to the government's appeal, the district court concluded that Fish and Wildlife failed to use the best available science to estimate the grizzly's population as part of the environmental baseline for its analysis of jeopardy under ESA Section 7 (CBD's claim four). 1-ER-14-19. And, because the Forest Service relied on Fish and

---

[5] The court found for the agencies on three claims (CBD's claim three, Alliance's claim two, and Alliance's claim four), based on plaintiffs' waiver. 1-ER-26, 38, 43.

Wildlife's resulting biological opinion, the district court concluded the Forest Service acted arbitrarily as well (CBD's claim seven). 1-ER-25.

Alliance brought one claim under both NFMA and NEPA (Alliance's claim one), alleging that the Forest Service failed to show how the project complied with the Forest Plan, particularly Access Standard 2. The district court held that "the [Forest Service] has failed to demonstrate how it has complied with" Access Standard 2, "violating NEPA and NFMA." 1-ER-45. The district court determined that existing unauthorized motorized use casts doubt on the Forest Service's conclusion that the project is consistent with Access Standard 2. The court further held that the Forest Service's justification for excluding temporary, short-term unauthorized use from its calculations was arbitrary. 1-ER-47-48. The district court also agreed with Alliance's argument "that the [Forest Service] obscured its methodology for how it calculated compliance with the Access [Standard 2] in violation of NEPA." 1-ER-49.[6] The district court further agreed with Alliance's related NEPA claim (claim 3) that the

---

[6] Though the district court ruled for Alliance on this claim for the reasons just discussed, it disagreed with Alliance on two subsidiary arguments in that claim, determining that the Forest Service had not "assum[ed] that the closures are 100% effective," and thus there was no NEPA violation for making an incorrect assumption, 1-ER-50-51, and that the Forest Service "considered and complied with" a separate Forest Plan standard relating to grizzly habitat, 1-ER-51-52.

environmental assessment failed to take a hard look at unauthorized motorized use.[7] 1-ER-53-54.

We and the Tribe appealed, 10-ER-2264-77, and CBD (but not Alliance) cross-appealed, 10-ER-2278-80. Our appeal presents three issues across four claims: (1) whether Fish and Wildlife considered the best available science when developing its grizzly population estimates in the biological opinion (CBD's claim four), and, relatedly, whether the Forest Service's reliance on the biological opinion was arbitrary (CBD's claim seven); (2) whether the Forest Service complied with NFMA and NEPA when it determined that the project is consistent with Access Standard 2 (Alliance's claim one), and (3) whether the environmental assessment satisfied applicable NEPA requirements for discussing unauthorized motorized use as part of the baseline in the project area (Alliance's claim three).

## SUMMARY OF ARGUMENT

The district court's fundamental error was its refusal to accord appropriate weight to the agencies' expertise in making highly technical and scientific determinations concerning grizzly bears and their habitat, and how best to account for unauthorized motorized use on the Forest. The Fish and Wildlife Service and the

---

[7] On this claim, the district court ruled that Alliance had not forfeited this issue by failing to administratively exhaust it, 1-ER-53, a conclusion that we do not appeal. Separately, it concluded that "[w]hile road closures pose a problem for the [Forest Service]" under NEPA's hard look standard, the agency "adequately considered the mitigation benefit provided by road closures," complying with NEPA's requirement to consider and analyze the effects of proposed mitigation measures. 1-ER-60.

Forest Service provided reasoned explanations for their scientific and factual judgments, and those judgments were themselves rational. That is all the APA requires, and the district court erred in requiring more.

1. a. Under the ESA, Fish and Wildlife must use the best available science to determine whether agency action will jeopardize the survival of a listed species. To evaluate the project's effects here, the agency estimated the grizzly bear's current population size and trends over time. Fish and Wildlife relied on research and monitoring (Kasworm et al. (2021)) for the Cabinet-Yaak Ecosystem that provided a population estimate of 60 bears as of 2020. Kasworm derived that population estimate from a comprehensive study of the grizzly bear population that provided the best available estimate of the grizzly bear population as of 2012. The study then extrapolated that estimate to present day (as of 2020) by applying an estimated growth rate developed through specialized computer modelling that incorporated grizzly bear survival and reproduction data.

The district court held that Fish and Wildlife failed to consider grizzly bear mortality data presented by CBD. But the agency specifically considered the reliability of that information and found it was not the best available science because it oversimplified population biology. 2-ER-251. This discussion shows that the agency did not impermissibly "disregard[] available scientific evidence." *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080-81 (9th Cir. 2006) (cleaned up). Ultimately, "[t]he determination of what constitutes the 'best scientific data available' belongs to the

19

agency's special expertise." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014). The district court erred in refusing to defer to Fish and Wildlife's scientific judgment on this issue.

b. For these same reasons, the district court likewise erred in concluding the Forest Service acted arbitrarily when it relied on the biological opinion.

2. Under NFMA, the Forest Service must "describe how the project or activity is consistent with applicable plan components," including Access Standard 2. 36 C.F.R. § 219.15(d). The Forest Service did so here through its extensive documentation of how the project would maintain compliance with Access Standard 2's metrics relating to core, open route density, and total route density in the project area. The Forest Service evaluated how the project would change motorized access and use in the project area, and catalogued those changes. The agency further explained what the changes would mean for Access Standard 2's metrics. That documentation rightly focused on the impacts on these metrics from the project itself—that is, how the project would change density of roads in the area against Access Standard 2's total, open, and core metrics. But, to comprehensively account for all kinds of motorized use in the pre-project baseline, the Forest Service also considered unauthorized motorized use within the Forest, which, as an illegal activity engaged in by third parties, is not a part of the project or any other federal agency action.

20

In general, the Forest Service does not treat unauthorized motorized use as altering Access Standard 2 metrics because it reasonably found most unauthorized motorized use is sporadic, not chronic from year to year, and geographically spread out. Further, the Forest Service monitors the Forest for unauthorized use and repairs or replaces ineffective road barriers. Where the Forest Service is unable to prevent unauthorized use of a road that occurs in the same area repeatedly, it counts that use against Access Standard 2's metrics. In other words, the Forest Service treats repeated unauthorized motorized use of a road as if that road is open for purposes of evaluating the impacts of road use on grizzly bears, even if the road is closed as a legal matter. As the Forest Service explains, this approach is consistent with Access Standard 2, because merely sporadic unauthorized motorized use "does not contribute to a long term or permanent change" as required to affect Access Standard 2's metrics—a view supported by the district court in prior cases involving the Cabinet-Yaak Ecosystem. The Forest Service's understanding of how to apply its Forest Plan is reasonable and appropriately accounts for motorized use. *See Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1059 (9th Cir. 2012).

The district court faulted the Forest Service's discussion as "vague and indecisive" but, at the same time, recognized that "the [Forest Service] does not include illegal motorized road use . . . into its calculations." 1-ER-48. And, contrary to the district court's determination that the Forest Service "refuses to disclose the actual motorized use, including unauthorized use," 1-ER-47, annual monitoring reports

disclose exactly that. Ultimately, whether to include unauthorized use in its road density calculations is a question that is subject to the Forest Service's discretion. The Forest Service reasonably determined that, in its experience, most unauthorized use did not rise to the level of permanence required for inclusion in Access Standard 2's metrics. The Forest Service's explanation of this point was sufficient to "describe how the project or activity is consistent with" Access Standard 2. 36 C.F.R. § 219.15(d). Nothing more is required, and the district court erred in concluding otherwise.

