Nos. 23-2882, 23-2886, 23-3146

---

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

CENTER FOR BIOLOGICAL DIVERSITY, et al.,
*Plaintiffs-Appellees/Plaintiffs-Appellants*,

and

ALLIANCE FOR THE WILD ROCKIES, et al.,
*Plaintiffs-Appellees/Plaintiffs*,

v.

UNITED STATES FOREST SERVICE, et al.,
*Defendants-Appellants/Defendants/Defendants-Appellees*,

and

KOOTENAI TRIBE OF IDAHO,
*Intervenor-Defendant/Intervenor-Defendant-Appellant/
Intervenor Defendant-Appellee.*

---

Appeal from the United States District Court for the District of Montana
No. 9:22-cv-114 (Hon. Donald W. Molloy)

---

**JOINT EXCERPTS OF RECORD
VOLUME 2 OF 10**

---

Of Counsel:

ELISE FOSTER
*Attorney*
U.S. Dep't of Agriculture

KATHRYN L. WILLIAMS-SHUCK
SARAH E. MCLAIN
*Attorneys*
U.S. Dep't of the Interior

TODD KIM
*Assistant Attorney General*

THEKLA HANSEN-YOUNG
HAYLEY A. CARPENTER
ERIKA A. FURLONG
JOHN P. TUSTIN
JACOB D. ECKER
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 305-0466

jacob.ecker@usdoj.gov

*Attorneys for Federal Defendants-Appellants*


Julie A. Weis
HAGLUND KELLEY LLP

Kris A. McLean
Tyson A. McLean
Kris A. McLean Law Firm

*Attorneys for Defendant-Intervenor-Appellant*
*Kootenai Tribe of Idaho*



**DEPARTMENT OF NATURAL RESOURCES
AND CONSERVATION**

Northwestern Land Office

655 Timberwolf Pkwy., Suite 1, Kalispell, MT 59901    Phone: (406) 751-2240    Fax: (406) 751-2287

GREG GIANFORTE, GOVERNOR                                             1539 ELEVENTH AVENUE

## STATE OF MONTANA

DIRECTOR'S OFFICE: (406) 444-2074                                  PO BOX 201601
FAX: (406) 444-2684                                          HELENA, MONTANA 59620-1601

March 16, 2023

William Barquin
Attorney General
Kootenai Tribe of Idaho
142 County Road 38A
Bonners Ferry, ID
83805

        RE:       Black Ram Project Litigation
                  Cause No. 22-CV-001114-DWM
                  United States District Court
                  for the District of Montana

As Area Manager for the Northwestern Land Office of the Montana Department of Natural Resources and Conservation (DNRC), I have been involved with the design and review of the Black Ram Project on the Kootenai National Forest. Due to staffing issues within DNRC's Legal Unit, DNRC will not be able to seek leave to file an amicus brief in the above-referenced litigation. In lieu of filing an amicus brief, DNRC has chosen to voice its support of the Black Ram Project by submitting this letter to you and the Kootenai Tribe of Idaho.

This case, 22-cv-001114-DWM, concerns the United States Department of Agriculture Forest Service (USFS) decision and authorization of the Black Ram Project (Project). The purpose of the Project includes increasing resiliency of the forested landscape to uncharacteristic wildfire and insects and disease events, to maintain or improve watershed conditions, and improve the quality of wildlife habitat. The Black Ram project will promote resilient vegetation conditions and improve habitat by increasing the diversity of landscape level vegetation patterns, structure, fuel loading, and species composition. It will reduce the potential for high intensity wildfire by altering fuel conditions in the landscape and in the Wildland Urban Interface (WUI).

The Project decision includes 11,455 acres of vegetation treatments to increase forest resiliency and reduce fuels north and west of Troy. The area has dense stands and substantial insect and disease mortality with heavy fuel loading and high wildfire risk. 4,368 acres (37 % of the acres to be treated) are in WUI as identified in the 2013 Lincoln County Community Wildfire Protection Plan (CWPP). The Project area is within a Priority Area for Focused Attention in the Montana Forest Action Plan due to risk associated with uncharacteristic wildfire. The treatment areas are in a Farm Bill Priority Landscape designated by the Governor and approved by the USDA Secretary.

The proposed national forest treatments are north and west of private lands in the Yaak Valley. Homes and

**Exhibit A
Page 1 of 2**

businesses are located in the narrow corridor along the Yaak Highway from Meadow Creek to Pete Creek and further to the north in the Yaak River Valley. The narrow valley with dense forests on steep slopes with high fuel loads and ladder fuels combined with prevailing west winds create potential for wind-driven crown fires with associated embers threating homes in these areas.

The Project advances DNRC's statutory mandate to promote forest health by reducing the risk of severe wildland fire to protect watersheds and public and firefighter safety. This project on federal lands will work together with projects on state and private land to significantly reduce wildfire risk in these WUI areas. This Project will allow for safer engagement in the event of a wildfire, specifically providing for safe suppression tactics, safety zones and escape routes. Fire starts on national forest can easily blow onto areas in which DNRC and/or Lincoln County, Montana have wildfire protection responsibilities and cause significant loss of structures and forage.

Wildfire will return to this landscape at some point and time. By implementing the treatments in this project, land managers have the ability to lessen the severity and intensity of these fires, resulting in a healthier, more resilient forest and reducing loss of habitat from a large severe fire. Without treatments, stands will remain overcrowded with unnaturally high fuel loadings. The threat of large, stand-replacing wildfires and resulting impacts to habitat, property, infrastructure, and public and firefighter safety will compound as insect infestation and the warming and drying climate increase. There is a clear urgency for action and the treatments proposed with this Project are critical to alleviating the risk in this area.

The DNRC has worked side by side with the Kootenai National Forest on this Project and other cooperative projects and can attest to the Forest's high commitment and extended efforts to use the best available science and meet standards for resource protection in project design, analysis, and implementation.

Sincerely,

Greg Poncin
Area Manager, Northwestern Land Office
MT Department of Natural Resources and Conservation

Exhibit A
Page 2 of 2

Kris A. McLean
Tyson A. McLean
Kris A. McLean Law Firm, PLLC
2315 McDonald Ave., Suite 106
Missoula, MT 59801
kris@krismcleanlaw.com
tyson@krismcleanlaw.com

Julie Weis
HAGLUND KELLEY LLP
2177 SW Broadway
Portland, OR  97201
jweis@hk-law.com
(admitted *pro hac vice*)

*Attorneys for Defendant-Intervenor/Consolidated*
*Defendant-Intervenor Kootenai Tribe of Idaho*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | Lead Case No. CV 22-114-M-DWM |
| Plaintiffs, | Member Case No. CV 23-3-M-DWM |
| and | **DEFENDANT-INTERVENOR/CONSOLIDATED DEFENDANT-INTERVENOR KOOTENAI TRIBE OF IDAHO'S STATEMENT OF DISPUTED FACTS** |
| ALLIANCE FOR THE WILD ROCKIES and NATIVE ECOSYSTEMS COUNCIL, | |
| Consolidated Plaintiffs, | |
| vs. | |
| U.S. FOREST SERVICE, et al., | |

**DEFENDANT-INTERVENOR/CONSOLIDATED
DEFENDANT-INTERVENOR'S STATEMENT
OF DISPUTED FACTS**

assumption that there were "**20 instances of known ineffective barriers and/or illegal user-crated roads in the Project area.**"

105.　Yaak Valley completed additional surveys on September 30, 2021 and October 1, 2021, including many of the locations above, and documented 15 ineffective berms, 17 ineffective gates, and 13 roads with no gate or berm. FS-044262–044266 (Yaak Valley report with photos excluded); FS-044664–044688 (Forest Service response with photos included).

**RESPONSE:  Dispute plaintiffs' assertion that Yaak Valley "documented 15 ineffective berms, 17 ineffective gates, and 13 roads with no gate or berm," including based on the administrative record documents cited below in response to Statements of Fact 106, 108, and 110.**

106.　The photographs below document 15 berms with established trails around the berm:

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201



FS-044262–044266; FS-044664–044688.

**RESPONSE:  Disputed.  Although the quality of plaintiffs' images is poor, and plaintiffs make no effort to identity the specific locations in the record where the poor-quality images can be found, it appears plaintiffs are referring to:**

| 276 (identified as functional at FS44684) | 276A (identified as functional at FS44684) | 747 (identified as functional at FS44665) | 748 (identified as functional at FS44666) |
|---|---|---|---|

Page 71 – **DEFENDANT-INTERVENOR'S STATEMENT OF DISPUTED FACTS**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

| 757 (identified as functional at FS44666) | 3101 (identified as functional at FS44667) | 3380 (identified as functional at FS44667) | 5839 (stating at FS44668 "Barrier was improved in 2021") |
|---|---|---|---|
| 5846 (identified as functional at FS44668) | 5852 (identified as functional at FS44668). | 5858 (identified as functional at FS44669) | 5860 (identified as functional at FS44669) |
| 5886A (identified as functional at FS44670) | 58865 (identified as functional at FS44670) | 5930 (identified as functional at FS44671) | |

107.　Despite the established trails around these berms that provide motorized access to motorcycles and/or ATVs, the Forest Service represents that these berms are "functional." FS-044664–044688.

**RESPONSE:  Undisputed that the Forest Service concluded the referenced road closures were functional (and in one instance pointed out that the barrier had been improved in 2021) as described above in response to Statement of Fact 106, otherwise dispute plaintiffs' characterization of the functionality of the berms in plaintiffs' poor-quality images.**

108.　The photographs below document 17 ineffective gates with openings around the gate that allows motorcycle and/or ATV use:

Page 72 – **DEFENDANT-INTERVENOR'S STATEMENT OF DISPUTED FACTS**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201



FS-044262–044266; FS-044664–044688.

**RESPONSE:  Disputed.  Although the quality of plaintiffs' images is
poor, and plaintiffs make no effort to identity the specific locations in the
record where the poor-quality images can be found, it appears plaintiffs are
referring to:**

Page 73 – **DEFENDANT-INTERVENOR'S STATEMENT
OF DISPUTED FACTS**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

| 523 (identified as functional at FS44671) | 595 (identified as functional, and not in the Black Ram Project area, at FS44672) | 902 (identified as functional at FS44672) | 5821 (identified as functional at FS44673) |
|---|---|---|---|
| 5835 (identified as functional at FS44673) | 5841 (identified as functional at FS44674) | 5856 (identified as functional, and noting "Extensive tree blowdown across road since 2020, at FS44674) | 5857 (identified as functional at FS44675) |
| 5873 (identified as functional at FS44675) | 5874 (identified as functional at FS44676). | 5894 (identified as functional at FS44676) | 5919 (identified as functional at FS44676) |
| 6084 (identified originally as not functional but repaired in October 2021, and also not in the Black Ram Project area, at FS44677) | 6134 (identified as functional at FS44678) | 6134 (identified as functional at FS44678) | 6708 (identified as functional at FS44679) |
| 6715 (identified as functional at FS44679) | | | |

Page 74 – **DEFENDANT-INTERVENOR'S STATEMENT OF DISPUTED FACTS**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

109.   Despite the openings around these gates that provide motorized access to motorcycles and/or ATVs, the Forest Service represents that these gates are "functional." FS-044664–044688.

**RESPONSE:  Undisputed that the Forest Service concluded the referenced road closures were functional (in one instance after having been repaired and in two instances the closures were not in the Black Ram Project area) as described above in response to Statement of Fact 108, otherwise dispute plaintiffs' characterization of the functionality of the closures in plaintiffs' poor-quality images.**

110.   The photographs below document 13 roads with no gate or berm:

Page 75 – **DEFENDANT-INTERVENOR'S STATEMENT OF DISPUTED FACTS**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

2-ER-077



FS-044262–044266; FS-044664–044688.

**RESPONSE**:  Disputed.  Although the quality of plaintiffs' images is

poor, and plaintiffs make no effort to identity the specific locations in the

record where the poor-quality images can be found, it appears plaintiffs are

referring to:

| 338K (identified as functional at FS44680) | 338N (identified as functional at FS44680) | 338P (identified as functional at FS44681) | 338R (identified as functional at FS44681) |
|---|---|---|---|
| | | | |

Page 76 – **DEFENDANT-INTERVENOR'S STATEMENT
OF DISPUTED FACTS**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

| 757A (identified as functional at FS44681) | 902A (identified as functional and not in the Black Ram Project area at FS44682) | 5857 (identified as functional at FS44682) | 5886 (identified as functional, and also considered open for monitoring and BMU metrics, at FS44683) |
|---|---|---|---|
| 5892 (stating at FS44683 that closure status was not applicable, and "At 0.3 mile: not passable by reasonable, prudent user; shows possible off-route ATV use.  At 0.9 mile: not passable by reasonable, prudent user.  At 2.4 mile: impassable (brush)") | 5892 (stating at FS44683 that closure status was not applicable, and "At 0.3 mile: not passable by reasonable, prudent user; shows possible off-route ATV use.  At 0.9 mile: not passable by reasonable, prudent user.  At 2.4 mile: impassable (brush)") | 14125 (identified as functional at FS44684) | 14125 (identified as functional at FS44684) |
| 14126 (identified as functional at FS44685) | | | |

111.    Despite the lack of berm or gate, the Forest Service represents that
these "closures" are "functional."  FS-044664–044688.

**RESPONSE:  Undisputed that the Forest Service concluded the**

Page 77 – **DEFENDANT-INTERVENOR'S STATEMENT OF DISPUTED FACTS**

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

JOHN P. TUSTIN (TX Bar No. 24056458)
Senior Attorney, Natural Resources Section
HAYLEY A. CARPENTER (CA Bar No. 312611)
Trial Attorney, Natural Resources Section
ERIKA A. FURLONG (PA Bar No. 319350)
Trial Attorney, Wildlife & Marine Resources Section
CAITLYN F. COOK (MD Bar No. 2112140244)
Trial Attorney, Wildlife & Marine Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone:    (202) 305-3022 (Tustin)
            (202) 305-0242 (Carpenter)
            (202) 305-0424 (Furlong)
            (202) 305-0269 (Cook)
Fax:        (202) 305-0275

JESSE LASLOVICH
United States Attorney

*Attorneys for Federal Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**MISSOULA DIVISION**

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | ) ) ) | Lead Case No. CV 22-114-M-DWM |
| Plaintiffs, and | ) ) ) | Member Case No. CV 23-3-M-DWM |
| ALLIANCE FOR THE WILD ROCKIES and NATIVE ECOSYSTEMS COUNCIL, | ) ) ) | |
| Consolidated Plaintiffs, | ) ) ) | FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR |

|                                           |   |                                           |
|-------------------------------------------|---|-------------------------------------------|
| v.                                        | ) | SUMMARY JUDGMENT AND                      |
|                                           | ) | RESPONSE IN OPPOSITION TO                 |
| U.S. Forest Service, et al.               | ) | PLAINTIFFS' AND                           |
|                                           | ) | CONSOLIDATED PLAINTIFFS'                   |
| Defendants,                               | ) | MOTIONS FOR SUMMARY                       |
|                                           | ) | JUDGMENT [ECF Nos. 50, 52]                |
| KOOTENAI TRIBE OF IDAHO,                  | ) |                                           |
|                                           | ) |                                           |
| Defendant-Intervenor, and                 | ) | Date: July 13, 2023                       |
|                                           | ) | Time: 9:00 am                             |
| KRISTEN KAISER, District Ranger,          | ) |                                           |
| Kootenai National Forest, et al.,         | ) |                                           |
|                                           | ) |                                           |
| Consolidated Defendants.                  | ) |                                           |
|                                           | ) |                                           |
|                                           | ) |                                           |

# <u>TABLE OF CONTENTS</u>

**PAGE**

I.    <u>INTRODUCTION</u> .................................................................................1

II.   <u>FACTUAL BACKGROUND</u>..........................................................2

III.  <u>LEGAL BACKGROUND</u>...............................................................2

     A.    Endangered Species Act ("ESA") ...........................................2

     B.    National Environmental Policy Act ("NEPA") ......................3

     C.    National Forest Management Act ("NFMA").........................3

IV.  <u>STANDARD OF REVIEW</u> ............................................................4

V.   <u>ARGUMENT</u>..................................................................................4

     A.    Federal Defendants satisfied the ESA's consultation
          requirements. .......................................................................4

          1.    The Cabinet-Yaak Ecosystem's population estimate is not
               part of the environmental baseline (Claim 4). ...........5

          2.    The Fish and Wildlife Service used the best available
               science to consider population data (Claim 4)..........................6

          3.    The Fish and Wildlife Service properly considered
               population connectivity (Claim 5). ...........................13

          4.    The Fish and Wildlife Service properly determined that
               the Project would not jeopardize the grizzly bear (Claim
               6). .............................................................................16

          5.    The Forest Service satisfied its substantive duty under
               Section 7 of the ESA (Claim 7). ...............................21

     B.    The Forest Service properly disclosed baseline conditions under
          NEPA (Claim 1). .................................................................22

     C.    The Forest Service took a hard look at the Project's climate
          impacts

*Fed. Defs.' Opening Brief*                                         i

(Claim 1)..................................................................................23

1.    The Forest Service sufficiently analyzed climate impacts. ......24

2.    Plaintiffs' challenge to the Forest Service's climate impacts analysis fails. ...............................................28

D.    The Forest Service reasonably found the Project will not have significant impacts (Claim 2). ..........................................32

1.    Context ......................................................34

2.    Intensity: Species ...................................36

3.    Intensity: Unique Characteristics.............................37

i.    Pacific Trail ..............................................................38

ii.    Wild and Scenic River Eligible Segments ...........................40

iii.    Pete Creek Botanical Area ...............................................42

E.    No supplemental NEPA analysis is required (Consolidated Claim 5)............................................................44

F.    The Project satisfies Forest Plan requirements for Bear Management Units (Consolidated Claim 1)........................46

1.    The Project complies with FW-STD-WL-02. ..........47

2.    The Project complies with FW-GDL-WL-15, the Forest Plan guideline applying Interagency Grizzly Bear Guidelines. ...............................................53

G.    The Project's analysis of the effectiveness of road closure devices satisfies NEPA (Consolidated Claim 3)................56

1.    Consolidated Plaintiffs forfeited complaints about alleged breaches on specific roads. ......................................56

2.    Yaak Valley's allegations do not show the closure devices are ineffective..........................................58

3.    Speculative allegations about illegal use fail to show the closure devices are ineffective.................................62

*Fed. Defs.' Opening Brief*           ii

        4.     The closure devices are effective.............................................63

     H.    If the Court finds a violation, the proper remedy is remand
           without vacatur. ....................................................................66

VI.    CONCLUSION.............................................................................68

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                          **PAGE**

*350 Montana v. Haaland*,
    50 F.4th 1254 (9th Cir. 2022)................................................................31

*Alliance for the Wild Rockies v. Gassmann*,
    CV-21-105-M-DLC, ECF No. 71 at 61-66 ...........................................64

*Alliance for the Wild Rockies v. Probert*,
    856 F.3d 1238 (9th Cir. 2017)...............................................................50

*Alliance for the Wild Rockies v. Probert*,
    412 F. Supp. 3d 1188 (D. Mont. 2019) .................................... 48, 49, 61

*Alliance for the Wild Rockies v. Probert*,
    421 F. Supp. 3d 1207-08 .......................................................................61

*Alliance for the Wild Rockies v. Kruger*,
    950 F. Supp. 2d 1172 (D. Mont. 2013) .................................................58

*Alliance for the Wild Rockies v. Marten*,
    464 F.Supp.3d 1169 (D. Mont. 2020) ...................................................62

*Alliance for the Wild Rockies v. Savage*,
    354 F. Supp. 3d 1185 (D. Mont. 2018) .................................................47

*Alliance for the Wild Rockies v. Savage*,
    897 F.3d 1025 (9th Cir. 2018)...............................................................50

*Aluminum Co. of America v. Administrator, Bonneville Power Admin.*,
    175 F.3d 1156 (9th Cir. 1999)...............................................................22

*Ariz. Cattle Growers' Ass'n v. Salazar*,
    606 F.3d 1160 (9th Cir. 2010).................................................................6

*Bark v. U.S. Forest Serv.*,
    958 F.3d 865 (9th Cir. 2020).................................................................34

*Fed. Defs.' Opening Brief*                                            iv

*Blue Mountains Biodiversity Project v. Blackwood*,
    161 F.3d 1208 (9th Cir. 1998) ...............................................................33

*Cal. Cmtys. Against Toxics v. U.S. EPA*,
    688 F.3d 989 (9th Cir. 2012) ................................................................66

*Cascade Forest Conservancy v. U.S. Forest Serv.*,
    577 F. Supp. 3d 1163 (W.D. Wash. 2021) ............................................40

*Cascadia Wildlands v. U.S. Forest Serv.*,
    937 F. Supp. 2d 1271 (D. Or. 2013) ................................................ 38, 40

*Ctr. for Biological Diversity v. Gould*,
    150 F. Supp. 3d 1170 (E.D. Cal. 2015) ................................................38

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
    698 F.3d 1101 (9th Cir. 2012) ..............................................................22

*Defs. of Wildlife v. U.S. Army Corps of Eng's*,
    CV-15-14-GF-BMM, 2018 WL 3510534 (D. Mont. July 20, 2018) .................20

*Earth Island Inst. v. Carlton*,
    626 F.3d 462 (9th Cir. 2010) ................................................................29

*EPIC v. U.S. Forest Serv.*,
    451 F.3d 1005 (9th Cir. 2006) ........................................................ 36, 37

*Forest Guardians*,
    329 F.3d ..............................................................................................49

*Forest Serv. Empls. for Envt'l Ethics v. U.S. Forest Serv.*,
    726 F. Supp. 2d 1195 (D. Mont. 2010) ................................................37

*Foundation for North American Wild Sheep v. U.S. Dep't of Agriculture*,
    681 F.2d 1172 (9th Cir. 1982) ..............................................................64

*Friends of the Clearwater v. Dombeck*,
    222 F.3d 552 (9th Cir. 2000) ................................................................45

*Fed. Defs.' Opening Brief*                                              v

*Friends of the Clearwater v. Petrick*,
    588 F. Supp. 3d 1071 (D. Idaho 2022) ........................................ 52, 63

*Friends of the Se.'s Future v. Morrison*,
    153 F.3d 1059 (9th Cir. 1998) ...............................................66

*Friends of the Wild Swan v. U.S. Forest Serv.*,
    875 F. Supp. 2d 1199 (D. Mont. 2012) ...............................................38

*Friends of the Wild Swan* v. *Weber*
    2015 WL 13715966 (D. Mont. Feb. 23, 2015) ...................................54

*Friends of the Wild Swan*,
    2013 WL 12344841 ....................................................... 54, 55

*Friends of Yosemite Valley v. Kempthorne*,
    520 F.3d 1024 (9th Cir. 2008)...............................................44

*Fund for Animals, Inc. v. Rice*,
    85 F.3d 535 (11th Cir. 1996) ...............................................36

*Greater Yellowstone Coal. v. Flowers*,
    359 F.3d 1257 (10th Cir. 2004) ....................................... 36, 37

*Hapner v. Tidwell*,
    621 F.3d 1239 (9th Cir. 2010) ........................................ 24, 32

*Helping Hand Tools v. U.S. Envtl. Prot. Agency*,
    848 F.3d 1185 (9th Cir. 2016) ...............................................31

*Idaho Farm Bureau Fed'n v. Babbitt*,
    58 F.3d 1392 (9th Cir. 1995) ...............................................66

*In Def. Of Animals v. U.S. Dep't of Interior*,
    751 F.3d 1054 (9th Cir. 2014) ....................................... 33, 34, 35

*Marsh*,
    490 U.S. ....................................................... 29, 30, 43, 44

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*,
   463 U.S. 29 (1983) ............................................................................16

*N. Alaska Env't Ctr. v. Kempthorne*,
   457 F.3d 969 (9th Cir. 2006) ...........................................................23

*Native Ecosystems Council v. Dombeck*,
   304 F.3d 886 (9th Cir. 2002) .............................................................5

*Native Ecosystems Council v. Tidwell*,
   599 F.3d 926 (9th Cir. 2010) ...........................................................46

*Native Ecosystems Council v. U.S. Forest Serv.*,
   428 F.3d 1233 (9th Cir. 2005) .........................................................33

*Native Ecosystems Council v. Weldon*,
   697 F.3d 1043 (9th Cir. 2012) ...........................................................3

*Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp.*,
   222 F.3d 677 (9th Cir. 2000) ...........................................................63

*Nat'l Wildlife Fed'n v. Espy*,
   45 F.3d 1337 (9th Cir. 1995) ...........................................................66

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   524 F.3d 917 (9th Cir. 2008) ...........................................................19

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
   402 F.3d 846 (9th Cir. 2005) ...........................................................33

*Or. Nat. Desert Assoc. v. Jewell*,
   840 F.3d 562 (9th Cir. 2016) ..................................................... 22, 23

*Portland General Elec. Co. v. Bonneville Power Admin.*,
   501 F.3d 1009 (9th Cir. 2007) .........................................................57

*Protect Our Communities Foundation v. Jewell,*
   825 F.3d 571 (9th Cir. 2016) ..................................................... 64, 65

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*,
  898 F.2d 1410 (9th Cir. 1990) ................................................................21

*Riverbend Farms, Inc. v. Madigan*,
  958 F.2d 1479 (9th Cir. 1992) ...............................................................51

*Robertson*,
  490 U.S. ................................................................................................61

*S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
  588 F.3d 718 (9th Cir. 2009) ......................................................... 63, 64

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ................................................. 4, 9, 10, 12

*San Luis & Delta-Mendota Water Auth. v. Locke*,
  776 F.3d 971 (9th Cir. 2014) ..............................................................6, 12

*Save Our Cabinets v. U.S. Fish & Wildlife Serv.*,
  255 F. Supp. 3d 1035 (D. Mont. 2017) ..............................................6, 19

*Sierra Club v. Bosworth*,
  352 F. Supp. 2d 909 (D. Minn. 2005) ...................................................65

*Swan View Coal. v. U.S. Forest Serv.*,
  782 F. Supp. 2d 1132 (D. Mont. 2011) ................................................54

*Swan View Coalition v. Barbouletos*,
  307 F. App'x 49 (9th Cir. 2009) ...........................................................54

*Swomley v. Schroyer*,
  484 F. Supp. 3d 970 (D. Colo. 2020) ............................................. 24, 32

*Swomley v. Schroyer*,
  No. 20-1335, 2021 WL 4810161 (10th Cir. Oct. 15, 2021) .......... 24, 25

*The Lands Council v. McNair*,
  537 F.3d 981 (9th Cir. 2008) ......................................... 13, 14, 17, 18

*The Lands Council v. McNair*,
   629 F.3d 1070 (9th Cir. 2010) ................................................................57

*U.S. Dept. of Transp. v. Public Citizen*,
   541 U.S. 754 (2004) ................................................................ 27, 58

*Wild Fish Conservancy v. Salazar*,
   628 F.3d 513 (9th Cir. 2010) ................................................................15

*WildEarth Guardians v. Mont. Snowmobile Ass'n*,
   790 F.3d 920 (9th Cir. 2015) ................................................................55

*WildEarth Guardians v. Steele*,
   545 F. Supp. 3d 855 (D. Mont. 2021) .............................. 22, 65, 67

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................13

## STATUTES

5 U.S.C. §706(2) ................................................................4
5 U.S.C. §706 ................................................................51
15 U.S.C. § 1532 ................................................................7
16 U.S.C. §1536 ................................................................2
16 U.S.C. §1536(a)(2) ................................................................ 2, 16, 21
16 U.S.C. §1539(1)(2) ................................................................20
42 U.S.C. §4321-4370m-12 ................................................................3
42 U.S.C. §4332(2)(C)(ii) ................................................................63
42 U.S.C. §4332(C) ................................................................3, 32

## FEDERAL REGULATIONS

36 C.F.R. §218.5(a) ................................................................56
36 C.F.R. §218.8(c) ................................................................ 56, 57
36 C.F.R. §218.8(d)(5) ................................................................57
36 C.F.R. §218.8(d)(6) ................................................................57
40 C.F.R. Part 1500 (2018) ................................................................3
40 C.F.R. § 1502.9(c)(1)(i-ii) (1987) ................................................................44
40 C.F.R. § 1502.9(c)(1)(ii) ................................................................46
40 C.F.R. § 1502.21 ................................................................ 51, 55
40 C.F.R. § 1502.24 ................................................................51

*Fed. Defs.' Opening Brief*　　　　　　　　　　　　　　　　　　　　ix

40 C.F.R. § 1508.9 ...................................................................3
40 C.F.R. § 1508.9(a) ............................................................33
40 C.F.R. § 1508.13 .................................................................3
40 C.F.R. § 1508.27 (2019) ...................................................33
40 C.F.R. § 1508.27(a) ..........................................................34
40 C.F.R. § 1508.27(b)(1)-(10) ............................................34
40 C.F.R. § 1508.27(b)(3) .....................................................37
40 C.F.R. § 1508.27(b)(9) .....................................................36
50 C.F.R. § 17.3 .....................................................................20
50 C.F.R. § 402.02 .........................................................5, 7, 16
50 C.F.R. § 402.14 ...................................................................2
50 C.F.R. § 402.14(a) ..............................................................2
50 C.F.R. § 402.14(g)(4) .........................................................2
50 C.F.R. § 402.14(i) ..............................................................20
78 Fed Reg. 18,481-02, 18,486 (Mar. 27, 2013) ....................58
86 Fed. Reg. 10,252 (Feb. 19, 2021) ......................................27

*Fed. Defs.' Opening Brief*                                      x

## I.     **INTRODUCTION**

These two consolidated actions challenge the Black Ram Project ("Project")

on the Kootenai National Forest.  In June 2022, the Forest Service authorized the

Project to: improve the Project area's resilience to disease, drought, insects, and

fire; reduce the risk of high-intensity wildfire; and improve big game habitat,

watershed conditions, and recreational opportunities.  Fire suppression and climate

change have resulted in increased tree density, a decreased proportion of

disturbance-resistant tree species, and a Project area severely burdened by root

disease.  These conditions carry increased fire risk and lower carbon storage

capacity that the Project will ameliorate over time.

Plaintiffs Center for Biological Diversity, Yaak Valley Forest Council, and

Wildearth Guardians ("Plaintiffs") filed suit in June 2022 and an Amended

Complaint in December 2022.  Complaint, ECF No. 1; Am. Compl. ("Pls.'

Compl."), ECF No. 31.  Plaintiffs Alliance for the Wild Rockies and Native

Ecosystems Council ("Consolidated Plaintiffs") filed suit in January 2023, and the

Court consolidated the cases on January 12.  "Con. Compl.," ECF No. 1 in 9:23-

cv-00003-DWM; ECF No. 36 (Consolidation Order).

Plaintiffs' and Consolidated Plaintiffs' Claims fail because the

Administrative Records show that the Project is not only crucial for forest health

and largely avoids impacts to grizzly bears, but complies with all applicable laws.

*Fed. Defs.' Opening Brief*                                                          1

## II.   FACTUAL BACKGROUND

For factual background, Federal Defendants refer the Court to their concurrently filed Statement of Undisputed Facts ("Defs.' Facts").

## III.   LEGAL BACKGROUND

### A.   Endangered Species Act ("ESA")

Section 7(a)(2) of the ESA requires federal agencies to ensure that any action authorized, funded, or carried out by that agency "is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. §1536(a)(2). The agency undertaking the action (the "action agency") is required to formally consult with the appropriate consulting agency (here, Fish and Wildlife Service) whenever the action "may affect" a threatened or endangered species. 16 U.S.C. §1536; 50 C.F.R. §402.14(a). During formal consultation, the Fish and Wildlife Service evaluates an action's impacts "adding the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat." 50 C.F.R. § 402.14(g)(4). The Fish and Wildlife Service must publish a Biological Opinion in which it uses "the best scientific and commercial data available" to determine whether the action will jeopardize the survival and recovery of a protected species. 16 U.S.C. §1536(a)(2); 50 C.F.R. §402.14.

**B.     National Environmental Policy Act ("NEPA")**

NEPA, 42 U.S.C. §§4321-4370m-12, requires agencies to prepare an

Environmental Impact Statement ("EIS") for all "major Federal actions

significantly affecting the quality of the human environment."  42 U.S.C.

§4332(C).  An agency may prepare an Environmental Assessment ("EA") to

ascertain whether a proposed federal action will have significant impacts.  40

C.F.R. §1508.9.[1]  If the agency concludes in the EA that there is no significant

impacts, the agency issues a finding of no significant impact in lieu of preparing an

EIS.  *Id*. at (a)(1); *id*. § 1508.13.

**C.     National Forest Management Act ("NFMA")**

"NFMA and its implementing regulations provide for forest planning and

management by the Forest Service on two levels: (1) forest level and (2) individual

project level."  *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th

Cir. 2012).  The Forest Service first develops a forest plan containing "broad, long-

term plans and objectives for the entire forest."  *Id*.  The agency then implements

the forest plan through site-specific projects that must be consistent with the

governing forest plan.  *Weldon,* 697 F.3d at 1056.

---

[1] All citations to the Council on Environmental Quality's regulations in this brief refer to those regulations as codified at 40 C.F.R. Part 1500 (2018).

## IV.   <u>STANDARD OF REVIEW</u>

Judicial review of administrative actions is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. §706(2).  *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014).  Under the APA, reviewing courts may set aside an agency's action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id*. (citation omitted).

## V.   ARGUMENT

### A.   <u>Federal Defendants satisfied the ESA's consultation requirements.</u>

Although Plaintiffs disagree with the Fish and Wildlife Service's interpretation of grizzly bear population data and believe that the agency could have done more to analyze the effects of connectivity between the action area and the Cabinet Mountains, the record demonstrates that the Fish and Wildlife Service carefully considered the issues Plaintiffs raise and explained why it credited some data over others.  The Fish and Wildlife Service reasonably determined that the Project would not jeopardize the grizzly bear because the Project will involve a low level of temporary impacts, the species is experiencing population growth throughout its range and in the Cabinet Yaak Ecosystem, and the Project activities are consistent with a conservation scenario that predicts continued population growth.  Finally, the Forest Service properly relied on the Biological Opinion.

**1.    The Cabinet-Yaak Ecosystem's population estimate is not part of the environmental baseline (Claim 4).**

Plaintiffs allege that the Fish and Wildlife Service failed to use the best available science to establish an accurate environmental baseline.  Pls. Br. in Supp. of Mot. for Summ. J. ("Pls.' Br.") 10-11, ECF No. 51; Compl. ¶ 146.  Yet the Cabinet-Yaak Ecosystem population estimate could not be part of the environmental baseline because the environmental baseline is by definition limited to the action area.

The ESA regulations define "environmental baseline" in part as "the condition of the listed species…*in the action area*, without the consequences to the listed species…caused by the proposed action."  50 C.F.R. § 402.02 (emphasis added); *Endangered Species Consultation Handbook* ("Consultation Handbook") at 4-22.  The ESA regulations define "action area" as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action."  FWS000006; 50 C.F.R. § 402.02.

The Fish and Wildlife Service determined that the Project's action area includes "the entirety of [bear management units] 14 and 15, an area larger than the Black Ram Project area" but only a portion of the Cabinet-Yaak Ecosystem. FWS000006-7.  This determination is entitled to deference, and Plaintiffs have not challenged it in any way.  *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 902 (9th Cir. 2002); *see* Pls.' Compl. ¶¶ 119-166; Pls.' Br. 10-16.

*Fed. Defs.' Opening Brief*                                                                 5

Even if there were a requirement to include a population estimate in the
environmental baseline, the analysis would be limited to bear management units 14
and 15—not the ecosystem, as Plaintiffs suggest.

> **2.      The Fish and Wildlife Service used the best available science to
> consider population data (Claim 4).**

The Fish and Wildlife Service used the best available science to evaluate
population data for the Cabinet-Yaak Ecosystem in the status of the species section
of the Biological Opinion.  FWS000010-15.

The Fish and Wildlife Service's analysis of the Cabinet-Yaak Ecosystem's
population data was consistent with the best available science standard, which is
intended to "prevent an agency from basing its action on speculation and surmise."
*San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir.
2014).  In evaluating the population data, the Fish and Wildlife Service complied
with this standard because it considered all the best available population data and
exercised its expertise to decide what data to credit.  *See id*; FWS000010-15.  This
determination is entitled to deference.  *See San Luis & Delta-Mendota Water
Authority*, 776 F.3d at 995).  Although the agency acknowledged that some
uncertainty exists as to the exact population size and the population growth rate,
FWS000011-12, "the ESA accepts agency decisions in the face of uncertainty."
*Save our Cabinets v. U.S. Fish & Wildlife Serv.*, 255 F. Supp. 3d 1035, 1052 (D.
Mont. 2017) (quoting *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1164

(9th Cir. 2010)).

The Fish and Wildlife Service considers population dynamics to be part of the status of the species analysis.  Neither the ESA nor its regulations define "status of the species."  *See* 15 U.S.C. § 1532; 50 C.F.R. § 402.02.  Yet the Consultation Handbook recommends that population dynamics be part of this section, including consideration of the population size, variability, and stability. Consultation Handbook at 4-20-21.  "[A]lthough population size has a clear relationship to a species' extinction probability, it can be less important than population variability and should be used carefully."  *Id*. at 4-21.

The Fish and Wildlife Service included a candid and thorough discussion of population dynamics for the Cabinet-Yaak Ecosystem in the status of the species section of the Biological Opinion, including an evaluation of multiple facets of population data and an acknowledgment of uncertainties.  FWS000010-15.  The Fish and Wildlife Service observed that although the ecosystem is "smaller" and "slowly recovering," its estimated population size has increased from 10 to 15 bears in the 1980s to 60 bears in bear year 2020.[2]  FWS000010-11.  The Cabinet-Yaak Ecosystem has also had a positive population trend since 2006 and "there is a 67 percent probability that the population is stable or increasing."  FWS000012.

---

[2] "Bear year" refers to the time when bears are active, which in the Cabinet-Yaak Ecosystem is April 1 through November 30.  FWS000007.

The agency acknowledged that "the exact number of individuals is unknown, and is a dynamic number that is difficult to pinpoint" but observed that the best available data suggests that the Cabinet-Yaak Ecosystem "is likely increasing." FWS000010-11.  The Fish and Wildlife Service also considered the "33 percent probability that the population is decreasing" and stated that it "is keeping abreast of current studies that are gathering data to develop more contemporary population estimates."  FWS000012.

Although Plaintiffs rely on the minimum counts to hypothesize that the population is decreasing, Pls.' Br. 12, the Fish and Wildlife Service considered the minimum counts and determined that they are not a reliable measure of population trend.  FWS000012.  Calculating population data for grizzly bears based on direct observation in the wild is difficult because grizzly bears have extensive ranges, avoid humans, and often live in densely forested habitat.  *See* FWS000017-18; FWS000060; FWS3495.  Intensive monitoring of grizzly bears may also "cause unnecessary additional stress or harm to the bears."  FWS000018.  For this reason, researchers monitor the status of grizzly bears in the Cabinet-Yaak Ecosystem by analyzing a variety of data (*e.g.*, capture, radio collared bears, deoxyribonucleic acid from tree rubs or hair snags, credible observations).  *See e.g.*, FWS000010; FWS001446.   Researchers use the data to calculate the minimum counts of grizzly bears each year.  *See, e.g.*, FWS001446.

In the Biological Opinion, the Fish and Wildlife Service explained that

minimum counts are "an over-simplification of population biology" and relying on

them to infer changes in total population size is "inappropriate" because other

factors affect minimum counts (*e.g.*, level of effort, level of funding, coronavirus

work restrictions).  FWS000012; Defs.' Facts ¶¶ 187-89.  For example, between

2016 and 2017 the minimum count varied by 19 bears (from 35 to 54 bears), an

amount too great to reflect population growth and thus a good illustration of

minimum counts' unreliability for preparing a population estimate or trend.  *See*

FS5337; FS5484.  Notably, in bear year 2017, researchers collected data from

nearly twice as many sample sessions as in 2016, which at least partially explains

why more bears were detected.  FWS002972.  Although Plaintiffs insist that the

minimum counts prove the population is declining, the Fish and Wildlife Service

determined that the best available data shows that the population is "likely

increasing."  FWS000010-11.

Plaintiffs attempt to make this issue akin to a battle of the experts by

suggesting that the Court should substitute the Fish and Wildlife Service's

determination that minimum count data is not a reliable method for establishing a

population trend in the Cabinet-Yaak Ecosystem.  Pls. Br. 12, 14; FWS000012.

But that is not the Court's role, and, even if it were, the Fish and Wildlife Service

explained why minimum counts are not reliable.  *See San Luis & Delta-Mendota*

*Water Authority v. Jewell*, 747 F.3d 581, 601-02; FWS000012.  Rather, the Court

must determine whether the agency considered the data and reasonably supported

its conclusion.  *Id*.  The record clearly demonstrates the agency did.  FWS000010-

15.

The method the Fish and Wildlife Service uses to calculate annual

population estimates and trends is also reasonable—especially given the inherent

difficulties in monitoring grizzly bears.  The Fish and Wildlife Service considers

population estimates "most useful when conducted the same way year after year,

leading to evidence of trend."  FWS000012.  For 40 years, researchers have

monitored the status of grizzly bears in the Cabinet-Yaak Ecosystem in part by

analyzing a variety of population data (*e.g.*, survival rates, reproduction rates,

population trend, population size estimates).  *See* FWS006971; FWS001461.  For

twenty-five of these years, researchers calculated the ecosystem's annual

population estimate by applying a population change rate to the prior best available

estimate of population size for the ecosystem and adding the augmentation bears

that are believed to still be in the area.  *See e.g.*, FWS000012; FWS001486; *see*

Decl. of Wayne Kasworm ¶ 5 ("Kasworm Decl."), attached as Exhibit 1.[3]  Since

---

[3] The Kasworm Declaration explains technical and complex issues regarding
grizzly bear population estimates, minimum counts, and mortalities. The
declaration is necessary to show that the agencies considered all factors and
explained their decision.

2016, the Fish and Wildlife Service has considered Kendall et al.'s population estimate for the Cabinet-Yaak Ecosystem for bear year 2012 the best available estimate of the ecosystem's population size. *See* FWS000010-12. Kendall et al. conducted a "rigorous" study that took five years to complete, cost $1.6 million to perform, and involved much more extensive sampling than occurs during annual monitoring. *See* FWS000011; FWS003493-510; Kasworm Decl. ¶ 7-8. Researchers use similar methodology to calculate the Northern Continental Divide Ecosystem's population estimate and rely on Kendall et al.'s 2004 bear year population estimate for that ecosystem. FWS001124.

Contrary to Plaintiffs' assertions, Pls.' Br. 11, the population growth rate reflects sound conservation biology principles. Researchers enter survival and reproduction data from the ecosystem's radio-collared bears into specialized software ("Booter"), which runs a grizzly bear specific growth rate equation under 5,000 scenarios to generate a reliable confidence interval. *See* FWS000012; FWS001486; FWS006996-07 (describing how Booter increases statistical power). This software is also used to calculate the Selkirk Ecosystem's growth rate and has been recognized in at least three peer-reviewed journal articles. FWS001124; FWS006971-81; FWS006982-93; FWS006994-7001. The method generates a conservative estimate of the grizzly bear population growth by considering data back to 1983 to account for annual variations. *See* FWS000012; FWS001486.

Plaintiffs' insinuation that the Fish and Wildlife Service did not consider the best available mortality data is also without merit. Pls.' Br. 12-15. In the Biological Opinion, the Fish and Wildlife Service noted that the Cabinet-Yaak Ecosystem had met its mortality rate recovery target of no more than 2.1 bear deaths per year and no more than 0.6 female deaths per year. FWS000012-13; FWS001461. The average annual human-caused mortality for 2015 to 2020 was 1.5 bears and 0.5 females per year. *Id*. The 2021 Species Status Assessment rated the ecosystem's "adult female survival" as "high" (meaning the survival rate is above 93%). FWS001078; FWS001076.

In claiming that the Fish and Wildlife Service ignored data indicating that population is declining, Plaintiffs do not credibly claim that the Fish and Wildlife Service ignored the data because they cite the same monitoring reports that the Fish and Wildlife Service recognizes as the best available science and that the agency considered in the Biological Opinion. Pls.' Br. 12-13 (citing monitoring reports written by Kasworm et al. for 2018 to 2020); FWS000010-15. Instead, Plaintiffs implore this Court to substitute the agency's judgment about what data to credit and what weight to afford the data by claiming that this Court should only consider the minimum count to infer population decline. *See San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 995. Yet the Fish and Wildlife Service determined that the population is likely increasing by considering all relevant data

(not just the minimum count) and articulated a rational basis for affording certain

data more weight.  While there may have been some uncertainty about the precise

population size or growth rate, the agency acknowledged this uncertainty and is

entitled to deference in the exercise of its expert judgment.  *See The Lands Council

v. McNair,* 537 F.3d 981, 993 (9th Cir. 2008), *overruled in part on other grounds

by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ("We are to be 'most

deferential' when the agency is 'making predictions within its [area of] special

expertise, at the frontiers of science.'") (citations omitted).

Thus, Plaintiffs cannot meet their burden of showing that the environmental

baseline is inaccurate, and the Court should grant summary judgment to Federal

Defendants on this claim.

### 3.    The Fish and Wildlife Service properly considered population connectivity (Claim 5).

Plaintiffs next argue that the Fish and Wildlife Service should have

conducted a more granular analysis of the Project impacts on the Yaak sub-

population because the action area is "completely isolated" from the Cabinet

Mountains.  *See* Pls.' Br. 16.  But this argument fails because the Yaak portion of

the ecosystem is not "completely isolated," and because the Fish and Wildlife

Service thoroughly considered the issue of population connectivity at multiple

levels.

The Fish and Wildlife Service analyzed population connectivity in the status

of the species, FWS000015, the environmental baseline, FWS000029-30, and the

effects of the action, FWS000048, sections of the Biological Opinion.  The agency

noted that connectivity is important because the Cabinet-Yaak Ecosystem "may

only support relatively small grizzly bear populations," and movement and

reproduction provide rescue to small populations.  FWS000015.  Yet the Yaak

portion of the ecosystem is bordered by British Columbia and experiences gene

flow from the Canadian grizzly bear population.  *Id*.  Recent telemetry and gene

flow data also confirm increasing connectivity both "between the Cabinet

Mountains and Yaak River portion of the [Cabinet Yaak Ecosystem], and between

the [Cabinet Yaak Ecosystem] and other grizzly bear ecosystems."  FWS000015

(citing FWS001478, a map demonstrating that Bear Management Units 14 and 15

lie at the intersection of many documented immigration/emigration and gene flow

events, and FWS001518-19, a list of documented movement and gene flow to or

from the Cabinet-Yaak recovery area).  The Fish and Wildlife Service noted that

"recent data indicate increasing movements by males and females and subsequent

reproduction, resulting in limited, but increasing population connectivity,

particularly in the Yaak portion of the [Cabinet-Yaak Ecosystem]."  FWS000015

(citing FWS001244).

　　　Contrary to Plaintiffs' assertion that the Fish and Wildlife Service did not

consider impacts to the local bear population, Pls.' Br. 17-18, in the environmental

baseline and effects of the action sections, the agency determined that there were
no specific connectivity concerns in the action area associated with the Project.
The agency noted that the action area "contains core areas and linkage areas" and
"does not contain major highways or interstates that present barriers to movement
or connectivity." FWS000030. The Project "will not result in any permanent
barriers to connectivity within or between [bear management units] in the action
area," nor "will there be any barriers to connectivity between the action area and
the rest of the [Cabinet-Yaak Ecosystem] or other Recovery Zones." FWS000048.

Plaintiffs cite *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 526-527 (9th
Cir. 2010), but this case is not applicable because the Fish and Wildlife Service
evaluated population connectivity concerns in both the action area and the Cabinet-
Yaak Ecosystem. FWS000015, FWS000030, FWS000048. Moreover, in that
case, the species (bull trout) had experienced negative population trends for
"nearly 70 years" and the Court also determined that the Fish and Wildlife
Service's analysis had insufficiently considered long-term impacts to the species.
*Wild Fish Conservancy*, 628 F.3d at 526-27. Here, grizzly bear populations are
increasing both across their range and within the Cabinet-Yaak Ecosystem, and the
Fish and Wildlife Service determined that the Project activities were consistent
with continued population growth over the next 30 to 45 years. FWS000056;
FWS000049; FWS000013. Finally, unlike *Wild Fish Conservancy*, the record here

demonstrates that the agency considered this issue at multiple levels and accurately evaluated the ecosystem's population dynamics. *Id*; FWS000010-15.

In sum, the Fish and Wildlife Service explicitly considered the issue of connectivity in the action area, the Yaak-subpopulation, and the Cabinet-Yaak Ecosystem, as well as those areas' connectivity with populations in other ecosystems and Canada. The agency also "articulate[d] a satisfactory explanation" for why isolation is not as much of a concern in the Cabinet-Yaak Ecosystem as it once was and how the Yaak portion is more genetically diverse thanks to it being well connected to Canadian populations, other bear management units, and increasingly other ecosystems. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins*., 463 U.S. 29, 30 (1983) (citations omitted).

### 4.   The Fish and Wildlife Service properly determined that the Project would not jeopardize the grizzly bear (Claim 6).

The Fish and Wildlife Service properly supported its determination that the Project would not jeopardize the grizzly bear and considered the condition in the Cabinet-Yaak Ecosystem. FWS000052-57 (summarizing the jeopardy analysis).

Plaintiffs incorrectly suggest that the jeopardy analysis must be performed at the level of the Cabinet-Yaak Recovery Area. Pls.' Br. 20. The statute and the regulations simply require an analysis of whether the Project is likely to jeopardize any listed "species". 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02. Neither the ESA nor its regulations mention recovery units or recovery areas. *See id*. It would be

*Fed. Defs.' Opening Brief*                                                          16

improper to "impose 'procedural requirements [not] explicitly enumerated in the pertinent statutes,'" such as a requirement for the agency to make a jeopardy determination at the ecosystem level. *The Lands Council v. McNair,* 537 F.3d at 993. Although the Consultation Handbook mentions that the jeopardy analysis may be based on an assessment of impacts to recovery units "when those units are documented as necessary to both the survival and recovery of the species" in either a final recovery plan or a recovery plan amendment, the Grizzly Bear Recovery Plan does not include such documentation. Consultation Handbook at 4-38; s*ee* FWS005285-479. More recently, in 2006, the Fish and Wildlife Service published a memorandum in which it emphasized that "establishment of 'recovery units' does not create a new listed entity" and clarified that "[w]hile a proposed Federal action may have significant adverse consequences to one or more 'recovery units,' this would only result in a jeopardy determination if these adverse consequences reduce appreciably the likelihood of both the survival and recovery of the listed entity." FWS004970. In other words, the proper level for evaluating whether a project may jeopardize the grizzly bear is at the species level, not a particular ecosystem or recovery unit.

Even so, the Fish and Wildlife Service analyzed the Project's impact to the action area, the Cabinet-Yaak Ecosystem, and grizzly bears in the lower-48 states before arriving at its jeopardy determination. FWS000053-57. In reaching the no

jeopardy determination, the Fish and Wildlife Service catalogued the Project's

impacts and determined that the magnitude of the Project's adverse effects were

low—limited to non-lethal take in the form of *potential* temporary displacement of

a few adult female grizzly bears from suitable habitat in a manner that could impair

breeding for 1-2 reproductive cycles.  FWS000054-55.  The Fish Wildlife Service

also observed that in the long-term harvest treatments and prescribed burns would

improve forage habitat.  FWS000054.  The Fish and Wildlife Service considered

the "location and scale of the project" as well as other ongoing activities in the

Cabinet-Yaak Ecosystem.  FWS000016-17; FWS000057.  The agency determined

that the Project's activities fall within the Species Status Assessments' continued

conservation scenario that "is predicted to increase grizzly bears in the [Cabinet-

Yaak Ecosystem] population in coming years."  FWS000049; FWS000055.  The

Fish and Wildlife Service also found that the Project "will not reduce reproduction,

numbers, or distribution of grizzly bears throughout the [Cabinet-Yaak

Ecosystem]."  FWS000055.  The agency observed that the Grizzly Bear Recovery

Plan has been "successful."  FWS000056.  The species' population and range in

the lower-48 states has increased and is expected to continue to increase in the

coming decades, and nearby ecosystems have "robust" populations and high

resiliency to stressors.  *Id.*

Although there is a line of cases in this district that analyzes jeopardy

determinations for bull trout, those cases are distinguishable because the bull trout's populations are declining.  *See e.g.*, *Save Our Cabinets*, 255 F. Supp. 3d at 1048-1049.  The grizzly bear's population is increasing both across its range and in the Cabinet-Yaak Ecosystem and, thus, the species condition is not degraded. FWS000010-11; FWS000056; FWS000976; *c.f.*, *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 933 (9th Cir. 2008).  Although the Cabinet-Yaak Ecosystem is smaller in both land and population size, the Fish and Wildlife Service also has not ascribed it a higher level of importance than other ecosystems or determined that it plays an essential role—and indeed found that there are not concentrated threats across the grizzly bear's ecosystems.  FWS000010; FWS000980; *see Save Our Cabinets*, 255 F. Supp. 3d at 1049-50.  Finally, unlike *Save Our Cabinets*, the magnitude of the Project's impacts will be low and temporary.  *See id*. at 1048-51 (noting the magnitude of the project, the essential role of the area, and the degraded health of the species' population).

Plaintiffs also imply that the jeopardy determination was flawed because the Biological Opinion acknowledged that displacement of female grizzly bears could temporarily reduce reproductive potential.  Pls.' Br. 21-22.  But the Fish and Wildlife Service reasonably found that a low level of temporary and non-lethal reproductive impairment to a few females would not rise to the level of jeopardy. FWS000053-57.  The mere existence of potential harm or harassment (which are

forms of "take") of individuals of a listed species does not necessarily lead to a jeopardy determination because the ESA permits the Fish and Wildlife Service to authorize incidental take of listed species if jeopardy will not occur. 16 U.S.C. §1539(1)(2); 50 C.F.R. 402.14(i). The Fish and Wildlife Service's regulations define "harm" to include "significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. Thus, take in the form of potential reproductive impairment alone does not require a jeopardy determination as Plaintiffs seem to suggest.

In sum, the Project will have temporary, non-lethal, and relatively minor impacts on grizzly bears in the action area, but it will not reduce appreciably the grizzly bear's survival and recovery in the lower-48 states, where its population and range have grown considerably in recent decades and are expected to continue to grow in coming decades. *See Defs. of Wildlife v. U.S. Army Corps of Eng's*, CV-15-14-GF-BMM, 2018 WL 3510534, at *10 (D. Mont. July 20, 2018) (To meet their burden of establishing the Service violated Section 7(a)(2), Plaintiffs must do more than "simply perceive deficiencies in the [Biological Opinion]").

Thus, Plaintiffs fail to meet their burden of demonstrating that the no jeopardy determination was unreasonable, and the Court should grant summary judgment to Federal Defendants on this claim.

**5.     The Forest Service satisfied its substantive duty under Section 7 of the ESA (Claim 7).**

Section 7(a)(2) imposes both procedural and substantive obligations on action agencies. *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990). The procedural obligation requires the action agency (here, the Forest Service) to consult with the expert agency (here, the Fish and Wildlife Service), and the substantive obligation requires the action agency to ensure that its actions will not jeopardize a listed species. *Id*; 16 U.S.C. § 1536(a)(2). The Forest Service's reliance on the Biological Opinion satisfies the substantive duty because the Biological Opinion reasonably determined that the Project will not jeopardize the grizzly bear, as explained above.

Plaintiffs must do more than suggest flaws to invalidate an action agency's reliance on a Biological Opinion. Yet Plaintiffs have not put forth any new information that the agencies did not consider. *See* Pls.' Br. 23-24. "[E]ven when the [Fish and Wildlife Service's] opinion is based on 'admittedly weak' information, another agency's reliance on that opinion will satisfy its obligations under the Act if a challenging party can point to no 'new' information—*i.e.*, information the [Fish and Wildlife Service] did not take into account – which challenges the opinion's conclusions." *Pyramid Lake*, 898 F.2d at 1415 (citation omitted). Although "an action agency may not escape its responsibility under the [ESA] by simply rubber stamping the consulting agency's analysis," the action

agency "need not undertake a separate, independent analysis in the absence of new information not considered by the consulting agency in reaching its 'no jeopardy' conclusion." *Aluminum Co. of America v. Administrator, Bonneville Power Admin.*, 175 F.3d 1156, 1161 (9th Cir. 1999). Plaintiffs identify only the Fish and Wildlife Service's monitoring reports and data concerning the "presence of reproducing female grizzly bears with cubs in the project area," Pls.' Br. 24, both of which the agencies considered during the ESA consultation. *See e.g.*, FWS000017; FWS000059; FWS000010-15; FS002540. Plaintiffs have provided no new information to undercut the Biological Opinion. *C.f., Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1127-28 (9th Cir. 2012); *WildEarth Guardians v. Steele*, 545 F. Supp. 3d 855, 881 (D. Mont. 2021).

Thus, the Forest Service's reliance was proper, and the Court should grant summary judgment to Federal Defendants on this claim.

**B.  The Forest Service properly disclosed baseline conditions under NEPA (Claim 1).**

Plaintiffs allege in their First Claim that the Forest Service violated NEPA by improperly establishing baseline conditions for the grizzly bear. Pls.' Compl. ¶¶ 119-123, 129; Pls.' Br. 25-27. Not so.

Under NEPA, "establishment of a baseline is not an independent legal requirement, but rather, a practical requirement in environmental analysis often

employed to identify the environmental consequences of a proposed agency action." *Or. Nat. Desert Assoc. v. Jewell*, 840 F.3d 562, 568 (9th Cir. 2016).

The EA describes the existing conditions of the Cabinet-Yaak grizzly bear population in detail, explaining not only the population data, but key stressors, attractants, road impacts, core habitat, and other key indicators. FS002541-48. This thorough baseline description finds, citing Kasworm et al. 2018, that "[i]n 2017, the Cabinet-Yaak Ecosystem had an estimated 55-60 individuals with a 73 percent probability that the population was stable or increasing." FS002541. Plaintiffs' claim that the annual minimum counts reveal a decline in the population size fails because, as explained above, minimum counts are influenced by the level of resources available each year and thus are not an appropriate metric to infer changes in population size. Pls.' Br. 26; *see, e.g.* FS005718.

Plaintiffs also claim that recent annual mortality data undermines the Forest Service's baseline, but the mortality data identified does not equate to a negative population trend. *See infra*, Part V.E. In sum, the Forest Service identified the existing condition, allowing it "to identify the environmental consequences of [the] proposed agency action," which is all that NEPA requires. *Or. Natural Desert Assoc.*, 840 F.3d at 568 (citation omitted).

### C.   The Forest Service took a hard look at the Project's climate impacts (Claim 1).

Despite Plaintiffs' demand for detailed quantitative modeling of the climate

impacts, Pls.' Br. 28-34, NEPA only requires the agency to analyze environmental impacts in a manner proportionate to their significance. *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006); *Hapner v. Tidwell*, 621 F.3d 1239, 1245 (9th Cir. 2010) (holding that climate change impacts from a timber project were not significant under NEPA); *Swomley v. Schroyer*, 484 F. Supp. 3d 970, 975-76 (D. Colo. 2020) (holding that the Forest Service's brief discussion of climate impacts was proportionate to their significance), *aff'd*, *Swomley v. Schroyer*, No. 20-1335, 2021 WL 4810161 (10th Cir. Oct. 15, 2021).  Here, the Forest Service took a hard look at the Project's climate impacts and properly determined they were insignificant.

### 1.   The Forest Service sufficiently analyzed climate impacts.

Climate change impacts are not a significant aspect of the Project because "[t]he Black Ram Project would affect only a tiny percentage of the forest carbon stocks of the Kootenai National Forest, and an infinitesimal amount of the total forest carbon stocks of the United States."  FS020743 (the Project Carbon Report). As the Project Carbon Report and EA explain, "[f]orests cycle carbon" and thus "are in a continual flux, both emitting carbon into the atmosphere and removing it (sequestration) through photosynthesis."  FS002364 (EA); FS020739 (Carbon Report).  The Project Carbon Report notes that the Project "may alter the rates and timing of that flux within the individually affected forest stands," but concludes

that "[t]hese changes would be localized and infinitesimal in relation to the role the world's forests play in ameliorating climate change and indistinguishable from the effects of not taking the action." FS020739. That conclusion is reasonable: the Kootenai National Forest *as a whole* stores only approximately 0.0039 percent of the carbon "stored in forests of the coterminous United States." FS020743.

The Project Carbon Report also explains that the Project could benefit the Project area's function as a carbon sink by making the forest healthier and more resilient to disturbances. FS020743; *see* FS002148-49. The Forest Service noted that "[t]o the extent the proposed actions reduce the risk or delay the event of future stand replacing disturbance events, potential emissions from those events would be reduced or forestalled." FS020743. The Project's prescriptions will "maintain[] the vigor and long-term productivity of forests and reduce the likelihood of high severity fires and insect outbreaks," and in turn, "can maintain the capacity of the forest to sequester carbon in the long-term." *Id.*

The Forest Service also analyzed climate impacts in the *Forest Carbon Assessment for the Kootenai National Forest in the Forest Service's Northern Region* ("Forest Carbon Report"). FS020711-38. The Forest Carbon Report used quantitative assessments from two technical reports to assess "the amount of carbon stored on the [Kootenai National Forest] and how disturbances, management, and environmental factors have influenced carbon storage over

time." FS020711; FS020714. The Forest Carbon Report confirms that carbon stocks—trees' stored carbon—in the Kootenai National Forest increased by 24 percent between 1990 and 2013. FS020715. The Forest Carbon Report also puts into perspective the miniscule effect that timber harvest has had on the Forest's carbon storage, projecting that carbon stored in the above-ground portion of trees "would have been approximately 0.9 percent higher in 2011 if harvest had not occurred since 1990." FS020723. In comparison, tree root disease negatively influenced carbon stocks more than all harvest on the Forest during the same period—non-soil carbon stocks would have been "approximately 1.3 percent higher in 2011 if disease had not occurred since 1990." FS020722. The EA explains that by ameliorating root disease the Project will improve carbon storage. *See* FS002243 (a purpose and need of the Project is to "[p]romote" root disease-resistant tree species like "western larch, ponderosa pine, and western white pine"); *see also* FS002348 ("about 88% of the Project area has some level of root disease hazard"); *see also* FS002745, FS002762 ("If a combination of white pine, ponderosa pine, and larch are restored in locations where root disease severity…is high…then significant potential carbon sequestration benefits would result").

Against this data-informed backdrop, the Project's harvest of 3,902 acres that consist of mostly root-diseased trees, FS002154, out of approximately 2,294,847 acres on the Forest, FS020715, supports the Forest Service's finding that

the Project would not significantly impact the Forest's, or Nation's, carbon stocks. FS020743.

The Forest Service's analysis is consistent with the Council on Environmental Quality's 2016 climate change guidance ("Council Guidance"),[4] which recognizes that there are "[s]pecial [c]onsiderations" for "biogenic [greenhouse gas] emissions from land management actions." Council Guidance 25. In urging that the Forest Service must include a Project-level comparison of emissions and carbon stock changes, Pls.' Br. 27-28 (citing Council Guidance 25-26), Plaintiffs omit that the very next paragraph includes more equivocal language: "NEPA reviews *should consider whether to include* a comparison of net [greenhouse gas] emissions and carbon stock changes…to provide information that is useful to the decision maker and the public to distinguish between alternatives." Council Guidance 26 (emphasis added). Because the Project would have no discernible impact, providing such a comparison would not be useful to the public or the agency. FS020739; *see Dept. of Transp. v. Public Citizen*, 541 U.S. 754, 767-69 (2004) (holding that an agency did not have to supplement its NEPA analysis when the new information would not be useful to the decisionmaker or public).

---

[4] The Council Guidance was withdrawn in 2017, but reinstated in February 2021. 86 Fed. Reg. 10,252 (Feb. 19, 2021). The Council Guidance is attached as Exhibit 3.

>    2.    **Plaintiffs' challenge to the Forest Service's climate impacts analysis fails.**

Plaintiffs' First Claim attacks the Forest Service's climate analysis by alleging that a quantitative analysis of climate impacts was required and that the Project Carbon Report is deficient in a handful of other respects.  Pls.' Compl. ¶¶ 119-29; Pls.' Br. 27-34.[5]  This claim fails.

First, Plaintiffs argue—based on various studies—that a quantitative Project-level analysis was required under NEPA.  Pls.' Br. 29-31.  None of the cited studies support that proposition.  Taking them in turn, the Tongass National Forest EIS may have noted that older trees store more carbon, FS038267, but this fact is irrelevant to this Project, where most of the trees proposed for harvest already have a low, if not negative, carbon storage capacity due to root disease.  FS020722, FS002348.  The Dellasalla 2015 paper notes that the Tongass National Forest operates as a carbon sink.  FS038272.  But this finding does not undermine the Forest Service's analysis here, which also recognizes that the Forest operates as a carbon sink.  FS020717.  The Law et al. 2018 paper applies only to coastal,

---

[5] Plaintiffs devote two sentences to arguing that the Project will have direct emissions not addressed in the EA.  Pls.' Br. 28.  However, the Carbon Report discloses that "motorized equipment used during any of the proposed activities will emit greenhouse gases," FS020742, but determines that "[n]either No Action or the Proposed Action would have a discernable impact on atmospheric concentrations of greenhouse gases or global warming," FS020743.

*Fed. Defs.' Opening Brief*                                                    28

temperate forests that have "lower vulnerability to mortality," FS038325, and thus is inapplicable to this Project area, which is not coastal and suffers significantly from root disease and disturbance risk.  FS002348; FS002346-49.

Plaintiffs lastly present the 2019 Buotte et al. paper.  Pls.' Br. 29-30.  This paper once again analyzes forests with "low vulnerability to future drought and fire," FS038331, which does not describe this Project area, FS002346-49. Plaintiffs attempt to divine from an extremely broad-scale map in the paper that the Project area has medium or high carbon priority rank, Pls.' Br. 30, but this conclusion is impossible to make from the map.  FS038334.  Even if it were, neither this paper, nor anything else Plaintiffs cite, override the Forest Service's scientific determinations about the Project's impacts.  *Earth Island Inst. v. Carlton*, 626 F.3d 462, 473 (9th Cir. 2010) (it is not the court's role to referee a "battle of the experts"); *Marsh*, 490 U.S. at 378 (the agency is permitted to rely "on the reasonable opinions of its own qualified experts").

Plaintiffs also overestimate the impact the Project's treatments will have on carbon stores.  *See* Pls.' Br. 30.  Plaintiffs' emphasis on clearcutting with reserves (a type of "regeneration" harvest) ignores the fact that the Project only plans to use this treatment on tree stands with root disease, where it is the only effective solution and where trees are not effectively storing carbon.  FS002370.  Contrary to Plaintiffs' argument, regeneration to more root disease-tolerant tree species will

*increase* carbon storage.  FS000283; *see also* FS002745, FS002762.

Notably, the Forest Service did provide a quantitative analysis in the Forest Carbon Report.  FS020711-38.  The Forest Service also provided a Project-level, qualitative analysis in the Project Carbon Report.  FS020739-48.  The Council Guidance sanctions the Forest Service's approach by recommending that agencies tier their climate change NEPA analyses to increase efficiency.  Council Guidance 27, 31.

Plaintiffs' other attempts to undermine the Project Carbon Report also fail. Plaintiffs first claim the Project Carbon Report was "cut and pasted, with minor alternations, from a 2015 report for an Idaho timber sale."  Pls.' Br. 31.  Not so. The two reports are unique in their description of the "Existing Condition." *Compare* FS020741, *with* FS038346.  But the proposed projects in these reports are on adjacent national forests, with similar geography and concerns, and thus overlap between the reports is not unexpected.  *Id.*  While the *approximate* amounts of carbon storage of the two forests are the same in both reports, this figure was transparently derived from the same academic study.  *Compare* FS020743, *with* FS038348.  Moreover, the Forest Service identified a more specific carbon storage figure for the Forest in the Forest Carbon Report. FS020715.  Plaintiffs also critique the Project Carbon Report for only analyzing the no action and proposed alternatives, but this is consistent with the Council

Guidance.  Council Guidance 26 ("NEPA reviews should consider whether to include a comparison of net [greenhouse gas] emissions and carbon stock changes…, with and without implementation of the proposed vegetation management practice").

Last, Plaintiffs compare the Project Carbon Report's conclusions to the climate analysis the Ninth Circuit held violated NEPA in *350 Montana v. Haaland*, 50 F.4th 1254, 1266, 1269-70 (9th Cir. 2022).  *350 Montana*, however, concerned approval of a coal mine expansion.  *Id.* at 1258.  The Ninth Circuit has recognized that projects that emit carbon dioxide from biomass, like the timber project here, "participate in the carbon cycle differently than other fuels, and biomass fuel stocks replenish more quickly than fossil fuel stocks."  *Helping Hand Tools v. U.S. Envtl. Prot. Agency*, 848 F.3d 1185, 1191 (9th Cir. 2016) (internal citation omitted).  Moreover, in *350 Montana*, "Interior did not cite any scientific evidence supporting the characterization of the project's emissions as 'minor' compared to global emissions."  *350 Mont.*, 50 F.4th at 1266.  Here, the Forest Service supported its conclusions by providing a quantitative and qualitative analysis of how minor the Project's climate impacts are when compared even with other disturbances at the Forest level.  FS020711-38, FS020739-48.  And, unlike the coal mine in *350 Montana*, this Project is likely to improve the Forest's long-term capacity as a carbon sink.  FS002370, FS000283, FS002745, FS002762.

*Fed. Defs.' Opening Brief*                                                      31

The Black Ram Project is more like the projects in *Hapner* and *Swomley*,

where the Court found that the Forest Service had analyzed climate impacts

sufficiently under NEPA.  Both cases involve timber projects rather than fossil fuel

projects.  *Hapner*, 621 F.3d at 1242; *Swomley*, 484 F. Supp. at 972.  Although the

810 harvested acres in *Hapner* are fewer than the Project's 3,902 (FS002154), the

District of Colorado (affirmed by the Tenth Circuit) recently applied the *Hapner*

ruling to a project authorizing harvest on 1,631 acres, *Swomley*, 484 F. Supp. at

973, because "agencies must only consider impacts in proportion to their

significance and may dedicate less resources to studying smaller, less significant

projects."  *Id.* at 977 (citation omitted).  The Forest Service also performed more

climate change analysis here than in *Hapner* or *Swomley*, commensurate with the

Project's larger size.  *Hapner*, 621 F.3d at 1245 (noting the Forest Service

addressed climate change in response to comments); *Swomley*, 484 F. Supp. at 976

(noting that while the agency conceded the project would contribute to greenhouse

gas emissions, it concluded that it would have "little bearing on climate change").

Because the Forest Service analyzed the Project's climate impacts

proportionate to their significance, it has complied with NEPA.

### D.   __The Forest Service reasonably found the Project will not have__
### __significant impacts (Claim 2).__

NEPA requires agencies to prepare an EIS for all "major Federal actions

significantly affecting the quality of the human environment." 42 U.S.C. §

4332(C).  Before preparing an EIS, however, an agency may first prepare an EA.

*Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1238-39 (9th Cir.

2005) (citing 40 C.F.R. §§ 1508.9(a), (b) (2000)).  If, after preparing an EA, the

agency concludes that the proposed action will not have significant environmental

effects, the NEPA process ends with a Finding of No Significant Impact

("Finding").  *Id.*

    That is what the Forest Service did here: prepare a thorough EA and issue a

Finding.  FS002231-828 (EA); FS002146-230 (Finding).  Although Plaintiffs need

only raise a "substantial question" that the Project will cause significant impacts,

*Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864-65 (9th Cir.

2005), the Forest Service's Finding must be upheld so long as it is "fully informed

and well-considered." *Blue Mountains Biodiversity Project v. Blackwood*, 161

F.3d 1208, 1211 (9th Cir. 1998) (internal citation omitted).  In reviewing an

agency's finding that a project has no significant effects, courts employ an

arbitrary and capricious standard to determine whether the agency has taken a

"hard look'" and provided a convincing statement of reasons to explain why a

project's impacts are insignificant. *In Def. of Animals v. U.S. Dep't of Interior*,

751 F.3d 1054, 1068 (9th Cir. 2014)).

    Under NEPA's implementing regulations, whether a proposed action has

significant environmental effects turns on the action's "context and intensity."  40

C.F.R. § 1508.27 (2019).  "Context simply delimits the scope of the agency's

action, including the interests affected."  *In Def. of Animals*, 751 F.3d at 1068.

Intensity refers to the "severity of impact," and the regulations identify ten factors

that agencies should consider in evaluating intensity.  40 C.F.R. § 1508.27(b)(1)-

(10).

Plaintiffs' Second Claim (Pls.' Compl. ¶¶ 130-135) alleges that the Forest

Service erred in declining to prepare an EIS because of the Project's context and

because of two regulatory intensity factors, which concern endangered or

threatened species and unique characteristics.  *See* Pls.' Br. 34-42.  But the record

shows that the Forest Service carefully tailored the Project to ensure there would

be no significant impacts to unique areas or the grizzly bear.  The Forest Service

thus properly concluded that the Project will not have significant effects and did

not need to prepare an EIS.

## 1.     Context

Plaintiffs' context argument rests on a fundamental misunderstanding of the

Project area and Project treatments.  Pls.' Br. 35-36.  Regarding consideration of

context, "in the case of a site-specific action, significance…usually depend[s] upon

the effects in the locale."  *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 869 (9th Cir.

2020), citing 40 C.F.R. § 1508.27(a).  The record reflects that the Forest Service

properly analyzed impacts to the locale and found them insignificant.  FS002253-

54 (table delineating the proposed treatment, and proportion of the larger Project area, for the various management areas within the Project area); FS002248-52 (explaining what each treatment entails); FS002265-675 (analyzing environmental impacts on site-specific resources for all alternatives); FS002172 (Finding).

Plaintiffs inaccurately characterize the entire Project area as a "sensitive area." *See id.* at 35. The sensitive areas that Plaintiffs identify comprise only a small portion of the Project area: the area eligible for Wild and Scenic River System inclusion is 3,538 acres, FS002253, of the 95,412-acre Project area, FS002242; the Pacific Northwest National Scenic Trail ("Pacific Trail") is a linear feature "span[ning] 28.1 miles through the Project [a]rea," FS002470; and the Peter Creek Botanical Area is 320 acres, FS000067. Thus, the areas Plaintiffs identify, together, amount to only a small portion of the Project area. Further, the Project only authorizes treatment on a small portion of these sensitive areas.

It is unclear what Plaintiffs' litany of mischaracterizations of the proposed treatments has to do with the context of the Project. *See* Pls.' Br. 35-36; *In Def. of Animals*, 751 F.3d at 1068 ("Context simply delimits the scope of the agency's action"). In any event, Plaintiffs' descriptions are misleading at best. *See, e.g.*, Pls' Br. 35-36 ("The Project will…authorize[]…90.3 miles of road reconstruction"); FS002155 (stating that the Project authorizes 90.3 miles of "Haul Road Route Reconstruction / *Maintenance*" (emphasis added)).

*Fed. Defs.' Opening Brief*                                                             35

Last, Plaintiffs' reliance on a 2017, pre-scoping "project initiation letter,"

Pls.' Br. 36 (quoting FS045772), is similarly unavailing because the mere fact that

Forest Service personnel "expected" to prepare an EIS for the Project almost five

years before it was finalized, and before scoping had begun, has no bearing on

whether an EIS is required. FS045772 (the letter, dated July 21, 2017); FS002174

(the Finding and Decision Notice, signed on June 21, 2022); FS045773 (stating

that scoping was to begin in July 2018).

### 2.    Intensity: Species

The ninth intensity factor is the *degree* to which an action may adversely

affect an ESA-listed species. 40 C.F.R. § 1508.27(b)(9); *EPIC v. U.S. Forest

Serv.*, 451 F.3d 1005, 1010 (9th Cir. 2006) (the agency considers impacts to the

species as a whole). While adverse effects to a listed species is one factor that may

warrant the preparation of an EIS, it is not dispositive and thus not a "standard" as

Plaintiffs claim, Pls.' Br. 37. *See Greater Yellowstone Coal. v. Flowers*, 359 F.3d

1257, 1276 (10th Cir. 2004) ("[I]ssuance of an incidental take statement

'anticipating' the loss of some members of a threatened species does not

automatically lead to the requirement to prepare a full EIS."); *Fund for Animals,

Inc. v. Rice*, 85 F.3d 535, 546-47 (11th Cir. 1996) (upholding an environmental

assessment and finding of no significant impact with a likely to adversely affect

and incidental take statement for the Florida Panther and the Eastern Indigo

Snake). NEPA's intensity factor "focuses on the *degree* to which an action may adversely affect a threatened or endangered species or critical habitat." *EPIC*, 451 F.3d at 1012 (quotation and citation omitted). For example, a finding of jeopardy could support a finding under factor (b)(9) that an EIS may be required. *Forest Serv. Empls. for Envt'l Ethics v. U.S. Forest Serv.*, 726 F. Supp. 2d 1195, 1218 (D. Mont. 2010).

Here, the Forest Service explained that the Project would not significantly affect any threatened, endangered, or proposed species or critical habitat. FS002170. The Finding explained that the Project's possible "adverse effect" on species under the ESA does not rise to "significance" under NEPA. *Id*. While the Project likely would adversely affect the grizzly bear, the Fish and Wildlife Service ultimately determined that the potential effects would not likely jeopardize the continued existence of the grizzly bear. FS004421. The intensity of the Project would not have significant effects on the grizzly bear within the meaning of NEPA. *Id*.; *see Greater Yellowstone Coal.*, 359 F.3d at 1276.

### 3.    Intensity: Unique Characteristics

The third intensity factor concerns "unique characteristics of the geographic area." 40 C.F.R. §1508.27(b)(3). Plaintiffs claim an EIS is required because of the following features in the Project area: the Pacific Trail, river segments eligible for Wild and Scenic River designation, and the Pete Creek Botanical Area. Pls.' Br.

37-42. However, the simple fact that a proposed treatment may affect one of these features does not alone require that an EIS be prepared. *See Friends of the Wild Swan v. U.S. Forest Serv.*, 875 F. Supp. 2d 1199, 1215-16 (D. Mont. 2012) (determining that a Forest Service project did not require an EIS under this factor even though treatment units included wetlands); *Ctr. for Biological Diversity v. Gould*, 150 F. Supp. 3d 1170, 1184 (E.D. Cal. 2015) ("logging of a roadless area does not automatically require an EIS"). It is the degree of the potential impact to these areas, considering the Forest Service's protective measures, that determines whether an impact is significant. *Cascadia Wildlands v. U.S. Forest Serv.*, 937 F. Supp. 2d 1271, 1281 (D. Or. 2013) (EIS required where logging and road work would leave "visible evidence…evident to the casual observer…for approximately fifty to sixty years" (quotation and citation omitted)).

> i. *Pacific Trail*

The Pacific Trail is a linear feature "span[ning] 28.1 miles through the Project [a]rea." FS002470. The below table summarizes the miles of the Pacific Trail adjacent to Project activity:

| Trail Type | Miles Adjacent to Fuel Units | Miles Adjacent to Harvest Units |
|---|---|---|
| Open Road | 1.7 | 5.9 |
| Trail | 1.0 | 0 |

FS002442. The Forest Service thoroughly analyzed the Project's impacts to the Pacific Trail in the EA and included protective design features. FS002470-78

(scenic resource impacts); FS002440-42 (recreation resource impacts); FS002474-75 (design features). The Forest Service concluded that "no significant adverse effects to the trail are expected." FS002167.

Plaintiffs claim that logging and burning "will occur adjacent to over eight miles of the Trail," Pls.' Br. 38, but omit that 7.6 of those miles are adjacent to existing open roads, where there is less of an expectation of solitude and undisturbed landscapes, FS002442. And although "[p]roposed timber harvest and fuel treatments may affect user access" to the Pacific Trail, Pls.' Br. 38, "[m]ost of the non-harvest fuel unit treatments and some harvest unit treatments would occur before or after the end of June and July when [Pacific Trail] hikers have moved through the Project area," FS002442. Even when Trail segments temporarily close, they will be open every weekend, FS002441, and hikers will be notified of the closure. FS002442.

Last, Plaintiffs inflate the Project's impacts to the Trail's scenic value. *See* Pls.' Br. 38-39. Plaintiffs claim that the Project violates a Forest Plan scenic integrity guideline because, allegedly, portions of the Pacific Trail will not achieve their scenic integrity objective for 15 years post-Project. *Id.* at 38, citing FS002475. But, the quoted page of the EA plainly states that "[t]he design features listed above would be effective in meeting the intent of a High [Scenic Integrity Objective] in the short term (5-15 years)." FS002475. Further, a thorough review

of "[s]everal past harvest units along this [Pacific Trail] road…showed that

vegetation (grass and shrub) regrowth occurs within the first few years." *Id.*

Plaintiffs argue that 15 years (maximum potential visual impact) is necessarily

significant, but a court in this Circuit has affirmed an EA based on the agency's

description of up to 15 years of impacts as "temporary." *Cascade Forest*

*Conservancy v. U.S. Forest Serv.*, 577 F. Supp. 3d 1163, 1184 (W.D. Wash. 2021)

(upholding an EA for construction of an access road along a hiking trail, where the

physical environment was not expected to look like pre-project conditions for 2-15

years post-project).

ii.   <u>*Wild and Scenic River Eligible Segments*</u>

The Project area contains river segments eligible for Wild and Scenic River

Designation: one section categorized as wild, and one as recreational, on the West

Fork Yaak River, and one section categorized as recreational on the Yaak River.

FS002443.

In the two recreational segments of river, the Project authorizes the

following treatments: 274 acres of harvest, 92 acres of non-harvest ecosystem

burning, 177 acres of ladder fuels reduction, and 3 acres of fuel break; in the wild

segment, the Project authorizes 108 acres of non-harvest ecosystem burning, and

potentially some ladder fuels reduction as needed for burning. FS002253,

FS002443, FS002691. The Forest Service thoroughly analyzed the impacts of

*Fed. Defs.' Opening Brief*          40

these treatments in the EA.  FS002253, FS002336-41, FS002443-48, FS002461-70, FS002477, FS002783.  Based on this analysis, the Forest Service determined that impacts to the Wild and Scenic Rivers eligible segments would be insignificant.  FS002167-68.

Once again, Plaintiffs exaggerate the Project's impacts.  Plaintiffs categorize the 177 acres of ladder fuels reduction on the river segments as "logging" of "trees up to 22 inches in *circumference*."  Pls.' Br. 40 (emphasis added).  But this treatment involves no harvest, but rather "cutting trees less than 7 inches [*diameter at breast height*], piling by hand or excavator, and then burning the piles." FS002335.  Further, the three acres of fuel breaks on a recreational segment of the river will not "caus[e] the complete elimination of trees."  Pls.' Br. 40.  Instead, fire-adapted trees like ponderosa pine, western larch, and Douglas-fir would be retained in the fuel breaks.  FS002620.

Finally, Plaintiffs argue—based on a few cherry-picked statements from the EA—that the Forest Service did not adequately disclose impacts to the river segments' values and did not "explain how the Project will maintain '*natural ecological processes*'" consistent with a forest plan guideline.  Pls.' Br. 40-41.  The EA, however, includes a robust analysis of the Project's impacts on the river segments.  FS002253, FS002336-41, FS002443-48, FS002461-70, FS002477, FS002783.  The Forest Service explains, for example, that "proposed treatments

[on the river segments] are designed to mimic ecological processes." FS002443.

"[F]ires were the primary agent in making [vegetation] changes" in the Project

area. FS002378. "Changes to vegetation from wildfire have been limited since the

advent of fire suppression," *id.*, so the Project "treat[s] fuels within the [Wildland

Urban Interface]" to mimic these natural ecological processes that have diminished

due to suppression. FS002336.

In sum, the Forest Service has provided a convincing statement of reasons

why impacts to the river segments are insignificant, and Plaintiffs have identified

nothing the agency missed.

### iii.   *Pete Creek Botanical Area*

The Pete Creek Special Area ("Pete Creek") is a 320-acre area of botanical

importance so identified because it contains a population of a rare plant species,

the Northern beechfern. FS000065-66; FS002422. The Project authorizes creation

of a 7-acre fuel break in Pete Creek that will "reduce fuels and decrease the

potential fire severity; thus helping to maintain the values of this special area."

FS002336. "The [beechfern] population…would not be impacted [by the Project]

because there would be no activity in the riparian area." FS002422. The Project

includes a design feature to further protect the beechfern. FS002262 ("equipment

must stay on existing road surface"). Impacts to Pete Creek are fully analyzed in

the EA. FS002336-41, FS002422-29, FS002461. Based on this analysis, the

Forest Service determined that impacts to this special area would be insignificant. FS002167-68.

Plaintiffs inflate impacts to Pete Creek by misunderstanding the fuel break treatment, which will retain large fire-tolerant trees as explained above.  Pls.' Br. 41; FS002620.  Plaintiffs also claim that the EA does not disclose the existing values of Pete Creek, Pls.' Br. 42, but the EA acknowledges the existence of the rare Northern beechfern—and explains that the Project will not impact it. FS002422, FS002262.

Plaintiffs' attempt to undercut the fire risk reduction benefits of the fuel break, Pls.' Br. 42, fares no better than their other arguments.  The EA excerpt that Plaintiffs quote is from the old growth section, *id.*, citing FS002369, which is inapplicable to treatments in Pete Creek, which do not occur in old growth.  The EA explains that the Project's fuel breaks "would provide fire managers more options and opportunities to safely suppress an approaching wildfire near the town of Yaak and nearby residences."  FS002335.  Plaintiffs have not and cannot challenge this technical conclusion.  *See Marsh*, 490 U.S. at 377 ("Because analysis of the relevant documents requires a high level of technical expertise, we must defer to the informed discretion of the responsible federal agencies." (internal citation and quotation omitted)).

In sum, because the context and intensity of the Project's impacts

demonstrate that they are insignificant, and Plaintiffs have identified no clear error of judgment, the Forest Service appropriately determined an EIS was not necessary.  *See* FS002166-70.[6]

**E.     No supplemental NEPA analysis is required (Consolidated Claim 5).**

Federal agencies must prepare a supplemental NEPA document when there "are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" or when the "agency makes substantial changes in the proposed action that are relevant to environmental concerns."  *Marsh*, 490 U.S. at 372 n. 16 (quoting and citing 40 C.F.R. §§ 1502.9(c)(1)(i-ii) (1987)).  Consolidated Plaintiffs contend that the EA should be supplemented under the first factor above based on Cabinet-Yaak female grizzly mortality data from 2022.  Con. Br. in Supp. of Mot. for Summ. J. ("Con. Br.") 35-39, ECF No. 53.  This contention lacks merit.

While Consolidated Plaintiffs are correct that the EA concludes the Cabinet-Yaak grizzly bear population is likely "stable or increasing," FS002541, the 2022 grizzly bear deaths they emphasize do not undermine that conclusion.  *See* Con.

---

[6] Plaintiffs have waived Claim Three and the cumulative impacts portion of Claim One by declining to argue them in their Summary Judgment Brief.  The Court should either grant judgment to Federal Defendants on these claims or dismiss them with prejudice.  *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1033 (9th Cir. 2008) ("Arguments not raised by a party in its opening brief are deemed waived.").

Br. 37-39.  A Wildlife Biologist for the Fish and Wildlife Service, Wayne Kasworm, gave a presentation in October 2022, disclosing that one adult male, two adult females, and one sub-adult female, grizzly bears had died in 2022 in the Cabinet-Yaak Ecosystem.  *Id.* at 37-38; *see* Kasworm Decl. ¶ 3.[7]  Consolidated Plaintiffs focus their argument on the female grizzly bear mortalities.  Con. Br. 38.  But, one of the two adult females was "older" and likely died from "natural causes."  Kasworm Decl. ¶ 9(a).  The sub-adult female mortality was a bear not native to the Cabinet-Yaak ecosystem, but that had "somehow made it on her own all the way to the Cabinet Mountains."  Kasworm Decl. ¶ 9(c).

In any event, the "[t]hree female mortalities in 2022 do[] not equate to a declining grizzly bear population in the Cabinet-Yaak Ecosystem."  *Id.* at ¶ 10.  Consolidated Plaintiffs quote the Kendall et al. 2016 article, which states that "the difference between growth and decline [in the Cabinet-Yaak population] is 1 or 2 adult females being killed annually or not."  Con. Br. 38, citing FS036961-78.  However, "this should not be interpreted to mean that the population is declining if there are more than 1-2 adult females killed in one year."  Kasworm Decl. ¶ 10.

---

[7] In NEPA supplementation claims, "review is not limited to the record as it existed at any single point in time, because there is no final agency action to demarcate the limits of the record."  *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000) (citation omitted).  Thus, both Kasworm's presentation, Con. Br. 38, and Kasworm's Declaration can be considered by the Court.

*Fed. Defs.' Opening Brief*                                          45

"Given the small sample sizes available in this small population, it is not always possible to determine population growth or decline based on just one or two timesteps (years). Biologists look at data over several timesteps (years)." *Id.* at ¶ 12. Kasworm's explanation for why Kendall et al. 2016's conclusion does not apply to the 2022 grizzly mortalities is further supported by the fact that he co-authored Kendall et al. 2016. FS036961.

In sum, the 2022 female grizzly mortality data does not present "significant new circumstances or information" requiring supplemental NEPA analysis. 40 C.F.R. §§ 1502.9(c)(1)(ii). Consolidated Plaintiffs' attempted analogy to *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 937 (9th Cir. 2010), is distinguishable because, there, the new information amounted to the existence of 1,900 acres of nesting habitat in the project area when the EA assumed there were none. Con. Br. 35-36, citing *id.* Comparatively, the new information here is insignificant because it does not equate to population decline according to the best available science. Kasworm Decl. ¶¶ 10, 12.

## F.   The Project satisfies Forest Plan requirements for Bear Management Units (Consolidated Claim 1).

Consolidated Plaintiffs allege the Forest Service has not demonstrated compliance with Forest Plan standards for grizzly bear. Consolidated Compl. ¶¶ 154-165; Con. Br. 1-17. They misinterpret Forest Plan requirements and case law and fail to meet their burden to show a violation of NEPA, NFMA, or the

*Fed. Defs.' Opening Brief*                                                      46

APA.

## 1.      The Project complies with FW-STD-WL-02.

Standard FW-STD-WL-02 in the 2015 Forest Plan incorporates the 2011

Access Amendments for motorized access in grizzly bear recovery zones.

FS000015; FS000143; FS000156-62 (Access Amendment).  The standard

establishes motorized access requirements in bear management units through three

metrics: open motorized road density, total motorized road density, and core area.[8]

FS000156-57.  The standard prohibits activities that permanently exceed any

metric.  FS000158.  Temporary exceedances are allowed for open motorized road

density and total motorized road density, so long as the baseline is restored post-

project.  *See* FS000158, FS000965.  The standard also allows for in-kind

replacement of core habitat concurrently or prior to the loss.  FS000158.  The

Forest Plan requires at least 30 percent of closure devices to be monitored annually

within the bear management units.  FS000160.

In 2020, the Forest Service and the Fish and Wildlife Service completed

reinitiated ESA consultation on the Forest Plan.  FWS001912-2060.  Unauthorized

---

[8] The Forest Plan specifies how to calculate each metric.  FS000953-57;
FS001234; FS004661; FS004667; FS004670; FS041998; FS042003; FS042021;
FS007884.  The metrics are based on the Wakkinen and Kasworm (1997) study,
which remains the best available science.  FS045865; *All. for the Wild Rockies v.
Savage*, 354 F. Supp. 3d 1185, 1191 (D. Mont. 2018).

*Fed. Defs.' Opening Brief*                                                    47

motorized use was a key concern, FWS001953-55, which the agencies included

based on *Alliance for the Wild Rockies v. Probert*, 412 F. Supp. 3d 1188 (D. Mont.

2019).  FS000939.  The 2020 Biological Opinion explained that "[a] private

entity's non-compliance with access management is an illegal activity."

FWS001953.  The environmental baseline considers illegal use, but illegal use

generally does not change baseline access metrics because it is not authorized by

the Forest.  FWS001953.  Furthermore, illegal use most likely results in only

temporary, minimal effects to grizzly bears because the Forest corrects the

situation and illegal use is "spatially disparate."  FS001245; FWS001954.  When

illegal use is reported by Forest Service employees or the public, closure devices

are repaired as soon as possible and generally within the same bear-year.

FS000954.

     The EA thoroughly examines the Project's effects on grizzly bear by

measuring changes to security habitat and road densities in each bear management

unit.  FS002539-64.  The EA identifies its methodology and data sources,

FS002540, describes the existing conditions, FS002540-48, and examines the

effects on grizzly bears for each alternative, FS002548-58.  The Biological

Assessment offers extensive quantitative and qualitative analyses regarding Forest

Plan requirements, FS004216-43, and the Project Biological Opinion contains

additional information on baseline conditions and effects.  FS004463-06,

FS004373-25.

The EA found that the selected alternative meets FW-STD-WL-02 because the motorized access metrics at Project completion remain unchanged from or improve the existing condition.  FS002251-53, 002560-61.  The Project includes in-kind replacement of core habitat to replace minimal habitat loss from Project activity.  FS002553-54.  Consistent with FW-STD-WL-02, the Forest identified routes being stored and will replace core prior to or concurrently with a reduction of core.  FS002553; *see id.* (Table 89, identifying routes and in-kind replacement acres), FS002190 (Table 18, identifying road mileage stored for in-kind replacement).

Consolidated Plaintiffs raise three arguments about the Forest's compliance with FW-STD-WL-02.  Con. Br. 3-12.  They first argue that "any road with motorized use must be included in road density calculations and excluded from core blocks," Con. Br. 7, but this statement is not supported by the Forest Plan Biological Opinion, which explains why illegal motorized access is excluded from the motorized access metrics.  FWS001953-54.  Use of these routes is not chronic, and the Forest Service generally addresses it within the bear year.  FS004530.  The explanation for the exclusion complies with FW-STD-WL-02 and is rational, supported by the record, and entitled to substantial deference.  *Forest Guardians*, 329 F.3d at 1097.

Consolidated Plaintiffs next misapply two Ninth Circuit cases about Bears

Outside Recovery Zones areas to advance their interpretation about illegal access

within and outside recovery zones. *Alliance for the Wild Rockies v. Bradford* did

not hold that "any road with an ineffective road closure must be counted in total

road calculations." Con. Br. 8 (quoting 856 F.3d 1238, 1243 (9th Cir. 2017).

*Bradford* concerned authorized temporary increases in linear miles of total roads,

not illegal use. *Bradford* supports the Forest Service's position here because it

rejected plaintiff's different reading of the Forest Plan standard and held that the

Forest Service's interpretation was reasonable and entitled to deference. 856 F.3d

at 1243. *Alliance for the Wild Rockies v. Savage* found the Forest Service did not

comply with Forest Plan standards because it was unknown whether undetermined

roads were included in the baseline calculation. 897 F.3d 1025, 1036 (9th Cir.

2018). "Undetermined roads" are not the same thing as illegal motorized access;

the term includes roads from past management activities that were unaccounted for

in the Forest Service's database. FS002496. There is no uncertainty with the

baseline calculation here because illegal motorized access is not included, except

for BR8. FS004558-77. *Savage* also supports the Forest Service's calculation of

the baseline.

Consolidated Plaintiffs' second argument alleges the Forest Service failed to

disclose the methodology for calculating compliance with FW-STD-WL-02. Con.

*Fed. Defs.' Opening Brief*                                              50

Br. 9-10.  NEPA regulations say agencies "shall identify any methodologies used" and allows incorporation by reference or reference in a footnote or appendix.  40 C.F.R. §§ 1502.21, 1502.24 (2018).  Here, the EA identifies FW-STD-WL-02 as the source of the resource measures and elements (FS002540, Table 83) and explains that it applies direction for motorized route densities from FW-STD-WL-02.  FS002542.  The EA also explains that habitat parameters were calculated with GIS applications that include road information.  FS002540.  The sources of the underlying data for road density calculations were reasonably available and satisfy NEPA's disclosure requirement.  40 C.F.R. § 1502.24.  For example, the Forest Service prepared a document in the record specifically addressing its process for assessing bear management unit metrics, including FW-STD-WL-02.  FS004529-33.  The Forest Plan's biological assessment also contains a road density methodology section.  FS000953-57.  Furthermore, the EA did not inhibit public participation or informed decisionmaking on this issue because Consolidated Plaintiffs' comments complained that the EA's methodology excluded illegal motorized access.  FS034691; *see Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1487 (9th Cir. 1992) ("The APA requires that we take 'due account' of the harmless error rule.") (citing 5 U.S.C. § 706).

Consolidated Plaintiffs' third argument mischaracterizes the role of closure devices in creating in-kind replacement of core habitat.  Con. Br. 11-12.  There is

no undisclosed presumption that all closure devices will be 100% effective. To the contrary, FW-STD-WL-02 requires the Forest Service to monitor at least 30% of closure devices in the respective ecosystem, and the Forest Service routinely monitors more than 30% Forest-wide. FS000160; FS000972-73. When the Forest identifies ineffective closure devices, either through monitoring or public reports, they are generally repaired within the same bear-year and thus have no permanent impact on core. FS000954, FS002544; *see e.g.*, FS004606-08 (Project monitoring report), FS004914 (annual summary for recovery zones).[9] Furthermore, the measure of effectiveness is not whether "a motorcycle can drive over or around a berm" (Con. Br. 12); it is whether a closure device restricts the road from being "reasonably and prudently driveable [sic] with a conventional passenger car or pickup." FWS005022. Additionally, some passageway around closure devices may be available for bicyclists, hikers, and equestrians. FS000124-25 (Maintenance Level 1 roads "are closed to vehicular traffic, but may be open and suitable for non-motorized uses"); FS005140. Consolidated Plaintiffs' general complaints about the long-term effectiveness of closure devices rest on speculation and mischaracterization. *See Friends of the Clearwater v. Petrick*, 588 F. Supp. 3d 1071, 1099 (D. Idaho 2022). Their specific complaints about road closure devices

---

[9] Consolidated Plaintiffs say the Forest Service "found that 72 monitored barriers or gates had been breached," Con. Br. 5, 11, but neglect to mention that this number is for the *entire* Forest and not just within the Project area. FWS006182.

fail both procedurally and substantively, as discussed *infra* in Part V.G.

### 2.     The Project complies with FW-GDL-WL-15, the Forest Plan guideline applying Interagency Grizzly Bear Guidelines.

Consolidated Plaintiffs allege the Forest did not demonstrate compliance with Interagency Grizzly Bear Guidelines.  Con. Br. 13-17.  Not so.

Guideline FW-GDL-WL-15 in the 2015 Forest Plan applies elements of the Interagency Grizzly Bear Guidelines to forest management activities.  FS000042. Under FW-GDL-WL-15, activities in Management Situation 1 lands give grizzly habitat maintenance and improvement the highest priority.[10]  FS005037.  Where other land values compete, management decisions favor the grizzly bear. FS005037.

The Forest uses established criteria to determine compliance with FS-GDL-WL-15, FS005040-56, FS004615-19, and the Forest demonstrated compliance by preparing a document that identifies each guideline element and associated guidance for Management Situation 1 lands.  FS004615-19.  The Forest explained that the relevant consideration is whether the Project, in consultation with the Fish and Wildlife Service, is compatible with grizzly bear recovery goals and

---

[10] Management Situation 1 lands contain grizzly population centers and habitat components necessary for the survival and recovery of the species or a segment of its population.  FS005037.  Bear Management Units are generally Management Situation 1 lands.  FS005037.

*Fed. Defs.' Opening Brief*                                                                53

objectives. FS004615. If it is, or can be made compatible, the project does not "compete" under FW-GDL-WL-15. FS004615. The Forest then articulated how the Project complies with each of the guidelines for Management Situation 1 lands. FS004615-19.

Consolidated Plaintiffs claim the above document fails to show Forest Plan compliance and cite *Swan View Coalition v. Barbouletos*, 307 F. App'x 49, 51 (9th Cir. 2009). They ignore the case's subsequent history, wherein this Court upheld the Forest Service's revised analysis and explanation that the challenged project complied with Interagency Grizzly Bear Guidelines for Management Situation 1 lands. *Swan View Coal. v. U.S. Forest Serv.*, 782 F. Supp. 2d 1132, 1140 (D. Mont. 2011) ("The document's clear purpose is to explain how the project complies with Forest Plan."). Consolidated Plaintiffs also ignore how a different court in this district rejected a similar challenge to the Forest Service's interpretation of the "compete" clause for Management Situation 1 lands. *Friends of the Wild Swan v. Weber*, CV-12-29-M-DLC, 2013 WL 1234481, at *15-18 (D. Mont. June 3, 2013), *adopted by* 2015 WL 13715966 (D. Mont. Feb. 23, 2015).

The guideline consistency document for FW-GDL-WL-15 follows the same process for evaluating when land uses "compete" with grizzly bears' needs as was developed in *Swan View Coalition* on remand and *Friends of the Wild Swan*. Further, the Forest Service relied on consultations with, and findings of, the Fish

and Wildlife Service.  FS004615.  Consolidated Plaintiffs complain about items that they believe do not "favor" the grizzly bear, Con. Br. 14-16, but the Forest addressed each of these specific activities.  FS004616-18.[11]

Consolidated Plaintiffs say the Forest cannot rely on the guideline consistency document because it was unavailable on the website during the comment and objection period.  But the same information was reproduced in the Biological Assessment, which was publicly available and referenced in the EA. FS0044339-42.  Consolidated Plaintiffs also acknowledge the Project EA identifies the guideline consistency document.  Con. Br. 17 (citing FS002557).  And a document incorporated by reference need only be "reasonably available for inspection."  40 C.F.R. § 1502.21 (2018); *see WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 925 (9th Cir. 2015).

The Forest Service explained how the Project complies with FW-GDL-WL-15.  Consolidated Plaintiffs have not met their burden to show how the Project is inconsistent with the Management Situation 1 standard from the Interagency Grizzly Bear Guidelines.  *Friends of the Wild Swan*, 2013 WL 12344841, at *18.

---

[11] Consolidated Plaintiffs cite to a post-decisional extra record declaration to support some of their assertions.  Con. Br. 15 (citing Garrity Decl. ¶¶ 5, 15). Federal Defendants are moving to strike this declaration or, in the alternative, provide proper context to Mr. Garrity's assertions.

*Fed. Defs.' Opening Brief*                                                        55

G.     **The Project's analysis of the effectiveness of road closure devices satisfies NEPA (Consolidated Claim 3).**

Consolidated Plaintiffs' third claim for relief alleges the Forest Service did not take a hard look at the effectiveness of road closure devices, violating NEPA and the APA.  Con. Pls.' Compl. ¶¶ 169-172; Con. Br. 17-34.  Consolidated Plaintiffs' speculative complaints about specific closure devices are forfeited and fail on the merits.

1.     **Consolidated Plaintiffs forfeited complaints about alleged breaches on specific roads.**

Consolidated Plaintiffs' argument rests on photographs Yaak Valley Forest Council ("Yaak Valley"), a plaintiff in the lead case, says document ineffective closure devices. Con. Br. 17-29.  But Yaak Valley did not plead this claim or argue it in its brief.  Consolidated Plaintiffs never raised concerns about specific alleged breaches in the administrative process and cannot raise them now or on behalf of another entity.

Forest Service appeal regulations require issues raised in objections to be based on "previously submitted specific written comments regarding the project or activity and attributed to the objector, unless the issue is based on new information that arose after the opportunities for comment."  36 C.F.R. §218.8(c).  For an EA, the public comment period includes during scoping or any other instance where the responsible official seeks written comments.  *Id*. §218.5(a).  In an objection, a

*Fed. Defs.' Opening Brief*                                                56

party can state specifically how it believes the environmental analysis violates a law, regulation, or policy. *Id*. § 218.8(d)(5). The burden is on the objector to demonstrate how its prior specific written comments connect to the objection. *Id*. §§ 218.8(c), (d)(6). "A party forfeits arguments that are not raised during the administrative process." *Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010).[12]

The scoping notice and Project EA include maps of the Project area and identify roads to be used for Project operations. FS033959-90 (scoping notice), 033993 (scoping map), 002806 (map of selected alternative in EA). Though Consolidated Plaintiffs had the opportunity to investigate and report on closure devices, they did not submit any specific comments to the Forest Service about this issue. FS033924-41 (scoping comments), 034673-828 (EA comments). Their voluminous comments about other issues fail to satisfy the requirement that objections be based on specific written comments attributed to the objector. 36 C.F.R. §218.8(c).

Consolidated Plaintiffs cannot evade eligibility requirements by signing onto Yaak Valley's comments and objections. Forest Service regulations expressly require that previously submitted comments be "attributed to the objector." 36

---

[12] Although this "principle has sometimes been phrased in terms of standing or exhaustion…it is best characterized as waiver" or forfeiture. *Portland General Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1023 (9th Cir. 2007).

C.F.R. § 218.8(c).  In adopting this regulation, the Department of Agriculture

rejected the sort of piggybacking that Consolidated Plaintiffs attempt here: "To

allow individuals who have not established their eligibility by submitting specific

written comments during an opportunity for comment to then sign-on to another's

objection circumvents the very purpose of the eligibility requirements."  Project-

Level Predecisional Administrative Review Process, 78 Fed Reg 18,481-02,

18,486 (Mar. 27, 2013).

Where, as here, an agency provides notice of a project and an opportunity

for comment, it is incumbent on challengers to "structure their participation so that

it alerts the agency to the parties' position and contentions."  *U.S. Dep't of Transp.

v. Public Citizen*, 541 U.S. 752, 764 (2004) (cleaned up).  Because Consolidated

Plaintiffs "did not raise these particular objections" about specific, alleged

breaches in its comments, they are forfeited.  *Id.*  Consolidated Plaintiffs submitted

no such evidence, and the Court should not consider it.  *All. for the Wild Rockies v.

Kruger*, 950 F. Supp. 2d 1172, 1190 (D. Mont. 2013).

### 2.      Yaak Valley's allegations do not show the closure devices are ineffective.

Even if the Court were to excuse these procedural deficiencies, Yaak

Valley's comments fail to show that the Project violates FW-STD-WL-02.  FW-

STD-WL-02 expressly allows many of the features Yaak Valley complains about.

The standard permits "roads that are impassable due to re-growth of vegetation,

*Fed. Defs.' Opening Brief*                                                        58

effective barriers other than gates, or placement of logging or forest debris so as to
no longer function as a motorized route," and Yaak Valley's photographs show
such barriers.  FS000158.  Also, the Standard excludes the first 500 meters of a
stored or decommissioned road behind a barrier or berm from core habitat.  *See*
FWS001942.

Second, the Forest investigated all Yaak Valley's specific allegations in July
and August 2021.  FS004558-605.  The Forest's detailed response matches each of
Yaak Valley's undated photographs with dated Forest Service photographs from
2020-2021.  FS004558-78.  Some of Yaak Valley's photographs are misleading
because they were taken from angles that omit closure devices or obstructive
features such as boulders.  Others do not show roads at all (BR6, BR9, BR10).
FS004567, 004593.  The table below displays some of the more misleading photos:

| Site | Yaak Valley's photo | Forest Service's photo |
|------|---------------------|------------------------|
| BR-3 |  |  |



FS004560, 004563, 004572, 004574.  On other roads, Yaak Valley identified only the first of multiple barriers.  FS004571 (BR-14).  The Forest Service found that the large majority of the closure devices identified were functional.  FS004558-77. Nevertheless, the Forest Service added additional barriers in an abundance of caution at two locations and notified law enforcement about illegal cross-country use at another two locations.  FS004569 (BR-12); FS004559 (BR-2); FS044730 (law enforcement notified about BR9 and BR10).

Yaak Valley claims it documented 15 berms with trails allowing motorized access.  Con. Br. 26-29 (citing FS0044262-66, 44664-88).  The Forest Service examined each photo and provided a corresponding photo, FS0044664-88, concluding that "[i]t appears that all of Mr. Holloways [sic] photographs were taken from the vantage point of the adjacent open road.  In some instances, this provides a sufficient view of the restriction device.  However, in the [Forest] photographs, the restrictions are absolutely evident."  FS044664.

The Forest's road density and habitat core calculations are premised on the overall effectiveness of closure devices and are entitled to deference, especially, as here, where they are specifically supported by the record.  *Robertson*, 490 U.S. at 334.  Yaak Valley's comments fail to document the frequency at which illegal use occurs or that illegal use is chronic or persistent enough to result in adverse effects to grizzly bear.

3.     **Speculative allegations about illegal use fail to show the closure devices are ineffective.**

Because Consolidated Plaintiffs forfeited claims about specific breaches that are also meritless, they are left with speculative assertions about the efficacy of closure devices.  Their speculation fails to establish a NEPA violation.

The only case cited in detail is *Alliance for the Wild Rockies v. Probert*, which does not apply here for three reasons.  Con. Br. 30-32 (citing 421 F. Supp. 3d at 1207-08).  First, *Probert* was based on *eight years of data* showing that ineffective road closures undermined the reasonableness of the Forest Service's assumptions.  412 F. Supp. 3d at 1195.  Plaintiffs fail to identify any similar evidence here.  At best, they rely on two bear years' worth of documentation from another group, to which the Forest Service responded.  *See* Part V.G.2, *supra*.

Second, in response to *Probert*, the Fish and Wildlife Service completed a Biological Opinion acknowledging illegal motorized use on the Forest and concluded that the Forest Plan—even with the illegal use—is not likely to jeopardize the continued existence of the grizzly bear.  FWS001912-2060.  The Project Biological Assessment identifies, and the Project incorporates, measures to discourage illegal use.  FS004049; FS002198-99.  While the Forest Service cannot anticipate when or where illegal use may occur, it "has made repairs for any such breaches as quickly as possible after discovery."  FS002544; *see also* FS004908 (2019 monitoring report identifying repairs).

*Fed. Defs.' Opening Brief*                                                              62

Third, this Court subsequently limited *Probert's* holding to historical, documented, ineffective road closures. *All. for the Wild Rockies v. Marten*, 464 F.Supp.3d 1169, 1176 (D. Mont. 2020). *Probert* does not extend to speculation or "the mere possibility that planned road closures will be ineffective." *Id.* The District of Idaho rejected a similar challenge by Plaintiff to the effectiveness of gate closures regarding elk security habitat. In *Friends of the Clearwater v. Petrick*, the court held, "[i]t was rational for the Forest Service to conclude that, although there had been gate failures in the past, increased monitoring would address the issue." 588 F. Supp. 3d 1071, 1099 (D. Idaho 2022). The same is true here.

### 4.    The closure devices are effective.

Consolidated Plaintiffs also argue that the Project did not analyze the adequacy of closure devices as mitigation measures. Con. Br. 32-34.

Under NEPA, an agency must consider appropriate mitigation measures that would reduce the environmental impact of the proposed action. 42 U.S.C. §4332(2)(C)(ii). The Court's review hinges on whether the agency's analysis is reasonable and offers "sufficient detail to ensure that environmental consequences have been fairly evaluated." *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009) (per curiam) (citation omitted). Mitigation measures "need not be legally enforceable, funded or even in final form

to comply with NEPA's procedural requirements." *Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp.*, 222 F.3d 677, 681 n.4 (9th Cir. 2000).

Consolidated Plaintiffs' argument rests heavily upon the above evidence that the Forest Service did not take a hard look at the effectiveness of road closure methods. It also makes the same claims—and cites mostly the same case law—as a pending challenge to the Ripley Project. There, Magistrate Judge DeSoto found the Forest Service appropriately addressed the efficacy of road closure devices and recommended rejecting plaintiff's claims; a final decision is pending. *All. for the Wild Rockies v. Gassmann*, CV-21-105-M-DLC, ECF No. 71 at 61-66.

As in Ripley and here, *see* Part V.G.2 *supra*, Consolidated Plaintiffs contort the record evidence and fail to show that the analysis of road closures is arbitrary and capricious. Consolidated Plaintiffs then pivot to an allegation that the EA must "more broadly…discuss the efficacy of proposed mitigation measures – here berms and gates," Con. Br. 32, but still focus entirely on the effects of road density on grizzly bears, which the Forest Service addressed. *See* FS002539-64.

In *Protect Our Communities Foundation v. Jewell*, the Ninth Circuit rejected a similarly vague allegation that mitigation measures did not provide sufficient detail to evaluate impacts. 825 F.3d 571, 582 (9th Cir. 2016). Here, the Forest Service developed design features, such as limits on Project activity on gated roads at important times of year for grizzly bear fertility. FS002263-64. In addition,

*Fed. Defs.' Opening Brief*                                                                 64

FW-STD-WL-02 requires at least 30 percent of closure devices to be monitored annually within the respective ecosystems. FS000160.

Consolidated Plaintiffs' citations are distinguishable. In *South Fork Band Council*, 588 F.3d at 727, the Bureau of Land Management did not explain how anticipated harms to ground water extraction would be avoided by the mitigation measures, and instead improperly deferred the mitigation analysis. *Foundation for North American Wild Sheep v. U.S. Dep't of Agriculture*, 681 F.2d 1172, 1178 (9th Cir. 1982), found that measures (such as seasonal closures and gate installation) did not adequately mitigate impacts to bighorn sheep from re-opening a road that had substantial truck traffic. *Sierra Club v. Bosworth*, 352 F. Supp. 2d 909, 925 (D. Minn. 2005), had little to no analysis of illegal road use, despite the Forest Service's concession that it occurred in the Project area.

Consolidated Plaintiffs also cite *WildEarth Guardians*, where this Court found a Forest Plan biological opinion's road reclamation requirements violated the ESA. 545 F. Supp. 3d at 869. Such an ESA claim is not before the Court here. Far more relevant is the NEPA claim in that case, where this Court held the Forest Service "considered the potential consequences, including adverse impacts, of high-use non-motorized routes in secure core habitat." *Id.* at 865. Here, there is no evidence that there are illegal motorized routes that have "high use," yet the Forest

Service still considered impacts from illegal motorized access.  FS002544, 004219-20.

Consolidated Plaintiffs merely "fly-speck" the agency's analysis of closure devices rather than "identify[ing] consequential flaws that would prevent the agency from sufficiently grasping the Project's potential environmental consequences." *Protect Our Cmties.*, 825 F.3d at 582.  Such conclusory statements fail to show a NEPA violation.  *Friends of the Se.'s Future v. Morrison*, 153 F.3d 1059, 1063 (9th Cir. 1998).[13]

**H.**   **If the Court finds a violation, the proper remedy is remand without vacatur.**

Federal Defendants satisfied all statutory obligations under the ESA, NEPA, and NFMA.  Should the Court conclude otherwise, it should remand the matter to the agencies to fix errors, not vacate the Biological Opinion or the Decision Notice.

"Although the district court has power to do so, it is not required to set aside every unlawful agency action." *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995).  The agency action "can be left in place while the agency follows the necessary procedures." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995).  The determination of "[w]hether agency action should be

---

[13] Consolidated Plaintiffs waived Claims Two and Four by declining to argue them in their Summary Judgment Brief.  The Court should either grant judgment to Federal Defendants on these claims or dismiss them with prejudice.

*Fed. Defs.' Opening Brief*                                                                 66

vacated depends on how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed." *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (per curiam) (quotation omitted)).

The Court considers three factors when assessing the seriousness of the agencies' errors: the possibility of environmental harm, whether the agencies could offer better reasoning on remand, and the scope of the errors. *WildEarth Guardians*, 545 F. Supp. 3d at 884. Project activities will promote healthy forests more resilient to stressors like climate change, drought, wildfire, insects, and disease. FS002148-49; Decl. of Chadwick Benson ¶¶ 5-12 ("Benson Decl."), attached as Exhibit 2. The Project also improves watershed conditions, big game winter range and forage, and recreation opportunities. FS002148-49; Benson Decl. ¶¶ 5-12. If these activities cannot proceed, environmental harm is possible. The scope of any errors is likely limited, and the Agencies could offer thorough reasoning on remand.

Vacatur would also be disruptive. The Project moves the Forest toward desired conditions, such as promoting early seral species, maintaining and improving old growth, and improving overall forest health and resilience. FS002148-49; Benson Decl. ¶ 5.

Even should the Court determine some vacatur is appropriate, the Court

should allow some Project activities to proceed. Plaintiffs object only to regeneration harvest, roadbuilding, and commercial timber harvest. Pls.' Br. 44. Consolidated Plaintiffs request wholesale vacatur or injunction of the Project, but without undertaking the equitable balancing required to support either remedy. Con. Br. 39. Thus, Project activities that do not involve changes in road access or commercial timber harvest should be allowed to proceed. This includes precommercial thinning, prescribed burns and some other non-harvest fuels treatment, recreation improvements, and road decommissioning. *See* FS002153-56; Benson Decl. ¶¶ 10-13. None of these activities require construction of any new permanent roads or allow motorized access in new areas. Benson Decl. ¶¶ 13, 14.

## VI.   <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant summary judgment in favor of Federal Defendants on all claims and deny Plaintiffs' and Consolidated Plaintiffs' motions for summary judgment.


Respectfully submitted on this 9th day of March, 2023.


TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

/s/   *Hayley A. Carpenter*
HAYLEY A. CARPENTER (CA Bar No. 312611)
Trial Attorney, Natural Resources Section
JOHN P. TUSTIN (TX Bar No. 24056458)
Senior Attorney, Natural Resources Section
ERIKA A. FURLONG (PA Bar No. 319350)
Trial Attorney, Wildlife & Marine Resources Section
CAITLYN F. COOK (MD Bar No. 2112140244)
Trial Attorney, Wildlife & Marine Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone:    (202) 305-3022 (Tustin)
              (202) 305-0242 (Carpenter)
              (202) 305-0424 (Furlong)
              (202) 305-0269 (Cook)
Fax:       (202) 305-0275

JESSE LASLOVICH
United States Attorney

*Attorneys for Federal Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief is 14,907 words as counted using the word count feature of Microsoft Word, excluding the caption, table of contents, table of authorities, signature blocks, certificate of compliance, and certificate of service.

/s/    *Hayley A. Carpenter*
HAYLEY A. CARPENTER
*Attorney for Federal Defendants*

# Exhibit 1
# Kasworm Declaration

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**MISSOULA DIVISION**

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | ) ) | Lead Case No. CV 22-114-M-DWM |
| Plaintiffs, and | ) ) | Member Case No. CV 23-3-M-DWM |
| ALLIANCE FOR THE WILD ROCKIES and NATIVE ECOSYSTEMS COUNCIL, | ) ) ) | |
| Consolidated Plaintiffs, | ) ) | DECLARATION OF WAYNE KASWORM |
| v. | ) ) | |
| U.S. Forest Service, et al. | ) ) | |
| Defendants, | ) ) | |
| KOOTENAI TRIBE OF IDAHO, | ) ) | |
| Defendant-Intervenor, and | ) ) | |
| KRISTEN KAISER, District Ranger, Kootenai National Forest, et al., | ) ) ) | |
| Consolidated Defendants | ) ) | |

I, WAYNE KASWORM, in accordance with the requirements of 28 U.S.C.

§ 1746 declare:

    1.    I am employed by the United States Department of Interior, Fish and

Wildlife Service.  My job title is Wildlife Biologist for the Grizzly Bear Recovery

Program.  As the Project Wildlife Biologist, I am responsible for collecting,

analyzing, and distributing data regarding research and monitoring of grizzly bears

in the Cabinet-Yaak Ecosystem.  I am stationed in Libby, Montana, and have been

employed in this position from June 1989 to the present.  Previously, I was

*Declaration of Wayne Kasworm*                                                  1

employed by Montana Fish, Wildlife, and Parks in a comparable position doing research and monitoring of grizzly bears in the Cabinet-Yaak Ecosystem from June of 1983 until I began working for the U.S. Fish and Wildlife Service in 1989. I am competent to testify to the matters contained in this Declaration.

2.      My declaration is presented as an objective view of data, not a judgment on the merits or environmental acceptability of the Black Ram Project. This is the same information I provided to the Fish and Wildlife Service biologists who wrote the biological opinion for the Black Ram Project and reviewed and responded to the Notice of Intent to Sue on the Black Ram Project.

3.      The Grizzly Bear Recovery Coordinator's Office publishes annual Cabinet-Yaak Grizzly Bear Recovery Area Research and Monitoring Progress Reports.  The most recent report was published in October 2022, and contains data on grizzly bears through 2021.  Data from 2022 will be published in 2023.  I presented preliminary raw data from 2022 to the Kootenai Valley Resource Initiative collaborative group and the Selkirk/Cabinet-Yaak Interagency Grizzly Bear Subcommittee in October and November of 2022 (respectively).

4.      The number of bears detected each year in the Cabinet-Yaak Grizzly Bear Recovery Area Research and Monitoring Progress Reports is NOT a count of the true population of grizzly bears in the Cabinet-Yaak Ecosystem.  Therefore, it is biologically inappropriate to infer changes in the minimum number of bears

*Declaration of Wayne Kasworm*                      2

detected from year to year as changes in total population size. These minimum

counts are influenced by the level of effort available each year. Effort is

influenced by funding, number of personnel, area of emphasis, and most recently

coronavirus work restrictions. All these factors have varied in recent years and

have contributed to variable minimum counts. Because of this variation in effort,

minimum counts are not treated as an indicator of trend in the data.

5.      Since 1999, the Grizzly Bear Recovery program has used the same

methods to calculate the Cabinet-Yaak Ecosystem's growth rate and population

estimate.

6.      I am a coauthor on the Kendall et al. 2016 paper and contributed my

time identifying sampling sites, field training for technicians, providing radio

telemetry data, hair collection data for the sample area, genetic profiles of bears

previously identified, and reviewing drafts of the paper prior to journal submission.

7.      The Kendall et al. study lasted from 2011 until 2016, when the results

were published. Sample site identification occurred in 2011, field sampling

occurred in 2012, genetic lab analysis occurred in 2013 and 2014 and data analysis

occurred during 2014 and 2015 prior to submission and publication.

8.      The Kendall et al. study was able to bring to bear far more resources

than are available during annual monitoring. The study involved 854 sampling

sessions, in comparison to the 5 to 92 sessions we have used for annual monitoring

*Declaration of Wayne Kasworm*                                              3

in the past ten years. *See* FWS001473. The project also utilized approximately 75-100 field technicians and cost approximately $1.6 million to complete. This effort would be difficult to duplicate based on budgets alone.

9. In 2022, we recorded 3 known mortalities of female grizzly bears in the Cabinet-Yaak Ecosystem. This is the highest number of known female mortalities in any year since we began monitoring in 1983. Of those three females that died:

a. One was an older adult female (roughly 25 years old) that was wearing a GPS collar for research purposes. She was found dead by our research team in a remote area with no evidence of human interaction. Her cause of death is presumed to be from natural causes.

b. One was an adult female that was struck by a motor vehicle on Highway 2.

c. One was a sub-adult female that was removed for management purposes after getting into unsecured attractants (chicken coop) at a private residence. Notably, this female was originally captured in 2021 by a bear management specialist in Whitefish, MT, part of the North Continental Divide Ecosystem. The bear was captured because she was getting into chickens in Whitefish, moved to the east side of Glacier National Park, and then somehow made it on her own all the

*Declaration of Wayne Kasworm*                                                          4

way to the Cabinet Mountains sometime between Fall of 2021 and Summer of 2022. We do not know the exact timing or route she took, as she lost her collar. However, this is the first known natural movement of a female into the Cabinets, which is evidence of increasing connectivity between the Cabinet-Yaak Ecosystem and other ecosystems. This female nor any other bear from the North Continental Divide Ecosystem is known to have produced offspring that resulted in genetic connectivity.

10.    Three female mortalities in 2022 does not equate to a declining grizzly bear population in the Cabinet-Yaak Ecosystem. Although the published paper by Kendall et al. (2016) states "In the small Cabinet and Yaak populations, the difference between growth and decline is 1 or 2 adult females being killed annually or not," this should not be interpreted to mean that the population is declining if there are more than 1-2 adult females killed in one year. The two keys to the quote are the words "adult" and "annually." If two adult female grizzly bears die annually for multiple years in a row, without commensurate immigration, augmentation, and/or natural recruitment, then the population could begin to see a declining trend again. However, one year of higher mortality does not necessarily equate to a decreasing trend.

11.    Also of note with the Kendall et al. (2016) study, the data was

*Declaration of Wayne Kasworm*                                                5

collected in 2012, and the estimated population at that time was 49 bears.  The most recent population estimate for grizzly bears in the Cabinet-Yaak Ecosystem is 60-65 grizzly bears as of 2021.  The increase is the result of the positive population growth rate as determined by known fate monitoring of radio collared bears. This estimate is calculated using similar methods as those used to estimate population trend in the North Continental Divide Ecosystem.

12.     Given the small sample sizes available in this small population, it is not always possible to determine population growth or decline based on just one or two timesteps (years).  Biologists look at data over several timesteps (years) and account for variation, both natural and observation variance.

13.     Over the past 10 years (2013-2022), there were 5 known deaths of native adult female grizzly bears in the Cabinet-Yaak Ecosystem: 2 in 2022, 0 in 2021, 1 in 2020, 1 in 2019, 1 in 2018, 0 in 2017, 0 in 2016, 0 in 2015, 0 in 2014, and 0 in 2013.  That is an annual rate of 0.5 adult females per year, on average, over that timeframe.  My report lists 2 additional females that died in 2015 and 2020, of which one was a subadult and one died in British Columbia.  One of the females that died in 2022 was a subadult female. Even if you count the British Columbia bear it would only raise the annual adult female rate to 0.6 for the period of 2013-2022.  This is still well below the 1-2 bears per year identified by Kendall et al (2016) as being indicative of decline for a population of 49 bears.

*Declaration of Wayne Kasworm*                                                      6

14.     Using published, peer-reviewed methods, our monitoring and research team calculates population growth rates (lambda) and publishes those in our annual reports (note that lambda above 1.0 denotes an increasing population and lambda less than 1.0 denotes a declining population).  Lambda is a product of reproductive rates and survival rates of four age classes of bears. Our most recent calculation, from our 2022 report covering data through 2021, shows lambda of 1.019, or an annual rate of increase of 1.9 percent.  We have not run the full models to calculate results for 2022.  Lambda and adult female survival rate may decrease due to the adult female mortality in 2022, but we do not expect a marked decline for 2022. Evaluations of the projected growth rate must also consider the survival rates of subadult females and yearlings, which improved during 2022.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 8th day of March 2023 in Libby, Montana.

_____
Wayne Kasworm
Grizzly Bear Recovery Coordinator's Office
U.S. Fish and Wildlife Service

*Declaration of Wayne Kasworm*                                                          7

Rebecca K. Smith
Public Interest Defense Center, P.C.
P.O. Box 7584
Missoula, MT 59807
(406) 531-8133
publicdefense@gmail.com

Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

Attorneys for Consolidated Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVISION, et al., <br>         Plaintiffs, <br>   and <br><br> ALLIANCE FOR THE WILD ROCKIES, et al., <br>      Consolidated Plaintiffs, <br> vs. <br><br> U.S. FOREST SERVICE, et al, <br>         Defendants, <br><br> KOOTENAI TRIBE OF IDAHO, <br>         Defendant-Intervenor, <br>   and <br><br> KIRSTEN KAISER, et al., <br>      Consolidated Defendants. | Lead Case No. <br> CV 22-114-M-DWM <br><br> Member Case No. <br> CV 23-3-M-DWM <br><br><br> BRIEF IN SUPPORT OF CONSOLIDATED PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |

TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        A.    The Forest Service has failed to demonstrate that the Project complies
              with the Forest Plan – specifically the Access Amendment and
              Interagency Grizzly Bear Guidelines – in violation of NEPA, NFMA,
              and the APA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

              1.    The Forest Service has failed to demonstrate compliance with
                    the Access Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

                    a.    The Forest Service impermissibly ignores user-created
                          roads and roads with breached closures in its Access
                          Amendment calculations. . . . . . . . . . . . . . . . . . . . . . . 6

                    b.    The Project EA fails to disclose the methodology for
                          Access Amendment calculations. . . . . . . . . . . . . . . . . 9

                    c.    The Forest Service impermissibly relies on an incorrect
                          and undisclosed assumption that all barriers will be
                          100% effective for "in-kind replacement" of core. . . . 11

              2.    The Forest Service has failed to demonstrate compliance with
                    the Interagency Grizzly Bear Guidelines. . . . . . . . . . . . . . . . 13

        B.    The Project EA fails to take a hard look at illegal motorized use and
              fails to discuss the efficacy of barriers and gates as mitigation
              measures in violation of NEPA and the APA. . . . . . . . . . . . . . . . . 17

              1.    The Project EA fails to take a hard look at illegal road use
                    because the EA relies on incorrect assumptions and data. . . . 30

i

2.    The Project EA fails to provide the mandatory analysis of the efficacy of barriers and gates as mitigation measures. . . . . . . 32

C.    The Forest Service must prepare supplemental NEPA analysis – either a supplemental EA or an EIS – to address the extremely high female grizzly mortalities suffered by the Cabinet-Yaak grizzly population in 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

ii

TABLE OF AUTHORITIES

CASES

*Alliance for the Wild Rockies v. Bradford*, 856 F.3d 1238 (9th Cir. 2017). . . . . . . 8

*All. for Wild Rockies v. Probert*, 412 F.Supp.3d 1188 (D. Mont. 2019). . . .  passim

*Alliance for the Wild Rockies v. Savage*, 897 F.3d 1025 (9th Cir. 2018) . . . . . . . . 8

*Cabinet Resources Grp. v. U.S. Fish and Wildlife Serv.,*
    465 F.Supp. 2d 1067 (D. Mont. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Oregon Nat. Res. Council v. U.S. BLM,* 470 F.3d 818 (9th Cir. 2006) . . . . . . . . . 2

*Neighbors of Cuddy Mountain v USFS,* 137 F.3d 1372 (9th Cir. 1998) . . . . . . . . 33

*N.Plains Res.Council, Incorporated v. Surface Transp.Bd.,*
    668 F.3d 1067 (9th Cir.2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Native Ecosystems Council v. Tidwell*, 599 F.3d 926 (9th Cir. 2010). . . . 36, 37, 38

 *Native Ecosystems Council v. U.S. Forest Service,*
    418 F.3d 953 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Foundation for North American Wild Sheep v. USDA,*
    681 F.2d 1172 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Southern Fork Band Council of Western Shoshone of Nevada v. U.S. Department*
    *of Interior,* 588 F.3d 718 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

*Sierra Club v. Bosworth,* 352 F.Supp.2d 909 (D. Minn. 2005). . . . . . . . . . . . . . . 33

*Swan View Coalition., Incorporated v. Barbouletos,*
    307 F. App'x 49 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*WildEarth Guardians v. Montana Snowmobile Association,*

iii

790 F.3d 920 (9th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Wildearth Guardians v. Steele*, 545 F.Supp.3d 855 (D. Mont. 2021) . . . . . . . . . 34

STATUTES

16 U.S.C. §1604 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

REGULATIONS

40 C.F.R. §1501.12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

40 C.F.R. §1502.23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9, 10

40 C.F.R. §1502.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

iv

# I.  INTRODUCTION

Consolidated Plaintiffs Alliance for the Wild Rockies and Native Ecosystems Council (collectively "Alliance") challenge the Black Ram Project (Project) on the Kootenai National Forest (Forest).  Alliance respectfully moves this Court for summary judgment on all claims and requests that this Court either vacate the Project decision or enjoin implementation of the Project until Defendants have complied with the law.

# II. STATEMENT OF FACTS

Pursuant to Local Rule 56.1, the relevant facts are set forth in Plaintiffs' and Consolidated Plaintiffs' Joint Statement of Undisputed Facts.

# III.  ARGUMENT

**A.**  **The Forest Service has failed to demonstrate that the Project complies with the Forest Plan – specifically the Access Amendment and Interagency Grizzly Bear Guidelines – in violation of NEPA, NFMA, and the APA.**

"NEPA's purpose is twofold: (1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public."  *N.Plains Res.Council, Inc. v. Surface Transp.Bd*., 668 F.3d 1067,1072 (9th Cir.2011).  "Agencies shall ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents. Agencies shall make use of reliable existing data and

resources. . . . They shall identify any methodologies used and shall make explicit

reference to the scientific and other sources relied upon for conclusions in the

statement." 40 C.F.R. §1502.23.

"Through the NEPA process, a federal agency must take a 'hard look' at the

potential environmental consequences of the proposed action." *Oregon Nat. Res.*

*Council v. U.S. BLM*, 470 F.3d 818, 820 (9th Cir. 2006)(citation and internal

punctuation omitted). In order "[t]o take the required 'hard look' at a proposed

project's effects, an agency may not rely on incorrect assumptions or data . . . . the

data the Forest Service provides to the public to substantiate its analysis and

conclusions must also be accurate." *WildEarth Guardians v. Montana Snowmobile*

*Ass'n*, 790 F.3d 920, 926 (9th Cir. 2015).

In turn, NFMA requires that each National Forest develop a "Land and

Resource Management Plan," i.e. a forest plan. 16 U.S.C. §1604(a). All

site-specific projects must be consistent with the governing forest plan. 16 U.S.C.

§1604(i). The "Forest Service's failure to comply with the provisions of a Forest

Plan is a violation of NFMA." *Native Ecosystems Council v. U.S. Forest Service*,

418 F.3d 953, 961 (9th Cir. 2005).

As set forth below, in this case the Forest Service's failure to demonstrate

compliance with the Access Amendment and Interagency Grizzly Bear Guidelines

for Management Situation 1 habitat, as required by the Forest Plan, violate NEPA

and NFMA.

    1.    **The Forest Service has failed to demonstrate compliance with the Access Amendment**.

The Forest Plan states: "***Standards*** . . . FW-STD-WL-02. The Motorized Access Management within the Selkirk and Cabinet Yaak Grizzly Bear Recovery Zone Management Direction and [Record of Decision] is included in appendix B, and shall be applied." FS-000040. Within the official "Cabinet-Yaak Grizzly Bear Recovery Zone," the Access Amendment sets specific numeric limits on open motorized route density and total motorized route density, and requires a specific numeric minimum of secure core habitat. FS-045909-12, 045860 (Table 2). These limits – commonly referred to as 33/26/55 – were derived from an agency study of six grizzly bears commonly referred to as Wakkinen and Kasworm (1997). FS-045865-66; *see Cabinet Res. Grp. v. U.S. Fish & Wildlife Serv.*, 465 F.Supp. 2d 1067, 1099 (D. Mont. 2006)(discussing flaws in this study). Although two of the six study bears were killed shortly after the study, the agencies nonetheless believe that the percentages averaged from the Wakkinen and Kasworm (1997) data constitute the best available science for motorized access management in the Cabinet-Yaak Recovery Zone. FS-045865-66.

The Project area is within the Cabinet-Yaak Grizzly Recovery Zone "Bear Management Units" 14 and 15, which are also referred to as "Northwest Peak" and

"Garver," respectively.  FS-002541.  Northwest Peaks (#14) is 99% National

Forest land, and must have no greater than 31% open motorized route density, no

greater than 26% total motorized route density, and no less than 55% core.

FS-045860.  Garver (#15) is 94% National Forest land, and must have no greater

than 33% open motorized route density, no greater than 26% total motorized route

density, and no less than 55% core.  FS-045860.  No reductions in existing

percentage core are permissible in either unit until all Bear Management Units meet

their minimum core standard.  FS-045910.

A document in the administrative record discloses that for the Black Ram

Project analyses, when assessing "permanent" road density and core for the

purposes of comparing existing condition and post-Project condition to Access

Amendment standards, the Forest Service deliberately ignores known illegal road

use: "any user-created routes or access, as well as breaches (e.g., dismantling or

damaging gates and then proceeding to drive the route) are not considered part of

the existing condition."  FS-004530.

In the Project EA section entitled "Methodology," the Forest Service fails to

disclose the fact that illegal roads – both user-created roads and breaches of system

roads – are ignored in Access Amendment calculations.  FS-002540; *see*

FS-004530.  The Forest Service also fails to reference the record document that

discloses this methodology.  FS-002540; *see* FS-004530.

Furthermore, in the most recent monitoring report in the record, the Forest Service found 72 monitored barriers and gates had been breached, i.e. one out of five monitored barriers and gates were breached. FWS006182. Additionally, members of Yaak Valley Forest Council documented dozens of ineffective closures in the Black Ram Project area in 2020 and 2021. FS-004585-604; FS-004558-77; FS-044262-66; FS-044664-88.

Even with the exclusion of user-created and breached roads, the Project will exceed the Wakkinen and Kasworm (1997)-derived limit of 33% for Garver during Project implementation, with an open motorized route density of 36%. FS-002552; FS-045866. Moreover, although undisclosed to the public in the Project EA, a document in the administrative record indicates that open motorized route density could reach as high as 42% during the Project. FWS006056-57.

Similarly, even with the exclusion of user-created and breached roads, the Project will exceed the Wakkinen and Kasworm (1997)-derived limit of 26% for Garver during Project implementation, with a total motorized route density of 32%. FS-002553; FS-045866.

Regarding core, the Forest Service plans to remove barriers or gates on 36 road segments to allow motorized access in existing core for the Project. This action will eliminate 4,952 acres of existing core habitat. FS-004404. Core will be reduced in Northwest Peak from 46,854 acres to 44,931 acres out of 83,030 total

acres, which is a reduction from 56% core to 54% core.  FS-004406.  Core will be

reduced in Garver from 32,434 acres to 29,405 acres out of 58,841 total acres,

which is a reduction from 55% core to 50% core.  FS-004406.

The Forest Service proposes to install barriers on roads to create new core

areas as "in-kind" replacement of core.  FS-002553.  If barriers are 100% effective,

new core would total 2,269 acres in Northwest Peak and 3,062 acres in Garver;

however, these calculations do not exclude from core those areas with illegal

motorized use or breached closures.   FS-004406; FS-002540.

Critically, if the new barriers installed for "in-kind replacement" of core are

not effective, core in both Northwest Peak and Garver will be reduced below the

Wakkinen and Kasworm (1997)-derived minimum, and Access Amendment

standard, of 55%.  *See* FS-045865-66.  Additionally, the level of actual core

remaining after Project implementation has not yet been disclosed to the public

because the core calculations do not exclude from core those areas with illegal

motorized use or breached closures.   FS-004406; FS-002540.

> a.     **The Forest Service impermissibly ignores user-created**
>         **roads and roads with breached closures in its Access**
>         **Amendment calculations.**

First, the Forest Service's refusal to include user-created roads and roads

with breached closures in road density calculations, as well as its failure to exclude

the same from core calculations, make it impossible to determine whether the

Project complies with the Access Amendment, which violates NFMA and NEPA.

The Ninth Circuit holds "we must . . . be able reasonably to ascertain from the

record that the Forest Service is in compliance with [a Forest] Plan standard."

*Native Ecosystems*, 418 F.3d at 963.  A reviewing court cannot "be expected to

chisel that which must be precise from what the agency has left vague and

indecisive."  *Id*. (citation omitted).  In *Native Ecosystems*, the Ninth Circuit found:

"The Elkhorn project EIS utilized a calculation denominator that was plainly

inconsistent with the Forest Plan standard. [] In our own review of the

administrative record, we are unable to discern that the Forest Service's hiding

cover calculations complied with the requirements of the [Forest] Plan."  *Id.*

Similarly here, the Black Ram Project EA fails to provide a calculation that

is consistent with the Forest Plan, and the administrative record also fails to

establish that the Project complies with the Forest Plan; therefore, the Project

violates NFMA and NEPA.  *See Native Ecosystems*, 418 F.3d at 963.  Under the

Forest Plan Access Amendment, any road with motorized use must be included in

road density calculations and excluded from core blocks.  Open Motorized Route

Density must include all roads "not meeting all restricted or obliterated criteria . . .

."  FS-045859.  Total Motorized Route Density must include all roads "not meeting

all reclaimed criteria . . . ."  FS-045859.  A restricted road "requires effective

physical obstruction," and a reclaimed/obliterated road "no longer function[s] as a

road." FS-007215-16.   Additionally, core areas must have "effective barriers" with no areas that "function as a motorized route."  FS-045909.

The Ninth Circuit has addressed a similar issue in the context of "Bears Outside Recovery Zone" Access Amendment standards in two cases.  First, in *Alliance for the Wild Rockies v. Bradford*, the court held that any road with an ineffective road closure must be counted in total road calculations.  856 F.3d 1238, 1243 (9th Cir. 2017).  Second, in *Alliance for the Wild Rockies v. Savage*, the court held that unauthorized roads, referred to as "undetermined roads" in that case, must be counted in total road calculations.  897 F.3d 1025, 1035-37, and  n.16, n.18 (9th Cir. 2018).  The same is true in this case: both breached roads (i.e. roads with ineffective closures) and user-created roads (i.e. unauthorized roads) must be included in Access Amendment calculations.  The fact that they are not in this case is undisputed and requires a remand to the agency.

In conclusion, by excluding user-created roads and breached roads from Access Amendment calculations for the Black Ram Project, the Forest Service is impermissibly excluding roads with actual motorized use from Access Amendment calculations.  The Forest Service's failure to disclose the true existing condition and post-Project condition of motorized access in the Project area renders it impossible to determine whether the Project complies with the Access Amendment

standards, in violation of both NFMA and NEPA.  *See, e.g., Native Ecosystems*,

418 F.3d at 963.

> **b.      The Project EA fails to disclose the methodology for Access
> Amendment calculations.**

Second, as noted above, the NEPA regulations require that the Forest Service

"shall identify any methodologies used" in a project EA.  40 C.F.R. §1502.23.

Moreover, in order to take the mandatory "hard look" at a project's effects, the

"data the Forest Service provides to the public . . . must . . . be accurate."

*WildEarth Guardians*, 790 F.3d at 926.

Here, the Project EA violates both mandates.  First, the Project EA fails to

identify the methodology the Forest Service uses for Access Amendment

calculations.  As noted above, a document in the administrative record entitled

"Process review for assessing [Bear Management Unit] metrics for the

project-specific grizzly bear analysis in the Black Ram Project" discloses that for

the Black Ram Project analyses, when assessing "permanent" road density and core

for the purposes of comparing existing condition and post-Project condition to

Access Amendment standards, the Forest Service excludes known illegal road use

from the calculations:

> The routes used to establish the 'permanent' condition are those that
> are authorized routes. Unauthorized use features are not. That is, *any
> user-created routes or access, as well as breaches* (e.g., dismantling

or damaging gates and then proceeding to drive the route) *are not considered part of the existing condition*.

FS-004530 (emphasis added).

The Project EA includes a section in the grizzly bear analysis section entitled "Methodology." FS-002540. This "Methodology" section fails to disclose the fact that both user-created roads and breaches of existing road closures are excluded from Access Amendment road density calculations and included in core calculations in the Project EA. FS-002540; *see* FS-004530. This "Methodology" section in the Project EA also fails to reference the record document entitled "Process review for assessing [Bear Management Unit] metrics for the project-specific grizzly bear analysis in the Black Ram Project." FS-002540; *see* FS-004530. These failures violate the regulatory mandate that the Forest Service "shall identify any methodologies used" in a project EA. 40 C.F.R. §1502.23.

Additionally, by failing to disclose accurate calculations of open motorized route density, total route density, and core – as those terms are defined by the Access Amendment – the Forest Service is also violating NEPA's "hard look" requirement because the "data the Forest Service provides to the public . . . must . . . be accurate." *WildEarth Guardians*, 790 F.3d at 926.

    **c.**     **The Forest Service impermissibly relies on an incorrect and undisclosed assumption that all barriers will be 100% effective for "in-kind replacement" of core.**

Finally, as noted above, an "agency may not rely on incorrect assumptions" in a NEPA analysis. *WildEarth Guardians*, 790 F.3d at 926. In this Project, the Forest Service plans to remove barriers or gates on 36 road segments to allow motorized access in existing core for the Project. This action will eliminate 4,952 acres of existing core habitat. FS-004404. Core will be reduced in Northwest Peak from 56% core to 54% core. FS-004406. Core will be reduced in Garver from 55% core to 50% core. FS-004406. The Forest Service proposes to install barriers on roads to create new core areas as "in-kind" replacement of core. FS-002553.

Critically, however, if the new barriers installed for "in-kind replacement" of core are not effective, core in both Northwest Peak and Garver will be reduced below the Wakkinen and Kasworm (1997) - derived minimum, and Access Amendment standard, of 55%. *See* FS-045865-66. The Project EA's analysis and conclusion regarding Access Amendment compliance is therefore premised on an unstated assumption that all barriers will be 100% effective.

Contrary to this unstated assumption, as set forth in more detail below in Section III(B), in the most recent monitoring report in the record, the Forest Service itself found that 72 monitored barriers and gates had been breached, i.e. one out of five monitored barriers and gates were breached. FWS006182.

Additionally, members of Yaak Valley Forest Council documented dozens of ineffective closures in the Black Ram Project area in 2020 and 2021. FS-004585-604, 4558 - 4577; FS-044262-66; FS-044664-88. Many of these ineffective closures are barriers – i.e. dirt berms – that have been easily driven over or around by all terrain vehicles or motorcycles. *See e.g.* FS-044262-66; FS-044664-88 (15 berms with established trails around them in Black Ram Project area).

Accordingly, the agency's assumption that barriers will be 100% effective is an incorrect assumption that the Forest Service "may not rely on" in the Project EA. *WildEarth Guardians*, 790 F.3d at 926. Without 100% barrier effectiveness, it is unclear whether the Project will violate the Access Amendment standard for core: the Project reduces core and proposes "in-kind replacement" of core, but in-kind replacement of core is only lawful if the barriers are "effective" so that routes behind the barriers can "no longer function as motorized routes." FS-045090. If a motorcyle can drive over or around a berm, then that route can still "function as a motorized route" and accordingly cannot be counted as in-kind core replacement. *See id.* A remand is therefore necessary to take a hard look at how the 22% ineffective closure rate across the Forest, and at least 15 known failed berms in the Black Ram Project area itself, impact the agency's "in-kind replacement" assumptions for grizzly core habitat. *See WildEarth Guardians*, 790 F.3d at 926.

**2.    The Forest Service has failed to demonstrate compliance with the Interagency Grizzly Bear Guidelines.**

In addition to mandating compliance with the Access Amendment, the Forest Plan also mandates compliance with the Interagency Grizzly Bear Guidelines.  The Forest Plan states: "***Guidelines*** . . . Elements contained in the most recent 'Interagency Grizzly Bear Guidelines,' or a conservation strategy once a grizzly bear population is delisted, would be applied to management activities." FS-000042.  Nearly all of the Northwest Peak Bear Management Unit is Management Situation 1 habitat for grizzly bears.  FS-002547-48.  86% of the Garver Bear Management Unit  is Management Situation 1 habitat for grizzly bears.  FS-002547-48.

The most recent Interagency Grizzly Bear Guidelines in the administrative record are from 1986, and for "Management Situation 1," they state: "Management decisions will favor the needs of the grizzly bear when grizzly habitat and other land use values compete. Land uses which can affect grizzlies and/or their habitat will be made compatible with grizzly needs or such uses will be disallowed or eliminated."  FS-005037.

The Ninth Circuit has previously addressed this language and required a remand where the Forest Service did not address this Forest Plan requirement in a project EIS or Record of Decision:

the Forest Service did not adopt *any* standard in either the FEIS or the
ROD for evaluating when land uses "compete" within the meaning of
the Forest Plan, or even acknowledge the requirement. We therefore
conclude that the district court's grant of summary judgment to the
agency defendants on this point was in error. As the Service did not
adequately consider a factor relevant to its compliance with the Forest
Plan, its decision cannot stand.

*Swan View Coal., Inc. v. Barbouletos*, 307 F. App'x 49, 51 (9th Cir. 2009).

The same holding is required in this case.  The Forest Service "did not
adequately consider a factor relevant to its compliance with the Forest Plan"
because it did not "even acknowledge the requirement" that "[m]anagement
decisions will favor the needs of the grizzly bear when grizzly habitat and other
land use values compete" in the Black Ram Project EA or decision.  *Id*.;
FS-005037.  Moreover, the Forest Service "did not adopt *any* standard in either the
[EA or decision] for evaluating when land uses 'compete' within the meaning of the
Forest Plan [.]"  *See Barbouletos*, 307 F. Appx at 51.

Furthermore, the Black Ram Project does not favor the needs of grizzlies and
the Project is not compatible with the needs of grizzlies for the following reasons:

•      The Project is likely to adversely affect Cabinet-Yaak grizzly bears,
       FS-002538;

•      The Project may cause incidental take of female Cabinet-Yaak grizzlies,
       FS-004427;

- The Project will allow a potentially 10-year exceedence of the best available scientific limits on road density for grizzly bears in the Cabinet-Yaak Recovery Zone, FS-002552-53, FS-045866, FWS006056-57;

- If all barriers are not 100% effective, the Project may reduce core below the 55% minimum that the agencies believe is the best available science, *see* FS-045865-66;

- The recovery target for Cabinet-Yaak grizzlies is 100 bears, but the last count of actual live bears was 42 individuals in 2020, FS-005718, down from 45 individuals in 2019, FS-005611, 50 individuals in 2018, FS-005961, and 54 individuals in 2017, FS-005509;

- The Cabinet-Yaak grizzly population is failing all recovery targets/goals, FS-005710;

- In the six-year period 2017 - 2022, there have been at least 17 mortalities of Cabinet-Yaak grizzlies, which is a mortality rate of at least 2.8 bears/year, FS-005705-07, Declaration of Michael Garrity ¶¶5, 15(Jan. 25, 2023);

- In the six-year period 2017 - 2022, there have been at least seven mortalities of female Cabinet-Yaak grizzlies, which is a female mortality rate of at least 1.2 female bears/year, FS-005705-07; Garrity Declaration ¶¶5, 15;

- "In the small Cabinet and Yaak populations, the difference between growth and decline is 1 or 2 adult females being killed annually or not," FS-036976; and

- The Cabinet-Yaak grizzly population has "low" resiliency, which means a low ability for populations to persist in the face of stochastic events, or for populations to recover from years with low reproduction or reduced survival, FS-007432, 007451.

Additionally, there are a number of other express and applicable provisions from the Interagency Guidelines, but the Project EA also fails to address these provisions. One such provision states: "Logging and/or fire management activities which will adversely affect grizzly bear populations or their habitat will not be permitted." FS-005042. Similarly, [e]xisting or proposed activities or uses which will adversely affect grizzly populations and/or their habitat will be terminated, removed, relocated or denied." FS-005051. The agencies reach a conclusion that the Black Ram Project is "likely to adversely affect" grizzly bears, FS-002538, but the conflict between the Interagency Guidelines and the adverse effect finding is not addressed in the Project EA. Other provisions from the Interagency Guidelines that are not addressed in the Project EA include timing restrictions, FS-005042, and road restrictions, FS-005048, 005052.

Instead of disclosing these provisions and applying them to the Project, the

Project  EA offers a conclusory sentence: "The planning process, project design, and forest-level activity are all consistent with the guidelines (see [Interagency Grizzly Bear Committee] guideline consistency in the project file)."  FS-002557. The referenced document, however, was not publicly available on the Forest Service's website during the public comment or objection period for the Black Ram Project.  *See* FS-002557.  Therefore, any reliance on this document would be improper because "[a]gencies may not incorporate material by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment."  40 C.F.R. §1501.12; *see also Wildearth Guardians*, 790 F.3d at 925.

For all of these reasons, the Forest Service has failed to demonstrate Forest Plan compliance, in violation of NEPA, NFMA, and the APA.

**B.     The Project EA fails to take a hard look at illegal motorized use and fails to discuss the efficacy of barriers and gates as mitigation measures in violation of NEPA and the APA.**

Access to Project units would occur on open, gated, barriered, or newly-constructed roads.  FS-002551.  The Project authorizes 3.3 miles of new permanent road construction and road reconstruction on 90.3 miles of open, gated, or barriered roads.  FS-002155, 002550.  The Forest Service promises to "block" 32.0 miles of existing system roads to provide for "in-kind" grizzly bear core habitat replacement.  The Forest Service also promises to "block[] the entrance" for 20.0

miles of existing system roads in order to "decommission" the roads and "remove[]" those roads "from the system." FS-002495; FS-002155, 002191.

On July 23, 2021, Yaak Valley Forest Council (Yaak Valley) informed the Forest Service that "based on field reviews conducted on July 22, 2021, . . . the Forest Service's efforts to limit unauthorized use are ineffective at halting motor vehicle trespass, contradicting the commitments made in both the EA and [Biological Assessment]." FS-004583. Yaak Valley documented the following ineffective barriers and instances of illegal motorized use in the Project area:



| Site | Yaak Valley Forest Council Photo (July 22, 2021) | Forest Service Photo (July or August 2021) |
|---|---|---|
| BR-1 | User-created bypass with an 8-foot cleared opening to the left of the gate | |
| BR-2 | Newly-installed berm can be bypassed to the left and right | |



| BR-3 | 5-foot opening to the left of gate with tire tracks behind the gate on the road bed | |
| BR-4 | Tire ruts allow motorized use passage to the left of the berm | |

//

//

//

19



BR-5

4-foot wide passage to the left of the berm with visible tire tracks

BR-6

User-created road with no barrier

//

//

//



| BR-7 | 3.5-foot wide passage to the right of the berm | |
| BR-8 | Shallow berm is ineffective and road is frequently traveled. | No Forest Service photo provided. Forest Service Report states: "This route is barriered (MVUM) but we consider it open for bear management unit assessment due to use." |
| BR-10 | User-created road with ineffective barrier. | No Forest Service photo provided. Forest Service Report states: "We documented this route this year. Unauthorized use is illegal regardless of terrain." |

//

//

| BR-9 |  User-created road with ineffective barrier. | No Forest Service photo provided.  Forest Service Report states: "We documented this route this year. Unauthorized use is illegal regardless of terrain." |
| --- | --- | --- |
| BR-11 |  Motor vehicle passage to right of berm with sign broken from being driven over |  |

//

//

//



//

//

//



//

//

//



| BR-16 | No barrier after fallen trees removed; motor vehicle tracks present | |
| BR-17 | No barrier and not mapped as an open road. | |
| BR-18 | 5-foot wide passage to the right of the gate | |



FS-004585-604, 004558-77.

Furthermore, Yaak Valley completed additional surveys on September 30, 2021, and October 1, 2021, including revisiting many of the locations pictured above, and Yaak Valley documented 15 ineffective berms, 17 ineffective gates, and 13 roads with no gate or berm.  FS-044262-66 (Yaak Valley report with photos excluded); FS-044664-88 (Forest Service response with photos included).

The photographs below document 15 berms with established trails around

the berms that allow motorcycle and potentially all terrain vehicle use:



FS-044262-66; FS-044664-88.

The photographs below document 17 ineffective gates with openings around

the gate that allow motorcycle and potentially all terrain vehicle use:

//


//



FS-044262-66; FS-044664-88.


//


//

The photographs below document 13 roads with no gate or berm:



FS-044262-66; FS-044664-88.

Finally, during 2020, across the Kootenai National Forest, the Forest Service itself found 32 breached barriers and repaired none. FWS006182. The Forest Service also found 40 breached gates and repaired only nine. FWS006182. The Forest Service did not disclose this monitoring report in its administrative record for the Project; instead, the document is found only in the U.S. Fish & Wildlife Service administrative record for the Project. FWS006182.

1.     **The Project EA fails to take a hard look at illegal road use because the EA relies on incorrect assumptions and data.**

As discussed above, in order "[t]o take the required 'hard look' at a proposed project's effects, an agency may not rely on incorrect assumptions or data . . . ." *Native Ecosystems Council*, 418 F.3d at 964.  In *All. for Wild Rockies v. Probert*, this Court addressed a case in which a logging project EIS on the Kootenai National Forest assumed that all road closures would be effective following project implementation.  412 F.Supp.3d 1188, 1207 (D. Mont. 2019).  However, a monitoring report in the record found ineffective closures and illegal road use.  *Id.* The Forest Service argued that its general statements in the EIS about grizzly bear displacement were sufficient, but this Court found that the EIS "specifically relie[d] on restricted public access to roads."  *Id.*

Thus, this Court held: "while the agency considered bear disturbance and displacement, the actual effects analyzed were limited by its assumption that public use would be effectively restricted.  As argued by Alliance, that assumption has shown false . . . ."  *Id*. at 1207-08.  The Court ultimately held: "This therefore leads to the close question of whether the incorrect assumptions of the NEPA documents coupled with the uncertainty of the extent of ineffective closures is sufficient to trigger supplemental analysis. It is."  *Id.* at 1208.

The same holding is required here.  As discussed above in Section (A)(1)(c), the Project EA's Access Amendment compliance calculations assume all road

closures will be effective.  Moreover, the Project EA represents and assumes that

any breaches will be quickly repaired:

> In the past, we have noted unauthorized use of restricted roads, and
> occasionally an unauthorized, user-created road is discovered. The
> District has made repairs for any such breaches as quickly as possible
> after discovery. . . .By making needed repairs, we continue to maintain
> the . . . standards for core and motorized route densities.

FS-002544.

Contrary to this representation and assumption that all breaches are quickly

repaired, during 2020, the Forest Service itself found 32 breached barriers and

repaired none of them (0%).  FWS006182.  Additionally, during 2020, the Forest

Service found 40 breached gates and repaired only nine of the breached gates

(24%).  FWS006182.  This available data is not disclosed to the public anywhere in

the Project EA or Decision.  FWS006182; *see, e.g.,* FS-002544.

Furthermore, neither the Project Decision nor the Project EA discloses to the

public any of the 45 instances of ineffective barriers, ineffective gates, and/or

missing gates/berms discovered and documented by Yaak Valley during surveys on

September 30, 2021, and October 1, 2021.  FS-044262-66; FS-044664-88.

Similarly, neither the Project Decision nor the Project EA discloses to the public

any of the 20 instances of known ineffective barriers and/or illegal user-created

roads in the Project area discovered by Yaak Valley in its 2020 and July 2021

surveys. FS-004585-604, 004558-77.

Significantly, in response to one of Yaak Valley's reports, the Forest Service acknowledges the existence of illegal, user-created roads in the Black Ram Project area, but refuses to take any response action. Instead of taking action, the Forest Service simply states: "Unauthorized use is illegal regardless of terrain." FS-004566, 004567.

Thus, as in *Probert*, 412 F.Supp.3d at 1207, here too the record disproves the Project EA's assumptions. While the Project EA assumes 100% closure effectiveness in its Access Amendment compliance calculations, and assumes that any breaches will be quickly repaired, the record belies these assumptions. For these reasons, here, as in *Probert*, "the actual effects analyzed were limited by [the EA's] assumption that public use would be effectively restricted. As argued by Alliance, that assumption has shown false . . . ." 412 F.Supp.3d at 1207-08. Accordingly, "the incorrect assumptions of the NEPA documents coupled with the uncertainty of the extent of ineffective closures" requires a remand for a supplemental NEPA analysis to take a hard look at this issue. *See id.* at 1208.

## 2. The Project EA fails to provide the mandatory analysis of the efficacy of barriers and gates as mitigation measures.

As discussed above, the Project EA violates NEPA because it is premised on false assumptions that closures will be 100% effective at preventing motorized use, and that any breaches in closures will be quickly repaired. In addition, more broadly, the Project EA fails to comply with NEPA's mandate to

discuss the efficacy of the proposed mitigation measures – here berms and gates –
in the NEPA analysis document.

The Ninth Circuit holds:  "An essential component of a reasonably complete
mitigation discussion is an assessment of whether the proposed mitigation
measures can be effective. . . . A mitigation discussion without at least some
evaluation of effectiveness is useless in making that determination."  *S. Fork Band
Council of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718, 727
(9th Cir. 2009).  "Mitigation must be discussed in sufficient detail to ensure that
environmental consequences have been fairly evaluated."  *Neighbors of Cuddy
Mountain v USFS*, 137 F.3d 1372, 1380 (9th Cir. 1998) (citations & quotation
marks omitted).

If the effectiveness of a mitigation measure – such as a road closure – is not
assured, then the Forest Service cannot issue a Decision Notice & Finding of No
Significant Impact, and instead must prepare an EIS. *See, e.g., Foundation for
North American Wild Sheep v. USDA*, 681 F.2d 1172, 1178 (9th Cir. 1982)
(EIS required because Forest Service failed to establish road closure was an
effective mitigation method); *Sierra Club v. Bosworth*, 352 F.Supp.2d 909, 924-25
(D. Minn. 2005)(EIS required because of "questionable efficacy of road closures
through use of berms and gates" and "illegal uses").

In this case, the Project EA does not provide the required "evaluation of

effectiveness" for closure devices, *see S. Fork Band Council*, 588 F.3d at 727, which at bare minimum should include a disclosure of the failure rate of closure devices, as well as the available data in the record from Forest Service and Yaak Valley monitoring reports documenting dozens of breaches.  As discussed above, the Forest Service monitoring report in the record documents 72 breaches of berms and gates in 2020; this available data is not disclosed to the public anywhere in the Project EA or Decision.  FWS006182; *see, e.g.,* FS-002544.

Furthermore, neither the Project Decision nor the Project EA discloses to the public any of the 45 instances of ineffective barriers, ineffective gates, and/or missing gates/berms discovered and documented by Yaak Valley during surveys on September 30, 2021, and October 1, 2021.  FS-044262-66; FS-044664-88. Similarly, neither the Project Decision nor the Project EA discloses to the public any of the 20 instances of known ineffective barriers and/or illegal user-created roads in the Project area discovered by Yaak Valley in its 2020 and July 2021 surveys. FS-004585-604, 004558-77.

The agency's failure to disclose and discuss this key information in the Project EA violates NEPA.  *S. Fork Band*, 588 F.3d at 727; *see also Wildearth Guardians v. Steele*, 545 F.Supp.3d 855, 867 (D. Mont. 2021)(this Court finding that the failure to address monitoring reports finding ineffective road closures in a biological opinion violates the Endangered Species Act).

**C.    The Forest Service must prepare supplemental NEPA analysis – either a supplemental EA or an EIS – to address the extremely high female grizzly mortalities suffered by the Cabinet-Yaak grizzly population in 2022.**

Finally, regardless of the Court's holdings on any other claims, significant new information has come to light since the June 2022 Decision Notice, and supplemental NEPA analysis is therefore required at this time – either in the form of a supplemental EA or a full EIS.  The NEPA regulations mandate:

Agencies:

(1) Shall prepare supplements to either draft or final environmental impact statements if a major Federal action remains to occur, and:

(i) The agency makes substantial changes to the proposed action that are relevant to environmental concerns; or

(ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

40 C.F.R. §1502.9.

The requirement to supplement an EIS under these circumstances applies in equal force to EAs.  For example, in *Native Ecosystems Council v. Tidwell*, the Ninth Circuit held:

the Forest Service's decision not to supplement the Environmental Assessment following the Connelly Review's discussion of the 1900 acres of nesting habitat fails to comply with the agency's obligations to supplement an environmental assessment when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its

35

impacts."

599 F.3d 926, 937 (9th Cir. 2010)(citations omitted).

In *Tidwell*, the Ninth Circuit found that the Forest Service's EA was "predicated on the assumption that no nesting habitat existed in the project area[.]" 599 F.3d at 937.  However, new information that post-dated the original EA undermined that assumption; thus the court found a supplemental EA or EIS would be necessary to address the impact to the species. *Id.*

In this case, as in *Tidwell*, new information that post-dates the Forest Service's EA indicates that actual effects on a sensitive wildlife species may differ from the impacts analyzed in the original EA.  *See Tidwell*, 599 F.3d at 937.  Here, the Black Ram Project EA is predicated on an assumption that the Cabinet-Yaak grizzly population is increasing and recovering; however, new information establishes a record-high female Cabinet-Yaak grizzly mortality rate in 2022, which undermines any assumption that this population is increasing and recovering.

The Project EA provides the public with the following assumptions regarding the status of the Cabinet-Yaak grizzly population:

- "In 2017, the Cabinet-Yaak Ecosystem had an estimated 55-60 individuals with a 73 percent probability that the population was stable or increasing (Kasworm et al. 2018)," FS-002541;

36

- "In the Cabinet-Yaak Recovery Zone . . . bear numbers have been increasing
  and with increasing confidence. . . . it is evident in the Cabinet-Yaak
  Recovery Zone and on the Kootenai National Forest that Forest Service
  activities under this framework have been successful at supporting
  recovery," FS-002557;

- "Current research indicates the population is increasing and is greater than
  when listed," FS-002559;

After the Project EA was released in June 2022, new information was
released by the U.S. Fish & Wildlife Service regarding the status of the Cabinet-
Yaak grizzly population.  On October 17, 2022, U.S. Fish and Wildlife Service
biologist Wayne Kasworm presented a powerpoint to the Kootenai Valley
Resource Initiative collaborative group.  Garrity Declaration ¶15.  In the
powerpoint presentation at page 8, the U.S. Fish & Wildlife Service disclosed the
fact that by that date – October 17, 2022 – three female Cabinet-Yaak grizzly
bears had been killed in 2022.  *Id.*  The following image is an unaltered screenshot
of page 8 of the U.S. Fish & Wildlife Service presentation:

//

//



*Id.*

The only published, peer-reviewed scientific study on the Cabinet-Yaak grizzly population is "Density, Distribution, and Genetic Structure of Grizzly Bears in the Cabinet-Yaak Ecosystem," which was published in The Journal of Wildlife Management, and is commonly referred to Kendall et al. (2016). FS-036961-78. Kendall et al. (2016) expressly finds: "In the small Cabinet and Yaak populations, the difference between growth and decline is 1 or 2 adult females being killed annually or not." FS-036976. Thus, the death of three females in a single year will likely lead to decline. *Id.*

The loss of three female Cabinet-Yaak grizzlies in a single year – 2022 – is thus significant new information or a change in circumstances that necessitates a

new and more accurate analysis in the Black Ram Project EA or EIS of the current

status of the Cabinet- Yaak grizzly population and how this logging and roading

project will likely impact this imperiled population.  This new analysis is

particularly crucial because the Project occurs within the designated Recovery

Zone for this population and, as discussed above in Section (A)(1), the Project

allows road densities and impacts that will exceed the "best available science"

limits for potentially ten years during Project implementation.  The Forest

Service's failure to prepare a supplemental EA or EIS under these circumstances

violates NEPA and the APA.  *See Tidwell*, 599 F.3d at 937.

## IV.  CONCLUSION

For all of the reasons stated above, Alliance respectfully requests that the

Court enter summary judgment in Alliance's favor, either vacate the Black Ram

Project decision or enjoin the Black Ram Project, and remand to the agency for

further analysis.


Respectfully submitted this 27th Day of January, 2023.

> */s/ Rebecca K. Smith*
> Rebecca K. Smith
> PUBLIC INTEREST DEFENSE CENTER, PC
>
> Timothy M. Bechtold
> BECHTOLD LAW FIRM, PLLC
>
> Attorneys for Consolidated Plaintiffs

CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing brief is 6,476 words, which is

within the 6,500 word limit set by Doc. 40, excluding the caption, table of

authorities, table of contents, signature blocks, and certificate of compliance.

*/s/ Rebecca K. Smith*
Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, P.C

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC

Attorneys for Consolidated Plaintiffs

Rebecca K. Smith
Public Interest Defense Center, P.C.
P.O. Box 7584
Missoula, MT 59807
(406) 531-8133
publicdefense@gmail.com

Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, NATIVE ECOSYSTEMS COUNCIL,<br><br>        Plaintiffs,<br>vs.<br><br>KIRSTEN KAISER, District Ranger, Kootenai National Forest, Three Rivers Ranger District; CHAD BENSON, Forest Supervisor, Kootenai National Forest; KEITH LANNOM, Deputy Regional Forester, U.S. Forest Service Region One; U.S. FOREST SERVICE.<br><br>        Defendants. | CV-23-<br><br>COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF |

## I.  INTRODUCTION

1.  This is a civil action for judicial review under the Administrative Procedure Act of the U.S. Forest Service's authorizations and/or lack thereof regarding the Black Ram Project (Project) on the Kootenai National Forest (Forest).

2.  Plaintiffs attest that Defendants' conduct is arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with law.

3.  Defendants' approval of the Project violates the National Environmental Policy Act (NEPA), 42 U.S.C. §4331 et seq., the National Forest Management Act (NFMA), 16 U.S.C. §1600 et seq., and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 et seq.

4.  Plaintiffs seek a declaratory judgment, injunctive relief, the award of costs, and expenses of suit, including attorney and expert witness fees pursuant to the Equal Access to Justice Act, 28 U.S.C. §2412, and/or such other relief as this Court deems just and proper.

## II. JURISDICTION

5.  This action arises under the laws of the United States and involves the United States as a Defendant. Therefore, this Court has subject matter jurisdiction over the claims specified in this Complaint pursuant to 28 U.S.C. §§ 1331, 1346.

6.  An actual controversy exists between Plaintiffs and Defendants. Plaintiffs'

152. One element from the Interagency Grizzly Bear Guidelines states: "Special care will be taken to assure that trail and road construction does not degrade important grizzly use areas."

153. The Project EA does not disclose any of the foregoing provisions from the Interagency Grizzly Bear Guidelines, nor apply them to the Project area.

## VI. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

*The Forest Service has failed to demonstrate that the Project complies with Forest Plan standards for grizzly bear – the Access Amendment and Interagency Grizzly Bear Guidelines – in violation of NEPA, NFMA, and the APA.*

154. All previous paragraphs are incorporated by reference.

155. The Forest Plan mandates: "FW-STD-WL-02. The Motorized Access Management within the Selkirk and Cabinet Yaak Grizzly Bear Recovery Zone Management Direction and ROD is included in appendix B, and shall be applied."

156. The Forest Plan mandates: "FW-GDL-WL-15. Grizzly bear. Elements contained in the most recent 'Interagency Grizzly Bear Guidelines,' or a conservation strategy once a grizzly bear population is delisted, would be applied to management activities."

157. The Project EA fails to demonstrate compliance with the Access

Amendment Record of Decision and the Interagency Grizzly Bear Guidelines.

158. Although undisclosed to the public in the Project EA, the Forest Service's calculations in the Project EA for open motorized route density and total motorized route density exclude breached roads and user-created roads. Similarly, the Forest Service's calculations in the Project EA for core fail to exclude breached roads and user-created roads.

159. By failing to disclose the true existing condition and post-project condition of motorized access in the Project area, both the existing condition and post-project condition calculations are inaccurate. Therefore, it is not possible to determine whether the Project complies with the Access Amendment standards for open motorized route density, total motorized route density, and core.

160. Although undisclosed to the public in the Project EA, the Forest Service has documented a 22% failure rate for barriers and gates in the Forest, and the agency has received documentation of dozens of barriers and gates that do not effectively prevent motorized use, as well as roads with no apparent barrier or gate, in the Project area.

161. It is arbitrary and capricious for the agency to assume 100% barrier/gate effectiveness in light of this available information. Moreover, it is not

possible to determine whether the Project complies with the Access

Amendment standards for open motorized route density, total motorized

route density, and core without consideration of the failure rate of

barriers/gates.  In particular, without 100% barrier effectiveness, the Project

will violate the Access Amendment standard for core: the Project reduces

core and proposes "in-kind replacement" of core, but in-kind replacement of

core is only lawful if the routes behind the barriers can "no longer function

as motorized routes."  If a motorcyle can drive over or around a berm, then

that route can still "function as a motorized route" and accordingly cannot

be counted as in-kind core replacement.

162.   The Project EA fails to disclose the elements of the Interagency Grizzly

Bear Guidelines and fails to apply them to the Project.

163.   Additionally, the Project EA and administrative record fail to disclose and

apply the Interagency Grizzly Bear Guidelines Management Situation-1

requirement:  "Management decisions will favor the needs of the grizzly

bear when grizzly habitat and other land use values compete. Land uses

which can affect grizzlies and/or their habitat will be made compatible with

grizzly needs or such uses will be disallowed or eliminated."

164.   The Project does not favor the needs of grizzlies and the Project is not

compatible with the needs of grizzlies because it will adversely affect the

Cabinet-Yaak grizzly, cause incidental take of female Cabinet-Yaak grizzlies, and allow a potentially 10-year violation of the 33/26/55 "best available science" road density limits from Wakkinen-Kasworm (1997), which is particularly egregious in light of the facts that the Cabinet-Yaak grizzly population is small (42 bears at last count, although recovery minimum is 100 bears), isolated, inbred, failing all recovery targets, and experiencing extremely high female mortality, and the fact that there are multiple other large-scale logging and road-building projects that are currently harming this population without any honest cumulative effects analysis of how the population is being impacted by all of the current projects in the Cabinet-Yaak Recovery Zone.

165.   For these reasons, the Project violates the Forest Plan, in violation of NFMA and the APA, and/or the Forest Service has failed to demonstrate Forest Plan compliance, in violation of NEPA, NFMA, and the APA.

## SECOND CLAIM FOR RELIEF

*The Project EA fails to take a hard look at Project impacts to the imperiled Cabinet-Yaak grizzly population – the Project EA is misleading and impermissibly relies on stale and/or inaccurate data.*

166.   All previous paragraphs are incorporated by reference.

167.   The Project EA does not take a hard look and fully and fairly disclose and

analyze Project impacts to the imperiled, ESA-listed Cabinet-Yaak grizzly bear. The most recent data disclosed and relied upon in the Project EA grizzly bear analysis section is from 2018, although the Project EA was issued in June 2022 – thus the Project EA ignores 3 ½ years of available information. Moreover, the Project EA misleadingly states that the Cabinet-Yaak grizzly bear population is recovering and increasing, which is contrary to the best available information.

168. The Forest Service's use of stale/inaccurate data and misleading representations in the Project EA violates NEPA and the APA.

### THIRD CLAIM FOR RELIEF

*The Project EA fails to take a hard look at unauthorized motorized use – illegal roads and ineffective barriers – and fails to provide adequate analysis of the effectiveness of using barriers and gates as mitigation measures.*

169. All previous paragraphs are incorporated by reference.

170. NEPA mandates that an agency must analyze the efficacy of proposed mitigation measures.

171. The Project EA never evaluates the effectiveness of dirt berms and gates as closure devices on this Forest, or accurately discloses the extent of the problem to the public. These measures repeatedly fail and thus allow unauthorized motorized access, yet the agency analyzes road density and

core as though all gates and berms will be 100% effective indefinitely.  As

discussed above, members of the public documented dozens of ineffective

closures in the Project area already, and the Forest Service did not fix those

closures to make them effective.  Moreover, the Forest Service itself

documented a 22% failure rate of barriers and gates across the Forest – a

known failure rate that the agency refused to disclose to the public in the

Project EA.

172.   The Forest Service's failure to take a "hard look" at unauthorized motorized

access and ineffective closures, and failure to provide the public with a full

and fair discussion about this issue, in the Project EA violates NEPA and the

APA.

### FOURTH CLAIM FOR RELIEF

*The Forest Service's refusal to prepare a full EIS for the Black Ram Project*

*violates NEPA and the APA.*

173.   All previous paragraphs are incorporated by reference.

174.   An EIS is required under NEPA to examine any "major Federal actions

significantly affecting the quality of the human environment." 42 U.S.C. §

4332(C).

175.   An EIS must be prepared if substantial questions are raised whether a project

may cause significant degradation of some human environmental factor. To

trigger this requirement a plaintiff need not show that significant effects will in fact occur, but raising substantial questions whether a project may have a significant effect is sufficient.

176.   The Council on Environmental Quality has adopted regulations governing the implementation of NEPA. In determining whether a federal action requires an EIS because it significantly affects the quality of the human environment, an agency must consider what "significantly" means. The regulations give it two components: context and intensity. 40 C.F.R. § 1508.27. Context refers to the setting in which the proposed action takes place; intensity means "the severity of the impact." *Id.*

177.   There are ten severity factors to consider. 40 C.F.R. §1508.27.

178.   The Ninth Circuit holds: "one of these factors may be sufficient to require preparation of an EIS in appropriate circumstances." *Ocean Advocs. v. U.S. Army Corps of Engineers*, 402 F.3d 846 (9th Cir. 2005).

179.   ADVERSE &/OR CUMULATIVELY SIGNIFICANT IMPACT.  The Project will have a cumulatively significant impact on the already-imperiled Cabinet-Yaak grizzly population when all other logging and road-building projects in the Cabinet-Yaak Recovery Zone are considered.

180.   ADVERSE EFFECT TO ESA SPECIES.   The Project will adversely affect the Cabinet-Yaak grizzly and cause incidental take of female Cabinet-Yaak

grizzlies.

181.    VIOLATION OF ACCESS AMENDMENT & FEDERAL LAWS.  The

Project violates the Forest Plan, NEPA, and the APA.

182.    For these reasons, the Forest Service violated NEPA by refusing to prepare a

full EIS for the Project.

## FIFTH CLAIM FOR RELIEF

*Alternatively, the Forest Service must prepare a supplemental EA for the Project*

*to address the extremely high female grizzly mortalities*

*suffered by the Cabinet-Yaak grizzly population in 2022.*

183.    All previous paragraphs are incorporated by reference.

184.    As noted above, in October 2022, the U.S. Fish and Wildlife Service

disclosed the fact that the Cabinet-Yaak grizzly population had suffered four

mortalities in 2022 – including three female grizzly mortalities.

185.    The conclusions and analyses in the Project EA are premised upon an

assumption that the Cabinet-Yaak grizzly population is increasing and

recovering.

186.    The best available science (Kendall et al (2016)) indicates that a loss of one

or two Cabinet-Yaak grizzly females in a year may result in a declining

population.

187.    The loss of three females in a single year – 2022 – is thus significant new

information and/or a change in circumstances that necessitate a new and
more accurate analysis in the Project EA of the current status of the Cabinet-
Yaak grizzly population and how this logging and roading project in the
Cabinet-Yaak Grizzly Recovery Zone – which will violate the "best
available science" 33/26/55 road limits for potentially 10 years –  will likely
impact this imperiled population.

188.   The Forest Service's failure to prepare a supplemental EA violates NEPA
and the APA.

## VII. RELIEF REQUESTED

For all of the above-stated reasons, Plaintiffs request that this Court award the
following relief:

A.     Declare that the Project violates the law;

B.     Either vacate the Project decision or enjoin implementation of the Project;

C.     Award Plaintiffs their costs, expenses, expert witness fees, and reasonable
attorney fees under EAJA; and

D.     Grant Plaintiffs any such further relief as may be just, proper, and equitable.

Respectfully submitted this 6th Day of January, 2023.

                              */s/ Rebecca K. Smith*
                              Rebecca K. Smith
                              PUBLIC INTEREST DEFENSE CENTER, PC
                              Timothy M. Bechtold
                              BECHTOLD LAW FIRM, PLLC
                              Attorneys for Plaintiffs

49

# Exhibit 2

Case 9:22-cv-00114-DWM   Document 35-2   Filed 12/13/22   Page 2 of 14

# U.S. Fish and Wildlife Service Administrative Record Index

| Bates # | Date | Document Type | From | To | Document Descriptor |
|---|---|---|---|---|---|
| | | | **Consultation Documents** | | |
| FWS000001-FWS000077 | 8/26/2022 | Biological Opinion | Zerrenner, FWS | Benson, FS | Revised biological opinion on the effects of the Black Ram project on grizzly bears |
| FWS000078-FWS000078 | 6/9/2022 | Letter of Concurrence | Conard, FWS | Benson, FS | Letter of concurrence for wolverine determination for the Black Ram project |
| FWS000079-FWS000081 | 10/6/2021 | Letter and Errata | Bush, FWS | Benson, FS | Errata to Black Ram Biop |
| FWS000082-FWS000155 | 9/15/2021 | Letter of Concurrence and Biological Opinion | Bush, FWS | Benson, FS | Letter of concurrence for lynx and lynx critical habitat and biological opinion on the effects of the Black Ram project on grizzly bears |
| FWS000156-FWS000167 | 2/17/2021 | Biological Assessment | Benson, FS | Bush, FWS | Black Ram Biological Assessment for Whitebark Pine, Kootenai National Forest |
| FWS000168-FWS000320 | 9/17/2020 | Biological Assessment | Benson, FS | Bush, FWS | Black Ram Biological Assessment for Canada Lynx and Grizzly Bear, Kootenai National Forest |
| | | | **Literature Cited and Miscellaneous** | | |
| FWS000321-FWS000352 | 2022 | Report | Population Review | | Report of population data for Lincoln County, MT, and for Yaak, MT |
| FWS000353-FWS000950 | 2022 | Report | U.S. Forest Service | | Black Ram Environmental Assessment |
| FWS000951-FWS000954 | 2021 | Meeting Notes | Wildlife Service | | Level 1 meeting between KNF and USFWS, Aug 13, 2021 |

Page 1 of 13

# U.S. Fish and Wildlife Service Administrative Record Index

| Bates # | Date | Document Type | From | To | Document Descriptor |
|---------|------|---------------|------|----|--------------------|
| FWS000955-FWS000957 | 2021 | Report | U.S. Forest Service | | Lynx Habitat treated using exemptions and exceptions on the KNF as of 4/19/2021 |
| FWS000958-FWS000984 | 2021 | Literature | Wildlife Service | | 5-Year Status Review for Grizzly Bear in the lower-48 states |
| FWS000985-FWS001065 | 2021 | Report | U.S. Forest Service | | Selkirk/Cabinet-Yaak Grizzly Bear Recovery Zones 2020 Bear Year Annual Monitoring Report |
| FWS001066-FWS001433 | 2021 | Literature | Wildlife Service | | Species status assessment for the grizzly bear (Ursus arctos horribilis) in the lower-48 states: a biological report |
| FWS001434-FWS001444 | 2021 | Report | U.S. Forest Service | | Schedule of Proposed Activities for the Kootenai National Forest. |
| FWS001445-FWS001552 | 2021 | Report | Kasworm et al. | | (Final) Cabinet-Yaak grizzly bear recovery area 2020 research and monitoring progress report |
| FWS001553-FWS001563 | 2021 | Biological Opinion Errata | U.S. Fish and Wildlife Service | | Errata to the Biological Opinion on the Revised Forest Plan for the Kootenai National Forest, Chapter III: Biological Opinion for Canada Lynx |
| FWS001564-FWS001567 | 2021 | Report | U.S. Forest Service | | acres of adverse effecs from treatments authorized under the Revised Forest Plan for years 2013 through 2020 for the Kootenai National Forest. |
| FWS001568-FWS001677 | 2021 | Report | Kasworm et al. | | (Draft) Cabinet-Yaak grizzly bear recovery area 2020 research and monitoring progress report |
| FWS001678-FWS001702 | 2021 | Report | Thomsen et al. | | Pacific Northwest National Scenic Trail: A geospatial analysis of Grizzly Bear core habitat, linkage corridors, habitat quality, and Bears Outside Recovery Zone (BORZ) |
| FWS001703-FWS001729 | 2021 | Report | PNTA | | Frequently Asked Questions about the Pacific Northwest Trail. https://www.pnt.org/pnta/know-before-you-go/plan-your-trip/faq/. Accessed 6/28/2021 |
| FWS001730-FWS001740 | 2021 | Literature | Colton et al. | | Grizzly bear respons to harvesting |

Page 2 of 13

Case 9:22-cv-00114-DWM  Document 35-2  Filed 12/13/22  Page 4 of 14

# U.S. Fish and Wildlife Service Administrative Record Index

| Bates # | Date | Document Type | From | To | Document Descriptor |
|---|---|---|---|---|---|
| FWS001741-FWS001779 | 2020 | Report | U.S. Forest Service | | Selkirk/Cabinet-Yaak Grizzly Bear Recovery Zones 2019 Bear Year Annual Monitoring Report |
| FWS001780-FWS001782 | 2020 | Objection | Center for Biological Diversity and WildEarth Guardians | | Black Ram Objection - Supplement 2 - CBD WEG - 2020-12-03 - FINAL |
| FWS001783-FWS001818 | 2020 | Report | U.S. Forest Service | | Survey Results National Summary Report: Data collected FY 2016 through FY 2020 |
| FWS001819-FWS001821 | 2020 | Objection | Center for Biological Diversity and WildEarth Guardians | | Black Ram Objection |
| FWS001822-FWS001899 | 2020 | Objection | Center for Biological Diversity and WildEarth Guardians | | Black Ram Objection - Supplement 1 - CBD WEG - 2020-12-01 - FINAL.doc |
| FWS001900-FWS001911 | 2020 | Report | Forest Council | | Black Ram Project Area- Road Barrier Survey |
| FWS001912-FWS002060 | 2020 | Biological Opinion | Wildlife Service | | Biological opinion on the effects of the Kootenai National Forest Land Management Plan on the grizzly bear. |
| FWS002061-FWS002085 | 2020 | Literature | Proctor et al. | | Effects of roads and motorized human access on grizzly bear populations in British Columbia and Alberta, Canada. |
| FWS002086-FWS002412 | 2020 | Literature | Subcommittee | | Conservation strategy for the grizzly bear in the Northern Continental Divide Ecosystem. |

Case 9:22-cv-00114-DWM   Document 35-2   Filed 12/13/22   Page 5 of 14

# U.S. Fish and Wildlife Service Administrative Record Index

| Bates # | Date | Document Type | From | To | Document Descriptor |
|---|---|---|---|---|---|
| FWS002413-FWS002465 | 2020 | Objection | Mattson | | Nov. 2020 |
| FWS002466-FWS002570 | 2020 | Literature | Kasworm et al. | | Cabinet-Yaak grizzly bear recovery area 2019 research and monitoring progress report. |
| FWS002571-FWS002592 | 2020 | Literature | Costello and Roberts | | Northern Continental Divide Ecosystem Grizzly Bear Monitoring Team Annual Report, 2019 |
| FWS002593-FWS002730 | 2019 | Literature | vanManen et al. | | Yellowstone grizzly bear investigations: annual report of the Interagency Grizzly Bear Study Team, 2018. |
| FWS002731-FWS002744 | 2019 | Report | U.S. Forest Service | | Selkirk and Cabinet- Yaak Grizzly Bear Recovery Zones 2018 Annual Monitoring Report |
| FWS002745-FWS002754 | 2019 | Literature | Ordiz et al. | | responses? Brown bear responses after repeated approaches by humans on foot |
| FWS002755-FWS002806 | 2019 | Report | Mattson | | the effects of hikers, hunters, photographers, campers, and watchers. |
| FWS002807-FWS002904 | 2019 | Report | Kasworm et al. | | Selkirk/Cabinet-Yaak Grizzly Bear Recovery Zones 2018 Bear Year Annual Monitoring Report |
| FWS002905-FWS002923 | 2019 | Report | Annis and Trimbo | | Grizzly and black bear management report; Cabinet-Yaak Ecosystem; 2019 Annual Report. |
| FWS002924-FWS002935 | 2018 | Report | U.S. Forest Service | | Cabinet-Yaak/Selkirk Grizzly Bear Recovery Zones 2017 Bear Year Annual Monitoring Report |
| FWS002936-FWS002947 | 2018 | Literature | Lamb et al. | | Effects of habitat quality and access management on the density of a recovering grizzly bear population |
| FWS002948-FWS003049 | 2018 | Report | Kasworm et al. | | Selkirk/Cabinet-Yaak Grizzly Bear Recovery Zones 2017 Bear Year Annual Monitoring Report |
| FWS003050-FWS003206 | 2018 | Literature | Cole | | Pacific Northwest National Scenic Trail. University of Montana Graduate Thesis. |
| FWS003207-FWS003220 | 2017 | Report | U.S. Forest Service | | Cabinet-Yaak/Selkirk Grizzly Bear Recovery Zones 2016 Bear Year Annual Monitoring Report |

Page 4 of 13

# U.S. Fish and Wildlife Service Administrative Record Index

| Bates # | Date | Document Type | From | To | Document Descriptor |
|---|---|---|---|---|---|
| FWS003221-FWS003230 | 2017 | Literature | Mowat et al. | | grizzly bear population density in the Kettle-Granby area of British Columbia |
| FWS003231-FWS003242 | 2017 | Literature | Lamb et al. | | Forbidden fruit: human settlement and abundant fruit create an ecological trap for an apex omnivore. |
| FWS003243-FWS003343 | 2017 | Report | Kasworm et al. | | Selkirk/Cabinet-Yaak Grizzly Bear Recovery Zones 2016 Bear Year Annual Monitoring Report |
| FWS003344-FWS003476 | 2016 | Literature | Wildlife Service | | 2016 conservation strategy for the grizzly bear in the Greater Yellowstone Ecosystem. |
| FWS003477-FWS003492 | 2016 | Report | U.S. Forest Service | | Cabinet-Yaak/Selkirk Grizzly Bear Recovery Zones 2015 Bear Year Annual Monitoring Report |
| FWS003493-FWS003510 | 2016 | Literature | Kendall et al. | | Density, distribution, and genetic structure of grizzly bears in the Cabinet-Yaak Ecosystem |
| FWS003511-FWS003612 | 2016 | Report | Kasworm et al. | | Selkirk/Cabinet-Yaak Grizzly Bear Recovery Zones 2015 Bear Year Annual Monitoring Report |
| FWS003613-FWS003638 | 2016 | Literature | Fortin et al. | | Impacts of Human Recreation on Brown Bears (Ursus arctos): A Review and New Management Tool |
| FWS0036639-FWS003773 | 2016 | Literature | Costello et al. | | Grizzly bear demographics in the Northern Continental Divide Ecosystem, Montana: research results (2004-2014) and suggested techniques for management of mortality |
| FWS003774-FWS003786 | 2015 | Report | U.S. Forest Service | | Cabinet-Yaak/Selkirk Grizzly Bear Recovery Zones 2014 Bear Year Annual Monitoring Report |
| FWS003787-FWS003975 | 2015 | Literature | U.S. Forest Service | | Land Management Plan. 2015 Revision. Kootenai National Forest, |
| FWS003976-FWS003990 | 2015 | Literature | Proctor et al. | | Grizzly bear connectivity mapping in the Canada–United States Trans-Border Region |

# U.S. Fish and Wildlife Service Administrative Record Index

| Bates # | Date | Document Type | From | To | Document Descriptor |
|---|---|---|---|---|---|
| FWS003991-FWS004086 | 2015 | Report | Kasworm et al. | | Selkirk/Cabinet-Yaak Grizzly Bear Recovery Zones 2014 Bear Year Annual Monitoring Report |
| FWS004087-FWS004099 | 2014 | Report | U.S. Forest Service | | Cabinet-Yaak/Selkirk Grizzly Bear Recovery Zones 2013 Bear Year Annual Monitoring Report |
| FWS004100-FWS004121 | 2014 | Literature | and Stenhouse | | The ipact of roads on the demography of grizzly bears in Alberta |
| FWS004122-FWS004263 | 2013 | Biological Opinion | Wildlife Service | | Kootenai National Forest; Chapter III- Biological opinion for Canada lynx. |
| FWS004264-FWS004387 | 2013 | Biological Opinion | Wildlife Service | | Kootenai National Forest; Chapter II- Biological opinion for Grizzly bear. |
| FWS004388-FWS004464 | 2013 | Biological Opinion | Wildlife Service | | Biological opinion on the Revised Forest Plan for the Kootenai National Forest; Chapter I- Introduction. |
| FWS004465-FWS004480 | 2013 | Report | U.S. Forest Service | | Selkirk/Cabinet-Yaak Grizzly Bear Recovery Zones 2012 Bear Year Annual Monitoring Report (corrected 2019) |
| FWS004481-FWS004492 | 2012 | Report | U.S. Forest Service | | Selkirk and Cabinet- Yaak Grizzly Bear Recovery Zones 2011 Annual Monitoring Report |
| FWS004493-FWS004497 | 2011 | Literature | U.S. Forest Service | | Kootenai National Forest Food Storage Order |
| FWS004498-FWS004571 | 2011 | Literature | U.S. Forest Service | | Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones. Record of Decision. Kootenai, Lolo, and Idaho Panhandle National Forests Lincoln, Sanders, Bonner, Boundary, and Pend Oreille Counties Montana, Idaho, and Washington. |
| FWS004572-FWS004798 | 2011 | Biological Opinion | U.S. Fish and Wildlife Service | | Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones on the Kootenai, Idaho Panhandle, and Lolo National Forests |

# U.S. Fish and Wildlife Service Administrative Record Index

| Bates # | Date | Document Type | From | To | Document Descriptor |
|---|---|---|---|---|---|
| FWS004799-FWS004830 | 2011 | Literature | Allen et al. | | best available science for the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones |
| FWS004831-FWS004844 | 2010 | Literature | Schwartz et al. | | Hazards affecting grizzly bear survival in the Greater Yellowstone Ecosystem |
| FWS004845-FWS004969 | 2007 | Biological Opinion | U.S. Fish and Wildlife Service | | Lynx Amendment on the Distinct Population Segment (DPS) of Canada lynx (Lynx canadensis)(lynx) in the contiguous United States. |
| FWS004970-FWS004971 | 2006 | Memorandum | U.S. Fish and Wildlife Service | | Recovery Units and Jeopardy Determinations under Section 7 of the Endangered Species Act. Memorandum from Director Hall to Regional Directors |
| FWS004972-FWS004982 | 2004 | Literature | Proctor et al. | | Gender-specific dispersal distances of grizzly bears estimated by genetic analysis |
| FWS004983-FWS004997 | 2004 | Literature | Mattson and Merrill | | A model-based appraisal of habitat conditions for grizzly bears in the Cabinet-Yaak region of Montana and Idaho |
| FWS004998-FWS005008 | 2002 | Literature | Gibeau et al. | | Grizzly bear response to human development and activities in the Bow River Watershed, Alberta, Canada |
| FWS005009-FWS005018 | 2001 | Literature | Gibeau et al. | | Managing for grizzly bear security areas in Banff National Park and the central Canadian Rocky Mountains. |
| FWS005019-FWS005026 | 1998 | Literature | Grizzly Bear Committee | | Revised interagency grizzly bear taskforce report: grizzly bear/motorized access management |
| FWS005027-FWS005055 | 1997 | Literature | Kasworm and Waller | | Grizzly bear and road density relationships in the Selkirk and Cabinet- Yaak recovery zones |
| FWS005056-FWS005265 | 1997 | Report | | | |
| FWS005266-FWS005276 | 1996 | Literature | Mace et al. | | Relationships among grizzly bears, roads and habitat on the Swan Mountains, Montana |

Page 7 of 13

Case 9:22-cv-00114-DWM   Document 35-2   Filed 12/13/22   Page 9 of 14

# U.S. Fish and Wildlife Service Administrative Record Index

| Bates # | Date | Document Type | From | To | Document Descriptor |
|---|---|---|---|---|---|
| FWS005277-FWS005284 | 1994 | Literature | Grizzly Bear Committee | | Interagency Grizzly Bear Committee - Taskforce report: grizzly bear/motorized access management |
| FWS005285-FWS005479 | 1993 | Literature | Wildlife Service | | Grizzly bear recovery plan |
| FWS005480-FWS005553 | 1992 | Literature | Waller | | management |
| FWS005554-FWS005662 | 1990 | Literature | Their | | Population characteristics and the effects of hunting on black bears in a portion of northwestern Montana |
| FWS005663-FWS005688 | 1990 | Literature | Grizzly Bear Committee | | CEM- A model for assessing effects on grizzly bears. |
| FWS005689-FWS006035 | 1989 | Literature | Kasworm | | Interagency publication |
| | | | | | Final report: East front grizzly studies Montana |
| **Messages (emails and letters)** | | | | | |
| FWS006036-FWS006041 | 8/26/2022 | Letter | Zerrenner | Zaccardi | ckRam |
| FWS006042-FWS006042 | 8/26/2022 | Email | Hill, FS | FWS | ownership |
| FWS006043-FWS006044 | 8/26/2022 | Email | Hill, FS | FWS | 20220826a_EM_Hill_Lewis_BMU 14 and 15 ownership |
| FWS006045-FWS006046 | 8/1/2022 | Email | FWS | FWS | population estimates |
| FWS006047-FWS006048 | 7/13/2022 | Email | Kasworm, FWS | Lewis, FWS | 20220713_EM_Kasworm_Lewis_RE_DRAFT response to Knotty Pine NOI minimum numbers |
| FWS006049-FWS006049 | 9/27/2021 | Email | Lewis, FWS | Anderson | 20210927_EM_Lewis_Anderson_Level1NotesReMonitori |
| FWS006050-FWS006051 | 9/10/2021 | Email | Hill, FS | Lewis, FWS | 20210910_EM_Hill_Lewis_RE_undetermined roads |
| FWS006052-FWS006053 | 8/13/2021 | Email | Hill, FS | Lewis, FWS | 20210813_EMattach2_Hill_Lewis_[EXTERNAL] RE_ draft Appendix language |
| FWS006054-FWS006054 | 8/13/2021 | Email | Hill, FS | Lewis, FWS | 20210813_EMattach1_Hill_Lewis_[EXTERNAL] RE_ draft Appendix language |
| FWS006055-FWS006055 | 8/13/2021 | Email | Hill, FS | Lewis, FWS | 20210813_EM_Hill_Lewis_[EXTERNAL] RE_ draft Appendix language |
| FWS006056-FWS006059 | 7/30/2021 | Email | Lewis, FWS | Hill, FS | Black Ram Project |

Page 8 of 13

# U.S. Fish and Wildlife Service Administrative Record Index

| Bates # | Date | Document Type | From | To | Document Descriptor |
|---|---|---|---|---|---|
| FWS006060-FWS006061 | 7/30/2021 | Email | Lewis, FWS | Hill, FS | Project |
| FWS006062-FWS006063 | 7/30/2021 | Email | Peterson, YVFC | Bush, FWS | [EXTERNAL] Black Ram project KNF Knotty Pine and Buckhorn |
| FWS006064-FWS006064 | 7/30/2021 | Email | Peterson, YVFC | Bush, FWS | [EXTERNAL] Black Ram project KNF Knotty Pine and Buckhorn |
| FWS006065-FWS006076 | 7/30/2021 | Email | Peterson, YVFC | Bush, FWS | 20210730b_EM_Peterson_Bush RE_[EXTERNAL] Black Ram project KNF Knotty Pine and Buckhorn |
| FWS006077-FWS006079 | 7/30/2021 | Email | Peterson, YVFC | Bush, FWS | [EXTERNAL] Black Ram project KNF Knotty Pine and Buckhorn |
| FWS006080-FWS006081 | 7/27/2021 | Email | Lewis, FWS | Hill, FS | 20210727b_EMattach_Lewis_Hill_RE_[EXTERNAL] draft biological opinion - KNF comments |
| FWS006082-FWS006084 | 7/27/2021 | Email | Lewis, FWS | Hill, FS | 20210727b_EM_Lewis_Hill_RE_[EXTERNAL] draft biological opinion - KNF comments |
| FWS006085-FWS006086 | 7/27/2021 | Email | Lewis, FWS | Hill, FS | 20210727a_EMattach2_Hill_Lewis_[EXTERNAL] draft biological opinion - KNF comments |
| FWS006087-FWS006088 | 7/27/2021 | Email | Lewis, FWS | Hill, FS | 20210727a_EMattach1_Hill_Lewis_[EXTERNAL] draft biological opinion - KNF comments |
| FWS006089-FWS006155 | 7/27/2021 | Email | Hill, FS | Lewis, FWS | 20210727a_EM_Hill_Lewis_[EXTERNAL] draft biological opinion - KNF comments |
| FWS006156-FWS006156 | 7/26/2021 | Email | Hill, FS | Lewis, FWS | 20210726_EM_Hill_Lewis_RE_[EXTERNAL] RE_ Black Ram lynx questions |
| FWS006157-FWS006159 | 7/22/2021 | Email | Carlson, FS | FWS | oringReport |
| FWS006160-FWS006240 | 7/22/2021 | Email | Carlson, FS | FWS | oringReport |
| FWS006241-FWS006241 | 7/22/2021 | Email | Carlson, FS | FWS | eport |
| FWS006242-FWS006243 | 7/18/2021 | Email | Lewis, FWS | Hill, FS | 20210718_EMattach_Lewis_Hill_DRAFT Black Ram BO for Forest Review |
| FWS006244-FWS006310 | 7/18/2021 | Email | Lewis, FWS | Hill, FS | Forest Review |

Page 9 of 13

# U.S. Fish and Wildlife Service Administrative Record Index

Case 9:22-cv-00114-DWM   Document 35-2   Filed 12/13/22   Page 11 of 14

| Bates # | Date | Document Type | From | To | Document Descriptor |
|---|---|---|---|---|---|
| FWS006311-FWS006311 | 7/15/2021 | Email | Hill, FS | Lewis, FWS | 20210715_EM_Hill_Lewis_[EXTERNAL] RE_ additional Black Ram questions |
| FWS006312-FWS006314 | 7/14/2021 | Email | Kasworm, FWS | Lewis, FWS | 20210714 EM Kasworm_Lewis_RE_ Draft Black Ram BO for FWS Review.docx |
| FWS006315-FWS006316 | 7/9/2021 | Email | Allen, FS | FWS | BiOp timeline |
| FWS006317-FWS006322 | 7/7/2021 | Email | Hollifield, FS | Lewis, FWS | 20210707b EMattach2_Hollifield_Lewis_RE_ EXTERNAL RE_ Forest monitoring report |
| FWS006323-FWS006370 | 7/7/2021 | Email | Hollifield, FS | Lewis, FWS | 20210707b EMattach1_Hollifield_Lewis_RE_ EXTERNAL RE_ Forest monitoring report |
| FWS006371-FWS006374 | 7/7/2021 | Email | Hollifield, FS | Lewis, FWS | 20210707b EM_Hollifield_Lewis_RE_ [EXTERNAL] RE_ Forest monitoring report... or pieces of it |
| FWS006375-FWS006395 | 7/7/2021 | Email | Hill, FS | Lewis, FWS | 20210707a EMattach_Hill_Lewis_[EXTERNAL] RE_ Request for information for Black Ram Project |
| FWS006396-FWS006398 | 7/7/2021 | Email | Hill, FS | Lewis, FWS | 20210707a EM_Hill_Lewis_[EXTERNAL] RE_ Request for information for Black Ram Project |
| FWS006399-FWS006399 | 7/6/2021 | Email | Hill, FS | Lewis, FWS | 20210706b EMattach_Hill_Lewis_RE [EXTERNAL] RE OMRD clarification |
| FWS006400-FWS006402 | 7/6/2021 | Email | Hill, FS | FWS | OMRD clarification |
| FWS006403-FWS006405 | 7/6/2021 | Email | Hill, FS | Lewis, FWS | 20210706a EM_Hill_Lewis_[EXTERNAL] RE_ core exchange question, and North-East Yaak Project |
| FWS006406-FWS006417 | 7/2/2021 | Email | Fox, WEG | Bush, FWS | 20210702_EMattach4_Fox_Bush_FW_ [EXTERNAL] Fwd_ Black Ram - Thank You and Follow-up |
| FWS006418-FWS006515 | 7/2/2021 | Email | Fox, WEG | Bush, FWS | 20210702_EMattach3_Fox_Bush_FW_ [EXTERNAL] Fwd_ Black Ram - Thank You and Follow-up |
| FWS006516-FWS006533 | 7/2/2021 | Email | Fox, WEG | Bush, FWS | 20210702_EMattach2_Fox_Bush_FW_ [EXTERNAL] Fwd_ Black Ram - Thank You and Follow-up |

# U.S. Fish and Wildlife Service Administrative Record Index

| Bates # | Date | Document Type | From | To | Document Descriptor |
|---|---|---|---|---|---|
| FWS006534-FWS006539 | 7/2/2021 | Email | Fox, WEG | Bush, FWS | 20210702_EMattach1_Fox_Bush_FW_[EXTERNAL] Fwd_Black Ram - Thank You and Follow-up |
| FWS006540-FWS006542 | 7/2/2021 | Email | Fox, WEG | Bush, FWS | 20210702_EM Fox Bush FW_[EXTERNAL] Fwd_Black Ram - Thank You and Follow-up |
| FWS006543-FWS006543 | 7/1/2021 | Email | Hill, FS | FWS | check me |
| FWS006544-FWS006545 | 7/1/2021 | Email | Hill, FS | FWS | check me |
| FWS006546-FWS006546 | 6/30/2021 | Email | Hill, FS | Lewis, FWS | 20210630b_EMattach_Hill_Lewis_FW_[EXTERNAL] RE_denning habitat map |
| FWS006547-FWS006548 | 6/30/2021 | Email | Hill, FS | Lewis, FWS | 20210630b EM_Hill_Lewis_FW_[EXTERNAL] RE_denning habitat map |
| FWS006549-FWS006549 | 6/30/2021 | Email | Hill, FS | Lewis, FWS | 20210630a_EMattach_Hill_Lewis_RE_[EXTERNAL] RE_denning habitat map |
| FWS006550-FWS006551 | 6/30/2021 | Email | Hill, FS | Lewis, FWS | 20210630a EM_Hill_Lewis_RE_[EXTERNAL] RE_denning habitat map |
| FWS006552-FWS006577 | 6/23/2021 | Email | Hill, FS | Lewis, FWS | 20210623_EMattach_Hill_Lewis_RE_[EXTERNAL] further supplemental information |
| FWS006578-FWS006583 | 6/23/2021 | Email | Hill, FS | FWS | habitat map |
| FWS006584-FWS006585 | 6/21/2021 | Email | Kasworm, FWS | Lewis, FWS | 20210621_EM_Kasworm_Lewis_RE_clarification on mortalities near open roads |
| FWS006586-FWS006695 | 6/4/2021 | Email | FWS | FWS | report |
| FWS006696-FWS006696 | 6/4/2021 | Email | FWS | FWS | 20210604_EM_Kasworm_Lewis_Draft CY Grizzly report |
| FWS006697-FWS006704 | 5/26/2021 | Email | Hill, FS | Lewis, FWS | 20210526_EMattach3_Hill_Lewis_RE_[EXTERNAL] further supplemental information |
| FWS006705-FWS006729 | 5/26/2021 | Email | Hill, FS | Lewis, FWS | 20210526_EMattach2_Hill_Lewis_RE_[EXTERNAL] further supplemental information |
| FWS006730-FWS006886 | 5/26/2021 | Email | Hill, FS | Lewis, FWS | 20210526_EMattach1_Hill_Lewis_RE_[EXTERNAL] further supplemental information |

# U.S. Fish and Wildlife Service Administrative Record Index

| Bates # | Date | Document Type | From | To | Document Descriptor |
|---|---|---|---|---|---|
| FWS006887-FWS006891 | 5/26/2021 | Email | Hill, FS | Lewis, FWS | 20210526_EM_Hill_Lewis_RE_[EXTERNAL] further supplemental information |
| FWS006892-FWS006892 | 5/25/2021 | Email | Hill, FS | Lewis, FWS | 20210525_EMattach_Hill_Lewis_[EXTERNAL] further supplemental information |
| FWS006893-FWS006894 | 5/25/2021 | Email | Hill, FS | Lewis, FWS | 20210525_EM_Hill_Lewis_[EXTERNAL] further supplemental information |
| FWS006895-FWS006895 | 5/21/2021 | Email | Hill, FS | Lewis, FWS | 20210521_EMattach6_Hill_Lewis_[EXTERNAL] Fine-scale habitat maps |
| FWS006896-FWS006896 | 5/21/2021 | Email | Hill, FS | Lewis, FWS | 20210521_EMattach5_Hill_Lewis_[EXTERNAL] Fine-scale habitat maps |
| FWS006897-FWS006897 | 5/21/2021 | Email | Hill, FS | Lewis, FWS | 20210521_EMattach4_Hill_Lewis_[EXTERNAL] Fine-scale habitat maps |
| FWS006898-FWS006898 | 5/21/2021 | Email | Hill, FS | Lewis, FWS | 20210521_EMattach3_Hill_Lewis_[EXTERNAL] Fine-scale habitat maps |
| FWS006899-FWS006899 | 5/21/2021 | Email | Hill, FS | Lewis, FWS | 20210521_EMattach2_Hill_Lewis_[EXTERNAL] Fine-scale habitat maps |
| FWS006900-FWS006900 | 5/21/2021 | Email | Hill, FS | Lewis, FWS | 20210521_EMattach1_Hill_Lewis_[EXTERNAL] Fine-scale habitat maps |
| FWS006901-FWS006901 | 5/21/2021 | Email | Hill, FS | FWS | habitat maps |
| FWS006902-FWS006902 | 5/20/2021 | Email | Hill, FS | FWS | Ram map |
| FWS006903-FWS006903 | 5/20/2021 | Email | Hill, FS | FWS | map |
| FWS006904-FWS006905 | 5/19/2021 | Phone Log | Lewis, FWS | , FWS | 20210519_PC_Lewis_Kasworm_call re Black Ram |
| FWS006906-FWS006930 | 5/19/2021 | Email | FS | FWS | Grizzly Bears |
| FWS006931-FWS006934 | 5/19/2021 | Email | Anderson, FS | Lewis, FWS | 20210519_EMattach_Anderson_Lewis_[EXTERNAL] PNT & Grizzly Bears |
| FWS006935-FWS006935 | 5/19/2021 | Email | Hill, FS | Lewis, FWS | 20210519_EM_Hill_Lewis_RE_[EXTERNAL] RE_ Black Ram lynx questions |

Page 12 of 13

# U.S. Fish and Wildlife Service Administrative Record Index

| Bates # | Date | Document Type | From | To | Document Descriptor |
|---|---|---|---|---|---|
| FW S006936-FWS006936 | 5/13/2021 | Email | Hill, FS | Lewis, FWS | 20210513_EMattach5_Hill_Lewis_[EXTERNAL] RE_ Black Ram lynx questions |
| FW S006937-FWS006937 | 5/13/2021 | Email | Hill, FS | Lewis, FWS | 20210513_EMattach4_Hill_Lewis_[EXTERNAL] RE_ Black Ram lynx questions |
| FW S006938-FWS006938 | 5/13/2021 | Email | Hill, FS | Lewis, FWS | 20210513_EMattach3_Hill_Lewis_[EXTERNAL] RE_ Black Ram lynx questions |
| FW S006939-FWS006939 | 5/13/2021 | Email | Hill, FS | Lewis, FWS | 20210513_EMattach2_Hill_Lewis_[EXTERNAL] RE_ Black Ram lynx questions |
| FW S006940-FWS006940 | 5/13/2021 | Email | Hill, FS | Lewis, FWS | 20210513_EMattach1_Hill_Lewis_[EXTERNAL] RE_ Black Ram lynx questions |
| FW S006941-FWS006943 | 5/13/2021 | Email | Hill, FS | Lewis, FWS | 20210513_EM_Hill_Lewis_[EXTERNAL] RE_ Black Ram lynx questions |
| FW S006944-FWS006955 | 5/11/2021 | Email | Carlson, FS | Lewis, FWS | 20210511_EMattach_Carlson_Lewis_RE_ [EXTERNAL] FW_ Black Ram Transmittal Letter |
| FW S006956-FWS006958 | 5/11/2021 | Email | Carlson, FS | Lewis, FWS | 20210511_EM_Carlson_Lewis_RE_ [EXTERNAL] FW_ Black Ram Transmittal Letter |
| FW S006959-FWS006962 | 4/5/2021 | Letter | Peterson, YVFC | Williams, FWS | 20210405_LTR_Petersonetal_Williamsetal_Grizzly status review and Black Ram |
| FW S006963-FWS006967 | 7/24/2020 | Email | Anderson, FS | Lewis, FWS | 20200724_EMattach_Anderson_Lewis_RE_ [EXTERNAL] RE_ clarifications |
| FW S006968-FWS006970 | 7/24/2020 | Email | Anderson, FS | Lewis, FWS | 20200724_EM_Anderson_Lewis_RE_ [EXTERNAL] RE_ clarifications |





# United States Department of the Interior

## Fish and Wildlife Service

Montana Ecological Services Office
585 Shephard Way, Suite 1
Helena, Montana 59601-6287

**In Reply Refer To:**
File: M.19 Kootenai National Forest
06E11000-2021-F-0440 Black Ram Project
2022-0068509

August 26, 2022

Chad Benson, Forest Supervisor
Kootenai National Forest
31374 US Highway 2
Libby, MT 59923-3022

Dear Mr. Benson,

The U.S. Fish and Wildlife Service (Service) has amended our Biological Opinion (BO) regarding the Black Ram Project on the Kootenai National Forest (Forest). The Service initially transmitted our BO to the U.S. Forest Service (USFS) on September 15, 2021, and sent an errata to the Forest on October 6, 2021. This revision serves to clarify our rationale in certain parts of the BO. It does NOT incorporate any new information, nor does it change any of our determinations or decisions regarding the Black Ram Project. We did, however, incorporate the corrections to the minor errors pointed out in the errata.

This revised BO supersedes the previous BO for grizzly bears (*Ursus arctos horribilis*). Our previous letter dated September 15, 2021, is still valid for our concurrence with your *Not Likely to Adversely Affect* determination for Canada lynx (*Lynx canadensis*) and its designated critical habitat and your *Not Likely to Jeopardize* determination for the proposed whitebark pine (*Pinus albus*). We provided our concurrence for your *Not Likely to Jeopardize* determination for wolverine (*Gulo gulo*) in a separate letter dated June 9, 2022.

The Service appreciates the Forest's efforts toward conservation of threatened and endangered species as part of our joint responsibility under the Endangered Species Act. If you have questions or comments related to this consultation, please contact Carly Lewis, USFS/USFWS Liaison, at (406) 329-3091 or carly_lewis@fws.gov.

Sincerely,

*for* Adam Zerrenner
Office Supervisor

i

FWS000001

**ENDANGERED SPECIES ACT SECTION 7 CONSULTATION**

**Effects of the Black Ram Project**

**on**

**Grizzly Bears**



Consultation Conducted by:

U.S. Fish and Wildlife Service Montana Ecological Services Office
Helena, Montana

Action Agency:

U.S. Forest Service Kootenai National Forest
Libby, Montana

TAILS Number: 06E11000-2021-F-0440
ECOSphere Number: 2022-0068509

August 26, 2022

0

FWS000002

TABLE OF CONTENTS

I.   Introduction ................................................................................................................... 3
   A.   Consultation History ............................................................................................ 3
II. Proposed Action ............................................................................................................ 4
   A.   Action Area .......................................................................................................... 4
   B.   Proposed Action ................................................................................................... 5
III. Analytical Framework for Jeopardy Determination ................................................... 6
IV. Status of the Species/Critical Habitat ........................................................................ 7
   A.   General Status of the Species ............................................................................... 8
   B.   Status of the Species in the Cabinet-Yaak Ecosystem ....................................... 8
   C.   Status of the Species in the Action Area ........................................................... 15
   D.   Factors Affecting the Species ............................................................................ 16
V. Environmental Baseline .............................................................................................. 17
   A.   Motorized Access .............................................................................................. 17
   B.   Non-Motorized Access and Developed Recreation Sites ................................. 23
   C.   Vegetation and Fire Management ...................................................................... 26
   D.   Cover and Forage Habitat .................................................................................. 26
   E.   Denning Habitat ................................................................................................. 27
   F.   Connectivity ....................................................................................................... 27
   G.   Attractants ......................................................................................................... 28
   H.   Other Factors ..................................................................................................... 28
VI. Effects of the Action ................................................................................................. 29
   A.   Motorized Access .............................................................................................. 29
   B.   Non-motorized Access and Recreation Improvements ..................................... 40
   C.   Vegetation and Fire Management ...................................................................... 42
   D.   Cover and Forage Habitat Quality ..................................................................... 43
   E.   Denning Habitat ................................................................................................. 45
   F.   Connectivity ....................................................................................................... 46
   G.   Attractants ......................................................................................................... 46
   H.   Summary of Effects for the Black Ram Project ................................................ 46
VII. Cumulative Effects ................................................................................................... 48
VIII. Conclusion .............................................................................................................. 50
IX. Incidental Take Statement ......................................................................................... 56
X. Literature Cited .......................................................................................................... 66

1

FWS000003

Appendix A ............................................................................................................. 71
Appendix B ............................................................................................................. 74

2

FWS000004

## I.    INTRODUCTION

Section 7(b)(3)(A) of the Act requires that the Secretary issue biological opinions on Federal agency actions that "may affect, likely to adversely affect" listed species or critical habitat.  Biological opinions determine if the action proposed by the action agency is likely to jeopardize the continued existence of listed species or destroy or adversely modify critical habitat. Section 7(b)(3)(A) of the Act also requires the Secretary to suggest reasonable and prudent alternatives to any action that is found likely to jeopardize the continued existence of listed species or result in an adverse modification of critical habitat, if any has been designated.  If the Secretary determines "no jeopardy," then regulations implementing the Act (50 C.F.R. § 402.14) further require the Director to specify "reasonable and prudent measures" and "terms and conditions" necessary or appropriate to minimize the impact of any "incidental take" resulting from the action(s).

This biological opinion (BO) addresses the effects of the Kootenai National Forest (Forest) implementing the Black Ram Project (project) on threatened grizzly bear (*Ursus arctos horribilis*).  The proposed project includes commercial and non-commercial vegetation treatments, prescribed burning, and associated road work, including road maintenance, new permanent and temporary road construction, and road decommissioning.  This BO addresses only the impacts to the federally listed grizzly bear within the action area; it does not address the overall environmental acceptability of the proposed action.

### A.  Consultation History

The Forest initiated informal discussions for consultation with the Service during regularly scheduled Level 1 team meetings in 2018.  The Forest submitted their consultation package to the Service on September 17, 2020, including the biological assessment (BA; U.S. Forest Service 2020) and accompanying maps.  By mutual agreement from both agencies, given other priority work, the Service did not begin review of the Black Ram Project until May of 2021.  The Service requested and received additional information from the Forest throughout the consultation process, which is documented in our files.  By July 8, 2021, the Service had all of the information needed to complete a draft BO.  The Service sent the Forest a draft BO on July 18, 2021, and the Forest provided written feedback on July 27, 2021.  The agencies discussed and agreed to changes to draft terms and conditions in the draft BO at a Level 1 meeting on August 12, 2021, taking into account contractual feasibility of implementing the terms and conditions.  At that time, the Service began finalizing the BO.

We also received information from other interested parties regarding this project, which we reviewed as available information that could inform our biological opinion (e.g., YVFC et al. 2021, YVFC 2021, with enclosures and citations).  The Forest also shared objection letters from other parties, so that we could see detailed comments and concerns from, and literature cited by, other interested parties regarding the proposed action, and we considered those comments and information within.

On July 5, 2022, the U.S. District Court of the Northern District Court of California (the Court) vacated the 2019 regulations implementing section 7 of the Endangered Species Act (ESA).  As

3

FWS000005

a result of the Court's vacatur order, the 2019 regulations are no longer in effect, and the Service has relied upon the pre-2019 regulations in rendering this biological opinion. However, because of the possibility the Court's vacatur could be stayed pending appeal or, ultimately, overturned on appeal, we considered whether our substantive analyses and conclusions for purposes of this consultation would have been different if the 2019 regulations were applied. Our analysis included the prior definition of "effects of the action," among other prior terms and provisions. We considered all the consequences of the action that would not have occurred but for the action and are reasonably certain to occur when determining the "effects of the action." As a result, we determined the analysis and conclusions would have been the same, irrespective of which regulations applied.

The Forest signed their decision to approve the Black Ram Project on June 21, 2022. The Service and the Forest received a Notice of Intent to sue on June 30, 2022. In the reviewing the Notice of Intent, the Service realized the need to provide further clarification or rationale in a few parts of this BO. Thus, this amended BO serves to clarify our rationale in certain parts of the BO. It does NOT incorporate any new information, nor does it change any of our determinations or decisions regarding the Black Ram Project. This BO supersedes the previous version that was issued September 15, 2021.

# II. PROPOSED ACTION

## A. Action Area

The term *action area* means all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action (50 CFR 402.02).

The project area is located on the Three Rivers Ranger District of the Kootenai National Forest, in the northwest corner of Montana. The legal description of the Project Area includes all or portions of Townships 36 and 37 North, Ranges 30, 31, 32, and 33 West, Lincoln County, Montana. The project boundary encompasses 95,412 acres, of which 91,647 acres are National Forest System (NFS) lands. Proposed activities will occur on NFS lands only.

The project area lies within the Cabinet-Yaak Ecosystem Recovery Zone (CYE), as identified and explained in the Grizzly Bear Recovery Plan (USFWS 1993), the Kootenai National Forest Land Management Plan (hereafter "Forest Plan;" USFS 2015) and the Biological Opinion (BO) on the Forest Plan for grizzly bears (USFWS 2020). In particular, the entire project area falls within two Bear Management Units (BMUs): BMU 14 (Northwest Peaks) and BMU 15 (Garver).

BMUs are analysis areas that approximate the lifetime size of a female's home range, but are not meant to depict the actual location of female home ranges on the landscape. BMUs were originally identified for management purposes to provide enough quality habitat for home range use and to ensure that grizzly bears were well distributed across each recovery zone (IGBC 1994). Because BMUs approximate female home ranges, they are an appropriate scale to use for assessing the effects of proposed actions on individuals for the purposes of Section 7(a)(2) consultation. Thus, for the purposes of analyzing grizzly bear effects in this biological opinion,

4

the action area for the Black Ram Project includes the entirety of BMUs 14 and 15, an area larger than the Black Ram Project area.

## B. Proposed Action

The Forest provided a detailed description of the proposed action in the BA, which is incorporated here by reference (USFS 2020, p. 7-13). A summary of proposed actions is provided in Table 1.

**Table 1. Summary of proposed vegetation, trail, and road-related treatments for the Black Ram Project.**

| Proposed Action | Amount | Notes |
|---|---|---|
| Commercial harvest | 4,038 acres | 3,581 acres will receive post-harvest fuel reduction, a mix of machine piling/burning or underburning |
| Non-commercial fuels reduction | 7,553 acres | Mostly broadcast burn; some slash/pile/burn |
| Thinning to create viewpoints along open roads | 14 locations | Commercial or non-commercial thinning within 60 feet of open road |
| New non-motorized trail construction | 11 miles | 2 miles on Wood Mountain Stock Loop, 2 miles on the North Fork Yaak River, 3 miles on the West Fork (Yaak River Falls) trail, 4 miles on Northwest Peak to Rock Candy Trail |
| Timber haul route use and maintenance/reconstruction | 90 miles | Combination of open and restricted roads |
| Decommission or stored roads | 57 miles | No motorized access (public nor administrative) once treated |
| New road construction | 3.3 miles of permanent; 0.2 mile of temporary | No public motorized access |
| Add existing roads to system | 2.0 miles | Add existing roads onto the official system—an administrative change with no on-the-ground change |

Road-related project activities will impact existing Core in BMU 14 and BMU 15, due to vegetation management activities and haul on roads that are currently barriered and do not allow for any motorized use during the active bear year (4/1 – 11/30). In order to use these roads, the Forest will close some existing gated roads to any wheeled motorized use. Once these roads are barriered and placed into Core, no administrative or public motorized use can occur on these roads during the bear year for at least 10 years. By managing access in this way, the amount of Core in each BMU will be maintained or increased. Approximately 34 miles of National Forest System Roads (NFSRs) will be stored for in-kind replacement of Core lost by road-related project activities.

5

A few segments of "undetermined" roads will be added to the NFSR, as shown in Appendix I of the BA (USFS 2020, p. 123). These are roads that have existed on the ground for some unknown amount of time-- often old logging roads that were not mapped or added to the Forest System decades ago, or user-created routes that the Forest discovered while planning the project. The Forest will make decisions on whether to add those to the system or to decommission those roads. Post-implementation, all known roads in the project area will be coded in the Forest's database regarding their determined status (e.g. added to system, decommissioned, etc.).

The Forest identified additional design features specific to grizzly bears (USFS 2020, p. 13) including:

- Within each Bear Management Unit, the use of helicopters to ignite prescribed burns will not last more than two days per burn season (spring and fall) and not exceed a total of four days per bear year (4/1 – 11/30).

- Mechanized equipment operation will be avoided from April 1 through May 1 in Harvest Units 42, 43, 44 (Garver Mountain area) and Harvest Units 77, 78A, 78B (upper Pete Creek Road); to avoid or minimize disturbance in areas of predicted denning habitat during spring emergence (per Forest Plan standard FW-GDL-WL-01).

- In the first year of project activity, motorized use is prohibited from April 1 through June 15th on barriered roads. The Forest will not un-berm existing bermed roads until June 16 or later for any roads that are going to be entered, to allow bears the spring season to take advantage of the secure habitat during that time. So this will apply to the areas of existing Core that will be entered—no entry until June 16 or later.

- Restriction device (gate or barrier) will be placed at or within 500 feet of desired location. A location will be selected that will best meet the desired purpose of the device. For example, a gate or barrier may be more effective if placed where there are steep, rocky cut and fill slopes.


## III. ANALYTICAL FRAMEWORK FOR JEOPARDY DETERMINATION

Section 7(a)(2) of the Endangered Species Act requires that Federal agencies ensure that any action they authorize, fund, or carry out is not likely to jeopardize the continued existence of any listed species. Regulations implementing section 7 define "jeopardize the continued existence" as "to engage in an action that reasonably will be expected, directly or indirectly, to reduce appreciably the likelihood of both survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species" (50 CFR 402.02).

In accordance with regulation (see 84 FR 44976), the jeopardy determination in this Biological Opinion relies on the following four components:

6

- The *Status of the Species*, which evaluates the species' current range-wide condition relative to its reproduction, numbers, and distribution; the factors responsible for that condition; its survival and recovery needs; and explains if the species' current range-wide population is likely to persist while retaining the potential for recovery or is not viable;

- The *Environmental Baseline*, which evaluates the current condition of the species in the action area relative to its reproduction, numbers, and distribution absent the consequences of the proposed action; the factors responsible for that condition; and the relationship of the action area to the survival and recovery of the species;

- The *Effects of the Action*, which evaluates all future consequences to the species that are reasonably certain to be caused by the proposed action, including the consequences of other activities that are caused by the proposed action, and how those impacts are likely to influence the survival and recovery role of the action area for the species; and,

- *Cumulative Effects*, which evaluates the consequences of future, non-Federal activities reasonably certain to occur in the action area on the species, and how those impacts are likely to influence the survival and recovery role of the action area for the species.

In accordance with policy and regulation (see 84 FR 44976), the jeopardy determination is made by evaluating the consequences of the proposed Federal action in the context of the species' current range-wide status, taking into account any cumulative effects, to determine if implementation of the proposed action is likely to cause an appreciable reduction in the likelihood of both the survival and recovery of the species in the wild.

Recovery units for the grizzly bear were established in the Service's final Grizzly Bear Recovery Plan (Recovery Plan) (USFWS 1993, p.16). Pursuant to Service policy, when an action impairs or precludes the capacity of a recovery unit from providing both the survival and recovery function assigned to it, that action may represent jeopardy to the species (U.S. Fish and Wildlife Service memo, March 6, 2006).

When using this type of analysis, the biological opinion describes how the action affects not only the recovery unit's capability, but also the relationship of the recovery unit to both the survival and recovery of the listed species as a whole. The jeopardy analysis in this biological opinion considers the range-wide survival and recovery needs of the grizzly bear and the role of the action area in the survival and recovery of the grizzly bear as the context for evaluating the significance of the effects of the proposed Federal action, taken together with cumulative effects, for purposes of making the jeopardy determination.

## IV. STATUS OF THE SPECIES/CRITICAL HABITAT

Grizzly bears are currently listed as threatened under the Act. Critical habitat has not been designated for this species, therefore none will be affected by the proposed action.

7

FWS000009

### A. General Status of the Species

For information on the status of grizzly bears, including species description, life history, and range-wide status and distribution, refer to the Grizzly Bear Recovery Plan (USFWS 1993), the Species Status Assessment (SSA) for the Grizzly Bear (USFWS 2021a), Grizzly Bear 5-Year Review (USFWS 2021b), the grizzly bear recovery program 2020 annual report (USFWS 2021), the North Continental Divide Ecosystem (NCDE) Grizzly Bear conservation strategy (NCDE Subcommittee 2020), Grizzly bear demographics in the NCDE (Costello et al. 2016), NCDE grizzly bear population monitoring team annual report 2020 (Costello and Roberts 2021), the Greater Yellowstone Ecosystem (GYE) conservation strategy (USFWS 2016), the Yellowstone Grizzly Bear Investigations 2018 (van Manen et al. 2019), the interagency grizzly bear study team 2019 annual report summary (IGBST 2020), the Cabinet-Yaak Grizzly Bear Recovery Area 2020 Research and Monitoring Progress Report (Kasworm et al. *in prep.*), Density, distribution, and genetic structure of grizzly bears in the Cabinet-Yaak Ecosystem (Kendall et al. 2016), and the Selkirk Mountains Grizzly Bear Recovery Area 2019 Research and Monitoring Progress Report (Kasworm et al. 2020a). These documents include the best available science regarding the life history, population dynamics, status and distribution of grizzly bears and are incorporated by reference.

In the recent SSA, the Service characterized the viability for the grizzly bear in the lower-48 States, or its ability to sustain populations in the wild over time, based on the best scientific understanding of its current and future abundance, distribution, and diversity. Based on our assessment, currently and 30 to 45 years into the future, viability for the grizzly bear in the lower-48 States improves slightly if conservation efforts continue at their current rate and levels of effectiveness. If conservation efforts decline, viability also decreases. If conservation efforts increase, viability improves (USFWS 2021a, p. 245). In our 5-year review (USFWS 2021b), and in consideration of the best available scientific and commercial information (USFWS 2021a), the Service determined that the grizzly bear in the lower-48 States does not meet the definition of an endangered species, but does meet the definition of a threatened species in accordance with Section 3(6) and 3(20) of the Act. Therefore it is appropriate for grizzly bears to remain listed as Threatened under the Endangered Species Act.

### B. Status of the Species in the Cabinet-Yaak Ecosystem

The proposed action occurs in the CYE, which is one of 4 recovery zones that is currently occupied and contributing towards the 3 R's of Redundancy, Resilience, and Representation for grizzly bears in the lower-48 states (USFWS 2021a, p. 245). The CYE is a smaller ecosystem that is still slowly recovering from being close to historical extirpation, particularly in the Cabinets portion of the ecosystem. In 1988, the Cabinet Mountains portion of the CYE population was estimated to be 15 bears or fewer on the basis of independent tracks, sightings, and expert opinion (as stated in Kasworm et al. 2020, p. 39). However, lack of resident bears identified since 1989 suggests the population was more likely 5-10 individuals (Kasworm et al. 2020, Ibid.). Prior to 1986, little work had been conducted on grizzly bears in the Yaak River portion of the CYE. Bears that used the area were thought to be largely transitory from Canada (Kasworm et al. 2020). However, a black bear study in the Yaak River drainage in 1986 and 1987 resulted in the capture and radio-collaring of five individual grizzly bears (Thier 1990).

8

The CYE population experienced a trend of increasing population growth from 1983-1998, followed by a decreasing trend for the period of 1998-2006. Human-caused mortality accounted for much of the interim decline in annual survival rates and population trend. However, since 2006, the trend has once again become positive, with survival rates increasing and thus resulting in an improving population trend estimate since 2006 (Kasworm et al. 2020; Figure 1).

**Figure 1. Estimated population rate change for grizzly bears in the Cabinet Yaak ecosystem for 1998 - 2019. Horizontal bars show the point estimate, and vertical lines show the 95% confidence intervals. Figure taken from Kasworm et al. 2020.**



A rigorous study was conducted in 2012 to determine a population estimate of grizzly bears in the CYE at that time (Kendall et al. 2016), and researchers have used demographic data and reasonable methods to determine changes in population size since that time (Kasworm et al. 2020, p. 10). Estimated grizzly bear abundance (all sex and age classes) in the CYE in 2012 was 48–50 bears, approximately half the population recovery goal. Researchers estimate the population of grizzly bears in the CYE in 2020 was around 60 individuals (Kasworm et al. 2021). While the exact number of individuals is unknown, and is a dynamic number that is difficult to pinpoint, researchers estimate the population of grizzly bears in the CYE is likely increasing, with a finite rate of increase of 1.017 for the period 1983-2020 (Kasworm et al., 2021).

Kasworm et al. (2021) use a method of estimating population change that has been published in at least three different peer-reviewed journals and is a scientifically based technique to estimate population trend (Hovey and McLellan 1996; Mace and Waller, 1998; Wakkinen and Kasworm, 2004). Kendall et al. (2016, p. 326) underscore the usefulness of the Kasworm et al. estimates,

9

FWS000011

stating that "*although these estimates are not true annual minimums and lack measures of precision, their similarity to our estimates of population abundance indicates that intensive, long-term monitoring can acquire knowledge of general population status useful in planning conservation actions.*" This method includes calculating confidence intervals, or statistical measures of certainty in the accuracy of the estimates. Small sample sizes yield a wide confidence interval around these population trend estimates; the confidence intervals indicate that statistically there is a 67 percent probability that the population is stable or increasing. Which means there is statistically a 33 percent probability that the population is decreasing. The Service considers this possible scenario, and is keeping abreast of current studies that are gathering data to develop more contemporary population estimates.

When statistical uncertainty exists, other sources of data can also inform and add or subtract certainty. Population estimates are most useful when conducted the same way year after year, leading to evidence of trend. Following steep declines in populations from 1998-2006, the population has been growing, and since 2013 has experienced growth each year. The confidence intervals around the data bars are a result of modeling techniques in which 5,000 scenarios are run with the model parameters. When considering all the data regarding trend, including the modeled population growth rates, the reduction in mortality rates, and the trend in population growth data showing improvements over time, with the decreases in mortality and the stable to increasing known reproduction and occupancy of BMUs by females, the conglomerate of the best available science suggests an improving trend in the population of grizzly bears in the CYE.

The best estimate of population size is 60 bears in the CYE. Kasworm et al. (2021, p. 42) explain that estimate was calculated based on the Kendall et al. (2016) estimate combined with estimated population increase plus net increase due to augmentations. This estimate differs from the minimum 50 grizzly bears detected (Kasworm et al. 31). The difference results from grizzly bear researchers using multiple methods to detect grizzly bears (capture, collared individuals, all sources of DNA sampling, photos, credible observations), and from those methods can obtain a minimum number of individuals known alive (Kasworm et al. 2021, p. 17, 31). This number is a *minimum* and does not account for individuals that were not detected.

To rely solely upon a count of the known detected individuals is an over-simplification of population biology. It is biologically inappropriate to infer changes in the minimum number of bears detected from year to year as changes in total population size. These minimum counts are influenced by the level of effort available each year. Effort is influenced by funding, number of personnel, area of emphasis, and most recently COVID-19 work restrictions. All these factors have varied in recent years and have contributed to variable minimum counts.

While the data show an improving trend since 2006 (Kasworm *et al.* 2020, p. 40), recovery criterion have not yet been met for the CYE. The number and distribution of female grizzly bears with cubs remains lower than recovery targets (USFWS 2021a, p. 89-90; Kasworm et al. 2021, p. 16). Unduplicated females with cubs (excluding Canada) varied from 2-5 per year and averaged 3.3 per year from 2015–2020 (Kasworm et al. 2021, p. 17). The target of 18 BMUs with young has not yet been met, either. Thirteen of 22 BMUs in the recovery zone had sightings of females with young (cubs, yearlings, or 2-year-olds) during 2015–2020 (Ibid.). Recovery targets related to human-caused mortality have been met for the past few years (Kasworm et al. 2021, p. 17). Note that the Kasworm et al. *in prep.* report we originally cited

10

FWS000012

showed the mortality target had not been met; this was an error, and the final published report (Kasworm et al. 2021) showed the target had been met as of bear year 2020. This change did not affect our understanding of the status of the species in the Cabinet Yaak for the purposes of this analysis.

In 1990, the Service and Montana Fish, Wildlife and Parks initiated an augmentation of grizzly bears in the CYE with the goal of boosting the small population, and to positively affect linkage and connectivity. The augmentation effort appears to be the primary reason that grizzly bears are increasing in the Cabinet Mountains (Kasworm et al. 2021). Research indicates that augmentation of small grizzly bear populations combined with a reduction in human-caused mortality has both short- and long-term positive effects on growth rates (Proctor et al. 2004). The augmentation effort has been focused in the Cabinet Mountains portion of the CYE, which is the southern portion of the Recovery Zone. The Black Ram Project is in the Yaak portion of the CYE, where no augmentation has occurred.

In summary, the CYE population has seen improvements over the past few decades, but is still a small population in which the survival and reproduction of each individual female grizzly bear is very important.

Positive population growth rates across all four occupied ecosystems (GYE, NCDE, CYE, and SE) suggests that no concentration of threats is influencing resiliency in any portion of these ecosystems that will lead them to have a different status than the entire entity (USFWS 2021b, p.22). Although the CYE has a less diverse assortment of foods than GYE and NCDE, particularly in the form of ungulate protein, body fat levels and reproductive rates of CYE grizzly bears indicate that individuals are relatively healthy (Kasworm et al. 2020a, pp. 40-42, 55–56). Large intact blocks of land are somewhat limiting in the CYE due to its overall smaller size. There are large protected areas within the CYE (with 44 percent designated as Wilderness or IRAs), as well as additional protections outside the CYE recovery zone and conservation efforts on private lands that improve security for grizzly bears. However, habitat standards for motorized route densities have not yet been met in the CYE recovery zone (USFWS 2021a, pp. 220–221), and development and use of private lands adjacent to public lands continue to pose threats to grizzly bears in terms of connectivity and survival.

Resiliency is the ability for populations to sustain in the face of environmental and demographic stochastic events, or for populations to recover from years with low reproduction or reduced survival, and is associated with population size, growth rate, connectivity, and the quality and quantity of habitats (USFWS 2021a, p. 3). The CYE has low resiliency primarily due to very low numbers of bears, although this factor is expected to change as bears reproduce and expand in the future (Ibid., p. 10-20). The Service evaluated 5 future scenarios in which conservation measures for grizzly bears increase, decrease, or remain constant for the next 30-45 years. If conservation actions continue at their same rate, magnitude, and effectiveness as current, and rate of private land development remains the same, the CYE is expected to improve resiliency from its current "low" to "moderate." A summary of other scenarios is presented in Table 2and explained in more depth in USFS 2021a (p. 232-243). Based on our assessment of the 3Rs, currently and 30 to 45 years into the future, viability for the grizzly bear in the lower-48 States

11

FWS000013

improves slightly if conservation efforts continue at their current rate and levels of effectiveness (Ibid., p. 245).

**Table 2.  Current and future resiliency in the 6 grizzly bear recovery zones in the lower 48. From USFWS 2021a, p.244.**

| CURRENT AND FUTURE RESILIENCY | | | | | | |
|---|---|---|---|---|---|---|
|  | Current Condition | Future Scenario 1 ↓↓ Conservation | Future Scenario 2 ↓ Conservation | Future Scenario 3 Continuation Conservation | Future Scenario 4 ↑ Conservation | Future Scenario 5 ↑↑ Conservation |
| GYE | High | Moderate | High | High | High | High |
| NCDE | High | Moderate | High | High | High | High |
| CYE | Low | V Low | Low | Moderate | Moderate | High |
| SE | Moderate | V Low | Low | Moderate | Moderate | High |
| BE | X | X | X | X | Low | Low |
| North Cascades | X | X | X | X | Low | Low |

Human-caused mortality has been a substantial factor influencing population growth of grizzly bears in the CYE.  From 1982-2020, Kasworm et al. (*in prep.*) report 64 instances of known and probable grizzly bear mortality from all causes inside or near the CYE (excluding Canada).  Of those known mortalities, 46 (72%) were human-caused, 15 (33%) were natural mortality, and 3 were unknown cause.  Sixty-four percent (16 of 25) of known[1] human-caused mortalities occurring on the National Forest System lands were less than 500 meters of an open road (open meaning available for public motorized access some or all of the year) and 36 percent were located within Core habitat (area greater than 500 meters from an open or gated road) from 1982–2019 (9 of 25).  While amounts of human caused mortality is less within Core, Core itself does not eliminate human-caused mortality.

Survival of adult female grizzly bears has improved over the years, and is currently ranked as "High" in the SSA (USFWS 2021a, p. 220).  This high survival is especially important to the overall resiliency of the population.  However, the overall population is still small, and fecundity (as measured by occupancy of BMUs by reproductive females) is "Low" (Ibid. at 212, 217). From 2015-2020, 13 of 22 BMUs in the recovery zone had sightings of females with young (cubs, yearlings, or 2-year-olds; Kasworm et al. *in prep.*)  Occupied BMUs were: 2, 4, 5, 6, 8, 11, 12, 13, 14, 15, 16, 17, and 18.  From 2015-2020, the CYE contained 2-5 adult female grizzly bears with cubs per year, with an average of 3.3 females with cubs per year (Ibid.)  Low fecundity is a result of the very low abundance in terms of the number of bears.  The Service

[1] Use of known human-caused mortality counts probably results in under-estimates of total human-caused mortality.  Kasworm et al. (2020, p. 10) use a correction factor to account for unreported mortalities when calculating survival rates that influence population growth rate estimates.  Therefore, while the number of unreported human-caused mortalities is not precisely known, its influence is captured in population estimates.

12

FWS000014

expects that over time, if the population trend and adult female survival rates remain high in the CYE, the population in this ecosystem will likely expand, which will improve the condition of fecundity and abundance (USFWS 2021a, p. 220).

Because habitat in the CYE may only support relatively small grizzly bear populations, connectivity with other grizzly bear populations, including populations in Canada, is necessary for their long-term conservation (USFWS 2021a, p. 211). Female movement and reproduction provides demographic and genetic rescue to a population, whereas male movement and reproduction may only provide genetic rescue. Data suggests that the Yaak River portion of the CYE (where the Black Ram Project is located) has experienced gene flow from British Columbia grizzly bear populations. No gene flow is known to have occurred from the NCDE or SE into the Yaak or Cabinets portions of the CYE yet - aside from augmentation bears - although there is evidence of movement into the CYE from these other ecosystems (Kasworm et al. 2020, USFWS 2021a, p. 177). Gene flow has been identified through reproduction by three immigrants (two males and one female) resulting in four offspring in the CYE. All three immigrants producing gene flow originated in the North Purcells (Kasworm et al. 2020, p. 34). Kendall et al. (2016) suggest the expansion of neighboring populations may eventually help sustain the CYE populations.

Kasworm et al. (2021, p. 34, 74-75) details the movement that has occurred between the Cabinet Mountains and Yaak River portion of the CYE, and between the CYE and other grizzly bear ecosystems. Movement of bears is the first step towards natural gene flow. In the Species Status Assessment (SSA; USFWS 2021a p. 79), the Service reports "Isolation of the CYE is more of a concern because of the small population size, but recent data indicate increasing movements by males and females and subsequent reproduction, resulting in limited, but increasing population connectivity, particularly in the Yaak portion of the CYE." (p. 79). All of this information was considered when analyzing the effects to individual grizzly bears affected by the Black Ram Project, and how those effects to individuals would affect the population in the CYE and the listed entity.

In the SSA, we rated Large Intact Blocks of Land as "Moderate" for the CYE, stating that "Even though there are large protected areas within the CYE (with 44 percent designated as Wilderness or IRAs), as well as additional protections outside the CYE recovery zone and conservation efforts on private lands that improve security for grizzly bears, habitat standards for motorized route densities have not yet been met in the CYE recovery zone, which limits the availability of large intact blocks of land in the CYE" (USFWS 2021a, pp. 220–221).

*Past, Present, and Ongoing Actions Affecting Grizzly Bears in the CYE Recovery Zone*

The Kootenai, Idaho Panhandle (IPNF), and Lolo National Forest are working to attain access management standards for the remaining BMUs that do not yet meet the standards, and thus increase the amount of large intact blocks of land. As described in our BO for the Forest Plan, the Forest's standards related to access management set amounts per BMU for Open Motorized Route Densities (OMRD), Total Motorized Route Densities (TMRD), and Core areas (USFWS 2020, p. 26-27; see also p. 18 in this BO for more detailed explanation of these metrics). As of Bear Year 2020, 7 of the 22 BMUs did not yet meet permanent access management standards

13

(BMUs 4, 5, 8, 9, 18, 19, and 22; USFS 2021). The Forests are actively implementing projects in BMUs 8, 18, 19, and 22 to attain standards. Until all standards are met in the CYE, the Forests can propose projects that temporarily increase OMRD or TMRD and/or propose in-kind replacement of secure habitat, or Core, within the BMU, per Forest Plan standards (USFS 2015, p. 148-149). The Forests anticipate all BMUs on the Lolo and Kootenai portions of the CYE will meet standards by 2023, and BMUs 18 and 19 on the IPNF will meet standards by 2028. Once all standards are met, the Forest may continue to propose projects that temporarily increase road densities, and may propose projects that permanently decrease Core (USFS 2015, p. 148; USFWS 2020, p. 61-62). All of such proposals are subject to project-specific Section 7 review prior to Project implementation.

In the past decade, the Forests have proposed multiple projects that have affected grizzly bear habitat in the CYE. All of these projects have met the access management standards that were put in place with the 2011 Access Amendment, and adopted into the 2015 Forest Plan (see USFWS 2020 for details). All have undergone site-specific consultation to assess the effects of individual projects to grizzly bears.

The Service is currently in consultation with the Forest on a few projects that may affect grizzly bears in the CYE, including the Montanore Mine Project (BMU 5) and the Knotty Pine Project (BMU 12) that may affect grizzly bears in the CYE Recovery Zone. In April 2021, the Service and Forest lost a challenge to the Rock Creek Mine Evaluation project in the U.S. District Court of Montana; thus, there is no active consultation on Rock Creek as of this writing. We are also aware of multiple wildfires currently active as of July 2021 in the CYE Recovery Zone, in which suppression activities may affect grizzly bears in BMUs 3, 10, and 22. Wildfires occur regularly within the CYE Recovery Zone.

The Forest provided a table summarizing the projects that have occurred on the Three Rivers Ranger District of the Kootenai National Forest, which encompasses most of the Yaak portion of the CYE (Table 3). This table provides an example of the types of projects that have occurred throughout the CYE Recovery Zone over the past decade under the Access Amendment standards. The Buckhorn, OLY, and Starry Goat projects all included in-kind Core replacement and temporary increases in road densities (see explanation in Environmental Baseline and Effects below). With each of these project-level consultations, we review the effects of the proposed action in the context of the entire CYE and entire range of the species in the continental U.S., as described in the Analytical Framework section above.

**Table 3. Summary of vegetation management/access management projects on the Three Rivers Ranger District of the Kootenai National Forest over the past decade.**

| BMU | Project Name (year signed) | Commercial Harvest Acres | Harvest period | Harvest Comments | Non-commercial Acres | Landscape burning | Burning period | Burning Comments |
|---|---|---|---|---|---|---|---|---|
| 13/14 | Buckhorn (2014) | 1240 | 2015-2018 | Two large sales divided spatially in adjacent HUCs but 3 miles apart (about ½ winter harvest) | 0 | 11,623 | Not started | Incomplete; includes hand and aerial ignition |

14

| BMU | Project Name (year signed) | Commercial Harvest Acres | Harvest period | Harvest Comments | Non-commercial Acres | Landscape burning | Burning period | Burning Comments |
|---|---|---|---|---|---|---|---|---|
| 10* | Lower Yaak, O'Brien, Sheep (aka "OLY" Project, 2015) | 3069 | 2017-2021 | One last sale not yet started (740 acres total). Largely on north side of Troy (WUI) | 876 (non-harvest fuels reduction) | 868 | 2020-current | Incomplete; includes hand and aerial ignition |
| 9 | Starry Goat (2018) | 1834 | 2018- small sales; one large sale area since 2020 | Largely on south side of Troy (WUI) | 3941 (non-harvest fuels; 3497 in WUI) | 9,695 | 2019-current | Incomplete; includes hand and aerial ignition |
| 11 | Grizzly (2012) | 907 | 2012-2016 | Interrupted by lawsuit; harvest completed in 2017 | 515 (PCT) | 718 | 2014-2018 | Complete |
| 1/3* | Sparring Bulls (2012) | 1035 | 2012-2017 | Complete | 309 (non-harvest fuels; complete) | 3,900 | 2014-current | Incomplete; includes hand and aerial ignition |

## C. Status of the Species in the Action Area

Both male and female grizzly bears have used the action area (BMUs 14 and 15) for decades. The action area has been an important area for female grizzly bears over the past several decades, and has supported multiple reproductive females that have contributed to the CYE population. Records of female grizzly bears with cubs (bears in their first year of life) or young (yearling or 2-year-old offspring) date back to 1989, and females with cubs or young have been documented in BMUs 14 and 15 in 17 and 14 years, respectively, since that time (Kasworm et al. 2021). In the past decade, researchers have observed females with cubs or young for 6 of the 10 years (Kasworm et al. 2020 and 2021). Two adult females were observed as recently as May of 2021—one with a 2-year-old offspring and one with two yearlings (W. Kasworm, pers. comm., June 2021). Data from collared female grizzly bears show that at times up to three adult female grizzly bears were alive and within, or in the vicinity of, the action area at the same time in past years (Kasworm et al. 2021, Figure 14, p. 51). Multiple male grizzly bears have also used some or parts of the action area over the years (see maps in Kasworm et al. 2021, p. 76-102).

The precise number of grizzly bears that may use the action area for a portion of their life cycle during the proposed action is unknown. Throughout the course of the proposed action, grizzly bears may move into or out of the action area. The bears may have home ranges that overlap all or just parts of the action area (for example, see p. 100 of Kasworm et al. 2021, showing

15

locations for a female grizzly bear using some of the action area plus some of Idaho and into Canada). Because grizzly bears are wide-ranging species that sometimes have overlapping home ranges and that also shift home ranges throughout the course of their lives, multiple grizzly bears may use the action area over the course of the proposed action. Biologists with the Forest and the Service are unable to count or monitor the movements of every grizzly bear that may use the action area. To even attempt to do so would require intensive survey efforts and invasive techniques such as capturing and GPS collaring grizzly bears on an ongoing basis beyond what is reasonable or necessary for research and monitoring purposes, and thus could cause unnecessary additional stress or harm to the bears. We do not expect many more than a few adult female grizzly bears in the action area at any time during the proposed action since grizzly bears occur at relatively low densities across the landscape, and given that the two BMUs approximate the size of two female grizzly bear home ranges

### D. Factors Affecting the Species

In general, a grizzly bear's individual habitat needs and daily movements are driven by the search for food, water, mates, cover, security, or den sites. All life stages require large intact blocks of land to breed, feed, shelter; high-caloric foods to feed and breed; and dens as winter shelter (USFWS 2021a). These basic biological needs then influence demographic factors, such as connectivity, fecundity, and survival, which influence genetic diversity, abundance, and population trend.

The primary factors affecting grizzly bears at both the individual and ecosystem levels are excessive human activity that reduces the quality and quantity of habitats, and increases the potential for human-caused mortality, both directly and indirectly. Human activities are the primary factor impacting habitat security and the ability of bears to find and access foods, mates, cover, and den sites (USFWS 2021a).

General factors affecting grizzly bears in the CYE were addressed in the SSA (USFWS 2021a, p. 99-141) and in the BO for the Forest Plan (USFWS 2020, p. 33-45), and are incorporated here by reference. In general, the stressors affecting grizzly bears in the CYE and in the action area include motorized access, developed sites, livestock allotments, energy and mineral development, recreation, vegetation management, habitat fragmentation, and private land development. Many of these factors are interrelated.

Human-caused mortalities are a main threat to grizzly bear populations, including in the CYE. These sources of mortality include management removals, accidental killings, mistaken identity killings, defense of life killings, and illegal killings. From 2002 to 2019, 76 percent (29) of the 38 known and probable grizzly bear mortalities in the CYE were human-caused (Kasworm *et al.* 2020a, pp. 33). Although humans are directly or indirectly responsible for most grizzly bear deaths in the CYE, mortality is mitigated through science-based management, monitoring, and outreach efforts. The Kootenai National Forest partners with USFWS and MT Fish, Wildlife, and Parks on multiple efforts to address public attitudes and actions towards grizzly bears, including information and education programs, and a Forest-wide food storage order. These efforts, combined with regulatory measures that manage public motorized access and thus

16

contribute towards areas where human-caused mortalities are less likely to occur, are important components of grizzly bear conservation in the CYE.

Specific factors affecting the species environment in the action area will be discussed in more detail below.

## V. ENVIRONMENTAL BASELINE

Under the provisions of section 7(a)(2), when considering the "effects of the action" on listed species, the Service is required to consider the *environmental baseline*. Regulations implementing the Act (50 C.F.R. § 402.02) define the *environmental baseline* as "the past and present impacts of all Federal, State, or private actions and other human activities in an action area, the anticipated impacts of all proposed Federal projects in an action area that have already undergone formal or early Section 7 consultation, and the impacts of State or private actions that are contemporaneous with the consultation in process."

This analysis of the environmental baseline focuses on factors that are relevant to grizzly bears in the *action area* (BMUs 14 and 15), including motorized access, non-motorized access/recreation, habitat quality for food and cover resources, denning habitat, management of attractants, and connectivity. While our description of the environmental baseline focuses on the action area, we put our analysis in context with information regarding the status of the species and its habitat in the entire CYE (as described in Status of the Species section above), including past, ongoing actions, and proposed future actions that are in consultation.

### A. Motorized Access

*Wheeled motorized access*

Wheeled motorized access within the action area is measured using three metrics to describe the amount and distribution of roads and motorized trails—open motorized route density (OMRD), total motorized route density (TMRD), and Core. The Access Amendment, incorporated into the Forest Plan (USFS 2015) defines how to calculate road densities (U.S. Forest Service 2011, p. 10). These definitions for OMRD, TMRD, and Core are from the Interagency Grizzly Bear Committee Task Force (IGBC 1998; p. 4), and were used by Wakkinen and Kasworm (1997) when measuring route densities in female grizzly bear home ranges within the CYE. These terms are also defined and described in our biological opinion (BO) on the Forest Plan (USFWS 2020, p. 25-27, 55).

As explained in the BO, the Service uses "research benchmarks" as a way to assess effects to grizzly bears from motorized access. These benchmarks are based on the average levels of access and secure habitat reported by Wakkinen and Kasworm (1997) to adequately support a female grizzly bear with cubs in the CYE and SE:

- On average, 33 percent of a female grizzly bear home range had OMRD greater than 1 mile per square mile.

17

FWS000019

- On average, 26 percent of a female grizzly bear home range had TMRD greater than 2 miles per square mile.

- On average, 55 percent of a female home range was comprised of Core area (i.e., roadless area or areas with barriered roads).

Allen et al. (2011) reviewed the data used to develop these research benchmarks, and their re-examination of roads in grizzly bear home ranges and the recovery zones (in the U.S.) demonstrated that the Core area results from the Wakkinen and Kasworm (1997) research effort are a reflection of bears actively choosing these areas and not an indication that they had a lack of opportunity to select home ranges with fewer roads. Their review provides rational explanation (incorporated here by reference) that the Wakkinen and Kasworm (1997) report provides the best data available for determining recommendations for the management of grizzly bear habitat in relationship to motorized routes for the CYE (Allen et al. 2011, p. 24).

The researchers modeled the OMRD, TMRD, and Core in actual female grizzly bear home ranges using GIS road layers available at the time of the study. While the model was an approximation of on-the-ground conditions, we know it was imprecise, because, for example, some roads were subsequently discovered and mapped, other mapped roads were subsequently discovered to be impassible by motor vehicles, and some unknown subset of closed roads probably received illegal use during the study (based on subsequent Forest-wide monitoring of closures).

The definition of Core used by Wakkinen and Kasworm (1997) and used by the Forest in its Plan is a very specific definition that is based on current conditions on the ground, pertaining to the Forest's legal status of a road or trail. Core is defined as all areas greater than 500 meters from a motorized route (a road or trail that is either open to public motorized access and/or is available for administrative access) or a high-use non-motorized trail, per recommendations from the Interagency Grizzly Bear Committee (IGBC 1994). In order for a road to not contribute towards Core, it must be bermed or barriered or otherwise made unsuitable for wheeled motorized access. High-use non-motorized trails detract from Core. The Forest uses a rough definition of 20 parties/week to determine if a trail is high-use, based on guidance from the IGBC (1990); this threshold was also used by Wakkinen and Kasworm (1997) when identifying Core in their research.

Core currently exists in 46,692 acres (56%) of BMU 14 and 32,083 acres (55%) of BMU 15. The Forest does not have a minimum patch size requirement of Core. Larger, less fragmented patches of secure habitat or Core are likely the ideal for a grizzly bear, and better support daily use. For example, Gibeau et al. (2001) approximated average daily foraging requirement of an adult female grizzly bear to be 2,223 acres. Other researchers, including Wakkinen and Kasworm (1997) and Proctor et al. (2015, 2020) also recommend larger patches of secure habitat for female grizzly bears. However, lacking clear research evidence that core areas of smaller size are actively avoided by bears as non-Core, there is no biological basis to discount or ignore smaller blocks of Core (Allen et al. 2011, p. 21).

18

FWS000020

The majority of Core in the action area occurs in very large patches. Currently 91 percent of the Core in BMU 14 occurs in two patches that measure 34,592 and 7,738 acres. In BMU 15, 93 percent of Core occurs in two very large patches that are 21,541 and 8,223 acres (see Tables 9 and 10 in the BA; USFS 2020, p. 20). Thus in these BMUs, the Forest is meeting, and has been meeting, its standards for the *amount* of Core required (which is also at or above the research benchmark), but we note here that also the *configuration* of Core is conducive to supporting female grizzly bears.

Although large patches of Core are likely most important to daily feeding and are likely very important for female grizzly bear reproductive success and survival, even a small patch of secure habitat or Core may afford a grizzly bear a valuable space to avoid the effects of roads and to move through or find valuable habitat in the area. Wakkinen and Kasworm (1997) were unable to identify a minimum patch size at which grizzly bears failed to use the secure habitat. However, they did show that the majority of telemetry points for female grizzly were in larger patches of secure habitat (see review in USFWS 2020, p.56 and in Allen et al. 2011). Within the action area, smaller patches of Core may provide areas for connectivity within and between home ranges, and their importance should not be discounted. Kasworm et al. (*in prep.*) found that the majority (64 percent) of human caused mortality occurred less than 500 meters from an open road, and 36 percent of the human-caused mortality occurred inside Core. This equates to human-caused mortality being twice as likely in areas near open roads than in Core areas.

It is important to note that the Forest's definition of Core differs from the "core areas" used by Proctor et al. (2015) to describe areas of higher quality habitat, as indicated by a resource selection function (RSF). Proctor et al. (2015) identified "core areas" as the areas where predicted values of grizzly bear use exceeded availability in the habitat model, and where minimum patches were at least 2,223 acres. This specific definition and use of the word "core" facilitated a computer based geographic information system (GIS) routine to model predicted linkage areas that will provide connectivity between predicted core areas. Thus, the definitions and subsequent amounts of areas identified as "core" by the Forest and by Proctor et al. (2015) provide different information about the environmental baseline for grizzly bears in the action area. The Forest's method shows areas that are outside the influence of motorized use, while the researchers show areas that are modeled to be most important to grizzly bears. The two are complementary, but should not be confused.

Proctor et al. (2015) identified a portion of the action area that could provide core habitat, and additional portions that could provide linkage habitat for grizzly bears (

FWS000021

Figure 2).  Similarly, Mattson and Merrill (2004) identified portions of the action area as "source areas" for grizzly bears in their various model iterations.  Similarly, the fine-scale habitat quality maps created by Proctor and Kasworm (see BA, USFS 2021, p. 93-95) show abundant high quality Spring, Summer, and Fall habitats for grizzly bears within large portions of the action area.  Together, these predictive models all indicate high potential habitat for grizzly bears in the action area, and for the potential for the action area to provide a source for grizzly bears within the CYE.

FWS000022

**Figure 2. Areas of predicted high quality habitat for grizzly bears in the Canada–USA trans-border region (from Proctor et al. 2015).** Black circle shows approximate location of the Black Ram project. Areas of green and darker green represent the best available predicted habitat, called "core areas" by Proctor et al. (2015). Areas of darker yellow represent predicted linkage habitat.



In addition to Core, the existing OMRD and TMRD meet standards set by the 2011 Access Amendment and incorporated into the 2015 Forest Plan for the Kootenai National Forest. They are also at or under (better than) the research benchmarks (Table 4).

**Table 4. Existing motorized access parameters and Forest Plan standards within the action area for the Black Ram project.**

| BMU | OMRD (standard/existing) | TMRD (standard/existing) | Core (standard/existing) |
|---|---|---|---|
| 14 - Northwest Peak | 31/28 | 26/24 | 55/56 |
| 15 – Garver | 33/30 | 26/26 | 55/55 |

OMRD: > 1 mile per square mile; TMRD: > 2 miles per square mile

A private entity's non-compliance with the Forest's access management is an illegal activity. While illegal use of the Forest via motorized access in areas unauthorized for such use may occur within the action area, such illegal use is not considered a Forest action. The term "action" for Section 7 consultation is defined in the Consultation Handbook (U.S. Fish and Wildlife Service, National Marine Fisheries Service 1998) as: all activities or programs of any kind *authorized, funded, and/or carried out*, in whole or in part, by Federal agencies in the United States or upon the high seas (emphasis added). These and any other illegal activities are not the result of a federal action and therefore not analyzed under effects of the action, but their influence is considered for describing the environmental baseline.

21

FWS000023

Illegal motorized access could occur anywhere in the action area. According to data provided by the Forest from Bear Year 2012 through 2020 monitoring reports (in our files), illegal motorized use was observed in the action area in 3 of the 8 years. This illegal use was not concentrated in any given area, and was not chronic in that no single road had observed breaches in multiple years, except for road 5890 on BMU 15. Because of other open public roads in the vicinity, illegal use of this road does not affect Core, OMRD or TMRD. The Forest asserts that it continues to address illegal motorized access in the action area in a timely manner when it is detected.

The Yaak Valley Forest Council also provided information to the Forest and the Service regarding their survey of roads in the action area and in nearby project areas (YVFC et al. 2021, YVFC 2021). The reports highlight multiple gated or bermed roads that may have been bypassed by all-terrain vehicles or motorcycles at some time in the past. In addition, a few user-created motor vehicle routes are documented in the reports. The reports do not document the frequency in which illegal use occurs. However, the reports further corroborate data from the Forest showing that illegal motorized use has occurred in multiple locations in the action area (USFS annual monitoring reports, in our files). The Forest's response to the YVFC report for the Black Ram Project showed evidence that the Forest monitors for illegal use and addresses issues in a reasonable and timely manner (email and accompanying documentation from S. Hill, 8 July, 2021).

Gated and bermed/barriered roads are available for public non-motorized use, including walking, bicycling (outside of designated Wilderness), and use by horses and pack stock. Designs for closures may include considerations to allow non-motorized access around a gate or barrier, such as a narrowed path around a gate or berm. Use of these paths by motorcycles, all-terrain vehicles (ATVs) or other motorized vehicles is an illegal action and has not been authorized by the Forest.

The Service assumes most Forest visitors abide by the law, and that a gated or bermed road indicates to reasonable members of the public that motorized use is not allowed. In addition, the Forest's Motor Vehicle Use Map (MVUM) provides the legal document to identify roads available for public motorized use. However, some Forest users have, and will likely continue to break the law and drive motorized vehicles where such use is illegal.

During the timeframe in which the Black Ram project is proposed, we anticipate illegal motorized use will continue to be spatially disparate and temporary, given the annual monitoring data provided by the Forest documenting when road breaches have occurred in the past and the District's commitment to monitoring, fixing known problems, and documenting those fixes when they occur. Depending on where illegal motorized use occurs, it may or may not affect OMRD, TMRD, and/or Core. For example, if illegal use occurs within a 500m buffer of an open route, that use would have little to no effect on access metrics, and may or may not result in access metrics becoming "worse than" the research benchmarks. Thus, not all illegal motorized affects grizzly bears the same. While effects to grizzly bears may occur as a result of illegal motorized access, it is the Service's opinion that the location and extent of such effects are not reasonably certain and we cannot predict whether motorized use will result in adverse effects to grizzly bears or not. Information as to the length, duration, amount of use, type of use, and location, among other conditions, is and will continue to be unpredictable. As such, the Service and the Forest are unable to calculate the extent of effects to grizzly bears, and ANY effects associated with illegal motorized access are not exempted under this biological opinion.

22

FWS000024

The existing motorized access condition was determined using the best available information, which includes the Forest's roads database with information regarding closure levels and status, as well as ground-verified information as available. Likewise, and as described earlier, the research benchmarks developed by Wakkinen and Kasworm (1997) were derived using the best available data at the time regarding the status of roads. The metrics described here are assumed to be an accurate representation of the existing motorized access condition as reviewed, although the Service and the Forest recognize that mapping and calculation errors can occur. If the Forest finds that it has made a mapping or calculation error in describing the existing condition and corrects the metrics, the Service does not expect any additional effects to grizzly bears related to those corrections, as long as the corrections do not represent an on-the-ground change to motorized access baselines. The intent of this analysis is to capture the existing condition and the potential effects to grizzly bears, including potential ongoing effects that may not be represented in the metrics described above due to potential errors.

***Over-Snow Motorized Access***

General effects of over-snow motorized access are described in the Forest Plan BO (USFWS 2020, p. 40-41, 71-75). The greatest potential for effects to grizzly bears comes from potential disturbance to bears as they are emerging from the den. Thus, areas where late season over-snow motorized use overlaps with denning habitat are the areas where effects to grizzly bears are most likely to occur.

Within the action area, many of the roads are legally accessible to over-snow use, although most have little use (USFS 2020, p. 21). Heavy use occurs primarily on routes that access high elevation areas. The dense forest vegetation limits off route snowmobile use in nearly the entire action area. There are three groomed routes that are regularly used: the Pete Creek – Hawkins Road, Whitetail Cutoff Road, and Spread Creek Road. Spring-time use of these three routes is often influenced by environmental conditions (e.g., winter snow-pack, spring temperatures, and aspect) that can affect the location, amount, and condition of snow and whether it is suitable for snowmobile use. Suitability of the routes can vary from year to year depending on these conditions.

### B. Non-Motorized Access and Developed Recreation Sites

In general, non-motorized access can occur anywhere within the action area. Hiking, biking, horseback riding, and other types of non-motorized travel are allowed on any roads, trails, or even off-road, except if otherwise restricted. Dense vegetation, steep terrain, and rocky areas near peaks all make off-road travel much more challenging. Recreational use of the action area is fairly low compared to many areas of the country, due to the remoteness from any major population sources.

Several hiking trails exist in the action area, including several shorter sections of trails that lead to peaks (Garver Mtn., Rocky Candy Mtn., Northwest Peak, and Mt. Obermeyer). The Forest maintains two designated campgrounds in the action area, both of which are located along Hwy 508 at the base of Whitetail and Pete Creeks. Dispersed camping (camping outside of a designated campground) can occur throughout the action area. All campers, hikers, and

23

recreationists are required to store food and attractants according to the Forest's Food Storage Order.  Hunting for black bear, deer, and elk, as well as upland game birds, occurs within the action area, subject to seasonal hunting regulations set by Montana Department of Fish, Wildlife, and Parks.  The most intensive use by hunters occurs in the fall, from roughly mid-October thru late November.

Non-motorized recreation effects to grizzly bears are discussed briefly in our BO on the Forest Plan (USFWS 2020, p. 93).  In general, effects of non-motorized recreation on grizzly bears can vary based on an individual bear's tolerance.  Individual bears that are more tolerant of pedestrians are less likely to be displaced by or avoid people.  Compared to intolerant bears, tolerant bears are also more likely to be efficient foragers when pedestrians are nearby.  In areas of dense vegetation, such as in the action area, grizzly bears are most likely to be startled by humans and have a short-term reaction (a few hours to a few days), in which they flee and may avoid the area for a short time (reviewed in Mattson 2019, p. 34).  If repeated interactions occur, long-term displacement may occur, in which bears may avoid the resource during the entire time it is available (Fortin et al. 2016).  The recent SSA for grizzly bears summarized non-motorized trail use, saying "although non-motorized trails may cause displacement of grizzly bears to varying degrees, grizzly bear mortality related to non-motorized recreation is rare and population-level impacts have not been documented" (USFWS 2021a, p. 126).  While this generalization may be true for the full range of grizzly bears, the 36% of human-caused mortality that occurs in Core in the CYE indicates non-motorized recreation *can* contribute substantially to mortality, and thus may have population-level impacts.

Specific data are not available to quantify the amount of non-motorized recreation that occurs in the action area, nor the specific responses of grizzly bears to non-motorized recreation in the action area.  However, the evidence of female bears with cubs or young observed on a regular basis at least anecdotally indicates some level of tolerance for the existing amount of non-motorized recreation that allows females to successfully feed, breed, and reproduce in the action area.  The creation of Core may improve but not eliminate human-caused mortality effects to the population.

*Pacific Northwest Trail*

A portion of the Pacific Northwest Trail (PNT) bisects the action area from east to west.  While some of the PNT occurs on open motorized roads, about half or a little more occurs on non-motorized trails (Thomson et al. 2021, p. 10).  The portions that are along non-motorized trails travel thru Core habitat as mapped and managed by the Forest (Ibid. p. 7)

The PNT was designated by Congress as a National Scenic Trail in 2009.  The PNT extends 1,200 miles across three states, seven national forests, three national parks, six wilderness areas, and multiple mountain ranges in Montana (MT), Idaho (ID), and Washington (WA).  The PNT follows a series of trails, roads, and in some areas, no trails or roads exist, and hikers must bushwhack to connect back to a road or trail.  The trail may be used by thru-hikers (those who complete the entire 1,200 mile course), or by hikers who choose to travel certain sections.  Equestrians may also use most of the trail, and mountain bikers can access portions that are outside of National Parks and Wilderness Areas.

24

FWS000026

According to the Pacific Northwest Trail Association (PNTA 2021), roughly 65-75 people attempted to thru-hike the trail in 2019. This is an increase from the 40-50 thru-hikers in 2015 (PNTA data cited in Cole 2018, p. 5). Most thru-hikers start on one end of the trail or the other in late June or early July, taking roughly 60-75 days to complete the journey. Thus, most thru hikers pass through the action area in July or August. Many more people visit the PNT for shorter trips, either as "section hikers" who complete all 1,200 miles over multiple years, or as day or overnight hikers on a shorter portion of the trail, and these users may access the trail at any time, although summer months are likely most popular.

During the course of the Black Ram Project's implementation, the degree to which use of the PNT may increase is unknown. Other National Scenic Trails, such as the Appalachian Trail and the Pacific Crest Trail, have seen substantial increases in use in the past decade. Both of those trails experience thru-hiker numbers in the thousands each year (cited in Cole 2018, p. 29). As the newest National Scenic Trail, the PNT is still being developed. It is mostly unmarked, receives light use, and may not have been recently maintained in some remote areas. Navigational challenges make the trail less popular at this time than other National Scenic Trails.

The National Trails System Act specifies that National Scenic Trails are non-motorized. To comply with the Act, the Forest Service will need to coordinate with local land managers and landowners to relocate the PNT from roads to non-motorized trails as opportunities arise. The Forest Service is not evaluating any relocations of the PNT at this time, but is developing the legislatively required comprehensive plan for the PNT, which the agency anticipates will include the criteria and process to be used in considering future non-substantial relocations. Any substantial relocations may only be by Act of Congress.

Mattson (2019, p. 37-42) provides insight as to effects of the PNT on grizzly bears in the CYE as use of the trail increases. At the current time, however, because of the relatively low use of the trail by hikers, he concludes "there are probably insufficient levels of close interaction to foster mutual tolerance among bears, much less transference of this tolerance to pedestrians… even if trail traffic is confined to daylight hours, foreseeable levels will almost certainly remain below the 1-1.5 hikers per hour constituting the apparent threshold for development of human-specific tolerance and finer-tuned avoidance" (Ibid. at p. 42).

Thus, while human-bear encounters along the PNT (and other existing trails in the action area) are likely to occur from time to time, the consequences of these interactions are unpredictable in space and time. Each species could observe and move around one another without a negative reaction on either part. Or the interactions could involve bears becoming startled and either fleeing, or acting aggressively towards the hikers (see summary of reactions in Mattson 2019, p. 6-9; also Ordiz et al. 2019). While these reactions often cause short-term disruptions to individual bears (e.g. increased movement, a shift towards nocturnal movements, or a shift away from open environments), the reactions are usually short-term (up to 3 days; Mattson 2019, p. 10-11). Given that most of the use on the PNT occurs in a few months of the year, and is temporally sporadic, we do not expect long-term reactions such as displacement from important habitats, given current human use levels on the PNT. Human reactions to a surprise encounter and/or an aggressive bear can vary. Most are non-lethal to the bear. However, it is important for

25

FWS000027

the Forest and other organizations to continue educating PNT hikers and other Forest users on how to respond during a bear encounter and proper use of bear deterrents (i.e. bear-spray), to help reduce human-bear conflicts and adverse outcomes of encounters.

### C. Vegetation and Fire Management

Road-accessible areas in the project have been managed for timber production using a number of methods, primarily by regeneration and intermediate harvest. Harvest on NFS lands began in earnest in the mid-1900s and have continued to the present, as summarized in the BA (USFS 2020, p. 22-23). This history of harvest and vegetation management has shaped the composition of forest stands that exist in the action area today, and has been a recurring source of temporary disturbances to grizzly bears in the action area.

Fire suppression since the early 1900s has likewise affected vegetation structure and composition, and has resulted in more homogenous stands with greater canopy closure, leading to less-than-expected areas with open canopy that create conditions ripe for huckleberry and other berry production on some sites (Ibid.). The Forest has used prescribed fire on roughly 900 acres in the action area in the past.

The action area has also been shaped by a few wildfires that escaped suppression, including the Davis Fire in 2018. That fire burned roughly 6,600 acres in the northwest portion of BMU 14 and into Canada (data in project files). The fire resulted in 2,998 acres of stand initiation habitat, as well as some lower-intensity burned areas (USFS 2020, p. 50, 93-95).

No timber sales are active in the action area (BMUs 14 and 15) at this time. Nor are any currently proposed by the Kootenai National Forest or the Idaho Panhandle National Forest, which manages the westernmost portion of BMU 14 (email communication from S. Hill, 1 July 2021). Some prescribed burning units associated with the Buckhorn Project in the southwestern portion of BMU 14 could be burned during the anticipated life of the Black Ram Project implementation (a 10-year period).

### D. Cover and Forage Habitat

Grizzly bears use a variety of cover types to rest and shelter, including for day beds to escape the sun during the hottest parts of the day, and to rest under at night (USFWS 2021a, p. 47). Several studies have documented grizzly bear preference for areas providing some level of vegetative cover or forest cover (see review in USFWS 2021a, p. 47). Vegetative cover is abundant in most of the action area (BA, USFS 2021, p. 22). Riparian areas are particularly dense, but many other areas provide cover for grizzly bears, except for open rocky areas around the tops of peaks and portions of the action area that recently burned in the Davis Fire.

Grizzly bears also use a variety of habitat types for food sources, and important habitats for grizzly bears vary seasonally. Fine-scale habitat models developed by Proctor and Kasworm show differences in habitat use across seasons. Best models for each season and ecosystem were dominated by greater-than-expected use for canopy openness and high level of greenness and less-than-expected use of high road densities (Kasworm et al. 2020, p. 100-105).

26

FWS000028

After den emergence in spring, bears seek sites that melt snow early and produce green vegetation.  These sites can often overlap with ungulate winter range and provide winterkill carrion, such as in the Whitetail Creek area in the southern portion of the action area (W. Kasworm, pers. comm. May 2021).  Spring habitat also exists on southerly facing snow chutes, alder shrub fields, grassy sidehill parks, and closed timber.  The Forest provided maps of modeled Spring habitat within the action area (based on fine-scale habitat models developed by Proctor and Kasworm (see Kasworm et al. 2020, p. 100-105).

Grizzly bears in the Yaak region and adjoining ecosystems heavily consume fruit during July-September, with peak consumption during August (McLellan et al. 1995, Kasworm et al. 2020).  Huckleberry provides an important food source for grizzly bears, and serviceberry and mountain ash may provide significant secondary food sources in some years when huckleberry crops have failed (Kasworm et al. 2020, p. 55-60).  Habitat models for the action area show mapped Summer habitat for grizzly bears is concentrated in the western half of BMU 14, and in a few smaller areas in the north-central and western portions of BMU 15.  Canopy openness is a powerful predictor of huckleberry patches (Kasworm et al. 2020, p. 102).  Thus, it stands to reason that Summer habitat is more limited in the action area than other seasonal habitats, due to the relatively low amounts of open canopy in the action area.

In fall months, forbs once again provide forage for grizzly bears in the CYE.  And in the Yaak portion of the CYE in particular, animal matter becomes a greater part of their diet (Kasworm et al. 2020, p. 55-56).  In the Yaak River area, bears decrease in elevation during October and November, which corresponds to the Montana general hunting season; bears may be utilizing wounded animals and gut piles (Ibid.).  Fine-scale habitat maps show Fall habitat is abundant and well-distributed throughout the action area.

### E.  Denning Habitat

Grizzly bears usually dig dens on steep slopes, where wind and topography cause an accumulation of snow that is unlikely to melt during warm periods (USFWS 2021, p. 45-47).  In the CYE, the majority of den sites occurred above 1,600 meters (5,248 feet), often on northerly and easterly aspects, though all aspects were used (Kasworm *et al.* 2020a, p. 53). Given the variety of den site use, den availability does not appear to be a limiting factor for populations at this time in the CYE (USFWS 2021a, p. 46).  Within the action area, denning habitat occurs in the vicinity of Northwest Peaks, Rock Candy Mountain, Black Top Mountain, and Marmot Mountain.  Fifteen grizzly bear dens have been documented in and near the Project Area boundary since the 1990s (cited in BA, USFS 2020, p. 24).

### F.  Connectivity

As shown in

Figure 2, the action area contains core areas and linkage areas, as identified by Proctor et al. (2015). The map of multi-generational female grizzly bear use of areas in and near the action area also indicates connectivity within and between adjacent and nearby BMUs. As generally discussed in the BO for the Forest Plan (USFWS 2020, p. 32-33), isolation of the CYE is a concern because of the small population size, but recent data indicate increasing movements by males and females and subsequent reproduction, resulting in limited, but increasing population connectivity. Maintaining or increasing current levels of genetic diversity in the CYE will help ensure genetic concerns do not become a threat in the future. The action area itself does not contain major highways or interstates that present barriers to movement or connectivity. Highway 508 in the southern part of the action area, and the associated private lands along it, likely pose the greatest threats to connectivity between the action area and other adjacent and nearby areas.

## G. Attractants

BMUs 14 and 15 are 99 percent and 94 percent NFS lands. The private lands in the action area range from small parcels in and around the town of Yaak to larger private parcels with rural residential development and small forestry or small agriculture operations farther outside of the town, mostly located along Hwy 92 on the southern border of the action area. In and around the Black Ram project area, there have been no management actions on grizzly bears (e.g. hazing, relocating, removing) related to food/attractants on NFS lands, and management actions on private lands have been relatively minimal and are not a chronic issue at this time (K. Annis, MT FWP, personal communication, 9 September 2021). Within the action area, there are no livestock grazing allotments on NFS lands, which further reduces potential grizzly bear attractants. As discussed in the 2020 BO, a Forest-wide food and attractant storage order has been in effect since 2011 (U.S. Forest Service 2011b). To date, there have been no known grizzly bear deaths associated with food attractants on NFS lands managed by the Kootenai National Forest in the Cabinet-Yaak Recovery Zone. There have also been very few known grizzly bear conflicts and management actions on KNF lands related to attractants and food storage.

## H. Other Factors

Aside from the factors described above, other ongoing factors can influence the environment for grizzly bears within the action area. These include factors such as wildfire, private land development, and other human activities that were discussed in general in the Forest Plan BO (USFWS 2020). The action area includes very little private land, most of which is located adjacent to Hwy 508 along the southern and southeastern edges of the action area (see map in BA, USFWS 2020, p. 136). General effects of private land on both threats and conservation opportunities to grizzly bears are discussed in the SSA (USFWS 2021a, p. 134-137). From the time period 1999-2006, grizzly bear mortality rates were substantially higher on private lands than on public lands (Kasworm et al. 2020, p. 37). However, from 2007-2019, mortality rates were nearly identical on public and private lands, and overall lower than in preceding time periods.

28

## VI. EFFECTS OF THE ACTION

Under section 7(a)(2) of the Act, "effects of the action" refers to the direct and indirect effects of an action on the species or critical habitat, with the effects of other activities interrelated or interdependent with that action. Indirect effects are those caused by the proposed action and are later in time, but still are reasonably certain to occur (50 C.F.R. § 402.02). The effects of the action are added to the environmental baseline to determine the future baseline and to form the basis for the determination in this opinion. Should the federal action result in a jeopardy situation and/or adverse modification conclusion, the Service may propose reasonable and prudent alternatives that the federal agency can take to avoid violation of section 7(a)(2). The effects discussed below are the result of direct and indirect impacts of implementing the proposed project.

### A. Motorized Access

*General Effects of Wheeled Motorized Access on Grizzly Bears*

In general, threats to grizzly bears associated with roads include displacement and loss of habitat, fragmentation of habitats, increased mortality to grizzly bears, and/or habituation. These general effects of wheeled motorized access are described in depth in our 2020 BO for the Forest Plan (USFWS 2020, p. 47-52), and represent a review of the best available scientific and commercial information regarding effects of roads on grizzly bears. We incorporate that review here by reference, with some explicit citations noted below.

*Road Density --* Grizzly bear population growth and persistence relies on female grizzly bears that successfully reproduce and rear young. Thus, much of the scientific literature focuses on effects to female grizzly bears. Scientists have clearly demonstrated that road densities can affect female grizzly bears, with higher road densities often leading to adverse effects to individuals, and thereby sometimes affecting the local population. Female bears tend to have higher survival rates in habitats with lower road densities (Schwartz et al. 2010; Boulanger and Stenhouse 2014; Proctor et al. 2017). Females also select home ranges at least partially in relation to road densities, as reported by Mace et al. (1996), Wakkinen and Kasworm (1997), Lamb et al. (2018b), and Proctor et al. (2017). Road densities also influence the density of female grizzly bears (Lamb et al. 2018) and population trend (Boulanger and Stenhouse 2014).

Other factors, such as habitat quality, attractants, and other factors, combine with road densities to affect grizzly bears, making it difficult to determine the exact influence of road density, and the exact density at which those influences occur. In addition, not all researchers calculate road densities in exactly the same way; this variation often depended on what digitized roads layers were available (as noted in Proctor et al. 2020). While some researchers included all road types in their calculations, including motorized trails receiving off-highway vehicle (OHV) use, others excluded motorized trails or closed roads (see Proctor et al. 2020, p. 23). Despite this, research shows road densities affect home range selection.

Mace et al. (1996, p. 1,400) found that grizzly bears selected for home ranges containing an average of 0.6 kilometer per square kilometer ($km/km^2$) (1 mile per square mile {$mi/mi^2$}) of roads (open and closed roads) where the surrounding landscape contained 1.1 $km/km^2$ (1.8

29

FWS000031

mi/mi$^2$) of roads. In the Selkirk and Purcell Mountains of B.C., Proctor et al. (2017, pp. 36-37) found females selected for, and survival was higher where, backcountry and resource road densities were less than 0.5 km/km$^2$ (0.8 mi/mi$^2$). They also found that there were no female home ranges in landscapes with road densities greater than 1.0 km/km$^2$ (1.6 mi/mi$^2$). Boulanger and Stenhouse (2014, pp. 14-15) found most grizzly bears in their study area in Alberta occurred where linear road densities (all paved and graveled secondary roads) were 1.5 km/km$^2$ (2.4 mi/mi$^2$) or less, with greater survival of reproductive females where road densities were less than 0.75 km/km$^2$ (1.2 mi/mi$^2$). Taking it one step further, they found low female survival had negative population level effects where road densities exceeded 0.75 km/km$^2$ (1.2 mi/mi$^2$).

Research on grizzly bear survival in other study areas documents the impact of road density on female grizzly bear survival. Schwartz et al. found grizzly bear survival in the GYE increased with increasing secure habitat and reducing road density outside of secure habitat (2010, p. 660). In the Kettle-Granby area of B.C., Mowat et al. (2017, p. 6) found grizzly bear density was three times higher on landscapes with open road densities less than 0.6 km/km$^2$ (1 mi/mi$^2$), which was also found in the Purcell and South Selkirk Mountains of B.C. (Proctor et al. 2017, pp. 39-40). Gibeau et al. (2018) corroborate this density, and adds that prudent management will also include areas greater than 500 m from roads (i.e. Core).

Within the Recovery Zones of the NCDE, CYE, and SE, access management has focused on an open road density of less than 0.6 km/km$^2$ (1 mi/mi$^2$) and total road density of less than 1.24 km/km$^2$ (2 mi/mi$^2$) within a portion of a grizzly bear analysis unit (approximating a female grizzly bear's home range) to support female grizzly bears in recovery zones. This road-density threshold, first identified by Mace et al. (1996) and used by Wakkinen and Kasworm (1997), has been roughly observed by other researchers in multiple study areas (summarized in Proctor et al. 2020) as being a density beyond which adverse effects to female grizzly bears can occur. However, road densities, and their effects to bears, occur on a spectrum, making it difficult to pinpoint an exact density at which we would expect adverse effects to an individual.

Although road density provides a useful threshold to describe human-caused effects to grizzly bears based on existing literature, road density alone fails to consider traffic volume, lethality (i.e., the tendency for people to kill bears), proximity to forage resources, and how road placement affects habitat patch size (Proctor et al. 2020, p. 25-26). For instance, even in a bear management unit with overall low road density, there may be patches of high road density interspersed with patches of low road density or even areas without roads. In these areas, measures of secure habitat may present a more accurate depiction of the spatial mix of motorized routes and secure habitat.

_Secure Habitat--_ Secure habitat describes where grizzly bears can meet their life history needs without the heightened mortality risk or negative consequences of disturbance-related behavioral modifications (i.e., habitat avoidance or nighttime use patterns) or repeated flight response. Secure habitat has been identified as one of the key issues related to effects of motorized access on grizzly bears and is important to the survival and reproductive success of grizzly bears. This metric more adequately represents the potential effects related to motorized access, as it provides a more accurate indication of the spatial mix of motorized routes and areas outside the influence of motorized routes (for example, see Figure 7 in Proctor et al. 2020, p. 26). Studies have shown that female grizzly bears selected for, and survival was higher in, areas with greater secure habitat (review in Proctor et al. 2020, p. 25-26; Mace et al. 1996, p.

30

FWS000032

1,400; Wakkinen and Kasworm 1997, p. 20; Gibeau et al. 2001, p. 126; Schwartz et al. 2010, pp. 659-660).

Secure habitat is generally defined as the area outside the zone of influence of high levels of human disturbance. Most studies (reviewed in Proctor et al. 2020) have used 500 meters as the zone of influence around roads and motorized trails. Some studies have then further defined secure habitat by using a minimum patch size (e.g. Schwartz et al. 2010 used 10 acres). The IGBC Task Force (IGBC 1998) used this basic definition and provided guidance for defining Core habitat for grizzly bears, which is essentially a subset of all secure habitat. Thus, different Forest Plans and management strategies have defined Core habitat in different ways for the different Recovery Zones. As described above in the Environmental Baseline, within the CYE, grizzly bear researchers were unable to define a minimum patch size when identifying Core, and management standards do not include a minimum patch size for Core.

*Metrics used in this analysis*

Within BMUs (which represent a theoretical female grizzly bear's home range), we rely on local research in our analysis of effects to grizzly bear in the CYE. Wakkinen and Kasworm (1997) showed that female grizzly bears were able to survive and reproduce in home ranges containing an average of 33 percent open motorized route densities (OMRD) of less than 0.6 kilometer per square kilometer (1 mile per square mile), 26 percent total motorized route densities (TMRD) of less than 1.24 kilometers per square kilometer (2 miles per square mile), and 55 percent Core habitat (all areas greater than 500 meters from any motorized route or high use trail).

In our Forest Plan BO, we explain our rationale for using these locally-derived metrics as a benchmark for measuring when effects to female grizzly bears are expected to be significant and rise to the level of adverse effects (USFWS 2020, p. 55). Values of OMRD or TMRD that exceed (are "worse than") these research benchmarks are considered to result in adverse effects to female grizzly bears (USFWS 2020, p. 55). Similarly, values of Core that are lower than ("worse than") the research benchmark for Core are considered to result in adverse effects to female grizzly bears (Ibid.).

*Effects specific to the existing, baseline motorized access condition*

The Forest Plan standards for wheeled motorized access in BMU 14 are 31/26/55 for OMRD/TMRD/Core, respectively (USFWS 2020, p. 28). Access conditions in BMU 14 are currently better than the research benchmarks for all three parameters (Table 4). In BMU 15, standards are 33/26/55. The existing condition in BMU 15 is currently better than the research benchmarks for OMRD, and equal to the benchmarks for TMRD and Core. Thus, we do not anticipate ongoing adverse effects to grizzly bears in these BMUs due to the permanent access conditions, as described in the Forest Plan BO (USFWS 2020, p. 59-62). Both BMUs also currently meet or are better than the Forest Plan standards for OMRD, TMRD, and Core.

31

FWS000033

*Effects specific to the proposed action*

The proposed action includes use of roughly 90 miles of roads in the action area for the purposes of vegetation management, and watershed work (e.g. upgrading or removing culverts). The Forest will use a combination of open public roads, gated roads, and currently barriered or bermed roads for project implementation. The temporary changes to access parameters are summarized in Table 5. In our BO on the Forest Plan, we anticipated the Forest could propose temporary increases to OMRD and TMRD related to specific projects, and that those would undergo project-related review (USFWS 2020, p. 62). This analysis represents such a review.

**Table 5.  Motorized access parameters within the action area for the Black Ram Project.**

| Metric | BMU 14 (Northwest Peak) | | | |
|---|---|---|---|---|
| | Standard | Existing | During Project | Post-Project |
| OMRD | 31 | 28 | 31 | 28 |
| TMRD | 26 | 24 | 26 | 23 |
| Core | 55 | 56 | 56 | 56 |
| | BMU 15 (Garver) | | | |
| | Standard | Existing | During Project | Post-Project |
| OMRD | 33 | 30 | 40[1,2] | 30 |
| TMRD | 26 | 26 | 32[1,2] | 26 |
| Core | 55 | 55 | 55 | 55 |

[1] Exceeds Forest Plan Standard for the BMU
[2] Exceeds ("worse than") research benchmark

The proposed action does not include changes in the amount of public motorized access in the action area. The amount and location of roads that are available for public motorized access will stay the same throughout the Black Ram Project. Thus, we do not anticipate changes in the mortality risk to grizzly bears related to open motorized routes (see reference to mortality risk near open roads in Environmental Baseline and in Kasworm et al. *in prep*).

Although public motorized access will not change, the use of gated roads to access treatment units will exceed administrative use limits, and thus be considered "open" for analysis and reporting purposes, as directed by the Forest Plan (USFS 2015, p. 149). The Forest estimated a maximum of 31 percent and 40 percent of BMUs 14 and 15, respectively, will have OMRD greater than 1 mile per square mile during implementation of the Black Ram project. These numbers represent the maximum effect (in terms of the increases in OMRD that could occur),

32

FWS000034

and the maximum timeframe could theoretically be as much as 10 years. During this time, in BMU 14, the during-project OMRD will be below (or "better than"), the Forest Plan Standards and research benchmarks; and in BMU 15, OMRD could temporarily increase up to 7 percent above (or "worse than") standards and research benchmarks.

In our analysis, we conservatively considered effects to grizzly bears if the maximum increases did occur, and analyzed effects to grizzly bears accordingly. Because BMU 14 will remain at or better than benchmarks at all times, we do not anticipate any adverse effects to grizzly bears. In BMU 15, however, OMRD will increase up to 40% for up to 10 years, which could adversely affect female grizzly bears. We understand from the Forest that this maximum effect (40% for 10 years) is very unlikely, given how similar projects have been implemented (Table 3). The Forest explained that timber purchasers generally prefer to complete the harvest and haul along one road system before moving to another road system to access treatment units, such that a pulse of activity occurs in one area, then another, but that OMRD is not elevated in all areas at the same time.

The Forest also explained that the maximum timeframe for elevated OMRD is unlikely, given that "*harvests are completed rather quickly, and during which motorized use is obviously intensive on both open and restricted access routes. Typically, post-harvest burning occurs one or two years after the harvest is complete. During this time, there is very little, if any, motor vehicle access on gated roads. Fire crews monitor fuel conditions prior to burning, about once per week, so our seasonal gated route use is very low. During subsequent hand ignition of units, there may be several fire vehicles accessing gated routes during the burn day. After burning, one vehicle trip weekly may be used for monitoring. Then gated access routes generally sit unused until planting the following year*" (email communication from S. Hill, USFS, on May 25, 2021). In discussions with the Forest during the consultation process, the Forest explained that although the timeframes for the timber harvest and haul would likely be 5 years or less, contracting limitations made it difficult to absolutely ensure the timeframe would be 5 years or less. However, the Forest could write contracts that would require completing work in one subdivision of a sale before moving to another subdivision of a sale, ensuring that all areas within a timber sale are not active at the same time. Terms and Conditions #3 and 4 in the Incidental Take Statement (ITS) for this BO were developed by the Service, in consultation with the Forest, to ensure the effects to grizzly bears are indeed lower than the theoretical maximum (see ITS in this BO, p. 55-56, and Appendix B for additional details).

Increases in TMRD will include a 2 percent temporary increase in BMU 14 and a 6 percent temporary increase in BMU 15. The temporary increase in BMU 15 will result in TMRD being 6 percent above (worse than) research benchmarks during the project. The Forest explains in the BA (USFS 2020, p. 28), that the values shown for TMRD also represent the maximum impact. However, the estimate "*does not take into account routes that would be barriered with in-kind replacement of Core. In the likely three operational areas [i.e. three timber sales], all access would not be used concurrently. With that in mind, the actual values (percent of TMRD greater than two miles per square mile) would be less than displayed. We do not yet know the order in which project units would be grouped or administered, and therefore have not determined the order in which in-kind replacement of Core would occur and that replacements must be the same size or greater than that being removed*" (Ibid). Similar to OMRD, the Service thus considered a

33

FWS000035

maximum effect of the increase in TMRD as shown, for the life of the project, but understands the maximum effect is very unlikely to occur, and that the effects will likely be much less.

We anticipate the temporary increases in disturbance along existing open roads will not significantly affect grizzly bears, since bears generally avoid those open roads already. However, we anticipate the increased use of restricted (gated) or bermed/barriered roads that result in OMRD amounts above research benchmarks (i.e. above 33 percent) may result in under-use of otherwise preferred habitat that is likely to cause adverse effects to some adult female grizzly bears. Likewise, the temporary increases in TMRD above research benchmarks (i.e. above 26 percent) may also result in adverse effects to some adult female grizzly bears in BMU 15.

Contractors, timber crews, and others assisting with harvest, thinning, and burning will travel on both open public roads and on restricted roads-- those that are gated or currently bermed/barriered. The restricted roads will remain closed to public motorized use, and the gates will be locked on evenings, weekends, and other times the roads are not in use for vegetation management purposes. Contractors, timber crews, and others assisting with the vegetation management are prohibited from carrying firearms, and speeds on the roads make the risk of a fatal bear-vehicle collision unlikely. Thus, while disturbance will increase on restricted roads, the risk of mortality to grizzly bears will not increase due to the use of open roads or restricted roads.

The proposed action also includes multiple areas of "in-kind replacement" of Core. This allowance under the Forest Plan was analyzed generically in our BO for the Forest Plan (USFWS 2020, p. 61-62). Our analysis herein represents the project-specific analysis necessary for this proposal. Figure 3 shows the areas where existing Core will be affected, and areas where the Forest proposes creating new Core by decommissioning or storing existing roads.

Existing areas of Core will be affected when berms or barriers are removed and vegetation is cleared to allow access onto the road. This may occur at any time during the 10 years of the project, but is most likely to occur within the first few years, when the timber sale activity begins. According to Appendix K in the BA (USFS 2020, p. 125-135), 36 road segments, affecting approximately 4,952 acres of Core, will have their barriers removed and gates installed to allow motorized access for the timber sale and associated activities. The Forest notes that *"once barriers are removed for harvest access, only the (sic) length of road needed for haul would be cleared and changed to gated/administrative access allowed (during and post-project). Any road beyond unit/haul road is to remain barriered; if existing vegetative barrier is not sufficient to prevent access, a barrier is to be installed by the purchaser"* (USFS 2020, p. 135). Vegetative barriers are an approved manner for restricting all motorized access under the Forest Plan (see Design Element 1(B)(1)(b) in USFS 2015, p. 148), which is consistent with guidance from the IGBC (1998, p. 4). However, if a wildfire were to occur and affect the vegetation, the Forest would need to reassess whether vegetation presents a sufficient barrier, or if another barrier such as a berm, guardrail, boulders, or other physical obstruction is needed.

New areas of Core will be created by decommissioning or storing existing gated roads, and thereby making them inaccessible to <u>all</u> motorized use (i.e. while administrative use is currently allowed, none will be in the future). In order to meet the direction of Forest Plan standard FW-STD-WL-02, in-kind replacement of Core will be made prior to or concurrently with a reduction

34

of Core. That is, new Core will be created by barrier installation prior to or at the same time another route affecting existing Core is opened.

The difference between 'decommissioning' and 'storing' a road can be slight to imperceptible to a grizzly bear. Both result in restricting any motorized use of the road. Decommissioning a road can result in a range of treatments. The Forest may allow the road to revegetate naturally, or they may rip the first few hundred feet of a road, or fully recontour the entire road, or a combination thereof. Stored roads are made hydrologically inert by pulling culverts and crossings, and providing physical closure to the entrance, but the road prism is left in place. In either case, grizzly bears will not experience motorized use of the road, and may or may not encounter a road "prism" or footprint, depending on treatment type. Decommissioned roads are removed from the Forest's road inventory, while stored roads are kept on the inventory, and may be used at a later date. Re-opening any stored roads in the action area in the future would constitute a new decision and proposed action that would be subject to site-specific Section 7 consultation. Because the Forest Plan standard FW-STD-WL-02 requires any Core to remain in place for at least 10 years, the Service does not anticipate any proposals for using stored roads for at least that amount of time.

In BMUs 14 and 15, the amount of existing Core that will be affected equals about 4 percent and 9 percent of the existing Core, respectively. In both BMUs, the new Core will have slightly more acres than existing amounts, but not enough to change a full percentage point. Thus, the percent of Core within the BMUs will remain constant throughout the project.

**Table 6. Summary of Core exchanges proposed with the Black Ram Project. All values are acres.**

|                 | BMU 14 (Northwest Peak) | BMU 15 (Garver) |
| --------------- | ----------------------- | --------------- |
| Core Affected   | 1,923                   | 3,029           |
| Core Created    | 2,269                   | 3,062           |
| Core Unaffected | 44,931                  | 29,405          |

35

FWS000037

Biological Opinion: Black Ram Project

06E11000-2021-F-0440

**Figure 3. Core in the Black Ram Project action area, showing areas of existing Core that will be affected (light blue and olive green) and areas of new Core to be created (purple and dark blue). Arrows highlight the largest/most substantial areas where existing Core will be affected (Core B and C) and the largest/most substantial areas where new Core will be created (Core A and D).**



While most roads being bermed or barriered to create Core will only need the barrier installed and no other work completed, four roads to be bermed or barriered include minor watershed site work to improve drainage (such as culvert removal). Any existing vegetation on the road will be cleared to allow motorized access to the point of where the drainage work was needed. All but one of these will require just one operational period (1 day); the remaining site consists of three individual crossing features and may take several days. Any grizzly bears using these areas may be temporarily disturbed during that work window. The disturbance will be insignificant given the short period of activity.

Because many of the roads to be treated to create new areas of Core have received little to no use in the recent past, many of the areas where new Core will be created may already be providing secure habitat. Grizzly bears are known to use some of the areas where in-kind replacement of Core will be created (USFS 2020, p. 29 and W. Kasworm, personal communication, June 2021). In particular, these include two of the larger areas where new Core will be created, including (1) the area around Wood and Grubstake Mountains (marked as "Core A" in Figure ) and (2) the area in between Pete and Whitetail Creeks (marked as "Core D"). Most of the roads in these areas are brushy and overgrown, and have received little to no administrative access for some time. Because the areas to become Core may have been providing security for some time, grizzly bears may actualize a slight decrease in the amount of areas providing secure habitat as areas of existing Core are disturbed by project activities. We are careful to note that this is not a decrease in overall habitat; bears use areas outside of Core, particularly areas behind gates, as well as areas of low open road density. However, we anticipate adverse effects to female grizzly bears in areas of current Core habitat, as those females may avoid such habitat once the roads are opened for use, and perceive a net reduction in habitat until they are able to adjust their use patterns and actualize the new areas of Core the Forest has created.

The time to realize the additional secure areas is likely to vary by individual bear; more security-conscious females may continue to avoid decommissioned or stored roads longer than other cohorts. Also, until the road prism becomes revegetated, recently decommissioned or stored roads may continue to provide ease of travel for non-motorized hunters or other recreationists. This could take one to several years.

In addition to the *quantity* of Core involved in the exchange, the Service considered the *quality* of habitat proposed for the in-kind Core replacement. The Forest provided maps of Proctor & Kasworm's modeled high and very high quality habitat for Spring, Summer, and Fall in relation to areas of Core exchanges (hereafter "high quality;" see maps in Appendix A). In general, all of the Core areas to be affected by the proposed action currently have high or very high quality habitat in at least one season, if not multiple seasons, per the models and verified with local experts (W. Kasworm, personal communication, June 2021; S. Hill, email communication, June 2021). Likewise, the areas of Core that will be created have high or very high quality habitat, although it may be for different seasons. For example, the area of existing Core near Black Top Mountain (marked as "Core C" in Figure ) consists of Summer habitat for grizzly bears. The area of in-kind replacement will be in the area between Pete and Whitetail Creeks (marked as "Core D"), which consists of Spring and Fall habitats. Of note, some of the new Core area provides whitetail deer winter range. Not only will the additional security benefit deer, but it could provide an area for grizzly bears to scavenge winter-killed deer. The other large area of

37

FWS000039

Core exchange ("Core A" and "Core B") is a similar situation, in which the existing Core provides mostly Summer habitat, and the area of new Core provides Spring and Fall habitat. Thus, while the exchanges are not an exact exchange (e.g. Summer for Summer, Spring for Spring; and such is not required), the newly-created Core areas will provide high quality habitat seasonal habitats for grizzly bears. Since Spring and Fall habitats are times when grizzly bears face higher mortality risks and have their highest energetic needs, the new areas of Core will provide high quality secure habitat during important seasons for grizzly bears in the action area.

The newly-created Core area will be relatively large. The area in between Pete and Whitetail Creeks ("Core D") will result in a patch of Core that exceeds 3,000 acres in size, and that will provide a "stepping stone" in between BMUs 14 and 15, and from those BMUs to BMU 11 just south of the action area. And the area near Wood and Grubstake Mountains ("Core A") will be connected to a much larger patch of Core that extends to the east (not shown on the map), providing connectivity between BMU 15 and BMU 16 (East Fork Yaak; email communication from Sean Hill, July 2021). Thus, the proposed in-kind exchanges of Core not only meet the requirements for equal or greater *quantity* of habitat being exchanged, but also provide high *quality* of habitat that grizzly bears will be able to use as secure habitats within their home ranges.

The Forest will need to make three entries into currently bermed or barriered roads that contribute to Core for the purposes of hydrologic stabilizing work. These are roads that are proposed to be decommissioned (USFS 2020, p. 27). These one-time entries into Core were analyzed in our BO for the Forest Plan (USFWS 2020, p. 61), and in that analysis, we anticipated short-term adverse effects to female grizzly bears associated with the disturbance in areas of Core. These effects will be in addition to other effects to Core, and could be completed at any time during the project, when funding and logistics allow. If these entries all occurred at once, and at the same time as other entries into existing Core are occurring, it could increase the magnitude of the effect, but minimize the frequency of the effect to one bear year. If the entries into Core occur sporadically throughout the life of the project, the magnitude of the effect would be less in any given year, but disturbances in Core would be a more frequent occurrence.

*Species response to wheeled motorized access effects*

To summarize, we anticipate adverse effects to female grizzly bears from the Black Ram Project related to increases in use along restricted roads that result in increases in OMRD and TMRD above research benchmarks in BMU 15. We also anticipate adverse effects to female grizzly bears related to displacement from current areas of Core (1,923 acres and 3,029 acres in BMUs 14 and 15, respectively), while bears are actualizing the newly created areas of Core. Finally, we anticipate adverse effects when the Forest makes one-time entries into other areas of Core for the purposes of stabilizing roads that will be decommissioned.

Male grizzly bears have larger home ranges than females; and males and subadults are independent, more mobile, and do not have the same energetic needs as adult females. While displacement may affect behavioral patterns of males and subadults, such as feeding or sheltering, we do not anticipate such effects to be significant to subadult or male grizzly bears. Displacement effects have more significant impacts on adult female grizzly bears than males or subadults

38

because adult females have higher energetic needs to sustain fitness prior to, and during, gestation and lactation and when rearing. As such, adult females can less afford the additional energy expended to find high quality foods and shelter if displaced, especially during the early spring or late summer to fall hyperphagia season. During some years, due to poor climatic conditions and resulting food scarcity and/or high levels of forest management activity or recreational activity, displacement effects from areas with high road densities could be more frequent and intense.

We do not expect that all adult females exposed to disturbances or displacement related to motorized route densities will suffer significant effects, given evidence that some adult females have successfully reproduced and raised offspring in BMUs that exceed research benchmarks in the CYE (e.g. BMU 12; Kasworm et al. 2021) and in other Recovery Zones. We do not expect female grizzly bears will be displaced from the entire action area; in other words, we expect female grizzly bears will continue to use both BMUs during the Black Ram Project. Nor will the effects persist throughout an individual female's life span; the maximum scope and magnitude of motorized access effects of the Black Ram Project, will last 10 years, if all routes were concurrently being used for the duration. The effects will likely persist closer to 3-5 years, given average timeframe to implement similar projects, which is a small portion of an adult female's average lifespan. After the project is implemented, route densities in both BMUs will once again be at or better than the research benchmarks. Grizzly bears will be able to resume using areas where the project road use displaced bears.

We expect non-lethal adverse effects to some individual female grizzly bears attempting to establish or maintain home ranges within the action area. Some adult females may be displaced from key habitats, and under certain conditions they may be displaced to levels that impair their normal ability to readily find food resources needed to sustain fitness necessary for breeding and raising offspring and finding shelter. Kasworm et al. (2020, p. 34) report that poor nutrition may not allow females to produce cubs in the following year, and/or may cause females to travel further for food, exposing young to greater risk of mortality from conflicts with humans, predators, or accidental deaths. Because survival rates of young bears are influenced by numerous factors, and because research has not provided a specific link between female displacement and effects to their offspring, we cannot reasonably quantify effects to offspring. However, we can reasonably expect some level of adverse effects to any offspring of females that are adversely affected by the proposed action."

Given that we know of at least two adult female grizzly bears in that have recently been observed in the action area (both of whom were detected with cubs in BMU 15 in May of 2021), and given that the action area is roughly the size of two to three adult female grizzly bear home ranges, it is reasonable to anticipate adverse effects to a few adult female grizzly bears at any given time during the proposed action. Because adult female grizzly bears may move in or out of the action area due to factors unrelated to the proposed action, we cannot reasonably estimate the net number of females that may be affected.

The most intensive time of implementation will be when timber harvest and haul and associated road use is occurring in multiple portions of the action area. This will be the time in which effects to adult female grizzly bears will be greatest, will likely last 3-5 years, affecting 1-2 reproductive cycles. We expect the effects will vary substantially depending upon the wariness

39

FWS000041

of the individual bear, the size of and habitat quality within her home range, the number of other grizzly bears using the particular area, climate conditions, annual food resources, and the nature, intensity and duration of human activity during any particular year. All of these are factors that may affect options available to adult females if displaced. Further, conditions the following year may be considerably different. We expect that the level and likelihood of effects will diminish as open and total road densities are lowered back to, or below, the research benchmark levels at the conclusion of the intensive period of timber harvest, and as grizzly bears begin to actualize the new areas of Core that provide secure habitat conditions for them.

*Over-Snow Motorized Access*

In our BO for the Forest Plan we provide a thorough analysis of the effects to grizzly bears from over-snow motorized access (USFWS 2020, p. 41-42, 70-71), which is incorporated by reference here. To summarize, we are unaware of any evidence to suggest that grizzly bears are affected by snowmobiles or other over-snow motorized access while in dens. Disturbance from snowmobiles may be most consequential shortly before or after den emergence of a female with cubs. Thus, areas where late season over-snow motorized use overlaps with denning habitat are the areas where effects to grizzly bears are most likely to occur.

The proposed action does not include any changes to over-snow motorized access beyond what is currently allowed. New proposed roads will not be constructed in high quality denning habitat (according to mapped habitat, in project file). Over-snow motorized users are allowed to access motorized routes and off-road areas throughout the action area. The proposed treatments will reduce vegetation density, making some of the treatment areas more accessible for off-road over-snow use. However, many of the treatment units are at lower elevations where denning habitat does not occur. Only five proposed units in the Black Ram Project occur wholly in or partially at the edge of mapped denning habitat, and none of these are on steep ground associated with typical denning sites (USFS 2020, p. 33, and additional data in project files). Additionally, most of the vegetation treatment units occur outside of mapped Spring habitat (maps in our files), and thus will not occur in areas where bears will be utilizing for forage after they emerge from dens.

Therefore, while off-road over-snow motorized use may be more accessible in proposed units after treatment, we do not anticipate any effects to bears in dens, and it is highly unlikely there will be any disturbance to bears emerging from dens. Thus, the effects to grizzly bears from over-snow motorized access are discountable and we do not anticipate any effects to grizzly bears related to over-snow access beyond what exists as part of the environmental baseline and addressed in our BO for the Forest Plan (USFWS 2020, p. 75).

## B. Non-motorized Access and Recreation Improvements

No new developed campgrounds or recreation sites are proposed with the Black Ram Project area. The Forest is proposing to improve the parking area for Upper and Lower Hawkins Lakes. Although this action could allow more visitors to park safely in the area than is possible now, it is not expected to substantially increase the volume of use of the area.

40

The proposed action includes 11 miles of new trails, some of which already exist on the ground as non-motorized paths along old roadbeds or along the ridgeline south of Northwest Peak. For those existing trails, the proposed action will be an administrative action that will adopt these areas onto the Forest's official trail system (S. Hill, personal communication, June 29, 2021). The only areas of new trail construction will be along the West Fork Yaak and in the Wood Creek area.

In the Wood Creek area, a few sections of new trail construction will connect existing trails. Some of the area will be in the new larger block of Core that will be created. The Forest does not anticipate new trail construction resulting in a substantial increase in the number or type of trail users, at least not to the degree that it will classify the trails as "high-use" (BA, USFS 2020, p. 30). While most of the new trail construction will be completed by hand, a mini-excavator could be used for some trail construction.

The trail along the West Fork Yaak River will parallel the open motorized road for a 4 mile stretch, allowing hikers better access to view the stream and waterfalls. The majority of the trail will be within the zone of influence of the open motorized road (500 meters; USFWS 2020, p. 47). Thus, it will occur in an area where grizzly bear use is expected to already be minimal due to the open road. Any disturbance associated with trail construction (using hand crews or a mini-excavator) will have minimal effect to grizzly bears, due to its proximity to the open road.

The PNT follows the open road in the West Fork Yaak River area. Once the new trail is constructed, PNT hikers will likely choose to follow the non-motorized trail versus walking along the open road for the 4 miles. In that sense, the proposed action represents a slight improvement to the PNT. However, because it is a stretch of the PNT that is already easily accessible (i.e. not a section that requires a bushwhack or crossing challenging terrain), and because of the short length (4 miles), we do not expect construction of the trail along the West Fork Yaak River to substantially increase the number or type of users of the PNT or the Forest in general. No other parts of the proposed action will affect the PNT.

No other actions are expected to substantially affect non-motorized access in the action area. Thinning vegetation within treatment units will make for easier non-motorized travel for hunters, berry pickers, or other users. The Forest's design features to leave coarse woody debris, and the expected quick regrowth of shrubs and understory vegetation, will make these areas more difficult to travel than a road or trail. Likewise, non-motorized use may become easier than it currently is on any bermed or restricted roads that are cleared for maintenance or use for timber haul. However, these actions are not expected to substantially change current human use of the area, nor use by grizzly bears.

Although the Black Ram Project itself is not expected to substantially increase the number or type of recreational users in the action area, increased recreational use of the area can be expected during the life of the project. A recent report on visitor use of National Forests across the United States showed a steadily increasing trend in use from 2007-2019, and a sharp increase in use in 2020, due in large part to the Covid-19 pandemic (USFS 2021, p. 3). Whether this spike in use continues, or whether it returns to pre-pandemic levels, is yet to be determined.

41

FWS000043

Because the proposed action is not expected to substantially increase non-motorized recreation in the action area, and does not increase the number or capacity of developed recreation sites in the action area, we do not expect the Black Ram Project to substantially increase the disturbance to grizzly bears associated with non-motorized recreation; nor the chances of human-bear interactions. Therefore, the proposed action will have insignificant effects to grizzly bears associated with non-motorized use and developed recreation.

## C. Vegetation and Fire Management

The effects of proposed vegetation and fire management-related activities with this project fall into two categories: (1) short-term disturbance effects during implementation, and (2) both short- and long-term effects to habitat for grizzly bears in the action area. The latter will be discussed in the next section related to habitat quality.

Although the Black Ram Project area encompasses 95,492 acres in the action area, active vegetation management is proposed on only 12,285[2] of those acres (13 percent of the project area, 9 percent of the action area). Some units will only require one short period of disturbance for treatment (e.g. ecosystem burn units may need one to a few days of work to complete all activities), while other treatment units may require up to four pulses of disturbance for treatment (e.g. commercial harvest units which are harvested, then receive non-commercial thinning and piling of non-merchantable material, then piles are burned, then replanting may occur, totaling many days over multiple years).

Proposed activities may result in short-term disturbance in the immediate vicinity of the treatment units. The use of mechanized equipment within harvest units will generate noise and activity that is likely to disturb any grizzly bears in or near the units. The same is true for non-commercial units, whether using machinery or hand crews with chainsaws. Bears will likely avoid the treatment units during the time that harvest activities are ongoing. Most vegetation removal within a unit is completed in one pulse lasting a few days to a few months. After the harvest or thinning is complete, the disturbance pulse will subside. A year or two after harvest, another short pulse of activity will occur as remaining fuels are burned (pile burning or underburning), which will last on the order of a few days. Finally, one more pulse of disturbance could occur if planting is needed in the unit. This will also last one to a few days per unit.

A history of past projects on the Three Rivers Ranger District of the Forest shows that for most projects, all of the timber harvest and haul are completed within 3-5 years (Table 3). During that time, a majority of the units are inactive at any time, as purchasers move around the project area to different units. In the same manner, prescribed burning occurs only when environmental conditions are right, usually for a few days to a few weeks per year, and only a few days per treatment unit. Ground crews or helicopters may be used for ignition. Aerial (helicopter) ignition will be limited to two days or less per season within each BMU, to avoid prolonged

---

[2] Total commercial harvest= 4,038 acres; Other vegetation management= 694 acres; Total non-harvest fuel treatment= 7,553 acres. Derived from BA, USFS 2020, p. 10.

disturbance to grizzly bears, and thus will not result in adverse effects to grizzly bears (see USFWS/USFS 2009).

While all of these treatments may occur over a period of 10 years, disturbance will occur sporadically in space and time, and not result in permanent press effects but rather short pulse effects. The pulses of disturbance associated with vegetation treatments will not be permanent disturbances to grizzly bears, and the pulses will subside, leaving the units undisturbed for much of the year. Therefore, we expect grizzly bears may temporarily avoid treatment units, but the disturbance and avoidance will not lead to permanent displacement from otherwise suitable habitats.

The most intensive time of implementation will be when timber harvest and haul is occurring in multiple portions of the action area. This will be the time in which effects to adult female grizzly bears will be greatest, will likely last 3-5 years, affecting 1-2 reproductive cycles. Given that the combination of all treatment types will occur on less than 10 percent of the total acreage of the action area, and will occur in temporary pulses of disturbance, we anticipate any localized effects to grizzly bears from harvest, thinning, or burning to be insignificant to grizzly bears.

### D. Cover and Forage Habitat Quality

Some types of vegetation management may serve to increase grizzly bear forage through improved growth of grasses, forbs, and berry-producing shrubs (Zager et al. 1983). In general, available evidence suggests early seral stages of vegetation are preferred by grizzly bears, but the years post-harvest at which a stand is suitable for bears can vary based on ecoregion and dominant tree species (Colton et al. 2021, p. 7). For example, in the NCDE, Waller (1992) reported that grizzly bears avoided recently harvested tree stands, as well as stands less than 30–40 years old where newly growing vegetation did not yet provide hiding cover. In contrast, Kearney et al. (2019) reported stands in that age range were not attractive grizzly bear habitat, because dense re-growth of vegetation had suppressed valuable bear forage. Nielson et al. (2004) suggested that forest design and silvicultural planning consider strategies such as increased perimeter-to-area ratio and low-impact site preparation to maximize grizzly bear food abundance, while minimizing human access (Nielsen et al. 2004). A recent review of studies regarding use of harvest stands or "cut blocks" suggests that grizzly bears may frequently use forestry cut blocks when vegetative forage is present, especially if human activity is minimal and natural forest openings are limited (Colton et al. 2021).

Proposed Black Ram harvest treatments will result in a reduction in hiding cover to some degree, affecting approximately 2,672 acres via regeneration harvest (including clearcuts with reserves, seed tree, and shelterwood prescriptions), and 1,366 acres of intermediate harvest. The BA described those different treatments and provided visual examples of each (USFS 2020, p. 6). Proposed treatments also includes other vegetation management that could affect cover for grizzly bears, including 7,553 acres of non-harvest-related fuels treatments and 694 acres of precommercial thinning and fuel breaks. In addition, the Forest proposes to clear trees at 14 locations along open public motorized routes, for the purpose of creating scenic vistas for Forest visitors. This could include felling and limbing trees within a 20 to 60 foot sight distance from

open roads.  The Forest also proposes thinning a 360-degree area at the top of Hensley Hill (BA, USFS 2020, p. 9).

Grizzly bears are able to occupy a variety of habitat types but generally prefer to forage in areas with hiding cover nearby, particularly when feeding in the daylight hours (Aune and Kasworm 1989; Mace and Waller 1997a).  Waller (1992) reported that grizzly bears avoided recently harvested tree stands, as well as stands less than 30–40 years old where newly growing vegetation did not yet provide hiding cover.  However, in the SE and CYE, Proctor and Kasworm's models for grizzly bear habitat use were dominated by greater-than-expected use for canopy openness and high level of greenness and less-than-expected use of high road densities, which suggests that certain timber harvest and prescribed burning practices may have some potential to improve grizzly bear habitat through opening the canopy and promoting deciduous and herbaceous bear foods (Kasworm et al. 2020, p. 102).

The proposed vegetation treatments will reduce overhead forest cover in harvest units and will reduce understory cover in units treated for fuels.  Approximately 13 percent of current dense cover will be temporarily reduced by harvest and burning activities, and the treatment areas are varied in size and shape, and are widely separated throughout the action area.  Therefore, dense, forested cover will remain abundant and well-distributed in the action area.  After about 15 years, saplings and shrubs are expected to again provide hiding cover and continue to provide forage opportunities within the treatment units.  Even given the recent Davis Fire and the proposed treatments, cover will not be a limiting factor for grizzly bears in either BMU.

Opening up the overstory while retaining and promoting the development of large, fire- and disease-tolerant tree species (like western larch) will provide more structurally diverse and productive stands, and stimulate the growth of forage species including huckleberries where present.  The proposed treatments will emulate ecological processes like fire, insects, and disease that create a mosaic of structural stages across the action area.  Where berry shrubs are sparse, but present, the Forest expects treatments that reduce overstory canopy to improve growing conditions for huckleberries and other shrubs and forbs, which provide forage for grizzly bears.  Because bears tend to avoid areas along motorized routes, the treatments that increase forage along open roads will not be expected to substantially increase forage opportunities for bears.  However, many of the units extend beyond the zone of influence or roads and may provide benefits to grizzly bear forage.  In particular, the prescribed burn units within areas of existing Core will create thousands of acres of improved habitat conditions in areas where bears can securely access them.  While prescribed burning will reduce horizontal cover at the ground and mid-story levels, it is likely to also result in a flush of herbaceous vegetation and shrubs, which will replace the horizontal cover lost during treatment; also providing important grizzly bear forage, especially during the spring.  As a result, grizzly bears will be able to use fire-created openings for foraging following treatment.

Consequently, cover and forage availability, as well as grizzly bear use, will vary both temporally and spatially.  Harvest treatments, as well as prescribed burns, are not anticipated to have long-term negative effects upon bears, but in turn provide a mosaic of successional stages to provide for grizzly bear habitat needs over the long term.  On a local level, changes in cover may affect individual grizzly bears in some portions of the action area.  However, because

44

FWS000046

grizzly bears operate at the landscape level, changes in forested cover at the unit level will not be expected to have a notable effect on their behavior when considered across the action area.

The Service considered whether the vista cuts and harvest units adjacent to roads open to public motorized access will result in additional effects to grizzly bears. In the CYE, mistaken identity and poaching are the two types of illegal killing that could be influenced by increased visibility, and these two sources of mortality have accounted for a combined 17 of the 64 known mortalities in the CYE from 1982-2020, respectively (27% of known mortalities, collectively; Kasworm et al. 2020, p. 37).

We do not have data to determine whether increased visibility is a causal mechanism for such mortality, and thus we cannot determine or quantify a direct relationship between illegal killing and increased visibility within the action area. The Forest predicts in the BA that clearings in other harvest units are expected to benefit huckleberry production. The same vegetation response could be reasonably expected for vista cuts, which also open the forest canopy. This increase in forage in units along an open road could attract grizzly bears to the open road, and thus the vista cuts could result in increased visibility of grizzly bears from open roads, if the bears choose to tolerate roads in order to access food sources. However, we anticipate most bears will either continue to avoid open roads altogether (see above analysis of open roads), or use open roads at times when human use is minimal (i.e. at night; Nielson et al. 2012).

The Service concludes that while vista cuts and harvest units along open roads could increase visibility of grizzly bears to Forest users, we anticipate most grizzly bears will continue to avoid areas within the influence of open roads, and thus illegal mortality risk will not increase significantly. Likewise, because bears that do choose to forage along open roads will likely choose to do so at night when human use is low, the chances of poaching will be discountable. Any effects associated with mistaken identity or poaching are illegal actions that are not exempted under this biological opinion.

The effects of the proposed action related to cover and forage for grizzly bears are expected to be minor and insignificant, given the relatively small amount of a bear's home range in which the changes will occur, and given the abundant amount of forest cover that will remain unaffected. While the proposed activities may decrease cover and forage in treatment units for several years, an overall net gain in terms of grizzly bear forage will occur. Grizzly bears are habitat generalists and will be able to shift their use to low disturbance areas within their home ranges during treatment activity. Thus, impacts to grizzly bears from vegetation treatments are expected to be insignificant and beneficial in the long-term.

### E. Denning Habitat

Potential denning habitat for grizzly bears will be largely unaffected. Only five units occur wholly or partially at the edge of mapped denning habitat. None of these are on steep ground associated with typical denning sites (USFS 2020, p. 33, and additional data in project files). Furthermore, heavy winter snows preclude access to higher elevation harvest units until summer, once grizzly bears have emerged from dens. Therefore, we expect no effects to denning bears nor any effects on denning habitat suitability.

Shortly after den emergence, excessive human activity can cause short-term avoidance of high quality spring habitats. Most of the vegetation treatment units occur outside of mapped Spring habitat (maps in our files), and thus will not occur in areas bears will be utilizing for forage after they emerge from dens. Riparian areas will not be impacted, and these important areas will remain available and without disturbance from harvest activities. Some of the prescribed burn units contain mapped Spring habitat, and any burning-related activities could disturb grizzly bears there. Given the small amount that will be burned in any year in relation to a female grizzly bear's home range, it is unlikely a grizzly bear will be in the area when disturbance related to the prescribed burn will occur. Therefore, we expect discountable effects to grizzly bears from any disturbance to bears emerging from dens.

## F. Connectivity

The proposed action will not result in any permanent barriers to connectivity within or between BMUs in the action area. Nor will there be any barriers to connectivity between the action area and the rest of the CYE or other Recovery Zones. Although forest roads in the project may deter bears from regularly using the habitat adjacent to roads, we do not expect the roads to create a barrier to movement.

While timber harvest and prescribed burning will open up patches of forested habitat and travel may be altered somewhat, treatments will not create a barrier to movement or preclude travel through the action area. Areas of untreated forest will remain within the action area. Linkage and habitat connectivity will not be significantly affected.

## G. Attractants

The proposed action will not result in increased attractants for grizzly bears, nor will it increase human-bear conflicts. All camping, day-use activities, and contractor work requires compliance with the Forest Food Storage Order, as covered in the Forest Plan BO (USFWS 2020, p. 87-89). Re-seeding will not use plants, such as clover, that attract bears. No livestock grazing on NFS lands is included in the proposed action. As discussed above, the proposed action is not expected to directly result in increases in recreational use in the action area. With proper food and attractant storage, the potential of attracting grizzly bears into the work sites will be reduced and the potential for conflicts between grizzly bears and personnel associated with the action will be minimized. With such measures taken to minimize the potential for grizzly bear-human conflicts, the effects of such conflicts are expected to be discountable.

## H. Summary of Effects for the Black Ram Project

We anticipate adverse effects to female grizzly bears from the Black Ram Project associated with proposed temporary increases in OMRD and TMRD above research benchmarks in BMU 15, and associated with displacement from existing areas of Core, until grizzly bears are able to adjust to and actualize newly-created areas of Core. We also anticipate adverse effects related to one-time entries into Core for the purposes of stabilizing hydrology on three road segments to be decommissioned. We expect a few adult female grizzly bears may be affected by the Black Ram Project over the course of some, but not all, of their lifetimes. We know of at least 2 adult

46

female grizzly bears in the action area at this time. That number may fluctuate over the life of the proposed action, but due to the size of adult female home ranges, we do not anticipate more than 2-3 adult female bears will occupy the action area at any given time during project implementation.

The adverse effects associated with the Black Ram Project may significantly impact an adult female grizzly bear's ability to find food resources, breed and raise young, and find adequate shelter at some time. Project effects related to access management, which includes using restricted/closed roads and temporary roads, will be temporary as access conditions will return to pre-project conditions (i.e. at or above research benchmarks) post-implementation. The temporary increases in OMRD and TMRD may result in under-use of suitable habitat by individual female grizzly bears for the life of the project, which could be as long as 10 years, but will likely be closer to 3-5 years. The effects include potentially disrupting normal breeding (or more specifically, cub rearing) or feeding patterns in the short-term. The amount of disturbance and/or displacement may vary across the action area, depending on site-specific conditions (i.e. whether the area is providing Core or is adjacent to other roads) and actions (i.e. duration of use and/or length of road segment). We do not expect female grizzly bears to abandon the action area, nor will the proposed action create a barrier to movement or dispersal for grizzly bears within or between the action area and other portions of the CYE or grizzly bear range.

Project activities are not anticipated to affect denning grizzly bears or grizzly bear denning habitat. Minimal and insignificant effects to grizzly bear forage and cover may occur as a result of the proposed treatments. Potential disturbance related to human activity and the use of mechanized equipment, including helicopter use, will be insignificant. The Black Ram Project will not create a barrier to movement or significantly affect linkage habitat or connectivity. With food storage order in place and enforced, the Service concludes that the proposed action will not result in habituation or grizzly bear mortality due to improper attractant storage.

In the SSA, a component of "Continued Conservation" scenario includes "Standards and protections in USFS and NPS land management plans that benefit grizzly bears stay the same" (USFWS 2021a, p. 230-231). The Black Ram Project meets the standards and guidelines of the Forest Plan. Thus, the Black Ram Project falls within the "Continued Conservation" scenario, which is predicted to result in increased resiliency of grizzly bears in the CYE in the coming years (USFWS 2021, p. 237-238).

In summary, with the exception of the potentially adverse effects related to motorized access, the remaining effects to grizzly bears as a result of the Black Ram Project will be insignificant and/or discountable. The adverse effects will last for a pulse of time, not to exceed 10 years. After the project is implemented, motorized access conditions will return to baseline levels and meet or be better than the current standards for motorized access in BMUs 14 and 15, which are favorable to the survival and successful feeding and breeding and sheltering for female grizzly bears.

47

## VII. CUMULATIVE EFFECTS

The implementing regulations for section 7 of the Act define "cumulative effects" as those effects of future state, tribal, local, or private actions that are *reasonably certain to occur* in the *action area* [in this case, described on page 5] of the Federal action subject to consultation [in this case, the Black Ram Project] (50 CFR 402.02). According to section 7 regulations (50 CFR 402.17(a)), conclusion of *reasonably certain to occur* must be based on clear and substantial information, using the best scientific and commercial data available. Future federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the Act. This includes any future proposed vegetation management or other projects within the action area or elsewhere on the Forest. Otherwise, current ongoing or proposed actions are considered in the Environmental Baseline. It is important to note that the section 7 definition (related to the Act) is not the same as the definition of "cumulative effects" under the National Environmental Policy Act.

*Non-Federal land Uses*
The action area BMUs are almost completely under federal land management (99 percent for BMU 14; 94 percent for BMU 15). Thus, the Forest influences the vast majority of habitat for grizzly bears in the action area. There are no other federal lands, nor any state or tribal lands in the action area. The 3,765 acres of private lands are mostly located along the southern edges of the BMUs (Figure 4).

**Figure 4. Map of land ownership in the action area for the Black Ram Project**.



Actions on private (non-industrial) lands in the action area influence grizzly bears in the action area. Due to the discretion of private landowners to choose how to manage their lands, it is difficult to comprehensively assess all of the future, non-Federal activities reasonably certain to occur in the action area that may affect the grizzly bear. No known site-specific, non-federal

48

FWS000050

actions are known to be reasonably certain to occur in the future (BA, USFS 2021, p. 35; EA, USFS 2022, p. 26-27). Thus, our analysis of cumulative effects is based on an assessment of land ownership and use patterns, and the patterns of grizzly bear mortality caused by non-Federal activities, as discussed above in the *Status of the Species* and *Environmental Baseline* sections.

Activities on private property can affect grizzly bear habitat by increasing road density, increasing human density, and indirectly reducing Core area on Forest lands (due to the 500 meter zone of influence considered in identifying Core). The Forest uses the best available data to map roads on private lands that may affect motorized access metrics, which is then digitized manually into the Forest's roads database. Data used includes publicly available images on Google Maps, Google Earth, and National Agriculture Imagery Program (NAIP) aerial photographs, offered by the U.S. Department of Agriculture. The Forest will also map roads that Forest staff observe from Forest lands while working in a project area, but Forest staff do not enter private lands for the express purpose of mapping roads or assessing activities on private lands (email communication, Sean Hill, Kootenai NF, August 2022). The Service relies on the best available data offered by the Forest for assessing effects. If access parameters change below standards for the BMU due to actions on private lands, the Forest would be responsible for adjusting their access management accordingly, so that access management standards are met. This ensures a high level of responsibility on the part of the Forest to provide habitat for grizzly bears despite what private landowners choose to do.

The Forest and the Service used local knowledge of the area as well as publicly available data such as Google maps to assess the character of the private lands in the action area to inform our assessment of reasonably foreseeable activities. Most private parcels are already relatively small and located generally along the southern edge of the action area adjacent to the highway (Figure 4). Although some subdivision and development may occur, the likelihood of a large subdivision of hundreds of acres is unlikely. The area is very rural with an estimated population of roughly 350 people (World Population Review 2022), and a 45-60 minute drive to the county seat of Libby, MT (population roughly 20,000; Ibid). There are no large industrial businesses or industries or mining operations in the action area. Activities on private land that are expected to continue include small scale timber harvest, home building, minor subdivisions, minor construction, well drilling, conversion of timbered land to pastures, and farming.

The potential for human-grizzly bear conflicts related to food attractants or livestock on private land likely has the largest potential for effects on private land. Montana Fish, Wildlife and Parks' bear specialist program is recognized as successful in fostering public awareness and support of grizzly bear conservation. The program is aimed at resolving conflicts between bears and people, but also reducing the potential for conflicts to arise though education and information regarding attractant storage. In the CYE, there has been an increase in the number of residents seeking proactive help (e.g. fencing gardens, beehives and other attractants) to prevent conflict prior to an incident and fewer incidents involving problem bears have occurred during recent years (Annis and Trimbo 2019). This represents notable progress toward reducing the potential for conflicts between people and grizzly bears on private lands, and in turn reduces grizzly bear mortality. Hence, these efforts partially offset the cumulative effects of activities on

49

private lands that increase the risk of human-bears conflicts (Annis and Trimbo 2019; Proctor et al. 2018).

While some activities on non-federal land may contribute to cumulative effects at the project level at some point in the future, large Forest ownership (that is highly regulated and large blocks of unroaded areas within which human access is restricted by regulation and topography) would serve to reduce the impacts of larger residential human populations on grizzly bears. While federal land management cannot entirely compensate for impacts on private land, management under the Forest Plan, including the proposed action, will continue to provide habitat for grizzly bears on the Forest.

*Illegal Motorized Access*
As described in the baseline section above, any private entity's non-compliance with the Forest's access management is an illegal activity. While future illegal use of the Forest via motorized access in areas unauthorized for such use may occur within the action area, such illegal use is not considered a Forest (federal) action. These, and any other illegal activities are not the result of a federal action and therefore not analyzed under effects of the action, but their influence is considered for potential cumulative effects.

While cumulative effects to grizzly bears may occur as a result of illegal motorized access, the information as to the length, duration, amount of use, type of use, and location, among other conditions, is and will continue to be unknown until such time that illegal use is found. Depending on the location, illegal motorized use may or may not affect road metrics of OMRD, TMRD, and Core. The probability of long-term illegal motorized access and probability of illegal access coinciding with the presence of grizzly bears is anticipated to be low but is unknown. As such, the potential consequences to grizzly bears are uncertain from these activities. Illegal motorized access is expected to be spatially disparate and temporary and is not likely to collectively cause an adverse effect because most users follow travel regulations and when illegal use is observed or when user-created roads become apparent the Forest corrects the situation as soon as they are able.

*Black Bear Hunting*
The State of Montana allows regulated hunting for black bears, as well as other wildlife species, within and around the CYE (which includes the action area). Hunters are not allowed to bait bears in Montana. Grizzly bear mortality as a result of mistaken bear identification and self-defense could occur within the action area but possibly decrease through hunter education programs outlined in the Grizzly Bear Management Plan for Western Montana (MFWP 2006).

# VIII. CONCLUSION

The *effects of the action* and *cumulative effects* are added to the *environmental baseline* and in light of the *status of the species* (and critical habitat if applicable), the Service formulates an opinion as to whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat. Should the federal action result in a jeopardy situation and/or adverse modification conclusion, the Service may propose

50

reasonable and prudent alternatives that the federal agency can take to avoid violation of section 7(a)(2).

After reviewing the current status of grizzly bears, the environmental baseline for the action area, the effects of the action, and the cumulative effects, it is the Service's opinion that the effects of the proposed Black Ram Project on grizzly bears are not likely to jeopardize the continued existence of the grizzly bear. No critical habitat has been designated for this species, therefore, none will be affected. Implementing regulations for section 7 (50 C.F.R. § 402) define "jeopardize the continued existence of" as to "engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." Our conclusion is based on, but not limited to, the information presented in the biological assessment (U.S. Forest Service 2020), correspondence during this consultation process, information in our files, and informal discussions between the Service and the Forest.

The proposed Black Ram Project occurs in occupied grizzly bear habitat within the Cabinet-Yaak Recovery Zone. The project may result in adverse effects to a few individual female grizzly bears as a consequence of the potential disturbance and/or displacement related to the temporary increases in motorized access in the action area that could displace grizzly bears from otherwise suitable habitats. In particular, we anticipate adverse effects related to displacement from temporary increases in OMRD and TMRD above research benchmarks in BMU 15, and the displacement in areas of existing Core, until female grizzly bears are able to adjust to new areas of Core.

**Factors related to the Action Area:**

➢ The existing (baseline) access condition within the action area (BMUs 14 and 15) is favorable for grizzly bears, and two female grizzly bears are known to currently reside in the action area and have successfully reproduced multiple cubs.

➢ Roughly 56 and 55 percent of BMUs 14 and 15, respectively, provides secure habitat (Core) for grizzly bears. These amounts meet or are better than the research benchmarks, or the amounts shown by researchers to support reproductively successful female grizzly bears in the CYE. Patches of secure habitat are well connected throughout the action area, allowing for large areas of undisturbed habitat for grizzly bears.

➢ The temporary use of restricted/closed roads and use of bermed/barriered roads will occur with implementation of the proposed action. This use will not increase public motorized access in the action area, but will exceed administrative use limits on restricted roads and thus result in a temporary increase in OMRD and TMRD above levels at which female grizzly bears are expected to experience significant effects to feeding, breeding, or sheltering.

➢ The Black Ram Project will affect areas of existing Core, while creating new areas of Core elsewhere in the action area. Female grizzly bears may be displaced from Core areas they currently use and experience a perceived reduction in Core until they are able

51

FWS000053

to actualize the new areas of Core. The total amount of Core available will increase slightly in the action area and will at all times be at or above the research benchmarks.

➢ The temporary use of restricted/closed roads and bermed/barriered roads will not likely occur across the project area all at the same time; but will likely occur in a few areas at a time, creating pulses of intense disturbance in some areas while other areas will be relatively undisturbed. Also, all restricted roads will remain closed to public motorized access.

➢ With the exception of adverse effects related to motorized access, any other effects to grizzly bears as a result of the Black Ram Project will be insignificant and/or discountable.

➢ While disturbance effects related to human activity and mechanized equipment may alter grizzly bear use of the area, the impacts will be of short duration for any particular unit. Treatment units make up 9 percent of the action area (which represents 2 female grizzly bear home ranges). Even considering prescribed burning that may also occur in the action area (associated with the Buckhorn Project), the amount of habitat to be affected is small in relation to a female grizzly bear's home range.

➢ The Black Ram Project will not preclude grizzly bears from using the action area (BMUs 14 and 15), nor will it form a barrier to dispersal and movement within or across the action area or between the action area and other parts of the CYE Recovery Zone. Nor will the project preclude movement between the CYE and other ecosystems (such as SE, BE, and NCDE).

➢ Project activities are not anticipated to affect denning grizzly bears or grizzly bear denning habitat or grizzly bears emerging from dens in spring.

➢ Minimal and insignificant effects to grizzly bear forage and cover may occur as a result of the proposed treatments in the short-term, and forage is expected to improve in treatment units as forbs and shrubs, particularly huckleberries, benefit from more open forest canopies.

➢ Prescribed burn units in areas of Core are expected to improve foraging habitat opportunities for grizzly bears in areas free from intense human disturbance.

➢ With a food storage order in place and enforced, the Service concludes that the proposed action will not result in habituation or grizzly bear mortality due to improper attractant storage. Any effects will be discountable.

➢ The proposed action may adversely affect a few adult female grizzly bears, and effects may range from slight disturbance to significant underuse of otherwise suitable habitat such that feeding and reproduction are negatively affected. We do not anticipate effects to result in direct mortality to any individuals. At most, reproduction may be slowed for the affected females during implementation of the Black Ram Project.

52

FWS000054

➢ The most intensive time of implementation will be when timber harvest and haul is occurring in multiple portions of the action area. This will be the time in which effects to adult female grizzly bears will be greatest, and will likely last 3-5 bear years, affecting 1-2 reproductive cycles.

➢ The proposed action will meet all standards and guidelines under the Forest Plan, and thus represents the type of continued conservation that is projected to result in increased resiliency of the CYE population over the next 30-45 years (USFWS 2021a, p. 230-231).

➢ Upon completion of the proposed action, access management conditions will provide conditions that will likely support long-term occupancy and successful reproduction by adult female grizzly bears in the action area.

➢ We do not anticipate grizzly bears will be displaced from the entire action area, but they may be displaced from otherwise suitable habitat within portions of the action area that are experiencing disturbance from motorized access.

➢ We anticipate these adverse effects will be non-lethal to a few adult female grizzly bears. We do not anticipate adverse effects to male or transient grizzly bears that may be in the action area during implementation of the Black Ram Project.

***Factors related to the CYE Recovery Zone:***

- The CYE is a smaller ecosystem that is still slowly recovering from being close to historical extirpation, particularly in the Cabinets portion of the ecosystem.

- The CYE has low resiliency due to low numbers of bears, low fecundity, moderate inter-ecosystem connectivity, low genetic diversity, and moderate amounts of large, intact blocks of land.[2]

- The current population estimate of 55-60 grizzly bears in the CYE remains below the anticipated minimum population of 100 bears (U.S. Fish and Wildlife Service 1993, p.83), but the population is likely stable or increasing (Kasworm et al. 2020), and successful augmentation and natural immigration has led to improved genetic diversity.

- Only a small proportion of the grizzly bears in the CYE are known to use BMUs 14 and 15 at any particular time. With only a few adult female grizzly bears present, non-lethal effects are not likely to reduce the CYE grizzly bear population.

- Genetic connectivity between the CYE and other grizzly bear populations is important. Recent data indicate increasing movements by males and females and subsequent reproduction, resulting in limited, but increasing population connectivity, particularly in the Yaak portion of the CYE." (USFWS 2021a, p. 79).

53

FWS000055

- In the CYE, demographic recovery criteria have not yet been met, but progress is being made towards meeting the criteria (Kasworm et al. 2021a). Mortality rates are low, but criteria related to occupancy and reproduction by female grizzly bears criteria have not yet been met. Occupancy and reproduction are slow processes that rely on multiple factors; managing mortality is a key factor in assuring opportunities for female grizzly bears to expand their range and reproduce.

- We expect that over time, if the population trend and adult female survival rates remain high in the CYE, the population in this ecosystem will likely expand. Expanding population size will result in increased resiliency of the population to stressors, ensuring greater viability of the CYE population (USFWS 2021a, p. 237-238).

- Resiliency is expected to increase in the next 30-45 year timeframe if current conservation is maintained. The Kootenai National Forest's access management standards that provide for large, intact blocks of land, is one of many current conservation measures in place in the CYE that was included in the future scenarios analysis in the SSA (USFWS 2021a, p. 23-231).

- Montana Fish, Wildlife and Parks' bear specialist program and the Bear Ranger program on the Kootenai National Forest are expected to continue to work with the public to reduce risks to grizzly bears on private and public lands. In cooperation with other agencies, these programs have made notable strides toward an informed public and reduced the availability of attractants to grizzly bears on private and public lands.

Recovery zones were established to identify areas necessary for the recovery of a species and are defined as the area in each grizzly bear ecosystem within which the population and habitat criteria for recovery are measured. Recovery zones are areas adequate for managing and promoting the recovery and survival of grizzly bear populations (U.S. Fish and Wildlife Service 1993). Areas within the recovery zones are managed to provide and conserve grizzly bear habitat. The recovery zones contain large portions of wilderness and in some cases national park lands, which are protected from the influence of many types of human uses occurring on lands elsewhere. Multiple use lands are managed with grizzly bear recovery as a primary factor. As anticipated in the Recovery Plan, grizzly bear populations have responded to these conditions, have stabilized, and are robust and have high resiliency in the NCDE and GYE. In the SE and CYE, population trends are increasing, and resiliency is expected to increase in both populations in the future, given continuation of current conservation. In addition, the grizzly bears have been expanding and continue to expand their existing range outside of the GYE, NCDE, CYE, and SE recovery zones, increasing opportunities for expanding population size and increased genetic connectivity between the ecosystems.

The recovery plan strategy has been successful and has resulted in growth of the grizzly bear populations. Grizzly bears in the GYE and NCDE populations have expanded into areas well outside of the recovery zones. Based on the best available information, the Service concludes that the status of both the GYE and NCDE grizzly bear populations are robust and have high resiliency to stressors.

54

FWS000056

While adverse effects may occur on some of the individual female grizzly bears using the action area, it will affect a few adult female grizzly bears in the CYE for a portion of their life. The adverse effects are all expected to be non-lethal and may range from disturbance that leads to shifting behavior and use patterns, to decreased reproduction for 1-2 reproductive cycles. The proposed adverse habitat conditions caused by high motorized road densities may displace individual grizzly bears from key habitat to the extent that significant under-use of habitat by grizzly bears occurs. Such under-use of key habitats could result in a female bear's failure to obtain adequate food resources and reduce fitness, impairing its normal reproductive potential. Some adult female grizzly bears wary of humans and human-generated disturbance (e.g. from roads) may not breed at their potential frequency or may fail to complete gestation due to decreased fitness.

Due to the location and scale of the project, we reasonably assume very few adult females will be affected, based on the typical distribution and density of female home ranges, and the fact that we know of only 2 adult females that have been observed in the action area in the recent past (spring of 2021). Access management conditions in BMU 14 will remain within the research benchmarks found to support reproductively successful female grizzly bears. Thus, the main effects will be from temporary access management conditions in BMU 15 which approximates the lifetime size of a female's home range. The effects will be temporary, and many of the other BMUs within the CYE have access management conditions that are favorable to fully successful reproduction during the time of the Black Ram Project, based on meeting or exceeding research benchmarks known to support reproductively successful females. The proposed action falls within the "Continued Conservation" scenario, which is predicted to result in increased resiliency of grizzly bears in the CYE in the coming years (USFWS 2021, p. 237-238). The Service has considered the overall favorable land management within the recovery zone, the presumably and likely stable or growing population and improved survival and distribution of grizzly bears in the CYE population, and the improving trends in survival rates. Thus, we anticipate the adverse effects on grizzly bears as a result of implementing the Black Ram Project will affect a small portion of the CYE Recovery Zone but will not appreciably impair or preclude the capacity of the CYE recovery unit from providing both the survival and recovery function assigned to it. The CYE will continue to contribute to redundancy and representation for grizzly bears in the lower-48 with implementation of the proposed action.

We do not expect the Black Ram Project to have any effects to individual grizzly bears outside of the action area or to grizzly bear populations outside of the CYE. In other words, we do not expect the Black Ram Project to affect grizzly bears within, or connectivity with, the surrounding grizzly bear ecosystems (Selkirk, North Continental Divide) nor the ecosystems further away (Yellowstone, North Cascades, Bitterroot). Because the Black Ram Project will not reduce the reproduction, numbers, or distribution of grizzly bears throughout the CYE, and considering the status of the CYE population as well as other grizzly bear populations in the lower 48 (particularly the NCDE and GYE that have exceeded recovery targets and are experiencing continued growth), we conclude that the level of adverse effects is not reasonably expected to reduce appreciably the likelihood of both the survival and recovery of the listed entity of grizzly bears as a whole. Thus, it is the Service's opinion that the effects of the Black Ram Project on grizzly bears are not likely to jeopardize the continued existence of the grizzly bear.

FWS000057

## IX. INCIDENTAL TAKE STATEMENT

Section 9 of the Act, and Federal regulations pursuant to section 4(d) of the Act, prohibit the take of Endangered and Threatened species, respectively without special exemption. *Take* is defined as harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct. *Harm* is further defined by the Service to include significant habitat modification or degradation that results in death or injury to listed species by significantly impairing behavioral patterns, including breeding, feeding, or sheltering. *Harass* is defined by the Service as an intentional or negligent act or omission that creates the likelihood of injury to listed wildlife by annoying it to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding or sheltering. *Incidental take* is defined as take that is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity. Under the terms of section 7(b)(4) and section 7(o)(2), taking that is incidental to and not intended as part of the agency action is not considered to be prohibited taking under the Act provided that such taking is in compliance with this Incidental Take Statement.

The measures described below are non-discretionary and must be undertaken by the Forest so that they become binding conditions of any grant or permit issued, as appropriate, for the exemption in section 7(o)(2) to apply. The Forest has a continuing duty to regulate the activity that is covered by this incidental take statement. If the Forest (1) fails to assume and implement the terms and conditions or (2) fails to require an applicant to adhere to the terms and conditions of the incidental take statement through enforceable terms that are added to the permit or grant document, the protective coverage of section 7(o)(2) may lapse. To monitor the impact of incidental take, the Forest must report the progress of the action and its impact on the species to the Service as specified in the incidental take statement [50 C.F.R. § 402.14(i)(3)].

### Amount or Extent of Take Anticipated

Based on research detailed earlier in this biological opinion, the Service has defined harm of grizzly bears in terms of adverse habitat conditions caused by high motorized road densities, which can displace individual grizzly bears from key habitat to the extent that significant under-use of habitat by grizzly bears occurs. The Service maintains that such under-use of key habitats could result in a female bear's failure to obtain adequate food resources and reduce fitness, impairing its normal reproductive potential. Some adult female grizzly bears wary of humans and human-generated disturbance (e.g. from roads) may not breed at their potential frequency or may fail to complete gestation due to decreased fitness.

The existing, baseline access condition for grizzly bears provides levels of road densities and secure habitat (Core) that allow adult female grizzly bears to successfully establish home ranges and successfully reproduce and rear cubs. We anticipate adverse effects to female grizzly bears from the Black Ram Project associated with proposed temporary increases in Open Motorized Route Density (OMRD) and Total Motorized Route Density (TMRD) above research benchmarks in BMU 15, and associated with displacement from existing areas of Core, until grizzly bears are able to adjust to and actualize newly-created areas of Core. We also anticipate

56

adverse effects related to one-time entries into Core for the purposes of stabilizing hydrology on three road segments to be decommissioned. We expect a few adult female grizzly bears may be affected by the Black Ram Project over the course of some, but not all, of their lifetimes. Refer to the discussion in the 'general effects of roads of grizzly bears' above for further information on the impacts of roads.

We do not anticipate any take of subadult or male grizzly bears. Male grizzly bears have larger home ranges than females, and males and subadults are more mobile and do not have the same energetic needs as adult females. We also do not anticipate take of grizzly bears that are transient (moving through areas outside of home range use). Such individuals are highly mobile and not restricted to finding food and shelter within a home range. Thus, while displacement may affect behavioral patterns such as feeding or sheltering, we do not anticipate such effects will cause injury or harm to transient, subadult, or male grizzly bears.

The incidental take we anticipate will harm only a very low number of female grizzly bears that may inhabit the area of activity within the action area during implementation of the project. The temporary effects related to increased use of restricted roads that will affect OMRD, and the use of roads in areas currently providing Core, may result in the under-use of habitat by grizzly bears. An adult female grizzly bear may be wary of humans and human-generated disturbance, which may disrupt normal breeding (or more specifically, cub rearing) or feeding patterns. We do not expect all adult female grizzly bears that may occur in the action area to suffer disruptions in normal breeding or feeding patterns, nor will we expect any female to experience permanent effects (lasting more than one to two reproductive cycles). Variables such as annual climate and resulting habitat and food resource conditions, the level of roading, and the number of grizzly bears using an area may change over time and are all factors influencing the displacement within a home range.

The effects on individual female grizzly bears are difficult to quantify. While incidental take may occur, grizzly bears are individualistic and display a wide variation in their tolerance of, and response to, human activity and road density. The best scientific and commercial data available at this time are not sufficient to enable the Service to determine a specific amount of incidental take of the grizzly bears due to displacement. Because of effects to existing Core in both BMUs and because of increases in OMRD and TMRD above the research benchmarks in BMU 15, we conservatively anticipate that any female grizzly bears that use BMUs 14 and 15 during the Black Ram Project may experience some level of harm resulting in incidental take. The precise amount of take is difficult to quantify for the following reasons:

1) The amount of take would depend on the number of adult female grizzly bears impacted by the project. Given that we know of two adult female grizzly bears in the action area (both of whom were detected with cubs in BMU 15 in May of 2021), and given that the action area is roughly the size of two to three adult female grizzly bear home ranges, it is reasonable to anticipate adverse effects to one to three adult female grizzly bears at any given time during the proposed action, although that number may vary. Because adult female grizzly bears may move in or out of the action area due to factors unrelated to the proposed action, we cannot reasonably estimate the net number of females that may be affected over the course of the project (roughly 10 years).

FWS000059

2) Individual grizzly bears will react differently to disturbance. Not all adult female bears that are exposed to road-related activities may be adversely impacted to the point of incidental take.

3) Individual female grizzly bears that initially may be sensitive to disturbances may adjust to the routine disturbances generated by human activity over time. Therefore, determining the precise amount of take, as defined by impaired reproductive potential, is impossible.

The amount of take will be also difficult to detect for the following reasons:

1) Grizzly bears are not easily detected or observed in the wild.
2) Reproductive rates of female grizzly bears and cub/young survival vary naturally due to environmental and physiological causes.
3) A reduction in "normal" reproductive success is not discernable in the wild.
4) The reasons a grizzly bear fails to breed and/or failure to complete gestation are not discernable in the wild.

Therefore, determining the precise amount of take, as defined by impaired reproductive potential cannot be practically obtained. Data from collared female grizzly bears show that at times up to three adult female grizzly bears were alive and in or in the vicinity of the action area (see Figure 14 in Kasworm et al. 2021, p. 51). Female bears range across large areas and may move in and out of the action area in response to multiple factors, including presence of other bears, quality of seasonal food sources, wildfires or other natural disturbances, and other factors besides the proposed action. Thus, the proposed action could result in take in the form of harm to any adult female grizzly bears that use the action area for breeding and raising cubs. At least two adult female grizzly bears were in the action area in May of 2021 (Kasworm, pers. comm. June 2021). We do not expect many more female grizzly bears in the action area at any time during the proposed action since grizzly bears occur at relatively low densities across the landscape in western Montana. Therefore, the Service anticipates only a low level of incidental take of female grizzly bears will occur in the form of harm from project-related activity that results in the use of restricted roads, and from motorized use of bermed/barriered roads.

We do not expect all adult female grizzly bears affected by displacement from the proposed activity to suffer impairment of breeding, feeding, and/or sheltering. We use the research benchmarks established by Wakkinen and Kasworm (1997) to measure the road metrics at which we anticipate adverse effects that result in take; these benchmarks were the average conditions in female grizzly bear home ranges, meaning that some bears were able to use home ranges with high road densities and lower Core amounts than the average. Since that research was conducted, females with cubs and young have been observed in BMUs in the CYE that have road metrics above the research benchmarks (e.g. in BMU 12; see Kasworm et al. 2021). Thus, some female grizzly bears may not be harmed by the proposed action. We expect such impairment to continue for many years. Females will likely adjust their use of habitat once activities have been implemented. Thus, we anticipate a non-lethal, fairly low level of incidental take of female grizzly bears.

FWS000060

According to Service policy, as stated in the Endangered Species Consultation Handbook (March 1998) (Handbook), some detectable measure of effect should be provided, such as the relative occurrence of the species or a surrogate species in the local community, or amount of habitat used by the species, to serve as a measure for take. Take also may be expressed as a change in habitat characteristics affecting the species (Handbook, p 4-47 to 4-48). In instances where incidental take is difficult to quantify, the Service uses a surrogate measure of take.

The Service has chosen to express take in terms of increases in OMRD or TMRD density above the research benchmarks or effects to existing areas of Core affecting the species for the Black Ram Project. This is a regular practice for biological opinions on effects to grizzly bears because these changes in road metrics are quantifiable, measurable, and based on the best available information that indicates female grizzly bears under-use habitat near roads and areas of high road densities. Such under-use of habitat can result in decreased fitness, impairing feeding and breeding, which are the types of harm we anticipate due to the proposed action. Research specific to the CYE and SE (Wakkinen and Kasworm 1997) provided data regarding the amount of area within six female grizzly bear home ranges with OMRD greater than 1 mile per square mile and TMRD greater than 2 miles per square mile. From this home range information, researchers recommended levels of OMRD, TMRD, and Core for BMUs in the CYE/SE. The Service uses these amounts to limit, measure, and monitor the displacement impacts from road densities. Thus, these measures represent a suitable surrogate for gauging the amount of incidental take. The Service anticipates adverse effects that "harm" grizzly bears due to the following conditions:

1. If OMRD calculated exceeds 1 mile per square mile in over 33 percent of a BMU. Research has demonstrated that when open road densities exceeded 1 mile per square mile of habitat, adult grizzly bear use of habitat significantly declined compared to expected use (Wakkinen and Kasworm 1997). It is reasonable to assume that some level of under-use of habitat may occur before essential behavior patterns are significantly impaired to the point of causing injury or death to individual bears. The amount of area within female grizzly bears' home ranges in the CYE/SE averaged 33 percent (ibid.) Thus, the Service uses this amount as a benchmark above which we anticipate harm may occur. However, research has also shown that adult females utilizing BMUs with OMRD greater 1 mile per square mile in greater than 33 percent of a BMU have been able to survive and produce cubs (Kasworm et al. 2021).

2. If TMRD exceeds 2 miles per square mile in over 26 percent of a BMU. Research has suggested that when total road densities exceeded 2 miles per square mile of habitat, use of habitat by female and male grizzly bears declined significantly from expected (Wakkinen and Kasworm 1997). It is reasonable to assume that some level of under-use of habitat may occur before essential behavior patterns are significantly impaired to the point of causing injury or death to individual grizzly bears. The amount of area within female grizzly bears' home ranges in the CYE/SE averaged 26 percent (Ibid.). Thus the Service uses this amount as a benchmark above which we anticipate harm may occur. However, researchers have also observed adult females with young utilizing BMUs with TMRD greater 2 mile per square mile in greater than 26 percent of a BMU (Kasworm et al. 2021).

FWS000061

3. If Core is less than 55 percent of a BMU. In the CYE/SE, Wakkinen and Kasworm (1997) found that grizzly bears strongly preferred Core areas within their home ranges. The average amount of Core within studied female grizzly bears was 55 percent. Thus the Service uses this amount as a benchmark below which we anticipate harm may occur.

**Surrogate #1: OMRD**

OMRD will not exceed research benchmarks in BMU 14, and thus we do not anticipate incidental take in BMU 14 due to OMRD. The Forest anticipated OMRD will exceed research benchmarks in BMU 15, rising as high as 40 percent during project implementation (or 7 percent above the research benchmark), for a period of up to 10 years. The Service subsequently reduced the amount of increase in OMRD to 37 percent via Term and Condition #3, below. Thus, **OMRD up to 37 percent in BMU 15 and increases above the research benchmark for more than 10 years represents our first surrogate of incidental take.**

**Surrogate #2: TMRD**

The Forest anticipates increases in total motorized route density (TMRD) above the research benchmark of 26 percent in BMU 15 during project implementation. The Forest estimates TMRD may increase as high as 32 percent in BMU 15 for a period of up to 10 years. We note that because in-kind Core replacements must be completed prior to entering new areas of Core, the increases in TMRD presented in the BA represent a maximum impact scenario, but will not increase if new areas of Core are created before existing areas are opened (USFS 2020, p. 28). **TMRD up to 32 percent in BMU 15 and increases above the research benchmark for more than 10 years represent our second surrogate of incidental take.**

**Surrogate #3: Core**

The Black Ram Project will re-open existing bermed or barriered road prisms and replace the berms or barriers, so that the roads could be used for administrative purposes associated with vegetation management, which will affect areas of existing Core. New areas of Core will be created by placing berms or barriers on certain existing gated roads, after accessing those roads to pull culverts and stabilize them hydrologically, as needed. Many of the roads where new Core will be created are currently overgrown and have received little use in the past decade or more, thus grizzly bears may perceive a decrease in Core for some time until they are able to discover the new areas of Core. The existing areas of Core that will be affected total 1,923 acres in BMU 14 and 3,029 acres in BMU 15 (Table 6). The percent of the BMUs in Core will not change. However, the Forest will affect a total of 4,952 acres of existing Core, which will potentially displace grizzly bears from Core areas they are accustomed to using without motorized vehicle disturbance. New motorized use of these areas may disturb or displace grizzly bears, and we anticipate adult female bears may be harmed by the displacement and may perceive a reduction in the amount of Core within their home ranges. **These 4,952 acres of existing Core that will be affected represent our third surrogate measure of incidental take.**

The Forest identified 9 segments of road that need watershed stabilization work not associated with the timber sale (USFS 2020, Appendix F, p. 120), 3 of which will affect Core and thus

60

result in incidental take to female grizzly bears (Ibid. at p. 27). These entries could occur at any time during the life of the Black Ram Project. The Service has already issued an incidental take statement (ITS) to address one-time entries into Core for the sake of watershed stabilization (USFWS 2020, p. 112). The level of incidental take anticipated would be exceeded "if more than one entry of Core occurs within a BMU more than once per 10-year time frame, or occurs for more than one bear season, or occurs for reasons other than the sole purpose of completing road decommissioning/stabilization activities on existing closed or barriered roads in Core area habitat." Thus, the proposed entries into Core for road stabilization, as identified in Appendix F (USFS 2020, p. 120) has already been exempted as the Forest invokes this provision. Therefore, this incidental take statement addresses take that may occur above the one-time entries into Core, as a result of implementing the Black Ram Project.

**Triggers for reinitiation:**

The level of incidental take anticipated in this biological opinion would be exceeded and therefore the level of take exempted would be exceeded if:

- OMRD increases to more than 37 percent in BMU 15; or
- OMRD above the research benchmark (33 percent) in BMU 15 for more than 10 years; or
- TMRD increases to more than 32 percent in BMU 15; or
- TMRD is above the research benchmark (26 percent) for more than 10 years; or
- any impacts to OMRD or TMRD above research benchmarks occur in BMU 14; or
- more than 4,952 acres of existing Core are affected by re-opening bermed/barriered roads; or
- the identified areas of existing Core to be affected are entered before in-kind Core is created; or
- less than 4,952 acres of new Core area are created.

If any of the above situations occur and the level of take exempted is exceeded, reinitiation of consultation would be required, as per CFR 402.16 (1).

The Service recognizes that mapping and calculation errors can occur. If the Forest finds that it has made a mapping or calculation error in describing the existing condition and updates the motorized access conditions to better reflect existing conditions on the ground (but no changes on the ground), the Service does not expect any additional incidental take of grizzly bears related to those corrections because the changes would not reflect any actual changes on the ground. The intent of this incidental take statement is to capture the existing and anticipated access conditions, including potential incidental take that may not be represented in the metrics described above due to potential errors or lack of information at the time of consultation.

**Effect of the take**

In the accompanying biological opinion, the Service determined that this level of anticipated take is not likely to result in jeopardy to the species. We anticipate no mortality of grizzly bears, and only some low level of harm related to the normal reproductive potential and/or feeding patterns of individual female grizzly bears in the area. The best information indicates the overall status of

61

FWS000063

the CYE grizzly bear population is stable to increasing. Considering the grizzly bear recovery strategies (U.S. Fish and Wildlife Service et al. 2013; U.S. Fish and Wildlife Service 1993) and the size, status, and distribution of the combined GYE, NCDE, SE and CYE grizzly bear population, incidental take of grizzly bears in the action area will not affect the recovery of the grizzly bear population in the conterminous United States as listed under the Act. Further, impacts on the grizzly bear population as a whole (all ecosystems) as a result of the Black Ram Project, including anticipated levels of incidental take, will not appreciably reduce the survival or the recovery of the species in the conterminous United States.

## Reasonable and prudent measures

Biological opinions provide reasonable and prudent measures that are expected to reduce the amount of incidental take. Reasonable and prudent measures are those measures necessary and appropriate to minimize incidental take resulting from the proposed Black Ram Project. Reasonable and prudent measures are nondiscretionary and must be implemented by the agency in order for the exemption in section 7(o)(2) to apply.

1. Reduce the potential for harm caused by displacement of female grizzly bears in Core areas.
2. Reduce the potential for harm caused by displacement of female grizzly bears related to the *amount* of increases in administrative use of restricted (gated) roads.

## Terms and conditions

In order to be exempt from the prohibitions of section 9 of the Act, the Forest must comply with the following terms and conditions that implement the reasonable and prudent measures described above and outline reporting and monitoring requirements. These terms and conditions are non-discretionary:

To implement RPM #1:

1. Berm or barrier all roads that will contribute to new Core areas as soon as possible after the Black Ram record of decision is signed authorizing the project, and before existing Core areas are entered (per Forest Plan standard). The intent is to allow bears to begin actualizing those new areas of Core as soon as possible. This includes all roads listed in Appendix K of the BA for which the "Reason for Action" includes "IKRC" (meaning in-kind replacement of Core). Any work to stabilize hydrology on these roads should be completed within this same timeframe, such that no further disturbance is needed in the new Core areas for at least 10 years.

2. Monitor all new closures (berms/barriers) on roads that are being closed for the purpose of creating Core at least twice during each bear year (once in spring/early summer and once in fall per seasonal definitions in the Forest Plan, USFS 2015, p. 149) for 3 years, to ensure effectiveness of closures at reasonably deterring motorized access during the first few years in which bears are learning to actualize those areas as Core. After 3 years,

FWS000064

monitoring of these roads can become less frequent, and be included as part of the 30 percent annual monitoring required under the Forest Plan as the Forest sees fit.

To implement RPM #2:

3. In BMU 15, subdivide project implementation such that OMRD does not exceed 37 percent at any time, for the 10 years of the project. Increases in OMRD are related to use of gated roads for timber harvest and haul. By reducing the amount of OMRD in the BMU, this Term and Condition will reduce the amount of area with elevated use of gated roads at any given time, giving grizzly bears more areas without disturbance than what the Forest initially proposed. This is the lowest amount of OMRD that is feasible for the Forest to attain while still being able to reasonably implement its proposed vegetation management actions. Use of restricted roads during grizzly bear denning season do not count towards increases in OMRD. Acceptable subdividing could involve working on one area for part of a bear year, then moving to another area the rest of the bear year, as long as OMRD does not exceed 37 percent at any given time.

4. In both BMUs, once timber harvest and haul is complete on a gated road, the Forest shall resume abiding by administrative use levels, as dictated by the Forest Plan, for the remainder of project implementation. An exception will be allowed for exceeding administrative use levels in one bear year per BMU, if needed to implement prescribed burning activities, granted the exception still meets Term & Condition 3.

***Reporting Requirements* – to demonstrate compliance with the terms and conditions for grizzly bears, the Forest shall:**

1. Provide a project-specific annual report to the Service to show compliance with Terms and Conditions 1, and 2 above for the first 3 years of project implementation. Continue to provide reports of OMRD, TMRD, and Core in the Forest-wide annual monitoring report for the CYE BMUs to show compliance with this Incidental Take Statement for the Black Ram Project.

2. Provide a report to the Service once all timber harvest and haul is complete and administrative use levels resume on gated roads.

3. Notify the Service's Montana Ecological Services Field Office, within 24 hours, of any grizzly bear-human conflicts or the management removal or human-caused death of a grizzly bear associated with implementation of the proposed action.

The Forest is required to submit a monitoring report to the Service annually regarding the levels of OMRD, TMRD, and Core for all BMUs on the Forest (USFWS 2020, p. 118). In the annual report, the Forest must show "the permanent condition, as well as any temporary variations related to projects that have undergone separate consultation and were being implemented in the reported Bear Year." The Forest has provided monitoring reports annually since the Access Amendment was enacted (from 2012 to present), all of which are in our files and demonstrate an ability to track the annual maximum effects to OMRD, TMRD, and Core in each BMU. This

serves to track individual projects and Forest Plan consultation compliance, as well as to put into context the overall motorized access conditions in the Recovery Zone at any given time. Thus, for the Black Ram Project, the annual monitoring report will serve as the mechanism to ensure our surrogate measures of take in this BO are not exceeded, and to ensure Term & Condition #3 is met.

**Closing statement**

The Service is unable to precisely quantify the number of grizzly bears that will be incidentally taken as a result of the Black Ram Project. Therefore, we used three surrogate measures for the amount of take we anticipate. Reasonable and prudent measures, with their implementing terms and conditions, are designed to minimize the impact of incidental take that might otherwise result from the proposed action. We have included reasonable and prudent measures along with terms and conditions in this incidental take statement, as well as reporting requirements that detail the progress of the action in order to monitor the impacts of incidental take. If, during the course of the action, the level of take occurring exceeds that anticipated in this incidental take statement, such incidental take represents new information requiring reinitiation of consultation and review of the incidental take statement. The federal agency must immediately provide an explanation of the causes of the taking and review with the Service the need for possible modification of the reasonable and prudent measures.

**CONSERVATION RECOMMENDATIONS**

Sections 7(a)(1) of the Act directs federal agencies to use their authorities to further the purposes of the Act by carrying out conservation programs for the benefit of Endangered and Threatened species. Conservation recommendations are discretionary agency activities to minimize or avoid adverse effects of a proposed action on listed species or critical habitat, to help implement recovery plans or to develop information.

1. Develop a strategy for quantifying and monitoring use of the Pacific Northwest Trail as it traverses the portion of the CYE managed by the Kootenai National Forest, to provide better data to inform potential levels of disturbance to grizzly bears (e.g., when "high-use" thresholds are reached as discussed on page 15).

2. Continue to monitor for signs of illegal motorized use in the action area and in other portions of the CYE managed by the Forest. Identify older berms or barriers that have eroded and show sign of illegal access or opportunities for motorized vehicles to breach the berm or barrier, or areas where gates have been driven around by motorized vehicles. Prioritizing areas where breaches or user-created routes compromise Core, implement measures to reduce the likelihood of future breaches, including but not limited to restoring the berm, placing boulders in strategic locations, or re-contouring or roughening the road prism for the first few hundred feet.

64

FWS000066

3.      Continue to work collaboratively with the IGBC, MT Fish Wildlife and Parks bear management specialists, U.S. Fish and Wildlife Service grizzly bear specialists, and non-government organizations to promote training in the use of bear spray, bear identification, and other ways to reduce conflicts with and mortality of grizzly bears on the Forest and surrounding communities.

**REINITIATION NOTICE**

This concludes consultation on the effects of the Black Ram Project on grizzly bears. As provided in 50 C.F.R. § 402.16, reinitiation of consultation is required and shall be requested by the federal agency or by the Service where discretionary federal involvement or control over the action has been retained or is authorized by law and: (1) if the amount or extent of taking specified in the incidental take statement is exceeded; (2) if new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (3) if the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence; or (4) if a new species is listed or critical habitat designated that may be affected by the identified action.

65

FWS000067

# X. LITERATURE CITED

Allen, L.R., B.R. Lyndaker, and G.D. Harris. 2011. A review of the Wakkinen and Kasworm (1997) report as best available science for the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones. Idaho Panhandle National Forest report, 32 pp.

Annis, K.M. and R. Trimbo. 2019. Grizzly and black bear management report; Cabinet-Yaak Ecosystem; 2019 Annual Report. Montana Fish, Wildlife & Parks, Region One, Libby, Montana.

Aune, K. and W.F. Kasworm. 1989. East Front grizzly bear study. Montana Department of Fish, Wildlife, and Parks. Helena, MT. 332pp.

Boulanger, J., and G. B. Stenhouse. 2014. The impact of roads on the demography of grizzly bears in Alberta. PloS One 9(12):1-22.

Cole, T.R. 2018. Investigating the thru-hiking experience: a study on the Pacific Northwest National Scenic Trail. University of Montana Graduate Thesis. 157 pp.

Colton, C.P., N.C. Coops, A.C. Burton. 2021. Grizzly bear (*Ursus arctos*) responses to forest harvesting: A review of underlying mechanisms and management recommendations. Forest Ecology and Management 497: 119471.

Costello, C.M., R.D. Mace, and L. Roberts. 2016. Grizzly bear demographics in the Northern Continental Divide Ecosystem, Montana: research results (2004-2014) and suggested techniques for management of mortality. Montana Department of Fish, Wildlife and Parks. Helena.

Costello, C.M., and L.L. Roberts. 2020. Northern Continental Divide Ecosystem Grizzly Bear Monitoring Team Annual Report, 2019. Montana Fish, Wildlife & Parks, 490 N. Meridian Road, Kalispell, MT 59901. Unpublished data. IGBST 2020

Fortin, J.K., K.D. Rode, G.V. Hilderbrand, J. Wilder, S. Farley, C. Jorgensen, B.G. Marcot. Impacts of human recreation on brown bears (Ursus arctos): a review and new management tool. PLoS ONE 11(1): e0141983. doi:10.1371/journal.pone.0141983

Gibeau, M. L., S. Herrero, B. N. McLellan, and J. G. Woods. 2001. Managing for grizzly bear security areas in Banff National Park and the central Canadian Rocky Mountains. Ursus 12:121–129.

Gibeau, M. L., A. P. Clevenger, S. Herrero, and J. Wierzchowski. 2002. Grizzly bear response to human development and activities in the Bow River Watershed, Alberta, Canada. Biological Conservation 103(2):227-236.

Interagency Grizzly Bear Committee (IGBC). 1990. CEM- A model for assessing effects on grizzly bears. Interagency publication, 26 pp.

66

FWS000068

Interagency Grizzly Bear Committee (IGBC). 1994. Interagency Grizzly Bear Committee -
Taskforce report: grizzly bear/motorized access management. Interagency publication, 7pp.
Interagency Grizzly Bear Committee (IGBC). 1998. Revised interagency grizzly bear taskforce
report: grizzly bear/motorized access management. U.S.D.A. Forest Service, Missoula, Montana
6pp.

Kasworm, W. F., T. G. Radandt, J. E. Teisberg, T. Vent, A. Welander, M. Proctor, H. Cooley and
J. Fortin-Noreus. 2020. Cabinet-Yaak grizzly bear recovery area 2019 research and monitoring
progress report. U.S. Fish and Wildlife Service, Missoula, Montana. 105 pp.

Kasworm, W. F., T. G. Radandt, J. E. Teisberg, T. Vent, A. Welander, M. Proctor, H. Cooley and
J. Fortin-Noreus. *In prep*. Cabinet-Yaak grizzly bear recovery area 2019 research and monitoring
progress report. U.S. Fish and Wildlife Service, Missoula, Montana.


Kendall, K. C., A. C. Macleod, K. L. Boyd, J. Boulanger, J. A. Royle, W. F. Kasworm, D.
Paetkau, M. F. Proctor, K. Annis, and T. A. Graves. 2016. Density, distribution, and genetic
structure of grizzly bears in the Cabinet-Yaak Ecosystem. Journal of Wildlife Management
80(2):314-331.

Lamb, C. T., G. Mowat, B. N. McLellan, S. E. Nielsen, and S. Boutin. 2017. Forbidden fruit:
human settlement and abundant fruit create an ecological trap for an apex omnivore. Journal of
Animal Ecology 86(1):55-65.

Lamb, C.T., G. Mowat, A. Reid, L. Smit, M. Proctor, B.N. McLellan, S.E. Nielsen, S. Boutin.
Effects of habitat quality and access management on the density of a recovering grizzly bear
population. Journal of Applied Ecology 55: 1406-1417.

Mace, R.D. and Waller, J.S., 1997. Final report: grizzly bear ecology in the Swan Mountains.
Montana Fish, Wildlife, and Parks Department, Helena, Montana. 191pp.

Mace, R. D., J. S. Waller, T. L. Manley, L. J. Lyon, and H. Zuuring. 1996. Relationships among
grizzly bears, roads, and habitat in the Swan Mountains, Montana. Journal of Applied

Mattson, D.J. 2019. Effects of pedestrians on grizzly bears, an evaluation of the effects of hikers,
hunters, photographers, campers, and watchers. Report GBRP-2019-3. 51pp.

Mattson, D.J. and T. Merrill. A model-based appraisal of habitat conditions for grizzly bears in
the Cabinet-Yaak region of Montana and Idaho. Ursus 15(1) Workshop Supplement: 76-89.
MFWP. 2006. Grizzly bear management plan for Western Montana. Montana Department of
Fish, Wildlife and Parks, Helena, Montana.

Mowat, G., C.T. Lamb, L. Smit, and A. Reid. The relationships among road density, habitat
quality, and grizzly bear population density in the Kettle-Granby area of British Columbia. Prov.
B.C., Victoria, B.C. Exten. Note 120. www.for.gov.bc.ca/hfd/pubs/Docs/En/En120.htm

NCDE Subcommittee. 2020. Conservation strategy for the grizzly bear in the Northern Continental Divide Ecosystem. 170 pages + appendices.

Ordiz, A., G.K. Moen, S. Saebo, N. Stenset, J.E. Swenson, O. Stoen. Habituation, sensitization, or consistent behavioral responses? Brown bear responses after repeated approaches by humans on foot. Biological Conservation 232(2019): 228-237.

Pacific Northwest Trail Association. 2021. Frequently Asked Questions about the Pacific Northwest Trail. https://www.pnt.org/pnta/know-before-you-go/plan-your-trip/faq/. Accessed 6/28/2021, and saved on file. 27 pp.

Proctor, M.F., B.N. McLellan, C. Strobeck and R.M.R. Barclay. 2004. Gender-specific dispersal distances of grizzly bears estimated by genetic analysis. Canadian Journal of Zoology 82:1108-1118.

Proctor, M.F., S.E. Nielsen, W.F. Kasworm, C. Servheen, T.G. Randandt, A.G. Machutchon, M.S. Boyce. 2015. Grizzly bear connectivity mapping in the Canada-United States Trans-Border Region. Journal of Wildlife Management, 79(4): 544-558.

Proctor, M. F., W. F. Kasworm, K. M. Annis, A. G. MacHutchon, J. E. Teisberg, T. G. Radandt, and C. Servheen. 2018a. Conservation of threatened Canada-USA trans-border grizzly bears linked to comprehensive conflict reduction. Human - Wildlife Interactions 12(3):348-372.

Proctor, M.F., McLellan, B.N., Stenhouse, G.B., Mowat, G., Lamb, C.T. and Boyce, M.S., 2020. Effects of roads and motorized human access on grizzly bear populations in British Columbia and Alberta, Canada. Ursus, 2019(30e2), pp.16-39.

Schwartz, C. C., M. A. Haroldson, and G. C. White. 2010a. Hazards affecting grizzly bear survival in the Greater Yellowstone Ecosystem. Journal of Wildlife Management 74(4):654-667.

Thier, T. J. 1990. Population characteristics and the effects of hunting on black bears in a portion of northwestern Montana. M.S. Thesis. University of Montana, Missoula.

Thomsen, J., C. Phelan, E. Metcalf. 2021. Pacific Northwest National Scenic Trail: A geospatial analysis of Grizzly Bear core habitat, linkage corridors, habitat quality, and Bears Outside Recovery Zone (BORZ). University of Montana unpublished document on file, 24 pp.

U.S. Fish and Wildlife Service. 1993. Grizzly bear recovery plan. U.S. Fish and Wildlife Service, Missoula, Montana. 181 pp.

U.S. Fish and Wildlife Service. 2006. Recovery Units and Jeopardy Determinations under Section 7 of the Endangered Species Act. Memorandum from Director Hall to Regional Directors. 2pp.

U.S. Fish and Wildlife Service. 2016. 2016 conservation strategy for the grizzly bear in the Greater Yellowstone Ecosystem. U.S. Fish and Wildlife Service, Missoula, Montana. 126pp.

FWS000070

U.S. Fish and Wildlife Service. 2020. Biological opinion on the effects of the Kootenai National Forest Land Management Plan on the grizzly bear. U.S. Fish and Wildlife Service, Helena, MT. 145pp.

U.S. Fish and Wildlife Service. 2021a. Species status assessment for the grizzly bear (*Ursus arctos horribilis*) in the lower-48 states: a biological report. U.S. Fish and Wildlife Service Grizzly Bear Recovery Office, Missoula, MT. 368 pp.

U.S. Fish and Wildlife Service. 2021b. 5-Year Status Review for Grizzly Bear in the lower-48 states. U.S. Fish and Wildlife Service, Denver, CO. 27 pp.

U.S. Forest Service. 2011. Forest Plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones. Record of Decision. Kootenai, Lolo, and Idaho Panhandle National Forests Lincoln, Sanders, Bonner, Boundary, and Pend Oreille Counties Montana, Idaho, and Washington. U.S. Forest Service. November 2011. 74 pp.

U.S. Forest Service. 2011b. Kootenai National Forest Food Storage Order. Kootenai National Forest, Libby, MT. 5 pp.

U.S. Forest Service. 2015. Land Management Plan. 2015 Revision. Kootenai National Forest, Libby, MT. 189 pp.

U.S. Forest Service. 2020. Biological Assessment for the Black Ram Project. Kootenai National Forest, Libby, MT 152 pp.

U.S. Forest Service. 2020a. Selkirk/Cabinet-Yaak grizzly bear recovery zones 2020 bear year annual monitoring summary report. Colville, Idaho Panhandle, Kootenai, and Lolo National Forests. 81 pp.

U.S. Forest Service. 2021. U.S. Forest Service National Visitor Use Monitoring Survey Results National Summary Report: Data collected FY 2016 through FY 2020. 36 pp.

van Manen, F.T., M.A. Haroldson, and B.E. Karabensh, editors. 2019. Yellowstone grizzly bear investigations: annual report of the Interagency Grizzly Bear Study Team, 2018. U.S. Geological Survey, Bozeman, Montana.

Wakkinen, W. L., and W. F. Kasworm. 1997. Grizzly bear and road density relationships in the Selkirk and Cabinet- Yaak recovery zones. U.S. Fish and Wildlife Service. 28pp.

Waller, J.S. 1992. Grizzly bear use of habitats modified by timber management. M.S. Thesis, Montana State University, Bozeman. 64pp.

Yaak Valley Forest Council (YVFC), Center for Biological Diversity, Wildearth Guardians. 2021. Letter to Jodi Bush re: Relevant Key Facts and Best Available Science Confirms Cabinet-Yaak Grizzly Population Will Be "Adversely Affected" by Black Ram Project. 6pp + enclosure entitled "Black Ram Project Area- Road Barrier Survey," 12 pp.

69

FWS000071

Yaak Valley Forest Council (YVFC). 2021. Letter to Jodi Bush et al. re: New Information Also Demonstrates Forest Service Failing to Halt Illegal Motorized Use in Grizzly Habitat outside the Black Ram Project Area. 2 pp + enclosures entitled "Knotty Pine Project Barrier Report" (12 pp) and Buckhorn Project Barrier Report (1 p).

FWS000072

**APPENDIX A**

Maps of existing Core and areas of new Core that will be created with the proposed action, in relation to habitat model for seasonal habitats for grizzly bears. Modeled habitat includes the high and very high quality habitats identified by Proctor and Kasworm. Details of habitat model development are described Kasworm et al. 2020, p. 100-105.



FWS000073



FWS000074



**APPENDIX B**
Clarifications regarding estimates of Open Motorized Route Densities (OMRD) associated with the proposed action.

- The BA submitted by the Forest included an estimated OMRD of 36 percent for BMU 15. This estimate was based on an assumption that the Forest will offer multiple timber sales, staggered over several years, such that the 36 percent was the "likely increase in route density based on three operational areas; that is, all access routes would not be used concurrently." (BA; USFS 2021, p. 28)

- In an email exchange[3] the Service asked the Forest to provide clarification on whether OMRD will definitely remain at or under 36 percent, or if there were possibilities for it going over. The Forest responded with a maximum estimate of 42 percent OMRD, if all sales and activities were active concurrently.

- The Service understood the unlikelihood of OMRD remaining at 42 percent for the entire 10 years of the project, due to past history of projects on the Forest and elsewhere, and the realities of how timber sales are generally implemented[4]. However, the Forest did not have measures built into the proposed action to ensure a lower amount of OMRD or lesser amount of time (years) that OMRD will be elevated.

- The Service drafted an incidental take statement that used "OMRD above research benchmarks" as a surrogate measure of take for grizzly bears. In discussions with the Forest over draft Terms and Conditions, the Service learned why limiting the number of years of increase will be infeasible to assure, due to contracting reasons. Thus, the Service drafted a revised Term and Condition that will limit the amount of increase in OMRD during the course of the project, reducing it 36 percent.

- The Forest provided additional information to the Service on Aug 12, 2021, in a Level 1 meeting to discuss the project:

  o The Forest re-analyzed estimated increases in OMRD using refined methodology, and showed the maximum amount of OMRD in BMU 15 will actually equal 40%, not 42%. This lower estimate was due to a refined analysis technique that truncated gated road systems used for timber harvest and haul at the furthest unit from the gate, not the terminus of the road.

  o The Forest considered whether it could reduce OMRD to 36 percent, as originally drafted in a Term & Condition. However, due to the configuration of the existing road systems in the project area in respect to proposed treatment units, it was not feasible to get OMRD as low as 36 percent, but 37 percent was feasible. The Forest will be able to accomplish this maximum OMRD of 37 percent by subdividing two of the timber sales it plans to offer, requiring timber harvest,

---

[3] 20210706_EM_Hill_Lewis_RE [EXTERNAL] RE OMRD clarification

[4] 20210525_EM_Hill_Lewis_[EXTERNAL] further supplemental information

74

FWS000076

haul, and road work to be completed in one subdivision before allowing such work to begin in another subdivision.[5]

Therefore, the final number the Service used to analyze OMRD in BMU 15 for the Black Ram Project is a maximum of 40 percent, for a maximum of 10 years. The ITS includes a Term and Condition requiring the Forest to reduce OMRD to a maximum of 37 percent.

**Figure a.  Simplistic representation showing the effects to OMRD estimates from two different analysis techniques.  Analysis A includes the entire gated road in OMRD calculations.  Analysis B includes only the portion needed to access the treatment units, showing a more realistic and refined depiction of the proposed road use.**





---

[5] Meeting with Service and Forest on Aug 12, 2021 and 20210813_EMattach2_Hill_Lewis_[EXTERNAL] RE_ draft Appendix language

FWS000077

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES
2020 BEAR YEAR ANNUAL MONITORING SUMMARY REPORT
Colville, Idaho Panhandle, Kootenai, and Lolo National Forests
07-20-2021

## Introduction

### Colville National Forest

On the Colville NF (CNF), grizzly bear management within the Selkirk Ecosystem is defined by the 1986 Interagency Grizzly Bear Guidelines, CNF Guidelines for Management in Occupied Grizzly Bear Habitat (USFS 1988c), Grizzly Bear Recovery Plan (USFWS 1993), and Amended Biological Opinion for the Continued Implementation of the CNF and the Idaho Panhandle NF(IPNF) Forest Plans (USFWS 2001). The revised CNF Land Management Plan and ROD were approved in 2019 (USFS 2019). Expectations for core, OMRD, TMRD in each BMU are described in the Access Amendment for the Sullivan-Hughes and Salmo-Priest BMUs (USFWS 2011) and the revised CNF FP (USFS 2019) for the LeClerc BMU.  The CNF Bear Year 2020 monitoring report (USDA FS, CNF 2021) for these three BMU's is attached as Appendix A.

### Idaho Panhandle, Kootenai, and Lolo National Forests

In 2011 the U. S. Fish and Wildlife Service issued their Biological Opinion for the Grizzly Bear Access Amendment of the Kootenai, Idaho Panhandle, and Lolo National Forest Plans (USFWS 2011).  This document directed the Forest Service to report annually on their progress made towards achieving Interagency Grizzly Bear Committee (IGBC) access management standards for the Selkirk and Cabinet-Yaak Recovery Zones (USFWS 2011).  These standards include open and total motorized route densities (OMRD & TMRD), and core areas for each bear management unit (BMU) in the two recovery zones. There are also standards for allowable administrative use of restricted access (gated) roads, and road closure monitoring effort.  Lastly, the Forest Service was to meet annually with other agency biologists to update the Bears Outside of Recovery Zones (BORZ) database (ibid). The Idaho Panhandle (IPNF) and Kootenai NF (KNF) incorporated and retained direction established in the 2011 Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones within their revised forest plan decisions (USFS 2015a, USFS 2015b).  The USFWS issued a BO (USFWS 2013) for the revised Forest Plan that superseded the 2011 BO, although the reporting requirements remained largely the same.

The Lolo NF reinitiated consultation with the USFWS and received a letter from USFWS (01/09/2020) that extended their incidental take coverage until 11/2022 under the Access Amendment 2011 BO.

In 2020, the IPNF and KNF reinitiated consultation on their Forest Plans with the USFWS issuing separate BOs for the IPNF (FWS IPNF LRMP BO 2020) and KNF (FWS KNF LMP BO 2020).  These BO's superseded and replaced the grizzly bear chapters of the 2013 BOs on the Forests LRMPs.  As of BY20, relative to this monitoring report, these BO's removed inclusion of short-term temporary unauthorized motorized access in the bear year metric calculations (though retaining long-term unauthorized user created routes documented in the BORZ areas in the BY19 report as part of the baseline), established new updated baselines for BORZ areas (with differences in the routes considered between the forests), and incorporated the metric of secure habitat calculation within the BORZ to more adequately represent the potential effects related to motorized access.

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING
FINAL SUMMARY REPORT (07/20/2021)
1

2-ER-317

FWS000985

# BMUs and Metrics on the Idaho Panhandle Kootenai, and Lolo NFs

Each grizzly bear recovery zone is divided into individual bear management units (BMUs) which biologists use for habitat evaluation and population monitoring.  An individual BMU is roughly 100 square miles in size; the approximate area required for supporting an adult sow with cubs.

As established (USFS 2011) there are three metrics measured within the Recovery Zones, and each BMU has its own set of standards for core, open and total motorized route densities. Roads as defined by IGBC (1998) are $\geq$500 feet long and are reasonably and prudently drivable with a conventional passenger car or pickup.  Motorized trails are routes not reasonably and prudently drivable with a conventional passenger car or pickup, but are used by 4-wheelers, 4-wheel drive vehicles and motorized trail bikes. Railroad tracks were not included in the metric calculations for the Access Amendment but are part of the existing condition. Starting in Bear Year 2019, railroad tracks and digitized railroad/powerline wheeled motorized access routes are considered in the metric calculations.  Their inclusion generally resulted in little change to percentages of BMU metrics due to their location within heavily roaded areas, although in BMU 9 railroad tracks resulted in OMRD rounding up a percentage.

## Core Area

All lands (all ownerships), roads, motorized trails, and high-use non-motorized trails in a BMU are included in core calculations. Routes considered in the core model are coded as IGBC 2 (gated during the active bear year), IGBC 4 (open year round or seasonally during the active bear year), IGBC 5 (open motorized trail during the active bear year), IGBC 8 (any high use non-motorized trail), and an additional identifier of "10" for railroad tracks. Buffer distance from open motorized routes and trails and high-use non-motorized trails is 500 meters (0.31 miles). Core areas were delineated by identifying and aggregating the full range of seasonal habitats, to the degree they are available, in the BMU. Within the CYE and SE core areas do not contain high-use non-motorized routes. Motorized use of routes (including administrative use) does not occur within a core area during the active bear year. All authorized motorized access is accounted for in the route layer. There is no minimum sized polygon for core calculations. A minimum percent of each BMU should be providing core habitat as defined by the individual BMU standard.

## OMRD, TMRD:

Access route density for Open Motorized Route Density (OMRD $\geq$1mi/mi$^2$) and Total Motorized Route Density (TMRD $\geq$2mi/mi$^2$) is calculated on a BMU basis using moving window analysis. Route density calculations consider all routes and motorized trails regardless of ownership/jurisdiction.  Between the forests, model pixel size is less than 100 x 100 meters.  For example, the KNF uses 60 meter pixel size and the IPNF uses 30 meter pixel size. The routes (in vector format) are converted into raster for the analysis. To account for any change in length calculations due to the conversion, a correction factor is calculated based on the length of routes in vector divided by the length of routes in raster.  Wakkinen and Kasworm (1997) identified a correction factor of 0.805 for the Selkirk and Cabinet-Yaak ecosystems. To determine a moving window density, motorized routes were buffered to create density contour maps based on the chosen set pixel size. Effective road density around each pixel was determined by calculating amounts of routes within a set window distance (e.g. 1 mi$^2$) around each pixel. Road densities are mapped by the categories:  0 mi/sq. mi., $\geq$ 0 - 1 mi/sq. mi., $\geq$1 - 2 mi/sq. mi., $\geq$2 mi/sq. mi.  Areas influenced by high route densities should not exceed a defined maximum percentage of each BMU as

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

2

FWS000986

defined by the individual BMU standard. For OMRD, the model considers routes coded as IGBC 4, IGBC 5, and a "10" for railroad tracks. For TMRD, the model considers routes coded as IGBC 2, IGBC 4, IGBC 5, and a "10" for railroad tracks.

## Core, OMRD, and TMRD

For core, OMRD, and TMRD, access features beyond the BMU boundary that are within the moving window frame will be included in BMU calculations (IGBC 1998).

## 2020 Access Parameter Status

Table 1 and Table 2 summarize the habitat parameters related to motorized access routes within the two recovery zones for the 2020 active bear year (BY) for the Lolo, IPNF and KNF. Please see APPENDIX A for BMU's reported by the Colville NF. The Lolo NF displays habitat parameters in BMU 22 per the Access Amendment (2011). Beginning in BY20, the IPNF LRMP BO (FWS 2020) and KNF LRMP BO (FWS 2020) in relation to the **first surrogate** measure of incidental take of grizzly bears and Reasonable and Prudent Measure #1, stated that the report shall describe both temporary variations related to projects that have undergone consultation and being implemented in the reported Bear Year, as well as the bear years progression to standard. In addition, beginning in BY20 for the IPNF and KNF, per their 2020 BO's, calculations of access metrics within the CYE and Selkirk BMU's reflect conditions resulting from authorized motorized access activities only. Please see **APPENDIX B** for a list of existing system roads or user created routes within the Recovery Zones documented to have temporary short-term unauthorized motorized access during BY20. For the IPNF and KNF, Table 1 and Table 2 display the metrics in the following two ways:

### Current Bear Year

Metrics for the current bear year on-the-ground conditions will begin with the "existing condition" as a baseline. Current bear year activities include: any database updates or corrections documented during the current bear year; authorized federal actions associated with project implementation (temporary for the bear year or could result in motorized access route changes as analyzed and approved through NEPA and ESA), administrative trip exceedances (project related work as analyzed and approved through NEPA and ESA or unplanned occurrences), emergency access such as for fire, and all similar activities not authorized by the NFS which affected motorized route status on state, corporate, and private lands. For summaries of **authorized** federal activity and activities on non-federal land and any reasons for changes in the metrics see summary of the previous bear years Progress to meeting standards (cite the previous bear year report Table 3).

### Post Bear Year

For the BMU's, the post bear years displays where BMU's are relative to the progress to meeting standards from the Forest Plan and ITS in the BOs standards resulting from authorized activities on all ownerships from prior years and the current bear year *implemented and completed*. Routes identified in the Current Bear Year route layers with temporary activities are returned to their legal non-activity status (ie. Routes exceeding administrative use or emergency fire access or temporary project activity). ***Temporary authorized activities implemented during the current bear year resulting in on-the-ground motorized access changes and improvements to bear metrics*** *(which in the past were not shown as completed until the following year Bear Year)* ***are shown as completed and implemented*** (ie. Implemented motorized access changes (ie route storage or decommissioning activities, including

FWS000987

installation of gates, barriers, removal of drainage structures or other activities) that resulted in improvements to bear habitat metrics are shown as completed. **Ongoing project activities affecting motorized route status, as analyzed in NEPA and ESA consultation, are reflected in these metrics**. This reflects the current Bear Year conditions of motorized access metrics within the BMUs that display the Bear Year 2020 progress for meeting Forest Plan standards.  In the future, the post bear year **becomes the existing condition from which the following bear year is based upon.**

*Route Layer components and differences*

Table A-1 describes the route layer components for the current and post bear year metric calculations for both the Recovery Zone and BORZ.  Please note the differences in the Post Bear Year route differences for the IPNF BORZ.

*Table A- 1.  Route Layer Differences for Current Bear Year and Post Bear Year Calculations*

| Component | Current Bear Year | Post Bear Year |
|---|---|---|
| Route layer | *Begins with the prior Post Bear Year* | *Begins with the 'Current Bear Year' route layer with the following differences:* |
| Database corrections updates | Current BY database corrections or updates | As documented in current bear year |
| Temporary activities not resulting in future motorized access changes (administrative use exceedance, emergency access | Included, reflects what occurred on the ground (i.e. gated shown as open; or an impassable or barriered route within the BMU shown as open or gated in BORZ if no public use). | Not included, routes put back to legal status |
| Temporary activities that result in on-the-ground change to motorized access and metrics | Included, reflect implementation (i.e. new road construction, temporary or new system roads shown as open in BMU, and in BORZ shown as gated if no public use). | Shown as completed (i.e. new route constructed is in the route layer and coded to reflect what was analyzed in NEPA/ESA such as open or gated during project). |
| Temporary activities that result in on-the ground changes to motorized access and **result in improvements** to the bear metrics. | Included, reflect implementation (i.e. Route decom., storage, gate or barrier install, removal of drainage structures. IGBC depends on BMU or BORZ. (i.e. for both, open route that's gated or stored is open; an impassable or gated route that is stored is open in BMU, in BORZ admin work is coded gated if no public use) | Shown as completed. All temporary activity that was implemented in the current bear year and was completed on the ground is reflected as completed in the Post BY. (i.e. an open route gated during current bear year is now shown as gated; an open route decommissioned in the current BY now reflected as barriered) |
| Ongoing project activities as analyzed through ESA and NEPA. Ongoing Projects consist of routes with a motorized access change that continue from the BY through the Post BY or beyond.  These will not show as completed in the Post BY until the final work on the route is implemented in that current BY. | Included, the actual routes being utilized during the BY (i.e. out of 20 total routes analyzed in NEPA/ESA, 4 might be receiving activity). (i.e. BMU impassable route used in project and gated during activity but admin use continually exceeded (as analyzed) is shown as open). In BORZ it would be gated if no public use. On-going projects during the current BY are treated like temporary activities. | Route included if use continues into next BY (i.e. IGBC code remains as analyzed during activity in Post BY). Once project use of route ends in current BY, it would be shown in Post BY as completed. This ensures Post BY progress to standard reflects on-the-ground progress and not the end-product result shown in BA/NEPA which hasn't yet occurred. It also enables more efficient tracking in NRM. **On IPNF for BORZ only,** route not included. Route put back to non-activity status for BORZ route layer. |

IGBC 1 "impassable"; IGBC 2 "gated"; IGBC 3 "barriered"; IGBC 4 "open",

[*]Motorized access changes resulting in improvement to grizzly bear metrics (eg. motorized access changes) implemented in a BY (ie route storage or decommissioning, including installation of gates, barriers, removal of drainage structures or other activities,) that resulted in improvements to metrics are not considered effective until

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

4

2-ER-320

FWS000988

the following year, and in previously were not shown as completed until the following bear year. By showing these activities implemented and completed in the "post-bear year", we display the year's progression to standards and provide an existing condition from which the next bear year begins with.

## BMU Metrics for the Cabinet-Yaak Recovery Zone

*Table 1. BMU Summary for authorized activities affecting motorized route status on all ownerships for the 2020 bear year (BY) [April 1 through November 30] in the Cabinet-Yaak Recovery Zone. Values in Blue represent existing BMU standards (USDA 2011).*

| BMU | Forest Plan Standard | | | Current BY20 Conditions[4] | | | Post- BY20 Progress to meeting standards[5] | | | % Federal Land | Priority |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | OMRD ≤ (%) | TMRD ≤ (%) | Core ≥ (%) | OMRD ≤ (%) | TMRD ≤ (%) | Core ≥ (%) | OMRD ≤ (%) | TMRD ≤ (%) | Core ≤ (%) | | |
| 1-Cedar | 15 | 15 | 80 | 14 | 10 | 84 | 14 | 10 | 84 | 99 | 2 |
| 2-Snowshoe | 20 | 18 | 75 | 15 | 14 | 77 | 15 | 14 | 77 | 94 | 2 |
| 3-Spar | 33 | 26 | 59 | 29 | 26 | 62 | 29 | 26 | 62 | 95 | 3 |
| 4-Bull | 36 | 26 | 63 | 38 | 30 | 61 | 38 | 30 | 61 | 84 | 2 |
| 5-St. Paul | 30 | 23 | 60 | 27 | 23 | 58 | 27 | 23 | 58 | 97 | 1 |
| 6-Wanless | 34 | 32 | 55 | 33 | 33 | 54 | 29 | 32 | 56 | 85 | 1 |
| 7-Silver Butte | 26 | 23 | 63 | 21 | 23 | 65 | 21 | 23 | 65 | 92 | 2 |
| 8-Vermillion | 32 | 21 | 55 | 32 | 22 | 58 | 32 | 22 | 58 | 93 | 3 |
| 9-Callahan | 33 | 26 | 55 | 28 | 28 | 58 | 28 | 27 | 59 | 90 | 2 |
| 10-Pulpit | 44 | 34 | 52 | 44 | 27 | 54 | 44 | 27 | 54 | 95 | 2 |
| 11-Roderick | 28 | 26 | 55 | 28 | 26 | 56 | 28 | 26 | 56 | 96 | 1 |
| 12-Newton | 45 | 31 | 55 | 42 | 31 | 57 | 42 | 31 | 57 | 92 | 1 |
| 13-Keno | 33 | 26 | 59 | 32 | 23 | 60 | 32 | 23 | 60 | 99+ | 1 |
| 14-NW Peak | 31 | 26 | 55 | 28 | 24 | 56 | 28 | 24 | 56 | 99+ | 1 |
| 15-Garver | 33 | 26 | 55 | 31 | 26 | 55 | 31 | 26 | 55 | 94 | 1 |
| 16-EF Yaak | 33 | 26 | 55 | 28 | 24 | 56 | 28 | 24 | 56 | 96 | 1 |
| 17-Big Creek | 33 | 26 | 55 | 30 | 15 | 58 | 30 | 15 | 58 | 99 | 2 |
| 18-Boulder | 33 | 29 | 55 | 32 | 31 | 52 | 31 | 30 | 53 | 92 | 3 |
| 19-Grouse | 59 | 55 | 37 | 61 | 61 | 30 | 58 | 59 | 32 | 54 | 3 |
| 20-North Lightning | 35 | 20 | 61 | 35 | 18 | 64 | 35 | 18 | 64 | 94 | 1 |
| 21-Scotchman | 34 | 26 | 62 | 34 | 26 | 65 | 34 | 26 | 65 | 81 | 2 |
| 22-Mt. Headley | 33 | 35 | 55 | 35 | 37 | 53 | NA | NA | NA | 89 | 3 |

[4] See Table 4 for description of BY20 activities on the KNF, IPNF and Lolo NF.

[5] See Table 4 for description of Post BY20 activities. The Post BY20 metrics are a requirement of the IPNF and KNF 2020 BOs (FWS 2020). BMUs-1-17 parameters reported by the Kootenai NF, BMUS 18, 19, 20, &21 parameters reported by the Idaho Panhandle NF, BMU 22 parameters reported by the Lolo NF. The Post BY20 metric calculations are not applicable to the Lolo NF under their current reporting requirements.

OMRD ≥ 1mi/mi² (%); TMRD ≥ 2mi/mi² (%)

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

5

2-ER-321

FWS000989

As discussed above, within the Selkirk RZ, the IPNF no longer considers short-term temporary unauthorized use in BY metrics per the IPNF LRMP BO 2020 (FWS 2020). Please see APPENDIX A for the Colville NF bear year 2020 monitoring report (USDA FS, Colville NF 2021) for additional information on habitat parameter metrics within the Salmo-Priest, Sullivan-Hughes, and LeClerc BMUs .

## BMU Metrics for the Selkirk Recovery Zone

*Table 2. BMU Summary for authorized activities affecting motorized route status on all ownerships for the 2020 bear year (BY) [April 1 through November 15] in the Selkirk Recovery Zone. Values in **Blue** represent BMU standards (USDA 2011).*

| Grizzly Bear Management Unit | Established Standard | | | Current BY20 Conditions[1] | | | Post BY20 Progress to Meeting Standards[2] | | | % Federal Land | Priority |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | OMRD ≤ (%) | TMRD ≤ (%) | Core ≥ (%) | OMRD ≤ (%) | TMRD ≤ (%) | Core ≥ (%) | OMRD ≤ (%) | TMRD ≤ (%) | Core ≥ (%) | | |
| Blue Grass | 33 | 26 | 55 | 30 | 29 | 48 | 27 | 29 | 48 | 96 | 1 |
| Long-Smith | 25 | 15 | 67 | 24 | 16 | 71 | 24 | 16 | 71 | 92 | 1 |
| Kalispell-Granite | 33 | 26 | 55 | 30 | 24 | 55 | 30 | 24 | 55 | 96 | 1 |
| Myrtle | 33 | 24 | 56 | 29 | 23 | 59 | 29 | 23 | 59 | 85 | 2 |
| Ball-Trout | 20 | 13 | 69 | 16 | 11 | 72 | 16 | 11 | 72 | 94 | 2 |
| Lakeshore | 82 | 56 | 20 | 80 | 45 | 22 | 80 | 45 | 22 | 86 | 2 |
| Salmo-Priest | 33 | 26 | 64 | 27 | 22 | 68 | NA | NA | NA | 99 | 1 |
| Sullivan-Hughes | 24 | 19 | 61 | 23 | 18 | 63 | NA | NA | NA | 99 | 1 |
| LeClerc | 48 | 60 | 27 | 46 | 56 | 27 | NA | NA | NA | 64 | 3 |

OMRD ≥ 1mi/mi$^2$ (%); TMRD ≥ 2mi/mi$^2$ (%)
BMU metric parameters for Salmo-Priest, Sullivan-Hughes, and LeClerc reported by the Colville NF. Please see APPENDIX A for detailed discussion of these BMUs. Post BY20 metrics are not applicable to the Colville NF under their current reporting requirements. All other BMU parameters are reported by the IPNF.
[1] **Current Bear Year**, See Table 4 for description of activities on IPNF and APPENDIX A for Colville NF.
[2] **Post Bear Year Progression to Forest Plan standards**. This becomes the "existing condition" from which the following Bear Year starts with. See Table 4 for description of activities on the IPNF.

## Recovery Zones Reasons for Change due to Authorized activities

The annual monitoring reports have previously described the motorized access activities (temporary authorized and short-term temporary unauthorized) across all ownerships that contribute to change (or documentation of a high use non-motorized trail that affected core) and included them in bear year metrics to reflect the on-the-ground conditions for that bear year. Beginning in 2020 only authorized activities are considered in the Recovery Zone Bear Year metrics. Authorized activities are now separated by columns for the current bear year and the Post bear year numbers. Within Recovery zones, the post bear year metrics display the current bear year progression to standards as defined above for the different forests and summarized below in Table 3. Table 4 and Table 5 summarize the reasons for change across all ownerships within the Recovery Zone applicable BMU's for BY20 and Post BY20 authorized motorized access activities. The Kootenai NF BMUs 2020 results are compared to the Post BY19 results displayed in the KNF Forest Plan BA 2020 (USDA FS, KNF 2020).

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)
6

FWS000990

2-ER-322

`Table 3. Management actions that resulted in changes to OMRD, TMRD or Core habitat on all ownership from 2019 to 2020 in **the Cabinet-Yaak Recovery Zone** on the Idaho Panhandle, Kootenai, and Lolo National Forests.*

| | Cabinet-Yaak RZ authorized Federal management actions on NFS lands; activities authorized by others on corporate and state lands; and private land development affecting route status in current bear year | |
|---|---|---|
| | Column A | Column B |
| **BMU** | **Current Bear Year 2020** | **Post Bear Year 2020 Progression to standard (where we are relative to FP standard)** |
| | *Describe database corrections, authorized temporary activities (admin use exceed/emergency access; authorized temporary activities resulting in on-the-ground changes to motorized access, and on-going authorized activities* | *Briefly Describe what BY20 activities are now shown as completed etc., (these are describe as implemented under BY20 and completed in Post BY) or what on-going activities are still considered.* |
| 1-Cedar | Standard OMRD <u><15%</u>, TMRD <u><15%</u>, Core <u>>80%</u><br>**BY20 OMRD 14%, TMRD 10%, core 84%**<br>No change from PostBY19. This BMU meets or is better than all FP standards. During BY20 no database corrections, no authorized temporary activities affecting motorized access, and no ongoing activities. | **PostBY20 OMRD 14%, TMRD 10%, Core 84%**<br>No change in percentages from BY20 as no authorized activities were completed and no ongoing activities. |
| 2-Snowshoe | Standard OMRD <u><20%</u>, TMRD <u><18%</u>, Core <u>>75%</u><br>**BY20 OMRD 15%, TMRD 14%, core 77%**<br>In BY19 Leigh Lake Trail was added as a high use non-motorized trail, with a corresponding decrease in 403 acres of core, but no change to core percentage. No change in BY20 from PostBY19. This BMU meets or is better than all FP standards, even with the reduction in core acres due to the Leigh Lake Trail During BY20 no database corrections, no authorized temporary activities that affected motorized access, and no ongoing activities occurred during BY20. | **PostBY20 OMRD 15%, TMRD 14%, core 77%**.<br>No change in percentages from BY20 as no authorized activities were completed and no ongoing activities. |
| 3-Spar | Standard OMRD <u><33%</u>, TMRD <u><26%</u>, Core <u>>59%</u><br>**BY20 OMRD 29%, TMRD 26%, core 62%**<br>No change from PostBY19. This BMU meets or is better than all FP standards. During BY20 no database corrections, no authorized temporary activities that affected motorized access, and no ongoing activities occurred. | **PostBY20 OMRD 29%, TMRD 26%, core 62%**<br>No change in percentages from BY20 as no authorized activities were completed and no ongoing activities. |
| 4-Bull | FP Standard OMRD <u><36%</u>, TMRD <u><26%</u>, Core <u>>63%</u><br>**BY20 OMRD 38%, TMRD 30%, core 61%**<br>No change in percentages from postBY19. This BMU does not meet FP standards for all three metrics. | **PostBY20 OMRD 38%, TMRD 30%, core 61%**.<br>No change in percentages from BY20. This BMU continues to not meet FP standards for all three metrics. |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

FWS000991

| | Cabinet-Yaak RZ authorized Federal management actions on NFS lands; activities authorized by others on corporate and state lands; and private land development affecting route status in current bear year | |
|---|---|---|
| | Column A | Column B |
| BMU | Current Bear Year 2020 | Post Bear Year 2020 Progression to standard (where we are relative to FP standard) |
| | *Describe database corrections, authorized temporary activities (admin use exceed/emergency access; authorized temporary activities resulting in on-the-ground changes to motorized access, and on-going authorized activities* | *Briefly Describe what BY20 activities are now shown as completed etc., (these are describe as implemented under BY20 and completed in Post BY) or what on-going activities are still considered.* |
| | ***Database corrections***: In BY20 database corrections on NFSR 2147, 2128K, 2128M, 2147A, and 2147B resulted in the routes being deleted from the route layer as were less than 300 feet in length.  Overall, this resulted in a 56 acre increase in core acres with no change to percentage. The Dry Creek Sale changed the barriered segment of NFSR 1118A to open for activities. | ***Ongoing activities***:  Use of a 0.4 mile segment of NFSR 1118A route by the Dry Creek sale continues. The berm will be reinstalled in the future after harvest activities are completed. |
| 5-St. Paul | FP Standard OMRD ≤30%, TMRD ≤23%, Core ≥60% **BY20 OMRD 27%, TMRD 23%, core 58%** Compared to PostBY19, no change in percentage of TMRD or core, while OMRD decreased 1 percent.  This BMU is lower (worse) than the standard for core by 2%, is lower (better) than the standard for OMRD by 3% and meets the FP standard for TMRD. ***Database corrections***: The BY20 route layer did not include an Avista created open route documented in BY19 on the Cabinet R.D.  The omission of this route located in an area of TMRD of >2 mi/mi² had a negligible effect. This route has no effect on core.  Other slight spatial variations in the route layer resulted in the model calculating slightly less acres for OMRD route density of >1 mi/mi². This contributed to the rounding down of OMRD by 1 percent compared to PostBY19. | **PostBY20 OMRD 27%, TMRD 23%, core 58%** No change in percentages from BY20 This BMU continues to not meet FP standard for core. For the bear year 2021 monitoring report the Avista fish trap access road will have been added to INFRA as a private system road. The route will be included under Avista's Special Use Permit and will be gated at some point in the future. Until that time the route contributes to OMRD which continues to remain below (and better than) the standard. |
| 6-Wanless | FP Standard OMRD ≤34%, TMRD ≤32%, core ≥55% **BY20 OMRD 33%, TMRD 33%, core 54%** Compared to PostBY19 TMRD down 1% and OMRD up 5%, with no change in Core at 54%. For BY20, this BMU remains worse (higher) than the FP standard for TMRD by 1% and less (worse) than the FP standard for core by 1%. | **PostBY20 OMRD 29%, TMRD 32%, core 56%**. Compared to BY20, OMRD down 4%, TMRD down 1%, and core up 2% (increase of 1,344 acres of core).  PostBY20 this BMU meets FP standards for all three metrics. ***Completion of ongoing project activity***: Activities in BY20 that resulted in on-the-ground improvements to bear metrics are shown as implemented. On *Libby RD* the |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

8

FWS000992

| | Cabinet-Yaak RZ authorized Federal management actions on NFS lands; activities authorized by others on corporate and state lands; and private land development affecting route status in current bear year | |
|---|---|---|
| | Column A | Column B |
| BMU | Current Bear Year 2020 | Post Bear Year 2020 Progression to standard (where we are relative to FP standard) |
| | *Describe database corrections, authorized temporary activities (admin use exceed/emergency access; authorized temporary activities resulting in on-the-ground changes to motorized access, and on-going authorized activities* | *Briefly Describe what BY20 activities are now shown as completed etc., (these are describe as implemented under BY20 and completed in Post BY) or what on-going activities are still considered.* |
| | **Database corrections**: *Libby RD* correction to the database due to an error in NRM IGBC coding for the BY19 and PostBY19 route layers which had erroneously coded the year round open 2332 Bramlet Creek Road as gated. This route has always been year-round open and contributes to both OMRD and TMRD<br><br>**Database updates**: *Libby RD* previously reported in BY18 the berm on the Miller Creek / West Fisher Creek Road (FR 385) was breached by ATV's, resulting in a 143 acre decrease in core. The berm was reinforced in late BY19 with the route functionally barriered and the core was back in place in BY20. *Cabinet RD*: Database updates on a Stimson section where harvest was recently completed are ongoing. For the BY20 calculations two routes Engle Creek A 2210A and 2210B are reflected as barriered and the routes 14623 McKay Flat, 14623B McKay Flat B, and 14623C McKay Flat C are shown as gated. More recent information from the District in June of 2021 verified the NFSR #14623 and its spurs #14623B and C are effectively bermed and these routes will be updated in NRM for BY 2021 metric calculations to reflect that status.<br><br>**Ongoing projects**: *Libby RD*: SF Miller # 4724 segment previously IGBC 3 was IGBC 4 (0.62 miles) in BY19, shown as barriered in PostBY19, and is back to open in BY20. Route was opened for brushing in BY19 as the Miller West Fisher 2009 road contract hadn't specified the unit 26 accessed off this route was required winter harvest. This route was rebarriered in May of 2020. The barriered portion of NFSR# 385, a previous breach, was repaired in late BY19, and resulted in an improvement to OMRD and core acres in BY20. The use of gated route #4725 north fork Miller Road for the Miller West Fisher TS contributed to OMRD. A barrier was also installed on gated 4725 for the ongoing MWF project in BY20 once timber harvest activities were completed in this | barrier installed on gated route NFSR North Fork Miller #4725 in contributed to 1,209 acres of new core created. The barrier on route 808E located just outside the BMU boundary within the Cabinet Face BORZ also contributed to this. The barrier being replaced on segment of NFSR SF Miller #4724 resulted in 135 acres of core being restored.<br><br>*Cabinet RD*: authorized activity on Stimson private land for timber harvest in BY20 was completed and routes returned to gated status. |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

9

2-ER-325

FWS000993

| | Cabinet-Yaak RZ authorized Federal management actions on NFS lands; activities authorized by others on corporate and state lands; and private land development affecting route status in current bear year | |
|---|---|---|
| | Column A | Column B |
| **BMU** | **Current Bear Year 2020** | **Post Bear Year 2020 Progression to standard (where we are relative to FP standard)** |
| | *Describe database corrections, authorized temporary activities (admin use exceed/emergency access; authorized temporary activities resulting in on-the-ground changes to motorized access, and on-going authorized activities* | *Briefly Describe what BY20 activities are now shown as completed etc., (these are describe as implemented under BY20 and completed in Post BY) or what on-going activities are still considered.* |
| | subdivision. *Cabinet RD*: Contributing to OMRD, the gated routes #2282 Translator Road, #1022A McKay Creek A and 14654 and 14654B were shown as open to reflect harvest on Stimson corporate timberland. Other ongoing authorized activity occurred on private land and motorized access routes contributing to OMRD and TMRD. | |
| 7-Silver Butte-Fisher | FP Standard OMRD ≤26%, TMRD ≤23%, core ≥63% **BY20 OMRD 21%, TMRD 23%, core 65%** Compared to PostBY19, no change in TMRD (23%) or core (65%), while OMRD decreased 1%.  This BMU meets FP standards for all three metrics. ***Database corrections/Updates***:  *Libby RD*: Routes shown as open for 2107 fires were corrected in NRM back to gated 990052, 990052A, 990052C, 990052D. *Cabinet RD*: Route 990013 Vermillion Owl was changed from open to gated as verified on ground.  Just outside BMU 7 within the 0.31 miles buffer two year-round open routes 99820 and 99824 (Vermillion E Fisher) on Stimson land, were barriered. | **PostBY20 OMRD 21%, TMRD 23%, core 65%** No change in percentages from BY20. This BMU continues to meet FP standards for all three metrics in PostBY20. |
| 8-Vermilion | STANDARD OMRD ≤32%, TMRD ≤21%, core ≥55%. **BY20 OMRD 32%, TMRD 22%, core 58%** No change in percentages from PostBY19. This BMU meets FP standard for OMRD and is higher (better than) the standard for core but is higher (worse) then the TMRD standard by 1%. ***Database corrections***: *Cabinet RD*: Core acres decreased by about 262 acres due to database updates.  During BY20 it was verified corporate private land routes #8585, 8586 and its spur 8586A are not barriered, but are gated near their junction with the year-round open #154 Vermilion E Fisher. | **PostBY20 OMRD 32%, TMRD 22%, core 58%** No change in percentages from BY20 as no authorized activities were completed. During the summer of 2021 the Elk Lake OHV implementation is planned and will bring the BMU to standards. These improvements will be reflected in the Bear Year 2021 monitoring report. |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

FWS000994

| | Cabinet-Yaak RZ authorized Federal management actions on NFS lands; activities authorized by others on corporate and state lands; and private land development affecting route status in current bear year | |
|---|---|---|
| | Column A | Column B |
| BMU | Current Bear Year 2020 | Post Bear Year 2020 Progression to standard (where we are relative to FP standard) |
| | *Describe database corrections, authorized temporary activities (admin use exceed/emergency access; authorized temporary activities resulting in on-the-ground changes to motorized access, and on-going authorized activities* | *Briefly Describe what BY20 activities are now shown as completed etc., (these are describe as implemented under BY20 and completed in Post BY) or what on-going activities are still considered.* |
| 9-Callahan | FP Standard OMRD ≤33%, TMRD ≤26%, core ≥55%<br>**BY20 OMRD 28%, TMRD 28%, core 58%**<br><br>Compared to PostBY19, no change in percentages of OMRD or core, while TMRD improves and decreases 1 percent. This BMU remains higher (worse) than the TMRD standard by 2%. The Starry Goat project activity which included road decommissioning work and improvements shown as implemented in BY19 and PostBY19 route layers and calculations and reflected in the estimates provided by the KNF FP BA (USDA FS KNF 2020) as well as in the BY20 metrics were expected to bring the BMU into compliance. However, the BY20 results demonstrated that the Starry Goat related improvements did not off-set the 2019 database updates to include railroad tracks.<br><br>***Database updates***: *Troy RD*: Improvement to core in BY20 resulted from NFSRs 14373 and 4556 (BY19 report typo said 4456) being barriered for in-kind replacement core during BY19.<br><br>***Emergency fire access*** *Troy RD* - Contributing to core decrease during BY20 was the Callahan Fire which removed existing berms for fire access on Road #14371, #4521, #414B, and #4140. No public use occurred on these routes and the berms were replaced in October.<br><br>***Ongoing Projects:*** Affecting both route densities and core in BY20 were ongoing activities associated with the Starry Goat Project. The road decommissioning work and improvement work that was reflected as being implemented in BY19 and PostBY19 are reflected as completed in BY20. | **PostBY20 OMRD 28%, TMRD 27%, core 59%**<br><br>Compared to BY20, PostBY20 OMRD does not change, TMRD improves and decreases 1% and core improves and increases 1%. This BMU remains higher (worse) than the FP standard 26% TMRD by 1%.<br><br>The BY20 results demonstrated the Starry Goat Project road management to improve TMRD was not able to offset the 2019 database updates to incorporate railroad tracks. The Troy RD has very little opportunity to barrier additional gated routes to decrease TMRD to bring the BMU into compliance due to different land ownership access. During 2021 the District is coordinating across the different resources to determine what options may be available on NFS routes.<br><br>Post BY20 core returns to pre-fire emergency access levels with increase 1% (and increase 552 acres) due to the Callahan fire being controlled and the earth berms replaced |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

11

2-ER-327

FWS000995

| | Cabinet-Yaak RZ authorized Federal management actions on NFS lands; activities authorized by others on corporate and state lands; and private land development affecting route status in current bear year | |
|---|---|---|
| | Column A | Column B |
| **BMU** | **Current Bear Year 2020** | **Post Bear Year 2020 Progression to standard (where we are relative to FP standard)** |
| | *Describe database corrections, authorized temporary activities (admin use exceed/emergency access; authorized temporary activities resulting in on-the-ground changes to motorized access, and on-going authorized activities* | *Briefly Describe what BY20 activities are now shown as completed etc., (these are describe as implemented under BY20 and completed in Post BY) or what on-going activities are still considered.* |
| | | |
| 10-Pulpit | Standard OMRD ≤44%, TMRD ≤34%, core ≥52%. <br> **BY20 OMRD 44%, TMRD 27%, core 54%** <br> No change in percentages from PostBY19. <br> This BMU meets the FP standards for all metrics during BY20 <br><br> ***Database corrections***: The need for a database correction for a year-round open segment of Kootenai River Road (#853) was identified in June 2020 after the BY19 and postBY19 calculations were completed.  When returning BY19 temporary activity on routes to their legal status for the PostBY19 route layer, an open segment of road #853 was erroneously changed to gated, rather than just changing the segment behind the gate back to gated.  On June 2, 2021 it was discovered this error remained in NRM and thus was in BY20 and PostBY20 route layers.  Both segments coded as gated contribute to TMRD and core metric but not to OMRD and the area's OMRD density of >1 mi/mi.sq largely remains at 1-2 miles/mi.sq. Based on BY19 where both segments of road #853 were coded as open most of the area would be at a OMRD density of >2 miles/mi.sq.  The database correction changing the open segment from gated back to open was made in NRM infra in June 2021 and will be reflected in BY21 route layers and calculations. <br><br> ***Temporary activities:*** Temporary authorized activities and ongoing projects did not contribute to percent changes in metric parameters***.*** <br> *Three Rivers RD:* NFSR road #14321; silviculture & forestry contractor, & fire management activity exceeded allowable trips as analyzed and authorized under the OLY Project. | **POST BY20 OMRD 44%, TMRD 27%, core 54%** <br> All FP standards are met. No change in percentages from BY20. <br><br> All temporary activities associated with the OLY Project route work and access changes are completed.  The BMU currently meets the FP standards. <br><br> ***Database corrections***: as noted under the current bear year discussion, the IGBC coding error on the open segment of the Kootenai River Road remains in the Post BY20 metrics. This segment will be accurately coded as open IGBC 4 and not as gated IGBC 2 in the bear year 2021 route layers and calculations. <br><br> ***Ongoing Projects***: One sale under the OLY Moly TS, Kootenai Face Off remains and is currently expected to occur summer 2022. During that future activity period, any temporary effects to metrics as analyzed in the BA and NEPA will be disclosed in that BY report. |

| | Cabinet-Yaak RZ authorized Federal management actions on NFS lands; activities authorized by others on corporate and state lands; and private land development affecting route status in current bear year | |
|---|---|---|
| | Column A | Column B |
| BMU | Current Bear Year 2020 | Post Bear Year 2020 Progression to standard (where we are relative to FP standard) |
| | *Describe database corrections, authorized temporary activities (admin use exceed/emergency access; authorized temporary activities resulting in on-the-ground changes to motorized access, and on-going authorized activities* | *Briefly Describe what BY20 activities are now shown as completed etc., (these are describe as implemented under BY20 and completed in Post BY) or what on-going activities are still considered.* |
| | ***Ongoing Projects:*** Authorized activities associated with the OLY project (Oly Moly TS and some small sales). Upon completion of the project, likely in the next two years, BMU 10 will comply with the Forest Plan standards | |
| 11-Roderick | FP Standard OMRD ≤28%, TMRD ≤26%, core ≥55% **BY20 OMRD 28%, TMRD 26%, core 56%** No change in percentages from PostBY19. This BMU meets the FP standards for all metrics. In BY20 a database correction was made on NFSR 6818 Oscar Meyer from open to gated. No authorized temporary activities affected motorized access, and no ongoing activities occurred. | **PostBY20 OMRD 28%, TMRD 25%, core 56%** All FP standards are met. No change in percentages from BY20 as no authorized activities were completed and no ongoing activities. An additional database correction will be made for bear year 2021 on the NFSR 6818A which should also be coded as gated. |
| 12-Newton | FP Standard OMRD ≤45%, TMRD ≤31%, core ≥55% **BY20 OMRD 42%, TMRD 31%, core 57%** Compared to PostBY19 no change in percentages of OMRD and core, while TMRD increased 1 percent. This BMU meets FP standards for all metrics. ***Database corrections:*** *Three Rivers RD*: Included removing routes (e.g., skid trails, tractor paths in meadows) that were not permanent and on other ownerships (updating database routes that were created in 2011; adding new private routes on private land and modifying spatial locations (including on NFSR 2370 Cadillac Road) to align with more recent imagery. All this work was part of assessing the existing condition for Knotty Pine. The improvement work implemented in BY19 under the Rocky Pine Project which included installment of barriers to meet the TMRD standard are reflected in BY20. | **PostBY20 OMRD 42%, TMRD 31%, core 57%** No change in percentages from BY20 as no authorized activities were completed and no ongoing activities. All FP standards are met. |
| 13-Keno | FP Standards OMRD ≤33%, TMRD ≤26%, core ≥59% | **PostBY20 OMRD 32%, TMRD 23%, core 60%** |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

FWS000997

| | Cabinet-Yaak RZ authorized Federal management actions on NFS lands; activities authorized by others on corporate and state lands; and private land development affecting route status in current bear year | |
|---|---|---|
| | Column A | Column B |
| BMU | Current Bear Year 2020 | Post Bear Year 2020 Progression to standard (where we are relative to FP standard) |
| | *Describe database corrections, authorized temporary activities (admin use exceed/emergency access; authorized temporary activities resulting in on-the-ground changes to motorized access, and on-going authorized activities* | *Briefly Describe what BY20 activities are now shown as completed etc., (these are describe as implemented under BY20 and completed in Post BY) or what on-going activities are still considered.* |
| | **BY20 OMRD 32%, TMRD 23%, core 60%** Compared to PostBY19, OMRD and TMRD increased by 1 percent and core decreased 1 percent. This BMU meets FP standards for all metrics as core remains 1 percent above the standard.<br><br>**On-going projects:** *IPNF*: during BY20 IPNF routes 2536UH and 2536UG, and 2536UC were gated and decrease core acres by a total of approximately 280 acres<br><br>*Three Rivers RD*: No activity in BY20. A forthcoming route change for oversnow use on NFSR 745 Hellroaring as analyzed in the Buckhorn Project will be implemented in the future and any effects to BY metrics will be addressed in that Bear Year report. | No change from BY20 percentages. PostBY20 metrics meet FP standards.<br>**On-going projects:** IPNF Deer Creek Project ongoing. Restricted FSR 2536G & 2536H remain in drivable status (to be stored) & temporary road off FSR 2549A remains open and drivable. |
| 14-NW Peaks | FP Standard <u><</u>OMRD 31%, TMRD <u><</u>26%, core <u>></u>55%<br>**BY20 OMRD 28%, TMRD 24%, core 56%**<br>Compared to PostBY19, no change to percentages.<br>This BMU meets FP standards for all metrics<br><br>**Temporary activities**: *Three Rivers RD*: silviculture and other activity on FS route #5932E exceeded allowable trips as authorized in the Buckhorn Project where the route was treated as "open" during implementation.<br>*IPNF*: none | **PostBY20 OMRD 28%, TMRD 24%, core 56%**<br><br>No change in percentages from BY20. PostBY20 metrics meet FP standards.<br><br>All temporary activities completed and returned to legal status. |
| 15-Garver | FP Standards OMRD <u><</u>33%, TMRD <u><</u>26%, core <u>></u>55%<br>**BY20 OMRD 31%, TMRD 26%, core 55%**<br>Compared to PostBY19, no change in percentages. This BMU meets all FP standards for metrics. | **PostBY20 OMRD 31%, TMRD 26%, core 55%**<br><br>No change in percentages from BY20. PostBY20 metrics meet FP standards. |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)
14

2-ER-330

FWS000998

| | Cabinet-Yaak RZ authorized Federal management actions on NFS lands; activities authorized by others on corporate and state lands; and private land development affecting route status in current bear year | |
|---|---|---|
| | Column A | Column B |
| **BMU** | **Current Bear Year 2020** | **Post Bear Year 2020 Progression to standard (where we are relative to FP standard)** |
| | *Describe database corrections, authorized temporary activities (admin use exceed/emergency access; authorized temporary activities resulting in on-the-ground changes to motorized access, and on-going authorized activities* | *Briefly Describe what BY20 activities are now shown as completed etc., (these are describe as implemented under BY20 and completed in Post BY) or what on-going activities are still considered.* |
| | ***Database corrections:*** Numerous database corrections were made in this BMU to reflect on the ground conditions verified by the wildlife biologist in the Black Ram analysis and contribute to an overall 180 acre increase in core acres.<br><br>***Authorized Temporary Activities***: NFSR #5857 exceeded administrative use due to Garver Mountain Lookout Rental. The gate is kept locked to the general public and the route is modeled as open every year to reflect admin use being exceeded. | |
| 16-East Fork Yaak | FP Standards OMRD ≤33%, TMRD ≤26%, core ≥55%<br>**BY20 OMRD 28%, TMRD 24%, core 56%**<br>Compared to PostBY19 OMRD improves (decreases) by 1%, while no change in percentages for TMRD and core. This BMU meets FP standards for all metrics.<br><br>The improvement to OMRD resulted from several contributing factors, including database updates in the adjacent BMU 15 and some spatial differences. | **PostBY20 OMRD 28%, TMRD 24%, core 56%**<br><br>No change in percentages from BY20. This BMU meets FP standards for all metrics. |
| 17-Big Creek | FP Standards OMRD ≤33%, TMRD ≤26%, core ≥55%<br>**BY20 OMRD 30%, TMRD 15%, core 58%**<br>Compared to PostBY19, no change in percentages. This BMU meets FP standards for all metrics. | **Post BY20 OMRD 30%, TMRD 15%, core 58%**<br><br>No change in percentages from BY20. This BMU continues to meet FP standards for all metrics. |
| 18-Boulder | FP Standards OMRD ≤33%, TMRD ≤29%, core ≥55%<br>**BY20 OMRD 32%, TMRD 31%, core 52%**<br>No change in OMRD, TMRD or Core. Ongoing activities (log haul on restricted road, 2 project roads still drivable) for 20mile Project. Temp | **Post BY20 OMRD 31%, TMRD 30%, core 53%**<br><br>Core increase, TMRD & OMRD decrease. Storage of 2 road segments from Boulder Creek (FSR 2111 and 2662 end), 20mile timber harvest completed. |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

FWS000999

| | Cabinet-Yaak RZ authorized Federal management actions on NFS lands; activities authorized by others on corporate and state lands; and private land development affecting route status in current bear year | |
|---|---|---|
| | Column A | Column B |
| **BMU** | **Current Bear Year 2020** | **Post Bear Year 2020 Progression to standard (where we are relative to FP standard)** |
| | *Describe database corrections, authorized temporary activities (admin use exceed/emergency access; authorized temporary activities resulting in on-the-ground changes to motorized access, and on-going authorized activities* | *Briefly Describe what BY20 activities are now shown as completed etc., (these are describe as implemented under BY20 and completed in Post BY) or what on-going activities are still considered.* |
| | road construction for Boulder Creek Project – 70 acre core loss offset by road storage in Column B. | |
| 19-Grouse | FP Standards OMRD <u><</u>59%, TMRD <u><</u>55%, core <u>></u>37%<br>**BY20 OMRD 61%, TMRD 61%, core 30%**<br>OMRD increase, no change to TMRD or Core. Ongoing activities (log haul on restricted road, 2 project roads still drivable) for 20mile Project. Grouse BMU road storage/decom (numerous segments) Phase I active and affected roads modeled as open. | **Post BY20 OMRD 58%, TMRD 59%, core 32%**<br>OMRD decrease, TMRD decrease, Core increase. Grouse BMU Phase I completed: FSR 2236, 2236A, 2625C, 2686A, 2693A; and non-system roads 729UV, 2686US, and unauthorized ATV trail all stored or decommissioned. 20mile timber harvest completed. |
| 20-North Lightning | FP Standards OMRD <u><</u>35%, TMRD <u><</u>20%, core <u>></u>61%<br>**BY20 OMRD 35%, TMRD 18%, core 63%**<br>No changes to OMRD, TMRD or Core | **Post BY20 OMRD 35%, TMRD 18%, core 64%**<br>No change. |
| 21-Scotchman | FP Standards OMRD <u><</u>34%, TMRD <u><</u>26%, core <u>></u>62%<br>**BY20 OMRD 34%, TMRD 26%, core 65%**<br>No percentage changes to OMRD or Core, TMRD increase. 0.7 mi of FSR 54-UZXZ-PO on private ground incorrectly coded as impassable, changed to open. 0.3 mi of same road on USFS incorrectly coded as impassable, changed to restricted. | **Post BY20 OMRD 34%, TMRD 26%, core 65%**<br>No change. |
| 22-Mt. Headley | FP Standards OMRD <u><</u>33%, TMRD <u><</u>35%, core <u>></u>55%<br>**BY20 OMRD 35%, TMRD 37%, core 53%**<br><br>This BMU currently does not meet FP standards. The BMU 22 Lolo NF Compliance Project Decision was signed 5/2021. This will be implemented in 2021 and 2022 and cause the BMU to be better than standards. | Implementing completed BMU 22 Compliance NEPA in 2021 and 2022. Will meet standards, likely in 2022 |

Note: On-going field validation of road status and road database cleanup may contribute to some changes each year. Conditions on the ground do not necessarily change from the previous year

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

FWS001000

*Table 4. Management actions that resulted in changes to OMRD, TMRD or Core habitat from 2019 to 2020 in the Selkirk Recovery Zone as reported by the Idaho Panhandle National Forest.*

| | SELKIRK RZ authorized Federal management actions on NFS lands; activities authorized by others on corporate and State lands; and private land development activities affecting route status in current bear year as reported by the IPNF | |
|---|---|---|
| | Column A | Column B |
| **BMU** | **Current Bear Year 2020** | **Post Bear Year 2020 Progression to standard (where we are relative to FP standard)** |
| | *Describe database corrections, authorized temporary activities (admin use exceed/emergency access; authorized temporary activities resulting in on-the-ground changes to motorized access, and on-going authorized activities* | *Briefly Describe what BY20 activities are now shown as completed etc., (these are describe as implemented under BY20 and completed in Post BY) or what on-going activities are still considered.* |
| Long-Smith | FP Standards OMRD <25%, TMRD <15%, core >67%<br>**BY20 OMRD 24%, TMRD 16%, core 71%**<br>No change to OMRD, TMRD or Core<br>Gate off FSR 281 at Cutoff Creek destroyed previously, gate and road located on private ground. Communication on-going with private timber company about gate repair or road closure. Road currently counted toward motorized access metrics pending resolution with landowner. | **Post BY20 OMRD 24%, TMRD 16%, core 71%**<br>No change |
| Ball-Trout | FP Standards OMRD <20%, TMRD <13%, core >69%<br>**BY20 OMRD 16%, TMRD 11%, core 72%**<br>No change to OMRD, TMRD or Core | **Post BY20 OMRD 16%, TMRD 11%, core 72%**<br>No change |
| Myrtle | FP Standards OMRD <33%, TMRD <24%, core >56%<br>**BY20 OMRD 29%, TMRD 23%, core 59%**<br>OMRD decrease, no change to TMRD, Core increase. FSR 2400 modeled as open due to damaged gate on Private lands, but OMRD improvement from 2019 due to end of Mini Mack TS activities on FSR 1309 and no private haul on FSR 1405. Core improvement from temporary fix (on private land) to curtail unauthorized ATV route on Apache Ridge. | **Post BY20 OMRD 29%, TMRD 23%, core 59%**<br>No change to reported metrics. Slight OMRD decrease pending gate repair on FSR 2400. |
| Lakeshore | FP Standards OMRD <82%, TMRD <56%, core >20%<br>**BY20 OMRD 80%, TMRD 45%, core 22%**<br>No changes to OMRD or Core, increase in TMRD. A 0.9 mile section of FSR 2249 was incorrectly identified as decommissioned. It is in fact restricted, and a database correction was made to reflect this. This resulted in the | **Post BY20 OMRD 80%, TMRD 45%, core 22%**<br>No change |

| | SELKIRK RZ authorized Federal management actions on NFS lands; activities authorized by others on corporate and State lands; and private land development activities affecting route status in current bear year as reported by the IPNF | |
|---|---|---|
| | Column A | Column B |
| **BMU** | **Current Bear Year 2020** | **Post Bear Year 2020 Progression to standard (where we are relative to FP standard)** |
| | *Describe database corrections, authorized temporary activities (admin use exceed/emergency access; authorized temporary activities resulting in on-the-ground changes to motorized access, and on-going authorized activities* | *Briefly Describe what BY20 activities are now shown as completed etc., (these are describe as implemented under BY20 and completed in Post BY) or what on-going activities are still considered.* |
| | increase in TMRD (0.5%) and a decrease in Core (0.3%) that is obscured by rounding. | |
| Kalispell-Granite | FP Standards OMRD ≤33%, TMRD ≤26%, core ≥55% **BY20 OMRD 30%, TMRD 24%, core 55%** Increase in OMRD and TMRD, no change to Core. All changes the result of database corrections or activities on private lands. In upper Sema Ck. section 5 on private lands, 0.9 mile of previously undocumented road added and 1.3 additional miles of restricted road used for log haul (open). On NFS lands, 0.6 mile segment in middle Sema Ck. drainage, and 0.1 mile segment in lower Sema previously modeled as restricted roads, but are not drivable. 0.5 mile UTV trail used for administrative purposes added (Indian Mtn.) as restricted route. Two restricted roads on private lands in upper Sema section 9 and lower Sema section 25 used for log haul in 2019 inactive in 2020. | **Post BY20 OMRD 30%, TMRD 24%, core 55%** No change (changes likely for private land road use, but unknown at this time). |
| Blue Grass | FP Standards OMRD ≤33%, TMRD ≤26%, core ≥55% **BY20 OMRD 30%, TMRD 29%, core 48%** No change to OMRD, TMRD or Core. FSR 2251 exceeded trip limits for research purposes; modeled as open. OMRD gain from this offset by OMRD loss (improvement) from maintaining FSR 636 below admin use limits. Short section of road in Canada added, resulting in slight (~20 acres) Core decrease and TMRD increase (0.2%). | **Post BY20 OMRD 27%, TMRD 29%, core 48%** OMRD decrease, no change to TMRD or Core. FSR 2251 reverts to restricted status. |

Note: On-going field validation of road status and road database cleanup may contribute to some changes each year. Conditions on the ground do not necessarily change from the previous year

*Please see APPENDIX A for current bear year activities for the Salmo-Priest, Sullivan Hughes and LeClerc BMUs as reported by the Colville NF.

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

FWS001002



SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

19

2-ER-335

FWS001003

## Administratively Entering core area blocks for road decommissioning or stabilization activities within the Recovery Zones

The Forest Service may affect underlying core area (i.e., any core habitat that is affected by the subject road and its buffer) within a BMU once per 10 year time frame, and not to exceed one bear year for the sole purpose of completing road decommissioning/stabilization activities on existing closed or barriered roads in core area habitat (USDA 2011), and as specified in the IPNF LRMP BO and the KNF LRMP BO (FWS 2020, respectively), as the **second surrogate** measure as a measure of the amount of take associated with displacement from core habitat. Table 5 lists the ongoing locations, dates, duration, and circumstances for invoking the allowance for administrative project work entering core area for the purposes of road decommissioning or stabilizations in the Cabinet-Yaak Recovery Zone.

*Table 5. List of ongoing locations, dates, duration, and circumstances for invoking the allowance for entering core area for purposes of road decommissioning or stabilizations in the Cabinet-Yaak RZ.*

| BMU | Location | Date | Duration | Circumstances |
|---|---|---|---|---|
| 1-Cedar | Southwestern corner of the BMU in the Madge Creek area. | Summer 2017 | ~ 2 wks | Combination of storage and decommissioning of roads 691, 691E, and 14705, Sparring Bulls Project |
| 9-Callahan | In finger of core between north and south Callahan creeks, east of Smith Patrol (mountain). | July-16-August 10, 2012 | ~3 ½ wks | Road 4521 – combination of decommissioning and storage work under West Troy Project |

As of Bear 2020, within the Selkirk Recovery Zone there have been no allowances for entering core area for the purposes of road decommissioning or stabilizations.

*Table 6. List of ongoing locations, dates, duration, and circumstances for invoking the allowance for entering core area for purposes of road decommissioning or stabilizations in the Selkirk RZ.*

| BMU | Location | Date | Duration | Circumstances |
|---|---|---|---|---|
| | | | | |

## Seasonal Administrative Use within the Recovery Zones

During the 2020 BY in the Cabinet-Yaak and Selkirk Recovery Zones, there were some instances where administrative vehicle entries on restricted access (gated) roads exceeded standards.

For the Cabinet-Yaak Ecosystem restricted roads that received administrative use in excess of the allowable trips (either seasonally or over the entire bear year) were considered "open" roads when determining the 2020 bear year temporary condition displayed in Table 1. Administrative use was considered on routes for federal, state, and cooperating corporate lands. Table 7 summarizes Cabinet-Yaak RZ seasonal authorized administrative use on restricted roads by BMU over the 2020 bear year. Unauthorized motorized use is not considered in this table.

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

20

2-ER-336

FWS001004

*Table 7. Seasonal administrative use within the Cabinet-Yaak RZ by bear management unit in BY 2020*

| Bear Management Unit | Number of Restricted Roads With Administrative Use During Bear Year 2020 | Number of Restricted Roads in the Cabinet-Yaak RZ Exceeding Administrative Use Levels During Bear Year 2020 | | | |
|---|---|---|---|---|---|
| | | Spring Use Period **4/1**-6/15 (≥18 trips) | Summer Use Period 6/16-9/15 (≥23 trips) | Fall Use Period 9/16-**11/30** (≥19 trips) | **Total Use** 4/1-11/30 (≥60 trips) |
| 1-Cedar | 2 | 0 | 0 | 0 | 0 |
| 2-Snowshoe | 0 | 0 | 0 | 0 | 0 |
| 3-Spar | 4 | 0 | 0 | 0 | 0 |
| 4-Bull | 0 | 0 | 0 | 0 | 0 |
| 5-St. Paul | 5 | 0 | 0 | 0 | 0 |
| 6-Wanless | 3 | 0 | 0 | 0 | 0 |
| 7-Silver Butte-Fisher | 2 | 0 | 0 | 0 | 0 |
| 8-Vermillion | 2 | 0 | 0 | 0 | 0 |
| 9-Callahan | 4 | 0 | 0 | 0 | 0 |
| 10-Pulpit [1] | 2 | **1** | 0 | 0 | 0 |
| 11-Roderick | 5 | 0 | 0 | 0 | 0 |
| 12-Newton | 7 | 0 | 0 | 0 | 0 |
| 13-Keno | 3 | 0 | 0 | 0 | 0 |
| 14-NW Peaks [2] | 7 | 0 | 0 | **1** | 0 |
| 15-Garver | 3 | 0 | 1[3] | 0 | 0 |
| 16-East Fork Yaak | 1 | 0 | 0 | 0 | 0 |
| 17-Big Creek | 1 | 0 | 0 | 0 | 0 |
| 18-Boulder | 6[4] | 0 | 2[4] | 0 | 2[4] |
| 19-Grouse | 9[4,5] | 0 | 6[4,5] | 0 | 1[4] |
| 20 -North Lightning | 0 | 0 | 0 | 0 | 0 |
| 21-Scotchman | 0 | 0 | 0 | 0 | 0 |
| 22-Mount Headley | 5 | 0 | 0 | 0 | 0 |
| **Total** | | **1** | **9** | **1** | **3** |

[1] BMU 10: Troy RD #14321 - silviculture & forestry contractor, & fire management activity exceeded allowable trips as analyzed and authorized under the OLY Project. The route was treated as "open" due to administrative use during project implementation.

[2] BMU 14: Troy RD #5932E – silviculture and other road use activity exceeded allowable trips as authorized in the Buckhorn Project where the route was treated as "open" during implementation due to administrative use.

[3] BMU 15: Troy RD # 5857 (Garver Mtn. Lookout) is a segment of the route gated to the general public but exceeds administrative use due to lookout rental traffic and therefore is modeled as open every year for BY monitoring

[4] FSR 2260 used as haul route counted in both Boulder and Grouse BMUs

[5] Includes 5 routes stored for Grouse BMU Phase 1

During Bear Year 2020 in the Selkirk Recovery Zone, there were some instances where administrative use exceeded allowable seasonal use levels (Table 8). Roads that experienced administrative use in excess of the allowable trips—either seasonally or for the entire bear year—were considered "open" when determining the bear year condition displayed in Table 2. Administrative use was considered on routes for federal, state, and cooperating corporate lands.

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

21

FWS001005

2-ER-337

Table 8 summarizes the Selkirk RZ seasonal authorized administrative use on restricted roads by BMU over the Selkirk 2020 bear year. Unauthorized motorized use is not considered in this table.

*Table 8. Seasonal administrative use within the Selkirk RZ by bear management unit in 2020 as reported by the Idaho Panhandle NF.[*]*

| Bear Management Unit | Number of Restricted Roads with Administrative Use During Bear Year 2020 | Number of Restricted Roads in the Selkirk RZ Exceeding Administrative Use Levels During "Bear Year" 2020 | | | |
|---|---|---|---|---|---|
| | | Spring 4/1-6/15 (≥19 round trips) | Summer 6/16-9/15 (≥23 round trips) | Fall 9/16-11/15 (≥15 round trips) | Total Use 4/1-11/15 (≥57 round trips) |
| Blue Grass | 4[1] | 0 | 2[1] | 0 | 2[1] |
| Long Smith | 3[2] | 0 | 0 | 0 | 1[2] |
| Kalispell Granite | 4[3] | 0 | 2[3] | 2[3] | 2[3] |
| Myrtle | 3[2] | 0 | 1[2] | 0 | 1[2] |
| Ball Trout | 0 | 0 | 0 | 0 | 0 |
| Lakeshore | 0 | 0 | 0 | 0 | 0 |
| **Total** | | **0** | **5** | **2** | **4** |

*Please see APPENDIX A for administrative use for the Salmo-Priest, Sullivan Hughes and LeClerc BMUs as reported by the Colville NF.

[1] Forest Roads 1009, 636, 1011 and 2546 form essentially one route to access a private inholding. These routes are also used extensively by the Border Patrol.
[2] Road behind damaged gate on private land included in total
[3] Includes 2 road segments on private land used for log haul

## Recovery Zone Existing Route Closure Monitoring

To fulfill the Forest's commitment to monitor from their individual LMRPs. The Forests committed to monitoring 30 percent of closure devices (gates and barriers) annually within the respective grizzly bear ecosystems, so as to ensure the effective implementation of the open motorized route density parameter of their Access Amendment (USFS 2010, pg. 12). The USFWS acknowledged and considered this design element in the 2011 Biological Opinion (USFWS 2011a, pg. 17). This monitoring commitment was carried forward on the LMRP (USFWS 2013), and in the 2020 reinitiation consultation on the access management portion of the KNF and IPNF LMRPs (USFWS 2020, respectively). The Forest Service monitors closed roads in the recovery zones as time and budgets allow. Agency personnel attempt to repair or replace any vandalized gates and locks as soon as possible. Where closure devices have been driven around, steps are taken to block this illegal access as soon as possible using boulders, earthen berms, cement posts, plantings, root wads, or other means. Table 9 and Table 10 display the numbers of gated and barriered routes that were monitored, number routes with unauthorized motorized access, percent devices monitored, and percent devices considered not functional during the 2020 bear year. The information in these tables reflect one trip for monitoring and one repair although a gate may have been visited numerous times with a lock replaced, or a barrier was repaired more than once. These multiple monitoring trips or repairs within the Recovery Zone are

FWS001006

2-ER-338

described in APPENDIX B BMU Unauthorized Motorized Use on Existing Restricted Routes.   Routes were considered barriered if an earth berm, boulders, or vegetation existed which made the route impassible to motorized access.

*Table 9. Summary of restricted Existing route monitoring within the Cabinet-Yaak Recovery Zone in 2020. Data on file at the district or supervisory offices.*

| Grizzly Bear Recovery Zone | National Forest | Closure Type | 2020 | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Number of Closure Devices[1] BY20 | Number Monitored[2] # | Total Monitored in BY Percent % | Number Breach detected[3] # | Total monitored that were breached % | Percent Repaired % |
| Cabinet-Yaak | Idaho Panhandle | Gate | 48 | 43 | 90 | 4[4] | 9 | 25 |
| | | Barrier | 41 | 6 | 15 | 0 | 0 | n/a |
| | | Total | 89 | 49 | 55 | 4[4] | 8 | 25 |
| | Kootenai[1] | Gate | 268 | 232 | 86 | 40 | 17 | 24 |
| | | Barrier | 683 | 683 | 100 | 32 | 5 | 0 |
| | | Total | 931 | 915 | 98 | 72 | 22 | 23 |
| | Lolo | Gate | | | 100 | | | 8 |
| | | Barrier | | | 100 | | | 0 |
| | | Total | | 72 | 100 | 13 | 18 | 84% (so far) |
| **Recovery Zone Total** | | | **1,092** | **1,036** | **95** | **89** | **9** | |

[1]starting point for # of closure devices is the total that are located off existing routes open to motorized vehicles but this can vary by year due if additional monitoring of closure devices on spur routes located behind a main access route device occurred or if new closure devices were installed.
[2]Total # of Devices Monitored includes all functional and non-functional devices on existing routes.
[3]Breach detected is # not Functional with unauthorized motorized access and is a subset of the Total # Monitored KNF and IPNF- Barrier includes concrete, earth berm, other, other barrier, rocks, vegetation,
[4]Total includes 2 gates along the same route. Only 3 routes actually affected.

*Table 10. Summary of restricted Existing route monitoring within the Selkirk Recovery Zone in 2020. Data on file at the district offices.*

| Grizzly Bear Recovery Zone | National Forest | Closure Type | 2020 | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Number of Closure Devices | Total Number Monitored # | Percent Monitored % | Breach Detected # | Percent Breached % | Percent Repaired % |
| Selkirk | Colville* | Gate or Guardrail | 76 | 59 | 78 | 3 | 4 | 100% |
| | | Impassable | 51 | 35 | 69 | 0 | | 0 |
| | | Total | 127 | 94 | 74 | 3 | 3 | 100% |
| | Idaho Panhandle | Gate or Guardrail | 79 | 70 | 87 | 3 | 4 | 67 |
| | | Barrier | 63 | 7 | 11 | 0 | 0 | 0 |
| | | Total | 142 | 77 | 33 | 3 | 4 | 67 |
| **Recovery Zone Total** | | | **269** | **171** | **64** | **6** | **4** | **83** |

[1]starting point for number of closure devices is the total that are located off routes open to motorized vehicles.
[2]Total Number of Devices Monitored includes all functional and non-functional devices.

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)
23

2-ER-339

FWS001007

[3]Breach detected is Number not Functional with unauthorized motorized access and is a subset of the Total Number Monitored

*Please see APPENDIX A for additional information for the Salmo-Priest, Sullivan Hughes and LeClerc BMUs as reported by the Colville NF. To summarize monitoring information for the Selkirk RZ, data from the CNF report was incorporated here.

In 2020, a total of 95 percent of all closure devices were monitored in the Cabinet-Yaak Ecosystem, with 9 percent considered not functional. Within the Selkirk Ecosystem, a total of 64 percent of all closure devices were monitored, with 4 percent considered not functional. The term not-functional captures situations (including gate destroyed, lock missing, barrier removed, vegetation sawed out, or vehicles getting around a device, etc.) where unauthorized motorized use occurred behind a closure device.

KNF Recovery Zone Existing Route monitoring: On the Kootenai National Forest due to covid-19 and other work limitations, no barriers were repaired or gates reinforced with rocks on the side to prevent motorized access around the gates within the Recovery Zones, but locks were replaced on existing gates, often numerous times. Of the total of 232 gates monitored, a total of 40 had evidence of unauthorized motorized use or were assumed breached if the gate was located behind a known breached gate. Of the 683 barrier devices monitored, 32 had evidence of unauthorized motorized use or were assumed breached if the device was located behind a known breach.

Lolo Recovery Zone Existing Route monitoring: Gate/barrier checks were done in BMU22 in summer 2020. A total of 72 gates/ barriers were checked. There were 8 (11%) breached by motorcycles, 1 (1%) breeched by vehicles <50", and 4 (5%) breached by vehicles >50". Of the 72 gates/ barriers 8 (11%) were missing locks, 5 (7%) gates had both FS and Timber company locks, 10 (14%) of the roads had a veg, dirt or rock barrier or the entrance was obliterated, 2 (3%) gates had a lock that was neither FS or timber co, and the remaining 47 (65%) had FS only locks. 30 (41%) roads had legible travel management signs, 10 (13%) roads had no need for signs, 23 (32%) had missing signs and 11 (14%) had signs that were illegible and need replaced. Road numbers and gate status are listed in Table 22.

This indicates that 82% of gates were effective 2020, 93% were effective at excluding all but motorcycles. Engineering staff and other personnel are in the process of repairing these gates as the snow melts and most should be repaired by June 2021

IPNF Recovery Zone Existing Route monitoring:

The IPNF monitored a total of 49 closures in the CYE and 77 closures in the SE. All gates that access drivable road segments were monitored – usually multiple times during the summer. Most barriers within recovery zones are not monitored because the roads they access are not currently drivable (even by ATVs) and have not been for a number of years. The IPNF detected 4 closure breaches in the CYE involving 3 different routes (two of the breaches involved multiple gates on the same route). One breach is a repeated issue on a recently stored road (FSR 2225) in the Keno BMU that is scheduled to be repaired (again) in 2021. A second road breach, involving two gates, was partially fixed but will require more work (with equipment) in 2021. The last involved a party traveling behind a gate left open by contractors on private land, becoming locked in, and subsequently destroying the gate. The gate was repaired and locks replaced later the same week.

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

24

2-ER-340

FWS001008

In the SE, 3 potential breaches were detected. Two were repaired soon after discovery, and the third is a gate that primarily serves private land, although NFS lands can also be accessed (this breach was not rectified in 2020). There are also 2 gates that have been destroyed in the past (one in Myrtle BMU, one in Long-Smith BMU) that exclusively access private lands. Each of these road systems is being modeled as open for reporting purposes (since the IPNF does not control access/use of these roads) until the closure can be repaired.  See Appendix B for details.

Colville Recovery Zone Existing Route monitoring:  See APPENDIX A


## Recovery Zone Unauthorized Motorized Access Monitoring

In addition to the 30 percent monitoring in BMU's, in relation to reasonable and prudent measure #1 for the IPNF LRMP BO (FWS 2020) and the KNF LRMP BO (FWS 2020) within the Recovery Zones, the reporting requirements for the RZs require that annually a list shall be provided of any gates, barriers, or other closure devices that were found to be ineffective at managing wheeled motorized access, any unauthorized creation of additional (motorized) routes that were discovered within the BMUs and the IPNF and the KNF's response to remedy the situation

Prior to bear year 2020 (Bear Year 2010 through 2019) temporary short-term unauthorized motorized access and any user-created routes were included within the analysis for current bear year metrics and included within the discussions for temporary reasons for change within the BMU's.

APPENDIX B, For the Cabinet -Yaak Recovery Zone, Table 24 and Table 25 summarize the IPNF CYE current Bear Year documented unauthorized motorized use on existing routes and user created routes, *Table 26* list those routes within the Lolo National Forest CYE BMU 22.  For the Selkirk Recovery Zone Table 27 and Table 28 the IPNF lists unauthorized motorized use on existing and user created routes respectively.  The Kootenai National Forest list of unauthorized motorized use on existing system routes and user created routes documented during BY20 within the recovery zone are attached in a separate pdf of an excel spreadsheet at the end of Appendix B.


# Bears Outside Recovery Zones (BORZ)

There are seven discrete areas of recurring grizzly bear use within proximity to the Selkirk and Cabinet-Yaak Recovery Zones (Allen 2011).  These areas are referred to as Bears Outside Recovery Zones (BORZ). According to the forest plan amendments signed in November of 2011, the forests are required to ensure "no permanent increases in the total linear miles of "open roads" and "total roads" above baseline conditions on National Forest System lands in any individual BORZ area, except in cases where the Forest Service lacks discretion to prevent road building across National Forest System lands due to legal or other obligations (USDA Forest Service 2011; USDI Fish and Wildlife Service 2011).  Any potential increases in linear miles of open or total roads must be compensated for with in-kind reductions concurrently or prior to such increases (ibid). As previously described the Idaho Panhandle and Kootenai National Forests reinitiated consultation on their Forest Plans in 2020, with the USFWS issuing separate BOs for the IPNF (IPNF LRMP BO, FWS 2020) and KNF (KNF LMP BO, FWS 2020). As of BY 2020, relative to this monitoring report, we have removed inclusion of temporary unauthorized motorized access in the bear year metric calculations (while retaining long-term unauthorized user created routes

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING
FINAL SUMMARY REPORT (07/20/2021)
25

FWS001009

2-ER-341

documented in the new BORZ baselines established in the BY19 report), established new updated baselines for BORZ areas (with differences in the routes considered between the forests), and incorporated the metric of secure habitat calculation within the BORZ to more adequately represent the potential effects related to motorized access.

The IPNF BO established the 2019 baseline condition will be the basis for evaluation any new projects in BORZ under the LRMP (Final IPNF LRMP BO, FWS 2020 page 49). The KNF LMP BO, FWS 2020, pg 112 specified the 2019 baseline conditions for BORZ may be *corrected* as described in this biological opinion without exceedance of incidental take (Baseline conditions from KNF LMP BO, Table 10).

## BORZ Metric Summary Tables

### Route layer assumptions

The route layer assumptions for the current bear year and post bear year KNF and IPNF BORZ are displayed in Table A-1. The summary of current BY20 BORZ metrics along with the Post BY20 metrics are displayed below for the IPNF and KNF BORZ in Table 11 and Table 12.

*Table 11. Baseline conditions of motorized access in Bears Outside Recovery Zone (BORZ) on the IPNF (IPNF LRMP BO, FWS 2020, Table 10, as clarified below) and on the KNF (KNF LMP BO, FWS 2020, Table 10, clarified) as updated for BY20, and displayed with BY20 and Post BY 2020 Motorized Access.*

| Bears Outside Recovery Zone | Recovery Zone | Total Size (Acres) | National Forest System Lands | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Total Area[1] (acres) | Total Routes (linear miles) | | | Open Routes (linear miles) | | |
| | | | | Baseline[2] | BY20 | Post BY20 | Baseline[2] | BY20 | Post BY20 |
| Priest Lake | Selkirk | 80,733 | 75,793 | 340.0 | 340.0 | 340.0 | 337.4 | 337.4 | 337.4 |
| Pack River[3] | Selkirk | 44,587[3] | 38,700[3] | 63.7 | 63.7 | 63.7 | 58.0 | 58.0 | 58.0 |
| Mission-Moyie[4] | Cabinet-Yaak | 107,517 | 90,806 | 367.7 | 374.1 | 364.1 | 335.3 | 335.3 | 333.5 |
| Cabinet Face | Cabinet-Yaak | 28,052 | 27,083 | 165.0 | 163.2 | 162.1 | 133.6 | 131.8 | 131.8 |
| Clark Fork[5] | Cabinet-Yaak | 101,899 | 100,209 | 267.3 | 256.3 | 256.3 | 185.8 | 184.4 | 183.8 |
| Tobacco[6] | Cabinet-Yaak | 287,240 | 266,992 | 1,170.3 | 1,159.8 | 1,159.6 | 914.0 | 905.3 | 905.1 |
| West Kootenai[5,6,7,8] | Cabinet-Yaak | 217,595 | 200,555 | 789.9 | 775.7 | 774.7 | 456.7 | 432.6 | 432.6 |

[1] Total Size: includes all ownerships within the boundary perimeter. BORZ management applies only to NFS land.

[2] Baselines established in IPNF and KNF 2020 BO's corrected, as adjusted and updated in this BY20 report.

[3] Total acres and Total NFS acres for the Pack River are updated here as the acreages displayed in Table 10 of the 2020 IPNF BO (FWS 2020) were incorrect.

[4] For the IPNF, 4.4 miles of railroad tracks documented in BY19 within the Mission-Moyie were removed from the total and open routes per the IPNF LMP BO (FWS 2020) as railroads were not included in the motorized access conditions of the AA, and are not under jurisdiction of the IPNF.

[5] For the KNF, per the KNF LMP BO (FWS 2020) railroad tracks documented in BY19 were not part of the proposed action, although they were included in Table 10 of the BO. The clarified baselines, without including railroad tracks, are shown above. Railroad tracks are considered as part of the existing conditions and there an additional 1.7 miles in the Clark Fork BORZ, 22.4 miles in the Tobacco BORZ and 0.8 miles in the West Kootenai BORZ.

[6] Includes the Bobtail, Lower Pipe, and Cedar Cr-Kootenai River Recurring Use areas (RUAs).

[7] For the KNF, per the BY19 monitoring report (USDA FS 2020b), there was a reported 10.2 miles of long-term user created routes (1.1 miles in Lower Pipe and 9.1 in Cedar-Cr-Kootenai River). Due to better information on one of the routes in Lower Pipe and in Cedar-Cr Kootenai River this has been adjusted to a total of 10.7 miles. See detailed paragraph.

[8] The BY20 and PostBY20 route layers had a segment of the year-round open portion of Kootenai River Road erroneously coded as gated IGBC 2, so the miles were not attributed to open linear miles. To accurately reflect the open linear miles, the 0.19 miles of this open segment were added to the open miles calculated by the route layer (432.4 + 0.19 miles = 432.6 miles, rounded).

*Table 12. Conditions of secure habitat in Bears Outside Recovery Zone (BORZ) on the IPNF (IPNF LRMP BO, FWS 2020, Table 10) and on the KNF (KNF LMP BO, FWS 2020, Table 10) displayed with BY20 and Post BY20 Secure Habitat conditions.*

| Bears Outside Recovery Zone | Recovery Zone | Total Size (Acres) | National Forest System Lands | | | |
|---|---|---|---|---|---|---|
| | | | Total Area (acres) | Secure Habitat 2019 BO (acres/percent) | Secure Habitat BY20 (acres/percent) | Secure Habitat Post BY20 (acres/percent) |
| Priest Lake[1] | Selkirk | 80,733 | 75,793 | 11,630/15.3 | 11,630/15.3 | 11,630/15.3 |
| Pack River[2] | Selkirk | 44,587 | 38,700[2] | 13,546/35.0 | 13,546/35.0 | 13,546/35.0 |
| Mission-Moyie | Cabinet-Yaak | 107,517 | 90,806 | 12,370/13.6 | 12,370/13.6 | 12,309/13.6 |
| Cabinet Face | Cabinet-Yaak | 28,052 | 27,083 | 889/3 | 888/3 | 991/4 |
| Clark Fork | Cabinet-Yaak | 101,899 | 100,209 | 33,330/33 | 33,293/33 | 33,293/33 |
| Tobacco | Cabinet-Yaak | 287,240 | 266,992 | 34,338/13 | 34,341/13 | 34,341/13 |
| West Kootenai | Cabinet-Yaak | 217,595 | 200,555 | 41,419/21 | 41,289/21 | 41,377/21 |

[1] Acres for the Priest Lake secure habitat are updated to correspond to Table 10 of the 2020 IPNF BO (FWS 2020, corrected October).

[2] Acres for the Pack River are updated here as the acreages displayed in Table 10 of the 2020 IPNF BO (FWS 2020, October) were incorrect.

## New BORZ and BORZ expansions/reductions beginning BY20

This section clarifies and describes any expansions made to BORZ areas beginning BY20 due to the following:

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

27

FWS001011

1. Expansion in acres and routes due to grizzly bear recurring use
2. Expansion or Reduction in acres or routes due to land exchanges
3. Increase in routes due to ANILCA access

The Biological Assessment for the Consultation on the Idaho Panhandle NF LRMP for grizzly bears (IPNF 2020 and the BA for the Consultation on the Kootenai NF LRMP for grizzly bear (KNF 2020) and the IPNF LRMP BO (FWS 2020) and on the KNF LMP BO (FWS 2020) documented all BORZ expansions and updates to baseline acres and total and open linear miles of routes due to grizzly bear recurring use, expansion or reduction in acres or routes due to land exchanges, and any increases in routes due to ANILCA access, that occurred from 2011 through 2019.

Review of the available BORZ data on the IPNF and KNF with the USFWS, Wayne Kasworm CYE Program Grizzly Bear Biologist occurred on March 18, 2021.  Based on review of the available data no additional HUCS met the recurring use criteria (as defined by Allen 2011, Appendix A).

In addition, on both the Idaho Panhandle and the Kootenai NF there were no changes to BORZ due to land exchanges or ANILCA access.

*Table 13. Summary of BORZ[1] expansions for NFS lands beginning in bear Year 2020*

| New BORZ or RUA or Land Ex | Recovery Zone | Forest | Existing Associated BORZ | Total NFS Acres +/- | Bear Year +/- | Condition when included as BORZ/RUA[2] | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Total Route Miles | Open Route Miles | Secure Habitat (acres) |
| | | | | | | | | |
| No expansions or land exchanges in BY2020 | | | | | | | | |

[1]Any future BORZ expansions based on the combined boundaries established in the IPNF LRMP BO (FWS 2020) and the KNF LRMP BO (FWS 2020).

[2] Motorized route miles for new BORZ that are associated with existing BORZ will be added to the "Updated Baseline" motorized route miles column in the BORZ Baseline Table for the Bear Year they are added, and in the "Baseline" road miles thereafter. Open and Total miles for new BORZ that are not associated with existing BORZ will be added to the BORZ Baseline Table and the "Baseline" road miles column.

## Current conditions in BORZ motorized Status

The current bear year conditions are displayed in Table 11.

BORZ baseline adjustments to total and open linear miles of routes from 2011 through 2020 were summarized in the IPNF and KNF 2020 Forest Plan reinitiation BA's and the 2020 IPNF and KNF LRMP BO's (FWS 2020 respectively), with the 2020 BO's establishing the 2019 baseline. Baseline conditions of motorized access in BORZ, as established on the IPNF (IPNF LRMP BO, FWS 2020, Table 10), and on the KNF (KNF LMP BO, Table 10, clarified in this BY20 report) displayed with the bear year 2020 motorized and secure habitat conditions.  The following Table 14 provides the background detail for the current bear year linear miles of routes for the Kootenai NF, while Table 15 and Table 16 provide the background detail for the current bear year linear miles of routes for the Idaho Panhandle NF.

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING
FINAL SUMMARY REPORT (07/20/2021)
28

2-ER-344

FWS001012

*Table 14. BORZ Baseline, Current condition and temporary project impacts, and Post BY conditions expressed in linear miles of motorized routes on KNF lands*

| BORZ | 2020 BO 2019 Baseline[1] (Miles) | | BY20 Baseline Updates or changes[4,5,6] | | BY20 Updated Baseline[7] | | Prior Year's Condition[8] | | BY20 Project Level Temporary Routes[9] | | Condition for BY20 (all Authorized Activities)[10] | | BY20 Permanent Changes[11] | | POST BY20[12] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Open | Total | Open | Total | Open | Total | Open | Total | Open | Total | Open | Total | Open | Total | Open |
| Cabinet Face | 165.0 | 133.6 | | | 165.0 | 133.6 | | | 0.4 | 0.4 | 163.2 | 131.8 | -1.1 | 0.0 | 162.1 | 131.8 |
| Clark Fork[3] | 265.7 | 184.7 | +1.6 | +1.1 | 267.3 | 185.8 | | | +2.27 | +1.7 | 256.3 | 184.4 | | -0.6 | 256.3 | 183.8 |
| Tobacco[3] | 1,170.3 | 914.0 | | | 1,170.3 | 914.0 | | | | | 1,159.8 | 905.3 | | | 1,159.6 | 905.1 |
| West Kootenai[3] | 789.3 | 456.1 | +0.6 | +0.6 | 789.9 | 456.7 | | | +7.03 | | 775.7 | 432.6 | -1.0 | | 774.7 | 432.6 |

[1] Previous Bear Years updated baseline (For BY20, see KNF BO for KNF BORZ, as clarified for railroad tracks.

[3] Per the KNF LMP BO (FWS 2020) railroad tracks documented in BY19 were not part of the proposed action but were included in in Table 10. The clarified baselines without including railroad tracks are shown above. Railroad tracks are part of the existing condition with an additional 1.7 miles in the Clark Fork BORZ, 22.4 miles in the Tobacco BORZ and 0.8 miles in the West Kootenai BORZ in the total and open linear miles.

[4] Changes due to correction to status of motorized routes that were determined to have existed on the ground at the time of the 2011 Access Amendments were signed (ie documentation of pre-existing motorized routes, corrections to IGBC coding, no on-the-ground changes).

[5] Linear mileage changes due to BORZ redelineation (expansion or land exchange (expansion or decrease).

[6] Linear miles change due to non-discretionary actions (road construction for ANILCA access, etc).

[7] Current bear years adjusted baseline due to corrections or updates to previous year's baseline.

[8] Prior Years Post BY results. Beginning BY21, this will be the Previous BY Post results (ie in BY21, the Post BY20 numbers will be displayed, in BY22, the PostBY21 numbers will be displayed and so on)

[9] Current BY temporary project routes: no public use (total mi.), and public use (open mi.), utilizing Design Element II, A.1

[10] Current BY authorized activities (temporary and all active discretionary forest activities) with updated baseline (Table 11)

[11] Current BY permanent changes resulting from NFS discretionary Forest activities, ie road construction, decommissioning/storage, or restrictions (gates)

[12] Post BY20 includes BY20 authorized activities that were completed, ongoing projects are considered on the KNF while on the IPNF they are not

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

29

2-ER-345

FWS001013

*Table 15. BORZ Baseline, as adjusted, in linear miles of motorized routes on Idaho Panhandle NF lands*

| BORZ | 2020 BO 2019 Baseline (Miles) | | BY20 Baseline Updates or changes 3, 4, 5 | | BY20 Updated Baseline[6] | |
|---|---|---|---|---|---|---|
| | Total | Open | Total | Open | Total | Open |
| Priest Lake | 340.0 | 337.4 | 0 | 0 | 340.0 | 337.4 |
| Pack River | 63.7 | 58.0 | 0 | 0 | 63.7 | 58.0 |
| Mission Moyie | 367.7 | 335.3 | 0 | 0 | 367.7 | 335.3 |

[1] Previous Bear Years updated baseline (For BY20, see IPNF BO for IPNF BORZ, as clarified for railroad tracks).

[2] An additional 4.4 miles of railroad tracks exist within the Mission-Moyie BORZ. These were not considered part of the proposed action in the IPNF LRMP BO (FWS 2020) and are not under the jurisdiction of the FS but are considered part of the existing condition.

[3] Changes due to correction to status of motorized routes that were determined to have existed on the ground at the time of the 2011 Access Amendments were signed (ie documentation of pre-existing motorized routes, corrections to IGBC coding, no on-the-ground changes.

[4] Linear mileage changes due to BORZ redelineation (expansion or land exchange (expansion or decrease).

[5] Linear miles change due to non-discretionary actions (road construction for ANILCA access, FS re-routes for safety etc).

[6] Current bear year adjusted baseline due to corrections or updates to previous year's baseline.

*Table 16. Idaho Panhandle NF BORZ 2020 condition, temporary project impacts, permanent changes, and Post BY conditions expressed in linear miles of motorized routes*

| BORZ | BY20 Updated Baseline[1] | | BY20 condition (excluding temporary routes) | | BY20 Project Level Temporary Routes [2] | | Condition for BY20 (all Authorized Activities [3] | | BY20 Permanent Changes [4] | | POST BY20[5] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Open | Total | Open | Total | Open | Total | Open | Total | Open | Total | Open |
| Priest Lake | 340.0 | 337.4 | 340.0 | 337.4 | 0.0 | 0.0 | 340.0 | 337.4 | 0.0 | 0.0 | 340.0 | 337.4 |
| Pack River | 63.7 | 58.0 | 63.7 | 58.0 | 0.0 | 0.0 | 63.7 | 58.0 | 0.0 | 0.0 | 63.7 | 58.0 |
| Mission Moyie | 367.7 | 335.3 | 367.7 | 335.3 | 6.4 | 0.0 | 374.1 | 335.3 | -3.6 | -1.8 | 364.1 | 333.5 |

[1] Current bear year adjusted baseline due to corrections or updates to previous year's baseline.

[2] Current BY temporary project routes: no public use (total mi.), and public use (open mi.), utilizing Design Element II, A.1

[3] Current BY authorized activities (temporary and all active discretionary forest activities) with updated baseline

[4] Current BY permanent changes resulting from NFS discretionary Forest activities, ie road construction, decommissioning/storage, or restrictions (gates)

[5] Post Bear Year 2020 are all 2020 authorized activities completed and implemented, ongoing projects are considered

2-ER-346

FWS001014

## BORZ Secure Habitat

### Introduction

The IPNF LMP BO (FWS 2020) and the KNF LMP BO (2020) established secure habitat (the baseline condition based on existing total routes as of 2019) at the time of BORZ delineation as the **third surrogate** measure of incidental take of grizzly bears related to motorized access. Should the IPNF or the KNF permanently reduce secure habitat in a BORZ resulting in a lower quantity of secure habitat reported as the 2019 baseline condition, the amount of incidental take will be exceeded unless that reduction in secure habitat is the result of a no net increase exemption. Minor changes in linear miles of motorized routes, and potential decreases in secure habitat below the baseline condition, may occur in BORZ, related to exceptions to the "no net increase" standard and for short route relocations done for safety purposes. We expect these losses may occur as the result of IPNF or the KNF obligations to provide access on NFS lands to private lands, and/or short movements of road segments or gates/closure devices to improve access management effectiveness and safety. The FWS assumed actions will result in no more than a 2 percent net decrease in secure habitat within each BORZ. Therefore, the FWS used a 2 percent decrease in secure habitat in each BORZ, due to exceptions to the "no net increase" standard, as the **fourth surrogate** measure of incidental take. If an IPNF or KNF action permanently reduces the amount of secure habitat by more than 2 percent of the reported baseline condition, or if the purposes for the decrease are other than those associated with exceptions to the "no net increase" standard or route relocation for safety purposes or to improve effectiveness, the level of incidental take anticipated here would be exceeded and reinitiation of consultation would be required.

### Secure Habitat Metrics

The current BORZ secure habitat python model (developed after the forests provided the 2019 baseline calculations for the 2020 BO's) creates a BORZ secure habitat polygon layer through a series of buffer processes based on total motorized routes, ownership, and BORZ outer boundaries. Currently total routes considered in this model are IGBC 2 (gated, yearlong or seasonally), IGBC 4 (open routes), IGBC 5 (open motorized trails), and an identifier of "10" for railroad tracks. The automated model resulted in slight rounding differences attributed to GIS processes.

Although railroad tracks were not part of the proposed action considered in the IPNF or KNF BOs, railroad tracks are considered part of the existing condition, and depending upon their location, may affect secure habitat, and thus are considered for secure habitat calculations. Please also note, that unlike core within the recovery zone, IGBC 8 - High intensity non-motorized trails are not considered in the route layer used in the model for BORZ secure habitat. Secure habitat is calculated two ways using the current bear year route layer and a Post bear year route layer. Table 17 displays the 2019 baseline, temporary project level changes, and any permanent project-level changes to secure habitat on the Kootenai NF. Table 18 and Table 19 display the Idaho Panhandle NF BORZ baseline security and BORZ 2020 security

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)
31

2-ER-347

FWS001015

*Table 17. BORZ Secure Habitat Current Bear Year 2020*

| | | | | Bear Year 2020 Secure Habitat | | | | | | POST Bear Year 2020 Secure Habitat | | |
| | | | | "Permanent" Changes (result in on-the-ground changes) | | | | Temporary Changes | | "Permanent" Changes | | |
| BORZ | BORZ Total NFS Acres | 2020 BO 2019 Baseline (Acres)[1] | 2021 Python Model | BY20 Database Updates or BORZ (Acres)[3,4] | BY20 Project Level (Acres)[5] | BY20 Anilca or route relocation (Acres)[6] | BY20 Updated Baseline (Acres)[7] | BY20 Project Level Changes (Acres +/-)[8] | BY20 Condition | PostBY20 Project Level Change (Acres)[5] | Post BY20 Condition (Acres) | POST BY20 Baseline |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cabinet Face | 27,083 | 889 | -1 | 0 | 0 | 0 | 888 | 0 | 888 | 0 | 888 | 888 |
| Clark Fork | 100,209 | 33,330 | +5 | -37[3] | 0 | 0 | 33,293 | 0 | 33,293 | 0 | 33,293 | 33,293 |
| Tobacco | 266,992 | 34,338 | +4 | 0 | 0 | 0 | 33,341 | 0 | 33,341 | 0 | 33,341 | 33,341 |
| West Kootenai | 200,555 | 41,419 | 0 | 0 | 0 | 0 | 41,419 | -130 | 41,289 | +88 | 41,377 | 41,419 |

[1] The 2019 Baseline secure habitat was established in the IPNF LMP BO and KNF LMP BO (FWS 2020). A python model script was developed after the calculationss for the 2020 BOs. This automated model results in slightly different acreages due to rounding.

[2] IPNF 2% exempted loss from IPNF LMP BO (FWS 2020) Table 14. KNF 2% exempted loss was calculated for this report as it was not provided in the KNF LMP BO (FWS 2020).

[3] Permanent changes due to correction to status of motorized routes determined to have existed on the ground at the time of the 2011 Access Amendments were signed (ie documentation of pre-existing motorized routes, corrections to IGBC coding, no on-the-ground changes, or for routes relocated due to safety in bear year 2019 prior to the establishment of secure habitat

[4] Permanent changes due to BORZ re-delineation (expansion or land exchange (expansion or decrease).

[5] Permanent changes due to Forest Service project level changes "Permanent" project level changes are defined as activities that result in on-the-ground changes

[6] Permanent changes in secure habitat due to non-discretionary actions (road construction for ANILCA access, etc).

[6] Project Level-changes against the updated BY20 baseline expressed in acres and percent

[7] "Permanent" project level changes are defined as activities that result in on-the-ground changes.

[8] Temporary project level changes.

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

32

2-ER-348

FWS001016

Table 18. Idaho Panhandle NF BORZ baseline security, as adjusted

| BORZ | BORZ Total NFS Acres | 2020 BO Secure Habitat 2019 Baseline (Acres)[1] | BY20 Database Updates or BORZ Change (Acres)[2,3,4] | BY20 Anilca Change (Acres)[4] | **BY20 Updated Baseline (Acres)** |
|---|---|---|---|---|---|
| Priest Lake | 75,793 | 11,630 | 0 | 0 | 11,630 |
| Pack River | 38,700 | 13,546 | 0 | 0 | 13,546 |
| Mission Moyie | 90,633 | 12,370 | -61 | 0 | 12,309 |

[1] Previous Bear Years updated baseline

[2] Permanent changes in secure habitat due to correction to status of motorized routes determined to have existed on the ground at the time of the 2011 Access Amendments were signed (ie documentation of pre-existing motorized routes, corrections to IGBC coding, no on-the-ground changes.

[3] Permanent changes in secure habitat due to BORZ re-delineation (expansion or land exchange (expansion or decrease)).

[4] Permanent changes in secure habitat due to non-discretionary actions (road construction for ANILCA access, etc) or short reroute/relocation of closure.

*Table 19.  Idaho Panhandle NF BORZ 2020 Secure Habitat 2020 condition, temporary project impacts, permanent changes, and Post BY conditions*

| BORZ | BY20 Updated Baseline (Acres)[1] | **BY20 Security (excluding temporary routes)** | BY20 Project Level temp Changes (Acres +/-)[2] | BY20 temp security[3] | Project level perm changes[4] | Post BY20 Condition (Acres)[5] |
|---|---|---|---|---|---|---|
| Priest Lake | 11,630 | 11,630 | 0 | 11,630 | 0 | 11,630 |
| Pack River | 13,546 | 13,546 | 0 | 13,546 | 0 | 13,546 |
| Mission Moyie | 12,309 | 12,309 | -560 | 11,749 | +70 | 12,379 |

[1] Current bear year adjusted baseline due to corrections or updates to previous year's baseline.

[2] Current BY secure habitat affected by temporary project routes (no public use)

[3] Current BY secure habitat from authorized activities (temporary and all active discretionary forest activities) with updated condition

[4] Current BY permanent changes to secure habitat resulting from NFS discretionary Forest activities, ie road construction, decommissioning/storage, or restrictions (gates)

[5] Post Bear Year 2020 are all 2020 authorized activities completed and implemented, ongoing projects are considered

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

33

FWS001017

## Permanent Reductions in BORZ secure habitat

As of bear year 2020, there have been no permanent reductions in BORZ secure habitat due to ANILCA on either the Kootenai or Idaho Panhandle NF.

*Table 20. Permanent reduction in Secure habitat due to factors outside FS discretion (ANILCA)*

| BORZ | Secure Habitat[1] 2019 Baseline (2020 BOs) (Acres) | Exempted Loss of Secure Habitat Allowed (2%) | Year Exemption Taken | Location | Change in Secure habitat acres eligible for exemption | Total acres & percent of exemptions |
|---|---|---|---|---|---|---|
| *Single entry every time exemption is used. Rows only get added, ( total to date)* | *Secure habitat adjusted to incorporate ANILCA* | *Acres may change as database corrections occur, but generally stays constant* | | *Rough description of location of loss (drainage/road/legal or other)* | *Acres secure habitat removed from this year (or multiple entries each occurrence)* | *Total to date of exempted acres (& %) for that BORZ. Added to each occurrence* |
| none | | | | | | |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)
34

FWS001018
2-ER-350

## BORZ Metric Reasons for Change

The following table provides the reasons for change for BY20 and the PostBY20 for the Kootenai and Idaho Panhandle NF.

*Table 21 . Management actions that resulted in changes to BORZ Total linear Miles, Open Linear Miles or Secure Habitat*

| BORZ | BORZ Current Bear Year 2020 | BORZ Post Bear Year 2020 |
|---|---|---|
| | *Describe database corrections, authorized temporary activities resulting in on-the-ground changes to motorized access and on-going authorized activities* | *Briefly describe what BY20 authorized activities are now shown as completed (these are described as implemented under BY20 and shown as completed in Post BY20, or any on-going activities that are still considered.* |
| Priest Lake | none | none |
| Pack River | ***Database correction:*** Total BORZ area and area of NFS lands are incorrect in the Forest Plan BO and are corrected here. Change in NFS acres also changes percent of secure habitat (secure habitat acres do not change). | none |
| Mission-Moyie | ***Database correction:*** During batched consultation on ongoing IPNF activities, a mapping error was discovered that reduced secure habitat by 61 acres (12,370 to 12,309). No change in linear road miles resulting from this error.<br><br>***On-going activities:***<br><br>Hellroaring – 0.9 miles of previously bermed portion of FSR 2484 remains open and drivable (to be stored) pending final fuels reduction activities (all logging completed); temp increase of 0.9 total route miles, temp loss of 186 acres of secure habitat.<br><br>Deer Creek – 0.7 miles of road (2522B) and 0.3 miles of road (2541F) reconstructed for Deer Placer TS (both previously non-system roads, added to sytem, used for Project, and to be stored post-Project). Temporary increase of 1.0 total motorized route miles; temporary loss of 27 secure habitat acres. Approximately 0.3 miles temp road still on landscape for Deer Stew TS; temp increase of 0.3 total route miles, no secure habitat affected.<br><br>Camp Robin – Temporary roads T7, T10, T12, T24 and T25 constructed and used in 2020 (also most of T9 remains from a | ***Completed activities:***<br><br>Hellroaring - Road storage was completed on restricted FSR 2266A (1.8 miles) and open FSR 1374A (1.8 miles). This will permanently decrease open motorized route miles in the BORZ by 1.8 miles in 2021, and total motorized route miles by 3.6 miles. Permanent secure habitat will increase by approximately 55 acres from storage of 2266A (no change from 1374A storage due to location in relation to other roads).<br><br>Camp Robin - T12 and T25 were closed in 2020, providing a 0.8 mile total road reduction in 2021. User-created route 2494UD was also closed, permanently increasing secure habitat by 15 acres for 2021. |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

35

2-ER-351

FWS001019

| BORZ | BORZ Current Bear Year 2020 | BORZ Post Bear Year 2020 |
|---|---|---|
| | previous project), totaling 4.2 miles of total road increase. Approximately 347 acres of secure habitat temporary loss. | |
| Cabinet Face | *On-going activities*:  The FRTA authorized construction of 0.4 miles of route on FR 4400C that was required to be gated and bermed following activity, remains on the ground. During BY19 as reported, and during BY20 the gate was found to be missing, although it was subject to the seasonal restriction on the 4400C.  The BY19 report stated the district would determine in 2020 when the 0.4 miles would be barriered per the FRTA in 2020. The work was not completed in BY20<br>The Miller West Fisher Timber sale barriered 1.2 miles of the end of gated route 808E. | *Completed activities:* Completion of the barrier on 808E resulted in increase of 103 acres of secure habitat, and a decrease of 1.2 mi in total linear miles of routes.<br><br>*Ongoing activities:* The 0.4 miles of the 4400C that is to be barriered following work on the corporate timberland, remains on the ground and contributes to both total and linear miles of routes until the district determines when the corporate owner will barrier the segment as required under the FRTA. |
| Clark Fork | *Database corrections*: As mentioned in the BY19 report the 332A-IPNF (1 mi) was determined to be an IPNF route and has always been managed as open, not impassible like the KNF had it coded. The route is used for mining claim access and was not a change on the ground.  This database correction was not reflected in the PostBY19 route layer utilized to calculate secure habitat for the FP 2020 BO.  This correction was reflected in the BY20 route layer and thus resulted in a decrease of 12 acres of secure habitat that was mapped for the 2020 BO based on the incorrect route layer, and increased total and open linear miles for the Clark Fork BORZ.<br><br>The reroute of 2273 was analyzed in the Elk Rice NEPA and BA and completed on the ground during bear year 2019, but the information did not make it into the BY19 report nor into the PostBY19 route layer which was used to provide the calculations for the FP 2020 BO. This reroute was required due to a washout and human safety. In terms of the BO secure habitat, it increased 6 acres in one block and decreases 19. acres in other block, however this reroute was in place on the ground | PostBY20 total linear miles decreases by 1.0 miles.<br><br>*Completed activities*: The segment of FR 1913 (0.6 mi) located on NFS land was gated as Stimson harvest and use of the #1913 located on Stimson land was completed.<br><br>*Project Activities on hold due to court decisions:*  As described under the current bear year activities, the gated segment of NFSR #2214H continues to contribute to total linear miles.<br><br>*Ongoing activities:*  The FR 1910 Pew Ridge (0.4 mi) used by Stimson for harvest remained open in PostBY20 contributing to open linear miles and is expected to be gated in 2021. In addition the temporary increase in total and open linear miles due to the NFSR #1944 (0.8 mi) and 2229N (0.7 mi) Avista permitted roads being opened to the public continues. |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

36

FWS001020

| BORZ | BORZ Current Bear Year 2020 | BORZ Post Bear Year 2020 |
|------|------------------------------|---------------------------|
|      | prior to the BO calculations, and resulted in an overall increase of about 0.1 miles | |
|      | The 2219A Beecher Peak A was a database correction due to the route was walked and the length verified (updated from 0.7 mi to 0.9 mi), for an overall increase of 0.2 miles. No change occurred on the ground, only a mapping update. This was not in the PostBY19 route layer used to calculate secure habitat for the FP 2020 BO. Based on the more accurate 2020 route layer a secure habitat block goes from 31 to 13 acres compared to PostBY19 BO estimate. | |
|      | Total permanent decrease in secure habitat with GIS processing due to all the 2020 route layer reflected database corrections, was 37 acres compared to the Post BY19 numbers generated for the 2020 BO. Since the KNF 2020 BO calculations, the more accurate python model results in 5 acre increase difference due to rounding. | |
|      | Route 2295K Beaver Peak K (0.3 mi), covered under a Special Use permit originally issued in 1992, was coded as IGBC 3 in the baseline, but corrected to gated IGBC 2 as SUP has permission to access the road. This was not a change on the ground. | |
|      | *Project Activities on hold due to court decisions*: A previously barriered portion of NFSR #2214H (0.8 miles) temporarily changed from barriered (IGBC 3) to gated (IGBC 2) under the Pilgrim Project prior to the Pilgrim 11 district court opinion remain gated until the district court decisions are addressed. As the court opinion remanded the original project decision, the KNF is required to reissue a new EIS and consult with FWS in order to complete the Pilgrim project. This gated segment of NFSR #2214H will continue to contribute to total linear miles until that analysis is completed. The | |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

37

2-ER-353

FWS001021

| BORZ | BORZ Current Bear Year 2020 | BORZ Post Bear Year 2020 |
|------|------|------|
|  | segment will be re-barriered once project work is completed.<br><br>***Ongoing project activities***: The 1910 Pew Ridge (0.4 mi) and 1913 Elk Ridge (0.6 mi) located on NFS land were open in BY20 due to Stimson logging on their private section,<br><br>Additional temporary increase in total linear and open miles continues with the NFSR #1944 Burr Knob (0.8 mi) and 2229N (0.7 mi) Avista permitted roads. The 2229N used to be bermed, Avista only gated one end, routes still showing as open. No projected timeline on when Avista will gate. |  |
| Tobacco | ***Database corrections***: The NFSR 7212A Ferry A (0.6 miles) has always been an open road. The IGBC code was incorrectly shown in NRM as gated IGBC 2. In BY20, this route was updated to open. This was not a change on the ground and is a permanent change to the open linear baseline.<br><br>***Database Updates***: The routes 15409A (0.1 miles) and 688A (0.1 miles) were part of the Frank Lake Land Exchange and were undetermined roads. These routes were open in the baseline when the land was added to the BORZ and were considered open in BY20 when they were bermed.<br><br>The 3 acres change in the Tobacco secure habitat acreage is due to rounding differences in the new python model. | ***Completed projects***: the BY20 change of 15409A (0.1 mi) and 688A (0.1 mi) from open to barriered contributed to decrease in the Post BY20 open and total linear miles |
| West Kootenai | ***Database Corrections***: Linear miles: In the BY19 monitoring report within the combined West Kootenai BORZ there were a total of 10.2 miles of long-term unauthorized user created motorized routes that were documented in the two recurring use areas added to the BORZ. Within the Lower Pipe RUA there were 1.1 miles with 0.1 mile of the routes later identified as a gated route built by a timber company corporate owner across | ***Completed projects***: During BY20 the West Pipe sale completed work on the 4613G (1.1 miles) and rebarriered the route, thus in PostBY 20 the 88 acres of secure habitat was restored<br><br>***Ongoing projects***: contributing to total linear miles the following impassable or barriered routes were gated for the following projects and remain in use: the West Pipe sale continued to use 4613H (0.83 miles), and the Pipe Bull project continues to use |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)
38

2-ER-354

FWS001022

| BORZ | BORZ Current Bear Year 2020 | BORZ Post Bear Year 2020 |
|---|---|---|
|  | NFS lands to access their private section for timber harvest (0.1 miles). In BY20, the Forest is removing the 0.1 miles associated with the corporate land from the list of user created unauthorized long-term motorized routes and will instead update the baseline of total routes to include it as a private jurisdiction route  Within the Cedar Creek-Kootenai River RUA in BY19 there were 9.1 miles of long-term unauthorized user created motorized routes identified when there should have been 9.7 miles identified in the BY19 report to be consistent with the on-the-ground digitizing documentation. At the time there was an expectation that 0.6 miles would be barriered. Therefore, in BY20 the mileage of long-term user created routes identified in the West Kootenai BORZ that the district will address is adjusted to 10.7 miles, with rounding.  With the incorrect IGBC coding (IGBC 2) on an open segment of Kootenai River Road still remaining in the route layer, the 0.19 miles of this segment was added to the open linear miles of road calculated by the route layer (432.4 miles + 0.19 miles) to arrive at the 432.6 miles displayed in the tables above.<br><br>***Ongoing Projects***: Libby RD:  Several routes previously identified as temporary increases remain on the ground. For Contributing to total linear miles the NFSR #5090 (1.3 mi) remains gated. This previously impassible route was originally opened in 2017 for fire suppression, and then remained opened with log decks on the road, with a temporary wooden barrier gate. The route remained gated in BY19 while the Libby District engineers decided on the drainage work and the work was expected to be completed in 2020 with the berm replaced. This work was not completed in BY20 and the route remains gated. Other Routes considered under the Pipe Bull Sale and | 6144E (0.8 mi), and 6145 (2 mi).  The 5090 (1.3 mi) continues to be gated until the Libby District is able to complete the drainage work and rebarrier the route.<br><br>On the Ksanka RD the NFSR 7168F continues to be used in the Burnt Caribou TS and contribute to temporary increase in total linear miles. The timber sale activity on 7168F is expected to be completed and the route re-barriered in summer of 2021. The 7168F (1 mi) also contributes temporary decrease in approximately 37 acres of secure habitat. The 7168F, as well as the 7164A (0.8 mi) and 7164B (1.8 mi) are scheduled to be bermed in summer of 2021 |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

39

2-ER-355

FWS001023

| BORZ | BORZ Current Bear Year 2020 | BORZ Post Bear Year 2020 |
|------|------------------------------|----------------------------|
| | changed from either IGBC 3 or 1 to IGBC 2 during by20 were NFSR #6144E (0.8 mi), 6145 Lindy Spur (2 mi). <br><br> During BY20 the West Pipe TS harvest continued on the 4613H (IGBC 1 to 2 for activity) (0.8 mi).The 4613G (1.1 mi) which was changed from IGBC 3 to 2 for activity, was completed and the route was actively re-barriered in BY20. <br><br> Ksanka RD: During BY20 the 7168F Marias Mtn F (1 mi) was used for the Burnt Caribou T.S. This was a barriered route changed to gated for the project.  Activity on the 7168F (1.0 mi) for the Burnt Caribou TS continued through BY20.In addition it was noted that the NFSR 7164A (0.8 mi), 7164B 1.8 mi) both barriered spurs off the year round gated 7168F had their guard rail barriers removed for the sale but these are not reflected in the route outputs for the BY as the transportation engineer determined as they were behind a gated route they hadn't been accessed and are scheduled to be bermed in 2021 <br><br> Improved model rounding accounts for approximately 5 acres in secure habitat. T125 acres temporary decrease is due to temporary project activity on the 4613G for the West Pipe and the 7168F in the Caribou fire Salvage. <br><br> As mentioned above in the linear miles discussion, Route 7168F, a previously barriered route was shown as IGBC 2 during BY19, and returned to IGBC 3 in the PostBY19 route layers used to generate the secure habitat for the FP BO 2020. However this route was still being used by the Caribou Sale as part of the ongoing project, so in BY20 it was again shown as IGBC 2 gated status, thus affecting the 52 acre block secure habitat identified in the BO and temporarily decreasing it to 15 acres. This secure habitat is not yet created on the ground as the | |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

40

2-ER-356

FWS001024

| BORZ | BORZ Current Bear Year 2020 | BORZ Post Bear Year 2020 |
|---|---|---|
|  | Caribou project activity on this route was ongoing and was occurring prior to the BO calculations for secure habitat. |  |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

41

2-ER-357

FWS001025

## BORZ Existing Route Closure Device Monitoring

As stated within the IPNF and KNF LRMP BOs (FWS 2020, respectively) the Forests will conduct ad hoc and opportunistic monitoring of access restriction devices within the BORZ in multiple ways, as described in the individual LRMP re-initiation BA's.

During Bear Year 2020, the Kootenai National Forest initiated data collection of route closure devices by all field going personnel across the forest using Collector 1,2,3 and AGOL. Data collected included the type of device (gate, barrier, type of barrier such as rock, earth berm, vegetation), whether it was functional or not or if there was signs of a motorized breach, if a repair was needed, and if a repair was done. This information was collected across the forest, including with the BORZ. Table 22 displays the total number of devices monitored within each KNF BORZ.

*Table 22. Kootenai NF BORZ ad hoc Monitoring of BORZ closure devices on existing NFS Routes*

| BORZ | Recovery Zone | Total Devices Monitored | | | Total Devices Breached | | | Repaired | |
|---|---|---|---|---|---|---|---|---|---|
| | | None | Barrier | Gate | Blank | Barrier | Gate | barrier | gate |
| Cabinet Face | Cabinet-Yaak | 0 | 22 | 31 | 0 | 1 | 1 | 1 | 0 |
| Clark Fork | Cabinet-Yaak | 0 | 116 | 39 | 0 | 5 | 2 | 0 | 1 |
| Tobacco | Cabinet-Yaak | 1 | 452 | 263 | 0 | 36 | 6 | 20 | 4 |
| West Kootenai | Cabinet-Yaak | 1 | 191 | 180 | 0 | 10 | 21 | 5 | 20 |
| **Grand Total** | | **2** | **781** | **513** | **0** | **52** | **30** | **26** | **25** |

[1]Total # of Devices Monitored includes all functional and non-functional devices on existing routes.
[2]Breach detected is # not Functional with unauthorized motorized access and is a subset of the Total # Monitored. Further investigation into the AGOL data indicates the number of total devices breached in this table is an over-estimation as some routes were given a repair date in the AGOL entry form, but the comments indicated there was no unauthorized use. In addition, comments on some routes indicated no restriction device was present, but an earthern berm or barrier was checked as an indication of what was needed. These are specified for repair in 2021 KNF - Barrier includes concrete, earth berm, other, other barrier, rocks, vegetation

Total devices breached is an over estimation as some routes were given a repair date in the AGOL entry form, but the comments indicated there was no unauthorized motorized use. Number of repairs taken from Appendix C.

During bear year 2020, the Idaho Panhandle National Forest monitored the number of devices in the BORZ as displayed in Table 23

Table 23 displays the IPNF ad hoc Monitoring of closure devices within each BORZ.

*Table 23. Idaho Panhandle NF BORZ ad hoc Monitoring of BORZ closure devices*

| BORZ | Recovery Zone | Total Devices Monitored | | Total Devices breached | |
|---|---|---|---|---|---|
| | | Barrier | Gate | Barrier | Gate |
| Priest Lake | Selkirk | 43 | 0 | 6 | 0 |
| Pack River | Selkirk | 11 | 0 | 5 | 0 |
| Mission-Moyie | Cabinet-Yaak | 1 | 0 | 0 | 0 |
| Grand Total | | 55 | 0 | 11 | 0 |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING
FINAL SUMMARY REPORT (07/20/2021)
42

2-ER-358

FWS001026

## BORZ Unauthorized Motorized Access

In addition to the Forests ad hoc and opportunistic monitoring of closure devices in the BORZ, the Reasonable and Prudent Measure #1 for the IPNF LRMP BO (FWS 2020) and the KNF LRMP BO (FWS 2020) reporting requirements require an annual list be provided of any gates, barriers, or other closure devices that were found to be temporary and short-term ineffective at managing wheeled motorized access, any unauthorized creation of additional motorized routes that were discovered within the BORZ and the IPNF and the KNF's response to remedy the situation.

On the KNF, long-term unauthorized motorized use routes documented in BY19 are accounted for in the baselines, BY20 and Post BY20 linear miles included in Table 11 and the previous current conditions sections.

Appendix C Tables for each Forest summarize the current bear year documented short-term temporary unauthorized motorized access on existing routes and user created routes on NFS lands within the Kootenai NF and IPNF BORZ areas for bear year 2020. *Table 29* and Table 30 display the routes documented on the Idaho Panhandle BORZ areas for existing routes and for user created routes respectively.

The Kootenai National Forest documentation of unauthorized motorized access within the BORZ on existing routes and user created routes are listed in the attached PDF at the end of Appendix C

## Over-Snow Use in the Recovery Zone

### Introduction

Over-snow use was discussed and reviewed in detail in both the BA's and BO's for the IPNF and KNF reinitiationed consultation on the LRMPs.

### Selkirk and Cabinet-Yaak Ecosystems Over-Snow Use

In relation to the **fifth surrogate** measure of incidental take, the IPNF LRMP BO (FWS 2020,specifying within the CYE or Selkirks), and the KNF LRMP BO (FWS) (relative to over-snow in the CYE and NCDE) specified that an up-to-date record of any changes in the amount of modeled grizzly bear denning habitat that overlaps with authorized late season over-the-snow motorized use be provided in the bear year monitoring report.

#### Kootenai NF

*Cabinet-Yaak RZ*

Over-snow use as documented in the (USDA Fish and Wildlife 2013, pg11) is summarized in the 2013 BA (pg 83) and in the KNF LRMP 2020 BA (page 41). The KNF LRMP BA (KNF 2020) further stated that since spring of 2016, the KNF has contributed funding for monitoring flights to map the use of over-snow motorized vehicles in areas of potential overlap with denning habitat. Monitoring has focused on the Northwest Peaks/Buckhorn Ridge and Spar Lake vicinities within the CYE. These are areas that can be accessed by over-snow motorized vehicles in the spring and have denning habitat. Monitoring indicates that the distribution of over-snow motorized use in these areas has been similar over the last several

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING
FINAL SUMMARY REPORT (07/20/2021)
43

FWS001027

2-ER-359

years. No new information is available on over-snow monitoring since the summary provided in the KNF LRMP BA (FS 2020) and the KNF LMP BO (FWS 2020).

*Northern Continental Divide Ecosystem*

As summarized in the KNF LRMP 2020 BA (KNF 2020), the KNF's portion of the Northern Continental Divide Ecosystem's (NCDE) Primary Conservation Area (PCA = Recovery Zone) covers 118,770 acres in the northeast portion of the Forest. This represents only 2 percent of the entire PCA. Most of the PCA on the KNF is within the Murphy Lake BMU, consisting of the Krinklehorn and Therriault subunits. Another 283,300 acres of the KNF lie within Zone 1 of the NCDE, which mostly overlaps with the Tobacco BORZ. The KNF only has 6 percent of the total acreage of Zone 1 of the NCDE. Most of the Zone 1 on the KNF is also within the NCDE's Salish Demographic Connectivity Area (DCA) at 276,822 acres (p. 40 in USFS 2017b). The KNF LRMP 2020 BA (Ibid) also summarized the key features of the NCDE Amendment BA (USFS 2017), with one of the key features related to over-snow use was within modeled grizzly bear denning habitat in the primary conservation area, there would be no net increase in the percentage of area or miles of routes that are open to over-snow vehicle use on NFS lands during the den emergence time period. No new information is available on over-snow monitoring in the NCDE since the summary provided in the KNF LRMP BA (FS 2020) and the KNF LMP BO (FWS 2020).

## Idaho Panhandle NF

### Selkirk

Over-snow use as documented in the IPNF Re-initiation BA, disclosed snowmobiling is permitted on 79 percent of the SE and 87 percent of the CYE (BA, pp. 53-54). The IPNF-managed portion of the SE include 14 miles of groomed routes overlapping approximately 118,200 acres of modeled grizzly bear denning habitat and off-route use is permitted on approximately 7,440 acres in the IPNF-managed portion of the SE. Both on- and off-route snowmobiling occurs on approximately six percent of modeled denning habitat on the IPNF-managed portion of the SE.

### Cabinet-Yaak

There are 26 miles of groomed routes overlapping approximately 74,750 acres of modeled grizzly bear denning habitat and off-route use is permitted on approximately 14,250 acres within the IPNF-managed portion of the CYE. Both on- and off-route snowmobiling occurs on approximately nineteen percent of the modeled denning habitat in the IPNF-managed portion of the CYE.

## BORZ on the IPNF and Over-Snow Use

### Idaho Panhandle NF

In relation to the **sixth surrogate** measure of incidental take specified in the IPNF LRMP BO (FWS 2020), the monitoring requirement states the IPNF must provide an up-to-date description of any changes in the amount of groomed or ungroomed trails providing over-the-snow use in any BORZ on the IPNF. Public motorized over-snow use is also facilitated by 71.3 miles of combined groomed and ungroomed routes in the Priest BORZ. Similarly, the Pack River BORZ contains 30.9 miles of combined groomed and ungroomed routes. The Mission-Moyie BORZ contains 21.4 miles of groomed routes. The extent of overlap between motorized over-snow use and grizzly bear denning habitat is uncertain because denning habitat has not been modeled in BORZ.

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING
FINAL SUMMARY REPORT (07/20/2021)
44

FWS001028

2-ER-360

# REFERENCES

Allen, L. 2011. A review of grizzly bear recurring use areas associated with the Selkirk and Cabinet-Yaak recovery zones. Unpublished USDA Forest Service report. 20 pp.

Borysewicz, M. 2021. Road Densities, Core Habitat in the Colville National Forest's portion of the Selkirk Mountains Grizzly Bear Recovery Area. Unpublished USDA Forest Service. March 22, 2021. 13 pp

USFS. 2019. Colville National Forest Land Management Plan, Ferry, Pend Oreille, and Stevens Counties, WA.  https://www.fs.usda.gov/main/colville/landmanagement/planning

USFS. 2015a. Land Management Plan 2015 Revision Kootenai National Forest. Libby, MT. Available at: https://www.fs.usda.gov/main/kootenai/landmanagement/planning

USFS. 2015a. Land Management Plan 2015 Revision Idaho Panhandle National Forest. Coeur D'Alene, ID 83815. https:// www.fs.usda.gov/main/ipnf/landmanagement/planning

USFS. 2011. Record of Decision – Forest Plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones. Kootenai, Lolo, and Idaho Panhandle National Forests. Signed November 11, 2011. 68 pp.

USFS. 2020. Idaho Panhandle National Forest. Biological Assessment Consultation on the Idaho Panhandle National Forest Land and Resource Management Plan for Grizzly Bears. Diane Probasco, 03/31/2020, updated 06/19/2020

USFS. 2020. Kootenai National Forest. Biological Assessment. Consultation on the Kootenai National Forest Land and Resource Management Plan for Grizzly Bears. Forest Plan Reinitiation BA. 04/15/2020. 123 pp.

USFWS. 2020. Biological opinion addressing the effects of the Idaho Panhandle National Forests' Land and Resource Management Plan on the Grizzly Bear. 01EIFW00-2021-F-0068. USFWS Idaho Fish and Wildlife Office, Spokane Valley, Washington, 27 October 2020. 160 pp.

USFWS. 2020. Biological opinion on the Effects of the Kootenai National Forest Land Management Plan on the Grizzly Bear. Date Issued August 28; CORRECTED on October 6, 2020. US Fish and Wildlife Service Reference :06E11000-2020-F-0508. U.S. Fish and Wildlife Services Office, Helena, Montana. 149 pp.

USFWS. 2011. Biological opinion on the Forest Plan amendments for motorized access management within the Selkirk and Cabinet-Yaak grizzly bear recovery zones on the Kootenai, Idaho Panhandle, and Lolo National Forests. Helena-Montana and Spokane-Northern Idaho Field Offices. Dated October 18, 2011. 227 pp.

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING
FINAL SUMMARY REPORT (07/20/2021)
45

FWS001029

2-ER-361