Nos. 23-2882, 23-2886, 23-3146

───────────────────

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

───────────────────

CENTER FOR BIOLOGICAL DIVERSITY, et al.,
*Plaintiffs-Appellees/Plaintiffs-Appellants*,

and

ALLIANCE FOR THE WILD ROCKIES, et al.,
*Plaintiffs-Appellees/Plaintiffs*,

v.

UNITED STATES FOREST SERVICE, et al.,
*Defendants-Appellants/Defendants/Defendants-Appellees*,

and

KOOTENAI TRIBE OF IDAHO,
*Intervenor-Defendant/Intervenor-Defendant-Appellant/
Intervenor Defendant-Appellee.*

───────────────────

Appeal from the United States District Court for the District of Montana
No. 9:22-cv-114 (Hon. Donald W. Molloy)

───────────────────

**JOINT EXCERPTS OF RECORD
VOLUME 5 OF 10**

───────────────────

Of Counsel:

ELISE FOSTER
*Attorney*
U.S. Dep't of Agriculture

KATHRYN L. WILLIAMS-SHUCK
SARAH E. MCLAIN
*Attorneys*
U.S. Dep't of the Interior

TODD KIM
*Assistant Attorney General*

THEKLA HANSEN-YOUNG
HAYLEY A. CARPENTER
ERIKA A. FURLONG
JOHN P. TUSTIN
JACOB D. ECKER
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 305-0466

jacob.ecker@usdoj.gov

*Attorneys for Federal Defendants-Appellants*

Julie A. Weis
HAGLUND KELLEY LLP

Kris A. McLean
Tyson A. McLean
Kris A. McLean Law Firm

*Attorneys for Defendant-Intervenor-Appellant*
*Kootenai Tribe of Idaho*



# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Montana Ecological Services Field Office
585 Shepard Way, Suite 1
Helena, Montana 59601–6287



In Reply Refer to:
FWS/IR05/IR07
M.19 Kootenai National Forest
06E11000-2020-F-0508

October 7, 2020

Chad Benson,
Forest Supervisor
Kootenai National Forest
31374 US Hwy 2
Libby, MT 59923

Dear Mr. Benson:

On August 28, 2020, the U.S. Fish and Wildlife Service (Service) issued a biological opinion regarding effects of the Kootenai National Forest's 2015 Land Management Plan (LMP) to grizzly bear (_Ursus arctos horribilis_).  Since that time, it has come to our attention that the biological opinion contained a few minor errors.  These errors do not change our effects analysis or biological conclusion.  However, we felt it was important to correct the errors and issue a corrected version of our biological opinion to replace the version that was issued on August 28, 2020.  Attached you will find the original August 28, 2020 cover letter for the biological opinion, as well as a CORRECTED version of the grizzly bear biological opinion.  Our findings in the August 28, 2020 cover letter for species other than grizzly bear still stand.  A list of corrections includes:

p. 41: We corrected the last two paragraphs to reference Table 13 and Table 14, respectively, instead of Table 12 and Table 13.

p. 54: We corrected the last sentence in the second to last paragraph to read "Table 15" instead of "Table 14."

p. 37: We corrected Table 4, acres of secure habitat for Cabinet Face BORZ, to be 889 instead of 899 (the error was due to a typo when copying acreages from the amounts provided by the Forest into the table).

p. 113: We corrected Table 10, acres of secure habitat for Cabinet Face BORZ, to be 889 (same rationale as above).

INTERIOR REGION 5
MISSOURI BASIN
KANSAS, MONTANA\*, NEBRASKA, NORTH DAKOTA,
SOUTH DAKOTA
\*PARTIAL

INTERIOR REGION 7
UPPER COLORADO RIVER BASIN
COLORADO, NEW MEXICO, UTAH, WYOMING

FWS001912

2

p. 143: We removed the duplicate map of the Cabinet Face BORZ, and replaced it with the map of the Clark Fork BORZ.

The attached Opinion supersedes and replaces all previous versions of the Opinion on the LMP with respect to the grizzly bear.

Thank you for your continued interest in the conservation of threatened and endangered species. If you have any questions regarding this consultation, please contact Carly Lewis of this office at (406) 329-3091 or Carly_Lewis@fws.gov.

Sincerely,

*for* Jodi L. Bush
Office Supervisor

Enclosure

FWS001913





# United States Department of the Interior

## FISH AND WILDLIFE SERVICE
### Montana Ecological Services Field Office
### 585 Shepard Way, Suite 1
### Helena, Montana 59601–6287

In Reply Refer to:
FWS/IR05/IR07
M.19 Kootenai National Forest
06E11000-2020-F-0508

Chad Benson,
Forest Supervisor
Kootenai National Forest
31374 US Hwy 2
Libby, MT 59923

August 28, 2020

Dear Mr. Benson:

This letter transmits the U.S. Fish and Wildlife Service's (Service) biological opinion (Opinion) on the effects of the Kootenai National Forest's 2015 Land Management Plan (LMP) on species and critical habitats listed under the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 et seq.; ESA). Our Opinion concludes that the LMP is not likely to jeopardize the continued existence of the grizzly bear.

In a letter dated November 4, 2019, and received by the Service on the same day, the Kootenai National Forest (KNF) requested re-initiation of consultation on the LMP in accordance with the requirements of section 7 of the ESA. This was necessary because of delays due to administrative challenges that have prevented full implementation of LMP-related grizzly bear conservation actions within the timeframes specified in the Plan, and in an Incidental Take Statement (ITS) accompanying the Service's 2013 biological opinion on the LMP (also referred to as the Revised Plan). The KNF submitted a biological assessment (BA), signed on April 15, 2020 and received by the Service on the same day, describing the effects of these delays on the threatened grizzly bear (*Ursus arctos horribilis*).

In the BA, the KNF determined that ongoing implementation of the LMP is not likely to cause effects to any listed species or critical habitat over and above those analyzed in the 2013 Opinion, except for the grizzly bear. Beside the grizzly bear, four other listed species may be present within the action area, including Canada lynx (*Lynx canadensis*), bull trout (*Salvelinus confluentus*), Kootenai River white sturgeon (*Acipenser transmontanus*), and Spaulding's campion (*Silene spaldingii*). The action area also encompasses portions of Canada lynx designated critical habitat, and bull trout designated critical habitat.

| INTERIOR REGION 5 | INTERIOR REGION 7 |
|:---:|:---:|
| MISSOURI BASIN | UPPER COLORADO RIVER BASIN |
| KANSAS, MONTANA*, NEBRASKA, NORTH DAKOTA, SOUTH DAKOTA | COLORADO, NEW MEXICO, UTAH, WYOMING |

*PARTIAL

FWS001914

2

The Service concurs with the above findings of the KNF, based on our review of the BA, our 2013 Opinion on the KNF LMP, and the biological opinion addressing the KNF 2011 Access Amendment. We also determined that the proposed action will not result in exceedance of incidental take exemptions for the other species referenced above as set forth in the ITS accompanying the 2013 Opinion. For the reasons presented above, reinitiation of consultation on the LMP is not necessary for the Canada lynx or its designated critical habitat, bull trout or its designated critical habitat, or the Kootenai River white sturgeon or Spaulding's campion.

The attached Opinion supersedes and replaces the 2013 Opinion on the LMP with respect to the grizzly bear.

Thank you for your continued interest in the conservation of threatened and endangered species. If you have any questions regarding this consultation, please contact Carly Lewis of this office at (406)329-3091 or Carly_Lewis@fws.gov.

Sincerely,

*for* Jodi L. Bush
Office Supervisor

Enclosure

FWS001915

# ENDANGERED SPECIES ACT SECTION 7 CONSULTATION

## Biological Opinion

## on the

## Effects of the Kootenai National Forest Land Management Plan

## on the Grizzly Bear

U.S. Fish and Wildlife Service Reference: 06E11000-2020-F-0508

Agency:   U.S. Department of Agriculture
          Forest Service
          Kootenai National Forest
          Libby, Montana

Consultation Conducted By:  U.S. Fish and Wildlife Service
                            Montana Ecological Services Office
                            Helena, Montana

Date Issued:   August 28, 2020; CORRECTED on October 6, 2020

1

FWS001916

**Table of Contents**

**I. Background** ................................................................................................. **4**

  A. Introduction and Consultation History ............................................... 4

  B. Analytical Framework for the Jeopardy Determination ...................... 6

**II. Proposed Action** ........................................................................................ **7**

  A. Action Area ...................................................................................... 7

  B. Proposed Activities .......................................................................... 12

  C. Term of the Proposed Action .......................................................... 18

  D. Conservation Measures ................................................................... 19

**III. Status of the Species** .............................................................................. **19**

  A. Range-Wide Status of the Species ................................................... 19

  B. Status of Critical Habitat ................................................................. 19

**IV. Environmental Baseline** ........................................................................ **19**

  A. Status of the Species in the Action Area .......................................... 20

  B. Factors Affecting Species Status in the Action Area ......................... 23

  C. Factors Affecting Species Environment in the Action Area .............. 33

**VI. Effects of the Action** ............................................................................. **46**

  1. Access Management ........................................................................ 47

  3. Habitat Management ....................................................................... 75

  4. Management of Human-Caused Mortality ....................................... 87

  5. Other Potential Actions ................................................................... 90

  6. Synthesis and Integration of Effects to Grizzly Bear from the Proposed Action ................. 93

**VII. Cumulative Effects** ............................................................................... **96**

**VII. Conclusion** ........................................................................................... **100**

2

FWS001917

**IX. Incidental Take Statement** ................................................................. **104**

    Relationship with Prior Consultations ................................................. 105

    Amount or Extent of Take Anticipated ............................................... 106

    Effects of Take ...................................................................................... 116

    Reasonable and Prudent Measures ...................................................... 117

    Terms and Conditions ........................................................................... 117

    Reporting Requirements ........................................................................ 118

**X. Conservation Recommendations** ....................................................... **119**

**XI. Reinitiation Notice** .............................................................................. **120**

**Literature Cited** ........................................................................................ **121**

**Appendix A.  Consultation History Details** ........................................... **132**

**Appendix B.  Seasonal Habitat for Grizzly Bears** ................................. **135**

**Appendix C.  Secure Habitat on the KNF** .............................................. **138**

**Appendix D.  Maps of Secure Habitat within 2019 BORZ on the KNF.** ............................. **140**

3

FWS001918

## I. BACKGROUND

The U.S. Fish and Wildlife Service (Service) analyzed the effects of the Land Management Plan (hereafter the LMP; U.S. Forest Service 2015) for the Kootenai National Forest on the federally listed grizzly bear (*Ursus arctos horribilis*), in accordance with the Endangered Species Act (Act), as amended (16 U.S.C. 1531 et seq.)  For ease of discussion throughout this document, the Kootenai National Forest will be referred to as the KNF or the Forest when referencing the single administrative unit, the staff that administers the unit, or the National Forest System lands within the unit.

### A. Introduction and Consultation History

The KNF is not modifying its Revised Land Management Plan (LMP) but on November 4, 2019, it reinitiated consultation with the Service to determine the effects to listed species and designated critical habitat resulting from the additional time required to meet the Access Amendment standards for the bear management units, the Term and Condition to develop a winter travel plan, and the management of motorized access outside bear recovery zones.  The Service issued a biological opinion on the KNF's LMP on August 28, 2013 (U.S. Fish and Wildlife Service 2013).  The Forest has been implementing the LMP since February 2015 (U.S. Forest Service 2015a).  A detailed list of the consultation history can be found in Appendix A.

As provided in 50 CFR 402.16, reinitiation of formal consultation is required where discretionary Federal agency involvement or control over the action has been retained (or is authorized by law) and if:

1. The amount or extent of incidental take is exceeded;
2. New information reveals effects of the agency action that may affect listed species or critical habitat in a manner or to an extent not previously considered;
3. The agency action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or
4. A new species is listed or critical habitat designated that may be affected by the action.

Although the KNF is not modifying their proposed action (the LMP), the KNF has had challenges that have prevented it from fully implementing the LMP commitments in relation to grizzly bear in the Cabinet-Yaak Grizzly Bear Recovery Zone within the specified timeframes.  The LMP incorporated the 2011 *Forest Plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones on the Kootenai, Idaho Panhandle, and Lolo National Forests* (hereafter referred to as the Access Amendment; U.S. Forest Service 2011).  The Access Amendment set standards for motorized access for grizzly bear management units (BMUs) in the Selkirk and Cabinet-Yaak grizzly bear recovery zones with the expectation that the National Forests (Kootenai, Lolo, and Idaho Panhandle) would meet those standards by November 2019.  The KNF has not attained those standards in a subset of BMUs it manages.

Additionally, the 2013 biological opinion on the LMP (U.S. Fish and Wildlife Service 2013) included an accompanying Incidental Take Statement (ITS) that contained Terms and Conditions, one of which required the KNF to complete a winter travel plan, including

4

FWS001919

considerations for grizzly bear and other federally listed species, within five years of the implementation of the LMP (by 2020). In its November 4, 2019, letter, the KNF identified delays impeding its ability to develop the winter travel plan within the identified timeframe.

This Opinion addresses the KNF's request for consultation on clarifications relating to the management of motorized access in areas identified as having recurring grizzly bear use outside of recovery zones (i.e. "Bears Outside of Recovery Zones" or BORZ). The KNF is not proposing changes to the Access Amendment standards for the BORZ, but is proposing to clarify its processes for implementing those standards as intended. The KNF has provided a clearer description of the process for updating the existing condition/database road miles when pre-existing (i.e., prior to 2010) roads are discovered, acknowledging those additional areas that have begun receiving reoccurring use by bears over the last nine years (i.e., expansion or creation of BORZ additions), and clarifying exceptions to the Access Amendment's "no net increase" standard that prohibits permanent increases in miles of open and total roads.

This Opinion also addresses the KNF's request for consultation on those elements of the LMP related to the timelines for achieving access management standards and developing a winter travel plan, and for clarifying the environmental baseline condition in BORZ. The KNF does not propose any changes to the types of actions that may occur under the LMP, nor does it introduce any additions to the actions or activity types beyond those considered in the 2013 biological opinion for the LMP or the biological opinion for the 2011 Access Amendment. Additionally, there would be no changes to the LMP desired conditions or standards and guidelines. Thus, this Opinion and its accompanying ITS replaces our 2013 LMP Opinion and ITS as to the effect on grizzly (i.e. Chapter 2 of the full biological opinion on the LMP).

The 2013 biological opinion also included a discussion of the baseline access conditions for the small portion of the Forest that falls within the North Continental Divide Ecosystem (NCDE) recovery zone for grizzly bears. The LMP was amended in December, 2018, for the portion of the Forest that falls within the (NCDE). The Service provided a biological opinion on the amendment in 2017 (U.S. Fish and Wildlife Service 2017). In that biological opinion, we determined that incidental take related to existing access conditions had already been exempted in the ITS associated with our 2013 biological opinion on the LMP (U.S. Fish and Wildlife Service 2017, p. 108, 110). Therefore, in this biological opinion, we will review the existing access condition for the portion of the Forest that falls within the NCDE, and include the NCDE portion of the Forest in the accompanying ITS of this Opinion.

Neither the 2013 biological opinion on the LMP nor the 2011 programmatic biological opinion on the Access Amendment analyzed site-specific project actions, relying instead on qualitative analysis of types of actions the KNF may authorize at the project level in the future that may result in effects to listed species. Specifically, the 2013 biological opinion on the LMP analyzed the types of actions that may occur based on the management area designations across the KNF, including vegetation and fuels management, recreation, grazing, mining, and roads. The biological opinion on the Access Amendment analyzed types of road actions, such as road decommissioning, access treatment (i.e., installing gates or barriers), and road building or road re-opening once BMUs are brought into compliance with the Access Amendment direction. Similarly, this Opinion will not analyze site-specific actions. Future actions undertaken by the

FWS001920

KNF will undergo separate consultation under section 7 of the Act, as appropriate. Nonetheless, because the KNF Access Amendment standards allow for motorized access in areas that are used by grizzly bear, and as described in our analysis, we are reasonably certain that some incidental take will occur and address that in our analysis and provide an incidental take statement.

Our analysis relies on information provided in the BA (USFS 2020a, entire), the 2015 LMP (USFS 2015), contemporary information regarding status of the species, scientific literature, and personal communications with researchers and experts, and other sources of information cited herein. Our analysis includes the best available scientific and commercial information, including any new science that has been published relative to grizzly bears and motorized access since completion of the 2013 biological opinion on the LMP. In this Opinion, we revise the grizzly bear ITS for the LMP. Thus, this Opinion and its accompanying ITS replaces the 2013 biological opinion the Service issued as to the effect of the LMP, including the Access Amendment standards incorporated into the LMP, on grizzly. In addition, this Opinion supersedes the ITS for grizzly bears. All other aspects of our 2013 biological opinion and ITS addressing the LMP remain in effect with respect to other species.

This consultation represents the first tier of a tiered consultation framework, with each subsequent project that may affect the listed species and/or designated critical habitat analyzed within this biological opinion, as implemented under the LMP, being the second tier of consultation. When applicable, some second tier consultations would reference back to this biological opinion to ensure that the effects of specific projects under consultation are commensurate with the effects anticipated in this biological opinion and incidental take statement.

## B. Analytical Framework for the Jeopardy Determination

Section 7(a)(2) of the Act requires that Federal agencies ensure that any action they authorize, fund, or carry out is not likely to jeopardize the continued existence of any listed species. Regulations implementing section 7 define "jeopardize the continued existence" as "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species" (50 CFR 402.02). In accordance with policy and regulation, the jeopardy analysis in this Opinion relies on four components:

1. The Status of the Species, which evaluates the species' rangewide condition, the factors responsible for that condition, and its survival and recovery needs;
2. The Environmental Baseline, which evaluates the condition of the species in the action area, the factors responsible for that condition, and the relationship of the action area to the survival and recovery of the species;
3. The Effects of the Action, which determines the consequences of the proposed Federal action; and
4. The Cumulative Effects, which evaluates the effects of future, non-Federal activities reasonably certain to occur in the action area on the species.

6

FWS001921

In accordance with policy and regulation, the jeopardy determination is made by evaluating the effects of the proposed Federal action in the context of the species' current status, taken together with cumulative effects, to determine if implementation of the proposed action is likely to cause an appreciable reduction in the likelihood of both the survival and recovery of the species in the wild.

Recovery units for the grizzly bear were established in the Service's final Grizzly Bear Recovery Plan (Recovery Plan) (U.S. Fish and Wildlife Service 1993, p.16). Pursuant to Service policy, when an action impairs or precludes the capacity of a recovery unit from providing both the survival and recovery function assigned to it, that action may represent jeopardy to the species. When using this type of analysis, the biological opinion describes how the action affects not only the recovery unit's capability, but also the relationship of the recovery unit to both the survival and recovery of the listed species as a whole.

The jeopardy analysis in this biological opinion considers the range-wide survival and recovery needs of the grizzly bear and the role of the action area in the survival and recovery of the grizzly bear as the context for evaluating the significance of the effects of the proposed Federal action, taken together with cumulative effects, for purposes of making the jeopardy determination.

## II. PROPOSED ACTION

This section describes the proposed Federal action, including any measures that may avoid or minimize adverse effects to listed species or critical habitat, and the extent of the geographic area affected by the action. The term "action" is defined in the implementing regulations for section 7 as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas" (50 CFR 402.02).

The Forest proposes to continue to implement the LMP but with the implementation timeline changes and other clarifications detailed below. The LMP is the land use planning level guidance document for the Forest, providing direction for project and activity decision making. The LMP provides an integrated plan for land and resource management, which articulates desired conditions, goals, objectives, standards, guidelines, and suitability of lands. The Forest estimates that the life of the LMP will be approximately 15 years.

## A. Action Area

The term "action area" is defined in the regulations as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action" (50 CFR 402.02). An action includes activities or programs "directly or indirectly causing modifications to the land, water, or air" (50 CFR 402.02).

For this Opinion, the area where land, water, or air is likely to be affected by the LMP include all National Forest System lands within the boundaries of the KNF. This includes those portions of the Cabinet-Yaak Ecosystem (CYE) and North Continental Divide Ecosystem (NCDE) Recovery Zones within the KNF and BORZ." (Figure 1). Grizzly bears have also been documented infrequently outside of these areas and given the LMP will remain in effect for the next 10 to 15

7

FWS001922

years, it is reasonable to assume that grizzly bears may continue to move outside of the Recovery Zones and BORZ and may occur in other portions of the KNF.

The KNF is located in the northwest corner of Montana and includes about 2.2 million acres of public land. Two major rivers, the Kootenai and the Clark Fork, along with several smaller rivers and their tributaries, dominate the Forest. The Whitefish Range, Purcell Mountains, Bitterroot Range, Salish Mountains, and Cabinet Mountains are all part of the rugged terrain radiating from the river valleys. In the north-central part of the Forest, the land is more open with gently rolling forested hills lying in the shadows of the Whitefish Range.

### 1. Relationship of Action Area to Grizzly Bear Recovery Zones

The Grizzly Bear Recovery Plan identified six grizzly bear recovery zones (Figure 1), defined as areas within which the population and habitat criteria for achievement of recovery will be measured (U.S. Fish and Wildlife Service 1993, p.33): the Cabinet/Yaak Ecosystem (CYE), North Continental Divide Ecosystem (NCDE), Selkirk Ecosystem (SE), Bitterroot Ecosystem (BE); North Cascades Ecosystem (NCE), and Greater Yellowstone Ecosystem (GYE). The KNF contains portions of two grizzly bear recovery zones, the CYE and the NCDE.

The Cabinet-Yaak Recovery Zone (6,705 km$^2$) is located in northwest Montana and northeast Idaho. Blocks of contiguous habitat extend into British Columbia, making this an international population. The recovery zone includes portions of the Kootenai, Idaho Panhandle, and Lolo National Forests (including one Wilderness Area). Approximately 90 percent of the recovery area is on public land administered by the Kootenai, Lolo, and Panhandle National Forests. LPP (formerly Plum Creek Timber Company Inc., then Weyerhaeuser) and Stimson Lumber Company are the main corporations holding a significant amount of land in the area. Individual ownership exists primarily along major rivers, and there are numerous patented mining claims along the Cabinet Mountains Wilderness boundary. The Cabinet Mountains Wilderness encompasses 381 km$^2$ of the higher elevations in the Cabinet Mountains.

The NCDE recovery zone (23,135 km$^2$) is situated in northwestern Montana, and includes Glacier National Park, parts of the Flathead Indian Reservation and Blackfeet Indian Reservation, parts of four National Forests (Flathead, Helena-Lewis and Clark, Kootenai, and Lolo), Bureau of Land Management lands, and a significant amount of State and private lands. Also within this ecosystem are all or parts of 5 federally designated Wilderness Areas (Bob Marshall, Great Bear, Mission Mountains, Rattlesnake, and Scapegoat), Tribal Wilderness Area (Mission Mountains). The KNF comprises a very small portion (roughly three percent of the total acreage) of the NCDE recovery zone.

8

FWS001923

**Figure 1.**  Grizzly bear recovery zones and estimated distributions as of 2018 for the GYE and NCDE, and as of 2017 for the CYE and SE.  The NCE and BE are currently unoccupied by breeding poplations, and distribution of grizzly bears within those recovery zones is currently unknown.



Map produced by U.S. Fish and Wildlife Service Grizzly Bear Recovery Office (2019).

## 2. Bear Management Units (BMUs)

Bear Management Units (BMUs) and subunits within each recovery zone approximate the annual home range size of adult females.  Development and delineation of BMUs was guided by the Interagency Grizzly Bear Committee (IGBC), which was established to develop recommendations for bear management (see Interagency Grizzly Bear Committee 1986).  The IGBC provided guidance for BMUs as units to aid in managing habitat and monitoring population trends for grizzly bears, and as units in which to apply the recommendations of the IGBC regarding habitat management.

In the CYE recovery zone, BMUs approximate the annual home range size of adult females (from 50 to over 150 square miles).  In the NCDE recovery zone, BMUs were further subdivided into subunits.  The BMUs are analysis areas that approximate the lifetime size of a female's home range, while BMU subunits are analysis areas that approximate the annual home range size of adult females within the NCDE and GYE.  The BMUs and subunits were identified for

9

FWS001924

management purposes to provide enough quality habitat for home range use and to ensure that grizzly bears were well distributed across each recovery zone. The BMUs and subunits are not meant to depict the actual location of female home ranges on the landscape.

Within the action area, there are 17 BMUs in the CYE recovery zone; 15 are wholly in the KNF, and 2 BMUs in the CYE with shared ownership between KNF and IPNF (Table 11 in BA, U.S. Forest Service 2020, p. 73). There are two BMU subunits in the NCDE recovery zone (Table 12 in BA, U.S. Forest Service 2020, p. 79). Maps of the BMUs are provided in the BA (U.S. Forest Service 2020, p. 63), and are also used by Kasworm et al. (2019) to display data regarding grizzly bear occupancy, mortalities, and other factors associated with recovery targets.

### 3. Bears Outside Recovery Zones (BORZ)

The Grizzly Bear Recovery Plan recognized that some grizzly bears wander outside of the recovery zones and some bears might even reside entirely outside of recovery zones. Despite this occurrence, the mere presence of bears outside of the recovery zone does not warrant that the recovery zone boundary be changed (U.S. Fish and Wildlife Service 1993, p. 17-18). However, some federal activities occurring outside of recovery zones may affect grizzly bears in areas that receive recurring use. Using credible grizzly bear sightings, an interagency team of biologists established BORZ to describe areas outside of the Selkirk and Cabinet-Yaak recovery zone that receive recurring grizzly bear use (see Allen 2011). The interagency team developed specific criteria under which BORZ boundaries may be extended (Allen 2011, reiterated in U.S. Forest Service 2020, p. 104-111), and specified that "the boundaries of these areas are not static, but may be adjusted as grizzly bear use patterns are reevaluated in future years" (ibid., p. 2).

The 2011 Access Amendment recognized the importance to grizzly bears of some areas outside of the Recovery Zone boundary. The Forests and the Service developed the concept of Bears Outside Recovery Zones (BORZ) to represent areas that receive recurring use by grizzly bears. The original intent was for BORZ areas to be evaluated annually between the Forests and grizzly bear researchers, and for BORZ polygons to expand as the distribution of grizzly bears expands (U.S. Forest Service 2020, p. 104-111).

Four of the seven BORZ areas identified in the Access Amendment area associated with the CYE on the KNF (the Idaho Panhandle National Forest manages the other 3 BORZ identified in the Access Amendment). More details are provided on BORZ in the *Environmental Baseline* section below. BORZ areas are depicted below in Figure 2, as well as in the BA (U.S. Forest Service 2020, p. 63-67).

### 4. Demographic Connectivity Area (DCA)

The NCDE Conservation Strategy (NCDE Subcommittee 2020) identifies the Salish Demographic Connectivity Area (DCA) and describes its importance as a stepping stone between the NCDE and CYE. The KNF manages a large portion (75%) of the Salish DCA, which overlaps almost entirely with the Tobacco Bears Outside Recovery Zone (BORZ) polygon. The Flathead National Forest manages the remainder of the Salish DCA.

10

FWS001925

**Figure 2. Location of Bear Management Units (BMUs) and Bears Outside Recovery Zone (BORZ) areas on the Kootenai National Forest (KNF).**



FWS001926

**B. Proposed Activities**

    **1. LMP Direction**

The Proposed Action is continued implementation of the LMP, with the implementation timelines and clarifications described below. The LMP direction is organized by goals, desired conditions, objectives, guidelines, and standards (see definitions for each in U.S. Forest Service 2015, p. 1-2). The LMP Forest-wide direction describes the framework under which lands will be managed for the next 10 to 15 years on the KNF.

The LMP desired conditions for wildlife and vegetation and guidelines and standards related to wildlife were discussed in Chapter I of our Biological Opinion on the LMP (U.S. Fish and Wildlife Service 2013) and are reiterated in Appendix F of the Forest's biological assessment (U.S. Forest Service 2020, p. 100-103). Standards are the limitations or requirements applied to project and activity decisions, and thus all projects carried out under the LMP must meet all applicable standards. Guidelines are the operational practices and procedures that are applied to project and activity decision making, and thus the Forest designs projects under the LRMP that meet the intent of guidelines. Several LMP guidelines and standards address the following grizzly bear management needs: linkage, access management/secure habitat, general habitat, human-bear conflicts and denning habitat (see Table 1).

The applicable guidelines and standards are applied Forest-wide or vary across the Management Areas (MAs) and Geographic Areas (GAs). Management Areas are those areas that have similar management characteristics and clarify the allowed uses on various parts of the KNF (see U.S. Fish and Wildlife Service 2013, p. I-10-12). The relationship of the BMUs and BORZ to the MAs is provided in Table 2.

FWS001927

**Table 1. Forest-wide guidelines and standards related to grizzly bear conservation in the in the Kootenai National Forest's Land Management Plan (LMP).**

| Management Need | Element Code[1] | Element Description (Paraphrased) |
|---|---|---|
| Linkage | FW-GDL-WL-12 | Sets direction for interagency coordination and inclusion on wildlife crossing features in roadway construction and reconstruction. |
| Linkage | FW-GDL-WL-13 | Restricts management activities within one-quarter mile of existing crossing features, and future crossing features. |
| Linkage | FW-GDL-WL-14 | Maintains federal ownership in wildlife linkages identified through interagency coordination. |
| General Habitat | FW-GDL-WL-15 | Applies "Interagency Grizzly Bear Guidelines," or a conservation assessment once a grizzly bear population is delisted, to all management activities. |
| Access Management / Secure Habitat | FW-STD-WL-02 | The Access Amendment is applied. |
| Access Management / Secure Habitat | FW-STD-WL-03 | Sets direction for OMRD, TMRD, and Core within the KNF's portion of the NCDE (Krinklehorn and Therriault BMUs). |
| Human-Bear Conflict | FW-STD-WL-04 | Requires sanitation measures to reduce human/wildlife conflicts and mortality in all permits and operating plans. |
| Denning Habitat / Human-Bear Conflict | FW-STD-WL-05 | Prohibits grooming of snowmobiles routes in grizzly bear core habitat in spring after April 1 each year. |

---

[1] Elements of the LMP include the Forest-Wide (FW) goals, objectives, desired conditions, guidelines (GDL), and standards (STD) for wildlife (WL).

FWS001928

**Table 2. Distribution and percent of CYE and NCDE BMU acreages and BORZ acreages on the KNF within the designated management areas under the LMP[2].**

| Management Area (MA) | Acres within BMUs | Acres within BORZ (as of 2010) | BORZ additions since 2010 | Acres within BORZ as of 2020 |
|---|---|---|---|---|
| 1a – Wilderness | 93,710 (8%) | 0 | | 0 |
| 1b – Recommended Wilderness | 102,734 (8%) | 0 | | 0 |
| 1c – Wilderness Study Area | 34,108 (3%) | 0 | | 0 |
| 2 – Eligible Wild, Scenic, Recreation River | 34,634 (3%) | 3,479 (1%) | 269 | 3,748 (1%) |
| 3 – Special Area | 23,131 (2%) | 4,432 (1%) | | 4,432 (1%) |
| 4 – Research Natural Area | 8,262 (<1%) | 1,276 (<1%) | | 1,276 (<1%) |
| 5a – Backcountry Non-motorized | 194,516 (16%) | 6,108 (1%) | | 6,108 (1%) |
| 5b – Backcountry Motorized | 126,563 (10%) | 33,153 (6%) | | 33,153 (6%) |
| 5c – Backcountry Winter Motorized and Summer Non-Motorized | 69,997 (6%) | 16,504 (3%) | | 16,504 (3%) |
| 6 – General Forest | 547,480 (44%) | 493,662 (88%) | 30,593 | 493,662 (88%) |
| 7 – Primary Recreation Area | 26 (<1%) | 5,268 (1%) | | 5,268 (1%) |
| Approximate Total | 1,235,161 | 563,883 | 30,862 | 594,745 |

Geographic Areas have desired conditions that are specific to a locale, such as a river basin or valley (see list of Geographic Areas in U.S. Forest Service 2020, p. 101-102). The GA desired conditions were developed to refine Forest-wide management to better respond to local conditions and situations that may occur within a specific GA. The desired conditions in GAs for listed species would not exert additional effects on the species, rather the desired condition would help the KNF achieve a Forest-wide desired condition, objective, standard, or guideline for the species. This is accomplished within the GAs by identifying or prioritizing areas where these conditions should be achieved. For example, a desired condition for wildlife in the Yaak GA states that low levels of disturbance occur for denning grizzly bear in the Northwest Peaks, Grizzly Peak, and Roderick Mountain areas. This condition complements Forest-wide desired condition for wildlife (FW-DC-WL-04), which states that low levels of disturbance exist in all grizzly bear BMUs to facilitate denning activities, spring use, limit displacement, and reduce human/bear conflicts and potential bear mortality. It also complements Forest-wide guideline (FW-GDL-WL-01) which states that "management activities should avoid or minimize disturbance in areas of predicted denning habitat during spring emergence (April 1 through May 1; U.S. Forest Service 2015, p. 41). In these examples, the GA desired conditions are identifying specific locations where the Forest-wide desired condition and guideline would be targeted.

---

[2] Derived from Table II-2 in U.S. Fish and Wildlife Service 2013 (p. II-5) and from Table 7 in U.S. Forest Service (2020; p. 30)

14

FWS001929

The LMP includes standard FW-STD-WL-02, which incorporates the 2011 Access Amendment (U.S. Forest Service 2011). Design Elements of the Access Amendment direct the Forest, Kootenai, and Lolo National Forests to reach specific standards for wheeled motorized access and security habitat for grizzly bears within all BMUs in the Selkirk and Cabinet-Yaak Recovery Zones. These Design Elements are detailed in Appendix E of the BA (U.S. Forest Service 2020), as well as Appendix B of the Forest Plan (U.S. Forest Service 2015), both referencing back to the Access Amendment (U.S. Forest Service 2011).

### 2. LMP Extended Timelines and Proposed Clarifications

In the biological assessment (U.S. Forest Service 2020), the KNF proposes the following extensions and clarifications regarding continued implementation of the LMP:

1) Revised timeline associated with Element I-C-1 (meeting the wheeled motorized access and secure habitat standards within in BMUs) of the Access Amendment, incorporated into the LMP through Standard FW-STD-WL-02
2) Extending the timeline established by the Terms and Conditions of the 2013 biological opinion on the LMP related to winter travel planning in grizzly bear habitat (U.S. Fish and Wildlife Service 2013)
3) Clarifying and providing a mechanism for updating or correcting the baseline condition in BORZ (Design Elements II-A and II-B of the Access Amendment) incorporated into the LMP through Standard FW-STD-WL-02

_Timelines_

The KNF is proposing the following extensions to timelines:

1) Extend the timeline beyond what was originally included in the LMP for achieving motorized access standards. In particular, the Forest proposes taking additional time for planning and project implementation to achieve motorized standards (open motorized route density or "OMRD": total motorized route density or "TMRD": and Core habitat or "CORE") in Bear Management Units 4 (Bull), 5 (St. Paul), 6 (Wanless), and 8 (Vermillion). Implementation is expected to occur by the end of 2021 for BMU 8, by the end of 2022 for BMUs 5 and 6, and by the end of 2023 for BMU 4.

2) Extend the timeline beyond what was originally stated in the Terms and Conditions of the 2013 biological opinion on the LMP for completing an over-snow motorized winter travel plan. Winter travel planning is expected to be completed by the end of 2024.

_Clarifications_

The Forest is also updating the baseline condition in terms of motorized access in BORZ that were established in 2010, showing the areas where BORZ have expanded since 2010, clarifying that the "no net increase" standards apply to the additional BORZ areas, and clarifying exemptions to the "no net increase" standards in Design Elements II-A and II-B of the Access Amendment direction (see below).

15

FWS001930

Corrections- As described in the Assessment, the Forest has improved their understanding of the motorized access condition of those BORZ that were delineated in 2010 through discoveries of pre-existing roads during project-level investigations and technological improvements in road mapping. Reporting these pre-existing miles of road as "database corrections" is part of the proposed action. In addition, the 2010 baseline condition did not include motorized trails or railroads in their calculations. Therefore, the proposed action updates the baseline condition from what was reported in the Access Amendment and LMP to reflect a more accurate and inclusive baseline of both open and total route miles in BORZ (Table 2). The Forest will likely discover additional roads in the future that it determines were pre-existing roads, and may find additional database errors. The proposed action clarifies these expectations.

Expansions- Since 2010, when the Record of Decision for the Access Amendment was signed, grizzly bear range has expanded and is likely to continue to expand. The Forest, in conjunction with the Service, evaluates BORZ areas annually, and adds additional areas as appropriate (Allen et al. 2011). The Forest explains in its biological assessment (U.S. Forest Service 2020) that the "Guidelines for Determining Recurring Use Areas (RUA) for Grizzly Bears and Guidelines on how to delineate BORZ in RUA" was provided in Appendix F of the 2010 Access Amendment BA (U.S. Forest Service 2010, p. 206). RUA are areas that have 3 or more credible observations of grizzly bears within the last 15 years and radio-telemetry research data on collared grizzly bears have documented use in some areas outside of the existing Recovery Zones. Adjacent 6th order HUCs with enough grizzly bear use to be considered RUAs were combined to create contiguous areas of recurring use or BORZs (USDA Forest Service 2010).

Since the Access Amendment ROD was signed, the Forest has met annually with the Service (specifically the grizzly bear recovery experts and biologists) to review credible grizzly bear observations to determine if recurring use has expanded beyond the original BORZ boundaries (per 2011 BO monitoring requirement, U.S. Fish and Wildlife Service 2011, p. II-106). In 2012 and 2019, documented grizzly bear recurrence in areas outside of the recovery zones and existing BORZ led the Forest to delineate areas that met the guidelines for determining a RUA. Thus, the Forest added the RUAs to the existing BORZ, and began applying the standards for BORZ to these new areas. The Forest updated the baseline condition for open and total motorized routes[3] for these BORZ expansion areas in their annual monitoring reports to the Service (U.S. Forest Service 2013b, 2020b), which increased the reported miles of open and total motorized routes for the BORZ that were expanded. This consultation thus serves to update the baseline for areas the Forest designated as BORZ since 2010, including the Bobtail HUC that was added to the West Kootenai BORZ in 2013 and the Lower Pipe Creek and Cedar Creek HUCs that were added to the West Kootenai BORZ in 2019.

Under the proposed action, the Forest is clarifying its intent to continue identifying and delineating additional BORZ expansions in coordination with the Service and updating the baseline condition for any additional, future expansion areas that meet the criteria for BORZ

---

[3] Throughout this Opinion, the term "road" and "motorized route" are used interchangeably, as the Service views both roads and motorized trails to have similar effects to grizzly bears, as described in the discussion of "General Effects of Wheeled Motorized Access" section of this Opinion.

16

FWS001931

delineation.  Future BORZ expansion areas may or may not be considered part of larger, existing BORZ, depending on their size and location relative to existing BORZ areas.  In other words, the Forest may expand existing BORZ or create new BORZ.  The Forest clarified that the BORZ standard for no-net increase in permanent miles of open and total roads will be applied to all BORZ, including expansions (U.S. Forest Service 2020, p. 7).  Again, these changes will be disclosed in the Bear Year monitoring reports to the Service as the changes are incorporated.

Design Element II-B of the Access Amendment, which is incorporated into the LMP via FW-STD-WL-02, assures there will be no net increase in permanent linear miles of open and total roads in any individual BORZ above the baseline conditions, which were identified for existing BORZ in the 2011 Access Amendment and the 2015 LMP as the existing miles of open and total roads at the time of BORZ delineation.  Through the proposed action, the Forest is also clarifying exceptions to the "no net increase" standard, specifically, the standard does *not* apply to the following:

- Motorized use by agency personnel or others authorized by the appropriate agency personnel (i.e., there is no limit on the administrative use on restricted roads within BORZ);
- Updated/improved road data without an actual change on the ground (i.e. "database corrections");
- Exchanging, acquiring, buying, or selling lands by the agency would modify the total linear miles of road by subtracting miles of motorized routes in lands no longer part of the Forest and adding the linear miles of road in parcels acquired by the Forest;
- Motorized use for emergency situations as defined by 36 CFR § 215.2
- Temporary roads[4] (all the design elements of the 2011 Motorized Access Management within the Selkirk and Cabinet Yaak Grizzly Bear Recovery Zone Management Direction, which was incorporated into the LMP, apply to the temporary roads, as shown in U.S. Forest Service 2020, p. 98-99).

As described in the Assessment (U.S. Forest Service 2020, p. 9-10), these exceptions do not include any permanent changes to the roaded condition on the ground, except in situations where the Forest lacks discretion to prevent roads.  That is, road miles in BORZ may also be adjusted to recognize increased road miles in situations where the Forest lacks discretion due to legal and other obligations.  Examples include, but are not limited to, Alaska National Interest Lands Conservation Act (ANILCA) claims, identification of Revised Statute 2477 thoroughfares (RS 2477), or other similar requirements that may result in additional miles of motorized routes beyond the control of the KNF.  The ANILCA mandates the Forest Service provide motorized access across federal lands when necessary to access private inholdings.  Revised Statute 2477 thoroughfares refers to a statute enacted by Congress in 1866 that provides a right of way for the construction of highways over public lands.

---

[4] All the design elements of the 2011 Motorized Access Management within the Selkirk and Cabinet Yaak Grizzly Bear Recovery Zone Management Direction, which was incorporated into the LMP, apply to the temporary roads, as shown in U.S. Forest Service 2020, p. 98-99).

17

FWS001932

These increases are permitted under Design Criteria II-A and II-B of the Access Amendment. The Forest realized it inadvertently omitted such roads in baseline calculations in 2010. The baseline presented in Table 8 of the BA (U.S. Forest Service 2020, p. 32) includes these roads.

Also in the BA, the Forest clarified their definition of a temporary road (U.S. Forest Service 2020, p. 10) as "A road necessary for emergency operations or authorized by contract, permit, lease, or other written authorization that is not a forest road and that is not included in a forest transportation atlas" (as defined in 36 CFR § 212.1). This definition includes the re-opening of existing bermed or barriered roads for temporary use. Temporary roads are expected to exist on the landscape roughly 5 years, but may remain for up to 10 years" (U.S. Forest Service 2020, p.10). Within BORZ, temporary roads may lead to temporary increases linear miles of open roads or total roads, with conditions defined in Design Criteria II.A. and II.B. of the Access Amendment (and thus incorporated into the LMP; U.S. Forest Service 2020, p. 98-99). Future project-specific consultation will analyze the effects of any proposed temporary roads in terms of their effects to grizzly bears and their habitat. As previously stated in the Introduction, the Service may tier future project evaluations to this biological opinion.

Monitoring—The KNF clarified their monitoring efforts related to roads and grizzly bears in both the Recovery Zone BMUs and within BORZ (U.S. Forest Service 2020, p. 10). As stated in the 2015 Forest Plan, "To ensure the effective implementation of the open road density parameter, at least 30 percent of closure devices (gates and barriers) will be monitored annually within the respective ecosystems. Monitoring techniques may include visual checks as well as road counters. The current monitoring in BMUs will continue under the proposed action."

Within BORZ, the Forest will conduct *ad hoc* monitoring in multiple ways, described in the BA (U.S. Forest Service 2020, p. 10), including via Travel Analysis Process for specific projects in the BORZ, and via incidental observations by Forest Service employees and others as they are discovered. The Forest explained that regular patrols occur within BORZ by recreation staff, fire crews, and other resource specialists. District staff also cooperate seasonally to open and close gates on restricted roads, as deemed appropriate in the Motor Vehicle Use Map. While not specifically designed for monitoring access management related to grizzly bears, the regular presence of Forest employees within BORZ offers regular "eyes on the ground" to discover issues such as breached closure devices or unauthorized user-created roads or motorized trails (Jeremy Anderson, pers. comm., April 2020). When the Forest discovers unauthorized route use, breaches of barriers, or breaches of gates, the issue is reported and breaches are repaired or addressed as soon as possible, generally within the same bear year[5] or early in the next bear year (U.S. Forest Service 2020, p. 10).

## C. Term of the Proposed Action

The LMP for the KNF states that it will provide guidance for project and activity level decision-making on the KNF for approximately the next 15 years (U.S. Forest Service 2015, p. 1). The

---

[5] The term "bear year" refers to the non-denning season within a given calendar year; in the CYE, this is defined as April 1 – November 30 (U.S. Forest Service 2020, p. 27). In the NCDE west of the Continental Divide this is defined as April 1 – November 30 (U.S. Fish and Wildlife Service 2017, p. 2-16).

18

FWS001933

LMP went into effect in 2015, and thus the Service assumes the LMP will continue to be in place until the end of 2030. The timelines for specific actions are analyzed as stated above.

## D. Conservation Measures

The proposed action does not contain any specific grizzly bear conservation measures apart from the sideboards established under the LMP standards and guidelines for site-specific land management activities.

## III. STATUS OF THE SPECIES

### A. Range-Wide Status of the Species

Currently, all grizzly bears in the lower-48 states are protected as threatened. For information on the status of grizzly bears, including species description, life history, and range-wide status and distribution, refer to the Grizzly Bear Recovery Plan (U.S. Fish and Wildlife Service 1993), the Grizzly Bear 5-Year Review (U.S. Fish and Wildlife Service 2011b), the grizzly bear recovery program 2019 annual report (U.S. Fish and Wildlife Service 2020), the NCDE Grizzly Bear conservation strategy (NCDE Subcommittee 2000), Grizzly bear demographics in the NCDE (Costello et al. 2016), NCDE grizzly bear population monitoring team annual report 2019 (Costello and Roberts 2020), the Greater Yellowstone Ecosystem conservation strategy (U.S. Fish and Wildlife Service 2016), the Yellowstone Grizzly Bear Investigations 2018 (van Manen et al. 2019), the interagency grizzly bear study team 2019 annual report summary (IGBST 2020), the Cabinet-Yaak Grizzly Bear Recovery Area 2018 Research and Monitoring Progress Report (Kasworm et al. 2019a), Density, distribution, and genetic structure of grizzly bears in the Cabinet-Yaak Ecosystem (Kendall et al. 2016), and the Selkirk Mountains Grizzly Bear Recovery Area 2018 Research and Monitoring Progress Report (Kasworm et al. 2019b). These documents (referenced here), include the best available science regarding the status and distribution of grizzly bears and are incorporated by reference.

### B. Status of Critical Habitat

No critical habitat has been designated for grizzly bears.

### IV. ENVIRONMENTAL BASELINE

Environmental baseline refers to the condition of the listed species or its designated critical habitat in the action area, without the consequences to the listed species or designated critical habitat caused by the proposed action. The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. The consequences to listed species or designated critical habitat from ongoing agency activities or existing agency facilities that are

19

FWS001934

not within the agency's discretion to modify are part of the environmental baseline (50 CFR 402.02, as revised by 84 FR 44976 in 2019).

As described in section II. Proposed Action, this biological opinion addresses the effects on grizzly bears related to the LMP for the KNF. Therefore, the action area is the entire KNF. Currently, grizzly bears on the KNF are most often using habitat within BMUs and BORZ (Kasworm et al. 2019, p. 19). However, bears are also observed infrequently on other areas of the KNF and given the 10 to 15 year timeframe this plan will be in place, it is reasonable to assume that grizzly bears may occur in additional areas of the KNF during the life of the plan.

### A. Status of the Species in the Action Area

#### 1. NCDE population

The NCDE Recovery Zone (23,135 km$^2$) is situated in northwestern Montana, and includes Glacier National Park, parts of the Flathead Indian Reservation (FIR) and Blackfeet Indian Reservation (BIR), parts of four National Forests (Flathead NF, Helena-Lewis and Clark NF, Kootenai NF, and Lolo NF), Bureau of Land Management lands, and a significant amount of State and private lands. Also within this ecosystem are all or parts of 5 Federally designated Wilderness Areas (Bob Marshall, Great Bear, Mission Mountains, Rattlesnake, and Scapegoat), Tribal Wilderness Area (Mission Mountains) designated by the CS&KT, and one federally designated Wilderness Study Area (Ten Lakes). The KNF manages approximately 2 percent (118,770 acres) of the NCDE Recovery Zone. The KNF also manages another 283,300 acres within Zone 1 of the NCDE, most of which is within the Salish Demographic Connectivity Area (DCA), which mostly overlaps with the Tobacco BORZ (BA, U.S. Forest Service 2020, p. 41-42).

The NCDE Subcommittee believes the grizzly bear population in the NCDE is recovered from threats to its long-term persistence, and has developed a Conservation Strategy to guide post-listing management of the species (NCDE Subcommittee 2020, p. 34). The population has shown a positive growth rate in both the number of individuals and in distribution. In Costello et al. (2016, p. 2), the estimated annual population growth rate from 2004-2016 was 2.3 percent per year. The estimated area of occupied range for the NCDE grizzly bear population as of 2018 was approximately 63,924 km$^2$ (24,600 mi$^2$), a portion of which nearly overlaps the CYE (U. S. Fish and Wildlife Service 2019, p. 5). This current distribution represents a 42 percent increase from 2004 and a 25 percent increase from 2010, according to the biennial population distribution analysis for the NCDE (Costello and Roberts 2019, p. 10). In short, the number and distribution of grizzly bears in the NCDE is showing a consistent positive trend.

In addition to the positive growth rate and distribution rate, grizzly bears in the NCDE population meet all recovery criterion (U. S. Fish and Wildlife Service 2020, p. 5-6). This includes criterion related to population size, occupancy of BMUs by females with young, and average human-caused mortality. During 2019, reproductive females occupied 18 of 23 BMUs (78%) and 7 of 7 supplementary BMUs (100%; Costello et al. 2020, p. 9). For the 6-year period 2014–2019, 22 of 23 BMUS were occupied by females with offspring, thus exceeding the objective of 21 of 23 BMUs occupied.

20

FWS001935

In summary, the Service believes the NCDE is robust and nearing recovery. We also believe that the NCDE has the potential to serve as an important genetic corridor between Canadian grizzly bear populations and other grizzly bear recovery zones in the United States (U. S. Fish and Wildlife Service 2020, p. 5). The NCDE also provides a source of grizzly bears for naturally augmenting the population in the CYE.

## 2. Cabinet Yaak population

The Cabinet-Yaak Recovery Zone (6,705 km2) is located in northwest Montana and northeast Idaho. Blocks of contiguous habitat extend into British Columbia, making this an international population. The recovery zone includes portions of the Kootenai, Idaho Panhandle, and Lolo National Forests (including 1 Wilderness Area). Approximately 90 percent of the recovery area is on public land administered by the Kootenai, Lolo, and Panhandle National Forests. LPP (formerly Plum Creek Timber Company Inc. and Weyerhaeuser) and Stimson Lumber Company are the main corporations holding a significant amount of land in the area. Individual ownership exists primarily along major rivers, and there are numerous patented mining claims along the Cabinet Mountains Wilderness boundary. The Cabinet Mountains Wilderness encompasses 381 km$^2$ of the higher elevations in the Cabinet Mountains.

The CYE is often described in terms of having two portions. The Cabinet Mountains portion forms the southern half of the CYE and is topographically diverse with steep mountain ranges (up to 8,700 feet) and definable seasonal habitats. The Yaak portion has gentler topography and lower elevations (up to 7,700 feet). Seasonal habitats are not as clearly definable. More research and telemetry work has occurred in the Yaak than the Cabinet Mountains. The Cabinet Mountains lie south of the Yaak River drainage and contain about 60 percent of the recovery zone.

The current population size is estimated at 55-60 individual grizzly bears in the CYE (Kasworm et al. 2019, p. 38). While still a relatively small number, this is a vast improvement for this ecosystem. In 1993 when the Recovery Plan was written, the population in the Cabinet Mountains portion of the recovery zone was thought to be less than 15 bears. More recent genetic information has indicated that number was more likely 5-10 bears (Kasworm et al. 2019, p.37). By 1999, the population was estimated to have grown to approximately 30-40 bears (64 FR 26725, May 17, 1999). During 2006 to 2011, there were approximately 42 grizzly bears in the CYE: 21 individuals in the Cabinet Mountains and 21 individuals in the Yaak portion of the recovery zone (Kasworm et al. 2012, pp.21-22).

Thus the population is growing at an increasing trend, with positive growth for the past 6 years (Figure 3). According to Kasworm et al. (2019, p. 37), the finite rate of population change was an annual 1.2 percent for 1983–2018, and the probability that the population was stable or increasing was 62 percent. The population experienced a trend of increasing population growth from 1983-1998, followed by a decreasing trend for the period of 1998-2006. Human-caused mortality accounted for much of that decline in annual survival rates and population trend. However, since 2006, the trend has once again become positive, with survival rates increasing and thus resulting in an improving population trend estimate since 2006 (Kasworm et al. 2019, p. 37).

21

FWS001936

**Figure 3. Estimated population rate change for grizzly bears in the Cabinet Yaak ecosystem for the past 20 years. Horizontal bars show the point estimate, and vertical lines show the 95% confidence intervals. Taken from Kasworm et al. 2019, p. 38.**



The Recovery Plan estimated that a recovered population in the CYE recovery zone would consist of a minimum of about 100 individual grizzly bears and grizzly bears would also live in and use areas outside the CYE recovery zone. Therefore, Recovery Plan population parameters include bears observed up to 10 miles outside the recovery zone boundary (U. S. Fish and Wildlife Service 1993, p.83).

Demographic recovery criteria were developed to address overutilization and human-caused mortality (listing factors) within each recovery zone and a 10 mile surrounding buffer by ensuring a sufficient population size and distribution. These demographic recovery criteria include measures for population size, distribution, and sustainable mortality.

Although the grizzly bear population trend is currently increasing, two of the three recovery targets identified in the Recovery Plan have not yet been met (U. S. Fish and Wildlife Service 1993, p. 81-83; Kasworm et al. 2019, p. 15-22). Extensive details regarding the rationale for these targets and progress to date can be found in the Recovery Plan (U. S. Fish and Wildlife Service 1993, p. 81-83) and in the annual monitoring reports for the CYE by Kasworm et al. (2019, p. 15-22), respectively. A summary from U.S. Fish and Wildlife Service (2020, p.7) includes:

> Recovery target 1: 6 females with cubs over a running 6-year average both inside the Recovery Zone and within a 10 mile area immediately surrounding the Recovery Zone. Progress: Unduplicated females with cubs averaged 3.0 per year from 2013–2018. This target **has not** been met.

22

FWS001937

<u>Recovery target 2:</u> 18 of 22 BMU's occupied by females with young from a running 6-year sum of verified evidence.  <u>Progress:</u> 11 of 22 BMUs were occupied from 2013–2018. This recovery target **has not** been met.

<u>Recovery target 3:</u> The running 6-year average of known, human-caused mortality shall be ≤ 4% of the population estimate; and ≤ 30% shall be females.  The mortality limit for 2018 was 2.3 bears/year and 0.7 females/year.  <u>Progress:</u> Average human caused mortality for 2013–2018 was 1.3 bears/year and 0.3 females/year.  These mortality levels were less than the limit.  This recovery target **has** been met.

The Service and Montana Fish, Wildlife and Parks (MFWP) continue to augment the population in the Cabinet Mountains, a program that began in 1990 to bolster reproduction through the addition of female bears, and overall genetic diversity through the addition of female and male bears.  Twenty bears have been added in the Cabinet Mountains since 1990.  Of 20 bears released through 2018, 6 are known to have left the target area (one was recaptured and brought back and one returned a year after leaving), three were killed within 4 months of release, and one was killed 16 years after release. One animal was known to have produced at least 10 first generation offspring, 16 second generation offspring, and one third generation offspring.  Another female was known to have produced three offspring and a male was also known to have produced one offspring (Kasworm et al. 2019, p. 23-24, 35).

## B. Factors Affecting Species Status in the Action Area

When grizzly bears were listed under the Endangered Species Act in 1975 (40 FR 31734, July 28, 1975), the primary factors included reduction in range, increase in trail and road construction, increase in recreation, livestock use of National Forest lands, unsustainable human-caused mortality, lack of data regarding populations, and genetic isolation.  The Service summarized the primary factors affecting grizzly bear populations in the United States in our 2011 5-Year Review (U.S. Fish and Wildlife Service 2011b), and concluded all of these factors have been addressed to some extent.  We are currently soliciting information for an updated 5-Year Review, which will address and update factors affecting the species.

The 2011 5-Year Review acknowledged access management strategies had been implemented by Glacier National Park and the Forest Service, but the ecosystem lacked regulatory mechanisms for managing the population and its habitat in the absence of Act protections (U. S. Fish and Wildlife Service 2011b, p.103).  The NCDE Conservation Strategy (NCDE Subcommittee 2020) addresses the conservation and management of grizzly bears and their habitat post-delisting.  Regulatory mechanisms stemming from the Strategy have recently been made into regulatory commitments by the Forest Service via incorporation into the Revised Forest Plan for the Flathead National Forest, and amendments to Forest Plans on the Kootenai, Lolo, and Helena-Lewis and Clark National Forests (U.S. Forest Service 2018a, b).

Because the KNF encompasses such a small portion of the NCDE, and because the Conservation Strategy and associated documents (such as the biological opinion for the NCDE Amendments to

23

the KNF, U.S. Fish and Wildlife Service 2017) thoroughly review the status and factors affecting the NCDE population, the remainder of this discussion about factors affecting the species in the action area will be specific to the CYE.

The 2011 5-Year Review listed the following factors affecting grizzly bears in the CYE: (1) incomplete habitat conservation measures (motorized access management); (2) unsustainable human-cause mortality; (3) small population size; and (4) population fragmentation that resulted in genetic isolation (U. S. Fish and Wildlife Service 2011b, p.103). Some of these factors have been addressed, at least in part, including major steps towards habitat conservation measures that were put into place with the 2011 Access Amendment (U.S. Forest Service 2011a). The following section provides further detail on these four factors affecting the status of the species in the CYE.

### 1. Habitat Conservation Measures

In general, habitat conservation includes measures and programs to avoid or reduce habitat loss or displacement (used here to mean "under-use" of habitat) by grizzly bears from important seasonal habitats. Such measures and programs that provide habitat conservation include acquisition of important lands for grizzly bears to prevent human encroachment and development; agreements for the conservation and protection of grizzly bear habitat by precluding activities that might otherwise displace bears; and comprehensive access management and secure habitat for grizzly bears to limit human disturbance and subsequent displacement or risk of conflict.

The following section describes conservation measures that have been enacted in recent years to benefit grizzly bears in the CYE. (Information for the NCDE is detailed extensively in the NCDE Conservation Strategy, NCDE Subcommittee 2020).

*Land Acquisitions*

Land acquisition and exchange in the CYE has placed additional areas within this recovery zone in the public domain and may benefit the long term conservation of the species. There have been 2 major land exchanges in particular that have been beneficial to grizzly bear habitat within the CYE. In 1997 the KNF completed a land exchange in which 33 square miles of land owned by Plum Creek Timber Company were placed in public ownership. Almost all of this land was within the CYE grizzly bear recovery zone and is now under Forest Service management.

In 2005, the Montana Department of Fish Wildlife, and Parks (MFWP) acquired almost 2 square miles in the Bull River Valley between the East and West Cabinet Mountains in the Bull BMU on the KNF. A conservation easement on an adjacent one square mile was accepted from the Avista Company. The area, now known as the Bull River Wildlife Management Area, provides linkage of public land across the river valley and will have value for a number of species including bull trout, westslope cutthroat trout, grizzly bear, lynx, and bald eagle.

FWS001939

*Conservation Plans and Agreements*

In 1995, the British Columbia provincial government developed a grizzly bear conservation strategy for the lands to the north of the CYE (British Columbia Ministry of Environment, Lands, and Parks 1995, entire). A major goal of the Strategy was to ensure effective, enhanced protection and management of habitat through land use planning processes, new protected areas, and the Forest Practices Code. Gilnockie Provincial Park was established in 1995 just north of the international border in the upper Yaak River drainage. The 11 square mile park is managed similarly to U. S. wilderness areas with little road access.

In September 2012, the MFWP secured a 28,000 acre conservation easement with Stimson Lumber Company for land in the City of Troy. These lands are the largest remaining private in-holding in the CYE recovery zone. The Kootenai Valleys Conservation Program protects important fish and wildlife habitat providing opportunities for linkage and connectivity across Highway 2 in the CYE (see additional information below in Fragmentation and Genetic Isolation).

Additional conservation in the CYE is being achieved through implementation of the State of Montana's habitat conservation plan (HCP) which addresses the effects of its forest management program on grizzly bears in the CYE (as well as other species). As a result of that plan, open road densities on state lands are maintained or improved, lands will be inactive for a period of 8 years following a commercial timber sale (to provide habitat security for grizzly bears), and all State forest management employees and its contractors will adhere to food storage and sanitation requirements.

*Food & Attractant Storage*

Food and attractant storage orders and direction in the Forest Plan require that food, garbage, and other attractants are stored properly so that grizzly bears cannot obtain access to them. This prevents food-conditioning of bears, which usually leads to grizzly bear-human conflicts, injuries, or fatalities. In 2011, the KNF issued and attractant storage order for the entire forest.

*Motorized Access Management*

Motorized access management protects secure habitat, which is important to the survival and reproductive success of grizzly bears, especially adult female grizzly bears (Mattson et al. 1987, pp.18-19; IGBC 1994, p. 1). Grizzly bear habitat security is primarily achieved by managing motorized access which: (1) minimizes human interaction and reduces potential grizzly bear mortality risk; (2) minimizes displacement from important habitat; (3) minimizes habituation to humans; and (4) provides habitat where energetic requirements can be met with limited disturbance from humans (Mattson et al. 1987; McLellan and Shackleton 1988; McLellan 1989; Mace and Manley 1993; Mace et al. 1996; Wakkinen and Kasworm 1997).

The LMP incorporates the 2011 Access Amendment, and includes measures to manage motorized access within the CYE recovery zone and in areas of recurring bear use (i.e. BORZ). A history of the development, and details of these conservation measures is described in this

FWS001940

section, while updates on the existing condition will be covered in C. Factors Affecting Species Environment in the Action Area.

In 1998, an IGBC interagency task force examined motorized access management and produced recommendations to standardize definitions and methods (IGBC 1998, pp.3-5). This report recommended three parameters to include as components of access management: (1) open motorized route density (OMRD); (2) total motorized route density (TMRD); and (3) core areas (CORE). The goal was to provide this mix of motorized and non-motorized use area at levels that ensure the food and shelter resource needs of grizzly bears, including females with cubs, were met. The objective was to provide sufficient levels of available habitat for grizzly bears while allowing other authorized uses of National Forest System (NFS) lands. These standards were determined through consultation between the Service, the involved Forests, and grizzly bear research scientists, and reflect the unique biological features and social factors found within specific BMUs. This tailored approach is exactly what was envisioned by the IGBC (July 21, 1994; July 29, 1998; September 23, 1998); and the Selkirk/Cabinet-Yaak Subcommittee (December 1, 1998) when they directed land managers to develop these standards.

The benchmarks for standards were based on the average levels of access and secure habitat reported by Wakkinen and Kasworm (1997) to adequately support a female grizzly bear with cubs in the CYE and SE:

- On average, 33 percent of a female grizzly bear home range had OMRD greater than 1 mile per square mile.

- On average, 26 percent of a female grizzly bear home range had TMRD greater than 2 miles per square mile.

- On average, 55 percent of a female home range was comprised of core area (i.e., roadless area or areas with barriered roads).

These "research benchmarks" represent the average condition found across the home ranges of six reproductively successful adult female grizzly bears in the SE and CYE during the time of the study (Wakkinen and Kasworm 1997). Notably, some grizzly bears reproduced in home ranges with better conditions than the research benchmarks (i.e., lower road density and higher Core habitat) and some home ranges contained poorer conditions. Although the research benchmarks do not translate into definitive thresholds of grizzly bear tolerance, they provide a measurable threshold for determining conditions at which the reproductive capacity of female grizzly bears may be compromised.

The research benchmarks were pivotal in guiding development of access management standards for the Forests (KNF and IPNF) as they began working in 1998 towards attaining 55 percent of each BMU comprised of core area, having no more than 33 percent of each BMU with OMRDs exceeding 1 mile per square mile, and having no more than 26 percent of each BMU with TMRDs exceeding 2 miles per square mile. Land ownership constraints in some BMUs made achieving universally-applied standards within each BMU pragmatically not feasible. Within a BMU, roads on both Forests and nonfederal lands (i.e., private or State) were included in the

26

FWS001941

calculations for measuring access.  High road densities in many cases were due to roads over which the Forests had no control.  Given these constraints, the Forests, in coordination with the Service and grizzly bear researchers familiar with each ecosystem, analyzed the inherent capability for individual BMUs to achieve or maintain maximum percentages of core area, and the lowest OMRDs and TMRDs.  The Access Amendment set most BMU standards at or above (better than) the average recommended values for percent core area, depending on site-specific capability of the BMUs and management needs (Table 3).

The Access Amendment defined how to calculate road densities (U.S. Forest Service 2011, p. 10).  These definitions for OMRD, TMRD, and Core from the Interagency Grizzly Bear Committee Task Force (IGBC 1998; p. 4), and were used by Wakkinen and Kasworm (1997) when measuring route densities).  OMRD is calculated using a "moving windows" analysis (i.e., a spatial analysis of road density distribution), and includes open roads, meaning roads that are open to public use for some or all of the active bear year, roads not meeting restricted or reclaimed/obliterated criteria, and open motorized trails (see U.S. Forest Service 2020, p. 22-24). TMRD is also calculated using a moving windows analysis, and includes open roads, roads that receive administrative use but are closed to the public (i.e., "restricted roads"), roads not meeting reclaimed/obliterated criteria, and all motorized trails.  Routes that receive administrative use but not public use include descriptors such as "restricted," "administrative," or "gated."  See Table 5 in the biological assessment (U.S. Forest Service 2020, p. 23-24) for details on road definitions and calculations.

According to the Access Amendment, and thus the LMP, administrative use shall not exceed 60 vehicle round trips per active bear year per road, apportioned as follows: ≤18 round trips in spring (April 1 through June15); ≤23 round trips in summer (June 16 through September 15); and ≤19 round trips in fall (September 16 through November 30).  If the number of trips per season is exceeded on a particular road, that road is reported as "open" for that year to reflect the potential for grizzly bear displacement.  To provide administrative flexibility, OMRD may fluctuate from year to year, but must remain below the established standard.

The Access Amendment (Design Element 1.B., as shown in U.S. Forest Service 2015, p. 148) also provided parameters to establish and protect Core habitat, which were incorporated into the LMP.  Core habitat must include high quality habitat, contain the full range of seasonal habitats, and cannot not include any motorized travel routes or high use trails, but may contain impassable, overgrown roads or roads that are barriered with vegetation or forest debris (i.e., no gates) that effectively prevent motorized use.  Motorized routes are buffered to 500 meters on each side and are not included in Core habitat calculations.  Once established, Core habitat must remain in place for a minimum of ten years and Core habitat losses must be offset with replacement habitat of equal or greater value prior to or concurrent with the loss.

27

FWS001942

**Table 3. Standards for access management in Bear Management Units (BMUs) in the KNF portion of the Cabinet Yaak Ecosystem recovery zone.** Numbers in bold represent standards that exceed research benchmarks for OMRD or TMRD, or Core.

| Forest Zone | Bear Management Unit | Percent OMRD >1 mi/mi$^2$ | Percent TMRD>2 mi/mi$^2$ | Percent Core Area | Percent Federal Land |
|---|---|---|---|---|---|
| KNF | 1 (Cedar) | 15 | 15 | 80 | 99 |
| KNF | 2 (Snowshoe) | 20 | 18 | 75 | 94 |
| KNF | 3 (Spar) | 33 | 26 | 59 | 95 |
| KNF | 4 (Bull) | **36** | 26 | 63 | 84 |
| KNF | 5 (St. Paul) | 30 | 23 | 60 | 97 |
| KNF | 6 (Wanless) | **34** | **32** | 55 | 85 |
| KNF | 7 (Silver Butte) | 26 | 23 | 63 | 92 |
| KNF | 8 (Vermilion) | 32 | 20 | 55 | 93 |
| KNF | 9 (Calahan) | 33 | 26 | 55 | 90 |
| KNF | 10 (Pulpit) | **44** | **34** | **52** | 95 |
| KNF | 11 (Roderick) | 28 | 26 | 55 | 96 |
| KNF | 12 (Newton) | **45** | **31** | 55 | 92 |
| KNF/IPNF | 13 (Keno) | 33 | 26 | 59 | 99+ |
| KNF/IPNF | 14 (NW Peak) | 31 | 26 | 55 | 99+ |
| KNF | 15 (Garver) | 33 | 26 | 55 | 94 |
| KNF | 16 (EF Yaak) | 33 | 26 | 55 | 96 |
| KNF | 17 (Big Cr.) | 33 | 26 | 55 | 99 |

When developing the Access Amendment, the Forest explained that some BMUs would be unable to meet the research-derived benchmarks for OMRD, TMRD, and Core habitat because, in BMUs with relatively high density of private lands, achieving the research-derived benchmarks is not pragmatic; therefore, in these BMUs, the Access Amendment established standards were modified from the research-derived benchmarks to what was deemed achievable (U. S. FISH AND WILDLIFE SERVICE 2011a, p. A-67). To compensate for these "degraded" BMUs, the National Forests established standards in other BMUs that exceed (i.e., provide greater protection) the research benchmarks for OMRD, TMRD, and Core habitat. As a result,

28

FWS001943

although there would remain persistent deficiencies in some BMUs, the research-derived benchmarks could be met at the recovery zone scale (U. S. Fish and Wildlife Service 2011b, pp. A-79 to A-80). The Access Amendment has not yet been fully implemented. This biological opinion analyzes the effects of the Forest Plan including the Access Amendment standards and guidelines, and the time to implement those habitat conservation measures.

## 2. Human-caused Mortality

Human-caused mortality is one of the greatest challenges to grizzly bear recovery. Many study areas across grizzly bear range have seen that most bears that are killed by people are killed within 500 meters of an open road (Benn and Herrero 2002; Boulanger and Stenhouse 2014, p. 9; McLellan et al. 2015, p. 756), but determining the extent of human-caused mortality can be difficult because up to 50 percent of human-caused mortalities may go unreported (McLellan 1999, p916; Kasworm et al. 2019b, p. 33)[6].

Human-caused mortality encompasses multiple forms of mortality and is one of the primary sources of mortality for grizzly bears on the KNF. Kasworm (2019, p. 1) summarized human-caused mortality in the CYE from 2000-2018, and reported known and probable human-caused mortality averaged 1.7 bears per year, and 0.8 females per year, from 2000-2018. A comparison of the first half of the period (2000-2009) to the second half of the period (2010-2018) showed the same number of mortalities, 16, in each nine-year timeframe. Female mortality declined from 12 individuals in the first half of the period to three individuals in the second half.

The greatest causes of mortality in the CYE included mistaken identity, defense of life, poaching/malicious, and train/auto collisions, in descending order. In the nearby U.S. Selkirk Mountains, the greatest sources of mortality were mistaken identity, defense of life, defense of property, and train/auto collisions, in descending order. Mortalities listed as "under investigation" involved a dead bear with a bullet wound or a cut-off radio collar. Probable causes for the "under investigation" category include defense of life, mistaken identity, or poaching/malicious. Of the 18 "under investigation" instances in the US, 16 occurred during the spring or fall black bear hunting season, and 13 of 18 were within 250 meters of an open road (Kasworm 2019, p. 4). Defense of life occurring within 250 meters of an open road is possible, but may be less likely, leaving mistaken identity or poaching / malicious as the suspected cause for many of these under investigation mortalities.

Within the CYE, human-caused mortalities have been on a decreasing trend over the past several years. Kasworm et al. (2019, p. 31) show a 6-year average of human-caused mortalities that peaked in 2005 and has been decreasing since. Over the period that monitoring has occurred (1982-2018), sixty instances of known and probable grizzly bear mortalities were detected inside or near the CYE (excluding Canada). Forty-four of those (73 percent) were human-caused. More than half of all mortalities (35 of 60) occurred on private or non-Forest Service lands. Of the mortalities on National Forest lands, 72 percent (18 of 25) of known *human-caused*

---

[6] Hence estimates for grizzly bear mortality rates in the Cabinet-Yaak Ecosystem rely on a statistical analysis to account for unreported mortalities (Kasworm et al. 2019, p. 33).

29

FWS001944

mortalities were <500 meters of an open road and 28 percent were >500 meters from an open road (7 of 25; Kasworm et al. 2019, p. 32). Twenty-eight percent (7 of 25) of known human-caused mortalities occurring on National Forests were located within core habitat (area greater than 500 meters from an open or gated road; ibid.).

A study evaluating the effectiveness of conflict prevention actions detected a reversal of the mortality trend in the CYE post-hiring of the CYE grizzly bear conflict specialist. Prior to 2009, the mortality trend was increasing, but a significant decrease was detected after 2009. This was accompanied by an increase in the grizzly bear population in 2013, reversing a decades-long trend of high mortality in the CYE (Proctor et al. 2018; Kasworm et al. 2019, p. 31). While difficult to statistically measure, effective human-bear conflict response along with education, outreach, and prevention have likely had a positive effect in preventing human-caused bear mortality (Annis and Trimbo 2019, p. 14).

**Figure 4. Known and probably human-caused mortality in the Cabinet-Yaak and Selkirk Ecosystems, from 2000-2018 (Kasworm 2019).**



### 3. Small Population Size

Small isolated populations face increased susceptibility of extinction due to mortality (human-caused and natural), lower population growth rates, and environmental processes (e.g. poor food years, climate change, and habitat loss; Soule 1987, Belovsky et al. 1994, IUCN 2003). Multiple factors can decrease extinction risk for small, fragmented populations. Increasing connectivity increases resiliency, redundancy, representation, and overall probability of persistence of remaining grizzly bear populations in the lower 48 States (Boyce 2000; Proctor et al. 2004; Soule 1987). In addition, small populations benefit from demographic rescue (i.e., the immigration of

FWS001945

female bears) and to a lesser degree genetic rescue (i.e., immigration of male bears) benefit small populations.

While grizzly bear populations in the CYE and SE contain less than 100 individuals each (55-60 and 75-80 individuals, respectively), they are not entirely isolated from Canadian populations. Fourteen individuals have immigrated (moved in) from adjacent populations in the North Purcells or South Selkirks (n=11) and the NCDE (n=3). Three of these immigrants (2 males and 1 female) produced offspring in the CYE, showing evidence of gene flow between the populations. Maintaining existing connectivity, and increasing opportunities for connectivity to the NCDE and Canadian populations will benefit these populations, and attenuate extinction risk (Proctor et al. 2004).

In contrast to the small populations in the CYE and SE, grizzly bears in the NCDE benefit from a large and growing population size (approximately 1,029 individuals; U. S. Fish and Wildlife Service 2019), expanding distribution, and connectivity to a larger grizzly bear population in the U.S.-Canadian border region (Proctor et al. 2004; Proctor et al. 2012; U. S. Fish and Wildlife Service 2019). For example, more than 50 percent of bears detected in southwestern Alberta from 2011–2014 were bears that also had detections in the U.S. or B.C., further supporting substantial connectivity across the boundary (Morehouse et al. 2016). Based on those movements and on measures of genetic diversity, Morehouse et al. (2016) concluded there is currently little risk of significant reduction in the present high levels of genetic diversity for the NCDE population. As such, the population faces low risk of extinction.

### *Augmentation*

Proctor et al. (2004) evaluated the relative importance of three management strategies—augmentation, mortality reductions, and population interchange—on grizzly bears in the small, fragmented population of grizzly bears in the CYE. They concluded adding female bears to the ecosystem (augmentation) would provide the largest boost to population growth rate over the short-term. The population would benefit most in the long-term from establishing and increasing population interchange and reducing mortality.

The Service and Montana Fish, Wildlife and Parks (MFWP) initiated an augmentation of grizzly bears in the CYE with the goal of boosting the small population, and to positively affect linkage and connectivity. From 1990 to 1994, four female grizzly bears were captured in the Flathead River Valley of British Columbia and released in the Cabinet Mountains to augment the existing population in an effort to determine if transplanted bears would remain in the target area and ultimately contribute to the population through reproduction. In 2005, the Service and MFWP again began augmenting the grizzly bears in the Cabinet Mountains, and this program has continued to release individuals into the Cabinet Mountains.

Augmentations and reintroductions of wildlife species typically include an expectation for relatively high mortality of relocated individuals and emigration of relocated individuals from the release area. However, augmentation of grizzly bears into the Cabinet Mountains has met significant success to date. Of 20 bears released through 2018, 6 are known to have left the target area (one was recaptured and brought back and one returned a year after leaving), three

31

FWS001946

were killed within 4 months of release, and one was killed 16 years after release. Despite some mortalities, successful reproduction has been documented. One animal was known to have produced at least 10 first generation offspring, 16 second generation offspring, and one third generation offspring. Another female was known to have produced three offspring and a male was also known to have produced one offspring.

### 4. Population Fragmentation and Genetic Isolation

Human activities fragmented historically contiguous populations of grizzly bears into the isolated "remnant" populations that we see today (Forman and Alexander 1996, p. 207; Proctor et al. 2012, p. 5; Servheen et al. 2001, p. 164). Potential isolation from grizzly bears in the Canada portion of the greater CYE potentially threatens grizzly bears in the U.S. portion of the ecosystem. Conditions in Canada and along the international boundary currently allow movement of grizzly bears between Canada and the Yaak portion of the CYE, but grizzly bear habitat is being affected by highways and associated development in Canada. Proctor et al. (2012, p.31) documented increasing genetic and demographic fragmentation across Canada Highway 3. If allowed to continue, this fragmentation could lead to a loss of connectivity between U.S. and Canadian grizzlies. This is an important concern for the CYE where the population is small, hence maintaining and increasing movements by females (i.e., demographic rescue) is critical to the long-term conservation of these populations. Female movement and reproduction provides demographic and genetic rescue to a population, whereas male movement and reproduction may only provide genetic rescue.

The genetic data analyzed by Proctor et al. (2012) reflect fragmentation occurring on the landscape in the past (i.e., last 30-60 years) and may not reflect current, improved levels of connectivity and recent movement of grizzly bears between areas. In other words, current grizzly bear populations may not be as isolated as the genetic data of this study suggest. Therefore, it is useful to supplement these genetic data with movement data to get a complete picture of current population connectivity.

Between the NCDE and the CYE lies the Salish Demographic Connectivity Area (DCA), of which the Tobacco BORZ is part. Within the DCA, multiple grizzly bears have been observed between 2011 and the present. The NCDE Conservation Strategy (NCDE Subcommittee 2000; p.199-200) provides a summary of what is known about grizzly bears in the Salish DCA, which includes several female grizzly bears that were likely residents of the DCA. No mortalities have been documented among female grizzlies primarily monitored within the Salish DCA, and no mortalities have been documented among their dependent offspring. Costello et al. (2016) reported that, using verified grizzly bear locations from 2004–2014, 100 percent of the Salish DCA is within the current distribution of grizzly bears. Kendall et al. (2016) reported detection of a male bear immigrating to the CYE from the NCDE, and of a male bear of Yaak origin making multiple forays to the NCDE. Furthermore, discovery of four offspring of a Yaak male bear with two NCDE female bears suggested that the intervening areas in the Salish Mountains are permeable to, and reasonably secure for, bear movement (Kendall et al. 2016).

Between the CYE and the SE, Proctor et al. (2012) found 4 males and 1 female using habitat between the Selkirk and Purcell Mountains, although there was no evidence indicating any

FWS001947

migration between these two mountain ranges.  Kasworm et al. (2019) analyzed capture, telemetry, and genetic data to evaluate movement and subsequent reproduction resulting in gene flow into and out of the CYE.  They identified thirty-six grizzly bears as immigrants, emigrants, or were the offspring of immigrants to the CYE.  While movement and gene flow out of the CYE may benefit other populations, gene flow into the CYE is most beneficial to genetic health of the CYE bears.  Fourteen individuals (11 males and 3 females) are known to have moved into the CYE from adjacent populations; however eight of these were killed or removed.  Most of these immigrants originated in the North Purcells or South Selkirks with only three originating in the NCDE.  All three immigrants producing gene flow originated in the North Purcells.  While this evidence of movement is encouraging, reproduction in the Cabinet Mountains that would contribute to the genetic health of the population has not been documented for any emigrants.

Of additional concern is population linkage between the Yaak and Cabinet portions of this recovery zone, which is bisected along the Highway 2 corridor by the highway, a railway, and the Kootenai River (Proctor et al. 2012, p. 12; Kendall et al. 2016, pp. 320–321).  The Yaak population is larger and connected to Canadian populations to the north, making it more genetically diverse than the Cabinet population (Proctor et al. 2012, p. 12; Kendall et al. 2016, pp. 320–321).  Based on DNA analysis, only 2 individuals (both males) were detected on both sides of Highway 2 from 2012 to 2019 (Kendall et al. 2016, p. 325; Kasworm et al. 2020a, *in prep.*).

Current levels of genetic diversity are not translating into any detectable deleterious effects to the CYE (U.S. Fish and Wildlife Service, *in prep.*)  Isolation of the CYE is more of a concern because of the small population size, but recent data indicate increasing movements by males and females and subsequent reproduction, resulting in limited, but increasing population connectivity.  Maintaining or increasing current levels of genetic diversity in the CYE would help ensure genetic concerns do not become a threat in the future.  Small population size makes this grizzly bear population more vulnerable to genetic, demographic, and environmental stochasticity.  Natural connectivity would alleviate potential future genetic concerns, reduce extinction risk due to small population size, and increase this population's resilience to environmental and climate change impacts.


**C. Factors Affecting Species Environment in the Action Area**

As discussed above in section B. *Factors Affecting Species Status in the Action Area*, the primary factors affecting the CYE grizzly bear population include access management, human-caused mortality, population size, and fragmentation and genetic isolation.  This section identifies and describes key areas of Forest management that affect the grizzly bears' environment.  These factors include access management, attractant management and developed sites, livestock management, vegetation management, fire management, and oil and gas leasing.  General impacts of these factors will be discussed in more detail in VI. *Effects of the Action* section below.

33

FWS001948

## 1. Access Management

The existing motorized access condition was determined using the best available information.  The metrics described here are assumed to be an accurate representation of the existing motorized access condition as reviewed, although the Service and the Forest recognize that mapping and calculation errors can occur.  If the Forest finds that it has made a mapping or calculation error in describing the existing condition and corrects the metrics, the Service does not expect any additional effects to grizzly bears related to those corrections, as long as the corrections do not represent an on-the-ground change to motorized access baselines.  The intent of this analysis is to capture the existing condition and the potential effects to grizzly bears, including potential ongoing effects that may not be represented in the metrics described above due to potential errors.  If there are changes to motorized access as a result of proposed KNF actions, then project-specific section 7 consultation would need to occur to determine the potential effects, or if reinitiation of this consultation is needed.

### a. Motorized (wheeled) Access in CYE BMUs

Access Management conditions in the CYE and SE Recovery Zones have been improving since the Access Amendment was finalized, as documented in annual monitoring reports sent to the U. S. Fish and Wildlife Service (see U.S. Forest Service 2020b, and other years on file).  In the KNF portion of the CYE Recovery Zone, there was an increase of more than 7,000 acres of designated Core Areas from 2009 to 2019.  This translates into an increase from 59 to 60 percent Core Area during this time period.  The corresponding KNF wide OMRD stayed the same at 30 percent while TMRD decreased from 25 to 24 percent for the same time period (U.S. Forest Service 2020, p. 33).

Currently four BMUs on the KNF have not yet permanently reached all of the standards.  The Forest has made multiple decisions that affect access management subsequent to the 2011 Access Amendment, as described in the biological assessment (U.S. Forest Service 2020).  The Forest previously estimated, and the Service issued its biological opinion based on that estimation, that the BMUs would be brought into standards by 2019.  However, as described in the *Introduction* and in the BA, those initial timeframes have not yet been met.  The Forest has faced challenges with attaining standards in four BMUs.  The BA provides details of the condition of each of these BMUs as well as when implementation of access management projects are expected to occur to make and to implement standards (U.S. Forest Service 2020, p. 34-35).  To summarize:

- An access management project in BMU 4 (Bull), which is intended to bring BMU 4 into compliance with the AA, is in the early phases of planning.

- BMU 5 (St. Paul) would have been brought into compliance by road access changes associated with the Rock Creek Project Phase 1 and the Montanore Evaluation Project.  These projects have been delayed due to litigation.

- BMU 6 (Wanless) would have been brought into compliance by road access changes associated with the Montanore Evaluation Project and the Miller-West

34

FWS001949

Fisher Project. However, litigation on these projects has precluded the Forest's ability to implement the proposed mitigation measures to bring these BMUs into compliance.

- BMU 8 (Vermillion) is also not up to compliance due to database corrections that account for a previous re-route of a motorized trail.

Once the standards are attained, 16 of the 17 BMUs in the action area will meet the research benchmarks for Core area (Table 3). BMU 10 (Pulpit) will be the only one that will not reach the research benchmark for core area due to its small size and private ownership (U.S. Fish and Wildlife Service 2011, p. A-83). Additionally, OMRD and TMRD will improve or be maintained, such that 13 of 17 BMUs will meet (or be better than) the OMRD research benchmark and 14 of 17 BMUs will meet (or be better than) the TMRD benchmark. The Forest provided clarification on the difference between meeting standards with a signed decision versus full on-the-ground implementation of an access management project. It clarifies: *"compliance with the standards occurs when implementation has made the changes on the ground, not when the project decision is signed. There is a lag time between project decision and the completion of project implementation that finally results in compliance on the ground with access management standards for grizzly bears. Project level BAs describe how projects would bring BMUs into compliance with access management standards, but it often takes several years once a project decision is signed for the access changes to be implemented on the ground. Timber sales, for example, may take more than 5 years to be completed, partially because the purchaser may opt to delay the start. Resolution of ongoing litigation may also delay implementation of access management changes that would improve conditions on the ground for grizzly bear"* (U.S. Forest Service 2020, p. 34)

As allowed under the LMP (U.S. Forest Service 2015, p. 148-149), the Forest has designed projects that have temporarily affected OMRD, TMRD, or Core. These projects have undergone section 7 consultation and have signed decisions authorizing the temporary changes in access management (U.S. Forest Service 2020b, p. 1-9). In the BA, the Forest reported numbers that were temporarily deviating from standards in BMUs 9, 10 and 13, due to temporary project implementation; we expect these BMUs will return to the permanent condition as shown in the standards (Table 3) once projects are completed (see additional details in U.S. Forest Service 2020b, p. 2-10, and U.S. Forest Service 2020, p. 76-78).

### b. Motorized (wheeled) Access in CYE BORZ

The 1993 Recovery Plan recognized that grizzly bears would occur outside the recovery zone lines and that the mere presence of bears outside of the recovery zone line is not sufficient reason to change the recovery zone lines (U.S. Fish and Wildlife Service 1993a). In recent years, credible observations of grizzly bears and radio-telemetry research data on collared grizzly bears have documented use in areas outside of existing recovery zone boundaries. These recurring use areas have been named 'Bears Outside Recovery Zones' (BORZ) for the Selkirk and Cabinet-Yaak grizzly bear ecosystems, and they were subsequently incorporated into the amendments to

35

FWS001950

the Kootenai (KNF), Idaho Panhandle (IPNF), and Lolo (LNF) National Forest Plans in 2011 (USDA Forest Service 2011a).

The KNF currently identifies four BORZ areas: Cabinet Face, Clark Fork, Tobacco, and West Kootenai. All four of these BORZ were identified in the BO for the Access Amendment and for the LMP (U.S. Fish and Wildlife Service 2011, 2013). Since the Access Amendment Record of Decision (ROD) was signed, the Forests have met several times with U.S. Fish and Wildlife Service to review credible grizzly bear observations to determine if recurring use has expanded beyond the original BORZ boundaries (per 2011 BO monitoring requirement, USDI Fish and Wildlife Service 2011b). The Forest has added all or portions of three 6th-order Hydrologic Unit Code (HUCs) to the original BORZ: Bobtail Creek (disclosed in the Bear Year 2011 monitoring report; U.S. Forest Service 2012, p. 11), Lower Pipe Creek, and Cedar Creek (both disclosed in the Bear Year 2019 monitoring report; U.S. Forest Service 2020b, p. 18). These HUCs have met the recurring use criteria established in the Access Amendment and described above. The Forest now applies the standards for BORZ that preclude any net increase in permanent open and total miles of road (Design Elements II A and II B in the Access Amendment ROD) to the entire BORZ polygons, including the additional HUCs (U.S. Forest Service 2020, p. 9).

As reflected in the Bear Year monitoring reports, the BORZ open/total road miles have varied since the establishment of the 2010 baseline. First, temporary increases have occurred, as allowed under Access Amendment Design Elements II A and B. Administrative use and project activities have resulted in temporary increases in both open and total roads, including the use of temporary roads. Some updates to the database or improved technology have resulted in improved accuracy of existing condition mileage estimates, and these types of updates are not the result of on the ground changes. The Forest has *corrected* the baselines as improved information is available. The Forest has also *expanded* BORZ areas by adding HUCs, as described above, and by conducting land exchanges which have added acres and miles of road to BORZ polygons because the Forest acquired lands within the BORZ polygon. In some cases there have been changes on the ground, such as the addition of roads for ANILCA access as allowed under Design elements II A and B, but very few permanent on-the-ground changes have occurred in BORZ. The detailed histories are described in annual monitoring reports, and summarized in the BA (U.S. Forest Service 2020, Appendix B).

The Forest provided updated information regarding the existing size of each BORZ, the amount of National Forest System (NFS) land in each BORZ, and the total and open roads in each BORZ, which is summarized in Table 4 below (derived from Table 8 in the BA, U.S. Forest Service 2020, p. 32). The Service also requested information on the amount of secure habitat within each BORZ, which is shown in Table 4 and in Appendix D. The Bear Year 2019 Monitoring Report (U.S. Forest Service 2020b, p. 17) displays the current condition, as of 2019, in each BORZ, including temporary changes to open and total routes as a result of projects that have undergone project-specific section 7 consultation. We acknowledge these

36

FWS001951

temporary conditions, but are defining the Environmental Baseline at this time based on the *permanent* condition within the BORZ, as shown in this table.

**Table 4. Baseline conditions as of 2019 Bear Year for permanent status of motorized access in BORZ on the KNF. Referred to in this opinion as the 2019 Baseline.**

| Bears Outside Recovery Zone | Total Size (acres) | Total Area NFS (acres) | Total Roads (linear miles) | Open Roads (linear miles) | Secure Habitat (acres and percent of NFS lands) |
|---|---|---|---|---|---|
| Cabinet Face | 28,052 | 27,083 | 165.0 | 133.6 | 889 acres (3 percent) |
| Clark Fork | 101,899 | 100,209 | 267.4 | 186.4 | 33,330 acres (33 percent) |
| West Kootenai* | 217,595 | 200,555 | 790.1 | 456.9 | 41,419 (21 percent) |
| Tobacco | 287,240 | 266,992 | 1192.7 | 936.4 | 34,338 acres (13 percent) |

*\* includes the Bobtail, Lower Pipe, and Cedar Cr-Kootenai River Recurring Use Areas (RUAs), as shown in Figure 1 of the BA (U.S. Forest Service 2020, p. 63)*

Current management direction in BORZ in the LMP, as clarified in the BA (U.S. Forest Service 2020, p. 32-33) assures the no-net increase in permanent motorized route miles applies to all areas that meet the definition of BORZ (i.e. 2010 and subsequent expansions). As new HUCs meet the definition of recurring use, and are added to the adjacent BORZ (e.g. West Kootenai + Bobtail HUC + Lower Pipe HUC + Cedar HUC = Combined West Kootenai) then a new (combined) baseline will be recorded in the Forest's annual report that is sent to the Service (for example, see U.S. Forest Service 2020b, the annual monitoring report for the KNF for Bear Year 2019). The 2019 Baseline shown in Table 4 will be the basis for evaluating any new projects in BORZ under the LMP. As described in the Proposed Action, and analyzed in the *Effects* section below, we expect that the Forest will continue to delineate additional expansions to BORZ in the future as grizzly bears expand their distribution.

*c. Motorized (wheeled) Access in NCDE subunits*

The KNF portion of the NCDE Recovery Zone (referred to as the Primary Conservation Area in the NCDE Conservation Strategy) contains two grizzly bear subunits within the Murphy Lake BMU: the Krinklehorn and Therriault subunits (see map at U.S. Forest Service 2020, p. 64). Our biological opinions on the LMP (U.S. Fish and Wildlife Service 2013, p. 52) evaluated the baseline condition within the two NCDE subunits.

The Forest recently provided the Service with a notice of needing to correct the baseline access parameters for these two subunits (J. Anderson, email *in litt.*, 2020). These corrections result in changes to the baseline numbers for OMRD and TMRD in the subunits, but do not represent any changes on the ground. NCDE-STD-AR-02 identified conditions that <u>are not to be</u> considered a

FWS001952

net increase/decrease from the baseline, including: underlined(updated or improved data on a motorized route without and actual change on the ground (U.S. Fish and Wildlife Service 2017, p. 2-3, and U.S. Forest Service 2018, p. I-18)). These new calculations result in no actual change on the ground, and would therefore fall under this condition, resulting in an update to the baseline.

**Table 5. Baseline condition for the NCDE subunits managed by the KNF.**

| Subunit | Core | OMRD (≥ 1 mile per square mile) | TMRD ( ≥ 2 miles per square mile) |
|---|---|---|---|
| Krinklehorn | 75% | 22% | 14% |
| Therriault | 71% | 26% | 12% |

### d. Unauthorized Motorized Use

A private entity's non-compliance with the Forest's access management is an illegal activity. While illegal use of the Forest via motorized access in areas unauthorized for such use may occur within the action area, such illegal use is not a Forest action. The term "action" for section 7 consultation is defined in the Consultation Handbook (U.S. Fish and Wildlife Service, National Marine Fisheries Service 1998) as: all activities or programs of any kind *authorized, funded, and/or carried out*, in whole or in part, by Federal agencies in the United States or upon the high seas (emphasis added). These and any other illegal activities are not the result of a federal action and therefore not analyzed under effects of the action, but their influence is considered for describing the environmental baseline.

Illegal motorized access could occur anywhere on the Forest. While illegal motorized access has the potential to affect individual grizzly bears, the amount, location, duration, and timing of effects resulting from such illegal use is not known. The probability of long-term illegal motorized access and probability of illegal access coinciding with the presence of grizzly bears is anticipated to be low but is unknown. As such, the potential consequences to grizzly bears are uncertain. Illegal motorized access is expected to be spatially disparate and temporary and is not likely to collectively cause an adverse effect because most Forest users follow travel regulations and when illegal use is observed, or when user-created roads become apparent, the Forest corrects the situation as soon as they are able. Because all routes are considered the same (whether open or restricted) for calculating secure habitat for grizzly bears (Appendix C), illegal motorized use of restricted routes does not affect secure habitat. Secure habitat could only be affected by off-road use or use of reclaimed/obliterated or bermed roads. However, effects of illegal motorized access would not result in a change in the Forest's baseline access conditions as such use was not authorized, carried out, or funded by the Forest. Also, illegal motorized access

FWS001953

would most likely result in temporary effects to grizzly bears as opposed to a permanent change in motorized access conditions because the Forest corrects the situation as soon as they are able.

Where illegal use is discovered, the Forest generally responds as soon as possible (U.S. Forest Service 2020, p. 40). Sometimes this is as simple as replacing a broken lock, which can be done immediately. Other times the fix may take a few days to a few weeks to replace a broken gate or device, or it may take longer to address the issue by adding boulders or taking other measures to attempt to block illegal motorized access. The Forest reports these responses generally occur in the same bear year, or early the next bear year.

The Kootenai National Forest provided substantial data regarding illegal access on the Forest. As shown in the BA (U.S. Forest Service 2020, p. 37-41), the Forest monitored hundreds of closure devices intended to restrict public motorized access on roads (a commitment from the 2011 Access Amendment). From 2011-2019, the Forest detected breaches resulting in unauthorized motorized access in the KNF portion of the CYE Recovery Zone in 8 of the 9 years. The number of breaches ranged from 0 to 33 breaches detected per year, which equates to 0 to 8 percent of devices being breached. Breaches occurred irregularly in space and time, meaning not every BMU had a breach every year; most BMUs had at least one year in which breaches were detected; and some BMUs had breaches most years, although the location of those breaches within the BMU generally changed from year to year (see annual monitoring reports, U.S. Forest Service 2012, 2013b, 2014, 2015b, 2016, 2017, 2018, 2019, 2020b). Some of these breaches resulted in public use of a gated or restricted road, and a smaller subset resulted in public use of a restricted road that affected Core areas. The length of time a road was breached, and the number of trips that were made, were less easily quantifiable.

Unauthorized use has been documented and is likely more extensive in BORZ and other landscapes than in BMUs. The Forest assumes BORZ may experience more extensive illegal use because these areas are generally more densely roaded and have more human use compared to BMUs (U.S. Forest Service 2020, p. 40). Many areas of BORZ are also closer to the public/private land interface, where private users may create unauthorized motorized trails from their land onto the Forest. Gentle topography and more open vegetation make it easier for motor vehicle operators to drive around closures or create their own unauthorized routes, and thus make it more challenging for the Forest to prevent the illegal access.

Given our review of the data in the BA and the annual monitoring reports, we assume persistent or chronic illegal motorized access is rare. However, the Forest has identified a few areas of "long-term illegal use," including 9.1 miles of user-created trails off the Pipe Creek Road in the Cedar Creek RUA (part of West Kootenai BORZ), and 1.1 miles in the Lower Pipe RUA (also in West Kootenai BORZ; U.S. Forest Service 2020b, p. 22-23). The Forest also provided information regarding recurring illegal use along railroad access routes and powerline access routes in several BORZ U.S. Forest Service 2020b, p. 17, 18). The Forest explained that it has no authority to obliterate or reclaim such routes, as it must provide access to the powerline and railroad infrastructures (J. Anderson, 2020b email *in litt.*). These routes are not on the Motor Vehicle Use Map and are therefore not legally open to the public, but physically restricting public access is difficult if not impossible based on topography and lack of vegetation under the cleared powerlines (ibid.). Most of these areas that experience long-term illegal use are in lower

FWS001954

elevations and generally in areas that are not considered secure habitat due to other existing routes, as such these areas do not generally provide high quality habitat for grizzly bears.

While effects to grizzly bears may occur as a result of illegal motorized access, it is the Service's opinion that such effects are reasonably uncertain. Information as to the length, duration, amount of use, type of use, and location, among other conditions, is and will continue to be unknown. As such, the Service and the Forest are not able to calculate the extent of effects to grizzly bears, and any effects associated with illegal motorized access is not exempted under this biological opinion.

### e. Over-the-Snow Motorized Access

Grizzly bears that are entering dens or emerging from dens during the time that motorized over-the-snow activities are occurring could be affected by that motorized use. To determine areas where over-the-snow activities could overlap with grizzly bear habitat use, it is important to know when bears den, then where motorized over-the-snow access can occur.

In the CYE, Kasworm et al. (2019) reported den entry dates ranged from the third week of October to the last week of December. Grizzly bears in the Cabinet Mountains (median entry in 2nd week of November) entered dens 2 weeks earlier than bears in the Yaak River drainage (median entry during 4th week of November). Males generally entered dens later than females. By December 1, 37 percent of Cabinet and Yaak grizzly bears had not entered winter dens.

Den exit dates ranged generally between the second week of March through the second week of May in the CYE (Kasworm et al. 2019). Grizzly bears in the Cabinet Mountains generally exited dens one week later than bears in the Yaak river drainage. Males tended to exit dens two weeks earlier than females. Seventy percent of den exits occurred during the month of April. By May 1, 14 percent of Cabinet and Yaak grizzly bears were still in dens, well over half of which were females with cubs-of-the-year. Females with cubs appear to exit dens later than other adult females.

The Forest provided estimates of where off-route snowmobile use occurs on approximately 18,686 acres within the KNF portion of the CYRZ and 7,905 acres of the KNF portion of the NCDE. Estimated snowmobiling acres have not changed from the acres listed in the BO for the LMP (U.S. Fish and Wildlife Service 2013) nor in the ROD for the LMP (U.S. Forest Service 2015a). There are approximately 53 miles of groomed trails and 58 miles of ungroomed routes on the KNF portion of the CYE Recovery Zone, and there are 7 miles of groomed routes and 4 miles of ungroomed routes on the KNF portion of the NCDE Recovery Zone. Forest Plan standard FW-STD-WL-05 prohibits grooming of snowmobile routes in grizzly bear core habitat in the spring after April 1 of each year (U.S. Forest Service 2015, p. 31). Off-route snowmobile travel occurs on about only 5 percent of modeled denning habitat within the CYE Recovery Zone portion of the KNF and 21 percent of the NCDE portion of the KNF.

The LMP includes a standard (FW-STD-WL-05), which states precludes grooming of snowmobile routes in grizzly core habitat in the spring after April 1 of each year. Monitoring on the KNF since 2016 has focused on the Northwest Peaks/Buckhorn and Spar Lake vicinities and

FWS001955

has detected overlap of late-season snowmobile activity (on un-groomed trails or off-trail areas) in predicted denning habitat after April 1 (J. Anderson, pers. comm., May 2020).

Winter travel planning was initiated on the NCDE portion of the KNF (Ten Lakes Travel Management Project). The purpose of the Ten Lakes Travel Management Project is to develop a travel management plan (over-snow and mechanized) for the Ten Lakes Wilderness Study Area to comply with the terms of the 2007 Settlement Agreement with the Montana Wilderness Association and to maintain wilderness character and the potential for inclusion in the National Wilderness Preservation system that existed in 1977. In August of 2019, the Ten Lakes Travel Management Project was paused in order to instead focus effort on ecosystem restoration and forest health issues.

### 2. Habitat quality and fragmentation

#### a. Habitat quality/seasonal maps

Grizzly bear occurrence is supported in the Selkirk and Cabinet-Yaak Recovery Zones by the availability of high quality forage and denning habitat, and use of areas outside of the recovery zones requires seasonal habitat availability to support continued use. Recently, Proctor and Kasworm developed a fine-scale model of sex- and season-specific habitat use for grizzly bears in the Selkirk Ecosystem and the Cabinet Yaak Ecosystem (2017). Although the model seasons differ slightly from the bear seasons identified in the Forest Plan (U.S. Forest Service 2020, p. 26-27), the model still provides a useful tool in predicting bear use of seasonal habitat. These habitat models can be used to inform project planning (e.g. timber harvest, road building, road closing, road decommissioning, and prescribed burns) in order to minimize effects to grizzly bears.

According to the model, the SRZ and CYE contains a full suite of seasonal habitats (i.e., spring, summer, and fall forage) distributed across the recovery zones and in BORZ (U.S. Forest Service 2020, p. 68-70, and Table 13 in this Opinion). In general, BMUs in the Yaak portion of the recovery zone contain more of the high and very high quality habitat than the Cabinet portion of the recovery zone. The Yaak portion of the recovery zone also has more BMUs with grizzly bear occupancy that the Cabinet portion, with 7 of 8 BMUs occupied in the Yaak compared to 3 of 13 in the Cabinet.

Similarly, individual BORZ contain varying quantities of seasonal habitat, and overall percentages of quality habitat are similar to the Recovery Zones when roads are not considered. Seasonal habitat models provide data for three of the KNF BORZ adjacent the Cabinet-Yaak Recovery Zone (West Kootenai, Cabinet Face, and Clark Fork), including the recently added West Kootenai BORZ expansions. Seasonal habitat models do not provide data for the Tobacco BORZ east of the Cabinet-Yak recovery zone or a small portion of the expansion area for the West Kootenai BORZ. As with the recovery zones, the quantity of seasonal habitat varies between BORZ (Table 14). In BORZ that are adjacent to the Cabinet-Yaak, the West Kootenai BORZ contains the highest percentage of quality spring and fall habitat. In general, BORZ adjacent the Cabinet-Yaak recovery zone contain lower amount of

41

FWS001956

high and very high quality seasonal habitat than BORZ adjacent the Selkirk Recovery Zone but, overall, the southern-most BORZ (Cabinet Face and Clark Fork) contain less quality habitat than BORZ to the north.

### b. Linkage and connectivity

Generally, habitat conditions on NFS lands within linkage zones currently contribute to connectivity and linkage within the CYE population and between the recovery zones. Highways, railroads, and private land uses contribute to fragmentation and increase the risk of isolation. Augmentation of grizzly bears in the Cabinet Mountains moderates the effects of this isolation. The recent purchase of the Kootenai Valleys Conservation Easement Project also conserves important lands in the corridor which will contribute to maintaining or promoting connectivity. The 2011 Access Amendment began implementing strategies to limit effects to grizzly bears in the BORZ by limiting linear miles of road to no more than the existing baseline open and total permanent roads to prevent additional impacts of road densities on grizzly bears between the CYE and NCDE and between the CYE and SE. A positive development has been grizzly bears, including females with cubs, being documented in the Tobacco BORZ and other parts of the Salish DCA.

### 3. Other Factors on KNF lands

#### a. Attractants

To date, there have been no grizzly bear deaths associated with food attractants on KNF lands in the Cabinet-Yaak Recovery Zone (U.S. Forest Service 2020). The KNF has installed numerous bear resistant containers and food storage poles since 2007. These have been placed in campgrounds and dispersed sites throughout the recovery zones on the KNF. A Forest-wide food and attractant storage order has been in effect since 2011 (U.S. Forest Service 2011b).

Many contracts and special-use permits in the Cabinet-Yaak contain provisions requiring protection of the grizzly bear and its habitat, in addition to proper storage of food and attractants. Some contract and permit provisions require temporary or permanent cessation of permitted activities to resolve grizzly bear-human conflicts. Timber sale prescriptions and contracts incorporate provisions to protect grizzly bear habitat.

Livestock grazing permits may include special provisions such as proper storage of food and attractants as well as carcass removal. Annual monitoring of livestock allotments is performed to check on compliance and assess any conflicts. Disposal of animal carcasses has been emphasized to reduce conflicts with grizzly bears.

#### b. Livestock grazing

Consequences to grizzly bears from livestock depredation include grizzly bear deaths (i.e., defense of property) or management removals. As described in its biological assessment, the Forest (2013a p. 92) reports that grazing occurs in 6 cattle grazing allotments that overlap BMUs

42

FWS001957

(14,609 acres or 1 percent of the BMU acres on the KNF – this includes 4,880 acres in the NCDE portion of the KNF). Multiple grazing allotments overlap the BORZ, mostly in the Tobacco BORZ and West Kootenai BORZ (J. Anderson, pers. comm. 2020c). This includes allotments that occur on the expansion areas in the West Kootenai BORZ. To date, there have been no grizzly bear/livestock conflicts associated with livestock use on the KNF, and none of the allotments allow sheep grazing. LMP standard FW-STD-WL-04 specifies that grazing permits and operating plans shall specify sanitation measures and adhere to the Forestwide food/attractant storage order.

### c. Vegetation & Fire Management

The KNF has a dynamic vegetation and fire management program. Timber production (timber stands with planned, scheduled entries for the purpose of generating commercial timber products) would occur within the suitable timber base on the KNF, which covers 218,212 acres in BMUs (16 percent of BMUs). The LMP originally included 333,925 acres of suitable timber base within BORZ (U.S. Fish and Wildlife Service 2013). An additional 30,594 acres of suitable timber base are included in the HUCs that have been added to the West Kootenai BORZ (U.S. Forest Service 2020), for a total of 364,519 acres of suitable timber base in the BORZ. The effects of timber harvest on grizzly bears was analyzed in our 2013 BO for the LMP, and those conclusions have not changed.

Access management to facilitate fire and timber management is subject to the access management standards. Future projects that may propose changes in wheeled motorized access and timber harvest would have to be evaluated in a site-specific biological assessment that would examine detailed effects to grizzly bears.

### d. Energy & Mineral Development

The Troy copper/silver mine occurs in the Spar BMU. The mine was in various stages of operation for over 20 years and affects approximately 50 acres of disturbed area at the mine site on NFS lands and an additional 400 acres of private lands. The mine is now closed and the lands are under reclamation and restoration. Operation of the mine and implementation of its mitigation plan was determined to contribute to or be compatible with the six priority needs to achieve recovery in the CYE (U.S. Fish and Wildlife Service 2006, p.A-16). Further, the parameters of the plan were determined to adequately conserve habitat for the continued use and occupancy by grizzly bears in the affected BMU (3) (ibid, p. 18).

In 2019, the Service issued a biological opinion supplement for grizzly bears covering effects associated with evaluation activities for the Rock Creek Mine (U.S. Fish and Wildlife Service 2019), which affects portions of BMUs 4, 5, and 6. The evaluation area includes roughly 19.6 acres of NFS lands, and associated road use. Activities beyond evaluation of the Rock Creek Mine will be subject to additional Endangered Species Act consultation, and will undergo a separate review in the future should the KNF propose to approve additional phases. Thus only the evaluation stage of the Rock Creek mine is considered part of the environmental baseline at this time.

FWS001958

*e. Recreation*

Recreation on KNF lands takes many forms, including hiking, biking, hunting, berry picking, cross-country skiing, and other activities.  Recreational use within all BMUs of the recovery zone and within BORZ has been well established and is an integral part of the management and use of the land.  Opportunities provided range from semi-primitive non-motorized to motorized summer and winter travel on a well-developed transportation system; from remote backpack and horse camping to developed campgrounds with tables, toilets, and other amenities; from a feeling of remoteness and solitude to one associated with the presence of other users.  Motorized routes facilitate human access onto KNF lands for recreation.  Access management reduces the potential for human-caused grizzly bear mortality and habitat loss on the KNF by moderating the miles of road in grizzly bear habitat and providing large blocks of habitat where motorized use of roads and trails is prohibited.

Non-motorized recreational use can occur along restricted roads, trails, and along reclaimed roads or trails, as well as off-road or off-trail.  Hiking on trails does not appear to result in conflicts leading to mortality of grizzly bears, although some level of disturbance can occur, depending on the timing and intensity of use, habitats affected, and other factors.  Mountain biking does not result in direct mortality of grizzly bears, although encounters with mountain bikes may elicit greater flight response from grizzly bears than other non-motorized use due to the higher potential for sudden encounters (Quinn and Chernoff 2010, Mattson 2019, Herrero and Herrero 2000 *in* Servheen et al. 2017).  Sudden surprise encounters can also result in human-grizzly bear conflicts, depending on whether the bear flees or charges.  Non-motorized activities such as hunting introduce the potential for intentional (self-defense, poaching or malicious kills, or hunter defense-of-kill) or unintentional (mistaken identity) shootings.  Most grizzly bear deaths in the CYE that occur on the KNF are hunting related or occur during the hunting season (Kasworm et al. 2019a; Kasworm et al. 2019b).

### 4. Climate Change

In the 5-year status review, the Service examined climate change and potential effects on grizzly bears (U.S. Fish and Wildlife Service 2011).  The most likely ways in which climate change may potentially affect grizzly bears are a reduction in snowpack levels, shifts in the denning season, shifts in the abundance and distribution of some natural food sources, and changes in fire regimes due to summer drought.  The potential positive and negative effects would likely be variable and are difficult to predict.  Grizzly bears are habitat generalists and opportunistic omnivores, which may make them less susceptible to changes in plant communities than some other wildlife species.

### 5. Other Human Activities

*a. Railroads*

Railroad tracks occur on NFS lands within the action area.  These tracks typically are in lower elevations, parallel closely-adjacent and heavily-trafficked highways, are confined to valley bottoms and passes, and are bounded by often rugged mountains.  Railroads can affect grizzly

44

FWS001959

bears in terms of connectivity (Waller and Servheen 2005) and mortality (Kasworm et al. 2019, Pollock et al. 2019). Train strikes have killed a minimum of 56 grizzly bears in the Northern Continental Divide (NCDE), Cabinet-Yaak (CYE), and Selkirk Ecosystems (Recovery Areas) of Montana and Idaho during 1980-2018 (Mattson 2019a). Railroads influence the environmental baseline conditions for grizzly bears, but are not part of the proposed action.

### b. Food and Attractant Storage Violations

Despite efforts to educate and encourage proper food storage and sanitation on the Forest, violations still exist. Forest officials regularly cite individuals for non-compliance with the forest-wide food storage order. However, no grizzly bear deaths have been associated with food attractants on KNF lands in the CYE recovery zone (U.S. Forest Service 2020, p. 17). These illegal activities influence the baseline conditions for grizzly bears, increasing opportunities for negative human-bear interactions, but are not part of the proposed action.

Improper food and attractant storage is also a factor on private lands that are within the CYE recovery zone and BORZ areas (Annis and Trimbo 2019).

### c. Other land uses

The CYE Recovery Zone also includes State, corporate and private lands. Past decisions made by these landowners regarding management on their lands may have resulted in disturbance or displacement effects to grizzly bears. Past and ongoing timber harvest occurring on private or state lands may have impacted the distribution, amount, and quality of grizzly habitat and may have affected connectivity between NFS lands. The SRZ and CYRZ include approximately 229,000 acres of private and state lands (p. 99 in U.S. Forest Service 2011a).

Activities on private and state may have caused avoidance of these areas, or conversely, increase the potential for habituation and subsequent removal or death of these bears for public safety. There have been several incidents of grizzly bears becoming habituated to homes and food attractants that have resulted in relocation or mortality of problem bears. The Montana Department of Natural Resources and Conservation has developed a Habitat Conservation Plan that covers state lands within the KNF boundary. This HCP was "designed to avoid, minimize, and/or mitigate the impacts of incidental take on threatened and endangered species as a result of timber harvest and related activities to the maximum extent practicable" (p. 1-1 in Vol. 2 of MT DNRC and U.S. Fish and Wildlife Service 2010). The HCP includes measures to protect grizzly bears on some State Trust Lands in Montana, including 6,174 acres in the CYE (page 2-3 in Vol 2 of MT DNRC and U.S. Fish and Wildlife Service 2010) (as amended).

Recreation has increased on all land ownership types, if for no other reason than human population growth. This likely increased human disturbance and caused the portions of NFS lands that have lower human disturbance to become more important for grizzlies. Increased human presence on all land ownerships increases the chance of a human/bear conflict. From 1980 until 2018 the population increased in all of the counties that overlap the KNF.

45

FWS001960

Black bear hunting occurs on both sides of the international boundary within the CYRZ and has the potential to contribute to illegal or mistaken identity mortality of grizzly bears. The province of British Columbia and the states of Montana, and Idaho continue to allow hunting for black bears, as well as other wildlife species, on both sides of the border within and around the CYRZ. Hunter encounters with grizzly bears may result in a bear death due to mistaken bear identification, self-defense, or opportunistic poaching.

## VI. EFFECTS OF THE ACTION

Regulations implementing the Act define "effects of the action" as "all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action. (50 CFR 402.02).

In terms of effects to the grizzly bear of implementation of the LMP and the extended timelines proposed by the KNF for (1) meeting the standards for all BMUs, (2) completing a winter travel plan, and (3) the effects exceptions to the standard for maintaining the baseline condition of BORZ on the grizzly bear; the proposed action does not change any of the other Design Elements of the Access Amendment direction, nor does it modify the desired condition or standards and guidelines of the 2015 LMP. We have determined that our analysis of the effects of the Access Amendment on grizzly bears remains valid, and that analysis is incorporated herein by reference (U.S. Fish and Wildlife Service 2011a, p. A-66 to A-73). In our biological opinion on the Access Amendment, we analyzed the effects of the direction for the combined SE and CYE, putting the effects of standards into context for both recovery zones (U.S. Fish and Wildlife Service 2011a, p. A-67).

The following sections analyze the consequences of the implementation of the elements of the LMP on grizzly bears. The effects will be discussed by broad categories of risk factors as identified in the *Environmental Baseline* section (above). The effects of the LMP are discussed under the following, often overlapping categories:

1. **Access management** including: roads, secure habitat, and motorized over-snow use.

2. **Habitat management** including vegetation management, fire management, and linkage.

3. **Human-caused mortality risk to grizzly bears** including attractant/food storage and information and education programs and grazing allotments.

4. **Other Potential Effects** such as mining proposals, collection of forest products, and special uses.

For each category of effect, we begin with a general summary of what the science currently tells us about the potential impacts on grizzly bears and grizzly bear habitat. This is followed by an analysis of the specific effects of the proposed action on grizzly bears and grizzly bear habitat.

46

FWS001961

## 1. Access Management

### a. General Effects of Wheeled Motorized Access on Grizzly Bears

This section provides a general discussion of direct and indirect effects of wheeled motorized access management on grizzly bears. Roads in and of themselves can reduce the amount of vegetative habitat available for grizzly bears and other wildlife, although direct habitat loss due to the road's footprint is not considered a major factor for grizzly bear populations (see Proctor et al. 2018, p. 7). Grizzly bears generally respond to motorized access in one of two ways: (1) increased human-caused mortality of bears and (2) reduced habitat effectiveness through displacement or fragmentation. Grizzlies can also become habituated to humans due to ongoing contact with roads and human activities conducted along roads.

*Road Types and Grizzly Bear Response*

When discussing the effects of roads on grizzly bears, it is important to consider the type of road, its location, and the amount of traffic or types of use, all of which can affect grizzly bears' response to the road. The following descriptions of the types of roads and their effects to bears is intended to be a general overview; exceptions and nuances exist.

Highways and high speed roads pose two major challenges for grizzly bears: risk of direct mortality and fragmentation. At high speeds, the chances are high that a bear-vehicle collision results in mortality to the bear. Mortality risk associated with high speed roads can vary based on a number of factors such as visibility, crossing structures, and habitat near the roads. In the CYE, just 5 percent of all known mortalities of grizzly bears occurred because of vehicle collisions (Kasworm et al. 2019). Highways have also been identified as a major contributing factor in habitat and population fragmentation (Proctor et al. 2012, entire). For example, in the southern Canadian Rocky Mountains, the odds of grizzly bear movement through an area was reduced by up to 44 percent by highways (Apps et al. 2013, p. 103).

Lower speed roads that are open to the general public, such as county, private, and Forest roads, typically pose less of a risk of mortality due to vehicle collisions than highways and high speed roads. However, open public roads do pose other mortality risks, as described below. In general, grizzly bears generally avoid open roads, regardless of habitat availability (Kasworm and Manley 1990, p. 80), and despite traffic volume (Northup et al. 2012, McLellan and Shackleton 1988, p. 455-456; Wielgus et al. 2002, p. 1600; Mace et al. 1999 p. 1402). More details are provided on these types of roads in the following discussion.

Motorized trails that accommodate smaller wheeled vehicles such as all-terrain vehicles (ATVs) or motorcycles, can result in disturbance or displacement to grizzly bears, similar to those associated with open roads. Benn and Herrero (2002) suggested 200 meters around a motorized trail was the zone of influence for bears, versus 500 meters for roads. The amount of use a motorized trail receives may be less than many roads, due to less overall users with access to trail-appropriate vehicles versus cars and trucks. However, the KNF regards motorized trails the same as an open public motorized road, buffering each by 500 meters, to ensure a conservative approach towards describing potential effects to grizzly bears.

47

FWS001962

Restricted roads are used primarily for administrative purposes and are closed to public motorized use, although public non-motorized use can occur. In some areas (e.g. within Recovery Zones), restricted roads have limitations on the number of administrative motorized trips that can occur during the active bear year. In other areas, traffic by administrative personnel is not limited, and restricted roads may receive substantially more use than restricted roads with access limitations. Because contractors and agency personnel authorized to use restricted roads are usually prohibited from carrying firearms while working, restricted roads pose a lower the risk of mortality to bears (U.S. Fish and Wildlife Service 1993, p. 148). A bear does not differentiate between agency and public use in terms of disturbance created by motorized vehicles. Thus grizzly bears may avoid restricted roads, depending on the level of use and disturbance on the restricted road.

Grizzly bears may not avoid restricted roads as much as open roads, (Kasworm and Manley 1990, p. 83; Wielgus et al. 2002, pp. 1,600-1,601), although traffic levels on those restricted roads can influence the degree to which grizzly bears avoid the road (Archibald et al 1987, p. 87; Kasworm and Manley 1990, p. 83). Wielgus et al. (2002, p. 1601) found none of the grizzly bears in their Selkirk Mountain study area avoided restricted roads; and Northup et al. (2012, p. 1,164) found grizzly bears in his southwestern Alberta study area used habitat near restricted roads similarly to unroaded habitat. By contrast, Mace et al. (1996, p. 1,402) found some grizzly bears in the Swan Mountains in Montana avoided closed roads receiving fewer than 1 vehicle per day. Trip limits on restricted roads may be able to reduce or eliminate displacement that results from grizzly bears avoiding restricted roads (Wakkinen and Kasworm 1999, p. 2). While restricted roads likely have a lesser effect on grizzly bears than do open public motorized routes, grizzly bears' degree of avoidance to restricted roads may depend on perceived mortality risk stemming from the amount of motorized use, degree of local hunting pressure, history of mortality risk in the area, and association with other nearby roads.

Roads that are made impassable to motorized vehicles include decommissioned and stored roads, but may also include barriered, obliterated, or even reclaimed roads. In some cases, the road surface may receive some level of re-contouring to match the surrounding hillslope near intersecting roads. These types of roads offer greater security and less disturbance than open or restricted roads and, over time, decommissioned and stored roads provide secure habitat to grizzly bears, once bears become aware of the fact that an additional portion of the landscape has become secure. Wakkinen and Kasworm (1997, p. 13) found that, compared to gated roads, bear response to vegetated and barriered roads appeared more similar to unroaded habitat. The time to realize the additional secure areas is likely to vary by individual where more security-conscious females may continue to avoid decommissioned or stored roads longer than other cohorts. Until the road prism becomes revegetated, recently decommissioned roads may continue to provide ease of travel for hunters or other recreationists.

### Mortality associated with roads

While some grizzly bears may be injured or killed as a result of vehicle strikes (Gunther 1998, pp. 32-33), more often grizzly bear mortality is the result of intentional (self-defense, hunter defense-of-kill, poaching) or unintentional (mistaken identity) shootings (Lamb et al. 2016, p. 10). Roads facilitate human access into grizzly bear habitat, which indirectly increases the risk

48

FWS001963

of human-caused mortality that affects the ability of bears to survive and reproduce (Nielson et al. 2004, p. 108; McLellan 2015, pp. 755-756; Proctor et al. 2018b, p. 4). When located near human settlements, roads can facilitate large numbers of people into grizzly bear habitat. Firearms and the attractants associated with human uses can lead to increased grizzly bear mortality (Yonge 2001, p. 56). By contrast, where activities such as carrying firearms or attractant and sanitation measures are minimized, humans and bears may maintain a certain level of coexistence. Social values and attitudes also contribute to the risk of grizzly bear mortality.

There is a strong positive association between motorized access into grizzly bear habitat and bear mortality (Nielsen et al. 2004a, pp. 108-110; Schwartz et al. 2010, pp. 659-660; Boulanger and Stenhouse 2014, p. 9; Proctor et al. 2017, p. 31). Studies from across west-central North America report that humans cause between 77 and 90 percent of grizzly bear mortalities (McLellan et al. 1999, p. 915; Garshelis et al. 2005, p. 284; Schwartz et al. 2006; Mace et al. 2012), and most bears are killed near a road (Benn and Herrero 2002; McLellan 2015, p. 756). In the Selkirk and Cabinet-Yaak Recovery Zones, 79 percent of known and probable grizzly bear mortalities between 1980 and 2018 were human-caused and, of those where the location relative to roads was known, 80 percent of human-caused mortalities occurred within 500 meters of an open road (Kasworm et al. 2019a, pp. 12-14: Kasworm et al. 2019b, pp. 16-18).

Similar patterns have been documented elsewhere (Schwartz et al. 2006, pp. 29, 34-35; Boulanger and Stenhouse 2014, p. 9; McLellan et al. 2015, p. 756). In southeastern B.C., 86 percent of radio-collared bears were killed within 120 meters of a backcountry road (McLellan 2015, p. 756) and, in Alberta 100 percent of radio-collared bears were within 100 meters of gravels roads or highways (G.B. Stenhouse, unpublished, as reported *in* Proctor et al. 2020, p. 20). Research in Canada found grizzly bear mortality was best predicted by measures of human access, such as road density, distance to roads, highways, and low elevation habitat (Nielsen et al. 2004, p. 108; Proctor et al. 2017, p. 31). Similarly, in the U.S., grizzly bear survival in the GYE was best explained by models including human development and open road density, as well as secure habitat (Schwartz et al. 2010, p. 657). Thus, increased motorized access into grizzly bear habitat increases bear mortality (Nielsen et al. 2004a; Schwartz et al. 2010; Boulanger and Stenhouse 2014; Proctor et al. 2017).

### *Habitat loss associated with roads*

Displacement from habitat near roads has the potential to reduce grizzly bear habitat effectiveness, body condition, reproductive rates, and ultimately population density due to habitat loss (McLellan and Shackleton 1988; Mace et al. 1996; Hertel et al. 2016). Avoidance is a behavior that is learned and passed along from sows to their cubs, and thus avoidance may occur for some time after a road closes. Learned avoidance behavior could persist for more than one generation of grizzly bears before grizzly bears again utilize habitat associated with closed roads.

Multiple factors likely contribute to whether an individual grizzly bear will be displaced from a road, and not all of the factors been quantified. The level of road-use by people is likely an important factor in assessing the potential displacement caused by any road. One study in Montana showed that as traffic levels on roads increased, grizzly bear use of adjacent habitat

decreased (Mace et al. 1996). Research has indicated that grizzly bears consistently were displaced from roads and habitat surrounding roads, often despite relatively low levels of human use (Mattson et al. 1987; McLellan and Shackleton 1988; Aune and Kasworm 1989; Kasworm and Manley 1990; Mace and Manley 1993; Mace et al.1996).

The avoidance area surrounding roads is often referred to as the "zone of influence" and has been documented anywhere from 100 meters to 914 meters (328-2,999 feet; McLellan and Shackleton 1988, p. 454; Kasworm and Manley 1990, p. 81, respectively; Gaines et al. 2003, p. 16). Both Mattson et al. in Yellowstone National Park (1987, pp. 269-270) and Mace et al. in the Swan Valley of Montana (1996, p. 1,402) found grizzly bears avoided an area within 500 meters of roads, which is the standard adopted by the IGBC to describe secure habitat (i.e., areas removed from human disturbances in which grizzly bears can meet their life history needs). Mattson et al. (1987) found road avoidance was greatest in spring and summer. By contrast, both Mace et al. (1996) and Roever et al. (2008, p. 1266) found greater selection for roads during the spring, noting that bears may be attracted to the higher quality roadside forage in their study area. Wielgus et al. (2002, p. 1,604) found that, in dense forested areas where roadside vegetation (i.e., cover) is greater, the area of influence tended to be smaller. These studies highlight the influence of forage and cover resources on selection near roads.

Avoidance behavior related to roads is often strongest in adult grizzly bears, whereas subadults may be more tolerant of roads. Adult males that were found using high quality habitat near roads, did so during the night where hiding cover was available (Gibeau et al. 2002). However, adult females were more likely to avoid humans all together, rather than seek out the highest quality habitats. Mueller et al. (2004) reported all age and sex classes used habitats closer to high-use roads and development during the human inactive period. All bears showed a considerably greater avoidance of high-use roads and development during periods of high human activity.

Aune and Kasworm (1989) and McLellan (1989a) found that female cubs generally established their home range within or overlapping with their mother's home range, whereas males generally dispersed from their mother's home range. Long-term displacement of a female from a portion of her home range may result in long-term under-use of that area by female grizzly bears because cubs have limited potential to learn to use the area. In this way, learned avoidance behavior could persist for more than one generation of grizzly bears before grizzly bears again utilize habitat associated with closed roads. Thus, displacement from preferred habitats may significantly modify normal grizzly bear behavioral patterns.

In the NCDE, Mace and Manley (1993) reported use of habitat by all sex and age classes of grizzly bears was less than expected in habitats where total road densities exceeded 2 miles per square mile. Twenty-two percent of the South Fork Study area exceeded 2 miles per square mile. Adult grizzly bears used habitats less than expected when open motorized access density exceeded 1 mile per square mile. Further, female grizzly bears in the South Fork Study area tended to use habitat more than 0.5 mile from roads or trails greater than expected.

In the CYE, Wakkinen and Kasworm (1997) reported total road density greater than 2 miles per square mile and open road density greater than 1 mile per square mile were used less than

FWS001965

expected (avoided) and unroaded areas in both categories were used more than expected (preferred).  The amount of area within six female grizzly bears' home ranges with a total road density exceeding 2 miles per square mile averaged 26 percent.  Home ranges averaged 33 percent open road density exceeding 1 mile per square mile, and on average, 55 percent of each

When grizzly bears spend little time near roads, or avoid roads altogether, they forego key resources that may be available in roadside adjacent habitats (i.e., habitat loss).  When roads are located in or near important seasonal habitats, such as riparian areas, snowchutes, or shrub fields, habitat loss through avoidance behavior can be significant (Apps et al. 2016, p. 406).  In the southern Selkirk and Purcell Mountains of B.C., Proctor et al. found that forage (i.e., habitat) variables were the most influential predictors of grizzly bear habitat selection (2018, p. 32).  Road density not only affected home range selection, roads limited how grizzly bears used habitat within their home range, with bears spending the least amount of time in those portions of their home range with higher road densities (Mace et al. 1996, p. 1400; Proctor et al.2017, p. 37).  Where roads reduce the total amount of seasonal habitat available, bears are forced to travel further to find suitable habitat, potentially forcing them into competition with other bears.  Alternatively, in areas where forage is abundant, grizzly bears may be able to meet their life history needs despite the habitat loss associated with avoidance of roads and human activity (McLellan 2015, p. 762).  Despite this, research in Canada found grizzly bear densities were three times higher where road densities were less than 0.6 km/km$^2$ (Mowat et al. 2017, p. 6; Proctor et al. 2017, p. 37).

*Habituation*

In converse to avoidance of habitat due to roads, sometimes grizzly bears can become conditioned to human activity and show a high level of tolerance, or habituation, to human activity.  If the location and nature of human use are predictable and do not result in overtly negative impacts for grizzly bears (Mattson 1993), areas with higher levels of human activity might have a positive effect for bears by serving as a kind of refugia for weaker population cohorts (e.g., subadults and females with cubs) seeking to avoid intra-specific competition (adult males; Mattson 1993, Yonge 2001).  In Glacier National Park, Jope (1985) suggested grizzly bears in parks habituate to high human use and showed less displacement, even in open habitats.  Yonge (2001) found that grizzly bears near Cooke City, Montana, were willing to consistently forage in very close proximity to high levels of human use if cover was sufficient and energetically efficient feeding opportunities were present.

Habituation may not be positive, however.  Mattson (1993) qualified his observation by adding that the beneficial effects vary as to whether hunting is allowed, and how closely the human population is regulated.  Further, food conditioned grizzly bears were much more likely to be killed by humans.  This may be especially true for subadults.  Mueller et al. (2004) showed that regardless of the time of day, subadult bears were found closer to high-use roads than adult bears.  Gibeau et al. (2002) also demonstrated that subadults were almost always closer to human activity than adults.  Boulanger and Stenhouse (2014) found that subadult grizzly bears were most vulnerable to road-based mortality.  Due to the fact that subadult females tend to remain within a portion of their mother's home range and have smaller dispersal distances, subadult males are at greater mortality risk as a result of habituation than subadult females.

51

FWS001966

*Fragmentation*

Research shows that secure habitat, areas free of motorized access, provided an important component for successfully reproducing female grizzly bears (Mattson et al. 1987, p. 262; Mace et al. 1996, p. 1400; Wakkinen and Kasworm 1997, pp. 20-22). In the NCDE, Mace and Manley (1993, p. 20) reported substantive blocks of unroaded habitat were components of all adult female home ranges. Roads contribute to habitat fragmentation by acting as barriers to movement (MacHutchon and Proctor 2015, p. 5). Traffic and human activity can cause bears to avoid habitat near roads or disturb them to the extent that they are unwilling to move through an area. Loss of cover, human behavior along roads, and traffic patterns all contribute to avoidance-related habitat fragmentation. Roads also introduce mortality risk that can prevent successful movement. Where roads isolate secure habitats, grizzly bears are forced to travel through areas of higher mortality risk to meet their life history needs (Schwartz et al. 2010, p. 661). And, where high road densities are interspersed with high quality habitat, grizzly bears may be more willing to navigate high-risk roaded areas in order to access high quality habitat which, depending on the type of road, proximity to population centers, and tendency for people to kill bears, can have population level effects (Proctor et al. 2012, entire; Lamb et al. 2016, entire). Localized habitat fragmentation may be less concern to male grizzly bears, in terms of locating adequate resources, because of their larger home range size and reduced energy budget, but can be problematic for female grizzly bears, especially reproductive females who tend to be more security conscious and are more likely to forego resources to avoid humans and roads.

Fragmentation can also affect dispersal patterns, reducing demographic and genetic exchange. Where grizzly bears are unwilling (through avoidance behavior) or unable (as a result of mortality) to move through an area, population fragmentation may occur. Factors contributing to population fragmentation include highways and their associated traffic patterns, human settlements, and human-caused mortality (Proctor et al. 2012, p. 2). Fragmentation can be a greater concern for female grizzly bears by limiting dispersal, and can have long-lasting effects as a result of learned behavior that is passed from sow to cubs. Long-term avoidance of a portion of a mother's home range as a result of roads may result in long-term under-use of that area by female grizzly bears because female cubs may have limited potential to learn to utilize that area. As such, learned avoidance may persist for more than one generation, leading to a situation where bears may continue to avoid an area after roads are closed, discouraging dispersal in the direction of the roaded area. Effects to dispersal are greater for female grizzly bears than male dispersal (Proctor et al. 2005, p. 2,414) because female dispersal distances are generally short (approximately 6.2 to 8.7 miles) and occur gradually over many years (see Proctor et al. 2018a, p. 363). Female grizzly bears generally establish their home range within or overlapping a portion of their mother's home range, so dispersal may be limited in areas of learned avoidance. Alternatively, young females that attempt to establish a home range outside of their mother's home range are at greater mortality risk if they are forced out of secure areas (Wielgus et al. 1994, p. 271).

Effects to grizzly bears from roads have primarily been assessed using two different metrics: road densities and secure habitat. Our analysis of effects to grizzly bears from the proposed action will assess both of these factors. A general description of each is provided here.

FWS001967

*Road Density*-- The scientific literature clearly demonstrates that road densities can affect female grizzly bears, with higher road densities often leading to adverse effects to individuals, and thereby sometimes affecting the population. Female bears tend to have higher survival rates in habitats with lower road densities (Schwartz et al. 2010; Boulanger and Stenhouse 2014; Proctor et al. 2017). Females also select home ranges at least partially in relation to road densities, as reported by Mace et al. (1996), Wakkinen and Kasworm (1997), Lamb et al. (2018b), and Proctor et al. (2017). Road densities also influence the density of female grizzly bears (Lamb et al. 2018b) and population trend (Boulanger and Stenhouse 2014).

Other factors, such as habitat quality, attractants, and other factors, combine with road densities to affect grizzly bears, making it difficult to determine the exact influence of road density, and the exact density at which those influences occur. In addition, not all researchers calculate road densities in exactly the same way; variation often depended on what digitized roads layers were available (as noted in Proctor et al. 2020). While some researchers included all road types in their calculations, including motorized trails receiving off-highway vehicle (OHV) use, others excluded motorized trails or closed roads (see Proctor et al. 2020, p. 23). Despite this, research shows how road densities affect home range selection.

Mace et al. (1996, p. 1,400) found that grizzly bears elected for home ranges containing an average of 0.6 km/km$^2$ (1 mi/mi$^2$) of roads (open and closed roads) where the surrounding landscape contained 1.1 km/km$^2$ (1.8 mi/mi$^2$) of roads. In the Selkirk and Purcell Mountains of B.C., Proctor et al. (2017, pp. 36-37) found females selected for and survived where backcountry and resource road densities were less than 0.5 km/km$^2$ (0.8 mi/mi$^2$). They also found that there were no female home ranges in landscapes with road densities greater than 1.0 km/km$^2$ (1.6 mi/mi$^2$). Boulanger and Stenhouse (2014, pp. 14-15) found most grizzly bears in their study area in Alberta occurred where linear road densities (all paved and graveled secondary roads) were 1.5 km/km$^2$ (2.4 mi/mi$^2$) or less, with greater survival of reproductive females where road densities were less than 0.75 km/km$^2$ (1.2 mi/mi$^2$). Taking it one step further, they found low female survival had negative population level effects where road densities exceeded 0.75 km/km$^2$ (1.2 mi/mi$^2$).

Research on grizzly bear survival in other study areas documents the impact of road density on female grizzly bear survival. Female grizzly bears are the reproductive engine of the population, so measure of female survival are most meaningful in describing population persistence. Schwartz et al. found grizzly bear survival in the GYE increased with increasing secure habitat and reducing road density outside of secure habitat (2010, p. 660). In the Kettle-Granby area of B.C., Mowat et al. found grizzly bear density were three times higher on landscapes with open road densities less than 0.6 km/km$^2$ (1 mi/mi$^2$) (2017, p. 6), which was also found the Purcell and South Selkirk Mountains of B.C. (Proctor et al. 2017, pp. 39-40).

Within the Recovery Zones of the NCDE, CYE, and SE, access management has focused on an open road density of less than 0.6 km/km$^2$ (1 mi/mi$^2$) and total road density of less than 1.24 km/km$^2$ (2 mi/mi$^2$) within a portion of a grizzly bear analysis unit (approximating a female grizzly bear's home range) to support female grizzly bears in recovery zones. This road-density threshold, first identified by Mace et al. (1996) and used by Wakkinen and Kasworm (1997), has been roughly observed by other researchers in multiple study areas (summarized in Proctor et al.

53

FWS001968

2020) as being a density beyond which adverse effects to female grizzly bears can occur. However, road densities, and their effects to bears, occur on a spectrum, making it difficult to pinpoint an exact density at which we would expect adverse effects to an individual.

Although road density provides a useful threshold to describe human-caused effects to grizzly bears based on existing literature, road density alone fails to consider traffic volume, lethality (i.e., the tendency for people to kill bears), proximity to forage resources and how road placement affects habitat patch size (Proctor et al. 2020, pp. 25-26). For instance, even in a bear management unit with overall low road density, there may be patches of high road density interspersed with patches of low road density or even unroaded areas. In these areas, measures of secure habitat may present a more accurate depiction of the spatial mix of motorized routes and secure habitat.

*Secure Habitat--* Secure habitat describes where grizzly bears can meet their life history needs without the heightened mortality risk or negative consequences of disturbance-related behavioral modifications (i.e., habitat avoidance or nighttime use patterns) or repeated flight response. Secure habitat has been identified as one of the key issues related to effects of motorized access on grizzly bears and is important to the survival and reproductive success of grizzly bears. This metric more adequately represents the potential effects related to motorized access as it provides a more accurate indication of the spatial mix of motorized routes and areas outside the influence of motorized routes (for example, see Figure 7 in Proctor et al. 2020, p. 26.) Studies have shown that female grizzly bears selected for, and survived better in, areas with greater secure habitat (review in Proctor et al. 2020, p. 25-26; Mace et al. 1996, p. 1,400; Wakkinen and Kasworm 1997, p. 20; Gibeau et al. 2001, p. 126; Schwartz et al. 2010, pp. 659-660).

Secure habitat is generally defined as the area outside the zone of influence of high levels of human disturbance. Most studies (reviewed in Proctor et al. 2020) have used 500 meters as the zone of influence around roads and motorized trails. Some studies have then further defined secure habitat by using a minimum patch size (e.g. Schwartz et al. 2010 used 10 acres). The IGBC Task Force (IGBC 1998) used this basic definition and provided guidance for defining Core habitat for grizzly bears, which is essentially a subset of all secure habitat. Thus different Forest Plans and management strategies have defined Core habitat in different ways for the different Recovery Zones. More detail is provided below in the discussion of metrics used in this analysis, per the standards and definitions that apply to Core habitat for the CYE and NCDE, and the metric of secure habitat used to analyze effects to grizzly bears in BORZ. An overview comparing secure habitat and Core for both the CYE and NCDE, is shown in Appendix C, Table 15.

### ***Road Metrics Used in this Analysis***

Within BMUs (which represent a theoretical female grizzly bear's home range) of the SE and CYE, we rely on local research in our analysis of effects to grizzly bear in the SE and CYE. Wakkinen and Kasworm (1997) showed that female grizzly bears were able to survive and reproduce in home ranges containing an average of 33 percent open motorized route densities of less than 0.6 km/km$^2$ (1 mi/mi$^2$), 26 percent total motorized route densities of less than 1.24 km/km$^2$ (2 mi/mi$^2$), and 55 percent Core habitat (all areas greater than 500 meters from any

54

FWS001969

motorized route or high use trail). Wakkinen and Kasworm (1997) completed their study in response to the 1994 IGBC direction to develop site-specific habitat security parameters in regards to motorized access for the Selkirk and Cabinet-Yaak ecosystems using data from local female grizzly bears. Their results were incorporated into the original Access Amendment direction in 2004. In 2006, the Montana District Court upheld the Service's Biological Opinion on the 2004 Access Amendment, concluding that the Service appropriately relied on Wakkinen and Kasworm (1997) to assess the impacts of access management on grizzly bear habitat (*Cabinet Resource Group v. U.S. Fish and Wildlife Service*, 465 F.Supp.2d 1067, 1088 (D. Mont. 2006)).

During the consultation on the Access Amendment, Allen et al. (unpublished report, 2011) completed a review of the report to address outstanding criticisms, to assess the validity of the Wakkinen and Kasworm report as the best available science for use in determining motorized access thresholds within the SE and CYE ecosystems. The Wakkinen and Kasworm study was reviewed by nine biologists from the Service, Idaho Department of Fish and Game, Forest Service, and Washington State University in light of criticisms raised against the Wakkinen and Kasworm report. Upon review, Allen et al. (2011) determined that the Wakkinen and Kasworm study provides the best data available for determining management recommendations relative to motorized access and secure habitat for grizzly bears (2011b, pp. 24-25). In the Service's Biological Opinion on the Access Amendment, the Service concluded there is no subsequent research that would replace the continued reliance on Wakkinen and Kasworm (1997) as the scientific benchmark against which to analyze the effects of the Access Amendment direction (U.S. Fish and Wildlife Service 2011, p. A-58). Although the review was completed in 2011, the Service is unaware of any research since then that would replace Wakkinen and Kasworm (1997).

**CYE BMUs-** For the purposes of this Opinion, we continue to rely on the Wakkinen and Kasworm study as the best available science to assess the effects of motorized access and secure habitat on grizzly bears in the SE and CYE. In our analysis, we assume adverse effects to female grizzly bears when greater than 33 percent of the BMU has open road densities greater than 1 mi/mi2 (0.6 km/km2) and/or when greater than 26 percent of the BMU has total road densities (open roads plus restricted roads) greater than 2 mi/mi$^2$ (1.24 km/km$^2$) (Wakkinen and Kasworm, 1997). We do not expect all female grizzly bears will experience adverse effects, as the Wakkinen and Kasworm research found that some female grizzly bears were able to survive and reproduce in home ranges with worse conditions (i.e., higher road densities or lower secure habitat), but the research provides a useful threshold to determine when adverse effects due to road effects is likely to occur.

Within recovery zones, where bear management units approximate the size of female home ranges, "Core habitat" is a subset of secure habitat and is defined as "areas of secure habitat within a BMU that contain no motorized roads *or high use non-motorized trails* during the active bear year and are more than 0.31 mile (500 meters) from a drivable route" (emphasis added; U.S. Forest Service 2011 [AA ROD], p. 10). The Access Amendment direction sets the parameters for establishing and managing Core habitat in all BMUs (U.S. Fish and Wildlife Service 2011, pp. 12-13). For example, Core habitat should include high quality habitat and, where possible,

FWS001970

should attempt to include the full range of seasonal habitats. In addition, once established, Core habitat should remain in place for at least ten years.

Larger, less fragmented patches of secure habitat are likely the ideal for a grizzly bear, and better support daily use (even a small patch of secure habitat may afford a grizzly bear a valuable space to avoid the effects of roads and to move through or find valuable habitat in the area). Although they did document greater use in the largest patch sizes, local researchers (Wakkinen and Kasworm 1997) did not identify a minimum patch size at which grizzly bears failed to use the secure habitat. However, they did show that the majority of telemetry points for female grizzly bears fell within larger patches of secure habitat. In the Selkirks, 94 percent of radiolocations occurring in secure habitat were in patches >4 mi$^2$ (2,560 acres) and in the Yaak, 89 percent were in patches the same size. However, because no minimum size polygon that grizzly bears would utilize could be detected, the Access Amendment direction, and thus LMP for the KNF, does not include a minimum block size for Core habitat. Therefore, using the best available information for the action area (i.e. data from Wakkinen and Kasworm 1997), we assume that within the SE and CYE, in BMUs with less than 55 percent secure habitat, regardless of patch size, some individual female bears may experience adverse effects.

**NCDE BMUs--** For a discussion of metrics used to assess roads and motorized route effects to grizzly bears in the NCDE, see the 2017 biological opinion on the NCDE Amendments (U.S. Fish and Wildlife Service 2017, p. 33, 57). Within the NCDE, research on female grizzly bears in the South Fork of the Flathead (Mace and Manley 1993) guided the establishment of research benchmarks for OMRD, TMRD, and Core. The Service uses those benchmarks of 19 percent OMRD, 19 percent TMRD, and 68 percent Core for determining when adverse effects to grizzly bears are anticipated (U.S. Fish and Wildlife Service 2017, p. 107). Note that in the NCDE, secure core is defined as "an area of the NCDE primary conservation area 500 meters or more from (1) a route open to public wheeled motorized use during the grizzly bear non-denning season, (2) a gated route, or (3) a route closed only with a sign, that is greater than or equal to 2,500 acres in size" (see U.S. Fish and Wildlife Service 2017, p. 2-19 and U.S. Forest Service 2018, p. 1-57). Thus, secure core in the NCDE subunits is defined differently than in the CYE BMUs.

**BORZ-** Unlike in the Recovery Zone, where BMUs are designed to approximate a potential female grizzly bear's home range, BORZ are simply polygons that show where recurring grizzly bear use has been documented. They do not necessarily represent a home range. The size of BORZ varies widely (Table 4), and can change as additional recurring use is documented, as explained above. Therefore, because BORZ are not designed to represent a female bear's home range, it is inappropriate to apply the same metrics that are used within the BMUs, as those metrics were based on female home ranges.

For analysis of standards related to motorized access in BORZ, the Forest provided information on linear miles of roads within BORZ, which can be calculated as a linear route density. Linear route density information is not directly comparable to the "moving windows" analysis conducted in BMUs (see U.S. Fish and Wildlife Service 2011, p A-71-72). Additionally, research does not provide a threshold at which linear miles of roads impairs the feeding, breeding, and sheltering behavior of grizzly bears. We assume that in the areas of BORZ where

road densities are relatively high, some individual female grizzly bears likely experience adverse effects as a result of high road densities and high levels of human activity. Despite this, grizzly bears continue to use BORZ, indicating that some bears have acclimated to what research would indicate are other-than-optimal conditions for road densities.

Secure habitat has been identified as one of the key issues related to effects of motorized access on grizzly bears and is important to the survival and reproductive success of grizzly bears. Secure habitat more adequately represents the potential effects related to motorized access as it provides a more accurate indication of the spatial mix of motorized routes and secure habitat. Thus, we have incorporated secure habitat into this analysis.

The Forest mapped secure habitat within BORZ (see Appendix D). Secure habitat includes all areas within the BORZ greater than 500 meters from any route which allows wheeled motorized access, including open public roads as well as restricted roads that are only available for administrative use. This is a basic definition that captures the essence of secure habitat being areas outside the influence of motorized vehicles. For the same reasons discussed above, no minimum patch size was used. Larger patches of secure habitat likely provide areas where grizzly bears, particularly females with cubs, can avoid the effects of motorized access. We do not know the actual importance of patches of secure habitat, but can assume some level of importance, based on the numerous studies showing a correlation between secure habitat and grizzly bear survival and other metrics (see review in Proctor et al. 2020).

### b. Effects of the Wheeled Motorized Access on Grizzly Bears in the Action Area

Motorized access management is primarily addressed by the Access Amendment standards incorporated into the LMP. The Access Amendment standards reduce the adverse effects of motorized access to grizzly bears associated with roads by limiting road-related disturbances that leads to avoidance or displacement of otherwise suitable grizzly bear habitat, and by limiting human access into grizzly bear habitat that increases the risk of human-caused mortality. The Access Amendment standards also promote the availability of secure habitat, providing to grizzly bears areas without human disturbances to meet their life history needs. In addition, the LMP also contains multiple elements that reduce the potential effects of land management activities on the grizzly bear, including the Forest-wide desired condition element FW-DC-AR-07 that trends the forest towards a transportation system that provides for safe and efficient public and administrative uses while having minimal impact on threatened and endangered species, including grizzly bear, and where unauthorized roads and trails are no longer created.

Forest-wide desired conditions and Geographic-wide desired conditions emphasize the need for large remote areas with low levels of disturbance so that grizzly bears have the necessary space and habitat unhampered by human activities. Guidelines and standards that limit roads, reconstruction and motorized use (Table 6) also decrease the risk of human-bear interactions. Forest-wide, MA, and GA desired conditions for large, remote areas with low disturbance that will contribute to habitat security for grizzly bears. These elements of the LMP compliment the Access Amendment and decrease the risk of human-bear interactions. Taken together, the LMP reduces the risk of human bear interactions and provides for the security needs of grizzly bear.

57

FWS001972

Management Area (MA) designations limit road construction, reconstruction, and motorized use such that 25 percent of BMU acres allow no road construction or reconstruction. Roads are highly scrutinized in an additional 32 percent of the BMU acres (Table 6). Additionally, up to 25 percent of the BMU acreage does not receive motorized use and use and occurs on designated routes only in an additional 22 percent of BMU acres.

Any proposed motorized routes or changes in motorized access management under the LMP must adhere to the requirements of the Access Amendment or require an amendment to the Plan. Hence, we anticipate that the LMP's effects of roads on bears will be largely the same as previously analyzed in our Access Amendment Biological Opinion, which we incorporate here by reference (U.S. Fish and Wildlife Service 2011 A-66-70 for BMUs and A-71-73 for BORZ). Thus, the section below focuses on the effects to grizzly bear related to the timelines for achieving access management standards and for completion of a winter travel plan, as well as on the updated environmental baseline conditions and clarification to access management for motorized access in BORZ.

58

FWS001973

**Table 6. Restrictions on new roads, road reconstruction, and wheeled motorized use by MA and acres of grizzly bear habitat affected under the LMP.**

| MA | Element Code | Percent of BMU Acreage Affected | Percent of BORZ Acreage Affected* |
|---|---|---|---|
| **No roads** | | | |
| MA1 – Wilderness, MA2 – Wild River Segments. MA3- Zoological, Historical and Botanical Areas, MA4- Research Natural Areas | MA1a-STD-AR-04, MA1bc-STD-AR-03, MA2-GDL-AR-03 (Wild Rivers), MA3-STD-AR-01, MA4-STD-AR-03 | Up to 25 | <1 |
| **No reconstruction** | | | |
| MA1 MA4 | MA1a-STD-AR-04, MA1bc-STD-AR-04, MA4-STD-AR-04 | 19 | <1 |
| **No roads or reconstruction unless certain criteria met.** | | | |
| MA5- Backcountry | MA5abc-STD-AR-01, MA5abc-STD-AR-02 | 32 | 10 |
| **No wheeled motor vehicle use** | | | |
| MA1, MA4 | MA1ab-STD-AR-01, MA1c-STD-AR-01, MA4-STD-AR-01, | Up to 25 | Up to 2 |
| **Wheeled motor vehicle use on designated routes only.** | | | |
| MA5ac, portions of MA2 | MA5ac-GDL-AR-02, MA2-GDL-AR-01 (Wild Rivers), | 22 | 4 |

* Derived from U.S. Forest Service 2013, p. II-54 and U.S. Forest Service 2020, p. 30.; these numbers may change in the future if BORZ expand

**Effects of Motorized Access in BMUs**

*CYE BMUs*

The Forest proposed revised timelines for achieving full compliance with access management standards. Design Element I-C of the Access Amendment direction provides an implementation schedule, charging the National Forests under the direction to achieve full compliance in all BMUs by 2019. The Forest adopted those timeframes into their 2015 LMP (U.S. Fish and Wildlife Service 2013; U.S. Forest Service 2020, p. 94-98). However, the Forest has been unable to meet the initial timeframe of 2019, and thus has proposed a revised timeframe for attaining compliance with standards. Extending the timelines for meeting standards will prolong the time it will take to meet access management standards in 4 of the 17 BMUs on the KNF. Currently (as of the end of Bear Year 2019), only one BMU is above standard for OMRD, three BMUs are above the standards for TMRD, and 3 BMUs are above the standards for Core (Table 7).

59

FWS001974

In particular, the Forest proposes taking additional time for planning and project implementation to achieve motorized standards in Bear Management Units 4 (Bull), 5 (St. Paul), 6 (Wanless), and 8 (Vermillion). Implementation is expected to occur in 2021 for BMU 8, 2022 for BMUs 5 and 6, and 2023 for BMU 4 (detailed in U.S. Forest Service 2020, p. 33-36, 43). The Forest anticipates full on-the-ground implementation of actions to attain standards for OMRD, TMRD, and Core by 2023 for all BMUs.

**Table 7. The 2019 condition of bear management units (BMUs) that remain out of compliance with LMP (Access Amendment) standards.** Shaded blocks indicate the existing condition does not meet the established standard. Numbers in bold represent those that are above research benchmarks for OMRD or TMRD, or below benchmark for Core. Derived from U.S. Forest Service 2020, p. 73-75.

| BMU | | OMRD | TMRD | Core |
|---|---|---|---|---|
| 4 (Bull) | Standard | **36** | 26 | 63 |
| | Current | **38** | **30** | 61 |
| 5 (St. Paul) | Standard | 30 | 23 | 60 |
| | Current | 28 | 23 | 58 |
| 6 (Wanless) | Standard | 33 | **32** | 55 |
| | Current | 28 | **34** | **54** |
| 8 (Vermillion) | Standard | 32 | 21 | 55 |
| | Current | 32 | 22 | 58 |

Until the Forest obtains on-the-ground implementation to get the BMUs to standards, we anticipate some female grizzly bears will continue to experience adverse effects in those BMUs that do not meet the research benchmarks for OMRD, TMRD, and Core. As shown in Table 7, we expect adverse effects due to OMRD above benchmark for BMU 4. We expect adverse effects due to TMRD above benchmark in BMUs 4 and 6; although BMU 8 has not yet met standards for TMRD, the existing condition and standard are both "better than" the research benchmark for TMRD, and thus we do not anticipate adverse effects due to TMRD. We expect adverse effects due to Core below benchmark in BMU 6; although BMUs 4 and 5 have not yet met standards for Core, both BMUs have existing Core amounts above benchmarks. In summary, we anticipate adverse effects to continue in BMUs 4 and 6, but not in 5 and 8.

We anticipate high road densities and lower secure habitat will continue to result in under-use of otherwise preferred habitat that is likely to cause adverse effects some adult female grizzly bears. Male grizzly bears have larger home ranges than females, and males and subadults are independent, more mobile and do not have the same energetic needs as adult females. While displacement may affect behavioral patterns of males and subadults, such as feeding or

60

FWS001975

sheltering, we do not anticipate such effects to be significant to subadult or male grizzly bears. We do not expect that all adult females exposed to disturbances or displacement related to motorized route densities would suffer significant effects, nor would the effects persist throughout an individual female's life span. We expect that effects would vary substantially depending upon the wariness of the individual bear, the size of and habitat quality within her home range, the number of other grizzly bears using the particular area, climate conditions, annual food resources, and the nature, intensity and duration of human activity during any particular year. All of these are factors that may affect options available to adult females if displaced. Further, conditions the following year may be considerably different. We expect that the level and likelihood of effects will diminish as open and/or total road densities are lowered, and/or core area increases nearer to benchmark levels.

As described in the *Habitat Protection Measures* section of this Opinion, the Access Amendment recognized that federal agencies would be unable to meet the research benchmarks in BMUs with higher amounts of private ownership. Thus, the Access Amendment established standards that were deemed achievable at the time, but recognized adverse conditions from high road densities and low secure habitat would be a persistent condition in some BMUs. To compensate for the persistent deficiencies of these BMU, the Access Amendment established standards in other BMUs that exceed (are "better than") the research benchmarks. BMUs 4 and 6 are examples of BMUs that will not meet research benchmarks, even once they meet the standards. However, BMUs 5 and 8 will exceed ("better than") the research benchmarks. In fact, current conditions in these BMUs currently exceed research benchmarks for all three access parameters, and thus even though these BMUs have not yet reached standards, we do not anticipate adverse effects as a result of motorized access in these BMUs at this time.

Once all standards have been achieved, 4 of the 17 BMUs in the KNF portion of the CYE would not achieve the OMRD research benchmark in the action area (U.S. Fish and Wildlife Service 2011 and 2013). For TMRD, 3 of the 17 would not achieve the TMRD research benchmark. Once all standards are met, Core area will eventually increase to 59 percent on the KNF (U.S. Fish and Wildlife Service 2011b, p. A-60). For the BMUs that would not meet the OMRD and/or TMRD benchmarks in the CYE, all but one (BMU 10- Pulpit) meets the research benchmarks for Core area. We determined that maintenance of good quality Core areas within the BMUs (except Pulpit BMU) may lessen the overall displacement impacts to grizzly bears related to the relatively high OMRD and TMRD outside the Core by providing ample amounts of relatively secure habitat within home ranges (U.S. Fish and Wildlife Service 2011a, p. A-67). Nevertheless, varying degrees of adverse effects are anticipated in any BMU not meeting the research benchmark for core area, OMRD, or TMRD (U.S. Fish and Wildlife Service 2011b, p. A-83 to A-84), depending upon how far or near the benchmark each parameter lies.

Until all standards are met, the LMP includes very limited flexibility for Forest actions affecting grizzly bear core areas. However, the LMP allows for a one-time entry into Core for the sole purpose of hydrologically stabilizing roads. The work must be completed in one bear season or less, and the road is not to be entered for at least 10 years afterward (U.S. Forest Service 2020, p. 96). Therefore, we do not expect these activities to cause adverse effects to grizzly bears in most cases, although the potential cannot be ruled out entirely. We expect only female grizzly bears with cubs would be adversely affected, as they tend to be more sensitive to human disturbance. However

61

FWS001976

these adverse effects would be short-term only.  Since 2011, the Forest has used this allowance twice (U.S. Forest Service 2020b, p. 16).  Thus it is reasonable to assume that these adverse effects would be minimal over the next few years as the Forest continues working to meet standards.

Vegetation management and other Forest actions often require the construction and use of temporary roads or temporary use of restricted roads for motorized access.  Temporary road construction and use and temporary use of restricted roads may occur on a project by project basis.  Temporary roads in BMUs built for resource extraction such as timber harvest or mining may be short-term in duration of use or may remain on the landscape for several years and receive a substantive amount of use.  Depending on the site specific information regarding the existing motorized access condition, permanent and/or temporary roads, and temporary use of restricted road (i.e. location, timing, length, duration, etc.), the Service anticipates that some level of adverse effects to female grizzly bears with home ranges impacted by such roads may occur in some situations during the life of the LMP.  Some adult females may be displaced from key habitats and under certain conditions they may be displaced to levels that impair their normal ability to readily find food resources needed to sustain fitness necessary for breeding and producing cubs, and finding shelter.  We do not expect that all existing roads, new permanent and/or temporary roads, or temporary use of restricted roads would have adverse impacts on female grizzly bears, or that all female grizzly bears would be adversely affected by these roads. The level of effects would depend on such things as location of the road, length of the road, the frequency and intensity of use, and the duration the road would be on the landscape, in relation to those factors listed above for effects of roads.  However, if under-use of key feeding and sheltering habitat by female grizzly bears is significant, they may fail to obtain the necessary resources to breed and successfully reproduce.  Those effects are not covered in this biological opinion, and will be subject to future project-specific consultation.

Once all BMUs within the recovery zone meet proposed standards (by the end of 2023), the LMP would allow reductions of core to levels specified in the standard (see Design Element I.D.3, U.S. Forest Service 2020, p. 97).  Only through future federal actions subject to section 7 consultation could core area in BMU's that currently exceed the proposed core area standard be reduced to the standard.  Several BMUs are at or close enough to the research benchmarks that future temporary changes to OMRD, TMRD or Core (as allowed under the LMP) may result in BMU conditions that have temporary adverse effects to individual bears.  Subsequent section 7 consultation, as appropriate, on the specific actions developed pursuant to the LMP will serve as the basis for analyzing the effects of those actions.

The Forest will also continue to monitor at least 30 percent of closure devices to assure the OMRD standards are maintained (U.S. Forest Service 2020, p. 10), reducing the likelihood that a restricted road would receive public motorized use, thereby reducing or eliminating displacement effects and maintaining the lower risk of mortality that afforded by restricted roads (i.e., no public use and minimal administrative trips).

*NCDE*

Currently, the Therriault and Krinklehorn bear management subunits in the Murphy BMU exceed ("worse than") the research benchmark level for OMRD, but are lower than ("better

than") the benchmarks for TMRD and Security Core (see Table 5). The majority of open roads in the subunits are main roads that provide public access to numerous campgrounds and trailheads through the subunits. Because these are such a heavily used roads that provide a high degree of access, it is likely that the OMRD in the subunits will remain greater than 19 percent, and will continue to have some adverse effects on grizzly bears due to higher risk of mortality and potential for disturbance or displacement from human activities.

The adverse effects associated with existing conditions in the Therriault subunit were analyzed in the Service's KNF Revised Forest Plan BO (U.S. Fish and Wildlife Service 2013, p.II-52). The Forest and the Service believed the Krinklehorn subunit was below ("better than") the benchmark for OMRD at the time. However, the Forest recently corrected calculations and realized that the Krinklehorn is indeed above the research benchmark for OMRD. No changes have occurred on the ground, only changes in the methods for calculating OMRD (i.e. the inclusion of MS-3 lands in the calculations, as directed in the NCDE Conservation Strategy (NCDE Subcommittee 2020, p. 289, Appendix 7; detailed in J. Anderson, email dated July 22, 2020, *in litt*.). Therefore, we assume adverse effects to female grizzly bears have been ongoing in the Krinklehorn subunit during the last decade or longer, due to the percentage of the subunit with open route density greater than 1 mile/square mile. We anticipate the baseline OMRD will continue to have adverse effects to a few female grizzly bears in both the Krinklehorn and Therriault subunits, due to elevated baseline OMRD. In both subunits, the amount of Secure Core exceeds ("better than") the research benchmark, and TMRD are lower ("better than") than the research benchmark, potentially tempering the adverse effects to some extent.

Under the NCDE Conservation Strategy Amendments to the LMP (U.S. Forest Service 2018), we analyzed the effects to grizzly bears due to NCDE-STD-AR-03, a standard that allows temporary changes in the OMRD, TMRD, and Secure core within BMUs relative to baseline conditions (U.S. Fish and Wildlife Service 2017 p. 91). We anticipated that temporary changes in OMRD, TMRD, and/or Secure Core could result in adverse effects to female grizzly bears (*ibid*, p. 114), but that the effects would not prevent the KNF from supporting a sustained NCDE grizzly bear population (*ibid*., p. 91). In this opinion, we reaffirm those conclusions, given the corrected baseline information for the Krinklehorn and Therriault subunits.

Under the LMP, other site-specific projects may result in adverse effects to individual grizzly bears primarily associated with vegetation management activities creating larger opening sizes; potential mining proposals; large-scale special use permits; and use of helicopters during vegetation management activities. Overall, we expect these activities to occur infrequently and associated adverse effects to be reduced by the elements of the LMP. Any remaining adverse effects would be addressed through project-level consultation.

### Summary of Effects of Wheeled Motorized Access in BMUs

Depending on the site specific information regarding the existing motorized access condition, permanent and/or temporary roads, and temporary use of restricted road (i.e. location, timing, length, duration, etc.), the Service anticipates that some level of adverse effects to female grizzly bears with home ranges impacted by such roads may occur within BMUs in some situations during the life of the LMP. Displacement from quality habitat has more significant impacts on

63

FWS001978

adult female grizzly bears than males or subadults because adult females have higher energetic needs to sustain fitness prior to and during gestation and lactation and when rearing. As such, adult females can less afford the additional energy expended to find high quality foods and shelter if displaced, especially during the early spring or late summer to fall hyperphagia season. During some years, due to poor climatic conditions and resulting food scarcity and/or high levels of forest management activity or recreational activity, displacement effects from areas with high road densities could be more frequent and intense. If under-use of key feeding and sheltering habitat by female grizzly bears is significant, they may fail to obtain the necessary resources to breed and successfully reproduce.

The LMP substantially reduces the impacts to female grizzly bears related to access management in BMUs by ensuring most BMUs either meet or are "better than" research benchmarks for OMRD, TMRD, and Core, and by limiting use of restricted routes. The Forest has shown a positive trend towards meeting the established standards in the CYE since 2011, thus a positive trend towards improving habitat conditions for grizzly bears related to access management in BMUs. We anticipate that continued improvements in habitat conditions through access management will provide conditions that improve opportunities for grizzly bears in the CYE to find the resources necessary for feeding, breeding, and sheltering. However, in the interim, we expect the proposed action to extend the timeframe to reach full compliance with the established standards in all BMUs will cause some female grizzly bears to be exposed to adverse habitat conditions and increased mortality risk as a result of high road densities and lack of suitable secure habitat. In the NCDE, we anticipate that management direction will continue to provide grizzly bear habitat on the KNF that contributes to a sustainable NCDE population.

**Effects of Motorized Access in BORZ**

The Biological Assessment provided information regarding the BORZ baseline and clarified standards related to meeting the Access Amendment direction (hence LMP direction) in BORZ. The Design Elements of the Access Amendment related to BORZ would continue under the Proposed Action through continued implementation of the LMP standard FW-STD-WL-02, particularly the standards that prevent permanent increase in linear miles of open and total routes in BORZ above the baseline condition at the time the BORZ was delineated. The BA includes a few key points regarding standards and baseline, which warrant evaluation in terms of effects to individual grizzly bears: (1) Clarifications to the "no net increase" standard, (2) Corrections to the baseline condition, and (3) Updates to the baseline from BORZ expansions since 2011.

*No-Net-Increase Standard*

The LMP prohibits increases in permanent linear miles of open and total roads on National Forest Lands in BORZ (Design Elements II-A & B; U.S. Forest Service 2020, p. 98-99). This is generally referred to as the "no net increase" standard. The no-net-increase standard attempts to maintain the existing roaded conditions of BORZ when grizzly bears begin using the areas on a regular basis.

Although the "no net increase" standard limits linear miles of motorized routes in each BORZ, it does not necessarily limit effects to secure habitat. The example in Figure 5 below shows a

FWS001979

simplistic example of how relocating the linear miles of route within a BORZ could decrease the amount of secure habitat while maintaining the linear miles and thus meet the standard. Future actions that would meet the no-net-increase standard could result in permanent reductions in secure habitat. Some of these actions would be due to future projects that decide to remove a route in one area in exchange for adding a route in another area.

**Figure 5. Simplistic example of a 5 percent decrease in secure habitat while miles of linear routes stay the same. Clear squares represent secure habitat, shaded squares represent non-secure habitat around roads or motorized routes (dark black lines).**

 

Route = 16, Secure= 51          Route= 16, Secure= 47

The Forest estimates permanent changes in road locations associated with future projects could result in permanent reductions, but at this time is unable to anticipate how much permanent reduction could occur. We anticipate a range of effects to grizzly bears could vary, depending on multiple factors. The loss of smaller patches of secure habitat may have minimal effects, depending on location and the habitat. However, if those small patches provide connectivity to other areas for grizzly bears, the permanent loss of the secure habitat could lead to increased fragmentation. The loss and/or fragmentation of larger patches of secure habitat may result in displacement from otherwise suitable habitat. The habitat quality within the patch of secure habitat, the configuration of the secure habitat, and the connectivity of the secure habitat to other habitats would all influence the ways in which grizzly bears would experience the effects of permanent reductions in secure habitat. The full range of effects cannot be anticipated in this consultation, and future projects that propose permanent reductions in secure habitat will be subject to project-specific section 7 consultation.

Permanent reductions in secure habitat could also result from actions that are exceptions to the no-net-increase standard, primarily the exception that allows for increases in linear miles in situations where the Forest lacks discretion to preclude permanent road building or access across NFS lands (U.S. Forest Service 2020, p. 98). While these roads would be allowable under the LMP standards, and would not count towards total or open road metrics, they could affect overall road densities and secure habitat. The annual monitoring reports (U.S. Forest Service 2012-

FWS001980

2020b) show very few of these situations have occurred in the past decade, and when they do occur, the amount of road is generally less than one mile. We expect the Forest to continue issuing special use permits for access to private lands as required, but for these situations to be relatively rare. We anticipate future road building across NFS lands due to legal or other obligations (as described in Design Element II-A.B., U.S. Forest Service 2020, p. 98) will result in no more than a 2 percent net reduction in secure habitat within BORZ. These reductions in secure habitat may result in adverse effects to female grizzly bears within BORZ. We do not anticipate adverse effects to males, or that the effects would preclude grizzly bears from using BORZ due to such minor reductions.

Temporary changes in linear miles of open and total routes in BORZ are allowed under exceptions to the no-net-increase standard, and may also affect secure habitat. Temporary roads built for resource extraction such as timber harvest or mining may be short-term in duration of use or may remain on the landscape for several years and receive a substantive amount of use. The LMP specifies temporary roads will not be open to the public except under limited circumstances, and will be made impassable immediately when no longer needed for their intended purpose (U.S. Forest Service 2015, p. 150). The Forest predicts temporary roads will generally remain on the landscape for five years, but may remain for up to ten years (USFS 2020, p. 8). The Forest is unable at this time to estimate the exact amount and location of secure habitat that may be affected by temporary roads.

Not all temporary roads would affect secure habitat, given that many temporary roads are constructed in areas with existing motorized routes. However, depending on the location, some temporary roads could affect secure habitat, and thus temporarily reduce its effectiveness. Temporary roads that exist for a few years would result in short-term disturbance to grizzly bears that may be insignificant if secure habitat is not affected. Temporary roads that affect secure habitat may result in displacement from suitable habitat that could result in adverse effects. Design element II.C. reduces effects by stating "*Timber harvest activities that will occur within multiple watersheds shall be scheduled such that disturbance of grizzly bears resulting from road use is minimized. The appropriate scale for scheduling harvest activities will be determined pursuant to project level consultation*" (U.S. Forest Service 2020, p. 99). Thus we anticipate some future adverse effects from temporary roads could occur under the LMP, but the full range of effects cannot be anticipated in this consultation. Future projects that propose temporary reductions in secure habitat will be subject to project-specific section 7 consultation.

Other exceptions to the "no net increase" standard may result in temporary reductions in the effectiveness of secure habitat. Motorized access for emergency situations (as defined by 36 CFR 215.2) are inherently unpredictable due to the nature of emergency situations, and we cannot reasonably assess the full impacts to grizzly bears at this time; however, most emergency response action result in *temporary* disturbances. We do not expect most emergency road use and construction to result in permanent effects to secure habitat. Effects to grizzly bears will be determined through the emergency section 7 consultation process.

Land exchanges or acquisitions are another exception to the "no net increase" standard. These actions may result in increased or decreased acreages, and changes to the linear miles of

66

FWS001981

motorized routes, on NFS lands within BORZ. Effects of land exchange are analyzed at the project level, but if they do not change the motorized access on those acres there would be no changes to on-the-ground effects for grizzly bears associated with motorized use. Although the mileage and acres may increase within a BORZ in this scenario, we do not expect the effects would change for grizzly bears, as bears using these areas should have already been acclimated to the existing miles of motorized routes. Due to the inherent uncertainties surrounding real estate transactions, potential effects to grizzly bears are analyzed at the time of transaction through site-specific section 7 consultation.

The Forest would continue its *ad hoc* monitoring within BORZ, as described in the BA (U.S. Forest Service 2020, p. 10). The Forest's prompt response to any issues it discovers will help ensure the effectiveness of access management decisions, including devices intended to restrict public or all motorized access on restricted or decommissioned/obliterated routes, respectively.

Most bears that currently use BORZ areas are males (Kasworm et al. 2019, p. 70-98 and pers. comm.). Female grizzly bear use of BORZ is peripheral for the most part, occurring where life ranges overlap the Recovery Zone and portions of BORZ. Patches of secure habitat within BORZ may be important for female grizzly bear use of the areas, and as such, we anticipate a reduction in the amount or fragmentation of larger blocks of secure habitat may result in adverse effects to grizzly bears, or may modify the use patterns in BORZ where some females may use BORZ with less frequency.

### Corrections to the Baseline Condition of BORZ

The baseline condition in BORZ establishes the miles of open and total roads against which there can be no permanent increase. It represents the best-known conditions on-the-ground at the time when BORZ polygons are delineated. The original BORZ polygons were delineated by the Access Amendment, and the baseline was established for miles of total and open routes. Since that time, the Forest has discovered errors in the database in terms of how roads are categorized (i.e. open roads actually had a gate that restricted access, or vice versa that roads assumed to be restricted did not have a closure device) or have discovered pre-existing roads that should have been, but were not, included in baseline. As these errors have been discovered, the Forest has corrected their database and recalculated the miles of open and total road for the baseline condition. These corrections have been communicated to the Service via the annual monitoring reports.

The Forest said that it intends to continue making corrections to the baseline as necessary to correctly reflect the conditions on-the-ground at the time the BORZ areas are established (U.S. Forest Service 2020, p. 50). Updates to the baseline will continue to be made when the Forest becomes aware of better information regarding the pre-existing[7] roaded condition of BORZ, so that the baseline condition is the most accurate depiction of the roaded condition in BORZ. Because these corrections represent improved information but do not represent any on-the-

---

[7] Corrections only include roads that are believed *with reasonable certainty* to have existed at the time that particular BORZ, or BORZ expansion area, was delineated.

FWS001982

ground changes in the amount of roads within the BORZ, the Service does not anticipate any effects to grizzly bears resulting from these baseline corrections. However, the Service will review these corrections as they are provided to validate this assumption, and will respond as appropriate.

*BORZ Expansions*

The Forest meets annually with the grizzly bear researchers from the CYE to review information on grizzly bear occurrence outside of recovery zones to determine whether new areas should be delineated as BORZ. The Forest expanded the West Kootenai BORZ to include the Bobtail HUC in 2012, and the Lower Pipe and Cedar Creek HUCs in 2019, to include lands that have recurring grizzly bear use (see U.S. Forest Service 2012 and U.S. Forest Service 2020b). The Forest will continue to append the linear miles of open and total roads within newly delineated BORZ to the baseline for the respective BORZ. All LMP standards for BORZ will apply to these expansion areas, including the standard that prohibits permanent increases in open and total road miles.

Linear route densities in most BORZ areas, including the expansion areas since 2011, are relatively high. Likewise, the existing amount of secure habitat in BORZ, including the expansion areas, is relatively low (Table 4). Thus, we reaffirm our previous assumptions that the existing motorized access conditions within the BORZ likely have adverse effects to grizzly bears attempting to use portions of these areas (U.S. Fish and Wildlife Service 2011, p. A-72,). However, we expect that a number of grizzly bears will continue to use these BORZ areas despite these suboptimal conditions, including females, albeit at lower densities than grizzly bears in the recovery zones, based on the fact that grizzly bears are moving into these areas under the prevailing conditions.

Design Elements of the Access Amendment, incorporated into the LMP, assure no permanent increases in linear miles of open and total roads in BORZ, and that proposed increases in linear miles of open and total road be compensated for with in-kind reductions in linear miles of open and total road elsewhere within the same BORZ. In addition, timber harvest activities in multiple watersheds in BORZ must be scheduled so that grizzly bears can avoid project-related disturbances, and provisions for temporary roads are included, as previously described. Applying the Access Amendment standards to BORZ expansion areas offers some habitat protection for grizzly bears by assuring the linear miles of open and total roads will remain at the same level as when bears began regularly using the area. Thus, the LMP maintains the amount of human disturbance associated with linear miles of open and total routes at the time grizzly bears began using these areas.

In summary, adding the BORZ expansion areas into the West Kootenai BORZ increases the baseline condition for acres and miles of open and total roads within BORZ from the baseline condition that was analyzed during consultation on the 2011 Access Amendment (U.S. Forest Service 2010, U.S. Fish and Wildlife Service 2011). However, these additional acres and miles of open and total roads are a reflection of the updated baseline condition and are not the result of changes to the motorized access condition on the ground. If anything, managing the additional BORZ under the Design Elements of the Access Amendment limits the quantity of open and

68

FWS001983

total road miles across an increasing area outside of the recovery zones, especially in those BORZ located between recovery zones, which minimizes the potential negative consequences to movement and connectivity that would occur in the absence of these protections.

As grizzly bears continue to expand their range and occupy areas outside the CYE recovery zone, we anticipate the Forest may expand BORZ in the future, following the process described in the Guidelines for Determining Recurring Use Areas (RUA) and process for delineating BORZ (Appendix F of the 2010 Access Amendment BA (U.S. Forest Service 2010, and Appendix A. in U.S. Forest Service 2020, Appendix A, p. 114). We expect additional BORZ areas will likely have high road densities and low amounts of secure habitat, but cannot infer site-specific conditions at this time. However, the Service cannot fully assess the effects of such expansions or baseline conditions for future expansions at this time, and thus the Forest will need to reinitiate section 7 consultation when BORZ are expanded.

*Summary of Effects to Grizzly Bears in BORZ*

We anticipate that the adverse effects from existing motorized access conditions, including the relatively high linear route densities and low amounts of secure habitat, as well as future permanent and/or temporary effects to secure habitat would affect only few adult females in BORZ over the life of the LMP. We do not expect that all adult females exposed to disturbances related to motorized access in BORZ would suffer significant effects, nor would the effects persist throughout an individual female's lifespan. We expect that effects would vary substantially depending upon the wariness of the individual bear, the size of and habitat quality within her home range, the number of other grizzly bears using the particular area, climate conditions, annual food resources, and the nature, intensity and duration of human activity during any particular year. All of these are factors that may affect options available to adult females if displaced. Further, conditions the following year may be considerably different. Finally, while future permanent or temporary effects to secure habitat within BORZ areas may result in adverse effects to some female grizzly bears, the under-use of habitat does not necessarily preclude use or form a barrier to dispersal and movement within or across BORZ.

Grizzly bears have been documented infrequently in areas of the KNF outside of BMUs or BORZ, and thus the Service considers grizzly bears "may be present" on areas outside of BMUs or BORZ for the purposes of consultation on the LMP and individual projects. These bears are generally males that are transient or making exploratory movements, or augmentation females that are making their way back to their natal grounds (W. Kasworm, personal communication, 2020b). Transient individuals are highly mobile and not restricted to finding food and shelter within a home range. Thus, while displacement from habitat along roads may affect behavioral patterns such as feeding or sheltering of all grizzly bears, we do not anticipate such effects would cause harm or significant impairment to these behavioral patterns of transient, subadult, or male grizzly bears. We do not anticipate any adverse effects to grizzly bears outside of the areas encompassed by BORZ and BMUs at this time. Because BORZ are expected to expand as recurring use is documented in the future, effects to bears in recurring use areas will be addressed in future section 7 consultations regarding those expansions.

69

FWS001984

### c. General Effects of Motorized Over-the-Snow Access on Grizzly Bears

Available information regarding the effects of snowmobiles[8] on grizzly bears is generally anecdotal, based on grizzly bear responses to various stimuli other than snowmobiles collected during research. Such reports typically lack information related to the timing of disturbance, type of den, winter conditions or other important factors necessary to assess the significance of disturbance to grizzly bears, if any. Some information collected on black bears or other *Ursids* may have some relevance, but even the data on these species is incidental and largely theoretical. Regarding effects on bears during denning, snow is an excellent sound barrier (Blix and Lentfer 1992) and impacts to denning bears would likely be less in deep snow situations than in shallow snow conditions. It is likely that hibernating bears exposed to meaningless noise, with no negative consequences to the bear, habituate to this type of disturbance (Knight and Gutzweiler 1995).

Den abandonment has been documented in association with industrial activity and direct approach (Reynolds et al. 1986, p. 174; Harding and Nagy 1980, p. 278; Jonkel 1980, p. 3; Craighead and Craighead 1972, p. 31). Harding and Nagy (1980, p. 278) found that one grizzly bear abandoned its den after having the den driven over by a seismic vehicle. On the other hand, other events with seemingly similar levels of disturbance have not led to den abandonment (Jonkel 1980, p. 2; Reynolds et al. 1986, p. 174; Mace and Waller 1997, p. 41; Linnell et al. 2000, pp. 407-408). We are not aware of any primary-source reports in the literature of grizzly bear den abandonment directly attributed to snowmobile activity (U.S. Fish and Wildlife Service 2008, p.33). Nor has other substantive adverse effects on bears from snowmobile use been substantiated (see discussion in U.S. Forest Service 2008, pp.32-53). In fact, Mace and Waller (1997, p. 41) reported no abandonment of dens by grizzly bear even though snowmobiles were often seen within 2 kilometers of den sites. Likewise, the Interagency Grizzly Bear Study Team has intensively researched grizzly bear ecology in the Yellowstone Grizzly Bear Ecosystem from the 1970's to present, but this research has never documented den abandonment attributed to snowmobiles.

Disturbance from snowmobiles may be most consequential shortly before or after den emergence of a female with cubs (Graves and Reams 2001). Females and their cubs remain in the den site area for several weeks after emergence from dens (Haroldsen et al. 2002, p. 33; Mace and Waller 1997, pp. 37-38). Females with cubs have high energetic needs, and cubs have limited mobility for several weeks after leaving the den. Disturbance levels that cause a female to prematurely leave the den in spring or move from the den area could impair the fitness of the female and safety of the cubs. If cubs attempt to follow their mother, they will likely experience decreased fitness and the family group may be pushed to less suitable habitat.

After den emergence in spring, grizzly bears seek sites that melt snow early and produce green vegetation (Kasworm et al. 2010, p. 65). There is limited potential for snowmobiles to occur in these areas and overlap spring grizzly bear habitat for a short period of time after den emergence.

---

[8] "Snowmobile" is the generic term we are using for all types of over-the-snow motorized vehicles, including true snowmobiles, snow coaches, snow bikes, and any other non-wheeled motorized vehicles.

FWS001985

The portion of the population using these habitats in early spring is most likely to be males and lone females (W. Kasworm 11/28/2013 pers. comm.). These bears are mobile and can move from disturbance (ibid).

Therefore, it is the Service's opinion that snowmobile-related impacts on post-den emergence females with cubs are more likely to impart serious consequences than any potential impacts to denning grizzly bears. To date, we are unaware of any documentation of snowmobile-related impacts on post-den emergent females with cubs, although detection of such events may go unreported. To summarize, we have found no primary-source reports in the literature of grizzly bear den abandonment directly attributed to snowmobile activity (Hegg 2010 pp. 26-27; Servheen 2010 pers. comm. as cited In U.S. Fish and Wildlife Service 2011b, p.34) U.S. Fish and Wildlife Service 2008) nor has other substantive adverse effects on bears from snowmobile use has been substantiated (Mace and Waller 1997, p.41; U.S. Forest Service 2006, pp.3-263 3-373).

### d. Effects of Over-the-Snow Access in the Action Area

The LMP allows over-snow motorized use on 1,920,500 (86 percent) of the Forest. However, the MA desired conditions are for 1,713,000 acres (77 percent) of the Forest to be designated for over-snow motorized use – a reduction of 248,200 acres (USFS 2013a, p.93). This reduction in acres (and percent of total Forest) would be achieved through future closures following site-specific winter travel planning (ibid). Note that not all of this acreage is in reality available for over-snow-vehicle use. Topography and vegetation limit where this activity can actually occur. In the CYE on KNF lands, there are currently 53 miles of groomed trails and 58 miles of ungroomed routes (off-route). There are 7 miles of groomed routes and 4 miles of ungroomed routes on the KNF portion of the NCDE. Currently, the Forest estimates that off-route snowmobiling occurs on just five percent (18,686 acres) of grizzly bear denning habitat in the KNF portion of the CYE and 21 percent (7,905 acres) of the denning habitat in the KNF portion of the NCDE (USFS 2013a, p. 83, U.S. Forest Service 2020, p. 46). The KNF biologists and recreation staff derived this estimate based on their professional judgement and experience identifying areas where snowmobile use occurs on their Forest, in relation to modeled grizzly bear denning habitat. Including motorized over-snow use on the IPNF portion of the CYE recovery zone, approximately 9 percent of the modeled denning habitat in the entire CYE recovery zone currently overlaps with motorized over-snow use. This amount would be reduced over time under the LMP, particularly once the Forest conducts winter travel planning and identifies areas where late-season closures are warranted to protect grizzly bear denning habitat or other resources.

Additional elements of the LMP that complement the desired condition for reduced acres of over-snow motorized use and may further reduce over-snow motorized use include desired conditions that state that dens for threatened and endangered species are relatively free of human disturbance when they are in use (FW-DC-WL-01); that all BMUs have low levels of disturbance to facilitate bear use such as denning, etc. (FW-DC-WL-04); guideline (FW-GDL-WL-01), which guides the Forest to avoid or minimize disturbance in areas of predicted denning habitat during spring emergence (April 1 – May 1); and standard (FW-STD-WL-05), which states that no grooming of snowmobile routes in grizzly core habitat would occur in the spring

71

FWS001986

after April 1 of each year. In the NCDE, element GA-DC-WL-TOB-01 identifies a desired condition for low levels of disturbance for denning activities for grizzly bear and other high elevation denning species and for summer use by big game in the Ten Lakes, Thompson Seton, and Marston Face areas. All elements of the LMP would be considered in the development of future winter travel plans.

We acknowledge that 79 percent and 91 percent of CYE and NCDE modeled denning habitat, respectively, on the KNF occurs in grizzly bear core areas (J. Anderson 02/06/2013 pers. comm.). There is no winter season ending date for motorized use on the KNF. Therefore, snowmobile use of roads, trails, and open areas is allowed as long as the snow persists. Snow conditions within the action area are often suitable for snowmobiling to continue beyond April 1, the beginning of the grizzly bear non-denning period. Therefore, some level of motorized use (snowmobile only) will likely occur within core habitat and on restricted roads during the non-denning period, compromising the effectiveness of core areas and OMRD for a short period of time.

**Effects on Denning Habitat.** The potential for disturbance to denning grizzly bears on the KNF does exist but is low due to the low probability of a direct encounter of a snowmobile to a den and even in that unlikely case, the excellent insulative properties of snow to mitigate the noise. As stated previously, only 5 percent (18,868 acres) of the modeled denning habitat in the KNF portion of the CYE recovery zone (1,669,760 acres) currently receives snowmobile use and there are only approximately 42 grizzly bears in the CYE. In the KNF portion of the NCDE, 21 percent (7,905 acres) of modeled denning habitat in the two KNF BMU subunits receive snowmobile use. As such, for both recovery zones, typical high-use snowmobile areas and potential den sites have a limited likelihood of substantive overlap. This is because grizzly bears generally den in either timbered habitat or very steep slopes, including the slopes of open basins (U.S. Fish and Wildlife Service 2010, p. 26). Most of the heavy snowmobile use occurs on trails, roads, or open basins, and meadows – although some direct overlap may occur where denning habitat is found on steep open slopes favored for "high marking" by snowmobiles (ibid). However, most denning habitat - except for "high-marking" areas - is less favorable for snowmobile use and as such there is a reduced chance of adverse overlap between grizzly bear den sites and snowmobile traffic (ibid).

Therefore, there is a low likelihood that some grizzly bears in the CYE and NCDE may be affected during the denning season, but the Service believes that the magnitude of impacts during this time in both the recovery zone and BORZ would be insignificant and unlikely to adversely affect grizzly bears.

**Effects on Emerging Females with Cubs of the Year.** Disturbance from snowmobiles may affect female grizzly bears with cubs of the year shortly after den emergence. Based on a sample size of 10 bears, radio-collared female bears with cubs in the CYE emerged between the third week of April and third week of May (W. Kasworm 02/21/2013 pers. comm.). In the NCDE on the Flathead National Forest, female grizzly bears begin emerging from their dens about April 1, with a median date of April 7 (Mace and Waller 1997, pg 37). To date, litter abandonment by grizzlies due to snowmobiling activity has not been documented in the lower 48 States (Hegg et al. 2010 and Servheen 2010 pers. comm. as cited *In* U.S. Fish and Wildlife Service 2011b, p.34)

FWS001987

nor has other adverse effects on grizzly bears from snowmobile use been substantiated (Mace and Waller 1997; USFS 2006, pp.3-263 3-373). However, snowmobiles could disturb females and their cubs near the den site after emergence from dens. Disturbance levels that cause a female to prematurely leave the den in spring or move from the den area could impair the fitness of the female and safety of the cubs.

Under the LMP, less temporal and spatial overlap of grizzly bears and snowmobiles would occur on the KNF due to the decrease in acres where winter motorized use is allowed; however, these changes would not be realized until winter travel plans are completed. Until such time, restrictions on grooming of snowmobile routes after April 1 (which is expected to deter most access and use by all but the most hard-core snowmobilers) and guideline (FW- GDL-WL-01) which states that management activities should avoid or minimize disturbance in areas of predicted denning habitat during spring emergence between April 1 and May 1 (that is, any activity that is carried out or authorized by the Forest that would result in impacts on natural resources or change human use of the Forest would be restricted in denning habitat during this time period) would reduce the likelihood of overlap of snowmobilers and females with cubs during den emergence (thereby improving the baseline condition). Nevertheless, winter motorized use could occur in a small proportion of modeled denning habitat during the den emergence period under the LMP, resulting in disturbance of females with cubs that could impair the fitness and safety of the female and cubs. The Service believes that the likelihood of impact from snowmobiles on emerging females with cubs is low. This is because:

- There is a low estimated number of grizzly bears in the CYE;
- The low proportion of female grizzly bears with cubs of the year;
- The overlap of just 5 percent of modeled denning habitat in KNF portion of the CYE where snowmobile use currently occurs (21 percent for KNF portion of the NCDE; two of 70 subunits in the NCDE recovery zone);
- The seasonally-declining numbers of snowmobilers by April of each year;
- Restrictions on grooming of snowmobile routes after April 1 (which may affect the ability of off-route users to access areas at higher elevations) (FW-STD-WL-05);
- The limited ability to access higher elevations with snowmobiles since road closures for wheeled motorized use are in effect after April 1; snowpack is breaking up at lower elevations; and trails are no longer groomed in core habitat.
- The late den exit dates for females with cubs in the CYE at which time snowmobiles are less likely to be able to access the area due to poor snow conditions at lower elevations);

Additionally, GA-DC-WL-BUL-02, GA-DC-WL-TOB-01, and GA-DC-WL-YAK-02, will reduce the probability that disturbance could occur during spring emergence due to snowmobile use. These elements specifically identify areas where the desired condition is for low levels of disturbance for grizzly bear denning and would be considered in the development of site-specific winter travel plans.

However, over the life of the Plan, we cannot entirely dismiss that a disturbance would occur or that it would not result in adverse effects on a female with cubs. However, we believe an individual female would not likely be affected for more than one denning season. Grizzly bears

typically do not reuse den sites. Thus, if a female grizzly bear suffers significant disturbance at or near her den site, it is probable that she would locate a new site to den in the future and would have options for denning elsewhere.

To date, there has been one female bear known to den in BORZ. The Forest has not mapped potential denning habitat in BORZ, but anticipates doing so as part of the winter travel planning process. We anticipate adverse effects could occur to female grizzly bears in BORZ where potential denning habitat and late-season over-snow use overlap.

**Effects on Spring Habitat.** After den emergence in spring, grizzly bears seek sites that melt snow early and produce green vegetation (Kasworm et al. 2010, p. 65). Spring habitat use in the CYE (April and May) indicated use of low elevation sites (ibid). The portion of the population using these habitats in early spring is most likely to be males and lone females (W. Kasworm 01/28/2013 pers. comm.). These bears are mobile and can move from disturbance (ibid). Females with cubs are more vulnerable, but are likely to remain at the higher elevation denning habitat in the early spring (effects described above). The potential for disturbance or displacement of grizzly bears from spring feeding habitat in the action area (CYE and NCDE) is influenced by the variability in snowpack and the rate of spring melt. Although snowmobiling would be permitted after April 1, spring snowmobiling areas and spring grizzly bear habitat are almost mutually exclusive in that the areas that would be suitable for spring snowmobiling (i.e. more snowpack) would not typically overlap with spring grizzly bear habitats (i.e. less snowpack). Some level of motorized (snowmobile only) use likely occurs during the spring period within core habitat and on restricted roads during the non-denning period compromising security core habitat and OMRD for a short period of time. However, these areas remain designated as security core habitat and continue to provide security core habitat during the remainder of the non-denning period. The risk of such a compromise within spring habitat is likely lessened due to the fact that if the area is accessible to snowmobiles (sufficient snowpack), then it is not likely providing spring feeding habitat for grizzly bears at the same time (as described above).

The LMP would reduce the total acres available to winter motorized use, and prohibit grooming of snowmobile trails after April 1. For these reasons and based on the discussion above, the Service expects that the likelihood adverse effects to spring habitat and foraging grizzly bears is low and the magnitude of impacts during this time in both the recovery zone and BORZ would be insignificant and unlikely to result in adverse effects.

Our 2013 Biological Opinion on the LMP revealed this potential overlap, and the accompanying Incidental Take Statement included a Term and Condition requiring the Forest to complete a winter travel plan within five years of implementation of the Revised Forest Plan (by February 2020; U.S. Fish and Wildlife Service 2013, p. II-58-62). The Forest has not yet fulfilled that Term and Condition, but commits to do so by the end of 2024 (U.S. Forest Service 2020, p. 46-47). The winter travel plan will consider and evaluate the risk of encounter between grizzly bears and late season snowmobilers, and may include area closures or other restrictions, if deemed necessary to protect grizzly bears emerging from dens.

74

FWS001989

The Forest has been monitoring late season snowmobile use near modeled grizzly bear denning habitat on the KNF since 2016, per the Term and Condition in the biological opinion for the LMP (U.S. Fish and Wildlife Service 2013, p. II-106). Monitoring to date has focused on the Northwest Peaks/Buckhorn and Spar Lake vicinities (BMUs 13, 1, 3, and 9) and has detected overlap of late-season snowmobile activity in predicted denning habitat after April 1. Monitoring results have not shown a substantial change in the area of overlap of late season snowmobiling and modeled denning habitat. The number of users during the late spring timeframe is unlikely to substantially increase in the next several years as winter travel plan is completed (U.S. Forest Service 2020, p. 47). Furthermore, snowmobiling after April 1 is relegated to a small subset of snowmobile users and is dependent on annual snow conditions and local avalanche danger.

Snowmobiling may also occur in all BORZ. The Forest estimates snowmobiling may occur on up to 587,360 acres of BORZ. Routes available for snowmobiling vary, with groomed and ungroomed routes available to facilitate public motorized over-snow use. Although snowmobiling is allowed on this many acres, actual snowmobile use that overlaps potential denning habitat likely occurs on a much smaller subset of these acres due to topography, areas that hold late season snow, and other factors. The Forest has not yet mapped potential grizzly bear denning habitat in BORZ. In many areas of BORZ, denning is unlikely due to lower elevation habitat with gentler topography. However, at least one female grizzly bear has denned in the West Kootenai BORZ (W. Kasworm, pers. comm. 2020). Some denning habitat may exist in other areas of BORZ, and other grizzly bears may den in BORZ.

The Forest concludes, and the Service agrees, that the overlap between late spring snowmobiling and potential denning habitat is currently very small in both space and time within the Recovery Zone and BORZ. Thus, the risk of a bear-snowmobile encounter on the KNF is expected to be very low. If an encounter did occur, however, the effects could be adverse, especially to females with cubs.

Therefore, while the risk of encounter is low, the consequences of an encounter would be adverse for some female grizzly bears shortly after den emergence. Delaying winter travel planning (until the end of 2024 at the longest) will prolong the amount of time that adverse encounters could occur in the few select areas where overlap is more likely. We expect not all female grizzly bears with cubs would be affected and those that are affected would not be affected for more than one season (for the reasons described earlier). We expect the impact on bears during spring emergence to be low both under the existing conditions and as a result of the proposed action to extend the timeline to complete winter travel planning.

## 3. Habitat Management

### a. General Effects of Vegetation Management on Grizzly Bears

Vegetation management activities include timber harvest, salvage, planting, thinning, prescribed burns, and mechanical fuel treatment. Vegetation management (timber harvest, salvage, planting, thinning, fuels treatment, prescribed fires) may impact grizzly bears by affecting food resource availability, proximity to escape cover, human access and conflicts, or temporarily shifting grizzly bears into less secure areas.

75

FWS001990

A study by Zager (1980, p. 35) found 81.8 percent of collared grizzly bears used harvested stands in proportion to their availability in the home range. The use of harvested stands increased in the summer, when huckleberry productivity was high and decreased in the fall, as bears moved to higher elevations or unharvested areas, likely related to the opening of hunting season (ibid, p. 36). Harvested stands produced the most food resources for grizzly bears approximately 8-15 years after harvest (Zager 1980 as cited by Waller 1980, p. 36; Martin 1983). Similarly, Lindzey and Meslow (1977) documented abundant food resources for black bears in harvest units 15 years after harvest.

Another factor to consider with regards to vegetation management is the availability and proximity of escape cover (Zager and Jonkel 1983, p. 131). A decrease in the amount of escape cover may result in different effects on grizzly bears and their habitat. If cover is limiting in the project area, either by the amount or distribution, timber harvest would likely result in negative impacts (Zager 1980, pp.75-76). However, if cover is not limiting in a project area, timber harvest may have either no effect or a positive effect in those situations where food abundance or distribution is improved. By removing or reducing overstory vegetation through harvesting, slashing and/or burning, grizzly bear food production may be increased during summer (Mace and Waller 1997, p. 120; Waller 1992, p. 36). This includes food resources such as berries and succulent forbs.

Harvest unit size and shape may have an indirect effect on grizzly bear use in that they determine the proximity of escape cover (Zager et al. 1983, p.131). Zager, in northwestern Montana found that nearly half of the harvest units used by grizzly bears were less than 40 hectares; however grizzly bear sign was also documented in units larger than 160 hectares (ibid, p. 131). In Yellowstone, Mealey et al. (1977) documented spring grizzly bear use in harvested stands less than 20 hectares that included leave trees and did not document use in larger units without leave trees, presumably due to the lack of cover.

If food production or distribution is improved with timber harvest but human activity is not controlled after the completion of harvest activities, negative impacts on grizzly bears may occur due to an increase in the potential for conflicts between humans and grizzly bears. Adequate motorized access management can support the exploitation of rejuvenated food resources in older harvested units by grizzly bears. Reduced cover may increase the visibility of grizzly bears, which could increase their vulnerability to illegal human-caused mortality. Harvested stands that are easy to access may receive an influx of berry pickers during the berry season which may limit grizzly bear use or increase human-caused mortality (Zager 1980). Waller (1992, p. 37) found that of the harvested stands that he studied in the Swan Mountains of Northwestern Montana, those with the highest grizzly bear use had limited access due to closed gates and/or over-grown roads. Grizzly bears within his study area that used harvested stands were found at higher elevations and spent little time in lower elevation harvested stands where harvest was most common (ibid, p. 37). Waller attributed this to human use of those lower, more accessible harvested stands. Waller also found that grizzly bears avoided stands where the vegetation had not recovered enough to provide security cover and preferred to use stands that were 30 to 40 years post-harvest (ibid, p. 39).

FWS001991

Timber harvest in the winter has advantages for grizzly bears. It occurs when bears are denned and so disturbance is not an issue. Additionally, during winter, snow roads versus temporary roads can be constructed in some cases, thereby reducing the effects from roads. Further, understory vegetation is dormant and covered by snow and often less affected by harvest activities.

Fuels reduction is not expected to adversely affect grizzly bears. These projects remove cover for the purpose of fire prevention near residential development. These stands may be treated again to retain them as fuel breaks, and not allowed to regenerate. Given the proximity to residential developments, many fuel reduction projects occur in or very near areas where management should discourage use by grizzly bears and focus on preventing conflicts between people and grizzly bears.

Timber harvest requires access, usually by existing roads and sometimes via temporary roads and/or helicopters. Grizzly bears may be affected by the increased use of restricted roads or temporary roads that are constructed in order to access harvest units. Substantive use of roads may cause adverse effects to grizzly bears, such as displacement from key habitats. Extensive information on the effects of roads on grizzly bears is presented above. We do not anticipate any effects of wheeled access management for timber sales beyond what was discussed above in the Wheeled Access Management analysis.

Helicopter use has advantages for grizzly bears in that it can often reduce the need for road use and road construction. Thus there are no lingering effects of roads on the landscape. Helicopter use in occupied grizzly bear habitat may elicit a response in grizzly bears, but the response is variable depending on several variables. Effects may range from a simple awareness of the helicopter, short-term disturbance or flight response or displacement from an area (U.S. Fish and Wildlife Service and U.S. Forest Service 2009). In timbered habitats, McLellan and Shackleton (1989, p.378) found that an overt avoidance or displacement response required high intensity helicopter activity, such as carrying equipment within 200 meters of a grizzly bear. Helicopter use that is short in duration and low in frequency, would not likely result in significant affects to grizzly bears (U.S. Fish and Wildlife Service and U.S. Forest Service 2009, p.4). Extended use with multiple passes could interfere with the normal behavior patterns of grizzly bears (ibid). The effects to grizzly bears of repeated, low altitude flight paths that follow open roads may partially offset the existing under-use of habitat in the immediate vicinity of the roads due to the "avoidance" by the grizzly bears of habitat in close proximity to open roads. In many cases, the effects of helicopter logging that occurs in roaded habitat would have insignificant effects to grizzly bears as long as affected BMUs have adequate core areas and management of motorized routes. However, helicopter logging in areas that are not highly roaded could result in adverse effects similar to adverse effects caused by roads.

### b. Effects of Vegetation Management in the Action Area

**Timber Harvest –** Timber production (timber stands with planned, scheduled entries for the purpose of generating commercial timber products) occur within the suitable timber base on the KNF. The suitable timber base on the KNF is mostly located in MA6 (general forest). Under the LMP, there are 218,212 suitable timber acres in BMUs (16 percent of the BMUs). Most of

FWS001992

the area in existing BORZ contain suitable timber acres (U.S. Forest Service 2020, p. 30) and we expect that future BORZ areas will also contain high amounts of suitable timber acres. However, all grizzly bear core habitat identified in MA6 (general forest) has been identified as not suitable for timber production (USFS 2011b, p. 358). Vegetation management in core areas would be done to meet resource needs other than timber production such as wood fiber utilization and other multiple-use purposes, including resource benefits and fuels management (U.S. Forest Service 2013a, p. 103).

As described above, timber harvest has varying effects on grizzly bears. The primary effect of timber harvest on grizzly bears is the disturbance resulting from people and equipment operating in grizzly bear habitat as well as the effects of roads used to access the timber stand. The effects of roads are addressed above. Timber harvest may result in temporary disturbance of bears during the time period the harvest takes place. During this time period bears would move away from the disturbance to access necessary resources. Since much harvest now occurs in winter, effects on grizzly bears from displacement would be reduced. Additionally, the LMP indirectly limits the amount of grizzly bear habitat in BMUs (and subunits) affected by vegetation management activities during the active bear year that generate noise and other disturbance (e.g. timber harvest and recreation) by limiting the road access needed for these activities. Given the healthy condition of core areas and adequate open and total route density management under the LMP, we do not anticipate that this disturbance would result in adverse effects on grizzly bears that cause impairment of the ability to feed, breed, or shelter.

Based on our history of consultation on vegetation management projects, information in our files, and the exclusion of core areas from timber production (i.e., commercial timber harvest with planned regular entries) we do not anticipate that vegetation management activities (not including associated roads) by themselves would result in effects to grizzly bears that would significantly impair breeding, feeding, or sheltering. Large core areas in each BMU and other land allocations (MA1-wilderness- no timber harvest and MA5-backcountry-limited timber harvest) with limited human disturbance would still be available for grizzly bears to meet their resource needs. Similarly, due to the availability of wilderness and core areas, nor do we anticipate significant impairment of grizzly bears' ability to feed, breed, or shelter as a result of incidental harvest outside the suitable timber base for other resource objectives such as fuels management or habitat restoration (allowed in MA2 (except wild river segments), MA3, MA5, MA6, and MA7).

In BORZ, grizzly bears would have fewer options providing undisturbed areas to select from if disturbed by timber harvest. However, we do not anticipate significant impairment of grizzly bears' ability to feed, breed, or shelter as a result of timber production or timber harvest for resource benefit. This is attributed to the occupation of these areas by grizzly bears despite the sub-optimal conditions (including existing, ongoing levels of timber harvest), the elements of the Access Amendment that limit open, total, and temporary roads, and the Access Amendment requirement in BORZ to schedule timber harvest activities that will occur within multiple watersheds in a manner to minimize disturbance of grizzly bears resulting from road use during project level section 7 consultation.

78

FWS001993

Fuels management projects in the Wildland-Urban Interface (WUI) that remove vegetative layers in order to reduce fire risk may or may not affect bears. Grizzly bears may forage in the WUI where there is sufficient cover and security or distance from human developments. Projects in the WUI that remove various forest canopy layers may reduce or increase foraging opportunities for bears depending on site-specific conditions. However, because the WUI occurs in proximity to communities and other human developments, we are less concerned about providing habitat for grizzly bears in these areas. Reduced foraging opportunities and hiding cover for grizzly bears in the WUI may help reduce the risk of grizzly bears becoming attracted to anthropogenic food sources on adjacent private lands and/or reduce the risk of grizzly bears encountering people, leading to grizzly bear mortality.

**Opening Size / Proximity of Cover –** This section addresses the effects of the desired vegetative conditions on the KNF as it relates to opening size. The USFS indicates that the vegetative component of habitat for grizzly bears has changed from historic conditions on the KNF due to a lack of disturbance (USFS 2013a p. 96). There are fewer openings and fewer stands with a semi-open canopy that promote grizzly bear forage (ibid). Larger opening size would potentially create more grizzly bear foraging habitat but at the same time these larger openings may be underused by grizzly bears due to lack of cover. Larger opening sizes may also increase the visibility of grizzly bears, which may potentially increase their vulnerability to human-caused mortality and/or contribute to displacement from preferred habitats. Lastly, larger openings may contribute to an overall reduction in cover within grizzly bear habitat on the Forest.

The KNF indicates that desired conditions for larger openings are based on natural disturbance processes and would mostly result from these processes (as opposed to vegetation management activities), which are the conditions grizzly bears evolved with in this area, and that security for grizzly bears is maintained or improved by implementing the access standard (FW-STD-WL-02) and through public information and education programs that reduce the risk of human/bear conflicts. The Forest also indicates that often in a timber harvest design, leave patches, thickets, riparian corridors, and/or other areas of unique habitat features are retained in the harvest unit, dependent upon site conditions, and that these features may interrupt line-of-sight; reduce visibility; and provide cover for bears (J. Anderson 03/12/2012 pers. comm.). The Forest also indicates that cover is abundant and would continue to be abundant in grizzly bear habitat on the KNF, because other elements of the LMP would moderate the effects of this plan direction (J. Anderson 07/15/2013 pers. comm.). For example, where LAUs overlap the grizzly bear recovery zones there would be an influence from the Northern Rockies Lynx Management Direction on "cover" for grizzly bears due to the limits on treatments in multi-story foraging and stand initiation stage snowshoe hare habitat. Generally, if a stand has a high stem density and horizontal cover to provide snowshoe hare habitat, it likely is capable of providing cover for grizzly bears. Further, timber harvest activities are expected to be small when measured against the total size of the Forest; acres of regeneration harvest are anticipated to total approximately 18,280 acres over the first decade on the KNF (this amounts to 0.8 percent of the entire KNF). Including the acres of intermediate harvest (40,000 acres total in the first decade on the KNF) increases the total timber harvest to 58,280 acres on the KNF, which is 2.6 percent of the entire KNF. Also grizzly bear core areas are not included in the suitable timber base and are not part of the 2.6 percent that is anticipated to have regeneration or intermediate harvest over the first

79

FWS001994

decade. Hence, opening sizes from timber harvest are not expected to contribute to measureable reductions in cover under the LMP.

Early successional grasses and forbs provide forage for grizzly bears. Of primary concern to the Service is effect of large openings adjacent to open roads or seasonally-managed roads allowing public access into recently harvested areas. In these situations, foraging opportunities may be avoided or under-used due the presence of human use (Waller 1992, p.37). This condition may persist for some period of time post-harvest (Waller 1992, p.39) based on site conditions and stand cover types. Additionally, grizzly bears that select these areas may be at higher risk of human detection, conflict, and resulting grizzly bear mortality. These types of effects would be site-specific depending on site conditions. The Forest indicates that larger openings are more likely to result from natural disturbances than from planned vegetation management activities. Additionally, the effects from larger openings are expected to be largely reduced by measures included during site-specific project development such as:

- Retention of riparian corridors (FW-DC-RIP-04; FW-STD-RIP-04).

- Retention of untreated patches that provide for structural diversity and these may provide vegetative screening or cover in openings

- Closure of roads for public use during and immediately after vegetation management activities.

- Ensuring adequate closure devises (i.e., gates, barriers, full or partial recontouring/ripping of road) are in place and functioning properly.

The KNF indicates large openings are more likely to result from natural disturbances than project activities. Still, vegetation management projects proposing large opening sizes that would have adverse effects on bears may be proposed under the LMP. These projects would be designed in consideration of desired conditions, etc. Security for bears would be provided by the access standard (FW-STD-WL-02) and through public information and education programs that reduce the risk of human/bear conflicts. Therefore, adverse effects resulting in impairment of breeding, feeding, and sheltering would be infrequent and we do not expect substantial negative effects on the population.

In BORZ, there are fewer limitations on timber harvest and more human presence. However, there are also fewer bears in BORZ, and security for bears in these situations would be provided by the access standard (FW-STD-WL-02) and through public information and education programs that reduce the risk of human/bear conflicts. Therefore, adverse effects resulting in impairment of breeding, feeding, and sheltering would be infrequent and we do not expect substantial negative effects on the population.

**Helicopter Harvest –** The LMP allows the use of helicopters for vegetation management projects. Based on our history of consultation on vegetation management projects with the KNF, helicopter harvest with adverse effects on bears is infrequent. LMP desired conditions would moderate effects of helicopter harvest in grizzly bear habitat (FW-DC-WL-01, 03, 04); and

FWS001995

effects of helicopter harvest are mostly temporary - ending after the harvest is complete (versus using permanent roads which remain on the landscape). Therefore, adverse effects resulting in impairment of breeding, feeding, and sheltering would be infrequent and we do not expect substantial negative effects on the population.

**Prescribed Fire –** The effects of prescribed fire on bears would be similar to that of timber harvest. Prescribed fires may result in disturbance and displacement impacts to grizzly bears through presence of humans, temporary camps, and use of motorized equipment for fire containment. During this time period bears would move away from the disturbance to access necessary resources. Given the healthy condition of core areas and adequate open and total route density management under the LMP, we do not anticipate that this disturbance would result in adverse effects on grizzly bears that cause impairment of the ability to feed, breed, or shelter. Presence of humans implementing prescribed fires are not expected to contribute to conflicts given the likelihood that bears would be displaced from the area, a Forest-wide food storage order is in place, and there is no history of conflicts from such activities on the Forest.

Prescribed fires would reinvigorate and increase the amount or quality of grizzly bear forage species such as grasses and berry-producing shrubs. We expect the only potential adverse effect on grizzly bears from prescribed fire would be those creating large opening size. The effects would be the same as those described above. Since 2007, the KNF has treated 6,501 acres in BMUs through prescribed fire (J. Anderson 08/20/2013 pers. comm.). Given the limited acres of habitat treated with prescribed fire and security provisions for bears through the Access Amendment (FW-STD-WL-02) and through public information and education programs that reduce the risk of human/bear conflicts, adverse effects resulting in impairment of breeding, feeding, and sheltering would be infrequent and we do not expect substantial negative effects on the population.

In BORZ, grizzly bears would have fewer options providing undisturbed areas to select from if disturbed by prescribed fire activities. However, we do not anticipate significant impairment of grizzly bears' ability to feed, breed, or shelter. This is attributed to the occupation of these areas by grizzly bears despite the sub-optimal conditions (including existing, ongoing levels of timber harvest), the elements of the Access Amendment that limit open, total, and temporary roads, and the Access Amendment requirement in BORZ to schedule timber harvest activities that will occur within multiple watersheds in a manner to minimize disturbance of grizzly bears resulting from road use during project level consultation (prescribed fire is often implemented as a post-harvest activity).

### c. General Effects of Fire Management on Grizzly Bears

Fire maintains the mosaic of openings and varying vegetation successional stages on the landscape that provide the diversity of foods required by bears. Wildfires can result in short-term negative effects and/or long-term beneficial effects depending on the vegetation species and fire severity. Some foraging habitat and/or cover may be lost in the short-term. However, fire often stimulates the understory and/or increases the vegetative diversity in high quality grizzly bear habitat, benefitting grizzly bears in the long-term.

81

FWS001996

Fire suppression alters the natural development of forests and species composition and can render forests susceptible to large-scale disturbance due to increased fuels and denser stands. Higher intensity stand-replacing fires may also occur as a result of past fire suppression requiring longer to recover or requiring active management to restore.

Fire management may result in disturbance and displacement impacts to grizzly bears through presence of humans and use of motorized equipment for fire suppression. Generally, grizzly bears would leave an area on their own, in advance of an approaching fire, and therefore, be out of the area associated with fire suppression activities. However, if suppression activities were to take place prior to an approaching fire, a grizzly bear may be affected before leaving the area. There may be some effects from disturbance caused by the overall increase in human activity in a particular area. These activities may include increased vehicular traffic, aerial support, and fire camps, any of which may cause disturbance or displacement of a grizzly bear prior to or when they are moving from the area. Similarly, there may be a concentration of human activities associated with fire suppression or fire clean-up, assessment, and restoration activities that result in disturbance and open roads that displace bears, or increase the risk of human food and attractants luring grizzly bears into the area.

Indirect, long-term effects from fire suppression activities may result from opening previously closed roads, constructing new roads or temporary roads, constructing firebreaks or constructing machine lines. These actions may contribute to the open and total road densities which are limited in certain areas to protect grizzly bears or result in effects to grizzly bears similar to effect of roads on grizzly bears (described above).

### d. Effects of Fire Management on Grizzly Bears in the Action Area

To reiterate, the effects of wildland fire on bears include short-term displacement, loss of forage, and alteration of habitat use patterns. In the long-term, bears are expected to benefit from fires from stimulated understory growth and increased vegetative diversity. The LMP includes an emphasis on the use of fire to trend vegetation towards the desired condition (FW-DC-FIRE-03; MA1abc-DC-VEG-01, MA1abc-DC-FIRE-01, MA1abc-GDL-FIRE-01, MA2-DC-FIRE-01, MA5abc-DC-VEG-01, MA5abc-DC-FIRE-01, MA5abc-GDL-FIRE-01. The KNF indicates that the use of fire to trend towards the desired conditions for vegetation and restoring habitats would provide the approximate types and amounts of habitats that grizzly bears would have evolved with on the KNF (USFS 2013a, p.106). The KNF also indicates that allowing fire to play a more natural role in the ecosystem through implementation of FW-DC-FIRE-03 under the LMP would maintain or improve the vegetative component of bear habitat (USFS 2013a, p.106). Early successional grasses and forbs would provide forage for grizzly bears, and the following successional stages in habitat types preferred by bears would also provide food and cover. Thus, the effects on grizzly bears of allowing unplanned ignitions to burn may result in temporary displacement of grizzly bears, a temporary reduction in foods and cover within the burned perimeter. Grizzly bears evolved with wildfire and so while the displacement effects may be adverse to individuals in specific instances, these negative effects would be offset beginning soon after the burn in many locations as regrowth of vegetation begins.

FWS001997

Under the LMP, undesirable wildfires will continue to be suppressed where necessary to protect life, property, and key resources (FW-DC-FIRE-03). At lower elevations in the action area, fire suppression has contributed to the development of denser stands which contribute to availability of cover but renders stands more susceptible to large-scale disturbance such as insects, disease, or fire (USFS 2013a, pp. 88,106). Past timber harvest that focused on larger trees, combined with fire suppression that increased fuels, created denser stands, and retarded the development of large trees, have contributed to the vegetation on the KNF being outside of historical conditions/disturbance processes (USFS 2013a, p.106) and increased the risk of large-scale fires in these locations. We anticipate that over time with implementation of desired conditions for vegetation under the LMP (USFS 2013a, p. 66) these conditions would change and risks of large-scale fires may be slightly reduced.

Fire suppression activities introduce a concentration of human activity into the affected area. Even when a decision is made to allow a fire to burn, it is typically controlled within a predetermined boundary. The effects of fires suppression and fire containment activities on grizzly bears include increased vehicular traffic, aerial support, and fire camps, any of which may cause disturbance or displacement of a grizzly bear prior. However, we do not anticipate adverse displacement effects on bears from these types of fire suppression activities. This is because bears would leave an area on their own, in advance of an approaching fire, and therefore be out of the area associated with fire suppression activities. There may also be human activities associated with fire clean-up, assessment, and restoration activities that result in open roads that displace bears or increase the risk of human food and attractants luring grizzly bears into the area. All fire suppression activities would comply with the Forest-wide Food Storage and Sanitation Special Order. Still other activities associated with wildfire suppression (such as fire breaks, temporary roads, changes in open or total road densities) are variable and may result in adverse effects on grizzly bears. These types of actions are planned and conducted under emergency situations and so the effects to grizzly bears would be analyzed in emergency consultation during and after the activities are complete (50 CFR 402.05).

### e. General Effects of Forest Management on Habitat Linkage for Grizzly Bears

Linkage zones are areas of habitat connectivity within or between populations of animals that foster the genetic and demographic health of the species. Often, these are specific locations on the landscape where conditions foster movement. Connectivity refers to the arrangement of habitat that allows animals to move across the landscape; patches of similar habitats are either close together or linked by corridors of vegetation. Linkage zones may be connected on the greater landscape only to be fragmented by major highways, railroads, high road densities, and human developments (i.e., fracture zones).

Habitat linkage and connectivity are important components of grizzly bear habitat (Servheen et al. 2001, 2003; U.S. Fish and Wildlife Service 1993). The main factors generally considered to affect the quality of linkage zones are major highways, railroads, road density, human site development, availability of hiding cover, and the presence of riparian areas (U.S. Forest Service 2005). Factors affecting connectivity of habitat include vegetative cover, adjacency of habitat, and habitat security. Actions that fragment habitat, either temporarily (timber harvest) or

FWS001998

permanently (developments), or alter species composition or stand characteristics, or decrease habitat security (access) also compromise habitat connectivity and linkage zones.

For the discussion of linkage zones, we note that these areas must be maintained through consideration of three areas: (1) the highways, railroads, and developments that create the fracture zones, (2) the private lands in the valley bottoms, and (3) the public lands that serve as approach areas on the side-slopes of the valleys (Servheen et al. 2003). Linkage areas for grizzly bears between recovery zones and Canada are key to the long-term survival and recovery of bears, particularly in the CYE since it influences population size and genetic health of populations in the U.S. recovery zones (Proctor et al. 2004).

### f. Effects of Forest Management on Linkage for Grizzly Bears in the Action Area

The main areas of concern in the action area for establishing long-term linkage for movement of bears between the CYE and Canada and U.S. recovery zones as identified in Servheen et al. (2003) are as follows: U.S. Highway-2 (US 2) and the parallel railway; Montana Highway 56 (MT 56); MT-95 and the parallel railway; and US-93. Servheen et al. (2001 and 2003) concluded that linkage between recovery zones (e.g., the CYE and the SE, NCDE and BE) will rely on actions outside the jurisdiction of the Forests. In other words, actions by others including developments, poor attractant storage on private lands, and highways are the biggest impediments to linkage.

The LMP includes direction for linkage on the Forest through FW-DC-WL-17, which states that Forest management contributes to wildlife movement within and between national forest parcels; movement between parcels separated by other ownerships is facilitated by management of the NFS portions of linkage areas identified through interagency coordination; and Federal ownership is consolidated at approach areas to highway and road crossings to facilitate wildlife movement. This condition would be achieved through implementation of guidelines FW-GDL-WL-12 through 14. Specifically, FW-GDL-WL-12 through 14 guide the KNF to coordinate with others on the development of crossing structures when major highways are reconstructed, and that they manage lands near future structures to maintain the effectiveness of the structure and maintain Federal ownership in identified linkage areas.

To support and maintain connectivity across the Forest, the desired conditions for wildlife for MA1-wilderness and MA5-backcountry (MA1a,b,c-DC-WL-01 and MA5a,b,c-DC-WL-01) state that these areas serve as large, remote areas with little human disturbance and habitat conditions that contribute to wildlife movement. As stated above, cover and security are important components of habitat connectivity and linkage. Lastly, the GA direction and MA3-DC-WL-01 (in Special Areas) aids in maintaining grizzly habitat and connectivity across the Forest in those areas where it would have been found under natural disturbance processes (historical conditions) (USFS 2013a, p. 105). Specifically, the desired conditions in GAs that would facilitate linkage and habitat connectivity include:

**MA3-DC-WL-01.** The Northwest Peak and Ten Lakes areas, in combination with MAs 1 and 5, contain large remote areas that contribute to movement across the Forest.

84

FWS001999

**GA-DC-WL-BUL-01.** *Wildlife move through the Scotchman Peaks area, particularly wide-ranging carnivores, linking the Cabinet Mountains Wilderness and Selkirk Mountains through the West Cabinets.*

**GA-DC-WL-BUL-04.** *Wildlife move along the Idaho/Montana border and from the West Cabinets into the Yaak, in the vicinity of the confluence of the Kootenai and Yaak Rivers. Wildlife also moves north-south through the Cabinet Mountains.*

**GA-DC-WL-CLK-03.** *Wildlife move between the Cabinet Mountains and the West Cabinets, and NFS lands south of Highway 200. Wildlife also moves north-south through the Cabinet Mountains.*

**GA-DC-WL-FSH-01.** *NFS lands, in particular those lands in the Miller Creek, Fritz Mountain, Calx Mountain, and Syrup Redemption areas, provide for wildlife movement between the larger blocks of forested lands in these areas and for movement between the Cabinet Yaak and Northern Continental Divide ecosystems. This includes movement for big game between the Cabinet Mountains and Fisher River. Wildlife also moves between the Fisher River, Wolf Creek, and areas east of Koocanusa Reservoir, the Blue Mountain vicinity north of the Kootenai River, and north-south through the Cabinet Mountains.*

**GA-DC-WL-KOO-02.** *Wildlife move to and from Roderick Mountain to the west of this GA. Wildlife also move to and from the Canadian border and along the Big Creek and Parsnip Mountain vicinities to and from Lake Koocanusa. To the east of Lake Koocanusa, wildlife move between the lake and vicinities or Lydia Mountain, Pinkham Mountain, Warland Peaks, and east to Wolf and Sunday creeks.*

**GA-DC-WL-LIB-01.** *Habitat conditions are retained for wildlife movement between the Cabinet Mountains and the Yaak, in particular, the area of Flagstaff Mountain. Habitat conditions for wildlife movement are also retained in the area between Turner Mountain and Alexander Creek (the Horse Range), including NFS lands in the Gold Hill and Blue Mountain areas. Wildlife move between the Blue Mountain vicinity, the Fisher River, and Koocanusa Reservoir areas.*

**GA-DC-WL-LIB-04.** *Wildlife move between the Cabinet Mountains and the Fisher River, as well as north-south through the Cabinet Mountains.*

**GA-DC-WL-TOB-02.** *Wildlife move between the large blocks of NFS lands across Highway 93 southeast of Murphy and Dickey Lakes. Wildlife also moves from the Lydia and Pinkham mountains vicinity and the Sunday Creek vicinity.*

**GA-DC-WL-TOB-05.** *Wildlife move to and from the border with Canada.*

**GA-DC-WL-YAK-01.** *Wildlife moves along the ridgeline between the states of Montana and Idaho from Northwest Peaks south and across the Yaak River to areas such as Grizzly Peak and Roderick Mountain. Wildlife also moves to and from the border with Canada and from Roderick Mountain across Road #68 (Pipe Creek Road).*

FWS002000

**GA-DC-WL-YAK-04.** Wildlife move between the Yaak and West Cabinets, particularly in the area around Yaak Mountain, Teepee Mountain, and the confluence of the Yaak and Kootenai Rivers. Wildlife also moves across the Yaak River and Highway 508 in the vicinity of Yaak Falls.

Some proposed projects may cause localized adverse effects on connectivity for individual bears. However, we do not anticipate substantial negative effects on the population. This is attributed to the access standard, which reduces or maintains moderate densities of open and total roads and provides large blocks of secure habitat where motorized use of roads and trails is prohibited. Notably, the KNF took into consideration connectivity issues when setting the individual BMU access management parameters (BA 2010a, p.50; Kaiser 2003 *in* U.S. Fish and Wildlife Service 2011b, p. A-76). Additionally, the existing conditions on the KNF generally support connectivity within and between the recovery zones (W. Kasworm 02/04/2012 pers. comm.); the LMP includes numerous provisions for linkage areas on the KNF, including MA and GA direction for wildlife movement; and the Forest-wide Food Storage Order would reduce risk of human-bear conflicts in lower elevations with higher concentrations of human development. Therefore, we conclude that LMP elements would support linkage conditions on NFS lands that are likely to foster movement of subadult and male grizzly bears which are required for genetic recovery, (see *Status of the Species* section) and may in time support linkage for females with cubs needed for demographic recovery.

More recently, the importance of BORZ in linking the recovery zones has been highlighted. One female grizzly bear with a cub is known to regularly use habitat between the NCDE and CYE. Prior to dropping her collar in 2006, she and her offspring spent most of their summer in the Salish Mountains of Montana less than 2 miles east of the edge of the CYE while denning within the boundaries of the NCDE recovery zone (Kasworm et al. 2010, p.47). Additional females with cubs have also been observed in the Tobacco BORZ between the CYE and NCDE (Kasworm et al. 2012, p. 16).

Because there are more allowable uses and higher road densities in BORZ, there are more existing effects on the baseline condition of linkages and connectivity. However, a few bears are meeting resource needs and using these areas to make movements between the CYE and NCDE. Under the LMP, we expect that these areas will continue to support grizzly bear movement and linkage on the whole, while causing some adverse effects on individual bears from site-specific projects. However, we do not anticipate substantial negative effects on the population. This is because the allowable uses under the LMP are already occurring in the BORZ and yet bears are meeting resources needs, albeit at lower densities than in the recovery zones. Additionally, the LMP implements the Access Amendment in BORZ which limits linear miles of open and total permanent roads to no more than the existing baseline conditions, which supports some use by grizzly bears, including females with cubs. Notably, the KNF took into consideration connectivity issues when setting the individual BMU access management parameters (BA 2010a, p.50; Kaiser 2003 *in* U.S. Fish and Wildlife Service 2011b, p. A-76) as well as the development of the BORZ polygons (USFS 2010a: Appendix F *In* U.S. Fish and Wildlife Service, p. A-76). Lastly, the Forest-wide Food Storage Order in BORZ will further facilitate connectivity between the NCDE and CYE by limiting risk of conflicts between bears and humans.

86

FWS002001

These provisions to maintain baseline motorized access conditions in the BORZ and implement Forest-wide Food Storage Orders would provide for continued use of these areas by grizzly bears and eventual linkage of the CYE to other recovery zones, albeit at lower densities than areas within the recovery zones.

## 4. Management of Human-Caused Mortality

Encounters with people or anthropogenic food and attractants rank among the greatest risk factors for grizzly bears. Habituation to human presence and human foods can lead to increases in bear-human interactions, resulting in an elevated risk of injury or death to both (Mace and Waller 1998). Public access to NFS lands for recreational purposes, as well as use of recreation facilities, including developed recreation sites, collection of forest products, special uses, and grazing of NFS lands can lead to increased risk of habituation and bear-human interactions. The effects of public access are addressed by the Access Amendment.

The risk of direct conflict between bears/humans and habituation of bears to food sources is best addressed through limits on motorized access on the Forest, programs informing the public of ways to avoid encounters with grizzly bears, and stringent requirements for food storage and sanitation (U.S. Fish and Wildlife Service 2011b, p.36,97). Much has been accomplished on the KNF to address the risk factors for bears related to human/grizzly bear conflicts. The Proposed Action would carry forward many of these efforts to reduce mortality risk to grizzly bears.

### a. General Effects of Sanitation/Food Storage and Information and Education Programs on Grizzly Bears

Improperly stored garbage, livestock or pet foods can lure grizzly bears to areas near people and pose a significant risk of habituating bears to human presence and/or conditioning grizzly bears to seek out anthropogenic foods and attractants. Food conditioned grizzly bears enter unsecured garbage receptacles, sheds and other buildings in search of a reward. Accessibility to human related attractants and conditioning to those rewards can lead to management removal of grizzly bears and additionally, mortality of grizzly bears by people defending their life and property. Bears are particularly susceptible to anthropogenic foods and attractants during years of poor natural food production. The increase in total known mortality beginning in 1999 in the CYE is thought to be linked to poor food production during 1998 to 2004. Huckleberry production during these years was about half the 20-year average (Kasworm et al. 2012, p.33).

Information and education programs, and food storage orders are particularly important during years of poor berry production and in seasons of high nutritional and energy needs for bears. The MFWP has stated that perhaps the greatest advancement in the management of problem bears has been the development of bear management specialist positions (MFWP 2001 *in* U.S. Fish and Wildlife Service 2011a, p. A-75). The combination of shortened response time to reports of grizzly bear conflicts, preventative actions to remove attractants, the deterrent effects of local law enforcement, and perhaps most important, building community involvement in the management and conservation of grizzly bears, has been and will continue to be invaluable in dealing with nuisance bears, preventing habituation of bears, and fostering local public support of grizzly bear conservation (Montana Fish, Wildlife and Parks 2005; Wenum 2002; Wenum

87

FWS002002

2004 *in* U.S. Fish and Wildlife Service 2011a, p. A-75). To demonstrate, in the CYE, based on anecdotal information, there has been an increase in the number of residents seeking proactive help (e.g. fencing gardens, beehives and other attractants) to prevent conflicts prior to an incident and fewer incidents involving problem bears have occurred during recent years (Annis 2013). This represents notable progress toward reducing the potential for conflicts between people and grizzly bears, and in return reduces grizzly bear mortality. We believe the importance of these types of programs is often underestimated, as the effects of these programs work over time, in some cases many years as the attitudes and behavior of local residents and visiting public change. Through information and education, people can learn to live in a way that is more compatible with the needs and behaviors of grizzly bears. Education programs can reduce grizzly bear mortalities by instructing people to avoid situation where self-defense becomes necessary and prevent habituation of grizzly bears to unnatural foods.

### b.  Effects of Sanitation/Food Storage and Information and Education Programs on Grizzly Bears in the Action Area

There has been a concerted effort to improve sanitation on NFS lands throughout the action area and CYE as a whole, with many campgrounds now having bear-resistant garbage and/or food storage containers to reduce such encounters and the potential for subsequent habituation. Currently, 39 developed recreation sites have bear resistant garbage containers on the KNF. Thirty-four other recreation sites have food storage containers. Notably, a mandatory food storage and sanitation order was implemented Forest-wide on the KNF in June 2011 to minimize adverse interactions between humans, bears, and other wildlife, and provide for visitor safety. The Service finds these programs (Food Storage Orders and bear resistant containers) key to avoiding conflicts associated with attractants on the KNF.

Currently, the KNF is a member of the Selkirk/Cabinet-Yaak Subcommittee of the IGBC. Through this subcommittee, the KNF has participated in and implemented several information and education programs on the Forest including most recently using grant funding to staff two ranger districts with bear rangers responsible for giving presentation and information on food storage/sanitation in bear country (USFS 2012b Accomplishment Report). Education pamphlets are available at Ranger District offices as well as other public places describing good attractant storage protocols in bear country (U.S. Fish and Wildlife Service 2011a, p. A-75). The Forest has provided access to a video on the use of bear spray and defensive behavior (e.g. IGBC–Safety in Bear Country Video) to back country users on a limited basis (ibid). Under the LMP, these programs would continue as would others continue to be pursued through guideline FW-GDL-WL-15, which implements the elements of the most recent "Interagency Grizzly Bear Guidelines" or conservation strategy.

Under the LMP, Forest-wide desired conditions for recreation state that food and garbage storage do not contribute to recreation user/wildlife conflicts (FW-DC-AR-01) and Forest-wide standard for wildlife FW-STD-WL-04 requires permits and operating plans (e.g., special use, grazing, mining) to specify sanitation measures to reduce human/wildlife conflicts and mortality by making wildlife attractants (ex: garbage, food, livestock carcasses) inaccessible through proper storage or disposal. Additionally, the LMP includes guideline FW-GDL-WL-15, which

88

FWS002003

implements the elements of the most recent "Interagency Grizzly Bear Guidelines" that address attractants and other sources of sanitation issues on the Forest (i.e., recreation and grazing).

We expect that implementation of the Food Storage and Sanitation Special Order coupled with KNF's other efforts to inform and educate the public as well as elements of the LMP (FW-STD-WL-04 and FW-GDL-WL-15) would ensure that the risk of conflicts on the Forest remains low. We do not expect adverse effects to grizzly bears on the KNF as a result of inadequate food and attractant storage.

### c. General Effects of Livestock Grazing on Grizzly Bears

Grizzly bears may be attracted to grazing operations and facilities to forage on newborn animals or carcasses of dead livestock. Grizzly bear predation on livestock can result in risks to human life, property damage, or indirectly, in mortality through habituation and removal of a bear to protect human safety. Grizzly bears can benefit from feeding on livestock carcasses in remote locations away from people. However, when dead livestock occur near human dwellings or other areas with high levels of human activity, the potential for human/bear encounters may be high, which can eventually lead to the death of the bear through management actions. Less frequently, grizzly bears learn to prey on livestock on more remote grazing lands and become repeat offenders, removed from the population through management action.

### d. Effects of Livestock Grazing on Grizzly Bears in the Action Area

The LMP allows grazing on NFS lands, and several grazing allotments exist within grizzly bear BMUs and BORZ, as well as on other areas of the Forest. The rangeland suitability analysis for the LMP identified 921,700 acres capable of grazing on the KNF; however, there are only approximately 149,000 acres on the KNF that are suitable for livestock grazing. This represents about seven percent of the KNF, and grazing is only allowed in MAs 5, 6, and 7 (Backcountry, General Forest, and Primary Recreation areas, respectively). Currently on the Forest, grazing occurs in 6 allotments that overlap BMUs (14,609 acres or 1 percent of the BMU acres on the Forest – this includes 4,880 acres in the NCDE portion of the Forest) and several allotments overlap portions of the BORZ, mostly in the Tobacco BORZ West Kootenai BORZ. All of the allotments are cattle allotments.

The desired condition for grazing under the LMP is that grazing occurs at sustainable levels in suitable locations while protecting resources (FW-DC-GRZ-01). Therefore, under the LMP, grazing allotments are permitted within suitable areas but no changes in existing allotments are expected and current use levels are expected to be maintained for the next 10 to 15 years (USFS 2011d, pp. 388-389). Livestock grazing permits may include special provisions such as proper storage of food and attractants as well as carcass removal. Annual monitoring of livestock allotments is performed to check on compliance and assess any conflicts. Disposal of animal carcasses has been emphasized to reduce conflicts with grizzly bears (U.S. Forest Service 2020, p. 17).

Notably, the LMP states that for wildlife, the long-term desired condition is recovery of threatened and endangered species (FW-DC-WL-03). Therefore, any changes to existing

89

FWS002004

allotments and new requests for grazing allotments would be evaluated at the site-specific level in adherence with the elements of the LMP. Additionally, FW-DC-GRZ-01 states that grazing occurs at sustainable levels in suitable locations while protecting resources and all permits would include sanitation measures to reduce attractants that would cause a human/livestock/bear conflict (FW-STD-WL-04). Lastly, the IGBC Guidelines for grazing would be applied (FW-GDL-WL-15). These elements of the LMP along with the expectation that current use levels would be maintained reduce the likelihood of new grazing allotments where conflicts with bears might occur or that existing allotments might contribute to conflicts in the future.

We do not anticipate that implementation of the LMP will result in habituation of grizzly bears leading to conflicts in the CYE because few acres are subject to livestock grazing, current use levels are expected to be maintained and not substantially increase (USFS 2011d, p.389), the LMP includes measures to address potential habituation risks to bears from livestock grazing, and there is no history of grizzly bear management actions in the CYE on NFS lands. While there are substantially more grazing allotment acres in BORZ, these allotments have existed for several decades with no history of conflicts with grizzly bears. To date, there have been no grizzly bear/livestock conflicts in BORZ or in BMUs. We expect that grizzly bear numbers in BORZ will grow relatively slowly over time, and so we expect the likelihood of conflicts associated with these allotments to remain low. Hence, we do not consider this type of land use, at its current or anticipated levels, to result in adverse effects on grizzly bears in the recovery zone or BORZ.

Similarly, we do not anticipate that implementation of the LMP will result in habituation of grizzly bears leading to conflicts in the NCDE subunits in the action area because few acres are subject to livestock grazing, existing allotments are not expected to change (i.e. increase), the LMP includes measures to address potential risks to bears from grazing action, and there is no history of bear management actions in these subunits related to grazing. Hence, we do not consider this type of land use, at its current or anticipated levels, to result in adverse effects on grizzly bears.

## 5. Other Potential Actions

Other actions on the Forest with the potential to affect grizzly bears include mining, collection of forest products, and operations associated with special use permits.

### a. Effects of Mining on Grizzly Bears Under the LMP

Mining encompasses: (1) the location and extraction of mineral materials (e.g., sand, gravel, rock), (2) the location and extraction of locatable minerals (e.g. gold, silver, copper), and (3) mineral leasing for oil, gas, coal, geothermal resources, potassium, sodium, phosphates, oil shale, and sulfur, which includes exploration and surface occupancy (extraction). Mining projects may result in loss of habitat within the footprint of the mine, or associated roads. Disturbance to grizzly bears from road use and mining activities and displacement from habitat from road use or mine development may also occur as well as impacts to habitat connectivity. New roads leading to mining sites may provide access to grizzly bear habitats.

90

FWS002005

The disposal (removal) of mineral material (salable minerals such as sand, rock, gravel, etc.) under the LMP is allowed in the General Forest MA6 and in other limited locations (Chapter I, Table I-16), but is not allowed on 772,000 acres of the KNF (USFS 2013a, p.91).

Under the LMP, the majority of KNF lands, with the exception of MA1a and 1c (Wilderness and Wilderness Study Areas – Chapter I, Table I-16 of U.S. Forest Service 2013) are be available for mineral leasing (e.g. oil, gas, coal, geothermal resources, potassium, sodium, phosphates, oil shale, and sulfur). Hence, future mining activities could occur in grizzly bear habitat under the LMP.

The range of effects of future mining activities on grizzly bears is expected to be similar to those occurring at existing mining sites (e.g. Troy Mine). Such effects may include loss of habitat within the footprint of the mine, disturbance to grizzly bears from road use and mining activities, displacement from habitat from road use or mine development, or impacts to habitat connectivity. The extent of these effects would be limited by elements of the LMP. Any mining proposal on the Forest would be considered in terms of Forest-wide desired conditions that trend the Forest toward providing remote areas for species with large home ranges, recovering Federally-listed species, facilitating denning and habitat use through low levels of disturbance, and managing motorized access to promote recovery (FW-DC-WL-01 through 05). At the project level, Forest-wide guidelines and standards would address potential effects of mining proposals on connectivity and linkage areas (FW-GDL-WL-15 through 17), food storage and attractants (FW-STD-WL-04, Food Storage Order), disturbance of grizzly bears (FW-GDL-WL-01), and access management (FW-STD-WL-02 and 03). Site-specific project development and mitigation plans (like those developed for the Troy Mine and Rock Creek Mine) would avoid, minimize, or compensate for any adverse effects associated with the mining proposal. This includes substantial mitigation plans that addresses the risk factors for grizzly bears associated with the particular mining site including changes in wheeled motorized vehicle access, potential for displacement, and potential for conflicts associated with attractants.

Combined, the LMP elements and required mitigation plans would reduce or limit the impacts of mining activities on grizzly bears. Nevertheless, some adverse effects on bears are anticipated if future mining activities are proposed, but we expect that the potential for adverse effects would be reduced or minimized through LMP requirements and standards and guidelines applied at the project level as well as the development of appropriate mitigation plans where needed. Future mining projects would be subject to project-specific section 7 consultation.

### b. Effects of Forest Products Collection on Grizzly Bears Under the LMP

The primary effects on bears associated with collection of forest products include disturbance to grizzlies due to human activities or risk of human/grizzly bear conflicts, resulting in grizzly bears avoiding the area. Existing areas of use are often tied to historical knowledge and patterns of use. The most popular special forest and botanical products on the Forest include huckleberries, firewood, Christmas trees, and boughs. Mushroom picking is a popular activity following wildfires. In recent years, requests from the general public for commercial and free use collection of special forest and botanical products have increased (J. Anderson, pers. comm. 2020).

91

FWS002006

Special forest and botanical products may be collected Forest-wide, unless an area has been closed for a specific reason. In total, under the LMP, 325,300 acres are excluded from collection of forest products. Commercial use of special forest and botanical products is not allowed in designated wilderness; recommended wilderness; wilderness study area; wild, scenic and recreational rivers; special areas; or RNAs. The opportunity for collecting special forest and botanical products is also affected by the amount of motorized access to the Forest. Areas with no motorized access (i.e., core areas) limit opportunities and reduce the ability to collect products since most of these activities occur along roads (U.S. Forest Service 2011d, p. 396; 2013a, p.109).

As previously stated, the primary effect on bears associated with collection of forest products is disturbance and risk of human/grizzly bear conflicts, and we expect that these risks are low. Generally, the collection of forest products occurs in close proximity to roads and the density of people engaged in this activity diminishes with increasing distance from a road or trail (USFS 2013a, p.109). Human presence for collection of forest products may disturb or displace bears, but we anticipate this effect would likely be short-term, temporary and for the most part, relatively low in intensity. We expect that grizzly bears would avoid the area while people are collecting products, but are likely to return after people leave the area. The LMP adequately manages roads and core area, so if displaced by human presence and activity, grizzly bears would have options to find needed food and shelter elsewhere. There would be areas on the Forest that would have very little or no collection of forest products due to limited accessibility. In addition, the information and education programs, Food Storage Order, IGBC Guidelines, and access management would reduce the risk of conflicts. Forest-product collection activities are subject to these measures and so we expect no adverse effects to grizzly bears as a result of Forest-product collection.

### c. Effects of Special Uses on Grizzly Bears Under the LMP

Special use authorizations permit occupancy and use on NFS lands by federal, state and local agencies, private industry, and individuals. Non-recreation special uses vary from low-intensity, often short-term actions such as filming or locations for scientific instruments, to larger developed facilities such as roads, communication sites, dams, and utility/energy transmission infrastructure (U.S. Forest Service 2011d, p. 289-290). Special use permits may allow activities that cause disturbance to grizzlies due to human activities or risk of human/grizzly bear conflicts, resulting in grizzly bears avoiding the area. Special uses can also alter some habitat, such as a ski area or utility corridor.

Under the LMP, future proposals would be considered in terms of Forest-wide desired conditions that trend the Forest toward providing remote areas for species with large home ranges, recovering Federally-listed species, facilitating denning and habitat use through low levels of disturbance, and managing motorized access to promote recovery (FW-DC-WL-01 through 05). At the project level, Forest-wide guidelines and standards would address potential effects of special use permits on connectivity and linkage areas (FW-GDL-WL-12 through 14), food storage and attractants (FW-STD-WL-04, FW-GDL-WL-15, and the Food Storage and Sanitation Special Order), and access management (FW-STD-WL-02 and 03).

92

FWS002007

Based on LMP desired conditions and implementation of the standards and guidelines at the project level, we do not anticipate effects on grizzly bears from most special use permits to result in adverse effects, but some may. All special use permits that may affect grizzly bears will be subject to section 7 consultation as they are proposed.

### d. Effects of Non-motorized Recreation Under the LMP

Non-motorized activities such as mountain biking, horseback riding, and hiking will occur throughout the action area. The potential for these non-motorized activities to result in disturbance effects to grizzly bears does exist. In most situations, such impacts would likely be short-term and would range from no response from a grizzly bear to a grizzly bear temporary fleeing the area. Grizzly bears may adapt to consistent, predictable activity and may notice the activity but not flee from it (Jope 1985; Mattson 2019b). This reaction is more likely to occur on trails with regular use. On non-motorized trails that receive low amounts of human use, human activity may result in a grizzly bear temporarily fleeing from the disturbance, expending extra amounts of energy (McClellan and Shackleton 1989; Mattson 2019b).

Due to varying skill levels and speed of travel of mountain bikers, they are less likely to travel in close groups and maintain verbal contact with other riders, resulting in minimizing the amount of noise and reducing the potential for early detection and avoidance by grizzly bears. Thus, mountain biking may elicit greater flight response from grizzly bears than other non-motorized use due to the higher potential for sudden encounters (Quinn and Chernoff 2010, Mattson 2019b, Herrero and Herrero 2000 *in* Servheen et al. 2017). Sudden surprise encounters can also result in human-grizzly bear conflicts, depending on whether the bear flees or charges. Often, grizzly bears disturbed by non-motorized use will exhibit increased nocturnal activity and decreased daytime activity when non-motorized use is most likely to occur (Mattson 2019b).

While grizzly bears may experience varying degrees of disturbance effects as a result of non-motorized recreation, due to the amount of human use and the type of activities on the Forest along with the lack of conflicts related to such, we expect effects will be insignificant as grizzly bears will likely adapt to such use or change its use patterns. Such impacts are not likely to significantly affect an individual grizzly bear's ability to breed or find food or shelter. Grizzly bears are habitat generalists and would be able to shift their use to low disturbance areas within their home ranges during activity.

### 6. Synthesis and Integration of Effects to Grizzly Bear from the Proposed Action

This section considers the aggregated effects of the LMP on the overall reproduction, numbers, and distribution of grizzly bears on the KNF. The proposed action includes extending the timeline to reach full compliance with the Access Amendment direction in BMUs, updating baseline condition and clarifying the "no net increase" standard for BORZ, and extending the time to complete a winter travel plan, in addition to continued implementation of other aspects of the LMP.

Grizzly bear numbers, reproduction and distribution have been improving across both the SE and CYE since the Access Amendment was implemented in 2011. The SE population trend appears

93

FWS002008

to be increasing, and is likely at or above the population goal of 90 bears. The CYE population remains far below the population goal of 100 bears and the CYE has not met its recovery criteria; however, the population appears to be increasing and successful augmentation and natural immigration has led to improved genetic diversity. In both recovery zones, human-caused mortality has declined (Kasworm et al. 2019a, c).

As described above, the primary adverse effect that may result in impairment of feeding, breeding, and sheltering activities by grizzly bears under the LMP is attributed to the effects of high road densities and decreased secure habitat for grizzly bears (U.S. Fish and Wildlife Service 2013, II-82).

Through our analysis, we have determined that grizzly bears in the BMUs that do not meet the research benchmarks for road density and Core habitat are likely to experience adverse effects as a result of habitat modification or degradation that displaces bears from key habitats to the extent that they suffer impaired foraging and decreased reproductive capacity. The delay in achieving full compliance with the access management standards will prolong the adverse effects to some female grizzly bears in 2 of the 17 BMUs in the KNF portion of the CYE[9,10]. We do not expect all female grizzly bears would experience adverse effects, and we do not expect any adult male, subadult, or transient grizzly bears would experience adverse effects. While we recognize that grizzly bears that utilize habitat within these BMUs likely use habitat elsewhere in adjacent landscapes, we expect adverse effect will be limited to those grizzly bears that occur primarily within these BMUs. Therefore, we expect extending the due date for compliance with the standards may affect a small number of female grizzly bears, including reduced reproductive capacity, but the effects would be short-lived, until the Forest attains compliance with the standards.

Once compliance with standards is obtained, we anticipate adverse effects to a few female grizzly bears may continue as a result of motorized access in a few BMUs that do not meet the research benchmark for OMRD, TMRD, and/or Core. However, due to the many measures to minimize the effects of motorized access, including 16 of 17 BMUs meeting or exceeding ("better than") benchmarks for Core, and limited motorized use of restricted roads for administrative use in BMUs, we expect the portion of the CYE managed by the Forest to contain motorized access conditions and qualities of secure habitat that support successful reproduction of female grizzly bears.

Population-level effects of the access management standards would require time to become evident because of the low reproductive rate of grizzly bears, which results in a population that

---

[9] As described above, although 4 BMUs have not attained standards, only two of those have conditions resulting in adverse effects to female grizzly bears.

[10] Forest Plan standards from the three Forests that manage for grizzly bears in the CYE would result in 9 of 22 BMUs providing more than 55 percent core, 11 of 22 BMUs would provide at least 55 percent core, and only 2 BMUs would provide less (see Table 2; Appendix A.2). All of these standards will be met by 2028 at the very latest (three additional BMUs in the CYE will be brought up to standards by 2022 (Mt. Headley), 2023 (Grouse), and 2028 (Boulder). Thus by 2028, all BMUs in the CYE will meet access management standards.)

94

FWS002009

increases or decreases slowly over time. The Service evaluated access management data from 2011-2019 in the CYE and SE, to determine whether there was any apparent correlation between access management conditions in individual BMUs and occupancy by females with cubs, or grizzly bear mortality. We found no correlation to suggest that occupancy of a BMU by females with cubs is directly tied to a BMU meeting access management standards or benchmarks. While it is likely that some females have experienced adverse effects due to access management conditions that have reduced their ability to successfully reproduce, the data show that others have successfully reproduced in some BMUs that do not meet standards and/or benchmarks. This is consistent with the analysis in the biological opinion for Access Amendment (U.S. Fish and Wildlife Service 2011, p. A-58), in which we stated "the findings reported by Wakkinen and Kasworm (1997) are based on an average of motorized access conditions within a total of six female grizzly bear home ranges in the CYE and SE. These averages did not translate into definitive thresholds of grizzly bear tolerance for these parameters. Some bears successfully used habitat that was more developed (in terms of roads) than the reported averages, some bears successfully used habitats that were more pristine (fewer roads) than the reported averages."

Similarly, we found no evidence in the data from 2011-2019 to suggest that mortalities are more abundant in BMUs that do not meet standards. Some bears died in Core area habitat, and some died in more developed habitat. The majority of human-caused mortality was closer to roads or other human development (such as residences, outbuildings, campgrounds; Kasworm et al. 2019, p. 17-18), likely due to the higher incidence of human contact and the availability of unnatural attractants (e.g. garbage, livestock feed). These analyses correspond with what other researchers have articulated regarding the multiple factors that affect grizzly bear habitat selection, distribution, reproduction, and mortality (Schwartz et. al 2010, Proctor et al. 2020). That is, access management is one very important piece of the equation for providing habitat that research has shown supports successful female grizzly bear occupancy and reproduction and is important for attaining recovery goals, but it is not the sole driver.

Female grizzly bear occupancy is a multi-generational process where females must live year-round in an area, successfully reproduce, and rear offspring that disperse into adjacent, unoccupied habitat. Within the CYE, female grizzly bear occupancy is radiating out from a few areas at roughly a rate of 10-15 kilometers per generation (W. Kasworm, personal communication, 2020; also see female distribution maps in Kasworm et al. 2019, p. 21), which aligns with rates observed in other populations (McLellan and Hovey 2001; Proctor et al. 2004). Therefore, we expect that the distribution of female grizzly bears in the action area and in the CYE Recovery Zone will continue to increase slowly, and that a delay in meeting access management standards for the next few years will not impede female grizzly bears' ability to continue to expand their distribution.

Outside of the CYE Recovery Zone, grizzly bears are expanding their range, with recurring use documented to the west, south, and east of the CYE. In these areas of recurring use, known as BORZ, the Forest will continue to manage for no-net-increase in the motorized access conditions at the time bears begin regularly using the area. Updates to the baseline condition of BORZ and the application of exceptions to the "no net increase" standard may result in motorized access conditions that reduce secure habitat in BORZ. We anticipate adverse effects to a few female grizzly bears as a result of the existing low amounts of secure habitat in BORZ, as well as future

FWS002010

permanent reductions and temporary reductions in the effectiveness of secure habitat in BORZ. Some females may experience significant reductions in their feeding, breeding, and sheltering.

The Forest had not previously considered effects to secure habitat in BORZ, and thus lacks data to show what changes have occurred in terms of secure habitat since the "no-net-increase" standard was enacted in 2011. Some changes have likely occurred, reducing secure habitat in some areas, or potentially creating some in others, in the past decade. Both permanent and temporary effects to secure habitat have likely occurred as a result of projects in BORZ. During that time, increasing grizzly bear use of BORZ and expansion of BORZ has occurred. Therefore, we believe it is reasonable to expect that some female grizzly bears, as well as male and subadult grizzly bears, will continue to find resources and use BORZ similar to the use that occurred from 2011-2019. Thus, we expect grizzly bears to continue to occupy BORZ at lower densities, and potentially with higher mortality risks, than within the Recovery Zone.

Finally, the Service determined that the extension to complete a winter travel plan, thus maintaining the current opportunities for motorized winter travel access, may affect a few female grizzly bears during den emergence that may experience adverse effects. These few females may experience increased stress, reduced foraging efficiency, and may lead to premature den abandonment that may decrease cub survival. However, we determined that the current overlap between modeled potential grizzly bear denning habitat and motorized winter access is very low and that very few females would be affected. We expect grizzly bears would only be affected during den emergence, and that no individual grizzly bear would be affected more than one year (for reasons stated earlier). Therefore, we do not expect the timeline extension to complete a winter travel plan will substantially alter the numbers, reproduction or distribution of grizzly bears in the Forest-managed portion of the CYE or NCDE.

In summary, the proposed action may cause localized and short- or long-term adverse effects to some female grizzly bears within the action area, but would result in overall improvements within the CYE Recovery Zone in terms of access management. The proposed action would also allow for some grizzly bear expansion out of the Recovery Zone and movement in and out of the Recovery Zone. We have seen a positive trend towards meeting standards since 2011, thus a positive trend towards improving habitat conditions for grizzly bears related to access management in BMUs, and protecting habitat conditions related to access management in BORZ. Since 2010, grizzly bear numbers and distribution have been increasing in the CYE and NCDE, and we anticipate that with continued improvements in habitat conditions (i.e., reducing road density and improving secure habitat), combined with efforts to minimize mortality (particularly human-caused mortality), that grizzly bears in the CYE and NCDE will continue to increase their distribution and population trend. The net effect of the access management direction supports survival and recovery of these population by supporting the numbers, distribution and reproduction of grizzly bears, including females, across each ecosystem.

## VII. CUMULATIVE EFFECTS

The implementing regulations for section 7 of the Act define cumulative effects as those effects of future state, tribal, local, or private actions that are *reasonably certain to occur* in the action area considered in this biological opinion. According to section 7 regulations (402.17(a)),

96

FWS002011

conclusion of *reasonably certain to occur* must be based on clear and substantial information, using the best scientific and commercial data available. Factors to consider when evaluating whether activities caused by the proposed action (but not part of the proposed action) or activities reviewed under cumulative effects are reasonably certain to occur include, but are not limited to: Past experiences with activities that have resulted from actions that are similar in scope, nature, and magnitude to the proposed action; Existing plans for the activity; and Any remaining economic, administrative, and legal requirements necessary for the activity to go forward.

Future federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the Act. Due to the broad geographic scope of the LMP and, therefore, the action area, it is difficult to comprehensively assess all of the future, non-Federal activities reasonably certain to occur in the action area that may affect the grizzly bear. This analysis of cumulative effects is based on an assessment of land ownership and use patterns, and the patterns of grizzly bear mortality caused by non-Federal activities, as discussed above in the *Status of the Species* and *Environmental Baseline* sections.

State and private lands comprise approximately 10 percent of the CYE recovery zone. Within the action area there are 99,781 acres of private lands encompassed in the CYE BMUs, BORZ, and NCDE BMU subunits (derived from Tables II-9,10, and 11). This represents approximately 5 percent of the action area. While this is a relatively small proportion of the action area, 50 percent of all recorded grizzly bear mortalities in the United States portion of the CYE (from 1982-2018) have occurred on private lands (Kasworm et al. 2019, p. 31, derived from Table 10). The decisions made by non-Federal landowners regarding management of their lands may affect this ecosystems' ability to meet its recovery goals. Mortality on private lands arises primarily from poaching and incidents occurring during the hunting season, although mistaken identification and self-defense outside the hunting season, management removal, and trains also contributed to mortality on private lands (Kasworm et al. 2019, p.31). Prior to 2009, the mortality trend was increasing, but a significant decrease was detected after 2009. This was accompanied by an increase in the grizzly bear population in 2013, reversing a decades-long trend of high mortality in the CYE (Proctor et al. 2018; Kasworm et al., 2019). While difficult to statistically measure, effective human-bear conflict response along with education, outreach, and prevention have likely had a positive effect in preventing human-caused bear mortality (Annis and Trimbo 2019; Proctor et al. 2018).

The effects on private lands are addressed through numerous programs. The Grizzly Bear Management Plan for Western Montana (MFWP 2006) outlines the state's role in responding to and managing grizzly bear/human conflicts, continuing its public information and education programs, black bear identification training for hunters, managing grizzly bear habitat, monitoring bears and habitat, and conducting research.

Montana Fish, Wildlife and Parks' grizzly bear specialist program is recognized as successful in fostering public awareness and support of grizzly bear conservation. The program is aimed at resolving conflicts between bears and people, but also reducing the potential for conflicts to arise though education and information regarding attractant storage. In the CYE, there has been an increase in the number of residents seeking proactive help (e.g. fencing gardens, beehives and

97

FWS002012

other attractants) to prevent conflict prior to an incident and fewer incidents involving problem bears have occurred during recent years (Annis and Trimbo 2019). This represents notable progress toward reducing the potential for conflicts between people and grizzly bears on private lands, and in turn reduces grizzly bear mortality. Hence, these efforts partially offset the cumulative effects of activities on private lands that increase the risk of human-bears conflicts (Annis and Trimbo 2019; Kasworm 2019; Proctor et al. 2018).

The work of MFWP bear specialists to reduce human-caused grizzly bear mortality occurs concurrently with augmentation of grizzly bears into the CYE. Since 1990, 13 female grizzly bears have been augmented in the Cabinet Mountains portion of the CYE. Four of these bears returned to the NCDE. Three were killed and one died of natural mortality. The fate of many bears is unknown due to loss of signal or collar drops. However, one female is known to have produced 9 offspring who in turn have produced 8 offspring. The augmentation effort appears to be the primary reason that grizzly bears are increasing in the Cabinet Mountains (Kasworm et al. 2012). Research indicates that augmentation of small grizzly bear populations combined with a reduction in human-caused mortality has both short- and long-term positive effects on growth rates (Proctor et al. 2004). Hence, these combined efforts (state grizzly bear specialists and the augmentation program) are essential to meet recovery goals in the CYE and to continue to reduce human-cause mortality and enhance the population.

Other activities on private lands that contribute to effects on bears include access, recreation, timber harvest, and developments. These actions on private or state lands may also affect connectivity and linkage within the action area. As described in the *Status of the Species*, the Montana DNRC Habitat Conservation Plan (HCP) addresses 6,174 acres in the CYE and would help provide secure habitat, facilitate connectivity, and reduce risk of conflicts on those covered lands. Implementation of the MFWP State Wildlife Conservation Strategy (2005) on non-NFS ownerships should complement habitat improvement and maintenance on NFS lands. Concerns and conservation strategies for grizzly bears listed in the Strategy include reducing road related impacts, reducing human-bear conflicts due to attractants, and protection of important habitats. Recreation is likely to increase on all land ownership types in the action area, if for no other reason than human population growth. From 1980 until 2009 the population increased in all of the counties that overlap the KNF, with the exception of Lincoln County (U.S. Forest Service 2011b, p. 400). Increases in human population and new or improved technologies (e.g. mountain bikes, snowmobiles, etc.) have led to more crowded recreation experiences during peak use times and increased levels and range of demands on resources on the KNF (U.S. Forest Service 2011b, p. 281-282) and adjacent state and private lands, particularly those providing access or similar recreational experiences. Increases in recreational use in the action area on non-federal lands may contribute to disturbance and cause the portions of NFS lands that have lower human disturbance to become more important for grizzlies. Additionally, along with increased human presence on all land ownerships along with progress toward our goal of increasing grizzly bear numbers in the CYE comes an increase in the chance of human/bear conflict and resulting grizzly bear mortality.

The Grizzly Bear Access Amendment established management direction for roads and secure habitat on NFS lands within the action area. However, the BMUs in the action area also include some state and private lands and decisions made on state and private lands could potentially

FWS002013

result in cumulative disturbance or displacement effects on grizzly bears. The calculations used for determining road densities and core areas on NFS lands include roads on state and private lands within the BMUs considered in this action, even though standards set by the Access Amendment apply only to NFS lands.

The State of Montana allows regulated hunting for black bears, as well as other wildlife species, within and around the CYE. Hunters are not allowed to bait bears in Montana. Grizzly bear mortality as a result of mistaken bear identification and self-defense are expected to continue within the action area and possibly decrease through hunter education programs outlined in the Grizzly Bear Management Plan for Western Montana (MFWP 2006).

*Illegal Motorized Access*

Any private individual's non-compliance with the Forest's access management restrictions is an illegal activity. While future illegal use of the Forest via motorized access in areas unauthorized for such use may occur within the action area, such illegal use is not considered a Forest (federal) action. Given past experiences on the Forest (as described in the *Environmental Baseline* section above), the Service believes some instances of illegal motorized use are reasonably certain to occur in the action area in the future. Therefore, we acknowledge cumulativeeffects to grizzly bears may occur as a result of illegal motorized access, but the information as to the length, duration, amount of use, type of use, and location, among other conditions, is and will continue to be unknown until such time that illegal use is discovered. The probability of long-term illegal motorized access and probability of illegal access coinciding with the presence of grizzly bears is anticipated to be low but is unknown. As such, the potential consequences to grizzly bears are uncertain. Illegal motorized access is expected to be spatially disparate and temporary and is not likely to collectively cause an adverse effect because most users follow travel regulations and when illegal use is observed or when user-created roads become apparent the Forest corrects the situation as soon as they are able.

For the Kootenai National Forest, the monitoring data do not show a clear trend, increasing or decreasing, in the amount of illegal use that was documented from 2011-2019 (U.S. Forest Service 2020, p. 39); thus, we do not have reason to believe the amount of illegal use will substantially change in the next 10-15 years during which the LMP is implemented. Because the Forest will not substantially increase opportunities for illegal use (because of its access management standards that limit increases in roads, as described above), we think that the amount and type of illegal use in the future will be similar, and thus effects to bears will be similar, to what occurred from 2011-2019 (a time in which grizzly bear mortality rates decreased and population trend increased, as described previously in this opinion). Based on past data, we assume the effects to grizzly bears from illegal motorized access will continue to be spatially disparate and temporary and are not likely to collectively cause an adverse effect because: (1) most users follow travel regulations and when illegal use is observed or when user-created roads are discovered, (2) the Forest corrects the situation as soon as they are able, generally within the same bear year, and (3) the Forest uses a variety of means available to ensure the effectiveness of closures, such that chronic use remains rare.

99

FWS002014

However, illegal trespass activity by a private individual is not part of the proposed action, and unauthorized wheeled motorized access is not covered by the ITS that accompanies this Opinion. Individuals that participate in unauthorized wheeled motorized uses on the KNF will remain subject to penalties for violation of KNF closure orders as well as for violation of the Act's section 9 take prohibitions for any resulting incidental take of grizzly bears.

*Summary of Cumulative Effects*

All of the various activities mentioned above have the potential to result in cumulative effects on grizzly bears in the action area. Potential effects include disturbance and displacement, fragmentation of habitat, and human/grizzly bear conflicts resulting in mortality of bears. The role of state and private lands, and the support of the local public, is critical to the recovery of the CYE bears. The Service and MFWP's augmentation program fulfills one high-priority conservation need for grizzly bears in the CYE. The implementation of the Access Amendment on Federal lands, which takes into account actions on private lands; the MT DNRC HCP, grizzly bear specialist program, and hunter education programs all address other conservation needs for the species and contribute to offsetting cumulative effects of mortality on private lands. At this time, the cumulative effects on grizzly bears on state and private lands contribute to the inability to meet the demographic criteria for human-caused mortality and mortality of female bears in the CYE. However, the CYE population is increasing in size and distribution, and the programs described above to offset these effects appear to be contributing to that change in population trend and lower mortality rates. Therefore, the cumulative effects are not expected to result in substantial negative effects on the population. Likewise, given the robustness of the NCDE population and its increasing population trend, cumulative effects on state and private lands in the NCDE do not appear to have negative effects on the population as a whole, although individual bears certainly do experience negative, if not lethal, effects.

## VII. CONCLUSION

After reviewing the current status of the grizzly bear, the environmental baseline for the action area, effects of the proposed action, and cumulative effects, it is the Service's biological opinion that ongoing implementation of the KNF LMP, inclusive of the proposed timeline extensions and clarifications, is not likely to jeopardize the continued existence of the grizzly bear.

Implementation of the LMP may occasionally result in adverse effects to individual grizzly bears over the life of the LMP. Some of these adverse effects are due to the existing motorized access conditions within the action area, and some are related to potential future authorized federal actions that result in the potential disturbance and/or displacement related to access management.

We expect the LMP direction will result in conditions that support continued grizzly bear use of the action area, especially in the CYE and NCDE recovery zones. Within the recovery zones, access management and other LMP direction will continue to maintain large expanses of suitable habitat that will support occupancy by females, allow for reproduction, and generally support some level of connectivity within the recovery zones.

100

FWS002015

Within BORZ, we expect some individual grizzly bears will continue to use the areas for dispersal or exploratory movements, and potentially some home range establishment, albeit at densities lower than those in the recovery zone. Managing motorized access conditions such that grizzly bears can use BORZ, particularly those areas that provide for connectivity between the CYE recovery zone and the SE to the west and NCDE to the east, will continue to be important for addressing threats to grizzly bears in the CYE, including the small population size and genetic isolation (identified in U.S. Fish and Wildlife Service 2011b).

The LMP will continue to support grizzly bear occupancy in the Recovery Zones and allow for some grizzly bear use of areas between recovery zones (i.e. BORZ). Thus, it is our opinion that the LMP would not appreciably reduce the likelihood of both the survival and recovery of grizzly bears. Below we summarize key factors of our rationale for our no-jeopardy conclusion as detailed and analyzed in this biological opinion. These key factors include, but are not limited to, the following:

*Factors related to the LMP:*

- In 1993, the Recovery Plan articulated the conservation needs for the recovery of grizzly bears. The Recovery Plan stated that recovery zones include areas large enough and of sufficient habitat quality to support recovered grizzly bear populations, and that although grizzly bears are expected to reside in areas outside the recovery zones, only habitat within the recovery zone is needed for management primarily for grizzly bears. The action area contains parts of two Recovery Zones (CYE and NCDE) as well as areas outside the recovery zones.

- The Forest will continue to manage for grizzly bears within the Recovery Zones by applying the Access Amendment standards within the CYE, and applying the NCDE amendment standards. These access management standards were designed to favor occupancy and reproduction of female grizzly bears within the Recovery Zones.

- Other portions of these Recovery Zones that are managed by adjacent National Forests (Idaho Panhandle, and Lolo for CYE, and Flathead, Lolo for NCDE) also have access management standards that are intended to ensure adequate habitat exists for female grizzly bears in the Recovery Zones.

- In the CYE, motorized access management under the LMP conserves and/or increases habitat for female home range use in the majority of BMUs, and so supports the distribution and reproduction of grizzly bears. Forest Plan standards from the three Forests that manage for grizzly bears in the CYE would result in 9 of 22 BMUs providing more than 55 percent core, 11 of 22 BMUs would provide at least 55 percent core, and only 2 BMUs would provide less (see Table 2; Appendix A.2).

- While motorized routes in some portions of the action area may result in displacement of some female grizzly bears from key habitat at some time over the life of the LMP, some grizzly bears are able to persist in areas with higher levels of human pressure, as

101

FWS002016

documented by verified reports of grizzly bears, including females with cubs (indicating home range use), outside of the NCDE and GYE recovery zones, as well as limited female use outside of the CYE and SE recovery zones.

- Not all actions related to motorized access carried out under the LMP, including the existing, baseline condition, will result in adverse effects to grizzly bears. In other words, the Service does not expect the existing, baseline condition in all portions of the action area to have adverse impacts on female grizzly bears. Nor do we expect all permanent or temporary roads or temporary use of restricted roads to have adverse effects on female grizzly bears. The level of effects would depend on such things as location and length of the road, the frequency and intensity of use of the road, and the duration that the road would be on the landscape. Not all females would experience the same effects, thus, some would not be adversely affected as a result of access management under the LMP.

- As described above, while adverse effects from high road densities and low amounts of secure habitat in some portions of the action area may result in the displacement of individual female grizzly bears, the avoidance of suitable habitat, and/or the reduction of habitat to an unsuitable condition, we anticipate that the adverse effects would affect only a few adult females over the life of the LMP.

- Where grizzly bears and snowmobiling do generally overlap, there is still some spatial separation. However, the potential of snowmobile use adversely impacting an individual grizzly bear cannot be eliminated.

- Other elements of the LMP, including the Forest-wide Food Storage Order and several of the desired conditions in the LMP, are designed to minimize grizzly bear mortality and avoid, reduce, or minimize adverse effects to grizzly bears. The Service upholds our previous determinations that the LMP desired conditions and standards and guidelines applied at the project level would avoid, reduce, or minimize adverse effects on grizzly bears (U.S. Fish and Wildlife Service 2013, p. 91-96). Adverse effects that could result in impairment of feeding, breeding, or sheltering would be infrequent and affect few bears. We did not then, and do not now, anticipate that project-level adverse effects on would appreciably reduce the likelihood of both survival and recovery of grizzly bears. However, future projects implemented under the LMP that may affect grizzly bears will undergo project-specific section 7 consultation, allowing the Service an opportunity to closely evaluate effects.

- The Forest has managed and will continue to manage their lands in such a way that has allowed grizzly bears to expand. Thus, although individual grizzly bears may be adversely affected at times over the life of the LMP, we anticipate that grizzly bears use will continue to increase within the action area into the future.

FWS002017

*Factors related to the NCDE and CYE Recovery Zones:*

- Using the 2004 population estimate and the percent annual growth, as of 2020, approximately 1,068 grizzly bears occupied the NCDE (U.S. Fish and Wildlife Service 2020).

- The NCDE grizzly bear population currently meets the demographic recovery criteria related to the number of BMUs occupied by family groups and the sustainable human-caused mortality levels for both total and female grizzly bears (U.S. Fish and Wildlife Service 2020). The NCDE population is estimated to be 1,068 grizzly bears (U.S. Fish and Wildlife Service 2020).

- The NCDE grizzly bear population is increasing, explaining the expansion of its range into areas outside the recovery zone and towards other recovery zones, including the CYE. Female grizzly bears with young have been observed outside of the recovery zone, indicating that a number of females are able to find the resources needed to establish home ranges and survive and reproduce outside the recovery zone, despite the lack of specific habitat protections.

- The current population estimate of 55-60 grizzly bears in the CYE remains below the anticipated minimum population of 100 bears (U.S. Fish and Wildlife Service 1993, p.83), but the population appears to be increasing and successful augmentation and natural immigration has led to improved genetic diversity. It should be noted that the 100 bears projected as the goal for this area are a subset of a much larger population that is contiguous with grizzly bear populations northward into Canada (U.S. Fish and Wildlife Service 1993, p.83).

- In the CYE, demographic recovery criteria have not yet been met, but progress is being made towards meeting the criteria. Mortality rates are low and meeting recovery criteria, but criteria related to occupancy and reproduction by female grizzly bears criteria have not yet been met. Occupancy and reproduction are slow processes that rely on multiple factors; managing mortality is a key factor in assuring opportunities for female grizzly bears to expand their range and reproduce.

- We expect that over time, if the population trend and adult female survival rates remain high in the CYE, the population in this ecosystem will likely expand. Maintaining or increasing current levels of genetic diversity in the CYE would help ensure genetic concerns do not become a threat in the future.

- Montana Fish, Wildlife and Parks' bear specialist program is expected to continue to work with the public to reduce risks to grizzly bears on private and public lands. In cooperation with other agencies, this program has made notable strides toward an informed public and reduced the availability of attractants to grizzly bears on private and public lands.

103

- The recovery plan strategy has been successful and has resulted in growth of the grizzly bear populations. Grizzly bears in the GYE and NCDE populations have expanded into areas well outside of the recovery zones. Based on the best available information, the Service concludes that the status of the both the GYE and NCDE grizzly bear populations are robust and have reached or are nearing recovery. The population trends for the CYE and SE are slightly increasing, with expanding distribution and low mortality rates.

Recovery zones were established to identify areas necessary for the recovery of a species and are defined as the area in each grizzly bear ecosystem within which the population and habitat criteria for recovery are measured. Recovery zones are areas adequate for managing and promoting the recovery and survival of grizzly bear populations (U.S. Fish and Wildlife Service 1993). Areas within the recovery zones are managed to provide and conserve grizzly bear habitat. The recovery zones contain large portions of wilderness and national park lands, which are protected from the influence of many types of human uses occurring on lands elsewhere. Multiple use lands are managed with grizzly bear recovery as a primary consideration. As anticipated in the Recovery Plan, grizzly bear populations have responded to these conditions in four of the six recovery zones have stabilized, and are increasing (SE and CYE) or at or near recovered levels (NCDE, GYE). In addition, the grizzly bears have been expanding and continue to expand their existing range outside of the recovery zones.

While the LMP may have adverse effects on some of the individual female grizzly bears that may use the action area now and into the future, considering the large size of the recovery zones, favorable land management within the recovery zones, and the robust status of the NCDE and increasing status of the CYE populations, adverse effects on grizzly bears as a result of continued implementation of the LMP would not have negative effects on the status of grizzly bears in the CYE or NCDE. Therefore, we conclude that the proposed action to implement the LMP, as described in the BA, is not likely to reduce the numbers, distribution, or reproduction of grizzly bears in the CYE or NCDE.

Because the proposed action would not reduce the reproduction, numbers, or distribution of grizzly bears in the CYE or NCDE, we conclude that **the proposed action is not reasonably expected to reduce appreciably the likelihood of both the survival and recovery of the species in the wild**. Therefore, it is the Service's opinion that the effects of the LMP on grizzly bears is **not likely to jeopardize the continued existence of the grizzly bear**.

## IX. INCIDENTAL TAKE STATEMENT

Section 9 of the Act, and Federal regulations pursuant to section 4(d) of the Act, prohibit the take of endangered and threatened species, respectively without special exemption. *Take* is defined as harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct. *Harm* is further defined by the Service to include significant habitat modification or degradation that results in death or injury to listed species by significantly impairing behavioral patterns, including breeding, feeding, or sheltering. *Harass* is defined by the Service as an intentional or negligent act or omission that creates the likelihood of injury to listed wildlife by annoying it to such an extent as to significantly disrupt normal behavior

FWS002019

patterns which include, but are not limited to, breeding, feeding or sheltering. *Incidental take* is defined as take that is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity. Under the terms of section 7(b)(4) and section 7(o)(2), taking that is incidental to and not intended as part of the agency action is not considered to be prohibited taking under the Act provided that such taking is in compliance with this Incidental Take Statement.

The LMP provides direction for future actions that may be authorized, funded, and/or carried out by the Forest, it does not in itself mandate or approve future implementation of activities on the Forests. For some activities implemented under the LMP, the level of detail available is insufficient to identify with particularity all possible circumstances that may possibly involve the incidental take of listed species. Given the lack of site-specific specificity and information regarding future effects of actions implemented under the LMP, providing the amount or extent of take would be speculative and unlikely to provide an accurate and reliable trigger for reinitiation of consultation for some effects. Consequently, with the exception of incidental take related to grizzly bears as described below, other potential for incidental take that we are unable to anticipate at this time is deferred to further section 7 consultation on individual projects. Any incidental take resulting from subsequent actions that proceed under the LMP will be subject to section 7 consultation, as appropriate. In addition, take that may occur due to illegal activities by private citizens within the action area is not exempted in this incidental take statement.

The measures described below are non-discretionary and must be undertaken by the Forest so that they become binding conditions of any grant or permit issued, as appropriate, for the exemption in section 7(o)(2) to apply. The Forest has a continuing duty to regulate the activity that is covered by this incidental take statement. If the action agency (1) fails to assume and implement the terms and conditions or (2) fails to require the applicant to adhere to the terms and conditions of the incidental take statement through enforceable terms that are added to the permit or grant document, the protective coverage of section 7(o)(2) may lapse. To monitor the impact of incidental take, the action agency must report the progress of the action and its impact on the species to the Service as specified in the incidental take statement [50 CFR 402.14(i)(3)].

**Relationship with Prior Consultations**

This Incidental Take Statement supersedes the Incidental Take Statement from our original BO for the LMP for grizzly bears (also known as the KNF Revised Plan; U.S. Fish and Wildlife Service 2013, p. II-96-106).

In 2017, the Service issued a biological opinion and associated Incidental Take Statement for the portion of the KNF that is within the NCDE, relative to the NCDE Conservation Strategy Amendments (U.S. Fish and Wildlife Service 2017, p. 84-90). The Incidental Take Statement associated with the 2017 biological opinion referenced the 2013 consultation on the KNF Forest Plan (LMP) regarding the existing access conditions within the two NCDE subunits/Murphy BMU (ibid. at p. 105). Therefore, in this opinion, we have updated the 2013 analysis and incidental take associated with existing access conditions. The 2017 BO exempted incidental take that may occur as a result of temporary changes in OMRD, TMRD, and/or secure core (as allowed under the NCDE amendments to the KNF Forest Plan; U.S. Fish and Wildlife Service 2017, p. 108). Thus, the 2017 programmatic biological opinion and its associated Incidental

105

FWS002020

Take Statement will still remain in effect for the Therriault and Krinklehorn subunits of the Murphy BMU. Similarly, the reporting requirements detailed in the 2017 Incidental Take Statement (ibid., p. 110) remain valid.

## Amount or Extent of Take Anticipated

*Motorized Access Management*

Based on research detailed earlier in this biological opinion, the Service has defined harm of grizzly bears in terms of adverse habitat conditions caused by high motorized route densities, and in low amounts of secure habitat, which may displace individuals from key habitat to the extent that significant under-use of habitat by grizzly bears may occur. Using the best information on the effects of motorized access on grizzly bears, we conclude that high motorized route densities and associated low amounts of secure habitat in portions of the action area are likely to result in a level of adverse effects to some female grizzly bears at some point during the life of the LMP, primarily those that attempt to establish and maintain home ranges within the action area. Future road construction, permanent or temporary, may add to or increase the likelihood of such adverse effects. These adverse effects would result from displacement of grizzly bears from otherwise suitable habitat. Displacement may result in significant under-use of key habitat when high amounts of motorized access exist on the landscape. The Service maintains that such under-use of otherwise suitable habitat within a grizzly bear's home range may constitute incidental take of grizzly bears through "harm" as a result of significant habitat alteration that impairs breeding, feeding and/or sheltering.

Portions of the action area have high levels of motorized routes while other portions have low levels of motorized routes or no motorized routes at all.

Recovery Zones-

The Krinklehorn and Therriault subunits within the NCDE exceed (i.e., are "worse than") the research benchmarks for OMRD, which may be resulting in ongoing significant effects to grizzly bears. Both subunits are better than the benchmarks for TMRD and Core. Within the CYE Recovery Zone, BMUs that exceed (i.e., are "worse than") the research benchmarks for OMRD, TMRD, and/or Core, currently have existing conditions that may be resulting in ongoing significant effects to grizzly bears, including BMUs 4, 6, 10, and 12. Once all standards are attained, we anticipate ongoing significant effects to continue for grizzly bears in these four BMUs due to the standards for at least one metric being below the research benchmarks.

Several other BMUs are at or close enough to the research benchmarks that temporary changes to OMRD, TMRD or Core (as allowed under the LMP) may result in BMU conditions that have temporary adverse effects to individual bears, thus resulting in incidental take of grizzly bears. More detail is needed to evaluate the effects to grizzly bears from future projects. Thus, subsequent section 7 consultation on the specific actions developed pursuant to the LMP will serve as the basis for enumerating the incidental take and determining if an exemption from the section 9 take prohibitions is warranted for site-specific projects in the future.

106

FWS002021

One exception is that the LMP allows the Forest to conduct a one-time entry (i.e., one season of construction activity) of Core habitat within a BMU, for the sole purpose of completing needed road decommissioning/ stabilization activities on existing closed or barriered roads in Core habitat. This can occur once per BMU per 10 years. Temporary motorized use of such previously closed roads in Core may in some cases result in incidental take of female grizzly bears in the form of harassment (displacement) or harm (significant habitat modification or degradation), which causes actual injury to grizzly bears by significantly disrupting normal behavioral patterns to levels that impair reproduction. Adult female grizzly bears that have established habitat use patterns within Core habitat may experience significant displacement from an area if a road(s) were entered for decommissioning. We anticipate a low level of take, as we do not expect take would occur if entries were limited in duration and actions taken were of relatively low impact. Further, not all females impacted by such entries and actions in core would suffer significant displacement.

In BORZ, providing the linear route (or density of linear motorized routes) gives an idea of the amount of motorized routes in the action area, however it does not represent how these routes spatially occur on the landscape. Secure habitat has been identified as one of the key issues related to effects of motorized access on grizzly bears and is important to the survival and reproductive success of grizzly bears. Secure habitat more adequately represents the potential effects related to motorized access as it provides a more accurate indication of the spatial mix of motorized routes and secure habitat. The estimates of secure habitat in BORZ (as defined and mapped in Appendix D) are in most cases underestimates of actual secure habitat that exists on the ground because some non-FS lands may provide secure habitat for grizzly bears, and some restricted roads may receive little to no use for years at a time. Accordingly, the secure habitat amounts provided are useful mainly as a broad index of what may be available to grizzly bears that may use BORZ.

The estimated amount of secure habitat ranges from 5 percent to 33 percent of BORZ. The effects of the existing motorized access conditions throughout the BORZ result in some level of ongoing effects, including some adverse effects that will continue during the life of the LMP and as BORZ expand in the future. Ongoing displacement of grizzly bears may be occurring due to the potentially significant under-use of key habitat by female grizzly bears and may constitute incidental take of grizzly bears through "harm" as a result of significant habitat alteration that impairs breeding, feeding and/or sheltering. It is likely that portions of all or most of the BORZ have existing conditions that may be resulting in such ongoing significant effects to grizzly bears if or when female grizzly bears are present.

Standards require the Forest to maintain the baseline open and total linear miles of motorized routes within existing BORZ, and in any future BORZ expansion areas. This will maintain the baseline linear miles at the time the BORZ is delineated, which is the time grizzly bear recurring use is documented as originally described in the BA for the Access Amendment (U.S. Forest Service 2010, p. 207-208) and reaffirmed in the supplemental BA for the LMP (U.S. Forest Service 2020, p. 25). In order to construct permanent roads in these areas, other roads would likely need to be decommissioned. Linear miles of open and total route will be compared with the baseline, and not allowed to permanently increase, save for a few exceptions, as analyzed in our biological opinion.

107

FWS002022

Even with restrictions on the amount of permanent open and total linear miles of motorized route in BORZ, the amount of secure habitat could potentially decrease, depending on the placement of motorized routes. If such decreases were to occur, the effects related to displacement may also increase. Similarly, the construction and use of temporary roads (including use of roads that are currently bermed or otherwise treated to prevent any wheeled motorized use) may occur on a project-by-project basis, and may increase the likelihood of disturbance and displacement of grizzly bears in or near a project area. Temporary roads built for resource extraction such as timber harvest or mining may be short-term in duration of use or may remain on the landscape for several years and receive a substantial amount of use.

In sum, existing motorized access in some areas of the KNF, and continued presence of these motorized routes under the LMP, along with new permanent and temporary road construction and use and restricted road use, may result in incidental take of some individual female grizzly bears attempting to establish or maintain home ranges in roaded areas at some point over the life of the LMP. We anticipate that in a limited number of circumstances, site specific conditions would result in significant displacement of adult females from key seasonal habitat, impairing their ability to find adequate food resources, breed and raise young, and/or find shelter.

We do not anticipate any take of subadult or male grizzly bears. Male grizzly bears have larger home ranges than females, and males and subadults are more mobile and do not have the same energetic needs as adult females. We also do not anticipate take of grizzly bears that are transient (moving through areas outside of home range use). Such individuals are highly mobile and not restricted to finding food and shelter within a home range. Thus, while displacement may affect behavioral patterns such as feeding or sheltering, we do not anticipate such effects would cause injury to transient, subadult, or male grizzly bears.

As detailed in this biological opinion, we anticipate that existing access management, future permanent road construction, temporary motorized route construction and use, and temporary use of restricted roads would affect only a very few adult females over the over the life of the LMP because grizzly bears occur at low densities in the action area and numbers of females are expected to increase only slowly over time in much of the action area. If subadult females move into the action area seeking to establish home range, they would be exposed to levels of roading that would factor into home range selection, and that level of roading is not likely to significantly increase. Therefore, the take we anticipate would be harm to a low number of female grizzly bears that may inhabit the action area now and into the future, over the life of the LMP. We expect harm would be caused by significant under-use of key habitat in areas affected by high road densities and low secure habitat to levels that result in decreased fitness and impaired reproductive potential. In other words, infrequently and in site-specific circumstances, an adult female grizzly bear wary of humans and human-generated disturbance may not breed at its potential frequency or may fail to complete gestation due to decreased fitness. We do not expect all adult female grizzly bears affected by high road densities or low secure habitat to suffer impairment of breeding, feeding, and/or sheltering, nor would we expect any female to experience permanent effects (lasting more than one reproductive cycle). Variables such as annual climate and resulting habitat and food resource conditions, the level of roading, and the number of grizzly bears using an area may change over time and are all factors influencing the displacement within a home range.

FWS002023

The effects of high road densities and low secure habitat on individual female grizzly bears are difficult to quantify in the short term and may be measurable only as long-term effects on the species' habitat and population levels. The amount of take is difficult to quantify for the following reasons:

1) The amount of take would depend on the number of adult female grizzly bears impacted by high road densities. We lack specific information on the precise number of adult female grizzly bears that have home ranges encompassing all or portions of the action area.

2) Individual grizzly bears would react differently to the disturbance. Not all adult female bears that are exposed to disturbances from high road densities would be adversely impacted to the point of take. Low numbers of grizzly bears would likely decrease intra-specific competition for habitat, allowing more options for individuals to move within home ranges in many cases.

3) Some individual female grizzly bears that initially may be sensitive to disturbances may adjust to the routine disturbances generated by human activity over time.

Therefore, determining the precise amount of take, as defined by impaired reproductive potential (as affected by feeding and sheltering), is difficult. The amount of take would be also difficult to detect for the following reasons:

1) Grizzly bears are not easily detected or observed in the wild.

2) Reproductive rates of female grizzly bears vary naturally due to environmental and physiological causes.

3) A reduction in "normal" reproductive success is not discernable in the wild.

4) The reasons a grizzly bear fails to breed and/or failure to complete gestation are not discernable in the wild.

In accordance with the regulations at 50 CFR 402.14(i)(1)(i), a surrogate may be used to express the amount or extent of incidental take provided that the biological opinion or the ITS describes: the causal link between the surrogate and take of the listed species; why it is not practical to express the amount or extent of take in terms of individuals of the listed species; and a clear standard for determining when the level of anticipated take has been exceeded. The discussion above explains why it is not practical to express the amount or extent of take in terms of individual grizzly bears. The Service is using seven habitat-based surrogate measures, summarized in Table 8 and described in more detail below, to express take of grizzly bears.

109

FWS002024

**Table 8. Summary of surrogate measures of incidental take for grizzly bears for the KNF Land Management Plan.**

| Surrogate | Applies to | Measure |
|---|---|---|
| 1st | CYE BMUs | research benchmarks for OMRD, TMRD, and Core in the CYE (33:26:55) |
| 2nd | CYE BMUs | one-time entry into Core, as described |
| 3rd | BORZ | existing level of secure habitat  (i.e., the baseline condition as of 2019) |
| 4th | BORZ | 2 percent decrease in secure habitat in each BORZ, due to exceptions to the "no net increase" standard |
| 5th | NCDE subunits | research benchmark levels of OMRD, TMRD, and security core (for the NCDE – 19:19:68) |
| 6th | CYE BMUs and NCDE subunits | acres of denning habitat that overlap with areas currently receiving late season late season over-snow motorized use |
| 7th | BORZ | acreage of BORZ available to snowmobiling (587,360 acres) |

In instances where incidental take is difficult to quantify, the Service uses a surrogate measure of take.  The number of grizzly bears that use the action area is unknown but grizzly bears have been documented.  However, female grizzly bears have yet to be verified within portions of the action area.  The mechanism of female grizzly bear dispersal makes it likely that only relatively few female grizzly bears would occupy much of the action area during the life of the LMP.  Therefore, for reasons explained above, the Service anticipates that incidental take of adult female grizzly bears would be very low and would occur only infrequently over the life of the LMP in the form of harm related to the displacement effects of existing motorized access, permanent and temporary road construction and use, and temporary use of roads currently closed to all motorized use.

Based on the best available research and information, we anticipate that some level of incidental take of female grizzly bears will occur within individual BMUs in the CYE recovery zone as long as: (1) OMRD exceeds one mile per square mile in more than 33 percent of a BMU; (2) TMRD exceeds two miles per square mile in more than 26 percent of a BMU, and/or (3) a core area makes up less than 55 percent of a BMU.  Incidental take of grizzly bears is unlikely to occur when these research benchmarks are achieved in those BMUs.  We use the research benchmarks for OMRD, TMRD, and Core in the CYE (33:26:55) as our **first surrogate measure of incidental take of grizzly bears** related to motorized access within the CYE recovery zone.  By the end of 2023, we anticipate all BMUs will meet the standards shown in Table 8 for the permanent access management condition.  Thus by the end of 2023, we expect 13 of the 17 BMUs in the KNF-managed portion of the CYE will have achieved established standards that will either meet or exceed research benchmarks that avoid adverse effects to grizzly bears.  Even after all BMUs reach compliance with the standards, the likelihood of incidental take would not be entirely eliminated in the four BMUs where the established

110

FWS002025

standards exceed the research benchmarks for at least one of the parameters (OMRD, TMRD, and/or Core).  Female grizzly bears with home range use in these BMUs may continue to avoid key habitat, and so incidental take in the form of harm is likely to be a persistent long-term condition.  If the permanent access management condition does not meet or exceed the standards shown in Table 9 in all BMUs by the end of 2023, the incidental take exempted here will be exceeded and reinitiation of consultation would be required.

**Table 9.  Standards for access management in Bear Management Units (BMUs) in the KNF portion of the Cabinet Yaak Ecosystem recovery zone.  Numbers in bold represent standards that we anticipate result in ongoing incidental take to grizzly bears.**  (Copy of Table 3 from this opinion).

| Forest Zone | Bear Management  Unit | Percent OMRD >1 mi/mi$^2$ | Percent TMRD>2 mi/mi$^2$ | Percent Core Area | Percent Federal Land |
|---|---|---|---|---|---|
| KNF | 1 (Cedar) | 15 | 15 | 80 | 99 |
| KNF | 2 (Snowshoe) | 20 | 18 | 75 | 94 |
| KNF | 3 (Spar) | 33 | 26 | 59 | 95 |
| KNF | 4 (Bull) | **36** | 26 | 63 | 84 |
| KNF | 5 (St. Paul) | 30 | 23 | 60 | 97 |
| KNF | 6 (Wanless) | **34** | **32** | 55 | 85 |
| KNF | 7 (Silver Butte) | 26 | 23 | 63 | 92 |
| KNF | 8 (Vermilion) | 32 | 20 | 55 | 93 |
| KNF | 9 (Calahan) | 33 | 26 | 55 | 90 |
| KNF | 10 (Pulpit) | **44** | **34** | **52** | 95 |
| KNF | 11 (Roderick) | 28 | 26 | 55 | 96 |
| KNF | 12 (Newton) | **45** | **31** | 55 | 92 |
| KNF/IPNF | 13 (Keno) | 33 | 26 | 59 | 99+ |
| KNF/IPNF | 14 (NW Peak) | 31 | 26 | 55 | 99+ |
| KNF | 15 (Garver) | 33 | 26 | 55 | 94 |
| KNF | 16 (EF Yaak) | 33 | 26 | 55 | 96 |
| KNF | 17 (Big Cr.) | 33 | 26 | 55 | 99 |

111

FWS002026

Adverse effects on grizzly bears may occur over the short-term through any permanent loss of core area from existing conditions within any individual BMU currently exceeding (being better than) the research benchmarks once all BMUs have reached standards. Additional adverse effects may occur over the short-term through individual projects that temporarily exceed the research benchmarks for OMRD, TMRD, or Core. These projects would occur in the future, where the environmental baseline, status of the species, and cumulative effects may be substantially different than now. Further, each project would have specific design elements related to scale and timing. Thus we lack information needed to enumerate the amount of take associated with these actions. As explained earlier, these projects would undergo independent section 7 consultation (as appropriate) and will be analyzed given the prevailing conditions and information at the time. *Thus, any incidental take that may result from future permanent reductions of core area or from temporary effects to OMRD, TMRD, or core area in BMUs is not exempted here.*

The Forest may make one-time entries into Core, which may result in incidental take. Here, we use the following **second surrogate measure of incident take of grizzly bears** related to such entries into Core: If more than one entry of Core occurs within a BMU more than once per 10-year time frame, or occurs for more than one bear season, or occurs for reasons other than the sole purpose of completing road decommissioning/stabilization activities on existing closed or barriered roads in Core area habitat (U.S. Fish and Wildlife Service 2011b, p. 13), the level of incidental take anticipated here would be exceeded and reinitiation of section 7 consultation would be required.

Outside of the recovery zone, we use the existing level of secure habitat (i.e., the baseline condition as of 2019) as our **third surrogate measure of incidental take of grizzly bears** related to motorized access. These acres are reported in Table 10 below. The existing access conditions were determined using the best available information. The metrics described here are assumed to be an accurate representation of the existing access condition as reviewed, although the Service recognizes that mapping and calculation errors can occur. If the Forest finds that it has made a mapping or calculation error in describing the existing condition and corrects the metrics, the Service does not expect any additional incidental take of grizzly bears related to those corrections. The intent of this Incidental Take Statement is to capture the existing access conditions, including potential incidental take that may not be represented in the metrics described above due to potential errors. Thus the 2019 baseline conditions for BORZ may be *corrected* as described in this biological opinion without exceedance of incidental take. Should the KNF permanently reduce secure habitat in a BORZ, resulting in a lower quantity of secure habitat reported as the 2019 baseline condition, the amount of incidental take will be exceeded, *unless that reduction in secure habitat is the result of a "no net increase" exemption described below*.

Minor changes in linear miles of motorized routes, and potential decreases in secure habitat below the baseline condition, may occur in BORZ related to exceptions to the "no net increase" standard. We expect these losses may occur as the result of KNF obligations to provide access on NFS lands to private lands. Based on past history, we assume such actions will result in no more than a 2 percent net decrease in secure habitat within each BORZ. Therefore, we use a 2

112

FWS002027

percent decrease in secure habitat in each BORZ, due to exceptions to the "no net increase" standard, as our **fourth surrogate** measure of incidental take. If a KNF action permanently reduces the amount of secure habitat by more than 2 percent of the reported baseline condition, or if the purposes for the decrease are other than those associated with exceptions to the "no net increase" standard or route relocation for safety purposes or to improve effectiveness, the level of incidental take anticipated here would be exceeded and reinitiation of section 7 consultation would be required.

**Table 10. Baseline conditions as of 2019 Bear Year for permanent status of motorized access in BORZ on the KNF.** (Copy of Table 4 from this opinion).

| Bears Outside Recovery Zone | Total Size (acres) | Total Area NFS (acres) | Total Roads (linear miles) | Open Roads (linear miles) | Secure Habitat (acres and percent of NFS lands) |
|---|---|---|---|---|---|
| **Cabinet Face** | 28,052 | 27,083 | 165.0 | 133.6 | 889 acres (3 percent) |
| **Clark Fork** | 101,899 | 100,209 | 267.4 | 186.4 | 33,330 acres (33 percent) |
| **West Kootenai\*** | 217,595 | 200,558 | 790.1 | 456.9 | 41,419 (21 percent) |
| **Tobacco** | 287,240 | 266,992 | 1192.7 | 936.4 | 34,338 acres (13 percent) |

Adverse effects on grizzly bears may occur over the short-term through temporary decreases in the effectiveness of secure habitat due to individual projects on the Forest. These projects would occur in the future, where the environmental baseline, status of the species, and cumulative effects may be substantially different than now. Further, each project would have specific design elements related to scale and timing. Thus we lack information needed to enumerate the amount of take associated with these actions. As explained earlier, these projects would undergo independent section 7 consultation (as appropriate) and will be analyzed given the prevailing conditions and information at the time. *Thus, any incidental take that may result from future temporary reductions in the effectiveness of secure habitat is not exempted here.*

In the NCDE, we anticipate that some level of incidental take of female grizzly bears will occur within individual subunits as long as: (1) OMRD exceeds one mile per square mile in more than 19 percent of a subunit; (2) TMRD exceeds two miles per square mile in more than 19 percent of a subunit, and/or (3) secure core area makes up less than 68 percent of a subunit. Incidental take attributed to existing high open road densities may occur for the Therriault and Krinklehorn subunits, where OMRD exceeds the research benchmarks. For these subunits, we use the research benchmark levels of OMRD, TMRD, and secure core (for the NCDE – 19:19:68) as **fifth surrogate measure of incidental take.** In these subunits, we conservatively anticipate some level of impaired habitat use, resulting in impaired breeding or feeding for some adult female grizzly bears. We anticipate a low level of take for these subunits since they are only slightly above research benchmark for OMRD and are better than the benchmark for TMRD and

113

FWS002028

secure core. If the *permanent* access management condition exceeds the amount of OMRD or TMRD, or is lower than the amount of secure core shown in Table 11, the incidental take exempted here will be exceeded and reinitiation of section 7 consultation would be required. Note that we exempted incidental take resulting from *temporary* changes in access management for the NCDE subunits on the KNF in our 2017 biological opinion on the NCDE amendments (U.S. Fish and Wildlife Service 2017, p.108).

**Table 11. Baseline access conditions in the NCDE subunits on the Kootenai National Forest.** (Copy of Table 5 from this opinion).

| Subunit | Secure core | OMRD (≥ 1 mile per square mile) | TMRD ( ≥ 2 miles per square mile) |
|---------|-------------|----------------------------------|-----------------------------------|
| Krinklehorn | 75% | 22% | 14% |
| Therriault | 71% | 26% | 12% |

*Over-snow Motorized Use*

The Service anticipates that winter motorized use (snowmobile or over-the-snow) that may occur under the LMP may incidentally result in some very low level of take of grizzly bears. Over-snow motorized use is allowed on most of the action area, although the overlap of over-snow motorized use during spring emergence in modeled denning habitat is estimated at just 5 percent of potential denning habitat within the KNF portion of the CYE, and at 21 percent of potential denning habitat within the KNF portion of the NCDE. Overlap could also occur in BORZ, but to an unknown extent, although a good deal of spatial separation is expected due to limitations of late-season snow and low amounts of denning habitat in BORZ. Although areas of potential overlap are relatively low, the potential of snowmobile use impacting an individual grizzly bear's breeding, feeding, or sheltering to the extent that harm or harassment occurs cannot be eliminated. The incidental take is expected to be in the form of harm or harassment to individual female grizzly bears and/or cubs caused by premature den emergence or premature displacement from the den site area, resulting in reduced fitness of females and cubs, ultimately resulting in injury and possibly death.

This opinion documents that the best information available indicates that snowmobile impacts to emergent bears was a higher concern than impacts to denning bears (Graves and Ream 2001). The Service concludes that snowmobile-generated disturbance to grizzly bears in dens during the deep of winter is not likely to rise to the level causing significant impairment of breeding or sheltering to the point of injury or death. In spring, disturbance from snowmobiles to grizzly bears in dens may cause premature den emergence. Based on naturally earlier den emergence of male bears and females without young, their independence and mobility, the Service does not anticipate the effects of disturbance caused by snowmobiles would result in take of male grizzly bears or female grizzly bears without cubs.

114

FWS002029

However, late season snowmobile use may cause a female grizzly bear with cubs to prematurely leave a den in the spring or cause a recently emerged female with cubs to be prematurely displaced from her den or den site, potentially resulting in decreased fitness of the adult female bear and/or decreased fitness or abandonment of her cubs. If cubs attempt to follow their mother from a den site prior to their gaining some mobility, they may suffer from decreased fitness or death.

The incidental take of female grizzly bears or their cubs may be indicated by:

- a female grizzly bear's premature den emergence (earlier than documented for this ecosystem, based on gender, age and reproductive status) following exposure to snowmobiles;
- the location of one or more cubs abandoned by their mother near or in a den in an area of snowmobile use;
- the location of one or more cubs accompanying a female prior to the normal (earlier than documented for this ecosystem) den emergence period in an area of snowmobile use; or
- a female bear that emerges in poor fitness in early spring (when other bears are in good condition) in an area of snowmobile use.

However, the Service anticipates such incidental take of grizzly bears will be difficult to detect for the following reasons:

- grizzly bears are difficult to detect in the wild;
- grizzly bears are wide-ranging and their denning habitat is remote and difficult to access;
- grizzly bear den sites cannot be precisely located over large portions of the denning habitat;
- grizzly bear den sites are often not re-used, so even known den sites cannot be monitored over time for indications of early abandonment, injury or mortality;
- close monitoring of den sites may actually increase the risk of abandonment;
- the resorption of or loss of fetuses, or loss of cubs born in inaccessible underground den sites cannot be quantified; and
- decreased fitness, loss of young, and premature den emergence may all be related to a variety of other factors; establishing a causal relationship between snowmobiling and these effects would be difficult.

Discovery of an individual grizzly bear injury or mortality attributed to snowmobiling is very unlikely. The exact number of grizzly bears in the population is unknown, den site locations are generally unknown, and the exact levels, frequency, and location of snowmobile use is not known. The number of females with cubs, pregnant females, den emergence dates, and snowmobile use varies each year due to a number of factors, including snow conditions. All of these variables are difficult to monitor or census. The Service concludes that the level of take of grizzly bears that would result from snowmobile use would be low based on the best available CYE and NCDE grizzly bear population information, the amount of protected and unprotected denning habitat available on the Forest, the amount of areas that the Forest estimates late-season

FWS002030

over-the-snow use may occur, the characteristics of most grizzly bear den sites, expert opinion of grizzly bear researchers, and the best available information on grizzly bear denning.

We use the acres of modeled denning habitat that overlap with areas currently receiving late season late season over-snow motorized use as our **sixth surrogate measure of incidental take of grizzly bears** for the respective ecosystems. The surrogate measure of take is the amount of mapped potential denning habitat currently overlapped by known late season over-the-snow motorized use (Table 12). If the KNF detects late season over-snow motorized use on more than this amount of denning habitat in either recovery zone, then the amount of take we anticipated in this biological opinion would be exceeded.

**Table 12. Amount of late-season snowmobile areas that overlap with mapped denning habitat in the CYE and NCDE recovery zones.**

|  | Date Range of Incidental Take | Amount of overlapping acreage /Habitat surrogate for Incidental Take |
|---|---|---|
| NCDE Recovery Zone | March 31 to May 31 | 7,905 acres |
| Cabinet-Yaak Recovery Zone | April 15 to May 31 | 18,868 acres |

Similar to BMUs, incidental take may occur where late season snowmobiling overlaps grizzly bear post-den habitat in BORZ. Incidental take is expected to be in the form of harm to some female grizzly bears and/or cubs caused by premature den emergence or premature displacement from the den site area in response to disturbances related to late season snowmobiling, resulting in reduced fitness of females and reduced fitness and survivorship of the cubs. We expect the extent of take would be very low given the low density of females expected to den in BORZ. Denning habitat has not been modeled in the BORZ, so we use acreage of BORZ available to snowmobiling (587,360 acres) as our **seventh surrogate measure of incidental take**. Because at least the Tobacco BORZ overlaps with part of the NCDE, we conservatively use the date associated with the NCDE for den emergence. And because denning acres are unknown at this time, we conservatively anticipate some level of incidental take between March 31 and May 31 in the 587,360 acres of BORZ where motorized over-snow use is allowed. Late season snowmobiling outside of the exempted period, or exceeding the acreage of BORZ would exceed the amount of incidental take anticipated. We expect the Forest will provide refined estimates of where late season snowmobiling may overlap potential denning habitat in BORZ when it completes its winter over-snow travel plan (by the end of 2024).

**Effects of Take**

In the accompanying biological opinion, the Service determined that this level of anticipated take is not likely to result in jeopardy to the species. The amount of incidental take described above is low. Much of the action area occurs outside of the recovery zone. As detailed in this opinion, and according to the 1993 Recovery Plan (U.S. Fish and Wildlife Service 1993), lands outside of the recovery zones are not considered biologically essential to recovery of the species. Further, considering the grizzly bear recovery strategies (U.S. Fish and Wildlife Service et al. 2013; U.S. Fish and Wildlife Service 1993) and the size, status, and distribution of the NCDE grizzly bear

FWS002031

population and CYE population, incidental take of grizzly bears in the action area would not affect the recovery of the NCDE or CYE grizzly bear population. The LMP implements several measures that would sufficiently minimize impacts to grizzly bears.

**Reasonable and Prudent Measures**

Biological opinions provide reasonable and prudent measures that are expected to reduce the amount of incidental take. Reasonable and prudent measures are those measures necessary and appropriate to minimize incidental take resulting from proposed actions. Reasonable and prudent measures are nondiscretionary and must be implemented by the agency in order for the exemption in section 7(o)(2) to apply. The Service believes that the KNF's LMP reduces the potential for and minimizes the effect of incidental take of grizzly bears. By managing for grizzly bears within the NCDE and CYE recovery zones and maintaining no net increase in linear miles of motorized route in BORZ, the amount of incidental take of grizzly bears will be limited. It is critical to understand that the conclusion of this opinion is based on those features being implemented as part of the proposed action; if they are not implemented, our analysis may not remain valid and this opinion may be subject to reinitiation (50 CFR 402.16(a)(3)).

The following reasonable and prudent measures are appropriate to further minimize the impacts of incidental take:

1. Reduce the potential for displacement of grizzly bears related to wheeled motorized access.
2. Reduce the potential for disturbance to grizzly bears related to late-season over-snow motorized use in denning habitat.

**Terms and Conditions**

In order to be exempt from the prohibitions of section 9 of the Act, the Forest must comply with the following terms and conditions that implement the reasonable and prudent measures described above and outline reporting and monitoring requirements. These terms and conditions are non-discretionary:

To implement Reasonable and Prudent Measure #1:

1. When managing wheeled motorized access, the KNF shall use devices or methods on restricted roads and reclaimed/obliterated roads that are, at a minimum, consistent with the devices or methods recognized by the IGBC (1998, p.3).
2. The KNF shall continue to monitor the effectiveness of access restriction devices or methods as described in the *Proposed Action* section of this Opinion, (i.e., 30 percent monitoring in BMUs and a combination of *ad hoc* and opportunistic monitoring in BORZ). If any access restriction devices or methods are found to be ineffective, the KNF shall attempt to remedy the situation (i.e., respond with an appropriate fix) as soon as practical within the same bear year, or no later than the following bear year.
3. The KNF shall provide an annual monitoring report to the Service on or before May 1 of each year, describing permanent and temporary wheeled motorized access condition in

117

FWS002032

each BMU and BORZ for the preceding calendar year. The monitoring reports shall include all of the elements described in "Monitoring and Reporting," below, and include information and data gathered during the effectiveness monitoring efforts described in Term and Condition 2 above.

To implement Reasonable and Prudent Measure #2:

4. The Forest shall complete and implement a Winter Travel Plan by the end of 2024, which will include considerations for minimizing effects to post-den emergent grizzly bears.

**Reporting Requirements**

To demonstrate that the LMP is adequately reducing the potential for, and minimizing the effect of any incidental take that may result, the Forest shall complete a report with the information listed below and submit it to the Service's Montana Field Office by May 15 of each year for the preceding bear year for the life of the LMP. The report shall include:

1. In relation to the first surrogate measures of incidental take of grizzly bears and Term and Condition #1, an up-to-date record of the conditions of access conditions (OMRD, TMRD, and Core) in the CYE BMUs[11] on the KNF. The report shall describe the permanent condition, as well as any temporary variations related to projects that have undergone separate consultation and were being implemented in the reported Bear Year.

2. In relation to the second surrogate measure of incidental take, an ongoing list detailing the locations, dates, duration, and circumstances for invoking the allowance for using motorized access to enter core area for the purposes of road decommissioning or stabilizations in the CYE.

3. In relation to the third surrogate measure of incidental take, the Forest shall provide an up-to-date record of the acres of secure habitat in each BORZ. The report should show the permanent condition, as well as any temporary decreases in effectiveness of secure habitat related to projects that have undergone separate consultation and were being implemented in the reported Bear Year. The Forest shall also provide an ongoing list that describes the location and amount of secure habitat in BORZ that has been reduced as a result of permanent access changes for circumstances in which the USFS lacks discretion (e.g. ANILCA, RS2477).

4. In relation to the fifth surrogate measure of incidental take, the Forest shall provide an up-to-date record of any changes in the amount of modeled grizzly

---

[11] Our 2017 ITS includes biennial reporting requirements for the NCDE subunits; those requirements are not repeated here. See U.S. Fish and Wildlife Service 2017, p. 110 and Appendix 2 for details.

118

FWS002033

bear denning habitat that overlaps with authorized late season over-the-snow motorized use.

5. In relation to Reasonable and Prudent Measure #1, the Forest shall provide a list of any gates, barriers, or other devices or methods that were found to be ineffective at managing motorized access, and any unauthorized creation of additional routes that were discovered, and the Forest's response to remedy the situation.

## X. CONSERVATION RECOMMENDATIONS

Section 7(a)(1) of the Act directs Federal agencies to utilize their authorities to further the purposes of the Act by carrying out conservation programs for the benefit of endangered and threatened species. Conservation recommendations are discretionary agency activities to minimize or avoid adverse effects of a proposed action on listed species or critical habitat, to help implement recovery plans, or to develop information.

The Service provides the following conservation recommendations for the grizzly bear:

1) Work with U.S. Fish and Wildlife Service Recovery Office, and state and federal grizzly bear researchers, to identify areas between recovery zones that are meaningful for demographic connectivity between recovery zones. Develop strategies to manage for such connectivity, as appropriate, including management that would favor some use of these areas by female grizzly bears.

2) Continue to manage access on the Forest to achieve lower road densities and higher amounts of secure habitat. By managing motorized access, several grizzly bear management objectives could be met including: (1) minimizing human interaction and potential grizzly bear mortality; (2) minimizing displacement from important habitats; (3) minimizing habituation to humans; and (4) providing relatively secure habitat where energetic requirements can be met (Interagency Grizzly Bear Committee 1998). Additionally, lower road densities would also benefit other wildlife and public resources.

3) Grizzly bears concentrate in certain areas during specific time periods to take advantage of concentrated food sources or because the area provides a high seasonal food value due to diversity in vegetation and plant phenology (e.g., important spring for fall range). Where grizzly bear use is known or likely to occur and where practicable, minimize or restrict disturbing activities or activities that increase the likelihood of a human-bear interaction during the season in which bears are concentrated in the area (e.g. delay timber harvest activities during the spring in or near spring habitats to minimize displacement of grizzly bears).

4) Education for Forest visitors, including hikers, bikers, hunters, campers, and snowmobilers, continues to be an important part of reducing disturbance to bears and chances of negative human-bear interactions. Continue to work collaboratively with the

119

FWS002034

IGBC, MT Fish Wildlife and Parks bear management specialists, U.S. Fish and Wildlife Service grizzly bear specialists, and non-government organizations to promote training in the use of bear spray, bear identification, and other ways to reduce conflicts with and mortality of grizzly bears.

## XI. REINITIATION NOTICE

This concludes formal consultation on the supplement to the Kootenai National Forest Land Management Plan and its effects on grizzly bears and grizzly bear habitat. As provided in 50 CFR 402.16, reinitiation of formal consultation is required where discretionary federal agency involvement or control over the action has been maintained (or is authorized by law) if: (1) the amount or extent of incidental take is exceeded; (2) new information reveals effects of the agency action that may affect listed species in a manner or to an extent not considered in this opinion; (3) the proposed action is subsequently modified in a manner that causes an effect to the listed species that was not considered in this opinion; or (4) a new species is listed or critical habitat designated that may be affected by the action.

120

FWS002035

# LITERATURE CITED

## Published Literature

Allen, L.R. et al. 2011. Unpublished Report. A review of Wakkinen and Kasworm (1997) and comparison with the South Fork Flathead River study. Unpublished report. 15 pp.

Annis, K. M. and R. Trimbo. 2019. Grizzly and black bear management report; Cabinet-Yaak Ecosystem; 2019 Annual Report. Montana Fish, Wildlife & Parks, Region One, Libby, MT. 19pp.

Apps, C. D., B. N. McLellan, M. F. Proctor, G. B. Stenhouse, and C. Servheen. 2016. Predicting spatial variation in grizzly bear abundance to inform conservation. Journal of Wildlife Management 80(3):396-413.

Apps, C., B. McLellan, and C. Servheen. 2013. Multi-scale population and behavioural responses by grizzly bears to habitat and human influence across the southern Canadian Rocky Mountains. Version 2.0. Aspen Wildlife Research in collaboration with Ministry of Forests, Lands and Natural Resource Operations, and the US Fish and Wildlife Service.

Archibald, W. R., R. Ellis, and A. N. Hamilton. 1987. Responses of grizzly bears to logging truck traffic in the Kimsquit River Valley, British Columbia. Volume 7. 251-257.

Benn, B., and S. Herrero. 2002. Grizzly bear mortality and human access in Banff and Yoho National Parks, 1971-98. Ursus 13:213-221.

Blix, A.S. and J.W. Lentfer. 1992. Noise and vibration levels in artificial polar bear dens as related to selected petroleum exploration and development activities. Arctic 45(1):20-24.

Boulanger, J., and G. B. Stenhouse. 2014. The impact of roads on the demography of grizzly bears in Alberta. PloS One 9(12):1-22.

Costello, C.M., and L.L. Roberts. 2020. Northern Continental Divide Ecosystem Grizzly Bear Monitoring Team Annual Report, 2019. Montana Fish, Wildlife & Parks, 490 N. Meridian Road, Kalispell, MT 59901. Unpublished data.

Costello, C.M., and L.L. Roberts. 2019. Northern Continental Divide Ecosystem Grizzly Bear Monitoring Team Annual Report, 2018. Montana Fish, Wildlife & Parks, 490 N. Meridian Road, Kalispell, MT 59901. Unpublished data.

Costello, C.M., R.D. Mace, and L. Roberts. 2016. Grizzly bear demographics in the Northern Continental Divide Ecosystem, Montana: research results (2004-2014) and suggested techniques for management of mortality. Montana Department of Fish, Wildlife and Parks. Helena.

Craighead, F.C., Jr., and J.J. Craighead. 1972. Data on grizzly bear denning activities and behavior obtained by using wildlife telemetry. Pages 94-106 in S. Herrero, ed. Bears - their biology and management. IUCN Publ. New Series 23.

121

FWS002036

Garshelis, D.L., Gibeau, M.L. and Herrero, S., 2005. Grizzly bear demographics in and around Banff National Park and Kananaskis country, Alberta. The Journal of Wildlife Management, 69(1), pp.277-297.

Gaines, W. L., P. H. Singleton, and R. C. Ross. 2003. Assessing the cumulative effects of linear recreation routes on wildlife habitats on the Okanogan and Wenatchee National Forests. United States Department of Agriculture, Forest Service 1-79.

Gibeau, M. L., A. P. Clevenger, S. Herrero, and J. Wierzchowski. 2002. Grizzly bear response to human development and activities in the Bow River Watershed, Alberta, Canada. Biological Conservation 103(2):227-236.

Graves, T. and V. Reams, editors. 2001. Record of the snowmobile effects on wildlife: Monitoring Protocols Workshop. April 10-12, 2001, Denver, Colorado. pp.110.

Gunther, K. A., M. J. Biel, and H. L. Robison. 1998. Factors influencing the frequency of road-killed wildlife in Yellowstone National Park. International Conference on Wildlife Ecology and Transportation: 32-42.

Harding, L. and Nagy, J.A., 1980. Responses of grizzly bears to hydrocarbon exploration on Richards Island, Northwest Territories, Canada. Bears: Their Biology and Management, pp.277-280.

Haroldson, M.A., Ternent, M.A., Gunther, K.A. and Schwartz, C.C., 2002. Grizzly bear denning chronology and movements in the Greater Yellowstone Ecosystem. Ursus, pp. 29-37.

Hegg, S.J., K. Murphy and D. Bjornlie. 2010. Grizzly bears and snowmobile use: A summary of monitoring a grizzly den on Togwotee Pass. Yellowstone Science. 6pp.

Herrero, J., & Herrero, S. 2000. Management options for the Moraine Lake Highline Trail: grizzly bears and cyclists. Report to Parks Canada, Calgary, Alberta.

Hood, G. A., and K. L. Parker. 2001. Impact of human activities on grizzly bear habitat in Jasper National Park. Wildlife Society Bulletin (1973-2006) 29(2):624-638.

Interagency Grizzly Bear Committee (IGBC). 1998. Revised interagency grizzly bear taskforce report: grizzly bear/motorized access management. U.S.D.A. Forest Service, Missoula, Montana 6pp.

IGBC. 1994. Interagency Grizzly Bear Committee - Taskforce report: grizzly bear/motorized access management. U.S.D.A. Forest Service, Missoula, Montana 7pp.

IGBC. 1986. Interagency Grizzly Bear Guidelines. U.S. Forest Service. 128pp.

Interagency grizzly bear study team. 2020. Interagency grizzly bear study team 2019 annual report summary.

122

FWS002037

Jope, K. L. 1985. Implications of grizzly bear habituation to hikers. Wildlife Society Bulletin (1973-2006) 13(1):32-37.

Kendall, K. C., A. C. Macleod, K. L. Boyd, J. Boulanger, J. A. Royle, W. F. Kasworm, D. Paetkau, M. F. Proctor, K. Annis, and T. A. Graves. 2016. Density, distribution, and genetic structure of grizzly bears in the Cabinet-Yaak Ecosystem. Journal of Wildlife Management 80(2):314-331.

Kasworm, W. F. 2019. Cabinet-Yaak and Selkirk Mountains Human-Caused Grizzly Bear Mortality Summary. Unpublished report, Libby, Montana. 5pp.

Kasworm, W.F. 2013. Summer Cabinet-Yaak ecosystem report. U.S. Fish and Wildlife Service 1-6.

Kasworm, W. F., and T. L. Manley. 1990. Road and trail influences on grizzly bears and black bears in northwest Montana. Bears: Their Biology and Management 8:79-84.

Kasworm, W. F., T. G. Radandt, J.E. Teisberg, A. Welander, M. Proctor, and H. Cooley. 2019a. Cabinet-Yaak grizzly bear recovery area 2018 research and monitoring progress report. U.S. Fish and Wildlife Service, Missoula, Montana. 53pp.

Kasworm, W. F., T. G. Radandt, J.E. Teisberg, A. Welander, W. Wakkinen, M. Proctor, and H. Cooley. 2019b. Selkirk Mountains grizzly bear recovery area 2018 research and monitoring progress report. U.S. Fish and Wildlife Service, Missoula, Montana. 98pp.

Kasworm, W. F., T. G. Radandt, J. E. Teisberg, A. Welander, W. L. Wakkinen, M. Proctor, and H. Cooley. 2018. Selkirk Mountains grizzly bear recovery area 2017 research and monitoring progress report. 1-45.

Kasworm, W. F., G. Radandt Thomas, J. E. Teisberg, A. Welander, M. Proctor, and C. Servheen. 2015. Cabinet-Yaak grizzly bear recovery area 2014 research and monitoring progress report. U.S. Fish and Wildlife Service 1-96.

Kasworm, W.F., H. Carriles, T.G. Radandt, and C. Servheen. 2012. Cabinet-Yaak grizzly bear recovery area 2011 research and monitoring progress report. U.S. Fish and Wildlife Service, Missoula, Montana.

Kasworm, W. F., H. Carriles, T. G. Radandt and C. Servheen. 2010. Cabinet-Yaak grizzly bear recovery area 2009 research and monitoring progress report. U.S. Fish and Wildlife Service, Missoula, Montana.

Knight, R.L. and K.J. Gutzwiller, editors. 1995. Wildlife and recreationists: coexistence through management and research. Island Press. Washington, DC. 372 pp.

Lamb, C. T., G. Mowat, B. N. McLellan, S. E. Nielsen, and S. Boutin. 2017. Forbidden fruit: human settlement and abundant fruit create an ecological trap for an apex omnivore. Journal of Animal Ecology 86(1):55-65.

123

FWS002038

Lindzey, F.G. and E.C Meslow. 1977. Home range and habitat use by black bears in southwestern Washington. Journal of Wildlife Management pp.413-425.

Linnell, J. D. C., J. E. Swenson, R. Andersen, and B. Barnes. 2000. How vulnerable are denning bears to disturbance? Wildlife Society Bulletin 28(2):400-413.

Mace, R, and T. L. Manley. 1993. South Fork Flathead River grizzly bear project: progress rep. for 1992. Montana Dep. of Fish, Wildl. and Parks, Helena. 32pp.

Mace, R. and L. Roberts. 2012. Northern Continental Divide Ecosystem grizzly bear monitoring team annual report, 2011. Montana Fish, Wildlife & Parks, 490 N. Meridian Road, Kalispell, MT 59901. Unpublished data.

Mace, R.D. and Waller, J.S., 1997. Final report: grizzly bear ecology in the Swan Mountains. Montana Fish, Wildlife, and Parks Department, Helena, Montana. 191pp.

Mace, R. D., J. S. Waller, T. L. Manley, L. J. Lyon, and H. Zuuring. 1996. Relationships among grizzly bears, roads, and habitat in the Swan Mountains, Montana. Journal of Applied

MacHutchon, A.G. and M.F. Proctor. 2018. Management plan for the Yahk and South Selkirk grizzly bear (Ursus arctos) subpopulations, British Columbia. Trans-Border Grizzly Bear Project, Kaslo, British Columbia, Canada.

MacHutchon, A.G. and M.F. Proctor. 2015. The effect of roads and human action on grizzly bears and their habitat. 1-12.

Martin, P.A. 1983. Factors influencing globe huckleberry fruit production in northwest Montana. International Conference on Bear Research and Management 5:159-165.

Mattson, D.J. 2019a. Effects of trains and railways on grizzly bears v2. The Grizzly Bear Recovery Project. Livingston, Montana.

Mattson, D.J. 2019b. Effects of pedestrians on grizzly bears, an evaluation of the effects of hikers, hunters, photographers, campers, and watchers. Report GBRP-2019-3. 51pp.

Mattson, D. J. 1990. Human impacts on bear habitat use. *Bears: their biology and management*, 33-56.

Mattson, D. J., R. R. Knight, and B. M. Blanchard. 1987. The effects of developments and primary roads on grizzly bear habitat use in Yellowstone National Park, Wyoming. Bears: Their Biology and Management, 259-273.

McLellan, B. N. 2015. Some mechanisms underlying variation in vital rates of grizzly bears on a multiple use landscape. The Journal of Wildlife Management 79(5):749-765.

FWS002039

McLellan, B.N., 1989. Dynamics of a grizzly bear population during a period of industrial resource extraction. III. Natality and rate of increase. Canadian Journal of Zoology, 67(8), pp.1865-1868.

McLellan, B.N. and F.W. Hovey. 2001. Habitats selected by grizzly bears in a multiple use landscape. Journal of Wildlife Management 65:92-99.

McLellan, B. N., and D. M. Shackleton. 1989. Immediate reactions of grizzly bears to human activities. Wildlife Society Bulletin (1973-2006) 17(3):269-274.

McLellan, B. N., and D. M. Shackleton. 1988. Grizzly bears and resource-extraction industries: effects of roads on behavior, habitat use and demography. Journal of Applied Ecology 25(2):451-460.

McLellan, B. N., F. W. Hovey, R. D. Mace, J. G. Woods, D. W. Carney, M. L. Gibeau, W. L. Wakkinen, and W. F. Kasworm. 1999. Rates and causes of grizzly bear mortality in the interior mountains of British Columbia, Alberta, Montana, Washington, and Idaho. Journal of Wildlife Management 63(3):911-920.

Mealey, S.P. 1977. Method for developing grizzly bear habitat quality and estimating consequences of impacts on grizzly bear habitat quality. USDA Forest Service Northern Region. Contract No. 11-1200. 47pp.

Mowat, G., 2017. The relationships among road density, habitat quality, and grizzly bear population density in the Kettle-Granby area of British Columbia. British Columbia [Ministry of Forests and Range, Forest Science Program].

Mowat, G. and Lamb, C.T., 2016. Population status of the South Rockies and Flathead grizzly bear populations in British Columbia, 2006–2014. Nelson, BC.

Mueller, C., S. Herrero, and M. L. Gibeau. 2004. Distribution of subadult grizzly bears in relation to human development in the Bow River Watershed, Alberta. *Ursus*, *15*(1), 35-48.

NCDE Subcommittee. 2020. Conservation strategy for the grizzly bear in the Northern Continental Divide Ecosystem. 170 pages + appendices.

Nielsen, S. E., S. Herrero, M. S. Boyce, R. D. Mace, B. Benn, M. L. Gibeau, and S. Jevons. 2004. Modelling the spatial distribution of human-caused grizzly bear mortalities in the Central Rockies ecosystem of Canada. Biological Conservation 120(1):101-113.

Northrup, J. M., J. Pitt, T. B. Muhly, G. B. Stenhouse, M. Musiani, and M. S. Boyce. 2012. Vehicle traffic shapes grizzly bear behaviour on a multiple-use landscape. Journal of Applied Ecology 49(5):1159-1167.

Pollock, S.Z., Whittington, J., Nielsen, S.E. and C.C. St Clair. 2019. Spatiotemporal railway use by grizzly bears in Canada's Rocky Mountains. The Journal of Wildlife Management, 83(8), pp.1787-1799.

125

FWS002040

Proctor, M. F. and W. F. Kasworm. 2017. Fine scale grizzly bear habitat modeling for the South Selkirk and Cabinet-Yaak ecosystems. Trans-border Grizzly Bear Project and the U.S. Fish and Wildlife Service. Provided via email from Wayne Kasworm, Recovery Biologist (U.S. Fish and Wildlife Service, Libby, Montana) to Kat Sarensen, Fish and Wildlife Biologist (U.S. Fish and Wildlife Service, Spokane, Washington). August 17, 2018.

Proctor, M.F., McLellan, B.N., Stenhouse, G.B., Mowat, G., Lamb, C.T. and Boyce, M.S., 2020. Effects of roads and motorized human access on grizzly bear populations in British Columbia and Alberta, Canada. Ursus, 2019(30e2), pp.16-39.

Proctor, M. F., W. F. Kasworm, K. M. Annis, A. G. MacHutchon, J. E. Teisberg, T. G. Radandt, and C. Servheen. 2018a. Conservation of threatened Canada-USA trans-border grizzly bears linked to comprehensive conflict reduction. Human - Wildlife Interactions 12(3):348-372.

Proctor, M. F., B. N. McLellan, G. B. Stenhouse, G. Mowat, C. T. Lamb, and M. S. Boyce. 2018b. Resource roads and grizzly bears in British Columbia and Alberta, Canada.

Proctor, M. F., C. T. Lamb, and A. G. MacHutchon. 2018c. The grizzly dance between berries and bullets: relationships among bottom-up food resources and top-down mortality risk on grizzly bear populations in southeast British Columbia. Trans-border Grizzly Bear Project, Kaslo, British Columbia, Canada.

Proctor, M. F., D. Paetkau, B. N. Mclellan, G. B. Stenhouse, K. C. Kendall, R. D. Mace, W. F. Kasworm, C. Servheen, C. L. Lausen, M. L. Gibeau, W. L. Wakkinen, M. A. Haroldson, G. Mowat, C. D. Apps, L. M. Ciarniello, R. M. R. Barclay, M. S. Boyce, C. C. Schwartz, and C. Strobeck. 2012. Population fragmentation and inter-ecosystem movements of grizzly bears in western Canada and the northern United States. Wildlife Monographs 180(1):1-46.

Proctor, M. F., B. N. McLellan, C. Strobeck, and R. M. R. Barclay. 2005. Genetic analysis reveals demographic fragmentation of grizzly bears yielding vulnerably small populations. Proceedings of the Royal Society B: Biological Sciences 272(1579):2409-2416.

Proctor, M.F., Servheen, C., Miller, S.D., Kasworm, W.F. and Wakkinen, W.L., 2004. A comparative analysis of management options for grizzly bear conservation in the US–Canada trans-border area. Ursus, 15(2), pp.145-160.

Quinn, M., & Chernoff, G. 2010. Mountain biking: a review of ecological effects. A literature review for Parks Canada—National Office (Visitor Experience Branch): final report. Miistakis Institute, University of Calgary, Calgary, Alberta.

Reynolds, P. E., H. V. Reynolds III, and E. H. Follmann. 1986. Responses of grizzly bears to seismic surveys in northern Alaska. Bears: Their Biology and Management 6:169-175.

Roever, C. L., Boyce, M. S., & Stenhouse, G. B. 2010. Grizzly bear movements relative to roads: application of step selection functions. Ecography, 33(6), 1113-1122.

126

FWS002041

Roever, C. L., M. S. Boyce, and G. B. Stenhouse. 2008. Grizzly bears and forestry II: grizzly bear habitat selection and conflicts with road placement. Forest Ecology and Management 256:1262-1269.

Schwartz, C. C., M. A. Haroldson, and G. C. White. 2010a. Hazards affecting grizzly bear survival in the Greater Yellowstone Ecosystem. Journal of Wildlife Management 74(4):654-667.

Schwartz, C.C., Cain, S.L., Podruzny, S., Cherry, S. and Frattaroli, L., 2010b. Contrasting activity patterns of sympatric and allopatric black and grizzly bears. The Journal of wildlife management, 74(8), pp.1628-1638.

Servheen, C., J. Waller, and P. Sandstrom. 2001. Identification and management of linkage zones for grizzly bears between the large blocks of public lands in the northern Rocky Mountains. Pp 161-198 in Proceedings of the 2001 International Conference on Ecology and Transportation, September 2001.

Servheen, C., J. S. Waller, and P. Sandstrom. 2003. Identification and management of linage zones for wildlife between the large blocks of public lands in the northern Rocky Mountains. U.S. Fish and Wildlife Service, Missoula, Montana. 83 pp.

Servheen, C. M. Haroldson, K. Gunther, K. Barber, M. Brucino, M. Cherry, B. DeBolt, K. Frey, L. Hanauska-Brown, G. Losinski, C. Schwartz, and B. Sommerfield. 2004. Yellowstone mortality and conflicts. Report to Yellowstone Ecosystem Subcommittee (YES), April 7, 2004.

U.S. Fish and Wildlife Service 2020. Grizzly Bear Recovery Program 2019 annual report. Grizzly Bear Recvoery Program. U.S. Fish and Wildlife Service, Missoula, Montana. 20 pp.

U.S. Fish and Wildlife Service. 2019. Supplement to the Biological Opinions on the Effects of the Rock Creek Project on Bull Trout, Designated Bull Trout Critical Habitat, and Grizzly Bear. U.S. Fish and Wildlife Service, Kalispell, Montana. 37 pp.

U.S. Fish and Wildlife Service. 2017. Effects of Incorporating Habitat Management Direction for the NCDE Grizzly Bear Population into the Helena, Lewis and Clark, Kootenai, and Lolo National Forest Plans on Grizzly Bears. U.S. Fish and Wildlife Service, Kalispell, Montana. 188pp.

U.S. Fish and Wildlife Service. 2013. Biological Opinion on the Revised Land and Resource Management Plan for the Idaho Panhandle National Forests. U.S Fish and Wildlife Service, Northern Idaho Field Office, Spokane Valley, Washington.

U.S. Fish and Wildlife Service. 2011a. Biological Opinion on the Forest Plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones on the Kootenai, Idaho Panhandle, and Lolo National Forests. U.S. Fish and Wildlife Service Montana Field Office Kalispell, Montana and U.S. Fish and Wildlife Service, Northern Idaho Field Office, Spokane, Washington. 227 pp.

127

FWS002042

U.S. Fish and Wildlife Service 2011b. Grizzly Bear (*Ursus arctos horribilis*) 5-Year Review: Summary and Evaluation. U.S. Fish and Wildlife Service, Grizzly Bear Recovery Office. Missoula, Montana. 205 pp.

U.S. Fish and Wildlife Service. 2008. Biological opinion on the effects of the winter motorized recreation. Forest Plan amendment for the Flathead National Forest "A24." U.S. Fish and Wildlife Service Montana Field Office, Helena, Montana.

U.S. Fish and Wildlife Service. 2006. Biological opinion for the Proposed Actions Associated with Plan of Operation for the Revett RC Resources Incorporated Rock Creek Copper/Silver Mine as proposed by the U.S. Forest Service, Kootenai National Forest, U.S. Fish and Wildlife Service Montana Field Office Helena, Montana.

U.S. Fish and Wildlife Service. 2007. Grizzly Bear Recovery Plan Supplement: Habitat-based Recovery Criteria for the Yellowstone Ecosystem. U.S. Fish and Wildlife Service. Missoula, Montana. 52pp.

U.S. Fish and Wildlife Service. 2001. Biological opinion for Stimson ANILCA access easement project – Colville National Forest: FWS Reference 1-9-00-F-3 (118.0000). May 17, 2001. 91pp.

U.S. Fish and Wildlife Service. 1999. Endangered and threatened wildlife and plants: 12-month finding on petitions to change the status of grizzly bear populations in the Selkirk area in Idaho and Washington and the Cabinet-Yaak area of Montana and Idaho from threatened to endangered. 50 CFR Part 17. Federal Register 64(94):26725–26733. Available at: https://www.gpo.gov/fdsys/pkg/FR-1999-05-17/pdf/99-12318.pdf. Accessed August 8, 2016.

U.S. Fish and Wildlife Service. 1997. Grizzly Bear Recovery Plan Supplement: North Cascades Ecosystem Recovery Plan Chapter. U.S. Fish and Wildlife Service. Missoula, Montana 64 pp.

U.S. Fish and Wildlife Service. 1996. Grizzly Bear Recovery Plan Supplement: Bitterrot Ecosystem Recovery Plan Chapter. U.S. Fish and Wildlife Service. Missoula, Montana 28 pp.

U.S. Fish and Wildlife Service. 1993. Grizzly bear recovery plan. U.S. Fish and Wildlife Service, Missoula, Montana. 181 pp.

U.S. Fish and Wildlife Service. 1982. Grizzly bear recovery plan. U.S. Fish and Wildlife Service, Missoula, Montana. 108 pp.

U.S. Fish and Wildlife Service and U.S. Forest Service. 2009. Guide to effects analysis of helicopter use in grizzly Bear Habitat. Prepared by Montana/Northern Idaho Level 1 Terrestrial Biologists Team. 19pp.

U.S. Forest Service. 2020a. Biological Assessment for the Consultation on the Kootenai National Forest Land and Resource Management Plan for Grizzly Bears. 123 pp.

128

FWS002043

U.S. Forest Service. 2020b. Cabinet-Yaak/Selkirk Grizzly Bear Recovery Zones 2019 Annual Monitoring Summary Report. Colville, Kootenai, Lolo and Idaho Panhandle National Forests. 39 pp.

U.S. Forest Service 2020c. Biological assessment. Consultation on the Idaho Panhandle National Forest Land and Resource Management Plan for Grizzly Bears. Kootenai National Forest. Missoula, Montana. 115pp.

U.S. Forest Service. 2019. Cabinet-Yaak/Selkirk Grizzly Bear Recovery Zones 2017 Annual Monitoring Summary Report. Colville, Kootenai, Lolo and Idaho Panhandle National Forests. 14 pp.

U.S. Forest Service. 2018. Cabinet-Yaak/Selkirk Grizzly Bear Recovery Zones 2017 Annual Monitoring Summary Report. Colville, Kootenai, Lolo and Idaho Panhandle National Forests. 12 pp.

U.S. Forest Service 2018a. Record of Decision for the Forest Plan Amendments to Incorporate Habitat Management Direction for the Northern Continental Divide Ecosystem Grizzly Bear Population. Helena-Lewis and Clark National Forest, Kootenai National Forest, Lolo National Forest. 148 pp.

U.S. Forest Service. 2017. Cabinet-Yaak/Selkirk Grizzly Bear Recovery Zones 2016 Annual Monitoring Summary Report. Colville, Kootenai, Lolo and Idaho Panhandle National Forests. 14 pp.

U.S. Forest Service. 2016. Cabinet-Yaak/Selkirk Grizzly Bear Recovery Zones 2016 Annual Monitoring Summary Report. Colville, Kootenai, Lolo and Idaho Panhandle National Forests. 14 pp

U.S. Forest Service. 2015. Land Management Plan. 2015 Revision. Kootenai National Forest, Libby, MT. 189 pp.

U.S. Forest Service. 2015a. Final Record of Decision for the Final Environmental Impact Statement and Kootenai National Forest Land Management Plan. Kootenai National Forest, Libby, MT. 56 pp.

U.S. Forest Service. 2015b. Cabinet-Yaak/Selkirk Grizzly Bear Recovery Zones 2014 Annual Monitoring Summary Report. Kootenai, Lolo and Idaho Panhandle National Forests. 12 pp.

U.S. Forest Service. 2014. Cabinet-Yaak/Selkirk Grizzly Bear Recovery Zones 2013 Annual Monitoring Summary Report. Kootenai, Lolo and Idaho Panhandle National Forests. 13 pp.

U.S. Forest Service. 2013a. Biological Assessment for Threatened, Endangered, and Proposed Species on the Revision of the Land and Resource Management Plan for the Kootenai National Forest: Terrestrial Wildlife. Kootenai National Forest. Libby, Montana. 227pp.

129

FWS002044

U.S. Forest Service. 2013b. Cabinet-Yaak/Selkirk Grizzly Bear Recovery Zones 2012 Annual Monitoring Summary Report. Kootenai, Lolo and Idaho Panhandle National Forests. 13 pp.

U.S. Forest Service. 2012. Cabinet-Yaak Grizzly Bear Recovery Zone 2011 Annual Monitoring Summary Report. Kootenai and Idaho Panhandle National Forests. 12 pp.

U.S. Forest Service. 2011a. Forest Plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones. Record of Decision. Kootenai, Lolo, and Idaho Panhandle National Forests Lincoln, Sanders, Bonner, Boundary, and Pend Oreille Counties Montana, Idaho, and Washington. U.S. Forest Service. November 2011. 74 pp.

U.S. Forest Service. 2011b. Kootenai National Forest Food Storage Order. Kootenai National Forest, Libby, MT. 5 pp.

U.S. Forest Service. 2010. Biological assessment for threatened, endangered, and proposed species on Forest Plan amendments for motorized access management within the Selkirk and Cabinet-Yaak grizzly bear recovery zones. Dec. 16. Idaho Panhandle and Kootenai National Forests. Coeur d'Alene, Idaho and Libby, Montana. 227pp.

U.S. Forest Service. 2006. Gallatin National Forest travel management plan – Record of decision and Final Environmental Impact Statement. Gallatin National Forest, Bozeman, MT, USA.

U.S. Forest Service. 2005. Selkirk and Cabinet-Yaak grizzly bear recovery zones 2005 annual monitoring summary report. U.S. Forest Service Unpublished Report. 8pp.

van Manen, F.T., M.A. Haroldson, and B.E. Karabensh, editors. 2019. Yellowstone grizzly bear investigations: annual report of the Interagency Grizzly Bear Study Team, 2018. U.S. Geological Survey, Bozeman, Montana.

Wakkinen, W. L., and W. F. Kasworm. 2004. Demographics and population trends of grizzly bears in the Cabinet-Yaak and Selkirk ecosystems of British Columbia, Idaho, Montana, and Washington. Ursus 15(1):65-75.

Wakkinen, W. L., and W. F. Kasworm. 1999. Letter to SCYE Subcommittee chair, Dave Wright, regarding administrative use limits for the Selkirk and Cabinet-Yaak grizzly bear recovery zones. 2 p.

Wakkinen, W. L., and W. F. Kasworm. 1997. Grizzly bear and road density relationships in the Selkirk and Cabinet Yaak recovery zones. U.S. Fish and Wildlife Service 1-28.

Waller, J.S. 1992. Grizzly bear use of habitats modified by timber management. M.S. Thesis, Montana State University, Bozeman. 64pp.

Waller, J.S. and C. Serveen. 2005. Effects of transportation infrastructure on grizzly bears in northwestern Montana. The Journal of Wildlife Management, 69(3), pp.985-1000.

FWS002045

Wielgus, R. B., P. R. Vernier, and T. Schivatcheva. 2002. Grizzly bear use of open, closed, and restricted forestry roads. Canadian Journal of Forest Research 32(9):1597-1606.

Wielgus, R. B., F. L. Bunnell, W. L. Wakkinen, and P. E. Zager. 1994. Population dynamics of Selkirk Mountain grizzly bears. Journal of Wildlife Management 58(2):266-272.

Yonge, S.R. 2001. The ecology of grizzly bears and black bears in the Cooke City, Montana area. Doctoral dissertation, Montana State University-Bozeman, College of Letters & Science. 58 p.

Zager, P.E. 1980. The influence of logging and wildfire on grizzly bear habitat in Northwestern Montana. PHD Dissertation, University of Montana, Missoula. 131pp.

Zager, P. E., and C. J. Jonkel. 1983. Managing grizzly bear habitat in the Northern Rocky Mountains. Journal of Forestry 81:524-536.

Zager, P.E., C.J. Jonkel, and J. Habeck. 1983. Logging and wildfire influence on grizzly bear habitat in northwestern Montana. International Conference of Bear Research and Management. 5:124-132.

## 6.2 *In Litteris* References

Anderson, J. 2020a, *in litt*. Email from Jeremy Anderson, Forest Wildlife Biologist (U.S. Forest Service, Libby, Montana to Carly Lewis, Fish and Wildlife Biologist (U.S. Fish and Wildlife Service, Missoula, Montana). Subject: NCDE BMUs- updated existing conditions.

Anderson, J. 2020b, *in litt.* Email from Jeremy Anderson, Forest Wildlife Biologist (U.S. Forest Service, Libby, Montana to Carly Lewis, Fish and Wildlife Biologist (U.S. Fish and Wildlife Service, Missoula, Montana). Subject: clarifications.

Kasworm, W. 2019, *in litt.* Email from Wayne Kasworm, Recovery Biologist (U.S. Fish and Wildlife Service, Libby, Montana) with attachment white paper prepared by Wayne Kasworm for Selkirk Cabinet-Yaak Subcommittee. Cabinet-Yaak and Selkirk Mountains Human-Caused Grizzly Bear Mortality Summary. June 2019. Subject: Population estimates discussion from March meeting.

Servheen, C. 2013, *in litt*. Email from Chris Servheen regarding status of grizzly bears in the Bitterroot Ecosystem.

## 6.3 Personal Communications

Anderson, J. 2013. Personal communication. Email correspondence between Jeremy Anderson, KNF Planning Biologist and Kathleen Ports, U.S. Fish and Wildlife Service Contractor, regarding the opening sizes under the revised forest plans for the KNF and IPNF. March 12, 2013.

FWS002046

Kasworm, W.F. 2020a. Personal communication. Conversation with Wayne Kasworm, Recovery Biologist (U.S. Fish and Wildlife Service, Libby, Montana) discussing the potential value of BORZ to the recovery of grizzly bear in the Selkirk and Cabinet-Yaak ecosystems. July 7, 2020.

Kasworm, W.F. 2020b. Personal communication. Conversation with Wayne Kasworm, Recovery Biologist (U.S. Fish and Wildlife Service, Libby, Montana) discussing female grizzly bear occupancy and mortality of grizzly bears in BMUs in regards to access management standards and female bear home range expansions. January 28, 2020.

Kasworm, W.F. 2012. Personal communication. Telephone conversation between Wayne Kasworm, U.S. Fish and Wildlife Service grizzly bear biologist and Kathleen Ports, U.S. Fish and Wildlife Service contractor, regarding the general effects of snowmobiling on grizzly bears and interpretation of grizzly bear population trends in the CYE. January 28, 2012.


# APPENDIX A. CONSULTATION HISTORY DETAILS

A chronology of this consultation is presented below. A complete record of this consultation is on file at the Service's Montana Ecological Services Office in Helena, Montana.

| | |
|---|---|
| May 8, 2019 | The U.S. Fish and Wildlife Service received notice from USFS regarding plans to achieve BMU compliance with the 2011 Access Amendment. |
| May 10, 2019 | The Montana and Idaho Fish and Wildlife Service Offices (MFWO and IFWO, respectively, or "Services," collectively) participated in a conference call with the Idaho Panhandle, Kootenai, and Lolo National Forests (IPNF, KNF, and LNF, respectively) to discuss challenges to achieving full compliance on the 2011 Access Amendment by the 2019 deadline and determine how to proceed. |
| October 22, 2019 | The Forest Service Region 1 Office and the Services participated in a conference call to discuss the reinitiation. |
| October 23, 2019 | The Services and IPNF and KNF (collectively, "Forests") biologists discussed reinitiation on the LMPs. |
| November 4, 2019 | The MTFWO received a letter from the KNF requesting reinitiation on the LMP to address effects to grizzly bear related to motorized access within the Cabinet-Yaak Recovery Zones and adjacent Bear Outside Recovery Zones (BORZ). |
| December 3, 2019 | The Services and Forests held a conference call to discuss the structure of the biological assessment (BA), data needs for the biological opinion, and consultation timelines. |

132

FWS002047

| December 17, 2019 | The MTESO replied to the KNF request for reinitiation of consultation for their LMP. |
| December 20, 2019 | The FWS received a draft biological assessment (BA) from the KNF for the LMP reinitiation. |
| January 17, 2020 | The FWS provided the KNF comments on the draft BA for the LMP reinitiation. |
| January 24, 2020 | The Services and the Forests discussed Service comments on the draft BA. |
| February 14, 2020 | The Services and the Forests discussed the draft BAs. |
| March 20-26, 2020 | The FWS and USFS jointly discussed road miles in BORZ. |
| April 15, 2020 | The FWS received from the KNF the final BA on the LMP reinitiation. |
| April 16, 2020 | The Services and the Forests discussed incidental take issues. |
| April 17, 2020 | The Services provided Forest Service Region 1 with suggested modifications to address incidental take, using secure habitat as a surrogate to evaluate incidental take of grizzly bears in BORZ. |
| May 6, 2020 | The Services and the Forests discussed use of secure habitat for addressing incidental take and potential gate monitoring in BORZ. |
| May 7 and 28, 2020 | The Services and the Forests discussed the data request and process for calculating secure habitat in BORZ, proposed updates to the monitoring plan, and road closures in BORZ. |
| June 18, 2020 | The Services and the Forests discussed the common language for environmental baseline versus Baseline Conditions; the Future Baseline Update document prepared by the KNF; quantifying secure habitat in BORZ; and the proposed incidental take reporting format. |
| July 1, 2020 | Conference call between FWS and USFS to discuss projected future changes in secure habitat in BORZ |
| July 7, 2020 | The KNF provided MTESO with final secure habitat maps and baseline condition data for BORZ. |
| July 15-24 2020 | The Services and the Forests discussed future potential permanent and temporary changes to secure habitat in BORZ, and process for future updates and corrections to baseline. |

133

FWS002048

| August 3, 2020 | The Services and the Forests discussed regarding future incidental take exemptions for future actions. |
| August 14, 2020 | The MTESO provided the KNF with a draft Biological Opinion for review. |
| August 21, 2020 | The KNF provided MTESO with comments on the draft Biological Opinion. |

134

FWS002049

## APPENDIX B.  SEASONAL HABITAT FOR GRIZZLY BEARS

Proctor and Kasworm developed a fine-scale model of sex- and season - specific habitat use for grizzly bears in the SE and CYE (2017).  Although the model seasons differ slightly from the bear seasons identified in the Forest Plan, the model still provides a useful tool in predicting bear use of seasonal habitat.

Seasonal habitat availability is presented in the table below within the Selkirk and Cabinet-Yaak Recovery Zones, and across the entirety of the four BORZ on the KNF.

Total female grizzly bear seasonal habitat availability in the Selkirk and Cabinet-Yaak Recovery Zones (RZ) and the adjacent BORZ for both the KNF and IPNF and is calculated without buffering roads or other motorized access routes.  Habitat is based on modelling by Proctor and Kasworm (2017).  Only 'Very High' and 'High' acreages are considered key foraging habitat for the species.  The Mount Headley BMU has been omitted from the seasonal habitat total for the Cabinet-Yaak Recovery Zone due to lack of data.

**Table 13.  Total female grizzly bear seasonal habitat availability in the Selkirk and Cabinet-Yaak Recovery Zones (RZ) and the adjacent recurring grizzly bear use areas known as "Bears Outside Recovery Zones" (BORZ).**

| Season | Habitat Quality[1] | Total for Ecosystem/Recurring Use Areas | | | |
|---|---|---|---|---|---|
| | | Selkirk RZ[2] | Cabinet-Yaak RZ | IPNF BORZ | KNF BORZ |
| **Spring** | Very High | 49,403 | 60,553 | 5,704 | 17,368 |
| | High | 547,566 | 566,995 | 72,078 | 114,525 |
| | **Subtotal** | **596,969** | **627,548** | **77,782** | **131,893** |
| | **Percent** | **35** | **41** | **37** | **40** |
| | Medium | 883,219 | 816,296 | 110,917 | 178,151 |
| | Low | 206,818 | 90,838 | 19,953 | 21,513 |
| | **Total** | **1,687,006** | **1,534,683** | **208,652** | **331,557** |
| **Summer** | Very High | 78,066 | 55,727 | 66,545 | 32,003 |
| | High | 642,790 | 569,108 | 62,475 | 85,944 |
| | **Subtotal** | **720,856** | **624,835** | **129,020** | **117,947** |
| | **Percent** | **43** | **41** | **62** | **36** |
| | Medium | 583,402 | 518,555 | 49,548 | 107,409 |
| | Low | 382,613 | 391,312 | 30,081 | 104,799 |
| | **Total** | **168,6871** | **153,4702** | **208,649** | **330,155** |
| **Fall** | Very High | 144,461 | 92280 | 14,632 | 16,864 |
| | High | 750,096 | 585,846 | 91,422 | 97,105 |
| | **Subtotal** | **894,558** | **678,125** | **106,054** | **113,969** |
| | **Percent** | **53** | **44** | **51** | **34** |
| | Medium | 679,790 | 653,216 | 87,630 | 175,431 |
| | Low | 112,664 | 203,447 | 14,968 | 42,172 |
| | **Total** | **1,687,012** | **1,534,789** | **208,652** | **331,572** |

135

FWS002050

[1] 'Very High' and 'High' habitats are used more than expected compared to what is available across the landscape, whereas 'Medium' and 'Low' quality habitats are used less than expected. Bears are known to use habitats in the Medium and Low categories, but only for travel from High and Very High quality foraging habitats, and to explore and/or search for mates (Proctor and Kasworm 2017, p. 5).
[2] RZ = Recovery Zone
[3] Some habitat polygons in the Proctor and Kasworm habitat modeling GIS data that are attributed for one season may be attributed with "No Data" for another season. This is the reason for the discrepancy between seasonal acreages within the BMU. (Proctor and Kasworm (2017).

Seasonal habitat availability within each BORZ unit is provided in the table below. Total female grizzly bear seasonal habitat availability in individual BORZ regardless of proximity to roads. Seasonal habitat data is not available for the Tobacco BORZ. Habitat is based on modelling by Proctor and Kasworm (2017). Only 'Very High' and 'High' acreages are considered key foraging habitat for the species.

136

FWS002051

**Table 14.  Total female grizzly bear seasonal habitat availability in individual BORZ regardless of proximity to roads.  Habitat is based on modelling by Proctor and Kasworm (2017).  Only 'Very High' and 'High' acreages are considered key foraging habitat.**

| Season | Habitat Quality | Cabinet Face | Clark Fork | West Kootenai (total)[1] | Mission-Moyie (Total)[2] | Pack River (Total)[3] | Priest |
|---|---|---|---|---|---|---|---|
| | | Kootenai BORZ | | | IPNF BORZ | | |
| Spring | Very High | 619 | 1,005 | 15,744 | 3529 | 954 | 1,221 |
| | High | 4,403 | 25,937 | 84,184 | 27909 | 22641 | 21,528 |
| | Subtotal | 5,022 | 26,942 | 99,928 | 31438 | 23595 | 22,750 |
| | Percent | 18 | 26 | 49 | 35 | 56 | 30 |
| | Medium | 15,784 | 65,631 | 96,736 | 48657 | 17580 | 44,680 |
| | Low | 6,753 | 9128 | 5,631 | 10950 | 637 | 8,366 |
| | Total | 27,560 | 101,702 | 202,296 | 91045 | 41811 | 75,795 |
| Summer | Very High | 483 | 590 | 30,930 | 31073 | 2663 | 32,809 |
| | High | 2,100 | 16,604 | 67,239 | 12934 | 17175 | 32,366 |
| | Subtotal | 2,583 | 17,195 | 98,169 | 44007 | 19838 | 65,175 |
| | Percent | 9 | 17 | 49 | 48 | 47 | 86 |
| | Medium | 9,947 | 60,562 | 36,900 | 20987 | 18922 | 9,639 |
| | Low | 15,042 | 23,945 | 65,812 | 26048 | 3051 | 981 |
| | Total | 27,572 | 101,702 | 200,881 | 91042 | 41811 | 75,795 |
| Fall | Very High | 340 | 1,408 | 15,117 | 5748 | 4216 | 4,668 |
| | High | 3,163 | 20,730 | 73,212 | 27285 | 28758 | 35,379 |
| | Subtotal | 3,502 | 22,138 | 88,329 | 33033 | 32973 | 40,048 |
| | Percent | 13 | 22 | 44 | 36 | 79 | 53 |
| | Medium | 13,821 | 57,001 | 104,609 | 47,367 | 8,641 | 31,623 |
| | Low | 10,252 | 22,562 | 9,358 | 10,646 | 197 | 4,125 |
| | Total | 27,575 | 101,702 | 202,296 | 91,045 | 41,811 | 75,795 |

[1] Includes the BORZ as of 2020, including the 2010 West Kootenai BORZ plus the Bobtail Creek, Cedar Kootenai, and Lower Pipeline expansion areas.
[2] Includes the 2010 Mission-Moyie BORZ plus the Mission-Moyie II and Mission-Moyie III expansions.
[3] Includes the 2010 Pack River BORZ plus the Pack River II expansion.

The seasonal habitat model had little overlap with the Mount Headley BMU, so data for this BMU was omitted.  Although there were also data gaps for the Vermillion BMU, data was provided for almost 97 percent of the BMU, so the data was retained.  Data are not available for the entire Tobacco BORZ, so that area was omitted.

137

FWS002052

## APPENDIX C.  SECURE HABITAT ON THE KNF

The KNF manages lands within both the Cabinet Yaak and Northern Continental Divide Ecosystem Recovery Zones (CYE and NCDE), as well as the BORZ (Bears Outside Recovery Zones).  As explained in this biological opinion, secure habitat for grizzly bears can be found in all of these areas.  Table 15 provides an overview to compare secure habitat and Core habitat for each Recovery Zone relative to the KNF LMP.

138

FWS002053

**Table 15. Comparison of definitions and management standards for the variations in secure habitat used on the KNF.**

| Terminology | Secure Habitat | Core | Secure Core |
|---|---|---|---|
| Where applied on KNF | BORZ | CYE Recovery Zone BMUs | NCDE Recovery Zone subunits |
| Time limitations | None | Must remain in place for at least 10 years | None |
| Buffer | 500 m from motorized routes and non-NFS lands | 500 m from motorized routes and high use non-motorized trails | 500 m from motorized routes |
| Minimum size | None | None | 2,500 acres |
| Where mapped | Only on NFS lands | On all ownerships | On all ownerships |
| Management standards | None | Amounts per BMU set by LMP standards shown in Table 3; loss or impacts must be compensated for with in-kind replacement (until all BMUs comply with standards; see U.S. Forest Service 2020, p. 97 for details) | Maintain or improve secure habitat as shown in Table 5; Temporary changes allowed as required by Standard NCDE-STD-AR-03 including limits on a 10-year-running average; see U.S. Forest Service 2018a, Appendix 1, p. 1-31 |
| Complete definition can be found: | Appendix D of this document | U.S. Forest Service 2015, p. 148 | U.S. Forest Service 2018a, Appendix 1, p. 1-57 |

139

FWS002054

## APPENDIX D.  MAPS OF SECURE HABITAT WITHIN 2019 BORZ ON THE KNF.

Methods for calculating secure habitat within BORZ are provided here, as well as maps of secure habitat within each BORZ.

Secure habitat is calculated for all NFS lands within each BORZ polygon by removing motorized routes, including a buffer to account for the "zone of influence" associated with grizzly bear avoidance and/or displacement.  All existing motorized routes are buffered by 500 meters on each side from the centerline of the route, regardless of whether they are legally open to public travel, or if they are restricted to administrative motorized use.  Thus, the KNF applied a 500 meter buffer around all open and restricted roads and motorized trails (all routes with IGBC codes 2, 4, and 5; see BA, pp. 23-24 for definitions of routes and IGBC codes).

Because of the rapid growth of vegetation, the backlog of maintenance on existing routes, and the longer amounts of time that some restricted routes may go without any use, the estimates of secure habitat are in most cases underestimates of actual secure habitat that exists on the ground because an unknown number of routes that are physically impassable to motor vehicle use.  The border of the KNF between BORZ and non-BORZ areas of NFS lands are also buffered inward (into the BORZ) by 500 meters to account for uncertainties in the roaded condition outside of BORZ.  This includes areas on NFS lands because the KNF does not maintain detailed data regarding access management for roads outside the recovery zones or BORZ, so it is difficult to accurately determine whether routes outside of the recovery zone or BORZ are available for motorized access or not.  Likewise, the KNF is not limited by motorized access standards outside of the recovery zone or BORZ.  Similarly, the Forest does not have accurate data on access restrictions for routes on private or other non-NFS lands within or adjacent to BORZ.  Thus, the KNF buffered all non-NFS lands by 500 meters (into the BORZ), assuming that some level of motorized access could occur that would reduce secure habitat within the BORZ.  The KNF did not buffer the border of BORZ boundary where it is adjacent to BMUs in the recovery zone, since accurate information is available for motorized routes in the BMUs.

The Forest provided the following step-wise description for calculating secure habitat:

1. Buffered all non-FS lands within BORZ outward 500 meters

2. Buffered the entire edge of BORZ boundary inward 500 meters EXCEPT along BORZ/BMU interface

3. Buffered all non-FS lands within the BMU along the BMU/BORZ interface outward 500 meters into the BORZ

4. No buffer along any BORZ/BMU interface where FS lands are present

5. Use total routes.  High intensity non-motorized trails are not buffered for BORZ secure habitat calculations (although these are considered for core calculations within the RZ).

6. Erase any secure habitat located within the buffer

140

FWS002055

These methods lead to a conservative estimate of the amount of secure habitat that exists within each BORZ. Location and patch sizes are shown in the following maps. We expect that the KNF will make corrections to these baseline maps and amounts of secure habitat, as necessary in the future, as improved information becomes available, and will provide the update in the annual monitoring report. We also expect the KNF to buffer all future BORZ expansions similarly. The resulting amount of secure habitat are useful as a broad index of the secure habitat that may be available to grizzly bears that use BORZ.

FWS002056

Cabinet Face BORZ Secure Habitat

| BORZ | NFS Lands (Acres) | Secure Habitat (Acres) |
|---|---|---|
| Cabinet Face | 27,083 | **889** |

Cabinet Face BORZ Secure Habitat

| Block Size Range (Acres) | # of Blocks | Total (Acres) |
|---|---|---|
| 1 to 26 | 13 | 115 |
| 207 to 292 | 3 | 774 |
| TOTAL | | **889** |

**Legend**

CabinetFaceBORZ_FSLandsOnly
CabinetFaceFinalSecureHabitatBuffer06152020
CabinetFaceFinalSecureHabitat08262020

**POSTBY19_BORZ_Intersect_03172020**
**Post BY19**

IGBC 2 Gated/Admin Use Only
IGBC 4 Open Route
IGBC 5 Open Motorized Trail
10 RailRoad Tracks
MajorLake
FS
Other
BMU
PostBY19CoreBMU

08262020

142

FWS002057



Clark Fork BORZ Secure Habitat

| BORZ | NFS Lands (Acres) | Secure Habitat (Acres) |
|---|---|---|
| Clark Fork | 100,209 | 33,330 |

Clark Fork BORZ Secure Habitat

| Block Size Range (Acres) | # of Blocks | Total (Acres) |
|---|---|---|
| 1 to 43 | 8 | 226 |
| 135 to 490 | 9 | 3,080 |
| 1,264 to 1,569 | 2 | 2,833 |
| 2,212 | 1 | 2,212 |
| 3,059 to 3,398 | 3 | 9,527 |
| 4,416 | 1 | 4,416 |
| 5,015 | 1 | 5,015 |
| 6,021 | 1 | 6,021 |
| **TOTAL** | **26** | **33,330** |

07012020

143

FWS002058



## Tobacco BORZ Secure Habitat

### Legend

TobaccoBORZ_FSLandsOnly
TobaccoFinalSecureHabitatBuffer06152020
TobaccoFinalSecureHabitat06242020

**POSTBY19_BORZ_Intersect_03172020**
Post BY19
- IGBC 2 Gated/Admin Use Only
- IGBC 4 Open Route
- IGBC 5 Open Motorized Trail
- 10 RailRoad Tracks
- MajorLake
- FS
- Other

**NCDE Core**
**NCDE CORE IGBCDescrip**
- CORE >=2500 acres
- gt 500m from rd/tr
- w/in 500m of rd/tr
- NCDE Subunit

| BORZ | NFS Lands (Acres) | Secure Habitat (Acres) |
|---|---|---|
| Tobacco BORZ | 266,992 | 34,338 |

| Tobacco BORZ | | |
|---|---|---|
| Secure Habitat Blocks | | |
| **Block Size Range (Acres)** | **# of Blocks** | **Total (Acres)** |
| 1 to 97 | 72 | 1,636 |
| 106 to 513 | 28 | 7,107 |
| 697 to 917 | 4 | 3,284 |
| 1,098 to 1,967 | 6 | 8,778 |
| 2,014 to 2,597 | 4 | 9,063 |
| 4,469 | 1 | 4,469 |
| Total | 115 | 34,338 |

07012020

144

FWS002059

West Kootenai Combined BORZ Secure Habitat



| BORZ | NFS Lands (Acres) | Secure Habitat (Acres) |
|---|---|---|
| West Kootenai Combined | 200,558 | 41,419 |

**West Kootenai Combined BORZ Secure Habitat**

| Block Size Range (Acres) | # of Blocks | Acres |
|---|---|---|
| 1 to 95 | 40 | 1,302 |
| 112 to 488 | 20 | 5,035 |
| 616 to 729 | 3 | 2,039 |
| 1,050 to 1,423 | 4 | 4,967 |
| 2,290 to 2,700 | 3 | 7,494 |
| 4,249 to 10,003 | 3 | 20,581 |
| TOTAL | 73 | 41,419 |

08262020

145

FWS002060



**USDA**

Department of
Agriculture

Forest
Service

November 2011



# Record of Decision

## Forest Plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones

**Kootenai, Lolo, and Idaho Panhandle National Forests**
Lincoln, Sanders, Bonner, Boundary, and Pend Oreille Counties
Montana, Idaho, and Washington



FWS004498

**Features of the Selected Alternative**

With the selected alternative, habitat security standards have been set individually for each BMU. These habitat security standards were determined through consultation with the USFWS and grizzly bear research scientists and reflect the unique biological factors (e.g., high quality habitat, sightings of family groups, human caused mortality, adjacency to BMUs having females with young, and tie to linkage areas), as well as other non-biological factors (highways, access to inholdings, access to popular recreation areas) in specific BMUs. Standards were set depending on the site-specific capability of each BMU. Constraints accounted and deducted for, as they were considered to affect an individual BMUs ability to achieve specific levels of core habitat and total and open motorized route densities included: 1) non-federal land, including corporate timber land, and private land contained within towns and municipalities; 2) public, county, and private roads; 3) some forest roads that function as "through" roads, and therefore, could not be closed without significantly increasing public travel distances between destination points, and popular recreational destinations; and 4) historically and culturally popular recreation destinations (e.g. campgrounds, concentrated fishing locations) with high human use. Figures 2 and 3 display the BMUs while Table 1 and Table 2 display features of the selected alternative.

For those BMUs that currently do not meet standards, implementing changes in habitat conditions to achieve the designated standard will be required for compliance with the USFWS biological opinion. Therefore, in BMUs not meeting OMRD, TMRD, or the core area standard, proposed actions affecting any of these parameters, must result in a post-project movement (improvement) toward the affected parameter's standard (FSEIS, p. 17).

Research recommended levels[2] for OMRD, TMRD, and core area are:

1) OMRD greater than 1 mile/square mile must comprise 33 percent or less of the BMU;
2) TMRD greater than 2 miles /square mile must comprise 26 percent or less of the BMU and
3) Core area at least 55 percent of the BMU.

As noted above, each specific BMU has its own set of standards based on biological and non-biological factors. Of the 30 BMUs, fourteen of the BMUs had at least one of the habitat parameters set at a higher level than recommended, six were set at the recommended level and 10 were less than recommended for at least one habitat parameter. Of the ten less than recommended, habitat levels were set to the degree possible while still providing access to private lands and not affecting county roads, through roads or access to popular recreational destinations (see Table 2).

---

[2] The recommendations were based on an average of conditions used by grizzly bears in the Cabinet-Yaak and Selkirk recovery zones. Five of six bears utilized habitat with core area values of less than or equal to 55. Three of six bears used habitat with TMRD values greater than or equal to 26 percent. Four of six bears used habitat with OMRD values of greater than or equal to 33 percent.

*Forest Plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones*    9

FWS004512

5-ER-1030

Record of Decision

**Table 1. Specific features of the selected alternative**

| Feature | Discussion |
|---|---|
| **Linear Open Rd Density (KNF, LNF and IPNF)** | **No standard** <u>within</u> BMUs (This means existing standards for grizzly bear will be removed for BMUs from the forest plans for the Kootenai and Lolo N.F. There is no existing standard for within BMUs to be removed from the forest plan for the Idaho Panhandle NF.) |
| **Habitat Effectiveness (Security)** | **No standard** (This means existing standards will be removed for grizzly bear from the forest plans for BMUs on the Kootenai and Idaho Panhandle NF. There is no existing standard to be removed from the forest plan for the Lolo NF.) |
| **Point Source Disturbance (a)** | The analysis of point source disturbances will be required in site-specific project documents. |
| **Open Motorized Route Density (OMRD) (b) (For all forests, unless specified)** | OMRD in BMUs within all three Forests will be set at numeric standards established for each BMU as detailed in Table 2. In BMUs not meeting OMRD, actions affecting OMRD must result in a post-project movement toward the standard. |
| **Total Motorized Route Density (TMRD) (c)** | TMRD in BMUs within all three Forests will be set at numeric standards established for each BMU as detailed in Table 2. In BMUs not meeting TMRD, actions affecting TMRD must result in a post-project movement toward the standard. |
| **Core Area (d)** | Core area in BMUs within all three Forests will be set at numeric standards established for each BMU as detailed in Table 2. In BMUs not meeting core area standard, actions affecting core area must result in increased post-project core area. Other core area requirements will include consideration for seasonal needs, and core area fixed in place for 10 years minimum. |
| **Administrative Use** | 60 and 57 round trips allowed per restricted road per year, divided by season within the Cabinet-Yaak and Selkirk Recovery Zones, respectively. |
| | Trips within the Cabinet-Yaak Recovery Zone are to be apportioned as follows: ≤18 round trips in spring (April 1 through June15); ≤23 round trips in summer (June 16 through September 15); and ≤19 round trips in fall (September 16 through November 30). |
| | Trips within the Selkirk Recovery Zone are apportioned as follows: ≤19 round trips in spring (April 1 through June15); ≤23 round trips in summer (June 16 through September 15); and ≤15 round trips in fall (September 16 through November 15). |
| **Public Use Period-30 day** | Public Use Periods (30 days) will not be allowed on restricted roads in any of the three national forests. |
| **Mapped areas of grizzly bear recurring use outside of the recovery zones (see Figures 2 and 3) (BORZ)** | No increases in permanent linear miles of open road on NFS lands above the baseline conditions identified for the Priest, Pack River, Clark Fork, Cabinet Face, West Kootenai, Tobacco, and Mission-Moyie areas (see Figures 2 and 3). |
| | No net permanent increases in linear miles of total roads above the baseline conditions identified for the Priest, Pack River, Clark Fork, Cabinet Face, West Kootenai, Tobacco, and Mission-Moyie areas (see Figures 2 and 3). |

(a) Point Source Disturbance - Pertains to a disturbance originating from a single point rather than a linear feature such as a road. Examples include a drill rig, a campground, a garbage collection site, etc…

(b) Open Motorized Route Density (OMRD) - Calculation made with the moving windows technique that includes open roads, other roads not meeting all restricted or obliterated criteria, and open motorized trails. The percent of the analysis area in relevant route density classes is calculated.

   Note: Moving windows is a technique for measuring road densities on a landscape using a computerized Geographic Information System (GIS).

(c) Total Motorized Route Density (TMRD) - Calculation made with the moving windows technique that includes open roads, restricted roads, roads not meeting all reclaimed criteria, and open motorized trails. The percent of the analysis area in relevant route density classes is calculated.

(d) Core Area - An area of secure habitat within a BMU that contains no motorized travel routes or high use non-motorized trails during the non-denning season [non-denning season includes the dates 4/1-11/15 (SRZ) or 4/1-11/30 (CYRZ), inclusive] and is more than 0.3 miles (500 meters) from a drivable road. Core areas do not include any gated roads but may contain roads that are impassible due to vegetation or constructed barriers. Core areas strive to contain the full range of seasonal habitats that are available in the BMU.

*Forest Plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones*

FWS004513

**Table 2. Alternative E Updated – BMU status and selected standards**

| BMU | BMU Priorities | OMRD $\geq 1$ mi/mi$^2$ (percent) | | TMRD $\geq 2$ mi/mi$^2$ (percent) | | Core Area (percent) | | Percent NFS Land |
|---|---|---|---|---|---|---|---|---|
| | | 2009 Status | Selected Standard (max) | 2009 Status | Selected Standard (max) | 2009 Status | Selected Standard (min.) | |
| 1-Cedar | 2 | 14 | 15 | 10 | 15 | 83 | 80 | 99 |
| 2-Snowshoe | 2 | 20 | 20 | 16 | 18 | 76 | 75 | 94 |
| 3-Spar | 3 | 27 | 33 | 26 | 26 | 62 | 59 | 95 |
| 4-Bull | 2 | 37 | 36 | 29 | 26 | 62 | 63 | 84 |
| 5-St. Paul | 1 | 28 | 30 | 23 | 23 | 58 | 60 | 97 |
| 6-Wanless | 1 | 29 | 34 | 34 | 32 | 53 | 55 | 85 |
| 7-Silver Butte-Fisher | 2 | 32 | 26 | 23 | 23 | 62 | 63 | 92 |
| 8-Vermillion | 3 | 33 | 32 | 24 | 21 | 55 | 55 | 93 |
| 9-Callahan | 2 | 27 | 33 | 26 | 26 | 59 | 55 | 90 |
| 10-Pulpit | 2 | 44 | 44 | 29 | 34 | 51 | 52 | 95 |
| 11-Roderick | 1 | 28 | 28 | 28 | 26 | 54 | 55 | 96 |
| 12-Newton | 1 | 42 | 45 | 29 | 31 | 58 | 55 | 92 |
| 13-Keno | 1 | 34 | 33 | 25 | 26 | 59 | 59 | 99 |
| 14-NW Peaks | 1 | 28 | 31 | 26 | 26 | 56 | 55 | 99 |
| 15-Garver | 1 | 29 | 33 | 25 | 26 | 55 | 55 | 94 |
| 16-East Fork Yaak | 1 | 29 | 33 | 27 | 26 | 54 | 55 | 96 |
| 17-Big Creek | 2 | 30 | 33 | 16 | 26 | 58 | 55 | 99 |
| 22-Mt.Headley | 3 | 38 | 33 | 37 | 35 | 51 | 55 | 89 |
| 18-Boulder | 3 | 31 | 33 | 35 | 29 | 50 | 55 | 92 |
| 19-Grouse[a,b] | 3 | 60 | 59 | 59 | 55 | 32 | 37 | 54 |
| 20-North Lightning | 1 | 36 | 35 | 20 | 20 | 62 | 61 | 94 |
| 21-Scotchman | 2 | 35 | 34 | 27 | 26 | 63 | 62 | 81 |
| Blue-Grass | 1 | 33 | 33 | 28 | 26 | 50 | 55 | 96 |
| Long-Smith | 1 | 21 | 25 | 14 | 15 | 73 | 67 | 92 |
| Kalispell-Granite | 1 | 31 | 33 | 28 | 26 | 49 | 55 | 96 |
| Lakeshore | 3 | 82 | 82 | 54 | 56 | 19 | 20 | 86 |
| Salmo-Priest | 2 | 30 | 33 | 24 | 26 | 66 | 64 | 99 |
| Sullivan-Hughes | 1 | 24 | 24 | 19 | 19 | 61 | 61 | 99 |
| Myrtle | 2 | 29 | 33 | 20 | 24 | 60 | 56 | 85 |
| Ball-Trout | 2 | 17 | 20 | 11 | 13 | 72 | 69 | 94 |

a - Less than or equal to 75 percent NFS lands;

b - Due to the high level of non-Federal lands within the Grouse BMU, existing conditions and standards are calculated assuming no contribution of secure habitat from private lands.

Management direction for the recovery zones prior to this decision (see Alternative B discussion, FEIS, pp. 2-9 to 2-11) provided for 30-day public use periods on one gated road system per year per BMU, if the BMU met prescribed security criteria (FEIS, p. 2-10). With this decision, the ability to provide new public use periods on restricted road systems within the recovery zones will no longer be available on the Kootenai, Lolo, or Idaho Panhandle National Forests.

FWS004514

ENDANGERED SPECIES ACT SECTION 7 CONSULTATION

BIOLOGICAL OPINION

on the

Forest Plan Amendments for
Motorized Access Management within the
Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones on the
Kootenai, Idaho Panhandle, and Lolo National Forests

Prepared by:

U.S. Fish and Wildlife Service
Montana Field Office
Kalispell, Montana

and

U.S. Fish and Wildlife Service
Northern Idaho Field Office
Spokane, Washington

October 18, 2011

FWS004572

DESCRIPTION OF THE PROPOSED ACTION

**Background**

Based on direction from the Interagency Grizzly Bear Committee (IGBC) and consideration of information from research conducted by Wakkinen and Kasworm (1997), the Selkirk/Cabinet-Yaak Subcommittee of the IGBC approved an Interim Access Management Rule Set (Rule Set) in 1998 to manage motorized access within the Selkirk Mountains Ecosystem (SE) and the Cabinet-Yaak Ecosystem (CYE) recovery zones (IGBC Subcommittee 1998). The Rule Set was to be in place over a three-year period (1998-2000), or until the affected LRMPs were revised, or the Subcommittee determined a need to modify the direction.

The Rule Set outlined the following goals for each element of the direction: (1) no net loss of core area habitat, and the Forests would work to achieve a level of 55 percent core area habitat in Priority 1 Bear Management Units (BMUs); (2) no net loss of core area habitat in the remainder of the BMUs (41 percent of all BMUs) in the SE and CYE; and (3) no net increase in open and total road densities on National Forest System lands within these recovery zones.

The Rule Set addressed the issue of administrative use on restricted roads within BMUs by setting a standard of up to an average of one vehicle per day during the non-denning bear season (April 1 through November 15) for a total of up to 115 round trips on restricted roads within a BMU during the non-denning period. The Rule Set also allowed for a 30-day public use period on one restricted road per BMU per year. This 30-day public use period can only occur after coordination with the Service in Priority 1 BMUs containing 55 percent core area habitat and in Priority 2 and 3 BMUs that meet 70 percent habitat security requirements.

In the spring of 1999, the Alliance for the Wild Rockies filed a lawsuit challenging the KNF and IPNF's implementation of the Rule Set without amending their LRMPs. The KNF and IPNF settled the lawsuit in March 2001 and agreed to amend their respective LRMPs to address grizzly bear management. The LNF was not included in the lawsuit; however, they requested to be included in the amendment process so as to update their LRMP to provide consistent direction within the CYE.

In March of 2001, the Forests established an Interdisciplinary Team (ID Team) to begin the process of amending the above referenced LRMPs. The Service was invited to participate on the ID Team and, thus, began informal ESA section 7 consultation with the Forests through participation on this ID Team.

In April of 2001, the Service issued an amended biological opinion and incidental take statement (ITS) on the IPNF LRMP (U.S. Fish and Wildlife Service 2001). In general, the incidental take statement and terms and conditions relative to the grizzly bear adopted the Rule Set access parameters: open (open to public) motorized route density (OMRD) of one mile per square mile or more, in less than or equal to 33 percent of each BMU; total (all roads) motorized route density (TRMD) of two miles per square mile or more in less than or equal to 26 percent of each BMU; core area (areas without motorized routes) greater than or equal to 55 percent of each

*Access Amendment Biological Opinion, October 2011*                                                    8
*Preface: Description of Proposed Action*

FWS004581

U 22 23 P8

**REVISED 1998**

# INTERAGENCY GRIZZLY BEAR COMMITTEE TASKFORCE REPORT



## _Grizzly Bear/Motorized Access Management_

Final Approved by IGBC
July 21, 1994

**Revision Approved by IGBC**
**July 29, 1998**

FWS005019

## BACKGROUND

History has demonstrated that grizzly bear populations and many of our large carnivores survived where frequencies of contact with humans were very low (Storer and Tevis 1955, Brown 1985, Servheen 1989). Populations of grizzly bears and other large carnivores persisted in those areas where large expanses of relatively secure habitat were retained and where human induced mortality was low. In the lower 48 conterminous states, this is primarily associated with National Parks, Wilderness areas and large blocks of public lands.

The importance of managing motorized access, one of the most influential parameters affecting habitat security, has been emphasized for many species of wildlife in the Northern Rockies; most notably for grizzly bears (Mattson, et. al. 1987; Mace and Manley, 1993; USFWS 1993, Mace, et. al. 1996) and for elk (Hillis et. al. 1991, Christensen et. al. 1993). By managing motorized access on the landscape, the following grizzly bear management objectives can be met:

- Minimize human interaction and potential grizzly bear mortality
- Minimize displacement from important habitats
- Minimize habituation to humans
- Provide relatively secure habitat where energetic requirements can be met.

Historically, management of motorized use has been primarily accomplished through restriction of certain types of motorized use on established access routes. Restrictions on vehicle use through timing and type of vehicle have been commonplace. Evaluation of the effects of motorized access have been based primarily on the density of open roads.

Research has indicated that evaluation of open road density alone is not a complete measure of the effects of motorized access on use of habitat by grizzly bears (Mace and Manley 1993; Mace et. al. 1996). In addition to open road density, total motorized access route density along with the presence of core areas, are important elements in the management of human access within grizzly bear recovery zones. Core areas are free of motorized traffic and high levels of human use.

The management of human use levels through access route management is one of the most powerful tools available to balance the needs of grizzly bears, and many species of wildlife, with the needs and activities of humans. It has been documented in several research projects that human access and development within grizzly bear habitat can contribute to increased bear mortality and affect bear use of existing habitat. It is also documented that human use of grizzly bear habitat within many of our recovery zones continues to increase.

## IGBC ACCESS TASKFORCE

At the request of the Interagency Grizzly Bear Committee (IGBC), this taskforce was created to evaluate current state and federal procedures for evaluating the effects of motorized access on grizzly bears within grizzly bear recovery zones. To accomplish this task, numerous documents were reviewed for consistency in methodology including USDA-Forest Service biological evaluations, USDI-Fish and Wildlife Service (USFWS) biological opinions, and Land and Resource Management Plans and Research reports. Upon completion of this review, it was readily apparent that consistent methods of analyzing and displaying the effects of human access on the quality, quantity, and distribution of habitat were lacking. The taskforce was requested to 1) establish standardized definitions for roads, i.e., open road, reclaimed road, etc., 2) standardize methods to measure road densities and define the analysis areas within which density should be measured, and 3) assure that developed definitions and procedures interface with the existing cumulative effects models. These actions were necessary to provide consistency in the evaluation of access effects on public lands. The taskforce completed the Interagency Grizzly Bear Committee Taskforce Report on Grizzly Bear/Motorized Access Management (Taskforce Report) (IGBC 1994).

In 1998, the taskforce reconvened to assess the clarity and applicability of the recommendations and definitions in the 1994 Taskforce Report. The taskforce assessed the 1994 report in light of two basic considerations: (1) experiences gained from nearly 4 years of implementation in the Northern Continental Divide Ecosystem, as well as the development of analysis and criteria for the Cabinet-Yaak and Selkirks Ecosystems, and (2) the most recent grizzly bear research information in each ecosystem. Intensive grizzly bear research has been ongoing in four grizzly bear ecosystems, the Cabinet-Yaak, Northern Continental Divide, Selkirk, and the Yellowstone. These research efforts vary in objectives, scientific methods used, intensity, and funding. As such, the data sets compiled in each ecosystem often lend themselves to dissimilar analyses with which to develop access management strategies.

This 1998 document represents the revised IGBC Taskforce Report. The overriding intent of the recommendations in this document remains the same as that in the original 1994 Taskforce Report: to provide a consistent approach to motorized access management between and within grizzly bear ecosystems. As in the 1994 Taskforce Report, these recommendations continue to utilize the three basic parameters of (1) open motorized route density, (2) total motorized route density, and (3) core area as the foundation for access management for grizzly bears. This 1998 revised report however recognizes the differences in research, data collection, and analyses between ecosystems as well as implementation issues that have arisen in the past.

FWS005020

Furthermore, the taskforce recommends that a supplement (appendix) to the 1998, revised Task Force Report be prepared by each subcommittee. The supplements will document and provide rationale as to how the taskforce report recommendations are being applied according to ecosystem-specific information. The supplements may be updated periodically to reflect new information in each ecosystem.

While the following definitions and procedures have been developed primarily for use in displaying effects of human access routes on grizzly bear habitat, the concepts are applicable for evaluating the effects on many other species of wildlife. Their use on private lands is encouraged.



FWS005021

# DEFINITIONS

During early review of definitions proposed by the taskforce, concerns were raised that many of the terms have already been defined locally and/or nationally, and to change the definitions of these terms would create confusion, misuse of terms, etc. After polling all the major land managers, it was apparent that consistency between land management and regulatory agencies was largely absent and that confusion, misuse of terms, etc., already existed.

It was the IGBC's intent to establish definitions and procedures that would allow for consistency among the various land management units in describing effects of human access routes on grizzly bear habitat use. This required defining access terms commonly used in biological analyses. The following definitions are recommended and are felt to cover all the various access route scenarios found within the recovery zones.

**ROAD**--all created or evolved routes that are >500 feet long (minimum inventory standard for the Forest Service Route Management System), which are reasonably and prudently drivable with a conventional passenger car or pickup.

OPEN ROAD--a road without restriction on motorized vehicle use.



RESTRICTED ROAD--a road on which motorized vehicle use is restricted seasonally or yearlong. The road requires *effective* physical obstruction (generally gated).*



**RECLAIMED/OBLITERATED ROAD**--a route which is managed with the long term intent for no motorized use, and has been treated in such a manner so as to no longer function as a road. An effective means to accomplish this is through one or a combination of several means including: recontouring to original slope, placement of logging, or forest debris, planting of shrubs or trees, etc.



The use of the term "Closed" has been improperly applied for years to what are actually "Restricted" roads. A "Closed" route or area is closed to all types of traffic including foot traffic and its use in describing roads is to be discouraged.

**TRAIL**--all created or evolved access routes that do not qualify as a "road." They are not reasonably and prudently drivable with a conventional passenger car or pickup.

OPEN MOTORIZED TRAIL--a trail that receives motorized use. Trails used by 4-wheelers, 4-wheel drive vehicles and motorized trail bikes are examples of this type of access route.

RESTRICTED MOTORIZED TRAIL-- a trail on which motorized use is restricted seasonally or yearlong. Motorized use is effectively/physically restricted.*

------------------------------------

*Motorized administrative use by personnel of resource management agencies is acceptable at low intensity levels as defined in existing cumulative effects analysis models. This includes contractors and permittees in addition to agency employees.*

5-ER-1038

FWS005022

# METHODOLOGY/PROCEDURES

This section is intended to provide a structured and consistent approach to the analysis and documentation of effects of motorized access on grizzly bear habitat. The goal is to improve efficiency and consistency of effects analyses and provide quality information needed for land stewardship. Its use should be applicable to many other species and its application should be encouraged in those instances.

The recommended procedure for evaluating motorized access effects on grizzly bear habitat is as follows:

1) **Delineate the Analysis Area(s):**
   Analysis areas that approximate the size of annual home ranges of an adult female grizzly bear should be delineated and used for effects analysis. The entire recovery area should be delineated in this manner. These areas will generally be the existing Bear Management Units or Subunits. They are not intended to be the actual home ranges of known adult female grizzly bears. Since analysis areas are intended to approximate home range sized areas, delineation should account for elevational and seasonal distribution of habitats when this information is available.

2) **Development of Access Route Density Maps:**
   Utilizing definitions found in this report develop statistics that describe Open Motorized Access Density and Total Motorized Access Density.

   A) All motorized access routes will be identified and considered for inclusion in density calculations. Routes not used in calculations will be identified and the rationale for exclusion documented.

   B) Open Motorized Route Density calculations will include open roads, other roads not meeting all restricted or obliterated criteria, and open motorized trails. Open motorized route density may be calculated for a season or yearlong.

   C) Total Motorized Route Density calculations will include open roads, restricted roads, roads not meeting all reclaimed criteria, and all motorized trails.

   D) Density calculations will use GIS moving window routines (Turner and Gardner 1990). Since the moving window routine considers routes within the "window", routes to ½ of the window size (radius for circles or ½ the diagonal length for squares) outside of the analysis area must be included.

   E) The same GIS software and processing methods, or a suitable conversion, that was used for development, must be used for comparison of existing or future conditions, as significant differences can occur between software packages and processing methods.

   F) Statistics will display the percent of the analysis area in relevant route density classes. Class relevance will be based upon the management levels chosen by each ecosystem.

3) **Identify Existing/Potential Core Areas:**
   Researchers and managers throughout the recovery areas agree that core areas, areas free of motorized access during the core security period, are an important component of adult females that have successfully reared and weaned offspring. Within the analysis area, identify existing/potential areas that meet the following criteria for each season of use:

Core Area(s) Criteria:
   A. No motorized use of roads and trails during the core period. Within the core area, restricted roads require effective physical closure devices.

   B. No roads or trails that receive non-motorized, high intensity use as defined in established cumulative effects activity definitions.

   C. Minimum of .31 miles from any open road or motorized trail. This will be accomplished by buffering all open roads and open motorized trails. Studies regarding the influence of roads on grizzly bear habitat have provided a range of distances wherein bears appear to show avoidance. Mattson et. al. (1987) found that grizzly bears in Yellowstone National Park tended to avoid habitat within 500 M (.31 miles) of roads during spring and summer. Research in southeastern British Columbia found that grizzly bears used the area within 100 M (.06 miles) of roads less than expected on the basis of availability (McLellan and Shackleton 1988). Aune and Kasworm (1989) reported less than expected use of habitat within 200 M (.12 miles) of roads during spring, 100 M (.06 miles) during summer and 400 M (.25 miles) during autumn on the East Front study area of north central Montana. A study of road influences on grizzly bears in the Cabinet Mountains of northwest Montana indicated less than expected use within 914 M (.57 miles) of roads with nonsignificant seasonal variation (Kasworm and Manley 1990). Given this range in the zones of less than expected use (100 - 914 M), the distance of .31 miles or 500 meters was recommended.

   D. Consideration should be given, when information is available to do so, to ensure that the core area(s) meet seasonal bear habitat needs by assuring that spring, summer, fall and denning

FWS005023

habitat within the core areas are representative of these seasonal habitats in the entire analysis area.

E. Once core areas become established and effective, these areas should remain in place for at least 10 years. This duration is based upon the generation time for a female grizzly bear or the time it takes a female grizzly bear to replace herself.

4) **Define Acceptable Level(s) of Motorized Access:**
The IGBC requested that the individual grizzly bear management subcommittees define and recommend the habitat conditions that should be maintained to provide habitat security for the grizzly bear.

Habitat security conditions cannot be defined entirely by motorized access route density. Other factors such as vegetation (food, cover), concentrated human use locations (e.g., town sites, campgrounds), heavily used non-motorized trails and areas of high levels of dispersed human use will also influence the effectiveness of area in regards to habitat security. However, motorized access routes and the human use associated with these routes are one of the most easily defined and measurable factors that we can evaluate. Motorized access is also one of the more influential parameters affecting habitat security.

The following parameters are recommended to be included as part of analyses regarding motorized access and its effect on habitat security for grizzly bears:

**TOTAL MOTORIZED ROUTE DENSITY** - Includes open and restricted roads and motorized trails. Density is displayed as a percentage of the analysis area in a defined density category. Example 20% >2.0 miles per sq. mile

**OPEN MOTORIZED ROUTE DENSITY** - Includes open roads and open motorized trails. Density is displayed as a percentage of the analysis area in a defined density category.

**PERCENTAGE OF ANALYSIS AREA IN CORE AREA(S)** - Percentage of the analysis area that meets core area criteria. Size and connectivity of patches will be established at the recovery area level.

Based on the best available information, each of the individual IGBC recovery area subcommittees will display for known adult female grizzly bears the above listed parameters. With this biological information, along with other research results and with social and other land management considerations, the individual subcommittees would recommend the level(s) at which parameters should be managed.

## CUMULATIVE EFFECTS INTERFACE

The IGBC requested that definitions and procedures recommended by this taskforce interface with existing cumulative effects models (CEM). There have been concerns raised that the above procedures would replace cumulative effects analyses procedures currently approved and in place. This is not the case. The current version of CEMs provides for the preparation of GIS based maps and numeric outputs of the parameters recommended for inclusion in effects analysis.

One of the basic outputs of a CEM model and the most often referenced is habitat effectiveness. This output reflects the area's ability to support bears given the quality of habitat and the cumulative human disturbances imposed upon the area. This output will still be important to biologists and managers in the preparation of biological analyses. The recommendation that additional parameters be measured will allow managers to take a more refined look at how motorized activities are affecting grizzly bear habitat.



5-ER-1040

FWS005024

# LITERATURE CITED

Aune, K. and W. Kasworm. 1989. East Front grizzly bear study; final report. Montana Dept. Fish, Wildlife and Parks. Helena. 332 pp.

Brown, D. E. 1985. The grizzly bear in the Southwest. Univ. Okla. Press, Norman. 274 pp.

Christensen, A.G., L.J. Lyon, and J.W. Unsworth. 1993. Elk management in the Northern Region: considerations in forest plan updates or revisions. GTR INT-303. U.S. Forest Service, Ogden, UT. 10 pp.

Kasworm, W. F. and T. Manley. 1990. Road and trail influences on grizzly bears and black bears in northwest Montana. Int. Conf. Bear Res. and Manage. 8:79-84.

Hillis, J.M., M.J. Thompson, J.E. Canfield, L.J. Lyon, C.L. Marcum, P.M. Dolan, and D.M. McCleerey. 1991. Defining elk security: the "Hillis" paradigm. Pp. 38-54 In: Christensen, A.G., L.J. Lyon and T.N. Lonner, eds. 1992. Proceedings: Elk vulnerability symposium; Apr. 10-12, 1991. Montana State University, Bozeman, MT. 221pp.

Lyon, L.J., and J.E. Canfield. 1991. Habitat selection by Rocky Mountain elk under hunting season stress. Pp. 99-105 In: Christensen, A.G., L.J. Lyon and T.N. Lonner, eds. 1992. Proceedings: Elk vulnerability symposium; Apr. 10-12, 1991. Montana State University, Bozeman, MT. 221 pp.

Mace, R.D. and T.M. Manley. 1993. South Fork grizzly bear study:progress report. MT. Dept. Fish, Wildlife and Parks. 38 pp.

Mace, R.D., J. Waller, T. L. Manley, L.J. Lyon, H. Zurring (1996). Relations among grizzly bears, roads, and habitat in the Swan Mountains, Montana: J. Appl. Ecology 33:1395-1404.

Mattson, D.J., R.R. Knight, and B.M. Blanchard. 1987. The effects of developments and primary roads on grizzly bear habitat use in Yellowstone National Park, Wyoming. Int. Conf. Bear Res. and Manage. 7:259-273.

McLellan, B.N., and D.M. Shackleton. 1988. Grizzly bears and resource extraction industries: effects of roads on behavior, habitat use and demography. J. Applied Ecol. 25:451-460.

Servheen, C. 1989. The status and conservation of the bears of the world. Int. Conf. Bear Res. and Manage. Monogr. Series 2:1-32

Storer, T.I., and L.P. Tevis. Jr. 1955. California grizzly. Univ. Calif. Press, Berkeley. 335 pp.

Turner, M.G. and R.H. Gardner. 1990. Quantitative methods in landscape ecology. The analysis and interpretation of landscape heterogeneity. Springer-Verlag. N.Y. 536 pp.

USDI-Fish and Wildlife Service. 1993. Grizzly Bear Recovery Plan. Missoula, MT.



5-ER-1041

FWS005025

"*One of the most insidious invasions of wilderness is via predator control. It works thus: wolves and lions are cleaned out of a wilderness area in the interest of big-game management. The big-game herds (usually deer or elk) then increase to the point of overbrowsing the range. Hunters must then be encouraged to harvest the surplus, but modern hunters refuse to operate far from a car; hence a road must be built to provide access to the surplus game. Again and again wilderness areas have been split by this process, but it still continues.*" Aldo Leopold, A Sand County Almanac, 1949.

"*We have also created technologies that make virtually every place on this planet accessible to us. With our curiosity, money, leisure time, and motorized contraptions, we can invade any corner of the earth with impunity... That we can alter human behavior to protect wildland ecosystems and wild animals is reason for hope.*" Hal Salwasser, Interagency Grizzly Bear Committee Meeting, Denver, December 9, 1997.

FWS005026



# GRIZZLY BEAR RECOVERY PLAN

FWS005285

# Executive Summary of the Recovery Plan for the Grizzly Bear

## Current Status

The grizzly bear (*Ursus arctos horribilis*) was listed as threatened on July 28, 1975. The original recovery plan was approved on January 29, 1982. This is the first revision of that plan. The grizzly bear was originally distributed in various habitats throughout Western North America from Central Mexico to the Arctic Ocean. Current distribution is reduced to less than 2 percent of its former range south of Canada in five, and perhaps six, small populations with an estimated total population of 800-1,000 bears. Four regions, or ecosystems— the Northern Continental Divide and Cabinet/Yaak in Montana, the Selkirks of Idaho and Washington, and the North Cascades of Washington—accommodate grizzly populations that are contiguous with Canadian populations. A grizzly population also exists in the Yellowstone ecosystem. These represent the five known populations. The Bitterroot ecosystem in Idaho represents the possible sixth population. It contains sufficient habitat but few if any grizzly bears at this time. A seventh area, the San Juans ecosystem in Colorado, currently is being considered for evaluation, but there has been no confirmed record of grizzly bears in the San Juans since 1979.

## Habitat Requirements and Limiting Factors

The grizzly has a broad range of habitat tolerance. Contiguous, relatively undisturbed mountainous habitat having a high level of topographic and vegetative diversity characterizes most areas where the species remains. Habitat loss and direct and indirect human-caused mortality is related to the decline in numbers.

## Recovery Objective

Delisting of each of the remaining populations by population as they achieve the recovery targets.

## Recovery Priority

The recovery priority for the grizzly bear has been designated as 6C, which indicates a subspecies with a high threat and a high recovery potential that is or may be in conflict with some form of economic activity.

## Recovery Criteria

Each individual population will remain listed until its specific recovery criteria are met. The species throughout the lower 48 States can be delisted when the populations in all established recovery zones have been delisted. (The San Juan ecosystem is being evaluated as a possible recovery zone and is not yet considered established.) Recovery criteria include a minimum number of females with cubs seen annually, distribution of family groups throughout the recovery zone, and a limit on human-caused mortality.

## Actions Needed

1.  Minimize sources of human-bear conflict.
2.  Limit habitat loss or degradation because of human actions such as road building, timber harvest, oil and gas exploration and development, mining, and recreation.
3.  Improve habitat and/or security where applicable.
4.  Understand the relationship between bear density and habitat value to better understand limiting factors.
5.  Develop techniques to successfully move bears into areas where the populations are in need of augmentation.

ii

FWS005288

**Cabinet/Yaak Grizzly Bear Recovery Zone**

(b) On average, 33 percent of adult females (at least 5 years old) will be with cubs each year. This is based on an average 3-year reproductive interval for adult females. Thus, the 6-year average number of females with cubs can be multiplied by three to estimate the minimum number of adult females in the population.

(c) The reporting efficiency for females with cubs is estimated to be 60 percent. Thus, of all females with cubs in the CYE in a given year, on average 60 percent will be detected/seen and reported (based on average reporting of females on the Rocky Mountain Front, Montana, Aune and Kasworm 1989). This is a conservative estimate of females with cubs. Because of the forested nature of much of the CYE, the reporting efficiency is most likely lower than 60 percent. Therefore, the calculated minimum number of females with cubs will underestimate the actual number. This process is designed to err on the side of the bear.

(d) The grizzly population in the CYE is assumed to be 50 percent adults and 50 percent subadults (Grizzly Bear Compendium, 1987, pp. 47-59).

(e) The sex ratio of both adults and subadults is assumed to be 1:1 (Grizzly Bear Compendium, 1987, pp. 47-59).

(f) The proportion of adult females in the population is 28.40 percent (using methods in Knight et al. 1988, Appendix C, and Knight et al. 1993, Appendix D).

The target of at least 6 females with cubs is sufficient to indicate a minimum population of at least 106 bears (using method of Knight et al. 1988) (Appendix C):

6 females with cubs seen divided by 0.6 (sightability correction factor) = 10 total females with cubs; 10 x 3 = 30 adult females; 30 divided by 0.2840 (the assumed proportion of adult females in population) = a minimum of 106 grizzly bears in the CYE.

(3) There is a relationship between sustainable human-caused mortality and the number of unduplicated females with cubs. Therefore, the number of females with cubs can be useful in managing mortality.

(4) Human-caused mortality will continue at some long-term rate due to inevitable interactions between bears and people.

(5) Unknown, unreported, human-caused mortality occurs each year at some level.

(6) The maximum human-caused mortality level that can be sustained without population decline by a grizzly bear population is 6 percent when no more than 30 percent of these mortalities are females (Harris 1984).

(7) The present minimum population estimate for the Cabinet/Yaak ecosystem is 15-20 bears. Insufficient monitoring data are available to report the number of females with cubs at this time. Because of low estimated population and uncertainty in estimates, the current human-caused mortality goal to facilitate recovery of the population is zero. In reality, this goal may not be realized because human-bear conflicts are likely to occur at some level within the ecosystem. Management will strive to prevent all human-caused grizzly bear mortality in the CYE.

FWS005380

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES
2020 BEAR YEAR ANNUAL MONITORING SUMMARY REPORT
Colville, Idaho Panhandle, Kootenai, and Lolo National Forests
07-20-2021

## Introduction

### Colville National Forest

On the Colville NF (CNF), grizzly bear management within the Selkirk Ecosystem is defined by the 1986 Interagency Grizzly Bear Guidelines, CNF Guidelines for Management in Occupied Grizzly Bear Habitat (USFS 1988c), Grizzly Bear Recovery Plan (USFWS 1993), and Amended Biological Opinion for the Continued Implementation of the CNF and the Idaho Panhandle NF(IPNF) Forest Plans (USFWS 2001). The revised CNF Land Management Plan and ROD were approved in 2019 (USFS 2019). Expectations for core, OMRD, TMRD in each BMU are described in the Access Amendment for the Sullivan-Hughes and Salmo-Priest BMUs (USFWS 2011) and the revised CNF FP (USFS 2019) for the LeClerc BMU. The CNF Bear Year 2020 monitoring report (USDA FS, CNF 2021) for these three BMU's is attached as Appendix A.

### Idaho Panhandle, Kootenai, and Lolo National Forests

In 2011 the U. S. Fish and Wildlife Service issued their Biological Opinion for the Grizzly Bear Access Amendment of the Kootenai, Idaho Panhandle, and Lolo National Forest Plans (USFWS 2011). This document directed the Forest Service to report annually on their progress made towards achieving Interagency Grizzly Bear Committee (IGBC) access management standards for the Selkirk and Cabinet-Yaak Recovery Zones (USFWS 2011). These standards include open and total motorized route densities (OMRD & TMRD), and core areas for each bear management unit (BMU) in the two recovery zones. There are also standards for allowable administrative use of restricted access (gated) roads, and road closure monitoring effort. Lastly, the Forest Service was to meet annually with other agency biologists to update the Bears Outside of Recovery Zones (BORZ) database (ibid). The Idaho Panhandle (IPNF) and Kootenai NF (KNF) incorporated and retained direction established in the 2011 Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones within their revised forest plan decisions (USFS 2015a, USFS 2015b). The USFWS issued a BO (USFWS 2013) for the revised Forest Plan that superseded the 2011 BO, although the reporting requirements remained largely the same.

The Lolo NF reinitiated consultation with the USFWS and received a letter from USFWS (01/09/2020) that extended their incidental take coverage until 11/2022 under the Access Amendment 2011 BO.

In 2020, the IPNF and KNF reinitiated consultation on their Forest Plans with the USFWS issuing separate BOs for the IPNF (FWS IPNF LRMP BO 2020) and KNF (FWS KNF LMP BO 2020). These BO's superseded and replaced the grizzly bear chapters of the 2013 BOs on the Forests LRMPs. As of BY20, relative to this monitoring report, these BO's removed inclusion of short-term temporary unauthorized motorized access in the bear year metric calculations (though retaining long-term unauthorized user created routes documented in the BORZ areas in the BY19 report as part of the baseline), established new updated baselines for BORZ areas (with differences in the routes considered between the forests), and incorporated the metric of secure habitat calculation within the BORZ to more adequately represent the potential effects related to motorized access.

## BMUs and Metrics on the Idaho Panhandle Kootenai, and Lolo NFs

Each grizzly bear recovery zone is divided into individual bear management units (BMUs) which biologists use for habitat evaluation and population monitoring. An individual BMU is roughly 100 square miles in size; the approximate area required for supporting an adult sow with cubs.

As established (USFS 2011) there are three metrics measured within the Recovery Zones, and each BMU has its own set of standards for core, open and total motorized route densities. Roads as defined by IGBC (1998) are $\geq$500 feet long and are reasonably and prudently drivable with a conventional passenger car or pickup. Motorized trails are routes not reasonably and prudently drivable with a conventional passenger car or pickup, but are used by 4-wheelers, 4-wheel drive vehicles and motorized trail bikes. Railroad tracks were not included in the metric calculations for the Access Amendment but are part of the existing condition. Starting in Bear Year 2019, railroad tracks and digitized railroad/powerline wheeled motorized access routes are considered in the metric calculations. Their inclusion generally resulted in little change to percentages of BMU metrics due to their location within heavily roaded areas, although in BMU 9 railroad tracks resulted in OMRD rounding up a percentage.

### Core Area

All lands (all ownerships), roads, motorized trails, and high-use non-motorized trails in a BMU are included in core calculations. Routes considered in the core model are coded as IGBC 2 (gated during the active bear year), IGBC 4 (open year round or seasonally during the active bear year), IGBC 5 (open motorized trail during the active bear year), IGBC 8 (any high use non-motorized trail), and an additional identifier of "10" for railroad tracks. Buffer distance from open motorized routes and trails and high-use non-motorized trails is 500 meters (0.31 miles). Core areas were delineated by identifying and aggregating the full range of seasonal habitats, to the degree they are available, in the BMU. Within the CYE and SE core areas do not contain high-use non-motorized routes. Motorized use of routes (including administrative use) does not occur within a core area during the active bear year. All authorized motorized access is accounted for in the route layer. There is no minimum sized polygon for core calculations. A minimum percent of each BMU should be providing core habitat as defined by the individual BMU standard.

### OMRD, TMRD:

Access route density for Open Motorized Route Density (OMRD $\geq$1mi/mi$^2$) and Total Motorized Route Density (TMRD $\geq$2mi/mi$^2$) is calculated on a BMU basis using moving window analysis. Route density calculations consider all routes and motorized trails regardless of ownership/jurisdiction. Between the forests, model pixel size is less than 100 x 100 meters. For example, the KNF uses 60 meter pixel size and the IPNF uses 30 meter pixel size. The routes (in vector format) are converted into raster for the analysis. To account for any change in length calculations due to the conversion, a correction factor is calculated based on the length of routes in vector divided by the length of routes in raster. Wakkinen and Kasworm (1997) identified a correction factor of 0.805 for the Selkirk and Cabinet-Yaak ecosystems. To determine a moving window density, motorized routes were buffered to create density contour maps based on the chosen set pixel size. Effective road density around each pixel was determined by calculating amounts of routes within a set window distance (e.g. 1 mi$^2$) around each pixel. Road densities are mapped by the categories: 0 mi/sq. mi., $\geq$ 0 - 1 mi/sq. mi., $\geq$1 - 2 mi/sq. mi., $\geq$2 mi/sq. mi. Areas influenced by high route densities should not exceed a defined maximum percentage of each BMU as

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

2

5-ER-1047

FWS006161

defined by the individual BMU standard. For OMRD, the model considers routes coded as IGBC 4, IGBC 5, and a "10" for railroad tracks. For TMRD, the model considers routes coded as IGBC 2, IGBC 4, IGBC 5, and a "10" for railroad tracks.

### Core, OMRD, and TMRD

For core, OMRD, and TMRD, access features beyond the BMU boundary that are within the moving window frame will be included in BMU calculations (IGBC 1998).

### 2020 Access Parameter Status

Table 1 and Table 2 summarize the habitat parameters related to motorized access routes within the two recovery zones for the 2020 active bear year (BY) for the Lolo, IPNF and KNF. Please see APPENDIX A for BMU's reported by the Colville NF. The Lolo NF displays habitat parameters in BMU 22 per the Access Amendment (2011). Beginning in BY20, the IPNF LRMP BO (FWS 2020) and KNF LRMP BO (FWS 2020) in relation to the **first surrogate** measure of incidental take of grizzly bears and Reasonable and Prudent Measure #1, stated that the report shall describe both temporary variations related to projects that have undergone consultation and being implemented in the reported Bear Year, as well as the bear years progression to standard. In addition, beginning in BY20 for the IPNF and KNF, per their 2020 BO's, calculations of access metrics within the CYE and Selkirk BMU's reflect conditions resulting from authorized motorized access activities only. Please see **APPENDIX B** for a list of existing system roads or user created routes within the Recovery Zones documented to have temporary short-term unauthorized motorized access during BY20. For the IPNF and KNF, Table 1 and Table 2 display the metrics in the following two ways:

### Current Bear Year

Metrics for the current bear year on-the-ground conditions will begin with the "existing condition" as a baseline. Current bear year activities include: any database updates or corrections documented during the current bear year; authorized federal actions associated with project implementation (temporary for the bear year or could result in motorized access route changes as analyzed and approved through NEPA and ESA), administrative trip exceedances (project related work as analyzed and approved through NEPA and ESA or unplanned occurrences), emergency access such as for fire, and all similar activities not authorized by the NFS which affected motorized route status on state, corporate, and private lands. For summaries of **authorized** federal activity and activities on non-federal land and any reasons for changes in the metrics see summary of the previous bear years Progress to meeting standards (cite the previous bear year report Table 3).

### Post Bear Year

For the BMU's, the post bear years displays where BMU's are relative to the progress to meeting standards from the Forest Plan and ITS in the BOs standards resulting from authorized activities on all ownerships from prior years and the current bear year *implemented and completed*. Routes identified in the Current Bear Year route layers with temporary activities are returned to their legal non-activity status (ie. Routes exceeding administrative use or emergency fire access or temporary project activity). ***Temporary authorized activities implemented during the current bear year resulting in on-the-ground motorized access changes and improvements to bear metrics*** *(which in the past were not shown as completed until the following year Bear Year)* ***are shown as completed and implemented*** (ie. Implemented motorized access changes (ie route storage or decommissioning activities, including

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING
FINAL SUMMARY REPORT (07/20/2021)

3

FWS006162

installation of gates, barriers, removal of drainage structures or other activities) that resulted in improvements to bear habitat metrics are shown as completed. **Ongoing project activities affecting motorized route status, as analyzed in NEPA and ESA consultation, are reflected in these metrics**. This reflects the current Bear Year conditions of motorized access metrics within the BMUs that display the Bear Year 2020 progress for meeting Forest Plan standards.  In the future, the post bear year **becomes the existing condition from which the following bear year is based upon.**

*Route Layer components and differences*

Table A-1 describes the route layer components for the current and post bear year metric calculations for both the Recovery Zone and BORZ.  Please note the differences in the Post Bear Year route differences for the IPNF BORZ.

*Table A- 1.  Route Layer Differences for Current Bear Year and Post Bear Year Calculations*

| Component | Current Bear Year | Post Bear Year |
|---|---|---|
| Route layer | *Begins with the prior Post Bear Year* | *Begins with the 'Current Bear Year' route layer with the following differences:* |
| Database corrections updates | Current BY database corrections or updates | As documented in current bear year |
| Temporary activities not resulting in future motorized access changes (administrative use exceedance, emergency access | Included, reflects what occurred on the ground (i.e. gated shown as open; or an impassable or barriered route within the BMU shown as open or gated in BORZ if no public use). | Not included, routes put back to legal status |
| Temporary activities that result in on-the-ground change to motorized access and metrics | Included, reflect implementation (i.e. new road construction, temporary or new system roads shown as open in BMU, and in BORZ shown as gated if no public use). | Shown as completed (i.e. new route constructed is in the route layer and coded to reflect what was analyzed in NEPA/ESA such as open or gated during project). |
| Temporary activities that result in on-the ground changes to motorized access and **result in improvements** to the bear metrics. | Included, reflect implementation (i.e. Route decom., storage, gate or barrier install, removal of drainage structures. IGBC depends on BMU or BORZ. (i.e. for both, open route that's gated or stored is open; an impassable or gated route that is stored is open in BMU, in BORZ admin work is coded gated if no public use) | Shown as completed. All temporary activity that was implemented in the current bear year and was completed on the ground is reflected as completed in the Post BY. (i.e. an open route gated during current bear year is now shown as gated; an open route decommissioned in the current BY now reflected as barriered) |
| Ongoing project activities as analyzed through ESA and NEPA. Ongoing Projects consist of routes with a motorized access change that continue from the BY through the Post BY or beyond.  These will not show as completed in the Post BY until the final work on the route is implemented in that current BY. | Included, the actual routes being utilized during the BY (i.e. out of 20 total routes analyzed in NEPA/ESA, 4 might be receiving activity). (i.e. BMU impassable route used in project and gated during activity but admin use continually exceeded (as analyzed) is shown as open). In BORZ it would be gated if no public use. On-going projects during the current BY are treated like temporary activities. | Route included if use continues into next BY (i.e. IGBC code remains as analyzed during activity in Post BY). Once project use of route ends in current BY, it would be shown in Post BY as completed. This ensures Post BY progress to standard reflects on-the-ground progress and not the end-product result shown in BA/NEPA which hasn't yet occurred. It also enables more efficient tracking in NRM. **On IPNF for BORZ only,** route not included. Route put back to non-activity status for BORZ route layer. |

IGBC 1 "impassable"; IGBC 2 "gated"; IGBC 3 "barriered"; IGBC 4 "open",

[*]Motorized access changes resulting in improvement to grizzly bear metrics (eg. motorized access changes) implemented in a BY (ie route storage or decommissioning, including installation of gates, barriers, removal of drainage structures or other activities,) that resulted in improvements to metrics are not considered effective until

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

4

FWS006163

the following year, and in previously were not shown as completed until the following bear year. By showing these activities implemented and completed in the "post-bear year", we display the year's progression to standards and provide an existing condition from which the next bear year begins with.

## BMU Metrics for the Cabinet-Yaak Recovery Zone

*Table 1. BMU Summary for authorized activities affecting motorized route status on all ownerships for the 2020 bear year (BY) [April 1 through November 30] in the Cabinet-Yaak Recovery Zone. Values in* **Blue** *represent existing BMU standards (USDA 2011).*

| BMU | Forest Plan Standard | | | Current BY20 Conditions[4] | | | Post- BY20 Progress to meeting standards[5] | | | % Federal Land | Priority |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | OMRD $\leq$ (%) | TMRD $\leq$ (%) | Core $\geq$ (%) | OMRD $\leq$ (%) | TMRD $\leq$ (%) | Core $\geq$ (%) | OMRD $\leq$ (%) | TMRD $\leq$ (%) | Core $\leq$ (%) | | |
| 1-Cedar | 15 | 15 | 80 | 14 | 10 | 84 | 14 | 10 | 84 | 99 | 2 |
| 2-Snowshoe | 20 | 18 | 75 | 15 | 14 | 77 | 15 | 14 | 77 | 94 | 2 |
| 3-Spar | 33 | 26 | 59 | 29 | 26 | 62 | 29 | 26 | 62 | 95 | 3 |
| 4-Bull | 36 | 26 | 63 | 38 | 30 | 61 | 38 | 30 | 61 | 84 | 2 |
| 5-St. Paul | 30 | 23 | 60 | 27 | 23 | 58 | 27 | 23 | 58 | 97 | 1 |
| 6-Wanless | 34 | 32 | 55 | 33 | 33 | 54 | 29 | 32 | 56 | 85 | 1 |
| 7-Silver Butte | 26 | 23 | 63 | 21 | 23 | 65 | 21 | 23 | 65 | 92 | 2 |
| 8-Vermillion | 32 | 21 | 55 | 32 | 22 | 58 | 32 | 22 | 58 | 93 | 3 |
| 9-Callahan | 33 | 26 | 55 | 28 | 28 | 58 | 28 | 27 | 59 | 90 | 2 |
| 10-Pulpit | 44 | 34 | 52 | 44 | 27 | 54 | 44 | 27 | 54 | 95 | 2 |
| 11-Roderick | 28 | 26 | 55 | 28 | 26 | 56 | 28 | 26 | 56 | 96 | 1 |
| 12-Newton | 45 | 31 | 55 | 42 | 31 | 57 | 42 | 31 | 57 | 92 | 1 |
| 13-Keno | 33 | 26 | 59 | 32 | 23 | 60 | 32 | 23 | 60 | 99+ | 1 |
| 14-NW Peak | 31 | 26 | 55 | 28 | 24 | 56 | 28 | 24 | 56 | 99+ | 1 |
| 15-Garver | 33 | 26 | 55 | 31 | 26 | 55 | 31 | 26 | 55 | 94 | 1 |
| 16-EF Yaak | 33 | 26 | 55 | 28 | 24 | 56 | 28 | 24 | 56 | 96 | 1 |
| 17-Big Creek | 33 | 26 | 55 | 30 | 15 | 58 | 30 | 15 | 58 | 99 | 2 |
| 18-Boulder | 33 | 29 | 55 | 32 | 31 | 52 | 31 | 30 | 53 | 92 | 3 |
| 19-Grouse | 59 | 55 | 37 | 61 | 61 | 30 | 58 | 59 | 32 | 54 | 3 |
| 20-North Lightning | 35 | 20 | 61 | 35 | 18 | 64 | 35 | 18 | 64 | 94 | 1 |
| 21-Scotchman | 34 | 26 | 62 | 34 | 26 | 65 | 34 | 26 | 65 | 81 | 2 |
| 22-Mt. Headley | 33 | 35 | 55 | 35 | 37 | 53 | NA | NA | NA | 89 | 3 |

[4] See Table 4 for description of BY20 activities on the KNF, IPNF and Lolo NF.

[5] See Table 4 for description of Post BY20 activities. The Post BY20 metrics are a requirement of the IPNF and KNF 2020 BOs (FWS 2020). BMUs-1-17 parameters reported by the Kootenai NF, BMUS 18, 19, 20, &21 parameters reported by the Idaho Panhandle NF, BMU 22 parameters reported by the Lolo NF. The Post BY20 metric calculations are not applicable to the Lolo NF under their current reporting requirements.

OMRD $\geq$ 1mi/mi² (%); TMRD $\geq$ 2mi/mi² (%)

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

5

FWS006164

5-ER-1050

As discussed above, within the Selkirk RZ, the IPNF no longer considers short-term temporary unauthorized use in BY metrics per the IPNF LRMP BO 2020 (FWS 2020). Please see APPENDIX A for the Colville NF bear year 2020 monitoring report (USDA FS, Colville NF 2021) for additional information on habitat parameter metrics within the Salmo-Priest, Sullivan-Hughes, and LeClerc BMUs .

## BMU Metrics for the Selkirk Recovery Zone

*Table 2. BMU Summary for authorized activities affecting motorized route status on all ownerships for the 2020 bear year (BY) [April 1 through November 15] in the Selkirk Recovery Zone. Values in **Blue** represent BMU standards (USDA 2011).*

| Grizzly Bear Management Unit | Established Standard | | | Current BY20 Conditions[1] | | | Post BY20 Progress to Meeting Standards[2] | | | % Federal Land | Priority |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | OMRD $\leq$ (%) | TMRD $\leq$ (%) | Core $\geq$ (%) | OMRD $\leq$ (%) | TMRD $\leq$ (%) | Core $\geq$ (%) | OMRD $\leq$ (%) | TMRD $\leq$ (%) | Core $\geq$ (%) | | |
| Blue Grass | 33 | 26 | 55 | 30 | 29 | 48 | 27 | 29 | 48 | 96 | 1 |
| Long-Smith | 25 | 15 | 67 | 24 | 16 | 71 | 24 | 16 | 71 | 92 | 1 |
| Kalispell-Granite | 33 | 26 | 55 | 30 | 24 | 55 | 30 | 24 | 55 | 96 | 1 |
| Myrtle | 33 | 24 | 56 | 29 | 23 | 59 | 29 | 23 | 59 | 85 | 2 |
| Ball-Trout | 20 | 13 | 69 | 16 | 11 | 72 | 16 | 11 | 72 | 94 | 2 |
| Lakeshore | 82 | 56 | 20 | 80 | 45 | 22 | 80 | 45 | 22 | 86 | 2 |
| Salmo-Priest | 33 | 26 | 64 | 27 | 22 | 68 | NA | NA | NA | 99 | 2 |
| Sullivan-Hughes | 24 | 19 | 61 | 23 | 18 | 63 | NA | NA | NA | 99 | 1 |
| LeClerk | 48 | 60 | 27 | 46 | 56 | 27 | NA | NA | NA | 64 | 3 |

OMRD $\geq$ 1mi/mi$^2$ (%); TMRD $\geq$ 2mi/mi$^2$ (%)

BMU metric parameters for Salmo-Priest, Sullivan-Hughes, and LeClerc reported by the Colville NF. Please see APPENDIX A for detailed discussion of these BMUs. Post BY20 metrics are not applicable to the Colville NF under their current reporting requirements. All other BMU parameters are reported by the IPNF.

[1] **Current Bear Year**, See Table 4 for description of activities on IPNF and APPENDIX A for Colville NF.

[2] **Post Bear Year Progression to Forest Plan standards**. This becomes the "existing condition" from which the following Bear Year starts with. See Table 4 for description of activities on the IPNF.

## Recovery Zones Reasons for Change due to Authorized activities

The annual monitoring reports have previously described the motorized access activities (temporary authorized and short-term temporary unauthorized) across all ownerships that contribute to change (or documentation of a high use non-motorized trail that affected core) and included them in bear year metrics to reflect the on-the-ground conditions for that bear year. Beginning in 2020 only authorized activities are considered in the Recovery Zone Bear Year metrics. Authorized activities are now separated by columns for the current bear year and the Post bear year numbers. Within Recovery zones, the post bear year metrics display the current bear year progression to standards as defined above for the different forests and summarized below in Table 3. Table 4 and Table 5 summarize the reasons for change across all ownerships within the Recovery Zone applicable BMU's for BY20 and Post BY20 authorized motorized access activities. The Kootenai NF BMUs 2020 results are compared to the Post BY19 results displayed in the KNF Forest Plan BA 2020 (USDA FS, KNF 2020).

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

6

FWS006165

5-ER-1051

*Table 3. Management actions that resulted in changes to OMRD, TMRD or Core habitat on all ownership from 2019 to 2020 in **the Cabinet-Yaak Recovery Zone** on the Idaho Panhandle, Kootenai, and Lolo National Forests.*

| BMU | Cabinet-Yaak RZ authorized Federal management actions on NFS lands; activities authorized by others on corporate and state lands; and private land development affecting route status in current bear year | |
|---|---|---|
| | Column A | Column B |
| | **Current Bear Year 2020** | **Post Bear Year 2020 Progression to standard (where we are relative to FP standard)** |
| | *Describe database corrections, authorized temporary activities (admin use exceed/emergency access; authorized temporary activities resulting in on-the-ground changes to motorized access, and on-going authorized activities* | *Briefly Describe what BY20 activities are now shown as completed etc., (these are describe as implemented under BY20 and completed in Post BY) or what on-going activities are still considered.* |
| 1-Cedar | Standard OMRD <u><</u>15%, TMRD <u><</u>15%, Core <u>></u>80%<br>**BY20 OMRD 14%, TMRD 10%, core 84%**<br>No change from PostBY19. This BMU meets or is better than all FP standards.  During BY20 no database corrections, no authorized temporary activities affecting motorized access, and no ongoing activities. | **PostBY20 OMRD 14%, TMRD 10%, Core 84%**<br>No change were percentages from BY20 as no authorized activities were completed and no ongoing activities. |
| 2-Snowshoe | Standard OMRD <u><</u>20%, TMRD <u><</u>18%, Core <u>></u>75%<br>**BY20 OMRD 15%, TMRD 14%, core 77%**<br>In BY19 Leigh Lake Trail was added as a high use non-motorized trail, with a corresponding decrease in 403 acres of core, but no change to core percentage. No change in BY20 from PostBY19. This BMU meets or is better than all FP standards, even with the reduction in core acres due to the Leigh Lake Trail  During BY20 no database corrections, no authorized temporary activities that affected motorized access, and no ongoing activities occurred during BY20. | **PostBY20 OMRD 15%, TMRD 14%, core 77%**.<br>No change in percentages from BY20 as no authorized activities were completed and no ongoing activities. |
| 3-Spar | Standard OMRD <u><</u>33%, TMRD <u><</u>26%, Core <u>></u>59%<br>**BY20 OMRD 29%, TMRD 26%, core 62%**<br>No change from PostBY19.  This BMU meets or is better than all FP standards. During BY20 no database corrections, no authorized temporary activities that affected motorized access, and no ongoing activities occurred. | **PostBY20 OMRD 29%, TMRD 26%, core 62%**<br>No change in percentages from BY20 as no authorized activities were completed and no ongoing activities. |
| 4-Bull | FP Standard OMRD <u><</u>36%, TMRD <u><</u>26%, Core <u>></u>63%<br>**BY20 OMRD 38%, TMRD 30%, core 61%**<br>No change in percentages from postBY19. This BMU does not meet FP standards for all three metrics. | **PostBY20 OMRD 38%, TMRD 30%, core 61%**.<br>No change in percentages from BY20. This BMU continues to not meet FP standards for all three metrics. |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

FWS006166

| | Cabinet-Yaak RZ authorized Federal management actions on NFS lands; activities authorized by others on corporate and state lands; and private land development affecting route status in current bear year | |
|---|---|---|
| | Column A | Column B |
| **BMU** | **Current Bear Year 2020** | **Post Bear Year 2020 Progression to standard (where we are relative to FP standard)** |
| | *Describe database corrections, authorized temporary activities (admin use exceed/emergency access; authorized temporary activities resulting in on-the-ground changes to motorized access, and on-going authorized activities* | *Briefly Describe what BY20 activities are now shown as completed etc., (these are describe as implemented under BY20 and completed in Post BY) or what on-going activities are still considered.* |
| | ***Database corrections***: In BY20 database corrections on NFSR 2147, 2128K, 2128M, 2147A, and 2147B resulted in the routes being deleted from the route layer as were less than 300 feet in length. Overall, this resulted in a 56 acre increase in core acres with no change to percentage. The Dry Creek Sale changed the barriered segment of NFSR 1118A to open for activities. | ***Ongoing activities***: Use of a 0.4 mile segment of NFSR 1118A route by the Dry Creek sale continues. The berm will be reinstalled in the future after harvest activities are completed. |
| 5-St. Paul | FP Standard OMRD $\leq$30%, TMRD $\leq$23%, Core $\geq$60%<br>**BY20 OMRD 27%, TMRD 23%, core 58%**<br>Compared to PostBY19, no change in percentage of TMRD or core, while OMRD decreased 1 percent. This BMU is lower (worse) than the standard for core by 2%, is lower (better) than the standard for OMRD by 3% and meets the FP standard for TMRD.<br><br>***Database corrections***: The BY20 route layer did not include an Avista created open route documented in BY19 on the Cabinet R.D. The omission of this route located in an area of TMRD of >2 mi/mi$^2$ had a negligible effect. This route has no effect on core. Other slight spatial variations in the route layer resulted in the model calculating slightly less acres for OMRD route density of >1 mi/mi$^2$. This contributed to the rounding down of OMRD by 1 percent compared to PostBY19. | **PostBY20 OMRD 27%, TMRD 23%, core 58%**<br>No change in percentages from BY20 This BMU continues to not meet FP standard for core.<br><br>For the bear year 2021 monitoring report the Avista fish trap access road will have been added to INFRA as a private system road. The route will be included under Avista's Special Use Permit and will be gated at some point in the future. Until that time the route contributes to OMRD which continues to remain below (and better) than the standard. |
| 6-Wanless | FP Standard OMRD $\leq$34%, TMRD $\leq$32%, core $\geq$55%<br>**BY20 OMRD 33%, TMRD 33%, core 54%**<br>Compared to PostBY19 TMRD down 1% and OMRD up 5%, with no change in Core at 54%. For BY20, this BMU remains worse (higher) than the FP standard for TMRD by 1% and less (worse) than the FP standard for core by 1%. | **PostBY20 OMRD 29%, TMRD 32%, core 56%**.<br>Compared to BY20, OMRD down 4%, TMRD down 1%, and core up 2% (increase of 1,344 acres of core). PostBY20 this BMU meets FP standards for all three metrics.<br><br>***Completion of ongoing project activity***: Activities in BY20 that resulted in on-the-ground improvements to bear metrics are shown as implemented. On *Libby RD* the |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

8

FWS006167

| | Cabinet-Yaak RZ authorized Federal management actions on NFS lands; activities authorized by others on corporate and state lands; and private land development affecting route status in current bear year | |
|---|---|---|
| | Column A | Column B |
| BMU | Current Bear Year 2020 | Post Bear Year 2020 Progression to standard (where we are relative to FP standard) |
| | *Describe database corrections, authorized temporary activities (admin use exceed/emergency access; authorized temporary activities resulting in on-the-ground changes to motorized access, and on-going authorized activities* | *Briefly Describe what BY20 activities are now shown as completed etc., (these are describe as implemented under BY20 and completed in Post BY) or what on-going activities are still considered.* |
| | **Database corrections**: *Libby RD* correction to the database due to an error in NRM IGBC coding for the BY19 and PostBY19 route layers which had erroneously coded the year round open 2332 Bramlet Creek Road as gated. This route has always been year-round open and contributes to both OMRD and TMRD<br><br>**Database updates**: *Libby RD* previously reported in BY18 the berm on the Miller Creek / West Fisher Creek Road (FR 385) was breached by ATV's, resulting in a 143 acre decrease in core. The berm was reinforced in late BY19 with the route functionally barriered and the core was back in place in BY20. *Cabinet RD*:  Database updates on a Stimson section where harvest was recently completed are ongoing. For the BY20 calculations two routes Engle Creek A 2210A and 2210B are reflected as gated and the routes 14623 McKay Flat, 14623B McKay Flat B, and 14623C McKay Flat C are shown as gated. More recent information from the District in June of 2021 verified the NFSR #14623 and its spurs #14623B and C are effectively bermed and these routes will be updated in NRM for BY 2021 metric calculations to reflect that status.<br><br>**Ongoing projects**:  *Libby RD*: SF Miller # 4724 segment previously IGBC 3 was IGBC 4 (0.62 miles) in BY19, shown as barriered in PostBY19, and is back to open in BY20. Route was opened for brushing in BY19 as the Miller West Fisher 2009 road contract hadn't specified the unit 26 accessed off this route was required winter harvest.   This route was rebarriered in May of 2020. The barriered portion of NFSR# 385, a previous breach, was repaired in late BY19, and resulted in an improvement to OMRD and core acres in BY20. The use of gated route #4725 north fork Miller Road for the Miller West Fisher TS contributed to OMRD.  A barrier was also installed on gated 4725 for the ongoing MWF project in BY20 once timber harvest activities were completed in this | barrier installed on gated route NFSR North Fork Miller #4725 in contributed to 1,209 acres of new core created. The barrier on route 808E located just outside the BMU boundary within the Cabinet Face BORZ also contributed to this.  The barrier being replaced on segment of NFSR SF Miller #4724 resulted in 135 acres of core being restored.<br><br>*Cabinet RD*: authorized activity on Stimson private land for timber harvest in BY20 was completed and routes returned to gated status. |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

9

FWS006168

| | Cabinet-Yaak RZ authorized Federal management actions on NFS lands; activities authorized by others on corporate and state lands; and private land development affecting route status in current bear year | |
|---|---|---|
| | Column A | Column B |
| **BMU** | **Current Bear Year 2020** | **Post Bear Year 2020 Progression to standard (where we are relative to FP standard)** |
| | *Describe database corrections, authorized temporary activities (admin use exceed/emergency access; authorized temporary activities resulting in on-the-ground changes to motorized access, and on-going authorized activities* | *Briefly Describe what BY20 activities are now shown as completed etc., (these are describe as implemented under BY20 and completed in Post BY) or what on-going activities are still considered.* |
| | subdivision. *Cabinet RD*: Contributing to OMRD, the gated routes #2282 Translator Road, #1022A McKay Creek A and 14654 and 14654B were shown as open to reflect harvest on Stimson corporate timberland. Other ongoing authorized activity occurred on private land and motorized access routes contributing to OMRD and TMRD. | |
| 7-Silver Butte-Fisher | FP Standard OMRD ≤26%, TMRD ≤23%, core ≥63% **BY20 OMRD 21%, TMRD 23%, core 65%** Compared to PostBY19, no change in TMRD (23%) or core (65%), while OMRD decreased 1%. This BMU meets FP standards for all three metrics. **Database corrections/Updates**: *Libby RD*: Routes shown as open for 2107 fires were corrected in NRM back to gated 990052, 990052A, 990052C, 990052D. *Cabinet RD*: Route 990013 Vermillion Owl was changed from open to gated as verified on ground. Just outside BMU 7 within the 0.31 miles buffer two year-round open routes 99820 and 99824 (Vermillion E Fisher) on Stimson land, were barriered. | **PostBY20 OMRD 21%, TMRD 23%, core 65%** No change in percentages from BY20. This BMU continues to meet FP standards for all three metrics in PostBY20. |
| 8-Vermilion | STANDARD OMRD ≤32%, TMRD ≤21%, core ≥55%. **BY20 OMRD 32%, TMRD 22%, core 58%** No change in percentages from PostBY19. This BMU meets FP standard for OMRD and is higher (better than) the standard for core but is higher (worse) then the TMRD standard by 1%. **Database corrections**: *Cabinet RD*: Core acres decreased by about 262 acres due to database updates. During BY20 it was verified corporate private land routes #8585, 8586 and its spur 8586A are not barriered, but are gated near their junction with the year-round open #154 Vermilion E Fisher. | **PostBY20 OMRD 32%, TMRD 22%, core 58%** No change in percentages from BY20 as no authorized activities were completed. During the summer of 2021 the Elk Lake OHV implementation is planned and will bring the BMU to standards. These improvements will be reflected in the Bear Year 2021 monitoring report. |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

FWS006169

| | Cabinet-Yaak RZ authorized Federal management actions on NFS lands; activities authorized by others on corporate and state lands; and private land development affecting route status in current bear year | |
|---|---|---|
| | Column A | Column B |
| **BMU** | **Current Bear Year 2020** | **Post Bear Year 2020 Progression to standard (where we are relative to FP standard)** |
| | *Describe database corrections, authorized temporary activities (admin use exceed/emergency access; authorized temporary activities resulting in on-the-ground changes to motorized access, and on-going authorized activities* | *Briefly Describe what BY20 activities are now shown as completed etc., (these are describe as implemented under BY20 and completed in Post BY) or what on-going activities are still considered.* |
| 9-Callahan | FP Standard OMRD ≤33%, TMRD ≤26%, core ≥55%<br>**BY20 OMRD 28%, TMRD 28%, core 58%**<br><br>Compared to PostBY19, no change in percentages of OMRD or core, while TMRD improves and decreases 1 percent. This BMU remains higher (worse) than the TMRD standard by 2%. The Starry Goat project activity which included road decommissioning work and improvements shown as implemented in BY19 and PostBY19 route layers and calculations and reflected in the estimates provided by the KNF FP BA (USDA FS KNF 2020) as well as in the BY20 metrics were expected to bring the BMU into compliance. However, the BY20 results demonstrated that the Starry Goat related improvements did not off-set the 2019 database updates to include railroad tracks.<br><br>*Database updates*: *Troy RD*: Improvement to core in BY20 resulted from NFSRs 14373 and 4556 (BY19 report typo said 4456) being barriered for in-kind replacement core during BY19.<br><br>***Emergency fire access*** *Troy RD* - Contributing to core decrease during BY20 was the Callahan Fire which removed existing berms for fire access on Road #14371, #4521, #414B, and #4140. No public use occurred on these routes and the berms were replaced in October.<br><br>***Ongoing Projects:*** Affecting both route densities and core in BY20 were ongoing activities associated with the Starry Goat Project. The road decommissioning work and improvement work that was reflected as being implemented in BY19 and PostBY19 are reflected as completed in BY20. | **PostBY20 OMRD 28%, TMRD 27%, core 59%**<br><br>Compared to BY20, PostBY20 OMRD does not change, TMRD improves and decreases 1% and core improves and increases 1%. This BMU remains higher (worse) than the FP standard 26% TMRD by 1%.<br><br>The BY20 results demonstrated the Starry Goat Project road management to improve TMRD was not able to offset the 2019 database updates to incorporate railroad tracks. The Troy RD has very little opportunity to barrier additional gated routes to decrease TMRD to bring the BMU into compliance due to different land ownership access. During 2021 the District is coordinating across the different resources to determine what options may be available on NFS routes.<br><br>Post BY20 core returns to pre-fire emergency access levels with increase 1% (and increase 552 acres) due to the Callahan fire being controlled and the earth berms replaced |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

FWS006170

| | Cabinet-Yaak RZ authorized Federal management actions on NFS lands; activities authorized by others on corporate and state lands; and private land development affecting route status in current bear year | |
|---|---|---|
| | Column A | Column B |
| **BMU** | **Current Bear Year 2020** | **Post Bear Year 2020 Progression to standard (where we are relative to FP standard)** |
| | *Describe database corrections, authorized temporary activities (admin use exceed/emergency access; authorized temporary activities resulting in on-the-ground changes to motorized access, and on-going authorized activities* | *Briefly Describe what BY20 activities are now shown as completed etc., (these are describe as implemented under BY20 and completed in Post BY) or what on-going activities are still considered.* |
| | | |
| 10-Pulpit | Standard OMRD <44%, TMRD <34%, core >52%.<br>**BY20 OMRD 44%, TMRD 27%, core 54%**<br>No change in percentages from PostBY19.<br>This BMU meets the FP standards for all metrics during BY20<br><br>***Database corrections***: The need for a database correction for a year-round open segment of Kootenai River Road (#853) was identified in June 2020 after the BY19 and postBY19 calculations were completed.  When returning BY19 temporary activity on routes to their legal status for the PostBY19 route layer, an open segment of road #853 was erroneously changed to gated, rather than just changing the segment behind the gate back to gated.  On June 2, 2021 it was discovered this error remained in NRM and thus was in BY20 and PostBY20 route layers.  Both segments coded as gated contribute to TMRD and core metric but not to OMRD and the area's OMRD density of >1 mi/mi.sq largely remains at 1-2 miles/mi.sq. Based on BY19 where both segments of road #853 were coded as open most of the area would be at a OMRD density of >2 miles/mi.sq.   The database correction changing the open segment from gated back to open was made in NRM infra in June 2021 and will be reflected in BY21 route layers and calculations.<br><br>***Temporary activities:*** Temporary authorized activities and ongoing projects did not contribute to percent changes in metric parameters**.**<br>*Three Rivers RD:* NFSR road #14321; silviculture & forestry contractor, & fire management activity exceeded allowable trips as analyzed and authorized under the OLY Project. | **POST BY20 OMRD 44%, TMRD 27%, core 54%**<br>All FP standards are met. No change in percentages from BY20.<br><br>All temporary activities associated with the OLY Project route work and access changes are completed.  The BMU currently meets the FP standards.<br><br>***Database corrections***: as noted under the current bear year discussion, the IGBC coding error on the open segment of the Kootenai River Road remains in the Post BY20 metrics. This segment will be accurately coded as open IGBC 4 and not as gated IGBC 2 in the bear year 2021 route layers and calculations.<br><br>***Ongoing Projects***: One sale under the OLY Moly TS, Kootenai Face Off remains and is currently expected to occur summer 2022. During that future activity period, any temporary effects to metrics as analyzed in the BA and NEPA will be disclosed in that BY report. |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

12

5-ER-1057

FWS006171

| | Cabinet-Yaak RZ authorized Federal management actions on NFS lands; activities authorized by others on corporate and state lands; and private land development affecting route status in current bear year | |
|---|---|---|
| | Column A | Column B |
| **BMU** | **Current Bear Year 2020** | **Post Bear Year 2020 Progression to standard (where we are relative to FP standard)** |
| | *Describe database corrections, authorized temporary activities (admin use exceed/emergency access; authorized temporary activities resulting in on-the-ground changes to motorized access, and on-going authorized activities* | *Briefly Describe what BY20 activities are now shown as completed etc., (these are describe as implemented under BY20 and completed in Post BY) or what on-going activities are still considered.* |
| | ***Ongoing Projects:*** Authorized activities associated with the OLY project (Oly Moly TS and some small sales). Upon completion of the project, likely in the next two years, BMU 10 will comply with the Forest Plan standards | |
| 11-Roderick | FP Standard OMRD ≤28%, TMRD ≤26%, core ≥55%<br>**BY20 OMRD 28%, TMRD 26%, core 56%**<br>No change in percentages from PostBY19.<br>This BMU meets the FP standards for all metrics.<br>In BY20 a database correction was made on NFSR 6818 Oscar Meyer from open to gated. No authorized temporary activities affected motorized access, and no ongoing activities occurred. | **PostBY20 OMRD 28%, TMRD 25%, core 56%**<br>All FP standards are met. No change in percentages from BY20 as no authorized activities were completed and no ongoing activities.<br>An additional database correction will be made for bear year 2021 on the NFSR 6818A which should also be coded as gated. |
| 12-Newton | FP Standard OMRD ≤45%, TMRD ≤31%, core ≥55%<br>**BY20 OMRD 42%, TMRD 31%, core 57%**<br>Compared to PostBY19 no change in percentages of OMRD and core, while TMRD increased 1 percent. This BMU meets FP standards for all metrics.<br><br>***Database corrections:*** *Three Rivers RD:* Included removing routes (e.g., skid trails, tractor paths in meadows) that were not permanent and on other ownerships (updating database routes that were created in 2011; adding new private routes on private land and modifying spatial locations (including on NFSR 2370 Cadillac Road) to align with more recent imagery. All this work was part of assessing the existing condition for Knotty Pine. The improvement work implemented in BY19 under the Rocky Pine Project which included installment of barriers to meet the TMRD standard are reflected in BY20. | **PostBY20 OMRD 42%, TMRD 31%, core 57%**<br>No change in percentages from BY20 as no authorized activities were completed and no ongoing activities. All FP standards are met. |
| 13-Keno | FP Standards OMRD ≤33%, TMRD ≤26%, core ≥59% | **PostBY20 OMRD 32%, TMRD 23%, core 60%** |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

13

FWS006172

| | Cabinet-Yaak RZ authorized Federal management actions on NFS lands; activities authorized by others on corporate and state lands; and private land development affecting route status in current bear year | |
|---|---|---|
| | Column A | Column B |
| **BMU** | **Current Bear Year 2020** | **Post Bear Year 2020 Progression to standard (where we are relative to FP standard)** |
| | *Describe database corrections, authorized temporary activities (admin use exceed/emergency access; authorized temporary activities resulting in on-the-ground changes to motorized access, and on-going authorized activities* | *Briefly Describe what BY20 activities are now shown as completed etc., (these are describe as implemented under BY20 and completed in Post BY) or what on-going activities are still considered.* |
| | **BY20 OMRD 32%, TMRD 23%, core 60%** Compared to PostBY19, OMRD and TMRD increased by 1 percent and core decreased 1 percent. This BMU meets FP standards for all metrics as core remains 1 percent above the standard. <br><br> **On-going projects:** *IPNF*: during BY20 IPNF routes 2536UH and 2536UG, and 2536UC were gated and decrease core acres by a total of approximately 280 acres <br><br> *Three Rivers RD*:  No activity in BY20.  A forthcoming route change for oversnow use on NFSR 745 Hellroaring as analyzed in the Buckhorn Project will be implemented in the future and any effects to BY metrics will be addressed in that Bear Year report. | No change from BY20 percentages. PostBY20 metrics meet FP standards. <br> **On-going projects:** IPNF Deer Creek Project ongoing. Restricted FSR 2536G & 2536H remain in drivable status (to be stored) & temporary road off FSR 2549A remains open and drivable. |
| 14-NW Peaks | FP Standard ≤OMRD 31%, TMRD ≤26%, core ≥55% <br> **BY20 OMRD 28%, TMRD 24%, core 56%** Compared to PostBY19, no change to percentages. This BMU meets FP standards for all metrics <br><br> **Temporary activities**: *Three Rivers RD*: silviculture and other activity on FS route #5932E exceeded allowable trips as authorized in the Buckhorn Project where the route was treated as "open" during implementation. *IPNF*:  none | **PostBY20 OMRD 28%, TMRD 24%, core 56%** <br><br> No change in percentages from BY20. PostBY20 metrics meet FP standards. <br><br> All temporary activities completed and returned to legal status. |
| 15-Garver | FP Standards OMRD ≤33%, TMRD ≤26%, core ≥55% <br> **BY20 OMRD 31%, TMRD 26%, core 55%** Compared to PostBY19, no change in percentages. This BMU meets all FP standards for metrics. | **PostBY20 OMRD 31%, TMRD 26%, core 55%** <br><br> No change in percentages from BY20. PostBY20 metrics meet FP standards. |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

14

FWS006173

| | Cabinet-Yaak RZ authorized Federal management actions on NFS lands; activities authorized by others on corporate and state lands; and private land development affecting route status in current bear year | |
|---|---|---|
| | Column A | Column B |
| **BMU** | **Current Bear Year 2020** | **Post Bear Year 2020 Progression to standard (where we are relative to FP standard)** |
| | *Describe database corrections, authorized temporary activities (admin use exceed/emergency access; authorized temporary activities resulting in on-the-ground changes to motorized access, and on-going authorized activities* | *Briefly Describe what BY20 activities are now shown as completed etc., (these are describe as implemented under BY20 and completed in Post BY) or what on-going activities are still considered.* |
| | ***Database corrections:*** Numerous database corrections were made in this BMU to reflect on the ground conditions verified by the wildlife biologist in the Black Ram analysis and contribute to an overall 180 acre increase in core acres. ***Authorized Temporary Activities***: NFSR #5857 exceeded administrative use due to Garver Mountain Lookout Rental. The gate is kept locked to the general public and the route is modeled as open every year to reflect admin use being exceeded. | |
| 16-East Fork Yaak | FP Standards OMRD ≤33%, TMRD ≤26%, core ≥55% **BY20 OMRD 28%, TMRD 24%, core 56%** Compared to PostBY19 OMRD improves (decreases) by 1%, while no change in percentages for TMRD and core. This BMU meets FP standards for all metrics. The improvement to OMRD resulted from several contributing factors, including database updates in the adjacent BMU 15 and some spatial differences. | **PostBY20 OMRD 28%, TMRD 24%, core 56%** No change in percentages from BY20. This BMU meets FP standards for all metrics. |
| 17-Big Creek | FP Standards OMRD ≤33%, TMRD ≤26%, core ≥55% **BY20 OMRD 30%, TMRD 15%, core 58%** Compared to PostBY19, no change in percentages. This BMU meets FP standards for all metrics. | **Post BY20 OMRD 30%, TMRD 15%, core 58%** No change in percentages from BY20. This BMU continues to meet FP standards for all metrics. |
| 18-Boulder | FP Standards OMRD ≤33%, TMRD ≤29%, core ≥55% **BY20 OMRD 32%, TMRD 31%, core 52%** No change in OMRD, TMRD or Core. Ongoing activities (log haul on restricted road, 2 project roads still drivable) for 20mile Project. Temp | **Post BY20 OMRD 31%, TMRD 30%, core 53%** Core increase, TMRD & OMRD decrease. Storage of 2 road segments from Boulder Creek (FSR 2111 and 2662 end), 20mile timber harvest completed. |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

15

FWS006174

| | Cabinet-Yaak RZ authorized Federal management actions on NFS lands; activities authorized by others on corporate and state lands; and private land development affecting route status in current bear year | |
| --- | --- | --- |
| | Column A | Column B |
| **BMU** | **Current Bear Year 2020** | **Post Bear Year 2020 Progression to standard (where we are relative to FP standard)** |
| | *Describe database corrections, authorized temporary activities (admin use exceed/emergency access; authorized temporary activities resulting in on-the-ground changes to motorized access, and on-going authorized activities* | *Briefly Describe what BY20 activities are now shown as completed etc., (these are describe as implemented under BY20 and completed in Post BY) or what on-going activities are still considered.* |
| | road construction for Boulder Creek Project – 70 acre core loss offset by road storage in Column B. | |
| 19-Grouse | FP Standards OMRD ≤59%, TMRD ≤55%, core ≥37% **BY20 OMRD 61%, TMRD 61%, core 30%** OMRD increase, no change to TMRD or Core. Ongoing activities (log haul on restricted road, 2 project roads still drivable) for 20mile Project. Grouse BMU road storage/decom (numerous segments) Phase I active and affected roads modeled as open. | **Post BY20 OMRD 58%, TMRD 59%, core 32%** OMRD decrease, TMRD decrease, Core increase. Grouse BMU Phase I completed: FSR 2236, 2236A, 2625C, 2686A, 2693A; and non-system roads 729UV, 2686US, and unauthorized ATV trail all stored or decommissioned. 20mile timber harvest completed. |
| 20-North Lightning | FP Standards OMRD ≤35%, TMRD ≤20%, core ≥61% **BY20 OMRD 35%, TMRD 18%, core 63%** No changes to OMRD, TMRD or Core | **Post BY20 OMRD 35%, TMRD 18%, core 64%** No change. |
| 21-Scotchman | FP Standards OMRD ≤34%, TMRD ≤26%, core ≥62% **BY20 OMRD 34%, TMRD 26%, core 65%** No percentage changes to OMRD or Core, TMRD increase. 0.7 mi of FSR 54-UZXZ-PO on private ground incorrectly coded as impassable, changed to open. 0.3 mi of same road on USFS incorrectly coded as impassable, changed to restricted. | **Post BY20 OMRD 34%, TMRD 26%, core 65%** No change. |
| 22-Mt. Headley | FP Standards OMRD ≤33%, TMRD ≤35%, core ≥55% **BY20 OMRD 35%, TMRD 37%, core 53%** This BMU currently does not meet FP standards. The BMU 22 Lolo NF Compliance Project Decision was signed 5/2021. This will be implemented in 2021 and 2022 and cause the BMU to be better than standards. | Implementing completed BMU 22 Compliance NEPA in 2021 and 2022. Will meet standards, likely in 2022 |

Note: On-going field validation of road status and road database cleanup may contribute to some changes each year. Conditions on the ground do not necessarily change from the previous year

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

16

5-ER-1061

FWS006175

*Table 4. Management actions that resulted in changes to OMRD, TMRD or Core habitat from 2019 to 2020 in the Selkirk Recovery Zone as reported by the Idaho Panhandle National Forest.*

| BMU | SELKIRK RZ authorized Federal management actions on NFS lands; activities authorized by others on corporate and State lands; and private land development activities affecting route status in current bear year as reported by the IPNF | |
| --- | --- | --- |
| | Column A | Column B |
| | **Current Bear Year 2020** | **Post Bear Year 2020 Progression to standard (where we are relative to FP standard)** |
| | *Describe database corrections, authorized temporary activities (admin use exceed/emergency access; authorized temporary activities resulting in on-the-ground changes to motorized access, and on-going authorized activities* | *Briefly Describe what BY20 activities are now shown as completed etc., (these are describe as implemented under BY20 and completed in Post BY) or what on-going activities are still considered.* |
| Long-Smith | FP Standards OMRD ≤25%, TMRD ≤15%, core ≥67%<br>**BY20 OMRD 24%, TMRD 16%, core 71%**<br>No change to OMRD, TMRD or Core<br>Gate off FSR 281 at Cutoff Creek destroyed previously, gate and road located on private ground.  Communication on-going with private timber company about gate repair or road closure. Road currently counted toward motorized access metrics pending resolution with landowner. | **Post BY20 OMRD 24%, TMRD 16%, core 71%**<br>No change |
| Ball-Trout | FP Standards OMRD ≤20%, TMRD ≤13%, core ≥69%<br>**BY20 OMRD 16%, TMRD 11%, core 72%**<br>No change to OMRD, TMRD or Core | **Post BY20 OMRD 16%, TMRD 11%, core 72%**<br>No change |
| Myrtle | FP Standards OMRD ≤33%, TMRD ≤24%, core ≥56%<br>**BY20 OMRD 29%, TMRD 23%, core 59%**<br>OMRD decrease, no change to TMRD, Core increase. FSR 2400 modeled as open due to damaged gate on Private lands, but OMRD improvement from 2019 due to end of Mini Mack TS activities on FSR 1309 and no private haul on FSR 1405. Core improvement from temporary fix (on private land) to curtail unauthorized ATV route on Apache Ridge. | **Post BY20 OMRD 29%, TMRD 23%, core 59%**<br>No change to reported metrics. Slight OMRD decrease pending gate repair on FSR 2400. |
| Lakeshore | FP Standards OMRD ≤82%, TMRD ≤56%, core ≥20%<br>**BY20 OMRD 80%, TMRD 45%, core 22%**<br>No changes to OMRD or Core, increase in TMRD. A 0.9 mile section of FSR 2249 was incorrectly identified as decommissioned. It is in fact restricted, and a database correction was made to reflect this. This resulted in the | **Post BY20 OMRD 80%, TMRD 45%, core 22%**<br>No change |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

17

FWS006176

| | SELKIRK RZ authorized Federal management actions on NFS lands; activities authorized by others on corporate and State lands; and private land development activities affecting route status in current bear year as reported by the IPNF | |
|---|---|---|
| | Column A | Column B |
| **BMU** | **Current Bear Year 2020** | **Post Bear Year 2020 Progression to standard (where we are relative to FP standard)** |
| | *Describe database corrections, authorized temporary activities (admin use exceed/emergency access; authorized temporary activities resulting in on-the-ground changes to motorized access, and on-going authorized activities* | *Briefly Describe what BY20 activities are now shown as completed etc., (these are describe as implemented under BY20 and completed in Post BY) or what on-going activities are still considered.* |
| | increase in TMRD (0.5%) and a decrease in Core (0.3%) that is obscured by rounding. | |
| Kalispell-Granite | FP Standards OMRD ≤33%, TMRD ≤26%, core ≥55% **BY20 OMRD 30%, TMRD 24%, core 55%** Increase in OMRD and TMRD, no change to Core. All changes the result of database corrections or activities on private lands. In upper Sema Ck. section 5 on private lands, 0.9 mile of previously undocumented road added and 1.3 additional miles of restricted road used for log haul (open). On NFS lands, 0.6 mile segment in middle Sema Ck. drainage, and 0.1 mile segment in lower Sema previously modeled as restricted roads, but are not drivable. 0.5 mile UTV trail used for administrative purposes added (Indian Mtn.) as restricted route. Two restricted roads on private lands in upper Sema section 9 and lower Sema section 25 used for log haul in 2019 inactive in 2020. | **Post BY20 OMRD 30%, TMRD 24%, core 55%** No change (changes likely for private land road use, but unknown at this time). |
| Blue Grass | FP Standards OMRD ≤33%, TMRD ≤26%, core ≥55% **BY20 OMRD 30%, TMRD 29%, core 48%** No change to OMRD, TMRD or Core. FSR 2251 exceeded trip limits for research purposes; modeled as open. OMRD gain from this offset by OMRD loss (improvement) from maintaining FSR 636 below admin use limits. Short section of road in Canada added, resulting in slight (~20 acres) Core decrease and TMRD increase (0.2%). | **Post BY20 OMRD 27%, TMRD 29%, core 48%** OMRD decrease, no change to TMRD or Core. FSR 2251 reverts to restricted status. |

Note: On-going field validation of road status and road database cleanup may contribute to some changes each year. Conditions on the ground do not necessarily change from the previous year

*Please see APPENDIX A for current bear year activities for the Salmo-Priest, Sullivan Hughes and LeClerc BMUs as reported by the Colville NF.

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

FWS006177



SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

19

5-ER-1064

FWS006178

## Administratively Entering core area blocks for road decommissioning or stabilization activities within the Recovery Zones

The Forest Service may affect underlying core area (i.e., any core habitat that is affected by the subject road and its buffer) within a BMU once per 10 year time frame, and not to exceed one bear year for the sole purpose of completing road decommissioning/stabilization activities on existing closed or barriered roads in core area habitat (USDA 2011), and as specified in the IPNF LRMP BO and the KNF LRMP BO (FWS 2020, respectively), as the **second surrogate** measure as a measure of the amount of take associated with displacement from core habitat. Table 5 lists the ongoing locations, dates, duration, and circumstances for invoking the allowance for administrative project work entering core area for the purposes of road decommissioning or stabilizations in the Cabinet-Yaak Recovery Zone.

*Table 5. List of ongoing locations, dates, duration, and circumstances for invoking the allowance for entering core area for purposes of road decommissioning or stabilizations in the Cabinet-Yaak RZ.*

| BMU | Location | Date | Duration | Circumstances |
|---|---|---|---|---|
| 1-Cedar | Southwestern corner of the BMU in the Madge Creek area. | Summer 2017 | ~ 2 wks | Combination of storage and decommissioning of roads 691, 691E, and 14705, Sparring Bulls Project |
| 9-Callahan | In finger of core between north and south Callahan creeks, east of Smith Patrol (mountain). | July-16-August 10, 2012 | ~3 ½ wks | Road 4521 – combination of decommissioning and storage work under West Troy Project |

As of Bear 2020, within the Selkirk Recovery Zone there have been no allowances for entering core area for the purposes of road decommissioning or stabilizations.

*Table 6. List of ongoing locations, dates, duration, and circumstances for invoking the allowance for entering core area for purposes of road decommissioning or stabilizations in the Selkirk RZ.*

| BMU | Location | Date | Duration | Circumstances |
|---|---|---|---|---|
|  |  |  |  |  |

## Seasonal Administrative Use within the Recovery Zones

During the 2020 BY in the Cabinet-Yaak and Selkirk Recovery Zones, there were some instances where administrative vehicle entries on restricted access (gated) roads exceeded standards.

For the Cabinet-Yaak Ecosystem restricted roads that received administrative use in excess of the allowable trips (either seasonally or over the entire bear year) were considered "open" roads when determining the 2020 bear year temporary condition displayed in Table 1. Administrative use was considered on routes for federal, state, and cooperating corporate lands. Table 7 summarizes Cabinet-Yaak RZ seasonal authorized administrative use on restricted roads by BMU over the 2020 bear year. Unauthorized motorized use is not considered in this table.

FWS006179

*Table 7. Seasonal administrative use within the Cabinet-Yaak RZ by bear management unit in BY 2020*

| Bear Management Unit | Number of Restricted Roads With Administrative Use During Bear Year 2020 | Number of Restricted Roads in the Cabinet-Yaak RZ Exceeding Administrative Use Levels During Bear Year 2020 | | | |
|---|---|---|---|---|---|
| | | Spring Use Period **4/1**-6/15 (≥18 trips) | Summer Use Period 6/16-9/15 (≥23 trips) | Fall Use Period 9/16-**11/30** (≥19 trips) | **Total Use** 4/1-11/30 (≥60 trips) |
| 1-Cedar | 2 | 0 | 0 | 0 | 0 |
| 2-Snowshoe | 0 | 0 | 0 | 0 | 0 |
| 3-Spar | 4 | 0 | 0 | 0 | 0 |
| 4-Bull | 0 | 0 | 0 | 0 | 0 |
| 5-St. Paul | 5 | 0 | 0 | 0 | 0 |
| 6-Wanless | 3 | 0 | 0 | 0 | 0 |
| 7-Silver Butte-Fisher | 2 | 0 | 0 | 0 | 0 |
| 8-Vermillion | 2 | 0 | 0 | 0 | 0 |
| 9-Callahan | 4 | 0 | 0 | 0 | 0 |
| 10-Pulpit [1] | 2 | **1** | 0 | 0 | 0 |
| 11-Roderick | 5 | 0 | 0 | 0 | 0 |
| 12-Newton | 7 | 0 | 0 | 0 | 0 |
| 13-Keno | 3 | 0 | 0 | 0 | 0 |
| 14-NW Peaks [2] | 7 | 0 | 0 | **1** | 0 |
| 15-Garver | 3 | 0 | 1[3] | 0 | 0 |
| 16-East Fork Yaak | 1 | 0 | 0 | 0 | 0 |
| 17-Big Creek | 1 | 0 | 0 | 0 | 0 |
| 18-Boulder | 6[4] | 0 | 2[4] | 0 | 2[4] |
| 19-Grouse | 9[4,5] | 0 | 6[4,5] | 0 | 1[4] |
| 20 -North Lightning | 0 | 0 | 0 | 0 | 0 |
| 21-Scotchman | 0 | 0 | 0 | 0 | 0 |
| 22-Mount Headley | 5 | 0 | 0 | 0 | 0 |
| **Total** | | **1** | **9** | **1** | **3** |

[1] BMU 10: Troy RD #14321 - silviculture & forestry contractor, & fire management activity exceeded allowable trips as analyzed and authorized under the OLY Project. The route was treated as "open" due to administrative use during project implementation.

[2] BMU 14: Troy RD #5932E – silviculture and other road use activity exceeded allowable trips as authorized in the Buckhorn Project where the route was treated as "open" during implementation due to administrative use.

[3] BMU 15: Troy RD # 5857 (Garver Mtn. Lookout) is a segment of the route gated to the general public but exceeds administrative use due to lookout rental traffic and therefore is modeled as open every year for BY monitoring

[4] FSR 2260 used as haul route counted in both Boulder and Grouse BMUs

[5] Includes 5 routes stored for Grouse BMU Phase 1

During Bear Year 2020 in the Selkirk Recovery Zone, there were some instances where administrative use levels exceeded allowable seasonal use levels (Table 8). Roads that experienced administrative use in excess of the allowable trips—either seasonally or for the entire bear year—were considered "open" when determining the bear year condition displayed in Table 2. Administrative use was considered on routes for federal, state, and cooperating corporate lands.

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

21

FWS006180

5-ER-1066

Table 8 summarizes the Selkirk RZ seasonal authorized administrative use on restricted roads by BMU over the Selkirk 2020 bear year. Unauthorized motorized use is not considered in this table.

*Table 8. Seasonal administrative use within the Selkirk RZ by bear management unit in 2020 as reported by the Idaho Panhandle NF.[*]*

| Bear Management Unit | Number of Restricted Roads with Administrative Use During Bear Year 2020 | Number of Restricted Roads in the Selkirk RZ Exceeding Administrative Use Levels During "Bear Year" 2020 | | | |
|---|---|---|---|---|---|
| | | Spring 4/1-6/15 (≥19 round trips) | Summer 6/16-9/15 (≥23 round trips) | Fall 9/16-11/15 (≥15 round trips) | Total Use 4/1-11/15 (≥57 round trips) |
| Blue Grass | 4[1] | 0 | 2[1] | 0 | 2[1] |
| Long Smith | 3[2] | 0 | 0 | 0 | 1[2] |
| Kalispell Granite | 4[3] | 0 | 2[3] | 2[3] | 2[3] |
| Myrtle | 3[2] | 0 | 1[2] | 0 | 1[2] |
| Ball Trout | 0 | 0 | 0 | 0 | 0 |
| Lakeshore | 0 | 0 | 0 | 0 | 0 |
| **Total** | | **0** | **5** | **2** | **4** |

*Please see APPENDIX A for administrative use for the Salmo-Priest, Sullivan Hughes and LeClerc BMUs as reported by the Colville NF.

[1] Forest Roads 1009, 636, 1011 and 2546 form essentially one route to access a private inholding. These routes are also used extensively by the Border Patrol.
[2] Road behind damaged gate on private land included in total
[3] Includes 2 road segments on private land used for log haul

## Recovery Zone Existing Route Closure Monitoring

To fulfill the Forest's commitment to monitor from their individual LMRPs. The Forests committed to monitoring 30 percent of closure devices (gates and barriers) annually within the respective grizzly bear ecosystems, so as to ensure the effective implementation of the open motorized route density parameter of their Access Amendment (USFS 2010, pg. 12). The USFWS acknowledged and considered this design element in the 2013 Biological Opinion (USFWS 2011a, pg. 17). This monitoring commitment was carried forward in the 2013 consultation on the LMRP (USFWS 2013), and in the 2020 reinitiation consultation on the access management portion of the KNF and IPNF LMRPs (USFWS 2020, respectively). The Forest Service monitors closed roads in the recovery zones as time and budgets allow. Agency personnel attempt to repair or replace any vandalized gates and locks as soon as possible. Where closure devices have been driven around, steps are taken to block this illegal access as soon as possible using boulders, earthen berms, cement posts, plantings, root wads, or other means. Table 9 and Table 10 display the numbers of gated and barriered routes that were monitored, number routes with unauthorized motorized access, percent devices monitored, and percent devices considered not functional during the 2020 bear year. The information in these tables reflect one trip for monitoring and one repair although a gate may have been visited numerous times with a lock replaced, or a barrier was repaired more than once. These multiple monitoring trips or repairs within the Recovery Zone are

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

22

5-ER-1067

FWS006181

described in APPENDIX B BMU Unauthorized Motorized Use on Existing Restricted Routes.   Routes were considered barriered if an earth berm, boulders, or vegetation existed which made the route impassible to motorized access.

*Table 9. Summary of restricted Existing route monitoring within the Cabinet-Yaak Recovery Zone in 2020. Data on file at the district or supervisory offices.*

| Grizzly Bear Recovery Zone | National Forest | Closure Type | 2020 | | | | | |
| | | | Number of Closure Devices[1] BY20 | Number Monitored[2] # | Total Monitored in BY Percent % | Number Breach detected[3] # | Total monitored that were breached % | Percent Repaired % |
|---|---|---|---|---|---|---|---|---|
| Cabinet-Yaak | Idaho Panhandle | Gate | 48 | 43 | 90 | 4[4] | 9 | 25 |
| | | Barrier | 41 | 6 | 15 | 0 | 0 | n/a |
| | | Total | 89 | 49 | 55 | 4[4] | 8 | 25 |
| | Kootenai[1] | Gate | 268 | 232 | 86 | 40 | 17 | 24 |
| | | Barrier | 683 | 683 | 100 | 32 | 5 | 0 |
| | | Total | 931 | 915 | 98 | 72 | 22 | 23 |
| | Lolo | Gate | | | 100 | | | 8 |
| | | Barrier | | | 100 | | | 0 |
| | | Total | | 72 | 100 | 13 | 18 | 84% (so far) |
| **Recovery Zone Total** | | | **1,092** | **1,036** | **95** | **89** | **9** | |

[1]starting point for # of closure devices is the total that are located off existing routes open to motorized vehicles but this can vary by year due if additional monitoring of closure devices on spur routes located behind a main access route device occurred or if new closure devices were installed.
[2]Total # of Devices Monitored includes all functional and non-functional devices on existing routes.
[3]Breach detected is # not Functional with unauthorized motorized access and is a subset of the Total # Monitored KNF and IPNF- Barrier includes concrete, earth berm, other, other barrier, rocks, vegetation,
[4]Total includes 2 gates along the same route. Only 3 routes actually affected.

*Table 10. Summary of restricted Existing route monitoring within the Selkirk Recovery Zone in 2020. Data on file at the district offices.*

| Grizzly Bear Recovery Zone | National Forest | Closure Type | 2020 | | | | | |
| | | | Number of Closure Devices | Total Number Monitored # | Percent Monitored % | Breach Detected # | Percent Breached % | Percent Repaired % |
|---|---|---|---|---|---|---|---|---|
| Selkirk | Colville* | Gate or Guardrail | 76 | 59 | 78 | 3 | 4 | 100% |
| | | Impassable | 51 | 35 | 69 | 0 | 0 | |
| | | Total | 127 | 94 | 74 | 3 | 3 | 100% |
| | Idaho Panhandle | Gate or Guardrail | 79 | 70 | 87 | 3 | 4 | 67 |
| | | Barrier | 63 | 7 | 11 | 0 | 0 | 0 |
| | | Total | 142 | 77 | 33 | 3 | 4 | 67 |
| **Recovery Zone Total** | | | **269** | **171** | **64** | **6** | **4** | **83** |

[1]starting point for number of closure devices is the total that are located off routes open to motorized vehicles.
[2]Total Number of Devices Monitored includes all functional and non-functional devices.

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

23

FWS006182

5-ER-1068

[3]Breach detected is Number not Functional with unauthorized motorized access and is a subset of the Total Number Monitored

*Please see APPENDIX A for additional information for the Salmo-Priest, Sullivan Hughes and LeClerc BMUs as reported by the Colville NF. To summarize monitoring information for the Selkirk RZ, data from the CNF report was incorporated here.

In 2020, a total of 95 percent of all closure devices were monitored in the Cabinet-Yaak Ecosystem, with 9 percent considered not functional. Within the Selkirk Ecosystem, a total of 64 percent of all closure devices were monitored, with 4 percent considered not functional. The term not-functional captures situations (including gate destroyed, lock missing, barrier removed, vegetation sawed out, or vehicles getting around a device, etc.) where unauthorized motorized use occurred behind a closure device.

KNF Recovery Zone Existing Route monitoring: On the Kootenai National Forest due to covid-19 and other work limitations, no barriers were repaired or gates reinforced with rocks on the side to prevent motorized access around the gates within the Recovery Zones, but locks were replaced on existing gates, often numerous times. Of the total of 232 gates monitored, a total of 40 had evidence of unauthorized motorized use or were assumed breached if the gate was located behind a known breached gate. Of the 683 barrier devices monitored, 32 had evidence of unauthorized motorized use or were assumed breached if the device was located behind a known breach.

Lolo Recovery Zone Existing Route monitoring: Gate/barrier checks were done in BMU22 in summer 2020. A total of 72 gates/ barriers were checked. There were 8 (11%) breached by motorcycles, 1 (1%) breeched by vehicles <50", and 4 (5%) breached by vehicles >50". Of the 72 gates/ barriers 8 (11%) were missing locks, 5 (7%) gates had both FS and Timber company locks, 10 (14%) of the roads had a veg, dirt or rock barrier or the entrance was obliterated, 2 (3%) gates had a lock that was neither FS or timber co, and the remaining 47 (65%) had FS only locks. 30 (41%) roads had legible travel management signs, 10 (13%) roads had no need for signs, 23 (32%) had missing signs and 11 (14%) had signs that were illegible and need replaced. Road numbers and gate status are listed in Table 22.

This indicates that 82% of gates were effective 2020, 93% were effective at excluding all but motorcycles. Engineering staff and other personnel are in the process of repairing these gates as the snow melts and most should be repaired by June 2021

IPNF Recovery Zone Existing Route monitoring:

The IPNF monitored a total of 49 closures in the CYE and 77 closures in the SE. All gates that access drivable road segments were monitored – usually multiple times during the summer. Most barriers within recovery zones are not monitored because the roads they access are not currently drivable (even by ATVs) and have not been for a number of years. The IPNF detected 4 closure breaches in the CYE involving 3 different routes (two of the breaches involved multiple gates on the same route). One breach is a repeated issue on a recently stored road (FSR 2225) in the Keno BMU that is scheduled to be repaired (again) in 2021. A second road breach, involving two gates, was partially fixed but will require more work (with equipment) in 2021. The last involved a party traveling behind a gate left open by contractors on private land, becoming locked in, and subsequently destroying the gate. The gate was repaired and locks replaced later the same week.

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

24

FWS006183

5-ER-1069

In the SE, 3 potential breaches were detected. Two were repaired soon after discovery, and the third is a gate that primarily serves private land, although NFS lands can also be accessed (this breach was not rectified in 2020). There are also 2 gates that have been destroyed in the past (one in Myrtle BMU, one in Long-Smith BMU) that exclusively access private lands. Each of these road systems is being modeled as open for reporting purposes (since the IPNF does not control access/use of these roads) until the closure can be repaired. See Appendix B for details.

Colville Recovery Zone Existing Route monitoring: See APPENDIX A

### Recovery Zone Unauthorized Motorized Access Monitoring

In addition to the 30 percent monitoring in BMU's, in relation to reasonable and prudent measure #1 for the IPNF LRMP BO (FWS 2020) and the KNF LRMP BO (FWS 2020) within the Recovery Zones, the reporting requirements for the RZs require that annually a list shall be provided of any gates, barriers, or other closure devices that were found to be ineffective at managing wheeled motorized access, any unauthorized creation of additional (motorized) routes that were discovered within the BMUs and the IPNF and the KNF's response to remedy the situation

Prior to bear year 2020 (Bear Year 2010 through 2019) temporary short-term unauthorized motorized access and any user-created routes were included within the analysis for current bear year metrics and included within the discussions for temporary reasons for change within the BMU's.

APPENDIX B, For the Cabinet -Yaak Recovery Zone, Table 24 and Table 25 summarize the IPNF CYE current Bear Year documented unauthorized motorized use on existing routes and user created routes, *Table 26* list those routes within the Lolo National Forest CYE BMU 22. For the Selkirk Recovery Zone Table 27 and Table 28 the IPNF lists unauthorized motorized use on existing and user created routes respectively. The Kootenai National Forest list of unauthorized motorized use on existing system routes and user created routes documented during BY20 within the recovery zone are attached in a separate pdf of an excel spreadsheet at the end of Appendix B.

## Bears Outside Recovery Zones (BORZ)

There are seven discrete areas of recurring grizzly bear use within proximity to the Selkirk and Cabinet-Yaak Recovery Zones (Allen 2011). These areas are referred to as Bears Outside Recovery Zones (BORZ). According to the forest plan amendments signed in November of 2011, the forests are required to ensure "no permanent increases in the total linear miles of "open roads" and "total roads" above baseline conditions on National Forest System lands in any individual BORZ area, except in cases where the Forest Service lacks discretion to prevent road building across National Forest System lands due to legal or other obligations (USDA Forest Service 2011; USDI Fish and Wildlife Service 2011). Any potential increases in linear miles of open or total roads must be compensated for with in-kind reductions concurrently or prior to such increases (ibid). As previously described the Idaho Panhandle and Kootenai National Forests reinitiated consultation on their Forest Plans in 2020, with the USFWS issuing separate BOs for the IPNF (IPNF LRMP BO, FWS 2020) and KNF (KNF LMP BO, FWS 2020). As of BY 2020, relative to this monitoring report, we have removed inclusion of temporary unauthorized motorized access in the bear year metric calculations (while retaining long-term unauthorized user created routes

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

25

5-ER-1070

FWS006184

documented in the new BORZ baselines established in the BY19 report), established new updated baselines for BORZ areas (with differences in the routes considered between the forests), and incorporated the metric of secure habitat calculation within the BORZ to more adequately represent the potential effects related to motorized access.

The IPNF BO established the 2019 baseline condition will be the basis for evaluation any new projects in BORZ under the LRMP (Final IPNF LRMP BO, FWS 2020 page 49). The KNF LMP BO, FWS 2020, pg 112 specified the 2019 baseline conditions for BORZ may be *corrected* as described in this biological opinion without exceedance of incidental take (Baseline conditions from KNF LMP BO, Table 10).

## BORZ Metric Summary Tables

### Route layer assumptions

The route layer assumptions for the current bear year and post bear year KNF and IPNF BORZ are displayed in Table A-1. The summary of current BY20 BORZ metrics along with the Post BY20 metrics are displayed below for the IPNF and KNF BORZ in Table 11 and Table 12.

*Table 11. Baseline conditions of motorized access in Bears Outside Recovery Zone (BORZ) on the IPNF (IPNF LRMP BO, FWS 2020, Table 10, as clarified below) and on the KNF (KNF LMP BO, FWS 2020, Table 10, clarified) as updated for BY20, and displayed with BY20 and Post BY 2020 Motorized Access.*

| Bears Outside Recovery Zone | Recovery Zone | Total Size (Acres) | Total Area[1] (acres) | National Forest System Lands | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Total Routes (linear miles) | | | Open Routes (linear miles) | | |
| | | | | Baseline[2] | BY20 | Post BY20 | Baseline[2] | BY20 | Post BY20 |
| Priest Lake | Selkirk | 80,733 | 75,793 | 340.0 | 340.0 | 340.0 | 337.4 | 337.4 | 337.4 |
| Pack River[3] | Selkirk | 44,587[3] | 38,700[3] | 63.7 | 63.7 | 63.7 | 58.0 | 58.0 | 58.0 |
| Mission-Moyie[4] | Cabinet-Yaak | 107,517 | 90,806 | 367.7 | 374.1 | 364.1 | 335.3 | 335.3 | 333.5 |
| Cabinet Face | Cabinet-Yaak | 28,052 | 27,083 | 165.0 | 163.2 | 162.1 | 133.6 | 131.8 | 131.8 |
| Clark Fork[5] | Cabinet-Yaak | 101,899 | 100,209 | 267.3 | 256.3 | 256.3 | 185.8 | 184.4 | 183.8 |
| Tobacco[6] | Cabinet-Yaak | 287,240 | 266,992 | 1,170.3 | 1,159.8 | 1,159.6 | 914.0 | 905.3 | 905.1 |
| West Kootenai[5,6,7,8] | Cabinet-Yaak | 217,595 | 200,555 | 789.9 | 775.7 | 774.7 | 456.7 | 432.6 | 432.6 |

[1] Total Size: includes all ownerships within the boundary perimeter. BORZ management applies only to NFS land.

[2] Baselines established in IPNF and KNF 2020 BO's corrected, as adjusted and updated in this BY20 report.

[3] Total acres and Total NFS acres for the Pack River are updated here as the acreages displayed in Table 10 of the 2020 IPNF BO (FWS 2020) were incorrect.

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

26

FWS006185

5-ER-1071

[4] For the IPNF, 4.4 miles of railroad tracks documented in BY19 within the Mission-Moyie were removed from the total and open routes per the IPNF LMP BO (FWS 2020) as railroads were not included in the motorized access conditions of the AA, and are not under jurisdiction of the IPNF.

[5] For the KNF, per the KNF LMP BO (FWS 2020) railroad tracks documented in BY19 were not part of the proposed action, although they were included in Table 10 of the BO. The clarified baselines, without including railroad tracks, are shown above. Railroad tracks are considered as part of the existing conditions and there an additional 1.7 miles in the Clark Fork BORZ, 22.4 miles in the Tobacco BORZ and 0.8 miles in the West Kootenai BORZ.

[6] Includes the Bobtail, Lower Pipe, and Cedar Cr-Kootenai River Recurring Use areas (RUAs).

[7] For the KNF, per the BY19 monitoring report (USDA FS 2020b), there was a reported 10.2 miles of long-term user created routes (1.1 miles in Lower Pipe and 9.1 in Cedar-Cr-Kootenai River). Due to better information on one of the routes in Lower Pipe and in Cedar-Cr Kootenai River this has been adjusted to a total of 10.7 miles. See detailed paragraph.

[8] The BY20 and PostBY20 route layers had a segment of the year-round open portion of Kootenai River Road erroneously coded as gated IGBC 2, so the miles were not attributed to open linear miles. To accurately reflect the open linear miles, the 0.19 miles of this open segment were added to the open miles calculated by the route layer (432.4 + 0.19 miles = 432.6 miles, rounded).

*Table 12. Conditions of secure habitat in Bears Outside Recovery Zone (BORZ) on the IPNF (IPNF LRMP BO, FWS 2020, Table 10) and on the KNF (KNF LMP BO, FWS 2020, Table 10) displayed with BY20 and Post BY20 Secure Habitat conditions.*

| Bears Outside Recovery Zone | Recovery Zone | Total Size (Acres) | National Forest System Lands | | | |
|---|---|---|---|---|---|---|
| | | | Total Area (acres) | Secure Habitat 2019 BO (acres/percent) | Secure Habitat BY20 (acres/percent) | Secure Habitat Post BY20 (acres/percent) |
| Priest Lake[1] | Selkirk | 80,733 | 75,793 | 11,630/15.3 | 11,630/15.3 | 11,630/15.3 |
| Pack River[2] | Selkirk | 44,587 | 38,700[2] | 13,546/35.0 | 13,546/35.0 | 13,546/35.0 |
| Mission-Moyie | Cabinet-Yaak | 107,517 | 90,806 | 12,370/13.6 | 12,370/13.6 | 12,309/13.6 |
| Cabinet Face | Cabinet-Yaak | 28,052 | 27,083 | 889/3 | 888/3 | 991/4 |
| Clark Fork | Cabinet-Yaak | 101,899 | 100,209 | 33,330/33 | 33,293/33 | 33,293/33 |
| Tobacco | Cabinet-Yaak | 287,240 | 266,992 | 34,338/13 | 34,341/13 | 34,341/13 |
| West Kootenai | Cabinet-Yaak | 217,595 | 200,555 | 41,419/21 | 41,289/21 | 41,377/21 |

[1] Acres for the Priest Lake secure habitat are updated to correspond to Table 10 of the 2020 IPNF BO (FWS 2020, corrected October).

[2] Acres for the Pack River are updated here as the acreages displayed in Table 10 of the 2020 IPNF BO (FWS 2020, October) were incorrect.

## New BORZ and BORZ expansions/reductions beginning BY20

This section clarifies and describes any expansions made to BORZ areas beginning BY20 due to the following:

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

FWS006186

1. Expansion in acres and routes due to grizzly bear recurring use
2. Expansion or Reduction in acres or routes due to land exchanges
3. Increase in routes due to ANILCA access

The Biological Assessment for the Consultation on the Idaho Panhandle NF LRMP for grizzly bears (IPNF 2020 and the BA for the Consultation on the Kootenai NF LRMP for grizzly bear (KNF 2020) and the IPNF LRMP BO (FWS 2020) and on the KNF LMP BO (FWS 2020) documented all BORZ expansions and updates to baseline acres and total and open linear miles of routes due to grizzly bear recurring use, expansion or reduction in acres or routes due to land exchanges, and any increases in routes due to ANILCA access, that occurred from 2011 through 2019.

Review of the available BORZ data on the IPNF and KNF with the USFWS, Wayne Kasworm CYE Program Grizzly Bear Biologist occurred on March 18, 2021. Based on review of the available data no additional HUCS met the recurring use criteria (as defined by Allen 2011, Appendix A).

In addition, on both the Idaho Panhandle and the Kootenai NF there were no changes to BORZ due to land exchanges or ANILCA access.

*Table 13. Summary of BORZ[1] expansions for NFS lands beginning in bear Year 2020*

| New BORZ or RUA or Land Ex | Recovery Zone | Forest | Existing Associated BORZ | Total NFS Acres +/- | Bear Year +/- | Condition when included as BORZ/RUA[2] | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Total Route Miles | Open Route Miles | Secure Habitat (acres) |
| | | | | | | | | |
| No expansions or land exchanges in BY2020 | | | | | | | | |

[1] Any future BORZ expansions based on the combined boundaries established in the IPNF LRMP BO (FWS 2020) and the KNF LRMP BO (FWS 2020).

[2] Motorized route miles for new BORZ that are associated with existing BORZ will be added to the "Updated Baseline" motorized route miles column in the BORZ Baseline Table for the Bear Year they are added, and in the "Baseline" road miles thereafter. Open and Total miles for new BORZ that are not associated with existing BORZ will be added to the BORZ Baseline Table and the "Baseline" road miles column.

## Current conditions in BORZ motorized Status

The current bear year conditions are displayed in Table 11.

BORZ baseline adjustments to total and open linear miles of routes from 2011 through 2020 were summarized in the IPNF and KNF 2020 Forest Plan reinitiation BA's and the 2020 IPNF and KNF LRMP BO's (FWS 2020 respectively), with the 2020 BO's establishing the 2019 baseline. Baseline conditions of motorized access in BORZ, as established on the IPNF (IPNF LRMP BO, FWS 2020, Table 10), and on the KNF (KNF LMP BO, Table 10, clarified in this BY20 report) displayed with the bear year 2020 motorized and secure habitat conditions. The following Table 14 provides the background detail for the current bear year linear miles of routes for the Kootenai NF, while Table 15 and Table 16 provide the background detail for the current bear year linear miles of routes for the Idaho Panhandle NF.

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)
28

5-ER-1073

FWS006187

*Table 14. BORZ Baseline, Current condition and temporary project impacts, and Post BY conditions expressed in linear miles of motorized routes on KNF lands*

| BORZ | 2020 BO 2019 Baseline [1] (Miles) | | BY20 Baseline Updates or changes [4,5,6] | | BY20 Updated Baseline[7] | | Prior Year's Condition [8] | | BY20 Project Level Temporary Routes [9] | | Condition for BY20 (all Authorized Activities [10] | | BY20 Permanent Changes [11] | | POST BY20 [12] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Open | Total | Open | Total | Open | Total | Open | Total | Open | Total | Open | Total | Open | Total | Open |
| Cabinet Face | 165.0 | 133.6 | | | 165.0 | 133.6 | | | 0.4 | 0.4 | 163.2 | 131.8 | -1.1 | 0.0 | 162.1 | 131.8 |
| Clark Fork [3] | 265.7 | 184.7 | +1.6 | +1.1 | 267.3 | 185.8 | | | +2.27 | +1.7 | 256.3 | 184.4 | | -0.6 | 256.3 | 183.8 |
| Tobacco [3] | 1,170.3 | 914.0 | | | 1,170.3 | 914.0 | | | | | 1,159.8 | 905.3 | | | 1,159.6 | 905.1 |
| West Kootenai [3] | 789.3 | 456.1 | +0.6 | +0.6 | 789.9 | 456.7 | | | +7.03 | | 775.7 | 432.6 | -1.0 | | 774.7 | 432.6 |

[1] Previous Bear Years updated baseline (For BY20, see KNF BO for KNF BORZ, as clarified for railroad tracks.

[3] Per the KNF LMP BO (FWS 2020) railroad tracks documented in BY19 were not part of the proposed action but were included in Table 10. The clarified baselines without including railroad tracks are shown above. Railroad tracks are part of the existing condition with an additional 1.7 miles in the Clark Fork BORZ, 22.4 miles in the Tobacco BORZ and 0.8 miles in the West Kootenai BORZ in the total and open linear miles.

[4] Changes due to correction to status of motorized routes that were determined to have existed on the ground at the time of the 2011 Access Amendments were signed (ie documentation of pre-existing motorized routes, corrections to IGBC coding, no on-the-ground changes).

[5] Linear mileage changes due to BORZ redelineation (expansion or land exchange (expansion or decrease).

[6] Linear miles change due to non-discretionary actions (road construction for ANILCA access, etc).

[7] Current bear years adjusted baseline due to corrections or updates to previous year's baseline.

[8] Prior Years Post BY results. Beginning BY21, this will be the Previous BY Post results (ie in BY21, the Post BY20 numbers will be displayed, in BY22, the PostBY21 numbers will be displayed and so on)

[9] Current BY temporary project routes: no public use (total mi.), and public use (open mi.), utilizing Design Element II, A.1

[10] Current BY authorized activities (temporary and all active discretionary forest activities) with updated baseline (Table 11)

[11] Current BY permanent changes resulting from NFS discretionary Forest activities, ie road construction, decommissioning/storage, or restrictions (gates)

[12] Post BY20 includes BY20 authorized activities that were completed, ongoing projects are considered on the KNF while on the IPNF they are not

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

29

5-ER-1074

FWS006188

*Table 15. BORZ Baseline, as adjusted, in linear miles of motorized routes on Idaho Panhandle NF lands*

| BORZ | 2020 BO 2019 Baseline (Miles) | | BY20 Baseline Updates or changes [3, 4, 5] | | BY20 Updated Baseline[6] | |
|---|---|---|---|---|---|---|
| | Total | Open | Total | Open | Total | Open |
| Priest Lake | 340.0 | 337.4 | 0 | 0 | 340.0 | 337.4 |
| Pack River | 63.7 | 58.0 | 0 | 0 | 63.7 | 58.0 |
| Mission Moyie | 367.7 | 335.3 | 0 | 0 | 367.7 | 335.3 |

[1] Previous Bear Years updated baseline (For BY20, see IPNF BO for IPNF BORZ, as clarified for railroad tracks).

[2] An additional 4.4 miles of railroad tracks exist within the Mission-Moyie BORZ. These were not considered part of the proposed action in the IPNF LRMP BO (FWS 2020) and are not under the jurisdiction of the FS but are considered part of the existing condition.

[3] Changes due to correction to status of motorized routes that were determined to have existed on the ground at the time of the 2011 Access Amendments were signed (ie documentation of pre-existing motorized routes, corrections to IGBC coding,  no on-the-ground changes.

[4] Linear mileage changes due to BORZ redelineation (expansion or land exchange (expansion or decrease).

[5] Linear miles change due to non-discretionary actions (road construction for ANILCA access, FS re-routes for safety etc).

[6] Current bear year adjusted baseline due to corrections or updates to previous year's baseline.

*Table 16. Idaho Panhandle NF BORZ 2020 condition, temporary project impacts, permanent changes, and Post BY conditions expressed in linear miles of motorized routes*

| BORZ | BY20 Updated Baseline[1] | | BY20 condition (excluding temporary routes) | | BY20 Project Level Temporary Routes [2] | | Condition for BY20 (all Authorized Activities [3] | | BY20 Permanent Changes [4] | | POST BY20[5] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Open | Total | Open | Total | Open | Total | Open | Total | Open | Total | Open |
| Priest Lake | 340.0 | 337.4 | 340.0 | 337.4 | 0.0 | 0.0 | 340.0 | 337.4 | 0.0 | 0.0 | 340.0 | 337.4 |
| Pack River | 63.7 | 58.0 | 63.7 | 58.0 | 0.0 | 0.0 | 63.7 | 58.0 | 0.0 | 0.0 | 63.7 | 58.0 |
| Mission Moyie | 367.7 | 335.3 | 367.7 | 335.3 | 6.4 | 0.0 | 374.1 | 335.3 | -3.6 | -1.8 | 364.1 | 333.5 |

[1] Current bear year adjusted baseline due to corrections or updates to previous year's baseline.

[2] Current BY temporary project routes:  no public use (total mi.), and public use (open mi.), utilizing Design Element II, A.1

[3] Current BY authorized activities (temporary and all active discretionary forest activities) with updated baseline

[4] Current BY permanent changes resulting from NFS discretionary Forest activities, ie road construction, decommissioning/storage, or restrictions (gates)

[5] Post Bear Year 2020 are all 2020 authorized activities completed and implemented, ongoing projects are considered

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

30

5-ER-1075

FWS006189

## BORZ Secure Habitat

### Introduction

The IPNF LMP BO (FWS 2020) and the KNF LMP BO (2020) established secure habitat (the baseline condition based on existing total routes as of 2019) at the time of BORZ delineation as the **third surrogate** measure of incidental take of grizzly bears related to motorized access. Should the IPNF or the KNF permanently reduce secure habitat in a BORZ resulting in a lower quantity of secure habitat reported as the 2019 baseline condition, the amount of incidental take will be exceeded unless that reduction in secure habitat is the result of a no net increase exemption. Minor changes in linear miles of motorized routes, and potential decreases in secure habitat below the baseline condition, may occur in BORZ, related to exceptions to the "no net increase" standard and for short route relocations done for safety purposes. We expect these losses may occur as the result of IPNF or the KNF obligations to provide access on NFS lands to private lands, and/or short movements of road segments or gates/closure devices to improve access management effectiveness and safety. The FWS assumed actions will result in no more than a 2 percent net decrease in secure habitat within each BORZ. Therefore, the FWS used a 2 percent decrease in secure habitat in each BORZ, due to exceptions to the "no net increase" standard, as the **fourth surrogate** measure of incidental take. If an IPNF or KNF action permanently reduces the amount of secure habitat by more than 2 percent of the reported baseline condition, or if the purposes for the decrease are other than those associated with exceptions to the "no net increase" standard or route relocation for safety purposes or to improve effectiveness, the level of incidental take anticipated here would be exceeded and reinitiation of consultation would be required.

### Secure Habitat Metrics

The current BORZ secure habitat python model (developed after the forests provided the 2019 baseline calculations for the 2020 BO's) creates a BORZ secure habitat polygon layer through a series of buffer processes based on total motorized routes, ownership, and BORZ outer boundaries. Currently total routes considered in this model are IGBC 2 (gated, yearlong or seasonally), IGBC 4 (open routes), IGBC 5 (open motorized trails), and an identifier of "10" for railroad tracks. The automated model resulted in slight rounding differences attributed to GIS processes.

Although railroad tracks were not part of the proposed action considered in the IPNF or KNF BOs, railroad tracks are considered part of the existing condition, and depending upon their location, may affect secure habitat, and thus are considered for secure habitat calculations. Please also note, that unlike core within the recovery zone, IGBC 8 - High intensity non-motorized trails are not considered in the route layer used in the model for BORZ secure habitat. Secure habitat is calculated two ways using the current bear year route layer and a Post bear year route layer. Table 17 displays the 2019 baseline, temporary project level changes, and any permanent project-level changes to secure habitat on the Kootenai NF. Table 18 and Table 19 display the Idaho Panhandle NF BORZ baseline security and BORZ 2020 security

FWS006190

*Table 17. BORZ Secure Habitat Current Bear Year 2020*

| BORZ | BORZ Total NFS Acres | 2020 BO 2019 Baseline (Acres)[1] | 2021 Python Model | Bear Year 2020 Secure Habitat | | | | | BY20 Condition | POST Bear Year 2020 Secure Habitat | | POST BY20 Baseline |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | "Permanent" Changes (result in on-the-ground changes) | | | | Temporary Changes | | "Permanent" Changes | | |
| | | | | BY20 Database Updates or BORZ (Acres)[3,4] | BY20 Project Level (Acres)[5] | BY20 Anilca or route relocation (Acres)[6] | BY20 Updated Baseline (Acres)[7] | BY20 Project Level Changes (Acres +/-)[8] | | PostBY20 Project Level Change (Acres)[5] | Post BY20 Condition (Acres) | |
| Cabinet Face | 27,083 | 889 | -1 | 0 | 0 | 0 | 888 | 0 | 888 | 0 | 888 | 888 |
| Clark Fork | 100,209 | 33,330 | +5 | -37[3] | 0 | 0 | 33,293 | 0 | 33,293 | 0 | 33,293 | 33,293 |
| Tobacco | 266,992 | 34,338 | +4 | 0 | 0 | 0 | 33,341 | 0 | 33,341 | 0 | 33,341 | 33,341 |
| West Kootenai | 200,555 | 41,419 | 0 | 0 | 0 | 0 | 41,419 | -130 | 41,289 | +88 | 41,377 | 41,419 |

[1] The 2019 Baseline secure habitat was established in the IPNF LMP BO and KNF LMP BO (FWS 2020). A python model script was developed after the calculationss for the 2020 BOs. This automated model results in slightly different acreages due to rounding.

[2] IPNF 2% exempted loss from IPNF LMP BO (FWS 2020) Table 14. KNF 2% exempted loss was calculated for this report as it was not provided in the KNF LMP BO (FWS 2020).

[3] Permanent changes due to correction to status of motorized routes determined to have existed on the ground at the time of the 2011 Access Amendments were signed (ie documentation of pre-existing motorized routes, corrections to IGBC coding, no on-the-ground changes, or for routes relocated due to safety in bear year 2019 prior to the establishment of secure habitat

[4] Permanent changes due to BORZ re-delineation (expansion or land exchange (expansion or decrease).

[5] Permanent changes due to Forest Service project level changes "Permanent" project level changes are defined as activities that result in on-the-ground changes

[6] Permanent changes in secure habitat due to non-discretionary actions (road construction for ANILCA access, etc).

[6] Project Level-changes against the updated BY20 baseline expressed in acres and percent

[7] "Permanent" project level changes are defined as activities that result in on-the-ground changes.

[8] Temporary project level changes.

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

FWS006191

Table 18. Idaho Panhandle NF BORZ baseline security, as adjusted

| BORZ | BORZ Total NFS Acres | 2020 BO Secure Habitat 2019 Baseline (Acres)[1] | BY20 Database Updates or BORZ Change (Acres)[2,3,4] | BY20 Anilca Change (Acres)[4] | **BY20 Updated Baseline (Acres)** |
|---|---|---|---|---|---|
| Priest Lake | 75,793 | 11,630 | 0 | 0 | 11,630 |
| Pack River | 38,700 | 13,546 | 0 | 0 | 13,546 |
| Mission Moyie | 90,633 | 12,370 | -61 | 0 | 12,309 |

[1] Previous Bear Years updated baseline

[2] Permanent changes in secure habitat due to correction to status of motorized routes determined to have existed on the ground at the time of the 2011 Access Amendments were signed (ie documentation of pre-existing motorized routes, corrections to IGBC coding, no on-the-ground changes.

[3] Permanent changes in secure habitat due to BORZ re-delineation (expansion or land exchange (expansion or decrease)).

[4] Permanent changes in secure habitat due to non-discretionary actions (road construction for ANILCA access, etc) or short reroute/relocation of closure.

*Table 19. Idaho Panhandle NF BORZ 2020 Secure Habitat 2020 condition, temporary project impacts, permanent changes, and Post BY conditions*

| BORZ | BY20 Updated Baseline (Acres)[1] | **BY20 Security (excluding temporary routes)** | BY20 Project Level temp Changes (Acres +/-)[2] | BY20 temp security[3] | Project level perm changes[4] | Post BY20 Condition (Acres)[5] |
|---|---|---|---|---|---|---|
| Priest Lake | 11,630 | 11,630 | 0 | 11,630 | 0 | 11,630 |
| Pack River | 13,546 | 13,546 | 0 | 13,546 | 0 | 13,546 |
| Mission Moyie | 12,309 | 12,309 | -560 | 11,749 | +70 | 12,379 |

[1] Current bear year adjusted baseline due to corrections or updates to previous year's baseline.

[2] Current BY secure habitat affected by temporary project routes (no public use)

[3] Current BY secure habitat from authorized activities (temporary and all active discretionary forest activities) with updated condition

[4] Current BY permanent changes to secure habitat resulting from NFS discretionary Forest activities, ie road construction, decommissioning/storage, or restrictions (gates)

[5] Post Bear Year 2020 are all 2020 authorized activities completed and implemented, ongoing projects are considered

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING
FINAL SUMMARY REPORT (07/20/2021)

33

5-ER-1078

FWS006192

## Permanent Reductions in BORZ secure habitat

As of bear year 2020, there have been no permanent reductions in BORZ secure habitat due to ANILCA on either the Kootenai or Idaho Panhandle NF.

*Table 20. Permanent reduction in Secure habitat due to factors outside FS discretion (ANILCA)*

| BORZ | Secure Habitat[1] 2019 Baseline (2020 BOs) (Acres) | Exempted Loss of Secure Habitat Allowed (2%) | Year Exemption Taken | Location | Change in Secure habitat acres eligible for exemption | Total acres & percent of exemptions |
|---|---|---|---|---|---|---|
| *Single entry every time exemption is used. Rows only get added, ( total to date)* | *Secure habitat adjusted to incorporate ANILCA* | *Acres may change as database corrections occur, but generally stays constant* | | *Rough description of location of loss (drainage/road/legal or other)* | *Acres secure habitat removed from this year (or multiple entries each occurrence)* | *Total to date of exempted acres (& %) for that BORZ. Added to each occurrence* |
| none | | | | | | |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

34

5-ER-1079

FWS006193

## BORZ Metric Reasons for Change

The following table provides the reasons for change for BY20 and the PostBY20 for the Kootenai and Idaho Panhandle NF.

*Table 21 . Management actions that resulted in changes to BORZ Total linear Miles, Open Linear Miles or Secure Habitat*

| BORZ | BORZ Current Bear Year 2020 | BORZ Post Bear Year 2020 |
|---|---|---|
| | *Describe database corrections, authorized temporary activities resulting in on-the-ground changes to motorized access and on-going authorized activities* | *Briefly describe what BY20 authorized activities are now shown as completed (these are described as implemented under BY20 and shown as completed in Post BY20, or any on-going activities that are still considered.* |
| Priest Lake | none | none |
| Pack River | **Database correction:** Total BORZ area and area of NFS lands are incorrect in the Forest Plan BO and are corrected here. Change in NFS acres also changes percent of secure habitat (secure habitat acres do not change). | none |
| Mission-Moyie | **Database correction:** During batched consultation on ongoing IPNF activities, a mapping error was discovered that reduced secure habitat by 61 acres (12,370 to 12,309). No change in linear road miles resulting from this error.<br><br>**On-going activities:**<br><br>Hellroaring – 0.9 miles of previously bermed portion of FSR 2484 remains open and drivable (to be stored) pending final fuels reduction activities (all logging completed); temp increase of 0.9 total route miles, temp loss of 186 acres of secure habitat.<br><br>Deer Creek – 0.7 miles of road (2522B) and 0.3 miles of road (2541F) reconstructed for Deer Placer TS (both previously non-system roads, added to sytem, used for Project, and to be stored post-Project). Temporary increase of 1.0 total motorized route miles; temporary loss of 27 secure habitat acres. Approximately 0.3 miles temp road still on landscape for Deer Stew TS; temp increase of 0.3 total route miles, no secure habitat affected.<br><br>Camp Robin – Temporary roads T7, T10, T12, T24 and T25 constructed and used in 2020 (also most of T9 remains from a | **Completed activities:**<br><br>Hellroaring - Road storage was completed on restricted FSR 2266A (1.8 miles) and open FSR 1374A (1.8 miles). This will permanently decrease open motorized route miles in the BORZ by 1.8 miles in 2021, and total motorized route miles by 3.6 miles. Permanent secure habitat will increase by approximately 55 acres from storage of 2266A (no change from 1374A storage due to location in relation to other roads).<br><br>Camp Robin - T12 and T25 were closed in 2020, providing a 0.8 mile total road reduction in 2021. User-created route 2494UD was also closed, permanently increasing secure habitat by 15 acres for 2021. |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

35

FWS006194

| BORZ | BORZ Current Bear Year 2020 | BORZ Post Bear Year 2020 |
|---|---|---|
| | previous project), totaling 4.2 miles of total road increase. Approximately 347 acres of secure habitat temporary loss. | |
| Cabinet Face | *On-going activities*: The FRTA authorized construction of 0.4 miles of route on FR 4400C that was required to be gated and bermed following activity, remains on the ground. During BY19 as reported, and during BY20 the gate was found to be missing, although it was subject to the seasonal restriction on the 4400C. The BY19 report stated the district would determine in 2020 when the 0.4 miles would be barriered per the FRTA in 2020. The work was not completed in BY20<br>The Miller West Fisher Timber sale barriered 1.2 miles of the end of gated route 808E. | *Completed activities:* Completion of the barrier on 808E resulted in increase of 103 acres of secure habitat, and a decrease of 1.2 mi in total linear miles of routes.<br><br>*Ongoing activities:* The 0.4 miles of the 4400C that is to be barriered following work on the corporate timberland, remains on the ground and contributes to both total and linear miles of routes until the district determines when the corporate owner will barrier the segment as required under the FRTA. |
| Clark Fork | *Database corrections*: As mentioned in the BY19 report the 332A-IPNF (1 mi) was determined to be an IPNF route and has always been managed as open, not impassible like the KNF had it coded. The route is used for mining claim access and was not a change on the ground. This database correction was not reflected in the PostBY19 route layer utilized to calculate secure habitat for the FP 2020 BO. This correction was reflected in the BY20 route layer and thus resulted in a decrease of 12 acres of secure habitat that was mapped for the 2020 BO based on the incorrect route layer, and increased total and open linear miles for the Clark Fork BORZ.<br><br>The reroute of 2273 was analyzed in the Elk Rice NEPA and BA and completed on the ground during bear year 2019, but the information did not make it into the BY19 report nor into the PostBY19 route layer which was used to provide the calculations for the FP 2020 BO. This reroute was required due to a washout and human safety. In terms of the BO secure habitat, it increased 6 acres in one block and decreases 19. acres in other block, however this reroute was in place on the ground | PostBY20 total linear miles decreases by 1.0 miles.<br><br>*Completed activities*: The segment of FR 1913 (0.6 mi) located on NFS land was gated as Stimson harvest and use of the #1913 located on Stimson land was completed.<br><br>*Project Activities on hold due to court decisions:* As described under the current bear year activities, the gated segment of NFSR #2214H continues to contribute to total linear miles.<br><br>*Ongoing activities:* The FR 1910 Pew Ridge (0.4 mi) used by Stimson for harvest remained open in PostBY20 contributing to open linear miles and is expected to be gated in 2021. In addition the temporary increase in total and open linear miles due to the NFSR #1944 (0.8 mi) and 2229N (0.7 mi) Avista permitted roads being opened to the public continues. |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

36

5-ER-1081

FWS006195

| BORZ | BORZ Current Bear Year 2020 | BORZ Post Bear Year 2020 |
|------|------------------------------|---------------------------|
|      | prior to the BO calculations, and resulted in an overall increase of about 0.1 miles<br><br>The 2219A Beecher Peak A was a database correction due to the route was walked and the length verified (updated from 0.7 mi to 0.9 mi), for an overall increase of 0.2 miles. No change occurred on the ground, only a mapping update.  This was not in the PostBY19 route layer used to calculate secure habitat for the FP 2020 BO.  Based on the more accurate 2020 route layer a secure habitat block goes from 31 to 13 acres compared to PostBY19 BO estimate.<br><br>Total permanent decrease in secure habitat with GIS processing due to all the 2020 route layer reflected database corrections, was 37 acres compared to the Post BY19 numbers generated for the 2020 BO.  Since the KNF 2020 BO calculations, the more accurate python model results in 5 acre increase difference due to rounding.<br><br>Route 2295K Beaver Peak K (0.3 mi), covered under a Special Use permit originally issued in 1992, was coded as IGBC 3 in the baseline, but corrected to gated IGBC 2 as SUP has permission to access the road. This was not a change on the ground.<br><br>***Project Activities on hold due to court decisions***: A previously barriered portion of NFSR #2214H (0.8 miles) temporarily changed from barriered (IGBC 3) to gated (IGBC 2) under the Pilgrim Project prior to the Pilgrim 11 district court opinion remain gated until the district court decisions are addressed.  As the court opinion remanded the original project decision, the KNF is required to reissue a new EIS and consult with FWS in order to complete the Pilgrim project. This gated segment of NFSR #2214H will continue to contribute to total linear miles until that analysis is completed. The |  |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

37

5-ER-1082

FWS006196

| BORZ | BORZ Current Bear Year 2020 | BORZ Post Bear Year 2020 |
|---|---|---|
| | segment will be re-barriered once project work is completed. *Ongoing project activities*: The 1910 Pew Ridge (0.4 mi) and 1913 Elk Ridge (0.6 mi) located on NFS land were open in BY20 due to Stimson logging on their private section, Additional temporary increase in total linear and open miles continues with the NFSR #1944 Burr Knob (0.8 mi) and 2229N (0.7 mi) Avista permitted roads. The 2229N used to be bermed, Avista only gated one end, routes still showing as open. No projected timeline on when Avista will gate. | |
| Tobacco | *Database corrections*: The NFSR 7212A Ferry A (0.6 miles) has always been an open road. The IGBC code was incorrectly shown in NRM as gated IGBC 2. In BY20, this route was updated to open. This was not a change on the ground and is a permanent change to the open linear baseline. *Database Updates*: The routes 15409A (0.1 miles) and 688A (0.1 miles) were part of the Frank Lake Land Exchange and were undetermined roads. These routes were open in the baseline when the land was added to the BORZ and were considered open in BY20 when they were bermed. The 3 acres change in the Tobacco secure habitat acreage is due to rounding differences in the new python model. | *Completed projects*: the BY20 change of 15409A (0.1 mi) and 688A (0.1 mi) from open to barriered contributed to decrease in the Post BY20 open and total linear miles |
| West Kootenai | *Database Corrections*: Linear miles: In the BY19 monitoring report within the combined West Kootenai BORZ there were a total of 10.2 miles of long-term unauthorized user created motorized routes that were documented in the two recurring use areas added to the BORZ. Within the Lower Pipe RUA there were 1.1 miles with 0.1 mile of the routes later identified as a gated route built by a timber company corporate owner across | *Completed projects*: During BY20 the West Pipe sale completed work on the 4613G (1.1 miles) and rebarriered the route, thus in PostBY 20 the 88 acres of secure habitat was restored *Ongoing projects*: contributing to total linear miles the following impassable or barriered routes were gated for the following projects and remain in use: the West Pipe sale continued to use 4613H (0.83 miles), and the Pipe Bull project continues to use |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)
38

FWS006197

5-ER-1083

| BORZ | BORZ Current Bear Year 2020 | BORZ Post Bear Year 2020 |
|---|---|---|
| | NFS lands to access their private section for timber harvest (0.1 miles). In BY20, the Forest is removing the 0.1 miles associated with the corporate land from the list of user created unauthorized long-term motorized routes and will instead update the baseline of total routes to include it as a private jurisdiction route  Within the Cedar Creek-Kootenai River RUA in BY19 there were 9.1 miles of long-term unauthorized user created motorized routes identified when there should have been 9.7 miles identified in the BY19 report to be consistent with the on-the-ground digitizing documentation. At the time there was an expectation that 0.6 miles would be barriered. Therefore, in BY20 the mileage of long-term user created routes identified in the West Kootenai BORZ that the district will address is adjusted to 10.7 miles, with rounding.  With the incorrect IGBC coding (IGBC 2) on an open segment of Kootenai River Road still remaining in the route layer, the 0.19 miles of this segment was added to the open linear miles of road calculated by the route layer (432.4 miles + 0.19 miles) to arrive at the 432.6 miles displayed in the tables above.<br><br>***Ongoing Projects***: Libby RD:  Several routes previously identified as temporary increases remain on the ground. For Contributing to total linear miles the NFSR #5090 (1.3 mi) remains gated. This previously impassible route was originally opened in 2017 for fire suppression, and then remained opened with log decks on the road, with a temporary wooden barrier gate. The route remained gated in BY19 while the Libby District engineers decided on the drainage work and the work was expected to be completed in 2020 with the berm replaced. This work was not completed in BY20 and the route remains gated. Other Routes considered under the Pipe Bull Sale and | 6144E (0.8 mi), and 6145 (2 mi).  The 5090 (1.3 mi) continues to be gated until the Libby District is able to complete the drainage work and rebarrier the route.<br><br>On the Ksanka RD the NFSR 7168F continues to be used in the Burnt Caribou TS and contribute to temporary increase in total linear miles. The timber sale activity on 7168F is expected to be completed and the route re-barriered in summer of 2021. The 7168F (1 mi) also contributes temporary decrease in approximately 37 acres of secure habitat. The 7168F, as well as the 7164A (0.8 mi) and 7164B (1.8 mi) are scheduled to be bermed in summer of 2021 |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

FWS006198

| BORZ | BORZ Current Bear Year 2020 | BORZ Post Bear Year 2020 |
|------|------------------------------|---------------------------|
| | changed from either IGBC 3 or 1 to IGBC 2 during by20 were NFSR #6144E (0.8 mi), 6145 Lindy Spur (2 mi).<br><br>During BY20 the West Pipe TS harvest continued on the 4613H (IGBC 1 to 2 for activity) (0.8 mi).The 4613G (1.1 mi) which was changed from IGBC 3 to 2 for activity, was completed and the route was actively re-barriered in BY20.<br><br>Ksanka RD: During BY20 the 7168F Marias Mtn F (1 mi) was used for the Burnt Caribou T.S. This was a barriered route changed to gated for the project.  Activity on the 7168F (1.0 mi) for the Burnt Caribou TS continued through BY20.In addition it was noted that the NFSR 7164A (0.8 mi), 7164B 1.8 mi) both barriered spurs off the year round gated 7168F had their guard rail barriers removed for the sale but these are not reflected in the route outputs for the BY as the transportation engineer determined as they were behind a gated route they hadn't been accessed and are scheduled to be bermed in 2021<br><br>Improved model rounding accounts for approximately 5 acres in secure habitat. T125 acres temporary decrease is due to temporary project activity on the 4613G for the West Pipe and the 7168F in the Caribou fire Salvage.<br><br>As mentioned above in the linear miles discussion, Route 7168F, a previously barriered route was shown as IGBC 2 during BY19, and returned to IGBC 3 in the PostBY19 route layers used to generate the secure habitat for the FP BO 2020. However this route was still being used by the Caribou Sale as part of the ongoing project, so in BY20 it was again shown as IGBC 2 gated status, thus affecting the 52 acre block secure habitat identified in the BO and temporarily decreasing it to 15 acres. This secure habitat is not yet created on the ground as the | |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

40

5-ER-1085

FWS006199

| BORZ | BORZ Current Bear Year 2020 | BORZ Post Bear Year 2020 |
|------|-----------------------------|--------------------------|
|      | Caribou project activity on this route was ongoing and was occurring prior to the BO calculations for secure habitat. |  |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

41

5-ER-1086

FWS006200

## BORZ Existing Route Closure Device Monitoring

As stated within the IPNF and KNF LRMP BOs (FWS 2020, respectively) the Forests will conduct ad hoc and opportunistic monitoring of access restriction devices within the BORZ in multiple ways, as described in the individual LRMP re-initiation BA's.

During Bear Year 2020, the Kootenai National Forest initiated data collection of route closure devices by all field going personnel across the forest using Collector 1,2,3 and AGOL. Data collected included the type of device (gate, barrier, type of barrier such as rock, earth berm, vegetation), whether it was functional or not or if there was signs of a motorized breach, if a repair was needed, and if a repair was done. This information was collected across the forest, including with the BORZ. Table 22 displays the total number of devices monitored within each KNF BORZ.

*Table 22. Kootenai NF BORZ ad hoc Monitoring of BORZ closure devices on existing NFS Routes*

| BORZ | Recovery Zone | Total Devices Monitored | | | Total Devices Breached | | | Repaired | |
|---|---|---|---|---|---|---|---|---|---|
| | | None | Barrier | Gate | Blank | Barrier | Gate | barrier | gate |
| Cabinet Face | Cabinet-Yaak | 0 | 22 | 31 | 0 | 1 | 1 | 1 | 0 |
| Clark Fork | Cabinet-Yaak | 0 | 116 | 39 | 0 | 5 | 2 | 0 | 1 |
| Tobacco | Cabinet-Yaak | 1 | 452 | 263 | 0 | 36 | 6 | 20 | 4 |
| West Kootenai | Cabinet-Yaak | 1 | 191 | 180 | 0 | 10 | 21 | 5 | 20 |
| **Grand Total** | | **2** | **781** | **513** | **0** | **52** | **30** | **26** | **25** |

[1]Total # of Devices Monitored includes all functional and non-functional devices on existing routes.
[2]Breach detected is # not Functional with unauthorized motorized access and is a subset of the Total # Monitored. Further investigation into the AGOL data indicates the number of total devices breached in this table is an over-estimation as some routes were given a repair date in the AGOL entry form, but the comments indicated there was no unauthorized use. In addition, comments on some routes indicated no restriction device was present, but an earthern berm or barrier was checked as an indication of what was needed. These are specified for repair in 2021 KNF - Barrier includes concrete, earth berm, other, other barrier, rocks, vegetation

Total devices breached is an over estimation as some routes were given a repair date in the AGOL entry form, but the comments indicated there was no unauthorized motorized use. Number of repairs taken from Appendix C.

During bear year 2020, the Idaho Panhandle National Forest monitored the number of devices in the BORZ as displayed in Table 23

Table 23 displays the IPNF ad hoc Monitoring of closure devices within each BORZ.

*Table 23. Idaho Panhandle NF BORZ ad hoc Monitoring of BORZ closure devices*

| BORZ | Recovery Zone | Total Devices Monitored | | Total Devices breached | |
|---|---|---|---|---|---|
| | | Barrier | Gate | Barrier | Gate |
| Priest Lake | Selkirk | 43 | 0 | 6 | 0 |
| Pack River | Selkirk | 11 | 0 | 5 | 0 |
| Mission-Moyie | Cabinet-Yaak | 1 | 0 | 0 | 0 |
| Grand Total | | 55 | 0 | 11 | 0 |

FWS006201

### BORZ Unauthorized Motorized Access

In addition to the Forests ad hoc and opportunistic monitoring of closure devices in the BORZ, the Reasonable and Prudent Measure #1 for the IPNF LRMP BO (FWS 2020) and the KNF LRMP BO (FWS 2020) reporting requirements require an annual list be provided of any gates, barriers, or other closure devices that were found to be temporary and short-term ineffective at managing wheeled motorized access, any unauthorized creation of additional motorized routes that were discovered within the BORZ and the IPNF and the KNF's response to remedy the situation.

On the KNF, long-term unauthorized motorized use routes documented in BY19 are accounted for in the baselines, BY20 and Post BY20 linear miles included in Table 11 and the previous current conditions sections.

Appendix C Tables for each Forest summarize the current bear year documented short-term temporary unauthorized motorized access on existing routes and user created routes on NFS lands within the Kootenai NF and IPNF BORZ areas for bear year 2020. *Table 29* and Table 30 display the routes documented on the Idaho Panhandle BORZ areas for existing routes and for user created routes respectively.

The Kootenai National Forest documentation of unauthorized motorized access within the BORZ on existing routes and user created routes are listed in the attached PDF at the end of Appendix C

## Over-Snow Use in the Recovery Zone

### Introduction

Over-snow use was discussed and reviewed in detail in both the BA's and BO's for the IPNF and KNF reinitiated consultation on the LRMPs.

### Selkirk and Cabinet-Yaak Ecosystems Over-Snow Use

In relation to the **fifth surrogate** measure of incidental take, the IPNF LRMP BO (FWS 2020,specifying within the CYE or Selkirks), and the KNF LRMP BO (FWS) (relative to over-snow in the CYE and NCDE) specified that an up-to-date record of any changes in the amount of modeled grizzly bear denning habitat that overlaps with authorized late season over-the-snow motorized use be provided in the bear year monitoring report.

#### Kootenai NF

##### *Cabinet-Yaak RZ*

Over-snow use as documented in the (USDA Fish and Wildlife 2013, pg11) is summarized in the 2013 BA (pg 83) and in the KNF LRMP 2020 BA (page 41). The KNF LRMP BA (KNF 2020) further stated that since spring of 2016, the KNF has contributed funding for monitoring flights to map the use of over-snow motorized vehicles in areas of potential overlap with denning habitat. Monitoring has focused on the Northwest Peaks/Buckhorn Ridge and Spar Lake vicinities within the CYE. These are areas that can be accessed by over-snow motorized vehicles in the spring and have denning habitat. Monitoring indicates that the distribution of over-snow motorized use in these areas has been similar over the last several

FWS006202

years. No new information is available on over-snow monitoring since the summary provided in the KNF LRMP BA (FS 2020) and the KNF LMP BO (FWS 2020).

*Northern Continental Divide Ecosystem*

As summarized in the KNF LRMP 2020 BA (KNF 2020), the KNF's portion of the Northern Continental Divide Ecosystem's (NCDE) Primary Conservation Area (PCA = Recovery Zone) covers 118,770 acres in the northeast portion of the Forest. This represents only 2 percent of the entire PCA. Most of the PCA on the KNF is within the Murphy Lake BMU, consisting of the Krinklehorn and Therriault subunits. Another 283,300 acres of the KNF lie within Zone 1 of the NCDE, which mostly overlaps with the Tobacco BORZ. The KNF only has 6 percent of the total acreage of Zone 1 of the NCDE. Most of the Zone 1 on the KNF is also within the NCDE's Salish Demographic Connectivity Area (DCA) at 276,822 acres (p. 40 in USFS 2017b). The KNF LRMP 2020 BA (Ibid) also summarized the key features of the NCDE Amendment BA (USFS 2017), with one of the key features related to over-snow use was within modeled grizzly bear denning habitat in the primary conservation area, there would be no net increase in the percentage of area or miles of routes that are open to over-snow vehicle use on NFS lands during the den emergence time period. No new information is available on over-snow monitoring in the NCDE since the summary provided in the KNF LRMP BA (FS 2020) and the KNF LMP BO (FWS 2020).

## Idaho Panhandle NF

### Selkirk

Over-snow use as documented in the IPNF Re-initiation BA, disclosed snowmobiling is permitted on 79 percent of the SE and 87 percent of the CYE (BA, pp. 53-54). The IPNF-managed portion of the SE include 14 miles of groomed routes overlapping approximately 118,200 acres of modeled grizzly bear denning habitat and off-route use is permitted on approximately 7,440 acres in the IPNF-managed portion of the SE. Both on- and off-route snowmobiling occurs on approximately six percent of modeled denning habitat on the IPNF-managed portion of the SE.

### Cabinet-Yaak

There are 26 miles of groomed routes overlapping approximately 74,750 acres of modeled grizzly bear denning habitat and off-route use is permitted on approximately 14,250 acres within the IPNF-managed portion of the CYE. Both on- and off-route snowmobiling occurs on approximately nineteen percent of the modeled denning habitat in the IPNF-managed portion of the CYE.

## BORZ on the IPNF and Over-Snow Use

### Idaho Panhandle NF

In relation to the **sixth surrogate** measure of incidental take specified in the IPNF LRMP BO (FWS 2020), the monitoring requirement states the IPNF must provide an up-to-date description of any changes in the amount of groomed or ungroomed trails providing over-the-snow use in any BORZ on the IPNF. Public motorized over-snow use is also facilitated by 71.3 miles of combined groomed and ungroomed routes in the Priest BORZ. Similarly, the Pack River BORZ contains 30.9 miles of combined groomed and ungroomed routes. The Mission-Moyie BORZ contains 21.4 miles of groomed routes. The extent of overlap between motorized over-snow use and grizzly bear denning habitat is uncertain because denning habitat has not been modeled in BORZ.

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING
FINAL SUMMARY REPORT (07/20/2021)
44

FWS006203

5-ER-1089

# REFERENCES

Allen, L. 2011. A review of grizzly bear recurring use areas associated with the Selkirk and Cabinet-Yaak recovery zones. Unpublished USDA Forest Service report. 20 pp.

Borysewicz, M. 2021. Road Densities, Core Habitat in the Colville National Forest's portion of the Selkirk Mountains Grizzly Bear Recovery Area. Unpublished USDA Forest Service. March 22, 2021. 13 pp

USFS. 2019. Colville National Forest Land Management Plan, Ferry, Pend Oreille, and Stevens Counties, WA.  https://www.fs.usda.gov/main/colville/landmanagement/planning

USFS. 2015a. Land Management Plan 2015 Revision Kootenai National Forest. Libby, MT. Available at: https://www.fs.usda.gov/main/kootenai/landmanagement/planning

USFS. 2015a. Land Management Plan 2015 Revision Idaho Panhandle National Forest. Coeur D'Alene, ID 83815. https:// www.fs.usda.gov/main/ipnf/landmanagement/planning

USFS. 2011. Record of Decision – Forest Plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones. Kootenai, Lolo, and Idaho Panhandle National Forests. Signed November 11, 2011. 68 pp.

USFS. 2020. Idaho Panhandle National Forest. Biological Assessment Consultation on the Idaho Panhandle National Forest Land and Resource Management Plan for Grizzly Bears. Diane Probasco, 03/31/2020, updated 06/19/2020

USFS. 2020. Kootenai National Forest. Biological Assessment. Consultation on the Kootenai National Forest Land and Resource Management Plan for Grizzly Bears. Forest Plan Reinitiation BA. 04/15/2020. 123 pp.

USFWS. 2020. Biological opinion addressing the effects of the Idaho Panhandle National Forests' Land and Resource Management Plan on the Grizzly Bear. 01EIFW00-2021-F-0068. USFWS Idaho Fish and Wildlife Office, Spokane Valley, Washington, 27 October 2020. 160 pp.

USFWS. 2020. Biological opinion on the Effects of the Kootenai National Forest Land Management Plan on the Grizzly Bear. Date Issued August 28; CORRECTED on October 6, 2020. US Fish and Wildlife Service Reference :06E11000-2020-F-0508. U.S. Fish and Wildlife Services Office, Helena, Montana. 149 pp.

USFWS. 2011. Biological opinion on the Forest Plan amendments for motorized access management within the Selkirk and Cabinet-Yaak grizzly bear recovery zones on the Kootenai, Idaho Panhandle, and Lolo National Forests. Helena-Montana and Spokane-Northern Idaho Field Offices. Dated October 18, 2011. 227 pp.

FWS006204

# APPENDIX A

## 2020 Road Densities, Core Habitat in the Colville National Forest's portion of the Selkirk Mountains Grizzly Bear Recovery Zone
## March 22, 2021



5-ER-1091

FWS006205

| United States | Forest | Colville | Newport - Sullivan Lake Ranger Districts |
| Department of | Service | National | 12641 Sullivan Lake Road, |
| Agriculture | | Forest | Metaline Falls, WA  99153 (509) 446-7500 |

**Reply To**: 2672                                          **Date**: March 22, 2021

**Subject**: 2020 Road Densities, Core Habitat in the Colville National Forest's portion of the
Selkirk Mountains Grizzly Bear Recovery Zone

**To**: Kat Sarensen, Endangered Species Coordinator, USDI Fish and Wildlife Service,
Karen Honeycutt, Natural Resources Program Manager, Colville National Forest,
Diane Probasco, Forest Wildlife Biologist, Idaho Panhandle National Forests,
Carin Vadala, District Ranger, Newport-Sullivan Lake Ranger Districts,
Rodney Smoldon, Forest Supervisor, Colville National Forest

## INTRODUCTION

There are six designated recovery zones for grizzly bears in the lower 48 United States (USDI 1993).
The Selkirk Mountains Grizzly Bear Recovery Zone includes lands in northeast Washington,
northwest Idaho, and southeast British Columbia.  In Washington, this recovery zone includes
portions of the Colville National Forest (CNF) and Idaho Panhandle National Forests (IPNF) lying
east of the Pend Oreille River, and north of the Mill Creek drainage.  Each recovery zone is divided
into individual Grizzly Bear Management Units (BMUs) which biologists use for habitat evaluation
and population monitoring.  An individual BMU is roughly 100 square miles in size; the approximate
area required to support an adult sow with cubs.  Three BMUs are shared between the CNF and the
IPNF.

Roads provide access for people into grizzly bear habitat.  In areas of high road densities, grizzly
bears are prone to being disturbed by vehicle traffic or people on foot.  A bear may learn to avoid
areas near open roads, forgoing access to any suitable habitats within the road corridor.  The risk of a
grizzly being shot is higher in areas with high road densities, than in areas with few or no roads.
Between 1993 and 2004, there were no known human-caused grizzly bear mortalities away from
roads in the Selkirk Mountains Ecosystem, while 15 mortalities were recorded near roads during that
period (Wakinnen and Kasworm 2004).  These authors consider human-caused mortality to be a
significant factor affecting grizzly population growth in the recovery zone.

This document describes the habitat conditions for grizzly bears related to roads in the three BMUs
shared between the CNF and IPNF, in 2020.  Road management activities and closed road monitoring
are also discussed here.

## 2020 ROAD DENSITIES & CORE HABITAT

Each BMU has its own set of standards for open and total road densities and core habitat for grizzly
bears.  Areas of high road densities should not exceed a defined maximum percentage of each BMU.
A minimum percent of each BMU should be providing core habitat, defined as lands lying further
than 500 meters from open or restricted (gated) roads.  The following table displays the current
habitat standards for the three BMUs shared between the CNF and IPNF (USDA 2011, 2019).

**Table 1. Present grizzly bear habitat standards for the shared BMUs of the CNF and IPNF**

| BMU | Federal land | Open roads >1 mile / sq. mi. | Total roads >2 mile / sq. mi | Core habitat |
|---|---|---|---|---|
| Salmo-Priest | 99 % | <= 33 % | <= 26 % | >= 64 % |
| Sullivan-Hughes | 99 % | <= 24 % | <= 19 % | >= 61 % |
| LeClerc | 64 % | <= 48 % | <= 60 % | >= 27 % |

Using a geographic information system (computerized mapping), we completed a "moving windows" analysis of road densities in each BMU per established protocol. We buffered open and restricted roads by 500 meters to obtain core habitat levels. The following table displays the 2020 habitat data for each of the three BMUs. In 2020, road densities and core habitat were all within standards.

**Table 2. 2020 grizzly bear habitat data for the shared BMUs of the CNF and IPNF**

| BMU | Federal land | Open roads >1 mi/sq. mi. | Total roads >2 mi/sq. mi | Core habitat |
|---|---|---|---|---|
| Salmo-Priest | 99 % | 27 % | 22 % | 68 % |
| Sullivan-Hughes | 99 % | 23 % | 18 % | 63 % |
| LeClerc | 64 % | 46 % | 56 % | 27 % |

## 2020 MANAGEMENT ACTIVITIES

Vehicle access on closed roads may be required for a host of forest management activities such as timber sales, prescribed burning, wildland fire suppression, and tree planting. Closed road access may also be occasionally required for administrative activities such as scientific research, forest survey and measurement, and law enforcement. If the total number of motorized entries (number of vehicles) on a given restricted road exceeds the thresholds in the following table, we must count the affected road segment as "active" (e.g., open) for the purposes of calculating road densities for that year.

**Table 3. Maximum allowable administrative entries on restricted roads in the Selkirk Mountains Grizzly Bear Recovery Area**

| Bear season | Dates | Maximum no. vehicle entries |
|---|---|---|
| spring | April 1 – June 15 | 19 |
| summer | June 16 – September 15 | 23 |
| fall | September 16 – Nov. 15 | 15 |
| "bear year" | April 1 – November 15 | 57 |

Because there are many vehicle entries on restricted roads being used for a timber sale, we class the affected road segments as active (open) for the years they are used.

The Salmo-Priest and Sullivan Hughes BMUs are almost entirely on National Forest System (NFS) lands. LeClerc BMU has a checkerboard ownership pattern with alternating sections of NFS lands and private or state-owned lands. The principal private landowner is Stimson Lumber Company (Stimson). Presently all the major landowners and cooperators track motorized vehicle entries on restricted roads in the recovery area and report that data to the Forest Service. See Appendix A for a

summary of motorized entries on restricted roads that occurred in 2020 in the three BMUs. The following is a brief description of management activities that affected road densities and core habitat in the three BMUs.

### Salmo-Priest BMU
CNF Projects
The Forest completed no management activities that affected road densities or core habitat in this BMU in 2020.

Department of Homeland Security, Customs and Border Protection (CBP)
Closed road entries by CBP law enforcement officers occur in this BMU each year. Based on data provided by M. Avey (2021), these vehicle trips were within allowable thresholds.

### Sullivan-Hughes BMU
CNF Projects
The Forest installed a gate on Forest Road (FR) 2200242 to provide security to a private recreation residence. This gate was requested by the cabin owner after his cabin was broken into and vandalized in recent years. The resulting change in status of this road from open to restricted had an insignificant effect on road densities and core habitat.

Projects on Other Ownerships
There were **no** other activities on other ownerships that affected road densities or core habitat in this BMU (pers. comm. with J. Durbin and M. Bessey 2021).

### LeClerc BMU
CNF Projects
The Forest completed no management activities that affected road densities or core habitat in this BMU in 2020.

WA Department of Natural Resources Projects
The DNR completed some road grading, herbicide spraying, and pile burning associated with their holding near Fourth of July Peak (T. 36N, R. 44E, Section 36). Motorized entries on the Seco Creek Road (Forest Road 1934070) required to accomplish this work were well within allowable thresholds.

Stimson Lumber Company Projects
Stimson timber sales, timber stand improvement work, and administrative entries resulted in several closed road segments being classed as active (open) in 2020, as displayed in the following table.

FWS006208

**Table 4. Stimson projects in the LeClerc BMU which increased open road densities in 2020**
(based on data provided by M. Bessey, LeClerc Unit Manager)

| Stimson project name | Project location | Restricted roads used | Season active | Comments |
|---|---|---|---|---|
| Going Hungry Timber Sale, Seco East TSI | T36N, R44E, Section 23, 25 | 1934070 (Seco Ck) | spring, summer, fall | Units 1 - 6 |
| Pulp Road TSI | T36N, R44E, Section13, T36N, R45E, Section 7 | 1934080 (Pulp Road) | summer | Units 2, 3, 4 |
| Pulp End Timber Sale | T36N, R44E, Section 1 | 1934080 (Pulp Road) | winter | outside the "active bear year" |
| unspecified entries | T36N, R44E, Section 13 | 1934200 (private) | summer | 29 entries – 6 above the summer entry threshold |
| unspecified entries | T36N, R44E, Section 33 | 1934200 (Cement Bridge Rd) | summer | 46 entries – 23 above the summer entry threshold |
| Going Hungry Timber Sale | T36N, R45E, Section 19 | 1934800 (private) | spring, summer | Units 1, 2, 3 |
| Oh Notta Line, Oh Not Again Timber Sales | T37N, R44E, Section 3, 11 | 1935024 (Onata Ck) | summer, fall | Unit 1, 2 Unit 1 |
| Hanlon Purge Timber Sale | T36N, R44E, Section 17 | 1935112 | winter | outside the "active bear year" |
| unspecified entries | T38N, R44E, Section 31, T37N, R44E, Section 5 | 1936200 | summer | 36 entries – 13 above summer entry threshold |

## 2020 CLOSED ROAD MONITORING

We monitor closed roads in the recovery zone as time and budgets allow.  We repair or replace any vandalized gates and locks as soon as possible.  Where a road closure has been breached, we take steps re-work the closure in order to block this illegal access as soon as possible.

The closure on the Yocum Lake Road (FR 1900640) was breached by OHV riders who have pioneered a trail up a steep hill from county land through a Stimson harvest unit, and onto the road behind the gate.  Both the CNF and Stimson have attempted to block this user-created trail without success to date.  We believe use of this challenging access route is very occasional / sporadic and most likely does not cause allowable administrative use levels to be exceeded on this road.  We will continue to explore methods to deter this access.

Stimson Road 3503003 in the West Branch of LeClerc Creek continues to be breached by OHVs originating from private land in T. 36N, R. 44E, Section 30.  This gate is difficult to secure due to its location near private residences, and the flat topography in the area.  Therefore, we count this road and side spurs as "active" (open) for the purpose of calculating open road densities.

The following table displays the monitoring effort we completed this year in the three BMUs shared between the two forests.  Note that impassable roads are no longer safely or prudently drivable due to

FWS006209

earthen berms or boulders installed on the road entrance.  Many impassable roads are brushed in.  It is quite rare for us to document motorized use on roads classed as impassable.

**Table 5. CNF closed road monitoring effort in 2020**

| BMU | Closure type (all ownerships) | Number of roads | Road closures monitored | Percent monitored | Breaches detected |
|---|---|---|---|---|---|
| Salmo-Priest | gate | 21 | 19 | 90 | |
| | guardrail | 2 | 2 | 100 | |
| | impassable | 26 | 21 | 81 | |
| Sullivan-Hughes (CNF portion) | gate | 9 | 8 | 89 | |
| | guardrail | 0 | - | - | |
| | impassable | 6 | 2 | 33 | |
| LeClerc | gate | 43 | 29 | 67 | 3 |
| | guardrail | 1 | 1 | 100 | |
| | impassable | 19 | 12 | 63 | |
| **All** | **All** | **127** | **94** | **74** | **3** |

/s/ *Michael A. Borysewicz*
Michael A. Borysewicz
East Zone Wildlife Biologist
Colville National Forest

## CITATIONS

Avey, M.  2021.  Public Lands Liason Agent, USDHS Customs and Border Protection, Metaline Station, Spokane Sector, WA.  Personal communication.

Bessey, M.  2021.  LeClerc Unit Manager, Stimson Lumber Company, Newport, WA.  Personal communication.

Durbin, J.  2021.  Wildlife Technician, Idaho Panhandle National Forests, Sandpoint Ranger District, Sandpoint, ID.  Personal communication.

Godley, C.  2021.  Forester, Washington Department of Natural Resources, Colville, WA.  Personal communication.

USDA Forest Service.  2019.  Colville National Forest Land Management Plan.  Colville, WA.  236 pp.

USDA Forest Service.  2011.  Record of Decision - Forest plan amendments for motorized access management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones.  Kootenai, Lolo, and Idaho Panhandle National Forests.  Signed November 11, 2011.  68 pp.

USDI Fish and Wildlife Service.  1993.  Grizzly bear recovery plan.  Missoula, MT.  181 pp.

FWS006210

Wakinnen, W. and Kasworm, W. 2004. Demographics and population trends of grizzly bears in the Cabinet-Yaak and Selkirk Ecosystems of British Columbia, Idaho, Montana, and Washington. Ursus. April 2004. pp. 65-75.

FWS006211

**APPENDIX A: 2020 Administrative Entries on Restricted Roads**

In a given year, motorized entries on restricted roads in the grizzly bear recovery zone may be completed by employees, permittees, cooperators, and contractors of the: USDA Forest Service (FS), USDHS Customs and Border Protection (CBP), USDI Fish and Wildlife Service (FWS), WA Department of Natural Resources (DNR), WA Department of Fish and Wildlife (WDFW), Stimson Lumber Company (SLC), Pend Oreille County (POC), and Kalispel Tribe Natural Resources Department (KNRD). The following tables display the known restricted road entries in the three grizzly bear management units (BMUs) on the Colville National Forest over the 2020 "bear year".

Note that the list of restricted roads for each BMU may change from year to year due to new road closures, restricted roads made un-drivable (with excavated berms or other means), or corrections to road status based on field review.

**Salmo-Priest BMU**

All restricted roads in this BMU are Forest Service roads administered by the CNF. The following table displays administrative entries on restricted roads in 2020. Roads in shaded blocks were either open in that season, or had administrative use exceeding allowable levels.

**Table A1. Administrative vehicle trips on restricted roads in the Salmo-Priest BMU in 2020.**

| CNF Roads | Road Name / Area | Closure Period | Vehicle Entries | | |
|---|---|---|---|---|---|
| | | | Spring (4/1 - 6/15) | Summer (6/16 - 9/ 15) | Fall (9/16 - 11/15) |
| 2212100 | Kinyon Creek | year-round | | | |
| 2212155 | T39, R44, Sec. 26 | year-round | | | |
| 2212165 | T39, R44, Sec. 23 | year-round | | | |
| 2212168 | talc mine | year-round | | | |
| 2212198 | T39, R44, Sec. 13 | year-round | | | |
| 2212200 | Bear Pasture | 8/15 - 5/15 | | 2 | 2 |
| 2212229 | T39, R44, Sec. 13 | year-round | | | |
| 2212245 | Sullivan Lookout | year-round | | | 1 |
| 2212250 | WB Lookout Ck. | year-round | | | |
| 2212445 | T39, R44, Sec. 32 | year-round | | | |
| 3155 | Slate Creek | 4/1 - 7/1 | 7 | 4 | road open |
| 3155 U | Upper Slate Creek | year-round | 2 | 9 | |
| 3155010 | 1st Slate Ck. spur | year-round | | | |
| 3155100 | Uncas Gulch | year-round | 1 | 1 | |
| 3155215 | T40, R44, Sec. 14 | year-round | | | |
| 3155220 | Styx Creek | year-round | 2 | 3 | 1 |
| 3155230 | Beaver Slide | year-round | 2 | 5 | 1 |
| 3160 | Slumber Creek | 12/1 - 7/1 | 9 | 2 | road open |
| 3160485 | T40, R44, Sec. 8 | year-round | | | |
| **Entries / restricted roads** | | | **23 / 19** | **26 / 19** | **5 / 17** |

2020 average number of vehicle trips / restricted road in the BMU
spring season        1.2 trips / road
summer season        1.4 trips / road
fall season          0.3 trips / road

FWS006212

## Sullivan-Hughes BMU

Restricted roads in this BMU are administered by the Forest Service. Roads in shaded blocks were either open in that season, or had administrative use exceeding allowable levels. We classed the affected road segments as "active" (open) in 2020, for the purposes of calculating road densities.

**Table A2. Administrative trips on restricted roads in the Sullivan-Hughes BMU in 2020.**

| CNF Roads | Road Name / Area | Closure Dates | Vehicle Entries | | |
|---|---|---|---|---|---|
| | | | Spring (4/1 – 6/15) | Summer (6/16 – 9/15) | Fall (9/16 – 11/15) |
| 1935018 (cost-share) | east of Onata Creek Road | year-round | | | |
| 1935030 | North Fork Harvey Creek | year-round | 1 | 4 | |
| 1935031 | Grassy Top Trail | year-round | | | |
| 2200280 | Old Pass Ck. Rd | year-round | | | |
| 2200360 | Mankato Creek | year-round | | | |
| 2200394 | Thor Creek | year-round | | | |
| 2200400 | Fetus-Gypo | year-round | | | |
| 2200500 L | John's Creek | 12/1 – 7/1 | | | road open |
| 2200500 U | Hall Mountain | 8/15 - 11/30 | | | 3 |
| 2200508 | Lower Pass Crk | year-round | | | |
| **IPNF roads** | | | | | |
| 662 | Hughes Cabin | 4/1 - 6/30, 9/10 - 11/15 | | 4 | |
| 2764 | Ruby Creek | year-round | | | |
| 1327 | Fish Hatchery | year-round | | | |
| 1343 | Hughes Ridge | year-round | | | 1 |
| 1343C | Hughes Helispot | year-round | | | |
| 1399 | Jackson Creek Trail | 4/1 - 6/30, 9/10 - 11/15 | | | |
| 662 | Hughes Meadow | 4/1 - 6/30 | | | road open |
| 662A | 662 road on right | year-round | | | |
| 1391 | Ledge Creek | year-round | | | |
| 1382 | Gold Creek | year-round | | | |
| 401 | Gold Peak | year-round | | | |
| 656 | Hemlock Loop | year-round | | | |
| 1388 | Lime Creek Trail | year-round | | | |
| 1013C | before Lime Ck. | year-round | | | |
| 1013A | North Gold Creek | year-round | | | |
| 302F | Pass Creek | year-round | | | |
| **Entries / restricted roads** | | | **1 / 26** | **8 / 25** | **4 / 24** |

2020 average number of vehicle trips / restricted road in the BMU (does not include "active" roads)
spring season          0.04 trips / road
summer season          0.3 trips / road
fall season            0.2 trips / road

FWS006213

## LeClerc BMU

All Forest Service roads in this BMU are administered by the CNF. There are presently no seasonal road closures in this BMU; all closures are year-round. Roads in shaded blocks had administrative use exceeding allowable levels. We classed these affected road segments as "active" (open) in 2020, for the purposes of calculating road densities.

**Table A3. Administrative vehicle trips on restricted roads in the LeClerc BMU in 2020.**

| Road System | Road Name / Area | Vehicle Entries | | |
|---|---|---|---|---|
| | | Spring (4/1 – 6/15) | Summer (6/16 – 9/15) | Fall (9/16 – 11/15) |
| 1900640♦ | South Dry Ridge | | 7 | |
| 1932 | 4th of July | | | |
| 1932012 | 4th of July spur | | | |
| 1933080**P** | T36, R43, Sec. 25 | | 9 | |
| 1933105♦ | W.B. Township | | 2 | |
| 1933110♦ | Ridge Lake | | 2 | |
| 1933130**P** | Scotchman Lake | | 5 | |
| 1934070♦ | Seco Creek | 23 Stimson, 2 DNR admin. entries | Going Hungry TS, Seco E. TSI (Stimson) | |
| 1934080♦ | Pulp Road | 9 | Pulp Road TSI (Stimson) | 3 |
| 1934090♦ | Kalispel Rock | 1 | 8 | |
| 1934150♦ | Prominence | 6 | 3 | |
| 1934200♦ | Cement Bridge | 14 | 46 Stimson admin. entries | 2 |
| 1934200**P** | W. Pulp Road | 12 | 29 Stimson admin entries | |
| 1934210**P** | Seco tie-through | | | |
| 1934281**P** | T36, R44, Sec. 28 | | | |
| 1934282**P** | T36, R44, Sec. 28 | 2 | 2 | |
| 1934295 | T36, R44, Sec. 28 | | | |
| 1934303**P** | T36, R44, Sec. 24 | | | |
| 1934705**P** | T36, R45, Sec. 7 | 2 | 15 | |
| 1934800**P** | T36, R44, Sec. 13 | Going Hungry TS (Stimson) | | 2 |
| 1935011♦ | Railroad Bridge | | 6 | |
| 1935018♦ | opposite Onata | | 4 | |
| 1935024♦ | Onata Creek | 4 | Oh Not Again, Oh Notta Line TS (Stimson) | |
| 1935090 | Harvey Rock Pit | | | |
| 1935110♦ | N. Hanlon Mtn. | | | |
| 1935112♦ | Hanlon Mountain | 1 | 9 | |
| 1935115**P** | T36, R44, Sec. 9 | | | |
| 1935116♦ | 116 road | | | |
| 1935200 | S. Mineral Creek | | | |
| 1935204**P** | T36, R44, Sec. 9 | | 5 | |
| 1935400**P** | G-Hollow | 3 | 2 | |
| 1935500♦ | Saucon Creek | 1 | | |

FWS006214

**Table A3 continued.**

| Road System | Road Name / Area | Vehicle Entries | | |
|---|---|---|---|---|
| | | Spring (4/1 – 6/15) | Summer (6/16 – 9/ 15) | Fall (9/16 – 11/15) |
| 1935502**P** | Monumental 1 | | | |
| 1935504**P** | Monumental 2 | | | |
| 1935702**P** | N. of Bunchgrass | | | |
| 1935704**P** | N. of Bunchgrass | | | |
| 1936010 | SW Molybdenite | | 1 | |
| 1936040♦ | Upper Paupac | | | |
| 1936100♦ | Cato Creek | | 1 | 1 |
| 1936200♦ | Rocky Fork | 8 | 36 Stimson admin entries | 6 |
| 1936300♦ | 1st Paupac spur | | 2 | 7 |
| 3503003**P** | W Branch detour | | | |
| 3503200**P** | Caldwell Lake | | | |
| 3521080**P** | | | | |
| 3521200**P** | Midway | 4 | 2 | |
| **DNR** | T36, R44, Sec. 36 | | | |
| **Entries / restricted roads** | | **67 / 44** | **85 / 39** | **21 / 44** |

♦: Cost-share roads that access both private and CNF lands
**P**: Private roads (usually Stimson Lumber Company)

2020 average number of vehicle trips / restricted road in the BMU (does not include "active" roads)
spring season          1.5 trips / road
summer season          2.2 trips / road
fall season            0.5 trips / road

**APPENDIX B: 2020 Core Habitat Maps**



FWS006216



FWS006217



FWS006218

# APPENDIX B

## Recovery Zone Unauthorized Motorized Use on Existing Restricted Routes or User Created Routes

Summaries of the current bear year documented unauthorized motorized access on existing routes and user created routes within the Kootenai NF, Lolo NF, and the Idaho Panhandle NF portions of the Cabinet-Yaak E and Selkirk Recovery Zone BMUs for Bear Year 2020. Please see attached PDFs of excel Spreadsheet for this information for all Kootenai National Forest BMUs.

### Idaho Panhandle National Forest Cabinet-Yaak Recovery Zone unauthorized use

*Table 24. Summary of Unauthorized Motorized Access on Existing Routes documented during **BY 2020** within the Cabinet-Yaak Recovery Zone on the Idaho Panhandle NF*

| BMU | Affected Routes[1] Route ID | Route Name | District | Existing Closure Device[2] | Route Miles | Date of Survey/ Breach Found | Problem | Date of Repair | Corrective Action[3] or reason repair not completed | Repeat Unauthorized motorized use?[4] |
|---|---|---|---|---|---|---|---|---|---|---|
| 13-Keno | 2225 | Goat Mtn | BF | Berm/rock/trees | 2.4 | 10/2020 | Rocks/dead fall moved | - | Need equipment | yes |
| 13-Keno | 435UAO | | BF | Gates (2) | 4.4 | 7/19/20 | Slider stolen | 7/27/20 | Slider replaced, but ATVs still circumventing gates. Need equipment | yes |
| 19-Grouse | 404 | Trail Ck | BF | gate | 4-6 | 10/7/20 | Gate damaged | 10/10/20 | Slider & locks replaced | no |

[1] Route documented to have unauthorized motorized access during the active bear year.
[2] Existing Closure Device (gate or Barrier (earthern berm, vegetation, rocks, concrete, or Other device as described)
[3] Describe how device was repaired (berm reinforced, lock replaced, existing gate replaced with berm etc), or anticipated time to implement
[4] If Route has received unauthorized motorized use since 2011 and up through the current BY, list all years in which it has occurred. For any Bear Year listed prior to 2020, please refer to that past BY monitoring report (from 2011 - 2019 see Table 3.).

*Table 25. Summary of Unauthorized Motorized Access on User Created Routes documented during BY2020 within the Cabinet-Yaak Recovery Zone on the Idaho Panhandle NF.*

| BMU | Affected Routes[1] Route ID | Route Name | District | Existing Closure Device[2] | Route Miles | Date of Survey/ Breach Found | Date of Repair | Problem | Corrective Action[3] / or Reason repair not completed |
|---|---|---|---|---|---|---|---|---|---|
| none | | | | | | | | | |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

FWS006219

## Lolo National Forest Cabinet-Yaak Recovery Zone BMU 22 unauthorized motorized use

The following Table displays the gate and barrier monitoring conducted by the Lolo National Forest during Bear Year 2020.

Table 26. Lolo NF 2020 Gate Barrier Inspections within BMU 22, Cabinet-Yaak Recovery Zone: Summary of roads checked with road number, lock type, gate condition, motor vehicle breach, and whether signs are needed.

| Road Number | Lock | Condition | Vehicle breach- Y/N | Signs Needed- Y/N | Comments |
|---|---|---|---|---|---|
| 7679 | No Lock | Good-Effective | N | N | Veg. barrier behind open gate |
| 7610 | FS Only | Good-Marginal | Motorcycle | N | Could get motorcycle around gate and veg barrier |
| 7681 | FS Only | Good- Marginal | Motorcycle | Y- Missing | |
| 7657 | - | Exc.-Effective | N | - | Partially obliterated, no gate, veg barrier |
| 603 | No Lock | Exc.-Effective | N | Y- need replaced | Veg/ bridge in poor shape |
| 7671 | FS Only | Exc.-Effective | N | Y- missing | |
| 7668 | FS Only | Exc.-Effective | N | N | |
| 16271 | FS Only | Exc.-Effective | N | Yes-Missing | Newer gate |
| 529 | FS Only | Good-Effective | N | Y-Need replaced | |
| 7666 | No Lock | Good-Effective | N | N | Spur road on a seasonally closed main road |
| 17068 | FS Only | Good-Effective | N | N | |
| 529 | No Lock | Poor-Effective | N | Yes-Missing | Piece of gate missing, no t or lock, large tree across road near gate |
| 38016 | FS Only | Exc.-Effective | N | N | |

FWS006220

| Road Number | Lock | Condition | Vehicle breach- Y/N | Signs Needed- Y/N | Comments |
|---|---|---|---|---|---|
| 7640 | FS & Timber Co | Good-Effective | N | N | Weyerhaeuser gate |
| 18807 | FS Only | Good-Effective | N | N | |
| 16212 | - | - | Yes->50" | - | No gate |
| 16215 | FS Only | Good-Effective | N | N | |
| 16734 | No Lock | Good-Effective | N | Y-Need replaced | Need to put lock on gate |
| 16211 | FS Only | Good-Effective | N | N | Locked Open |
| 38025 | FS & Timber Co | Good-Effective | N | N | |
| 7692 | FS Only | Good-Effective | N | Y- Missing | |
| 7609 | FS Only | Exc.-Effective | N | N | |
| 687 | - | Good-Marginal | Y-Motorcycle | - | No gate, partial dirt barrier |
| 5571 | FS Only | Good-Marginal | N | Y-Need Replaced | |
| 16715 | - | Good-Effective | N | - | Veg barrier |
| 7571 | - | Exc.-Effective | N | N | Entrance obliterated |
| 7563 | - | Good-Marginal | Y- Motorcycle | - | Obliterated entrance, could get motorcycle around entrance |
| 18467 | FS Only | Good-Effective | N | N | Gate bent in middle, still effective |
| 7555 | FS Only | Exc.-Effective | N | N | |
| 18461 | FS Only | Exc.-Effective | N | Y-Missing | |
| 18289 | FS Only | Exc.-Effective | N | Y-Missing | |
| 18469 | FS Only | Exc.-Effective | N | N | |
| 16541 | FS Only | Exc.-Effective | N | Y-Missing | |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

5-ER-1107

FWS006221

| Road Number | Lock | Condition | Vehicle breach- Y/N | Signs Needed- Y/N | Comments |
|---|---|---|---|---|---|
| 16544 | FS Only | Exc.-Effective | N | Y- Missing | |
| 462 | FS Only | Exc.-Effective | N | Y-Need replaced | |
| 16545 | FS Only | Exc.-Effective | N | Y-Missing | |
| 16176 | FS Only | Good-Marginal | Y-Motorcycle | Y-Missing | |
| 5571 | No Lock | Exc.-Ineffective | Y- >50" | Y-Missing | |
| 16717 | FS Only | Exc.-Effective | N | Y-Missing | |
| 17325 | FS Only | Good-Marginal | Y-<50" | Y-Missing | Gate post loose in ground and falling over |
| 7564 | FS Only | Exc.-Marginal | Y-Motorcycle | N | |
| 7561 | FS Only | Exc.-Effective | N | Y-Missing | |
| 17359 | - | Exc.-Effective | N | - | No gate, dirt and veg barrier |
| 1045 | No Lock | Good-Marginal | N | Y-Missing | |
| 16388 | FS Only | Good-Effective | N | N | |
| 16182 | FS Only | Good-Effective | N | N | |
| 9992 | FS Only | Good-Effective | N | Y-Missing | Gate open but veg barrier just behind gate |
| 16393 | FS Only | Good-Effective | N | N | |
| 18824 | - | Good-Effective | N | N | No visible road, just veg |
| 16392 | FS Only | Good-Effective | N | N | |
| 7691 | FS Only | Good-Effective | N | N | |
| 9992 | FS Only | Good-Effective | N | N | |
| 3800 | FS Only | Good-Effective | N | Y-Missing | |
| 17391 | FS Only | Good-Effective | N | N | |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)
50

FWS006222

| Road Number | Lock | Condition | Vehicle breach- Y/N | Signs Needed- Y/N | Comments |
|---|---|---|---|---|---|
| 894 | FS & Timber Co | Good-Effective | N | Y-Need Replaced | |
| 875 | FS Only | Good-Effective | N | Y-Need Replaced | |
| 18815 | Other | Exc.-Effective | N | N | Lock looked like a silver yale but did not sale yale on it |
| 18817 | FS & Timber Co | Good-Effective | N | Y-Need Replaced | |
| 18818 | - | - | - | - | No gate or obvious road |
| 7572 | Other | Exc.-Effective | N | Y-Need Replaced | |
| 17336 | FS Only | Good-Effective | N | Y-Need Replaced | |
| 17335 | FS Only | Good-Effective | N | N | |
| 17355 | - | - | Y->50" | - | Map said dirt berm but road was open with no barrier |
| 17354 | FS Only | Good-Effective | N | Y-Missing | |
| 16181 | FS Only | Exc.-Marginal | Y-Motorcycle | Y-Missing | |
| 16610 | FS Only | Exc.-Effective | N | Y-Missing | |
| 18301 | FS Only | Good-Effective | N | Y-Need Replaced | |
| 18300 | FS Only | Good-Effective | Y-Motorcycle | Y-Missing | |
| 16611 | FS Only | Good- Effective | N | N | |
| 18299 | FS & Timber Co | Good-Effective | N | N | |
| 18932 | No Lock | Good-Ineffective | Y->50" | Y-Missing | |
| 18934 | FS Only | Exc.-Effective | N | N | |

**SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)**

51

5-ER-1109

FWS006223

## Idaho Panhandle National Forest Selkirk Recovery Zone unauthorized use

The following two tables summaries the Idaho Panhandle National Forest existing routes and unauthorized user created routes within the Selkirk RZ.

*Table 27.  Summary of Unauthorized Motorized Access on Existing Routes documented during **BY 2020** within the Selkirk Recovery Zone.*

| BMU | Affected Routes[1] Route ID | Route Name | District | Existing Closure Device[2] | Route Miles | Date of Survey/ Breach Found | Date of Repair | Problem | Corrective Action[3] / or Reason repair not completed | Repeat Unauthorized motorized use?[4] |
|---|---|---|---|---|---|---|---|---|---|---|
| Blue Grass | 2258 | Italian Ck | BF | gate | 6.3 | ~4/2/20 | 4/2/20 | Lock shot off | Chained shut 4/2; lock replaced 4/30 | no |
| Long-Smith | 2443B | Cutoff B | BF | gate | 1.9 | 9/23/20 | - | Tracks around gate | Leads to private land - single occurrence, need equipment | no |
| Kalispell-Granite | 311 | Petit Lake | PL | gate | 5 | 8/12/20 | 8/24/20 | Pvt lock missing | Locked w/ FS | yes |

[1]Route documented to have unauthorized motorized access during the active bear year.
[2]Existing Closure Device (gate or Barrier (earthern berm, vegetation, rocks, concrete, or other device as described)
[3] Describe how device was repaired (berm reinforced, lock replaced, existing gate replaced with berm etc), or anticipated time to implement
[4] If Route has received unauthorized motorized use since 2011 and up through the current BY, list all years in which it has occurred. For any Bear Year listed prior to 2020, please refer to that past BY monitoring report (from 2011 - 2019 see Table 3.).

*Table 28. Summary of Unauthorized Motorized Access on User Created Routes documented during BY2020 within the Selkirk Recovery Zone*

| BMU | Affected Routes[1] Route ID | Route Name | District | Existing Closure Device[2] | Route Miles | Date of Survey/ Breach Found | Date of Repair | Problem | Corrective Action[3] / or Reason repair not completed |
|---|---|---|---|---|---|---|---|---|---|
| Myrtle | 633UI | | BF | berm | 0.5 | 9/1/20 | - | ATV use | Private land |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

52

5-ER-1110

FWS006224

**Kootenai National Forest Documented Unauthorized Motorized Use on Existing Routes during Bear Year 2020 within the CYE Recovery Zone**

| BMU | BY20 AGOL CD# | Road ID | Name | Miles | district | Juris diction | Survey Date | Existing Device | Problem | Device Functional ? | BY20 repair? | Repair Date | closure Device Gate | closure Device Type | barrier Type | Corrective Action BY20 | Reason For not Repairing in BY20 | Prior documented unauthorized motorized use? If yes, state BY report | 2021 Status as of 07/09/2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BMU 1** | | | | | | | | | | | | | | | | | | | |
| BMU 1 | CD957 | 619G | "blank" | 0.4 | D4 | FS | 10/19/20 | none | No barrier exists, drivable to the end | no | No | | | | barrier | other | | Covid-19 limitations, repair needed 2021 | no | District to consider inclusion in GNA contract |
| **BMU 2** | | | | | | | | | | | | | | | | | | | |
| BMU 2 | CD845 | 278H | BEAR CR H (278Hatv) | 0.5 | D5 | FS | 07/06/20 | earth berm | exist igbc 3, ATVs driving over barrier. Barrier needs reinforcement. CD845 documents the repair with earth barrier on 09/10/20. this is same point as CD847 which documented the breach on 07/06/2020. | no | No | 09/10/20 | | | barrier | earthen berm | earthern berm installed | NA | | |
| **BMU 3** | | | | | | | | | | | | | | | | | | | |
| BMU 3 | CD855 | 384 | LAKE CREEK/ SPAR LAKE | 3.3 | D4 | FS | 10/15/20 | earth berm | Berm needs to be rebuilt, 4wheeler tracks going over it | no | No | | | | barrier | earthen berm | | Covid-19 limitations, repair needed 2021 | | District to consider inclusion in GNA contract |
| BMU 3 | CD1106 | 4580 | CARR DRAW | 4.7 | D4 | FS | 10/15/20 | gate | 4wheeler trail around gate | no | No | | gate | | barrier | | | Covid-19 limitations; repair needed 2021 | | District to consider inclusion in GNA contract |
| BMU 3 | CD753 | 4628 | SOUTH FACE MT VERNON | 2.8 | D4 | FS | 10/13/20 | gate | Link cut out of chain, chain replaced 10/13/2020 | no | Yes | 10/13/20 | gate | | | Chain replaced | NA | | |
| BMU 3 | CD755 | 4628A | SOUTH FACE MT VERNON A | 0.6 | D4 | FS | 10/13/20 | rocks | Barrier rocks moved ATV path around gate, looks like someone locked the gate shut with their own lock | no | No | | | gate | | | Covid-19 limitations, accesses Troy Mine, Repair needed /big rocks 2021 | no | District to consider inclusion in GNA contract (are duplicated points with same entry but will filter out the duplicate if included in GNA the state |
| **BMU 4** | | | | | | | | | | | | | | | | | | | |
| BMU 4 | CD355 | 2280C | GOV'T RIDGE C | 0.8 | D7 | FS | 08/04/20 | none | coded igbc 3, Open drivable no berm. Barrier needed | no | No | | | | barrier | vegetation | | Limited funding, contract limitations, repair needed 2021 | | District to consider inclusion in GNA contract |
| BMU 4 | CD375 | 2280 | GOV'T RIDGE | 4.0 | D7 | (blank) | 08/04/20 | none | coded igbc 3, no berm or gate. drivable. Section of 2280 open. Private. | no | No | | | | barrier | vegetation | | D7 will verify jurisdiction of route, if private of FS. If private, will do a database correction | | District to consider inclusion in GNA contract, district to make a decision on jurisdiction prior to including |
| BMU 4 | CD390 | 150F | ROCK CREEK F | 0.3 | D7 | FS & P | 08/04/20 | none | coded igbc 1. Drivable by atvs but not sure how far. Needs barrier | no | No | | | | barrier | vegetation | | Limited funding, contract limitations, repair needed 2021 | | District to consider inclusion in GNA contract |
| BMU 4 | CD397 | 2775 | 2275 | 0.5 | D7 | FS | 08/04/20 | earthberm | coded igbc 1, No berm, filled in, atvs have been using a little. Needs Barrier | no | No | | | | barrier | earthen berm | | Limited funding, contract limitations, repair needed 2021 | no | submited to district for priority GNA contract consideration |
| BMU 4 | CD432 | 2292B | FATMAN B | 0.3 | D7 | FS | 08/06/20 | none | coded igbc 1. No berm or vegetation, road drivable. Needs barrier or decom. Downed tree blocking | no | No | | | | barrier | vegetation | | Limited funding, contract limitations, repair needed 2021 | no | District to consider inclusion in GNA contract (AGOL input said was user created, is not) |
| BMU 4 | CD443 | 2293C | DEAD HORSE C | 0.5 | D7 | FS | 08/06/20 | none | coded igbc 1. No vegetation or berm. Area is flat and difficult to close | no | No | | | | barrier | vegetation | | Limited funding, contract limitations, repair needed 2021 | | District to consider inclusion in GNA contract |
| BMU 4 | CD464 | 2292G | FATMAN G | 0.3 | D7 | FS | 08/06/20 | none | coded igbc 1, no vegetation or berm. Needs barrier | no | No | | | | barrier | vegetation | | Limited funding, contract limitations, repair needed 2021 | no | District to consider inclusion in GNA contract |
| BMU 4 | CD472 | 2745B | W FK BLUE CREEK B | 0.3 | D7 | FS | 08/06/20 | earth berm | coded igbc 1. Firewood getting happening and removed berm, atv can drive need berm. Barrier needs enhancement | no | No | | | | barrier | earthen berm | | Limited funding, contract limitations, repair needed 2021 | no | District to consider inclusion in GNA contract |

Kootenai National Forest Documented Unauthorized Motorized Use on Existing Routes during Bear Year 2020 within the CYE Recovery Zone

| BMU | BY20 AGOL CD# | Road ID | Name | Miles | district | Jurisdiction | Survey Date | Existing Device | Problem | Device Functional ? | BY20 repair? | Repair Date | closure Device Gate | closure Device Type | barrier Type | Corrective Action BY20 | Reason For not Repairing in BY20 | Prior documented unauthorized motorized use? If yes, state BY report | 2021 Status as of 07/09/2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BMU 4 | "" | 14729 | blank | 0.1 | D7 | FS | | | coded igbc 1, not sure if drivable but behind breached point | | | | | barrier | | | "" | no | (will be fixed per CD472 being fixed) |
| BMU 4 | CD520 | 2110A | 2110A | 0.2 | D7 | FS | 07/28/20 | none | coded igbc 1 no vegetation or berm. Heavy use, needs decommissioning because barrier would not work, motorized use off off power line access. | No | No | | | barrier | earthen berm | | 2110A is shown as decommissioned in the database, but 2 drivable routes leave the open road where the 2110A used to be | no | District to consider inclusion in GNA contract |
| BMU 4 | CD590 | 14694 | blank | 0.4 | D7 | FS | 07/29/20 | none | coded igbc 1 No berm. Going to be used for Dry Creek TS as a temp | no | No | | | barrier | vegetation | | Route currently open, will be used and barriered after Dry Creek TS where off road equipment (ie. Skidders) may | | Not submitted to district for contract, is part of TS |
| BMU 4 | CD592 | 14693 | 14692 | 0.1 | D7 | FS | 07/29/20 | none | coded igbc 1 No berm or vegetation. Going to be used for Dry Creek TS as a temp | no | No | | | barrier | vegetation | | Route currently open, will be used and barriered after Dry Creek TS where off road equipment (ie. Skidders) may travel on it. Post sale will rehab skid trails | | Not submitted to district for contract, is part of TS |
| **BMU 5** | | | | | | | | | | | | | | | | | | | |
| BMU 5 | CD3035 | 2117 | 2117 | 0.1 | D7 | FS | 07/15/20 | | coded igbc 1 Not a lot of vegetation and no berm. First culvert is plugged washed out needs fixed water going over Road. Becomes undrivable at culvert washout | no | No | | | barrier | vegetation | | Limited funding, contract limitations, repair needed 2021 | | District to consider inclusion in GNA contract |
| BMU 5 | CD307 | 150B | ROCK CREEK B | 0.2 | D7 | FS | 07/15/20 | | coded igbc 4. No vegetation or berm or barrier at 0.2 mile yet. Will do a database correction of igbc for appropriate segment | no | No | | | barrier | vegetation | | Limited funding, contract limitations, repair needed 2021 | BY2012 (USDA 2013, cor | District to consider inclusion in GNA contract |
| BMU 5 | CD319 | 150B | ROCK CREEK B | 0.3 | D7 | FS | 07/15/20 | | coded igbc 1, Not a lot of brush or berm. Needs berm | | | | | barrier | vegetation | | Limited funding, contract limitations, repair needed 2021 | | District to consider inclusion in GNA contract |
| BMU 5 | CD314 | 150C | ROCK CREEK C | 0.4 | D7 | FS | 07/15/20 | | coded igbc 1, No vegetation or berm, road continues, needs barrier | | | | | barrier | vegetation | | Limited funding, contract limitations, repair needed 2021 | no | District to consider inclusion in GNA contract |
| BMU 5 | CD386 | 150G | ROCK CREEK G | 0.1 | D7 | P | 08/04/20 | vegetation | coded igbc 1, Access Radio tower site but rd continues onto pvt completely vegged in from there. Originates on FS lands no special use permit & not an open FS road | no | No | | | barrier | vegetation | | D7 will discuss access with Radio Tower site operator | | District to consider inclusion in GNA contract/district to make determination of status prior to including |
| BMU 5 | CD405 | 150T | ROCK CREEK T | 0.6 | D7 | FS | 08/04/20 | | coded igbc 3, No berm, barrier needed | | | | | barrier | earthen berm | | Lack of funding, contract limitations, repair needed 2021 | no | submitted to district for priority GNA contract consideration |
| BMU 5 | CD409 | 2741T | CHICAGO PEAK T | 0.1 | D7 | FS | 07/15/20 | | coded igbc 1, No veg. or berm, barrier needed | | | | | barrier | vegetation | | Originates on FS lands no special use permit and not an open FS road. Access HECLA MT, Inc land. | | District to consider inclusion in GNA contract/district needs to make determination of status prior to including |
| BMU 5 | CD423 | 2741I | 2741I | 0.1 | D7 | FS | 07/15/20 | | coded igbc 1. not completely vegetation blocked. Motorized use, needs berm. | | | | | barrier | vegetation | | Limited funding, contract limitations, repair needed 2021 | | District to consider inclusion in GNA contract |
| BMU 5 | CD411 | 2741K | 2741K | 0.4 | D7 | FS | 07/15/20 | none | coded igbc 1, No vegetation or berm, barrier needed | no | No | | | barrier | rocks | | Originates on FS lands no special use permit and not an open FS road. Access HECLA MT, Inc land. | no | District to consider inclusion in GNA contract/district to make determination of status prior to including |

Kootenai National Forest Documented Unauthorized Motorized Use on Existing Routes during Bear Year 2020 within the CYE Recovery Zone

KNF App B Page 2

FWS006226

| BMU | BY20 AGOL CD# | Road ID | Name | Miles | district | Juris diction | Survey Date | Existing Device | Problem | Device Funct ional ? | BY20 repair? | Repair Date | closure Gate | closure Device Type | barrier Type | Corrective Action BY20 | Reason For not Repairing in BY20 | Prior documented unauthorized motorized use? If yes, state BY report | 2021 Status as of 07/09/2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BMU 5 | CD415 | 2741P | CHICAGO PEAK TP | 0.2 | D7 | FS | 07/15/20 | earthberm | Berm filled in, barrier needed | no | No | | | | barrier | earthen berm | | Originates on FS lands no special use permit and not an open FS road. Access to HECLA Montana, Inc, land. | no | District to consider inclusion in GNA contract/district to make determination of status prior to including |
| BMU 5 | CD417 | 2741L | 2741L | 0.2 | D7 | FS | 07/15/20 | vegetation | Not a lot of vegetation, barrier needed | no | No | | | | barrier | vegetation | | Originates on FS lands no special use permit and not an open FS road. Access to HECLA Montana Inc, land. | no | District to consider inclusion in GNA contract/district to make determination of status prior to including |
| BMU 5 | CD492 | 2278F | AVISTA FISH ACCESS | 0.1 | D7 | FS | 07/28/20 | none | Avista needs to install gate | no | No | | gate | | | | | D7 will pursue discussion with Avista needs to install gate, but no timeframe currently specified | was added to system in B | District needs to pursue gate installation with Avista, did not submit to district for GNA contract consideration |
| **BMU 6** | | | | | | | | | | | | | | | | | | | |
| BMU 6 | CD349 | 2314 | CORRAL SECONDARY | **6.8** | D5 | 5.2 mi FS and 1.5 Mi P - HECLA | 08/24/20 | Gate | igbc 2, gated year-round. Lock missing, new lock added, and lock missing again. Happened 4 times over the summer in 2021. 2314 extends into BMU 7 where spurs are listed (2314M, 99808, 99809, 99809A,99809B, 99809C, 99810 | | | | gate | | | Replaced lock | NA | BY2018 (USDA 2019 v2); BY2019 (USDA 2020) | |
| BMU 6 | CD342 | 2315 | TRAIL CREEK | 2.8 | D5 | FS | 08/24/20 | gate | existing igbc 2, lock post damaged | yes | Yes | 08/24/20 | gate | | | Replaced lock post on 2315 | NA | no | |
| BMU 6 | "" | 2315A | SPOTTED TAIL | 0.6 | D5 | FS | | | routes located behind breached AGOL point on main access route 2315 No indication in AGOI of status, assumed breached. | | | | gate | | | access route 2315 lock post replaced | NA | no | |
| BMU 6 | "" | 2315B | KICKING BEAR | 1.4 | D5 | FS & P | | | see above. 0.7 mi FS & 0.8 Mi Hecla MT, Inc | | | | gate | | | "" | NA | no | |
| BMU 6 | "" | 2315D | WOUNDED KNEE | 0.7 | D5 | FS | | | see above | | | | gate | | | "" | NA | no | |
| BMU 6 | "" | 99817 | TRAIL CREEK 99817 | 0.6 | D5 | P | | | see above | | | | gate | | | "" | NA | no | |
| BMU 6 | "" | 99818 | TRAIL CREEK 99818 | 0.7 | D5 | P | | | see above | | | | gate | | | "" | NA | no | |
| BMU 6 | "" | 99821 | TRAIL CREEK 99821 | 1.0 | D5 | P | | | see above | | | | gate | | | "" | NA | no | |
| BMU 6 | "" | 99822 | TRAIL CREEK 99822 | 1.0 | D5 | P | | | see above | | | | gate | | | "" | NA | no | |
| BMU 6 | "" | 99822A | TRAIL CREEK 99822A | 0.2 | D5 | P | | | see above | | | | gate | | | "" | NA | no | |
| BMU 6 | CD451 | 4725 | N FORK MILLER CR | 3.8 | D5 | FS | 10/16/20 | gate | existing igbc 2, Lock missing; sign of firewood cutters all the way to the end of the road. Restriction sign missing Lock and tee missing. Contacted | yes | Yes | 10/16/20 | gate | | | Installed Yale Lock | NA | no | |
| BMU 6 | CD248 | 8378 | TIMBER RIDGE | 0.0 | D7 | P | 07/15/20 | gate | Stimson, Lock and T were at SUP holder's house. Put back after just a couple days. | | | 07/22/20 | gate | | | Lock replaced | NA | no | |
| **BMU 7** | | | | | | | | | | | | | | | | | | | |
| BMU 7 | CD349 | 2314M | PORCUPINE RIDGE M | 0.7 | D5 | FS | | Gate | Routes located behind breached Route 2314 listed under BMU 6. No indication in AGOI of status, assumed breached. | | | | gate | | | access route 2314. CS lock replaced | NA | BY2018 (USDA 2019 v2); BY2019 (USDA 2020) | |
| BMU 7 | "" | 99808 | CORRAL SECONDARY 99808 | 0.3 | D5 | P - HECLA MT, Inc | | | "" | | | | "" | | | "" | NA | BY2018 (USDA 2019 v2); BY2019 (USDA 2020) | |

Kootenai National Forest Documented Unauthorized Motorized Use on Existing Routes during Bear Year 2020 within the CYE Recovery Zone

5-ER-1113

KNF App B Page 3
FWS006227

| BMU | BY20 AGOL CD# | Road ID | Name | Miles | district | Jurisdiction | Survey Date | Existing Device | Problem | Device Functional ? | BY20 repair? | Repair Date | closure Device Gate | closure Device Type | barrier Type | Corrective Action BY20 | Reason For not Repairing in BY20 | Prior documented unauthorized motorized use? If yes, state BY report | 2021 Status as of 07/09/2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BMU 7 | "" | 99809 | CORRAL SECONDARY 99809 | 1.7 | D5 | P - HECLA MT, Inc | | | "" | | | | "" | | | "" | NA | BY2018 (USDA 2019 v2); BY2019 (USDA 2020) | |
| BMU 7 | "" | 99809A | CORRAL SECONDARY 99809A | 0.4 | D5 | P - HECLA MT, Inc | | | "" | | | | "" | | | "" | NA | BY2018 (USDA 2019 v2); BY2019 (USDA 2020) | |
| BMU 7 | "" | 99809B | CORRAL SECONDARY 99809B | 0.8 | D5 | P - HECLA MT, Inc | | | "" | | | | "" | | | "" | NA | BY2018 (USDA 2019 v2); BY2019 (USDA 2020) | |
| BMU 7 | "" | 99809C | CORRAL SECONDARY 99809C | 0.9 | D5 | P - HECLA MT, Inc | | | "" | | | | "" | | | "" | NA | BY2018 (USDA 2019 v2); BY2019 (USDA 2020) | |
| BMU 7 | "" | 99809D | CORRAL SECONDARY 99809D | 0.1 | D5 | P - HECLA MT, Inc | | | "" | | | | "" | | | "" | NA | BY2018 (USDA 2019 v2); BY2019 (USDA 2020) | |
| BMU 7 | "" | 99810 | CORRAL SECONDARY 99810 | 1.5 | D5 | P - HECLA MT, Inc | | | "" | | | | "" | | | "" | NA | BY2018 (USDA 2019 v2); BY2019 (USDA 2020) | |
| **BMU 8** | | | | | | | | | | | | | | | | | | | |
| BMU 8 | CD146 | 5008 | SILVER BUTTE PASS II | 0.3 | D5 | FS - FOREST SERVICE | 08/26/20 | none | exist igbcv 3, No vegetation or berm, open to motorized use. Needs barrier | no | No | | | | barrier | earthean berm | covid-19 work limitations, ran out of time | no | District to consider inclusion in GNA contract |
| BMU 8 | CD64 | 8436 | (blank) | 0.5 | D7 | P | 06/30/20 | gate | Gate Open. Private gate | no | No | | gate | | | | D7 contacted Hecla MT, Inc about missing lock in BY20 and management intentions for routes (gated igbc 2 or open). FS will adjust code based on response | no | not submitted to district for GNA contract, private gate. District needs to follow up and adjust NRM IGBC code depending upon response |
| BMU 8 | "" | 8436A | (blank) | 0.4 | | P | | | "" | | | | gate | | | | see above | no | |
| BMU 8 | CD73 | 2232D | SIMS CREEK D | 0.2 | D7 | FS | 06/30/20 | earthberm | Barrier not long enough | no | No | | | | barrier | earthean berm | | Limited funding, contract limitations, repair needed 2021 | no | District to consider inclusion in GNA contract |
| BMU 8 | CD84 | 8588 | (blank) | 0.3 | D7 | P | 06/30/20 | gate | No lock, PRIVATE GATE | no | No | | gate | | | | D7 contacted Hecla MT, Inc, about missing lock in BY20 and management intentions for routes (gated igbc 2 or open). FS will adjust code based on response | no | not submitted to district for GNA contract, private gate. District needs to follow up, and adjust NRM IGBC code depending upon response |
| BMU 8 | "" | 148D | SILVER BUTTE PASS D | 1.9 | D7 | FS and P | | | routes located behind main access route 8588 with lock missing | | | | gate | | | | see above | no | |
| BMU 8 | "" | 8587 | 8587 | 2.4 | D7 | P | | | "" | | | | gate | | | | see above | no | |
| BMU 8 | "" | 8587A | 8587A | 0.1 | D7 | P | | | "" | | | | gate | | | | see above | no | |
| BMU 8 | "" | 8587B | 8587B | 0.3 | D7 | P | | | "" | | | | gate | | | | see above | no | |
| BMU 8 | "" | 8587C | 8587C | 0.8 | D7 | P | | | "" | | | | gate | | | | see above | no | |
| BMU 8 | "" | 8587D | 8587D | 0.3 | D7 | P | | | "" | | | | gate | | | | see above | no | |
| BMU 8 | "" | 8589 | 8589 | 1.0 | D7 | P | | | "" | | | | gate | | | | see above | no | |
| BMU 8 | "" | 8589A | 8589A | 0.2 | D7 | P | | | "" | | | | gate | | | | see above | no | |
| **BMU 11** | | | | | | | | | | | | | | | | | | | |
| BMU 11 | CD2293 | 472F | BURNT CREEK DUTCH CREEK F | 3.0 | D4 | FS | 10/16/20 | gate | Gate can/has been lifted off hinges but replaced. | | | | gate | | | | Covid-19 limitations; repair needed 2021 | | District to consider inclusion in GNA contract |
| **BMU 12** | | | | | | | | | | | | | | | | | | | |
| BMU 12 | CD1610 | 4601 | COOL PLACE | 0.2 | D4 | FS | 10/20/20 | earthberm | Barrier has been circumnavigated. | no | no | | | | barrier | earthean berm | | Covid-19 limitations; repair needed 2021 | | District to consider inclusion in GNA contract |
| BMU 12 | CD1707 | 5929 | PINE AWAY | 0.3 | D4 | FS | 10/20/20 | vegetation | barrier should be at powerline ROW; | no | no | | | | barrier | vegetation | | Covid-19 limitations; repair needed 2021 | | District to consider inclusion in GNA contract |

Kootenai National Forest Documented Unauthorized Motorized Use on Existing Routes during Bear Year 2020 within the CYE Recovery Zone

KNF App B Page 4

FWS006228

| BMU | BY20 AGOL CD# | Road ID | Name | Miles | district | Juris diction | Survey Date | Existing Device | Problem | Device Funct ional ? | BY20 repair? | Repair Date | closure Device Gate | closure Device Type | barrier Type | Corrective Action BY20 | Reason For not Repairing in BY20 | Prior documented unauthorized motorized use? If yes, state BY report | 2021 Status as of 07/09/2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BMU 12 | CD1735 | 408A | LEONIA A | 0.4 | D4 | FS | 10/20/20 | earthberm | This one looks like it's being driven around uphill side by ATV traffic. | no | No | | | | barrier | earthen berm | | Covid-19 limitations; repair needed 2021 | no | District to consider inclusion in GNA contract |
| **BMU 16** | | | | | | | | | | | | | | | | | | | |
| BMU 16 | CD2726 | 470 | DODGE SUMMIT | **5.0** | D1/D3 | FS | 8/18/2020 | gate | T is broken off. Did not have one on hand to fix. | yes | Yes | 09/10/20 | gate | | | T and lock placed on gate | Repaired within a month of discovery. | BY2017 (USDA 2018) | |
| BMU 16 | CD2637 | 6064 | TURNER CREEK | **6.1** | D4 | FS | 10/06/20 | gate | Lock and chain replaced is gone. Bolt sheared off. "BLM" graffiti on reflectors. Did not replace lock and chain yet, would still be compromised anyway. | no | No | 11/01/20 | gate | | | lock & chain replaced in 2020, district Wibio verified | | no | |
| BMU 16 | CD2690 | 746B | AURORA | **2.6** | D4 | FSs | 09/01/20 | rocks | Center rock boulder drug 200 ft down the road, possible for a full size truck to pass thru the barrier. Lots of firewood cutting | no | No | | | | barrier | rocks | | Covid-19 limitations; repair needed 2021 | no | District to consider inclusion in GNA contract |
| BMU 16 | CD2807 | 6047 | BUNKER HILL CREEK | **5.2** | D4 | FS | 10/05/20 | gate | Same as 746 gates, someone shot lock/chain and spray painted "BLM" on gate reflectors. | no | Yes | 01/14/21 | gate | | | lock replaced | NA | no | |
| BMU 16 | CD2807 | 6047F | BUNKER HILL CR F | **0.3** | D4 | FS | | | Route located behind reported AGOL breach on access route 6047. No indication in AGOL of status, assumed breached. | | Yes, via 6047 repair | | gate | | | lock replaced on main route | NA | no | |

Kootenai National Forest Documented Unauthorized Motorized Use on Existing Routes during Bear Year 2020 within the CYE Recovery Zone

KNF App B Page 5

FWS006229

Kootenai National Forest Documented  Unauthorized Motorized Use on User Created Routes during Bear Year 2020 within the CYE Recovery Zone

| BMU | User created ID | BY20 AGOL identifier | Other District Name | Miles | District | Survey Date | Existing Device | Problem | Device functional? | 2020 Repair? | Repair Date | Closure Device Type | Barrier Type | Corrective Action | Reasoning not repaired in BY20 | 2021 status as of 07/09/2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BMU 2** | | | | | | | | | | | | | | | | |
| BMU 2 | | CD853 | | Unk | D5 | 07/06/20 | | No barrier | no | no | | earthern berm | | | Covid-19 work limitations, ran out of time | |
| BMU 2 | 1.7 mile on 867 | CD854 | | Unk | D5 | 09/10/20 | | user created route | no | Yes | 09/10/20 | earthern berm | | Installed berm | NA | |
| BMU 2 | | CD856 | | Unk | D5 | 07/06/20 | | No barrier | no | no | 09/04/20 | earthern berm | | NA | No Action Taken, Mining Claim Acces | |
| BMU 2 | User created | CD718 | | Unk | D7 | 07/28/20 | | Atv user created motorized, cut open route | no | No | | barrier | vegetation | | Limited funding, contract limitations, repair needed 2021 | District to consider inclusion in GNA contract |
| **BMU 3** | | | | | | | | | | | | | | | | |
| BMU 3 | 4555 | CD1130 | usercreated off of road 4555 | Unk | D4 | 08/27/20 | earthberm | Dirt and logs used to fill in trench behind earthen barrier allowing motorized use. Continuing Issue at site., user created motorized tracks also present | no | no | | barrier | earthern berm | | Covid-19  limitations on work, Timing; unable to get to it in the fall | District to consider inclusion in GNA contract |
| **BMU 4** | | | | | | | | | | | | | | | | |
| BMU 4 | Unk | CD235 | | 0.1 | D7 | 08/04/20 | | No berm or gate. | no | no | | barrier | vegetation | | District will discusss with HECLA. Road extends from powerline to Hecla private | District to consider inclusion in GNA contract/district to make determination of status prior to including in contract |
| BMU 4 | Unk | CD323 | | unk | D7 | 07/30/20 | | Atv and firewood gathering | no | no | | barrier | earthern berm | | Limited funding, contract limitations, repair needed 2021 | District to consider inclusion in GNA contract |
| BMU 4 | Unk | CD361 | | 0.1 | D7 | 08/04/20 | | Main gate broke, PVT off 2128. driveable loop rd connects to point 500' ish feet east | no | no | | gate | | | Private gate, no authority for NFS to repair. Will adjust NRM to reflect as open route | |
| BMU 4 | Unk | CD362 | | unk | D7 | 08/04/20 | | Main gate broken. Driveable loop road connects to point 500 ish feet west | no | no | | gate | | | Private gate, no authority for NFS to repair. Will adjust NRM to reflect as open route | |
| BMU 4 | Unk | CD371 | | 0.1 | D7 | 08/04/20 | | Main gate broken and this is located just behind gate | no | no | | gate | | | Unmapped road that ties in is in 2128 at 2128E. District needs to determine if is valid private road or user created on FS? | District to consider inclusion in GNA contract/district needs to make determination of status prior to including in contract |
| BMU 4 | Unk | CD466 | | unk | | 08/06/20 | | No berm or vegetation. Area is flat and difficult to close. Firewood gathering occurring | no | no | | barrier | vegetation | | Limited funding, contract limitations, repair needed 2021 | District to consider inclusion in GNA contract |
| BMU 4 | 2705 | CD471 | | 0.3 | D7 | 07/30/20 | | No berm or gate. Need barrier on main 2705, road has been reopened by public. | no | no | | barrier | vegetation | | Limited funding, contract limitations, repair needed 2021 | District to consider inclusion in GNA contract |
| BMU 4 | 2705 | CD473 | | 0.1 | D7 | 07/30/20 | | Opened for 2015 fire chipping pile. Only goes abou 300 feet in. Needs barrier now | no | no | | barrier | earthern berm | | Limited funding, contract limitations, repair needed 2021 | District to consider inclusion in GNA contract |
| BMU 4 | Unk | CD475 | | | D7 | 07/29/20 | | Open driveable, needs berm. | no | no | | barrier | vegetation | | Limited funding, contract limitations, repair needed 2021 | District to consider inclusion in GNA contract |
| BMU 4 | User created | CD477 | | 0.1 | D7 | 07/29/20 | | Needs bermed. Illegal trap site. User created trail into old unit | no | no | | barrier | vegetation | | Limited funding, contract limitations, repair needed 2021 | District to consider inclusion in GNA contract |
| BMU 4 | Unk | CD493 | | unk | D7 | 08/06/20 | | No vegetation or berm, user created for firewood | no | no | | barrier | vegetation | | Limited funding, contract limitations, repair needed 2021 | District to consider inclusion in GNA contract |
| BMU 4 | 2110 dunk spur | CD519 | | unk | D7 | 08/12/20 | | No vegetation or berm. Motorized use off of powerline access | no | no | | barrier | vegetation | | Limited funding, contract limitations, repair needed 2021 | District to consider inclusion in GNA contract |
| BMU 4 | User Created | CD520 | | 0.1 | D7 | | | User created. Difficult to control access because of power line and 2017 fires. | no | no | | barrier | vegetation | | Limited funding, contract limitations, repair needed 2021 | District to consider inclusion in GNA contract |
| BMU 4 | Unk | CD525 | | unk | D7 | 08/12/20 | | No vegetation or berm. Motorized use off of powerline access | no | no | | barrier | vegetation | | Limited funding, contract limitations, repair needed 2021 | District to consider inclusion in GNA contract district to make decision prior to including |
| BMU 4 | Unk | CD529 | | 0.4 | D7 | | | User created. Difficult to control access because of power line and 2017 fires. | no | no | | barrier | vegetation | | Limited funding, contract limitations, repair needed 2021 | |
| BMU 4 | Unk | CD587 | | 0.5 | D7 | 08/12/20 | | No vegetation or berm.User Created motorized use off of powerline use | no | no | | barrier | vegetation | | Limited funding, contract limitations, repair needed 2021 | District to consider inclusion in GNA contract |
| BMU 4 | Unk | CD588 | | 0.1 | D7 | 07/29/20 | | No berm or vegetation. 1118a- being used as dispersed camping  camping access 500' | no | no | | barrier | vegetation | | D7 to determine what to do with route. | District to consider inclusion in GNA contract/district to make determination of status prior to including in contract |
| BMU 4 | 14611 | CD597 | | unk | D7 | 07/30/20 | | No berm or gate or vegetation.  Rd keeps going past where mapped | no | no | | barrier | | | D7 to determine what to do with route. | District to consider inclusion in GNA contract/district to make determination of status prior to including in contract |
| BMU 4 | Unk | CD606 | | unk | D7 | 07/29/20 | | Needs berm but very flat ground | no | no | | barrier | | | District will barrier after use as temp road for Dry Creek TS | Not submited, District will barrier with TS |
| **BMU 5** | | | | | | | | | | | | | | | | |
| BMU 5 | User created | CD484 | | unk | D7 | 07/28/20 | | No berm or vegetation, user created route. AGOL comments by engineer state creek is end of the road and that device is functional. No repair date as none needed | no | No | | creek is end of road | barrier | vegetation | NA | |

Kootenai National Forest Documented  Unauthorized Motorized Use on User Created Routes during Bear Year 2020 within the CYE Recovery Zone

KNF App B Page 6
FWS006230

| BMU | User created ID | BY20 AGOL identifier | Other District Name | Miles | District | Survey Date | Existing Device | Problem | Device functional? | 2020 Repair? | Repair Date | Closure Device Type | Barrier Type | Corrective Action | Reasoning not repaired in BY20 | 2021 status as of 07/09/2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BMU 5 | User Created | CD485 | User Created | 0.1 | D7 | 07/28/20 | | Motorized Use. Needs to be added to system or closed | No | No | | | barrier | vegetation | | D7 will determine status of route | District to consider inclusion in GNA contract/district to make determination of status prior to including in contract |
| BMU 5 | Unk | CD528 | | 0.2 | D7 | 07/28/20 | | No berm or gate, user created trail leads to private land | no | No | | | barrier | earthern berm | | District to determine if route starts on NFS land | District to consider inclusion in GNA contract/district to make determination of status prior to including in contract |
| **BMU 6** | | | | | | | | | | | | | | | | |
| BMU 6 | Unk | CD212 | | unk | D7 | 07/14/20 | | Not enough vegetation to be considered closed. Firewood getting happening | no | No | | | barrier | vegetation | | j | District to consider inclusion in GNA contract/district to make determination of status prior to including in contract |
| BMU 6 | Unk | CD223 | | unk | D7 | 07/14/20 | | Not sure if this route is on FS land or private possibly needs a berm. | no | No | | | barrier | | | District to determine if route is NFS or private | District to consider inclusion in GNA contract/district to make determination of status prior to including in contract |
| BMU 6 | User created | CD233 | | unk | D7 | 07/15/20 | | No berm. Needs bermed | no | No | | | barrier | earthern berm | | Limited funding, contract limitations, repair needed 2021 | District to consider inclusion in GNA contract/district to make determination of status prior to including in contract |
| **BMU 8** | | | | | | | | | | | | | | | | |
| BMU 8 | User Created | CD3039 | | 0.3 | D7 | | | user created motorized route, near intersection of gated road 2206 cold creek and open road 367 Graves Vermilion. We added a point to 2020 AGOL on 07092021 | | | | | barrier | | | Limited funding, contract limitations, repair needed 2021 | District to consider inclusion in GNA contract |
| **BMU 10** | | | | | | | | | | | | | | | | |
| BMU 10 | Track 13 | CD3040 | Track 13 | 0.1 | D5 | | | user created motorized route off of road 601.point added on 07092021 | | | | | | | | Covid-19 work limitations; ran out of time. | District to consider inclusion in GNA contract |
| **BMU 12** | | | | | | | | | | | | | | | | |
| BMU 12 | User created | CD1771 | | Unk | D4 | 09/01/20 | | Earthen berm knocked down to fill the trench, not functional | no | No | | | barrier | earthern berm | | Covid-19 limitations on work, Timing; unable to get to it in the fall | District to consider inclusion in GNA contract |
| BMU 12 | 2338 | CD1868 | | Unk | D4 | 08/06/20 | | User created route around berm, not functional | no | No | | | barrier | earthern berm | | Covid-19 limitations on work, Timing; unable to get to it in the fall | District to consider inclusion in GNA contract |
| **BMU 15** | | | | | | | | | | | | | | | | |
| BMU 15 | 5886 rd | CD2599 | User created off 5886 rd | Unk | D4 | 08/06/20 | | No closure device. User created firewood cutting route with multiple branchs, length estimated at 0.5 miles | no | No | | | barrier | | | Covid-19 limitations on work, Timing; unable to get to it in the fall | District to consider inclusion in GNA contract |

Kootenai National Forest Documented Unauthorized Motorized Use on User Created Routes during Bear Year 2020 within the CYE Recovery Zone

KNF App B Page 7

FWS006231

# APPENDIX C

# BORZ Unauthorized Motorized Use on Existing Restricted Routes or User Created Routes

## Kootenai National Forest Unauthorized Motorized Use in BORZ

Please see attached PDFs of excel Spreadsheets for all existing routes and user created routes with documented unauthorized motorized use during the active bear year within the Recovery Zone and BORZ.

## Idaho Panhandle National Forest BORZ unauthorized use

Summaries of the current bear year documented unauthorized motorized access on existing routes and user created routes within the Idaho Panhandle NF BORZ areas are displayed below

Table 29. Summary of Unauthorized motorized access on Existing Routes documented during BY20 in BORZ associated with the IPNF

| BORZ | Affected Routes[1] Route ID | Route Name | District | Existing Closure Device[2] | Route Miles | Date survey Breach Found | Problem | Date of Repair | Corrective Action[3] / or reason not completed |
|------|------|------|------|------|------|------|------|------|------|
| Priest Lake | 1385* | | PL | Felled tree | 2 | 9/9/20 | Tree cut open | - | Will fix in 2021 |
| Priest Lake | 2250* | | PL | Multiple downed trees | 2.5 | 9/2/20 | Cut open | - | " |
| Priest Lake | 2291UF* | | PL | " | | 7/29/20 | " | Prior to 8/2/20 | Trees felled |
| Priest Lake | 313DUB* | | PL | None | 1.1 | 7/27/20 | No barrier present | Prior to 8/12/20 | Trees felled |
| Priest Lake | 313DUC* | | PL | None | 1.1 | 7/28/20 | No barrier present | Prior to 8/4/20 | Trees felled |
| Pack River | 2258 | McPearson | SPT | none | 1.8 | 5/15/20 | ATVs going past trail on closed road | - | Need equipment |
| Pack River | 293UI | | SPT | berm | 0.2 | 5/15/20 | Berm driven over | - | Need equipment |
| Pack River | 2607 | Very Ridge | SPT | berm | 1.8 | 5/15/20 | Berm driven over | - | Need equipment |
| Pack River | 2605UH & UA | | SPT | berm | 1.8 | 5/15/20 | Berm driven over | - | Need equipment |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

53

FWS006232

| Pack River | 293UH | | SPT | berm | 0.6 | 5/15/20 | Berm driven over | - | Need equipment |
| Pack River | 2605UB | | SPT | berm | 1.4 | 5/15/20 | Berm driven over | - | Need equipment |

[1]Route was documented to have unauthorized motorized access during the active bear year.

[2]Existing Closure Device (gate or Barrier (Barrier defined as earth berm, vegetation, rocks, concrete, or Other device as described)

[3] Briefly describe how existing device was repaired if work completed (ie, berm reinforced, lock replaced), or anticipated time to implement

[4] If Routes received unauthorized motorized use since 2011 and up through the current BY, if so list all years in which unauthorized use has occurred. For any Bear Year listed prior to 2020, please refer to that past BY monitoring report (from 2011 – 2019) under the individual BORZ discussion.

*Routes are all part of a groomed winter ski trail system. Proposal to erect bollards to allow grooming and restrict summer wheeled use. Project under litigation and bollards not yet available. Felled trees for temp fix.

*Table 30 Summary of Unauthorized Motorized Access on User Created Routes documented during BY20 within the IPNF BORZ*

| BORZ | Affected Routes[1] Route ID | Route Name | District | Existing Closure Device[2] | Route Miles | Date of Survey/ Breach Found | Date of Repair | Problem | Corrective Action[3] / or Reason repair not completed |
|------|------|------|------|------|------|------|------|------|------|
| | | | | | | | | | |

SELKIRK / CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES – BEAR YEAR 2020 ANNUAL COMPLIANCE MONITORING FINAL SUMMARY REPORT (07/20/2021)

54

FWS006233

Kootenai National Forest Documented Unauthorized Motorized Use on Existing Routes during Bear Year 2020 within Bears Outside Recovery Zones (BORZ)

| BORZ | BY20 AGOL ID | Road ID | Name | MILES | DISTRICT | Juris diction | Survey Date | Existing Device | Problem | Device Functional? | By 20 Repair? | Repair Date | Closure Device gate | Closure Device Type | barrier Type | Corrective Action | Reason for not repairing in BY 20 | Prior documented unauthorized motorized use?  If yes, state BY report | 2021 Status as of 07/09/2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cabinet Face** | | | | | | | | | | | | | | | | | | | |
| Cabinet Face | CD594 | 4776 | HORSE MTN LOOKOUT | 1.6 | D5 | FS | 09/09/20 | barrier | end of 4776, coded igbc 3, barrier filled in with brush | no | Yes | 09/09/20 | | barrier | earthen berm | existing berm reinforced | | no | |
| Cabinet Face | NA | 4400C | HOODOO CR C | 0.4 | D5 | FS | | wooden gate | Segment constructed to access corporate timber land has been tossed to the side and has been missing since 2019 | no | No | | gate | | | | FRTA required Weyerhauser install gate for activity and a barrier when completed. New landowner Stimson was contacted in BY20 | Not submitted for GNA contract as the FRTA requires the corporate timber owner to barrier.  District will follow up. | BY2019 (USDA 2020) |
| **Clark Fork** | | | | | | | | | | | | | | | | | | | |
| Clark Fork | CD111 | 2214H | STEVENS RIDGE H | 2.2 | D7 | FS | 08/04/20 | gate | igbc 2, room on left side of gate for dirt bikes to drive around gate & evidence of their use.  carbonite sign broken on ground. | no | No | | gate | | | | Limited funding, repair needed 2021 | no | District to consider inclusion in GNA contract |
| Clark Fork | CD286 | 2747 | RICE BENCH | 1.8 | D7 | FS | 08/04/20 | gate | igbc 2, lock was removed/cut from gate. Unauthorized motorized use, signs of tree removal. | no | Yes | 08/04/20 | gate | | | lock replaced multiple times | | no | |
| Clark Fork | CD291 | 8347 | 8347 | 0.3 | D7 | P | 08/13/20 | none | coded as igbc 4, breach?, was opened up recently, No vegetation or berm. Starting at mm 0.32 road is undetermined and on FS lands. | no | | | | barrier | vegetation | | . Transportation and Special Uses determing if this needs a permit or is a trespass | no | District to consider inclusion in GNA contract/district to make determination of status prior to including in contract |
| Clark Fork | CD298 | 8347 | 8347 | 0.3 | D7 | FS | 08/13/20 | none | coded as igbc 4, breach?, No vegetation or berm . Starting at mm 0.32 road is undetermined and on FS lands. Rd goes all the way to private land. Road recently gravelled.   This point is tied to the linear feature IN USER CREATED ROUTE LAYER for 2020 as "User created motorized route trespass between private". where it says its 0.3 miles | no | | | | barrier | vegetation | | Transportation & Special Uses determining if this needs a permit or is a trespass. There appears to be a non system route that ties from the end of 8347 back south to private property. | no | District to consider inclusion in GNA contract/district to make determination of status prior to including in contract |
| Clark Fork | CD337 | 2295N | BEAVER PEAK N | 0.3 | D7 | FS | 08/06/20 | none | coded igbc 1, No vegetation or berm can only go 300feet. | no | | | | barrier | vegetation | | Route left open, **less than 300 feet currently open**. Route will be used and closed by the Lazy Jack TS. | not submitted to contract, district using in TS and will barrier after | |
| Clark Fork | CD94 | 14605 | LOWER FIRE CREEK | 0.9 | D7 | FS | 08/11/20 | Gate | coded igbc 1, *behind a seasonal gate but the road itself* **does not have any barrier. Needs a barrier** | no | | | | barrier | other | | Limited funding, contract limitations, repair needed 2021 | no | District to consider inclusion in GNA contract |
| Clark Fork | CD96 | 14606 | UPPER FIRE CREEK | 0.9 | D7 | FS | 08/11/20 | Gate | coded igbc 1, **No barrier present**, *is behind an admin gate* . **Is accessible by admin motorized vehicles, needs barrier** | no | | | | barrier | other | | Limited funding, contract limitations, repair needed 2021 | no | District to consider inclusion in GNA contract |
| **Tobacco** | | | | | | | | | | | | | | | | | | | |
| Tobacco | CD1427 | 3507D | ZELLER CREEK D | 0.1 | D1/D3 | FS | 07/01/20 | vegetation | **needs berm**. Vegetation is not closing in the road | no | | | | barrier | vegetation | | Covid-19 work limitiations; ran out of time | no | District to consider inclusion in GNA contract |
| Tobacco | CD1467 | 3520G | TWIN MEADOWS G | 0.3 | D1/D3 | FS | 10/01/20 | none | **No device, needs berm**. Has been accessed recently but steep slope would likely deter most. | no | | | | barrier | earthen berm | | Covid-19 work limitiations; ran out of time. | no | District to consider inclusion in GNA contract |
| Tobacco | CD1669 | 3533D | OLD ROUTE | 0.3 | D1/D3 | FS | 06/30/20 | guard rail | Taurus rail is missing. Guard rail ineffective, needs barrier | no | | | | barrier | other | | Covid-19 work limitiations; ran out of time | no | District to consider inclusion in GNA contract |
| Tobacco | CD1682 | 3533C | SMALL SADDLE | 0.9 | D1/D3 | FS | 06/30/20 | guard rail | Guard rail ineffective,Taken down. Needs berm | no | | | | barrier | other | | Covid-19 work limitiations; ran out of time | no | District to consider inclusion in GNA contract |
| Tobacco | CD1689 | 3716 | PARK | 0.8 | D1/D3 | FS | 07/15/20 | none | **No gate found; NRM & IGBC are consistent. IGBC 2- gated; admin access. Needs gate;  Decision - Gate install needed 2021.** | no | | | gate | | | | Has had no gate - review of NEPA has confirmed gate is needed.- | no | District to consider inclusion in GNA contract |

Kootenai National Forest Documented Unauthorized Motorized Use on Existing Routes during Bear Year 2020 within Bears Outside Recovery Zones (BORZ)

KNF Appendix C pg 1

| BORZ | BY20 AGOL ID | Road ID | Name | MILES | DISTRICT | Juris diction | Survey Date | Existing Device | Problem | Device Funct ional? | By 20 Repair? | Repair Date | Closure Device gate | Closure Device Type | barrier Type | Corrective Action | Reason for not repairing in BY 20 | Prior documented unauthorized motorized use? If yes, state BY report | 2021 Status as of 07/09/2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tobacco | CD1689 | 3716A | PARK A | 0.8 | D1/D3 | FS | | assumed none | spur route, assumed open | | no | | | | | | currently no gate, 3716A will be effectively restricted when gate on 3716 installed. | no | (will be fixed per 3716 being rgated) |
| Tobacco | CD1807 | 14268 | (blank) | 0.2 | D1/D3 | FS | 07/16/20 | none | No barricade; needs berm | yes | yes | 10/14/20 | | | barrier | vegetation | earth berm installed, is behind gated road | | no | |
| Tobacco | CD1833 | 3566B | STERLING RIDGE | 0.8 | D1/D3 | FS | 06/30/20 | barrier | Damaged during the 10 mile fire | no | no | | | gate | barrier | | currently being used for salvage sale, needs barrier when work completed | behind a gate currently- - will be reviewed in 2021 ; | | District to consider inclusion in GNA contract |
| Tobacco | CD2016 | 7994 | MCGUIRE BREAKS | 6.4 | D1/D3 | FS | 07/23/20 | gate | Missing lock. | yes | yes | 08/10/20 | gate | | barrier | | lock replaced | NA | | |
| Tobacco | CD2016 | 7994B | LOWER MCGUIRE | 2.2 | D1/D3 | FS | | gate | spur route, assumed open | | yes | 08/10/20 | gate | | | | 7994 lock replaced | NA | | |
| Tobacco | CD2032 | 851B | TREGO FLATS B | 0.4 | D1/D3 | FS | 07/17/20 | none | No closure device present. | yes | yes | 10/14/20 | | | barrier | other | Berm installed | NA | | |
| Tobacco | CD2035 | 851A | TREGO FLATS A | 0.2 | D1/D3 | FS | 07/17/20 | none | Drove road. Found no closure device | yes | yes | 08/13/20 | | | barrier | other | Berm installed | NA | | |
| Tobacco | CD2037 | 15824 | DEER FIELD | 0.2 | D1/D3 | FS | 07/17/20 | none | Drove road and found no closure device | yes | yes | 10/14/20 | | | barrier | other | Berm installed | NA | | |
| Tobacco | CD2057 | 3592A | EDNA BENCHES A | 0.3 | D1/D3 | FS | 07/17/20 | none | No berm present, needs barrier . Road drivable to private land | no | no | | | | barrier | | | Covid-19 work limitations - needs berm on pvt land/fs boundary- Ran out of time | | District to consider inclusion in GNA contract |
| Tobacco | CD2058 | 494S | SUTTON SWAMP S | 0.1 | D1/D3 | FS | 07/23/20 | none | No barrier, ATV tracks | no | no | 08/11/20 | | | barrier | | | | | |
| Tobacco | CD2098 | 3719B | DUDLEY MAC B | 0.2 | D1/D3 | FS | 06/30/20 | none | needs barrier. Was a log down originally, then no log or berm. | no | no | | | | barrier | other | | Covid-19 work limitations, ran out of time. Scheduled summer of 2021 | | |
| Tobacco | CD2123 | 3637C | POSTON CAMP C | 0.2 | D1/D3 | FS | 07/17/20 | none | No closure device present. Needs berm. Road is drivable. Berm at jctn with 7836 | no | no | | | | barrier | | | Covid-19 work limitations, ran out of time. | | District to consider inclusion in GNA contract |
| Tobacco | CD2190 | 14282 | (blank) | 0.5 | D1/D3 | FS | 07/01/20 | none | Drivable | yes | yes | 08/27/20 | | | barrier | earthen berm | Berm installed | NA | | |
| Tobacco | CD2236 | 14279 | MEADOW CREEK BUCKHORN SPUR | 0.4 | D1/D3 | FS | 07/01/20 | vegetation | No barrier, signs of light breaching. Needs a berm | no | no | | | | barrier | vegetation | | Covid-19 work limitations, ran out of time, No repair completed. Needs a berm | | District to consider inclusion in GNA contract |
| Tobacco | CD2258 | 14053 | (blank) | 0.1 | D1/D3 | FS | 07/21/20 | none | There is no barrier people can easily drive it | yes | yes | 07/29/20 | | | barrier | earthen berm | Berm installed | NA | | |
| Tobacco | CD2264 | 14200 | EAST PINKHAM PATROL | 1.3 | D1/D3 | FS | 07/16/20 | earthberm | Driving around barrier from private land onto south end of 14200. needs a berm | no | no | | | | barrier | earthen berm | | Covid-19 work limitations, ran out of time | | District to consider inclusion in GNA contract |
| Tobacco | CD2284 | 1044A | MARL RIDGE A | 0.1 | D1/D3 | FS | 07/16/20 | vegetation | needs a berm, or road decom | no | no | | | | barrier | vegetation | | Covid-19 work limitations, ran out of time | | District to consider inclusion in GNA contract |
| Tobacco | CD2341 | 7214C | WORKMAN DRAW C | 0.2 | D1/D3 | FS | 07/30/20 | none | Needs berm on both ends (off of 7217 and 856 rd) | no | no | | | | barrier | other | | Covid-19 work limitations, ran out of time, No repair completed. Needs a berm | | District to consider inclusion in GNA contract |
| Tobacco | CD2371 | 7961 | SHORT TEEPEE | 1.0 | D1/D3 | FS | 07/30/20 | rocks | Trail around left side of rocks. Site is very open. Needs barrier with rocks | no | no | | | | barrier | rocks | | Covid-19 work limitations, ran out of time | | District to consider inclusion in GNA contract |
| Tobacco | CD2373 | 7147C | DRY MEADOW | 1.7 | D1/D3 | FS | 07/30/20 | earthberm | Shallow berm | yes | yes | 09/24/20 | | | barrier | earthen berm | Bermed (extended and deepened berm with backhoe) | NA | | |
| Tobacco | CD2382 | 3685 | STARLING | 1.2 | D1/D3 | FS | 07/20/20 | gate | Gate needs berm on right side, could be driven around. Needs rock next to gate | no | no | | gate | | barrier | earthen berm | | Covid-19 work limitations, ran out of time | | District to consider inclusion in GNA contract |
| Tobacco | CD2460 | 15409A | SUMMERVILLE RIDGE A | 0.1 | D1/D3 | P | 10/08/20 | none | Berm is needed at each end of road. | yes | yes | 10/13/20 | | | barrier | earthen berm | earth berm installed | NA | | |
| Tobacco | CD2463 | 3686G | WEST FRANK G | 0.5 | D1/D3 | FS | 07/21/20 | none | Needs berm at end of road | yes | yes | 10/13/20 | | | barrier | earthen berm | earth berm installed | NA | | |
| Tobacco | CD2478 | 7912E | VIRGINIA SLOPE E | 0.4 | D1/D3 | FS | 07/29/20 | none | No berm,people are driving the road | yes | yes | 09/28/20 | | | barrier | earthen berm | earth berm installed | NA | | |
| Tobacco | CD2481 | 688A | FRANK LAKE A | 0.1 | D1/D3 | FS | 10/08/20 | none | Need to decommission road. Berm at junction | yes | yes | 10/13/20 | | | barrier | earthen berm | earth berm installed | NA | | |

Kootenai National Forest Documented Unauthorized Motorized Use on Existing Routes during Bear Year 2020 within Bears Outside Recovery Zones (BORZ)

KNF Appendix C pg 2

FWS006235

| BORZ | BY20 AGOL ID | Road ID | Name | MILES | DISTRICT | Juris diction | Survey Date | Existing Device | Problem | Device Funct ional? | By 20 Repair? | Repair Date | Closure Device gate | Closure Device Type | barrier Type | Corrective Action | Reason for not repairing in BY 20 | Prior documented unauthorized motorized use? If yes, state BY report | 2021 Status as of 07/06/2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tobacco | CD2483 | 15145 | FRANK LAKE KNOB | 0.3 | D1/D3 | FS | 08/20/20 | ? | road needs berm. Road is very drivable for being decommissioned | yes | yes | 10/13/20 | | barrier | other | Berm installed | NA | no | District to consider inclusion in GNA contract. Although AGOL shows a repair date, pictures and comments say decommissioning was very light and that route needs a berm installed. |
| Tobacco | CD2514 | 3683 | ROCK LAKE | 0.5 | D1/D3 | FS | 07/16/20 | none | has carsonite sign that blocks larger vehicles, but not atvs. Needs a berm | no | no | | | barrier | earthen berm | | Covid-19 work limitations, ran out of time | | District to consider inclusion in GNA contract |
| Tobacco | CD2532 | 3664 | RANSOME RIDGE | 0.1 | D1/D3 | FS | 07/29/20 | none | Not impassible, you can drive the road | yes | yes | 09/28/20 | | barrier | earthen berm | Berm installed | NA | no | |
| Tobacco | CD2574 | 3630 | LOWER GUT CREEK | 1.3 | D1/D3 | FS | 08/17/20 | gate | Clear evidence of people driving around gate, on left side. | yes | yes | 09/30/20 | gate | | | Added berm next to gate | NA | no | |
| Tobacco | CD2598 | 7182C | RONDO C | 0.4 | D1/D3 | FS | 07/20/20 | earthberm | Can drive over | yes | yes | 07/30/20 | | barrier | earthen berm | Berm added | NA | no | |
| Tobacco | CD2606 | 3701A | THIRSTY LAKE CAMP A | 0.7 | D1/D3 | FS | 07/16/20 | ? | Bypassed decom. Road, needs berm | no | no | | | barrier | earthen berm | | Covid-19 work limitations, ran out of time, | | repaired by district 06/22/21, double tanked trap on route, |
| Tobacco | CD2627 | 15103 | EAST THIRSTY LAKE | 0.6 | D1/D3 | FS | 07/16/20 | ? | signs of breach, needs berm | no | no | | | barrier | earthen berm | | Covid-19 work limitations, ran out of time | | repaired by district 06/22/21, double tanked trap on route, |
| Tobacco | CD2629 | 7299A | ROCK LAKE A | 0.1 | D1/D3 | FS | 07/20/20 | none | Can drive around. No device present, needs berm. | yes | yes | 08/10/20 | | barrier | earthen berm | Need to confirm type of corrective action taken - no picture | | no | |
| Tobacco | CD2642 | 7178 | BLACK BUTTE SOUTH RIDGE | 1.2 | D1/D3 | FS | 04/30/20 | gate | User created path around gate post. | yes | yes | 06/16/20 | gate | | | Need to confirm type of corrective action taken - no picture | | no | |
| Tobacco | CD2648 | 15102 | POTHOLE FOR DUCKS | 0.2 | D1/D3 | FS | 07/16/20 | | no berm, needs a berm | no | no | | | barrier | earthen berm | | Covid-19 work limitations, ran out of time, No repair completed. Needs a berm | | District to consider inclusion in GNA contract |
| Tobacco | CD2666 | 3706D | NORTH THIRSTY LAKE D | 0.1 | D1/D3 | FS | 07/29/20 | none | No barrier | yes | yes | 10/21/20 | | barrier | earthen berm | Berm added | NA | no | |
| Tobacco | CD2670 | 3706A | NORTH THIRSTY LAKE A | 0.1 | D1/D3 | FS | 07/29/20 | none | No barrier on lake side | yes | yes | 10/21/20 | | barrier | vegetation | Berm added | NA | no | |
| Tobacco | CD2696 | 15106 | HILLTOP MEADOW | 0.4 | D1/D3 | FS | 07/29/20 | earthberm | People are driving around berm | yes | yes | 10/21/20 | | barrier | earthen berm | Berm added | NA | no | |
| **West Kootenai** | | | | | | | | | | | | | | | | | | | |
| West Kootenai | CD1663 | 4814 | LOST SOUL | 6.7 | D1/D3 | FS | 08/05/20 | gate | Lock missing, gate found open. | yes | yes | 09/02/20 | gate | | | new lock installed | NA | | Past reports say route was to be bermed after Bristow TS (berm removed in BY11, and supposedly rebermed in BY12, but then reports for the next few years say that wasn't done.. D1/D3 & D5 to verify status in BY2021 |
| West Kootenai | CD2158 | 4880 | NORTH STEEP TIE | 6.2 | D1/D3 | FS | 08/13/20 | gate | no lock on gate, no sign of recent use | yes | yes | 08/13/20 | gate | | | Replaced lock | NA | no | |
| West Kootenai | CD2158 | 4880A | BIG OVERLOOK | 0.5 | D1/D3 | FS | 08/13/20 | gate | no lock on main route, so assumed opened, was not field checked. | yes | yes | 08/13/20 | gate | | | replaced lock on 4880, effectively restricting 4880A | NA | no | |
| West Kootenai | CD2158 | 4880B | MIDDLE NORTH | 0.2 | D1/D3 | FS | 08/13/20 | gate | no lock on main route, so assumed opened, was not field checked. | yes | yes | 08/13/20 | gate | | | replaced lock on 4880 effectively restricting 4880B | NA | no | |
| West Kootenai | CD2158 | 4880C | ROCK BENCH VIEW | 1.2 | D1/D3 | FS | 08/13/20 | gate | no lock on main route, so assumed opened, was not field checked. | yes | yes | 08/13/20 | gate | | | replaced lock on 4880 effectively restricting 4880C | NA | no | |
| West Kootenai | CD2580 | 337D | BOULDER CREEK D | 1.0 | D1/D3 | FS | 08/21/20 | none | No barrier present. Requires tractor to create an earthen berm. | yes | yes | 10/07/20 | | barrier | | Berm placed | NA | no | |
| West Kootenai | CD2736 | 92Z | SULLIVAN CREEK Z | 0.8 | D1/D3 | FS | 08/24/20 | gate | Missing lock. Replaced on 8/24/2020 | yes | yes | 08/24/20 | gate | | | Replaced lock. | NA | no | |
| West Kootenai | CD2766 | 8000H | BURRO CREEK H | 2.7 | D1/D3 | FS | 08/24/20 | gate | Post with bell needs to be replaced or reset. Bent. Rigged it to close and lock. Part of gate that goes over bell has been bent, lock may be able to slip thru. | yes | yes | 10/06/20 | gate | | | Replaced post with bell, T-for lock, and bent gate | NA | no | |

Kootenai National Forest Documented Unauthorized Motorized Use on Existing Routes during Bear Year 2020 within Bears Outside Recovery Zones (BORZ)     KNF Appendix C pg 3

5-ER-1122

| BORZ | BY20 AGOL ID | Road ID | Name | MILES | DISTRICT | Jurisdiction | Survey Date | Existing Device | Problem | Device Functional? | By 20 Repair? | Repair Date | Closure Device gate | Closure Device Type | barrier Type | Corrective Action | Reason for not repairing in BY 20 | Prior documented unauthorized motorized use? If yes, state BY report | 2021 Status as of 07/09/2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| West Kootenai | CD2790 | 14921 | MULEY BENCH | 0.3 | D1/D3 | FS | 09/17/20 | rocks | Rocks have been moved. Need tractor to reclose. | yes | yes | 09/28/20 | | barrier | rocks | replaced rocks | NA | no | |
| West Kootenai | CD2814 | 7233A | HUNTER POINT AHUNTER POINT A | 0.5 | D1/D3 | FS | 09/17/20 | none | Road is labeled as decommissioned but drivable. Pt is junction of 7233 and 7233A. | yes | yes | 09/28/20 | | barrier | earthen | Bermed 7233, effectively closing this road. | NA | no | |
| West Kootenai | CD2815 | 7233 | HUNTER POINT | 0.7 | D1/D3 | FS | 09/17/20 | none | Berm not present. Need tractor to replace berm. | yes | yes | 09/28/20 | | barrier | earthen | Berm placed and 7233 and 7233A effectively closed | NA | no | |
| West Kootenai | CD2838 | 474F | WEST KOOTENAI F | 0.3 | D1/D3 | FS | 09/29/20 | earthberm | Berm filled in, able to drive over. Needs a berm | | | | | barrier | earthen | | Covid-19 work limitations, ran out of time | | repair completed 07 07 2021 , ditch and earth berm and rocks. Flat area, difficult to restrict |
| West Kootenai | CD2945 | 7972D | SPRING D | 0.3 | D1/D3 | FS | 09/25/20 | none | Berm needed at both ends,Barrier in different location than shown on map. Mid point closure on 7292D spur. | no | no | | | barrier | earthen | | Covid-19 work limitations, ran out of time | | District to consider inclusion in GNA contract |
| West Kootenai | CD2957 | 7212C | FERRY C | 0.3 | D1/D3 | FS | 09/25/20 | none | No berm present. Needs berm | | | | | barrier | earthen | | Covid-19 work limitations, ran out of time, no repair completed. Needs a berm. | | District to consider inclusion in GNA contract |
| West Kootenai | CD2959 | 7212B | FERRY B | 0.3 | D1/D3 | FS | 09/25/20 | none | No berm present. Driveable. Needs berm | | | | | barrier | earthen | | Covid-19 work limitations, ran out of time | | District to consider inclusion in GNA contract |
| West Kootenai | CD2971 | 303 | YOUNG CREEK | 0.9 | D1/D3 | FS | 08/06/20 | gate | Tracks around gate. Needs rocks on right side of gate | yes | yes | 08/31/20 | gate | | | | NA | no | |
| West Kootenai | CD2971 | 303A | YOUNG CREEK AYOUNG CREEK A | 1.3 | D1/D3 | FS | 08/06/20 | vegetation | Rocks or berm needed. No tracks or recent traffic. Trees across 100 yds down the road | yes | yes | 08/31/20 | | barrier | vegetation | Berm created | NA | no | |
| West Kootenai | CD3021 | 7222J | LOWER YOUNG CREEK J | 0.4 | D1/D3 | FS | 08/06/20 | none | No device present. Within fire area. No good way to close. No recent use, but likely being accessed from private. | no | no | | | barrier | other | | Covid-19 work limitations, ran out of time, no repair completed. Needs a berm. Will review w engineer/wl in 2021 | | repaired by district 07/07/21, one dirt berm installed, |
| West Kootenai | CD1244 | 4753N | SHELDON MTN N | 0.9 | D5 | FS | 06/17/20 | gate | coded igbc 2 Lock is missing | no | No | 10/28/20 | gate | | | | | no | |
| West Kootenai | CD1256 | 4753C | SHELDON MTN C | 1.0 | D5 | FS | 11/05/20 | gate | igbc 2 on - 0.7 mi | yes | Yes | 11/05/20 | gate | | | Replace lock post and 1 new lock | NA | no | |
| West Kootenai | CD1308 | 4696A | PIPE BULL CONNECTION A | 1.0 | D5 | FS | 10/27/20 | gate | igbc 4, lock missing | yes | Yes | 10/27/20 | gate | | | Installed lock | NA | BY2018 (USDA 2019) | |
| West Kootenai | CD1365 | 755L | DOAK CR BLUE MTN LDOAK CR BLUE MTN L | 1.7 | D5 | FS | 10/28/20 | gate | igbc 4, Bent inner pipe. Bent swing post | yes | yes | 10/28/20 | gate | | | Installed new inner pipe and tang. Straighten swing post | NA | no | |
| West Kootenai | CD1387 | 4614 | UPPER TERGE CR | 2.8 | D5 | FS Stimson | 10/27/20 | gate | igbc 4, lock missing | yes | Yes | 10/27/20 | gate | | | Installed lock | NA | no | |
| West Kootenai | CD1387 | 4614A | UPPER TERGE CR A | 2.1 | D5 | FS | 10/27/20 | gate | igbc 4, lock missing | yes | Yes | 10/27/20 | gate | | | Installed lock | NA | no | |
| West Kootenai | CD1387 | 4614B | UPPER TERGE CR B | 0.8 | D5 | FS | 10/27/20 | gate | igbc 4, lock missing | yes | Yes | 10/27/20 | gate | | | Installed lock | NA | no | |
| West Kootenai | CD1588 | 863-2 | BRISTOW ZIEGLER MTN | 4.2 | D5 | FS | 06/30/20 | gate | igbc 2, lock missing | yes | Yes | 09/02/20 | gate | | | New 2035 lock installed on gate | NA | BY2019, USDA 2020 | |
| West Kootenai | CD1608 | 4742 | NOISY CR W BRANCH | 1.5 | D5 | FS | 10/28/20 | gate | igbc 2 and 4, Cut inner pipe | yes | yes | 10/28/20 | gate | | | Installed new lock tang | NA | no | |
| West Kootenai | CD1608 | 4742N | NOISY CR W BRANCH N | 0.9 | D5 | FS | 10/28/20 | gate | igbc 2, Cut inner pipe | yes | yes | 10/28/20 | gate | | | Installed new lock tang | NA | no | |
| West Kootenai | CD1642 | 6236 | CAMP CREEKCAMP CREEK | 4.6 | D5 | FS | 06/30/20 | gate | igbc 2, missing lock | yes | yes | 09/02/20 | gate | | | New 2035 lock installed on gate | NA | no | |
| West Kootenai | CD1642 | 6236G | CAMP CR G | 0.5 | D5 | FS | 06/30/20 | gate | igbc 2, missing lock | yes | yes | 09/02/20 | gate | | | New 2035 lock installed on gate | NA | no | |
| West Kootenai | CD1642 | 6300 | CAMP HICKEY | 0.5 | D5 | FS | 06/30/20 | gate | igbc 2, missing lock | yes | yes | 09/02/20 | gate | | | New 2035 lock installed on gate | NA | no | |

Kootenai National Forest Documented Unauthorized Motorized Use on Existing Routes during Bear Year 2020 within Bears Outside Recovery Zones (BORZ)

KNF Appendix C pg 4

FWS006237

Kootenai National Forest Documented Unauthorized Motorized Use on user Created Routes during Bear Year 2020 within Bears Outside Recovery Zone Areas (BORZ)

| BORZ | User created ID | BY20 AGOL identifier | Other District Name | Miles | District | Survey Date | Existing Device | Problem | Device functional? | 2020 Repair? | Repair Date | Closure Device Type | Barrier Type | BY 20 Corrective Action | Reasoning not repaired in BY20 | 2021 status as of 07/09/2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cabinet Face | | | | | | | | | | | | | | | | |
| Cabinet Face | 1.7 mile on 4791 rd. | CD1000 | Track 6 | 0.1 | D5 | 9/15/2020 | | user created motorized route. | no | Yes | 09/15/20 | barrier | earthern berm | 11 earthern berms installed | NA | |
| Cabinet Face | 1.6 mile on 4791 rd. | CD1002 | Track 8 | 0.3 | D5 | 9/15/2020 | | user created motorized route. | no | Yes | 09/15/20 | barrier | earthern berm | installed earthern berm | NA | |
| Cabinet Face | 5287 | CD1005 | Track 6a | 0.0 | D5 | 9/16/2020 | | user created motorized route. | no | Yes | 09/16/20 | barrier | earthern berm | installed earthern berm | NA | |
| Cabinet Face | Snowshoe 1405 and 4791 | CD1006 | | unk | D5 | 9/15/2020 | | user created motorized route. | no | Yes | 09/15/20 | barrier | earthern berm | installed earthern berm | NA | |
| Cabinet Face | O.1 snowshoe rd. | CD1009 | Track 4 | 0.7 | D5 | 9/16/2020 | | user created motorized route. | no | Yes | 09/16/20 | barrier | earthern berm | installed earthern berm | NA | |
| Cabinet Face | 0.1 snowshoe rd. 1405 | CD1011 | Track 5 | 0.2 | D5 | 9/16/2020 | | user created motorized route. | no | Yes | 09/16/20 | barrier | earthern berm | installed earthern berm | NA | |
| Cabinet Face | 1.3 mile on 4791 rd. | CD1017 | | unk | D5 | 9/15/2020 | | user created motorized route. | no | Yes | 09/15/20 | barrier | earthern berm | installed earthern berm on 4 wheeler trail | NA | |
| Cabinet Face | Snowshoe  road | CD1020 | na | unk | D5 | 9/17/2020 | | user created motorized route. | no | Yes | 09/17/20 | barrier | earthern berm | access for buried cable line, no berms installed | NA | |
| Cabinet Face | 0. 2 snow shoe  rd. 1405 | CD1021 | Track 7 | 0.1 | D5 | 9/16/2020 | | user created motorized route. | no | Yes | 09/16/20 | barrier | earthern berm | installed earthern berm | NA | |
| Cabinet Face | 0.6 mile on snowshoe road  1405 | CD1023 | | unk | D5 | 9/16/2020 | | user created motorized route. | no | Yes | 09/16/20 | barrier | earthern berm | Re-inforced existing earth berm that was being breached | NA | |
| Cabinet Face | 2.7 mile on granite creek road 618 | CD1028 | | unk | D5 | 9/17/2020 | | user created motorized route. | no | Yes | 09/17/20 | barrier | earthern berm | | NA | |
| Cabinet Face | 1.9 mile on granite creek road  618 | CD1041 | | unk | D5 | 9/18/2020 | | user created motorized route. | no | Yes | 09/18/20 | barrier | earthern berm | Reinforced 1 existing earthern berm and installed 4 earthern berms. Total 5  installed | NA | |
| Cabinet Face | 1.5 mile on granite creek road 618 | CD1042 | Untitled Path 3 | 0.3 | D5 | 9/17/2020 | | user created motorized route. The point is tied to Untitled Path 3 user created route layer for 2020 | no | Yes | 09/17/20 | barrier | earthern berm | installed earthern berm on route | NA | |
| Cabinet Face | 1.5 mile on granite creek road 618 | CD1044 | Untitled Path 2 | 0.2 | D5 | 9/17/2020 | | user created motorized route. | no | Yes | 09/17/20 | barrier | earthern berm | installed earthern berm | NA | |
| Cabinet Face | Snowshoe rd. | CD1063 | Untitled path 1 & Track 2 | | D5 | 9/16/2020 | | user created motorized route. Point is tied to Untitled Path 1 and Track 2 identified in User Created route layer for 2020 | no | Yes | 09/16/20 | barrier | earthern berm | installed earthern berm | NA | |
| Cabinet Face | 1.0 mile on granite creek road 618 | CD1067 | Track 2 | 0.6 | D5 | 9/18/2020 | | user created motorized route. Also identified with Track 2, one entry point of track 2 is barriered by CD1067, and the other by CD1063 | no | Yes | 09/18/20 | barrier | earthern berm | installed erthern berm | NA | |
| Cabinet Face | 0.7 mile on granite creek road  618 | CD1072 | Track 1 | 0.2 | D5 | 9/18/2020 | | user created motorized route. | no | Yes | 09/18/20 | barrier | earthern berm | Reinforced existing earthern berm | NA | |
| Cabinet Face | 0.6 mile on granite creek road  618 | CD1077 | | unk | D5 | 9/18/2020 | | user created motorized route. | no | Yes | 09/18/20 | barrier | earthern berm | installed erthern berm on route | NA | |
| Cabinet Face | 0.7 mile on 4791 rd. | CD972 | Track 9 | 0.0 | D5 | 9/14/2020 | | user created motorized route | no | Yes | 09/14/20 | barrier | earthern berm | Reinforced existing earthern berm | NA | |
| Cabinet Face | 0.2 mile on 4791 dirt road | CD992 | | unk | D5 | 9/14/2020 | | user created motorized route | no | Yes | 09/14/20 | barrier | earthern berm | Redid and Reinforced existing earthern berms | NA | |
| Cabinet Face | | CD3037 | Untitled Path 1 | 0.4 | D5 | | | user created motorized route. one entry point remains unbarriered (point added on 07092021 in AGOL 2020 for the unbarriered) off of road #1405. The other entry is barriered by CD1063. | | | | | | | Covid-19 limitations, ran out of time | District to consider inclusion in GNA contract |
| Cabinet Face | | CD3036 | Track 12 | 0.1 | D5 | | | user created motorized route, one entry point remains unbarriered off of route #1405. Added point on 07092021 in AGOL 2020 for the unbarriered entry point | | | | | | | Covid-19 limitations, ran out of time | District to consider inclusion in GNA contract |

Kootenai National Forest Documented Unauthorized Motorized Use on user Created Routes during Bear Year 2020 within Bears Outside Recovery Zone Areas (BORZ)     KNF Appendix C pg 5

FWS00620B

| BORZ | User created ID | BY20 AGOL identifier | Other District Name | Miles | District | Survey Date | Existing Device | Problem | Device funct ional? | 2020 Repair? | Repair Date | Closure Device Type | Barrier Type | BY 20 Corrective Action | Reasoning not repaired in BY20 | 2021 status as of 07/09/2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cabinet Face | | no CD# | 6199E NEroute | 1.1 | D5 | | | user created motorized route | | | | | | | More discussions need to occur to determine future of existing route. Currently used for access to suction dredge mining claims | District having discussions |
| Cabinet Face | | no CD# | 6199E SWroute | 0.5 | D5 | | | user created motorized route | | | | | | | More discussions need to occur to determine future of existing route. Currently used for access to suction dredge mining claims | District having discussions |
| Cabinet Face | | CD3038 | Track 10 | 0.1 | D5 | | | user created motorized route. Point added on07092021 in AGOL for the unbarriered entry point off of road 4792 | | | | | | | Covid-19 limitations, ran out of time | District to consider inclusion in GNA contract |
| **Clark Fork** | | | | | | | | | | | | | | | | |
| Clark Fork | Unk | CD140 | | unk | D7 | 08/11/20 | | Vegetation not preventing ATV use up unmarked trail/route for over 200 yard, a well travelled recently used trail | no | No | | barrier | vegetation | | Limited funding, contract limitations, repair needed 2021 | District to consider inclusion in GNA contract |
| Clark Fork | Unk | CD149 | | 0.1 | D7 | 08/20/20 | | Road drivable uphill for 100+ yards, some veg and downed logs. Evidence of recent motorized use. User created switchback cut-off | no | No | | barrier | vegetation | | Limited funding, contract limitations, repair needed 2021 | District to consider inclusion in GNA contract |
| Clark Fork | Unk | CD177 | | unk | D7 | 08/20/20 | | No barrier, Any vehicle can pass. Connects to other point taken | no | No | | barrier | other | | Limited funding, contract limitations, repair needed 2021 | District to consider inclusion in GNA contract |
| Clark Fork | Unk | CD191 | | 0.5 | D7 | 08/20/20 | | No barrier, very obvious and open road, passable by any motorized vehicle. Native road bed. Parallels existing road. No camp sites seen | no | No | | barrier | other | | Limited funding, contract limitations, repair needed 2021 | District to consider inclusion in GNA contract |
| Clark Fork | Unk | CD258 | | unk | D7 | 08/13/20 | | No vegetation or berm, open and drivable, barrier needed | no | No | | barrier | earthern berm | | Limited funding, contract limitations, repair needed 2021 | District to consider inclusion in GNA contract |
| Clark Fork | User created | CD288 | | unk | D7 | 08/06/20 | | Atvs were going up to ridge road 332a in the past very little use due to brush growing up but could easily be used again. Barrier needed | no | No | | barrier | vegetation | | Limited funding, contract limitations, repair needed 2021 | District to consider inclusion in GNA contract |
| Clark Fork | Unk | CD71 | | unk | D7 | 08/13/20 | | User created route, might connect with other unk. Appears to be ATV/bike road. Barrier needed | no | No | | barrier | other | | Limited funding, contract limitations, repair needed 2021 | District to consider inclusion in GNA contract |
| Clark Fork | Unk | CD75 | | unk | D7 | 08/04/20 | | user created motorized route | no | No | | barrier | other | | Limited funding, contract limitations, repair needed 2021 | District to consider inclusion in GNA contract |
| Clark Fork | Unk | CD83 | | unk | D7 | 08/13/20 | | Heavily used user created motorized route, accessible by any motorized vehicle. Entrance obvious. Barrier needed | no | No | | barrier | other | | Limited funding, contract limitations, repair needed 2021 | District to consider inclusion in GNA contract |
| **Tobacco** | | | | | | | | | | | | | | | | |
| Tobacco | 15105 | CD2658 | | unk | D1/D3 | 11/12/20 | | Unauthorized road | no | No | | barrier | earthern berm | | Covid-19 limitations, ran out of time | repaired by district 06/22/21, two sets of earth berms and ditchs installed |
| **West Kootenai** | | | | | | | | | | | | | | | | |
| West Kootenai | 350b | CD1168 | Sheldon | 0.1 | D5 | 6/17/2020 | | Berm is not deep enough and atv's are going through it. | no | No | | barrier | earthern berm | | Covid-19 limitations, ran out of time | District to consider inclusion in GNA contract |
| West Kootenai | Digitized Spur off NFSR 14413 | no CD# | | 0.1 | D5 | | | Undetermined route | | | | | | | Stimson land access route. ROW? Need to review NEPA to identify decision to create route through FS lands. | |
| West Kootenai | DigitizUserCre1 off PipeCr | no CD# | | 0.2 | D5 | | | user created motorized route that ties into upmapped portion of the 7714 on Stimson lands | | | | | | | District will analyze these user created and open motorized routes in future nepa | |

Kootenai National Forest Documented Unauthorized Motorized Use on user Created Routes during Bear Year 2020 within Bears Outside Recovery Zone Areas (BORZ)    KNF Appendix C pg 6

5-ER-1125

| BORZ | User created ID | BY20 AGOL identifier | Other District Name | Miles | District | Survey Date | Existing Device | Problem | Device funct ional? | 2020 Repair? | Repair Date | Closure Device Type | Barrier Type | BY 20 Corrective Action | Reasoning not repaired in BY20 | 2021 status as of 07/09/2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| West Kootenai | DigitizUserCre2 off PipeCr | no CD# | | 0.4 | D5 | | | user created motorized route that ties into upmapped portion of the 7714 on Stimson lands | | | | | | | District will analyze these user created and open motorized routes in future nepa | |
| West Kootenai | DigitizUserCreated between 4756 and 4756F | no CD# | | 0.2 | D5 | | | user created motorized route | | | | | | | District will analyze these user created and open motorized routes in future nepa | |
| West Kootenai | DigitizUserCreSpur accessto567D | no CD# | | 0.8 | D5 | | | user created motorized route | | | | | | | District will analyze these user created and open motorized routes in future nepa | |
| West Kootenai | DigitizUserCreSpur off 8624 | no CD# | | 0.2 | D5 | | | user created motorized route that ties into upmapped portion of the 7714 on Stimson lands | | | | | | | District will analyze these user created and open motorized routes in future nepa | |
| West Kootenai | Sheldon UserCreated | no CD# | | 8.8 | D5 | | | open flat area with numerous user created motorized routes | | | | | | | per BY19 report (USDS FS 2020), district will analyze these user created and open motorized routes in future nepa | |

Kootenai National Forest Documented Unauthorized Motorized Use on user Created Routes during Bear Year 2020 within Bears Outside Recovery Zone Areas (BORZ)

KNF Appendix C pg 7

FWS006240

| | |
|---|---|
| **From:** | Hill, Sean -FS |
| **To:** | Lewis, Carly |
| **Subject:** | RE: [EXTERNAL] further supplemental information |
| **Date:** | Wednesday, June 23, 2021 3:13:54 PM |
| **Attachments:** | IGBC1990GrizzlyBearCEM.pdf |

CEM attached.

High-use non-motorized: Yes, according to our motorized access management development (based on research of Wakkinen and Kasworm 1997), we (Selkirk/Cabinet-Yaak) incorporated the IGBC 1998 Task Force Report Grizzly Bear/Motorized Access Management definition of high-use non-motorized trails as affecting core habitats. If we hit 20 parties/week, then there is an impact to core calculations. Jeremy would be better able to address the measure and calculation for high-use. The recreation program has used some trail counters and self-registration at some trailheads to account for the number of users at least on this District. Sorry if that is so fuzzy.

Sean


Sean Hill
District wildlife biologist
Kootenai National Forest
Three Rivers Ranger District
12858 US Highway 2
Troy, Montana 59935


**From:** Lewis, Carly <carly_lewis@fws.gov>
**Sent:** Wednesday, June 23, 2021 2:43 PM
**To:** Hill, Sean -FS <sean.hill@usda.gov>
**Subject:** RE: [EXTERNAL] further supplemental information

Hey, would you send me the 1990 Grizzly Bear Cumulative Effects Model?

Also, does the Forest use the 20 parties/week to define high-use?  Or is it a more subjective measure?  How do you know if/when a trail is high-use?


**From:** Hill, Sean -FS <sean.hill@usda.gov>
**Sent:** Wednesday, May 26, 2021 10:17 AM
**To:** Lewis, Carly <carly_lewis@fws.gov>
**Subject:** RE: [EXTERNAL] further supplemental information


Hi, Carly,

My responses are in red. If you have any questions, just ask by whatever means needed.


Sean Hill

FWS006578

District wildlife biologist
Kootenai National Forest
Three Rivers Ranger District
12858 US Highway 2
Troy, Montana 59935

---

**From:** Lewis, Carly <carly_lewis@fws.gov>
**Sent:** Tuesday, May 25, 2021 4:58 PM
**To:** Hill, Sean -FS <sean.hill@usda.gov>
**Subject:** RE: [EXTERNAL] further supplemental information

Thanks, Sean! This is super helpful information. Given what you've shown, I can see that the Forest does show a track record of completing the intensive timber sale portion of a project in a few years (intense pulse), followed by additional minor disruptions (short duration, low intensity) for several years afterward. That helps me put the Black Ram project into perspective in terms of the proposed levels of activity with Black Ram compared to what has been happening for the past several years on the district. Appreciate the data.

I wrote up a summary of our discussion the other day (May 20 phone call), for both of our notes, and also had a few follow-up questions (in green):

- Level of activity relative to past projects: We discussed assumptions that the proposed level of work is similar to other work that's been ongoing on the Forest for the past decade or more, thus reflects a continuation of efforts rather than a change towards more or less conservation measures… all of this to check in with the scenario predictions presented in the grizzly bear SSA regarding future projections under different scenarios. The Forest will continue to work towards meeting all of its standards in terms of permanent condition of access within BMUs, with all BMUs on the Forest meeting standards within the next few years. The Forest will continue to have temporary deviations above standards for OMRD and/or TMRD, and the Black Ram project is fairly similar to past projects you listed.

- Core swap: Thanks for providing the additional maps that showed habitat quality (per the Proctor and Kasworm modeling). Overall the two areas of most interest to me were the area up towards Black Top and the KooKoo Boyd area. In both of those places, the Forest proposes affecting 1,272 and 1,332 acres of existing core, respectively. New patches of roughly the same size will be created between Whitetail and Pete Creek, and between Yaak River and Blacktail Creek, and the Forest has definitely done due diligence in making sure the standard is met and that the total acres of Core is actually increasing slightly, and the percent Core will remain the same, thereby meeting the standard. However, I wanted to ensure that the quality of new Core is also good, in addition to the quantity. In talking with both you and Wayne, and seeing the maps you provided, I can see that there definitely are high quality habitats in the new areas to become Core (for at least 10 years).
  - The existing Core in the Black Top Mtn area is mostly high quality summer habitat for

FWS006579

bears. The primary swap area, in between Whitetail-Pete Creeks, the habitat in the new Core area consists of some high quality fall and spring habitat, some of which is whitetail deer winter range, which may offer some feeding sources for bears. So even though there may be a loss of some high quality summer, there will be a gain of high quality spring and fall habitat for grizzly bears. For this and the next bulleted item, I want to be sure to emphasize the change in habitat would be for a short-term; within approximately 15 years and given vegetation responses, we expect that high -quality summer foraging would be available. This is a result of decreasing canopy cover that is limiting forage plant growth, especially in stands where canopy cover is approaching 100 percent and understories are depauperate (as you know, this is a common condition because dense, mid-seral stands are so widespread).

- The existing Core in the KooKooBoyd area also provides high quality summer habitat. The new large area of Core to the east (1,179 acres) also contains some high quality summer habitat, as well as high quality spring and fall habitat.

- A check of other areas of new Core also show that a lot of the area will be providing high quality habitat for grizzly bears. So the Forest has not only ensured the quantity of Core swap is adequate, but the quality of habitat in new Core will also be commensurate with the existing Core that will be affected by the proposed action.

- Wayne also pointed out, and you confirmed based on your experience and professional judgements, that the proposed burns in existing Core areas will help improve habitat quality in many of those areas, leading to an overall improvement in conditions.

- Non-motorized recreation: You confirmed that the proposed action does not affect the Pacific Northwest Trail. None of the proposed 11 miles of new trail are specifically related to the PNWT. You also mentioned that the Forest does not expect high use of the new trails, nor on the portion of the PNWT that runs thru the action area.

  - Does the Forest have trail counter data or other methods for determining how much use does occur on the PNWT corridor? I know I've seen it before, but now I can't find it —what constitutes a "high use" trail? Where can I find that definition, and how does the Forest intend to monitor use of the trails within the action area to determine if/when use becomes high?

    The language for high-use non-motorized trails comes from the 1998 IGBC Task Force report (page 4, Core Area Criteria). It is also mentioned in the 1990 Grizzly Bear Cumulative Effects Model (I can send this is you want). High-use non-motorized trails are considered in the Selkirk and Cabinet-Yaak ecosystems based on the research by Wakkinen and Kasworm (1997) which informed our current motorized access management plan. The definition for high-use is vague: how many people make a party? One? Two? Three or more? Obviously we would measure such use during the active bear year, but there is no direction indicating how to calculate the value.

    We do not have trail counters and so rely hikers self-registering. In 2019, there were 45 such registrations; most were single hikers. Here is what I could determine: 4 could not determine party size; 25 single hikers; 15 parties of two or more. If and/or when such use meets whatever threshold that is established to measure high-use,

FWS006580

we would then have to consider how too compensate for core impacted by such a trail (the non-motorized trail would not be used in calculations of route density).

The attachments included refer to the bear habitats along the trail route/alternatives and a thesis from a University of Montana student Cole. Cole reports on page 43 that in 2017, there were approximately 100 through hiking attempts (Glacier NP to the coast), and about 50 completed it. This thesis was about hiker experiences on the trail, so I did not read it in detail except to look for numbers.

- Illegal motorized use: One final question I forgot to ask you when we were on the phone was in regards to illegal motorized use in the action area (BMUs 14 and 15). We addressed the issue in our Forest Plan BO, and made some assumptions that I want to verify for this project. In looking at past monitoring reports and the data on road breaches that Jeremy provided when I was working on the Forest Plan reconsultation, I noted a few things:

  - BMU 15 has had some breaches in a few areas in the past years, which have been reported in monitoring reports. The data clearly show the Forest addresses those problems in a timely manner, such that the effects to bears are temporary. And there don't appear to be any strong patterns of use *except* possibly for road 5890. The Bear Year 2019 monitoring report states " we list this as open anyway because of historic unauthorized use." Was this road considered "open" for your analysis? Does the Forest have a plan for addressing the unauthorized use on this road? Yes, this road is run as open (IGBC) even though our Motor Vehicle Use Map and regulations do not authorize such access. It does not impact core due to its location between other year-round open roads, and road densities are already high in that location and therefore it does not impact that parameter, either. We have attempted to rebarrier it in the past.

  - BMU 14 has historically experienced very few instances of illegal motorized use. Do you have any reason to suspect that would change in the foreseeable future? I would expect no change to unauthorized use. This BMU is further away from Yaak, has only three primary, open access routes, vegetation is very thick along all routes, and combined with the steep terrain there is little opportunity for pulling off an open route, much less driving off route. The Idaho Panhandle NF portion of the BMU is even thicker with vegetation, even on gated routes; I have been there on a snogo and most of the routes are brushed in and impassable even with deep snow.


I think that's all the questions I had, and all of my notes from our discussion the other day. If I missed anything, or if you want clarification on any of my questions, feel free to get in touch. Thanks!

Carly

Carly Lewis

U.S. Forest Service/U.S. Fish & Wildlife Service Liaison

26 Fort Missoula Rd

FWS006581

Missoula, MT 59804

(406)329-3091

carly_lewis@fws.gov

---

**From:** Hill, Sean -FS <sean.hill@usda.gov>
**Sent:** Tuesday, May 25, 2021 12:51 PM
**To:** Lewis, Carly <carly_lewis@fws.gov>
**Subject:** [EXTERNAL] further supplemental information

> **This email has been received from outside of DOI - Use caution before clicking on links, opening attachments, or responding.**

Hi again, Carly,

Attached is a document (table) summarizing the last five vegetation management project decisions. It includes the project name (decision date); harvest; noncommercial; and burning acres; each with comments as needed.

As you can tell, the harvests are completed rather quickly, and during which motorized use is obviously intensive on both open and restricted access routes. Typically, post-harvest burning occurs one or two years after the harvest is complete. During this time, there is very little, if any, motor vehicle access on gated roads. Fire crews monitor fuel conditions prior to burning, about once per week, so our seasonal gated route use is very low. During subsequent hand ignition of units, there may be several fire vehicles accessing gated routes during the burn day. After burning, one vehicle trip weekly may be used for monitoring. Then gated access routes generally sit unused until planting the following year. We manage our planting crew and inspection trips to remain well below administrative allotments. All this being said, most of our units are along open routes because we strive to minimize impacts to bears, obviously.

Hopefully this is helpful. As always, just ask if you need anything more.

Sean



**Sean Hill**
**District wildlife biologist**
**U.S. Forest Service**
**Kootenai National Forest**
**Three Rivers Ranger District**
Desk: 406-295-7463
sean.hill@usda.gov
12858 US Highway 2
Troy, MT 59935-8750
www.fs.fed.us

FWS006582

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

FWS006583