3. Finally, under NEPA, the Forest Service must, as relevant here, (1) identify its methodologies and their sources, and (2) employ some reasonable method for establishing an environmental baseline against which to compare the project's impacts. The Forest Service satisfied these requirements in its discussion of unauthorized motorized use.

On the methodology issue, the environmental assessment reproduces large portions of its calculations for compliance with road density standards, identifies the source of that methodology, and "make[s] explicit reference" to its sources. 40 C.F.R. § 1502.24 (2018). That is all NEPA requires. The district court concluded that the agency impermissibly incorporated its methodology by reference, but incorporation by reference is not an issue where, as here, the discussion of methodology in the environmental assessment itself was sufficient. Even assuming some failure under NEPA, the district court erred in failing to apply the doctrine of harmless error. The extensive discussion of the issue of unauthorized motorized use in publicly available

22

documents sufficed to inform the decisionmaker and the public about the consequences of the project, satisfying the harmless error rule.

This same discussion satisfied the agency's duty to reasonably describe the project area's baseline conditions. The district court faulted the agency's discussion as relying on inaccurate data. The court pointed to plaintiff Yaak Valley Forest Council's documentation of 45 allegedly ineffective road closure devices and to Forest Service data reflecting breaches in three out of eight years. But the Forest Service investigated Yaak Valley's allegations by visiting each site and compiled its findings on each alleged defect. That investigation meets NEPA and the APA's requirement to consider and respond to opposing viewpoints, and the district court should have deferred to the Forest Service's factual findings, instead of crediting Yaak Valley's allegations. Similarly, that Forest Service data reflects breaches in three years between 2012 and 2020 does not undermine the ultimate conclusion that, in general, breaches are spread out and do not typically recur. After all, "[e]ven if the evidence is susceptible of more than one rational interpretation, the court must uphold the agency's findings." *San Luis*, 747 F.3d at 601 (cleaned up).

This Court should reverse the district court's judgment on CBD's claims four and seven, and Alliance's claims one and three.

## STANDARD OF REVIEW

This Court "review[s] de novo a challenge to a final agency action decided on summary judgment and pursuant to Section 706 of the Administrative Procedure Act

('APA')." *Corrigan v. Haaland*, 12 F.4th 901, 906 (9th Cir. 2021) (cleaned up). This "means the court views the case from the same position as the district court," *id.* (cleaned up), applying the APA's arbitrary and capricious standard, *Westlands Water District v. Department of the Interior*, 376 F.3d 853, 865 (9th Cir. 2004) (quoting 5 U.S.C. § 706(2)(A)). This "standard of review is 'highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision.'" *Cal. Pac. Bank v. Fed. Deposit Ins. Corp.*, 885 F.3d 560, 570 (9th Cir. 2018) (cleaned up). The reviewing "court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). And courts must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* (cleaned up).

## ARGUMENT

## I.    The biological opinion's population estimates satisfy the ESA's best available science requirement.

A biological opinion must include information on the environmental baseline, which "refers to the condition of the listed species . . . in the action area, without the consequences . . . caused by the proposed action," 50 C.F.R. § 402.02 and provides "the context or background against which the action's effects will occur," 84 Fed. Reg. 44,976, 44994 (Aug. 27, 2019); *National Wildlife Federation v. National Marine Fisheries Service*, 524 F.3d 917, 930 (9th Cir. 2008) (citation omitted) (the Service must consider the effects of the action "within the context of other existing human

activities that impact the listed species"). Here, the Fish and Wildlife Service thoroughly assessed the environmental baseline—including both the current population status and condition of grizzly habitat—using the best available data, which provided the requisite context for its no-jeopardy determination. Although the district court held that Fish and Wildlife should have considered grizzly bear mortality data, the record shows that the agency did consider that data. And, in any event, Fish and Wildlife was explicit in its biological opinion that the data the district court relied on did not reflect increased mortality and that relying on it would result in a flawed population estimate. The court should have deferred to the agency's expertise on this highly technical question.

### A. The Fish and Wildlife Service's determination on what sources constitute the best available science for estimating population size was reasonable and is entitled to deference.

The district court erred in its conclusion that the Fish and Wildlife Service failed to use the best available science in establishing the grizzly's population as part of the environmental baseline for its analysis of jeopardy under ESA Section 7. 1-ER-14-19. "The best available data requirement merely prohibits an agency from disregarding available scientific evidence that is in some way better than the evidence it relies on." *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080-81 (9th Cir. 2006) (cleaned up). It does not require that the agency credit particular data or information that, in its view, does not represent the best available science. *Id.* at 1081 (rejecting challenge to listing decision absent "any evidence in the record that [Fish and Wildlife]

25

ignored relevant information"). Ultimately, "[t]he determination of what constitutes the 'best scientific data available' belongs to the agency's special expertise." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014). The record here shows that Fish and Wildlife used the best available science to assess the environmental baseline; the district court erred in failing to credit that determination.

Fish and Wildlife included a thorough discussion of population dynamics for the Cabinet-Yaak Ecosystem in its biological opinion. 2-ER-249-54. The biological opinion observes that although the ecosystem is "smaller" and "slowly recovering," its estimated population size has increased from 10 to 15 bears in the 1980s to 60 bears in bear year 2020. 2-ER-249-50. The biological opinion acknowledges that "the exact number of individual[] [bears] is unknown, and is a dynamic number that is difficult to pinpoint." 2-ER-249-50. But it notes that the ecosystem has experienced a positive population trend since 2006, and "there is a 67 percent probability that the population is stable or increasing," while there is a "33 percent probability that the population is decreasing." 2-ER-251. Because of this uncertainty, Fish and Wildlife "is keeping abreast of current studies that are gathering data to develop more contemporary population estimates." 2-ER-251. Still, "the conglomerate of the best available science suggests an improving trend in the population of grizzly bears in the [Cabinet-Yaak Ecosystem]." 2-ER-251.

Fish and Wildlife relied on best available science for its population trend and total population estimates. For its 60-bear population estimate, Fish and Wildlife

relied on Kasworm et al. (2021) as "[t]he best estimate of population size." 2-ER-251.

Kasworm "use[d] a method of estimating population change that has been published

in at least three different peer-reviewed journals and is a scientifically based technique

to estimate population trend . . . ." 2-ER-250. Unlike "minimum population size,"

which, as its name implies, reflects only "a *minimum*" that "does not account for

individuals that were not detected," 2-ER-251, Kasworm calculated its estimate

"based on the Kendall et al. (2016) estimate combined with estimated population

increase plus net increase" from bears introduced from other areas. 2-ER-251.

Kendall, et al. (2016), in turn, was a "rigorous" five-year study that relied on 854

samples to create a reliable estimate of grizzly bear population as of 2012. 2-ER-250;

2-ER-165-66.[8] Kasworm multiplied the rate of increase by the 2012 estimate to

calculate a present population level estimate. 2-ER-250-51.

 To arrive at its rate-of-increase multiplier, Kasworm entered survival and

reproduction data from the ecosystem's radio-collared bears into software that runs a

grizzly-bear-specific growth rate equation under 5,000 scenarios. 2-ER-251; 4-ER-

771-72. This method generates a conservative estimate of the grizzly bear population

growth by considering data back to 1983 to account for annual variations. *See* 2-ER-

251; 4-ER-771-72. The relatively long time horizon of the data Kasworm used

---

[8] The district court considered Wayne Kasworm's declaration as "necessary to help explain the complexities of [Fish and Wildlife's] population counting methodologies." 1-ER-17.

"produces the effect of smoothing the data over time and results in a more *conservative* estimate of population trend." 4-ER-771 (emphasis added).

The district court acknowledged this extensive explanation. Indeed, in a separate NEPA claim not at issue in this appeal, the district court determined that the Forest Service *should have* relied on Kasworm to establish the baseline for the environmental assessment over older data. 1-ER-38. The court nevertheless determined that Fish and Wildlife "disregarded biological information indicating an increase in grizzly bear mortality," 1-ER-15—specifically, annual minimum population count data. 1-ER-18 (citing 2017, 2019, and 2020 minimum counts). It is true that Fish and Wildlife "detected a minimum 50 individual grizzly bears alive and in the [Cabinet-Yaak Ecosystem] grizzly bear population at some point during 2019." 4-ER-732. But minimum count data does not indicate an increase in grizzly bear mortality, such that the population is actually smaller than the 60 bears Kasworm projected. 2-ER-251. As the biological opinion explains, "[t]o rely solely upon a count of the known detected individuals is an over-simplification of population biology," because "minimum counts are influenced by the level of effort available each year" by the agency and its partners. 2-ER-251. That level of effort varies annually based on "funding, number of personnel, area of emphasis, and most recently COVID-19 work restrictions." *Id.*

The district court faulted Fish and Wildlife for "fail[ing] to explain how the amount of resources going into minimum counts correlates with the actual number of

bears found each year." 1-ER-17-18. But the "agency's path may reasonably be discerned," *Motor Vehicle Mfrs.*, 463 U.S. at 43, through its discussion of minimum counts and available resources. For its contrary conclusion, the district court points to a chart in a 2022 monitoring report that "note[s] that in 2012, 1376 tree rubs were checked yielding 85 rubs with grizzly bear DNA while in 2019, only 839 tree rubs were checked yielding almost the same number of rubs with grizzly bear DNA (87)." 1-ER-17-18 (citing 8-ER-1929).

It is true that there is not a one-to-one relationship between level of effort and number of detections, but Fish and Wildlife reasonably concluded that there is some correlation. *See supra* pp. 28. The district court oversimplifies the analysis by pointing to one method of data collection—tree rubs—whereas annual minimum counts are based on "capture, collared individuals, all sources of DNA sampling, photos, [and] credible observations." 2-ER-251. It is the totality of the level of effort across all these methods that goes into minimum count data that led Fish and Wildlife to its conclusion that the data "is a *minimum* and does not account for individuals that were not detected." 2-ER-251. The district court's reliance on only a small portion of the data Fish and Wildlife considered in reaching this conclusion is improper "second guess[ing] [of Fish and Wildlife's] scientific analysis." *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 659 (9th Cir. 2009). In the face of this varied scientific evidence, it was the expert agency's role, not the district court's, to evaluate the science and reach a reasoned conclusion. *See San Luis*, 747 F.3d at 602.

By directly contradicting the district court's reading of annual minimum count data, the biological opinion demonstrates that the agency did not "disregard[] available scientific evidence," *Kern Cnty. Farm Bureau*, 450 F.3d at 1080, and in fact explained why this data was not the best available, in contrast to the estimates that it concluded were the best available. In concluding otherwise, the district court doubly erred. It erred in its determination that additional discussion was required, as the agency discusses the evidence the district court pointed to. And it erred in declining to credit the agency's reasoned discussion for why it would be "biologically inappropriate" to rely on minimum count data in precisely the way the district court did. 2-ER-251. After all, "[t]he determination of what constitutes the 'best scientific data available' belongs to the agency's special expertise." *San Luis*, 747 F.3d at 602.

More broadly on the topic of mortality, the record reflects that Fish and Wildlife considered grizzly bear mortality in at least three ways. First, Kasworm incorporated both reported and unreported bear mortality directly into population modelling. 2-ER-253. Second, as the biological opinion explains, adult female grizzly bear survival "is currently ranked as 'High' . . . ." 2-ER-253. This means the survival rate of adult female grizzlies in the Cabinet-Yaak Ecosystem is above 93%. 3-ER-614, 619. Third, Fish and Wildlife observed in its biological opinion that the Cabinet-Yaak Ecosystem met its mortality rate recovery targets for bear years 2015-2020. 2-ER-251-52 (noting, in discussing data from 2015-2020, that "[r]ecovery targets related to human-caused mortality have been met for the past few years"). That target is 2.1 bear

30

deaths per year and no more than 0.6 female deaths per year, whereas the "[a]verage annual human caused mortality for 2015-2020 was 1.5 bears [per] year and 0.5 females [per] year." 4-ER-747. The district court did not acknowledge these explicit discussions of bear mortality. 1-ER-18.

In sum, the Fish and Wildlife Service explicitly considered, and rejected, the data advanced by CBD and accepted by district court. In doing so, the agency explained its interpretation of the various scientific sources and their merits, and reasonably concluded that the statistical method embodied in Kasworm et al. (2021) was the best available science on the grizzly bear population at the time the project was approved. The district court erred in refusing to defer to these conclusions.

### B. The Forest Service's reliance on the biological opinion was not arbitrary and capricious.

Relying on its erroneous conclusion that the biological opinion was flawed, the district court held that the Forest Service's approval of the project in reliance on the same biological opinion was arbitrary and capricious, and granted summary judgment to CBD on claim six. 1-ER-25. Because the district court erred in concluding the biological opinion failed to use best available science, this conclusion is also incorrect. *See Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415-16 (9th Cir. 1990). The Court should thus reverse the district court's grant of summary judgment for CBD on its sixth claim as well.

## II.    The Forest Service's determination that the project is consistent with Access Standard 2 satisfies NFMA and the APA.

For Alliance's claim one, the district court concluded that "the [Forest Service] has failed to demonstrate how it has complied with" Access Standard 2, "violating NEPA and NFMA." 1-ER-45.[9] It is a substantive requirement of NFMA that the project be consistent with the applicable Forest Plan standards, including Access Standard 2. *Weldon,* 697 F.3d at 1056. And NFMA's implementing regulations require that the Forest Service document projects' consistency with governing forest plan provisions. 36 C.F.R. § 219.15(d). Here, the Forest Service (1) adequately explained its conclusion that the project complies with Access Standard 2, and (2) that conclusion was reasonable. The district court erred in concluding that NFMA requires more.

### A.    The Forest Service satisfied NFMA regulations' procedural requirement to document consistency with Forest Plan standards.

Forest Service regulations implementing NFMA require that "[a] project or activity approval document must describe how the project or activity is consistent with applicable plan components," including standards, for which the Forest Service must document how "[t]he project or activity complies." 36 C.F.R. § 219.15(d). This rule does not set a specific level of detail required, or otherwise dictate the methods the Forest Service must use in making its consistency findings. *Cf.* National Forest

---

[9] The NEPA component of the district court's ruling on Alliance's claim one is discussed in the following section. *See infra* pp.43-47.

System Land Management Planning, 77 Fed. Reg. 21,162, 21,241 (Apr. 9, 2012) ("Given the very large number of project and activities, and the wide variety of those projects and activities, it is not feasible to provide any direction more specific than that set out in paragraph (d)."). As in other areas, courts review the agency's compliance with its regulations under the arbitrary and capricious standard. *Cf. ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1071 (9th Cir. 2015) (holding agency's action applying agency regulation to be judicially reviewable, but noting the ordinary abuse of discretion and arbitrary and capricious standards apply to "accord [the agency] the proper deference").

The Forest Service adequately explained the project's compliance with Access Standard 2. The Forest Service included in its decision notice a list of nearly 70 roads that would be affected by the action and explained how the action complied with Access Standard 2's total route density, open route density, and core metrics. 7-ER-1686-92. For each change to routes associated with the project, the Forest Service described the change, its timing, and the reason for it. *Id.* For example, the Forest Service documented seven instances of "[i]n-kind [r]eplacement of Core [habitat] to meet Forest Plan [Access Standard 2]." 7-ER-1692; 7-ER-1686-92; *see also* 7-ER-1474 (Access Standard 2's in-kind replacement requirement). More generally, the Forest Service's summary of project-related actions reflects many instances of installing new gates, restricting public motorized access to certain areas, and otherwise taking numerous actions aimed at wildlife habitat security. 7-ER-1686-92. Based on this

33

analysis, the Forest Service concluded that "proposed activities would be compliant with [Access Standard 2]." 7-ER-1655.

The environmental assessment also documents the Forest Service's consistency with Access Standard 2, among the various other requirements of the Forest Plan. 8-ER-1757-82. It explains that Access Standard 2's "parameters of core, [open route density], and [total route density] . . . will be the resource indicators for measuring change to security habitat and road densities." 8-ER-1757. These metrics "are used to compare alternatives as well as *display compliance with [Access Standard 2].*" *Id.* (emphasis added). The environmental assessment describes existing conditions, including road impacts and the present status of core, open route density, and total route density compared with the minimum required by Access Standard 2. 8-ER-1760-61. Likewise, based on several pages of analysis of the project's effects on road use in the area, including charts reflecting all project effects on core, open route density, and total route density, the environmental assessment explains that "[b]oth action alternatives would meet [Access Standard 2]." 8-ER-1768-72. In total, the environmental assessment devotes nearly 10 pages of discussion to compliance with Access Standard 2. *See* 8-ER-1757-62, 1767-1772.

The environmental assessment specifically addresses the issue of unauthorized motorized use as part of its discussion of compliance with Access Standard 2. It explains that the Forest Plan requires monitoring for signs of unauthorized use. 8-ER-1762. The environmental assessment then explains that the Forest Service has "[i]n

34

the past . . . noted unauthorized use of restricted roads, and occasionally an unauthorized, user-created road." *Id.* But the Forest Service "has made repairs for any such breaches as quickly as possible after discovery." 8-ER-1762. The agency also "[m]onitor[s] . . . road closures . . . daily or weekly," and organizes an "annual Adopt-A-Road event" to help identify roads and barriers needing repair. 8-ER-1762. By actively monitoring and ensuring against pervasive unauthorized motorized use, the Forest Service "continue[s] to maintain . . . standards for core and motorized route densities" under Access Standard 2. 8-ER-1762.

These analyses of both authorized and unauthorized motorized use meet Section 219.15(d)'s requirement that the Forest Service document its compliance with Forest Plan standards. 36 C.F.R. § 219.15(d). Section 219.15(d) requires the Forest Service to analyze "[t]he project or activity" for compliance with applicable standards. 36 C.F.R. § 219.15(d). The bulk of the Forest Service's extensive discussion thus focuses on the effects of the project itself, like the roads that will be needed to access the project area, other roads that will be closed as in-kind replacement, and the like. 8-ER-1760-61; 7-ER-1686-92. Though each environmental analysis document and decision document includes discussion of unauthorized motorized use, that discussion is naturally less extensive than the discussion of the effects of the project itself because unauthorized use is not considered a part of the project, a premise Alliance has not disputed. *See* 2-ER-262; 2-ER-177-87; *supra* pp. 13-15. Still, the discussion of unauthorized motorized use meets Section 219.15(d)'s requirement, because it

35

explains how the Forest Service determined the project complies with Access Standard 2.

    The district court concluded that more explanation was required for two principal reasons: (1) the discussion of unauthorized motorized use was "vague and indecisive," because "the [Forest Service] does not include illegal motorized road use that it knows occurs into its calculations," 1-ER-48; and (2) the Forest Service "refuse[d] to disclose the actual motorized use, including unauthorized use, as required by [Access Standard 2]," 1-ER-47.

    On the first point, the environmental assessment explains that unauthorized motorized use is excluded because monitoring and repair ensure continued compliance with Access Standard 2's core and density requirements despite occasional unauthorized motorized use. 8-ER-1762. The district court in fact understood that this was the Forest Service's approach, as evidenced by its recognition that "the [Forest Service] does not include illegal motorized road use that it knows occurs into its calculations." 1-ER-48. Whatever substantive disagreement the district court had with that approach (discussed below, pp. 37-42), it does not make the Forest Service's explanation "vague and indecisive." 1-ER-48. The level of explanation the Forest Service included was reasonable and entitled to deference.

    On the second point, there is nothing in Section 219.15(d) that requires that the Forest Service catalogue the results of its monitoring in the decision documents themselves. 36 C.F.R. § 219.15(d). In any event, the Forest Service's monitoring

36

reports provide detailed descriptions of route monitoring in the Forest, including the number of breaches for each monitoring period along with repairs made. *See, e.g.*, 2-ER-338-39 (cataloguing route monitoring findings and repairs).

The district court's only role in determining whether the Forest Service's discussion was adequate was to ensure that the Forest Service complied with the requirement to "describe how the project . . . complies with" Access Standard 2. 36 C.F.R. § 219.15(d). This requirement is not overly burdensome, and the district court accordingly erred in requiring the Forest Service to extensively document not only how the project complies with Access Standard 2, but how it is protecting against illegal motorized use that is unrelated to the project.

**B.   The Forest Service's conclusion that the project complies with Access Standard 2 was reasonable.**

The Forest Service's conclusion that the project complies with Access Standard 2 was reasonable. In determining whether its action is consistent with the Forest Plan, this Court "ask[s] whether, based on the record before [it], the Forest Service's actions reflect a clear error of judgment." *Oregon Nat. Desert Ass'n v. United States Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020) (cleaned up). Beyond that, "the Forest Service's interpretation and implementation of its own Forest Plan is entitled to substantial deference." *Weldon*, 697 F.3d at 1059. Indeed, this Court has applied this deferential standard to uphold the Forest Service's determination "that roads closed to motorized access by berms or barriers do not count toward 'linear miles of total roads,'" a metric

37

that applies outside recovery zones but where grizzlies are present. *All. for the Wild Rockies v. Bradford*, 856 F.3d 1238, 1243 (9th Cir. 2017). Contrary, reasonable readings of a Forest Plan standard do not "render[] the Forest Service's interpretation unreasonable." *Id.* (citing *Castaneda*, 574 F.3d at 661).

The Forest Service reasonably concluded that its method for calculating core, open roads, and total roads, was consistent with Access Standard 2. As the agency explains, "[t]he routes used to establish the permanent condition" of road density "are those that are *authorized* routes." 8-ER-1806. This approach is consistent with Access Standard 2 because that standard contemplates that temporary deviations from density and core standards may occur without violating the standard. *See* 5-ER-918 (discussing temporary deviations for bear management units 9, 10, and 13 for core, open road, and total road metrics). The agency explained that, based on its experience in managing the Forest, in general, "unauthorized use on any given route is *not* chronic from year to year" and thus "does not contribute to a long term or permanent change to the routes database." 8-ER-1806. That approach is also consistent with Access Standard 2's focus on grizzly bear conservation; as the agency explained, because "[i]llegal motorized access is expected to be spatially disparate and temporary," it "is not likely to collectively cause an adverse effect" on grizzlies. 2-ER-291.

Consistent with Access Standard 2's focus on permanent changes in road access conditions, the Forest Service's general observation that unauthorized use is

38

usually not chronic allows for exceptions. The Forest Service *did* count road breaches that it determined were chronic and that it was unable to effectively limit to a temporary effect with monitoring, repairs, and law enforcement. The Forest Service "observed breaches in multiple years" only on Road 5890, in bear management unit 15—one of the two units where the project will take place. 2-ER-263. That road was therefore considered "open" for purposes of Access Standard 2 compliance despite the unauthorized nature of the use, because of the "strong patterns of use" and "historic unauthorized use" on that road. 5-ER-1130. By contrast, the Forest Service addressed other unauthorized road use in bear management unit 15, making "the effects to bears . . . temporary." *Id.* And, unlike bear management unit 15, unit 14 (the other unit where project activities will take place) "has historically experienced very few instances of illegal motorized use" and the Forest Service does not expect this to change in the foreseeable future. *Id.*[10] For these breaches, the Forest Service explains that "in [its] experience unauthorized use on any given route is *not* chronic from year

_____

[10] Before the Forest Service and Fish and Wildlife reinitiated consultation in 2020 over the Forest Plan, the Forest Service's annual monitoring reports treated all unauthorized use as altering open route density and total route density metrics for that bear year. *See, e.g.*, 4-ER-847. Reinitiated consultation in 2020 resulted in a monitoring plan that more clearly required only reporting of permanent changes in conditions. Thus, as the Forest Service explained in its 2020 monitoring report, "[a]s of [bear year] 2020," the Forest Service "removed inclusion of short-term temporary unauthorized motorized access in the bear year metric calculations." 2-ER-317.

to year" and thus "does not contribute to a long term or permanent change to the routes database." 8-ER-1806.[11]

The district court's contrary conclusion relied primarily on two previous District of Montana decisions relating to road closure effectiveness outside recovery zones. 1-ER-47-48 (applying *All. for the Wild Rockies v. Marten* (*Marten II*), --- F. Supp. ----, 2023 WL 4977712 (D. Mont. Aug. 3, 2023), *Ctr. for Biological Diversity v. U.S. Forest Serv.* (*Knotty Pine*), 670 F. Supp. 3d 1121 (D. Mont. 2023)). Even though the district court confirmed in earlier cases that only "chronic deviations from the effective [road] closures" not contemplated by Access Standard 2 were problematic, *All. for Wild Rockies v. Probert*, 412 F. Supp. 3d 1188, 1205 (D. Mont. 2019), and that "the mere possibility that planned road closures will be ineffective" does not render the agency's analysis arbitrary, *Marten I*, 464 F. Supp. 3d at 1176, the district court's more recent decisions improperly raise the bar.

In *Knotty Pine*, the district court "credit[ed] [the Forest Service's] assertions that [it] monitors closures and fixes known problems promptly," so "that the use of any

---

[11] In evaluating the substance of the Forest Service's conclusion that the project is consistent with Access Standard 2, the Court reviews the entire record. *See Oregon Nat. Desert Ass'n*, 957 F.3d at 1034 ("In our substantive review, we consider the administrative record and decide whether" the Forest Service considered the proper factors, offered an explanation contradicted by the record or otherwise "so implausible that it could not be ascribed to a difference in view or the product of agency expertise" (quoting *The Lands Council v. McNair*, 537 U.S. 981, 993 (9th Cir. 2008), *overruled in part on other grounds by Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008)).

particular illegal road is, indeed, temporary." 670 F. Supp. 3d at 1136. Despite this fact, the district court concluded that the "ongoing chronic problem of ineffective closures"—resulting in "a small percentage of closures" being breached—meant that the agency had to in some additional way account for unauthorized use. *Id.* at 1136-38. In *Marten II*, the court reached a similar conclusion: that the Forest Service and Fish and Wildlife must account for unauthorized use beyond the explanation offered in that case's record. 2023 WL 4977712, at *11.[12]

The fundamental problem with these decisions, and the district court's application of them here, is that Access Standard 2 contains no hard-and-fast rule on whether and how unauthorized use should be factored into road calculations at all; it is silent on the issue, and the Forest Service's conclusion that it does not require the agency to treat roads experiencing sporadic, temporary illegal use the same as roads on which regular access is authorized is reasonable, for the reasons stated. So long as the Forest Service's project approval "was based on a consideration of the relevant factors" and the agency committed no "clear error of judgment," it is lawful. *San Luis*, 747 F.3d at 601. The Forest Service made a reasoned, informed decision about how to

---

[12] *Marten I* dealt with a project's eligibility for a categorical exclusion under NEPA and *Probert* dealt with reinitiation of consultation under the ESA. *Probert*, 412 F. Supp. 3d at 1205; *Marten I*, 464 F. Supp. 3d at 1176. *Knotty Pine* was a preliminary injunction ruling concluding a likelihood of success under the ESA based on the unauthorized motorized use issue, 670 F. Supp. 3d at 1138, and *Marten II* also ruled under the ESA, 2023 WL 4977712, at *11. The court here applied these cases to the NFMA claim here. 1-ER-47-49.

treat unauthorized use, based on its expert judgment that such use would be temporary and geographically disparate, and would not permanently change road density conditions in the project area. The Forest Service allowed that exceptions existed and, where unauthorized use was pervasive, it counted that unauthorized use in its road density metrics. There is nothing in NFMA or the APA that requires more. The Forest Service's conclusion that the project complies with Access Standard 2 thus satisfies NFMA and the APA, and the district court erred in concluding otherwise.

## III. The environmental assessment satisfies NEPA and the APA.

The district court relied on NEPA principles in making two separate incorrect conclusions: (1) for Alliance's claim one, "that the [Forest Service] obscured its methodology for how it calculated compliance with the Access [Standard 2] in violation of NEPA," 1-ER-49; and (2) for Alliance's claim three, that the environmental assessment "did not take a 'hard look' at unauthorized or illegal road use," 1-ER-54. Because unauthorized motorized use is not part of the agency's action, but is instead part of the existing condition, NEPA's requirements on this front are not particularly demanding, and the Forest Service's discussions of its methodology and unauthorized use generally were reasonable. The district court erred in declining to defer to the agency's chosen method of compliance with NEPA.

**A.  The environmental assessment reasonably describes its methodology.**

In the second part of its discussion of Alliance's claim one, the district court agreed with Alliance's argument "that the [Forest Service] obscured its methodology for how it calculated compliance with the Access [Standard 2] in violation of NEPA." 1-ER-49. In reaching this conclusion, the district court determined (1) an environmental assessment, unlike an environmental impact statement, may not incorporate documents by reference under NEPA's implementing regulations; and (2) this limitation on how documents are incorporated by reference meant that the environmental assessment's references to Access Standard 2 were insufficient, because those references "incorporate[] the road densities with no further discussion of how they are calculated" in violation of Section 1502.24's requirement that the agency "state its methodology." 1-ER-49. The environmental assessment's discussion of methodology was reasonable, and the district court erred in concluding otherwise.

While a court may evaluate a project's NEPA documents to assist in its determination of whether the Forest Service has complied with NFMA, NEPA itself does not require the Forest Service to explain a project's compliance with other statutes. NEPA requires only that agencies "identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement." 40 C.F.R. § 1502.24 (2018). The environmental assessment does exactly that. As discussed above, *see supra* pp. 34-35, the

43

environmental assessment explains Access Standard 2's "parameters of core, [open route density], and [total route density]." 8-ER-1757. The environmental assessment contains several pages of qualitative and quantitative discussion of existing conditions, and the present status of core, open route density, and total route density, and the project's impacts on these metrics. 8-ER-1760-62. The environmental assessment explains that, in its annual monitoring, the Forest Service "report[s] motorized access effects against the[se]" metrics, and the Forest Service "continue[s] to maintain the associated [bear management unit] standards for core and motorized route densities" through monitoring and repair. 8-ER-1762.

This description of methodology is adequate under NEPA. The Forest Service did far more than just "identify" its methodology, as required by 40 C.F.R. § 1502.24; the environmental assessment reproduces much of that methodology directly. 8-ER-1760-62. And it "make[s] explicit reference" to its sources—it references (and explains) not only Access Standard 2's metrics, but also the studies relied on for "[g]rizzly bear population ecology, biology, habitat description and relationships." 8-ER-1758 (citing the 1993 Grizzly Bear Recovery Plan along with "the annual progress reports for the Cabinet-Yaak grizzly bear research (Kasworm et al. 2018), Kasworm and Manley (1988), and Kasworm and Manley (1989)").

Because the environmental assessment complied with NEPA's methodology regulation by "mak[ing] explicit reference" to its sources, 40 C.F.R. § 1502.24 (2018), the district court erred in concluding that the incorporation-by-reference rule was

44

implicated at all. That rule requires agencies to incorporate material into an environmental impact statement by reference when doing so will cut down on bulk without impeding agency and public review. 40 C.F.R. § 1502.21 (2018).[13] That rule, however, applies to material that would be required to be included in the NEPA document itself absent incorporation by reference. Where, as here, the environmental assessment itself contains a NEPA-compliant discussion of methodology, incorporation by reference is unnecessary. *See id.* The district court erred in relying on the incorporation-by-reference rule to conclude the environmental assessment violated NEPA.

Overarching NEPA principles support this conclusion. Because unauthorized motorized use is not part of the project's activities, 2-ER-262, any analysis of unauthorized motorized use was properly discussed in the context of existing conditions in the project area. NEPA and its implementing regulations do not independently require an analysis of baseline environmental conditions. As a practical matter, however, establishing baseline conditions is necessary "to determine what

---

[13] The district court characterized our brief below as arguing "that the methodology was intentionally omitted from the environmental assessment because it was incorporated by reference." 1-ER-49. We instead pointed out the requirement in Section 1502.24 that "agencies 'shall identify any methodologies used,'" and noted that this regulation allows reference to such methodologies in a footnote or appendix, while Section 1502.21 allows incorporation by reference of materials when doing so will save "bulk" in an environmental impact statement. 2-ER-136, 141-42. We then made the same argument we make here: that the environmental assessment identifies Access Standard 2 as the source of its metrics, explains its calculations under those metrics, and cites its sources. *Id.*

effect [the action] will have on the environment." *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988). The requirement is flexible: "An agency need not conduct measurements of actual baseline conditions in every situation—it may estimate baseline conditions using data from a similar area, computer modeling, or some other reasonable method." *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016) (citation omitted). The method the agency selected for describing the baseline environmental conditions was reasonable. It describes existing road access conditions in the project area, including unauthorized motorized use. 8-ER-1757-62.

Finally, any error in describing the methodology for establishing baseline environmental conditions for roads in the project area was harmless. "The APA requires courts to take 'due account' of harmless error." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) (cleaned up). In the NEPA context, "[t]he harmless-error analysis asks whether the failure . . . materially impeded NEPA's goals—that is, whether the error caused the agency not to be fully aware of the environmental "consequences of the proposed action, thereby precluding informed decisionmaking and public participation, or otherwise materially affected the substance of the agency's decision." *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1104 (9th Cir. 2016).

Whether or not the environmental assessment was clear enough about how it analyzed unauthorized motorized use, Alliance's own comments make plain that it

46

understood the Forest Service's methodology. In their comments, Alliance argued that the agency *should have* counted unauthorized motorized use against its core, open route density, and total route density metrics, reflecting that they understood these uses were excluded. *See* 9-ER-2039-40 (arguing that "the open and total road numbers in the monitoring reports are not accurately reflecting the conditions on the ground"). In the district court, Alliance identified no comments that they would have made if the Forest Service had provided even more information about its approach. 2-ER-183-84. NEPA's goal of informed decisionmaking was also at least partially satisfied by the extensive discussion of unauthorized motorized use in the biological opinion, which made clear that "[t]he routes used to establish the permanent condition are those that are *authorized* routes," while "[u]nauthorized use features," like "any user-created routes or access, as well as breaches, . . . are not considered part of the existing condition." 8-ER-1806 (emphasis added).[14] Any defect under NEPA was thus harmless.

The Forest Service disclosed the methodology it used to establish the baseline for its NEPA effects analysis. NEPA requires nothing more, and the district court erred in concluding otherwise.

---

[14] It makes sense that the biological opinion's discussion of this issue would be more detailed, as ESA implementing regulations require the agency to establish baseline conditions. 50 C.F.R. § 402.14(g)(4); 50 C.F.R. § 402.02; *see supra* pp. 4-5.

47

## B. The environmental assessment reasonably discusses unauthorized motorized use.

The district court next determined that the environmental assessment "did not take a 'hard look' at unauthorized or illegal road use." 1-ER-54. Under the "hard look" standard, agencies must provide "a reasonably thorough discussion of the significant aspects of probable environmental consequences." *Neighbors of Cuddy Mtn. v. U.S. Forest Service*, 137 F.3d 1059, 1376 (9th Cir. 1998) (cleaned up). The hard-look standard mirrors "review for an abuse of discretion." *Id.* Agencies are "entitled to wide discretion in assessing the scientific evidence, so long as [they] take[] a hard look at the issues and respond[] to reasonable opposing viewpoints." *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1301 (9th Cir. 2003).

At the threshold, the "hard look" standard applies to the "reasonably foreseeable environmental effects of the proposed agency action." 42 U.S.C. § 4332(C)(i); *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006) ("A court's inquiry, when reviewing whether an agency complied with NEPA, is whether the agency adequately considered a *project's potential impacts* and whether the consideration given amounted to a 'hard look' at the environmental effects." (emphasis added) (cleaned up)). Unauthorized motorized uses "are not the result of a

federal action," 2-ER-262,[15] and were thus properly discussed in the context of existing baseline conditions in the environmental assessment. 8-ER-1759, 1762.

As discussed above, *supra* pp. 45-46, establishing a baseline for a NEPA analysis is a practical requirement that calls only for some "reasonable method." *Great Basin*, 844 F.3d at 1101 (citation omitted). The "hard look" standard does not apply directly—rather, the question is whether "[t]he failure to explain [a] baseline assumption frustrated the [agency's] ability to take a 'hard look' at" the effects of its action. *Id.* Though the agency's "assessment of baseline conditions must be based on accurate information and defensible reasoning," *id.* (cleaned up), courts may not substitute their judgment for the agencies' in determining what information to credit, *see San Luis*, 747 F.3d at 601 ("Even if the evidence is susceptible of more than one rational interpretation, the court must uphold the agency's findings." (cleaned up)).

The environmental assessment satisfies NEPA. The Forest Service recognized that "[i]n the past, [the agency] ha[s] noted unauthorized use of restricted roads, and occasionally an unauthorized, user-created road is discovered." 8-ER-1762. Despite this fact, extensive monitoring "helps [the Forest Service] identify needed road or barrier repairs," and repairs ensure each bear management unit maintains its "standards for core and motorized route densities." *Id.* Moreover, the agency "has

---

[15] Alliance's arguments in the district court do not dispute the premise that unauthorized motorized use is not a consequence of the agency's action while still arguing that the agencies failed to adequately consider unauthorized use. 2-ER-177-187.

made repairs for any . . . breaches as quickly as possible after discovery." *Id.* As discussed above, each of these points is supported by the administrative record. *See supra* pp. 35-37, 38-41.

NEPA requires discussion of issues "in proportion to their significance." *Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 584 (9th Cir. 2016). The environmental assessment devoted much of its discussion to the effects of the project itself on core, open route density, and total route density. 8-ER-1757-62, 1767-1772. It concluded that the project "would maintain or improve conditions with regard to core, [open route density], and [total route density] at project completion," and therefore would "contribute to [species] recovery." 8-ER-1767. Against this backdrop, it was reasonable to include a shorter discussion of unauthorized motorized use. That use is not an effect of the action, and the action itself will maintain or improve existing road conditions in the area. *See Protect Our Cmtys. Found.*, 825 F.3d at 584; *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 974 (9th Cir. 2002) (upholding Forest Service decision not to expand cumulative effects analysis "to landscape scale" where Forest Service "found no adverse effects on the[] species within the project area"). The environmental assessment's discussion of unauthorized road use thus satisfied NEPA.

In concluding otherwise, the district court relied on the principle that "[t]o take the required 'hard look' at a proposed project's effects, an agency may not rely on incorrect assumptions or data." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964 (9th Cir. 2005); *see* 1-ER-53. The district court held that (1) the effectiveness

of closure measures employed by the Forest Service was uncertain, and (2) given this uncertainty, the Forest Service erroneously assumed that illegal motorized use would be effectively restricted by measures it had taken. 1-ER-58. It is true that some uncertainty exists, but incorrect that the Forest Service assumed away unauthorized motorized use.

The Forest Service made no assumption that all its barriers would be effective. *See* 1-ER-58. The environmental assessment and biological opinion both recognize that unauthorized use has been discovered in the past, and monitoring and repairs will remain necessary in the future. 8-ER-1762; 2-ER-263 ("[S]ome Forest users have, and will likely continue to break the law and drive motorized vehicles where such use is illegal."). The district court's opinion likewise recognizes that there was no faulty assumption here, noting that the Forest Service "acknowledges the history of breaches" because it documented unauthorized use "in the [project] area in 3 of the 8 years," 1-ER-57 (quoting 2-ER-263), and that "Federal Defendants persuasively show that there is no assumption that the closures are 100% effective," 1-ER-50. The record here thus reflects no "incorrect assumption[]." *Native Ecosystems*, 418 F.3d at 964; 1-ER-58.

It is also true that some uncertainty exists surrounding future unauthorized use. Indeed, as the district court pointed out, the Forest Service's monitoring revealed unauthorized motorized use in three years between 2012 and 2020, *see* 1-ER-57, and the agencies expect unauthorized use to continue, 2-ER-263. But, as discussed, the

51

Forest Service does not assume it can prevent all unauthorized motorized use. Rather, as the biological opinion explains after disclosing that breaches had been found in three years out of eight, "[t]his illegal use was not concentrated in any given area, and was not chronic in that no single road had observed breaches in multiple years, except for road 5890 in [bear management unit] 15." 2-ER-263. That road, however, did "not affect Core, [open route density] or [total route density]" due to "other open public roads in the vicinity." 2-ER-263. And, as already discussed, the agencies considered this road as open for purposes of its density metrics. *See supra* pp.39-40. The Forest Service and the Fish and Wildlife Service's approach to unauthorized use, focusing as it did on permanent effects of pervasive road use that has the potential to change the access metrics, while emphasizing that the Forest Service takes steps that largely ensure unauthorized use is sporadic and temporary, was reasonable and entitled to deference. *See San Luis*, 747 F.3d at 601 ("Even if the evidence is susceptible of more than one rational interpretation, the court must uphold the agency's findings."); *see supra* pp. 38-40, 47.

In addition to relying on the Forest Service's reporting that reflected unauthorized road use in three years between 2012 and 2020, the district court also pointed to evidence submitted by plaintiff Yaak Valley Forest Council purporting to show "45 instances of ineffective barriers and gates." 1-ER-57. In July 2021, Yaak Valley Forest Council submitted "[n]ew information for the Black Ram Project" relating to "gates, berms, and road closures," citing to photos taken by the

commenter. 9-ER-2177-2207; *see also* 8-ER-4583-84 (Yaak Valley Forest Council letter).

In response to this submission, the Forest Service investigated each site. 8-ER-1810-57. It included Yaak Valley's original picture, side-by-side with 2020 and 2021 monitoring photos, along with a narrative reflecting the Forest Service's conclusion. 8-ER-1810-30. The Forest Service's investigation revealed that most barriers were effective at preventing motorized use. *See id.* In some instances, the Yaak Valley photos were taken from angles that failed to include existing closure devices or obstructions. 8-ER-1810-30; *see, e.g.*, 8-ER-1812. In one instance, the Forest Service had already scheduled a repair for a user-created route, and conducted the repair in Spring 2021. 8-ER-1821. None of this supports the district court's conclusion that the environmental assessment's discussion of unauthorized use violates NEPA. It is true, as the district court points out, that "the [Forest Service] acknowledges the history of breaches." 1-ER-57. But this recognition reflects compliance with NEPA, not a violation. After all, the Forest Service need only "respond[] to reasonable opposing viewpoints." *Earth Island*, 351 F.3d at 1301. And its determination about whether specific barriers were effective, and whether unauthorized use was actually occurring in any area, is entitled to deference.

Finally, the district court erroneously relied on a single Forest Service annual monitoring report from 2020 for the proposition that "the record does not support" the Forest Service's statement that it repairs breaches as quickly as it can. 1-ER-57. It

53

is true, as the district court pointed out, that in 2020 "the [Forest Service] found 32 breached barriers and repaired none of them and found 40 breached gates and repaired about a quarter of them." 1-ER-57 (citing 5-ER-1068). The same monitoring report explains, however, "due to covid-19 and other work limitations, no barriers were repaired or gates reinforced with rocks on the side to prevent motorized access around the gates within the Recovery Zones, but locks were replaced on existing gates, often numerous times." 5-ER-1069. The Forest Service deferred work because of the pandemic. *See* 5-ER-1111 (noting "Covid-19 limitations, repair needed in 2021"). There were exceptional circumstances that year, and this single monitoring report does not suggest that the Forest Service consistently fails to repair breaches.

The Forest Service's analysis took a broader view of the record, which (absent exceptional circumstances) reflects extensive monitoring and repairs within the same year. For example, the Forest Service's 2019 monitoring report reflects that the Forest Service monitored 75% of gates and 63% of barriers across the Forest's recovery zones, well above the minimum of monitoring "at least 30 percent of all gates and barriers within the recovery zones." 4-ER-853. That same report notes several repairs or new berms or other obstructions in its breakdown of density standard metrics in each bear management unit. 4-ER-841-47. For the project area, the Forest Service's administrative record includes a list of "[a]ll closure repairs needed and completed in the Black Ram Project Area from 2019 through 2022." 8-ER-1804. All non-functional devices were repaired, a missing or damaged lock was replaced, and the Forest Service

54

installed berms on a user-created route, an undetermined route, and an existing road. *Id.*; *see also* 5-ER-922 (noting that the Forest Service responds to illegal use "as soon as possible," which is sometimes "as simple as replacing a broken lock" but "[o]ther times may take a few days to a few weeks to replace a broken gate or device, or it may take longer to address the issue by adding boulders or taking other measures to attempt to block illegal motorized access"); 4-ER-853 ("Where road closures have been driven around, steps are taken to block this illegal access as soon as possible using boulders, earthen berms, cement posts, plantings, root wads, or other means."). The district court's contrary reading of the record does not make the Forest Service's conclusion irrational. *San Luis*, 747 F.3d at 601.

In any event, the data the district court relied on reflects total breaches across the Cabinet-Yaak Ecosystem recovery area, not just units 14 and 15, where the project is located. *See* 5-ER-1068. The report reflects *no unauthorized motorized use* on existing routes for the year in the project area (bear management units 14 and 15) and only one instance of unauthorized use on a user-created route that year. 5-ER-1111-17. The one instance of a user created route reflects "[c]ovid-19 limitations on work, [t]iming," and the Forest Service's inability "to get to it in the fall." 5-ER-1117. Thus, even assuming the district court was correct that the data reflects unauthorized use, it does not necessarily follow that the environmental assessment's discussion of baseline conditions in the project area was flawed as a result.

The environmental assessment's discussion of unauthorized motorized use, including the effectiveness of its monitoring and repair program, was reasonable. The district court erred in requiring more.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the district court as to CBD's claims four and seven, and Alliance's claims one and three, and enter judgment for Federal Defendants on these counts.

|  |  |
|---|---|
|  | TODD KIM<br>*Assistant Attorney General* |
| Of Counsel: |  |
|  | */s/ Jacob D. Ecker* |
| ELISE FOSTER | THEKLA HANSEN-YOUNG |
| *Attorney* | HAYLEY A. CARPENTER |
| U.S. Department of Agriculture | ERIKA A. FURLONG |
|  | JOHN P. TUSTIN |
| KATHRYN L. WILLIAMS-SHUCK | JACOB D. ECKER |
| SARAH E. MCLAIN | *Attorneys* |
| *Attorneys* | Environment and Natural Resources Division |
| U.S. Department of the Interior | U.S. Department of Justice |
|  | Post Office Box 7415 |
|  | Washington, D.C. 20044 |
|  | (202) 305-0466 |
|  | jacob.ecker@usdoj.gov |

March 22, 2024
DJ # 90-1-4-16616/1

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)**　　　23-2882, 23-2886, 23-3146

　　　I am the attorney or self-represented party.

　　　**This brief contains 13,775 words,** excluding the items exempted by Fed. R.

App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5)

and (6).

　　　I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[X] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5),
　　 Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select
　　 only one)*:
　　 [ ] it is a joint brief submitted by separately represented parties;
　　 [ ] a party or parties are filing a single brief in response to multiple briefs; or
　　 [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature**　　s/ *Jacob D. Ecker*

**Date**　　　　March 22, 2024

# ADDENDUM

Endangered Species Act and Implementing Regulations

16 U.S.C. § 1536(a)(2) ................................................................ 1a

50 C.F.R. § 402.14(a), (g) ......................................................... 2a

50 C.F.R. § 402.02 ..................................................................... 3a

National Forest Management Act Implementing Regulations

36 C.F.R. § 219.15(b), (d) ........................................................ 4a

National Environmental Policy Act regulations of the Council on
Environmental Quality (2018)

40 C.F.R. § 1502.24 (2018) ...................................................... 5a

40 C.F.R. § 1502.21 (2018) ...................................................... 6a

**Endangered Species Act**
**16 U.S.C. § 1536 – Interagency cooperation**

**(a)**     **Federal agency actions and consultations**

\*\*\*

(2) Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

\*\*\*

1a

## Endangered Species Act Implementing Regulations
## 50 C.F.R. § 402.14 – Formal consultation

(a) Requirement for formal consultation. Each Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat. If such a determination is made, formal consultation is required, except as noted in paragraph (b) of this section. The Director may request a Federal agency to enter into consultation if he identifies any action of that agency that may affect listed species or critical habitat and for which there has been no consultation. When such a request is made, the Director shall forward to the Federal agency a written explanation of the basis for the request.

     \*\*\*

(g) Service responsibilities. Service responsibilities during formal consultation are as follows:

    (1) Review all relevant information provided by the Federal agency or otherwise available. Such review may include an on-site inspection of the action area with representatives of the Federal agency and the applicant.

    (2) Evaluate the current status and environmental baseline of the listed species or critical habitat.

    (3) Evaluate the effects of the action and cumulative effects on the listed species or critical habitat.

    (4) Add the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat, formulate the Service's opinion as to whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.

     \*\*\*

2a

**Endangered Species Act Implementing Regulations
50 C.F.R. § 402.02 – Definitions**

\*\*\*

Environmental baseline refers to the condition of the listed species or its designated critical habitat in the action area, without the consequences to the listed species or designated critical habitat caused by the proposed action. The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. The consequences to listed species or designated critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify are part of the environmental baseline.

\*\*\*

**National Forest Management Act Implementing Regulations
36 C.F.R. § 219.15 – Project and activity consistency with the plan**

\*\*\*

(b) Application to projects or activities authorized after plan decision. Projects and activities authorized after approval of a plan, plan amendment, or plan revision must be consistent with the plan as provided in paragraph (d) of this section.

\*\*\*

(d) Determining consistency. Every project and activity must be consistent with the applicable plan components. A project or activity approval document must describe how the project or activity is consistent with applicable plan components developed or revised in conformance with this part by meeting the following criteria:

(1) Goals, desired conditions, and objectives. The project or activity contributes to the maintenance or attainment of one or more goals, desired conditions, or objectives, or does not foreclose the opportunity to maintain or achieve any goals, desired conditions, or objectives, over the long term.

(2) Standards. The project or activity complies with applicable standards.

(3) Guidelines. The project or activity:

(i) Complies with applicable guidelines as set out in the plan; or

(ii) Is designed in a way that is as effective in achieving the purpose of the applicable guidelines (§ 219.7(e)(1)(iv)).

(4) Suitability. A project or activity would occur in an area:

(i) That the plan identifies as suitable for that type of project or activity; or

(ii) For which the plan is silent with respect to its suitability for that type of project or activity.

\*\*\*

**National Environmental Policy Act Implementing Regulations (2018)
40 C.F.R. § 1502.24 (2018) – Methodology and scientific accuracy**

Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements. They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement. An agency may place discussion of methodology in an appendix.

**National Environmental Policy Act Implementing Regulations (2018)**
**40 C.F.R. § 1502.21 (2018) – Incorporation by reference**

Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. The incorporated material shall be cited in the statement and its content briefly described. No material may be incorporated by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment. Material based on proprietary data which is itself not available for review and comment shall not be incorporated by reference.