Nos. 23-2882, 23-2886, 23-3146

─────────────────────────────

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

─────────────────────────────

CENTER FOR BIOLOGICAL DIVERSITY, et al.,
*Plaintiffs-Appellees/Plaintiffs-Appellants*,

and

ALLIANCE FOR THE WILD ROCKIES, et al.,
*Plaintiffs-Appellees/Plaintiffs*,

v.

UNITED STATES FOREST SERVICE, et al.,
*Defendants-Appellants/Defendants/Defendants-Appellees*,

and

KOOTENAI TRIBE OF IDAHO,
*Intervenor-Defendant/Intervenor-Defendant-Appellant/
Intervenor Defendant-Appellee.*

─────────────────────────────

Appeal from the United States District Court for the District of Montana
No. 9:22-cv-114 (Hon. Donald W. Molloy)

─────────────────────────────

**JOINT EXCERPTS OF RECORD
VOLUME 7 OF 10**

─────────────────────────────

| | |
|---|---|
| Of Counsel: | TODD KIM<br>*Assistant Attorney General* |
| ELISE FOSTER<br>*Attorney*<br>U.S. Dep't of Agriculture | THEKLA HANSEN-YOUNG<br>HAYLEY A. CARPENTER<br>ERIKA A. FURLONG |
| KATHRYN L. WILLIAMS-SHUCK<br>SARAH E. MCLAIN<br>*Attorneys*<br>U.S. Dep't of the Interior | JOHN P. TUSTIN<br>JACOB D. ECKER<br>*Attorneys*<br>Environment and Natural Resources Division<br>U.S. Department of Justice<br>Post Office Box 7415<br>Washington, D.C. 20044<br>(202) 305-0466 |

jacob.ecker@usdoj.gov

*Attorneys for Federal Defendants-Appellants*

Julie A. Weis
HAGLUND KELLEY LLP

Kris A. McLean
Tyson A. McLean
Kris A. McLean Law Firm

*Attorneys for Defendant-Intervenor-Appellant Kootenai Tribe of Idaho*

# Chapter 5—KNF Monitoring Program

Monitoring provides the feedback for the forest planning cycle by testing assumptions, tracking relevant conditions over time, measuring management effectiveness, and evaluating effects of management practices. Monitoring information should enable the Forest to determine if a change in plan components or other plan management guidance may be needed, forming a basis for continual improvement and adaptive management. Direction for the monitoring and evaluation of forest plans is found under the 1982 Planning Rule at 36 CFR 219.12(k) and under the 2012 Planning Rule at 36 CFR 219.12.

The plan monitoring program addresses the most critical components for informed management of the Forest's resources within the financial and technical capability of the agency. Every monitoring question links to one or more goals, desired conditions, objectives, standards, or guidelines. However, not every plan component has a corresponding monitoring question.

This monitoring program is not intended to depict all monitoring, inventorying, and data gathering activities undertaken on the Forest; nor is it intended to limit monitoring to just the questions and indicators listed in table 22. Consideration and coordination with broad-scale monitoring strategies, multi-party monitoring collaboration, and cooperation with state agencies where practicable will increase efficiencies and help track changing conditions beyond the Forest boundaries to improve the effectiveness of the plan monitoring program. In addition, project and activity monitoring may be used to gather information for the plan monitoring program if it will provide relevant information to inform adaptive management.

The monitoring program sets out the plan monitoring questions and associated indicators. It is comprised of a monitoring guide and a biennial evaluation report.

- The monitoring guide provides detailed information on the monitoring questions, indicators, frequency and reliability, priority, data sources and storage, and cost.
- An interdisciplinary team will develop a biennial Monitoring Evaluation Report which will summarize the results of completed monitoring, evaluate the data, consider relevant information from broad-scale or other monitoring efforts, and make recommendations to the responsible official. The monitoring evaluation report will indicate whether or not a change to the Forest Plan, management activities, or the monitoring program, or a new assessment, may be warranted based on the new information. The monitoring evaluation report is used to inform adaptive management of the Plan area. The Monitoring Evaluation Report will be made available to the public.

Some kinds of monitoring indicators will require longer time frames for thorough evaluation of results, but a biennial review of what information has been collected will ensure timely evaluation to inform planning. The biennial monitoring evaluation does not need to evaluate all questions or indicators on a biennial basis but must focus on new data and results that provide new information regarding management effectiveness, progress towards meeting desired conditions or objectives, changing conditions, or validation (or invalidation) of assumptions.

Table 22 is the monitoring program. This table displays the monitoring questions, the reference to Forest Plan direction, the indicator(s) for answering the monitoring question, the frequency of measure, and the precision. Monitoring questions are used to evaluate whether management is moving toward, moving away from, or maintaining desired conditions. The references to forest plan direction provide a link between the monitoring question and the forest plan. The forest plan references may not include all relevant direction, but rather the primary direction that is addressed by the monitoring question. Indicators are the specific resource measures used in answering the monitoring questions. Frequency of measure is the timeframe for collecting data on each indicator. Precision is defined as Class A or B. For Class A, mostly quantitative methods are widely accepted with repeatable results and statistical validity. Reliability, precision, and accuracy are very good. For Class B, mostly qualitative methods include

7-ER-1421

Chapter 5—KNF Monitoring Program

project records, communications, or less formal measurements like walk-thru exams or informal visitor surveys. Reliability, accuracy, and precision are good, but usually less than Class A. The associated evaluation process determines if the observed changes are consistent with the Forest Plan and the effectiveness of implementation. Evaluation reports will be produced biennially (as per 2012 Rule, 36 CFR 219.12(d)). Not all questions or indicators will be reported in the biennial Monitoring Evaluation Report.

7-ER-1422

Chapter 5—KNF Monitoring Program

## Table 22. Monitoring Program

| Resource | Monitoring Question | Reference to Forest Plan Direction | Indicator | Frequency of Measure/Precision |
|---|---|---|---|---|
| **Physical and Biological** | | | | |
| **Vegetation** | **MON-VEG-01:** To what extent are management activities and natural disturbance processes trending toward desired conditions for vegetation composition, structure, and pattern, increasing resistance and resiliency to disturbance factors including climate change? This includes vegetation dominance type and size, old growth, down wood, snags, fire-killed forest, and insect and disease infested forest. | GOAL-01 – ECO INTEGRITY and RESILIENCY, FW-DC-Veg-01, FW-DC-VEG-02, FW-DC-VEG-03, FW-DC-VEG-05, FW-DC-VEG-07, FW-DC-VEG-08, FW-OBJ-VEG-01, FW-STD-VEG-01, FW-GDL-VEG-01, FW-GDL-VEG-03, FW-GDL-VEG-04, FW-GDL-VEG-05, FW-GLD-VEG-06, FW-DC-WL-14, FW-DC-WL-13 | **MON-VEG-01-01:** Acres treated to meet FW-OBJ-VEG-01<br>**MON-VEG-01-02:** Acres burned<br>**MON-VEG-01-03:** Acres of forest by dominance type and size class compared to the desired condition<br>**MON-VEG-01-04:** Acres meeting the old growth definition (see glossary) as determined by the FIA program<br>**MON-VEG-01-05:** Acres of old growth and acres of recruitment potential old growth, as determined by the Forests' stand inventory and mapping procedures<br>**MON-VEG-01-06:** Acres of old growth treated<br>**MON-VEG-01-07:** Snags per acre forestwide<br>**MON-VEG-01-08:** Number of acres influenced by insects and disease | Annual/Class A<br><br>Annual/Class A<br>Every 5 Years/Class A<br><br>Every 5 Years/Class A<br><br>Annual/Class A<br><br>Annual/Class A<br>Every 5 Years/Class A<br>Every 5 Years/Class A |
| **Vegetation** | **MON-VEG-02:** Have management activities met Plan objectives and trended towards desired conditions for invasive terrestrial plant species? | FW-DC-VEG-10, FW-OBJ-VEG-02 | **MON-VEG-02-01:** Acres of non-native invasive plants treated<br>**MON-VEG-02-02:** Number of sites of new non-native invasive plant species and number of acres treated | Annual/Class A<br><br>Annual/Class A |
| **Fire** | **MON-FIRE-01:** To what extent are management activities moving hazardous fuels towards desired conditions? | FW-DC-FIRE-02, FW-OBJ-FIRE-01, FW-DC-SES-04, GA-DC-FIRE-BUL-01, GA-DC-FIRE-CLK-01, GA-DC-FIRE-FSH-01, GA-DC-FIRE-KOO-01, GA-DC-FIRE-LIB-01, GA-DC-FIRE-TOB-01, GA-DC-FIRE-YAK-01 | **MON-FIRE-01-01:** Acres of hazardous fuel treatments within the WUI, and in areas outside of the WUI | Annual/Class A |

Kootenai National Forest                                                                                                              97

7-ER-1423

FS-000107

Chapter 5—KNF Monitoring Program

| Resource | Monitoring Question | Reference to Forest Plan Direction | Indicator | Frequency of Measure/Precision |
|---|---|---|---|---|
| Fire | **MON-FIRE-02:** To what extent is unplanned fire used to trend vegetation towards desired conditions? | FW-DC-FIRE-03, FW-OBJ-FIRE-02 | **MON-FIRE-02-01:** Number of unplanned natural fire ignitions managed for the maintenance and/or restoration of fire-adapted ecosystems, and the number of unplanned natural ignition managed with the primary goal of suppression | **Annual/Class A** |
| Watershed | **MON-WTR-01:** Are soil, water quality, and riparian and aquatic habitats protected and moving towards desired conditions? | FW-DC-WTR-02, FW-DC-WTR-04, FW-GDL-WTR-01, FW-GDL-WTR-03, FW-GDL-SOIL-05, FW-DC-RIP-03, and FW-DC-AQH-01 | **MON-WTR-01-01:** Number of Best Management Practices (BMP) evaluations conducted and the percent of BMPS that were implemented correctly and the percent that were effective. | **Annual/Class A** |
| Watershed | **MON-WTR-02:** To what extent are management activities moving watersheds towards desired conditions? | FW-DC-WTR-01, FW-DC-WTR-02, FW-DC-WTR-03, FW-DC-WTR-04, FW-OBJ-WTR-01, FW-OBJ-WTR-02, FW-STD-WTR-01, FW-GDL-WTR-01 | **MON-WTR-02-01:** Acres (or miles) of restoration activities accomplished by 6th code watershed and acres (or miles) accomplished in 303d/TMDL watersheds <br> **MON-WTR-02-02:** Percent of subwatersheds trended towards an improved condition | **Annual/Class A** <br><br><br> **Every 5 Years/Class A** |
| Aquatic Habitat | **MON-AQH-01:** To what extent is the Forest meeting Forest Plan objectives and trending towards desired condition to reconnect fragmented stream habitat to increase population resilience to disturbance including climate change? | FW-DC-AQH-02, FW-DC-AQS-01, FW-DC-AQS-04, FW-DC-AQS-05, FW-OBJ-AQH-03 | **MON-AQH-01-01:** Miles of reconnected stream habitat | **Annual/Class A** |
| Soils | **MON-SOIL-01:** To what extent has coarse woody debris been retained for long-term soil productivity and other ecosystem functions? | FW-DC-SOIL-01, FW-DC-SOIL-03, FW-DC-SOIL-04, FW-GDL-SOIL-02, FW-GDL-SOIL-03, FW-DC-VEG-08 | **MON-SOIL-01-01:** Number of regeneration harvest units surveyed and percent meeting coarse woody debris criteria post- harvest | **Annual/Class A** |

7-ER-1424

FS-000108

Chapter 5—KNF Monitoring Program

| Resource | Monitoring Question | Reference to Forest Plan Direction | Indicator | Frequency of Measure/Precision |
|---|---|---|---|---|
| Soils | **MON-SOIL-02:** To what extent have vegetation management activities prevented irreversible damage to soil conditions? | FW-DC-SOIL-02, FW-DC-SOIL-03, FW-DC-SOIL-04; FW-DC-SOIL-05, FW-GDL-SOIL-01, FW-GDL-SOIL-04 | **MON-SOIL-02-01:** Number of harvest units surveyed and percent that meet the Regional Soil Quality Standard, post-harvest (FSM, R1 Supplement No. 2500-99-1) | **Annual/Class A** |
| Riparian | **MON-RIP-01:** Have riparian and wetland areas been maintained or improved to provide for healthy streams and aquatic environments to increase resiliency to disturbance including climate change? | FW-OBJ-RIP-01 | **MON-RIP-01-01:** Acres (or miles) of riparian habitat maintained or improved | **Annual/Class A** |
| Federally Listed Species | **MON-FLS-01:** To what extent is forest management contributing to the conservation of federally listed species and moving toward habitat objectives? | FW-DC-WL-03, FW-DC-WL-05, FW-STD-WL-01, FW-STD-WL-02, FW-STD-WL-03, FW-DC-VEG-01, FW-DC-VEG-02, FW-DC-VEG-05, FW-DC-VEG-08, FW-DC-VEG-11, FW-OBJ-VEG-01, FW-GDL-VEG-03, FW-DC-FIRE-03 | **MON-FLS-01-01:** Grizzly Bear: progress towards achieving and maintaining standards for percent core area, OMRD, and TMRD within the Recovery Zones (see monitoring requirements for the Grizzly Bear Access Amendment in appendix B) **MON-FLS-01-02:** Canada lynx: changes in lynx habitat as a result of moving towards the desired conditions for vegetation through vegetation management, prescribed fire, or natural disturbance (see monitoring requirements for the NRLMD in appendix B) **MON-FLS-01-03:** Bull Trout population trends based on redd counts in known spawning reaches | **Annual/Class A** **Annual/Class A** **Annual/Class A** |

7-ER-1425

FS-000109

Chapter 5—KNF Monitoring Program

| Resource | Monitoring Question | Reference to Forest Plan Direction | Indicator | Frequency of Measure/Precision |
|---|---|---|---|---|
| **MIS** | **MON-MIS-01:** Are habitat trends for Management Indicator Species (MIS) consistent with the objectives? | FW-OBJ-WL-02, FW-OBJ-WL-03, FW-GDL-WL-10, FW-DC-VEG-01, FW-DC-VEG-02, FW-DC-VEG-03, FW-DC-VEG-04, FW-DC-VEG-05, FW-DC-VEG-07, FW-DC-VEG-11, FW-OBJ-VEG-01, FW-STD-VEG-01, FW-GDL-VEG-01, FW-GDL-VEG-04, FW-GDL-VEG-05, FW-GDL-VEG-06, FW-DC-FIRE-03, FW-OBJ-AQH-02 | **MON-MIS-01-01:** Elk: number of planning subunits providing >30% security and >50% security on NFS lands during the hunting season<br>**MON-MIS-01-02:** Landbird assemblage (insectivores): a) number of acres where planned ignitions were used to maintain/improve habitat; b) percentage of natural unplanned ignitions managed for the maintenance or restoration or fire adapted ecosystems<br>**MON-MIS-01-03:** Changes in KNF River Invertebrate Prediction and Classification System (Observed/Effect model) score | **Annual/Class A**<br><br>**Annual/Class A**<br><br><br><br><br><br><br>**Every 5 Years/Class A** |
| **Wildlife** | **MON-WDL-01:** Have management activities met Plan objectives and maintained or improved habitat to achieve desired terrestrial habitat conditions? | FW-OBJ-WL-01 FW-DC-VEG-01, FW-DC-VEG-02, FW-DC-VEG-03, FW-DC-VEG-04, FW-DC-VEG-05, FW-DC-VEG-07, FW-DC-VEG-08, FW-DC-VEG-11, FW-OBJ-VEG-01, FW-STD-VEG-01, FW-GDL-VEG-01, FW-GDL-VEG-03, FW-GDL-VEG-04, FW-GDL-VEG-05, FW-GDL-VEG-06, FW-DC-FIRE-03 | **MON-WDL-01-01:** Acres of terrestrial habitat restored or enhanced<br>Also see results for **MON-VEG-01-01** through **MON-VEG-01-05, MON-VEG-02-02, MON-VEG-02-03**, and **MON-FIRE-02-02** | **Annual/Class A** |
| **Human Uses and Designations of the Forest** | | | | |
| **Access and Recreation** | **MON-AR-01:** Have appropriate management actions been taken on recreation sites where opportunities have been identified, use is at or near capacity, or where there are resource concerns? | FW-DC-AR-01, FW-OBJ-AR-01, FW-OBJ-AR-02, MA6-DC-AR-01, MA7-DC-AR-01, MA7-DC-AR-5, GA-DC-AR-BULL-01, GA-DC-AR-CLK-01, GA-DC-AR-KOO-01, GA-DC-AR-LIB-01, GA-DC-AR-TOB-01, GA-DC-AR-YAK-01 | **MON-AR-01-01:** Number and type of recreation sites<br>**MON-AR-01-02:** Number of Persons at One Time (PAOT – capacity)<br>**MON-AR-01-03:** Amount of deferred maintenance for developed recreation sites<br>**MON-AR-01-04:** Number of recreation partnerships<br>**MON-AR-01-05:** Changes in percent of Forest in each ROS setting | **Every 5 Years/Class A**<br><br>**Every 5 Years/Class A**<br><br>**Every 5 Years/Class A**<br><br><br>**Every 5 Years/Class A**<br><br>**Every 5 Years/Class A** |

FS-000110

Chapter 5—KNF Monitoring Program

| Resource | Monitoring Question | Reference to Forest Plan Direction | Indicator | Frequency of Measure/Precision |
|---|---|---|---|---|
| **Access and Recreation** | **MON-AR-02:** Have management activities trended towards desired conditions for a minimum transportation system that provides recreation opportunities, safe and efficient public and agency access, and are environmentally compatible? | FW-DC-AR-03, FW-DC-AR-04, FW-DC-AR-05, FW-DC-AR-07, FW-OBJ-AR-03, MA6-DC-AR-03, GA-DC-AR-BUL-01, GA-DC-AR-TOB-03 | **MON-AR-02-01:** Miles of road open year-long<br>**MON-AR-02-02:** Miles of road open seasonally<br>**MON-AR-02-03:** Miles of roads maintained by maintenance level<br>**MON-AR-02-04:** Miles of roads decommissioned<br>**MON-AR-02-05:** Miles of roads put into intermittent storage | **Annual/Class A**<br><br>**Annual/Class A**<br><br>**Annual/Class B**<br><br>**Annual/Class A**<br><br>**Annual/Class A** |
| **Access and Recreation** | **MON-AR-03:** To what extent are motorized and non-motorized winter and summer trail recreation opportunities available for a variety of users? | FW-DC-AR-03, FW-DC-AR-04, FW-DC-AR-05, FW-OBJ-AR-04, FW-OBJ-AR-05, MA5a/b/c-DC-AR-03, MA6-DC-AR-03, MA7-DC-AR-03, GA-DC-AR-BUL-01, GA-DC-AR-CLK-01, GA-DC-AR-KOO-04, GA-DC-AR-LIB-01, GA-DC-AR-LIB-03, GA-DC-AR-LIB-04 | **MON-AR-03-01:** Acres open to over-snow vehicle use<br>**MON-AR-03-02:** Miles of managed over-snow vehicle trails<br>**MON-AR-03-03:** Miles of managed cross-country ski trails<br>**MON-AR-03-04:** Miles of trail designated for motor vehicle use year-long or seasonally<br>**MON-AR-03-05:** Miles of trails maintained for varied managed uses (e.g., hiker, equestrian, mountain biking, OHV, motorcycle) | **Annual/Class A**<br><br>**Annual/Class A**<br><br>**Annual/Class A**<br><br>**Annual/Class A**<br><br><br>**Annual/Class B** |
| **Access and Recreation** | **MON-AR-04:** What are the trends in visitation forestwide, and are visitors satisfied with the facilities, access, services, and perception of their safety? | FW-DC-AR-01, FW-DC-AR-04, MA6-DC-AR-01, MA7-DC-AR-01, MA7-DC-AR-05 | **MON-AR-04-01:** Visitor use and trends in use forestwide<br>**MON-AR-04-012:** Percent Satisfaction Index (National Visitor Use Monitoring) for developed facilities, access, services and perception of safety | **Every 5 Years/Class A** |

7-ER-1427

FS-000111

Chapter 5—KNF Monitoring Program

| Resource | Monitoring Question | Reference to Forest Plan Direction | Indicator | Frequency of Measure/Precision |
|---|---|---|---|---|
| Wilderness | **MON-WLDN-01:** Have management activities met Forest Plan desired conditions and standards, and trended towards management area desired conditions for designated wilderness and Wilderness Study Areas? | MA1a-DC-AR-01, MA1a-DC-AR-04; FW-DC-AR-06 | MON-WLDN-01-01: Designated Wilderness managed to standard<br><br>MON-WLDN-01-02: Montana Wilderness Study Area wilderness character is not diminished beyond what existed in 1977 | **Annual/Class A** |
| **Cultural Resources** | **MON-CR-01:** To what extent is the Forest meeting Forest Plan objectives and trending towards desired condition to identify, evaluate, and nominate cultural resources for listing on the National Register of Historic Places? | FW-DC-CR-01, FW-OBJ-CR-01, FW-OBJ-CR-02 | **MON-CR-01-01:** Number of properties identified<br>**MON-CR-01-02:** Number of properties evaluated<br>**MON-CR-01-03:** Number of properties nominated | **Annual/Class A**<br><br>**Annual/Class A**<br><br>**Annual/Class A** |
| **Cultural Resources** | **MON-CR-02:** To what extent are historic properties protected and public education and interpretation provided to move towards desired conditions? | FW-DC-CR-02 | **MON-CR-02-01:** Number of properties protected/preserved<br>**MON-CR-02-02:** Number of newly interpreted or updated historic properties | **Annual/Class A**<br><br>**Every 5 Years/Class A** |
| **American Indian Rights and Interests** | **MON-AI-01:** To what extent is the Forest meeting Forest Plan objectives and trending towards desired conditions for consultation with each Tribe? | FW-DC-AI-02, FW-OBJ-AI-03 | **MON-AI-01-01:** Number of approved consultation protocols | **Annual/Class A** |
| **American Indian Rights and Interests** | **MON-AI-02:** To what extent has the agreement for access and acquisition of forest products for traditional cultural uses progressed in consultation with each Tribe? | FW-DC-A1-01, FW-OBJ-AI-01 | **MON-AI-02-01:** Number of approved product use agreements | **Annual/Class A** |

FS-000112

Chapter 5—KNF Monitoring Program

| Resource | Monitoring Question | Reference to Forest Plan Direction | Indicator | Frequency of Measure/Precision |
|---|---|---|---|---|
| **American Indian Rights and Interests** | **MON-AI-03:** To what extent is the Forest meeting Forest Plan objectives and trending towards desired conditions for protecting traditional cultural areas? | FW-DC-AI-03, FW-OBJ-AI-02 | **MON-AI-03-01:** Number of approved management plans for traditional cultural areas | **Annual/Class A** |
| **Production of Natural Resources** | | | | |
| **Timber** | **MON-TBR-01:** To what extent is the Forest meeting Forest Plan objectives and trending towards desired conditions to provide a mix of timber products in response to market demands? | FW-DC-TBR-01, FW-OBJ-TBR-01 | **MON-TBR-01-01:** MMBF offered and MMBF sold annually | **Annual/Class A** |
| **Timber** | **MON-TBR-02:** To what extent is the Forest meeting NFMA requirements and desired conditions on size of harvest openings? | FW-DC-VEG-05, FW-STD-TBR-02 (Also 1982 Rule requirement [219.12(k)(5)(iii)]) | **MON-TBR-02-01:** Number of even-aged regeneration harvest units exceeding 40 acres in size and category for exceeding | **Annual/Class A** |
| **Timber** | **MON-TBR- 03:** To what extent are regeneration units restocked to trend towards vegetation desired conditions? | FW-DC-VEG-04, FW-DC-VEG-11, FW-DC-TBR-02, FW-DC-TBR-03, FW-STD-TBR-03 (Rule requirement [219.12(k)(5)(i)]) | **MON-TBR- 03-01:** On lands suitable for timber production, percent of acres with regeneration harvest that are adequately restocked within 5 years of harvest | **Annual/Class A** |
| **Minerals** | **MON-MIN-01:** Are reclamation activities improving ecological and human health conditions? | FW-DC-MIN-01, FW-OBJ-MIN-01 | **MON-MIN-01-01:** Number of reclaimed abandoned mine sites over a five-year period. Number reclaimed to reduce the risk to human health | **Every 5 Years/Class A** |
| **Economic and Social Environment** | | | | |
| **Social and Economic Systems** | **MON-SOC-01:** To what extent is forest management contributing towards desired conditions for a stable and functioning local economy? | FW-DC-SES-02 | **MON-SOC-01-01:** Number of jobs and thousands of dollars in labor income from KNF management and percent of total planning area1 jobs and income | **Every 5 Years/Class A** |

Chapter 5—KNF Monitoring Program

| Resource | Monitoring Question | Reference to Forest Plan Direction | Indicator | Frequency of Measure/Precision |
|---|---|---|---|---|
| **Social and Economic Systems** | **MON-SOC-02**: Is the cost of implementing the Forest Plan consistent with that predicted in the FEIS? | Rule requirement (219.12(k)(3)) | **MON-SOC-02-01:** Forest annual budget | **Annual/Class A** |

Kootenai National Forest

7-ER-1430

FS-000114

# Glossary

**303(d) Segments**  A stream or other waterbody that is listed by the state as being "water quality impaired" by a pollutant in their current 303(d)/305(b) Integrated Report, pursuant to the Clean Water Act.

**Activity Area**  A land area affected by a management activity to which soil quality standards are applied. Activity areas include harvest units within timber sale areas, prescribed burn areas, recreation areas, and grazing areas or pastures within range allotments.

**Adaptive Management**  An approach to natural resource management where actions are designed and executed and effects are monitored for the purpose of learning and adjusting future management actions, which improves the efficiency and responsiveness of management.

**Allotment Management Plan (AMP)**  A document applying to management of rangeland ecosystems and livestock operations on the public lands prescribing: (1) the manner in and extent to which livestock operations will be conducted in order to meet ecosystem health, multiple use, economic, and other objectives; (2) describing range improvements to be installed and maintained; and (3) containing such other provisions relating to livestock grazing and other objectives found by the Secretary of Agriculture to be consistent with the provisions of Federal Land Policy and Management Act. An AMP integrates resource objectives, standards, guidelines, and management requirements for soil and water for watershed protection, wildlife and fisheries, recreation, timber, and other resources on lands within a range allotment.

**Allowable Sale Quantity (ASQ)**  The quantity of timber that may be sold from the area of suitable land covered by the Forest Plan for a time period specified by the Plan. This quantity is usually expressed on an annual basis as "the average annual allowable sale quantity."

**Ancient Cedar Groves**  Stands containing some cedar trees 60 inches or greater DBH and/or 500 years old. The density of 60 inches or greater DBH trees may be low and the distribution is often patchy, but these big (and/or old trees) can be found at least occasionally, scattered across the grove. Usually covers at least one-half acre in area, unless there is a concentration of 60 inches or greater DBH trees on a smaller area. In the same stand, there are often (but not always) additional unusually large (48 inches or greater DBH) trees.

**Approach Areas**  Areas on public lands, adjacent to wildlife crossings, that will be managed to facilitate animal movements.

**Aquatic Ecosystem**  Waters and wetlands of the United States that serve as habitat for interrelated and interacting communities and populations of plants and animals. The stream channel, lake or estuary bed, water, biotic communities, and the habitat features that occur therein.

**Bear Year**  The active bear year is from April 1 to November 30. (Spring (April 1 to June 15), summer (June 16 to September 15), fall (September 16 to November 30), winter (December to March 30)).

Glossary

| | |
|---|---|
| **Bear Management Unit (BMU)** | Areas established for use in grizzly bear analysis. BMUs generally a) approximate female home range size; and b) include representations of all available habitat components. |
| **Beneficial Uses** | Any of the various uses which may be made of the water, including, but not limited to, domestic water supplies, fisheries and other aquatic life, industrial water supplies, agricultural water supplies, navigation, recreation in and on the water, wildlife habitat, and aesthetics. |
| **Best Management Practices (BMPs)** | Practice or set of practices that enable a planned activity to occur while still protecting the resource managed, normally implemented and applied during the activity rather than after the activity. |
| **Best Management Practices (BMPs) (Watershed)** | A practice or a combination of practices, that is determined by the state (or designated area-wide planning agency) after problem assessment, examination of alternative practices, and appropriate public participation to be the most effective, practicable (including technological, economic, and institutional considerations) means of preventing, or reducing the amount of pollution generated by nonpoint sources to a level compatible with water quality goals. |
| **Big Game** | Those species of large mammals normally managed as a sport hunting resource. Generally includes; elk, moose, white-tailed deer, mule deer, mountain goat, bighorn sheep, black bear, and mountain lion. |
| **Biophysical Setting** | An aggregation of vegetation response units, grouped by broad, climatic modifiers including temperature and moisture gradients. |
| **Cavity** | The hollow excavated in a tree that is used by birds or mammals for roosting and/or reproduction. |
| **Coarse Woody Debris (CWD)** | Coarse woody debris consists of dead woody material larger than 3 inches in diameter and derived from tree limbs, boles, and roots. |
| **Composition (stand)** | The proportion of each tree species in a stand expressed as a percentage of the total number, basal area, or volume of all tree species in the stand. |
| **Connectivity** | The arrangements of habitats that allows organisms and ecological processes to move across the landscape; patches of similar habitats are either close together or linked. The opposite of fragmentation. |
| **Conservation Watersheds** | Subwatersheds (6th level HUC) that are considered to have excellent habitat, excellent water quality and strong populations of native fish species or all practical restoration opportunities have been completed. These areas are intended to protect stronghold populations of native salmonids and compliment restoration efforts. See also Priority Watersheds. Priority watersheds have been replaced by restoration watersheds for implementation of the revised Forest Plan. See also definition for Priority Watersheds appendix D of the final Forest Plan FEIS discusses the methodology for establishing Conservation Watersheds. |

Kootenai National Forest

7-ER-1432

| | |
|---|---|
| **Corridors** | Avenues along which wide ranging animals can travel, plants can propagate, genetic interchange can occur, populations can move in response to environmental changes and natural disasters, and threatened species can be replenished from other areas. |
| **Cultural Properties** | The definite location of a past human activity, occupation, or use identifiable through field inventory, historic documentation, or oral evidence. Cultural properties include prehistoric and historic archaeological remains, or architectural sites, structures, objects, or places with important public and scientific uses. |
| **Decommission** | Demolition, dismantling, removal, obliteration and/or disposal of a deteriorated or otherwise unneeded asset or component, including necessary cleanup work. This action eliminates the deferred maintenance needs for the fixed asset. |
| **Deferred Maintenance** | Maintenance that was not performed when it should have been or when it was scheduled, and therefore, was put off or delayed for a future period. When allowed to accumulate without limits or consideration of useful life, deferred maintenance leads to deterioration of performance, increased costs to repair, and decrease in asset value. Code compliance (e.g., life safety, ADA, OSHA, environmental, etc.), Forest Plan Direction, Best Management Practices, Biological Evaluations other regulatory or Executive Order compliance requirements, or applicable standards not met on schedule are considered deferred maintenance. |
| **Depressed Native Fish Population** | Populations which have numbers that have been reduced or are declining or a major life-history component has been eliminated. |
| **Designated Route** | A National Forest System road or a National Forest system trail on National Forest System lands that is designated for motor vehicle use pursuant to 36 CFR 212.51 on a motor vehicle use map. |
| **Designated Utility Right-of-Way (ROW) Corridor** | A parcel of land with specific boundaries identified by law, Secretarial order, the land use planning process, or by some other management decision as being a preferred location for existing and future ROW facilities. The corridor may be suitable to accommodate more than one type of ROW use or facility or one or more ROW uses or facilities that are similar, identical, or compatible. A designated corridor may already be occupied by existing utility facilities. It has been adequately analyzed to provide for a high degree of assurance that in being identified as a "designated corridor," it can accommodate at least one new additional utility facility. (FSM 1905) |
| **Detrimental Soil Disturbance** | The soils in an activity area are considered detrimentally disturbed at a given sample point when one or a combination of any of the attributes listed below is present due to past forest management activities: |

    a. Compaction: a 15 percent increase in natural bulk density. Soil compaction reduces the supply of air, water, and nutrients to plants. Roading, ground based yarding, dozer and grapple piling activities are the major contributors to compaction.

    b. Soil ruts: Machine-generated soil displacement having smeared the soil

Glossary

surface in a rut. Wheel ruts at least 2 inches deep in wet soils.

c. Displacement: Removal of one inch or more surface soil continuous area greater than 100 sq. feet which often consists of the O and A soil horizons. Displacement removes the most productive part of the soil resource. Temporary roads, skid trails, ground-based yarding, dozer piling and cable corridors are the major contributors to displacement.

d. Surface erosion: Indicated by rills, gullies, pedestals, and localized soil deposition.

e. Severely burned soils: Physical and biological changes to the soil resulting from high-intensity burns of long duration as described in the Burned Area Emergency Rehabilitation Handbook (FSH 2509.13).

f. Soil mass movement: Any soil mass movement caused by management activity.

**Development Scale**  The classification of the scale of development of recreation facilities with scales ranging from 0 to 5. Development scales are defined by levels of site modifications, type of construction material, management controls, design style, development density, services offered, and site modification allowed. Development scale 0-2 are considered dispersed sites and 3-5 are considered developed sites:

**Development Scale 0:** No Site Modification
**Development Scale 1:** Almost No Site Modification
**Development Scale 2:** Minimal Site Modification
**Development Scale 3:** Moderate Site Modification
**Development Scale 4:** Heavy Site Modification
**Development Scale 5:** Extensive Site Modification

**Disturbance**  A discrete event that changes existing plant community composition or structure, and interrupts, changes, or resets the ongoing successional sequence.

Or

Human presence, noise, or other activity that causes wildlife to move away from the area or alter behavior.

**Dominance Group**  Dominance group is determined by the following:

**Single species** – species that makes up at least 60 percent of the canopy cover or weighted basal area.

**Species mix** – No single species determination can be made. Type of mix, either tolerant or intolerant, is determined by what species combination makes up 80 percent of the canopy cover or weighted basal area, with each species contributing more than 20 percent to the total. Mixed species were combined with habitat types to derive a single species label.

**Down Wood**  Accumulation of woody material scattered on the forest floor that consists of two categories: coarse woody debris and fine woody debris.

Glossary

| | |
|---|---|
| **Ecological Conditions** | Components of the biological and physical environment that can affect diversity of plant and animal communities and the productive capacity of ecological systems. These components could include the abundance and distribution of aquatic and terrestrial habitats, roads and other structural developments, human uses, and invasive, exotic species. |
| **Ecosystems** | An interacting system of living organisms and their environment. |
| **Ecological Integrity** | The capacity to support and maintain a balanced, integrated, and adaptive biological system having the full range of elements and processes expected in a region's natural habitat. The ability to support and maintain a balanced, integrated, adaptive community of organisms having a species composition, diversity, and functional organization comparable to that of the natural habitat of the region. An ecosystem is said to have high integrity if its full complement of native species is present in normal distributions and abundances, and if normal dynamic functions are in place and working properly. In systems with integrity, the capacity for self-repair when perturbed is preserved, and minimal external support for management is needed. |
| **Endangered Species** | A plant or animal species listed under the Endangered Species Act that is in danger of extinction throughout all or a significant portion of its range. |
| **Final Regeneration Harvest** | Timber harvest designed to regenerate a timber stand or release a regenerated stand. This includes clearcut, removal cut of a shelterwood, or seed tree system, and selection cut. |
| **Fine Woody Debris** | Fine woody debris consists of downed dead branches, twigs, and small tree or shrub boles less than 3 inches not connected to a live tree or shrub. Fine woody debris interacts with the biotic components of soil and litter as storage sites for moisture, nutrients, and energy and is in various stages of decomposition. |
| **Fire Behavior** | The manner in which a fire reacts to the influences of fuel, weather, and topography. |
| **Fire Hazard** | A fuel complex defined by volume, type condition, arrangement, and location, which determines the degree of ease of ignition and of resistance to control. |
| **Fire Intensity** | A general term relating to the heat energy released by a fire. |
| **Fire Management** | Activities required for the protection of burnable wildland values from fire and the use of prescribed fire to meet land management objectives. |
| **Fire Severity** | The degree to which a site has been altered or disrupted by fire. A product of fire intensity, fuel consumption, and residence time. |
| **Fire Suppression** | An appropriate management response to wildland fire that results in curtailment of fire spread and eliminates all identified threats from the particular fire. All wildland fire suppression activities provide for firefighter and public safety as the highest consideration, but minimize loss of resource values, economic expenditures, and/or the use of critical firefighting resources. |

7-ER-1435

FS-000119

Glossary

| | |
|---|---|
| **Forest Health** | The perceived condition of a forest derived from concerns about such factors as its age, structure, composition, function, and vigor, presence of unusual levels of insects and disease, and resilience to disturbance. |
| **Fragmentation** | A condition in which a continuous area is reduced and divided into smaller sections. Habitat can be fragmented by natural events or development activities. |
| **Fuel Treatment** | Any manipulation or removal of fuels to lessen potential damage and resistance to control (includes mechanical and planned ignitions treatments). |
| **Grazing** | The authorized use of standing vegetation on NFS lands for livestock production within permitted grazing allotments. |
| **Grazing Allotments** | Area designated for the use of a certain number and kind of livestock for a prescribed period of time. |
| **Grizzly Bear Core Habitat** | An area of secure habitat within a BMU that contains no motorized travel routes or high use non-motorized trails during the non-denning season and is more than 0.31 miles (500 meters) from a drivable road. Core areas do not include any gated roads but may contain roads that are impassible due to vegetation or constructed barriers. Core areas strive to contain the full range of seasonal habitats that are available in the BMU. |
| **Grizzly Bear Recovery Zone** | The area in each grizzly bear ecosystem within which the population and habitat criteria for achievement of recovery will be measured.<br><br>**Cabinet/Yaak and North Continental Divide Ecosystem grizzly bear recovery zones:** These zones are two of six grizzly bear recovery zones identified in the Grizzly Bear Recovery Plan (USFWS 1993). Located in northwestern Montana and northern Idaho, the two ecosystems encompass 12,220 square miles of habitat. Portions of the Kootenai, Idaho Panhandle, Lolo, Flathead, Helena, and Lewis and Clark National Forests are included in the recovery areas. Additionally, some state, private, Bureau of Land Management, Glacier National Park, Flathead Indian Reservation, and Blackfeet Indian Reservation lands overlap the recovery zones. |
| **Head Month (HM)** | One month's use and occupancy of the range by one animal. For grazing fee purposes, it is a month's use and occupancy of range by one weaned or adult cow with or without calf, bull, steer, heifer, horse, burro, or mule, or five sheep or goats. |
| **Hibernacula** | Habitat niches where certain animals (e.g., bats) overwinter, such as caves, mines, tree hollows, or loose bark. |
| **Hydrologic Unit (HU)** | A hydrologic unit is a drainage area delineated to nest in a multi-level, hierarchical drainage system. Its boundaries are defined by hydrographic and topographic criteria that delineate an area of land upstream from a specific point on a river, stream, or similar surface waters. A hydrologic unit can accept surface water directly from upstream drainage areas, and indirectly from associated surface areas such as remnant, non-contributing, and diversions to form a drainage area with single or multiple outlet points. Hydrologic units are only synonymous with classic watersheds when their boundaries include all the |

110

Kootenai National Forest

source area contributing surface water to a single defined outlet point."

| | |
|---|---|
| **Hydrologic Unit Code (HUC)** | The numeric identifier of a specific hydrologic unit consisting of a 2-digit sequence for each specific level within the delineation hierarchy. |
| | **4th code** refers to the 4th pair of an 8-digit code of a subbasin HU that is generally 450,000 acres in size. |
| | **5th code** refers to the 5th pair of a 10-digit code of a watershed HU that generally ranges from 40,000 to 250,000 acres in size. |
| | **6th code** refers to the 6th pair of a 10-digit code of a subwatershed HU that generally ranges from 10,000 to 40,000 acres in size. |
| **Hydrological stability** | Condition where the potential for road failure and sedimentation is expected to be reduced. |
| **Instream Flows** | Streamflow regime required to satisfy a mixture of conjunctive demands being placed on water while it is in the stream. |
| **Integrated Pest Management** | A process for selecting strategies to regulate forest pests in which all aspects of a pest-host system are studied and weighed. |
| **Intermittent Stored Service** | An existing road where future use is expected but not known and is currently closed to vehicle traffic. The road is in a condition that there is little resource risk if maintenance is not performed. |
| **Invasive Species** | Executive Order 13112 defines an invasive species as "an alien species whose introduction does or is likely to cause economic or environmental harm or harm to human health." The Forest Service relies on Executive Order 13112 to provide the basis for labeling certain organisms as invasive. Based on this definition, the labeling of a species as "invasive" requires closely examining both the origin and effects of the species. The key is that the species must cause, or be likely to cause, harm and be exotic to the ecosystem it has infested before we can consider labeling it as "invasive". Thus, native pests are not considered "invasive", even though they may cause harm. Invasive species infest both aquatic and terrestrial areas and can be identified within any of the following four taxonomic categories: Plants, Vertebrates, Invertebrates, and Pathogens. |
| **Inventoried Roadless Area** | **For National Forest System lands in Montana**, inventoried roadless areas are those areas mapped under the 2001 Roadless Area Conservation Rule (36 CFR 294 Subpart B, 66 Fed Reg. 3244-3273). These areas are identified in appendix C of the FEIS for the revised Forest Plan. The official set of maps is maintained at the national headquarters office of the Forest Service. |
| | **For National Forest System lands in Idaho**, inventoried roadless areas are those areas designated as Idaho Roadless Areas pursuant to 36 CFR §294 Subpart C. These areas are identified in a set of maps maintained at the national headquarters office of the Forest Service. |
| **Landbird Assemblage** | A group of species having similar ecological resource requirements and foraging strategies, and therefore, having similar roles in the community. |

Glossary

| | |
|---|---|
| **Lands Suitable for Timber Production** | Lands determined to be suitable for timber production. See the definition of timber production. These lands were identified as part of the forest planning process. See the FEIS chapter 3 "Timber" for a description of the process used in determining suitability. These lands are mapped and reside as spatial data in the Forest library. |
| **Large Woody Debris** | Large pieces of relatively stable woody material located within the bankfull channel and appearing to influence bankfull flows. These are categorized as singles, aggregates, or rootwads. |

**Single** – A single piece that has a length equal to or greater than 3 meters or two-thirds of the wetted stream width and 10 cm in diameter one-third of the way from the base.

**Aggregate** – Two or more clumped pieces, each of which qualifies as a single piece.

**Rootwad** – Rootmass or boles attached to a log less than 3 meters in length.

| | |
|---|---|
| **Linkage Areas** | The area between larger blocks of habitat where animals can live at certain seasons and where they can find the security they need to successfully move between these larger habitat blocks. |
| **Long-term Sustained Yield Capacity (LTSYC)** | The highest uniform wood yield from lands being managed for timber production that may be sustained under specified management intensities consistent with multiple-use objectives. |
| **Lynx Analysis Units (LAU)** | An area of at least the size used by an individual lynx, from about 25 to 50 square miles. A project analysis unit upon which direct, indirect, and cumulative effects analyses are performed. |
| **Maintenance** | The upkeep of the entire forest development transportation facility including surface and shoulders, parking and side areas, structures, and such traffic-control devices as are necessary for its safe and efficient utilization. |
| **Management Activity** | Any activity that is carried out or authorized by the Forest that would result in impacts on natural resources or change human use of the Forest. |
| **Mechanized** | Wheeled forms of transportation including non-motorized carts, wheelbarrows, bicycles, and any other non-motorized, wheeled vehicles. |
| **Minerals-Locatable** | Those hardrock minerals that are mined and processed for the recovery of metals. They also may include certain nonmetallic minerals and uncommon varieties of mineral materials, such as valuable and distinctive deposits of limestone or silica. |
| **Minerals-Leasable** | Coal, oil, gas, phosphate, sodium, potassium, oil shale, sulphur, and geothermal resources. |
| **Minerals- Materials (Salable)** | A collective term to describe common varieties of sand, gravel, stone, pumice, pumicite, cinders, clay, and other similar materials. Common varieties do not include deposits of those materials that may be locatable. |

7-ER-1438

| | |
|---|---|
| **Minimum Impact Suppression Tactics (MIST)** | The concept of Minimum Impact Suppression Tactics is to use the minimum amount of forces necessary to effectively achieve fire management protection objectives. It implies a greater sensitivity to the impacts of suppression tactics and their long-term effects, when determining how to implement an appropriate suppression response. Fire managers and firefighters select tactics that have minimal impact to values at risk. These values are identified in approved Land or Resource Management Plans. Standards and guidelines are then tied to implementation practices which result from approved Fire Management Plans. Minimum Impact Suppression Tactics is not intended to represent a separate or distinct classification of firefighting tactics but rather a mindset of how to suppress a wildfire while minimizing the long-term effects of the suppression action on other resources. The principle of fighting fire aggressively but providing for safety first will not be compromised in the process and when selecting an appropriate suppression response, firefighter safety must remain the highest concern. |
| | **Examples of Minimum Impact Suppression Tactics might include;** "Personnel should avoid using rehabilitated fire lines as travel corridors whenever possible because of potential soil compaction and possible detrimental impacts to rehab work," or "avoid use of non-native materials for sediment traps in streams." |
| **Mitigation** | Measures implemented to minimize, reduce, rectify, avoid, eliminate, and/or compensate the potential impacts to resources identified in the effects analysis. |
| **Motorized Equipment** | Any machine activated by a nonliving power source except small battery-powered hand carried devices such as flashlights, GPS, cameras, or cell phones (36 CFR 261.2). Examples include: chain saw or generator. |
| **Motor Vehicle** | Any vehicle which is self-propelled, other than: (1) A vehicle operated on rails; and (2) Any wheelchair or mobility device, including one that is battery-powered, that is designed solely for use by a mobility- impaired person for locomotion, and that is suitable for use in an indoor pedestrian area. (36 CFR 212.1) |
| **Motor Vehicle Use Map (MVUM)** | A map reflecting designated roads, trails, and areas on an administrative unit or a ranger district of the National Forest System. (36 CFR 212.1) |
| **Municipal Supply Watersheds (public supply watersheds)** | A watershed that serves a public water system as defined in Public Law 93-523 (Safe Drinking Water Act); or as defined in state safe drinking water regulations. The definition does not include communities served by a well or confined groundwater unaffected by Forest Service activities. |
| **National Register of Historic Places** | The National Register of Historic Places is the Nation's official list of cultural resources worthy of preservation. Authorized under the National Historic Preservation Act of 1966, the National Register is part of a national program to coordinate and support public and private efforts to identify, evaluate, and protect our historic and archeological resources. Properties listed in the Register include districts, sites, buildings, structures, and objects that are significant in American history, architecture, archeology, engineering, and culture. The National Register is administered by the National Park Service, which is part of the U.S. Department of Interior. |

Glossary

| | |
|---|---|
| **Native Species** | Animals or plants that have historically occupied a given aquatic or terrestrial area. |
| **Non-Game** | Those species of animals that are not managed as a sport hunting resource. |
| **Noxious Weeds** | Any plant or plant product that can directly or indirectly injure or cause damage to crops (including nursery stock or plant products), livestock, poultry, or other interests of agriculture, irrigation, navigation, the natural resources of the United States, the public health, or the environment. The term typically describes species of plants that have been determined to be undesirable or injurious in some capacity. Federal noxious weeds are regulated by USDA-Animal and Plant Health Inspection Service under the Plant Protection Act of 2000, which superseded the Federal Noxious Weed Act of 1974. State statues for noxious weeds vary widely, with some States lacking any laws defining or regulating noxious weeds. Depending on the individual State law, some plants listed by a State statute as "noxious" may be native plants which that State has determined to be undesirable. When the species are native, they are not considered invasive species by the Federal Government. However, in most cases, State noxious weed lists include only exotic (non-native) species. |
| **Nutrient Limited Rock Types** | Geologies (e.g., quartzites, dolomites, mafic sills) that is naturally deficient in chemical elements necessary for long-term site productivity. |
| **Off-Highway Vehicle (OHV)** | Any motor vehicle designed for or capable of cross-country travel on or immediately over land, water, sand, snow, ice, marsh, swampland, or other natural terrain. |
| **Old Growth** | Old growth stands are defined as those that meet the definitions in Green et al. 1992 (errata corrected 12/11). Those definitions include the discussion in that document titled "USE OF OLD GROWTH TYPE DESCRIPTIONS" (see pages 11 and 12). If that document is revised or replaced by the Northern Region, the updated version will be used. |
| **Open Motorized Route Density (OMRD)** | Calculation made with the moving windows technique that includes open roads, other roads not meeting all restricted or obliterated criteria, and open motorized trails. The percent of the analysis area in relevant route density classes are calculated. |
| **Openings** | Meadows, clearcuts, and other areas of vegetation that do not provide cover. |
| **Operational Maintenance Level (roads)** | Defines the level of service provided by, and maintenance required for, a specific road, consistent with road management objectives and maintenance criteria. The maintenance level to be assigned at a future date considering future road management objectives, traffic needs, budget constraints, and environmental concerns. The objective maintenance level may be the same as, or higher or lower than, the operational maintenance level.<br><br>**Maintenance Level 1:** Assigned to intermittent service roads during the time they are closed to vehicular traffic. The closure period must exceed 1 year. Basic custodial maintenance is performed to keep damage to adjacent |

Kootenai National Forest

7-ER-1440

FS-000124

resource to an acceptable level and to perpetuate the road to facilitate future management activities. Emphasis is normally given to maintaining drainage facilities and runoff patterns. Planned road deterioration may occur at this level. Appropriate traffic management strategies are "prohibit" and "eliminate." Roads receiving level 1 maintenance may be of any type, class or construction standard, and may be managed at any other maintenance level during the time they are open for traffic. However, while being maintained at level 1, they are closed to vehicular traffic, but may be open and suitable for non-motorized uses.

**Maintenance Level 2:** Assigned to roads open for use by high clearance vehicles. Passenger car traffic is not a consideration. Traffic is normally minor, usually consisting of one or a combination of administrative, permitted, dispersed recreation, or other specialized uses. Log haul may occur at this level. Appropriate traffic management strategies are either (1) discourage or prohibit passenger cars or (2) accept or discourage high clearance vehicles.

**Maintenance Level 3:** Assigned to roads open and maintained for travel by a prudent driver in a standard passenger car. User comfort and convenience are not considered priorities. Roads in this maintenance level are typically low speed, single lane with turnouts and spot surfacing. Some roads may be fully surfaced with either native or processed material. Appropriate traffic management strategies are either "encourage" or "accept." "Discourage" or "prohibit" strategies may be employed for certain classes of vehicles or users.

**Maintenance Level 4:** Assigned to roads that provide a moderate degree of user comfort and convenience at moderate travel speeds. Most roads are double lane and aggregate surfaced. However, some roads may be single lane. Some roads may be paved and/or dust abated. The most appropriate traffic management strategy is "encourage." However, the "prohibit" strategy may apply to specific classes of vehicles or users at certain times.

**Maintenance Level 5:** Assigned to roads that provide a high degree of user comfort and convenience. Normally, roads are double-lane, paved facilities. Some may be aggregate surfaced and dust abated. The appropriate traffic management strategy is "encourage."

| | |
|---|---|
| **Outstandingly Remarkable Value (WSRs)** | A river-related value that is a rare, unique, or exemplary feature that is significant at a comparative regional or national scale. |
| **Over-Snow Vehicle** | A motor vehicle that is designed for use over snow and that runs on a track or tracks and/or a ski or skis, while in use over snow. |
| **Patch** | An area of vegetation that is relatively homogeneous that differs from surrounding vegetation. |
| **Pattern** | Number, frequency, size, and juxtaposition of landscape elements (stands and patches) that are important to the determination or interpretation of ecological processes. |

Glossary

| | |
|---|---|
| **Peat** | Organic matter (the dead remains of plants) deposited under water-soaked conditions as a result of incomplete decomposition. Peat accumulates when the rate of deposition of dead plant matter (usually sedges or sphagnum mosses) exceeds the rate of decomposition. |
| **Peatlands** | Any waterlogged area containing an accumulation of peat 30cm or more thick. Any type of peat-covered terrain, including bogs, fens, and muskegs. Once peat has developed to this depth, the availability of oxygen and nutrients essential to plant growth drops sharply, and plant roots must obtain their mineral nutrients from the saturated, oxygen-poor peat. Because nutrient cycling is limited, peatlands depend on external supplies of nutrients from either the atmosphere or inflowing, mineral-enriched water. |
| **Plan Area** | The National Forest System lands covered by a plan. |
| **Population (Ecological)** | Organisms of the same species that occur in a particular place at a given time. |
| **Planned Ignitions** | A fire intentionally ignited by management under an approved plan to meet specific objectives. |
| **Planning Subunit** | Mapped areas, generally following grouped 6th code watersheds, used for project-level NEPA and forest plan implementation. These areas are typically 30,000–60,000 acres, with some areas smaller and some larger. |
| **Priority Watersheds** | Subwatersheds (6th level hydrologic units) as described in INFS (USDA Forest Service 1998), which are intended to provide a pattern of protection across the landscape, where habitat for inland native fish would receive special attention and treatment and would have the highest priority for restoration, monitoring and watershed analysis. Priority watersheds have been further refined by Conservation Subwatersheds and Restoration Subwatersheds for implementation of the Forest Plan. |
| **Project Area** | The NFS lands covered by a project. |
| **Public Water System** | A public water system (PWS) is a system for the provision of water to the public for human consumption through pipes or other constructed conveyances, if such system has at least 15 service connections or regularly serves an average of at least 25 individuals at least 60 days out of the year. A public water system can be one of three types: |
| | **Community Water System:** Serves at least 15 service connections or 25 people year round in their primary residences (e.g., most cities and towns, apartments, and mobile home parks with their own water supplies). |
| | **Non-transient Non-community Water System (NTNCWS):** Serves at least 25 of the same persons over six months per year (e.g., schools, churches, nursing homes, factories, and hospitals that have their own water source). |
| | **Transient Non-community Water System (TNCWS):** Serves an average of at least 25 persons (but not the same 25) less than six months per year (e.g., campgrounds or highway rest stops that have their own water source). |

Kootenai National Forest

7-ER-1442

| | |
|---|---|
| **Reclamation** | Those actions performed during or after mineral activities to shape, stabilize, revegetate, or otherwise treat the affected lands in order to achieve a safe and ecologically stable condition and land use that is consistent with long-term forest land and resource management plans and local environmental conditions. |
| **Recreation Opportunity Spectrum (ROS)** | A framework of land delineations that identifies a variety of recreation experience opportunities categorized into classes on a continuum. The Spectrum's continuum has been divided into six major classes for Forest Service use: Urban (U), Rural (R), Roaded Natural (RN), Semi-primitive Motorized (SPM), Semi-Primitive Non-Motorized (SPNM), and Primitive (P). |
| **Recreation sites** | Specific places in the Forest other than roads and trails that are used for recreational activities. These sites include a wide range of recreational activities and associated development. These sites include highly developed facilities like ski areas, resorts, and campgrounds. It also includes dispersed recreation sites that have few or no improvements but show the effects of repeated recreational use. |
| **Recruitment Potential Old Growth** | Forest stands that do not meet the definition of old growth in Green et al. 1992 (errata corrected 12/11) but are being managed with the goal of meeting that definition in the future. |
| **Resilience** | The ability of a social or ecological system to absorb disturbances while retaining the same basic structure and ways of functioning, the capacity for self-organization, and the capacity to adapt to stress and change. |
| **Resistance** | The ability of an organism, population, community, or ecosystem to withstand perturbations without significant loss of structure or function. From a management perspective, resistance includes both 1) the concept of taking advantage of and boosting the inherent (biological) degree to which species are able to resist change, and 2) manipulation of the physical environment to counteract and resist physical and biological change. |
| **Restoration** | Restoration is the process of assisting the recovery of resilience and the capacity of a system to adapt to changes if the environment where the system exists has been degraded, damaged, or destroyed. Ecological restoration focuses on reestablishing ecosystem functions by modifying or managing the composition, structural arrangement, and processes necessary to make a terrestrial and aquatic ecosystem sustainable and resilient under current and future conditions. |
| **Restoration Watersheds** | Restoration watersheds are subwatersheds with a condition rating of 'Moderate' or "High" and have depressed populations of bull trout, westslope cutthroat trout, interior redband trout, or a combination of the three species. These subwatersheds are a priority for restoration, as they may have degraded habitat conditions, water quality limitations, depressed populations of native fish species, or a combination of the above, but have a high potential improvement through active or passive restoration efforts. Priority watersheds have been replaced by restoration watersheds for implementation of the Forest Plan. See also definition for Priority Watersheds. Appendix D of the Forest Plan FEIS discusses the methodology for establishing Restoration Watersheds. |

7-ER-1443

Glossary

| | |
|---|---|
| **Right-of-Way (ROW)** | Public or National Forest System lands authorized to be used or occupied pursuant to a ROW grant or special use authorization. |
| **Riparian Habitat Conservation Areas (RHCAs)** | Portions of watersheds where riparian-dependent resources receive primary emphasis and management activities are subject to specific guidelines. The followings RHCA widths are based on the best available science and apply to all aquatic habitats, except where site-specific analysis supports modification: |

**Category 1** – Fish-bearing streams: RHCAs consist of the stream and the area on either side of the stream extending from the edges of the active channel to the top of the inner gorge, or to the outer edges of the 100-year floodplain, or to the outer edges of the riparian vegetation, or to a distance equal to the height of two site-potential trees, or 300 feet slope distance (600 feet, including both sides of the stream channel), whichever is greater.

**Category 2** – Permanently flowing non-fish bearing streams: RHCAs consist of the stream and the area on either side of the stream extending from the edges of the active channel to the top of the inner gorge, or to the outer edges of the 100-year floodplain, or to the outer edges of the riparian vegetation, or to a distance equal to the height of one site-potential tree, or 150 feet slope distance (300 feet, including both sides of the stream channel), whichever is greater.

**Category 3** – Ponds, lakes, reservoirs, and wetlands greater than one acre: RHCAs consist of the body of water or wetland and the area to the outer edges of the riparian vegetation, or to the extent of the seasonally saturated soil, or to the extent of moderately and highly unstable areas, or to a distance equal to the height of one site-potential tree, or 150 feet slope distance from the edge of the maximum pool elevation of constructed ponds and reservoirs or from the edge of the wetland, pond, or lake, whichever is greater.

**Category 4** – Seasonally flowing or intermittent streams, wetlands less than one acre: This category includes features with high variability in size and site-specific characteristics. At a minimum, the RHCAs in priority watersheds must include the area from the edges of the stream channel or wetland, to a distance equal to the height of one site-potential tree, or 100 feet slope distance, whichever is greater. The definition for this category has been slightly adjusted from INFISH, using a buffer of 100 feet for both priority and non-priority watersheds.

| | |
|---|---|
| **Risk** | A combination of 1) the likelihood that a negative outcome will occur and 2) the severity of the subsequent negative consequences. |
| **Risk Factors** | Land-use disturbances that are negatively affecting watershed functions and processes and stream-riparian environments. |
| **Road** | A motor vehicle route over 50 inches wide, unless identified and managed as a trail. |
| **Road Construction** | FSM 7705 defines road construction or reconstruction together as the supervising, inspecting, actual building, and incurrence of all costs incidental to the construction or reconstruction of a road (36 CFR 212.1). |

| | |
|---|---|
| **Roadless Area** | See Inventoried Roadless Area |
| **Road Maintenance** | The objective of road maintenance is to provide for safe and efficient travel; access for administration, utilization and protection of NFS lands; and protection of the environment, adjacent resources, and public investment (FSM 7730.2). |
| | The term road maintenance is defined at FSM 7705 as the "ongoing upkeep of a road necessary to maintain or restore the road in accordance with its road management objectives (FSM 7714)." |
| | FSH 7709.59 62.1 describes the scope of road maintenance to "include any expenditure in the repair or upkeep of a road necessary to perpetuate the road and provide for its safe use. Work items may include surface rock replacement, seal coats and asphalt overlays, bridge replacement, slide removal, and other items that contribute to the preservation of the existing road. Road maintenance is not intended to substantially improve conditions above those originally constructed; however, there may be a need for adding to or modifying the original conditions without increasing the service provided. Typical examples of this include installing additional minor culverts and traffic control devices, implementing traffic management strategies, placing small quantities of spot surfacing, and revegetating cut and fill slopes." |
| **Road Reconstruction** | FSM 7705 defines road construction or reconstruction together as the supervising, inspecting, actual building, and incurrence of all costs incidental to the construction or reconstruction of a road (36 CFR 212.1). In practical terms, road reconstruction is conducted when the required work items to maintain or restore a road to its RMOs exceed what is expected during routine road maintenance. Additionally, work performed to upgrade the road's service level above that for which it was originally constructed, to accommodate commercial haul or meet the needs of additional traffic, to realign an existing road for water quality protection, or to repair a road after natural disaster would be considered reconstruction. |
| **Salvage Cutting (or Salvage Logging)** | The removal of dead trees or trees being damaged or dying due to injurious agents other than competition, to recover value that would otherwise be lost. |
| **Scenic Integrity Objective** | The Scenic Integrity Objectives (SIOs) serve as the desired conditions for the scenic resources and represent the degree of intactness of positive landscape attributes. SIOs are categorized into 5 levels. The highest scenic integrity ratings are given to those landscapes where valued landscape attributes will appear complete with little or no visible deviations evident. Lowers SIOs are given to those landscapes where modifications to the landscape will be more evident. Each of the SIOs is defined as follows: |

**Very High** – Landscape is intact with changes resulting primarily through natural processes and disturbance regimes.

**High** – Management activities are unnoticed and the landscape character appears unaltered.

**Moderate** – Management activities are noticeable but are subordinate to the landscape character. The landscape appears slightly altered.

Glossary

**Low** – Management activities are evident and sometimes dominate the landscape but are designed to blend with surroundings by repeating line, form, color, and texture of valued landscape character attributes. The landscape appears altered.

**Very Low** (not used in this final Plan) – Human activities of vegetative and landform alterations may dominate the original, natural landscape character but should appear as natural occurrences when viewed at back-ground distances.

| | |
|---|---|
| **Security Habitat** | An area with low levels of human disturbance. This general definition covers most uses of the term security habitat, except for elk, which has a specific definition. |
| **Security Habitat (elk)** | Generally timbered stands on NFS lands at least 250 acres in size greater than 0.5 mile away from open motorized routes during the hunting season. Security is calculated for individual planning subunits. Roads not open to the public for motorized use during the hunting season are not included in this calculation. The effects of non-motorized use and/or administrative motorized use of closed or temporary roads during the hunting season are not included in this calculation and would instead be analyzed separately at the project level. |
| **Self-sustaining Populations** | Populations that is sufficiently abundant, interacting, and well-distributed in the Plan area, within the bounds of their life history and distribution of the species and the capability of the landscape, to provide for their long-term persistence, resilience, and adaptability over multiple generations. |
| **Sensitive Species** | The Forest Service Manual (2670.5) defines Sensitive Species as "those plant and animal species identified by a regional forester for which population viability is a concern as evidenced by significant current or predicted downward trend in numbers or density" and "habitat capability that would reduce a species' existing distribution." |
| **Silvicultural Practices** | Activities that control the establishment, composition, structure, and function of forested ecosystems. |
| **Silvicultural Prescription** | A silvicultural prescription is a written document that describes in detail the management activities needed to implement a silvicultural treatment or treatment sequence. The prescription is based on an examination of the stand being proposed for management. The prescription documents the results of an analysis of present and anticipated future stand conditions and evaluates this in terms of management direction. It also describes the desired future vegetation conditions in measurable terms. |
| **Silvicultural Systems** | A planned series of treatments for tending, harvesting, and re-establishing a stand (e.g., even-aged, uneven-aged, two-aged, coppice). |
| **Size Class** | Size class is based on basal area weighted diameter of the plot/stand. Weighted diameter is calculated then classification is made as follows according to weighted diameter: |

**Seedling/sapling:** 0.0 – 4.9 inch DBH (if basal area weighted diameter is

|  | 0.0, must have 100 or more trees per acre) |
|---|---|
|  | **Small:** 5.0 – 9.9 inch |
|  | **Medium:** 10.0 – 14.9 inch |
|  | **Large:** 15.0 + |
| **Snag** | A standing dead tree usually greater than five feet in height and six inches in diameter at breast height (DBH). |
| **Soil Productivity** | The inherent capacity of a soil to support the growth of specified plants, plant communities, and soil biota. It is often expressed by some measure of biomass accumulation. |
| **Source Water Areas** | Source water areas contain untreated water from streams, rivers, lakes, or underground aquifers that is used to supply private wells and public drinking water. |
| **Special Use Authorization** | A permit, term permit, lease, or easement that allows occupancy, use, rights, or privileges of NFS land. |
| **Stand** | A contiguous group of trees sufficiently uniform in age-class distribution, composition, and structure; and growing on a site of sufficiently uniform quality to be a distinguishable unit. |
| **Stand Replacement Fire** | A fire severity classification where at least 75 percent average top-kill of vegetation occurs within a typical fire perimeter. |
| **Stressors** | Any physical, chemical, or biological entity that can induce an adverse response. Stressors can arise from physical and biological alternations of natural disturbances, increased unmanaged demand for ecosystem services (such as recreation), alterations of the surrounding landscape, chemical alterations in regional air quality, or from legacy of past management actions. |
| **Stronghold Populations** | Directly associated with strong populations. For native fish, strong populations have stable numbers or are increasing, and all major life history forms that historically occurred within the watershed are present. |
| **Structure (stand)** | The horizontal and vertical distribution of components of a forest stand including the height, diameter, crown layers, and stems of trees, shrubs, herbaceous understory, snags, and down woody debris. |
| **Suitable Habitat** | Habitat that currently has both the fixed and variable stand attributes for a given species habitat requirements. Variable attributes change over time and may include seral stage, cover type and overstory canopy cover. |
| **Sustainability** | Meeting needs of the present generation without compromising the ability of future generations to meet their needs. Sustainability is composed of desirable social, economic, and ecological, economic conditions or trends interacting at varying spatial and temporal scales embodying the principles of multiple-use and sustained yield. |

7-ER-1447

Glossary

| | |
|---|---|
| **Temporary Road or Trail** | A road or trail necessary for emergency operations or authorized by contract, permit, lease, or other written authorization that is not a forest road or a forest trail and that is not included in a forest transportation atlas. |
| **Threatened Species** | Any species that is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range and which the appropriate Secretary has designated as a threatened species. |
| **Timber Harvest** | The removal of trees for wood fiber utilization and other multiple-use purposes. |
| **Timber Production** | The purposeful growing, tending, harvesting, and regeneration of regulated crops of trees to be cut into logs, bolts, or other round sections for industrial or consumer use. In addition, managing land to provide commercial timber products on a regulated basis with planned, scheduled entries. |
| **Total Maximum Daily Load (TMDL)** | An estimate of the total quantity of pollutants (from all sources - point, nonpoint, and natural) that may be allowed into waters without exceeding applicable water quality standards. |
| **Total Motorized Route Density (TMRD)** | Calculations made with the moving windows technique that includes open roads, restricted roads, roads not meeting all reclaimed criteria, and open motorized trails. The percent of the analysis area in relevant route density classes is calculated. |
| **Traditional Cultural Areas** | Those areas of the Forest used by American Indians for traditional activities and often referred to as "religious use areas" or "sacred areas." They may include areas traditionally used for gathering of special forest products. These areas are not mapped as a Management Area, but specific areas are delineated and kept on file in the supervisor's office. A data layer showing the traditional cultural areas is retained in the KNF GIS library. |
| **Trail** | A route 50 inches or less in width or a route over 50 inches wide that is identified and managed as a trail. |
| **Transitory Range** | Rangelands not normally suitable for livestock grazing which have been made suitable for a period of time by a management action. In the Forest Service, this mostly pertains to areas that have been logged and provide forage for one or two decades until the trees return at high densities. |
| **Unauthorized Road or Trail** | A road or trail that is not a forest road or trail or a temporary road or trail and that is not included in a forest transportation atlas. |
| **Ungulate** | A hoofed mammal such as a deer or elk. |
| **Unplanned Ignition** | A wildland fire resulting from an unplanned event. Unplanned ignitions are caused by lightning, volcanoes, and unauthorized or accidental human-caused actions. |

Kootenai National Forest

7-ER-1448

| | |
|---|---|
| **Vegetation Management** | Activities designed primarily to promote the health of forest vegetation in order to achieve desired results. When vegetation is actively managed, it means that it is manipulated or changed on purpose by humans to produce desired results. Where active management of vegetation is required, techniques are based on the latest scientific research and mimic natural processes as closely as possible. Vegetation management is the practice of manipulating the species mix, age, fuel load, and/or distribution of wildland plant communities within a prescribed or designated management area in order to achieve desired results. It includes prescribed burning, the use of unplanned fire ignitions, grazing, chemical applications, biomass harvesting, and any other economically feasible methods of enhancing, retarding, modifying, transplanting, or removing the aboveground parts of plants. |
| **Watershed** | A geographic area of land, water, and biota within the confines of a drainage divide. The total area above a given point of a water body that contributes flow to that point. |
| **Watershed Condition Rating** | The state of the watershed based on physical and biogeochemical characteristics and processes (such as, hydrologic, geomorphic, landscape, topographic, vegetative cover, and aquatic habitat), water flow characteristics and processes (such as volume and timing), and water quality characteristics and processes (such as chemical, physical, and biological). |

**Low:** Watersheds exhibit geomorphic, hydrologic, and biotic integrity, relative to their natural potential condition. The drainage network is generally stable. Physical, chemical, and biologic conditions suggest that soil, aquatic, and riparian systems are predominately functional in terms of supporting beneficial uses.

**Moderate:** Watersheds exhibit moderate geomorphic, hydrologic and biotic integrity relative to their natural potential condition. Portions of the watershed may exhibit an unstable drainage network. Physical, chemical, and biologic conditions suggest that soil, aquatic, and riparian systems may not support beneficial uses.

**High:** Watersheds may have limited geomorphic, hydrologic, and biotic integrity relative to their natural potential condition. A majority of the drainage network may be unstable. Physical, chemical, and biologic conditions suggest that soil, riparian, and it is assumed that beneficial uses are not generally supported.

| | |
|---|---|
| **Watershed Scale Aquatic Restoration** | Restoration, based on problem-identification through watershed analyses, where the emphasis is on treating the entire catchment area rather than focusing on just a local project or site. The intent is to establish a trend, at the watershed scale, toward a desired condition of functions and processes, or toward proper functioning condition within an acceptable range of variability. Site-scale restoration is then used to address or treat specific elements Watershed-scale problems can be defined as anything that interferes with the normal functions and processes that operate in a watershed, from runoff volume and timing of stream flows to slope stability, to canopy conditions in the riparian areas, and water quality. |

Glossary

| | |
|---|---|
| **Wet Season** | A time frame that identifies the length of leaving tops and limbs onsite for nutrient retention and soil productivity. It should consist of a minimum of 4 to 6 months, not including summer months from July through September. |
| **Wetlands** | Those areas that are inundated by surface or ground water with a frequency sufficient to support, and under normal circumstances do or would support a prevalence of vegetation or aquatic life that requires saturated or seasonally saturated soil conditions for growth and reproduction. Wetlands generally include swamps, marshes, bogs, peatlands, and similar areas such as sloughs, potholes, wet meadows, river overflows, mud flats, and natural ponds. |
| **Wilderness Character** | Wilderness character may be described as the combination of biophysical, experiential, and symbolic ideals that distinguish wilderness from all other lands. The definition of wilderness from section 2 (c) of the Wilderness Act identifies four qualities of wilderness related to wilderness character: |

> **Untrammeled** – wilderness is essentially unhindered and free from modern human control or manipulation;

> **Natural** – wilderness ecological systems are substantially free from the effects of modern civilization;

> **Undeveloped** – wilderness is essentially without permanent improvements or modern human occupation; and

> **Outstanding opportunities for solitude or a primitive and unconfined type of recreation** – Wilderness provide outstanding opportunities for people to experience solitude or primitive and unconfined recreation, including the values of inspiration and physical and mental challenge.

| | |
|---|---|
| **Wildfire** | An unplanned, unwanted wildland fire including unauthorized human-caused fires, escaped wildland fire use events, escaped prescribed fire projects, and all other wildland fires where the objective is to put the fire out. |
| **Wildland Fire** | A general term describing any non-structure fire that occurs in the wildland. Two distinct types of wildland fire have been defined and include planned ignitions (prescribed fire) and natural, unplanned fire (wildfire). |
| **Wildland Fire Mitigation Plan** | A plan for an at-risk community that: |

> Is developed within the context of the collaborative agreements and the guidance established by the Wildland Fire Leadership Council and agreed to by the applicable local government, local fire department, and state agency responsible for forest management, in consultation with interested parties and the federal land management agencies managing land in the vicinity of the at-risk community;

> Identifies and prioritizes areas for hazardous fuel reduction treatments and recommends the types and methods of treatment on federal and non-federal land that will protect one or more at-risk communities and essential infrastructure; and

> Recommends measures to reduce structural ignitability throughout the at-risk community.

| | |
|---|---|
| **Wildland Urban Interface (WUI)** | The term "wildland urban interface" means either: |

(A) an area within or adjacent to an at-risk community that is identified in recommendations to the Secretary in a community wildfire protection plan; or

(B) in the case of any area for which a community wildfire protection plan is not in effect,

    (i) an area extending ½-mile from the boundary of an at-risk community;

    (ii) an area within 1 ½ miles of the boundary of an at-risk community, including any land that—

        (I) has a sustained steep slope that creates the potential for wildfire behavior endangering the at-risk community;

        (II) has a geographic feature that aids in creating an effective fire break, such as a road or ridge top; or

        (III) is in condition class 3, as documented by the Secretary in the project-specific environmental analysis; and

    (iii) an area that is adjacent to an evacuation route for an at-risk community that the Secretary determines, in cooperation with the at-risk community, requires hazardous fuel reduction to provide safer evacuation from the at-risk community.

| | |
|---|---|
| **Wildlife Crossing** | A structure that facilitates the safe movement of wildlife across a man-made barrier such as a highway or railroad, or warning systems for motorist that reduce the likelihood of a collision with wildlife. Examples include overpasses, underpasses, culverts, fencing and electronic systems that detect the presence of large animals, and flash warning signs to slow down drivers. |
| **Winter (Recreation)** | December 1 through April 30 every year. This is the period defined for the suitable-use tables for winter motorized and non-motorized activities. |
| **Winter Range** | The area available to and used by wildlife (big game) during the winter season (Dec 1 to April 30). Generally, lands below 4,000 feet in elevation, on south and west aspects, that provides forage and cover. |
| **Wolf Rendezvous Site** | Sites that are used once wolf pups are old enough to leave the den. These sites are meeting places where the pack gathers and where the pups are often left while most of the adult wolves in the pack are hunting. |

FS-000136

# Appendix A—Possible Actions

Proposed and possible actions are those actions that the Forest anticipates to occur over the life of the Plan that show the variety of multiple use opportunities or resource management programs that the Forest expects to provide (36 CFR 219.11(b)). The proposed and possible actions are presented as a brief summary of the types of projects that may occur to maintain or move the Forest toward desired conditions. Because the Plan is a strategic document that provides general management guidance, the following items include program strategies anticipated during the next 15 years.

The list of proposed and possible actions is not intended to be all-inclusive, nor are they intended to be decisions. They are projections of what actions may take place in the future for program areas that might constitute the typical annual program of work for a forest.

## Vegetation Management

Vegetation management includes those activities that actively move vegetation towards desired conditions. Vegetation management might include activities that would maintain or increase representation of early seral, shade-intolerant, drought and fire tolerant, insect/disease resistant species dominance types. Activities could treat areas to maintain or improve forest resilience, natural diversity, and productivity, and to reduce negative impacts of non-native organisms over the life of the Plan. Specifically, the following types of actions are likely to occur:

- Thinning stands to maintain or improve forest health and trend towards historic densities, composition, and structure;
- Regeneration timber harvest using a variety of silvicultural prescriptions (see timber section);
- Planting blister rust resistant white pine;
- Pruning of white pine to reduce vulnerability to blister rust fungus;
- Planting shade-intolerant, fire-adapted, drought resistant species;
- Managing stands to retain or move towards old growth;
- Treating invasive terrestrial plant species; and
- Treating insects and disease using integrated pest management techniques.

## Fire Management

Actions related to treatment of fuels will include the following:

- Planned ignitions;
- Mechanical treatments, including commercial timber sales and noncommercial treatments; and
- Unplanned ignitions.

## Watershed, Soils, Riparian, Aquatic Habitat, and Aquatic Species

Activities may include:

- Active stream restoration actions at selected stream reaches to improve degraded conditions and stream channel stability;
- Constructing instream structures to stabilize channels and improve aquatic habitat;
- Planting riparian vegetation for bank stability and shade;

7-ER-1453

FS-000137

- Treating invasive terrestrial plant species in riparian areas to improve riparian community structure;
- Removal, reconstruction, or improved maintenance of roads located in riparian areas to improve watershed health and reduce sediment delivery to the aquatic ecosystem;
- Treating upland roads to reduce water interception and reduce landslide risk;
- Completing status assessments of water quality limited streams in cooperation with Montana Department of Environmental Quality through water quality assessments, total maximum daily loads, restoration plans, best management practices implementation, and monitoring;
- Culvert replacement or removal to improve passage for native species, where appropriate;
- Culvert replacement or removal to improve hydrologic function and sediment transport;
- Riparian area fencing;
- Reclamation of abandoned mines and rehabilitation of disturbed sites; and
- Collaborate with Montana Fish Wildlife and Parks, other agencies, and the public to reintroduce native fish species to their historic habitat.

## Wildlife

Wildlife habitat management involves establishing and maintaining the vegetation diversity necessary to provide food, cover, and security for all wildlife species native to the Forest in cooperation with federal, state, and other organizations. Activities might include:

- Maintenance or restoration of wildlife habitat (e.g., burning, invasive terrestrial plant species control, aspen promotion, vegetation alteration, wetland protection, thinning encroaching conifers, hardwood management, etc.);
- Site-specific improvement of motorized access densities (through road closures or restrictions) and secure core habitat parameters (by preventing disturbance through activities) within Bear Management Units;
- Travel management restrictions in concert with grizzly bear and big game direction to provide secure habitat for resident wildlife species during important biological periods (e.g., denning, rearing, nesting);
- Conducting amphibian surveys to better map important breeding habitats and their conditions;
- Cooperative work with other agencies and organizations to promote various wildlife habitats such as bighorn sheep habitat, big game winter range, etc.;
- Cooperative work with other internal resources such as range and hydrology to manage livestock influence on wildlife water sources and foraging habitats with emphasis on native ungulates;
- Cooperative work with other agencies and organizations in the monitoring of wildlife species important to Montana such as the peregrine falcon, bighorn sheep, Coeur d'Alene salamander, bats, etc. for future management purposes;
- Maintain, manage, and protect lands known or suspected to contribute to landscape linkages for wildlife (e.g., wolverine, lynx, grizzly bears, and fisher) in order to promote genetic dispersal and healthy populations;
- Installation of nesting boxes for bats, ducks, and birds in areas where natural cavity habitat is lacking;
- Installing gates on abandoned mine adits to protect bat hibernacula and provide for public safety;
- Installation/maintenance of nesting platforms for loons and other waterfowl where habitat is lacking or in poor condition;

7-ER-1454

- Promote KNF Food Storage Order and other bear information to encourage safe use of the Forest for both humans and wildlife; and
- Continue to provide presentations on wildlife, emphasizing actions to take when "living and recreating in bear country."

# Access and Recreation

Recreation management includes those activities that assist in providing a range of recreation opportunities across the Forest. Controlling visitor impacts to resources and other visitors; constructing and maintaining facilities and trails; and providing a positive visitor experience. Specifically, the following types of actions are likely to occur:

- Trail construction, reconstruction, maintenance, and relocation;
- Construction of facilities such as parking areas, toilets, trailheads, information kiosks, fishing access, and boating access points;
- Maintain and upgrade facilities such as campgrounds, picnic areas, toilets, and parking lots;
- Maintain and modify dispersed recreation sites to reduce or eliminate resource concerns;
- Complete and implement the Recreation Facility Analysis and identify unsustainable recreation programs to be eliminated. An unsustainable recreation program would be recreation site(s) that do not meet all of the following criteria, or fall sufficiently short in one or more of the criterion so as to render the capability of meeting it unsustainable. Criteria: meet Forest Recreation Niche, be environmentally sustainable, is supported by local communities, has sustainable management cost/benefit ratio;
- Implement the Scenic Management System across the Forest;
- Maintain (e.g., clearing, grading, brushing, providing functioning water structures) and improve (e.g., realignment, resurface, bridges and water structures) existing road and trail system and construct new roads and trails when needed;
- Enter into agreements with cooperators to provide access to winter motorized and non-motorized trails;
- Complete travel management planning. Identify summer routes that are open to wheeled motorized vehicles. Identify areas and trails for motorized and non-motorized winter uses on the Forest;
- Provide special use permits for commercial recreation opportunities (e.g., resorts, ski areas, outfitter and guides, special events);
- Provide recreational rental cabins and lookouts for public use; and
- Develop interpretation and educational opportunities for public enjoyment.

## Road Construction

- Road reconstruction (includes BMP work);
- Temporary road construction;
- Annual road maintenance;
- Deferred road maintenance;
- Drainage structure repair and replacement;
- Putting roads into 'intermittent stored service';
- Road decommissioning; and

Appendix A—Possible Actions

- Emergency repairs caused by natural events.

## For Administrative Facilities

- Annual maintenance;
- Deferred maintenance;
- Improvements to meet health and safety requirements;
- Improvements to reduce operation and maintenance costs (increase energy efficiency);
- Emergency repairs caused by natural events; and
- Building decommissioning.

## Lands

Lands program actions are likely to include:

- Maintaining landlines and actions associated with adjusting NFS ownership through purchases, exchanges, or other conveyances;
- Permitting uses (e.g., easements), structures (e.g., communication towers), outfitter/guides, and special events;
- Conveyance;
- Land exchange; and
- Right-of-way acquisition.

## Cultural Resources

Cultural resources activities will likely consist of:

- Conducting surveys to identify sites, and follow-up actions necessary to protect, stabilize, or salvage sites;
- Identifying and evaluating cultural resources for the National Register of Historic Places;
- Stabilizing, rehabilitating, restoring, and caring for cultural resources;
- Conducting maintenance to historic facilities;
- Promoting heritage values through public education, outreach, and interpretative programs; and
- Conducting scientific and historic research on cultural resources.

## American Indian Rights and Interests

Activities will likely consist of:

- Continued habitat management of traditional use areas through development of management plans for ongoing consultation through a cooperatively established communication policy;
- Cooperatively established policy for continued access and acquisition of forest products for each federally recognized tribe with historical or treaty interest for cultural uses; and
- Ongoing government-to-government and staff consultation for each federally recognized tribe with historical or treaty interests in forest land, through a cooperatively established communication policy.

7-ER-1456

Appendix A—Possible Actions

# Timber

Timber management is used to move vegetation towards desired condition and to reduce fuels. Activities for timber management may include the following:

- Intermediate timber harvest (commercial thinning, improvement cutting, etc.);
- Regeneration harvest with treatments that are even-age in nature (clearcut, or two-age regeneration), or uneven-age (group selection or single tree selection); and
- Salvage of dead or dying timber.

The predicted volume sold (under current budget levels) is 47.5 MMBF/year. It is anticipated that an average of 5,700 acres per year would be harvested to achieve this timber volume and move vegetation towards desired conditions.

# Minerals

Activities will likely consist of:

- Locatable minerals exploration and development;
- Mineral materials development;
- Abandoned mine reclamation; and
- Locatable and leasable minerals exploration and development.

# Grazing

Activities will likely consist of:

- Permitting livestock grazing where compatible with management area suitability.

# Special Forest Products

- Gathering of firewood, huckleberries, and other special forest products.

# Social and Economic Systems

- Contribute to and support local jobs and labor income within the counties surrounding the Forest through anticipated output associated with management activities.

7-ER-1457

FS-000142

# Appendix B—Summary of Retained Decisions

## Introduction

The KNF is including the direction from the following decisions with their associated biological opinions:

- Inland Native Fish Strategy (INFISH) - Decision Notice and Finding of No Significant Impact (USDA Forest Service, July 1995)
- Forest Plan Amendments for Motorized Access Management Within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones - Record of Decision (USDA Forest Service, November 2011)
- Northern Rockies Lynx Management Direction - Record of Decision (USDA Forest Service, March 2007)

Following are key components of this retained direction, including desired conditions, standards, guidelines, and monitoring requirements. Copies of the Records of Decision and associated biological opinions for these retained decisions are available on the web at http://www.fs.usda.gov/main/kootenai/landmanagement/planning.

The direction within these retained decisions has the same definitions as found in this Forest Plan (see pages 11 and 12). Projects and activities must be consistent with the direction within these decisions.

## Inland Native Fish Strategy

The Inland Native Fish Strategy (INFISH) amended the Forest Plans of 22 national forests in eastern Oregon, eastern Washington, western Montana (including the Kootenai NF), Idaho (including the Idaho Panhandle NFs), and portions of Nevada when it was signed in 1995. This decision is retained in the revised Forest Plan through standard FW-STD- RIP-03.

INFISH includes riparian goals, riparian management objectives, and "standards and guidelines." Riparian goals and riparian management objectives are defined on page II-12 of the Inland Native Fish Strategy Environmental Assessment (USDA Forest Service 1995). "Standards and guidelines" are not defined except to state they were developed and describe where they were to be applied. The definition of riparian goals is consistent with the definition of "goals" on page 9 of this Forest Plan. The definition of riparian management objectives is consistent with the definition of "desired conditions" in the Forest Plan rather than the definition of "objectives." The Forest Plan thus defines the riparian management objectives as "desired conditions."

Unlike the Forest Plan, which has specific definitions for standards (limitation or requirement that is applied to project and activity decision-making to help achieve goals and objectives) and for guidelines (operational practice and procedure that is applied to project and activity decision-making to achieve goals, desired conditions, and objectives), INFISH blends them into "standards and guidelines." Most of the INFISH "standards and guidelines" fit the guideline category of "operational practices or procedures." However, some INFISH "standards and guidelines" are "limitations or requirements," particularly those that prohibit certain activities. The Forest Plan thus defines the following INFISH "standards and guidelines" as standards: TM-1, MM-3, MM-4, MM-5, and RA-4. All others are defined as guidelines.

Consultation on effects to bull trout from continued implementation of USFS LRMPs and BLM RMPs, as amended by PACFISH and INFISH (US Fish and Wildlife Service 1998) is in effect for this retained decision. In response to the Reasonable and Prudent Measures in the biological opinion as well as the need for change for the revised Plan (developing restoration strategies), INFISH Priority Watersheds have been added to and adapted for Conservation and Restoration watersheds. Furthermore, in INFISH, the description for Category 4 under Standard Widths Defining Interim RHCAs is different for Priority Watersheds (Category 4 [d]: The area from the edges of the stream channel, wetland, landslide, or

landslide-prone area to a distance equal to the height of one site-potential tree, or 100 feet slope distance, whichever is greatest) and those not identified as Priority Watersheds (Category 4 [e], which uses one-half site-potential tree, or 50 feet slope distance). The Forest Plan now uses a consistent description (Category 4 [d]) for all Category 4 streams and water bodies (see the glossary).

INFISH was originally intended to be an eighteen month strategy and therefore used the word "interim" to describe Riparian Habitat Conservation Areas (RHCAs). Over time, and by continuing INFISH direction in this Plan, the interim RHCA widths have essentially become "default" widths. The descriptions in INFISH of where to apply interim RHCA widths, and the requirements for modifying interim RHCAs, establishing RHCAs that are different from the interim RHCA widths, and changing site-specific widths are somewhat confusing. To clarify:

- Interim (default) RHCA widths are applied where watershed analysis has not been completed;
- Establishing new RHCAs requires a watershed analysis in advance;
- Modifying interim (default) RHCAs can be accomplished by amendment in the absence of watershed analysis; and
- Site-specific widths can be changed (increased where necessary to achieve management goals and objectives, or decreased where interim widths are not needed to attain RMOs or avoid adverse effects) and requires documentation of rationale supporting the change, but does not require watershed analysis or an amendment.[6]

The following information is excerpted from the Decision Notice of the Inland Native Fish Strategy (USDA Forest Service, 1995: Interim Strategies for Managing Fish-producing Watersheds in Eastern Oregon, Washington, Idaho, Western Montana, and Portions of Nevada USDA Forest Service, Intermountain, Northern, and Pacific Northwest Regions).

## Riparian Goals

The goals establish an expectation of the characteristics of healthy, functioning watersheds, riparian areas, and associated fish habitats. Since the quality of water and fish habitat in aquatic systems is inseparably related to the integrity of upland and riparian areas within the watersheds, the strategy identifies several goals for watershed, riparian, and stream channel conditions. The goals are to maintain or restore:

(1) water quality, to a degree that provides for stable and productive riparian and aquatic ecosystems;

(2) stream channel integrity, channel processes, and the sediment regime (including the elements of timing, volume, and character of sediment input and transport) under which the riparian and aquatic ecosystems developed;

(3) instream flows to support healthy riparian and aquatic habitats, the stability and effective function of stream channels, and the ability to route flood discharges;

(4) natural timing and variability of the water table elevation in meadows and wetlands;

(5) diversity and productivity of native and desired non-native plant communities in riparian zones;

(6) riparian vegetation, to:

---

[6] The distinction is the difference between a site-specific area (for example, a geologic break on a short stretch of stream that limits effects to the area between the stream and the break) versus the overall RHCA width for an entire stream or water body.

    (a) provide an amount and distribution of large woody debris characteristic of natural aquatic and riparian ecosystems;

    (b) provide adequate summer and winter thermal regulation within the riparian and aquatic zones; and

    (c) help achieve rates of surface erosion, bank erosion, and channel migration characteristic of those under which the communities developed.

(7) riparian and aquatic habitats necessary to foster the unique genetic fish stocks that evolved within the specific geo-climatic region; and

(8) habitat to support populations of well-distributed native and desired non-native plant, vertebrate, and invertebrate populations that contribute to the viability of riparian-dependent communities.

## Riparian Management Objectives (RMOs)

In the development of PACFISH, landscape-scale interim RMOs describing good habitat for anadromous fish were developed, using stream inventory data for pool frequency, large woody debris, bank stability and lower bank angle, and width to depth ratio. Applicable published and non-published scientific literature was used to define favorable water temperatures. All of the described features may not occur in a specific segment of stream within a watershed, but all generally should occur at the watershed scale for stream systems of moderate to large size (3rd to 6th order streams).

This material was reviewed in regard to its applicability to inland native fish. It has been determined that the RMOs described in PACFISH are good indicators of ecosystem health. The analysis that led to development of the RMOs involved watersheds in Oregon, Washington, and Idaho that include inland native fish as well as anadromous fish. With the exception of the temperature objective, which has been modified, the RMOs represented a good starting point to describe the desired condition for fish habitat.

Under INFISH, these interim RMOs would apply where watershed analysis has not been completed. The components of good habitat can vary across specific geographic areas. Interim RMOs are considered to be the best watershed scale information available; national forest managers would be encouraged to establish site-specific RMOs through watershed analysis or site-specific analysis.

RMOs should be refined to better reflect conditions that are attainable in a specific watershed or stream reach based on local geology, topography, climate, and potential vegetation. Establishment of RMOs would require completion of watershed analysis to provide the ecological basis for the change. However, interim RMOs may be modified by amendment in the absence of watershed analysis where watershed or stream reach specific data support the change. In all cases, the rationale supporting RMOs and their effects would be documented.

The interim RMOs for stream channel conditions provide the criteria against which attainment or progress toward attainment of the riparian goals is measured. Interim RMOs provide the target toward which managers' aim as they conduct resource management activities across the landscape. It is not expected that the objectives would be met instantaneously, but rather would be achieved over time. However, the intent of interim RMOs is not to establish a ceiling for what constitutes good habitat conditions. Actions that reduce habitat quality (whether existing conditions are better or worse than objective values) would be inconsistent with the purpose of this interim direction. Without the benchmark provided by measurable RMOs, habitat suffers continual erosion.

As indicated below, some of the objectives would apply to only the forested ecosystems, some to non-forested ecosystems, and some to all ecosystems regardless of whether or not they are forested.

7-ER-1461

Appendix B—Summary of Retained Decisions

Objectives for six environmental features have been identified, including one key feature and five supporting features. These features are good indicators of ecosystem health, are quantifiable, and are subject to accurate, repeatable measurements. They generally apply to 3rd to 6th order watersheds.

Under the strategy, interim RMOs would apply to watersheds occupied by inland native fish. Application of the interim RMOs would require thorough analysis. That is, if the objective for an important feature such as pool frequency is met or exceeded, there may be some latitude in assessing the importance of the objectives for other features that contribute to good habitat conditions. For example, in headwater streams with an abundance of pools created by large boulders, fewer pieces of large wood might still constitute good habitat. The goal is to achieve a high level of habitat diversity and complexity through a combination of habitat features, to meet the life-history requirements of the fish community inhabiting a watershed.

Many people commented on the draft what it meant to not retard the attainment of the RMOs. For the purposes of analysis, to "retard" would mean to slow the rate of recovery below the near natural rate of recovery if no additional human caused disturbance was placed on the system. This obviously will require professional judgment and should be based on watershed analysis of local conditions.

**Table 23. Interim Riparian Management Objectives**

| Habitat Feature | Interim Objectives |
|---|---|
| **Pool Frequency** (kf[1]) (all systems) | Varies by channel width (see table 24[3]) |
| **Water Temperature** (sf[2]) | No measurable increase in maximum water temperature (7 day moving average of daily maximum temperature measured as the average of the maximum daily temperature of the warmest consecutive 7-day period). Maximum water temperatures below 59°F within adult holding habitat and below 48°F within spawning and rearing habitats |
| **Large Woody Debris** (sf) (forested systems) | East of Cascade Crest in Oregon, Washington, Idaho, Nevada, and western Montana: >20 pieces per mile; >12 inch diameter; >35 foot length |
| **Bank Stability** (sf) (non-forested systems) | >80 percent stable |
| **Lower Bank Angle** (sf) non-forested systems) | >75 percent of banks with <90 degree angle (i.e., undercut) |
| **Width/Depth Ration** (sf) (all systems) | <10, mean wetted width divided by mean depth |

[1] Key feature
[2] Supporting feature
[3] Table 2 in the 1995 INFISH ROD

**Table 24. Interim Objectives for Pool Frequency**

| Wetted Width (feet) | Pools per Mile |
|---|---|
| 10 | 96 |
| 20 | 56 |
| 25 | 47 |
| 50 | 26 |
| 75 | 3 |
| 100 | 18 |
| 125 | 14 |
| 150 | 12 |
| 200 | 9 |

Kootenai National Forest

7-ER-1462

Appendix B—Retained Existing Decisions

# Riparian Habitat Conservation Areas (RHCAs)

Interim RHCAs would be delineated in every watershed on NFS lands within the geographic range of the strategy.

RHCAs are portions of watersheds where riparian-dependent resources receive primary emphasis, and management activities are subject to specific standards and guidelines. RHCAs include traditional riparian corridors, wetlands, intermittent streams, and other areas that help maintain the integrity of aquatic ecosystems by (1) influencing the delivery of coarse sediment, organic matter, and woody debris to streams; (2) providing root strength for channel stability; (3) shading the stream; and (4) protecting water quality (Naiman et al. 1992).

The RHCAs under the strategy would be nearly identical to those under the Idaho Conservation Strategy (Idaho Department of Fish and Game Commission's Bull Trout Conservation Strategy, 1995). The main difference is that, under the Idaho Conservation Strategy, RHCAs would apply only in key watersheds. Since their key watersheds are large and cover much of the NFS lands in Idaho, there would be little difference between the two strategies in regard to RHCAs within occupied bull trout habitat.

Widths of interim RHCAs that are adequate to protect streams from non-channelized sediment inputs should be sufficient to provide other riparian functions, including delivery of organic matter and woody debris, stream shading, and bank stability (Brazier and Brown 1973, Gregory et al. 1984, Steinblums et al. 1984, Beschta et al. 1987, McDade et al. 1990, Sedell and Beschta 1991, Belt et al. 1992). The effectiveness of riparian conservation areas in influencing sediment delivery from non-channelized flow is highly variable. A review by Belt et al. (1992) of studies in Idaho (Haupt 1959a, 1959b; Ketcheson and Megehan 1996; Burroughs and King 1985, 1989; and elsewhere (Trimble and Sartz 1957, Packer 1967, Swift 1986) concluded that non-channelized sediment flow rarely travels more than 300 feet and that 200-300 foot riparian "filter strips" are generally effective at protecting streams from sediment from non-channelized flow.

Interim RHCA widths apply where watershed analysis has not been completed. Site-specific widths may be increased where necessary to achieve riparian management goals and objectives, or decreased where interim widths are not needed to attain RMOs or avoid adverse effects. Establishment of RHCAs would require completion of watershed analysis to provide the ecological basis for the change. However, interim RHCAs may be modified by amendment in the absence of watershed analysis where stream reach or site-specific data support the change. In all cases, the rational supporting RHCA widths and their effects are documented.

## Standard Widths Defining Interim RHCAs

The four categories of stream or water bodies and the standard widths for each are:

*Category 1- Fish-bearing streams:* Interim RHCAs consist of the stream and the area on either side of the stream extending from the edges of the active stream channel to the top of the inner gorge, or to the outer edges of the 100-year floodplain, or to the outer edges of riparian vegetation, or to a distance equal to the height of two site-potential trees, or 300 feet slope distance (600 feet, including both sides of the stream channel), whichever is greatest.

*Category 2- Permanently flowing non-fish-bearing streams:* Interim RHCAs consist of the stream and the area on either side of the stream extending from the edges of the active stream channel to the top of the inner gorge, or to the outer edges of the 100-year flood plain, or to the outer edges of riparian vegetation, or to a distance equal to the height of one site-potential tree, or 150 feet slope distance (300 feet, including both sides of the stream channel), whichever is greatest.

7-ER-1463

***Category 3- Ponds, lakes, reservoirs, and wetlands greater than 1 acre:*** Interim RHCAs consist of the body of water or wetland and the area to the outer edges of the riparian vegetation, or to the extent of the seasonally saturated soil, or to the extent of moderately and highly unstable areas, or to a distance equal to the height of one site-potential tree, or 150 feet slope distance from the edge of the maximum pool elevation of constructed ponds and reservoirs or from the edge of the wetland, pond, or lake, whichever is greatest.

***Category 4- Seasonally flowing or intermittent streams, wetlands less than 1 acre, landslides, and landslide-prone areas:*** This category includes features with high variability in size and site-specific characteristics. At a minimum, the interim RHCAs must include:

    (a) the extent of landslides and landslide-prone areas;

    (b) the intermittent stream channel and the area to the top of the inner gorge;

    (c) the intermittent stream channel or wetland and the areas to the outer edges of the riparian vegetation;

    (d) for Priority Watersheds, the area from the edges of the stream channel, wetland, landslide, or landslide-prone area to a distance equal to the height of one site-potential tree, or 100 feet slope distance, whichever is greatest;

    (e) for watersheds not identified as Priority Watersheds, the area from the edges of the stream channel, wetland, landslide, or landslide-prone area to a distance equal to the height of one-half site potential tree, or 50 feet slope distance, whichever is greatest.

In non-forested rangeland ecosystems, the interim RHCA width for permanently flowing streams in categories 1 and 2 is the extent of the 100-year flood plain.

## Standards and Guidelines

Project and site-specific standards and guidelines listed below would apply to all RHCAs and to projects and activities in areas outside RHCAs that are identified through NEPA analysis as potentially degrading RHCAs. The combination of the standards and guidelines for RHCAs specified below with the standards and guidelines of existing forest plans and Land Use Plans would provide a benchmark for management actions that reflects increased sensitivities and a commitment to ecosystem management.

Under the strategy, the standards and guidelines listed below would be applied to the entire geographic area for the project. Due to the short-term duration of this interim direction, provisions for development and implementation of road/transportation management plans and the relocation, elimination, or reconstruction of existing roads, facilities, and other improvements (i.e., RF-2 c, RF-3 a and c, RF-4, RF-5, GM-2, RM-1, and MM-2) would be initiated but would be unlikely to be completed during the interim period. Where existing roads, facilities, and other improvements found to be causing an unacceptable risk cannot be relocated, eliminated, or reconstructed, those improvements would be closed. Also, due to the short-term duration of this direction, adjustments to management not within the sole discretion of the agencies (i.e., RF-1, LH-3, RA-1, WR-2, FW-3, and FW-4) would be initiated but would be unlikely to be completed during the interim period.

The standards and guidelines under INFISH have the same intent as the 38 standards and guidelines under the Idaho Conservation Strategy. INFISH had one additional standard and guideline (RA-4), related to storage of fuels and refueling in RHCAs.

Many people commented on the draft what it meant to not retard the attainment of the RMOs. For the purposes of analysis, to "retard" would mean to slow the rate of recovery below the near natural rate of recovery if no additional human caused disturbance was placed on the system. This obviously will require professional judgment and should be based on watershed analysis of local conditions.

## Timber Management

**TM-1.** Prohibit timber harvest, including fuelwood cutting, in RHCAs, except as described below

(a) Where catastrophic events such as fire, flooding, volcanic, wind, or insect damage result in degraded riparian conditions, allow salvage and fuelwood cutting in RHCAs only where present and future woody debris needs are met, where cutting would not retard or prevent attainment of other Riparian Management Objectives (RMOs) and where adverse effects on inland native fish can be avoided. For priority watersheds, complete watershed analysis prior to salvage cutting in RHCAs.

(b) Apply silvicultural practices for RHCAs to acquire desired vegetation characteristics where needed to attain RMOs. Apply silvicultural practices in a manner that does not retard attainment of RMOs and that avoids adverse effects on inland native fish.

## Roads Management

**RF-1.** Cooperate with federal, tribal, state, and county agencies, and cost-share partners to achieve consistency in road design, operation, and maintenance necessary to attain RMOs.

**RF-2.** For each existing or planned road, meet the RMOs and avoid adverse effects on inland native fish by:

(1) completing watershed analyses prior to construction of new roads or landings in RHCAs within priority watersheds.

(2) minimizing road and landing locations in RHCAs.

(3) initiating development and implementation of a Road Management Plan or a Transportation Management Plan. At a minimum, address the following items in the plan:

(a) Road design criteria, elements, and standards that govern construction and reconstruction.

(b) Road management objectives for each road.

(c) Criteria that govern road operation, maintenance, and management.

(d) Requirements for pre-, during-, and post-storm inspections and maintenance.

(e) Regulation of traffic during wet periods to minimize erosion and sediment delivery and accomplish other objectives.

(f) Implementation and effectiveness monitoring plans for road stability, drainage, and erosion control.

(g) Mitigation plans for road failures.

(4) avoiding sediment delivery to streams from the road surface.

   (a) Outsloping of the roadway surface is preferred, except in cases where outsloping would increase sediment delivery to streams or where outsloping is infeasible or unsafe.

   (b) Route road drainage away from potentially unstable stream channels, fills, and hillslopes.

(5) avoiding disruption of natural hydrologic flow paths.

(6) avoiding sidecasting of soils or snow. Sidecasting of road material is prohibited on road segments within or abutting RHCAs in priority watersheds.

**RF-3.** Determine the influence of each road on the RMOs. Meet RMOs and avoid adverse effects on inland native fish by:

(1) reconstructing road and drainage features that do not meet design criteria or operation and maintenance standards, or that have been shown to be less effective than designed for controlling sediment delivery, or that retard attainment of RMOs, or do not protect priority watersheds from increased sedimentation.

(2) prioritizing reconstruction based on the current and potential damage to inland native fish and their priority watersheds, the ecological value of the riparian resources affected, and the feasibility of options such as helicopter logging and road relocation out of RHCAs.

(3) closing and stabilizing or obliterating, and stabilizing roads not needed for future management activities. Prioritize these actions based on the current and potential damage to listed inland native fish in priority watersheds, and the ecological value of the riparian resources affected.

**RF-4.** Construct new, and improve existing, culverts, bridges, and other stream crossings to accommodate a 100-year flood, including associated bedload and debris, where those improvements would/do pose a substantial risk to riparian conditions. Substantial risk improvements include those that do not meet design and operation maintenance criteria, or that have been shown to be less effective than designed for controlling erosion, or that retard attainment of RMOs, or that do not protect priority watersheds from increased sedimentation. Base priority for upgrading on risks in priority watersheds and the ecological value of the riparian resources affected. Construct and maintain crossings to prevent diversion of streamflow out of the channel and down the road in the event of crossing failure.

**RF-5.** Provide and maintain fish passage at all road crossings of existing and potential fish-bearing streams.

### Grazing Management

**GM-1.** Modify grazing practices (e.g., accessibility of riparian areas to livestock, length of grazing season, stocking levels, timing of grazing, etc.) that retard or prevent attainment of RMOs or are likely to adversely affect inland native fish. Suspend grazing if adjusting practices is not effective in meeting RMOs.

**GM-2.** Locate new livestock handling and/or management facilities outside of RHCAs. For existing livestock handling facilities inside the RHCAs, assure that facilities do not prevent attainment of RMOs. Relocate or close facilities where these objectives cannot be met.

**GM-3.** Limit livestock trailing, bedding, salting, loading, watering, and other handling efforts to those areas and times that would not retard or prevent attainment of RMOs or adversely affect inland native fish.

**GM-4.** Adjust wild horse and burro management to avoid impacts that prevent attainment of RMOs or adversely affect inland native fish.

## Recreation Management

**RM-1.** Design, construct, and operate recreation facilities, including trails and dispersed sites, in a manner that does not retard or prevent attainment of the RMOs and avoids adverse effects on inland native fish. Complete watershed analysis prior to construction of new recreation facilities in RHCAs within priority watersheds. For existing recreation facilities inside RHCAs, assure that the facilities or use of the facilities would not prevent attainment of RMOs or adversely affect inland native fish. Relocate or close recreation facilities where RMOs cannot be met or adverse effects on inland native fish cannot be avoided.

**RM-2.** Adjust dispersed and developed recreation practices that retard or prevent attainment of RMOs or adversely affect inland native fish. Where adjustment measures such as education, use limitations, traffic control devices, increased maintenance, relocation of facilities, and/or specific site closures are not effective in meeting RMOs and avoiding adverse effects on inland native fish, eliminate the practice or occupancy.

**RM-3.** Address attainment of RMOs and potential effect on inland native fish in Wild and Scenic Rivers, Wilderness, and other Recreation Management plans.

## Minerals Management

**MM-1.** Minimize adverse effects to inland native fish species from mineral operations. If the Notice of Intent indicates a mineral operation would be located in a RHCAs, consider the effects of the activity on inland native fish in the determination of significant surface disturbance pursuant to 36 CFR 228.4. For operations in a RHCA ensure operators take all practicable measures to maintain, protect, and rehabilitate fish and wildlife habitat which may be affected by the operations. When bonding is required, consider (in the estimation of bond amount) the cost of stabilizing, rehabilitating, and reclaiming the area of operations.

**MM-2.** Locate structures, support facilities, and roads outside RHCAs. Where no alternative to siting facilities in RHCAs exists, locate and construct the facilities in ways that avoid impacts to RHCAs and streams adverse effects on inland native fish. Where no alternative to road construction exists, keep roads to the minimum necessary for the approved mineral activity. Close, obliterate and revegetate roads no longer required for mineral or land management activities.

**MM-3.** Prohibit solid and sanitary waste facilities in RHCAs. If no alternative to locating mine waste (waste rock, spent ore, tailings) facilities in RHCAs exists, and releases can be prevented and stability can be ensured, then:

    (1) analyze the waste material using the best conventional sampling methods and analytic techniques to determine its chemical and physical stability characteristics;

    (2) locate and design the waste facilities using the best conventional techniques to ensure mass stability and prevent the release of acid or toxic materials. If the best conventional technology is not sufficient to prevent such releases and ensure stability over the long term, prohibit such facilities in RHCA;

    (3) monitor waste and waste facilities to confirm predictions of chemical and physical stability, and make adjustments to operations as needed to avoid adverse effects to inland native fish and to attain RMOs;

Appendix B—Summary of Retained Decisions

(4) reclaim and monitor waste facilities to assure chemical and physical stability and revegetation to avoid adverse effects to inland native fish and to attain the RMOs; and

(5) require reclamation bonds adequate to ensure long-term chemical or physical stability and successful revegetation of mine waste facilities.

**MM-4.** For leasable minerals, prohibit surface occupancy within RHCAs for oil, gas, and geothermal exploration and development activities where contracts and leases do not already exist, unless there are no other options for location and RMOs can be attained and adverse effects to inland native fish can be avoided. Adjust the operating plans of existing contracts to (1) eliminate impacts that prevent attainment of RMOs and (2) avoid adverse effects to inland native fish.

**MM-5.** Permit sand and gravel mining and extraction within RHCAs only if no alternatives exist, if the action(s) would not retard or prevent attainment of RMOs, and adverse effects to inland native fish can be avoided.

**MM-6.** Develop inspection, monitoring, and reporting requirements for mineral activities. Evaluate and apply the results of inspection and monitoring to modify mineral plans, leases, or permits as needed to eliminate impacts that prevent attainment of RMOs and avoid adverse effects on inland native fish.

### Fire/Fuels Management

**FM-1**. Design fuel treatment and fire suppression strategies, practices, and actions so as not to prevent attainment of RMOs, and to minimize disturbance of riparian ground cover and vegetation. Strategies should recognize the role of fire in ecosystem function and identify those instances where fire suppression or fuel management actions could perpetuate or be damaging to long-term ecosystem function or inland native fish.

**FM-2.** Locate incident bases, camps, helibases, staging areas, helispots, and other centers for incident activities outside of RHCAs. If the only suitable location for such activities is within the RHCAs, an exemption may be granted following a review and recommendation by a resource advisor. The advisor would prescribe the location, use conditions, and rehabilitation requirements, with avoidance of adverse effects to inland native fish a primary goal. Use an interdisciplinary team, including a fishery biologist, to predetermine incident base and helibase locations during pre-suppression planning.

**FM-3.** Avoid delivery of chemical retardant, foam, or additives to surface waters. An exception may be warranted in situations where overriding immediate safety imperatives exist; or, following a review and recommendation by a resource advisor and a fishery biologist when the action agency determines an escape fire would cause more long-term damage to fish habitats than chemical delivery to surface waters.

**FM-4.** Design prescribed burn projects and prescriptions to contribute to the attainment of the RMOs.

**FM-5.** Immediately establish an emergency team to develop a rehabilitation treatment plan to attain RMOs and avoid adverse effects on inland native fish whenever RHCAs are significantly damaged by a wildfire or a prescribed fire burning out of prescription.

### Lands

**LH-1.** Require instream flows and habitat conditions for hydroelectric and other surface water development proposals that maintain or restore riparian resources, favorable channel conditions, and fish passage, reproduction, and growth. Coordinate this process with the appropriate state agencies. During relicensing of hydroelectric projects, provide written and timely license conditions to the Federal Energy Regulatory Commission (FERC) that require fish passage and flows and habitat conditions that

7-ER-1468

maintain/restore riparian resources and channel integrity. Coordinate relicensing projects with the appropriate state agencies.

**LH-2.** Locate new hydroelectric ancillary facilities outside RHCAs. For existing ancillary facilities inside the RHCAs that are essential to proper management, provide recommendations to FERC to assure that the facilities will not prevent attainment of the RMOs and that adverse effects on inland native fish are avoided. Where these objectives cannot be met, provide recommendations to FERC that such ancillary facilities should be relocated. Locate, operate, and maintain hydroelectric facilities that must be located in RHCAs to avoid effects that would retard or prevent attainment of the RMOs and avoid adverse effects on inland native fish.

**LH-3.** Issue leases, permits, rights-of-way, and easements to avoid effects that would retard or prevent attainment of the RMOs and avoid adverse effects on inland native fish. Where the authority to do so was retained, adjust existing leases, permits, rights-of-way, and easements to eliminate effects that would retard or prevent attainment of the RMOs or adversely affect inland native fish. If adjustments are not effective, eliminate the activity. Where the authority to adjust was not retained, negotiate to make changes in existing leases, permits, rights-of-way, and easements to eliminate effects that would prevent attainment of the RMOs or adversely affect inland native fish. Priority for modifying existing leases, permits, rights-of-way, and easements would be based on the current and potential adverse effects on inland native fish and the ecological value of the riparian resources affected.

**LH-4.** Use land acquisition, exchange, and conservation easements to meet RMOs and facilitate restoration of fish stocks and other species at risk of extinction.

### General Riparian Area Management

**RA-1**. Identify and cooperate with federal, tribal, state and local governments to secure instream flows needed to maintain riparian resources, channel conditions, and aquatic habitat.

**RA-2.** Trees may be felled in RHCAs when they pose a safety risk. Keep felled trees on site when needed to meet woody debris objectives.

**RA-3.** Apply herbicides, pesticides, and other toxicants, and other chemicals in a manner that does not retard or prevent attainment of RMOs and avoids adverse effects on inland native fish.

**RA-4.** Prohibit storage of fuels and other toxicants within RHCAs. Prohibit refueling within RHCAs unless there are no other alternatives. Refueling sites within RHCAs must be approved by the Forest Service or Bureau of Land Management and have an approved spill containment plan.

**RA-5.** Locate water drafting sites to avoid adverse effects to inland native fish and instream flows, and in a manner that does not retard or prevent attainment of RMOs.

### Watershed and Habitat Restoration

**WR-1.** Design and implement watershed restoration projects in a manner that promotes the long-term ecological integrity of ecosystems, conserves the genetic integrity of native species, and contributes to attainment of RMOs.

**WR-2.** Cooperate with federal, state, local, and tribal agencies, and private landowners to develop watershed-based Coordinated Resource Management Plans (CRMPS) or other cooperative agreements to meet RMOs.

### Fisheries and Wildlife Restoration

**FW-1.** Design and implement fish and wildlife habitat restoration and enhance actions in a manner that contributes to attainment of the RMOs.

**FW-2.** Design, construct, and operate fish and wildlife interpretive and other user-enhancement facilities in a manner that does not retard or prevent attainment of the RMOs or adversely affect inland native fish. For existing fish and wildlife interpretive and other user-enhancement facilities inside RHCAs assure that RMOs are met and adverse effects on inland native fish are avoided. Where RMOs cannot be met or adverse effects on inland native fish avoided, relocate or close such facilities.

**FW-3.** Cooperate with federal, tribal, and state wildlife management agencies to identify and eliminate wild ungulate impacts that prevent attainment of RMOs or adversely affect inland native fish.

**FW-4.** Cooperate with federal, tribal, and state fish management agencies to identify and eliminate adverse effects on inland native fish associated with habitat manipulation, fish stocking, fish harvest, and poaching.

## Priority Watersheds

Priority watersheds have been designated in Oregon, Idaho, Montana, Nevada, and Washington. Criteria considered designating priority watersheds in the 22 national forests were:

1. Watersheds with excellent habitat or strong assemblages of inland native fish, with a priority on bull trout populations.

2. Watersheds that provide for meta-population objectives.

3. Degraded watersheds with a high restoration potential.

The intent of designating priority watersheds is to provide a pattern of protection across the landscape where habitat for inland native fish would receive special attention and treatment, Areas in good condition would serve as anchors for the potential recovery of depressed stocks, and also would provide colonists for adjacent areas where habitat had been degraded by land management or natural events, Those areas of lower quality habitat with high potential for restoration would become future sources of good habitat with the implementation of a comprehensive restoration program. Priority watersheds would have the highest priority for restoration, monitoring, and watershed analysis.

Within priority watersheds, ongoing activities have been screened. This screening effort is a way to monitor ongoing activities to categorize the extent of risk they represent to bull trout habitat or populations. Projects determined to be a high or medium risk must be reviewed by forest supervisors and, subject to valid existing rights, they have three options to pursue:

1. Modify the action to reduce the risk.

2. Postpone the action until the final direction is issued.

3. Cancel the action.

Forest supervisors will submit to their respective regional foresters an action plan for how high and moderate risk projects will be modified to avoid an unacceptable risk. This action plan will be submitted within one month. Modifications for moderate and high risk projects should be initiated within two months with high risk projects having the highest priority. If there are compelling reasons why a project cannot be modified, delayed, or cancelled, the forest supervisor will include in the action plan written

documentation of the rationale for such action and what other mitigating measures will be implemented to assure there is not an unacceptable risk. For low risk projects, forest supervisors must provide an action plan by March 1, 1996 for means to assure there is not an unacceptable risk.

## Watershed Analysis

Watershed analysis is a systematic procedure for determining how a watershed functions in relation to its physical and biological components. This is accomplished through consideration of history, processes, landform, and condition. Generally, watershed analysis would be initiated where the interim RMOs and the interim RHCA widths do not adequately reflect specific watershed capabilities, or as required in the standards and guidelines before specific projects are initiated. The guidelines and procedural manuals being developed by the Interagency Watershed Analysis Coordination Team and other potentially relevant procedures (e.g., the Cumulative Watershed Effects Process for Idaho, etc.) would be considered and used, where appropriate, in development of a watershed analysis protocol. Eventually, any watershed analysis would follow the final *Ecosystem Analysis at a Watershed Scale*. Additional information will be sent out when it is available.

Watershed analysis is a prerequisite for determining which processes and parts of the landscape affect fish and riparian habitat, and is essential for defining watershed-specific boundaries for RHCAs and for RMOs. Watershed analysis can form the basis for evaluating cumulative watershed effects; defining watershed restoration needs, goals, and objectives; implementing restoration strategies; and monitoring the effectiveness of watershed protection measures, depending upon the issues to be addressed in the watershed analysis. Watershed analysis employs the perspectives and tools of multiple disciplines, especially geomorphology, hydrology, geology, aquatic and terrestrial ecology, and soil science. It is the framework for understanding and carrying out land use activities within a geomorphic context, and is a major component of the evolving science of ecosystem analysis. Forests should utilize local fish and game department, tribal staff, or other local groups whenever possible to increase the knowledge base and expertise for watershed analysis.

Watershed analysis consists of a sequence of activities designed to identify and interpret the processes operating in specific landscape. Since the concept of watershed analysis was first introduced, there has been much discussion as to the procedures and detail that a watershed analysis should complete. It is recognized that the components and intensity of the analysis would vary depending on level of activity and significance of issues involved. Following are the general process steps for watershed analysis currently being considered.

1. Characterization of the Watershed:

    a) Place the watershed in a broader geographic context.

    b) Highlight dominant features and processes with the watershed,

2. Identification of Issues and Key Questions:

    a) Key questions and resource components.

    b) Determine which issues are appropriate to analyze at this scale.

3. Description of Current Condition.

4. Description of Reference Conditions:

    a) Establish ecologically and geomorphically appropriate reference conditions for the watershed.

5. Interpretation of Information:

    a) Provide a comparison and interpretation of the current, historic, and reference conditions.

6. Recommendations:

    a) Provide conclusions and recommendations to management.

The process described above is significantly streamlined to allow managers to focus watershed analysis to address specific issues and management needs. This can include modification of RMOs, RHCAs, or identification of restoration and monitoring needs. The state-of-art for watershed analysis is still developing and the processes would need to be flexible.

## Watershed Restoration

Watershed restoration comprises actions taken to improve the current conditions of watersheds to restore degraded habitat, and to provide long-term protection to natural resources, including riparian and aquatic resources. The strategy does not attempt to develop a restoration strategy given the short time period for implementation of this interim direction, It is expected that forests would utilize the information from watershed analysis and project development to initiate restoration projects where appropriate and funds are available. Priority watersheds would have the highest priority for restoration efforts.

## Monitoring

Monitoring is an important component of the proposed interim direction. The primary focus is to verify that the standards and guidelines were applied during the project implementation. Monitoring to assess whether those protective measures are effective to attain riparian goals and management objectives would be a lower priority given the short time frame for this interim direction, Complex ecological processes and long time frames are inherent in the RMOs, and it is unrealistic to expect that the planned monitoring would generate conclusive results within 18 months. Nevertheless, it is critical to begin monitoring. Forests are urged to utilize current forest plan monitoring efforts, and Section 7 Monitoring results from PACFISH areas where on the same forest to establish a baseline for determining the effectiveness of these standards and guidelines. Priority watersheds would have the highest priority for monitoring efforts.

A third type of monitoring (validation monitoring) is intended to ascertain the validity of the assumptions used in developing the interim direction. Because of the short-term nature of the management direction, no specific requirements are included for validation monitoring.

# Grizzly Bear Access Amendment

The design elements of the selected alternative for the Kootenai, Idaho Panhandle, and Lolo National Forests Land and Resource Management Plans Amendment for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones are included below.

## Design Elements

I. The following access management standards would apply to individual BMUs within the Selkirk Recovery Zone on the IPNFs and Cabinet-Yaak Recovery Zone on the KNF, IPNFs and portion of the LNF:

    A. The OMRD, TMRD, and percent core standards displayed in table 25 would be established for the BMUs in the Cabinet-Yaak and Selkirk grizzly bear ecosystems.

Appendix B—Retained Existing Decisions

**Table 25. Alternative E Updated – BMU Status and Selected Standards[1]**

| BMU | BMU Priorities | OMRD >1mi/mi$^2$(percent) | | TMRD >2 mi/mi$^2$(percent) | | Core Area (percent) | | Percent NFS Land |
|---|---|---|---|---|---|---|---|---|
| | | 2009 Status | Selected Standard (max) | 2009 Status | Selected Standard (max) | 2009 Status | Selected Standard (min.) | |
| 1-Cedar | 2 | 14 | 15 | 10 | 15 | 83 | 80 | 99 |
| 2-Snowshoe | 2 | 20 | 20 | 16 | 18 | 76 | 75 | 94 |
| 3-Spar | 3 | 27 | 33 | 26 | 26 | 62 | 59 | 95 |
| 4-Bull | 2 | 37 | 36 | 29 | 26 | 62 | 63 | 84 |
| 5-St. Paul | 1 | 28 | 30 | 23 | 23 | 58 | 60 | 97 |
| 6-Wanless | 1 | 29 | 34 | 34 | 32 | 53 | 55 | 85 |
| 7-SilverButte-Fisher | 2 | 32 | 26 | 23 | 23 | 62 | 63 | 92 |
| 8-Vermillion | 3 | 33 | 32 | 24 | 21 | 55 | 55 | 93 |
| 9-Callahan | 2 | 27 | 33 | 26 | 26 | 59 | 55 | 90 |
| 10-Pulpit | 2 | 44 | 44 | 29 | 34 | 51 | 52 | 95 |
| 11-Roderick | 1 | 28 | 28 | 28 | 26 | 54 | 55 | 96 |
| 12-Newton | 1 | 42 | 45 | 29 | 31 | 58 | 55 | 92 |
| 13-Keno | 1 | 34 | 33 | 25 | 26 | 59 | 59 | 99 |
| 14-NW Peaks | 1 | 28 | 31 | 26 | 26 | 56 | 55 | 99 |
| 15-Garver | 1 | 29 | 33 | 25 | 26 | 55 | 55 | 94 |
| 16-East Fork Yaak | 1 | 29 | 33 | 27 | 26 | 54 | 55 | 96 |
| 17-Big Creek | 2 | 30 | 33 | 16 | 26 | 58 | 55 | 99 |
| 22-Mt.Headley | 3 | 38 | 33 | 37 | 35 | 51 | 55 | 89 |
| 18-Boulder | 3 | 31 | 33 | 35 | 29 | 50 | 55 | 92 |
| 19-Grouse [2, 3] | 3 | 60 | 59 | 59 | 55 | 32 | 37 | 54 |
| 20-North Lightning | 1 | 36 | 35 | 20 | 20 | 62 | 61 | 94 |
| 21-Scotchman | 2 | 35 | 34 | 27 | 26 | 63 | 62 | 81 |
| Blue-Grass | 1 | 33 | 33 | 28 | 26 | 50 | 55 | 96 |
| Long-Smith | 1 | 21 | 25 | 14 | 15 | 73 | 67 | 92 |
| Kalispell- Granite | 1 | 31 | 33 | 28 | 26 | 49 | 55 | 96 |
| Lakeshore | 3 | 82 | 82 | 54 | 56 | 19 | 20 | 86 |
| Salmo-Priest | 2 | 30 | 33 | 24 | 26 | 66 | 64 | 99 |
| Sullivan-Hughes | 1 | 24 | 24 | 19 | 19 | 61 | 61 | 99 |
| Myrtle | 2 | 29 | 33 | 20 | 24 | 60 | 56 | 85 |
| Ball-Trout | 2 | 17 | 20 | 11 | 13 | 72 | 69 | 94 |

[1] Table 2 (page 11) in the Grizzly Bear Access Amendment ROD
[2] Less than or equal to 75 percent NFS lands
[3] Due to the high level of non-federal lands within the Grouse BMU, existing conditions and standards are calculated assuming no contribution of secure habitat from private lands

Appendix B—Summary of Retained Decisions

B.  Parameters for establishing and managing core habitat in all BMUs:

1.  In accordance with IGBC (1998) and Selkirk/Cabinet-Yaak Ecosystem Subcommittee (1998) direction, core areas shall be established for the purpose of providing secure habitat for grizzly bears.

   a)  Core areas include high quality habitat within a BMU that contains no motorized travel routes or high use trails.

   b)  Core areas do not include any gated or restricted roads but may contain roads that are impassable due to re-growth of vegetation, effective barriers other than gates, or placement of logging or forest debris so as to no longer function as a motorized route.

   c)  When possible, core areas would be delineated by identifying and aggregating the full range of seasonal habitats that are available in the BMU.

   d)  The IGBC anticipated that minimum core area size might be determined for each recovery zone. For the Selkirk/Cabinet-Yaak Grizzly Bear Recovery Zones, no scientifically based minimum effective size polygon for core area has been determined (Wakkinen and Kasworm 1997), though minimum block sizes of 2-8 mi2 were suggested. Therefore, discounting small or narrow blocks of core area is not prudent at this time. Individual project analyses would disclose the percent and size of core areas in each BMU.

   e)  Once route closures to create core areas are established and effective, these core areas should remain in place for at least 10 years. Therefore, except for emergencies or other unforeseen circumstances requiring independent section 7 consultation, newly created core area shall not be entered for at least 10 years after creation.

   f)  Roads that are closed, decommissioned, or barriered in the future to create core area would be put in a condition such that a need for motorized access for maintenance is not anticipated for at least 10 years. Until such closed roads are placed in the above- described condition, they would not be considered as contributing to core area.

2.  Entering core area blocks for road decommissioning or stabilization activities:

   a)  Without further section 7 consultation on grizzly bears, the Forest Service may affect underlying core area (i.e., any core habitat that is affected by the subject road and its buffer) within a BMU once per 10-year time frame, and not to exceed one bear year for the sole purpose of completing road decommissioning/stabilization activities on existing closed or barriered roads in core area habitat.

   b)  Subsequent needs to re-enter individual core areas within a BMU more frequently than once per decade for the purposes of road decommissioning shall be handled on a case-by-case basis through standard section 7 consultation procedures. The effects of additional entries would be analyzed pursuant to such project level consultation. Pending the outcome of each analysis, additional measures to minimize potential effects to grizzly bears may be required.

3.  Routine forest management may be proposed in a core area block after 10-years of core area benefit. However, BMUs must remain at or above the core standard. Therefore, potential losses to existing core must be compensated with in-kind replacement concurrently or prior to incurring the losses. Such in-kind replacement of core would be established within the affected BMU in accordance with the direction in Part I.B.1., above. For exceptions, see specialized circumstances outlined in Part I.D. concerning BMUs that exceed standards. Following management, core areas must subsequently be managed undisturbed for 10 years.

C. Parameters for BMUs currently not meeting core area, OMRD, and/or TMRD standards:

1. These BMUs are anticipated to be brought up to standards in the following manner: 33 percent of those BMUs currently not meeting one or more standard within each ecosystem are estimated to meet all standards within three years of the amendment decision date; 66 percent of those BMUs currently not meeting one or more standard within each ecosystem are estimated to meet all standards within 5 years of the amendment decision date, and 100 percent of those BMUs currently not meeting one or more standard within each ecosystem are estimated to meet all standards within eight years of the amendment decision date.

D. For those BMUs currently meeting or exceeding (being better than) the standards for core area:

1. Except as provided above for road stabilization projects, no reductions in core habitat without in-kind replacements would be proposed until all BMUs administered by the IPNF, KNF and LNF in the respective ecosystems are up to standard (table 25; which does not include the LeClerc BMU or the Idaho State Lands BMU in the Selkirk recovery zone).

2. Once all BMUs meet all standards then subsequent projects that propose to permanently reduce core area by roads shall undergo independent section 7 formal consultations.

3. Reductions of core area within individual BMUs shall not reduce the percent core area below the minimum standards for the affected BMU without compensating with in-kind replacement concurrently or prior to incurring the losses (see Part I.B.3.).

E. Road use associated with completing administrative activities:

1. In the Selkirk ecosystem (aka Selkirk recovery zone):

   a) Administrative use shall not exceed 57 vehicle round trips per active bear year per road, apportioned as follows: ≤19 round trips in spring (April 1 through June15); ≤23 round trips in summer (June 16 through September 15); and ≤15 round trips in fall (September 16 through November 15).

   b) If the number of trips exceeds 57 trips per active bear year in the Selkirk ecosystem, then that road would be considered "open" for analysis and reporting purposes. Likewise, if the number of trips exceeds the allowable ecosystem-specific seasonal (spring, summer, and fall) vehicle round trips per road, then that road would be considered "open" for analysis and reporting purposes.

2. In the Cabinet-Yaak ecosystem (aka Cabinet-Yaak recovery zone):

   a) Administrative use shall not exceed 60 vehicle round trips per active bear year per road, apportioned as follows: ≤18 round trips in spring (April 1 through June15); ≤23 round trips in summer (June 16 through September 15); and ≤19 round trips in fall (September 16 through November 30).

   b) If the number of trips exceeds 60 trips per active bear year in the Cabinet-Yaak ecosystem, then that road would be considered "open" for analysis and reporting purposes. Likewise, if the number of trips exceeds the allowable ecosystem-specific seasonal (spring, summer, and fall) vehicle round trips per road, then that road would be considered "open" for analysis and reporting purposes.

Appendix B—Summary of Retained Decisions

II.    The following access management applies to seven grizzly bear recurring use areas (i.e., BORZ areas) located outside of the Cabinet-Yaak Grizzly Bear Recovery Zone (KNF and IPNFs) and Selkirk Grizzly Bear Recovery Zone (IPNFs):

A.    The Forests shall ensure no increases in permanent linear miles of open road on National Forest System lands in any individual BORZ, above the baseline conditions identified in table 26, except in cases where the Forest Service lacks discretion to prevent road building across National Forest System lands due to legal or other obligations (examples include, but are not limited to, ANILCA claims, identification of RS2477 thoroughfares). Potential increases in linear miles of open roads must be compensated for with in-kind reductions in linear miles of open road concurrently with, or prior to, project implementation within the same BORZ. Temporary increases in linear miles of open roads are acceptable under the following conditions:

1.    Roads that are closed to public motorized use or roads created or reconstructed to facilitate land management activities that are otherwise closed to public use may be "opened" to the public immediately following completion of all mechanized harvest and post-harvest slash activities requiring use of the road, to allow motorized public use during the bear summer season prior to the fall bear hunt (i.e., June 16 - August 31) for activities such as personal firewood collection. This public access would only be provided in cases where the mechanized harvest and/or post-harvest slash activities occurred during the same active bear year.

B.    The Forest shall ensure no net permanent increases in linear miles of total roads in any individual BORZ area above the baseline conditions identified in table 26, except in cases where the Forest Service lacks discretion to prevent road building across National Forest System lands due to legal or other obligations (examples include, but are not limited to, ANILCA claims, identification of RS2477 thoroughfares, etc.). Otherwise, potential increases in linear miles of total roads must be compensated for with in-kind reductions in linear total road miles concurrently with, or prior to, new road construction or reconstruction of currently bermed or barriered roads. Temporary increases (not off-set) in linear miles of total roads are acceptable under the following conditions:

1.    Temporary increases in linear miles of total roads are acceptable under the following conditions:

a.    Newly constructed roads would be effectively gated and would be restricted with a CFR closure clarifying they are not open for public use.

b.    These roads shall be closed immediately upon completion of activities requiring use of the road, except as described in Part II., A.1., above. Roads must be closed with a berm, guardrail or other measure that effectively prevents motorized access, and put in a condition such that a need for motorized access for maintenance is not anticipated for at least 10 years.

c.    Upon completion of a land management project, linear miles of total roads would be returned to or below the baseline levels contained in table 26.

C.    Timber harvest activities that would occur within multiple watersheds shall be scheduled such that disturbance of grizzly bears resulting from road use is minimized. The appropriate scale for scheduling harvest activities would be determined pursuant to project level consultation.

III.    To ensure the effective implementation of the open road density parameter, at least 30 percent of closure devices (gates and barriers) would be monitored annually within the respective ecosystems. Monitoring techniques may include visual checks as well as road counters.

Table 26. Habitat Conditions for Bears Outside Recovery Zone (BORZ) Occupancy Areas as of Bear Year 2010[1, 2]

| BORZ Name | Grizzly Bear Ecosystem | Total Size (Acres) | NFS Lands (Acres) | Total Linear Miles of Roads on NFS Lands | Total Linear Miles of Open Roads on NFS Lands |
|---|---|---|---|---|---|
| Priest | Selkirk | 80,733 | 75,793 | 316.4 | 314.4 |
| Pack River | Selkirk | 33,869 | 28,097 | 41.9 | 37.9 |
| Mission-Moyie | Cabinet-Yaak | 71,545 | 58,472 | 200.3 | 167.3 |
| Clark Fork | Cabinet-Yaak | 101,899 | 100,421 | 256.1 | 176.9 |
| Cabinet Face | Cabinet-Yaak | 28,052 | 27,093 | 164.1 | 128.0 |
| West Kootenai | Cabinet-Yaak | 173,122 | 169,705 | 615.3 | 315.9 |
| Tobacco | Cabinet-Yaak | 287,240 | 266,947 | 1,123.9 | 867.0 |

[1] Table 16 in Appendix B of the Grizzly Bear Access Amendment ROD

[2] This data is reviewed annually. See the most recent Bear Year monitoring report for any updated baseline numbers

## USFWS Biological Opinion Grizzly Bear Related Reporting Requirements

1. By April 15 each year, the Forests shall submit annual reports to the Service that detail the progress made toward achieving and maintaining the standards for Percent Core Area, OMRD, and TMRD within the Recovery Zones.

2. The Forests shall coordinate with state and federal agency biologists to collect credible grizzly bear observations that occur outside of the Recovery Zone boundaries and add this information to the 6th-order HUC database for inclusion into the annual report.

3. The annual report shall provide an ongoing list detailing the locations, dates, duration, and circumstances for invoking the allowance for entering core area for the purposes of road decommissioning or stabilizations.

## USFWS Biological Opinion Terms and Conditions for Bull Trout

In order to be exempt from the prohibitions of section 9 of the Act, the Forests must comply with the following terms and conditions. These terms and conditions are non-discretionary.

1. The Forests should assure consistent implementation of measures and standards specified in the Aquatic Conservation strategies as indicated in the 1998 Biological Opinion for the Effects to Bull Trout from the Continued Implementation of Land and Resource Management Plans and Resource Management Plans as Amended by the Interim Strategies for Managing Fish-producing Watersheds in Eastern Oregon and Washington, Idaho, Western Montana and portions of Nevada (INFISH).

2. The Forests should ensure that the watershed baselines are updated according to the INFISH Biological Opinion's Reasonable and Prudent Measure #2 (U.S. Fish and Wildlife Service 1998b). These baselines should be updated after every project requiring consultation which may affect them until the LRMP for each Forest is revised, or another analysis method is developed in conjunction with the Service.

3. The Forests should assume bull trout are present in a given watershed if it is connected to an area known to be occupied, unless site-specific information indicates otherwise. The Forests should

informally consult with the Service to determine the effects of proposed actions upon bull trout prior to initiating formal consultation and to ensure that the necessary site-specific information and technical data is provided in the baseline and effects analysis for biological assessments for the individual projects.

4.  The Forests should integrate the value and risk to both bull trout and grizzly bears when deciding where to implement projects stemming from this proposed action. This action may entail increasing the priority for implementation of some BMUs.

5.  In the course of planning projects to achieve the grizzly bear access standards, the Forests should conduct site-specific assessments of roads and road-crossings at the 6th code subwatershed scale to identify: road segments that are primary contributors of sediment or at risk of failure; stream crossings at risk of failure or that will not pass a 100-year flood event; culverts or other road crossings that act as fish barriers.

6.  Assessments and corrective actions within any given BMU should follow the prioritization provided in this biological opinion, if practicable, unless new site-specific information changes the priority.

7.  The Forests should ensure that all road features, particularly stream crossings on roads or any road that is closed by a barrier (i.e., not a gate) and is intended to be kept closed for at least 5 years is hydrologically neutral (as defined in subsequent project level consultations with the Service) and capable of passing at least a 100-year flood event with minimal erosion. Should the Forests decide to leave a culvert on a road blocked by a barrier, then that crossing should be capable of passing a 100-year event. Crossings that are barriers to fish passage should be removed, unless site-specific analysis contradicts such action. Roads that are intended to be kept closed for less than 5 years should be adequately stabilized so that maintenance is not expected to be required for the duration of the closure.

8.  The Forests should minimize sediment input to the maximum extent practicable from culvert removals and subsequent streambed and streambank restoration activities by following all appropriate best management practices.

9.  The Forests should, where practical, time culvert removals to coincide with low flow on perennial streams or no flow on intermittent streams to minimize sediment impacts to bull trout spawning activities and bull trout spawning and rearing habitat.

10. The placement of new roads and reopening of previously closed roads should be done in a manner to reduce or eliminate impacts to bull trout streams and critical habitat. The design of new or replaced culverts should be done in accordance with the Forest Service's Aquatic Organism Passage program, or other design criteria that ensure fish passage at the appropriate life stages.

11. Prior to closing a road by gate or barricade, the Forests should complete an inventory and risk assessment of individual stream crossing structures and features behind the proposed barrier and develop a monitoring plan based on the risk assessment. After closing, periodically monitor and inspect culvert stream crossings, bridges, fords, and other drainage features behind gated or barriered roads in bull trout watersheds which are subject to high erosion risk due to floods or peak storm events and/or are in close proximity to bull trout occupied streams or critical habitat.

# Northern Rockies Lynx Management Direction

Northern Rockies lynx management direction (USDA Forest Service, 2007): ROD. USDA Forest Service, national forests in Montana and parts of Idaho, Wyoming, and Utah. See the Lynx Glossary for definitions, including those for Goals[14], Objectives[30], Standards[44], and Guidelines[15].

## Goal

Conserve the Canada lynx.

## All Management Practices and Activities (ALL)

The following objectives, standards, and guidelines apply to all management projects in lynx habitat in lynx analysis units (LAUs) in occupied habitat and in linkage areas, subject to valid existing rights. They do not apply to wildfire suppression, or to wildland fire use.

### Objective ALL O1:

Maintain[26] or restore[40] lynx habitat[23] connectivity[16] in and between LAUs[21], and in linkage areas[22].

### Standard ALL S1:

New or expanded permanent development[33] and vegetation management[49] projects[36] must maintain[26] habitat connectivity[16] in an LAU[21] and/or linkage area[22].

### Guideline ALL G1:

Methods to avoid or reduce effects on lynx should be used when constructing or reconstructing highways[18] or forest highways[12] across federal land. Methods could include fencing, underpasses, or overpasses.

### Standard LAU S1:

Changes in LAU[21] boundaries shall be based on site-specific habitat information and after review by the Forest Service Regional Office.

## Vegetation Management Activities and Practices (VEG)

The following objectives, standards, and guidelines apply to vegetation management projects[36] in lynx habitat within lynx analysis units (LAUs) in occupied habitat. With the exception of Objective VEG O3 that specifically concerns wildland fire use, the objectives, standards, and guidelines do not apply to wildfire suppression, wildland fire use, or removal of vegetation for permanent developments such as mineral operations, ski runs, roads, and the like. None of the objectives, standards, or guidelines applies to linkage areas.

### Objective VEG O1:

Manage vegetation[49] to mimic or approximate natural succession and disturbance processes while maintaining habitat components necessary for the conservation of lynx.

### Objective VEG O2:

Provide a mosaic of habitat conditions through time that support dense horizontal cover[19], and high densities of snowshoe hare. Provide winter snowshoe hare habitat[51] in both the stand initiation structural stage and in mature, multi-story conifer vegetation.

Appendix B—Summary of Retained Decisions

### Objective VEG O3:

Conduct fire use[11] activities to restore[40] ecological processes and maintain or improve lynx habitat.

### Objective VEG O4:

Focus vegetation management[49] in areas that have potential to improve winter snowshoe hare habitat[51] but presently have poorly developed understories that lack dense horizontal cover.

### Standard VEG S1:

**Where and to what this applies**: Standard VEG S1 applies to all vegetation management[49] projects[36] that regenerate[38] forests, except for fuel treatment[13] projects[36] within the wildland urban interface[50] (WUI) as defined by HFRA[17], subject to the following limitation:

Fuel treatment projects[36] within the WUI[50] that do not meet Standards VEG S1, VEG S2, VEG S5, and VEG S6 shall occur on no more than 6 percent (cumulatively) of lynx habitat on each administrative unit (a unit is a national forest). In addition, fuel treatment projects may not result in more than three adjacent LAUs exceeding the standard.

For fuel treatment projects[36] within the WUI[50] see guideline VEG G10.

**The Standard**: Unless a broad scale assessment has been completed that substantiates different historic levels of stand initiation structural stages[45] limit disturbance in each LAU as follows:

If more than 30 percent of the lynx habitat in an LAU is currently in a stand initiation structural stage that does not yet provide winter snowshoe hare habitat, no additional habitat may be regenerated by vegetation management projects[36].

### Standard VEG S2:

**Where and to what this applies:** Standard VEG S2 applies to all timber management[47] projects[36] that regenerate[38] forests, except for fuel treatment[13] projects[36] within the wildland urban interface[50] (WUI) as defined by HFRA[17], subject to the following limitation:

Fuel treatment projects[36] within the WUI[50] that do not meet Standards VEG S1, VEG S2, VEG S5, and VEG S6 shall occur on no more than 6 percent (cumulatively) of lynx habitat on each administrative unit (a unit is a national forest).

For fuel treatment projects[36] within the WUI[50] see guideline VEG G10.

**The Standard:** Timber management[47] projects[36] shall not regenerate[38] more than 15 percent of lynx habitat on NFS lands within an LAU in a ten-year period.

### Standard VEG S5:

**Where and to what this applies:** Standard VEG S5 applies to all precommercial thinning[35] projects[36], except for fuel treatment[13] projects[36] that use precommercial thinning as a tool within the wildland urban interface[50] (WUI) as defined by HFRA[17], subject to the following limitation:

Fuel treatment projects[36] within the WUI[50] that do not meet Standards VEG S1, VEG S2, VEG S5, and VEG S6 shall occur on no more than 6 percent (cumulatively) of lynx habitat on each administrative unit (a unit is a national forest).

For fuel treatment projects[36] within the WUI[50] see guideline VEG G10.

**The Standard:** Precommercial thinning projects[36] that reduce snowshoe hare habitat may occur from the stand initiation structural stage[45] until the stands no longer provide winter snowshoe hare habitat only:

1. Within 200 feet of administrative sites, dwellings, or outbuildings; or

2. For research studies[39] or genetic tree tests evaluating genetically improved reforestation stock; or

3. Based on new information that is peer reviewed and accepted by the regional level of the Forest Service, and state level of FWS, where a written determination states:

    a) that a project[36] is not likely to adversely affect lynx; or

    b) that a project[36] is likely to have short term adverse effects on lynx or its habitat, but would result in long-term benefits to lynx and its habitat; or

4. For conifer removal in aspen, or daylight thinning[5] around individual aspen trees, where aspen is in decline; or

5. For daylight thinning of planted rust-resistant white pine where 80 percent of the winter snowshoe hare habitat[51] is retained; or

6. To restore whitebark pine.

*Exceptions 2 through 6 shall only be utilized in LAUs where Standard VEG S1 is met.*

### Standard VEG S6:

**Where and to what this applies:** Standard VEG S6 applies to all vegetation management[49] projects[36] except for fuel treatment[13] projects[36] within the wildland urban interface[50] (WUI) as defined by HFRA[17], subject to the following limitation:

Fuel treatment projects[36] within the WUI[50] that do not meet Standards VEG S1, VEG S2, VEG S5, and VEG S6 shall occur on no more than 6 percent (cumulatively) of lynx habitat on each administrative unit (a unit is a national forest).

For fuel treatment projects[36] within the WUI[50] see guideline VEG G10.

**The Standard:** Vegetation management projects[36] that reduce snowshoe hare habitat in multi-story mature or late successional forests[29] may occur only:

1. Within 200 feet of administrative sites, dwellings, outbuildings, recreation sites, and special use permit improvements, including infrastructure within permitted ski area boundaries; or

2. For research studies[39] or genetic tree tests evaluating genetically improved reforestation stock; or

3. For incidental removal during salvage harvest[42] (e.g., removal due to location of skid trails).

*Exceptions 2 and 3 shall only be utilized in LAUs where Standard VEG S1 is met.*

(NOTE: Timber harvest is allowed in areas that have potential to improve winter snowshoe hare habitat but presently have poorly developed understories that lack dense horizontal cover (i.e., uneven age management systems could be used to create openings where there is little understory so that new forage can grow).

Appendix B—Summary of Retained Decisions

### Guideline VEG G1:

Vegetation management[49] projects[36] should be planned to recruit a high density of conifers, hardwoods, and shrubs where such habitat is scarce or not available. Priority for treatment should be given to stem-exclusion, closed-canopy structural stage[46] stands to enhance habitat conditions for lynx or their prey (e.g., mesic, monotypic lodgepole stands). Winter snowshoe hare habitat[51] should be near denning habitat[6].

### Guideline VEG G4:

Prescribed fire[34] activities should not create permanent travel routes that facilitate snow compaction. Constructing permanent firebreaks on ridges or saddles should be avoided.

### Guideline VEG G5:

Habitat for alternate prey species, primarily red squirrel[37], should be provided in each LAU.

### Guideline VEG G10:

Fuel treatment projects[36] within the WUI[50] as defined by HFRA[17] should be designed considering Standards VEG S1, S2, S5, and S6 to promote lynx conservation.

### Guideline VEG G11:

Denning habitat[6] should be distributed in each LAU in the form of pockets of large amounts of large woody debris, either down logs or root wads, or large piles of small wind thrown trees ("jack-strawed" piles). If denning habitat appears to be lacking in the LAU, then projects[36] should be designed to retain some coarse woody debris[4], piles, or residual trees to provide denning habitat[6] in the future.

## Livestock Management (GRAZ)

The following objectives and guidelines apply to grazing projects in lynx habitat in lynx analysis units (LAUs) in occupied habitat. They do not apply to linkage areas.

### Objective GRAZ O1:

Manage livestock grazing to be compatible with improving or maintaining[26] lynx habitat[23].

### Guideline GRAZ G1:

In fire- and harvest-created openings, livestock grazing should be managed so impacts do not prevent shrubs and trees from regenerating.

### Guideline GRAZ G2:

In aspen stands, livestock grazing should be managed to contribute to the long-term health and sustainability of aspen.

### Guideline GRAZ G3:

In riparian areas[41] and willow carrs[3], livestock grazing should be managed to contribute to maintaining or achieving a preponderance of mid- or late-seral stages[28], similar to conditions that would have occurred under historic disturbance regimes.

7-ER-1482

FS-000166

Appendix B—Retained Existing Decisions

### Guideline GRAZ G4:

In shrub-steppe habitats[43], livestock grazing should be managed in the elevation ranges of forested lynx habitat in LAUs[21], to contribute to maintaining or achieving a preponderance of mid- or late-seral stages, similar to conditions that would have occurred under historic disturbance regimes.

## Human Use Projects (HU)

The following objectives and guidelines apply to human use projects, such as special uses (other than grazing), recreation management, roads, highways, and mineral and energy development, in lynx habitat in lynx analysis units (LAUs) in occupied habitat, subject to valid existing rights. They do not apply to vegetation management projects or grazing projects directly. They do not apply to linkage areas.

### Objective HU O1:

Maintain[26] the lynx's natural competitive advantage over other predators in deep snow, by discouraging the expansion of snow-compacting activities in lynx habitat[23].

### Objective HU O2:

Manage recreational activities to maintain lynx habitat and connectivity[16].

### Objective HU O3:

Concentrate activities in existing developed areas, rather than developing new areas in lynx habitat.

### Objective HU O4:

Provide for lynx habitat needs and connectivity when developing new or expanding existing developed recreation[9] sites or ski areas.

### Objective HU O5:

Manage human activities, such as special uses, mineral and oil and gas exploration and development, and placement of utility transmission corridors, to reduce impacts on lynx and lynx habitat.

### Objective HU O6:

Reduce adverse highway[18] effects on lynx by working cooperatively with other agencies to provide for lynx movement and habitat connectivity[16], and to reduce the potential of lynx mortality.

### Guideline HU G1:

When developing or expanding ski areas, provisions should be made for adequately sized inter-trail islands that include coarse woody debris[4], so winter snowshoe hare habitat[51] is maintained.

### Guideline HU G2:

When developing or expanding ski areas, lynx foraging habitat should be provided consistent with the ski area's operational needs, especially where lynx habitat occurs as narrow bands of coniferous forest across mountain slopes.

### Guideline HU G3:

Recreation developments and operations should be planned in ways that both provide for lynx movement and maintain the effectiveness of lynx habitat[23].

### Guideline HU G4:

For mineral and energy development sites and facilities, remote monitoring should be encouraged to reduce snow compaction.

### Guideline HU G5:

For mineral and energy development sites and facilities that are closed, a reclamation plan that restores[40] lynx habitat should be developed.

### Guideline HU G6:

Methods to avoid or reduce effects on lynx should be used in lynx habitat[23] when upgrading unpaved roads to maintenance levels 4 or 5, if the result would be increased traffic speeds and volumes, or a foreseeable contribution to increases in human activity or development.

### Guideline HU G7:

New permanent roads should not be built on ridge-tops and saddles, or in areas identified as important for lynx habitat connectivity[16]. New permanent roads and trails should be situated away from forested stringers.

### Guideline HU G8:

Cutting brush along low-speed[25], low-traffic-volume roads should be done to the minimum level necessary to provide for public safety.

### Guideline HU G9:

On new roads built for projects[36], public motorized use should be restricted. Effective closures should be provided in road designs. When the project[36] is over, these roads should be reclaimed or decommissioned, if not needed for other management objectives.

### Guideline HU G10:

When developing or expanding ski areas and trails, consider locating access roads and lift termini to maintain and provide lynx security habitat[10], if it has been identified as a need.

### Guideline HU G11:

Designated over-the-snow routes or designated play areas should not expand outside baseline areas of consistent snow compaction[1], unless designation serves to consolidate use and improve lynx habitat. This may be calculated on an LAU basis, or on a combination of immediately adjacent LAUs.

This does not apply inside permitted ski area boundaries, to winter logging, to rerouting trails for public safety, to accessing private inholdings, or to access regulated by guideline HU G12.

Use the same analysis boundaries for all actions subject to this guideline.

### Guideline HU G12:

Winter access for non-recreation special uses and mineral and energy exploration and development, should be limited to designated routes8 or designated over-the-snow routes[7].

## Linkage Areas (LINK)

The following objective, standard, and guidelines apply to all projects within linkage areas in occupied habitat, subject to valid existing rights.

Appendix B—Retained Existing Decisions

### Objective LINK O1:

In areas of intermingled land ownership, work with landowners to pursue conservation easements, habitat conservation plans, land exchanges, or other solutions to reduce the potential of adverse impacts on lynx and lynx habitat.

### Standard LINK S1:

When highway[18] or forest highway[12] construction or reconstruction is proposed in linkage areas[22], identify potential highway crossings.

### Guideline LINK G1:

NFS lands should be retained in public ownership.

### Guideline LINK G2:

Livestock grazing in shrub-steppe habitats[43] should be managed to contribute to maintaining or achieving a preponderance of mid- or late-seral stages[28], similar to conditions that would have occurred under historic disturbance regimes.

## Required Monitoring

Map the location and intensity of snow compacting activities and designated and groomed routes that occurred inside LAUs during the period of 1998 to 2000. The mapping is to be completed within one year of this decision, and changes in activities and routes are to be monitored every five years after the decision.

When project decisions are signed report the following:

1. Fuel treatments:
   a) Acres of fuel treatment in lynx habitat by forest and LAU, and whether the treatment is within or outside the WUI as defined by HFRA.
   b) Whether or not the fuel treatment met the vegetation standards or guidelines. If standard(s) are not met, report which standard(s) are not met why they were not met, and how many acres were affected.
   c) *Whether or not 2 adjacent LAUs exceed standard VEG S1 (30% in a stand initiation structural stage that is too short to provide winter snowshoe hare habitat), and what event(s) or action(s) caused the standard to be exceeded.*

2. *Application of exception in Standard VEG S5*
   a) *For areas where any of the exemptions 1 through 6 listed in Standard VEG S5 were applied: Report the type of activity, the number of acres, and the location (by unit, and LAU) and whether or not Standard VEG S1 was within the allowance.*

IV. *Application of exceptions in Standard VEG S6*
   a) *For areas where any of the exemptions 1 through 3 listed in Standard VEG S6 were applied: Report the type of activity, the number of acres, and the location (by unit, and LAU) and whether or not Standard VEG S1 was within the allowance.*

V. *Application of guidelines*
   a) *Document the rationale for deviations to guidelines. Summarize what guideline(s) was not followed and why.*

Directions in italics were terms and conditions that were incorporated from the FWS Biological Opinion (USDI FWS 2007).

Appendix B—Summary of Retained Decisions

## Lynx Glossary

[1] **Area of Consistent Snow Compaction** – An area of consistent snow compaction is an area of land or water that during winter is generally covered with snow and gets enough human use that individual tracks are indistinguishable. In such places, compacted snow is evident most of the time, except immediately after (within 48 hours) snowfall. These can be areas or linear routes, and are generally found in or near snowmobile or cross-country ski routes, in adjacent openings, parks and meadows, near ski huts or plowed roads, or in winter parking areas. Areas of consistent snow compaction will be determined based on the acreage or miles used during the period 1998 to 2000.

[2] **Broad Scale Assessment** – A broad scale assessment is a synthesis of current scientific knowledge, including a description of uncertainties and assumptions, to provide an understanding of past and present conditions and future trends, and a characterization of the ecological, social, and economic components of an area. (LCAS)

[3] **Carr** – Deciduous woodland or shrub land occurring on permanently wet, organic soil. (LCAS)

[4] **Course Woody Debris** – Any piece(s) of dead woody material (e.g., dead boles, limbs, and large root masses on the ground or in streams). (LCAS)

[5] **Daylight Thinning** – Daylight thinning is a form of precommercial thinning that removes the trees and brush inside a given radius around a tree.

[6] **Denning Habitat (lynx)** – Denning habitat is the environment lynx use when giving birth and rearing kittens until they are mobile. The most common component is large amounts of coarse woody debris to provide escape and thermal cover for kittens. Denning habitat must be within daily travel distance of winter snowshoe hare habitat – the typical maximum daily distance for females is about three to six miles. Denning habitat includes mature and old growth forests with plenty of coarse woody debris. It can also include young regenerating forests with piles of coarse woody debris, or areas where down trees are jack-strawed.

[7] **Designated Over-the-Snow Routes** – Designated over-the-snow routes are routes managed under permit or agreement or by the agency, where use is encouraged, either by on-the-ground marking or by publication in brochures, recreation opportunity guides or maps (other than travel maps), or in electronic media produced or approved by the agency. The routes identified in outfitter and guide permits are designated by definition; groomed routes also are designated by definition. The determination of baseline snow compaction will be based on the miles of designated over-the-snow routes authorized, promoted or encouraged during the period 1998 to 2000.

[8] **Designated Route** – A designated route is a road or trail that has been identified as open for specified travel use.

[9] **Developed Recreation** – Developed recreation requires facilities that result in concentrated use. For example, skiing requires lifts, parking lots, buildings, and roads; campgrounds require roads, picnic tables, and toilet facilities.

[10] **Security Habitat (lynx)** – Security habitat amounts to places in lynx habitat that provide secure winter bedding sites for lynx in highly disturbed landscapes like ski areas. Security habitat gives lynx the ability to retreat from human disturbance. Forest structures that make human access difficult generally discourage human activity in security habitats. Security habitats are most effective if big enough to provide visual and acoustic insulation and to let lynx easily move away from any intrusion. They must be close to winter snowshoe hare habitat. (LCAS)

7-ER-1486

Appendix B—Retained Existing Decisions

[11] **Fire Use** – Fire use is the combination of wildland fire use and using prescribed fire to meet resource objectives. (NIFC) Wildland fire use is the management of naturally ignited wildland fires to accomplish resource management objectives in areas that have a fire management plan. The use of the term wildland fire use replaces the term prescribed natural fire. (Wildland and Prescribed Fire Management Policy, August 1998)

[12] **Forest Highway** – A forest highway is a forest road under the jurisdiction of, and maintained by, a public authority and open to public travel (USC: Title 23, Section 101(a)), designated by an agreement with the FS, state transportation agency, and Federal Highway Administration.

[13] **Fuel Treatment** – A fuel treatment is a type of vegetation management action that reduces the threat of ignition, fire intensity, or rate of spread, or is used to restore fire-adapted ecosystems.

[14] **Goal** – A goal is a broad description of what an agency is trying to achieve, found in a land management plan. (LCAS)

[15] **Guideline** – A guideline is a particular management action that should be used to meet an objective found in a land management plan. The rationale for deviations may be documented, but amending the plan is not required. (LCAS modified)

[16] **Habitat Connectivity (lynx)** – Habitat connectivity consists of an adequate amount of vegetation cover arranged in a way that allows lynx to move around. Narrow forested mountain ridges or shrub-steppe plateaus may serve as a link between more extensive areas of lynx habitat; wooded riparian areas may provide travel cover across open valley floors. (LCAS)

[17] **HFRA (Healthy Forests Restoration Act)** – Public Law 108-148, passed in December 2003. The HFRA provides statutory processes for hazardous fuel reduction projects on certain types of at-risk National Forest System and Bureau of Land Management lands. It also provides other authorities and direction to help reduce hazardous fuel and restore healthy forest and rangeland conditions on lands of all ownerships. (Modified from Forest Service HFRA web site)

[18] **Highway** – The word highway includes all roads that are part of the National Highway System. (23 CFR 470.107(b))

[19] **Horizontal Cover** – Horizontal cover is the visual obscurity or cover provided by habitat structures that extend to the ground or snow surface primarily provided by tree stems and tree boughs, but also includes herbaceous vegetation, snow, and landscape topography.

[20] **Isolated Mountain Range** – Isolated mountain ranges are small mountains cut off from other mountains and surrounded by flatlands. On the east side of the Rockies, they are used for analysis instead of sub-basins. Examples are the Little Belts in Montana and the Bighorns in Wyoming.

[21] **LAU (Lynx Analysis Unit)** – An LAU is an area of at least the size used by an individual lynx, from about 25 to 50 square miles (LCAS). An LAU is a unit for which the effects of a project would be analyzed; its boundaries should remain constant.

[22] **Linkage area** – A linkage area provides connectivity between blocks of lynx habitat. Linkage areas occur both within and between geographic areas, where basins, valleys, or agricultural lands separate blocks of lynx habitat, or where lynx habitat naturally narrows between blocks. (LCAS updated definition approved by the Steering Committee 10/23/01)

[23] **Lynx Habitat** – Lynx habitat occurs in mesic coniferous forest that experience cold, snowy winters and provide a prey base of snowshoe hare. In the northern Rockies, lynx habitat generally occurs between

Appendix B—Summary of Retained Decisions

3,500 and 8,000 feet of elevation, and primarily consists of lodgepole pine, subalpine fir, and Engelmann spruce. It may consist of cedar-hemlock in extreme northern Idaho, northeastern Washington and northwestern Montana, or of Douglas-fir on moist sites at higher elevations in central Idaho. It may also consist of cool, moist Douglas-fir, grand fir, western larch and aspen when interspersed in subalpine forests. Dry forests do not provide lynx habitat. (LCAS)

[24] **Lynx Habitat in an Unsuitable Condition** – Lynx habitat in an unsuitable condition consists of lynx habitat in the stand initiation structural stage where the trees are generally less than ten to 30 years old and have not grown tall enough to protrude above the snow during winter. Stand replacing fire or certain vegetation management projects can create unsuitable conditions. Vegetation management projects that can result in unsuitable habitat include clearcuts and seed tree harvest, and sometimes shelterwood cuts and commercial thinning depending on the resulting stand composition and structure. (LCAS)

[25] **Low-speed, Low-traffic-volume Road** – Low speed is less than 20 miles per hour; low volume is a seasonal average daily traffic load of less than 100 vehicles per day.

[26] **Maintain** – In the context of this decision, maintain means to provide enough lynx habitat to conserve lynx. It does not mean to keep the status quo.

[27] **Maintenance Level** – Maintenance levels define the level of service provided by and maintenance required for a road. (FSH 7709.58, Sec 12.3) Maintenance level 4 is assigned to roads that provide a moderate degree of user comfort and convenience at moderate travel speeds. Most level 4 roads have double lanes and an aggregate surface. Some may be single lane; some may be paved or have dust abated. Maintenance level 5 is assigned to roads that provide a high degree of user comfort and convenience. Normally, level 5 roads are have double lanes and are paved, but some may be aggregate surfaced with the dust abated.

[28] **Mid-seral or later** – Mid-seral is the successional stage in a plant community that is the midpoint as it moves from bare ground to climax. For riparian areas, it means willows or other shrubs have become established. For shrub-steppe areas, it means shrubs associated with climax are present and increasing in density.

[29] **Multi-story Mature or Late Successional Forest** – This stage is similar to the old multistory structural stage (see below). However, trees are generally not as old, and decaying trees may be somewhat less abundant.

[30] **Objective** – An objective is a statement in a land management plan describing desired resource conditions and intended to promote achieving programmatic goals. (LCAS)

[31] **Old Multistory Structural Stage** – Many age classes and vegetation layers mark the old forest, multistoried stage. It usually contains large old trees. Decaying fallen trees may be present that leave a discontinuous overstory canopy. On cold or moist sites without frequent fires or other disturbance, multi-layer stands with large trees in the uppermost layer develop. (Oliver and Larson, 1996)

[32] **Old Growth** – Old growth forests generally contain trees that are large for their species and the site, and are sometimes decadent with broken tops. Old growth often contains a variety of tree sizes, large snags, and logs, and a developed and often patchy understory.

[33] **Permanent Development** – A permanent development is any development that results in a loss of lynx habitat for at least 15 years. Ski trails, parking lots, new permanent roads, structures, campgrounds, and many special use developments would be considered permanent developments.

Appendix B—Retained Existing Decisions

[34] **Prescribed Fire** – A prescribed fire is any fire ignited as a management action to meet specific objectives. A written, approved prescribed fire plan must exist, and NEPA requirements met, before ignition. The term prescribed fire replaces the term management ignited prescribed fire. (NWCG)

[35] **Precommercial Thinning** – Precommercial thinning is mechanically removing trees to reduce stocking, concentrate growth on the remaining trees, and not resulting in immediate financial return. (Dictionary of Forestry)

[36] **Project** – All, or any part or number of the various activities analyzed in an Environmental Impact Statement, Environmental Analysis, or Decision Memo. For example, the vegetation management in some units or stands analyzed in an EIS could be for fuel reduction, and therefore those units or stands would fall within the term fuel treatment project even if the remainder of the activities in the EIS are being conducted for other purposes, and the remainder of those units or stands have other activities prescribed in them. All units in an analysis do not necessarily need to be for fuel reduction purposes for certain units to be considered a fuel reduction project.

[37] **Red Squirrel Habitat** – Red squirrel habitat consists of coniferous forests of seed and cone-producing age that usually contain snags and downed woody debris, generally associated with mature or older forests.

[38] **Regeneration Harvest** – The cutting of trees and creating an entire new age class; an even-age harvest. The major methods are clearcutting, seed tree, shelterwood, and group selective cuts. (Helms 1998)

[39] **Research** – Research consists of studies conducted to increase scientific knowledge or technology. For the purposes of standards VEG S5 and VEG S6, research applies to studies financed from the forest research budget (FSM 4040) and administrative studies financed from the NF budget.

[40] **Restore Restoration** – To restore is to return or re-establish ecosystems or habitats to their original structure and species composition. (Dictionary of Forestry)

[41] **Riparian Area** – An area with distinctive soil and vegetation between a stream or other body of water and the adjacent upland; includes wetlands and those portions of floodplains and valley bottoms that support riparian vegetation. (LCAS)

[42] **Salvage Harvest** – Salvage harvest is a commercial timber sale of dead, damaged, or dying trees. It recovers economic value that would otherwise be lost. Collecting firewood for personal use is not considered salvage harvest.

[43] **Shrub Steppe Habitat** – Shrub steppe habitat consists of dry sites with shrubs and grasslands intermingled.

[44] **Standard** – A standard is a required action in a land management plan specifying how to achieve an objective or under what circumstances to refrain from taking action. A plan must be amended to deviate from a standard.

[45] **Stand Initiation Structural Stage** – The stand initiation stage generally develops after a stand-replacing disturbance by fire or regeneration timber harvest. A new single-story layer of shrubs, tree seedlings, and saplings establish and develop, reoccupying the site. Trees that need full sun are likely to dominate these even-aged stands. (Oliver and Larson, 1996)

[46] **Stem Exclusion Structural Stage (Closed canopy structural stage)** – In the stem exclusion stage, trees initially grow fast and quickly occupy all of the growing space, creating a closed canopy. Because the trees are tall, little light reaches the forest floor so understory plants (including smaller trees) are

7-ER-1489

Appendix B—Summary of Retained Decisions

shaded and grow more slowly. Species that need full sunlight usually die; shrubs and herbs may become dormant. New trees are precluded by a lack of sunlight or moisture. (Oliver and Larson, 1996)

[47] **Timber Management** – Timber management consists of growing, tending, commercially harvesting, and regenerating crops of trees.

[48] **Understory Re-initiation Structural Stage** – In the understory re-initiation stage, a new age class of trees gets established after overstory trees begin to die, are removed, or no longer fully occupy their growing space after tall trees abrade each other in the wind. Understory seedlings then re-grow and the trees begin to stratify into vertical layers. A low to moderately dense uneven-aged overstory develops, with some small shade-tolerant trees in the understory. (Oliver and Larson, 1996)

[49] **Vegetation Management** – Vegetation management changes the composition and structure of vegetation to meet specific objectives, using such means as prescribed fire or timber harvest. For the purposes of this decision, the term does not include removing vegetation for permanent developments like mineral operations, ski runs, roads and the like, and does not apply to fire suppression or to wildland fire use.

[50] **Wildland Urban Interface (WUI)** – Use the definition of WUI found in the Healthy Forests Restoration Act. The full text can be found at HFRA § 101. Basically, the wildland urban interface is the area adjacent to an at-risk community that is identified in the community wildfire protection plan. If there is no community wildfire protection plan in place, the WUI is the area 0.5 mile from the boundary of an at-risk community; or within 1.5 miles of the boundary of an at-risk community if the terrain is steep, or there is a nearby road or ridgetop that could be incorporated into a fuel break, or the land is in condition class 3, or the area contains an emergency exit route needed for safe evacuations. (Condensed from HFRA, for full text see HFRA § 101.)

[51] **Winter Snowshoe Hare Habitat** – Winter snowshoe hare habitat consists of places where young trees or shrubs grow densely – thousands of woody stems per acre – and tall enough to protrude above the snow during winter, so snowshoe hare can browse on the bark and small twigs (LCAS). Winter snowshoe hare habitat develops primarily in the stand initiation, understory reinitiation and old forest multistoried structural stages.

# Appendix C—Summary of the Analysis of the Management Situation

In the spring of 2002, the Forest Service announced the revision of the Kootenai and Idaho Panhandle National Forests land management plans. The Analysis of the Management Situation (AMS) and AMS Technical Report were released to the public in March 2003. The AMS and AMS Technical Report described the historic and current conditions for the Kootenai and Idaho Panhandle Planning Zone (KIPZ) and established the need for revising management direction for seven revision topics. These seven revision topics were identified through monitoring and evaluation, current science and assessments and through daily contacts with people who work in and recreate on the national forest. The revision topics include: Vegetation, Fire Risk, Timber Production, Wildlife, Watersheds and Aquatic Species, Inventoried Roadless Areas, Recommended Wilderness Areas, and Access and Recreation. The revision topics are broad categorizations of the issues that have been identified where resource conditions, technical knowledge, or public perception of resource management has created a potential "need for change."

In 2006, the KIPZ released for public review and comment, a draft Comprehensive Evaluation Report (CER) along with the proposed Plans for both Forests. The CER was developed as a requirement under the 2005 (and 2008) Planning Rule and was intended to be a part of the Plan Set of Documents for each Forest Plan. The 2006 draft CER included the analysis and evaluation of conditions and trends for both Forests under the existing Plans, and supplemented the AMS in documenting the need for changing the 1987 Forest Plans. The CER described the conditions and trends from proposed changes to both Forests Plans and described the probability of meeting the desired conditions in the 2006 Proposed Plans. The CER incorporated by reference the AMS and AMS Technical Report. It presented each revision topic and documented additional or updated information to the AMS and Technical Report.

Additional topics, not identified as primary revision topics, were identified to be addressed in the Forest Plan but did not meet the criteria for the main revision topics. In general, these additional topics represent inadequate or outdated Forest Plan direction; however, addressing these topics would not necessarily require a significant amendment to the Forest Plan. The additional topics include: Minerals, Designated Wilderness Management and Wilderness Study Areas, Facilities, Research Natural Areas (RNAs), Cultural Resources, Scenery Management, Lands, Special Areas (SAs), Wild and Scenic Rivers, and Range.

Following is a brief summary of the demand and supply conditions for production potentials, use, and opportunities for resources that are applicable to the revision topics. This analysis provides the sideboards or decision space used in developing alternatives for the Environmental Impact Statement (EIS).

## Vegetation Treatment and Wildlife Habitat

Moving vegetation towards desired future conditions contributes to sustainable and resilient vegetation and habitat. Vegetation conditions are dynamic and change over time based on succession and disturbance. Management actions can aide in moving vegetation towards desired condition. Vegetation treatments such as timber harvest and prescribed burning provide opportunities to change the trajectory for vegetation and move it closer to desired conditions.

Modeling vegetation treatments tracks changes in vegetation over time and analyzes movement towards desired future conditions. The model runs with an objective to move vegetation towards desired condition. Acres that are not within desired conditions generate penalty points. The goal of each run is to minimize these penalty points (i.e., minimize land outside of desired conditions). Two benchmarks were run to analyze the effects of maximum or minimum management on vegetation condition. A benchmark where no management was allowed had the maximum penalty points for not achieving desired condition at more than 73,500,000 points. The benchmark where all lands suitable for timber production were

managed resulted in 15,000,000 points or about an 80 percent reduction in penalties. These benchmarks did not include constraints for wildlife, watershed, operational limitations, or budget. Under this Forest Plan, the penalties for not achieving desired condition are at 28,400,000 points. Movement towards desired condition under the Forest Plan is an improvement over no management, but not as great as if all suitable lands were managed.

# Recreation

A wide variety of recreation opportunities are offered on the Kootenai National Forest (KNF), with an emphasis on dispersed recreation. There are 93,700 acres of designated Wilderness and an additional 639,100 acres of Inventoried Roadless Areas. There are 1,400 miles of trails, most of which are available to hikers, horseback riders, and mountain bikers. Almost 11 percent of the trails are also available for motorized use. Nearly 45 percent of approximately 7,900 miles of roads are open to motorized public use. There are 21 developed and 14 dispersed campgrounds. A ski area and several areas for backcountry cross-country skiing are also located on the KNF.

The majority of recreation on the KNF is dispersed, meaning it does not rely on or concentrate around constructed facilities. Based on National Visitor Use Monitoring, recreation use in 2007 was estimated at 919,300 visits. The majority of this (more than 80 percent) was dispersed use. Demand for both dispersed and developed recreation is expected to continue growing at 13 percent per decade, based on projected population growth over the next 10 years in the western U.S. (2000 U.S. Census data, Population Projections table 6). The KNF has the capacity to support demand for developed and dispersed activities for at least the next 50 years.

Demand for wilderness recreation experiences, based on visitation only, is currently about 12,000 visits (USDA, 2009). Demand for wilderness recreation is also expected to continue growing at 13 percent per decade. Demand for wilderness based on ecological and societal need is more difficult to quantify as it applies to a single forest, but is addressed by the Region 1 Wilderness Needs Assessment (USDA, 2003). This Forest Plan identifies 112,800 acres of Recommended Wilderness.

# Timber Production

The timber demand was derived using a capacity and capability analysis for the Forest. This analysis was conducted by the University of Montana's Bureau of Business and Economic Research, resulting in a report prepared for the KNF (Keegan et al., 2005). Virtually all of the KNF non-reserved timberland is located in two Montana counties: Lincoln and Sanders. More than 35 percent of the recent (1998) timber harvest in this two-county area originated from the KNF.

The KNF identified a five-county area as the "Kootenai National Forest Impact Zone." The counties comprising the Kootenai National Forest Impact Zone are Bonner and Boundary counties in Idaho; and Flathead, Lincoln, and Sanders counties in Montana. As of September 1, 2005, capacity to process timber in the Kootenai National Forest Impact Zone is 191,020 thousand cubic feet (MCF), with slightly less than 78 percent of capacity being used. Mills in the Kootenai National Forest Impact Zone are currently using about 148,899 MCF of timber annually. Slightly less than 87 percent (129,209 MCF) of the volume processed in the Impact Zone is composed of trees with diameter at breast height (DBH) greater than or equal to 10 inches. Nearly 13 percent (18,977 MCF) of the volume processed comes from trees 7.0–9.9 inches DBH, while less than 1 percent (714 MCF) of processed volume comes from trees less than 7 inches DBH.

The capacity and capability analysis indicates there is not much of a market for the small diameter trees (less than 7 inches DBH). There is strong demand for larger trees (greater than 10 inches DBH).

Appendix C—Summary of the Analysis of the Management Situation

From 1988 to 2009, the KNF sold an average of 83.1 MMBF (16,600 MCF) annually. The amount of timber sold has declined from the mid-1990s, from a high of 203 MMBF in 1992 to a low of 24 MMBF in 2003, with an average of 44.4 MMBF/year (8,900 MCF/year) over the past 5 years.

Under this Forest Plan, approximately 791,400 acres are suitable for timber production. The allowable sale quantity (ASQ) from the lands suitable for timber production is 70.2 MMBF (13.2 MMCF) for the first decade with a long-term sustained yield capacity of 16.7 MMCF. The predicted timber volume sold from suitable lands under this Forest Plan, given current budget levels, is 47.5 MMBF (8.7 MMCF) for the first decade.

7-ER-1493

FS-000178

# Appendix D—KNF Designated Utility Rights-of-Way Corridors, Communication Sites, and Areas Withdrawn from Mineral Entry

**Table 27. Designated Utility Rights-of-Way Corridors in the KNF**

| Corridor Name | Authorized User |
|---|---|
| Cabinet – Noxon | Avista |
| Cabinet – Rathdrum | Avista |
| Noxon – Hot Springs | Avista |
| Noxon – Pine Creek | Avista |
| Bonners Ferry – Troy No. 1 | BPA [1] |
| Troy – Libby | BPA |
| Columbia Falls – Trego No. 1 | BPA |
| Lancaster – Noxon No. 1 | BPA |
| Libby – Conkelly No. 1 | BPA |
| Libby – Libby (Pacific Power and Light) No. 1 | BPA |
| Libby PH – Libby No. 1 | BPA |
| Libby PH – Libby No.2 | BPA |
| Noxon – Hot Springs No. 1 | BPA |
| Noxon – Libby No. 1 | BPA |
| Montanore | [2] |
| Rock Creek | [2] |

Note: Includes corridors that only partially cross NFS lands
[1] Bonneville Power Administration
[2] Dependent on final authorization

**Table 28. Designated Communication Sites on the KNF**

| Communication Site Name | Location (District) | Status | Designated For | Restrictions |
|---|---|---|---|---|
| Berray Mountain | Cabinet | New | Pending NEPA | |
| Black Butte | Rexford | Existing | Non-broadcast | |
| Blue Mountain | Libby | Existing | Non-broadcast | |
| Calx Mountain | Libby | Existing | Non-broadcast | |
| Eighty Peak | Cabinet | Existing | Non-broadcast | Gov't Use Only |
| Flower Point | Libby | Existing | Non-broadcast | |
| Garver Mountain | Three Rivers | New | Pending NEPA | |
| Government Mountain | Cabinet | Existing | Non-broadcast | Gov't Use Only |
| Green Mountain | Cabinet | Existing | Broadcast, Non-broadcast | |
| Horse Mountain | Libby | New | Pending NEPA | |
| Indianhead Mountain | Libby | Existing | Broadcast | |

7-ER-1495

FS-000179

Appendix D—Designated Sites withdrawn from Mineral Entry

| Communication Site Name | Location (District) | Status | Designated For | Restrictions |
|---|---|---|---|---|
| King Mountain | Three Rivers | Existing | Broadcast, Non-broadcast | |
| Lost Horse Mountain | Rexford | New | Pending NEPA | |
| Meadow Peak | Libby | Existing | Non-broadcast | |
| Minton Peak | Cabinet | New | Pending NEPA | |
| Mt. Baldy | Three Rivers | Existing | Non-broadcast | |
| Mt. Henry | Three Rivers | Existing | Non-broadcast | Gov't Use Only |
| Mt. Marston | Fortine | New | Non-broadcast | |
| Pinkham Mountain | Rexford | Existing | Non-broadcast | |
| Preacher Mountain | Three Rivers | Existing | Non-broadcast | |
| Sheldon Mountain | Libby | Existing | Broadcast, Non-broadcast | |
| Smith Mountain | Three Rivers | New | Pending NEPA | |
| Stahl Peak | Fortine | New | Pending NEPA | |
| Swede Mountain | Libby | Existing | Broadcast | |
| Tony Peak | Libby | Existing | Non-broadcast | |
| Turner Mountain | Libby | New | Pending NEPA | |
| Webb Mountain | Rexford | Existing | Non-broadcast | Gov't Use Only |
| Ziegler Mountain | Rexford | New | Pending NEPA | |

Kootenai National Forest

7-ER-1496

FS-000180

Appendix D—Designated Sites withdrawn from Mineral Entry



**Figure 18. Designated Utility Rights-of-Way Corridors and Communication Sites on the KNF**

Appendix D—Designated Sites withdrawn from Mineral Entry

# Minerals

**Table 29. Lands Withdrawn from Mineral Entry on the KNF**

| Name | Township (T), Range (R), Section (Sec.) | Acres |
|---|---|---|
| Ant Flat Admin. Site | T34N R25W Sec 7 | 80 |
| Bad Medicine Rec. Area | T28N R33W Sec 4 | 37.46 |
| Baldy Mountain Lookout | T35N R33W Sec 6 | 10 |
| Big Bend Admin. Site | T30N R29W Sec 8 | 160 |
| Big Creek Rec. Area | T34N R29W Sec 2 | 10 |
| Big Eddy Rec. Area. | T27N R34W Sec 25 | 16.25 |
| Big Swede Lookout | T30N R30W Sec 17 | 10 |
| Big Creek Baldy Lookout | T33N R31W Sec 12 | 10 |
| Black Butte Lookout | T36N R27W Sec 20 | 10 |
| Blue Mountain Lookout | T32N R30W Sec 32 | 20 |
| Bull River Bay Rec. Area | T26N R33W Sec 10 | 32.5 |
| Bull River Ranger Station | T27N R32W Sec 7 | 79.28 |
| Bunch Grass Flat Ranger Station | T35N R25W Sec 6 | 151.76 |
| Cabinet Mountain Wilderness | T25N R31W Sec 1,2,3; T26N R30W Sec 19,30; T26N R31W Sec 2-18,21-28,33-36; T26N R32W Sec 1,12; T27N R31W Sec 5-8,16-21,28-34; T27N R32W Sec 1-3,10-16,21-27,35-36; T28N R31W Sec 6-7,18-19,30-32; T28N R32W Sec 1-29,35-36; T28N R33W Sec 1; T29N R32W Sec 3-11,14-24,26-35; T29N R33W Sec 1,11-15,22-27,34-36; T30N R32W Sec 5-8,16-22,25-36; T30N R33W Sec 1-2,10-15,23-26,36; T31N R32W Sec 29-32; T31N R33W Sec 25-26,35-36 | 94,596.76 |
| Cabinet Ranger Station | T31N R34W Sec 2 | 159.31 |
| Callahan Creek Ranger Station | T31N R34W Sec 23 | 160 |
| Calx Mountain Lookout | T28N R28W Sec 10 | 10 |
| Camp 32 Recreation Area | T36N R28W Sec 35 | 25 |
| Caribou Creek Rec Area | T37N R30W Sec 21-22,28 | 12.5 |
| Dorr Skeels | T29N R33W Sec 20 | 45.9 |
| East Dickey Lake | T34N R25W Sec 14 | 7.62 |
| Enco Development Corp. | T33N R34W Sec 26,27 | 240 |
| Eureka Hydroelectric Co. | T35N R25W Sec 5,6 | 191 |
| Fairview Ranger Station | T30N R27W Sec 22 | 160 |
| Frank Lake Rec. Area | T35N R26W Sec 17 | 35.31 |
| Garver Mountain Lookout | T37N R32W Sec 32 | 10 |
| Glacier Silver Led Mn Co. | T29N R31W Sec 6,7,12 | 237.92 |
| Grasshopper Ranger Station | T26N R33W Sec 3 | 107.8 |
| Horse Hill Lookout | T28N R30W Sec 30,33 | 20 |

7-ER-1498

Appendix D—Designated Sites withdrawn from Mineral Entry

| Name | Township (T), Range (R), Section (Sec.) | Acres |
|---|---|---|
| Horse Thief Ranger Station | T27N R33W Sec 4 | 10 |
| Howard Lake Rec. Area | T27N R31W Sec 13 | 50 |
| International Boundary | T37N R24W Sec 4; T37N R25W Sec 1,3,4; T37N R26W Sec 1-6; T37N R28W Sec 2-6; T37N R29W Sec 1-5; T37N R30W Sec 3,5; T37N R31W Sec 3-6; T37N R32W Sec 1-6; T37N R33W Sec 1-6; T37N R34W Sec 1; T37N R25W Sec 2,5,6; T37N R26W Sec 3; T37N R29W Sec 6; T37N R30W Sec 1,2,4,6; T37N R31W Sec 1; T37N R31W Sec 2; T37N R24W Sec 6 | 342.86 |
| Jack Pine Flats Rec. Area | T22N R32W Sec 12 | 65 |
| Kenelty Mountain Lookout | T27N R29W Sec 22 | 10 |
| Kilbrennan Adm. Site | T33N R33W Sec 29 | 22.5 |
| Kootenai Power Const. | T31N R32W Sec 18 | 184 |
| Kootenai Power Const. | T31N R33W Sec 13 | 216.3 |
| Lake Creek Campground | T26N R30W Sec 5,8 | 40 |
| Lastchance Admin. Site | T32N R34W Sec 5,8 | 194.02 |
| Libby Dam Project | T29N R27W Sec 17; T29N R29W Sec 4,22; T30N R26W Sec 3,4; T30N R27W Sec 22; T30N R29W Sec 4,8,18,34; T31N R26W Sec 5,8,16,20,27,28; T31N R29W Sec 1-4,8,10-12,15,16,22,27,28,32,34; T32N R26W Sec 5-8,17-20,29-32; T32N R28W Sec 5-8,18-19; T32N R29W Sec 1,10-15,22-28,34,35; T33N R25W Sec 1,6; T33N R26W Sec 1,12-14,21,22,27,28,33,34; T33N R28W Sec 7,17-21,27-30,32-34; T33N R29W Sec 2,3,10-13,24; T33N R29W Sec 11; T34N R25W Sec 20-22,25-29,31,32,35; T34N R29W Sec 1-4,10-12,14,15,22,23,26,27,34,35; T35N R28W Sec 4-7,30,31; T35N R29W Sec 1,11-14,23-26,33-36; T36N R28W Sec 2,3,9,10,12,15-17,20-22,28,29,31-33; T37N R27W Sec 30; T37N R28W Sec 12,13,24,25; T37N R28W Sec 26,35 | 43,423.17 |
| Libby Ranger Station | T31N R31W Sec 34 | 80 |
| Liberty Metals Co. | T30N R34W Sec 2,10,11,34 | 215 |
| Loon Lake Rec. Site | T33N R32W Sec 25 | 10 |
| Lower Big Therriault Lake | T37N R25W Sec 30 | 20 |
| Lower Spar Lake Rec. Area | T29N R34W Sec 22 | 10 |
| Marston Lookout | T35N R25W Sec 26 | 10 |
| McGregor Lake | T26N R26W Sec 12 | 94.16 |
| Montana Power Co. | T24N R31W Sec 15 | 85.04 |
| Mount Henry Lookout | T36N R30W Sec 17 | 20 |
| Mud Lake Lookout | T36N R28W Sec 25 | 40 |
| Murphy Lake | T34N R25W Sec 5,8 | 71.88 |
| Murphy Lake Admin. Site | T34N R25W Sec 6 | 20 |
| North Dickey Lake | T34N R25W Sec 9 | 18.25 |
| Noxon Admin Site | T26N R33W Sec 24 | 109.09 |
| Olson Flat Admin. Site | T35N R32W Sec 3 | 45 |
| Pacific Hydropower Co. | T33N R34W Sec 36 | 560 |
| Paul Bunyan Rec. Area | T29N R30W Sec 30 | 45 |

7-ER-1499

FS-000183

Appendix D—Designated Sites withdrawn from Mineral Entry

| Name | Township (T), Range (R), Section (Sec.) | Acres |
|---|---|---|
| Pete Creek Rec. Area | T35N R32W Sec 5 | 20 |
| Pinkham Mountain Lookout | T33N R27W Sec 9 | 10 |
| Pipecreek Ranger Station | T31N R31W Sec 2 | 80 |
| Pleasant Valley Rec. Area | T26N R29W Sec 2 | 10 |
| PSR 359 | T25N R32W Sec 4 | 145.4 |
| PSR 25 | T24N R32W Sec 2,4,10,12,22,34 | 532.93 |
| Raven Ranger Station | T26N R29W Sec 2 | 50 |
| Redtop Creek Rec. Area | T35N R33W Sec 31 | 10 |
| Rexford Ranger Station | T36N R28W Sec 21 | 40 |
| Rock Lake Rec. Area | T35N R26W Sec 6 | 78.61 |
| Rock Meadows Rec. Area | T26N R31W Sec 6,31,32 | 170 |
| Rolling Rock Ranger Station | T27N R34W Sec 24 | 3.7 |
| Ross Creek | T28N R34W Sec 12 | 20 |
| Ross Creek Cedar | T28N R34W Sec 12 | 100 |
| Scenery Mountain Lookout | T31N R32W Sec 29 | 10 |
| Smith Mountain Lookout | T59N R3 Sec 32 | 10 |
| South Dickey Lake | T34N R25W Sec 15 | 60.03 |
| Stahl Peak Lookout | T37N R25W Sec 33 | 30 |
| Sunday Mountain Lookout | T33N R25W Sec 29 | 10 |
| Swamp Creek | T27N R30W Sec 11,12 | 50 |
| Swamp Creek Ranger Station | T25N R31W Sec 20 | 60 |
| Sylvan Lake Rec. Area | T25N R29W Sec 24 | 86.86 |
| Sylvanite Admin. Site | T34N R33W Sec 9,16 | 116.8 |
| Timberline | T32N R31W Sec 35 | 35 |
| Trout Creek Admin. Site | T24N R31W Sec 6 | 105.83 |
| Trout Creek Ranger Station | T24N R32W Sec 24 | 160 |
| Troy Ranger Station | T31N R34W Sec 1 | 67.83 |
| Turner Mt. Rec. Area | T33N R31W Sec 21 | 20 |
| Turner Mt. Winter Sports | T33N R31W Sec 20 | 240 |
| Turner Mtn. Ski Area | T33N R31W Sec 19,20,29 | 844.97 |
| Twin Meadows Ranger Station | T32N R26W Sec 29 | 62 |
| Upper.Ford Admin. Site | T36N R31W Sec 6,7,12 | 69.13 |
| Upper Big Therriault Lake | T37N R25W Sec 29,32 | 60 |
| Upper Spar Lake Rec. Area | T29N R34W Sec 16 | 20 |
| Warland Ranger Station | T32N R29W Sec 27,34 | 76.63 |
| Washington Water Power | T24N R31W Sec 15 | 126.05 |

174

Kootenai National Forest

7-ER-1500

Appendix D—Designated Sites withdrawn from Mineral Entry

| Name | Township (T), Range (R), Section (Sec.) | Acres |
|---|---|---|
| Washington Water Power | T24N R32W Sec 2,5,12 | 191.36 |
| Washington Water Power | T24N R33W Sec 1,11,12,14,15,20-22; T25N R32W Sec 4,9,10,16,22,27,28,31-34; T26N R32W Sec 20,33,34; T26N R33W Sec 5,6,8,10,14-16,23,24; T27N R33W Sec 30-32; T27N R34W Sec 9,21,25,27,28,32-34 | 2,637.26 |
| Webb Mountain Lookout | T35N R29W Sec 10 | 10 |
| West Bull Lake Rec. Area | T28N R33W Sec 4 | 27.3 |
| White Pine Ranger Station | T23N R31W Sec 14 | 92.06 |
| Whitetailcamp Expansion | T35N R32W Sec 6; T35N R33W Sec 1; T36N R32W Sec 31; T36N R33W Sec 36 | 55.31 |
| Whitetail Creek Rec. Area | T35N R33W Sec 1 | 67.1 |
| Willow Creek | T24N R29W Sec 3,4 | 20 |
| Wm. Park Mills Pr. Project | T25N R29W Sec 32 | 150 |
| Wm. Park Mills Pr. Project 11-Oct-1920 | T24N R30W Sec 1 | 80 |
| Wolf Creek Ranger Station | T29N R27W Sec 20 | 80 |
| Yaak Falls Rec. Area | T33N R33W Sec 9 | 20 |
| Yaak Mountain Lookout | T32N R34W Sec 2 | 10 |
| Ziegler Mountain Lookout | T33N R28W Sec 31 | 10 |
| Data Unavailable | T27N R34W Sec 21,34 | 34.77 |
| Data Unavailable | T31N R33W Sec 14,15 | 352.58 |

Source: Bureau of Land Management

* = Data Not Available

FS-000186

# Appendix E—Reasonable and Prudent Measures and Terms and Conditions for Grizzly Bear and Canada Lynx

The Biological Opinion for the Revised Land and Resource Management Plan (Forest Plan) for the Kootenai National Forest (USDI Fish and Wildlife Service, August 28, 2013) contained the following reasonable and prudent measures and terms and conditions for grizzly bear and Canada lynx.

## Grizzly Bear

### Reasonable and Prudent Measures

Biological opinions typically provide reasonable and prudent measures that are expected to reduce the amount of incidental take. Reasonable and prudent measures are those measures necessary and appropriate to minimize incidental take resulting from a proposed action. Reasonable and prudent measures are nondiscretionary and must be implemented by the agency in order for the exemption in section 7(o)(2) to apply.

The Service concludes that the Forest has incorporated all practical measures possible into the proposed action to minimize the impacts of take on grizzly bears. For that reason, the Service has not identified any Reasonable and Prudent Measures necessary to further minimize the impacts of such take on the grizzly bears. However, the Service has identified mandatory reporting and monitoring requirements below as Terms and Conditions that must be complied with in order for the take exemption in this Incidental Take Statement to be valid.

It is critical to understand that the conclusion of this opinion is based on those features being implemented as part of the proposed action; if they are not implemented, our analysis may not remain valid and this opinion may be subject to reinitiation (50 CFR 402.16(3)).

### Terms and Conditions

The Forest shall conduct monitoring and reporting of incidental take as follows:

1) By April 15 each year, the KNF shall submit an annual report to the Service that details the progress made toward achieving and maintaining the standards for percent Core Area, OMRD, and TMRD within the Recovery Zones.
2) The annual report shall provide an ongoing list detailing the locations, dates, duration, and circumstances for invoking the Access Amendment allowance for entering core area for the purposes of road decommissioning or stabilizations.
3) The KNFs shall coordinate with State and Federal agency biologists to collect credible grizzly bear observations that occur outside of the Recovery Zone boundaries and add this information to the 6th-order HUC database for inclusion into the annual report.
4) During the first year of implementation of the Revised Forest Plan, the Forest and the Service shall cooperatively develop a plan to monitor the scope and magnitude of late-season snowmobiling (post April 15) as it relates to effects on post-den emergent grizzly bears (see Incidental Take Statement). Within five years of implementation of the Revised Forest Plan, the Forests shall complete a winter travel plan, which will include considerations for grizzly bear and other federally listed species.
5) The Forest shall notify the Grizzly Bear Recovery Coordinator or Service's Montana Field Office within 24 hours of any bear-human conflicts that occur on the Forest, regardless of cause or season.

7-ER-1503

FS-000187

Appendix E—Reasonable and Prudent Measures and Terms and Conditions for Grizzly Bear and Canada Lynx

# Canada Lynx

## Reasonable and Prudent Measures

The Service believes that the following reasonable and prudent measures are necessary and appropriate to minimize impacts of incidental take of lynx:

RPM #1: The Forest shall minimize harm of lynx from fuels management by ensuring that the acres impacted are not concentrated in a geographic area or several adjacent LAUs.

RPM #2: The Forest shall minimize harm of lynx from pre-commercial thinning and other vegetation management projects by ensuring that female lynx home ranges, as represented by LAUs, either retain sufficient foraging habitat (when sufficient foraging habitat already exists in an LAU) or does not substantially reduce foraging habitat (when sufficient foraging habitat does not already exist in an LAU).

RPM #3: The Forest shall monitor and report the progress of the action and the impact on the species.

These reasonable and prudent measures, with their implementing terms and conditions (below), are designed to minimize the impact of incidental take that might otherwise result from the proposed action, and to ensure that the level of take exempted in this incidental take statement is not exceeded.

## Terms and Conditions

To be exempt from the prohibitions of section 9 of the Act, the Forest must comply with the following terms and conditions, which implement the reasonable and prudent measures described above and outline reporting and monitoring requirements. These terms and conditions are non-discretionary.

*The following terms and conditions implement reasonable and prudent measure #1:*

The Forest Service shall ensure that fuels management projects conducted under the exemptions from standards VEG S1, S2, S5 and S6 on the KNF:

8. Do not occur in greater than 57,052 acres in the WUI.
9. Do not result in more than 3 adjacent LAUs not meeting the VEG S1 standard of no more than 30 percent of an LAU be in SISS.

*The following term and conditions implement reasonable and prudent measure #2:*

The Forest Service shall ensure that vegetation management projects conducted under exceptions to VEG S5 and S6 on the KNF:

10. Do not occur in greater than 11,862 acres.
11. In lynx habitat on the KNF, precommercial thinning and vegetation management projects allowed per the exceptions listed under VEG S5 and S6, shall not occur in any LAU exceeding VEG S1, except for protection of structures.

*The following term and conditions implement reasonable and prudent measure #3:*

12. In support of the monitoring and reporting requirements of the NRLMD, the KNF shall provide to the Service and the Forest Service Northern Region (Region 1) Office in Missoula, summaries of the reporting requirements listed below. The summaries shall document the following information related to fuel treatment and vegetation management projects occurring in lynx habitat:
    a. Individual vegetation management projects conducted in lynx habitat under the exemptions and exceptions to the vegetation standards VEG S1, S2, S5 and S6 of the NRLMD may reduce the

Appendix E—Reasonable and Prudent Measures and Terms and Conditions for Grizzly Bear and Canada Lynx

quality or quantity of snowshoe hare habitat, but not all will result in a detectable, measurable effect to lynx (i.e. may affect, but not likely to adversely affect). This type of project may occur many times over the life of the proposed action. The acres impacted by these projects will be reported and the total aggregated to ensure that over the life of the revised Forest Plan, the number of acres impacted does not exceed the acres projected to be treated and the effects analyzed in our biological opinion.

For the projects that are likely to result in detectable and measurable effects to lynx (and our biological opinion's analysis found may rise to the level of take) the acreages will also be tracked and aggregated to ensure that they do not exceed the number of acres used as a surrogate for take of lynx. This approach to tracking and monitoring ensures that the proposed action is implemented as proposed and is consistent with our analysis. In addition, given the long timespan of the proposed action, this process provides information that can help determine whether consultation reinitiation ever becomes necessary.

Thus report as follows:

The BA prepared for each proposed project shall include a report of the acres to be treated under the exemptions and/or exceptions from the vegetation management standards VEG S1, S2, S5, and S6. The report shall also include the total acres treated likewise on the Forest as a whole, to date. This total shall include the acres in the proposed project, other projects that have signed decisions (including those that have been completed), and those projects that have completed section 7 consultations.

b.  In addition, each BA shall report whether or not the project met any applicable Revised Plan guidelines for lynx. If guidelines were not met, provide rationale as to why they could not be met.

c.  To ensure that term and condition 2 is met, report in each project level biological assessment, any two, adjacent LAUs that have more than 30 percent of lynx habitat in SISS, either because of natural events, vegetation management or fuel treatment projects, or any combination of these or other causes.

d.  To ensure that term and condition 4 is met, report on the KNF by LAU, of lynx habitat treated through precommercial thinning or other vegetation management projects as allowed in VEG S5 and S6; record the type of activity, acres, location and whether or not standard VEG S1 was adhered to.

e.  The KNF shall report this project level monitoring information, at the time the project decision is signed, to the designated Forest Service office with responsibility for maintaining an accurate accounting of reports. This data will be used in the annual report as required under the 2007 NRLMD biological opinion.



United States
Department of
Agriculture

Forest
Service

August 2013



# Final Environmental Impact Statement (Including 2015 Errata)

## For the Revised Land Management Plan

### Kootenai National Forest



7-ER-1506

FS-000190

Code of Federal Regulations (CFR)

- **36 CFR 261 Prohibitions in Areas Designated by Order; Closure of National Forest System Lands to Protect Privacy of Tribal Activities (2011):** "provides regulations regarding special closures to provide for closure of NFS lands to protect the privacy of tribal activities for traditional and cultural purposes to ensure access to NFS land, to the maximum extent practicable, by Indian and Indian tribes for traditional and cultural purposes".
- **36 CFR 223.239 and .240 Sale and Disposal of National Forest System Timber, Special Forest Products, and Forest Botanical Products:** Section 223.239 provides regulations for free-use without a permit for members of Tribes with treaty or other reserved rights related to special forest products. Also free-use without a permit upon the request of the governing body of a Tribe. Section 223.240 provides regulations regarding harvest of special forest products by Tribes with treaty or other reserved rights.

## Key Indicator

- The measurement indicators for American Indian Consultation are the effects to tribal interests as defined by Tribes, including tribally affiliated cultural resources, sacred sites, treaty rights, and religious freedom.

## Methodology and Analysis Process

Effects to tribal interests are known only through direct tribal consultation. The Confederated Salish and Kootenai Tribes have responded to outreach on Forest Plan revision with expressed interest in consultation throughout the process.

## Affected Environment (Existing Condition)

There are five federally-recognized American Indian nations with cultural affiliation on the KNF: the Kootenai Tribe of Idaho, the Kalispel Tribe, the Coeur d'Alene Tribe, the Spokane Tribe, and the Confederated Salish and Kootenai Tribes. Forest Service administered lands today occupies lands that were in traditional aboriginal territory. The aboriginal territory of the Kalispel, Coeur d'Alene, and Spokane Tribes overlap with the territory now managed by the KNF along the Clark Fork Valley with the territory used by the Kootenai Tribe of Idaho and the Confederated Salish and Kootenai Tribes. The entire Forest is within aboriginal territory for the Confederated Salish and Kootenai Tribes and the Kootenai Tribe of Idaho.

Ethnographic records provide extensive documentation for the past aboriginal use of the Forest. There remains a poignant connection for American Indian Tribes between traditional and contemporary uses on their original aboriginal lands. Tribes continue to rely on ecosystems even as their cultures change, employing both traditional and contemporary ways of relating to their homelands and lands where they traditionally ranged to sustain their way of life. Lands within the KNF help to sustain a way of life, cultural integrity, social cohesion, and economic well-being for Tribes.

The KNF takes an active role on the Tribes behalf, especially in areas of treaty interest, rights, traditional/cultural resources, and ecosystem integrity, by maintaining opportunities for traditional American Indian land and resource use. The presence of healthy habitats is fundamental to the achievement of both usable and harvestable levels of resources significant to American Indians, as well as to ecosystem integrity.

FS-000723

Forest Plan Reinitiation BA                                   Kootenai National Forest

**Biological Assessment**

**Consultation on the Kootenai National Forest Land and Resource Management Plan**

**For Grizzly Bears**

Prepared by:

Northern Region, USDA Forest Service

7-ER-1508

FS-000933

Forest Plan Reinitiation BA                                                                                           Kootenai National Forest

## Table of Contents

Summary of Findings.................................................................................................................... 6

Introduction ................................................................................................................................ 6

    Legal and regulatory framework........................................................................................... 6

    Reinitiation of Section 7 Consultation on the KNF LMRP ..................................................... 7

Proposed Action .......................................................................................................................... 8

Action Area............................................................................................................................... 11

    General description of the Kootenai National Forest ......................................................... 11

    General description of the Area Considered Occupied by Grizzly Bears ............................. 11

Species List ............................................................................................................................... 11

        Canada Lynx and Designated Critical Habitat .............................................................. 12

        Bull Trout and Designated Critical Habitat................................................................... 14

        Kootenai River White Sturgeon and Designated Critical Habitat ................................ 14

        Spalding's Campion ..................................................................................................... 15

Grizzly Bears............................................................................................................................. 15

    Background ........................................................................................................................ 15

    Risk Factors Affecting Grizzly Bears .................................................................................. 16

    Ongoing Actions that Assist with Protection of Grizzly Bears............................................ 17

        Bear Safety Training and Public Information ............................................................... 17

        Food/Attractant Storage............................................................................................. 17

Existing Conditions ................................................................................................................... 18

    Population Size and Trend ................................................................................................. 18

    Recovery Goals Associated with Population Status and Delisting........................................ 19

    Habitat Associations.......................................................................................................... 20

    Bear Management Units (BMUs), Bears Outside Recovery Zones (BORZ), Available Habitat, and Connectivity ...................................................................................................................... 21

        Data and Methodology ............................................................................................... 21

        Bear Management Units ............................................................................................. 25

        Bears Outside Recovery Zones (BORZ) – Recurring Use Areas by Grizzly Bears................ 25

        Available habitat ........................................................................................................ 26

        Connectivity ............................................................................................................... 27

    Activities Outside the Control of the KNF Contribute to Existing Conditions......................... 27

    Current Management for Grizzly Bears in the Cabinet Yaak Ecosystem ............................. 28

7-ER-1509

FS-000934

Forest Plan Reinitiation BA                                           Kootenai National Forest

BORZ/Recurring Use Areas ................................................................................................ 29

BMUs - Wheeled Motorized Access....................................................................................... 33

Monitoring the Effectiveness of Road Closures...................................................................... 37

High-Use Non-Motorized Trails ........................................................................................... 41

Over-snow Motorized Use ................................................................................................... 41

Northern Continental Divide Ecosystem........................................................................................ 41

Effects of the Proposed Action .................................................................................................... 43

Effects of Extending the Timeline to Meet BMU Standards .............................................................. 43

Effects of Extending the Timeline to Complete Winter Travel Planning ............................................. 45

Effects of Expanding Recurring Use Areas and Applying BORZ standards............................................ 47

Effects of Management Area Direction on New Recurring Use Areas (post-2010)............................ 48

Database Corrections................................................................................................................... 50

Other Effects .............................................................................................................................. 50

Timber Harvest.......................................................................................................................... 51

Fire (natural ignitions, planned ignitions) ....................................................................................... 51

Effects of Applicable Forest-wide and Geographic Area Direction, and Forest-wide Standards and
Guidelines on Allowable Activities in Grizzly Bear Habitat with Regard to the Proposed Action .......... 52

General Habitat Security and Connectivity..................................................................................... 52

Cumulative Effects ..................................................................................................................... 53

Determination of Effects and Rationale ......................................................................................... 53

Literature Cited ............................................................................................................................. 55

Maps ........................................................................................................................................... 63

Appendix A .................................................................................................................................. 73

BMU Status Summary ................................................................................................................ 73

Appendix B .................................................................................................................................. 79

BORZ changes on the KNF since 2010............................................................................................ 79

Appendix C .................................................................................................................................. 88

Administrative Use within BMUs .................................................................................................. 88

Appendix D.................................................................................................................................. 93

Record of Consultation History with U.S. Fish and Wildlife Service ................................................. 93

Appendix E .................................................................................................................................. 94

Grizzly Bear Access Amendment.................................................................................................. 94

Design Elements.................................................................................................................... 94

Forest Plan Reinitiation BA                                          Kootenai National Forest

Appendix F .................................................................................................................... 100

   Relevant Forest Plan Direction ................................................................................... 100

     Desired Conditions..................................................................................................... 100

     Geographic Area ......................................................................................................... 101

     Guidelines ................................................................................................................... 102

     Standards .................................................................................................................... 102

Appendix G........................................................................................................................ 1

   Allen 2011 .................................................................................................................. 1


Table 1. Threatened and Endangered species under the Endangered Species Act (ESA) found on the Kootenai National Forest. ................................................................................ 11

Table 2. Five risk factors potentially affecting grizzly bear conservation as summarized on p. 101-102 in USDI Fish and Wildlife Service 2011b). ...................................................... 16

Table 3. Recovery goals associated with the Cabinet-Yaak grizzly bear population recovery zone and existing status as of 2018 (Kasworm et al. 2019, USDI Fish and Wildlife Service 1993a)......................... 19

Table 4. Change in Cabinet-Yaak grizzly bear population estimates, rate of increase, and distribution from 2000 until 2018. ....................................................................................... 20

Table 5. Displayed are the IGBC codes, their definitions, and whether they were included in the total and open linear miles calculations for the BORZ, and OMRD, TMRD, and core for the BMUs. This includes both the 2010 calculations for the Access Amendment and this analysis. ................................................. 23

Table 6. Active Bear Year Seasons according to the 2015 Forest Plan and Proctor and Kasworm (2017). 27

Table 7. Allowable uses and activities under existing Forest Plan Management Area (MA) direction in new (since 2010) areas of grizzly bear recurring use outside of the Cabinet-Yaak grizzly bear recovery zone. The suitability of these acres for bears is unknown.......................... 30

Table 8. Wheeled motorized access in BORZ on the KNF, 2019. Shows all motorized routes (roads, trails, and railroad miles). ............................................................................................ 32

Table 9. Known/anticipated changes in grizzly bear access parameters since 2010 in the CYRZ by project name and BMU on the Kootenai NF. This does not include emergency consultation and changes to BMUs due to fire suppression activities. NC = no change in parameter.......................... 35

Table 10. Documented closure breaches[1] in BMUs on roads managed by the KNF[2] (2011-2019 bear year). ................................................................................................................................ 39

Table 11. Summary of BMUs from Annual Monitoring Reports. These numbers represent a snapshot in time each year and reflect changes due to project activities, exceedance of administrative use limits, and breaches of road closure devices. Red numbers indicate the parameter that year does not meet the BMU standard. ...................................................................................................... 73

Table 12. Summary of updates and corrections to KNF Bears Outside Recovery Zone (BORZ) Total roads. ................................................................................................................................ 79

Table 13. Summary of updates and corrections to KNF BORZ Open roads................................. 83

Table 14. Shown is the number of roads exceeding administrative use levels by BMU by Bear Year. ...... 88

Table 15. Consultation history regarding the 2015 Forest Plan. ................................................ 93

Table 16. NCDE Recovery Zone Bear Management Units (BMUs) ............................................ 102

Forest Plan Reinitiation BA                                        Kootenai National Forest

Figure 1. Cabinet-Yaak Recovery Zone, Bear Management Units, original Bears Outside of Recovery Zone areas, and recurring use area additions since the 2011 Access Amendment. .......................................... 63

Figure 2. Overlap of the Tobacco BORZ (Cabinet-Yaak) and the Northern Continental Divide Ecosystem 64

Figure 3. Bobtail, Cedar-Kootenai River, and Lower Pipe Creek HUC 6s (near the West Kootenai BORZ) management areas and ownership. ................................................................................................... 65

Figure 4. Map showing the original (2010) BORZ boundaries used in the Forest Plan consultation (2013 Biological Assessment). ................................................................................................................ 66

Figure 5. Management Areas within the original 2010 boundary for the West Kootenai BORZ. Note that the Access Amendment ROD lists the West Kootenai BORZ as 169,705 acres, a difference of only ~6 acres. This difference is no enough to change the analysis. Of the MA 2, 1,506 acres are classified as Wild, and 706 acres are classified as Recreational. Of the MA 3, 282 acres are classified as Botanical and 1,101 acres are classified as Geological. .................................................................................. 67

Figure 6. Spring Habitat Quality. Fine scale habitat mapping from Proctor and Kasworm (2017) ............ 68

Figure 7. Summer Habitat Quality. Female grizzly bear fine scale habitat mapping from Proctor and Kasworm (2017). ................................................................................................................. 69

Figure 8. Fall Habitat Quality. Female grizzly bear fine scale habitat mapping from Proctor and Kasworm (2017). ................................................................................................................................... 70

Figure 9. BMUs occupied by females with young during 2013-2019. Eleven BMUs were occupied (Kasworm et al. 2019.) ................................................................................................................ 71

Figure 10. This map is taken from p. 19 in Kasworm et al. 2019 and depicts grizzly bear observations (1959-2018) and known or probable mortalities from all causes (1949-2018) in and around the Cabinet-Yaak recovery area. ................................................................................................................ 72

7-ER-1512

FS-000937

Forest Plan Reinitiation BA                                    Kootenai National Forest

## Summary of Findings

The Kootenai National Forest 2015 revised Land Management and Resource Plan is programmatic in scope, providing a framework for future site-specific actions. The continued implementation of the plan **may affect, and is likely to adversely affect** grizzly bears.

## Introduction

### Legal and regulatory framework

Threatened, endangered, and proposed species are managed by the Forest Service in accordance with the National Forest Management Act (NFMA) of 1976 (PL 94-588) and the Endangered Species Act (ESA) of 1973 (PL 93-205, as amended). NFMA requires that forest plans provide for multiple use and sustained yield of products and services in accordance with the Multiple-Use, Sustained-Yield Act of 1960, and specifically that they include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness (section 6(e)(1)). ESA section 7(a)(1) directs all federal agencies to carry out programs for the conservation of endangered species and threatened species. ESA section 7(a)(2) requires federal agencies to ensure that any actions authorized, funded, or carried out by the agency are not likely to jeopardize the continued existence of any threatened, endangered, or proposed species or to adversely modify critical habitat. ESA section 9 prohibits the taking or possession of any endangered species of fish or wildlife, except as provided for in the ESA.

A Land Management and Resource Plan (LMRP) identifies general land use purposes or suitability, desired future conditions, objectives for resource conditions on specific lands, and standards and guidelines for management activities. The LMRP provides the framework for future site-specific decision making concerning all activities conducted and allowed on National Forest System lands. Therefore the effects of a LMRP are indirect (occur later in time). As required by the NFMA, all resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands must be consistent with the LMRP.

It is Forest Service policy that management direction in a forest plan will contribute to the recovery of federally listed species (Forest Service Manual 2622). The responsible official may consult on the plan as a "conservation program" for listed species to comply with ESA section 7(a)(1). If a plan, plan revision, or amendment may affect federally listed species or critical habitat, the responsible official will consult on the LMRP (Forest Service Manual 1920.3) in accordance with the provisions of ESA section 7(a)(2) and accompanying regulations that guide interagency cooperation (50 CFR 402). If the action may result in the incidental take of a listed species, the consultation may include issuance of a permit for incidental take in accordance with ESA section 10.

The regulations guiding interagency cooperation under the ESA (50 CFR 402.02) [Federal Register, Vol. 84, No. 166] define a *framework programmatic action* as a broad-scale plan that provides the framework for development of future action(s) that are authorized, funded or carried out at a later time. An incidental take statement may be provided, recognizing that actual take of a listed species would not occur unless and until those future action(s) are authorized, funded, or carried out and subject to their own future section 7 consultation. This consultation on the Kootenai National Forest (KNF) LMRP fits the definition of a framework programmatic action.

Forest Plan Reinitiation BA                                    Kootenai National Forest

## Reinitiation of Section 7 Consultation on the KNF LMRP

The ESA regulations for interagency cooperation identify four situations in which federal agencies are required to request reinitiation of consultation (50 CFR 402.16) (2019 revised regulations). These are situations where the federal agency retains discretionary involvement or control over the action or the action is authorized by law and:

a) the amount or extent of taking specified in the incidental take statement is exceeded;
b) new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;
c) the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence; or
d) a new species is listed or critical habitat is designated that may be affected by the identified action.

In November 2011, the FS completed the *Grizzly Bear Access Amendment for Motorized Access Management within the Selkirk and Cabinet-Yaak Recovery Zones* (Access Amendment) which set standards for motorized access within the Selkirk and Cabinet-Yaak grizzly bear ecosystems—and an expectation that **those standards would be achieved by 2019** (USDA Forest Service 2011). This direction was subsequently incorporated into the revised KNF 2015 LMRP in January of 2015, after completion of consultation in 2013 (USDI Fish and Wildlife Service 2013, USDA Forest Service 2015).

In addition to incorporating all elements of the 2011 Access Amendment, the Biological Opinion (BO) for the revised LMRP (USDI Fish and Wildlife Service 2013, p. II-108) required that "***within five years** of implementation of the Revised Forest Plan (i.e. 2020), the Forests shall complete a winter travel plan, which will include considerations for grizzly bear and other federally listed species*."

Since the revised KNF LMRP was approved in January 2015, the forest has made progress towards meeting the motorized access standards and the over-snow vehicle winter travel plan as prescribed the LMRP Record of Decision (ROD). However, the Forest recognized in early 2019 that they would not reach the stated timelines and that they would need to re-initiate consultation on the LMRP to determine the impact these delays may have on grizzly bears.

This reinitiation of consultation and biological assessment is also in response to the ruling on October 3rd, 2019 from the United States District Court for the District of Montana in the case *Alliance for the Wild Rockies v. Probert* (*Alliance v. Probert*) (CV 18-67-M-DWM). The US District Court of Montana found in *Alliance v. Probert* that reinitiation of consultation under ESA Section 7 is required under 50 CFR 402.16 for the 2011 Access Amendments.

The US District Court of Montana determined that permitted take had been exceeded due to two factors. First, ineffective road closures, and the resulting illegal motorized access, resulted in more motorized access that was affecting grizzly bears "in a manner not previously considered" during consultation on Access Amendment (2011) and revised LMRP (2013). Additionally, updates (e.g. database corrections) to the 2010 baseline from the Access Amendment had also resulted in a newer baseline that exceeded what was originally considered. Several additional HUCs have met the criteria for recurring use since the Access Amendment ROD was signed, and the no-net increase in permanent open or total roads standards have been applied to these additional areas.

Forest Plan Reinitiation BA                                        Kootenai National Forest

With regard to the effectiveness of road closures, the court stated on p. 5 of *Alliance v. Probert,*

> "Alliance persuasively shows that while the agencies' assumptions regarding closure effectiveness may have been reasonable in 2011, data over the last eight years demonstrates that ineffective closures have contributed to increases in linear road miles and potentially impacted grizzly bears in ways not previously considered."

Additionally, with regard to updates to the baseline, the court wrote on p. 22 of *Alliance v. Probert:*

> "The 2010 baseline is static, and the mileage provided in Table 4 of the 2011 Biological Opinion, see AR284:001571, sets the threshold for permissible take."

Table 4 in the 2011 BO is the same as Table 16 on p. 63 of the Access Amendment ROD, which is part of Design Element II. The Design Elements were incorporated into the 2015 Forest Plan under FW-STD-WL-02.

In *Alliance v. Probert*, p. 20-21, the court also stated:

> "As explained by Defendants, the Forest Service has been 'updating' the 2010 baseline amounts when it discovers mileage that was inadvertently omitted from the amounts included in Table 4. But the Forest Service's repeated modification of the 2010 baseline mileage is not consistent with the incidental take statement. While the take statement provides that the surrogate measure of take for grizzly bears is 'the existing (2010) linear miles of road in each BORZ polygon,' it includes a specific reference to the 'standards in Table 4.' AR 284:001662; see also AR284:001571. The Forest Service may be able to persuasively argue that there were errors in the 2010 mileages…But the specific mileages identified in that table were what the agencies considered in concluding that 'this level of anticipated take is not likely to result in jeopardy to the grizzly bear.' AR 284:001663. Naturally, then, any mileage not included in Table 4 was not considered in the take analysis. While the Defendants are correct that these baselines are 'flexible' in that they allow the Forest Service to add and subtract mileages below the baseline mileage amounts, the Forest Service cannot simply 'update' that baseline as it goes along."

The ineffective closures and resulting illegal use, as well as the updates to the baseline, were considered by the US District Court of Montana to be permanent increases in road miles within the BORZ. *Alliance v. Probert*, p. 24-25:

> "In light of these permanent increases beyond baseline levels, permitted take has been exceeded in violation of Section 9, compelling reinitiation under §402.16(a)."

The Forest Service requested to reinitiate on their revised 2015 LMRP on November 4, 2019 (USDA Forest Service 2019). The original Biological Assessment on the LMRP (USDA Forest Service 2013a) is incorporated here by reference.

## Proposed Action

The Proposed Action is to continue to implement the 2015 LMRP as written, with the following modifications and clarifications:  1) timeline associated with Element I-C-1 (meeting motorized standards in BMU) and 2) new information related to Element II-B (Bears Outside Recovery Zones) both of which

Forest Plan Reinitiation BA                                              Kootenai National Forest

are found in *Standard FW-STD-WL-02*[1]; and 3) the timeline established by the 2013 Biological Opinion related to winter travel planning in grizzly bear habitat (U.S. Fish and Wildlife Service 2013). Specifically, the KNF is proposing the following:

1. Extend the timeline beyond what was originally included in the LMRP for achieving motorized access standards.  In particular, the Forest proposes taking additional time for planning and project implementation to achieve motorized standards (OMRD:TMRD:CORE) in Bear Management Units 4 (Bull), 5 (St. Paul), 6 (Wanless), and 8 (Vermillion)[2]. Implementation is expected to occur in 2021 for BMU 8, 2022 for BMUs 5 and 6, and 2023 for BMU 4; and

2. Extend the timeline beyond what was originally stated in the LMRP for completing an over-snow motorized winter travel plan.  Winter travel planning is expected to be completed in 2024.

The KNF is also clarifying the environmental baseline in terms of motorized access of areas identified as having recurring grizzly bear use in 2010. This includes updating the database road miles when pre-existing (i.e., in 2010) roads are discovered and acknowledging those additional acreages/miles where grizzly bears recurring use was found over the last nine years. This includes clarifying the process for making database corrections when roads that existed prior to 2010 are discovered.

The baseline for BORZ is defined as conditions at the time the polygon was delineated as a BORZ; for the original BORZ, that date was 2010; for recurring use areas (BORZ) delineated since the Access Amendment ROD was signed, see the annual monitoring report (and Table 12 and Table 13) for the year in which the BORZ was delineated.

It is likely that more recurring use areas will be identified in the future and the BORZ standards for no-net increase in permanent miles of open/total roads would be applied to these new areas. When this occurs, these new areas will be disclosed in the annual Bear Year monitoring reports submitted to USFWS. Additionally, it is likely that more updates to the roads database will occur in the future, necessitating the need to clarify the existing conditions for the BORZ. Again, these changes will be disclosed in the Bear Year monitoring reports as the changes are incorporated.

For clarification, within the BORZ, the "no net increase" standard does not apply to the following:

- Motorized use by agency personnel or others authorized by the appropriate agency personnel (i.e. there is no limit on the administrative use on restricted roads within BORZ)

- Updated/improved road data without an actual change on the ground (i.e. database corrections)

- Exchanging, acquiring, buying, or selling lands by the agency

- Motorized use for emergency situations as defined by 36 CFR § 215.2

---

[1] **FW-STD-WL-02.** The Motorized Access Management within the Selkirk and Cabinet Yaak Grizzly Bear Recovery Zone Management Direction and ROD is applied (Appendix B [of the Forest Plan]) [Note: the Design Elements from the ROD are included in Appendix E of this BA].

[2] As noted in the 2011 FSEIS for the Grizzly Bear Access Amendment: "*Full implementation of the actions needed to reach the prescribed standards of this alternative is estimated to take up to eight years from the date of decision for these programmatic Forest Plan amendments. While steady progress is expected during this timeframe, actions beyond the control of the Forest Service could delay full implementation. These actions include but are not limited to: a) administrative appeals or litigation of project level decisions, b) budgets to support project level decisions, or c) future and/or unforeseen priorities affecting the project level decisions*"

Forest Plan Reinitiation BA                                    Kootenai National Forest

- Temporary roads

For the purposes of this biological assessment, a temporary road, whether in the BORZ or in a BMU, is defined as "A road necessary for emergency operations or authorized by contract, permit, lease, or other written authorization that is not a forest road and that is not included in a forest transportation atlas (36 CFR § 212.1). This definition includes the re-opening of existing bermed or barried road prisms. Temporary roads are roads that are not available for public use during their lifespan. Temporary roads will be made impassable when no longer needed. Temporary roads are expected to exist on the landscape roughly 5 years, but may remain for up to 10 years. Future project-specific consultation will analyze the effects of any proposed temporary roads in terms of their effects to grizzly bears and their habitat.

The KNF also proposes to maintain the existing LRMP Desired Conditions, Guidelines , and Standards  of the KNF LMRP aimed at conservation of threatened and endangered species (and grizzly bears in particular). The LMRP provides an integrated plan for land and resource management, and existing KNF LMRP direction that may assist in the management of grizzly bears is listed in Appendix F[3].

The KNF also proposes to continue the existing monitoring efforts related to roads and grizzly bears:

1) BMU monitoring- As stated in the 2015 Forest Plan: To ensure the effective implementation of the open road density parameter, at least 30 percent of closure devices (gates and barriers) will be monitored annually within the respective ecosystems. Monitoring techniques may include visual checks as well as road counters. The current monitoring in BMUs will continue under the proposed action.

2) BORZ monitoring: The KNF will conduct ad hoc monitoring in the BORZ in multiple ways:

a. Travel Analysis Process Report (TAP) developed for specific projects in the BORZ will be conducted to identify unauthorized motorized use within the project area and other areas of high potential use if any are known in other parts of the BORZ. If occurring, unauthorized routes are closed or stored, if they are not needed as system roads or for the project, with the National Environmental Policy Act (NEPA) conducted for that project. If it is decided that an undetermined road will be added to the system, then the no-net increase in permanent miles of open or total roads above the standard would still apply.

b. Incidental observations of unauthorized route use, breaches of barriers, or breaches of gates are also reported by Forest Service employees, members of the public, other state and federal employees driving on the KNF. These reports are recorded and roads are closed, if materials and contracted equipment area available. If not, devices are repaired as soon as possible, generally within the same bear year or early in the next bear year.

c. Any changes to road miles as a result of unauthorized motorized use or any corrective action, will be reported in the annual reports to the USFWS documenting the open and total linear miles of roads within each BORZ.

---

[3] The December 2018 Record of Decision for the Forest Plan Amendments to Incorporate Habitat Management Direction for the Northern Continental Divide Ecosystem Grizzly Bear Population for the Helena-Lewis and Clark National Forest, Kootenai National Forest, and Lolo National Forest added numerous additional LRMP direction specific to the NCDE. Those are not included in this BA and are not part of this reinitiated consultation.

3) Database corrections will be disclosed in the annual monitoring reports.

## Action Area

### General description of the Kootenai National Forest

The KNF is located in the northwest corner of Montana (within Lincoln and Sanders counties) and includes about 2.2 million acres of public land. The Forest administers the entire proclaimed Kootenai and a portion of the Kaniksu National Forest. The KNF is divided into five ranger districts: Rexford, Fortine, Three Rivers, Libby, and the Cabinet. Rexford and Fortine are managed together and are also collectively known as Ksanka. Seven geographic areas (GAs) are defined within the Forest Plan: Bull, Clark, Fisher, Koocanusa, Libby, Tobacco, and Yaak. Two major rivers, the Kootenai and the Clark Fork, along with several smaller rivers and their tributaries, dominate the Forest. The Whitefish Range, Purcell Mountains, Bitterroot Range, Salish Mountains, and Cabinet Mountains are all part of the rugged terrain radiating from the river valleys. In the north-central part of the Forest, the land is more open with gently rolling forested hills lying in the shadows of the Whitefish Range.

The principal population centers within the KNF are Libby, Troy, Eureka, and Trout Creek, Montana. Smaller communities that have social, economic, and historic ties to the KNF include Fortine, Trego, Stryker, the Yaak community, Rexford, Noxon, and Heron Montana. The nearest larger urban areas, Spokane, Washington, and the Flathead Valley in Montana have a social and economic influence on the local communities as well. The majority of land administered by the KNF is located in Lincoln and Sanders counties in Montana with smaller portions of land in Flathead County, Montana and Boundary, and Bonner counties in Idaho.

### General description of the Area Considered Occupied by Grizzly Bears

Grizzly bears may be present on the entirety of the KNF, although only specific areas have been identified outside of the recovery zone as having recurring use (BORZ polygons) (Figure 1). The 2018 Forest Plan amendment for the NCDE provides direction overlapping a portion of the lands covered under the 2011 Access Amendment. The Tobacco BORZ polygon largely overlaps the NCDE's Zone 1 and Salish Demographic Connectivity Area on the KNF (Figure 2).

## Species List

In accordance with section 7(c) of the ESA, the U.S. Fish and Wildlife Service (Service) has determined that the listed entities shown in Table 1 may be present on the KNF. A current species list was obtained, dated 12/12/2019, from the USFWS (Montana) website (https://www.fws.gov/montanafieldoffice/Endangered_Species/Listed_Species/Forests.html). This list included the Canada lynx, grizzly bear, bull trout, white sturgeon, and Spalding's campion. Species status and the designation of critical habitat are shown in Table 1.

*Table 1. Threatened and Endangered species under the Endangered Species Act (ESA) found on the Kootenai National Forest.*

| Species | ESA Status | Critical Habitat Designated? | Status in Analysis Area |
|---|---|---|---|
| Canada Lynx *(Lynx canadensis)* | **Threatened** | **Yes** | Suitable habitat exists and species is known to occur within planning unit. |

FS-000943

Forest Plan Reinitiation BA                                    Kootenai National Forest

|  | March 24, 2000 (65 FR 16052) | March 27, 2009 (74 FR 8616) | Designated critical habitat within the analysis area. |
|---|---|---|---|
| Grizzly Bear (*Ursus arctos horribilis*) | **Threatened** July 28, 1975 (40 FR 31734) | **No** Proposed Nov. 5, 1976 but never finalized (41 FR 48757) | Suitable habitat exists and species is known to occur within the planning unit. |
| Bull Trout (*Salvelinus confluentus*) | **Threatened** | **Yes** Oct. 18, 2010 (75 FR 63898) | Suitable habitat exists and species is known to occur within the planning unit. |
| White Sturgeon (*Acipenser transmontanus*) | **Endangered** | **No** | Bottom dwelling; Kootenai River population |
| Spalding's Campion (*Silene spaldingii*) | **Threatened** | **No** | Open grasslands with rough fescue or bluebunch wheatgrass; upper Flathead and Fisher River drainages |

This BA focuses on grizzly bear for the specific reasons listed for this reinitiated consultation. See the 2013 BA completed for the LMRP, as well as the specialist's report for the LRMP, for additional information on Canada lynx, lynx critical habitat, wolverine (proposed), bull trout, bull trout critical habitat, white sturgeon, Spalding's Campion, and whitebark pine (candidate). Also, see the programmatic BA for wolverine completed in 2014 for Region 1 of the Forest Service. The changes described in the proposed action and the introduction will not change the determinations or affects analyzed in the 2013 Forest Plan BA for these species. The following is a brief summary of the reasons why the other Threatened or Endangered species are not analyzed further in this BA.

### Canada Lynx and Designated Critical Habitat

The Canada lynx was officially listed as a threatened species in March of 2000. In that same year, the "Canada Lynx Conservation Assessment and Strategy" (LCAS) was developed to provide a consistent and effective approach to conserve Canada lynx on federal lands (Ruediger et al. 2000). Lynx habitat was mapped according to the direction provided in the LCAS for the KNF at that time. In 2007, the Forest Service completed the Northern Rockies Lynx Management Direction (NRLMD) (USDA Forest Service 2007) which adopted many of the recommendations from the LCAS, but incorporated more recent

Forest Plan Reinitiation BA                                      Kootenai National Forest

research findings to develop standards and guidelines to protect lynx and their habitat within designated LAUs and linkage zones.

On February 28, 2008, the FWS issued a proposed rule revising critical lynx habitat and finalized the designation on February 25, 2009 (USDI Fish and Wildlife Service 2008, USDI Fish and Wildlife Service 2009). In total, approximately 39,000 square miles fall within the boundaries of the revised critical habitat designation, in five units in the states of Maine, Minnesota, Montana, Wyoming, Idaho and Washington. Canada lynx habitat on the KNF is considered "occupied" (USDI Fish and Wildlife Service 2005).

The KNF partially falls in designated critical lynx habitat within the Northern Rocky Mountain critical habitat unit 3 (USDI Fish and Wildlife Service 2009), all north of Highway 2. This includes approximately 911,403 acres of designated critical habitat on the KNF (p. 30 in USFS 2013, and p. III-63 in US Fish and Wildlife 2013).

*Previous programmatic consultations*
Currently, management of lynx habitat on the KNF is directed by the 2015 Revised Forest Plan (USDA Forest Service 2015), which incorporated the NRLMD (USDA Forest Service 2007). Additionally, 62 percent of the lynx analysis units (LAU) on the KNF overlap with BMUs, with an 87 percent overlap with BMUs and BORZ combined (p. 29 in USDA Forest Service 2013). The design elements in the Access Amendment incorporated into the Forest Plan (USDA Forest Service 2015) provide additional direction and limits in regards to wheeled motorized access for grizzly bears that may affect lynx and critical habitat.

The KNF completed ESA section 7 consultation on the effects of the 2015 Revised Forest Plan (USDA Forest Service 2013). The potential impacts of the Forest Plan actions were analyzed. The biological assessment concluded that the Forest Plan actions may affect, and is likely to adversely affect Canada lynx and Canada lynx critical habitat. In its August 28, 2013 Biological Opinion, the USFWS concluded that the 2015 Revised Forest Plan is not likely to jeopardize the continued existence of grizzly bears, Canada lynx, and bull trout, or adversely modify designated critical habitat of Canada lynx and bull trout (USDI Fish and Wildlife Service 2013).

*Existing conditions and forest plan direction*
The 2015 Revised Forest Plan set the management direction goals, desired conditions, objectives, guidelines, and standards and Management Area (MA) themes. The 2015 Revised Forest Plan retained the direction from the 2007 NRLMD. The NRLMD was intended to address the major threats to lynx and the inadequacy of existing regulatory mechanisms in order to reduce adverse effects and avoid jeopardy through its implementation. The NRLMD applies to all management actions in lynx habitat in LAUs in occupied habitat and in linkage areas (USDA Forest Service 2007). The primary issues addressed in the NRLMD included winter snowshoe hare habitat in multistoried forests, wildland fire risk, over-the-snow recreation, and the nature of management direction applied to grazing, mineral development, roads, and over-the-snow recreation. To that end, the NRLMD provided a series of general planning objectives, standards, and guidelines for each of 15 identified risk factors (USDI Fish and Wildlife Service 2007).

Although the NRLMD pre-dates the designation of critical habitat, it does maintain and address those habitat features that make up the PCE. Implementation of the NRLMD maintains the vegetative components of lynx and snowshoe hare habitats. The NRLMD was designed to conserve lynx, and

FS-000945

Forest Plan Reinitiation BA                                  Kootenai National Forest

although there may be short-term adverse effects for lynx, there would be long-term benefits or maintenance of lynx habitat.

The effects of the 2015 Revised Forest Plan were previously consulted on and evaluated. There is no new information indicating that the changes proposed to the forest plan, listed in the proposed action above, would result in effects to lynx or lynx critical habitat beyond those analyzed in the biological assessment on the 2015 Revised Forest Plan. There is no need at this time to reinitiate consultation on the effects of the forest plan on the Canada lynx or designation of critical habitat.

## Bull Trout and Designated Critical Habitat

The effects of the action remain the same as discussed in the 2011 biological assessment for the access amendment as approved at that time. The action would continue to result in a change to wheeled motorized vehicle access management resulting in a short term increase of instream sediment and a long-term net decrease of sediment delivery associated with said roads. Bull trout are most sensitive to changes that occur in headwater areas encompassing important spawning and rearing habitats for fluvial and adfluvial stocks, as well as resident populations (Quigley et al. 1997). With many forest roads in headwater areas, there remains a high potential for bull trout to be affected by road related activities.

The proposed action is programmatic direction that requires future decisions affecting access as it relates to specific activities and projects. All direct and indirect effects would be caused by implementing future subsequent site-specific decisions affecting wheeled motorized access status on roads and trails to meet current forest plan direction. While these future actions and their effects are highly uncertain, on the Kootenai National Forest, they would occur in BMU's 4, 5, 6 and 8 within a set timeframe. All four BMU's currently support bull trout and designated critical habitat. The level or intensity of effects to bull trout and their habitat would vary depending on the location of selected roads and the level of treatment for the specific road.

**Determination of Effects**

Based on the review of the 2011 analysis and existing conditions the effects determination remains **may affect, and is likely to adversely affect** bull trout and designated critical bull trout habitat. This determination remains based on the superimposition of affected BMUs on occupied bull trout habitat. Impacts associated with implementing the proposed action would result in the potential for short-term negative impacts to habitat and the possible harm or harassment to individuals.

## Kootenai River White Sturgeon and Designated Critical Habitat

As in 2011, occupied sturgeon habitat occurs outside the Cabinet Yaak Recovery Zone. All habitat identified as critical habitat lies outside the Recovery Zone. Effects associated with barriering/obliterating/decommissioning roads in tributaries to the Kootenai River have not been shown to be significant to sturgeon or their habitat. Effects within the smaller watersheds would be diluted by the larger volume of the Kootenai River. As a result there is no chance for direct or indirect effects nor are there any cumulative effects as a result of implementing the access standards.

**Determination of Effects**

Forest activities continue to not be listed among the threats to the Kootenai River white sturgeon or their habitat (USDI 1994, USDI 2008b). Changes in access and potential road treatments will continue to

Forest Plan Reinitiation BA                                          Kootenai National Forest

have **no effect** to Kootenai River white sturgeon or designated critical habitat in the mainstem Kootenai River.

## Spalding's Campion

Spalding's campion *(Silene spaldingii)* is a species of Palouse Prairie grasslands. These grasslands are composed largely of wheatgrass and Idaho fescue and have scattered ponderosa pine. Elevations range from 2,700 to 3,500 feet.

This species occurs on lands that have historically been well suited to agricultural production, including grazing, hay, and other crop production. These lands are also desirable for residential development. Noxious weed introduction into western grasslands and domestic livestock grazing has also had a detrimental effect on this species.

This species is known to occur on private lands within the boundaries of the Kootenai National Forest, but has not been found on NFS lands.

### Previous Programmatic Consultations

The Access Amendment BA (USFS 2010) included an analysis of effects on Spalding's Campion (p. 173-175), and the determination was that the Access Amendment would have no effect on this species. An analysis of effects to Spalding's Campion was also conducted for the revised Forest Plan (p. 119-120, 124, and 130 in USFS 2013).

### Existing Condition and Forest Plan Direction

GA-DC-VEG-TOB-03 is a Desired Condition included in the 2015 Forest Plan and states that management of vegetation towards the desired vegetation condition improves or possibly increases habitat for Spalding's Campion. The proposed action analyzed in this BA does would not change this desired condition.

Taking several more years to complete winter travel planning and to get BMUs to standard, and changes in the BORZ would not change these determinations. There is no new information indicating that the changes proposed to the Forest Plan would result in effects to Spalding's Campion beyond those analyzed in the biological assessment for the Access Amendment and the analysis completed for the 2015 Forest Plan. There is no need at this time to reinitiate consultation on the effects of the Forest Plan on Spalding's Campion.

## Grizzly Bears

### Background

The grizzly bear was listed as a threatened species in August of 1975. At that time, five population centers, or recovery zones, were identified for protection, including the Selkirk and Cabinet-Yaak ecosystems located in northeastern Washington, northern Idaho, southern British Columbia, and Montana.  Portions of the Cabinet-Yaak (CYRZ) and Northern Continental Divide (NCDRZ) recovery zones are located on the KNF.  A Grizzly Bear Recovery Plan was subsequently developed and approved in 1982 and later revised in 1993 (USDI Fish and Wildlife Service 1982 and 1993a).

On November 5, 1976, the Service released a proposal to designate critical habitat for the grizzly bear. This proposal was subsequently made stale by the 1978 critical habitat amendments to the ESA which required an economic analysis and was never finalized (USDI Fish and Wildlife Service 2011b).

Forest Plan Reinitiation BA                                                     Kootenai National Forest

Consequently, the Interagency Grizzly Bear Committee[4] (IGBC) issued habitat management guidelines within all occupied grizzly bear habitat (IGBC 1986) as a way of protecting important habitats.

In 1993 and 1999, the Service found that reclassification from threatened to endangered in the Cabinet-Yaak and Selkirk ecosystems, respectively, was warranted due to existing threats to recovery. However, this reclassification was precluded by work on higher priority species (USDI Fish and Wildlife Service 1993b and 1999). More recently, the Service found that the Cabinet-Yaak grizzly bear population is warranted for uplisting to endangered status but precluded due to higher priority work (p. 54732 in U.S. Fish and Wildlife Service 2019b [Federal Register, Vol. 84, No. 197]).

The most recent five-year review of the status of grizzly bears was completed in August of 2011. This document provided detailed status summaries and suggests that the current 1993 Recovery Plan be revised among several other recommendations (USDI Fish and Wildlife Service 2011b). Grizzly bear research and monitoring currently occurs in both the Selkirk and Cabinet-Yaak ecosystems, and the USDI Fish and Wildlife Service publishes annual reports describing the outcome of those efforts.

### Risk Factors Affecting Grizzly Bears

When grizzly bears were listed in 1975, the vast reduction in their historic range, increases in motorized and non-motorized routes and associated recreational use, high levels of human-caused mortality, livestock use, lack of population data, and genetic isolation were identified as factors affecting their conservation status (USDI Fish and Wildlife Service 1975). All of these threats have been addressed to varying degrees over time in the occupied grizzly bear ecosystems (USDI Fish and Wildlife Service 2011b). The Service synthesized these threats into five grizzly bear risk factors and evaluated the situation in each of the six ecosystems (Table 2) (ibid).

*Table 2. Five risk factors potentially affecting grizzly bear conservation as summarized on p. 101-102 in USDI Fish and Wildlife Service 2011b).*

| GRIZZLY BEAR RISK FACTORS |
| --- |
| • Lack of effective Security Habitat |
| • Mortality due to scientific or recreational purposes |
| • Mortality from humans |
| • Lack of regulatory mechanisms (e.g. motorized access management, oil & gas development, food storage orders/sanitation) |
| • Genetic isolation; climate change; willingness of public to accept recovery efforts |

The Service noted that the major threats to the Cabinet-Yaak population were incomplete habitat protection measures, unsustainable human-caused mortality, small population size, and population fragmentation that resulted in genetic isolation. Please see USDI Fish and Wildlife Service (2011b) for additional details regarding all the five threats.

---

[4] The IGBC was formed in 1983 to help ensure recovery of grizzly bear populations and their habitats in lower 48 States through interagency coordination of policy, planning, management and research.

Forest Plan Reinitiation BA                                Kootenai National Forest

## Ongoing Actions that Assist with Protection of Grizzly Bears

Over the years, the KNF has undertaken actions both inside and outside the Cabinet-Yaak and Northern Continental Divide recovery zones to maintain or improve grizzly bear habitat and to reduce grizzly bear-human conflicts on the National Forest. These actions will continue. Examples include the following:

### Bear Safety Training and Public Information

Public education is an important element of any program designed to reduce grizzly bear mortalities. Through education, people can learn to live in a way that is more compatible with the needs and behaviors of bears. Education programs can reduce bear mortalities in instances of self-defense and habituation to unnatural foods. The KNF and cooperating agencies (e.g. Montana Fish, Wildlife and Parks) maintain and financially support a regular program of public information and education within the CYRZ (see annual accomplishment reports submitted to IGBC [SCYE 2008 through 2019]).

A variety of information and education materials (e.g., pamphlets, brochures, signs, videos, etc.) and programs are provided to the public at Forest Service offices. Signs and brochures about bear identification and proper behavior and safety procedures in bear country are placed at campgrounds, trailheads, dispersed recreation sites, picnic areas, etc. The Forest has employees providing bear education to visitors at campgrounds. Forest Service employees are provided with information and training about working in bear habitat and the proper use of bear-deterrent pepper spray. Additional efforts include providing information of Bear Be Aware information to visitors on the forest and food storage compliance, as well as conducting presentations for bear education off the forest in the communities.

### Food/Attractant Storage

Food and attractant storage orders and regulations require that food, garbage, and other attractants are stored properly so that grizzly bears cannot obtain access to them. This prevents food-conditioning of bears, which usually leads to grizzly bear-human conflicts, injuries, or fatalities. In 2011, the KNF issued a food storage order for the entire forest. To date, there have been no grizzly bear deaths associated with food attractants on KNF lands in the Cabinet-Yaak Recovery Zone.

The KNF has installed numerous bear resistant containers and food storage poles.  These have been placed in campgrounds and dispersed sites throughout the recovery zones on the KNF (see annual accomplishment reports submitted to IGBC [SCYE 2008 through 2019).

Many contracts and special-use permits in the Cabinet-Yaak contain provisions requiring protection of the grizzly bear and its habitat, as well as proper storage of food and attractants. Some contract and permit provisions require temporary or permanent cessation of permitted activities to resolve grizzly bear-human conflicts. Timber sale prescriptions and contracts incorporate provisions to protect grizzly bear habitat.

Livestock grazing permits may include special provisions such as proper storage of food and attractants as well as carcass removal. Annual monitoring of livestock allotments is performed to check on compliance and assess any conflicts. Disposal of animal carcasses has been emphasized to reduce conflicts with grizzly bears.

Forest Plan Reinitiation BA                                                      Kootenai National Forest

## Existing Conditions

### Population Size and Trend

The FWS estimated a population of 15 grizzly bears in the CYE in 1993 (USDI Fish and Wildlife Service 1993a).  More recently, Kasworm et al. (2019) calculated a minimum population estimate of 54 individual bears. Twenty-five bears were detected in the Cabinets and twenty-nine bears were detected in the Yaak (p. 27 in Kasworm et al. 2019). The latest data from Kasworm et al. (2019) indicates the Cabinet-Yaak grizzly population is growing at a rate of 1.2% per year for 1983-2018, with a 62% probability of the population being stable or increasing, and that the population is comprised of 55-60 individuals.  The USDI Fish and Wildlife Service (2011b) noted that improved rates of subadult and adult female survivorship has lessened the rate of decline and resulted in an improving population trend estimate since 2006.  The 2013-18 reporting period shows that we are meeting all mortality targets and moving closer to recovery (p. 16 in Kasworm et al 2019).

Kasworm et al. (2019) report that in the greater Cabinet-Yaak Grizzly Bear Recovery Zone, from 2007-2018, there were 35 instances of known mortality with 27 (77%) of these mortalities being human-caused. The annual rate of known human-caused mortality was 2.25 per year in this period. The authors point out that the loss of females is the most critical factor affecting the population trend because of their reproductive contribution to current and future growth. The rate of known female mortality was 0.67 during 2007-2018 and known human-caused female mortality rate decreased from the previous period (1999-2006) from 1.38 to 0.50. This decline of female mortality is largely responsible for the improving population trend from 2007-2018.

In bear year 2018, 4 known human-caused mortalities occurred in the greater Cabinet-Yaak Grizzly Bear Recovery Zone (1 subadult male, 1 adult female, 2 cubs-of-the-year). The adult female had 2 cubs-of-the-year at time of death. Because of known low chance of cubs surviving through winter without mother, the 2 cubs were considered collateral mortality. However, subsequent camera and genetic data from later in 2018 verified that the 2 cubs had survived their first month separated from mother; further, photo evidence in 2019 of two yearling young without mother at same location of cubs in 2018 suggests the pair may have survived the winter. DNA analysis has not yet confirmed this (results due in 2020). If genetic evidence confirms the pair survived the winter, these 2 bears would no longer count as human-caused mortality in 2018. Until then, human-caused mortality in 2018 stands at 4 bears. An additional probable, but unknown-cause mortality occurred with a subadult male. The bear was photographed by a trail camera with what appeared to be a broken back. Genetic analysis of hair collected at the site indicated this was bear #821 (a 4 year-old male). A carcass was never located.

A research and monitoring report for the Cabinet-Yaak grizzly bear ecosystem for the 2019 bear year will not be completed until late 2020 or early 2021. However, we have the following preliminary information for human-caused mortality in these years. In bear year 2019, one adult female was killed in self-defense. (Kasworm 2019, as presented to the Selkirk/Cabinet-Yaak Grizzly Bear Subcommittee meeting on November 6, 2019); and 1 adult male was euthanized November 10 near Libby after it broke into a garage seeking a food source (Montana Fish, Wildlife & Parks news release, November 12, 2019). The female was killed along the Devil's Club Trail (#966) within BMU 5 and she may have had young present, but it is unknown if they were cubs-of-the year or yearlings (p. 14 in MTFWP 2020). The euthanized male was on private lands in the Libby Creek area (Ibid), which was outside of the recovery zone and BORZ.

Forest Plan Reinitiation BA                                    Kootenai National Forest

Kasworm et al. 2019 maps known mortality within the CYE from 1949-2018 (see Figure 10 in this BA). Based on that map, there are a number of mortalities that have occurred over the years within BMUs on the KNF that still are not at standard for core, OMRD, and TMRD (BMUs 4, 5, 6, and 8) [Compare Figure 10 to Figure 1].

In 2012, a DNA-based hair snare effort was conducted throughout the CYE to quantify the number of grizzly bears residing in-and-around the recovery zone (Kendall et al. 2015).  This effort estimated the population at 48-50 bears and that the Cabinet and Yaak portions appeared to be demographically and reproductively isolated from each other (Ibid).

As part of an effort to maintain the existing small population of bears in the Cabinet Mountains, a total of 22 grizzly bears (14 females and 8 males) have been released into the Cabinet Mountains between 1990 and 2019 (Kasworm 2019).  Of the 22 bears; 7 bears left the Cabinet Mountains, but three of those have returned; 6 are known to be dead; and 2 females and 1 male are known to have reproduced (Kasworm 2019).  Bears were trapped from source populations in British Columbia as well as the North and the South Fork of the Flathead River in the U.S. (Kasworm et al. 2006, Kasworm et al. 2009).

## Recovery Goals Associated with Population Status and Delisting

The recovery plan identified three population status indicators to be used as the basis for recovery in each ecosystem (USDI Fish and Wildlife Service 1993). These indicators focused on ensuring sufficient reproduction to offset existing levels of human-caused mortality, limiting total human-caused mortality, and providing adequate distribution of breeding animals throughout the area.  Table 3 displays the population criteria used to monitor the recovery of the Cabinet-Yaak grizzly bear population.  According to the Recovery Plan, the minimum population goal for the Cabinet-Yaak ecosystem is 100 bears (ibid).

*Table 3. Recovery goals associated with the Cabinet-Yaak grizzly bear population recovery zone and existing status as of 2018 (Kasworm et al. 2019, USDI Fish and Wildlife Service 1993a).*

| Recovery Criteria | Recovery Zone Cabinet-Yaak (2018) | |
|---|---|---|
| | Target | Observed |
| Females w/Cubs (6-year average) | ≥6.0 | 3.0 |
| Mortality Limit (4% of minimum estimate) | 1.9 | 1.3 |
| Female Mortality Limit (30% of total mortality) | 0.6 | 0.3 |
| Distribution of Females w/Young | 18 of 22 BMUs | 11[1] of 22 BMUs |

[1]Snowshoe (2), St. Paul (5), Wanless (6), Vermillion (8), Roderick (11), Newton (12), Keno (13), NW Peak (14), Garver (15), East Fork Yaak (16), and Big Creek (17) BMUs were occupied by family groups in 2013-2018. All are on the KNF.

The Recovery Plan goals for mortality limits are meeting the target. However, the goals for 6-year running average of number of females with cubs are not currently being achieved. In the CYE, the target of 18 of 22 BMUs is not currently being achieved (Figure 9) but all of the mortality limits are meeting targets.

Table 4 compares Cabinet-Yaak grizzly bear population estimates, rate of increase, and distribution from 2000 until 2018. The population estimate has increased from 30-40 bears in the year 2000 to 55-60

Forest Plan Reinitiation BA                                            Kootenai National Forest

bears in 2018. Additionally, the number of BMUs with credible grizzly bear sightings has increased from 10 to 15 during the same time period. The rate of increase has varied over that timeframe, showing and increasing population in 2000 and 2018, but that the population was likely declining around the year 2010.

*Table 4. Change in Cabinet-Yaak grizzly bear population estimates, rate of increase, and distribution from 2000 until 2018.*

| Year | Population Estimate[1] | Estimated finite rate of increase[2] | Distribution (number of BMUs in the Cabinet-Yaak with credible sightings)[3] |
|------|------------------------|--------------------------------------|------------------------------------------------------------------------------|
| 2000 | 30-40 | 1.026 with 67.5% probability of an increasing population | 10 of 22 BMUs |
| 2010 | Minimum of 41 bears | 0.963 with 78% probability that the population was declining | 12 of 22 BMUs |
| 2018 | 55-60 | 1.012 with 62% probability that the population was stable or increasing | 15 of 22 BMUs |

[1] Sources: p. 40 in Kasworm et al. 2001; p. 2 and 21-22 in Kasworm et al. 2011; p. 38 in Kasworm et al. 2019

[2] Sources: p. 2 in Kasworm et al. 2001; p. 35 in Kasworm et al. 2011; p. 37 in Kasworm et al. 2019

[3] Sources: p. 11 in Kasworm et al. 2001; Table 2, p. 17 in Kasworm et al. 2011; Table 2, p. 18 in Kasworm et al. 2019

## Habitat Associations

Grizzly bears are considered habitat generalists, using a broad spectrum of habitats. Use patterns are usually dictated by food distribution and availability, combined with habitat that provides privacy or seclusion. Seasonal habitat are often separated into spring/early–summer pre-berry period, when bears forage on a variety of locally available gramminoids, forbs and roots and a summer/early-fall berry producing period when bears fatten on locally available berry crops (Mace and Waller 1997). During spring bears are generally in lower elevation habitats eating emergent vegetation and winter-killed ungulates. During late spring, they move to higher elevations following the phenological advance of vegetal foods. During summer, bears move to sites to exploit habitats with early-ripening berry crops. They repeat their altitudinal movements following the ripening fruits to higher elevation during early fall (ibid). Grizzlies feed heavily in the late summer and early fall – a period of two to four months called "hyperphagia" to build their bodies' reserves for winter denning and hibernation. During hyperphagia, bears eat constantly as they put on weight in preparation for hibernation (McLellan and McLellan 2015).

Natural caves or excavated dens (mean elevation of 6,150 feet in the Cabinet Mountains and 5,570 feet in the Yaak, p. 53 in Kasworm et al. 2019) are entered in late fall and occupied for approximately 4 to 5 months (p. 46-47, Ibid):

> "Den entry dates (n = 120) ranged from the third week of October to the last week of December. One hundred fourteen (95%) entries occurred between the 4th week of

Forest Plan Reinitiation BA                                            Kootenai National Forest

> October and the 3rd week of December (Fig. 13). Grizzly bears in the Cabinet
> Mountains (median entry in 2nd week of November) entered dens 2 weeks earlier
> than bears in the Yaak River drainage (median entry during 4th week of November).
> Males generally entered dens later than females. Female-offspring family groups
> tended to enter dens later than independent adult females (Fig. 14). By December 1,
> 37% of Cabinet and Yaak grizzly bears had not yet entered winter dens."

After emerging from the den, grizzly bears typically move to the areas where they can take advantage of food sources such as early greening herbaceous vegetation at low elevations, in riparian areas, and in melted-out avalanche chutes (USFWS 1993a). The majority of den emergence in the CYRZ and SRZ occurs after April 1, with females with young of year cubs emerging later than other individual bears (Kasworm et al. 2019). These habitats consist of warmer sites or areas that are most likely to lose snow early and have an earlier green-up, such as wet meadows and peatlands. Research has shown that grizzly bears, particularly sows with cubs-of-the-year, remain close to their den sites for a few weeks or more post-emergence (Craighead and Craighead 1972; Mace and Waller 1997; Schoen et al. 1986; Vroom et al. 1977) and continue to rely on fat reserves during this time (Craighead and Sumner 1980).

## Bear Management Units (BMUs), Bears Outside Recovery Zones (BORZ), Available Habitat, and Connectivity

The Service delineated recovery zones[5] for grizzly bears in the Grizzly Bear Recovery Plan (USDI Fish and Wildlife Service 1982 and 1993a). The CYE Recovery Zone is approximately 2,609 square miles in size and is located primarily in northwestern Montana with small portions in northern Idaho. Land ownership in the CYE is approximately 90 percent Federal, 5 percent State, and 5 percent private lands. The Kootenai National Forest manages approximately 72 percent) of all lands within the CYE recovery zone, with the Idaho Panhandle and Lolo National Forests administering the remaining Federal lands within the recovery zone (p. A-17 in USFWS 2011b).

The existing access condition was determined using the best available information. The metrics described here are assumed to be an accurate representation of the existing access condition as reviewed, although the Forest recognizes that mapping and calculation errors can occur. If the Forest finds that it has made a mapping or calculation error in describing the existing condition and corrects the metrics, no additional effects to grizzly bears related to those corrections are expected. The intent of this analysis is to capture the existing condition and the potential effects to grizzly bears, including potential ongoing effects that may not be represented in the metrics described above due to potential errors. If however, changes in the metrics occur due to Forest actions on-the-ground, site-specific consultation or reinitiation of this consultation would occur to determine the potential effects.

## Data and Methodology

Past management actions on NFS lands related to motorized access (e.g., timber sales and associated road construction, road maintenance, and watershed improvements through sediment reduction from roads – including road decommissioning) led to the existing wheeled motorized vehicle route system on the landscape. Standards for core area, Open Motorized Route[6] Density (OMRD) and Total Motorized

---

[5] A recovery zone is defined as the area in each grizzly bear ecosystem within which the population and habitat criteria for achievement of recovery will be measured
[6] Includes both roads and trails

Forest Plan Reinitiation BA                                                    Kootenai National Forest

Route Density (TMRD) for each BMU in the Recovery Zones are based on local research by Wakkinen and Kasworm (1997). Allen et al. 2011 provides a review of Wakkinen and Kasworm (1997) and it's applicability to this recovery zone. The KNF does not propose any changes to the core, OMRD, or TMRD standards within the Cabinet-Yaak. Descriptions of these parameters are as follows:

**Core Areas** – An area of high quality habitat within a BMU that contains no motorized travel routes or high use trails. Core areas do not included any gated or restricted roads but may contain roads that are impassible due to vegetation or barriers.

- Minimum of 0.31 miles (500 m) from any open road or motorized trail.

- Must remain in place for at least 10 years to be functionally effective for grizzly bears

- Loss or impacts to core must be compensated for with in-kind replacement of core habitat

**Open Motorized Route Density (OMRD)** – is calculated using a moving-windows technique that includes open roads, other roads not meeting all restricted or obliterated criteria, and open motorized trails. Density is display as a percent of the analysis area with >1 mile/mile$^2$. Calculated on a BMU basis.

**Total Motorized Route Density (TMRD)** – is calculated using a moving-windows technique that includes open roads, restricted roads, roads not meeting all reclaimed criteria, and open motorized trials. Density is displayed as a percentage of the analysis area with >2 mile/mile$^2$. Calculated on a BMU basis.

In order to determine the current **linear miles of open and total routes within the BORZ**, and to calculate open motorized route densities, and total motorized route densities within the BMUs, the first step is to make sure the INFRA (Infrastructure) database is up to date. The INFRA database includes, among other things, all routes on the Forest that receive, or are intended to receive, vehicular motorized use. Updating INFRA is an as-needed effort depending on what is found during monitoring and to capture project implementation changes in route status. Monitoring occurs formally as part of the required closure device monitoring within the recovery zone required by the Access Amendment (Design Element III). Closure device monitoring occurs both within and outside of the recovery zone as part of the districts' "adopt-a-road," "adopt-a-drainage," or similar programs. Drainages/areas are monitored twice a year, for instance, to open then close seasonal gates and to monitor year-long closure devices. Additional unauthorized use is discovered and reported by Forest Service employees and the public. Breaches are repaired based upon a general prioritization of those within the recovery zone, those within the BORZ, and those outside of both the recovery zone and BORZ. Repairs are dependent on resource availability, but are repaired as soon as possible and generally within the same bear-year.

After updating the database, we then query by IGBC (Interagency Grizzly Bear Committee) codes to determine what qualifies as an open route and what qualifies as a total route (Table 5) for the calculations. The IGBC Codes used in the Access Amendment are described on p. 156 of the FEIS for the Access Amendment (p. 156 in USDA FS 2011a). We use the same IGBC codes in this analysis. This includes both system roads and undetermined roads. Undetermined roads are coded in the database based on their current on-the-ground status (e.g. an undetermined road that has no barrier or gate would be coded as IGBC 4). Undetermined roads are those whose long term purpose and need has yet to be determined, whereas systems roads are assigned a maintenance level and are part of the Forest Transportation System. If an undetermined road is not in INFRA the KNF attempts to discern when it

Forest Plan Reinitiation BA                                    Kootenai National Forest

originated on the landscape. If it can be determined that it existed prior to the original 2010 baseline used in the Access Amendment, then the database is corrected to reflect the additional miles and this update is disclosed in the annual Bear-Year monitoring reports submitted to USFWS. This has occurred several times since 2011, as can be seen in the Bear-Year 2011-2019 monitoring reports. Changes such as this are an update to the database and are not a change on the ground.

The Access Amendment used the existing conditions as of the end of 2010 for linear miles and road density calculations and used the INFRA database for roads information (p. 12 in USDA FS 2011a). This means that any route in the INFRA database at the end of 2010, including both system and undetermined roads, would have been included in the calculations for total or open linear miles of routes in the BORZ, and OMRD, TMRD, and core in the BMUs if they had the IGBC codes that fit for those calculations. Codes 2, 4, and 5 would have qualified for total linear miles in the BORZ and TMRD and core calculations in the BMUs, while codes 4 and 5 would have qualified for open linear miles in the BORZ and OMRD in the BMUs. This analysis also uses INFRA and the same IGBC codes (Table 5).

*Table 5. Displayed are the IGBC codes, their definitions, and whether they were included in the total and open linear miles calculations for the BORZ, and OMRD, TMRD, and core for the BMUs. This includes both the 2010 calculations for the Access Amendment and this analysis.*

| IGBC Code | Definition | Included in the BORZ calculation of total routes? | Included in the BORZ calculation of open routes? | Included in TMRD Calculations in the BMUs? | Included in OMRD Calculations in the BMUs? | Included in the core calculations in the BMUs? |
|---|---|---|---|---|---|---|
| 1 | Impassable Roads: roads not reasonable or prudently passable by conventional 4-wheeled passenger vehicles, all-terrain vehicles or motorcycles. These roads include roads that have grown in and are no longer passable. | N | N | N | N | N |
| 2 | Restricted Roads (i.e. gated): a road on which motorized vehicle use is restricted yearlong. The road requires effective physical obstruction (generally | Y | N | Y | N[7] | Y |

---

[7] If administrative use exceeded the allowable number of trips a gated road will be temporarily coded as IGBC 4 for the purposes of calculating OMRD. Access Amendment design element E.2. sets the maximum allowable administrative use as ≤60 round trips per bear year per road, apportioned as ≤18 round trips in spring (April 1-June 15), ≤23 round trips in summer (June 16-September 15), and ≤19 round trips in fall (September 16-November 30).

7-ER-1530

FS-000955

Forest Plan Reinitiation BA                                    Kootenai National Forest

| IGBC Code | Definition | Included in the BORZ calculation of total routes? | Included in the BORZ calculation of open routes? | Included in TMRD Calculations in the BMUs? | Included in OMRD Calculations in the BMUs? | Included in the core calculations in the BMUs? |
|---|---|---|---|---|---|---|
|  | gated). Administrative motorized use may occur on these roads. |  |  |  |  |  |
| 3 | Reclaimed/Obliterated and Barriered Roads: a road that is managed with the long-term intent for no motorized use, and has been treated in such a manner to no longer function as a road. An effective way to accomplish this is through one or a combination of several means, including recontouring to original slope, placement of logging, or forest debris, planting shrubs or trees, obliterating/putting barriers at the entrance, etc. No administrative use may occur on these roads. | N | N | N | N | N |
| 4 | Open Roads: a road without restriction or having a seasonal restriction on motorized vehicle use. | Y | Y | Y | Y | Y |
| 5 | Open Motorized Trails: a trail that receives motorized use. Trails used by 4-wheelers, 4-wheel drive vehicles, and motorized trail bikes are examples of this type of access route. | Y | Y | Y | Y | Y |

7-ER-1531

FS-000956

Forest Plan Reinitiation BA                                    Kootenai National Forest

**Note**: Access Amendment Design Element II A and B (Appendix E) to "road," but the BORZ baseline on the KNF included motorized trails as well. The KNF has continued to apply the no-net increase in open/total permanent miles to motorized *routes* (i.e. roads *and* motorized trails) in the BORZ rather than *only* roads. Project level analyses and Bear Year monitoring reports have included motorized trails in the BORZ in the calculations as well.

## Bear Management Units

Recovery zones are divided into areas known as Bear Management Units or BMUs, to facilitate population monitoring and habitat evaluation with each ecosystem.  Each BMU is approximately the home range size of an adult female grizzly bear (average size about 100 square miles) (Christensen and Madel 1982).  These BMUs assist in characterizing grizzly bear numbers and distribution within each ecosystem as well as analyzing and tracking cumulative effects (ibid, USDI Fish and Wildlife Service 1993a).

There are twenty-two BMUs contained within the CYRZ, and most are located on the KNF with two shared between the KNF and IPNF and one located on the LNF. Potential impacts from the Proposed Action will only address the BMUs (and portions of BMUs) located within the KNF administrative boundary (Figure 1).

## Bears Outside Recovery Zones (BORZ) – Recurring Use Areas by Grizzly Bears

The 1993 Recovery Plan recognized that grizzly bears would occur outside the recovery zone lines and that the mere presence of bears outside of the recovery zone line is not sufficient reason to change the recovery zone lines (U.S. Fish and Wildlife Service 1993a). In recent years, credible observations of grizzly bears and radio-telemetry research data on collared grizzly bears have documented use in areas outside of existing recovery zone boundaries.  These recurring use areas have been named 'Bears Outside Recovery Zones' (BORZ) for the Selkirk and Cabinet-Yaak grizzly bear ecosystems, and they were subsequently incorporated into the amendments to the Kootenai (KNF), Idaho Panhandle (IPNF), and Lolo (LNF) National Forest Plans in 2011 (USDA Forest Service 2011a).

BORZ areas have not been identified by the Service as areas that are essential to the recovery of grizzly bears in the SCYEs and therefore the same set of management standards and conditions applicable to BMUs would not be appropriate to apply to these areas.  If and when these areas are deemed essential they would be formally appended to the Recovery Zones through Service action. While observation data is limited and these habitats have not been evaluated to determine if they are of significant biological value it is recognized that on-going and future land management activities in these areas could result in adverse effects (e.g. incidental take) to grizzly bears (Allen 2011, USDI Fish and Wildlife Service 2011a).

Guidelines for Determining Recurring Use Areas (RUA) for Grizzly Bears and Guidelines on how to delineate BORZ in RUA was provided in Appendix F of the 2010 Access Amendment BA (USDA Forest Service 2010) and was developed in collaboration with USFWS (p. 6 in USDI Fish and Wildlife Service 2011). RUA are areas that have 3 or more credible observations of grizzly bears within the last 15 years and radio-telemetry research data on collared grizzly bears have documented use in some areas outside of the existing Recovery Zones. Adjacent 6th order HUCs with enough grizzly bear use to be considered RUAs were combined to create contiguous areas of recurring use or BORZs (USDA Forest Service 2010).

A total of seven BORZ areas were identified as part of the recurring use process for the SCYE, but only four of these are located within the KNF administrative boundary and area associated with the CYE: Cabinet Face, Clark Fork, Tobacco, and West Kootenai (Figure 1).  The KNF administers the majority of

Forest Plan Reinitiation BA                                             Kootenai National Forest

land included in these BORZ (Table 12 and Table 13). Since the Access Amendment ROD was signed, the Forests have met several times with USFWS to review[8] credible grizzly bear observations to determine if recurring use has expanded beyond the original BORZ boundaries (per 2011 BO monitoring requirement, USDI Fish and Wildlife Service 2011b). The Bobtail Creek (disclosed in the Bear Year 2011 monitoring report), Lower Pipe Creek, and Cedar Creek (both disclosed in the Bear Year 2019 monitoring report) HUCs have met the recurring use criteria used in the Access Amendment. The no-net increase in permanent open and total miles of road (Design Elements II A and II B in the Access Amendment ROD) has been applied to these HUCs once it was determined that they met the criteria for recurring use.

As reflected in the Bear Year monitoring reports, the BORZ open/total road miles have varied since the establishment of the 2010 baseline. First, temporary increases have occurred, as allowed under Access Amendment Design Elements II A and B. Administrative use and project activities have resulted in temporary increases in both open and total roads, including the use of temporary roads. Illegal use of roads have also been included in the BORZ calculations in the annual monitoring reports. Some updates to the database or improved technology have resulted in improved accuracy of existing condition mileage estimates, and these types of updates are not the result of on the ground changes. Land exchanges have also added acres and miles of road to BORZ polygons[9]. In some cases there have been changes on the ground, such as the addition of roads for ANILCA access as allowed under Design elements II A and B.

### Available habitat

There are three seasonal time periods recognized as being important to grizzly bears in the CYE: spring (April 1st – June 15th); summer (June 16th – September 15th); and fall (September 16th – November 30th were the seasons used in the Access Amendment (USDA Forest Service 2011b) and revised Forest Plan (USDA Forest Service 2015). The proposed action would not change this or how we track administrative use (Design Element E. 2. In the Access Amendment).

Since 2011, Proctor and Kasworm (2017) developed fine-scale habitat modeling of sex-, season-, and ecosystem-specific habitat use for grizzly bears in the CYRZ based on 2004–2015 radio-collared bears. This is a new and important analytical tool for project level analyses which helps facilitate the identification of quality seasonal habitat and strategic selection of high-quality core per the KNF LRMP (Proctor and Kasworm 2017:3). As shown in Table 6, Figure 6, Figure 7, and Figure 8 the modeled seasons differ slightly from the 2015 KNF LRMP active bear year seasons but this does not diminish the model's utility for project level analysis for predicting bear use of seasonal habitats. Figure 6, Figure 7, and Figure 8 show the relative habitat quality within the recovery zone, the BORZ, and the added HUCs with recurring use (i.e. Bobtail, Lower Pipe, and Cedar Cr. HUCs).

Management that secures important female habitat and food resources may be most efficient for conservation purposes. Males are important as well and in some instances can dominate the very best

---

[8] The forests coordinate with State and federal agency biologists to collect credible grizzly bear observations that occur outside of the recovery zone boundaries and add this information to a 6th order HUC database for inclusion into an annual report to the FWS (USDI Fish and Wildlife Service 2011a).

[9] There has only been one land exchange that resulted in an updated mileage for the BORZ. It was the Alberton land exchange in the Tobacco BORZ in 2004, which was prior to the original Access Amendment baseline. Future land exchanges would undergo project specific consultation. If the land exchange do not result in changes to road miles on the ground, then no additional effects from roads on grizzly bears would be expected.

Forest Plan Reinitiation BA                                        Kootenai National Forest

of food resources (Proctor and Kasworm 2017). These habitat models can be used to inform project planning (e.g. timber harvest, road building, road closing, road decommissioning, and prescribed burns) in order to minimize effects to grizzly bears.

*Table 6. Active Bear Year Seasons according to the 2015 Forest Plan and Proctor and Kasworm (2017).*

| Active Bear Year (Non-Denning) Season | Revised 2015 IPNF Forest Plan (from 2011 Access Amendment) | Proctor and Kasworm 2017 Predicted Seasonal Habitat |
|---|---|---|
| Spring | April 1 – June 15 | Den emergence to July 14 |
| Summer | June 16 – September 15 | July 15 – September 15 (berry season) |
| Fall | September 16 – November 15 (SE) September 16 – November 30 (CYE) | September 16 – October 30 |

## Connectivity

Connectivity between recovery zones has been identified as important for grizzly bear recovery (Servheen et al. 2003; Proctor et al. 2002, 2005, 2012, 2015, 2018).  Lack of habitat connectivity or "linkage" is associated with major highways and railways and the habitat within the approach zones near these features.

The NCDE Amendment to the KNF's LMRP established management direction associated with the Salish Demographic Connectivity Area that lies between the NCDE and CYE and overlap with the Tobacco BORZ. The 2015 revised Forest Plan also had connectivity direction (Appendix F), and the effects of that direction was analyzed in the 2013 BA and BO (USFS 2013a and USDI Fish and Wildlife 2013).

## Activities Outside the Control of the KNF Contribute to Existing Conditions

The CYRZ also include State, corporate and private lands. Past decisions made by these landowners regarding management on their lands may have resulted in disturbance or displacement effects to grizzly bears. Past and ongoing timber harvest occurring on private or State lands may impact the distribution, amount, and quality of grizzly habitat and may impact connectivity between NFS lands. The SRZ and CYRZ include approximately 229,000 acres of private and State lands (p. 99 in USFS 2011a). Activities here may have caused avoidance of these areas, or conversely, increase the potential for habituation and subsequent removal or death of these bears for public safety. There have been several incidents of grizzly bears becoming habituated to homes and food attractants that have resulted in relocation or mortality of problem bears. The Montana Department of Natural Resources and Conservation has developed a Habitat Conservation Plan that covers state lands within the KNF boundary. This HCP was "designed to avoid, minimize, and/or mitigate the impacts of incidental take on threatened and endangered species as a result of timber harvest and related activities to the maximum extent practicable" (p. 1-1 in Vol. 2 of MT DNRC and USFWS 2010). The HCP includes measures to protect grizzly bears on some State Trust Lands in Montana, including 6,174 acres in the CYE (page 2-3 in Vol 2. Of MT DNRC and USFWS 2010).

The Montana State Wildlife Conservation Strategy improved habitat for a variety of species, and when utilized on non-NFS ownerships may have complemented habitat improvement/maintenance on NFS lands.  Concerns and conservation strategies for grizzly bears listed in the State Wildlife Conservation

Forest Plan Reinitiation BA                                    Kootenai National Forest

Strategy include reducing road related impacts, reducing human-bear conflicts due to attractants, and protection of important habitats.

The existing transportation system (e.g. highways and railroads) has likely impacted grizzly bear connectivity and in some cases lead to mortality (i.e. collisions) of bears.

Climate change in an ongoing impact that could continue to have varied impacts on grizzly bears and their habitats, especially when combined with fire (or fire suppression), insects, and disease effects on habitat. Past fire suppression has led to an increase in fuels, denser forests that are more susceptible to insects and disease, and forests that are less resilient and sustainable. Large, stand-replacing disturbance would be more likely and may be exacerbated as the climate changes. Large-scale disturbances could convert a large area of grizzly habitat from forested to open in one event, similar to how fires have altered habitat on the KNF over the last several years. Fires may continue to alter the availability of bear foods and cover, potentially changing how bears use the landscape.

Recreation has increased on all land ownership types, if for no other reason than human population growth. This likely increased human disturbance and caused the portions of NFS lands that have lower human disturbance to become more important for grizzlies. Increased human presence on all land ownerships increases the chance of a human/bear conflict. From 1980 until 2018 the population increased in all of the counties that overlap the KNF.

Black bear hunting occurs on both sides of the international boundary within the CYRZ and has the potential to contribute to illegal or mistaken identity mortality of grizzly bears. The province of British Columbia and the States of Montana, and Idaho continue to allow hunting for black bears, as well as other wildlife species, on both sides of the border within and around the CYRZ. Hunter encounters with grizzly bears may result in a bear death due to mistaken bear identification, self-defense, or opportunistic poaching.

MFWP has a public education program to teach hunters and other members of the public how to identify grizzly bears and black bears. MFWP also has a public education program to teach hunters how to handle attractants in the back country. State bear specialists with MFWP are key to reducing grizzly bear mortality. Specialists deal with nuisance bears, work with landowners and the public to prevent the habituation of bears, and foster local public support for grizzly bear conservation. Wildlife attractants on private lands can lure bears into conflict situation. This may be in the form of garbage, pet food, fruit trees, or others. Bears that become habituated or a nuisance may lead to the bear being killed. Additionally, the more a bear comes into contact with humans, the higher the likelihood that someone would poach that bear. Not only does MFWP work to reduce mortality of grizzly bears, but they also augment the CYE grizzly bear population with grizzly bears from other parts of Montana (pp A-74 and A-75 in USFWS 2011).

## Current Management for Grizzly Bears in the Cabinet Yaak Ecosystem

The current KNF LMRP established prohibitions and permissions on allowable activities including *timber harvest, commercial and personal use of forest products and firewood, prescribed fire, natural fire ignitions, livestock grazing, road construction, wheeled and over –the-snow motorized access and minerals* activities based on Management Area direction. The effects of management area direction and allowable activities within the BMUs and BORZ were described in the 2013 Biological Assessment for the LMRP (see pages 100-104, USDA Forest Service 2013a).

Forest Plan Reinitiation BA                                    Kootenai National Forest

Desired Conditions, Guidelines, and Standards relevant to grizzly bears are listed in Appendix F of this document. Key components of grizzly bear management on the KNF focus on wheeled motorized access management, sanitation, and information and education (I & E) of forest visitors. Over the years, the KNF has undertaken substantial actions both inside and outside the Cabinet Yaak recovery zone to maintain or improve grizzly bear habitat and to reduce grizzly bear-human conflicts on the national forests.

### BORZ/Recurring Use Areas

A key feature of **Standard FW-STD-WL-02** (i.e. Appendix E, Access Amendment Element II-B) was the development of a process for denoting grizzly bear recurring occupancy areas (BORZ), and establishment of a no-net increase in existing linear miles of open and permanent roads for approximately **564,166**[10] acres of NFS lands on the KNF. BORZ areas have not been identified by the Service as areas that are essential to the recovery of grizzly bears in the SCYEs, nor has the area within their boundaries been assessed for their suitability as grizzly bear habitat. However, it is recognized that on-going and future land management activities in these areas could result in adverse effects (e.g. incidental take) to grizzly bears (Allen 2011, USDI Fish and Wildlife Service 2011). Impacts from roads in these new recurring use areas are likely similar to other areas where grizzly bears encounter roads, which includes increased risk of human-caused mortality, habitat displacement, fragmentation, and direct habitat loss (p. 18-19 in Proctor et al. 2019).

Past management actions on NFS lands related to motorized access (e.g., timber sales and associated road construction, road maintenance, and watershed improvements through sediment reduction from roads – including road decommissioning) led to the existing wheeled motorized vehicle route system on the landscape. A key feature of the 2011 Access Amendment was the establishment of a no-net increase in existing linear miles of open and permanent roads within the 2010 BORZ boundaries (Access Amendment ROD, Table 16, p. 63 in USFS 2011b). Table 12 and Table 13 of this BA illustrates the updated 2019 conditions of the 564,166 acres originally identified as having recurring grizzly bear use in 2010, as well as the Bobtail, Lower Pipe, and Cedar HUC additions. This includes adjustments to the linear miles of open and total routes associated with clerical and database errors which have been day-lighted in the 2010-2019 bear year monitoring reports (USDA Forest Service 2011-2020).

Since 2010, bears have expanded their use to approximately 30,862 acres in several watersheds outside the CYRZ, near the original West Kootenai BORZ. These changes are also described in Table 12 and Table 13. These new recurring use areas include the Bobtail Cr., Lower Pipe Cr., and Cedar Cr. watersheds (Figure 3). These expansions are documented in the Bear Year 2011 and 2012 monitoring reports (Bobtail), as well as the in-progress Bear Year 2019 monitoring report (Lower Pipe and Cedar). The no-net increase in linear miles of open or total road in the BORZ (Access Amendment Design Elements II. A. and II. B.) has been applied to these additional recurring use areas once they were identified as meeting the recurring use criteria, just as those standards have been applied to the original Access Amendment (2011) BORZ areas. Table 7 illustrates the degree of allowable uses under current direction for the 30,862 acres of KNF NFS lands found in the areas beyond the original West Kootenai BORZ:

---

[10] As per the 2011 Access Amendment ROD, p. 63, Table 16.

Forest Plan Reinitiation BA                                    Kootenai National Forest

*Table 7. Allowable uses and activities under existing Forest Plan Management Area (MA) direction in new (since 2010) areas of grizzly bear recurring use outside of the Cabinet-Yaak grizzly bear recovery zone. The suitability of these acres for bears is unknown.*

| Allowable Uses Under Forest Plan Management Area Direction | MA Where Allowed[11] | Current Condition | | | | West Kootenai Combined Acres (% of total) |
|---|---|---|---|---|---|---|
| | | Bobtail[12] Creek HUC 6 Acres (% of Total) | Lower Pipe[13] Creek HUC 6 Acres (% of Total) | Cedar Creek – Kootenai River[14] HUC 6 Acres (% of Total) | West Kootenai BORZ 2010 Acres[15] (% of Total) | |
| Timber Harvest | 2 (Scenic/ Recreational), 3 (all), 4, 5 (all), 6, 7 | 10,189 (100%) | 14,498 (100%) | 6,175 (100%) | 168,193 (99%) | 199,055 (99%) |
| Timber Production | 6 | 10,181 (99.9%) | 14,498 (100%) | 5,914 (95.8%) | 151,609 (89%) | 182,202 (91%) |
| Commercial Use – Special Forest Products & Firewood | 5 (all), 6, 7 | 10,181 (99.9%) | 14,498 (100%) | 5,914 (95.8%) | 165,927 (98%) | 196,520 (98%) |
| Personal Use – Special Forest Products & Firewood | 1 (all), 2 (all), 3 (Recreational / Geological, Scenic), 5 (all), 6, 7 | 10,189 (100%) | 14,498 (100%) | 6,175 (100%) | 169,240 (99%) | 200,102 (99%) |
| Planned Fire Ignition | All | 10,189 (100%) | 14,498 (100%) | 6,175 (100%) | 169,699 (100%) | 200,561 (100%) |
| Natural, Unplanned Fire Ignitions to meet Resource Objectives | 1 (all), 2 (all), 3 (Scenic), 4, 5 (all), 6, 7 | 10,189 (100%) | 14,498 (100%) | 6,175 (100%) | 168,316 (99%) | 199,178 (99%) |
| Livestock Grazing | 5 (all), 6, 7 | 10,181 (99.9%) | 14,498 (100%) | 5,914 (95.8%) | 165,927 (98%) | 196,520 (98%) |

---

[11] Based on Table 14 on p. 69 in the Forest Plan (USFS 2015).

[12] Within the Bobtail HUC 6, there are also 42 acres of State lands, 2,169 acres owned by Stimson Lumber, and another 1,575 acres of private lands. Of the 10,189 acres of FS lands, 10,181 are in Management Area 6 (General Forest), with the remaining 9 acres in MA 2 (Eligible Wild and Scenic Rivers - Recreational). Figure 3

[13] Within the Lower Pipe HUC 6, there are also 596 acres of State lands, 2,547 acres owned by Stimson Lumber, and another 1,397 acres of private lands. Of the 14,498 acres of FS lands, all 14,498 acres are in Management Area 6 (General Forest). Figure 3

[14] Within the Cedar HUC 6, there are also 42 acres of Weyerhaeuser lands, 1,227 acres owned by Stimson Lumber, and another 3,620 acres of private lands. Of the 6,175 acres of FS lands, 5,914 acres are in Management Area 6 (General Forest), with the remaining 260 acres in MA 2 (Eligible Wild and Scenic Rivers - Recreational). Figure 3

[15] See Figure 4 for a map of the 2010 BORZ boundaries used in the Forest Plan consultation (2013). Figure 5 displays management areas within the West Kootenai BORZ boundary (2010).

Forest Plan Reinitiation BA                                              Kootenai National Forest

| Allowable Uses Under Forest Plan Management Area Direction | MA Where Allowed[11] | Current Condition | | | | |
|---|---|---|---|---|---|---|
| | | Bobtail[12] Creek HUC 6 Acres (% of Total) | Lower Pipe[13] Creek HUC 6 Acres (% of Total) | Cedar Creek – Kootenai River[14] HUC 6 Acres (% of Total) | West Kootenai BORZ 2010 Acres[15] (% of Total) | West Kootenai Combined Acres (% of total) |
| Wheeled Motor Vehicle | 2 (Scenic/ Recreational), 3 (Recreational / Geological, Scenic), 5b, 6, 7 | 10,189 (100%) | 14,498 (100%) | 6,175 (100%) | 157,198 (93%) | 188,060 (94%) |
| Over-the-snow Motor Vehicle | 1c, 2 (Scenic/ Recreational), 3 (Recreational / Geological, Scenic), 5b, 5c, 6, 7 | 10,189 (100%) | 14,498 (100%) | 6,175 (100%) | 167,603 (99%) | 198,465 (99%) |
| Road Construction (permanent or temporary) | 2 (Scenic/ Recreational), 3 (Recreational / Geological, Scenic), 6, 7 | 10,189 (100%) | 14,498 (100%) | 6,175 (100%) | 157,198 (93%) | 188,060 (94%) |
| Minerals – Leasable | 1b, 2 (all), 3 (all), 4, 5 (all), 6, 7 | 10,189 (100%) | 14,498 (100%) | 6,175 (100%) | 169,699 (100%) | 200,561 (100%) |
| Minerals - Materials | 2 (Scenic/ Recreational), 6, 7 | 10,189 (100%) | 14,498 (100%) | 6,175 (100%) | 156,097 (92%) | 186,959 (93%) |

The Access Amendment ROD was signed on November 11, 2011. As stated in the BO for the Access Amendment (p. B-86), "The Forests shall coordinate with State and federal agency biologists to collect credible grizzly bear observations that occur outside of the Recovery Zone boundaries and add this information to the 6th-order HUC database for inclusion into the annual report."

The first such meeting occurred a few months after the ROD was signed. On March 16, 2012, biologists from the FS, FWS, and IDFG met to review 2010-2011 credible grizzly bear sightings and update the existing database and BORZ areas (Bear Year 2011 Monitoring Report [USDA 2012]). At that meeting it was decided that the Bobtail Creek HUC 6 met the criteria used in the Access Amendment BORZ creation (Allen 2011).

Starting with the Bear Year 2011 and 2012 monitoring reports (USDA 2012 and 2013c) the Bobtail HUC 6 was added to the West Kootenai BORZ, including acres and miles of open and total roads. This was used as the updated existing condition and the Bobtail HUC 6 was included in all subsequent monitoring

Forest Plan Reinitiation BA                                    Kootenai National Forest

reports submitted to FWS (Bear Years 2011-2018 [USDA 2012, 2013c, 2014, 2015b, 2016, 2017, 2018, and 2019]). The BORZ standards regarding permanent increases in open and total roads were applied to the Bobtail HUC 6 and reflected in project analyses within the updated West Kootenai BORZ.

The understanding was that the intent from the Access Amendment was that the BORZ would grow as additional HUC 6s had enough credible observations meeting the criteria.

*Table 8. Wheeled motorized access in BORZ on the KNF, 2019. Shows all motorized routes (roads, trails, and railroad miles).*

| Bears Outside Recovery Zone | Grizzly Bear Recovery Zone | Total Area – NFS Lands (Acres) | Total Routes[1] – NFS Lands (Miles) | Open Routes[1] – NFS Lands (Miles) |
|---|---|---|---|---|
| **Cabinet Face** | Cabinet-Yaak | 27,083 | 165.0 | 133.6 |
| **Clark Fork** | Cabinet-Yaak | 100,209 | 267.4 | 186.4 |
| **West Kootenai (Combined)** | Cabinet-Yaak | 200,555 | 790.1 | 456.9 |
| **Tobacco** | Cabinet-Yaak | 266,992 | 1,192.7 | 936.4 |

[1] 2010 open/total road and motorized trail miles + corrections + expanded recurring use area open/total miles = 2019 BORZ open/total route miles.

Table 8 displays the existing motorized access condition for areas with recurring grizzly bear use as of 2019. This includes all corrections[16] to the existing 2010 baseline (Table 12 and Table 13), and subsequent expansions (i.e. Bobtail, Lower Pipe, and Cedar HUCs added to the West Kootenai BORZ) based on bears moving into new areas and the 2011 BORZ process (Allen 2011[17] - see Appendix G in this BA).

The no-net increase in permanent motorized route miles applies to all areas that meet the definition of BORZ (i.e. 2010 and subsequent expansions) listed in Table 8. As new HUCs meet the definition of recurring use, and are added to the adjacent BORZ (e.g. West Kootenai + Bobtail HUC + Lower Pipe HUC + Cedar HUC = Combined West Kootenai) then a new (combined) baseline will be recorded in the annual report that is sent to the USFWS. The information in Table 8 displays the motorized access baseline as of the 2019 bear year that will be included in the monitoring report that is sent to the USFWS in April 2020.

Annual monitoring reports shall include the following information for BORZ:

1. Baseline Corrections— if the Forest discovers roads that existed in the BORZ at the time the BORZ polygon was delineated (i.e. 2010 for the original BORZ, or other years for expansion areas), corrections will be made to the baseline and described as such.

2. Baseline Expansions—if the Forest determines, with Forest Service biologists and grizzly bear experts with USFWS, that a HUC meets the recurring use criteria and will be added to a BORZ polygon, the BORZ polygon will be expanded. If within BORZ the baseline roads were x, and the

---

[16] Corrections = database errors and omissions in the total count of linear miles of road and are not a reflection of on-the-ground changes. **Database or mapping errors that do not reflect actual on-the-ground changes in the motorized access environment are not expected to result in any effects to grizzly bears.**

[17] Page 2 of Allen 2011 notes: "*The methodology allowed for future expansion in the overall size of the BORZ if adjacent 6th order HUCs experienced repeated visitation by grizzly bears*"

Forest Plan Reinitiation BA                                      Kootenai National Forest

expansion area had z miles[18], then the expanded BORZ will have miles = x + z. This expansion of the baseline is not expected to affect bears, since the roads are in place at the time bears have chosen to occupy the area.

3. Permanent changes in the BORZ. Permanent roads are added to the Forest Service road system, and either added to the MVUM for public use or managed for administrative use only. This includes permanent roads that are constructed, open roads that become closed, and/or any roads that are decommissioned or become un-drivable.  These get added or subtracted from the BORZ, appropriately, and are subject to the "no net increase" in permanent miles standard.

4. Temporary changes in the BORZ. This includes temporary roads that are constructed for project-specific purposes, or temporary opening of a closed road for administrative access. These temporary changes are not subject to the "no net increase" in permanent miles standard.

## BMUs - Wheeled Motorized Access

The LMRP established timeframes in which all standards in individual BMUs in the SRZ and CYRZ would be met (i.e. completion by 2019; Access Amendment Design Element I. C. 1.)[19]. Appendix A reflects the current condition and changes over time in BMUs since the Access Amendment was finished in 2011 as well as the current condition of the BMUs within the CYRZ on the KNF.

Access Management conditions in the CYRZ and SRZs have been improving since the Access Amendment was finalized, as documented in annual monitoring reports sent to the USFWS (U.S. Forest Service 2012, 2013c, 2014, 2015b, 2016, 2017, 2018, 2019).

In the KNF portion of the CYRZ, there was an increase of >7,000 acres of designated Core Areas from 2009 to 2019. This translates into an increase from 59 to 60 percent Core Area during this time period. The corresponding KNF wide OMRD stayed the same at 30[20] percent while TMRD decreased from 25 to 24 percent for the same time period.

Temporary increases in linear miles of roads within the BORZ, and temporary increases in road densities within the BMUs, allowable under the FP standards, are disclosed in the annual monitoring reports.

---

[18] In the case of the Lower Pipe and Cedar HUCs, the mild winter in 2019-2020 and low elevation of the HUCs allowed on-the-ground verification of route status in some portions of these HUCs to aid in identifying a baseline condition. This may not always be possible. The annual monitoring reports are developed during the winter months (i.e. after a bear-year has ended) and are submitted to USFWS by April 15 each year. Winter conditions and the location of routes within a HUC may not always allow field verification in the winter. The inability to field verify during development of the annual monitoring report would increase the likelihood of future corrections to the database as errors are found.

[19] Actual accomplishment dates would depend on management priorities, funding, and the completion of required environmental analyses under the National Environmental Policy Act.

[20] If compared to the status of roads once breaches and emergency closures are returned to their legal status in the 2019 calculations. If breaches and emergency use are included in the calculations, the percentage in 2019 increases to 31%.

Forest Plan Reinitiation BA                                    Kootenai National Forest

Four BMUs on the KNF have not yet reached all of the standards[21]. BMU 5 (St. Paul) would have been brought into compliance[22] by road access changes associated with the Rock Creek Project Phase 1 and the Montanore Evaluation Project. BMU 6 (Wanless) would have been brought into compliance by road access changes associated with the Montanore Evaluation Project and the Miller-West Fisher Project. However, litigation on these projects has delayed implementation of the proposed mitigation measures to bring these BMUs into compliance. It is anticipated that **_implementation_**[23] could occur by the end of 2022, assuming these projects stay on schedule. BMU 5 is currently at the TMRD standard (23), is better than the OMRD standard (Bear Year 19 was at 28 and the standard is 30), and does not meet the core standard (BY 19 was at 58 and the standard is 60). BMU 6 is currently better than the OMRD standard (BY 19 was at 32, including temp increases, and the standard is 34), does not meet the TMRD standard (BY 19 was at 34 and the standard is 32) or core (BY 19 was at 53 and the standard is 55). Please see Table 11 for a summary of access management parameters for these BMUs. Both of these BMUs straddle the main Cabinet Mountains and the Cabinet Mountain Wilderness Area on the southern end of the mountain range. These BMUS are listed as Priority 1 in the Access Amendment ROD (p. 66 in USFS 2011b).

An access management project in BMU 4 (Bull), which is intended to bring BMU 4 into compliance with the Access Amendment, is in the early phases of planning. It is expected to take several years to complete project planning as well as implementation. Some scoping has been done and some potential alternative routes have been identified that could bring the BMU into compliance with the existing standard. A project decision is expected in Fiscal Year 2022 with **_implementation_** occurring in Fiscal Year 2023. BMU 4 does not meet the OMRD standard (BY 19 was at 38 and the standard is 36), TMRD standard (BY 19 was at 30 and the standard is 26), or core standard (BY 19 was at 61 and the standard is 63). Please see Table 11 for a summary of access management parameters for this BMU. BMU 4 straddles the Bull River and connects the main Cabinet Mountains and the Cabinet Mountains Wilderness Area with the West Cabinets and Idaho. Private lands along the Bull River have been an obstacle to meeting standards in this BMU due to the development of these lands and increase in roads. This BMU is listed as a Priority 2 in the Access Amendment ROD (p. 66 in USFS 2011b).

---

[21] Note that there are an additional two BMUs that are temporarily above road density standards due to ongoing project activities. Temporary increases are allowed under the Access Amendment. Both BMUs are expected to return to meeting the standard post-implementation. Both the Starry Goat (BMU 9 – Callahan) and OLY (BMU 10 – Pulpit) met the standards pre-project and will again post-project. In-kind replacement of core already occurred with both projects, and the increases of during-project road densities are temporary. BMU 9 is expected to again meet standard by the end of Bear Year 2020, and BMU 10 will meet standards again by the end of Bear Year 2022. These projects have already undergone project specific consultation. Table 11 shows the changes in these BMUs over time.

[22] Compliance with the standards occurs when implementation has made the changes on the ground, not when the project decision is signed.

[23] There is a lag time between project decision and the completion of project implementation that finally results in compliance on the ground with access management standards for grizzly bears. Project level BAs describe how projects would bring BMUs into compliance with access management standards, but it often takes several years once a project decision is signed for the access changes to be implemented on the ground. Timber sales, for example, may take more than 5 years to be completed, partially because the purchaser may opt to delay the start of project implementation for several years. Litigation is another factor that may delay implementation of access management changes that would improve conditions on the ground for grizzly bear.

Forest Plan Reinitiation BA                                    Kootenai National Forest

BMU 8 (Vermillion) is also out of compliance due to database corrections that account for a previous re-route of a motorized trail. A small access management project will be planned for this BMU to bring it into compliance with a project decision by the end of Fiscal Year 2020 and **implementation** expected in Fiscal Year 2021. BMU 8 currently meets the OMRD standard (standard is 32), does not meet the TMRD standard (BY 19 was at 22 and the standard is 21), and core is better than the standard (BY 19 was at 58 and the standard is 55). Please see Table 11 for a summary of access management parameters for this BMU. This BMU is listed as a Priority 3 in the Access Amendment ROD (p. 66 in USFS 2011b). It lies on the southern end of the main Cabinet Mountains adjacent to the Lolo National Forest and is outside of the Cabinet Mountains Wilderness.

Table 9 include a summary of the land management decisions and implementation activities that have occurred since 2010 or are pending for the CYRZ.

*Table 9. Known/anticipated changes in grizzly bear access parameters since 2010 in the CYRZ by project name and BMU on the Kootenai NF. This does not include emergency consultation and changes to BMUs due to fire suppression activities. NC = no change in parameter.*

| Project Name and Decision Date | Bear Management Unit | Motorized Access Parameters | | | Comments |
|---|---|---|---|---|---|
| | | OMRD Change (%)[1] | TMRD Change (%)[2] | CORE Change (%)[3] | |
| BMU 4 - pending | 4-Bull | -2 | -4 | +2 | Access management project is in the early stages of planning and is intended to bring the BMU to standard. A project decision is expected in Fiscal Year 2022 with implementation occurring in Fiscal Year 2023. |
| Rock Creek Project Phase 1 Supplemental BO 2019, Final ROD pending | 5-Saint Paul | -1 | -3 | +3 | Project in consultation. No access changes occur under Phase 1, Proposed motorized access changes would not occur until Phase 2. Project has been delayed due to litigation. |
| Montanore Evaluation Project - pending | 5-Saint Paul | -1 | -4 | +4 | Project in consultation. Project has been delayed due to litigation. |
| Miller West Fisher - 2009 supplemental FSEIS 08/2017 and Final ROD 10/17 | 6-Wanless | NC | NC | +1 | Core not yet improved on the ground. BORZ part of the project delayed due to litigation. |
| Montanore Evaluation Project - pending | 6-Wanless | NC | -3 | +4 | Project in consultation. Project has been delayed due to litigation. |
| BMU 8 - pending | 8-Vermillion | NC | -1 | NC | Project is intended to bring the BMU to standard. A project decision is expected by the end of Fiscal Year 2020 with implementation in Fiscal Year 2021. |

7-ER-1542

FS-000967

Forest Plan Reinitiation BA                                          Kootenai National Forest

| Project Name and Decision Date | Bear Management Unit | Motorized Access Parameters | | | Comments |
|---|---|---|---|---|---|
| | | OMRD Change (%)[1] | TMRD Change (%)[2] | CORE Change (%)[3] | |
| Starry Goat – Final ROD 06/22/2018 | 9 – Callahan | NC | NC | NC | In-kind core replacement, and temp increases in road densities. Temporary increases should return to standard by the end of Bear Year 2020. |
| Libby-Troy Powerline EIS | 10 – Pulpit | NC | NC | +1 | BMU was at standard in 2014. |
| OLY (Lower-Yaak, O'Brien, Sheep) – Final ROD 10/7/2016 | 10 – Pulpit | NC | NC | NC | Project involved in-kind replacement of core and temporary increase in OMRD. Post project returns to existing condition (better than standard) for OMRD. Implementation is on-going and is expected to return to standard by Bear Year 2022. |
| Grizzly Project – Final ROD 2/8/2012 | 11 – Roderick | NC | -2 | +1 | Project work ongoing, but the project has already met the standard on the ground at the end of Bear Year 2019. |
| BMU 12 – Completed 2019 | 12 - Newton | NC | -1 | NC | Some gated roads barriered in Bear Year 2019 to bring TMRD to standard. Also database was corrected for some roads that were previously identified as open but were in fact barriered on the ground. Changes will be reflected in the Bear Year 2020 report. |
| BMU 13 | 13 – Keno | NC | NC | +0.7 | No change on KNF side, although IPNF has a project (Deer Creek) that is ongoing and will bring BMU to standard. Decision date – 06/13/2014. Most of the timber harvest within the BMU has been completed. Final road maintenance still needs to be completed. |
| Northeast Yaak Project – ROD 4/16/2007 | 16 – East Fork Yaak | NC | -2 | +1 | Project implementation resulted in parameters meeting or being better than the standard. |

[1] (-) (+) and (NC) indicates a percentage decrease, increase or no change in Open Motorized Road Density
[2] (-) (+) and (NC) indicates a percentage decrease, increase or no change in total Motorized Road Density
[3] It takes 2-6 miles of change in wheeled motorized vehicle access status to achieve a one percent increase in Core (Johnson et al. 2008).

7-ER-1543

FS-000968

Forest Plan Reinitiation BA                                                    Kootenai National Forest

A key feature of the **Standard FW-STD-WL-02** (i.e. Appendix E) is the requirement to monitor at least 30 percent[24] of closure devices (gates and barriers) annually to ensure the effectiveness of the open road density parameter.

Roads are closed for motorized travel through a variety of methods. This may include a physical barrier (metal and post barricade, large rocks, or earthen or rock berm/and a ditch. Since 2011, roads closed to provide security are no longer simply "bermed" or "tank-trapped" to prevent motorized use. Instead, to ensure that roads are closed, decommissioned, stored or barriered roads to create core are put in a condition such that a need for motorized access for maintenance is not anticipated for at least 10 years (A.A. Design Element 1.B. f), and roads have culverts removed, non-drivable waterbars installed and/or slash placed on the surface, and are partially or fully recontoured—or some combination of these methods. As a result, in general roads closed since 2011 to provide core habitat are even more effective at preventing motorized use.

### Monitoring the Effectiveness of Road Closures

The KNF monitors and enforces closures and restrictions on routes entering and within the Cabinet-Yaak Recovery Zone. Information on year round open road, seasonally open roads and related road closure orders is available through signing, KNF Ranger District Travel Access Maps, Motor Vehicle Use Maps (MVUM) which are available at district offices, local stores, and on the World Wide Web. Closures are enforced through law enforcement patrols, and gate and barrier monitoring. The KNF monitors closures during the active bear season to determine whether unauthorized use has occurred. Unauthorized use is determined by damage to or removal of the restriction device, by vegetation and ground disturbance that indicate wheeled motorized vehicle use.

The Forest Service submits annual reports to the USFWS documenting the progress made toward achieving and maintaining the standards for core area, OMRD, and TMRD within the recovery zones (USDA Forest Service 2012, 2013c, 2014, 2015b, 2016, 2017, 2018, 2019) and open/total linear miles of road within the BORZ. These annual reports reflect effects to core, OMRD and TMRD (expressed as whole percentages) from on the ground conditions for that bear year, and include consideration of projects such as timber sales, special uses, administrative access which exceeds allowed use (Appendix C), and any documented illegal motorized use. To err on the side of the bear and show all potential effects, if illegal motorized access has occurred on a restricted route, the route is analyzed as open for the entire bear year, even if the route may only receive little or short term use. Unauthorized motorized

---

[24] In 2010, the Forests, in consultation with USFWS, proposed monitoring 30 percent of closure devices (gates and barriers) annually within the respective grizzly bear ecosystems, so as to ensure the effective implementation of the open road density parameter of their Access Amendment (USFS 2010, pg. 12). The 30 percent target was arrived at through consideration of the planning team's knowledge of past monitoring efforts and results, the anticipated staff capacity and budgets; and would result in at least 90 percent verification over a three-year cycle. The USFWS acknowledged and considered this design element in the 2011 Biological Opinion (USFWS 2011a, pg. 17). The Forests signed the Access Amendment Record of Decision on November 9, 2011, adopting this monitoring plan (USFS 2011b, ROD, pg. 14, 63). Consequently, beginning in 2012, the Access Amendment Forests were required to ensure that at least 30 percent of the gates and barriers within the recovery zones were monitored annually. Forest personnel attempt to repair or replace any vandalized gates and locks as soon as possible. Where road closures have been driven around, steps are taken to block this illegal access as soon as possible using boulders, earthen berms, root wads, or other means (see annual Bear Year monitoring reports, from 2012-2020).

Forest Plan Reinitiation BA                                   Kootenai National Forest

use occurs both in the form of breaching of closure devices, and user-created routes. Both kinds are included in the monitoring reports and are closed as soon as practicable after discovery.

The KNF has spent considerable resources replacing and improving closure devices over the years. Damaged or stolen gate locks are regularly replaced, key use is closely monitored and keys cannot be duplicated. Closure devices that are damaged or ineffective[25] are reported to the district engineering shop, which prioritizes and repairs or reinforces the device as resources permit, but as soon as practicable. The Ksanka Ranger District purchased a small Kubota backhoe to facilitate repair and reinforcement of motorized restriction devices in a timely manner.

Table 10 demonstrates the results of closure device monitoring on the KNF since the Access Amendment was signed. More than the minimum 30% of closure devices in the CYRZ have been monitored in any given year. From 2011-2019, a yearly average of **59** percent of closure devices in the Kootenai NF portion of the CYRZ were monitored to ensure OMRD compliance. These monitoring efforts detected unauthorized motorized activity that may impact core, either through cross-country travel or use of non-motorized trails or older road closures. Monitoring ensures compliance with the OMRD limits and that any damaged closures are promptly repaired. See the annual monitoring reports for more details on this effort (USDA Forest Service 2012, 2013c, 2014, 2015b, 2016, 2017, 2018, 2019, 2020 [in progress]).

---

[25] Effective closures are those that prevent unauthorized motorized use.

7-ER-1545

FS-000970

Forest Plan Reinitiation BA                                    Kootenai National Forest

*Table 10. Documented closure breaches[1] in BMUs on roads managed by the KNF[2] (2011-2019 bear year).*

| BMU | | Bear Year | | | | | | | | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| CABINET-YAAK | Cedar (1) | | | 4 1:<0.6% | | | | 4 1:<0.1% | | |
| | Snowshoe (2) | 7 0:0% | | 3 1:0.4% | | 1 1:0.6% | | | 2 0:0% | 3 0:0% |
| | Spar (3) | 2 0:0% | | | 2 0:0% | 1 0:0% | | | | |
| | Bull (4) | | | | | | | | | |
| | St. Paul (5) | | | | 1 0:0% | | | | | 2 0:0% |
| | Wanless (6) | 1 0:0% | | | | | | 2 0:0% | 11 1:0.2% | 4 1:0.4% |
| | Silver Butte - Fisher (7) | | | | | | | | 2 0:0% | 8 0:0% |
| | Vermillion (8) | | | | | | | | | 1 1:0.02% |
| | Callahan (9) | | | | 3 1:<0.05% | | | | | 2 1:0.4% |
| | Pulpit (10) | 2 2:<0.6% | | 1 0:0% | 3 2:<0.05% | 2 2:<0.1% | 2 0:0% | | 1 1:0.06% | 1 1:0.7% |
| | Roderick (11) | | | | | | 1 1:<0.3% | | | 2 0:0% |
| | Newton (12) | | | | | 3 0:0% | | | | 3 1:0.1% |
| | Keno (13) | | | | | 2 1:<0.1% | 1 1:<3.0% | | | |
| | Northwest Peak (14) | | | | | | 1 1:<0.1% | | | |
| | Garver (15) | 1 1:<0.1% | | | 2 2: <3.0% | | 6 5:<2.0% | | | 3 2:1.4% |
| | East Fork Yaak (16) | | | | 3 0:0% | | 4 4:2.1% | 1 0:0% | | 3 1:1.6% |
| | Big Creek (17) | | | | | | | 2 0:0% | 3 2:0.6 | 1 1:0.02% |
| | **Total # Breaches (# of Breaches that affect Core)** | **12(3)** | **0** | **8(2)** | **15(5)** | **9(4)** | **15(12)** | **9(1)** | **19(4)** | **33/9** |
| | **Total Devices[3]** | **954** | **961** | **987** | **765[4]** | **603** | **603** | **605** | **605** | **866[4]** |
| | **Monitored (# (%))** | **410(43)** | **519(54)** | **594(60)** | **344(45)** | **513(85)** | **452(75)** | **398(66)** | **229(38)** | **619 (71)** |
| | **Ineffective (%)[5]** | **3%** | **0%** | **1%** | **4%** | **2%** | **3%** | **2%** | **8%** | **5%** |

[1]Includes core and gate breaches. Breaches that affect adjacent BMUs are only counted once. Core breaches are counted in the total, then specified as (# breaches: % core affected).
[2] Only breaches on KNF roads are included in BMUs co-managed with the IPNF (Keno and NW Peaks).
[3]Gates and barriers. This includes gates that restrict use to 'undrivable' roads and gates that may have additional gates behind them. The latter explains some of the apparent 'jump' in gate numbers from 2016 to 2017. Most high-visibility gates gets monitored 3-5 times per year.
[4]As of 2014, the monitoring report only covers devices in the recovery zone or entering the recovery zone. This explains the reduction in the number of devices monitored from 2013 to 2014. Prior to that the total included

Forest Plan Reinitiation BA                                      Kootenai National Forest

devices on roads outside of the recovery zone. Additionally, the database was updated to reflect conditions on the ground due to data collected in 2015. As of spring 2016 the numbers for Rexford RD and Libby District have been further refined to reflect more accurate counts. On the ground data collected in 2018 and 2019 further updated the number of closure devices as a number of impassable roads (due to vegetation) were found to actually have a barrier in place, among other database updates.
[5]Ineffective = percent of monitored closure devices (gates and other barriers/closures) that experienced a breach or unauthorized use.

Table 10 demonstrates that 92 to 100 percent of all monitored closure devices (gates and barriers) were found to prevent unauthorized use, depending on the year, with an average of 97 percent from 2011-2019 in the portions of the CYRZ BMUs managed by the KNF. Table 10 estimates it appears that the level of illegal use at approximately 0-8% of closure devices in the BMUs.

BORZ areas are more roaded and have more human use compared to BMUs, and the monitoring within the BMUs doesn't necessarily translate to the BORZ. Even with more roads, more human use, and more land management activities within the BORZ compared to the BMUs, grizzly bears still occur within the BORZ areas. Bears are still using the BORZ, including the expanded BORZ areas (Bobtail, Lower Pipe, and Cedar HUCs), with the current level of unauthorized motorized use. The grizzly bear population has continued to increase within the Cabinet-Yaak (Kasworm et al. 2019), even with the current unauthorized motorized use within both the recovery zone and BORZ.

There is some level of illegal use occurring within the BORZ. Although there is no formal requirement to monitor closure devices outside of the recovery zone, monitoring and maintenance does occur. Closure device monitoring occurs both within and outside of the recovery zone as part of the districts' "adopt-a-road," "adopt-a-drainage," or similar programs. Drainages/areas are monitored twice a year, for instance, to open then close seasonal gates and to monitor year-long closure devices. Additional unauthorized use is discovered and reported by Forest Service employees and the public. Breaches are repaired based upon a general prioritization of those within the recovery zone, those within the BORZ, and those outside of both the recovery zone and BORZ. Repairs are dependent on resource availability, but are repaired as soon as possible and generally within the same bear-year.

When a project proposes motorized route changes, surveys are completed in the project area. For these projects a Travel Analysis Process Report (TAP) is conducted to help meet the travel management regulations (36 CFR 212.5(b)). The TAP report assists in determining the minimum road system needed for safe and efficient travel and for administration, utilization, and protection of National Forest System lands within the project area. Through the TAP, the interdisciplinary team identify needs and make recommendations for road maintenance, decommissioning, long-term storage of roads, and closures. Unauthorized motorized use is identified, if occurring, within the project area through the TAP. Unauthorized routes are closed or stored, if not needed, during project implementation.

Due to the increase in motorized UTVs with higher clearance and the ability to navigate steep embankments, earthern berms and ditches, as well as the use of mobile welders to cut through locks and gates, the KNF has increased monitoring efforts to identify illegal motorized use. The KNF has found that wooden board barrier gates are now routinely removed or damaged and has been working toward identifying and replacing these with more substantial restriction devices[26].

---

[26] Wooden barrier gates are primarily found outside of the Recovery Zones and the BORZ.

Forest Plan Reinitiation BA                                      Kootenai National Forest

These breaches of closure devices are illegal, but they do occur, and may impact grizzly bears. Similar to motorized use on legally open roads and trails, the potential effects may include disturbance to individual bears, less bear use of habitat near the routes that are breached, and risk of grizzly bears being maliciously shot or shot due to mistaken identity. Although breaches of closure devices occur, they occur at low levels (e.g. ~0-8% within BMUs, Table 10). Impacts to individual bears are more likely to occur from breaches within the recovery zone due to the presence of more bears, compared to the BORZ where fewer bears are present. The BORZ areas have not been identified by USFWS as essential to the recovery of grizzly bears in the SCYE. Any future expansion of BORZ areas are likely to have unauthorized use occurring as well.

### High-Use Non-Motorized Trails

While compiling the Bear Year 2019 monitoring report (USFS 2020, in progress), analysis of monitoring data revealed that two non-motorized trails on the KNF, the Leigh Lake Trail in BMU 2 (Snowshoe) and the Ross Creek Cedars Trail in BMU 3 (Spar), appear to meet the threshold of high-use (average of at least 20 parties per week during the bear-year). Both BMUs are currently 2-3% better than the core standard (standard = 75 in BMU 2 and 59 in BMU 3), and the loss of core due to these trails does not reduce either BMU below the standard. BMU 2 lost approximately 403 acres of core, and BMU 3 lost approximately 183 acres. Neither loss was enough to change the core percentage in either BMU. The KNF will examine options for replacing the lost core habitat acres within these BMUs through site-specific analysis.

### Over-snow Motorized Use

The KNF would need several years to complete a Winter Travel Plan that addresses over-the-snow motorized use. Winter travel planning is expected to be completed in FY 2024.

At the time of the consultation on the revised Forest Plan, the amount of overlap of over-snow motorized use during spring emergence in denning habitat was estimated at 5 percent of denning habitat within the KNF portion of the CYE (p. II 59 in USDI Fish and Wildlife 2013). Within the NCDE portion of the KNF the overlap was estimated at 21 percent (ibid). This overlap was expected to decrease once winter travel plans were implemented (ibid). Both the CYE and NCDE populations of grizzly bears have increased since the revised Forest Plans were completed, which has occurred with the existing levels of overlap of over-snow motorized use in denning habitat during spring emergence.

Since spring of 2016, the KNF has contributed funding for monitoring flights to map the use of over-snow motorized vehicles in areas of potential overlap with denning habitat. Monitoring has focused on the Northwest Peaks/Buckhorn Ridge and Spar Lake vicinities within the CYE. These are areas that can be accessed by over-snow motorized vehicles in the spring and have denning habitat. Monitoring indicates that the distribution of over-snow motorized use in these areas has been similar over the last several years.

### Northern Continental Divide Ecosystem

The KNF's portion of the Northern Continental Divide Ecosystem's (NCDE) Primary Conservation Area (PCA = Recovery Zone) covers 118,770 acres in the northeast portion of the Forest. This represents only 2 percent of the entire PCA. Most of the PCA on the KNF is within the Murphy Lake BMU, consisting of the Krinklehorn and Therriault subunits. Another 283,300 acres of the KNF lie within Zone 1 of the NCDE, which mostly overlaps with the Tobacco BORZ. The KNF only has 6 percent of the total acreage of Zone 1

Forest Plan Reinitiation BA                                    Kootenai National Forest

of the NCDE. Most of the Zone 1 on the KNF is also within the NCDE's Salish Demographic Connectivity Area (DCA) at 276,822 acres (p. 40 in USFS 2017b)

The NCDE grizzly bear population has been increasing over the last several decades and is likely over 1,000 bears and their distribution occupies an area about twice the size of the recovery zone (p. 26 in USDI Fish and Wildlife 2017). The expanding NCDE population is important to the CYE due to its potential to provide demographic connectivity (p. 27, Ibid).

The Record of Decision for the Forest Plan Amendments to Incorporate Habitat Management Direction for the Northern Continental Divide Ecosystem Grizzly Bear Population (Helena-Lewis and Clark National Forest, Kootenai National Forest, and Lolo National Forest) was signed on December 24, 2018 (USFS 2018b). This amendment included desired conditions, standards, and guidelines intended to support the recovery of the NCDE population of grizzly bears and only applied to the NCDE portion of the KNF (PCA, Zone 1, and DCA). This amendment included Forest Plan direction for access and recreation, vegetation management, grazing, special forest products, renewable/non-renewable energy and mineral resources, and connectivity. A biological assessment was completed on March 13, 2017 (USFS 2017b), with a biological opinion dated November 21, 2017 (USDI Fish and Wildlife 2017).

As stated on p. 5-6 of the NCDE Amendment BA (USFS 2017b), some of the key features of the amendment included:

1. Special orders for storage of food/wildlife attractants would be in place across NFS lands in the primary conservation area, zone 1 and zone 2.
2. Within the primary conservation area, open motorized route density, total motorized route density, and secure core would be maintained at baseline levels in each grizzly bear subunit. High intensity use nonmotorized trails would no longer be counted in the calculations. Temporary increases in open and total motorized route densities and temporary decreases in secure core would be allowed for projects. No temporary use by the public during the non-denning season would be authorized within secure core.
3. In the demographic connectivity areas, habitat protections would focus on limiting miles or density of motorized roads/routes open to the public during the non-denning season.
4. Within modeled grizzly bear denning habitat in the primary conservation area, there would be no net increase in the percentage of area or miles of routes that are open to over-snow vehicle use on NFS lands during the den emergence time period.
5. Within the primary conservation area, developed recreation sites designed and managed for overnight use during the non-denning season would be limited to one increase above the baseline in number or capacity per decade per bear management unit.
6. Vegetation management would be designed to consider grizzly bear habitat and to reduce the risk of grizzly bear-human conflicts within the primary conservation area.
7. Livestock allotments in the primary conservation area would have requirements for no net increase in the number of cattle and sheep allotments and no net increase in sheep AUMs. Livestock allotments would be managed to limit the risk of grizzly bear-human conflicts in the primary conservation area and zone 1.
8. Minerals and energy development would be managed with consideration of grizzly bear habitat and to reduce the risk of grizzly bear-human conflicts in the primary conservation area and zone

7-ER-1549

Forest Plan Reinitiation BA                                          Kootenai National Forest

1. New leases for fluid minerals (e.g., oil and gas) in the primary conservation area would be required to have a no surface occupancy stipulation.

9. Forest plan monitoring items would be added.

Standard NCDE-KNF Zone 1-STD-01 from the NCDE Amendment does reference the 2015 Forest Plan and restates that there will be no increase in permanent linear miles of open roads, total roads, or motorized trails within the BORZ polygons, with listed exceptions (i.e. those allowed under the 2011 Access Amendment, incorporated into the 2015 Forest Plan as Appendix B in the Forest Plan).

The analysis completed for the NCDE Amendment, including the BA and BO, still represent the most up-to-date information for the KNF's portion of the NCDE and are incorporated into this analysis by reference.

## Effects of the Proposed Action

The Proposed Action represents a programmatic decision, thus there would be no immediate environmental consequences of the proposal. Any immediate effects would occur later at the project level when site specific decisions are made based on the direction provided in the Proposed Action.

### Effects of Extending the Timeline to Meet BMU Standards

Although the KNF has pursued compliance with the AA standards, four BMUs remain out of compliance and did not meet the November 2019 timeline for BMU compliance.

BMU 5 (St. Paul) would have been brought into compliance by road access changes associated with the Rock Creek Project Phase 1 and the Montanore Evaluation Project. BMU 6 (Wanless) would have been brought into compliance by road access changes associated with the Montanore Evaluation Project and the Miller-West Fisher Project. However, litigation on these projects has delayed implementation of the proposed mitigation measures to bring these BMUs into compliance. It is anticipated that implementation could occur by the end of 2022, if these projects stay on schedule.

An access management project in BMU 4 (Bull), which is intended to bring BMU 4 into compliance with the AA, is in the early phases of planning. It is expected to take several years to complete project planning as well as implementation. Some scoping has been done and some potential alternative routes have been identified that could bring the BMU into compliance with the existing standard. A project decision is expected in Fiscal Year 2022 with *implementation* occurring in Fiscal Year 2023.

BMU 8 (Vermillion) is also out of compliance due to database corrections that account for a previous re-route of a motorized trail. A small access management project will be planned for this BMU to bring it into compliance with a project decision expected by the end of Fiscal Year 2020 and *implementation* expected in Fiscal Year 2021.

There are an additional two BMUs that are temporarily above road density standards due to ongoing project activities. Temporary increases are allowed under the Access Amendment. Both BMUs are expected to return to meeting the standard post-implementation. Both the Starry Goat (BMU 9 – Callahan) and OLY (BMU 10 – Pulpit) met the standards pre-project and will again post-project. In-kind replacement of core already occurred with both projects, and the increases of during-project road densities are temporary. BMU 9 is expected to again meet standard by the end of Bear Year 2020, and BMU 10 will meet standards again by the end of Bear Year 2022. These projects have already undergone

Forest Plan Reinitiation BA                                    Kootenai National Forest

project specific consultation. Table 11 shows the changes in these BMUs over time. While these projects are ongoing they would continue to potentially impact grizzly bears through the increased road densities and associated disturbance from activities. See those project specific consultations for details, but in general these temporary increases in road density would impact grizzly bears along a similar timeframe as it will take to get BMUs 4, 5, 6 and 8 to standard.

The longer timeframe to reach compliance with the access standards in the four BMUs (4, 5, 6, and 8) would prolong the existing conditions within those BMUs and the effects associated with motorized access routes. The temporary increases in road density in BMUs 9 and 10 would continue to impact grizzly bears for the next couple years as well.

Displacement effects would continue at their current levels and would not be reduced until these BMUs meet the access standards. Similarly, the mortality risks associated with the existing amount of motorized routes within BMUs 4, 5, 6, and 8 would continue at their current levels and would not be reduced until the BMUs reach standards. All age classes and both male and female bears may be impacted, including females with young.

The relationship between grizzly bears and roads has been studied extensively (i.e., Boulanger and Stenhouse 2014, Kasworm and Manley 1990, Mace and Manley 1993, Mace et al. 1996, Mace and Waller 1997, Mattson et al. 1987, McLellan and Shackleton 1988, Proctor et al. 2018, Wakkinen and Kasworm 1997, Schwartz et. al 2010). Human use of motorized roads and trails within occupied grizzly bear habitat may produce or facilitate several kinds of adverse effects to grizzly bears, including the following:

- Bears may be displaced[27] from preferred habitat by the human disturbance associated with road use, with a resultant reduction in habitat availability and quality and potential effects on nutrition and reproduction.
- Direct shooting resulting in injury or mortality may occur through mistaken identity for black bears or other game animals, through defense of life actions, through poaching for trophy animals, and through malicious killings.
- Attractants (human and animal foods and garbage) brought into grizzly bear habitat in motorized vehicles may result in habituated bears that may eventually need to be destroyed, or may result in human/bear conflicts that result in a poor outcome for the bear.
- Some bears may become conditioned to the presence of vehicles and humans on roads and thus become more vulnerable to direct mortality through the means identified above.
- Direct vehicle collision mortality may occur along major highways within and between the SRZ and CYRZ, both on NFS and private lands.

Consequently, human action on roads can negatively impact grizzly bear survival to reproduce and, ultimately, depress population productivity (MacHutchon and Proctor 2015). Given this reality, habitat security is an important element of grizzly bear management, helping to minimize human-caused bear

---

[27] As defined in the Access Amendment BO (p. A-48 in USDI FWS 2011), displacement from roaded areas is when bears respond with a longer term avoidance and movement to another area due to human use/presence. When bears avoid roaded areas they forgo the resources in those areas, which may result in under-use of key habitats.

Forest Plan Reinitiation BA                                          Kootenai National Forest

mortalities and displacement from preferred habitats. By definition, security habitat[28] is an area or space outside or beyond the influence of high levels of human activity. Managing wheeled motorized access is an important component of providing sufficient secure and effective habitat for grizzly bears.

Illegal motorized use on roads behind breached closure devices occur and contribute to effects to grizzly bears. The known extent of illegal use and potential effects are disclosed above in the Existing Condition section of this BA (page 37). As described previously, the KNF monitors closure devices and works to close the breaches as soon as practicable to reduce impacts to grizzly bears and other resources.

The current LRMP direction FW-DC-WL-02, FW-DC-WL-04 and 05, FW-STD-WL-02 and 03, FW-GDL-WL-10, MA1a-DC-WL-01, MA1b-DC-WL-01, MA1c-DC-WL-01, MA3-DC-WL-01, MA5abc-DC-WL-01, GA-DC-WL-KOO-03, GA-DC-WL-LIB-02 and 03, GA-DC-WL-TOB-01, and GA-DC-WL-TOB-03 reduce the possibility of road related impacts by creating security habitat with lower human presence due to lack of motorized access.

Overall, implementation of the Proposed Action would reduce the possibility of road related impacts to grizzly bears by creating security habitat with lower human presence due to lack of wheeled motorized access. This security habitat provides areas on the Forest where bears can escape the disturbance, displacement and increased mortality risk associated with roads. *This will remain the same but will take several years longer to achieve. Access management projects to bring BMUs 4 and 8 to standard are in planning, and compliance for BMUs 5 and 6 have been delayed by litigation on the Rock Creek and Montanore Mines. Implementation is expected in Fiscal Year 2021 for BMU 8, 2022 for BMUs 5 and 6, and 2023 for BMU 4.*

## Effects of Extending the Timeline to Complete Winter Travel Planning

Over-the-snow vehicles are considered to be motorized vehicles and presumably are somewhat similar in their disturbance effects to grizzly bears as motorized wheeled vehicles. However, impacts from over snow vehicles to hibernating bears are not well documented. Additionally, because the potential response of individual bears to disturbance in winter varies greatly from no response to den abandonment, the possible impacts to individual bears is difficult to measure. Therefore, the disturbance intensity and the severity of over snow vehicle use on grizzly bears are difficult to quantify or describe directly.

A key component of understanding the potential impact to grizzly bears from over snow vehicles is addressing the expected level of use and distribution of over snow vehicles across the landscape, particularly during den emergence. On the KNF during the month of November, over-the-snow vehicle use is rare to non-existent due to the lack of snow or poor snow conditions. Over-the-snow vehicle use begins to increase starting in December and decreases in March, with the peak of use being January and February. During the month of April, over-the-snow vehicle use is minimal based on decreasing snowpacks and avalanche danger, with local, dedicated users attempting to access high elevation openings. Over-the-snow vehicle use continues to be rare to non-existent in May due to the lack of snow or the lack of drivable access with wheeled vehicles to areas containing sufficient snow due to soft

---

[28] Access Amendment BO (p. A-54 in USDI FWS 2011) equates security habitat to core areas. Core areas are those greater than 500 meters from an open road, gated/restricted road, motorized trail, or high-use non-motorized trail. Core areas may contain roads that are impassible due to vegetation or barriers (Access Amendment FEIS, p. 272 in USDA Forest Service 2011a).

Forest Plan Reinitiation BA                                              Kootenai National Forest

roadbed conditions. Even during the highest peaks of over-the-snow vehicle use, activity is far greater on weekends along established routes and use areas than at any other time or location. During the week or in off trail areas there is a precipitous drop in over-the-snow vehicle use.

As stated in the 2013 BA for the revised Forest Plan (p. 83), there are approximately 53 miles of groomed trails and 58 miles of ungroomed routes on the KNF portion of the CYRZ, and there are 7 miles of groomed routes and 4 miles of ungroomed routes on the KNF portion of the NCDE. Off-route use occurs on approximately 18,686 acres within the KNF portion of the CYRZ and 7,905 acres of the KNF portion of the NCDE. Off-route snowmobile travel occurs on about only 5 percent of modeled denning habitat within the CYRZ portion of the KNF and 21% of the NCDE portion of the KNF.

As noted in the 2013 BA, future winter travel planning would take the LMRP MA direction into consideration when developing a winter travel plan both within the recovery zones and the BORZs. Additionally in the 2013 BO, it was recognized that all elements of the Revised Plan would be considered in the development of future winter travel plans. The elements of the Revised Plan that may reduce the acres of over-snow motorized use and may further reduce the amount of over-snow motorized use include desired conditions that state that dens for threatened and endangered species are relatively free of human disturbance when they are in use (FW-DC-WL-01); that all BMUs have low levels of disturbance to facilitate bear use such as denning, etc. (FW-DC-WL-04); guideline (FW-GDL-WL-01), which restricts management activities during spring emergence (4/1-5/1) where predicted denning habitat occurs; and standard (FW-STD-WL-05), which states that no grooming of snowmobile routes in grizzly core habitat would occur in the spring after April 1 of each year. The 2013 BO on the LMRP contained a Term and Condition stating that within five years (February 2020) of implementation of the Revised Forest Plan, the Forest shall complete a winter travel plan, which will include considerations for grizzly bear and other federally listed species. The KNF shall cooperatively monitor the scope and magnitude of late-season snowmobiling (post April 15) as it relates to effects on post-den emergent grizzly bears. If snowmobiling exceeds 18,686 acres in the CYE recovery zone or 7,905 acres in the NCDE that reinitiation would be required. Monitoring on the KNF since 2016 has focused on the Northwest Peaks/Buckhorn and Spar Lake vicinities and has detected overlap of late-season snowmobile activity in predicted denning habitat after April 1. The estimated snowmobiling acres have not changed from the acres listed in the 2015 Revised Forest Plan.

Winter travel planning was initiated on the NCDE portion of the KNF (Ten Lakes Travel Management Project). The purpose of the Ten Lakes Travel Management Project is to develop a travel management plan (over-snow and mechanized) for the Ten Lakes Wilderness Study Area to comply with the terms of the 2007 Settlement Agreement with the Montana Wilderness Association and to maintain wilderness character and the potential for inclusion in the National Wilderness Preservation system that existed in 1977. In August of 2019, the Ten Lakes Travel Management Project was paused in order to instead focus effort on ecosystem restoration and forest health issues (August 19, 2019 letter to project commenters on the Ten Lakes Travel Management Project [USFS 2019b]). Winter travel planning is expected to be completed in FY 2024.

Forest-wide desired conditions FW-DC-WL-01, 02, 03, and 04 and Geographic –wide Desired Conditions GA-DC-WL-BUL-02, GA-DC-WL-TOB-01, and GADC-WL-YAK-02 emphasize the need for large remote areas with low levels of disturbance so that grizzly bears have the necessary space and habitat unhampered by human activities.

7-ER-1553

FS-000978

Forest Plan Reinitiation BA                                     Kootenai National Forest

As mentioned earlier, the overlap between late spring snowmobiling and denning habitat is currently very small in both space and time (Forest Plan BA, USDA Forest Service 2013a; Forest Plan BO, USDI Fish and Wildlife Service 2013; monitoring results to meet the Term and Condition from the 2013 Forest Plan BO, USDI Fish and Wildlife Service 2013 [USFS 2016b, 2017c, 2018c, and 2019c]). Monitoring results since 2015 have not shown a substantial change in the area of overlap of late season snowmobiling and denning habitat. The number of users during the late spring timeframe is unlikely to substantially increase in the next several years as winter travel plan is completed. Furthermore, snowmobiling after April 1 is relegated to a subset of snowmobile users and is dependent on annual snow conditions and local avalanche danger. The risk of an encounter is expected to be very low. Therefore, the expected impact on bears during spring emergence is expected to be low both under the existing conditions and as a result of extending the timeline to complete winter travel planning. ***This will remain the same under the Proposed Action, but completion of a Winter Travel Plan would consider and evaluate the risk of encounter between grizzly bears and late season snowmobilers. Winter travel planning is expected to be completed in FY 2024.***

While winter travel planning is occurring there would continue to be a low likelihood of disturbance to a grizzly bear during spring emergence. During this time of year bears are vulnerable to disturbance, particularly females with cubs because they stay close to the den for a short time after emergence. It is possible that a female disturbed by snowmobiles near the den could become separated from her cubs, leading to cub mortality. While the probability of an encounter such as this appears to be low, as described above, there exists the potential of severe impacts to a few individual bears. During winter travel planning the KNF would evaluate the areas of overlap between denning habitat and late season snowmobiling during den emergence. An option to reduce the amount of overlap between late season snowmobiling and denning habitat would be to close some areas to snowmobiling during spring emergence. Delaying winter travel planning by several years would extend the current, albeit low, amount of overlap between late season snowmobiling and denning habitat during spring emergence. This would extend the current level of risk of disturbance, and potential for cub mortality, until winter travel planning is completed and closure orders are implemented. It is likely that closure orders implementing the winter travel plan would be finalized soon after a decision on the winter travel plan, or possibly in conjunction with finalizing the decision. Additionally, FW-STD-WL-05 states that no grooming of snowmobile routes in grizzly core habitat would occur in the spring after April 1 of each year.

## Effects of Expanding Recurring Use Areas and Applying BORZ standards

Three additional HUCs have received recurring use outside of the original 2010 BORZ boundaries. The no-net increase in permanent miles of open or total routes has been applied to these new HUCs, similar to management within the original BORZ boundaries. The no-net increase in miles of open or total routes would maintain the possibility of road related impacts to grizzly bears to existing levels (e.g. mortality risk, displacement, security, connectivity), however, the fact that more bears are occurring in these areas indicates some level of tolerance of existing levels of motorized access within these HUCs. Limiting the amount of motorized access to existing levels provides areas on the Forest where bears can utilize habitat outside of the recovery zones and provide a buffer to the BMUs. The BORZ are still areas with more wheeled motorized access and more disturbance and mortality risk than in the BMUs. Outside the BORZ and the additional HUCs (Bobtail, Lower Pipe, and Cedar creeks), there will be no

Forest Plan Reinitiation BA                                      Kootenai National Forest

limitation on linear miles of roads, but they will still have to comply with the MVUM and site specific analysis (NEPA and ESA) if roads or trails change.

While observation data is limited in the BORZ and habitats have not been evaluated to determine if they are of significant biological value to bear recovery, it was recognized that on-going and future land management activities in these areas could result in adverse effects (e.g. incidental take) of grizzly bears (USDA Forest Service 2010).

It is assumed that road densities within the BORZ are above the average moving window density standards with the recovery zones. However, grizzly bears, including females, have been frequently documented outside the recovery zone (Wittinger 2002; USDA Forest Service 2010, USFWS 2011). The low density of grizzly bears in these BORZ areas allow individual bears greater flexibility in habitat selection. The presence of grizzly bears in these areas indicates that some bears have apparently acclimated to the conditions within them, and at least in the short-term, seem able to find and secure the resources necessary for their needs and avoid human encounters resulting in mortality. However, research indicates that increased road density and the use of roads affects grizzly bear behavior and habitat use, resulting in displacement or habituation of grizzly bears (USDI Fish and Wildlife 2011).

Actual cross-country travel, in the BMUs and BORZ, is still managed according to the Motor Vehicle Use Map, which restricts travel to designated routes (36 CFR 212.15). It is prohibited to possess or operate a motor vehicle on National Forest System lands on the KNF other than in accordance with the MVUM designations (36 CFR 261.13). Illegal motorized use does occur on the KNF and is described above as part of the existing condition (page 37).

Within the expanded BORZ areas, as well as within the original BORZ boundaries, there are certain situations where the "no net increase" standard does not apply. For example, land exchanges may occur and result in increased acreage of NFS lands within BORZ. Effects of land exchange are analyzed at the project level, but if they do not change the motorized access on those acres there would be no changes to on-the-ground effects for grizzly bears associated with motorized use. Although the mileage and acres may increase within a BORZ in this scenario, the effects wouldn't change for grizzly bears as bears using these areas should have already been acclimated to the existing miles of motorized routes.

As within the original BORZ boundaries, temporary increases in motorized routes are allowed within the expanded BORZ areas. For example, temporary roads, administrative use by agency personnel or others authorized by the appropriate agency personnel, or motorized use for emergency situations (e.g. fire suppression) represent temporary increases in motorized access allowed under Access Amendment Design Elements II A and B.

As discussed elsewhere in this BA, database corrections do not result in on-the-ground changes in effects for grizzly bears. They are simply a more accurate accounting of the existing conditions within the BORZ and expanded BORZ areas.

## Effects of Management Area Direction on New Recurring Use Areas (post-2010)

Management Area direction and delineation provides the on-the-ground reality of where allowable uses may occur.  Table 7 summarized the degree of allowable uses in new areas of grizzly bear occupancy (i.e. Bobtail, Lower Pipe, and West Kootenai HUCs) not previously disclosed in the 2013 LMRP Biological

Forest Plan Reinitiation BA                                        Kootenai National Forest

Assessment.  The following section characterizes these new areas of grizzly bear occupancy and explores the effects of the resulting management direction on the species.

As stated earlier, design features in the Access Amendment (Appendix E) tempers any on-the-ground decisions about future road construction/reconstruction or wheeled motorized access under the Proposed Action. Projects that propose road construction/reconstruction would undergo separate consultation. Table 7 illustrates the distribution of new areas of grizzly bear occupancy (i.e. Bobtail, Lower Pipe, and Cedar Cr) areas by Management Area.

*Eligible Wild/Scenic Rivers*
Approximately 269 acres within the Bobtail, Lower Pipe, and Cedar Creek HUCs occur within this MA (Eligible Wild and Scenic Rivers – Scenic and Recreational). This MA occurs within these HUCs at lower elevations along the Kootenai River and is well outside of denning habitat and is near private residences along the river. Although this MA allows timber harvest, it is not part of the suitable timber base. Road building and over-snow motor vehicle use are allowed as well.

Impacts to bears within this MA are likely to be influenced by the adjacent private lands. With all the nearby human disturbance, bears are less likely to spend time in this part of the new recurring use areas compared to portions of these HUCs further from concentrations of people. Although road building and timber harvest are allowed within this MA, these activities are less likely to occur here compared to the General Forest MA within these HUCs. This portion of the HUCs are low elevation and are well outside of denning habitat, are unlikely to retain snow late in the spring, and are not an area where there would be concerns with snowmobiling impacting bears emerging from the den.

*General Forest*
Approximately 30,594 acres of the Bobtail, Lower Pipe, and Cedar Creek HUCs occur within this MA.

Grizzly bear habitat located within the General Forest MA offers varying levels of habitat security due to past road construction and timber harvest.  The majority of the Bobtail, Lower Pipe, and Cedar Creek HUCs are located within the General Forest MA.

Existing wheeled motorized access in these HUCs will continue under the Proposed Action in this MA. New motorized access routes are allowed to be constructed in this MA but there would be a no-net increase in open and total linear miles of motorized route, similar to the original 2010 BORZ areas. Likewise, timber harvest is allowed, but wheeled access to timber harvest sites is guided by the no-net increase in open and total linear miles of motorized routes. Future projects that propose changes in wheeled motorized access and timber harvest would be evaluated in a site-specific biological assessment that would examine detailed effects to grizzly bears.

Over-the-snow motorized use is allowed in this MA. While winter travel planning is occurring there would continue to be a low likelihood of disturbance to a grizzly bear during spring emergence. During this time of year bears are vulnerable to disturbance, particularly females with cubs because they stay close to the den for a short time after emergence. It is possible that a female disturbed by snowmobiles near the den could become separated from her cubs, leading to cub mortality. While the probability of an encounter such as this appears to be low, as described above, there exists the potential of severe impacts to a few individual bears. During winter travel planning the KNF would evaluate the areas of overlap between denning habitat and late season snowmobiling during den emergence. An option to reduce the amount of overlap between late season snowmobiling and denning habitat would be to close

Page **49** of **123**                                                          **04/15/2020**

Forest Plan Reinitiation BA                                        Kootenai National Forest

some areas to snowmobiling during spring emergence. Delaying winter travel planning by several years would extend the current, albeit low, amount of overlap between late season snowmobiling and denning habitat during spring emergence. This would extend the current level of risk of disturbance, and potential for cub mortality, until winter travel planning is completed and closure orders are implemented. It is likely that closure orders implementing the winter travel plan would be finalized soon after a decision on the winter travel plan, or possibly in conjunction with finalizing the decision. Additionally, FW-STD-WL-05 states that no grooming of snowmobile routes in grizzly core habitat would occur in the spring after April 1 of each year.

Illegal motorized use on roads behind breached closure devices occur and contribute to effects to grizzly bears. The known extent of illegal use and potential effects are disclosed above in the Existing Condition section of this BA (page 37).

## Database Corrections

Database (INFRA) corrections occur annually as errors are found. Errors are generally discovered during the annual monitoring process or as projects are developed and on the ground information daylights errors. Errors in the database, if there is evidence (e.g. aerial imagery) to support the conclusion that they existed as an open road at the time of the Access Amendment baseline (2010), are identified as updates to the existing condition and disclosed in the annual monitoring reports submitted to USFWS. These types of changes are database corrections only, and do not represent a change on the ground from the conditions grizzly bears experienced at the time of the original consultation for the Access Amendment (i.e. bears were already experiencing effects from these roads at the time of the Access Amendment).  These updates don't represent a decrease in security or connectivity on the ground. It does, however, result in different existing condition in the BORZ than found in the Access Amendment ROD (Table 16 on p. 63 of USDA Forest Service 2011b) and the BO for the Access Amendment (Table 4 on p. 17 in USDI Fish and Wildlife Service 2011). Appendix B of this BA and the Bear Year 2019 annual monitoring report (USDA Forest Service 2020) have the most recent BORZ conditions with updated existing conditions. It is likely that database corrections and updates to the database will occur in the future as more errors are discovered, including in the expanded BORZ areas (e.g. Bobtail, Lower Pipe, and Cedar HUCs). As has been done previously, future corrections to the existing condition due to database corrections will be identified in the annual Bear Year monitoring reports that are submitted to USFWS.

## Other Effects

**Key Stressors – Grizzly Bears:**  Stressors can be activities that have occurred in the past but may not be occurring presently, or stressors are activities that currently occur but are not necessarily expected to occur in the future. These are activities that *might* impact grizzly bears if not managed or mitigated.

Of the management activities changes discussed under the Proposed Action, motorized access (wheeled and over-the-snow) and associated road construction are the key stressors to grizzly bears. Those are discussed in the above sections. Other key stressors identified in the 2013 Forest Plan BA are discussed where it may occur under the appropriate allowable management activity with ties to the changes in the Proposed Action.

Forest Plan Reinitiation BA                                    Kootenai National Forest

## Timber Harvest

In general, grizzly bears are considered habitat generalists, where the most important habitat characteristics revolve around the availability of sufficient food resources and areas free from human disturbance (i.e. secure habitat). In the absence of the large wildfires (which was common before fire exclusion practices) silviculture methods can provide similar early seral plant communities (Johnson and Gautreaux 2008). However, timber harvest has the potential to alter both habitat quality/quantity and the amount of human disturbances as follows (IGBC 1987):

- Vegetation management, including timber cutting, in grizzly bear habitat may alter forest conditions sufficiently to change the composition, distribution, and abundance of forage for grizzly bears.
- Existing water regimes may be indirectly impacted by timber harvest activities, where changes in surface and/or subsurface water movement and/or distribution contribute to changes in key grizzly bear foraging habitats, such as *carex* spp. meadows.
- Timber cutting activities that require construction of new roads or reconstruction of currently undrivable roads may increase human access to grizzly bear habitat previously remote from such activities, which as discussed above, has the potential to increase grizzly bear mortality where human/bear interactions result.
- Timber cutting activities in and of themselves introduce human disturbance into the environment during implementation, which can displace bears from key habitats, at least temporarily.

However, timber harvest is usually associated with road construction and multiple years of harvest and post-harvest activities which create disturbance and cause grizzlies to avoid the area. Additionally, some timber harvest operations may include helicopter logging. If the latter occurs in grizzly bear core habitat, it can affect grizzly bears resulting in their displacement). Timber harvest and associated activities, such as road construction, would undergo separate, project level consultation.

## Fire (natural ignitions, planned ignitions)

Seral plant communities, which historically originated from wildfires and insect and disease outbreaks, provide many key grizzly bear foods. Fire in grizzly bear habitat can be beneficial or detrimental depending on when and where it occurs, and the scale at which it occurs. In general, fire is thought to have a positive effect on grizzly bear habitat and the decline of grizzly bear populations has been attributed to fire suppression (Contreras and Evans 1986, Tirmenstein 1983). Grizzly bears are an opportunistic species with very large home ranges and their populations change little in response to fire (p. 29 in Smith 2000). Fires promote and maintain many important berry-producing shrubs and forbs and provide a medium for insects and sometimes carrion (associated primarily with very large fires). However, fire can also affect other food sources such as the availability of whitebark pine nuts. So, although grizzly bears may benefit from improved habitat quality due to periodic burns, a very large fire could destroy key habitats resulting in habitat fragmentation.

Conversely, fire suppression throughout the western U.S. over the past 50 to 100 years has substantially altered the natural succession of many forested ecosystems, whereas early successional forest stages have been reduced or eliminated (Lee and Jonkel 1981, Zager 1980 (as cited in IGBC 1987)). Such changes have likely impacted the availability of many key forage species for bears. Use of prescribed fire has the potential to improve grizzly bear habitat, particularly where it creates openings which can

7-ER-1558

FS-000983

Forest Plan Reinitiation BA                                      Kootenai National Forest

support berries, bulbs and other important grizzly foods, reduces conifer encroachment into brushfields, meadow habitats and high-elevation whitebark pine[29] stands, and increases understory plant growth where nutrients are released from conifer litter.

Most prescribed burning in grizzly bear habitat on the KNF has been associated with post-harvest treatments although there have been a few landscape prescribed burns in recent years to promote habitat improvement for big game winter range and whitebark pine restoration. Short-term adverse effects to grizzly bears from prescribed fire could occur where implementation overlaps grizzly bear activity in space and time. Limited operating periods applied at the project level may assist in minimizing negative effects during periods of high grizzly bear use.

### Effects of Applicable Forest-wide and Geographic Area Direction, and Forest-wide Standards and Guidelines on Allowable Activities in Grizzly Bear Habitat with Regard to the Proposed Action

The primary potential impact on grizzly bears under the Proposed Action would be human disturbance. Disturbance, primarily associated with wheeled motorized access along roads, can cause bears to avoid those areas and consequently reduce the amount of effective habitat. Additionally, from 1982-2018, most (72%) of mortality on NFS lands in the Cabinet-Yaak Recovery Zone occurred within 500 meters of an open road (p. 32 in Kasworm et al. 2019).

The Forest Plan includes Forest and Geographic Area-wide Desired Conditions, Standards, and Guidelines to minimize adverse effects to threatened, endangered and proposed species resulting from allowable activities that are key stressors to grizzly bears such as motorized access. Additional key stressors and analysis can be found in the 2013 Forest Plan BA (USFS 2013a) and BO (USDI Fish and Wildlife 2013).

### General Habitat Security and Connectivity

In terms of overall habitat security and connectivity, the changes to the Proposed Action will continue to maintain or improve these conditions for grizzly bears as outlined in the 2013 revised Forest Plan BA, **but will take several years longer to achieve once winter travel planning and access management planning for BMU compliance begin**. Winter travel planning is expected to be completed in FY 2024. Implementation of access management project are expected to be implemented in 2021 (BMU 8), 2022 (BMUs 5 and 6), and 2023 (BMU 4).

In regards to habitat security, the desired conditions in the Forest Plan emphasize the importance that is placed on providing sufficient areas of secure habitat for grizzly bears. Desired conditions would provide secure denning opportunities and conditions that facilitate the unimpeded use of seasonally important habitats. **With the exception of the timeline associated with achieving the motorized access standards in the remaining BMUs and winter travel planning, none of the desired conditions, standards or guidelines are changing.** For these components see the 2013 Forest Plan BA.

Similar to the BMUs, the overall habitat security and connectivity in the BORZ, the changes to the Proposed Action will continue to maintain these conditions for grizzly bears as outlined in the 2013

---

[29] Unlike the situation in the GYE and parts of the NCDE where whitebark pines can be an important part of the grizzly bear populations diet, whitebark pine is not a key food source in the SCYEs (page A-35 in USDI Fish and Wildlife Service 2011b).

Forest Plan Reinitiation BA                                    Kootenai National Forest

revised Forest Plan BA. Several additional HUCs have met the criteria for recurring use since 2011: Bobtail Cr., Lower Pipe Cr., and Cedar Cr. HUCs. The no net increase in permanent miles of open or total route has been applied to the Bobtail Cr. HUC since inclusion in the Bear Year 2011 monitoring report, and Lower Pipe Cr. and Cedar Creek HUCs will be included in the Bear Year 2019 monitoring report. These HUCs will be managed the same as the original 2010 BORZ included in the Access Amendment. Database corrections and addition of roads for ANILCA access have occurred since 2010 within the original BORZ boundaries.

## Cumulative Effects

Cumulative effects are those effects of future State or private activities, not involving Federal activities, which are reasonably certain to occur within the action area of the Federal action subject to consultation. The CYRZ also include State, corporate and private lands. Activities here may cause avoidance of these areas, or conversely, increase the potential for habituation and subsequent removal or death of these bears for public safety. Decisions made by these landowners regarding management on their lands could potentially result in cumulative disturbance or displacement effects to grizzly bears. Future timber harvest occurring on private or State lands may impact the distribution, amount, and quality of grizzly habitat and may impact connectivity between NFS lands. As private lands are sold and developed it may lead to more conflicts with grizzly bears due to attractants associated with residence (e.g. pet food, garbage, chickens). The SRZ and CYRZ include approximately 229,000 acres of private and State lands (p. 99 in USFS 2011a).

The decision for the Access Amendment established management direction for NFS lands within grizzly bear habitat. However, the CYRZ also include State, corporate and private lands. Decisions made by these landowners regarding management on their lands could potentially result in cumulative disturbance or displacement effects to grizzly bears. In many cases, the USFS would ultimately mitigate for these effects through additional wheeled motorized vehicle access management on NFS lands. For example, if a private landowner built a road on private lands that reduced core below the standard within a BMU, then the KNF would offset the core loss on NFS lands in order to maintain the standard. The numbers used for road densities and Core Area in this analysis include consideration of roads on State and private lands within grizzly bear habitat, even though the standards apply only to NFS lands (p. A-75 in USFWS 2011).

## Determination of Effects and Rationale

The proposed action **may affect, but is likely to adversely affect, the grizzly bear**. This determination is based on:

- Compliance with access management standards in BMUs 4, 5, 6, and 8 would take several more years to implement. This would continue the existing level of road related impacts to grizzly bears and postpone improvement for several years until implementation of road closures are completed.
- BMU 9 (Callahan) and BMU 10 (Pulpit) have NEPA decisions in place and active projects. These two BMUs are temporarily above standard for road densities due to project activities, but will return to meeting standard at the end of implementation. BMU 9 is expected to again meet standard by the end of Bear Year 2020, and BMU 10 will meet standards again by the end of Bear Year 2022. These projects have already undergone project specific consultation.

7-ER-1560

FS-000985

Forest Plan Reinitiation BA                                     Kootenai National Forest

- Winter travel planning would take several more years to complete. During this time the existing risk to grizzly bears would continue. There would remain the risk of disturbance, and potentially mortality to cubs, from late season snowmobiling in denning habitat during spring emergence.
- Bobtail, Lower Pipe, and Cedar Creek HUCs have met the criteria for recurring use since the 2011 Access Amendment and the delineation of the BORZ boundaries. Baselines have been established for these HUCs, and the no-net increase in open and total linear miles of motorized route is applied to these areas as it is for the BORZ areas established with the 2011 Access Amendment. The baseline conditions within these new recurring use areas are causing effects similar to the original BORZ areas.
- Illegal motorized use behind closure devices is occurring and impacts grizzly bears similar to authorized motorized use on gated and year-long open roads (e.g. disturbance). As with open roads, roads with closure devices that have been breached contribute to the risk of illegal shooting of grizzly bears. Monitoring of gates and barriers indicates that illegal use has occurred behind 0-8% of closure devices monitored within the BMUs. Breaches are repaired after they are discovered, generally during the same Bear Year. Illegal breaches have been included in the Bear Year monitoring reports and disclosed to USFWS for the year they occurred.
- Database corrections have occurred since the baseline used in the 2011 Access Amendment. These corrections to the database have been disclosed in the monitoring reports as they were discovered. These changes do not represent increased effects on the ground for grizzly bears because any road included as a database correction existed at the time of the 2011 Access Amendment and was already impacting bears at that time. In some cases, new roads have been added (i.e. ANILCA access), but these increases were allowed under Access Amendment design criteria II-A and II-B.

Forest Plan Reinitiation BA                                        Kootenai National Forest

## Literature Cited

Allen, L. R. 2011. A Review of Grizzly Bear Recurring Use Areas Associated with the Selkirk and Cabinet-Yaak Ecosystems. Idaho Panhandle National Forest. 20pp.

Allen, L. R., B. R. Lyndaker, and G. D. Harris. A Review of the Wakkinen and Kasworm (1997) Report as Best Available Science for the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones. Idaho Panhandle National Forest. 32 pp.

Boulanger, J. and G.B. Stenhouse. 2014. The impact of roads on the demography of grizzly bears in Alberta. PLoS ONE 9(12): e115535.doi:10.1371/journal.pone.0115535. 22 pp.

Christensen, A. G. and M. J. Madel. 1982. Cumulative effects analysis process: grizzly habitat component mapping. US DA Forest Service report. Kootenai National Forest.

Contreras, G. P., and K. E. Evans, eds. 1986. Proceedings – Grizzly Bear Habitat Symposium. Missoula, Montana, April 30-May 2, 1985. 260 pp.

Craighead, F. C., Jr., and J. J. Craighead. 1972. Grizzly bear pre-hibernation and denning activities as determined by radio-tracking. Wildlife Monographs No. 32. 35 pp.

Craighead, J. J., and J. S. Sumner. 1980. Grizzly Bear Habitat Analysis, Section II, Evaluation of Grizzly Bear Food Plants, food Categories and Habitat.

Interagency Grizzly Bear Committee (IGBC). 1986. Interagency grizzly bear guidelines. Wyoming Fish and Game, BLM, USDI Fish and Wildlife Service, USDA Fish and Wildlife Service, National Park Service, Idaho Fish and Game, Montana Fish Wildlife and Parks, Washington Game Department. 99 pp.

Interagency Grizzly Bear Committee. 1987. Grizzly bear compendium. 540 pp.

Johnson, W. (editor). 2008. "Bear Year" definition for the Cabinet-Yaak ecosystem. U.S. Forest Service. Unpublished report. Kootenai National Forest. Libby, MT. 2 pp.

Johnson, W., and R. Gautreaux. 2008. Vegetation management prescriptions for grizzly bear habitat enhancement or restoration in the Cabinet-Yaak Ecosystem. Kootenai National Forest. 33 pp.

Kasworm, W. 2019. Presentation at the Selkirk/Cabinet-Yaak IGBC Subcommittee meeting. Meeting Notes. November 6, 2019. Coeur d'Alene, ID.

Kasworm, W., M.F. Proctor, C. Servheen, T. Manley, J. Brown, and J. Williams. 2006. Simulations of Grizzly Bear Population Augmentation on Trend Estimates in the Cabinet-Yaak Recovery Zone. USDI Fish and Wildlife Service. 8 pp.

Kasworm, W. F., H. Carriles, T. G. Radandt, M. Proctor, and C. Servheen. 2009. Cabinet-Yaak grizzly bear recovery area 2008 research and monitoring progress report. US Fish and Wildlife Service, Missoula, Montana. 78 pp.

Kasworm, W. F., H. Carriles, T. G. Radandt, M. Proctor, and C. Servheen. 2010. Cabinet-Yaak grizzly bear recovery area 2009 research and monitoring progress report. US Fish and Wildlife Service, Missoula, Montana. 78 pp.

7-ER-1562

FS-000987

Forest Plan Reinitiation BA                                                    Kootenai National Forest

Kasworm, W. F., H. Carriles, T. G. Radandt, M. Proctor, and C. Servheen. 2011. Cabinet-Yaak grizzly bear recovery area 2010 research and monitoring progress report. USDI Fish and Wildlife Service, Missoula, Montana. 86 pp.

Kasworm, W. F., H. Carriles, T. G. Radandt, J. Teisberg, M. Proctor, and C. Servheen. 2012. Cabinet-Yaak grizzly bear recovery area 2011 research and monitoring progress report. USDI Fish and Wildlife Service, Missoula, Montana. 90 pp.

Kasworm, W. F., and T. L. Manley. 1990. Road and trail influences on grizzly bears and black bears in northwest Montana. Bears: Their Biology and Management, Vol 8, a Selection of Papers from the Eighth International conference on Bear Research and Management, Victoria, British Columbia, Canada. P. 79-84.

Kasworm, W. F., T. G. Radandt, J. Teisberg, M. Proctor, and C. Servheen. 2013. Cabinet-Yaak grizzly bear recovery area 2012 research and monitoring progress report. USDI Fish and Wildlife Service, Missoula, Montana. 97 pp.

Kasworm, W. F., T. G. Radandt, J. Teisberg, M. Proctor, and C. Servheen. 2014. Cabinet-Yaak grizzly bear recovery area 2013 research and monitoring progress report. USDI Fish and Wildlife Service, Missoula, Montana. 110 pp.

Kasworm, W. F., T. G. Radandt, J. Teisberg, A. Welander, M. Proctor, and C. Servheen. 2015. Cabinet-Yaak grizzly bear recovery area 2014 research and monitoring progress report. USDI Fish and Wildlife Service, Missoula, Montana. 96 pp.

Kasworm, W. F., T. G. Radandt, J. Teisberg, A. Welander, M. Proctor, and C. Servheen. 2016. Cabinet-Yaak grizzly bear recovery area 2015 research and monitoring progress report. USDI Fish and Wildlife Service, Missoula, Montana. 102 pp.

Kasworm, W. F., T. G. Radandt, J. Teisberg, A. Welander, M. Proctor, and H. Cooley. 2017. Cabinet-Yaak grizzly bear recovery area 2016 research and monitoring progress report. USDI Fish and Wildlife Service, Missoula, Montana. 101 pp.

Kasworm, W. F., T. G. Radandt, J. Teisberg, A. Welander, M. Proctor, and H. Cooley. 2018. Cabinet-Yaak grizzly bear recovery area 2017 research and monitoring progress report. USDI Fish and Wildlife Service, Missoula, Montana. 102 pp.

Kasworm, W. F., T. G. Radandt, J. Teisberg, T Vent, A. Welander, M. Proctor, H. Cooley, and J. Fortin-Noreus. 2019. Cabinet-Yaak grizzly bear recovery area 2018 research and monitoring progress report. USDI Fish and Wildlife Service, Missoula, Montana. 98 pp.

Kendal, K. C., A. C. MacLeod, K. L. Boyd, J. Boulanger, J. A. Royle., W. F. Kasworm, D. Paetkau, M. F. Proctor, K. Annis, and T. A. Graves. 2015. Density, distribution, and genetic structure of grizzly bears in the Cabinet-Yaak ecosystem. Journal of Wildlife Management. 48 pp.

Mace, R. D., and T. L. Manley. 1993. South Fork Flathead River Grizzly Bear Project: Progress Report for 1992. Montana Department of Fish, Wildlife and Parks. 39 pp.

Mace, R. D. and J. S. Waller. 1997. Final Report: Grizzly bear ecology in the Swan Mountains, Montana. Montana Fish, Wildlife and Parks. Helena, MT. 191. pp.

FS-000988

Forest Plan Reinitiation BA                                        Kootenai National Forest

Mace, R. D., J. S. Waller, T. L. Manley, L. J. Lyon, and H. Zuuring. 1996. Relationships among grizzly bears, roads and habitat in the Swan Mountains, Montana. Journal of Applied Ecology, 33:1395-1404.

MacHutchon, G., and M. Proctor. 2015. The effects of roads and human action on roads on grizzly bears and their habitat. Trans-Border Grizzly Bear Project. 12 pp.

Mattson, D. J., R. R. Knight, and B. M. Blanchard. 1987. The effects of developments and primary roads on grizzly bear habitat use in Yellowstone National Park, Wyoming. Int. Conf. Bear Res. And Manage. 7:259-273.

McLellan, M. L., and B. N. McLellan. 2015. Effect of season and high ambient temperature on activity levels and patters of grizzly bears (Ursus arctos). PLoS ONE 10(2): e0117734. doi:10.1371/journal.pone.0117734. 14pp.

McLellan, B, N, and D. M. Shackleton. 1988. Grizzly bears and resource-extraction industries: effects of roads on behavior, habitat use and demography. Journal of Applied Ecology, vol 25(2):451-460.

Montana Department of Natural Resources and Conservation and United States Fish and Wildlife Service. 2010. Montana Department of Natural Resources and Conservation, Forested Trust Lands, Habitat Conservation Plan, Final EIS, Volume 2. September 2010. 526 pp.

Montana Fish, Wildlife & Parks. 2020. Bear Management Report, Cabinet-Yaak Ecosystem, 2019. Montanan Department of Fish, Wildlife & Parks, Region 1. 19 pp.

Proctor, M., and W. Kasworm. 2017. Fine scale grizzly bear habitat modeling for the South Selkirk and Cabinet-Yaak ecosystems. Trans-border Grizzly Bear Project and the US Fish and Wildlife Service. 8pp.

Proctor, M. F., W. F. Kasworm, K. M Annis, A. Grant MacHutchon, J. E. Teisberg, T. G. Radandt, and C. Servheen. 2018. Conservation of threatened Canada-USA trans-border grizzly bears linked to comprehensive conflict reduction. Human-Wildlife Interactions, 12(3)348-372.

Proctor, M. F., B. N. McLellan, and C. Strobeck. 2002. Population fragmentation of grizzly bears in southeastern British Columbia, Canada. Ursus, v 13: 153-160.

Proctor, M. F., B. N. McLellan, B. G. Stenhouse, G. Mowat, C. T. Lamb, and M. S. Boyce. 2018. Resource roads and grizzly bears in British Columbia and Alberta, Canada. 38pp.

Proctor, M. F., B. N. McLellan, B. G. Stenhouse, G. Mowat, C. T. Lamb, and M. S. Boyce. 2019. Effects of roads and motorized human access on grizzly bear populations in British Columbia and Alberta, Canada. Ursus, 2019(30e2):16-39.

Proctor, M.F., B.N. McLellan, C. Strobeck, and R.M.R. Barclay. 2005. Genetic analysis reveals demographic fragmentation of grizzly bears yielding vulnerably small populations. Proceedings of the Royal Society (2005) 272:2409-2416.

Proctor, M. F, S. E. Nielsen, W. F. Kasworm, C. Servheen, T. G. Radandt, A. G. MacHutchon, and M. S. Boyce. 2015. The Journal of Wildlife Management, 79(4)544-558.

Proctor, M. F., D. Paetkau, B. N. McLellan, G. B. Stenhouse, K. C. Kendall, R. D. Mace, W. F. Kasworm, C. Servheen, C. L. Lausen, M. L. Gibeau, W. L. Wakkinen, M. A. Haroldson, G. Mowat, C. D. Apps, L. M. Ciarniello, R. M. R. Barclay, M. S. Boyce, C. C. Schwartz, C. Strobeck. 2012. Population fragmentation and

inter-ecosystem movements of grizzly bears in western Canada and the northern United States. Wildlife Monographs, 180:1-46.

Quigley, T.M. and Arbelbide, S.J., tech. eds. 1997. An assessment of ecosystem components in the interior Columbia basin and portions of the Klamath and Great Basins: volume III. General Technical Report # 405. Portland, OR: USDA Forest Service, Pacific Northwest Research Station. 4 vol.

Ruediger, B., J. Claar, S. Gniadek, B. Holt, L. Lewis, S. Mighton, B. Naney, G. Patton, T. Rinaldi, J. Trick, A. Vandehey, F. Wahl, N. Warren, D. Wenger, and A. Williamson. 2000. Canada lynx conservation assessment and strategy. USDA Forest Service, USDI Fish and Wildlife Service, USDI Bureau of Land Management, and USDI National Park Service. Forest Service Publication #R1-00-53, Missoula, MT. 142 pp.

Schoen, J. W., L. R. Beier, J. W. Lentfer, L. J Johnson. 1986. Denning ecology of brown bears on Admiralty and Chichogof Islands. In Bears: their biology and management.  Seventh International Conference on Bear Research and Management. Pages 293-304.

Schwartz, C. C., M. A. Haroldson, and G. C. White. 2010. Hazards affecting grizzly bear survival in the Greater Yellowstone Ecosystem. Journal of Wildlife Management, 74(4):654-667.

Selkirk/Cabinet-Yaak Ecosystem. 2008. Accomplishment Report. Selkirk/Cabinet-Yaak Subcommittee of the Interagency Grizzly Bear Committee. 15pp.

Selkirk/Cabinet-Yaak Ecosystem. 2009. Accomplishment Report. Selkirk/Cabinet-Yaak Subcommittee of the Interagency Grizzly Bear Committee. 15pp.

Selkirk/Cabinet-Yaak Ecosystem. 2010. Accomplishment Report. Selkirk/Cabinet-Yaak Subcommittee of the Interagency Grizzly Bear Committee. 14pp.

Selkirk/Cabinet-Yaak Ecosystem. 2011. Accomplishment Report. Selkirk/Cabinet-Yaak Subcommittee of the Interagency Grizzly Bear Committee. 16pp.

Selkirk/Cabinet-Yaak Ecosystem. 2012. Accomplishment Report. Selkirk/Cabinet-Yaak Subcommittee of the Interagency Grizzly Bear Committee. 20pp.

Selkirk/Cabinet-Yaak Ecosystem. 2013. Accomplishment Report. Selkirk/Cabinet-Yaak Subcommittee of the Interagency Grizzly Bear Committee. 17pp.

Selkirk/Cabinet-Yaak Ecosystem. 2014. Accomplishment Report. Selkirk/Cabinet-Yaak Subcommittee of the Interagency Grizzly Bear Committee. 14pp.

Selkirk/Cabinet-Yaak Ecosystem. 2015. Accomplishment Report. Selkirk/Cabinet-Yaak Subcommittee of the Interagency Grizzly Bear Committee. 4pp.

Selkirk/Cabinet-Yaak Ecosystem. 2016. Accomplishment Report. Selkirk/Cabinet-Yaak Subcommittee of the Interagency Grizzly Bear Committee. 6pp.

Selkirk/Cabinet-Yaak Ecosystem. 2017. Accomplishment Report. Selkirk/Cabinet-Yaak Subcommittee of the Interagency Grizzly Bear Committee. 11pp.

FS-000990

Forest Plan Reinitiation BA                                     Kootenai National Forest

Selkirk/Cabinet-Yaak Ecosystem. 2018. Accomplishment Report. Selkirk/Cabinet-Yaak Subcommittee of the Interagency Grizzly Bear Committee.

Selkirk/Cabinet-Yaak Ecosystem. 2019. Accomplishment Report. Selkirk/Cabinet-Yaak Subcommittee of the Interagency Grizzly Bear Committee.

Servheen, C., J. S. Waller, and P. Sandstrom. 2003. Identification and management of linkage zones for wildlife between the large blocks of public lands in the northern Rocky Mountains. U.S. Fish and Wildlife Service, Missoula, MT. 83 pp.

Smith, J. K. ed. 2000. Wildland fire in ecosystems: effects of fire on fauna. Gen. Tech. Rep. RMRS-GTR-42 vol 1. Ogden, UT: US Department of Agriculture, Forest Service, Rocky Mountain Research Station. 83pp.

Tirmenstein, D. A. 1983. Grizzly bear habitat and management in the Rattlesnake National Recreation Area and Wilderness. Master's thesis. University of Montana, 230 pp.

USDA Forest Service. 2007. Northern Rockies Lynx Management Direction. Record of Decision. US Forest Service. National Forests in Montana and parts of Idaho, Wyoming, and Utah. 51 pp. plus attachments.

USDA Forest Service. 2010. Biological Assessment for Threatened, Endangered and Proposed Species on the Forest Plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones. 227 pp.

USDA Forest Service. 2011a. Final Supplemental Environmental Impact Statement: Forest Plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones. USDA Forest Service, Kootenai, Lolo and Idaho Panhandle National Forests. November 2011. Libby, MT. 447 pp.

USDA Forest Service. 2011b. Record of Decision for the Forest Plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones. USDA Forest Service, Kootenai, Lolo and Idaho Panhandle National Forests. November 2011. Libby, MT. 74 pp.

USDA Forest Service. 2011c. Kootenai National Forest food storage and sanitation closure order. Dated June 3, 2011. 5 pp.

USDA Forest Service. 2012. Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones 2011 Annual Monitoring Summary Report. Idaho Panhandle, Kootenai, Lolo, and Colville National Forests. 12 pp.

USDA Forest Service. 2013a. Biological Assessment for Threatened, Endangered, and Proposed Species on the Revision of the Land and Resource Management Plan for the consultation on Terrestrial Wildlife. Kootenai National Forest. 148 pp.

USDA Forest Service. 2013b. Final Environmental Impact Statement for the Revised Land Management Plan. Kootenai National Forest. 682 pp.

USDA Forest Service. 2013c. Selkirk/Cabinet-Yaak Grizzly Bear Recovery Zones 2012 Annual Monitoring Summary Report. Idaho Panhandle, Kootenai, Lolo, and Colville National Forests. 13 pp.

USDA Forest Service. 2014. Cabinet-Yaak/Selkirk Grizzly Bear Recovery Zones 2013 Annual Monitoring Summary Report. Idaho Panhandle, Kootenai, Lolo, and Colville National Forests. 13 pp.

Forest Plan Reinitiation BA                                    Kootenai National Forest

USDA Forest Service. 2015. Land Management Plan, 2015 Revision. Kootenai National Forest. 189 pp.

USDA Forest Service. 2015b. Cabinet-Yaak/Selkirk Grizzly Bear Recovery Zones 2014 Annual Monitoring Summary Report. Idaho Panhandle, Kootenai, Lolo, and Colville National Forests. 12 pp.

USDA Forest Service. 2016. Cabinet-Yaak/Selkirk Grizzly Bear Recovery Zones 2015 Annual Monitoring Summary Report. Idaho Panhandle, Kootenai, Lolo, and Colville National Forests. 16 pp.

USDA Forest Service. 2016b. Kootenai National Forest: Monitoring the overlap of over-snow motorized use in grizzly bear denning habitat during spring den emergence. March 23, 2016. 1pp.

USDA Forest Service. 2017. Cabinet-Yaak/Selkirk Grizzly Bear Recovery Zones 2016 Annual Monitoring Summary Report. Idaho Panhandle, Kootenai, Lolo, and Colville National Forests. 14 pp.

USDA Forest Service. 2017b. Biological Assessment for Threatened, Endangered, and Proposed Species. Forest Plan Amendments – incorporating habitat management direction for the NCDE grizzly bear population into the Helena, Lewis and Clark, Kootenai, and Lolo National Forest Plans. 174 pp.

USDA Forest Service. 2017c. Kootenai National Forest: Monitoring the overlap of over-snow motorized use in grizzly bear denning habitat during spring den emergence. March 22, 2017. 2pp.

USDA Forest Service. 2018. Cabinet-Yaak/Selkirk Grizzly Bear Recovery Zones 2017 Annual Monitoring Summary Report. Idaho Panhandle, Kootenai, Lolo, and Colville National Forests. 12 pp.

USDA Forest Service. 2018b. Record of Decision for the Forest Plan Amendments to Incorporate Habitat Management Direction for the Northern Continental Divide Ecosystem Grizzly Bear Population. Helena-Lewis and Clark National Forest, Kootenai National Forest, Lolo National Forest. 149pp.

USDA Forest Service. 2018c. Kootenai National Forest: Monitoring the overlap of over-snow motorized use in grizzly bear denning habitat during spring den emergence. February 14, 2018. 1pp.

USDA Forest Service. 2019. Selkirk/Cabinet-Yaak Grizzly Bear Recovery Zones 2018 Annual Monitoring Summary Report. Idaho Panhandle, Kootenai, Lolo, and Colville National Forests. 14 pp.

USDA Forest Service. 2019b. Letter to commenters on the Ten Lakes Travel Management Project. Kootenai National Forest, Eureka Ranger Station. 1pp.

USDA Forest Service. 2019c. Kootenai National Forest: Monitoring the overlap of over-snow motorized use in grizzly bear denning habitat during spring den emergence. March 1, 2019. 2pp.

USDA Forest Service. 2020. Selkirk/Cabinet-Yaak Grizzly Bear Recovery Zones 2019 Annual Monitoring Summary Report. Idaho Panhandle, Kootenai, Lolo, and Colville National Forests. In Prep.

USDI Fish and Wildlife Service. 1975. Federal Register: Determination of the grizzly bear as threatened throughout the conterminous United States. July 28, 1985. 40 FR 31734.

USDI Fish and Wildlife Service. 1982. Grizzly Bear Recovery Plan. 234 pp.

USDI Fish and Wildlife Service. 1993a. Grizzly bear recovery plan.  Missoula, MT. 181 pp.

USDI Fish and Wildlife Service. 1993b. Federal Register: Endangered and Threatened Wildlife and Plants: Finding on petitions to change the status of grizzly bear populations in the Cabinet-Yaak Area of

FS-000992

Forest Plan Reinitiation BA　　　　　　　　　　　　　　　　　Kootenai National Forest

Montana and the Selkirk Mountains of Idaho and Washington from threatened to endangered. Federal Register pp. 8250.

USDI Fish and Wildlife. 1994. Endangered and threatened wildlife and plants: Determination of endangered status for the Kootenai River population of white sturgeon. Federal Register Vol. 59, No. 171, pp. 45989-46002, September 6, 1994.

USDI Fish and Wildlife Service. 1999. Federal Register: Endangered and Threatened Wildlife and Plants: 12-month Finding on Petitions to Change the Status of Grizzly Bear Populations in the Selkirk Area in Idaho and Washington and the Cabinet-Yaak Area of Montana and Idaho from Threatened to Endangered. Federal Register, May 17, 1999, v 64(94): 26725-26733.

USDI Fish and Wildlife Service. 2005. Recovery outline: contiguous United States Distinct Population segment of the Canada lynx. Montana Field Office, Helena, MT. U.S. Dept. of the Interior – Fish and Wildlife Service. Mountain-Prairie Region. Lakewood, CO. September 12, 2005.

USDI Fish and Wildlife Service. 2007. Biological Opinion on the Northern Rocky Mountains Lynx Amendment. US Fish and Wildlife Service. Helena, MT. 94 pp. plus appendices.

USDI Fish and Wildlife Service. 2008. Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the Contiguous United states Distinct Population Segment of Canada Lynx. Proposed Rule. Federal Register, v 73(40):10860-10896. February 28, 2008.

USDI Fish and Wildlife. 2008b. Federal Register. 73 FR 39506, July 9, 2008, 50 CFR Part 17, Endangered and threatened wildlife and plants: Critical habitat revised designation for the Kootenai River population of white sturgeon (*Acipenser transmontanus*).

USDI Fish and Wildlife Service. 2009. Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the Contiguous United states Distinct Population Segment of Canada Lynx. Federal Register, v 74(36):8616-8702. February 25, 2009.

USDI Fish and Wildlife Service. 2011. Endangered Species Act Section 7 Consultation Biological Opinion on the Forest Plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones on the Kootenai, Idaho Panhandle, and Lolo National Forests. US Fish and Wildlife Service, Montana Field Office, Kalispell, MT, and Northern Idaho Field Office, Spokane, WA. 227 pp.

USDI Fish and Wildlife Service. 2011b. Grizzly Bear (*Ursus arctos horribilis*) 5-Year Review: Summary and Evaluation. US Fish and Wildlife Service, Grizzly Bear Recovery Office. Missoula, MT. 205 pp.

USDI Fish and Wildlife Service 2013. Endangered Species Act Section 7 Consultation Biological Opinion on the Revised Forest plan for the Kootenai National Forest.

USDI Fish and Wildlife Service. 2017. Endangered Species Act Section 7 Consultation Biological Opinion on the Effects of Incorporating Habitat Management Direction for the NCDE Grizzly Bear Population into the Helena, Lewis and Clark, Kootenai, and Lolo National Forest Plans on Grizzly Bears. 188 pp.

USDI Fish and Wildlife Service. 2019. Endangered and Threatened Wildlife and Plants; Regulations for Interagency Cooperation. Federal Register, Vol 84 (166): 44976-45018.

FS-000993

Forest Plan Reinitiation BA                                                          Kootenai National Forest

USDI Fish and Wildlife. 2019b. Endangered and Threatened Wildlife and Plants; Review of Domestic and Foreign Species That are Candidates for Listing as Endangered or Threatened; Annual Notification of Findings on Resubmitted Petitions; annual Description of Progress on Listing Actions. Federal Register, Vol 84 (197):54732-54757.

Vroom, G.W., S. Herrero, and R.T. Ogilvie. 1977. The ecology of winter den sites of grizzly bears in Banff National Park, Alberta. Int. Conf. On Bear Research and management. 3: 321-330.

Wakkinen, W. L. and W. F. Kasworm. 1997. Grizzly bear and road density relationships in the Selkirk and Cabinet-Yaak recovery zones. Unpublished report. 28 pp.

Wittinger, T. 2002. Grizzly bear distribution outside of recovery zones. 2pp.

Zager, P. E. 1980. The influence of logging and wildfire on grizzly bear habitat in northwestern Montana. PhD Dissertation. University of Montana. Missoula, Montana. 131 pp.

Forest Plan Reinitiation BA                              Kootenai National Forest

## Maps



*Figure 1. Cabinet-Yaak Recovery Zone, Bear Management Units, original Bears Outside of Recovery Zone areas, and recurring use area additions since the 2011 Access Amendment.*

Forest Plan Reinitiation BA                                    Kootenai National Forest



*Figure 2. Overlap of the Tobacco BORZ (Cabinet-Yaak) and the Northern Continental Divide Ecosystem*

| Primary Management Areas | GIS Acres |
|---|---|
| Bobtail Creek | 13,975 |
| 2 | 9 |
| 6 | 10,181 |
| ot | 3,785 |
| wt | 0 |
| Cedar Creek-Kootenai River | 11,263 |
| 2 | 260 |
| 6 | 5,915 |
| ot | 4,889 |
| wt | 200 |
| Lower Pipe Creek | 19,039 |
| 6 | 14,498 |
| ot | 4,541 |
| wt | 0 |
| Grand Total | 44,277 |

| Ownership | GIS Acres |
|---|---|
| Bobtail Creek | 13,975 |
| FS | 10,189 |
| MT_State | 42 |
| Other_Private | 1,575 |
| Stimson_Lumber | 2,169 |
| Water | 0 |
| Cedar Creek-Kootenai River | 11,263 |
| FS | 6,175 |
| Other_Private | 3,620 |
| Stimson_Lumber | 1,227 |
| Water | 200 |
| Weyerhaeuser | 42 |
| Lower Pipe Creek | 19,039 |
| FS | 14,498 |
| MT_State | 596 |
| Other_Private | 1,397 |
| Stimson_Lumber | 2,547 |
| Water | 0 |
| Grand Total | 44,277 |

*Figure 3. Bobtail, Cedar-Kootenai River, and Lower Pipe Creek HUC 6s (near the West Kootenai BORZ) management areas and ownership.*

Forest Plan Reinitiation BA

Kootenai National Forest



*Figure 4. Map showing the original (2010) BORZ boundaries used in the Forest Plan consultation (2013 Biological Assessment)*

Forest Plan Reinitiation BA                                    Kootenai National Forest



*Figure 5. Management Areas within the original 2010 boundary for the West Kootenai BORZ. Note that the Access Amendment ROD lists the West Kootenai BORZ as 169,705 acres, a difference of only ~6 acres. This difference is no enough to change the analysis. Of the MA 2, 1,506 acres are classified as Wild, and 706 acres are classified as Recreational. Of the MA 3, 282 acres are classified as Botanical and 1,101 acres are classified as Geological.*

7-ER-1574

FS-000999

Forest Plan Reinitiation BA                                    Kootenai National Forest



Figure 6. Spring Habitat Quality. Fine scale habitat mapping from Proctor and Kasworm (2017).

Forest Plan Reinitiation BA                                   Kootenai National Forest



Figure 7. Summer Habitat Quality. Female grizzly bear fine scale habitat mapping from Proctor and Kasworm (2017).

Forest Plan Reinitiation BA                                    Kootenai National Forest



Figure 8. Fall Habitat Quality. Female grizzly bear fine scale habitat mapping from Proctor and Kasworm (2017).

Forest Plan Reinitiation BA                    Kootenai National Forest



*Figure 9. BMUs occupied by females with young during 2013-2019. Eleven BMUs were occupied (Kasworm et al. 2019.)*

Forest Plan Reinitiation BA                    Kootenai National Forest



*Figure 10. This map is taken from p. 19 in Kasworm et al. 2019 and depicts grizzly bear observations (1959-2018) and known or probable mortalities from all causes (1949-2018) in and around the Cabinet-Yaak recovery area.*

Forest Plan Reinitiation BA                                    Kootenai National Forest

## Appendix A

### BMU Status Summary

*Table 11. Summary of BMUs from Annual Monitoring Reports. These numbers represent a snapshot in time each year and reflect changes due to project activities, exceedance of administrative use limits, and breaches of road closure devices. Red numbers indicate the parameter that year does not meet the BMU standard.*

| BMU | BMU Acres | 2009 BY And AA baseline | 2010 BY | AA STD 2011 | 2011 BY | 2012 BY | 2013 BY | 2014 BY | 2015 BY | 2016 BY | 2017 BY | 2018 BY | 2019 BY | Change from BY 2009 to BY 2019 | POST BY 2019 | Change from BY 2009 to Post BY 2019 | Does Post BY 2019 Meet Standard? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1-Cedar** | **56,818** | | | | | | | | | | | | | | | | |
| OMRD >1% | | 14 | 15 | 15 | 15 | 14 | 14 | 14 | 15 | 16 | 14 | 14 | 16 | +2 % | 14 | 0% | Yes |
| TMRD >2% | | 10 | 11 | 15 | 8 | 8 | 10 | 8 | 8 | 9 | 8 | 8 | 10 | 0 % | 10 | 0% | Yes |
| Core % /ac | | 83 46,924 | 81 46,250 | 80 | 83 47,302 | 83 47,302 | 83 47,019 | 83 47,297 | 83 47,297 | 82 46,630 | 83 47,434 | 84 47,493 | 84 47,493 | +1 % +569 | 84 47,493 | +1 % +569 | Yes |
| **2-Snowshoe** | **65,241** | | | | | | | | | | | | | | | | |
| OMRD % | | 20 | 20 | 20 | 18 | 18 | 19 | 18 | 19 | 18 | 18 | 19 | 16 | -4 % | 15 | -5% | Yes |
| TMRD % | | 16 | 16 | 18 | 16 | 16 | 16 | 15 | 16 | 14 | 15 | 15 | 14 | -2 % | 14 | -2% | Yes |
| Core % /ac | | 76 49,341 | 76 49,556 | 75 | 77 49,998 | 77 49,968 | 77 49,934 | 77 50,248 | 76 49,845 | 77 50,335 | 77 50,310 | 77 50,310 | 77 50,366 | +1 % +1,025 | 77 50,366 | +1 % +1,025 | Yes |
| **3-Spar** | **75,701** | | | | | | | | | | | | | | | | |
| OMRD % | | 27 | 28 | 33 | 30 | 30 | 33 | 33 | 34 | 32 | 29 | 29 | 29 | +2 % | 29 | +2 % | Yes |
| TMRD % | | 26 | 26 | 26 | 26 | 26 | 26 | 26 | 26 | 26 | 26 | 26 | 26 | 0 % | 26 | 0 % | Yes |
| Core % /ac | | 62 46,896 | 62 46,897 | 59 | 62 46,887 | 62 46,862 | 62 46,759 | 61 46,517 | 62 46,791 | 62 46,791 | 62 46,791 | 62 46,791 | 62 46,609 | 0 % -287 | 62 46,609 | 0 % -287 | Yes |
| **4-Bull** | **81,750** | | | | | | | | | | | | | | | | |
| OMRD % | | 37 | 37 | 36 | 38 | 38 | 38 | 38 | 37 | 37 | 38 | 38 | 38 | +1 % | 38 | +1 % | No [1] |
| TMRD % | | 29 | 29 | 26 | 29 | 29 | 29 | 29 | 29 | 29 | 30 | 30 | 30 | +1 % | 30 | +1 % | No [1] |
| Core % /ac | | 62 50,658 | 62 50,612 | 63 | 62 50,454 | 62 50,288 | 62 50,288 | 62 50,380 | 62 50,380 | 61 50,177 | 61 49,834 | 61 49,858 | 61 49,576 | -1 % -1,082 | 61 49,576 | -1 % -1,082 | No [1] |
| **5-St.Paul** | **70,210** | | | | | | | | | | | | | | | | |
| OMRD % | | 28 | 27 | 30 | 29 | 28 | 28 | 29 | 28 | 28 | 28 | 28 | 28 | 0 % | 28 | 0 % | Yes |
| TMRD % | | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 0 % | 23 | 0 % | Yes |
| Core % /ac | | 58 40,591 | 58 40,809 | 60 | 58 40,916 | 58 40,908 | 58 40,908 | 58 40,908 | 58 40,908 | 58 40,908 | 58 40,964 | 58 40,969 | 58 40,992 | 0 % +401 | 58 40,992 | 0 % +401 | No [2] |

Forest Plan Reinitiation BA                                             Kootenai National Forest

| BMU | BMU Acres | 2009 BY And AA baseline | 2010 BY | AA STD 2011 | 2011 BY | 2012 BY | 2013 BY | 2014 BY | 2015 BY | 2016 BY | 2017 BY | 2018 BY | 2019 BY | Change from BY 2009 to BY 2019 | POST BY 2019 | Change from BY 2009 to Post BY 2019 | Does Post BY 2019 Meet Standard? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **6-Wanless** | 64,148 | | | | | | | | | | | | | | | | |
| OMRD % | | 29 | 33 | 34 | 32 | 32 | 32 | 32 | 32 | 32 | 29 | 33 | 32 | +3 % | 28 | -1 % | Yes. |
| TMRD % | | 34 | 34 | 32 | 34 | 34 | 34 | 33 | 33 | 33 | 34 | 34 | 34 | 0 % | 34 | 0 % | No [2] |
| Core % /ac | | 53 34,294 | 53 33,782 | 55 | 53 34,211 | 53 33,759 | 53 34,210 | 54 34,326 | 54 34,326 | 54 34,326 | 54 34,334 | 54 34,419 | 53 34,285 | 0 % -9 | 54 34,419 | + 1 % +125 | No [2] |
| **7-Silver Butte** | 63,151 | | | | | | | | | | | | | | | | |
| OMRD % | | 32 | 32 | 26 | 24 | 27 | 24 | 22 | 22 | 22 | 24 | 29 | 24 | -8 % | 22 | -10 % | Yes |
| TMRD % | | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | -0 % | 23 | 0 % | Yes |
| Core % /ac | | 62 39,424 | 62 39,424 | 63 | 63 39,485 | 65 40,930 | 65 40,930 | 65 41,054 | 65 41,054 | 65 41,054 | 65 40,884 | 65 41,241 | 65 41,219 | +3 % +1,795 | 65 41,219 | +3 % +1,795 | Yes |
| **8-Vermilion** | 68,567 | | | | | | | | | | | | | | | | |
| OMRD % | | 33 | 33 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | -1 % | 32 | -1 % | Yes |
| TMRD % | | 24 | 24 | 21 | 24 | 25 | 24 | 21 | 21 | 22 | 22 | 22 | 22 | -2 % | 22 | -2 % | No [3] |
| Core % /ac | | 55 37,595 | 55 37,378 | 55 | 55 37,890 | 55 37,656 | 55 37,656 | 58 39,903 | 58 39,892 | 58 39,833 | 58 39,833 | 58 39,833 | 58 39,932 | + 3 % +2,337 | 58 39,922 | + 3 % +2,337 | Yes |
| **9-Callahan** | 85,617 | | | | | | | | | | | | | | | | |
| OMRD >1% | | 27 | 27 | 33 | 28 | 29 | 27 | 27 | 27 | 27 | 27 | 31 | 29 | +2 % | 28 | +1 % | Yes. |
| TMRD % | | 26 | 26 | 26 | 27 | 27 | 26 | 27 | 27 | 26 | 26 | 26 | 29 | +3 % | 29 | +3 % | No[4] |
| Core % /ac | | 59 50,108 | 59 50,108 | 55 | 58 49,360 | 57 49,004 | 59 50,128 | 58 49,965 | 59 50,041 | 59 50,282 | 59 50,398 | 59 50,398 | 57 49,168 | -940 | 58 49,357 | -1 % -751 | Yes |
| **10-Pulpit** | 95,924 | | | | | | | | | | | | | | | | |
| OMRD % | | 44 | 45 | 44 | 45 | 45 | 45 | 44 | 44 | 44 | 45 | 45 | 45 | +1 % | 44 | | No [5] |
| TMRD % | | 29 | 30 | 34 | 27 | 27 | 27 | 26 | 27 | 26 | 27 | 26 | 28 | -1 % | 27 | | Yes |
| Core % /ac | | 51 49,387 | 51 49,184 | 52 | 54 51,443 | 54 51,688 | 54 52,016 | 54 52,214 | 54 52,136 | 54 52,262 | 54 51,622 | 54 51,194 | 51,441 | +3 % +2,054 | 51,840 | +3 % +2,453 | Yes |
| **11-Roderick** | 77,746 | | | | | | | | | | | | | | | | |
| OMRD % | | 28 | 28 | 28 | 28 | 28 | 29 | 33 | 32 | 30 | 29 | 30 | 29 | +1 % | 28 | 0 % | Yes [6] |
| TMRD % | | 28 | 28 | 26 | 27 | 27 | 28 | 29 | 28 | 27 | 27 | 27 | 26 | -2 % | 26 | -2 % | Yes |

FS-001006

Forest Plan Reinitiation BA                    Kootenai National Forest

| BMU | BMU Acres | 2009 BY And AA baseline | 2010 BY | AA STD 2011 | 2011 BY | 2012 BY | 2013 BY | 2014 BY | 2015 BY | 2016 BY | 2017 BY | 2018 BY | 2019 BY | Change from BY 2009 to BY 2019 | POST BY 2019 | Change from BY 2009 to Post BY 2019 | Does Post BY 2019 Meet Standard? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Core % /ac | | 54 41,615 | 54 41,615 | 55 | 54 41,615 | 53 41,181 | 54 41,615 | 53 41,222 | 53 41,582 | 53 41,382 | 54 42,276 | 54 42,276 | 56 43,167 | +2 % +1,552 | 56 43,167 | +2 % +1,552 | Yes |
| 12-Newton | 51,562 | | | | | | | | | | | | | | | | |
| OMRD % | | 42 | 42 | 45 | 43 | 43 | 42 | 42 | 47 | 45 | 42 | 42 | 43 | +1 % | 42 | 0 % | Yes |
| TMRD % | | 29 | 29 | 31 | 32 | 32 | 32 | 32 | 34 | 34 | 32 | 32 | 32 | +3 % | 30 | +1 % | Yes [7] |
| Core % /ac | | 58 29,905 | 58 29,902 | 55 | 56 29,008 | 56 29,084 | 56 29,084 | 56 29,131 | 53 27,094 | 54 27,991 | 56 29,095 | 56 29,095 | 54 28,093 | -2 % -1,812 | 57 29,206 | -1 % -699 | Yes [7] |
| 13-Keno | 51,235 | | | | | | | | | | | | | | | | |
| OMRD % | | 34 | 33 | 33 | 33 | 33 | 32 | 32 | 34 | 35 | 32 | 35 | 34 | 0 % | 31 | -3 % | No [8] |
| TMRD % | | 25 | 25 | 26 | 25 | 24 | 24 | 24 | 24 | 24 | 24 | 25 | 24 | -1 % | 22 | -3 % | Yes |
| Core % /ac | | 59 30,121 | 59 30,120 | 59 | 59 30,120 | 60 30,490 | 60 30,647 | 60 30,647 | 60 30,507 | 57 29,032 | 60 30,640 | 59 30,305 | 59 30,478 | 0 % +357 | 61 31,152 | +2 % +1,031 | Yes |
| 14-NW Peak | 83,027 | | | | | | | | | | | | | | | | |
| OMRD % | | 28 | 28 | 31 | 28 | 35 | 28 | 28 | 29 | 29 | 27 | 30 | 29 | +1 % | 28 | 0 % | Yes |
| TMRD % | | 26 | 26 | 26 | 26 | 26 | 26 | 26 | 24 | 25 | 24 | 24 | 24 | -2 % | 24 | -2 % | Yes |
| Core % /ac | | 56 46,131 | 56 46,131 | 55 | 56 46,131 | 56 46,115 | 55 46,000 | 56 46,406 | 56 46,696 | 56 46,599 | 56 46,696 | 56 46,753 | 56 46,843 | 0 % +712 | 56 46,843 | 0 % +712 | Yes |
| 15-Garver | 58,842 | | | | | | | | | | | | | | | | |
| OMRD % | | 29 | 34 | 33 | 31 | 30 | 30 | 32 | 30 | 32 | 29 | 30 | 32 | +3 % | 31 | +2 % | Yes |
| TMRD % | | 25 | 25 | 26 | 26 | 25 | 25 | 26 | 25 | 26 | 25 | 27 | 27 | +2 % | 27 | +2 % | Yes [9] |
| Core % /ac | | 55 32,339 | 55 32,338 | 55 | 54 32,006 | 55 32,338 | 55 32,337 | 52 30,690 | 55 32,309 | 53 31,138 | 55 32,317 | 54 31,984 | 54 32,024 | -1 % -315 | 55 32,476 | 0 % +137 | Yes [9] |
| 16-EF Yaak | 97,586 | | | | | | | | | | | | | | | | |
| OMRD % | | 29 | 32 | 33 | 29 | 31 | 29 | 29 | 28 | 30 | 43 | 30 | 30 | +1 % | 29 | 0% | Yes |
| TMRD % | | 27 | 27 | 26 | 27 | 27 | 26 | 25 | 25 | 26 | 33 | 25 | 25 | -2 % | 24 | -3 % | Yes |
| Core % /ac | | 54 52,566 | 54 52,627 | 55 | 54 52,627 | 54 52,641 | 55 53,340 | 53 51,649 | 55 53,742 | 53 51,696 | 43 41,800 | 55 53,742 | 54 52,915 | 0 % +349 | 56 54,799 | +2 % +2,233 | Yes [10] |
| 17-Big Creek | 83,724 | | | | | | | | | | | | | | | | |
| OMRD >1% | | 30 | 30 | 33 | 31 | 31 | 30 | 30 | 30 | 30 | 34 | 34 | 30 | 0 % | 30 | 0 % | Yes |

Forest Plan Reinitiation BA                                        Kootenai National Forest

| BMU | BMU Acres | 2009 BY And AA baseline | 2010 BY | AA STD 2011 | 2011 BY | 2012 BY | 2013 BY | 2014 BY | 2015 BY | 2016 BY | 2017 BY | 2018 BY | 2019 BY | Change from BY 2009 to BY 2019 | POST BY 2019 | Change from BY 2009 to Post BY 2019 | Does Post BY 2019 Meet Standard? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TMRD >2% | | 16 | 16 | 26 | 16 | 16 | 16 | 16 | 15 | 15 | 16 | 17 | 15 | -1 % | 15 | -1% | Yes |
| Core % /ac | | 58 48,397 | 58 48,397 | 55 | 56 47,057 | 58 48,302 | 56 47,059 | 57 47,702 | 57 47,886 | 58 48,270 | 57 47,449 | 55 46,424 | 58 48,290 | 0% -107 | 58 48,303 | 0 % -94 | Yes |

*Bear Year Annual Monitoring reports includes impacts from timber projects analyzed through NEPA and ESA, emergency fire access, roads with admin use exceeded, and public breaches.

**Post Bear Year 2019 estimate considered effects of ongoing Projects approved through NEPA and ESA (such as ongoing road work or decommissioning or routes opened for timber harvest), while breaches, emergency fire access or roads that exceeded administrative use not associated with an ongoing project, were returned to their legal status.  For example, a project may bring a BMU into compliance by road work or decommissioning during a bear year (ie. 2019), but improvements to habitat parameters from that work although they have occurred on the ground and the BMU complies with the standards would not be reported until the following bear year monitoring report (ie. 2020).

[1] **BMU 4 -** An access management project in BMU 4 (Bull), which is intended to bring BMU 4 into compliance with the AA, is in the early phases of planning. It is expected to take several years to complete project planning as well as implementation. Some scoping has been done and some potential alternative routes have been identified that could bring the BMU into compliance with the existing standard. A project decision is expected in Fiscal Year 2022 with *implementation* occurring in Fiscal Year 2023.

[2] **BMU 5 and BMU 6 -** See USDA FS 2020, BY 2019, in progress. Within BMU 6 during Bear Year 2019, a temporary 1% decrease in core resulted from a breach on a barriered segment of FR 385 that occurred in 2018 and remained through 2019, in combination with 2019 road work on a barriered segment of FR 4724 associated with the Miller West Fisher Project. Both barriers are expected to be repaired in 2020. BMUs 5 (St. Paul) would have been brought into compliance by road access changes associated with the Rock Creek Project Phase 1 and the Montanore Evaluation Project.  BMU 6 (Wanless) would have been brought into compliance by road access changes associated with the Montanore Evaluation Project and the Miller-West Fisher Project. However, litigation on these projects has delayed implementing the proposed mitigation measures to bring these BMUs into compliance. It is anticipated that implementation could occur by the end of 2022.

[3] **BMU 8 -** See USDA FS 2020, BY 2019, in progress. BMU 8 (Vermilion) is out of compliance due to database corrections to account for a previous re-route of a motorized trail. A small access management project will be planned for this BMU to bring it into compliance. A project decision is expected by the end of Fiscal Year 2020 with implementation expected in Fiscal Year 2021.

[4] **BMU 9** – See USDA FS 2020, BY 2019, in progress. During BY 2019, BMU 9 (Callahan) TMRD increased from 26% to 29%. Post BY 2019, TMRD remains 3% above standard.  Affecting both route densities and core in BY 2019 were ongoing activities associated with the Starry Goat Project,

Forest Plan Reinitiation BA                                             Kootenai National Forest

two temporary breaches, and database updates (no change on the ground) to include the existing Burlington Northern Railroad tracks and access roads. The Starry Goat Project BA analyzed a temporary increase in TMRD to 28% during activity, and post project TMRD would return to 26%. As displayed in the table above, project activity in 2018 in conjunction with breaches increased TMRD to 29%. TMRD remained at 29% in BY 2019 due to Starry Goat Project activity in combination with different breaches and the database updates for railroads. Post BY 2019 included the Starry Goat project, and it is expected that the database update to include railroads kept Post BY19 TMRD rounded up to 29%. The Starry Goat Project activity occurring in Post BY19 runs included road decommissioning work and improvements which will be reflected in BY 2020. The database update for the railroad associated routes, due to their location, are not expected to change the post Starry Goat project TMRD of 26% per the BA and NEPA analysis, and the BMU is expected to be in compliance with Forest Plan by Bear Year 2020.

[5] **BMU 10 -** See USDA FS 2020, BY 2019, in progress. During BY 2019, BMU 10 (Pulpit) temporary increase in route density is related primarily with ongoing, authorized activities associated with the OLY project (Oly Moly TS and some small sales), as well as a temporary breach. Also during BY 2019, database updates were made for existing Powerline access routes resulted in slight decreases to core acres and increases in route densities. Current harvest access via of gated routes (OLY project) results in OMRD high by one percent. Upon completion of the project, likely in the next two years, BMU 10 will comply with the Forest Plan standards.

[6] **BMU 11 -** See USDA FS 2020, BY 2019, in progress. During BY 2019, BMU 11 (Roderick) project-related improvements occur due to the Grizzly Vegetation and Transportation Management Project, while OMRD temporarily remained at 29% due to unauthorized access on two gated roads. The project is not yet fully implemented: placement of two barriers on one road (NFSR 902) will connect two large core blocks. There would be no change to core percentage and decrease in TMRD to 25% as directed in the decision document. Post BY 2019, OMRD drops to 28% and the BMU currently complies with the Forest Plan standards due to implementation of the Grizzly Project.

[7] **BMU 12 -** See USDA FS 2020, BY 2019, in progress. During BY 2019, The Three Rivers Ranger District repaired breaches, installed barriers approved under Rocky Pine and barriered gated roads to meet the TMRD standard during the 2019 Bear Year (which would not show as improving TMRD until bear year 2020) and corrections were made to the database where roads were still showing as opened but were barriered on the ground. This BMU complied with the Forest Plan standards at the end of Bear Year 2019, although the improvement to habitat parameters won't be reported until the bear year 2020 monitoring report.

[8] **BMU 13 -** See USDA FS 2020, BY 2019, in progress. BMU 13 (Keno) temporary project-related increases related to the Idaho Panhandle National Forest Deer Creek Project. This BMU will comply with Forest Plan standards once the Deer Creek project is completed. Most timber harvest within the BMU has been completed, but final road maintenance still needs to be completed.

[9] **BMU 15 -** Please see USDA, FS. 2020, in progress. BMU 15 (Garver) BY 2019 increases in OMRD and TMRD and decrease in core resulted from database updates to reflect subdivisions and road construction on private land. Ground-verification by the Three Rivers Ranger District in bear year 2019 provided the district with information to reclassify some National Forest system gated segments of road to impassable due to the roads being brushed in. These updates to the database (which will be reflected in the Bear Year 2019 report, USDA, FS. 2020 in progress) will

Forest Plan Reinitiation BA                                        Kootenai National Forest

enable the BMU to meet the Forest Plan standards, which became the existing condition for the proposed Black Ram Project.   Also temporarily contributing to increases in BY 2019 were unauthorized used on several roads. Restriction devices were repaired during the fall of bear year 2019 on all unauthorized routes, therefore the BMU will be in compliance with the standards going into BY 2020

[10] **BMU 16** – Please see USDA, FS 2020, in progress. BMU 16 (East Fork Yaak) bear year 2019 1 percent decrease in core resulted from unauthorized use which occurred on the following NFSRs: barriered routes 746B, 6061, and gated route 6062. The breach on FR 6061 temporarily affected core and route densities while the breaches on 746B and 6062 temporarily affected route densities. Actual use was likely infrequent. All restrictions were repaired during bear year 2019 and will be considered barriered and gated going in to 2020 when the improvement to core will be reported. The BMU will be in compliance with the standards going into BY 2020.

### Bear Year Monitoring Reports

USDA, FS. 2012. Selkirk/Cabinet-Yaak Grizzly Bear Recovery Zones 2011 Annual Monitoring Summary Report. **4/16/2012.** 12 pp.

USDA 2013. Selkirk/Cabinet-Yaak Grizzly Bear Recovery Zones _(BY_ 2012 Annual Monitoring Summary Report. Corrected 9/23/2013, **with additional corrections 06/12/2019**.  Colville, Idaho Panhandle, Kootenai, and Lolo National Forests. 13 pp.

USDA 2014. Cabinet-Yaak/Selkirk grizzly Bear Recovery Zones 2013 Annual Monitoring Summary Report. Kootenai, Lolo and Idaho Panhandle National Forests. 12pp.

USDA FS 2015. Cabinet-Yaak/Selkirk Grizzly Bear Recovery Zones 2014 Annual Monitoring Summary Report Kootenai, Lolo and Idaho Panhandle National Forests. 16 pp.

USDA FS 2016. Cabinet-Yaak/Selkirk Grizzly Bear Recovery Zones 2015 Annual Monitoring Summary Report.  Kootenai, Lolo and Idaho Panhandle National Forests. 16pp

USDA FS 2017. Cabinet-Yaak/Selkirk Grizzly Bear Recovery Zones 2016 Annual Monitoring Summary Report.  Colville, Idaho Panhandle, Kootenai, and Lolo National Forests. **04-14-2017**. 14pp

USDA FS 2018. Cabinet-Yaak/Selkirk Grizzly Bear Recovery Zones 2017 Annual Monitoring Summary Report.  Colville, Idaho Panhandle, Kootenai, and Lolo National Forests, **07-18-2018**. 12pp.

USDA FS 2019. Cabinet-Yaak/Selkirk Grizzly Bear Recovery Zones 2018 Annual Monitoring Summary Report.  Colville, Idaho Panhandle, Kootenai, and Lolo National Forests, **10-31-2019**. 14pp.

USDA FS 2020. Cabinet-Yaak/Selkirk Grizzly Bear Recovery Zones 2019 Annual Monitoring Summary Report.  Colville, Idaho Panhandle, Kootenai, and Lolo National Forests, **_in progress._**

Forest Plan Reinitiation BA                                    Kootenai National Forest

## Appendix B

### BORZ changes on the KNF since 2010

*Table 12. Summary of updates and corrections to KNF Bears Outside Recovery Zone (BORZ) Total roads.*

| Bears Outside Recovery Zone | Total Size (Acres) | Total Area NFS (Acres) | Total Roads (Linear Miles) 2011 AA Baseline and Bear Year (BY) Updated Existing Condition | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2011[1] AA | 2011 BY | 2012 BY | 2013 BY | 2014 BY | 2015 BY | 2016 BY | 2017 BY | 2018 BY | 2019 BY |
| Cabinet Face | 28,052 | 27,083[2] | 164.1 | 164.1 | 164.6[3] | 164.6 | 164.6 | 165.0[4] | 165.0 | 165.0 | 165.0 | 165.0 |
| Clark Fork | 101,899 | 100,209[5] | 256.1 | 256.1 | 256.1 | 256.1 | 256.1 | 256.1 | 256.1 | 256.1 | 256.1 | 267.4[6] |
| West Kootenai 2011 | 173,122 | 169,705 | 615.3 | 615.3 | 616.3[7] | 616.3 | 616.3 | 616.3 | 616.3 | 616.3 | 616.8[8] | 616.8 |
| Bobtail RUA | +13,975 acres | +10,189 acres | NA | 38.1 | 38.1 | 38.1 | 38.1 | 38.1 | 38.1 | 40.5[9] | 40.5 | 41.2[10] |
| West Kootenai & Bobtail RUA Combined 2012-2018 | 187,293[11] | 179,882[11] | NA | NA | 654.4[7] | 654.4 | 654.4 | 654.4 | 654.4 | 656.8[9] | 657.3[8] | NA |
| Cedar Cr-Kootenai River RUA | +11,263 | +6,175 | NA | NA | NA | NA | NA | NA | NA | NA | NA | 44.6[12] |
| Lower Pipe Creek RUA | +19,039 | +14,498 | NA | NA | NA | NA | NA | NA | NA | NA | NA | 87.5[13] |
| West Kootenai and All RUAs 2012-2019 | 217,595 | 200,555 | NA | NA | NA | NA | NA | NA | NA | NA | NA | 790.1[14] |
| Tobacco | 287,240 | 266,992[15] | 1,123.9 | 1,123.9 | 1,123.9 | 1,123.9 | 1,123.9 | 1,123.9 | 1,123.9 | 1,124.7[16] | 1,127.4[17] | 1,192.7[18] |

[1] See USDA FS 2012, BY 2011 Table 9, footnote #2, stating 2011 AA ROD baseline numbers represents the 2010 environmental baseline identified in the amendments to the Forest Plan (USDA Forest Service 2011) and incorporated into the KNF Forest Plan (USDA Forest Service 2015).

[2] See USDA FS 2019, October 31, version2, BY 2018, Table 10 and the Cabinet Face BORZ paragraph where it states "In reviewing the 2011 AA BORZ NFS land layer, we determined the Access Amendment ROD Table 16 had a clerical error when it reported the Cabinet Face BORZ NFS acres as 27,093 acres. The NFS acres for the Cabinet Face BORZ have not changed on the ground since the 2011 Access Amendment established the boundaries. Using the Access Amendment and the current Forest ownership GIS layers, we have corrected the acres to 27,083 acres in size".

7-ER-1586

FS-001011

Forest Plan Reinitiation BA                                                                 Kootenai National Forest

**3** See USDA FS 2013, BY 2012 Table 8, footnote #6, stating the database was updated to show a [*gated*] road [*N. Poker Hill Face D #99865D*] that originates on Plum Creek land, crosses NFS lands for approximately 0.5 miles, and then ends on Plum Creek land. Only part of this road that was located on Plum Creek land was shown in the 2010 baseline, with none of the road being accounted for that crossed NFS lands. The database is now updated to show this road (0.5 miles across NFS lands). The 2010 existing condition of 164.1 is now updated to 164.6 miles. ***No change occurred on the ground. This is only a correction of the database***."

**4**  See USDA FS 2016 Final Bear Year 2015 Table 9, Footnote #3 and See USDA FS 2017 Final Bear Year 2016 Table 9, Footnote #3. Both state the increase in the existing condition from 164.6 to 165.0 resulted from the re-routing and construction of the lower 0.465 miles of road 5252 from private land to NFS land for access to a private mining claim (**ANILCA access***). This resulted in a change on NFS lands*."

**5** See USDA FS 2020, BY 2019, in progress. Table 10. Clark Fork BORZ paragraph which states The Forest ownership GIS layers calculates the federal ownership in the Clark Fork BORZ at 100,209 acres. It has been determined clerical error resulted in the AA reporting 100,421 acres.  The boundary of the Clark Fork BORZ has not changed since being established in the Access Amendment. No change occurred on the ground."

**6** See USDA FS 2020, BY 2019, in progress. Table 10, Footnote #4. This states Clark Fork BORZ: for BY 2019 the existing condition of total routes of 256.1 is reset to 267.4 miles to account for 1.84 miles of gated Avista Powerline Access, plus **9.5 miles of existing routes not previously reported** (1.7 miles of railroad tracks, 0.1 miles of Railroad access roads and 7.7 miles of powerline access). The existing condition of open routes of 176.9 miles was reset to 186.4 miles to account for the **9.5 miles of existing routes not previously reported. The 9.5 miles are existing routes and not a change on the ground.**

**7** See USDA FS 2013, BY 2012 Table 8, Footnote #9 stating the 2011 West Kootenai BORZ AA baseline (615.3 miles) has been updated to reflect the addition of this 1 mile of motorized trail. This change to 616.3 miles was only an update of the database and did not reflect any changes on the ground.  ***Subsequently a total of 38.1 miles of road associated with the inclusion of the Bobtail HUC into this BORZ resulted in the new existing condition*** of 654.4 linear miles of total roads (615.3 + 1 + 38.1 = 654.4 miles).

**8** See updated bear Year 2018 report, USDA FS 2019 10312019 where it states below Table 10 under the West Kootenai BORZ the KNF updated the database for total roads in this BORZ from 656.8 miles established in the 2017 annual report to 657.3 miles in 2018, due to a database correction of FR 7219 (0.45 miles). This road segment had been classed as barriered in the initial 2010 BORZ baseline but the road has always been open.  No change occurred on the ground. **Note FR 7219 was located within the 2011 West Kootenai BORZ boundary which accounted for the increase from 616.3 miles to 616.8 miles).**

**9** See USDA FS 2018, BY 2017 Final Revised 07182018, Table 9, Footnote #9 stating ***No change on ground***. Database conditions reset and increased due to ***corrections in Infra database***. Road 6144B (2 mi.) and Road 4614B (0.45 mi.) were incorrectly coded as barriered but are gated on the ground. (*and these database corrections for 2.45 miles of total roads occurred within the Bobtail RUA boundary, so were added to the 31.1 miles within the Bobtail RUA, and when the combined West Kootenai BORZ was considered, the 2.45 miles was added to the 654.4 miles of total road within the larger boundary to arrive at the 656.8 miles as described in the Bear Year report*)

Forest Plan Reinitiation BA                                                                                        Kootenai National Forest

[10] See USDA FS 2020, BY 2019, in progress. Table 10, Footnote #6 stating for the Bobtail RUA, "In BY 2019 total linear routes were reset from 40.5 miles to 41.2 miles to account for 0.7 miles of existing powerline access routes not previously reported. The 0.7 miles of powerline access route is existing and no change on the ground.

[11] See USDA FS 2013, BY 2012. Table 8, stating updated acres for the inclusion of the Bobtail 6th order HUC into the West Kootenai BORZ and Footnote #8. Note in 2020 GIS verified acreage of the combined BORZ was 187,293, and Forest Service only acres were calculated at **179,882 acres**. Total acreage depended on whether private land on the border of the RUA was included or excluded, and this would change as RUA's were added.

[12] See USDA FS 2020, BY 2019, in progress. Table 10, Footnote #7, which states for the Cedar Creek – Kootenai River RUA tha*t "*The existing condition established in 2019 for this new RUA (*Cedar Creek-Kootenai River*) are 44.6 miles of total routes (33.1 total miles of KNF roads and 11.5 miles of other routes (consisting of 9.1 miles of long-term illegal user-created routes, 0.8 miles of railroad tracks, and 1.6 miles of existing powerline access routes).

[13] See USDA FS 2020, BY 2019, in progress. Table 10, Footnote #8, which states for the Lower Pipe RUA that "The existing condition established in 2019 for this new RUA are 87.5 miles of total routes (86.4 miles of total KNF roads and 1.1 miles of long-term illegal user-created routes.

[14] S See USDA FS 2020, BY 2019, in progress. Table 10, Footnote #9, which states for the West Kootenai BORZ 2019 (the 2011 boundary with the expansion of Bobtail, Cedar Creek-Kootenai River, and Lower Pipe RUAs that "The updated combined 2019 West Kootenai BORZ existing condition established for total routes is 790.1 miles and open routes is 456.9 miles.

[15] See USDA FS 2019, BY 2018 Table 10, and the subsequent Tobacco BORZ paragraph where it states "In reviewing the 2011 ArcGIS BORZ NFS land layer, we determined the Access Amendment ROD Table 16 had a clerical error when it reported the NFS acres as 266,947. The ArcGIS layer from 2011 through 2017 calculated Tobacco BORZ NFS lands as 266,892 acres. In 2018 the Forest updated its land ownership GIS layer to reflect the 2004 Alberton Land Exchange, which resulted in an additional 98.4 acres of NFS land near Frank Lake. This correction updates the NFS acres in the Tobacco BORZ to 266,992 acres.

[16] See USDA FS 2018, BY 2017, Final Revised 07182018, Table 9, and Footnote #13 for the Tobacco BORZ stating **no change on ground**. Existing condition total linear mile conditions (1,123.9 mi.) within the NFS BORZ reset and increased to 1,124.7 mi. due to Infra database correction. Portion of road # 3505 (0.8 mi.) was incorrectly coded as barriered when it is gated for powerline access by Lincoln Electric.

[17] See updated bear Year 2018 report, USDA FS 2019 10-31-2019 where it states below Table 10 under the Tobacco BORZ  that the existing condition total road miles (1,124.7 miles) established in the 2017 report is reset to 1,127.4 miles in 2018. This increase resulted from database updates to incorporate existing roads on the parcel added to NFS ownership and additional database corrections on FR 850B, 5216, 5216B, 5216D, and 4884. FR 850B was a previously existing but unmapped open railroad access road; FRs 5216, 5216B and 5216D were also previously unmapped open routes on NFS land but existed prior to Libby Dam construction. FR 4884 was missed in the 2010 baseline but existed on the ground as a gated Private Special Use road and has been accounted for in the bear year runs since 2012, but was not accounted for in the

Forest Plan Reinitiation BA                                        Kootenai National Forest

database. The 2018 bear year report resets the existing condition total roads to include these existing routes. **No change occurred on the ground."**

**18** See USDA FS 2020, BY 2019, in progress. Table 10, Footnote #**10 for the Tobacco BORZ, where it states "**For BY 2019, the existing condition for total routes was reset from 1,127.4 miles to 1,192.7 miles. This increase reflects database corrections on 1.4 miles of KNF routes (**either ANILCA or corrections to database and no change on groun**d), and **updates for 63.9 miles of existing routes not previously recorded** (22.4 miles of existing railroad tracks, 2.9 miles of railroad access roads, 26.9 miles of railroad dozerbladed firelines, and 11.7 miles of powerline access routes." **The 63.9 miles are existing routes and no change on ground.**

Forest Plan Reinitiation BA      Kootenai National Forest

*Table 13. Summary of updates and corrections to KNF BORZ Open roads.*

| Bears Outside Recovery Zone | Total Size (Acres) | Total Area NFS (Acres) | Open Roads (Linear Miles) AA Baseline and Bear Year (BY) Updated Existing Conditions | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2011 AA[1] | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| Cabinet Face | 28,052 | 27,083[2] | **128** | **130**[3] | **129.5**[4] | 129.5 | 129.5 | 129.5 | 129.5 | **133.6**[5] | 133.6 | 133.6 |
| Clark Fork | 101,899 | 100,205[6] | **176.9** | 176.9 | 176.9 | 176.9 | 176.9 | 176.9 | 176.9 | 176.9 | 176.9 | **186.4**[7] |
| West Kootenai | 173,122 | 169,705 | **315.9** | 315.9 | **316.9**[8] | **318.3**[9] | 318.3 | 318.3 | 318.3 | **331.0**[10] | **331.5**[11] | **331.6**[12] |
| Bobtail RUA | **+13,975 acres** | **+10,189 acres** | **NA** | NA | **24.7** | 24.7 | 24.7 | 24.7 | 24.7 | **28.2**[10] | 28.2 | **29.1**[13] |
| West Kootenai & Bobtail RUA Combined 2012-2018 | **187,200**[14] | **179,882** [14] | **NA** | NA | **341.6**[8] | **343.0**[9,9a] | 343.0 | 343.0 | 343.0 | **359.2**[10] | **359.7**[11] | **NA** |
| Cedar Cr- Kootenai River RUA | **+11,263** | **+6,175** | NA | NA | NA | NA | NA | NA | NA | NA | NA | **32.4**[15] |
| Lower Pipe Creek RUA | **+19.039** | **+14,498** | NA | NA | NA | NA | NA | NA | NA | NA | NA | **63.8**[16] |
| West Kootenai and All RUAs 2012-2019 | **217,595** | **200,555** | NA | NA | NA | NA | NA | NA | NA | NA | NA | **456.9**[17] |
| Tobacco | 287,240 | **266,992** [18] | **867.0** | 867.0 | 867.0 | 867.0 | 867.0 | 867.0 | 867.0 | 867.0 | **872.0**[19] | **936.4**[20] |

[1] See USDA FS 2012, BY 2011 Table 9, footnote #2, stating 2011 AA ROD baseline numbers represents the 2010 environmental baseline identified in the amendments to the Forest Plan (USDA Forest Service 2011).

[2] See USDA FS 2019, Bear Year 2018 SCYE Monitoring report Final To USFWS updated 10312019 (vers2) under the Cabinet Face BORZ stated "In reviewing the 2011 AA BORZ NFS land layer, we determined the Access Amendment ROD Table 16 had a clerical error when it reported the Cabinet Face BORZ NFS acres as 27,093 acres. The NFS acres for the Cabinet Face BORZ have not changed on the ground since the 2011 Access Amendment established the boundaries. Using the Access Amendment and the current Forest ownership GIS layers, we have corrected the acres to 27,083 acres in size

[3] See USDA FS 2012, BY 2011 Table 9, footnote #6, for the Cabinet Face stating the database of 128 miles was updated to reflect a correction to Road 4745 which was incorrectly identified as [*gated*] in the baseline from the AA. The approximately two miles of 4745 should have been included as open in the database. ***There was no change on the ground, just a correction in the database***.

Page **83** of **123**      04/15/2020

FS-001015

Forest Plan Reinitiation BA                                                    Kootenai National Forest

[4] See USDA FS 2013, BY 2012 Table 8, footnote #7, for Cabinet Face stating Road 4745 was incorrectly identified as closed in the baseline from the Access Amendment, as noted in the Bear Year 2011 monitoring report. The approximately two miles of road on 4745 should have been included as open in the database. ***There is no change on the ground, just a correction in the database***. Those 2 miles have been added to the 2010 existing condition of 128.0 miles. Another error was discovered when preparing this year's monitoring report. Road 5195 was incorrectly identified as open in the Access Amendment baseline when it should have been identified as gated. This 0.5 miles of Road 5195 ***does not represent a change on the ground, just a correction in the database***. The newly corrected database shown in the table above is derived by taking the Access Amendment existing condition (128.0 miles), adding the miles for Road 4745 (2 miles), and subtracting the miles for Road 5195 (0.5 miles). The newly corrected existing condition is now 129.5 miles.

[5] See USDA FS 2018, Final Bear Year 2017 Report, Table 9, and Footnote #5 for the Cabinet Face which states ***No change on ground***. Existing condition reset and increased from 129.5 by 4.1 miles to 133.6 due to corrections in the INFRA database for errors on road Big Hoodoo B 6205B which was incorrectly coded as gated, but is seasonally open.

[6] See USDA FS 2020, BY 2019, in progress. Table 10. Clark Fork BORZ paragraph which states The Forest ownership GIS layers calculates the federal ownership in the Clark Fork BORZ at 100,209 acres and this is reported in the BY 2019 report, It has been determined clerical error resulted in the AA reporting 100,421 acres.  The boundary of the Clark Fork BORZ has not changed since being established in the Access Amendment. No change occurred on the ground."

[7] See USDA FS 2020, BY 2019, in progress. Table 10, Footnote #4. This states Clark Fork BORZ: for BY 2019 the AA 2010 baseline of open routes of 176.9 miles was reset to 186.4 miles to account for the 9.5 miles of existing routes not previously reported (1.7 miles of railroad tracks, 0.1 miles of Railroad access roads and 7.7 miles of powerline access). The database of open routes of 176.9 miles was reset to 186.4 miles to account for the **9.5 miles of existing routes not previously reported. This is not a change on the ground.**

[8] See USDA FS 2012, BY 2011 Table 9, footnote #7, stating the (West Kootenai BORZ) increase in baseline due to approximately one mile of the Ziegler Mountain motorized trail that was not accounted for in the Access Amendment baseline when it should have been. The baseline has been updated to reflect the addition of this 1 mile of motorized trail. This change is only an update of the baseline and does not reflect any changes on the ground. The Baseline from 2010 (315.9 miles) was updated to 316.9 miles to account for this correction.  The changes resulting to the existing condition were an ***update to the INFRA database and did not reflect changes on the ground.***

[9] See USDA FS 2013, BY 2012 Sept Corrected, Footnote #10 which states in the Bear Year 2011 monitoring report it was disclosed that the Ziegler Mountain motorized trail had not been accounted for in the Access Amendment baseline when it should have been. The old existing condition (315.9 miles) was updated to reflect the addition of this 1 mile of motorized trail to 316.9 miles. This change is only an update of the database and ***does not reflect any changes on the ground***. **A total of 24.7 miles of road associated with the inclusion of the Bobtail HUC into this BORZ resulted in the new existing condition of 341.6** linear miles of open road. The footnote goes on to say that this 341.6 linear miles of open road was then updated for the 2012 bear year with an additional 1.4 miles of open road to 343.0 miles to reflect the increase in road miles due to use of two roads to access private lands. ***Both the 14505 and 4604C roads within the old BORZ boundary were not identified as open in the Access Amendment baseline calculations. These two roads are now identified as open due to their use to access private lands (ANILCA).***

Forest Plan Reinitiation BA                                                      Kootenai National Forest

**9a** See USDA FS 2014, BY 2013, Table 8, footnote #1 stating "The increase in the existing condition is due to use of two roads to access private lands. Both the 14505 and 4604C roads were not identified as open in the Access Amendment baseline calculations. The database has been corrected and these two roads are now identified as open due to their use to access private lands. These two roads were disclosed in the 2012 monitoring report. The existing condition has been updated in 2013 to reflect this correction in the database. **No changes on the ground occurred.**

**10** See USDA FS, 2018, Bear Year 2017, Table 9, Footnote #11. Where it states No change on ground. Database conditions within the NFS BORZ reset and increased (to 359.2 miles) due to corrections in Infra database. Portions of, or all of NFSR roads #309 (0.48 mi.), #4613 (2.42 mi.), #4614 (2.78 mi.), #4733 (0.34 mi.), #4734 (0.92 mi.), #4742 (0.64 mi.), #7239 (4.8 mi.), #7239A (0.32 mi.), #7236 (1.1 mi.), #7236A (2.6 mi.) were incorrectly coded as gated when they are seasonally open during the bear year.(**Note database corrections occurred within the following boundary's: NFSR roads 309, 4733, 4734, 4742, 7239, 7239A, 7236, 7236A are located in the 2011 AA boundary of West Kootenai BORZ; corrections on 4613 (1.622 miles in 2011 AA boundary, and 0.798 miles in Bobtail RUA; corrections on #4614 (2.78 miles) occur in Bobtail RUA. So 2011 AA West Kootenai BORZ boundary baseline of 318.3 plus 12.8 miles adjusted to 331.1) and Bobtail RUA adjusted baseline 24.75 + 3.578 = 28.3, rounded down to 28.2 to adjust for splitting rounding errors)**

**11** See updated bear Year 2018 report, USDA FS, 2019 09232019 where it states under the West Kootenai BORZ paragraph " that the existing condition for open roads was also reset from 359.2 miles established in the BY17 report to the current 359.7 miles due to the database correction on FR 7219. This road segment had been classed as barriered in the initial 2010 BORZ baseline, but the road has always been open. **No change occurred on the ground.**

**12** See USDA FS 2020, BY 2019, in progress. Table 10, Footnote #5 and under the West Kootenai BORZ 2011 paragraph it states total routes were reset from 331.5 to 331.6 miles with a database correction/update of 0.08 miles of 4604 from gated to open. No change occurred on the ground, only more accurate mapping of existing condition.

**13** See USDA FS 2020, BY 2019, in progress. Table 10, Footnote # 6, for the Bobtail RUA where it states, "Open routes were reset from 28.2 miles to 29.1 miles for database updates to include the existing 0.7 miles of powerline route not previously reported and database corrections on FR 6144D (0.1 mi) and FR 4698A (0.1 mi) (no changes occurred on the ground). Additional information is provided under the Bobtail RUA paragraph following the table.

**14** See USDA FS 2013, BY 2012. Table 8, stating updated acres for the inclusion of the Bobtail 6th order HUC into the West Kootenai BORZ and Footnote #8. Note in 2020 GIS verified acreage of the combined BORZ was 187,293, not 187,097. Total acreage depended on whether private land on the border of the RUA was included or excluded, and this would change as RUA's were added.

**15** See USDA FS 2020, BY 2019, in progress. Table 10, Footnote # 7 for the Cedar Creek – Kootenai River RUA where it states "Existing condition for open routes are established at 32.4 miles (20.9 miles of open KNF roads and the 11.5 miles of other routes described for total routes) (consisting of 9.1 miles of long-term illegal user-created routes, 0.8 miles of railroad tracks, and 1.6 miles of existing powerline access routes). Additional information is provided under the Cedar Creek – Kootenai River paragraph following Table 10.

Forest Plan Reinitiation BA                                                    Kootenai National Forest

[16] See USDA FS 2020, BY 2019, in progress. Table 10, Footnote # 8 for the Lower Pipe RUA, where it states "Existing condition for open Routes are established at 63.8 miles (62.7 miles of open KNF roads, and 1.1 miles of illegal user-created routes. No existing railroad tracks or powerline access routes exist". Additional information is provided under the Lower Pipe RUA paragraph following Table 10.

[17] See USDA FS 2020, BY 2019, in progress. Table 10, Footnote # 9 for the West Kootenai BORZ 2019 expansion, where it states the updated combined database established for total routes is 790.1 mils and open routes is 456.9 miles. Additional information is provided under associated paragraph following Table 10.

[18] See USDA FS 2019, BY 2018 Table 10, stating the correction and updated acres due to determination that the Access Amendment ROD Table 16 had a clerical error when it reported the NFS acres as 266,947. The ArcGIS layer from 2011 through 2017 calculated Tobacco BORZ NFS lands as 266,892 acres. In 2018 the Forest updated its land ownership GIS layer to reflect the 2004 Alberton Land Exchange, which resulted in an additional 98.4 acres of NFS land near Frank Lake. This correction updates the database of NFS acres in the Tobacco BORZ to 266,992 acres.

[19] See updated bear Year 2018 report, USDA FS 2019 *10-31-2019* where it states below Table 10 under the Tobacco BORZ, "the KNF reset the existing condition open roads from 867.0 miles established in the 2011 Access Amendment to 872.0 miles in 2018 to reflect the existing open roads located on the NFS acquired 98.4 acre parcel and the other database corrections to FR's 7185, 3701, 850B, 5216, 5216B, 5216D. Database corrections on FRs 7185 and 3701 updated the roads from gated to open as the roads have always been seasonally open to the public. **No change occurred on the ground**."

[20] See USDA FS 2020, BY 2019, in progress. Table 10, Footnote # 10, where it states Tobacco BORZ existing condition open routes were reset from 872.0 miles to 936. 4 miles. This increase reflects database updates on 0.5 miles of KNF routes (ANILCA access) and database updates for 63.9 miles of existing routes not previously recorded (22.4 miles of existing railroad tracks, 2.9 miles of railroad access roads, 26.9 miles of railroad dozerbladed firelines, and 11.7 miles of powerline access route )- as described for total roads. The 63.9 miles are existing routes and no change occurred on the ground. Additional information is provided under the Tobacco BORZ paragraph following Table 10.

**Selkirk/Cabinet-Yakk Grizzly Bear Recovery Zones Annual Monitoring Reports Summarized in Tables 1 and 2.**

USDA, Forest Service. 2012. Selkirk/Cabinet-Yaak Grizzly Bear Recovery Zones 2011 Annual Monitoring Summary Report. 04/16/2012. Typo says 2010 monitoring report. Colville, Idaho Panhandle, Kootenai, and Lolo National Forests. 12 pages

USDA, Forest Service. 2013. Selkirk/Cabinet-Yaak Grizzly Bear Recovery Zones 2012 Annual Monitoring Summary Report. **Corrected 09/23/2013, with additional corrections 06/12/2019** for table headings. Colville, Idaho Panhandle, Kootenai, and Lolo National Forests. 13 pp.

USDA, Forest Service. 2014. Selkirk/Cabinet-Yaak Grizzly Bear Recovery Zones 2013 Annual Monitoring Summary Report. Kootenai, Lolo, and Idaho Panhandle National Forests. 13 pp.

Forest Plan Reinitiation BA                                         Kootenai National Forest

**USDA, Forest Service. 2015**.  Selkirk/Cabinet-Yaak Grizzly Bear Recovery Zones 2014 Annual Monitoring Summary Report. Colville, Kootenai, Lolo, and Idaho Panhandle National Forests. 13 pp.

**USDA, Forest Service. 2016**.  Selkirk/Cabinet-Yaak Grizzly Bear Recovery Zones 2015 Annual Monitoring Summary Report. Colville, Kootenai, Lolo, and Idaho Panhandle National Forests. 16 pp.

**USDA, Forest Service. 2017**.  Selkirk/Cabinet-Yaak Grizzly Bear Recovery Zones 2016 Annual Monitoring Summary Report. Colville, Kootenai, Lolo, and Idaho Panhandle National Forests. 04/14/2017. 14 pp.

**USDA, Forest Service. 2018**.  Selkirk/Cabinet-Yaak Grizzly Bear Recovery Zones 2017 Annual Monitoring Summary Report. Colville, Kootenai, Lolo, and Idaho Panhandle National Forests. 07/18/2018. 12 pp.

**USDA, Forest Service. 2019.** Selkirk/Cabinet-Yaak Grizzly Bear Recovery Zones 2018 Annual Monitoring Summary Report. Colville, Kootenai, Lolo, and Idaho Panhandle National Forests. 10/31/2019. 14pp.

**USDA, Forest Service. 2020.** Selkirk/Cabinet-Yaak Grizzly Bear Recovery Zones 2019 Annual Monitoring Summary Report. Colville, Kootenai, Lolo, and Idaho Panhandle National Forests. In progress, April 2020.


**Other Literature**

**USDI Fish and Wildlife Service. 2011**. Biological opinion on the Forest Plan amendments for motorized access management within the Selkirk and Cabinet-Yaak grizzly bear recovery zones on the Kootenai, Idaho Panhandle, and Lolo National Forests. Helena-Montana and Spokane-Northern Idaho Field Offices. Dated October 18, 2011. 227 pp.

**USDA Forest Service. 2011.** Record of Decision – Forest Plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones. Kootenai, Lolo, and Idaho Panhandle National Forests. Signed November 11, 2011. 68 pp.

**USDA, Forest Service. 2015.**  Final Record of Decision for the Final Environmental Impact Statement and Kootenai National Forest Land Management Plan, January 2015. 56 pages.
USDA, Forest Service. 2013. Final Land Management Plan and Final environmental Impact Statement for the Revised Land Management Plan, Kootenai National Forest. August 2013

**USDI, U.S. Fish and Wildlife Service**. Biological Opinion on the Revised Forest Plan for the Kootenai National Forest. Prepared by the U.S. Fish and Wildlife Service, Montana Field Office, Helena Montana, and the U.S. Fish and Wildlife Service, Northern Idaho Field Office, Spokane Valley, Washington, August 28, 2013.

Forest Plan Reinitiation BA                                    Kootenai National Forest

# Appendix C

## Administrative Use within BMUs

*Table 14. Shown is the number of roads exceeding administrative use levels by BMU by Bear Year.*

| BMU | BY 10 | BY 11 | BY 12 | BY 13 | BY 14 | BY 15 | BY 16 | BY 17 | BY 18 | BY 19 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 0[1] | 3 | 1 | 0 | 3[22] | 1[31] | 6[41] | 0 | 0 | 1[57] |
| 2 | 0[2] | 0[9] | 0 | 0 | 0 | 8[32] | 0 | 0 | 0 | 0 |
| 3 | 4[3] | 10[10] | 4 | 4[17] | 4[23] | 0 | 2[42] | 0 | 0 | 0 |
| 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5 | 0 | 2 | 1 | 0 | 1[24] | 0 | 0 | 0 | 0 | 0 |
| 6 | 2[4] | 0[11] | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 7 | 1[5] | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8 | 0 | 0 | 0 | 0 | 0 | 1[43] | 0 | 0 | 0 | 0 |
| 9 | 0 | 1 | 6 | 0 | 4[25] | 0 | 0 | 0 | 2[52] | 0 |
| 10 | 1[6] | 2[12] | 2[14] | 2[18] | 2[26] | 2[33] | 2[44] | 1[49] | 17[53] | 0 |
| 11 | 0 | 0 | 0 | 0 | 9[27] | 11[34] | 4[45] | 0 | 2[54] | 0 |
| 12 | 0 | 9 | 9 | 5[19] | 0 | 4[35] | 4[46] | 0 | 0 | 2[58] |
| 13 | 0 | 0 | 0 | 0 | 0 | 1[36] | 0 | 0 | 7[55] | 1[59] |
| 14 | 0 | 0 | 3[15] | 2[20] | 0 | 5[37] | 2[47] | 0 | 3 | 0 |
| 15 | 2[7] | 3[13] | 1[16] | 1[21] | 1[28] | 1[38] | 0 | 0 | 0 | 0 |
| 16 | 6[8] | 4 | 3 | 3 | 2[29] | 2[39] | 1[48] | 26[50] | 2[56] | 1[60] |
| 17 | 0 | 1 | 0 | 0 | 1[30] | 1[40] | 0 | 2[51] | 0 | 1[61] |

[1] BMU 1- ATVs bypassing gate on road 402D, and bypassing berms on 4727B, 4727C, and 4728, due to unknown amount of access, and these roads are estimated to exceed allowable trips

[2] BMU 2 - ATVs/vehicles bypassed gate on road 4790, and berms bypassed on 99775A, 99775B, 99775C, and 99775D, and these roads are estimated to exceed allowable trips

[3] BMU 3 Troy Mine exploratory drilling use of roads 4628, 4628C, 4624, and 4624A estimated to exceed allowable trips. Also, accidental opening of gate on road 14334 (and therefore 14334A) which has changed to yearlong closure and estimated to exceed allowable trips.

[4] BMU 6 -Plum Creek Logging activity on roads 99812 and road 99812B with allowable trips not recorded, but number of trips exceeded (per Plum Creek).

[5] BMU 7 – Plum Creek logging activity on road 99770, with trips not recorded, but number of allowable trips exceeded (per Plum Creek)

[6] BMU 10 – LIBBY PORTION – Road 853 exceeded admin use during the Fall due to BPA power upgrade work. Part of road 601, all of 601B, and 601C had berms bypassed by ATVs/vehicles and these barriered roads were considered open. Road 4653 had administrative use (50 trips), then gate vandalized and road open to public and unrecorded admin access through August. Three Rivers Portion – Roads 4407 (rental use of Yaak Mt. Lookout) and 4439 (maintenance of King Mt. radio towers) should be modeled open every year.

Forest Plan Reinitiation BA                                                        Kootenai National Forest

[7] BMU 15 - Use of roads 5824 & 5825 for timber harvest analyzed for NE Yaak EIS. Road 5857 (Garver Lookout) modeled as open annually.

[8] BMU 16 - Use of roads 6003, 6038, 6044, 5814, 14128, and 14132 for timber harvest analyzed for NE Yaak EIS.

[9] BMU 2- Additionally: ATVs bypassing gate on road 4792 resulted in an unknown amount of access, and these roads are also modeled open.

[10] BMU 3 – Additionally: Gate vandalized on 14334 late in the year, allowing unknown amount of access on it and 14334A.

[11] BMU 6 – Additionally: Road 2332 considered open due to broken barricade which was subsequently replaced on 6/28/11.

[12] BMU 10 – Additionally: Road 4691 modeled open in spring and summer due to ATVs getting past the berm (enhanced berm on 7/6/11). 4690 modeled open in summer and fall due to ATVs going over the berm.

[13] BMU 15 – Additionally: 757 modeled open due to ATV use past berm; will be replaced in spring 2012.

[14] BMU 10 Administrative use exceeded due to Yaak Mountain Lookout rental and King Mountain radio tower.

[15] BMU 14 Administrative use exceeded due to Border Patrol activities.

[16] BMU 15 Administrative use exceeded due to Garver Mountain Lookout rental.

[17] BMU 3 Admin use exceeded on the 2201, 397, and 4580 roads due to Sparring Bulls project related activities. Admin use exceeded in the spring on the 4601 road due to Sparring Bulls, however this road is open seasonally anyway and is always modeled as open.

[18] BMU 10 Admin use exceeds due to Yaak Mountain Lookout rental (rd 4407). This road generally exceeds admin use due to ongoing use of these facilities. The same is true for the 4439 road to King Mtn radio tower.

[19] BMU 12 Rds 14329B, 2343, 3957, 2369, and a temp road/driveway used for the Rocky Pine project.

[20] BMU 14 Rds 435X and 435Y exceeded due to Grizzly project related roadwork.

[21] BMU 15 Admin use exceeds due to Garver Mountain Lookout rental. This road generally exceeds admin use due to the ongoing activities of this facility.

[22] BMU 1 Admin use exceeded on roads 4603, 4603C and 691A due to Sparring Bulls EIS harvest activities.

[23] BMU 3 Admin use exceeded on roads 14334, 4580, 4610, 4641, and 604B due to Sparring Bulls EIS harvest activities.

[24] BMU 5 Admin use exceeded on 231 road due to access to private property.

FS-001021

Forest Plan Reinitiation BA                                        Kootenai National Forest

[25] BMU 9 Admin use exceeded on roads 14368, 4476, 4479, and 9992 due to West Troy EIS harvest activities.

[26] BMU 10 Admin use exceeded due to Yaak Mountain Lookout rental (road 4407). This road generally exceeds admin use due to ongoing use of this facility. The same is true for the 4439 road to King Mountain radio tower.

[27] BMU 11 Admin use exceeded on roads 6084, 6108, 6715, 8021, 8021B, 902, 902V, 902Y due to Grizzly Project EIS road work and thinning activities.

[28] BMU 15 Admin use exceeded due to Garver Mountain Lookout rental (road 5857). This road generally exceeds admin use due to the ongoing use of this facility.

[29] BMU 16 Roads 6062 and 6074 exceeded due to South Fork Fuels EA road work.

[30] BMU 17 Fire suppression activities on road 4824.

[31] BMU 1 Admin use exceeded on road 4729E within the BMU boundary due to Klatawa Fire emergency wildfire suppression efforts.

[32] BMU 3 Admin use exceeded on roads 14324, 14324A, 14324B, 2201, 2202, 4580 and 4630 due to Sparring Bulls EIS harvest activities or road work, and on 4626 due to Sparring Bulls EIS roadwork and mine activities.

[33] BMU 10 Admin use exceeded due to Yaak Mountain Lookout rental (road 4407). This road generally exceeds admin use due to ongoing use of this facility. The same is true for the 4439 road to King Mountain radio tower.

[34] BMU 11 Admin use exceeded on roads 2355, 2374,2374C, 472Z, 8021, 8021B, 902, 902Y and 902Z due to Grizzly Project EIS harvest or road work, admin use exceeded on road 6114 due to South Fork Fuels Project, and on road 902X for timber recon.

[35] BMU 12 Admin use exceeded on roads 2351, 5996, 6121, 6121B for emergency wildfire suppression efforts.

[36] BMU 13 Admin use exceeded on road 393 for emergency wildfire suppression efforts. IPNF recorded admin use on road 2225 (road surveys) that did not exceed allowed trips.

[37] BMU 14 Admin use exceeded on road 435Y for Grizzly EIS harvest, and on roads 5932E, 5932G, 5955, 5956 due to Buckhorn EIS roadwork or harvest. IPNF recorded admin use on roads 2514 (homeland security), 2798 (homeland security) and 871 (fire) that did not exceed allowed trips.

[38] BMU 15 Admin use exceeded due to Garver Mountain Lookout rental (road 5857). This road generally exceeds admin use due to the ongoing use of this facility.

[39] BMU 16 Admin use exceeded on roads roads 6062 and 6074 for timber harvest.

[40] BMU 17 Admin use exceeded on road 6713 due to South Fork Fuels EA harvest.

[41] BMU 1 Admin use exceeded on gated/barriered roads (#14705, 4603, 4603A, 4605B, 691, 691E) due to Sparring Bulls EIS roadwork decom/storage work.

Forest Plan Reinitiation BA                                                          Kootenai National Forest

[42] BMU 3 Admin use exceeded on roads 2201 and 4580 due to Sparring Bulls EIS harvest/post-harvest work in summer and prescribed fire in fall.

[43] BMU 8 Admin use exceeded on road 2771 due to Spring Gulch timber sale harvest and haul use.

[44] BMU 10 Admin use exceeded on road 4407 due to Yaak Mountain lookout rental use in addition to administrative use, Admin use exceeded on road 4439 due to King Mtn radio tower use and maintenance.

[45] BMU 11 Admin use exceeded on roads 8021, 902, 902Y and 902Z due to Grizzly EIS harvest activities and post-harvest activities. Roads 902Y and 902Z will be opened to public use beginning in 2017 as part of the Grizzly EIS.

[46] BMU 12 Barriered roads 2351, 5996, 6121, and 6121B opened for Teepee fire post-fire weeds spraying and treatment.

[47] BMU 14 Admin use exceeded on road 5932E and 5932G due to Buckhorn EIS harvest and post-harvest TSI work.

[48] BMU 16 Admin use exceeded on road 5857 due to Garver Mountain Lookout rental use on top of administrative use.

[49] BMU 10 the 4407 Yaak Mtn Lookout road is kept gated, but receives permitted public use to access the Lookout Rental. The road is kept gated and modeled as open due to exceeding administrative use.

[50] BMU 16 the Caribou Wildfire required access on 26 gated, impassable and barriered roads for suppression activities and suppression activity repair. Administrative use on these 26 roads during this timeframe was not tracked. A breach occurred on road #470 and the gate was considered open.

[51] BMU 17, suppression of the Boulder Eclipse Fire required removal of the berm on road #7184 for several days in August. Also within BMU 17 use of road #254 by a timber sale from Lower Big Creek exceeded administrative use.

[52] BMU 9 two roads exceeded allowable use levels during the summer (FRs 1055 and 4618), while one (FR 4618) exceeded use during the fall. Use of FR 1055 by the Forest Service was modeled as open for the Starry Goat decision for unit prep while use of FR 4618 was state DNRC access for pre-commercial thinning on state land.

[53] BMU 10 the Yaak Mountain Lookout Road (FR 4407) is kept gated, but receives permitted public use to access the lookout rental. The road is kept gated and modeled as open due to exceeding administrative use. The Oly Project resulted in 17 roads being considered open for the Bear Year (FRs 2365, 14321A, 14321, 14393, 14393A, 14321, 176F, 2393, 4446, 4447, 4447A, 2394A, 2394C, 2394I, 9933, 4407, 2380/2380A, 14309B).

[54] BMU 11 two roads (FR 902Z and FR 8021) exceeded allowable administrative use during the spring period for project related fire management work.

[55] BMU 13 Idaho Panhandle National Forest timber sale project related work resulted in construction of temporary roads, heavy equipment work for road storage on FR 2225 and FR 2225A, gated road FR 2536 was opened and being hauled on, and sections of the FR 2536UH and FR 2536UC were reopened for

FS-001023

Forest Plan Reinitiation BA                                    Kootenai National Forest

timber haul. The road #2798 was opened to pull a culvert. FR 2514 was brushed out for fire and considered open for the bear year.

[56] BMU 16 allowable administrative use was exceeded on two roads during the fall period on the North Fork Dodge East Road (FR 7205) and on the Plumb Bob Road (FR 999) due to activities associated with a 2017 fire salvage project.

[57] BMU 1 – Libby RD FR 4729E – accessed via gate on 4729, exceeded allowable use levels during summer. Use of FR 4729E was modeled as open for the Flower Creek Project for sale prep activities. Public use did not occur.

[58] BMU 12 – Three Rivers RD- emergency (fire) access occurred on two barriered roads in BY 2019: NFSR 2531 (Teepee Mountain) and NFSR 393 (Redtop Cyclone), but not the entire length of the affected segments. The access on NFSR 393 also occurred in adjacent BMU 13.

[59] BMU 13 – Three Rivers RD - emergency (fire) use occurred on the barriered portion of NFSR 393 (RedTop Cyclone) to access a fire in BMU 12 to the south and temporarily affected core and route density

[60] BMU 16 – Ksanka RD -FR 999 Plum Bob considered open for "Young Fork" timber sale activities, administrative use only. Activities approved under Caribou Fire Salvage Project.  So one road that exceeded administrative use accessing both BMU 16 and 17.

[61] BMU 17 – Ksanka RD - FR 999 Plum Bob considered open for "Young Fork" timber sale activities, administrative use only. Activities approved under Caribou Fire Salvage Project. So one road that exceeded administrative use accessing both BMU 16 and 17

Forest Plan Reinitiation BA                                          Kootenai National Forest

# Appendix D

## Record of Consultation History with U.S. Fish and Wildlife Service

*Table 15. Consultation history regarding the 2015 Forest Plan.*

| Date | Consultation |
|------|--------------|
| Nov. 4, 2019 | KNF sent a letter to USFWS requesting reinitiation of consultation on the Forest Plan for motorized effects on grizzly bear. |
| Dec. 17, 2019 | USFWS sent a letter to the KNF acknowledging the request to reinitiate consultation on the Forest Plan for motorized effects on grizzly bear. |
| Dec. 3, 2019 | First meeting (conference call) of the Level 1 team from the KNF and IPNF, as well as SERVICE from Spokane, Kalispell and Missoula. Discussed consultation strategy (roles/responsibilities), sideboards, data needs, and timeline. |
| Dec. 20, 2019 | KNF transmitted a draft BA to USFWS for review. |
| Jan. 17, 2020 | Received comments on draft BA back from USFWS |
| Jan. 24, 2020 | Call with KNF, IPNF, RO, and USFWS (ID and MT) bios to discuss comments on the draft BA. |
| Feb. 14, 2020 | Call with KNF, IPNF, RO, and USFWS (ID and MT) bios to discuss progress addressing comments on draft BA. |
| Mar. 6, 2020 | Call with KNF, IPNF, RO, and USFWS (ID and MT) bios to discuss progress addressing comments on draft BA. |
| Mar. 20, 2020 | Call with KNF, IPNF, RO, and USFWS (ID and MT) bios to discuss progress addressing comments on draft BA. |
| Apr. 2, 2020 | Call with KNF, IPNF, RO, and USFWS (ID and MT) bios to discuss progress on draft BA. |
| Apr. 8, 2020 | Call with KNF, IPNF, RO, and USFWS (ID and MT) bios to discuss Final IPNF BA. |
| Apr. 14, 2020 | Call with KNF & USFWS (MT) to discuss BORZ and NCDE. |

7-ER-1600

FS-001025

Forest Plan Reinitiation BA                                        Kootenai National Forest

# Appendix E

## Grizzly Bear Access Amendment

### Design Elements

I.    The following access management standards apply to individual BMUs within the Selkirk
Recovery Zone on the IPNF and Cabinet-Yaak Recovery Zone on the KNF, IPNF and portion of
the LNF:

A.   The following OMRD, TMRD, and Percent Core standards are established for the BMUs
in the Cabinet-Yaak (Table 1) and Selkirk (Table 2) Grizzly Bear Ecosystems:

**Table 1. The access standards for the Cabinet-Yaak Grizzly Bear Recovery Zone, Kootenai, Idaho Panhandle, and Lolo National Forests.**

| Bear Management | Access Parameter | Standard | Bear Management | Access Parameter | Standard |
|---|---|---|---|---|---|
| **1 Cedar** | OMRD(%) | 15 | **12 Newton** | OMRD(%) | 45 |
| | TMRD(%) | 15 | | TMRD(%) | 31 |
| | CORE(%) | 80 | | CORE(%) | 55 |
| **2 Snowshoe** | OMRD(%) | 20 | **13 Keno** | OMRD(%) | 33 |
| | TMRD(%) | 18 | | TMRD(%) | 26 |
| | CORE(%) | 75 | | CORE(%) | 59 |
| **3 Spar** | OMRD(%) | 33 | **14 NW Peaks** | OMRD(%) | 31 |
| | TMRD(%) | 26 | | TMRD(%) | 26 |
| | CORE(%) | 59 | | CORE(%) | 55 |
| **4 Bull** | OMRD(%) | 36 | **15 Garver** | OMRD(%) | 33 |
| | TMRD(%) | 26 | | TMRD(%) | 26 |
| | CORE(%) | 63 | | CORE(%) | 55 |
| **5 St. Paul** | OMRD(%) | 30 | **16 E Fork Yaak** | OMRD(%) | 33 |
| | TMRD(%) | 23 | | TMRD(%) | 26 |
| | CORE(%) | 60 | | CORE(%) | 55 |
| **6 Wanless** | OMRD(%) | 34 | **17 Big Creek** | OMRD(%) | 33 |
| | TMRD(%) | 32 | | TMRD(%) | 26 |
| | CORE(%) | 55 | | CORE(%) | 55 |
| **7 Silver Butte-Fisher** | OMRD(%) | 26 | **18 Boulder** | OMRD(%) | 33 |
| | TMRD(%) | 23 | | TMRD(%) | 29 |
| | CORE(%) | 63 | | CORE(%) | 55 |
| **8 Vermillion** | OMRD(%) | 32 | **19 Grouse** (54% Federal) | OMRD(%) | 59 |
| | TMRD(%) | 21 | | TMRD(%) | 55 |
| | CORE(%) | 55 | | CORE(%) | 37 |
| **9 Callahan** | OMRD(%) | 33 | **20 North Lightning** | OMRD(%) | 35 |
| | TMRD(%) | 26 | | TMRD(%) | 20 |
| | CORE(%) | 55 | | CORE(%) | 61 |
| **10 Pulpit** | OMRD(%) | 44 | **21 Scotchman** | OMRD(%) | 34 |
| | TMRD(%) | 34 | | TMRD(%) | 26 |
| | CORE(%) | 52 | | CORE(%) | 62 |
| **11 Roderick** | OMRD(%) | 28 | **22 Mt. Headley** | OMRD(%) | 33 |
| | TMRD(%) | 26 | | TMRD(%) | 35 |
| | CORE(%) | 55 | | CORE(%) | 55 |

7-ER-1601

FS-001026

Forest Plan Reinitiation BA                                   Kootenai National Forest

Table 2. The proposed action access standards for the Selkirk Grizzly Bear
Recovery Zone, Idaho Panhandle National Forest.

| Bear Management Unit | Access Parameter | Alternative E Updated Standard |
|---|---|---|
| Blue Grass | OMRD(%) | 33 |
| | TMRD(%) | 26 |
| | CORE(%) | 55 |
| Long-Smith | OMRD(%) | 25 |
| | TMRD(%) | 15 |
| | CORE(%) | 67 |
| Myrtle | OMRD(%) | 33 |
| | TMRD(%) | 24 |
| | CORE(%) | 56 |
| Ball-Trout | OMRD(%) | 20 |
| | TMRD(%) | 13 |
| | CORE(%) | 69 |
| Lakeshore | OMRD(%) | 82 |
| | TMRD(%) | 56 |
| | CORE(%) | 20 |
| Kalispell-Granite | OMRD(%) | 33 |
| | TMRD(%) | 26 |
| | CORE(%) | 55 |
| Sullivan-Hughes | OMRD(%) | 24 |
| | TMRD(%) | 19 |
| | CORE(%) | 61 |
| Salmo-Priest | OMRD(%) | 33 |
| | TMRD(%) | 26 |
| | CORE(%) | 64 |

B.  Parameters for establishing and managing Core habitat in all BMUs:

1.  In accordance with IGBC (1998) and S/C-YE Subcommittee (1998) direction, Core areas shall be established for the purpose of providing secure habitat for grizzly bears.

    a.  Core Areas[30] include high quality habitat within a BMU that contains no motorized travel routes or high use trails.

    b.  Core Areas do not include any gated or restricted roads but may contain roads that are impassable due to re-growth of vegetation, effective barriers other than gates, or placement of logging or forest debris so as to no longer function as a motorized route.

---

[30] Percent Core Area is the sum of individual "blocks" or polygons of Core Area that are separated spatially from other Core Areas with the BMU. Their distribution and tenure are dependent on the existing transportation system and the history of access management activities within the BMU (e.g. road closures and decommissioning and/or changes from motorized road to non-motorized trail).

    c.  When possible, Core Areas will be delineated by identifying and aggregating the full range of seasonal habitats that are available in the BMU.

    d.  The IGBC anticipated that minimum Core Area size might be determined for each recovery zone. For the Selkirk/Cabinet-Yaak Grizzly Bear Recovery Zones, no scientifically-based minimum effective size polygon for Core Area has been determined (Wakkinen and Kasworm 1997), though minimum block sizes of 2-8 mi$^2$ were suggested. Therefore, discounting small or narrow blocks of Core Area is not prudent at this time. Individual project analyses will disclose the percent and size of Core Areas in each BMU.

    e.  Once route closures to create Core Areas are established and effective, these Core Areas should remain in place for at least 10 years. Therefore, except for emergencies[31] or other unforeseen circumstances[32] requiring independent section 7 consultation, newly created Core Area shall not be entered for at least 10 years after creation.

    f.  From the Record of Decision date forward, roads that are closed, decommissioned, or barriered to create Core Area will be put in a condition such that a need for motorized access for maintenance is not anticipated for at least 10 years. Until such closed roads are placed in the above described condition, they will not be considered as contributing to Core Area.

2.  Entering Core Area blocks for road decommissioning or stabilization activities:

    a.  Without further section 7 consultation on grizzly bears, the Forest Service may affect underlying Core Area habitat (i.e., any core habitat that is affected by the subject road and its buffer) within a BMU once per 10-year time frame, and not to exceed one bear year for the sole purpose of completing road decommissioning/stabilization activities on existing closed or barriered roads in Core habitat[33].

    b.  Subsequent needs to re-enter individual Core Areas within a BMU more frequently than once per decade for reasons other than emergencies shall be handled on a case-by-case basis through standard section 7 consultation procedures. The effects of additional entries will be analyzed pursuant to such project level consultation. Pending the outcome of each analysis, additional measures to minimize potential effects to grizzly bears may be required.

3.  Routine forest management may be proposed in a Core Area block after 10-years of Core area benefit. However, BMU's must remain at or above the Core standard. Therefore potential losses to existing Core must be compensated with in-kind replacement concurrently or prior to incurring the losses. Such in-kind replacement

---

[31] "Emergencies" as defined by ESA regulations [50 CFR 402.05] and associated policy and handbook direction.

[32] "Unforeseen circumstances" means changes in the circumstances affecting the geographic area covered by the Access Amendment that could not reasonably have been anticipated by the ID Team. Unforeseen circumstances are not intended to include timber harvest, including salvage harvest.

[33] Previous to this direction, some Core Areas were established containing impassable, closed, or barriered roads exhibiting hydrologically unstable conditions such as undersized culverts. This creates a pending resource issue for watershed and fishery concerns. The intent of this Design Element is to respond to these resource threats and to improve the integrity of Core Areas so as not to require future management entry.

of Core will be established within the affected BMU in accordance with the direction in Part I.B.1. above.  For exceptions, see specialized circumstances outlined in Part I.D. concerning BMUs that exceed standards. Following management, core areas must subsequently be managed undisturbed for 10 years.

C.  Parameters for BMUs currently not meeting Core Area, OMRD, and/or TMRD standards:
  1.  These BMUs are anticipated to be brought up to standards in the following manner: 33 percent of those BMUs currently not meeting one or more standard within each ecosystem are estimated to meet all standards within *three* years of the amendment decision date; 66 percent of those BMUs currently not meeting one or more standard within each ecosystem are estimated to meet all standards within *five* years of the amendment decision date, and 100 percent of those BMUs currently not meeting one or more standard within each ecosystem are estimated to meet all standards within *eight* years of the amendment decision date.

D.  For those BMUs currently meeting or exceeding (being better than) the standards for Core Area:
  1.  Except as provided above for road stabilization projects or emergencies, no reductions in Core habitat without in-kind replacements will be proposed until all BMUs administered by the IPNF, KNF and LNF in the respective ecosystems are up to standard (Tables 1 and 2; which do not include the LeClerc BMU or the Idaho State Lands BMU in the Selkirk Recovery Zone.)
  2.  Once all BMUs meet standards then subsequent projects which propose to permanently reduce Core Area by roads shall undergo independent section 7 formal consultation.
  3.  Reductions of Core Area within individual BMUs shall not reduce the Percent Core Area below the standards for the affected BMU without compensating with in-kind replacement concurrently or prior to incurring the losses (see Part I.B.3.)

E.  Road use associated with conducting administrative activities:
  1.  In the Selkirk Ecosystem:
     a.  Administrative use shall not exceed 57 vehicle round trips per active bear year per road, apportioned as follows: ≤19 round trips in spring (April 1 through June15); ≤23 round trips in summer (June 16 through September 15); and ≤15 round trips in fall (September 16 through November 15).
     b.  If the number of trips exceeds 57 trips per active bear year in the Selkirk ecosystem, then that road will be considered "open" for analysis and reporting purposes. Likewise, if the number of trips exceeds the allowable ecosystem-specific *seasonal* (spring, summer, fall) vehicle round trips per road, then that road will be considered "open" for analysis and reporting purposes.
  2.  In the Cabinet-Yaak Ecosystem:
     a.  Administrative use shall not exceed 60 vehicle round trips per active bear year per road, apportioned as follows: ≤18 round trips in spring (April 1 through June15); ≤23 round trips in summer (June 16 through September 15); and ≤19 round trips in fall (September 16 through November 30).
     b.  If the number of trips exceeds 60 trips per active bear year in the Cabinet-Yaak ecosystem, then that road will be considered "open" for analysis and reporting purposes. Likewise, if the number of trips exceeds the allowable ecosystem-

FS-001029

Forest Plan Reinitiation BA                                      Kootenai National Forest

specific *seasonal* (spring, summer, fall) vehicle round trips per road, then that road will be considered "open" for analysis and reporting purposes.

II.     The following access management applies to seven grizzly bear recurring use areas (i.e. BORZ areas) located <u>outside of the Cabinet-Yaak Grizzly Bear Recovery Zone (KNF and IPNF) and Selkirk Grizzly Bear Recovery Zone (IPNF)</u>:

A.     The Forests shall ensure no increases in permanent linear miles of open road[34] on National Forest System lands in any individual BORZ, above the baseline conditions identified in Table 3, except in cases where the USFS lacks discretion to prevent road building across USFS lands due to legal or other obligations (examples include, but are not limited to, ANILCA claims, identification of RS2477 thoroughfares). Potential increases in linear miles of open roads must be compensated for with in-kind reductions in linear miles of open road concurrently with, or prior to, project implementation within the same BORZ.

Temporary increases in linear miles of open roads are acceptable under the following conditions:

1.     Roads that are closed[35] to public motorized use or roads created or reconstructed to facilitate land management activities that are otherwise closed to public use may be "opened" to the public immediately following completion of all mechanized harvest and post-harvest slash activities requiring use of the road, to allow motorized public use during the bear summer season prior to the fall bear hunt (i.e. June 16 – August 31) for activities such as personal firewood collection. This public access would only be provided in cases where the mechanized harvest and/or post-harvest slash activities occurred during the same active bear year.

B.     The Forest shall ensure no net permanent increases in linear miles of total roads[36] in any individual BORZ area above the baseline conditions identified in Table 3, except in cases where the USFS lacks discretion to prevent road building across USFS lands due to legal or other obligations (examples include, but are not limited to, ANILCA claims, identification of RS2477 thoroughfares, etc.). Otherwise, potential increases in linear miles of total roads must be compensated for with in-kind reductions in linear total road miles concurrently with, or prior to, new road construction or reconstruction of currently bermed or barriered roads.

Temporary increases (not off-set) in linear miles of total roads are acceptable under the following conditions:

1.     Newly constructed roads will be effectively gated and will be restricted with a CFR closure clarifying they are not open for public use.

---

[34] Open roads are roads that are open for all or part of the active bear year.
[35] Closed with a closure order and/or some type of closure device such as a gate.
[36] Includes roads that do not have restrictions on motorized use and roads that are closed to public motorized use.

Forest Plan Reinitiation BA                                  Kootenai National Forest

    2.   These roads[37] shall be closed immediately upon completion of activities requiring use of the road, except as described in Part II. A.1., above.  Roads must be closed with a berm, guardrail or other measure that effectively prevents motorized access, and put in a condition such that a need for motorized access for maintenance is not anticipated for at least 10 years.

    3.   Upon completion of a land management project, linear miles of total roads will be returned to or below the baseline levels contained in Table 3.

C.   Timber harvest activities that will occur within multiple watersheds shall be scheduled such that disturbance of grizzly bears resulting from road use is minimized. The appropriate scale for scheduling harvest activities will be determined pursuant to project level consultation.

**Table 3. Existing motorized access conditions for Bears Outside of Recovery Zone (BORZ) areas situated on the Idaho Panhandle and Kootenai National Forests.**

| BORZ Name | Grizzly Bear Ecosystem | Total Size (Acres) | NFS[1] Lands (Acres) | Total Linear Miles of Roads on NFS Lands | Total Linear Miles of Open Roads on NFS Lands |
|---|---|---|---|---|---|
| Priest | Selkirk | 80,733 | 75,793 | 316.4 | 314.4 |
| Pack River | Selkirk | 33,869 | 28,097 | 41.9 | 37.9 |
| Mission-Moyie | Cabinet-Yaak | 71,545 | 58,472 | 200.3 | 167.3 |
| Clark Fork | Cabinet-Yaak | 101,701 | 100,223 | 256.1 | 176.9 |
| Cabinet Face | Cabinet-Yaak | 28,052 | 27,093 | 164.1 | 128.0 |
| West Kootenai | Cabinet-Yaak | 173,122 | 169,705 | 615.3 | 315.9 |
| Tobacco | Cabinet-Yaak | 287,240 | 266,947 | 1,123.9 | 867.0 |

[1]National Forest System Lands

III.   To ensure the effective implementation of the open road density parameter, at least 30 percent of closure devices (gates and barriers) will be monitored annually within the respective ecosystems. Monitoring techniques may include visual checks as well as road counters.

---

[37] Includes temporary roads built to facilitate the completion of the project and not intended to be left on the landscape—i.e. typically for 10 years or less) as well as the re-opening of existing bermed or barried road prisms.

7-ER-1606

FS-001031

Forest Plan Reinitiation BA                                    Kootenai National Forest

## Appendix F

### Relevant Forest Plan Direction

Desired Conditions[38], Guidelines[39], and Standards[40] of the 2015 KNF LMRP aimed at conservation of threatened and endangered species (and grizzly bears in particular) include:

#### Desired Conditions

**FW-DC-WL-01.** Nests and den sites and other birthing and rearing areas for terrestrial threatened, endangered, proposed, or sensitive species are relatively free of human disturbance during the period they are active at these sites. Individual animals that establish nests and den sites near areas of pre-existing human use are assumed to be accepting of that existing level of human use at the time the animals establish occupancy.

**FW-DC-WL-02.** A forestwide system of large remote areas to accommodate species associated with large home ranges and low disturbance areas, such as some wide-ranging carnivores (e.g. grizzly bear).

**FW-DC-WL-03.** Recovery of the terrestrial threatened and endangered species is the long-term desired condition. Foraging, denning, rearing and security habitat is available for occupation. Populations trend toward recovery through cooperation and coordination with USFWS, state agencies, other federal agencies, tribes, and interested groups.

**FW-DC-WL-04.** All grizzly BMUs have low levels of disturbance to facilitate denning activities, spring use, limit displacement, and reduce human/bear conflicts and potential bear mortality. Spring, summer, and fall forage is available for the grizzly bear.

**FW-DC-WL-05.** Recovery of the grizzly bear is promoted by motorized access management within the KNF portion of the Northern Continental Divide Ecosystem (NCDE) and Cabinet-Yaak recovery zones.

**FW-DC-AR-07.** A transportation system is in place that provides safe and efficient public and administrative access to the Forest for recreation, special uses, forest resource management, and fire management activities. It is efficiently maintained, environmentally compatible, and responsive to public needs and desires. The transportation system and its use have minimal impacts on resources including threatened and endangered species, sensitive species, heritage and cultural sites, watersheds, and aquatic species. Newly constructed or reconstructed roads do not encroach into streams and riparian areas in ways that impact channel function, geometry, or sediment delivery. Roads in intermittent stored service pose minimal risks to water quality and aquatic ecosystems. Drainage structures have a minimal risk of failure, and provide adequate drainage that prevents accelerated runoff, erosion, and sediment

---

[38] **Desired Conditions:** These are the social, economic, and ecological attributes that will be used to guide management of the land and resources of the Plan area. Desired conditions are not commitments or final decisions approving projects and activities. The desired condition for some resources may currently exist, or for other resources may only be achievable over a long time period. The Forest may need to make adjustments in the desired conditions if monitoring results indicate they are not achievable in the long term. Budget levels are an important factor in moving towards the desired conditions. Budgets are also directed by program area, with limited flexibility in moving funds between programs.

[39] **Guidelines:** Operational practice and procedure that is applied to project and activity decision making to achieve goals, desired conditions, and objectives. Guidelines can be developed for forestwide application or for specific areas and may be applied to all management activities or selected activities.

[40] **Standards**: Limitation or requirement that is applied to project and activity decision making to help achieve goals and objectives. Standards can be developed for forestwide application or for specific areas and may be applied to all management activities or selected activities.

7-ER-1607

FS-001032

Forest Plan Reinitiation BA                                          Kootenai National Forest

delivery to streams. In addition, stream crossings provide for passage of aquatic organisms. Unauthorized roads and trails are no longer created.

## Geographic Area

**GA-DC-WL-BUL-01.** Wildlife move through the Scotchman Peaks area, particularly wide-ranging carnivores, linking the Cabinet Mountains Wilderness and Selkirk Mountains through the West Cabinets.

**GA-DC-WL-BUL-02.** The timing of use and location of over-snow motorized recreation use in the Scotchman Peaks area provides secure habitat conditions for mountain goat use of winter habitats, and denning activities for wide-ranging carnivores that are sensitive to human disturbance (e.g., grizzly bear).

**GA-DC-WL-BUL-04.** Wildlife move along the Idaho/Montana border and from the West Cabinets into the Yaak, in the vicinity of the confluence of the Kootenai and Yaak Rivers. Wildlife also moves north-south through the Cabinet Mountains.

**GA-DC-WL-CLK-03.** Wildlife move between the Cabinet Mountains and the West Cabinets, and NFS lands south of Highway 200. Wildlife also moves north-south through the Cabinet Mountains.

**GA-DC-WL-FSH-01.** NFS lands, in particular those lands in the Miller Creek, Fritz Mountain, Calx Mountain, and Syrup Redemption areas, provide for wildlife movement between the larger blocks of forested lands in these areas and for movement between the Cabinet Yaak and Northern Continental Divide ecosystems. This includes movement for big game between the Cabinet Mountains and Fisher River. Wildlife also moves between the Fisher River, Wolf Creek, and areas east of Koocanusa Reservoir, the Blue Mountain vicinity north of the Kootenai River, and north-south through the Cabinet Mountains.

**GA-DC-WL-KOO-02.** Wildlife move to and from Roderick Mountain to the west of this GA. Wildlife also move to and from the Canadian border and along the Big Creek and Parsnip Mountain vicinities to and from Lake Koocanusa. To the east of Lake Koocanusa, wildlife move between the lake and vicinities or Lydia Mountain, Pinkham Mountain, Warland Peaks, and east to Wolf and Sunday creeks.

**GA-DC-WL-LIB-01.** Habitat conditions are retained for wildlife movement between the Cabinet Mountains and the Yaak, in particular, the area of Flagstaff Mountain. Habitat conditions for wildlife movement are also retained in the area between Turner Mountain and Alexander Creek (the Horse Range), including NFS lands in the Gold Hill and Blue Mountain areas. Wildlife move between the Blue Mountain vicinity, the Fisher River, and Koocanusa Reservoir areas.

**GA-DC-WL-LIB-04.** Wildlife move between the Cabinet Mountains and the Fisher River, as well as north-south through the Cabinet Mountains.

**GA-DC-WL-TOB-01.** Low levels of human disturbance allows for denning activities of wide-ranging carnivores that are sensitive to human disturbance (e.g., grizzly bear), and for summer use by big game in the Ten Lakes, Thompson Seton, and Marston Face areas.

**GA-DC-WL-TOB-02.** Wildlife move between the large blocks of NFS lands across Highway 93 southeast of Murphy and Dickey Lakes. Wildlife also moves from the Lydia and Pinkham mountains vicinity and the Sunday Creek vicinity.

**GA-DC-WL-TOB-03.** In the Therriault and Krinklehorn BMUs the current levels of security core habitat, open motorized route densities, and total motorized route densities are also the desired condition.

**GA-DC-WL-TOB-05.** Wildlife move to and from the border with Canada.

Forest Plan Reinitiation BA                                    Kootenai National Forest

**GA-DC-WL-YAK-01.** Wildlife moves along the ridgeline between the states of Montana and Idaho from Northwest Peaks south and across the Yaak River to areas such as Grizzly Peak and Roderick Mountain. Wildlife also moves to and from the border with Canada and from Roderick Mountain across Road #68 (Pipe Creek Road).

**GA-DC-WL-YAK-02.** Low levels of human disturbance allows for denning activities of wide-ranging carnivores that are sensitive to human disturbance (e.g., grizzly bear) in the Northwest Peaks, Grizzly Peak, and Roderick Mountain areas.

**GA-DC-WL-YAK-04.** Wildlife move between the Yaak and West Cabinets, particularly in the area around Yaak Mountain, Teepee Mountain, and the confluence of the Yaak and Kootenai Rivers. Wildlife also moves across the Yaak River and Highway 508 in the vicinity of Yaak Falls.

## Guidelines

**FW-GDL-WL-01. Grizzly Bear.** Management activities should avoid or minimize disturbance in areas of predicted denning habitat during spring emergence (April 1 through May 1).

**FW-GDL-WL-15. Grizzly bear**. Elements contained in the most recent "Interagency Grizzly Bear Guidelines," or a conservation strategy once a grizzly bear population is delisted, would be applied to management activities.

## Standards

**FW-STD-WL-01.** The Northern Rockies Lynx Management Direction (2007) and ROD is included in appendix B, and shall be applied.

**FW-STD-WL-02.** The Motorized Access Management within the Selkirk and Cabinet Yaak Grizzly Bear Recovery Zone Management Direction and ROD is included in appendix B[41], and shall be applied.

**FW-STD-WL-03.** Within the Kootenai portion of the NCDE recovery zone, BMU subunits shall maintain or improve the access and habitat parameters as shown in Table 16. Site-specific motorized access densities and security core habitat are developed at the project level in consultation with the USFWS and through appropriate public involvement and NEPA procedures.

*Table 16. NCDE Recovery Zone Bear Management Units (BMUs)*

| Bear MGMT Subunit | Open Motorized Route Density (OMRD)[1] | Total Motorized Route Density (TMRD)[1] | Security Core Area[2] |
|---|---|---|---|
| Krinklehorn BMU | ≤18% | ≤11% | ≥75% |
| Therriault BMU | ≤23% | ≤10% | ≥71% |

[1] The standard for OMRD and TMRD is to be ≤ the percentage listed in the table above. This is calculated based on the percentage of the BMU with an OMRD ≥1 mi/mi2 and TMRD ≥2 mi/mi2. OMRD and TMRD are defined in the glossary.

---

[41] This is the original text of this Standard and refers to Appendix B in the 2015 revised Forest Plan. The same information can be found in this BA in Appendix E.

Forest Plan Reinitiation BA                                          Kootenai National Forest

[2] The standard for Core is to be ≥ the percentage listed in the table. This is calculated based on the definition of "grizzly bear core habitat" in the glossary

**FW-STD-WL-04.** Permits and operating plans (e.g., special use, grazing, and mining) shall specify sanitation measures and adhere to the forestwide food/attractant storage order in order to reduce human/wildlife conflicts and mortality by making wildlife attractants (e.g., garbage, food, livestock carcasses) inaccessible through proper storage or disposal.

**FW-STD-WL-05.** No grooming of snowmobile routes in grizzly bear core habitat in the spring after April 1 of each year.

## Appendix G
### Allen 2011

## A review of Grizzly Bear Recurring Use Areas Associated with the Selkirk and Cabinet-Yaak Ecosystems

Lydia R. Allen
IPNF Forest Wildlife Biologist Updated October 2011

In recent years, there has been an upsurge in credible grizzly bear sightings and known use by radio-collared research bears in some areas located outside of existing recovery zone boundaries. The 1993 Recovery Plan recognized that grizzly bears could occur outside the recovery zone lines and that the mere presence of bears outside of the boundary was not sufficient reason to change the recovery zones (USDI Fish and Wildlife Service 1993). While observation data is limited and these habitats have not been evaluated to determine if they are of significant biological value, it is recognized that on-going and future land management activities in these areas could result in adverse effects (e.g. incidental take)[1] of grizzly bears.

By 2002, agency biologists acknowledged that grizzly bears were occurring in areas outside of established grizzly bear recovery zones and warranted some level of management consideration. Consequently, interagency teams of biologists were convened to describe the extent of these use areas for the Greater Yellowstone (GYE), Northern Continental Divide (NCDE), Selkirk and Cabinet-Yaak (SCYE) ecosystems (Wittinger 2002)[2]. These areas were called Bears Outside Recovery Zones (BORZ) for the SCYE and they were subsequently incorporated into the amendments to the Kootenai (KNF), Idaho Panhandle (IPNF), and Lolo (LNF) National Forest Plans in 2004 (USDA Forest Service 2004)[3].

The nature and amount of motorized access in these areas was quantified in order to discuss the potential impacts to grizzly bears in the amendment to the Forest Plans. Based on direction provided by Wittinger (2003), existing motorized use in these recurring use areas was defined using open and total road densities (miles of road/size of area in square miles). Road density (total length of road (miles)/total area (acre)) was selected for its ease in calculation and utility in monitoring changes in motorized access over time[4]. Subsequent consultation and the resulting biological opinion resulted in a term and condition of "no net increase" in the amount of open road and total road density (miles/square mile) in these areas (USDI Fish and Wildlife Service 2004).

The biologists involved in the 2002-2003 BORZ analysis recognized that the mapping may need to be revisited and updated periodically. Consequently, an interagency team of biologists revisited the BORZ

---

[1] ESA requires that "incidental take" (takings resulting from, but not the purpose of, otherwise lawful activity conducted by the Federal agency or applicant) be considered for each threatened or endangered individual animal, regardless of whether the animal is needed for recovery or not. The Endangered Species Act (ESA Section 9-B) prohibits take of a listed species, however Section 7(o)(2) permits take if any taking is in compliance with a written statement provided under subsection 7(b)(4)(iv). The agency must show the likely impact resulting from such take and the steps to take that will minimize such impacts.

[2] Biologists reviewed all grizzly bear monitoring data including radio relocation records, credible observations, and nuisance grizzly bear activity information with direction to consider sightings during the last 5-10 years, i.e. 1993-2002, in their delineation of recurring use areas (Wittinger 2002). In the SCYE, boundaries were chosen based on the ease of identification and were not denoted based on a desired size (in area) or buffer around individual grizzly bear locations.

[3] This decision was successfully overturned in 2006 which necessitated the development of a supplemental environmental impact statement (DEIS). The 2009 Draft SEIS used the 2002 BORZ delineations (USDA Forest Service 2009).

[4] Research in the 1980s and 1990s focused on the distance from roads that grizzly bears avoided (e.g. Schallengerger and Jonkel (1980) and Kasworm (1985)) or GIS derived road density classes (e.g. Mace and Mandley (1993) and Wakkinen and Kasworm (1997)) rather than using simple road density (total length of road (miles)/total area (sq.mile)) in a research area to quantify bear movements and habitat use.

for the SCYE to refine the maps of occupied grizzly bear habitat as part of renewed effort to amend the KNF, IPNF, and LNF forest plans in 2009-2010. This new effort focused on examining credible sightings of grizzly bears since 1994, as observations and known habitat use outside recovery zone boundaries prior to that date were taken into consideration in revising recovery zone boundaries with finalization of the revised 1993 Recovery Plan (USDI Fish and Wildlife Service 1993)[5]. Furthermore, the team developed a process to consistently identify these areas based on the number and type of observations[6] and the use of an objective mapping unit boundary to help define these areas. Specifically, delineation was generally based on three or more credible observations[7] within the last 16 years (1994-2009) in individual 6th order watershed Hydrologic Unit Codes (HUCs)[8] (Appendix A). Sixth order HUCs were selected because of their size (typically 10,000-to 40,000 acres)[9] and their common use as cumulative effects boundaries for watershed, fisheries, and wildlife analyses in environmental documents by the Forest Service[10]. Adjacent HUCs with enough grizzly bear use to be considered recurring use areas were combined to create contiguous areas of recurring use. The size and juxtaposition of individual BORZ were not developed to emulate Bear Management Units (BMUs) in the recovery zone[11]. The methodology allowed for future expansion in the overall size of the BORZ if adjacent 6th order HUCs experienced repeated visitation by grizzly bears (ibid).

The following information and assessment from the 2009 interagency effort supersedes the original 2002 BORZ delineation (Wittinger 2002) and the Johnson (2003) analysis in regards to access management for grizzly bears that occur outside the recovery zones on the IPNF, KNF, and LNF.

**BORZ Areas and Size:** A total of seven BORZ areas were identified using this process. This includes five BORZ adjacent to the Cabinet-Yaak recovery zone and two BORZ adjacent to the Selkirk recovery zone (Figures 1 and 2). The IPNF administers the majority of land included in the Priest Lake, Pack River, and Mission-Moyie BORZ (formerly called Deer Ridge in the 2002 effort), while the KNF administers the majority of land included in the Cabinet Face, Clark Fork, West Kootenai, and Tobacco BORZs. No BORZ areas were identified adjacent to the Lolo National Forest boundary. The BORZ areas are highly variable in size, ranging from less than 53 square miles (Pack River) to nearly 449 square miles (Tobacco). Additionally, the boundaries of these areas are not static, but may be adjusted as grizzly bear use patterns are reevaluated in future years.

[5] The Selkirk recovery zone was expanded to incorporate the Kalispell-Granite and Lakeshore BMUs with completion of the 1993 recovery plan (Servheen et al. 1991, U.S. Forest Service 1995). This was based on radio-telemetry data showing use of these areas by a female grizzly bear and her cubs in the 1980s and early 1990s. This was the only instance where the U.S. Fish and Wildlife Service chose to alter the existing recovery zone boundary based on known grizzly bear sightings and habitat use (up through 1993) outside the existing boundary in either the Selkirk or Cabinet-Yaak ecosystems.
[6] BORZ were identified using all grizzly bear data, regardless of the population source of individual bears (i.e. Selkirk ecosystem (SE), Cabinet-Yaak ecosystem (CYE) or Northern Continental Divide ecosystems (NCDE). Specific to the Kootenai NF, grizzly bears observed east of Lake Koocanusca in the Tobacco BORZ are part of the NCDE population.
[7] Observations of females with cubs were weighted more heavily.
[8] A nationwide system of delineating watersheds based on surface hydrologic features. The designation is completed by the U.S. Geological Survey.
[9] The 6th Order HUC was considered large enough to incorporate some level of daily movements by the grizzly bear(s) that were observed in the area, but not so large as to obscure the potential importance of the immediate area surrounding the location. [10] The 2002 effort resulted in BORZ boundaries that were hand-drawn onto forest maps with no consistent approach to buffering distance from known sightings. Therefore, having a consistent and objective mapping criteria was important in the 2009 review of the BORZ because the available data does not allow for a more informed decision to be made concerning the overall use of these areas (i.e. few observations, little-to-no movement information, lack of habitat availability and use data). [11] The Selkirk and Cabinet-Yaak BMUs are based on the home range size of a female grizzly bear (i.e. approximately 100 square miles) and were developed to incorporate all seasonal habitats.



Figure 1. Cabinet-Yaak Grizzly bear recovery zone and associated Bears Outside Recovery Zone (BORZ) areas.



Figure 2. Selkirk Grizzly bear recovery zone and associated Bears Outside Recovery Zone (BORZ) areas

**BORZ and Credible Bear Sightings:** Table 1 displays a summary of the number of credible sightings of grizzly bears documented for the last 16 years (1994-2009) within the seven BORZ (Appendix A)[12]. These sightings do not necessarily represent unique individuals, and in many cases, a single animal is responsible for a number of sightings that occurred across the BORZ area in a given year. However, the information in Table 1 does provide a relative index of the amount of use these areas have received over time and illustrates those BORZ with known use by females with cubs. Available radio telemetry data demonstrates that some bears incorporate portions of these areas within their seasonal home range; however, there is no indication of exclusive use of any BORZ from that data source. In addition, grizzly bear telemetry monitoring data indicates that grizzly bears frequenting the eastern portion of the Tobacco BORZ are tied to the Northern Continental Divide Ecosystem (NCDE) Recovery Zone.

The presence of grizzly bears in these areas indicates that some bears have apparently acclimated to the conditions within them and, at least in the short term, seem able to find and secure the resources necessary for their needs and avoid human encounters resulting in mortality (USDI Fish and Wildlife Service 2011). It is not possible to estimate of the number of animals that may be using these areas from the available data.

**Table 1. Summary of bear sightings in the seven BORZ areas situated outside the Selkirk and Cabinet-Yaak Recovery Zones, 1994-2009 (data derived from Appendix B). See footnote 12 for exceptions in years of data used for the Cabinet Face BORZ.**

| Bears Outside Recovery Zone | Grizzly Bear Recovery Zone | National Forest | Total Size (Acres) | Number of Credible Sightings 1994-2009 | | |
|---|---|---|---|---|---|---|
| | | | | Total | Females with Cubs | Bear Mortality |
| Priest | Selkirk | IPNF | 80,733 | 17 | 0 | 1 |
| Pack River | Selkirk | IPNF | 23[a] | 4 [a] | | 0 |
| Mission-Moyie[1] | Cabinet-Yaak | IPNF | 71,545 | 28 | 2 | 0 |
| Clark Fork | Cabinet-Yaak | KNF | 101,899 | 16[a] | 3 | 0 |
| Cabinet Face | Cabinet-Yaak | KNF | 28,052 | 23[2a] | 1 | 1 |
| West Kootenai | Cabinet-Yaak | KNF | 173,122 | 62[a] | 10 | 3 |
| Tobacco | Cabinet-Yaak | KNF | 287,240 | 60[a] | 17 | 0 |

[1]Formerly called 'Deer Ridge' (Wittinger 2002).
[2]Includes observations of two different female grizzly bears in 2010.
[a]These data differ from the total number of credible sightings portrayed in Table 22 of the Biological Assessment (USDA Forest Service 2010) due to an counting error in the 2010 document.

**BORZ and Bear Mortality:** There has been one human-caused bear death on National Forest System lands within the identified grizzly bear recurring use area after they were originally mapped by Wittinger et al. (2002). This occurred in the fall of 2002 when a subadult male grizzly bear was killed in Lamb Creek in the SRZ-associated Priest BORZ. Two other grizzlies were killed on non-FS lands within the CYRZ- associated West Kootenai BORZ in 2003 and 2004. Also, two grizzlies from the Cabinet-Yaak ecosystem

[12] The interagency review and re-delineation of the BORZ occurred in 2009 and was finalized in March of 2010. Therefore, the re-delineation was based on credible observations from 1994 to 2009. However, an exception was made for the Cabinet Face BORZ in the CYE after a review of 2010 telemetry data indicated recent use of an area just outside the BORZ (West Fisher River HUC) that had been frequented by two radio-collared female grizzly bears (Allen and Kasworm pers. comm. 2010). This was the only case where 2010 observation data was incorporated into the datasets included in Appendix B, as there were no other instances where there were sufficient numbers of 2010 observations which would have altered the boundaries of the seven BORZ as finalized in March of 2010.

were killed in 1996 and 1997 prior to the creation of BORZ in 2002. Table 2 provides a history of human-caused mortality in the seven areas that are now mapped as BORZ from 1994 - 2009.

**Table 2. Summary of human-caused mortality in the seven areas that have been recognized as supporting recurring grizzly bear use, i.e. BORZ, 1984-2009 (Wakkinen and Allen pers. comm. 2010, Kasworm and Allen pers. comm. 2010).**

| Recovery Zone | Bears Outside of Recovery Zones - BORZ | National Forest System Lands | Private, State, and Railroad Lands |
|---|---|---|---|
| **Selkirk** | Priest | 2002-Male | None |
| | Pack River | None | None |
| **Cabinet-Yaak** | Mission - Moyie | 1984-Male | None |
| | West Kootenai | 1990-Male 1996-Male | 2004-Female 2005-Female |
| | Cabinet Face | None | 1997-Male |
| | Tobacco | None | None in BORZ |
| | Clark Fork | None | 2001-Female 2008-Female 2008-Female |

**BORZ and Motorized Access Management:** Table 3 displays the size, land ownership, and linear miles of open and total roads for the BORZ areas as of 2009. These areas are characterized by having a high percentage of miles of open road (51 to 100 percent on NFS lands) in relation to the total miles of road.

**Table 3. Existing motorized access conditions for Bears Outside of Recovery Zone (BORZ) situated on the Idaho Panhandle (IPNF) and Kootenai National Forests (KNF), 2009.**

| Bears Outside Recovery Zone | Grizzly Bear Recovery Zone | National Forest | Total Size (Acres) | National Forest Lands | | | Private and State Lands | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Total Area (Acres) | Total Roads (Miles) | Open Roads (Miles) | Total Area (Acres) | Total Roads (Miles) | Open Roads (Miles) |
| Priest | Selkirk | IPNF | 80,733 | 75,793 | 316.4 | 314.4 | 4,940 | 36.1 | 33.6 |
| Pack River | Selkirk | IPNF | 33,869 | 28,097 | 41.9 | 37.9 | 5,772 | 6.9 | 6.9 |
| Mission-Moyie[1] | Cabinet-Yaak | IPNF | 71,545 | 58,472 | 200.3 | 167.3 | 13,073 | 112.8 | 105.7 |
| Clark Fork | Cabinet-Yaak | KNF | 101,899 | 100,421 | 256.1 | 176.9 | 1,478 | 13.0 | 10.4 |
| Cabinet Face | Cabinet-Yaak | KNF | 28,052 | 27,093 | 164.1 | 128.0 | 963 | 6.9 | 6.9 |
| West Kootenai | Cabinet-Yaak | KNF | 173,122 | 169,705 | 615.3 | 315.9 | 3,417 | 30.3 | 16.0 |
| Tobacco | Cabinet-Yaak | KNF | 287,240 | 266,947 | 1,123.9 | 867.0 | 20,291 | 179.8 | 168.0 |

[1]Formerly called 'Deer Ridge' (Wittinger 2002).

Linear miles of road were used to quantify the amount of access in this new assessment of BORZ because they are more easily communicated and monitored than road densities. The proposed action includes the following standards to conserve grizzly bear habitat in the BORZ:

- No permanent increases in the total linear miles of "open roads" and "total roads" on National Forest System lands in any individual BORZ area above baseline conditions, except in cases where the Forests lacks discretion to prevent road building across national forest lands due to legal or other obligations (e.g. ANILCA access claims, identification of RS2477 thoroughfares).

- Potential increases in linear miles of open or total roads must be compensated for with in-kind reductions concurrently or prior to such increases.

- Provisions will be made for temporary increases in linear miles of open road to allow for public motorized use of roads associated with recent land management activities. Public use must occur from June 16 to August 31 of the same year that mechanized harvest and/or post-harvest slash activities occurred (i.e. the same bear year).

- Future timber sales will be scheduled to avoid concurrent disturbance in multiple adjacent watersheds.

Within Recovery Zone boundaries, proposed access management standards for grizzly bear habitat within recovery zone boundaries include thresholds for Open Motorized Route Density (OMRD), Total Motorized Route Density (TMRD), and Core area. OMRD and TMRD are based on research using a Geographic Information System (GIS) "moving window" analysis technique, while core area is derived using a buffering routine to define secure habitat that is more than 500 meters from a usable motorized route (IGBC 1998, Mace and Manley 1993, Wakkinen and Kasworm 1997). Research indicates that increasing densities of both open and restricted roads have negative effects upon grizzly bear behavior and habitat use. However, these standards are not appropriate for describing the existing baseline in the BORZ or the effects of motorized access on grizzly bears in these areas for a number of reasons, including:

- The value of these areas to grizzly bears is currently unknown as no assessment of seasonal habitat availability has been completed at this time. They were not included when the respective recovery zones were first delineated following federal listing, nor were they considered when the Lakeshore and Kalispell-Granite BMUs were added to the Selkirk recovery zone in 1993. If and when these areas are deemed essential for the recovery of the species, they would be formally appended to the Recovery Zones through U.S. Fish and Wildlife Service action. If that were to happen, then the use of OMRD, TMRD and Core parameters may be appropriate.

- Bears using these areas apparently tolerate substantially greater levels of human disturbance (highways, residences, heavy industrial use and highly roaded areas) than those in BMUs (USDI Fish and Wildlife Service 2011). Research on the use of BORZ should focus on the demographics of bears frequenting these areas (e.g numbers, sex and age; survival and reproductive rates; home range size and habitat use) as well as the conditions within their individual home ranges rather than just the motorized access-related conditions of the areas.

- BMU sizes are in most cases biologically based (approximately the size of an adult female home range), facilitating comparison between BMUs. Conversely, the BORZ areas are highly variable in size, ranging from less than 53 square miles (Pack River) to nearly 449 square miles (Tobacco). Additionally, the boundaries of these areas are not static, but may be adjusted as grizzly bear use patterns are reevaluated in future years. There is limited basis of comparison between units of substantially different acreages, or within units that vary in size and shape over time.

- While external BORZ boundaries were drawn to intentionally exclude non-federal ownerships whenever possible, some BORZ areas (as currently delineated) contain substantial private or other inholdings. Even if these in holdings are removed after the moving windows analysis is complete, road densities are still potentially influenced by the presence of roads up to 900 meters outside the actual analysis area. This is a greater issue for BORZ areas than BMUs because the former can be surrounded by private lands (rather than merely having this situation present along one boundary), and additional road building on surrounding lands or inholdings can influence road densities even if the areas themselves are not included in the final percentages. Consequently, the current direction of no net increase of linear road miles is applied to **NFS lands only** within BORZ boundaries.

## LITERATURE CITED

Allen, L.R. and W. Kasworm. 2010. Phone conversation between Lydia Allen (Forest Service) and Wayne Kasworm (Fish and Wildlife Service) regarding 2010 grizzly bear observation data in the Flower and West Fisher 6th order HUCs associated with the Cabinet Face BORZ, Cabinet-Yaak Recovery Zone. Dated December 10, 2010.

Johnson, W. J. 2003. Incidental take analysis for grizzly bears that occur outside recovery zones on the Kootenai and Idaho Panhandle National Forests and a portions of Lolo National Forest. Unpublished report, U.S. Forest Service, Kootenai NF, Libby, MT. 26 pp.

Kasworm, W. 1985. Cabinet Mountains grizzly bear study. USDI Fish and Wildlife Service 1984 annual progress report. Helena, MT. 81 pp.

Kasworm, W. and L.R. Allen. 2010. Electronic communication between Wayne Kasworm (Fish and Wildlife Service) and Lydia Allen (Forest Service) regarding grizzly bear mortalities in the Cabinet- Yaak ecosystem. Dated July 9, 2010.

Mace, R. D. and T. L. Manley. 1993. South Fork Flathead River Grizzly Bear Project: Progress Report for 1992. Montana Department of Fish, Wildlife, and Parks, USDA Forest Service, Intermountain Research Station, USDI Fish and Wildlife Service, and National Fish and Wildlife Foundation. 34 pp.

Schallenberger, A. and C. Jonkel. 1980. Rocky Mountain East Front Grizzly Studies, 1979. Border Grizzly Project. University of Montana, Missoula Special Report No. 39. 207 pp.

Servheen, C., J. Gore, and T. Layser. 1991. Delineation of the Kalispell-Granite and Lakeshore Bear Management Units in the Selkirk Recovery Zone. Internal communication.

USDA Forest Service. 1986. Interagency grizzly bear management guidelines. U.S. Forest Service, Missoula, Montana. 85 pp.

USDA Forest Service. 1988. Cumulative effects analysis process for the Selkirk/Cabinet-Yaak grizzly bear ecosystems. 32 pp.

USDA Forest Service. 1995. Kalispell-Granite grizzly bear access management environmental assessment. Idaho Panhandle National Forests, Priest Lake Ranger District.

USDA Forest Service. 2010. Biological Assessment for the Threatened, Endangered, and Proposed Species on Forest Plan Amendments for Motorized Access Management with the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones. Prepared by L. Allen, L. Hawdon, and D. Bond. Idaho Panhandle National Forests. 227 pp.

USDI Fish and Wildlife Service. 1993. Grizzly bear recovery plan. Missoula, MT. 181 pp.

USDI Fish and Wildlife Service. 2011. Endangered Species Act Section 7 Consultation Biological Opinion on the Forest Plan Amendments for Motorized Access Management within the Selkirk and

Cabinet-Yaak Grizzly Bear Recovery Zones on the Kootenai, Idaho Panhandle, and Lolo National Forests. 227 pp.

Wakkinen, W. L. and W. F. Kasworm. 1997. Grizzly Bear and Road Density Relationships in the Selkirk and Cabinet-Yaak Recovery Zones. Idaho Department of Fish and Game and U.S. Fish and Wildlife Service. 28 pp.

Wakkinen, W. and L.R. Allen. 2010. Electronic communication between Wayne Wakkinen (Idaho Department of Fish and Game) and Lydia Allen (Forest Service) regarding grizzly bear mortalities in the Cabinet-Yaak ecosystem. Dated July 13, 2010.

Wittinger, T. (editor). 2002. Grizzly bear distribution outside of recovery zones. U.S. Forest Service unpublished report. Northern Region. Missoula, Montana. 2 pp.

Wittinger, T. (editor). 2003. Incidental take analysis for grizzly bears that occur outside of Recovery Zones in Montana. Forest Service Unpublished report. Northern Region. 3 pp.

**Appendix A. Guidelines and data used to delineate the recurring grizzly bear use areas known as Bears Outside of Recovery Zones (BORZ)**

- **Delineation**
  - 6th order Hydrologic Unit Codes (HUCs) located around Recovery Zone boundaries used to objectively delineate a boundary around a given set of bear observation data
  - HUCs in one general area aggregated to create a 'Bears Outside of Recovery Zone' (BORZ).

- **Grizzly Bear Data used for Classification**
  - determination based on evidence of multiple individuals with females + cubs given high priority
  - multiple years of use (typically at least 3 observations since 1994[13])
  - radio collar documentation being given a high priority
  - additional information such as credible sightings, captures, and mortality sites also taken into consideration

- **Additional Considerations in Selecting HUCs for inclusion into BORZ**
  - Proximity to the Recovery Area boundary
  - Recurring use in adjacent HUC's
  - Suitable habitats
  - Importance of identified and potential linkages zones

- **Potential Exceptions to Inclusion of Entire 6th Order HUC**
  - Areas that include high concentrations of private lands or recreational residences on FS lands where it has been determined that grizzly bear use should be discouraged[14]
  - HUCs that are split by major highways that include little/no observational data or habitat on one side of the highway

- **Maximum BORZ Boundaries**
  - SRZ
    - Canadian border on the north and the IPNF boundary on the west
    - 6th order HUCs that lie between the SRZ and the CYRZ in the Kootenai River valley could be considered for inclusion into the process
    - Southern boundary will include consideration of FS lands north of Pend Oreille Lake and Pend Oreille River and the Clark Fork River[15]
  - CYRZ
    - Canadian border on the North, to the KNF border on the east (excluding NCDE), and to the Idaho/Montana state line on the southwest
    - Consider the entire KNF because of the merging of CYRZ and NCDE
    - Southern boundary will extend no further than the Clark Fork River on the IPNF portion of the CYRZ

---

[13] All known observations were incorporated into the database included sightings from the 1970s. Sightings of bears outside of the recovery zones started to become more frequent in the 1990s.
[14] Similar to Management Situation 3 lands within the Recovery Zone boundaries (USDI Fish and Wildlife Service 1993 Recovery Plan).
[15] It is possible that non-FS lands within 10 miles of the Recovery Zone boundaries could also be identified as BORZ using this process. This information is useful to the US Fish and Wildlife Service in their efforts to manage for grizzly bear recovery into the future. However, only grizzly bear use that is occurring on FS lands outside of the recovery area boundary is being taken into consideration with the forest plan amendments on the IPNFs and KNF.

## CABINET-YAAK Recovery Zone

Datasets Considered
- Forest Service IPNF sightings
- U.S. Fish and Wildlife Service (USFWS) sightings (category 4[16] and 5[17]) for the last 49 years (1960-2010)[18].
- USFWS radio collared, VHF, and GPS data
- Montana Fish, Wildlife and Parks data for NCDE (radio telemetry and sightings)

**Occupied 6th order HUCs (BORZ) surrounding the Cabinet-Yaak Grizzly Bear Recovery Zone (KNF). Updated version 12/10/2010[19].**

| General Location in Relation to Recovery Zone | 6th Order HUC Name | Number | Documented Grizzly Bear Use Details | Meets Selection Criteria to be Considered Occupied? Yes or No | BORZ |
|---|---|---|---|---|---|
| Area west of Lake Koocanusca and north of north of Highway 2 | Sink Creek | 170101010402 | 1993, 2003, 2004 sightings & tracks; 2003 two males & 1 female captures | Yes | West Kootenai |
| | Young Creek | 170101010403 | 1996 sightings; 1998 sighting; 1998 female w\cubs; 2002 female w\cubs; 2003 female w\cubs | Yes | |
| | Dodge Creek | 170101010405 | 1991 radio collared adult male; 1996 male mortality; 2005 radio collared adult male; 2005 sighting adult male; 2005 radio collared sub-adult male | Yes | |
| | Sullivan Creek | 170101010406 | 1990 sightings (2); 1990 radio collared adult male; 2001 sighting; 2005 radio collared adult male; 2006 radio collared sub-adult male | Yes | |
| | Lake Koocanusa -Poverty Creek | 170101010409 | 1990 radio collared sub-adult male mortality;1994 tracks; 2005 radio collared sub-adult male; 2005 sighting—all sightings west of lake boundary. Cut HUC on east side of reservoir into North and South portions on Black lake road 7283 from reservoir east to Rd 758 then north to Eureka. North of this road is not included; south of this road is included | Yes | |
| | Upper South Fork Big Creek | 170101010501 | 1994 sighting;1998 radio collared adult male; 2004 radio collared adult male | Yes | |
| | Lower South Fork Big Creek | 170101010502 | 1971 female w\cubs; 1981 sighting;1997 sighting; 1998 sighting; 2003 sighting; 2003 radio collared sub-adult male | Yes | |
| | Big Creek | 170101010503 | 1971 sighting of female w\cubs; 1988 adult male; 1990 radio collared sub-adult male; 2003 sub-adult collared sub-adult male; 2005 radio collared adult male; 2005 radio collared sub-adult male; | Yes | |
| | Boulder Creek | 170101010601 | 1993 sighting; 2001 sighting; 2005 sighting; 2005 radio collared adult male; 2006 female w\cub; 2006 two additional sightings | Yes | |
| | Lake Koocanusa - Gold Creek | 170101010604 | 1990 radio collared adult male; female w\cub 2001; 2003 sub-adult male; 2005 sub-adult male | Yes | |
| | Parsnip Creek | 170101010605 | 2003 and 2004 radio collared sub-adult male (augmentation bear); 2004 sighting | Yes | |
| | Lake Koocanusa – Geibler Creek | 170101010607 | 1993 sighting (on east side of lake); sighting 2003; 2004 radio collared sub-adult male; 2004 radio-collared adult male | Yes | |

[16] Credible sighting where the researcher talked with the observer and had a relatively high level of confidence that it was a grizzly bear
[17] Documented sighting (e.g. trapping location, observation, photograph, video, or track—most often by USFWS, USFS, or MTFWP biologists) [18] U.S. Fish and Wildlife Service data reviewed on site courtesy of W. Kasworm. Data is not on file with the Kootenai or Idaho Panhandle NFs. [19] Review of the 2010 radio-collared information for the Cabinet-Yaak ecosystem indicated that there were enough recent observations in the West Fisher River HUC (Cabinet Face BORZ) to add the NFS lands from this area into the overall BORZ. This includes observations of two different female bears in conjunction with the 2006 sighting of a male bear along the border of this HUC. This combination of observations constitutes sufficient evidence of recurring use. (Allen and Kasworm pers. comm. 2010)

| General Location in Relation to Recovery Zone | 6th Order HUC | | Documented Grizzly Bear Use Details | Meets Selection Criteria to be Considered Occupied? Yes or No | BORZ |
|---|---|---|---|---|---|
| | Name | Number | | | |
| Area west of Lake Koocanusca and north of north of Highway 2 | Upper Seventeen mile Creek | 170101030303 | Most of this HUC is in the RZ; 1 radio-collared male in HUC outside of RZ; HUC surrounded by other HUCs that have recurring use | Yes | |
| | Bristow Creek | 170101010702 | 1991 radio collared adult male; 1998 sighting; 2003 radio collared sub-adult male. | Yes | |
| | Barron Creek | 170101010704 | 2004 radio-collared sub-adult male | No | NA |
| | Jackson Creek | 170101010706 | 2003 radio collared sub-adult male | No | NA |
| | Lake Koocanusa - Little Jackson Creek | 170101010708 | 1987 & 1989 sightings of males | No | NA |
| | Rainy Creek | 170101010710 | 2003 sighting | No | NA |
| | Upper Kootenai River | 170101010711 | 1986 sighting; 1989 sighting | No | NA |
| | East Fork Pipe Creek | 170101010901 | Adult female w cubs 1997, 1998, 2000; female w/cubs 2004; female w/cubs 2007 | Yes | West Kootenai |
| | Upper Pipe Creek | 170101010902 | 1997 sighting; 1998 adult male; 1999 adult male; 2003 sub-adult male; 2004 sighting; 2004 sub-adult male; 2005 mortality of a female; 2005 capture of nuisance bear (sub-adult male) | Yes | |
| | Lower Pipe Creek | 170101010903 | 1990 sighting; 1996 sighting | No | NA |
| | Bobtail Creek | 170101011003 | 2004 Sighting | No | NA |
| General area located west of Lake Koocanusca | Swamp Creek-Lake Creek | 170101010201 | 1995 female w/cubs; 2004-'05 radio collared adult female; 2003 female w/cubs; 2007 female w/cubs | Yes | |
| | Upper Fortine Creek | 170101010202 | 1997 sighting; 2004 collared female w/ cub; 2006 sighting; 2007 sighting. | Yes | Tobacco |
| | Sunday Creek | 170102100102 | 1995 sighting; 2001 large tracks near Louis lake; 2004 collared adult female – lactating when caught; 2003 adult female w/cubs on periphery; 2009 tracks in meadow & Harvey creek; reports of tracks during hunting season every year (FWP) | Yes | |
| | Edna Creek | 170101010203 | 2003-04 radio collared female; 2003 female w/cubs; 2003, 2004, 2005, 2007 sightings | Yes | |
| | Middle Fortine Creek | 170101010204 | 2003 radio collared adult female; 2003 female w/cubs; 2004 female w/cubs; 2005 sighting; 2006 sighting | Yes | |
| | Deep Creek | 170101010205 | HUC is all PVT land outside of recovery area. | No | NA |
| | Meadow Creek | 170101010206 | 1992 sighting; 2003,2004,2005 radio collared female w/young | Yes | Tobacco |
| | Lower Fortine Creek | 170101010207 | 1995 female w/cubs; 2004 radio collared female w/cub; 2006 female w/cubs | Yes | |
| | Therriault Creek | 170101010303 | One third of HUC in RZ; FS has small in-holdings surrounded by PVT | No | NA |
| | Sinclair Creek | 170101010304 | One-half of HUC is in RZ; half in PVT, except for small FS in-holdings | No | NA |
| | Lower Grave Creek | 170101010302 | Two-thirds of HUC in Recovery; only 5% of rest in FS in-holdings. | No | NA |
| | Upper | 170102100103 | 2003 track & dig site; 2003 sighting; 2007 track. | Yes | Tobacco |

| General Location in Relation to Recovery Zone | 6th Order HUC | | Documented Grizzly Bear Use Details | Meets Selection Criteria to be Considered Occupied? **Yes or No** | BORZ |
|---|---|---|---|---|---|
| | Name | Number | | | |
| General area located west of Lake Koocanusca | Stillwater River-Hellroaring Creek | | | | |
| | Indian Creek | 170101010305 | HUC is all PVT land outside of recovery area. | No | NA |
| | Tobacco River | 170101010306 | 1979 sighting; 1998 sighting; 2003 radio collared adult female, 2005 radio collared adult female; Cut off portion of HUC NE of Hwy 93 due to Private land & isolated FS parcels | Yes | Tobacco |
| | Phillips Creek | 170101010404 | 85-90% of HUC is PVT. Small portion of FS along reservoir/border in P-Pine habitat. FS portion in unroaded mgmt. 9/04 yearling grizzly bear killed on hwy near border. | No | NA |
| | Upper Pinkham Creek | 170101010407 | 1987 dig site; 1990 female w/cubs; 1995 adult female capture; 1999 female w/cubs; 2003, 2004, 2005 radio collared female, plus additional sightings | Yes | Tobacco |
| | Lower Pinkham Creek | 170101010408 | 2003 radio collared female; 2004 female w/cubs; 2005 radio collared female; 2006 sighting | Yes | |
| | Sutton Creek | 170101010602 | 1995 female w/cubs; 2002 sighting; 2004-05 radio collared adult female | Yes | |
| | McGuire Creek | 170101010603 | 1972-74 sightings; 2005 radio collared adult female; 2006 radio collared adult female | Yes | |
| | Tenmile Creek | 170101010606 | 1974 sighting; 2000 sighting; 2002 sighting; 2003 sighting; 2004-2005 radio collared adult female | Yes | |
| | Fivemile Creek | 170101010701 | 1986 sighting of female w/cubs; 2003-2004 radio collared female 2003; linkage | Yes | |
| | Warland Creek | 170101010703 | No data | No | NA |
| | Cripple Horse Creek | 170101010705 | 1969 & 1971 sightings; 2005 sighting | No | NA |
| | Canyon Creek | 170101010707 | No data | No | NA |
| | Weigel Creek | 170101020301 | 2003 Sighting | No | NA |
| | Upper Wolf Creek | 170101020302 | No data | No | NA |
| | Dry Fork Creek | 170101020303 | 2003 sighting; 2005 sighting | No | NA |
| Area south and west of Highway 2 | Swamp Creek-Cowell Creek | 170101010802 | 2 radio-collared sub-adult females (augmentation bears) 1994, 2006, 2008; 2006 sighting. No use east of Hwy 2—cut HUC off at highway due to lack of sightings and lack of habitat. | Yes | Cabinet Face |
| | Granite Creek | 170101010802 | 2007 observation | No | |
| | Big Cherry Creek | 170101010804 | 1981 sighting; 1991 radio-collared augmentation bears; 2002 sighting; 2005 sighting of bear crossing Hwy 2; 2007 sightings; 2007 video of 2 bears. | Yes | Cabinet Face |
| | Upper Libby Creek | 170101010801 | 1975 sighting; 1995 sighting; 1999 sighting; radio collared sub-adult female 2005, radio collared sub-adult female 2008 | Yes | |
| | Lower Libby Creek | 170101010805 | 1997 mortality of male; 2005 sighting east of Highway 2; 2006 sighting. Area west of highway little info and not a linkage zone. Cut HUC off at highway due to lack of sightings and habitat. | Yes | |
| | Flower Creek | 170101011001 | 1991 sub-adult female | No | NA |
| | Parmenter Creek | 170101011002 | No data | No | NA |
| | Middle | 170101011005 | Sighting in 1980's; 1990 augmentation female | | NA |

| General Location in Relation to Recovery Zone | 6th Order HUC | | Documented Grizzly Bear Use Details | Meets Selection Criteria to be Considered Occupied? **Yes or No** | BORZ |
|---|---|---|---|---|---|
| | Name | Number | | | |
| Area south and west of Highway 2 | Kootenai River | | | | |
| | Island Creek | 170101020102 | 2001 sighting of an adult male and track | No | NA |
| | Pleasant Valley Creek | 170101020103 | No data | No | NA |
| | Pleasant Valley Fisher River-Pearsons Reservoir | 170101020104 | No data | No | NA |
| | Pleasant Valley Fisher River-Barnum Creek | 170101020105 | 2006 relocated male captured on the Flathead | No | NA |
| | Elk Creek | 170101020106 | No data | No | NA |
| | McGinnis Creek | 170101020107 | 2006 sub-adult male sighting—augmentation bear | No | NA |
| | Pleasant Valley Fisher River-Loon Lake | 170101020108 | No data | No | NA |
| | East Fisher Creek | 170101020201 | 1983 sighting; 1985 sighting; 2008 sighting | No | NA |
| | Silver Butte Fisher River | 170101020202 | 2007 sighting (most of HUC in RZ) | No | NA |
| | Little Wolf Creek | 170101020304 | No data | No | NA |
| | Middle Wolf Creek | 170101020305 | No data | No | NA |
| | Dunn Creek | 170101010709 | No data | No | NA |
| | Lower Wolf Creek | 170101020306 | 1987 sighting; 2006 sighting | No | NA |
| | West Fisher Creek | 170101020401 | 2006 sighting; radio telemetry location of two different augmentation females in 2010 along border of HUC. | Yes | Cabinet Face |
| | Upper Fisher River | 170101020402 | 1986 sighting; 1992 sighting; 1996 sighting; 1997 female w/cubs; 2008 radio-collared sub-adult female; identified linkage zone. HUC cut off at Hwy. 2 due to lack of sightings and lack of habitat. | Yes | Cabinet Face |
| | McKillop Creek | 170101020403 | No data | No | NA |
| | Cow Creek | 170101020404 | No data | No | NA |
| | Middle Fisher River | 170101020405 | No data | No | NA |
| | Lower Fisher River | 170101020406 | No data | No | NA |
| | McGregor Creek | 170102130101 | No data | No | NA |
| | Thompson Lakes | 170102130102 | No data | No | NA |
| | Lower | 170101011207 | Most of HUC is in RZ; 1990 sub-adult female | No | NA |

| General Location in Relation to Recovery Zone | 6th Order HUC | | Documented Grizzly Bear Use Details | Meets Selection Criteria to be Considered Occupied? **Yes or No** | BORZ |
|---|---|---|---|---|---|
| | Name | Number | | | |
| | Kootenai River | | | | |
| | Radio Creek | 170102130401 | Lolo-No data | No | NA |
| | Upper Fishtrap Creek | 170102130402 | Lolo | No | NA |
| | Upper Vermillion | 170102130801 | Lolo | No | NA |
| Area located to the southwest of Highway 200 and the recovery zone | Upper Big Beaver Creek | 170102130701 | 1 peripheral sighting in 1995 | No | NA |
| | Little Beaver Creek | 170102130702 | 1979 sighting; 1993 peripheral sighting | No | NA |
| | White Pine Creek | 170102130703 | 1984 and 1985 radio-collared adult male | No | NA |
| | Lower Big Beaver Creek | 170102130704 | 1980 sighting; 1984 and 1985 radio-collared adult male; 1992 and 1993 sightings | No | NA |
| | Lower Vermillion River | 170102130803 | No data | No | NA |
| | Graves Creek | 170102130901 | No data | No | NA |
| | Noxon Reservoir-Squaw Creek | 170102130902 | No data | No | NA |
| | Deep Creek | 170102130903 | No sightings outside RZ | No | NA |
| | Noxon Reservoir-Mosquito Creek | 170102130904 | 1979 sighting | No | NA |
| | Noxon Reservoir-Bear Creek | 170102130905 | No sightings outside RZ | No | NA |
| | Upper Trout Creek | 170102131001 | 1984 and 1985 radio-collared adult male; 1984 sighting; 1995 sighting | No | NA |
| | Lower Trout Creek | 170102131002 | 1984 and 1985 radio-collared adult male | No | NA |
| | Noxon Reservoir-Belgian Gulch | 170102131003 | No Data | No | NA |
| | Marten Creek | 170102131004 | 1980 sighting; 1984 sighting; 1984 radio collared adult male;1987 sighting; 1991 sighting; 2002 sighting; 2003 sub-adult male (cub) and 2003 sub-adult female (cub-later died)(cubs were moved there after death of sow) | Yes | NA |
| | Swamp Creek | 170102131006 | No data | No | NA |
| | Noxon Reservoir-Stevens Creek | 170102131006 | 1984 and 1985 radio-collared adult male; 2008 sighting; potential linkage corridor | Yes | |
| | Pilgrim Creek | 170102131302 | 1980 sighting on edge of HUC; 2009 sighting. Surrounded by other RUAs so added to BORZ. | Yes | |

| General Location in Relation to Recovery Zone | 6th Order HUC | | Documented Grizzly Bear Use Details | Meets Selection Criteria to be Considered Occupied? **Yes or No** | BORZ |
| | Name | Number | | | |
|---|---|---|---|---|---|
| Area located to the southwest of Highway 200 and the recovery zone | Upper Cabinet Gorge Reservoir | 170102131303 | 1985 radio-collared adult female, 2007 adult female w/cubs, 2008 sighting of female | Yes | Clark Fork |
| | East Fork Elk Creek | 170102131304 | 2002 radio-collared sub-adult male; 2005 adult male. Linkage | Yes | |
| | Elk Creek | 170102131305 | 1993 sighting; 2003 sighting; 2005 adult female w/cubs | Yes | |
| | Lower Cabinet Gorge Reservoir | 170102131306 | 2001 adult female w/cubs-later died on RR tracks; 2002 tracks; 2003 three yearlings; 2008 radio-collared female | Yes | Clark Fork |
| | Clari Fork River-Cabinet Gorge Dam | 170102133309 | No data | No | NA |
| Area northwest of the recovery zone that is located north and east of Kootenai River | Mission Creek | 170101040508 | 1990 radio-collared male; 1990 sighting; 1997 sighting; 1999 radio-collared female; 1999 tracks; 2000 sighting; 2005 capture site; 1 radio-collared sub-adult female in 2005; radio-collared sub-adult male in 2006; another radio-collared sub-adult male in 2006 and 2007 | Yes | Mission-Moyie (formerly Deer Ridge) |
| | Round Prairie Creek | 170101050303 | 2000 sighting; 2006 sighting; 2006 track, another 2006 track; 1 radio-collared sub-adult female in 2005; sub-adult male in 2006; another sub-adult male in 2006 and 2007 | Yes | |
| | Moyie River above Feist Creek | 170101050203 | 1986 sighting; radio-collared male in 1997; 1998 sighting of female w/cubs; radio collared female in 2000; sightings in 2004 and radio-collared male in 2004; radio-collared female in 2007; female with cubs in 2009 | Yes | |
| | Moyie River above Placer Creek | 170101050301 | 2 sub-adult males 2007; tracks of grizzly in 2001; and radio collared sub-adult male in 2004 | Yes | |
| | Meadow Creek | 170101050304 | No data | No | NA |
| | Lower Moyie River | 170101050306 | No data | No | NA |
| | Deer Creek | 170101050308 | Most of this HUC is in the RZ; no other sightings at lower elevations outside of the RZ boundary | No | NA |
| | Curley Creek | 170101040103 | No data | No | NA |
| | Pine Creek | 170101040102 | No data | No | NA |
| | Kootenai River above Bonners Ferry | 170101040304 | No data | No | NA |
| | Kootenai River above Cow Cr | 170101040303 | No data | No | NA |
| | Kootenai R above Dobson Cr | 170101040302 | No data | No | NA |
| | Kootenai R above Sand Cr | 170101040301 | No data | No | NA |
| | Kootenai R abv Bonners | 170101040101 | No data | No | NA |

7-ER-1627

FS-001052

| General Location in Relation to Recovery Zone | 6th Order HUC | | Documented Grizzly Bear Use Details | Meets Selection Criteria to be Considered Occupied? **Yes or No** | BORZ |
|---|---|---|---|---|---|
| | Name | Number | | | |
| Area northwest of the recovery zone that is located north and east of Kootenai River | Ferry | | | | |
| | Brown Creek including Twentymile Creek | 170101040406 | No data | No | NA |
| | Deep Creek above Brown Creek | 170101040402 | No data | No | NA |
| | Rapid Lightning Creek | 170102140506 | Most of this HUC is in the RZ; no other sightings at lower elevations outside of the RZ boundary | No | NA |
| | Grouse Creek | 170102140505 | Most of this HUC is in the RZ; no other sightings at lower elevations outside of the RZ boundary | No | NA |
| | Lower Pack River | 170102140504 | Portions of this HUC is in the RZ; no other sightings at lower elevations outside of the RZ boundary. | No | NA |
| | Strong Creek | 170102140401 | Most of this HUC is in the RZ; no other sightings at lower elevations outside of the RZ boundary. | No | NA |
| | Lightning Cr below EF Lightning Creek | 170102131304 | Most of this HUC is in the RZ; no other sightings at lower elevations outside of the RZ boundary. | No | NA |
| | Lower Clark Fork at mouth | 170102131204 | Portion of this HUC is in the RZ; no other sightings at lower elevations outside of the RZ boundary. | No | NA |
| | Lower Clark Fork below Cabinet Gorge | 170102131201 | Most of this HUC is in the RZ; no other sightings at lower elevations outside of the RZ boundary. | No | NA |

## SELKIRK Recovery Zone

Datasets Considered
- Forest Service IPNF sightings (1948-2008)
- IDF&G sightings (category 4[20] and 5[21]) for the last 10 years (1999-2009)[22]
- IDF&G radio collared and VHF information (1999-2009)

**Occupied 6th order HUCs (BORZ) surrounding the Selkirk Grizzly Bear Recovery Zone.**

| General Area in relation to Recovery Zone | 6th Order HUC Name | Number | Documented Grizzly Bear Use Details | Meets Selection Criteria to be Considered Occupied? **Yes or No** | BORZ |
|---|---|---|---|---|---|
| Area to the west of Priest Lake and Priest River and south of Kalispell-Granite, LeClerc, and Lakeshore BMUs | Lower Granite | 170102150303 | 2007 habituated sub-adult male | No | |
| | Reeder | 170102150206 | 2007 two sub-adult males including a habituated bear | No | |
| | Kalispell | 107102150208 | 2005 sighting; 2 sub-adult males including 1 habituated bear (2007), 2005 sighting | Yes* | Priest |
| | Reeder (Reynolds Cr) | 170102150206 | 1997 sighting; 2007 two sub-adult males including habituated bear (turn on due to juxtaposition between Kalispell and Lamb Cr) | Yes* | |
| | Lamb Creek | 170102150401 | Female with cubs 1989; radio-collared female in 1989; sub-adult male in 2007; another sub-adult male in 2007 | Yes* | |
| | Priest River below Outlet Bay including Binarch Creek | 170102140402 | 2007 habituated sub-adult male | No | |
| | Upper W. Branch below Solo Creek | 170102150502 | 2007 habituated sub-adult male, 2001 radio collared sub-adult male, close proximity to location where 2 sub-adult males caught and moved in 2001 | Yes | |
| | Upper W. Branch above Solo Creek | 170102150501 | 1990 sighting; 2007 sub-adult male. Turned on in part because of juxtaposition to RZ boundary, and linkage between HUCs further to the south that have recurring use. | Yes | Priest |
| | Goose Creek | 170102150503 | 2001 two sub-adult males caught and moved, female likely in area. Turned on in part because of juxtaposition to RZ boundary, and linkage between HUCs further to the south that have recurring use. | Yes | |
| | Lower W. Branch above Flat Cr | 170102150701 | 1986 sighting; 2001 sub-adult male; 2004 sighting; 2007 radio-collared sub-adult male. | Yes | |
| | Lower W. Branch below Flat Cr | 170102150702 | No data | No | |
| | Priest River above East River | 170102150403 | 2007 habituated sub-adult male | No | |
| | Moore's Creek | 170102150703 | No data | No | |
| | Lower Pend Oreille River | 170102150406 | No data | No | |
| | Priest River below Big Creek | 170102150405 | No data | No | |

[20] Reliable sighting with a relatively high level of confidence
[21] Highly reliable sighting (e.g. trapping location or sighting by IDF&G personnel or experienced grizzly bear biologists
[22] Idaho Fish and Game data reviewed on site courtesy of W. Wakkinen. Data is not on file with the Idaho Panhandle NFs.

FS-001054

| General Area in relation to Recovery Zone | 6th Order HUC | | Documented Grizzly Bear Use Details | Meets Selection Criteria to be Considered Occupied? **Yes or No** | BORZ |
|---|---|---|---|---|---|
| | Name | Number | | | |
| | Big Creek | 170102150404 | 2006 sighting | No | |
| | Priest Lake East Face (NFS) | 170102150502 | No data | No | |
| | Middle Fork East River | 170102150601 | No data | No | |
| | North Fork East River (NFS) | 170102150603 | No data | No | |
| | Lower Priest River | 170102150406 | No data | No | |
| Area located between the south eastern corner of the Recovery Zone and Highway 95 | Pack River above Caribou Creek | 170102140201 | 3 bears (radio collared)—sub-adult male 2001 & 2007 and adult male in 2001, plus sightings in 1996, 1998, 2000 | Yes | Pack River |
| | Deep Creek above McArthur Lake outlet | 170101040401 | 2006 sighting of female w/cubs; 2009 two sub-adult bears—one captured and relocated. | Yes | |
| | Pack River above Jeru Creek | 170102140201 | Radio-collared male 1986; sighting in 1999; radio-collared male in 2000; tracks in 2000; female with cubs 2000; female with cubs in 2005; tracks in 2009. | Yes | |
| | Fall Creek | 170101040403 | 2007 sub-adult male; 2003 sub-adult female capture + other bears in vicinity; 2007 sow w/cubs; 2001 adult male; 2007 sighting | Yes | |
| | Soldier Creek (NFS lands) | 170102150210 | 3 radio collared bears (sub-adult male 2007, sub-adult male 2001) and 2000 | Yes | |
| | Pack River above Sand Creek | 170102140503 | 2000 radio collared bear | No | |
| | Deep Cr below Brown Creek | 170101040405 | 2001 adult male; 2007 radio collared sub-adult male | No | |
| | Snow Creek | 170101040408 | 2007 subadult male | No | |

\*Areas east of Highway 57 within these RUAs have issues related to a higher level of private property and recreational residences where we do not want to manage for grizzly bear occupancy. Emphasis here is on education and sanitation.

FS-001055



**United States Department of Agriculture**

# Black Ram

## Decision Notice and Finding of No Significant Impact



**Kootenai National Forest, Three Rivers Ranger District, Lincoln County, Montana-June 2022**

FS-002146

For More Information Contact:
Kirsten Kaiser, District Ranger
Three Rivers Ranger District
12858 US Highway 2
Troy, MT 59935
(406) 295-4693
Email: kirsten.a.kaiser@usda.gov

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www.ascr.usda.gov/complaint_filing_cust.html and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer and lender.

Black Ram Project Decision Notice and FONSI

# Introduction

The December 2019 objection period for the Black Ram project was cancelled on February 18, 2020. Forest Supervisor Chad Benson sent a letter to all commenters advising them that the objection process was cancelled and that he had withdrawn his draft decision notice. The USDA Forest Service, Region One Office informed all objectors that the objection process was cancelled and the draft decision was withdrawn.

The court in *Alliance for the Wild Rockies v. Probert*, 9:18-cv-0067-DWM (concerning the Pilgrim Project) ordered the Forest Service to reinitiate consultation with the United States Fish Wildlife Service (FWS) on the effects of the motorized access direction for grizzly bear management contained within the Kootenai National Forest's Land Management Plan (Forest Plan). The Black Ram project was delayed until a new Forest Plan grizzly bear biological opinion (BO) was completed. That new Forest Plan grizzly bear BO was received on October 7, 2020, and supersedes and replaces the grizzly bear chapter of the 2013 BO on the Forest Plan. The new BO is located in the project file.

## Why did we propose this Project

This proposal is the result of the need to move the existing resource conditions in this project area toward the desired conditions as stated in the 2015 Forest Plan (see the purpose and need below). Forestwide management goals, as well as specific management area direction, represent the desired condition that management actions are designed to achieve.

### Purpose and Need

Based on field review of the area and analysis of the existing data by the Three Rivers Ranger District's resource specialists, the following purpose and need for treatment were identified to help move the landscape toward the desired condition:

1) Promote resilient vegetation conditions by managing for landscape-level vegetation patterns, structure, patch size, fuel loading, and species composition:

- ♦ Promote early seral tree species including western larch, ponderosa pine, and western white pine.
- ♦ Maintain or improve old growth character within existing old growth.
- ♦ Encourage fire's ecological function on the landscape.
- ♦ Improve resilience and resistance to insects, disease and fire.
- ♦ Design size of treatments to be consistent with the patch size and pattern of the respective biophysical setting.
- ♦ Diversify successional stages.

2) Maintain or improve watershed conditions in order to provide water quantity, water quality, stream channel conditions, and native aquatic species habitat that support ecological functions and beneficial uses:

- ♦ Aquatic Resource - Reduce sediment delivery to aquatic systems by implementing Best Management Practices (BMP) on Forest Service Roads.

1

FS-002148

- ♦ Improving and stabilize road/stream crossings and improve drainage distribution on Project Area roads.

3) Improve big game winter range conditions and promote forage opportunities:

- ♦ Maintain or increase the forage component of forested stands in the project area, including an increase of seedling/sapling age class and early seral species, through timber harvest and prescribed fire.
- ♦ Improve vigor, extent, and long-term productivity of huckleberry and other native plants to increase forage availability.

4) Maintain and improve the recreation opportunities in the project area:

- ♦ Maintain public access to national forest land.
- ♦ Create new recreational opportunities.

5) Reduce the potential for high intensity wildfire while promoting desirable fire behavior characteristics and fuel conditions in the Wildland Urban Interface and other areas with values at risk.

6) Provide forest products that contribute to the sustainable supply of timber products from National Forest System Lands.

The environmental assessment documents the analysis of three alternatives to meet this need and the following provides more information as per how regeneration harvest and treatments in old growth move the vegetation from existing to desired conditions.

## The Need for Regeneration Harvest

The existing condition of the Black Ram project area forest vegetation was analyzed at the landscape scale and compared to the desired conditions of the forest plan. The comparison of existing to desired conditions demonstrated that the project area did not meet desired conditions in several key components, such as forest composition, structure, and function. The combination of these vegetation components reflect resistance and resiliency to disturbance and stressors, resulting in potential future conditions and the ability to adjust to climate change.

In order to move a landscape toward desired conditions, areas are evaluated one stand at a time. Individual stands with current conditions inconsistent with desired conditions were diagnosed for silvicultural treatment. A step-down approach is used when diagnosing and prescribing silvicultural treatment. Regeneration harvest, or restarting a stand, is only considered after evaluating the options of deferring or modifying the present stand (i.e. intermediate harvest). Regeneration harvest is proposed when it is necessary to create a new stand to meet the desired conditions. In stands that were not composed of desired early-seral species, had high insect and disease hazard and risk, and/or were overstocked with heavy fuel accumulations were diagnosed with regeneration harvest as the optimal method of moving toward the desired condition at the stand-level, as well as the project purpose and need and the 2015 Forest Plan.

Regeneration harvest stands would establish and grow site-adapted ponderosa pine, western larch, and/or western white pine while maintaining individuals and groups of healthy trees. Areas treated would resemble a mosaic of individual leave trees and even-aged groups after harvest, fuels treatments, and planting activities are completed. It is the combination of site-specific silvicultural methods in individual stands of various sizes, biophysical settings, and species compositions in the Black Ram project area that will move the landscape toward desired forest vegetation conditions.

2

Black Ram Project Decision Notice and FONSI

## Treatment in Old Growth

Of the 91,647 acres of National Forest System land within the Black Ram project area, 13,705 acres are old growth. There are 579 acres proposed for intermediate harvest that meet the definition of old growth and are supported by scientific basis and rationale as to why vegetation management would be the most effective strategy in increasing resilience. There is no clearcutting (or any type of regeneration harvest) of any old growth stand in this project.

Old growth stands with intermediate harvest proposed are in disturbance prone habitat types where wildfire historically occurred on these sites and was a key factor in their development. Absence of fire has led to substantial amounts of shade intolerant species and fuel accumulation. These sites are at risk for stand-replacing fires and other disturbances (such as bark beetles). The treatment proposed would emulate a non-lethal or mixed-severity wildfire that served to extend the time that shade intolerant western larch or ponderosa pine could maintain their presence in stands that would otherwise become dominant by shade tolerant species. Climate change encourages the protection of old growth trees by restoring stands and landscapes to more sustainable conditions. The desired result of developing resilient old growth conditions through management techniques is to meet restoration objectives while maintaining composition and structure that conforms to the Green et al old growth definition (Green et al. 1992). Based on the current literature, this approach to maintaining resilience in old growth ecosystems has been incorporated into Alternative 2

## Monitoring

The Forest Service will collaborate with our partners (e.g. Tribes, FWS and Montana Department of Fish, Wildlife and Parks) to monitor project treatment outcomes such as harvest in old growth and Best Management Practices. Appendix F in this document includes the monitoring plan for the Black Ram project.

# Biological Opinion

The FWS completed the Biological Opinion (BO) and the Forest received it on September 15, 2021. The BO considered the Black Ram project's effects on the federally listed, proposed, and candidate species including: grizzly bear (*Ursus arctos horribilis*), Canada lynx (*Lynx canadensis*), designated Canada lynx critical habitat, bull trout (*Salvelinus confluentus*), bull trout critical habitat, white sturgeon (*Acipenser tranmontanus*), wolverine (*Gulo gulo luscus*), and whitebark pine (*Pinus albicaulis*).

Following a May 26, 2022, order by U.S. District of Montana, wolverine are again considered "proposed" for listing. Pursuant to the requirements of 7(a)(4) of the Act and 50 C.F.R. § 402.10, the Forest assessed the effects of their proposed action (see the project file document 20220609BA_Black Ram_wolverine0153.pdf) and determined that the Project will not likely jeopardize the continued existence of the proposed wolverine. The FWS reviewed the biological assessment, and they concur with the Forest's determination.

## Findings

The Forest determined that the proposed project will have *no effect* on bull trout (*Salvelinus confluentus*), or designated bull trout critical habitat.

The Forest made a determination that the proposed action *will not likely jeopardize the continued existence of wolverines* Pursuant to the requirements of 7(a)(4) of the Act and 50 C.F.R. § 402.10, the

7-ER-1635

Black Ram Project Decision Notice and FONSI

Forest assessed the effects of their proposed action and made a no jeopardy determination for whitebark pine (proposed) and wolverine (proposed). The FWS reviewed the biological assessment related to whitebark pine and wolverine and they concurred with this determination.

The Forest determined in the biological assessment that the proposed project *may affect, but is not likely to adversely affect* Canada lynx and designated Canada lynx critical habitat, and *may affect, and is likely to adversely affect grizzly bear*.

## Canada lynx

The FWS stated "In summary, any effects to lynx as a result of the Black Ram Project will be insignificant to Canada lynx. The FWS concurs with the Forest's determination that the proposed action is not likely to adversely affect threatened Canada lynx. The FWS bases its concurrence on the information and analysis in the biological assessment prepared by Sean Hill, Wildlife Biologist, and information in our files."

## Canada lynx critical habitat

The FWS stated "In summary, we reviewed: the biological assessment for Black Ram Project, the effects of the action, cumulative effects within the action area; the 2013 BO with 2021 errata; the information we relied upon to develop the BO; and information in our files. We anticipate any effects to lynx critical habitat from project-related activities to be insignificant. Following review of those documents and the status of lynx critical habitat, the environmental baseline for the action area, and the effects of project as proposed, including the cumulative effects, the FWS concurs that the Black Ram Project is not likely to adversely affect designated Canada lynx critical habitat."

## Grizzly Bear

The FWS stated, "After reviewing the current status of grizzly bears, the environmental baseline for the action area, the effects of the action, and the cumulative effects, it is the FWS's opinion that the effects of the proposed Black Ram Project on grizzly bears *are not likely to jeopardize the continued existence of the grizzly bear*. No critical habitat has been designated for this species, therefore, none will be affected. Implementing regulations for section 7 (50 C.F.R. § 402) define "jeopardize the continued existence of" as to "engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." Our conclusion is based on, but not limited to, the information presented in the biological assessment (U.S. Forest Service 2020), correspondence during this consultation process, information in our files, and informal discussions between the FWS and the Forest."

The September 15, 2021, biological opinion from the USFWS stated on page 54: "this level of anticipated take is not likely to result in jeopardy to the species. The amount of incidental take described in the biological opinion is low. Further, the FWS anticipates no mortality of grizzly bears, but rather some low level of effect on the normal reproductive potential and/or feeding patterns of individual female grizzly bears in the area. The best information indicates the overall status of the CYE grizzly bear population is stable to increasing. Considering the grizzly bear recovery strategies (U.S. Fish and Wildlife Service et al. 2013; U.S. Fish and Wildlife Service 1993) and the size, status, and distribution of the combined GYE, NCDE, SE and CYE grizzly bear population, incidental take of grizzly bears in the action area will not affect the recovery of the grizzly bear population in the conterminous United States as listed under the Act. Further, impacts on the grizzly bear population as a whole (all ecosystems) as a result of the Black Ram Project, including anticipated levels of incidental take, will not appreciably reduce the survival or the recovery of the species in the conterminous United States."

4

Black Ram Project Decision Notice and FONSI

Reasonable and prudent measures (RPM) are expected to reduce the amount of incidental take resulting from the project. This is non-discretionary and must be implemented by the USFS. The reasonable and prudent measure are:

1. Reduce the potential for harm caused by displacement of female grizzly bears in Core areas.

2. Reduce the potential for harm caused by displacement of female grizzly bears related to the amount of increases in administrative use of restricted (gated) roads.

## Terms and conditions

In order to be exempt from the prohibitions of section 9 of the Act, the Forest will comply with the following terms and conditions that implement the reasonable and prudent measure described above and outline reporting and monitoring requirements. These terms and conditions are non-discretionary:

### *To implement RPM #1:*

1. Berm or barrier all roads that will contribute to new Core areas as soon as possible after the Black Ram record of decision is signed authorizing the project, and before existing Core areas are entered (per Forest Plan standard). The intent is to allow bears to begin actualizing those new areas of Core as soon as possible. This includes all roads listed in Appendix K of the biological assessment for which the "Reason for Action" includes "IKRC" (meaning in-kind replacement of Core). Any work to stabilize hydrology on these roads should be completed within this same timeframe, such that no further disturbance is needed in the new Core areas for at least 10 years.

2. Monitor all new closures (berms/barriers) on roads that are being closed for the purpose of creating Core at least twice during the bear year (once in spring/early summer and once in fall per seasonal definitions in the Forest Plan, USFS 2015, page 149) for 3 years, to ensure effectiveness of closures at reasonably deterring motorized access during the first few years in which bears are learning to actualize those areas as Core. After 3 years, monitoring of these roads can become less frequent, and be included as part of the 30 percent annual monitoring required under the Forest Plan as the Forest sees fit.

### *To implement RPM #2:*

3. In Bear Management Unit (BMU) 15, subdivide project implementation such that open motorized route density (OMRD) does not exceed 37 percent at any time, for the 10 years of the project. Use of restricted roads during grizzly bear denning season do not count towards increases in OMRD. Acceptable subdividing could involve working on one area for part of a bear year, then moving to another area the rest of the bear year, as long as OMRD does not exceed 37percent at any given time.

4. In both BMUs, once timber harvest and haul is complete on a gated road, the Forest shall resume abiding by administrative use levels, as dictated by the Forest Plan, for the remainder of project implementation. An exception will be allowed for exceeding administrative use levels in one bear year per BMU, if needed to implement prescribed burning activities, granted the exception still meets Term & Condition 3.

## Reporting Requirements – to demonstrate compliance with the terms and conditions for grizzly bears, the Forest shall:

1. Provide a project-specific annual report to the FWS to show compliance with Terms and Conditions 1 and 2 above for the first 3 years of project implementation.

5

2. Provide a report to the FWS once all timber harvest and haul is complete and administrative use levels resume on gated roads.

3. Notify the FWS's Montana Ecological Services Field Office, within 24 hours, of any grizzly bear-human conflicts or the management removal or human-caused death of a grizzly bear associated with implementation of the proposed action.

See the Biological Opinion section below for details on the other species that were included in consultation process.

### Re-initiation Notice

As provided in 50 C.F.R. § 402.16, re-initiation of consultation is required and shall be requested by the federal agency or by the FWS where discretionary federal involvement or control over the action has been retained or is authorized by law and: (1) if the amount or extent of taking specified in the incidental take statement is exceeded; (2) if new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (3) if the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence; or (4) if a new species is listed or critical habitat designated that may be affected by the identified action.

# Decision and Reasons for the Decision

The Decision Notice (DN) and Finding of No Significant Impact (FONSI) incorporates the Black Ram Project Environmental Analysis (EA) and all supporting documents and appendices. The Black Ram EA, June 2022 is located in the EA folder in the Analysis folder and the Black Ram DN/FONSI is located in the Decision folder at https://www.fs.usda.gov/project/?project=52784.

Based upon my review of the analysis, the project file, discussions with the interdisciplinary team (IDT), Tribes, and other agencies I have decided to implement EA Alternative 2. Management actions are described in detail in Appendix A (Harvest and Non-harvest Treatment Summary) and in Appendix B (Road Work Tables). To avoid or minimize potential adverse impacts to resources from this project, the design features in Appendix C have been incorporated into this alternative. Please also see the government to government section below as well as the project file for additional information related to the communication and consultation with the Kootenai Tribe of Idaho, the Confederated Salish Kootenai Tribe (CSKT) and the Ksanka Elders from CSKT.

## A summary of the actions in my decision include:

**Table 1. Harvest Treatments**

| Proposed Treatment | Alt 1 Acres | Selected Alternative Alt. 2 Acres | Alt. 3 Acres |
|---|---|---|---|
| Seedtree Cut | 0 | 621 | 623 |
| Clearcut with Reserves | 0 | 1,783 | 1,833 |
| Shelterwood Cut | 0 | 38 | 38 |
| Total Regeneration Harvest | 0 | 2,442 | 2,494 |
| Improvement Cut | 0 | 1,356 | 979 |

FS-002153

Black Ram Project Decision Notice and FONSI

| Proposed Treatment | Alt 1 Acres | Selected Alternative Alt. 2 Acres | Alt. 3 Acres |
|---|---|---|---|
| Commercial Thin | 0 | 104 | 104 |
| Total Intermediate Harvest | 0 | 1,460 | 1,083 |
| **Total Commercial Harvest** | **0** | **3,902** | **3,577** |
| **Total Harvest Volume (MMBF/ CCF)* Includes saw timber and non-saw timber** | **0** | **57/ 108,800** | **51/ 97,500** |
| Precommercial Thin/Prune | 0 | 618 | 618 |
| Harvest Fuel breaks | 0 | 76 | 76 |

* MMBF = million board feet, CCF= hundred cubic feet

**Table 2. Fuel Treatments**

| Proposed Fuel Treatments | Alt. 1 Acres | Selected Alternative Alt. 2 Acres | Alt. 3 Acres |
|---|---|---|---|
| Harvest followed by excavator piling | 0 | 2,228 | 2,045 |
| Harvest followed by underburning | 0 | 1,353 | 1,143 |
| **Total Fuels Treatment with Timber Harvest** | **0** | **3,581** | **3,188** |
| Non-harvest ecosystem burning | 0 | 7,034 | 7,034 |
| Non-harvest ladder fuels reduction - cut non-merchantable ladder fuels, hand or excavator pile cut material, burn the piles | 0 | 519 | 519 |
| **Total Non-harvest Fuel Treatment** | **0** | **7,553** | **7,553** |

**Table 3. Activities in the Wildland Urban Interface (WUI) and Inventoried Roadless Areas (IRAs)**

| Proposed Activities | Alt 1 Acres | Selected Alternative Alt. 2 #of Units/ Acres | Alt. 3 # of Unites/ Acres |
|---|---|---|---|
| Harvest Treatment in the WUI | 0 | 46 /1,485 | 41 /1,170 |
| Non-harvest fuels treatment in the WUI | 0 | 23 /2,883 | 23 /2,883 |
| Harvest Treatment in the IRAs | 0 | 0 | 0 |
| Non-harvest fuels treatments in the IRAs | 0 | 5 /2,199 | 5 /2,199 |

**Table 4. Activities in Old Growth**

| Proposed Activity* | Alt. 1 Acres | Selected Alternative Alt. 2 Acres | Alt. 3 Acres |
|---|---|---|---|
| Harvest Treatment within Old Growth | 0 | 579 | 437 |
| Harvest Treatment within Recruitment Potential Old Growth | 0 | 123 | 117 |
| Non-harvest Fuels Treatment within Old Growth | 0 | 343 | 343 |

7-ER-1639

FS-002154

Black Ram Project Decision Notice and FONSI

| Proposed Activity* | Alt. 1 Acres | Selected Alternative Alt. 2 Acres | Alt. 3 Acres |
|---|---|---|---|
| Non-harvest Fuels Treatment within Recruitment Potential Old Growth | 0 | 318 | 318 |
| Road Building in Old Growth | 0 | 0.8 miles | 0 |

*These treatments will retain old growth characteristics and are consistent with the 2015 Forest Plan.

**Table 5. Roadwork**

| Roadwork | Alt. 1 Miles | Selected Alternative Alt. 2 Miles | Alt. 3 Miles |
|---|---|---|---|
| Decommissioning of 39 NFSRs | 0 | 20.0 | 20.0 |
| Decommission of 7 segments of undetermined roads | 0 | 3.0 | 3.0 |
| Storage of 19 roads | 0 | 32.0 | 32.0 |
| Segments of road to be added to the NFSR system (undetermined) | 0 | 2.0 | 2.0 |
| New Permanent Road construction – there will be no new public access on these roads | 0 | 3.3 | 0 |
| Temporary Road construction to access Unit 5 | 0 | 0.2 | 0.2 |
| Haul Route Road Reconstruction / Maintenance | 0 | 90.3 | 89.4 |

**Table 6. Recreation Improvements**

| Improvement | Alt. 1 | Selected Alternative Alt. 2 | Alt. 3 |
|---|---|---|---|
| Wood Mountain Stock Loop Trail- new additional trail miles | 0 | 2.0 | 2.0 |
| North Fork River Trail miles | 0 | 2.0 | 2.0 |
| West Fork Falls Trail – new additional Trail miles | 0 | 3.0 | 3.0 |
| Northwest Peaks to Rock Candy Trail miles | 0 | 4.0 | 4.0 |
| Proposed number of scenic vistas | 0 | 15 | 15 |
| Parking lot improvement for the Upper and Lower Hawkins Lake trailheads | 0 | Yes | Yes |

# Funding dependent work

**Table 7. Road Work to Improve Watershed Conditions for Alternatives 2**

| Road Number | Location | Action |
|---|---|---|
| 338M | Between Davis and Winkum Creek | Remove buried log structure and road fill* |
| 1520 | Between Davis and Winkum Creek | Remove remaining log structure abutments and road fill* |
| Unnamed road prism off 338 | Located on the North end of Unit 77 | Remove road fill from stream crossing* |
| 3388 | Tributary to West Fork Yaak River | Remove wooden box culvert* |

8

7-ER-1640

Black Ram Project Decision Notice and FONSI

| Road Number | Location | Action |
|---|---|---|
| 523B | Unnamed spur off 523B, Tributary to West Fork Yaak River | Remove collapsed wooden cross drain and road fill* |
| 5856B | Upper Hensley Creek, west of NFSR 5856 | Remove undersized culvert* |
| 5856E | Upper Hensley Creek, west of NFSR 5856 | Remove undersized culvert* |
| 5875B | Slim Creek tributary | Clean the inlet and improve armored overflow channel. This work will be done by hand |
| 5877 | Pete Creek tributary | Remove failing undersized culvert* |
| 5882B | Lap Creek spur road | Remove culvert* |
| 14125 | West of NFSR 338 | Remove 2 undersized culverts and construct overflow channel* |

*Work will include stabilizing stream bed and banks onsite where needed.

# Reason for choosing Alternative 2

When compared to the other alternatives this alternative will treat the largest portion of the landscape to promote resilient vegetation conditions, create big game forage opportunities, provide wood products, and reduce the potential for high intensity wildfires, therefore promoting Forest Plan desired conditions more effectively than Alternative 3.

My criteria for making a decision on this project are based on:

Achievement of the project's purpose and need.

Other alternatives considered.

Public involvement, Scoping and EA comments.

Communication, Consultation, and Coordination with the Tribes.

How the project makes progress toward meeting the desired conditions and other Plan components included in the 2015 Forest Plan.

## Achievement of the project's purpose and need

The purpose and need for the Black Ram Project and the desired condition are based upon the 2015 Forest Plan standards, goals and objectives, and review of the project area by the interdisciplinary team (IDT).

As summarized in Table 8 below, Alternative 2 is the most responsive to the purpose and need objectives for the Black Ram Project.

Table 8. Comparison of Purpose and Need Objectives by Alternative

| Purpose and Need Objective | Alt. 1 | Selected Alternative Alt. 2 | Alt. 3 |
|---|---|---|---|
| **Promote resilient vegetation conditions by managing towards the 2015 Forest Plan desired conditions** | | | |
| Promote early seral tree species including western larch, ponderosa pine, and western white pine (acres) | 0 | 10,881 | 10,420 |

9

Black Ram Project Decision Notice and FONSI

| Purpose and Need Objective | Alt. 1 | Selected Alternative Alt. 2 | Alt. 3 |
|---|---|---|---|
| Contribute to fire's ecological function on the landscape (acres) | 0 | 7,553 | 7,553 |
| **Maintain or improve watershed conditions** | | | |
| BMP work on haul roads (miles) | 0 | 90 | 89 |
| Road Storage (miles) on closed roads | 0 | 32 | 32 |
| Decommissioning (miles) on closed roads | 0 | 23 | 23 |
| Stabilize and improve drainage on closed roads | No | Yes | Yes |
| **Improve big game winter range conditions and promote forage opportunities while maintaining secure habitat for wildlife** | | | |
| Maintain or increase the wildlife forage component and seedling/sapling age class (acres) | No | Yes | Yes |
| Maintain areas of secure grizzly bear habitat through access management (Yes/No) | Yes | Yes | Yes |
| Maintain areas of habitat with no change to calculated elk security (Yes/No) | Yes | Yes | Yes |
| Improve the quality and the area of big game winter range forage | No | Yes | Yes |
| **Provide a variety of wood products to the American public** | | | |
| Timber Volume (MMBF/ CCF)[1] Includes both saw timber and non-saw timber | 0 | 57/ 108,800 | 51/ 97,500 |
| Complete necessary construction, reconstruction and maintenance of roads (Yes/No) | No | Yes | Yes |
| **Maintain and improve the recreation opportunities in the project area** | | | |
| Maintain public access to National Forest land | Yes | Yes | Yes |
| Create new non-motorized trail (miles) | 0 | 18 | 18 |
| Create new scenic vistas (number) | 0 | 15 | 15 |
| **Reduce the potential for high intensity wildfire[2]** | | | |
| Fuels reduction in Harvest and Non-harvest Units (prescribed burning) in the WUI (acres) | 0 | 4,368 | 4,053 |
| Prescribed burning outside the WUI (acres) | 0 | 4,670 | 4,670 |

[1] MMBF = million board feet, CCF= hundred cubic feet
[2] The 2021 fire season in the vicinity of the project area further demonstrates that the changes due to forest management (Lower Yaak, O'Brien, and Sheep (OLY) project) are effective in reducing the potential for high intensity wildfire.

# Other Alternatives Considered

In addition to the Selected Alternative, I considered two other alternatives. A comparison of these alternatives can be found in the EA, pages 13-16.

## No Action

Under the No Action Alternative, the 2015 Forest Plan will continue to guide management of the project area.

Black Ram Project Decision Notice and FONSI

## Alternative 3

Alternative 3 is similar to Alternative 2 without the new permanent road construction and treats 461 less harvest acres. This alternative address's public concerns regarding the impacts of building 3.3 miles of new permanent road in the Project Area.

# Public Involvement, Scoping and EA comments

Collaboration with public interests was a crucial element in Black Ram project development and helped the District identify and modify its proposed action and alternatives.

A letter was mailed to residents and interested public on August 17, 2017, and the vegetation management proposal was presented during a public meeting at the Yaak Community Center on September 7, 2017. This meeting was advertised and open to the public. The District received 41 comment letters or emails.

A scoping notice was mailed and a legal ad was placed in the *Missoulian* on July 13, 2018, to solicit comments on the proposed action from the public, various interest groups, agencies, and Tribes. The project details were posted on the Kootenai National Forest's land and resources management project web page. After these public involvement efforts, a total of 15 comment letters were received. The IDT carefully considered the comments and determined how to incorporate them into project development.

Two comment letters suggested that we develop alternatives to address their group's concerns: 1) American Forest Resource Council (AFRC) suggested that the District complete a maximum mechanical treatment alternative that would bring all stands into an improved forest health condition and would provide a maximum timber harvest alternative to satisfy the Purpose and Need. 2) The Yaak Valley Forest Council (YVFC) and The Kootenai Forest Stakeholders Coalition (KFSC) expressed their desire to have a "wildness" alternative. The December 10, 2018, letter from the KFSC, located in the project file, includes their definition of wildness. Following are excerpts of their definition:

> "One of the components of wildness can be remoteness, as well as the perception of remoteness… We would expect that current management directives will not contribute to further such long lasting scars upon the landscape."

> "A place is wild if one can imagine being the first person to discover it. Such a route whether traversed afoot, on a bike or in a car may be experienced as people first encountered it."

> "Another component of wildness is the absence of man-made geometry."

> "One characteristic of wildness has to do with scale, with the feeling of being small and insignificant in a vast landscape…"

> "To sum up, a wild landscape is one in which nature clearly has the upper hand, where evidence of man's activities is subtle and insignificant."

These alternatives were not brought forward as alternatives by the IDT or the decision maker as they did not meet the Purpose and Need for the Black Ram project. The majority of timber harvest (3,764 acres) will occur in Management Area (MA) 6- General Forest- where harvest is scheduled and contributes to the allowable sale quantity (ASQ). See Table 10 in this decision for more information.

Other suggestions that the YVFC and KFSC proposed for this project included dropping the helispots, the Hensley Hill to Garver Trail, the public road access proposal, and Harvest Unit 14. These proposal activities were dropped in Alternative 2 in the December 2019 EA. They also suggested that the IDT drop or change Harvest Unit 72 and make changes to the harvest units along the Pacific Northwest National Scenic Trail (PNNST). The IDT added additional design features for the units along the PNNST in the

FS-002158

December 2019 EA (see EA pages 5-6). The IDT also modified Harvest Unit 72 as a result of public comment. This unit was divided into three units (Unit 72, 72A, and 72B) and added more leave islands which reduced unit size.  These changes are reflected in Tables 1 and 2.  Communication and consultation with these entities began prior to project development and continued throughout the process. The IDT, District Ranger and Forest Supervisor communicated and consulted with the Confederated Salish and Kootenai Tribes (CSKT), the Kootenai Tribe of Idaho (KTOI), Montana Fish, Wildlife, and Parks and the U.S. Fish and Wildlife Service. These discussions have influenced the design of proposed activities and design features to benefit habitat conditions.

As a result of public, agency and Tribal input, the Forest Service created the alternatives described above. The main issue of public concern includes about 3.3 miles of new permanent road construction in the Rampike, North Fork Yaak and Hensley Face areas of the project. This new road construction facilitates treatments to help meet the purpose and need to improve resilience and resistance to insects, disease and fire and maintain or improve old growth character within existing old growth. In response to the proposed action we received comments opposing the new road construction and specifically the new road construction through old growth. Alternative 3 was developed to address this concern, see the Public Involvement and Collaboration section of the EA on pages 3-6.

For over two years, the District worked and communicated with the public, the Yaak Valley Forest Council (YVFC) and the Kootenai Forest Stakeholder Coalition (KFSC). The KFSC did not submit comments on the EA or during scoping. Some members of the KFSC and the YVFC wanted the District to retain the scenic objectives related to the Pacific Northwest National Scenic Trail (PNNST) and at the same time they wanted to re-route the PNNST away from the Yaak. The Yaak is a 384,500 acre geographical area with private and National Forest System (NFS) lands. See pages 92-94 of the 2015 Forest Plan. The project record outlines the meeting and field trips taken with the KFSC and YVFC.

Concerns from other commenters include regeneration harvest, road construction and harvest in old growth, management in/near grizzly bear and lynx habitat, and retaining the scenic objectives related to the PNNST.

During layout of Harvest Unit 72, this unit was split into multiple units (Unit 72, 72A, and 72B) due to verifications of Riparian Habitat Conservation Area (RCHA) locations, as well as the public comments we received on the proposed action. During the 2020 field season additional changes were made to Units 72, 72A and 72B to include more leave islands in all three units which decreased the harvest size of these units. These 2020 field season changes are reflected in Table 1. Harvest Treatments and Table 10. Alternative 2 Harvest Treatments.

Other units and acres proposed in the EA could decrease or change shape due to the creation of islands or exclusion of wet areas during layout and implementation. On the ground disturbance from activities would be less due to these changes. Filters protecting certain features (i.e. RHCAs) will be followed using 2015 Forest Plan guidelines, best management practices, and design features. Additional modifications to reduce the potential for disturbance to resources occurs when design features are implemented on the ground such as identifying leave islands and other exclusion areas.

## Progress toward meeting the Forest Plan and Findings Required by Other Laws and Regulations

Each resource report in the EA provides a section on how this project is consistent with the laws and regulations relevant to that resource. After reviewing each report, the EA, the 2020 BO and

communication with Tribes, I find my decision to implement Alternative 2 complies with all applicable laws, regulations, and policies.

## The National Forest Management Act (NFMA)

This project does not require any Forest Plan amendments. Project activities are consistent with the 2015 Forest Plan for the Kootenai National Forest and project-specific activities described in the NFMA (16 USC 1604 (i)). The EA discusses the Forest Plan and management area standards applicable to the Black Ram Project Area.

### Other NFMA Requirements

I have determined the Selected Alternative is consistent with the following provisions of the National Forest Management Act and the 2015 Forest Plan:

1. Suitability for Timber Production: No timber harvest, other than salvage sales or sales to protect other multiple-use values, shall occur on lands not suited for timber production (16 USC 1604(k), Forest Plan FW-DC-TBR-02 and FW-DC-TBR-03).

> Timber harvest will occur on sites identified as suitable for timber production (Forest Vegetation section, EA, pages 140-141, 145).

2. Timber harvest on other than suitable for timber production lands will occur for multiple use values as described in the EA on pages 140 and 235-236. Timber Harvest on National Forest Lands (16 USC 1604(g)(3)(E)): A Responsible Official may authorize site-specific projects and activities to harvest timber on National Forest System lands only where:

a. Soil, slope, or other watershed conditions will not be irreversibly damaged (16 USC 1604(g)(3)(E)(i), Forest Plan FW-DC-SOIL-02 and FW-GDL-SOIL-04).

> Features of the Selected Alternative described in this decision and the EA will ensure that soil, water, and watershed resources will be protected. See the EA, Soils section pages 238 and 248 and Water Resource section, pages 292-293.

b. There is assurance that the lands can be adequately restocked within five years after final regeneration harvest (16 USC 1604(g)(3)(E)(ii), Forest Plan FW-STD-TBR-03).

> Technology and professional knowledge were applied to assure that adequate stocking will occur within five years after final harvest (Forest Vegetation section in the EA, pages 141-142).

c. Protection is provided for streams, streambanks, shorelines, lakes, wetlands, and other bodies of water from detrimental changes in water temperatures, blockages of water courses, and deposits of sediment, where harvests are likely to seriously and adversely affect water conditions or fish habitat (16 USC 1604(g)(3)(E)(iii), Forest Plan FW-STD-RIP-03).

> See the Aquatic Resources section of the EA, page 56 for protections of streams and RCHAs.

d. The harvesting system to be used is not selected primarily because it will give the greatest dollar return or the greatest unit output of timber (16 USC 1604(g)(3)(E)(iv), Forest Plan FW-STD-TBR-05).

> The selected timber harvest is governed by objectives to improve forest resilience and other resource conditions. Our monitoring efforts have determined that timber harvest can improve or

13

Black Ram Project Decision Notice and FONSI

maintain resources while ensuring economic viability. See the Economic section in the EA, page 77 and the Forest Vegetation section on page 142.

3. Clearcutting and Even-aged Management (16 USC 1604(g)(3)(F)): Insure that clearcutting, seed tree cutting, shelterwood cutting, and other cuts designed to regenerate an even-aged stand of timber will be used as a cutting method on National Forest System lands only where:

**a.** For clearcutting, it is determined to be the optimum method, and for other such cuts it is determined to be appropriate, to meet the objectives and requirements of the relevant land management plan (16 USC 1604(g)(3)(F)(i), Forest Plan FW-STD-TBR-07).

Clearcutting with reserves will occur on about 1,876 acres. Even-aged management will occur and was found to be appropriate to meet Forest Plan direction. See the Forest Vegetation section, pages 142 and 144 for additional details and the stand diagnosis documents in the project record.

**b.** The interdisciplinary review as determined by the Secretary has been completed and the potential environmental, biological, esthetic, engineering, and economic impacts on each advertised sale area have been assessed, as well as the consistency of the sale with the multiple use of the general area (16 USC 1604(g)(3)(F)(ii)).

Potential environmental, biological, esthetic, engineering, and economic impacts have been assessed in detail in the EA and documented in more detail in the EA resource reports. The timber harvest is consistent with the multiple use of the general area described in the Forest Plan for Management Area 6 and other forest-wide components.

**c.** Cut blocks, patches, or strips are shaped and blended to the extent practicable with the natural terrain (16 USC 1604(g)(3)(F)(iii), Forest Plan FW-GDL-AR-01).

The Selected Alternative will meet the Forest Plan scenic integrity objectives, which were developed to emulate the appearance of areas that have undergone changes through the natural processes of fire and insects and disease, see the EA pages 229-236. Design features are intended to minimize short term impacts and meet Forest Plan direction for scenery, see the EA, pages 19-22.

**d.** Cuts are carried out according to the maximum size limit requirements for areas to be cut during one harvest operation, provided, that such limits shall not apply to the size of areas harvested as a result of natural catastrophic conditions such as fire, insect and disease attack, or windstorm (FSM R1 supplement 2400-2001-2 2471.1, 16 USC 1604(g)(3)(F)(iv), Forest Plan FW-STD-TBR-02).

Direction provided in the Region 1 supplement to FSM 2471.1 has been followed and the Regional Forester approved the units that will exceed the 40-acre opening size limitation. A 60-day public notice period was provided for public comments. The first 30-day period began when the Black Ram project scoping notice was published in the *Missoulian* on July 13, 2018. The second public comment period started on July 5, 2019, when the Black Ram EA was published.

**e.** Such cuts are carried out in a manner consistent with the protection of soil, watershed, fish, wildlife, recreation, and esthetic resources, and the regeneration of the timber resource (16 USC 1604(g)(3)(F)(v)).

Cuts will be carried out in a manner that will protect soil (EA, pages 247-249), watershed (EA, pages 291-294), aquatic resources (EA, pages 56-58), wildlife (EA, pages 300, 305,

14

FS-002161

327-329, 336-339, 341, 344, 347, 349, 352, 384, 389-390, 401, 405-406, 415, 430-432), scenic resources (EA, pages 208, 235-237), and the regeneration of the timber resource (EA, pages 128-129, 136, 140-145).

4. Stands of trees are harvested according to requirements for culmination of mean annual increment of growth (16 USC 1604(m), Forest Plan FW-STD-TBR-04).

The project meets this requirement (Forest Vegetation section, EA pages 137 and 142).

5. Construction of temporary roadways in connection with timber contracts, and other permits or leases: Unless the necessity for a permanent road is set forth in the forest development road system plan, any road constructed on land of the National Forest System in connection with a timber contract or other permit or lease shall be designed with the goal of reestablishing vegetative cover on the roadway and areas where the vegetative cover has been disturbed by the construction of the road, within ten years after the termination of the contract, permit, or lease either through artificial or natural means. Such action shall be taken unless it is later determined that the road is needed for use as a part of the National Forest Transportation System (16 USC 1608(b)).

In consideration of 16 USC 1608(b), the 0.2 mile of temporary road shall be designed with the goal of reestablishing vegetative cover on the roadway and areas where the vegetative cover has been disturbed by the construction of the road, within 10 years after the termination of the timber sale contract either through artificial or natural means. Such action shall be taken unless later travel analysis determines the road is needed for use as a part of the National Forest Transportation System.

6. Standards of roadway construction: Roads constructed on National Forest System lands shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources (16 USC 1608(c), Forest Plan FW-DC-AR-07).

The Transportation system analysis in the EA (pages 250-260), the Black Ram Travel Analysis Report (TAR), and the Forest-wide TAR, located in the project file informed my decision. While my decision is informed by the Forest-wide TAR, the Black Ram project TAR provided valuable site-specific information upon which my decision is based. I have determined the project meets the requirements of 16 USC 1608 (b) and (c).

Management actions associated with the Black Ram Project include the construction of 3.3 miles of permanent roads to access Harvest Units 15, 16, 17, 54, 55A, 55B, 55C, 72, and 76. (EA page 15, and EA Appendix B pages 21-24 and all resource sections)

7. Provide for diversity of plant and animal communities (16 USC 1604[g][3][B], Forest Plan GOAL-WL-01)

The vegetation management approach in the 2015 Forest Plan is one that provides for ecosystem diversity by providing the ecological components, patterns, and processes at multiple scales on the landscape, and thereby provides the full spectrum of habitats and conditions needed for all of the biological organisms associated with the various ecosystems (USDA Forest Service 2013). This includes the goal that "the KNF manages wildlife habitat through a variety of methods (e.g., vegetation alteration, prescribed burning, invasive species treatments, etc.) to promote the diversity of species and communities and to contribute toward the recovery of threatened and endangered terrestrial wildlife species" (Forest Plan, GOAL-WL-01).

In addition, the 2015 Forest Plan provides management direction in the form of vegetation and wildlife desired conditions, coarse woody debris and snag guidelines, and old growth standards and guidelines. The companion approach to ecosystem diversity (coarse filter) is the "fine filter" approach in which conservation strategies are used for individual species or groups of species to contribute to species diversity. The fine filter approach narrows the focus to those species that require habitat that maybe outside the range of variation and are not covered under the coarse filter. The 2015 Forest Plan provides fine filter management direction in the form of grizzly bear, lynx, and other species-specific standards and guidelines.

Based on consideration of consistency with the Forest Plan, the monitoring and design features of the Black Ram Project decision, analysis of effects, the biological assessments/evaluations (in the project record), and the BO, I find this decision will continue to provide for a diversity of species and communities.

## Clean Water Act and Montana State Water Quality Standards

Montana has developed numeric or narrative criteria for various pollutants that may impact these beneficial uses. The pollutant of primary concern with land management operations is sediment, and the beneficial use of most concern in these waters is generally fish. No increases of sediment or suspended sediment are allowed above naturally occurring concentrations which will render the waters harmful, detrimental, or injurious to fish (ARM 17.30.623). The Forest Service addresses this requirement through application of best management practices (BMPs).

Upon review of the Black Ram Project EA and the project file, I find that the activities associated with the Selected Alternative will comply with the Clean Water Act and Montana State Water Quality standards. My decision includes project design features (Appendix C) and best management practices (Appendix E) which are designed to protect the water resource and achieve water quality standards. In addition, Forest Plan RHCAs will be implemented along all wetlands and stream courses that are in or adjacent to treatment areas.

## Clean Air Act

After reviewing the specialist reports of the EA, I find that the activities in the Selected Alternative will be coordinated to meet the requirements of the State Implementation Plans, Smoke Management Plan, and Federal Air Quality requirements (EA, page 38).

## Consideration of Relevant and Applicable Science

My decision is based on relevant and applicable science and includes a review of the science presented by the public. This science is discussed throughout the EA, in Response to Comments, and in the project file documentation.

## National Historic Preservation Act, American Indian Religious Freedom Act, and Native American Graves Protection and Repatriation Act

As described in the cultural resource section of the EA and in FONSI Intensity factor 8, the Selected Alternative complies with this act.

## Government to Government Relations

The Forest Service consulted with the Confederated Salish and Kootenai Tribes and the Kootenai Tribe of Idaho during the analysis process. The intent of this consultation has been to remain informed about the

FS-002163

tribal concerns regarding the American Indian Religious Freedom Act tribal issues, and project specific concerns. In addition, the Salish, Kootenai, and Upper Pend d'Oreilles have rights under the Hellgate Treaty of 1855 (July 16, 1855). These rights include the "right of taking fish at all usual and accustomed places, in common with citizens of the Territory, and of erecting temporary buildings for curing; together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land." The federal government has trust responsibilities to Tribes under a government-to-government relationship to insure that the Tribes reserved rights are protected. Consultation and communication with the Tribes is ongoing and has helped insure that these trust responsibilities are met, see the project file for documentation.

## The Endangered Species Act

A biological assessment was submitted to the Fish, Wildlife Service (FWS) on September 16, 2020. The project received FWS concurrence on September 15, 2021. The BO findings can be found on pages 3 and 4 of this document and in the project file. In accordance with the Endangered Species Act, Section 7, I have completed formal consultation with regard to the project effects to grizzly bear. The activities in the Selected Alternative with the determination of likely to adversely affect grizzly bears are consistent with the 2015 Forest Plan and are covered by the Incidental Take Statement issued as a result of that consultation. I have also received concurrence with regards to our determination for effects to Canada lynx, Canada lynx critical habitat, and wolverine.

## Administration of the Forest Development Transportation System-Roads Policy- 36 CFR Part 212 et al.

A roads analysis was prepared for the Black Ram project area (EA, beginning on page 250). Reference the Black Ram Travel Analysis Report and the Travel Analysis Report for the Kootenai National Forest, located in the project file. In the travel analysis report, we identified and analyzed roads needed for project activities to be added to the transportation system. These include new construction of road segments and undetermined road segments that are needed for project activities but cannot currently be managed for resource protection as non-system roads. Adding these undetermined roads to the national forest system allows for funding to manage resource protection and maintain the roads for future use. Should the Forest re-enter this project area for future management, it is likely the District will go through a new travel analysis process, at which time different roads and actions to be implemented through a NEPA decision may be identified. I have determined that the Selected Alternative complies with the Roads Policy, which includes 3.3 miles of new permanent road construction, the addition of 2.0 miles of existing road to the NFS transportation system, 0.2 mile of temporary road, decommissioning of 23 miles of closed roads, and storage of 32 miles of closed road. complies with the Roads Policy.

## Migratory Bird Treaty Act of 1918; Executive Order 13186 of January 2001

The Selected Alternative is in compliance with the Migratory Bird Treaty Act of 1918 (See EA wildlife section pages 423-434). Upon review of the information in the EA I find that the Selected Alternative complies with this Executive Order.

## Roadless Area Conservation Rule

I have considered the effects of prescribed burning in Non-harvest Fuels Units E and M and slashing and burning in Non-harvest Units B, C, and D. Slashing understory vegetation (less than 7-inch diameter breast height (DBH) including up to 200 acres in each of Units B, C, and D may occur in the Northwest Peaks and West Fork Yaak Inventoried Roadless Areas. This proposed activity is consistent with the 2001

Roadless Area Conservation Rule (36 CFR 294.13(b)(2)); which states that the cutting (slashing) of timber is incidental to the implementation of a management activity not otherwise prohibited. The objective of the slashing is to promote and ensure ladder fuels reduction while also meeting the objectives during the burn. Slashing creates areas of fuel accumulations that would increase the available fuel on the ground so that a burn would carry fire under prescribed fire burning conditions.

## Environmental Justice

I have considered the effects of the proposed action and it is not expected to negatively affect the civil rights of consumers, minority groups, low-income groups, women, or American Indian tribes. This project is compliant with EO 12898, "Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations." This project was designed to contribute to the economic well-being of local communities (see EA, purpose and need section on pages 1-3 and the economics report on pages 67-77). Environmental justice issues were considered in all steps of the NEPA process including public participation, alternative development, determining the affected environment, project design, and analysis of environmental consequences. At no step were minority, low-income, or Tribal populations negatively affected by any of the proposed actions in any of the alternatives.

## Executive Order 13112–Invasive Species

The Selected Alternative includes design features and other measures for minimizing weed introduction and spread, thus will comply with this order. In addition, Forest Service personnel continue to treat and manage State-listed noxious weeds in the project area (EA, pages 10, 17-18, 20, 24, 54, 141, 182, 184, 246; 257, 287, 317, 341, 350, 401, 419, 432, the Noxious Weeds section, pages 162-174, and Appendix F page 59).

## Compliance with Other Laws, Regulations, and Policies

Compliance with other laws, regulations, and policies are listed in various sections of the project file, the 2015 Forest Plan, and the EA (primarily in the " Relevant Laws, Regulations and Policy or Regulatory Framework and Consistency" discussion at the beginning and end of each resource sections).

# Finding of No Significant Impact

As the responsible official, I am responsible for evaluating the effects of the project relative to the definition of significance established by the CEQ Regulations (40 CFR 1508.13). I have reviewed and considered the Environmental Assessment and documentation included in the project file. In my decision, I have considered both context and intensity of impacts (40 CFR 1508.27) and have determined the management actions included in the decision for the Black Ram Project do not constitute a major federal action and will not have a significant effect on the quality of the human environment. As a result, no environmental impact statement will be prepared. My rationale is as follows, organized by sub-section of the CEQ definition of significance cited above. Before making my determination, I carefully reviewed and considered the following information:

- ♦ The direct, indirect, and cumulative effects of these actions as documented in the Black Ram Project Environmental Assessment, June 2022.

- ♦ The analysis documentation in the project file of the Black Ram Project.

- ♦ Comments received during all comment periods for this project including comments and communications from Tribes.

Black Ram Project Decision Notice and FONSI

    ♦   Past experiences with similar activities and projects.

The following is a summary of the project analysis to determine significance, as defined by Forest Service Handbook 1909.15 Chapter Zero Code, Section05. "Significant", as used in NEPA, requires consideration of both context and intensity of the expected project effects.

## Context

For the action alternatives, the context of the environmental effects is based on the environmental analysis in the environmental assessment. The analysis of effects did not identify any effects that will impact the quality of the human environment outside of the project area, with the exception of possible smoke related impacts to air quality. All of the proposed activity types have been conducted before on the Kootenai National Forest, and the effects have been localized to the project area or wildlife habitat analysis areas immediately adjacent and affected by the proposed activities. Economic benefits from employment opportunities and commercial timber products have been mostly experienced in the local communities surrounding the Kootenai National Forest. Therefore, the context of this project will not have measurable effects on regional, national, or global environments.

## Intensity

Intensity is a measure of the severity, extent, or quantity of effects, and is based on information from the effects analysis of this EA and the references in the project record. The effects of this project have been appropriately and thoroughly considered with an analysis that is responsive to concerns and issues raised by the public, agencies and Tribes. The agency has taken a hard look at the environmental effects using relevant scientific information and knowledge of site-specific conditions gained from field visits and data. My finding of no significant impact is based on the context of the project and intensity of effects using the ten factors identified in 40 CFR 1508.27(b).

### 1) Impacts may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on the balance the effects will be beneficial.

I considered the past, ongoing, and reasonably foreseeable actions in conjunction with beneficial and adverse impacts associated with activities as presented in the Black Ram EA. These impacts are within the range of effects identified in the 2015 Forest Plan. I conclude that the specific direct, indirect, and cumulative effects of the Selected Alternative, Alternative 2, are not significant and this action does not rely on beneficial effects to override any adverse environmental effects.

Impacts associated with the decision to implement Alternative 2 are discussed in the EA and are listed by resource, for example, "Effects to Fire and Fuels" begins on page 78 and the cumulative effects of implementing each alternative are explained on pages 95 and 96.

There may be short-term adverse impacts during project implementation or for a period after activity completion, but these impacts are not anticipated to persist over the long-term.

Predicted impacts to resources were identified early in the development of the proposed action and Design Features (Appendix C) and monitoring (Appendix F) will be integrated into project activities to minimize or avoid short-term impacts as much as possible.

This analysis showed that over the long-term, the management actions included in the Selected Alternative will help move the project area toward the goals and objectives described in the Forest Plan and support the purpose and need for this project.

## 2) The degree to which the proposed action affects public health or safety.

All of the management actions included in this decision have been implemented before on the Kootenai National Forest without compromising public health. There are no circumstances or conditions associated with my decision to indicate there will be unusual or substantial risks to public health and safety. No proposed activities have been identified as being detrimental to public health. Public health or safety were not a concern in public comments, and they did not become an issue during analysis. During harvest and prescribed burning operations certain trails and the Pete Creek road will be closed to provide for public safety. Some road work activities on the West Fork Yaak and Garver Mountain roads will be closed to the public for public safety during the time work occurs. When treatment activities occur along the Pacific Northwest National Scenic Trail (PNNST), District personnel will notify the public when road closure and log hauling occurs using methods such as social media, Recreation.gov, and signage located at the junction of Yaak highway 92 and NFSR 276. Please see the Design Features, Appendix C, for details regarding the road and trail closures. All prescribed burning will meet State Air Quality requirements. Standard provisions will be included in all timber sale contracts to protect the safety of others.

## 3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

Historical and cultural resources have been identified, and design features have been established in the event unknown historic or cultural resources are discovered to ensure adequate protection of these resources occurs. If previously unknown heritage resources are encountered during implementation of the project, activities at the site will be halted and the district ranger will be notified immediately. Activities will not resume until adequate protective measures are developed and specified in the field. Based on the cultural analysis section and the findings of the cultural resource inventory, there are no adverse effects to historic properties expected as a result of implementing Alternative 2. Consultation has also occurred with the Confederated Salish and Kootenai Tribes and the Kootenai Tribe of Idaho regarding this project.

There are no parklands, prime farmlands, or ecologically critical areas within the project area based upon the specific management area designations. Riparian areas will be avoided and the appropriate buffers will be applied for fish-bearing streams, permanent flowing non-fish bearing streams; ponds, lakes, reservoirs, wetlands, and seasonally flowing or intermittent streams. See the project design features (Appendix C). It is expected that project related sediment impacts to stream channels, floodplains, and wetland areas will be negligible with the application of buffers and use of road improvement BMPs, see Appendix E. No municipal watersheds or source water protection areas exist within the project area.

The Pacific Northwest National Scenic Trail (PNNST) runs through the project area and will be managed according to the 2015 Forest Plan. Due to project design, layout, and design features, no significant adverse effects to the trail are expected. The direct, indirect and cumulative effects to the PNNST can be found on EA pages 229-235.

There are some unique characteristics within the project area, such as the West Fork Yaak Wild and Scenic River and Yaak Wild and Scenic River, Pete Creek Botanical Area, French Creek Cedars Botanical Area, Lower West Fork Yaak Falls Geological Area, Northwest Peaks Scenic Area, and Wood Creek

Larch Scenic Area. Due to project design, layout, and design features, no significant adverse effects to these unique characteristics are expected. Management Area direction compliance is discussed on EA pages 95, 98-100, 144-145, 161, 190-191, 195-199, 202-203, 206-207, 220-221, 223-226, 236-237, 260-261, 293, 321, 343, and 419.

## 4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

All of these management actions have been conducted many times in similar conditions on the Kootenai National Forest and other lands managed by the Forest Service. From past projects, the effects are well known and no significant impacts to the human environment are expected. Although there is public concern over the effects the proposed action may have and the level of the significance of these effects, I find that the analysis and findings documented in the environmental assessment indicate that there is not a level of scientific dispute or controversy over the actions proposed that will require the preparation of an environmental impact statement.

## 5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

These methods of vegetation management, road management, trail improvement, watershed and wildlife management activities have all occurred numerous times on the Kootenai National Forest and on other lands managed by the Forest Service. These are not unique or new actions that involve high levels of uncertainty. The project file demonstrates relevant scientific information, consideration of responsible opposing views, and acknowledgement of incomplete or unavailable information, scientific uncertainty, risk, and a review of monitoring associated with past activities. The analysis shows the effects of these management activities are well known and understood. The effects of these actions are not uncertain, and do not involve unique or unknown risks as documented in the environmental assessment.

## 6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

This action is in compliance with the 2015 Forest Plan direction and will help achieve desired conditions put forth in the Forest Plan. The Selected Alternative does not represent a decision about future actions in this project area. Any future proposals will be subject to NEPA requirements and will require a new decision.

## 7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.

I have again reviewed the impacts of the management actions in consideration of past, present, and reasonably foreseeable actions described in the environmental effects section of the environmental assessment. All relevant and known cumulative actions and effects have been identified and analyzed and there will be no significant cumulative effects as a result of this project. The effects of the action are limited to the local area and there are no other effects that will add to the effects of the proposed action.

## 8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in the National Register of

Black Ram Project Decision Notice and FONSI

## Historic Places or may cause loss or destruction of significant cultural or historical resources.

The action will have no significant adverse effect on districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places (NRHP). There are no historic districts within or adjacent to the project area. All NRHP eligible or unevaluated sites were field verified and site records were updated to reflect any changes in site conditions or where old spatial data could be updated with new, high-accuracy GPS data. Additionally, all areas within the area of potential effect with a high to moderate probability for the presence of historic properties that had not been recently surveyed (within 20 years) were surveyed by Forest Service archaeology crews. In accordance with the Region One Programmatic Agreement with the Montana State Historic Preservation Office and the Kootenai National Forest's Site Identification Strategy, this project was found to have no potential to effect cultural resources. Consultation has also occurred with the Confederated Salish and Kootenai Tribes and the Kootenai Tribe of Idaho regarding this project. Based on this information, I conclude that this action will not cause loss or destruction of significant scientific, cultural, or historical resources.

## 9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act.

The degree to which endangered or threatened species or critical habitat will be affected has been indicated in the wildlife analysis. See Table 9 for the status of endangered, threatened or proposed species in the Black Ram project area.

**Table 9. Threatened, Endangered and Proposed Species in the Black Ram Project Area**

| Species | Determination* | EA, Page |
|---|---|---|
| Grizzly Bear (*Ursus arctos horribilis*) Threatened | MALAA | 297, 322-323 |
| Canada Lynx (*Lynx canadensis*) Threatened | MANLAA | 297,344 |
| Canada Lynx Critical Habitat | MANLAA | 297, 352 |
| Whitebark Pine (*Pinus albicaulis*) | NLJ | 178-179, 185 |
| Silene spaldingii (*Spalding's catchfly*) Threatened | No Effect | 185, 187 |
| White sturgeon (*Acipenser transmontanus*) Endangered | No Effect | 39, 55 |
| Bull Trout *Salvelinus confluentus* Endangered | No Effect | 39, 55 |
| Bull Trout Critical Habitat | No Effect | 39, 55 |
| Wolverine (*Gulo gulo Luscus*) Proposed | NLJ | 297, 344, 357 |

*Determination Key: MALAA = May Affect, Likely to Adversely Affect and MANLAA = May Affect, Not Likely to Adversely Affect and NLJ= Not likely to Jeopardize the Continued Existence.

22

7-ER-1654

Black Ram Project Decision Notice and FONSI

**Significance with regard to the NEPA and the ESA**

The proposed action would not significantly affect any threatened, endangered, or proposed species or designated critical habitat that may be present on the Kootenai National Forest, as identified by the U.S. Fish and Wildlife Service. The resource sections in the EA describe the occurrence and potential effects of the proposed activities to Endangered Species Act (ESA) listed species and critical habitat. The potential impacts are summarized below.

Determinations regarding the ESA effects include the word "adversely". In this project an action may have an adverse effect according to the ESA definition, yet not rise to the level of significance as described in the NEPA.

The Biological Assessment for grizzly bear, Canada lynx, Canada lynx critical habitat, and wolverine is in the project file. Consultation with the FWS is completed and the terms and conditions are listed in the Biological Opinion section above.

*Grizzly bear*

The proposed action may affect, and is likely to adversely affect grizzly bears. This determination is based on: 1) project activities may cause temporary disturbance and avoidance of the affected areas and 2) entries into existing core for routine forest management and watershed improvement work may result in short-term adverse effects to grizzly bears. Core would be maintained or improved in each Bear Management Unit (BMU). Motorized route densities would temporarily increase: open motorized route density (OMRD) by three to six percent, and total motorized route density (TMRD) by two to five percent. However, 3) proposed activities would be compliant with FW-STD-WL-02; 4) the in-kind replacement of core for harvest would maintain the existing core standard. This would result in essentially the same area of core in BMU 14 and a small increase in core acres in BMU 15; 5) harvest impacts to OMRD and TMRD are temporary and road status would return to the designated condition upon completion of activities; 6) vegetation management treatments would move stands towards desired vegetation and fire tolerant conditions characteristic of the area; 7) the treatments would encourage increased production of forage species for grizzly bears and other wildlife; 8) nearly all harvest units are not within high-quality spring habitat; 9) there would be no change to open, motorized public road access; 10) availability of large core areas and maintenance of movement corridors would accommodate potential bear movement from project activity areas; 11) project activities would not result in a source of bear attractants; and 12) no increased risk of bear mortality is expected on federal lands.

*Canada lynx*

The proposed action may affect, but is not likely to adversely affect Canada lynx. This determination is based on: 1) lynx are generally considered tolerant of human activity; 2) implementing design features that minimize disturbance during denning periods and potential denning habitat; 3) proposed harvest in Alternatives 2 and 3 would increase early stand initiation habitat than currently exists; 4) proposed actions would move stands towards desired vegetative conditions characteristic of the area, including increased habitat diversity; 5) regeneration harvest is proposed within stands that currently do not provide lynx foraging habitat (i.e., stem exclusion) which could improve lynx winter foraging opportunities in approximately 15 years; 6) treatments would reduce the risk of severe fire within the treated and surrounding areas; 7) there would be a slight increase of early stand initiation habitat within the Hawkins LAU which is well below the standards for VEG S1 and VEG S2; 8) activities would retain potential movement areas; 9) large areas of the project LAUs would remain free of activity to accommodate potential short-term displacement from activity areas; 10) the Project Area units are a very small portion of the LAUs; and 11) lynx mortality is not expected.

23

FS-002170

Black Ram Project Decision Notice and FONSI

### Canada lynx designated Critical Habitat

The proposed action may affect, but is not likely to adversely affect Canada lynx critical habitat. This determination is based on: 1) vegetation management, both regeneration harvest and prescribed burning would not affect currently suitable multistory foraging and young forest habitat; 2) affected stands in currently unsuitable habitat would become suitable in approximately 15 years; 3) there would be no effect to current denning habitat, however pockets of fire mortality and snag and down wood retention guidelines are likely to improve future denning site material; 4) matrix habitat may change in canopy cover and species composition, but there would be no loss; and 5) winter snow conditions would not change as a result of management.

### Wolverine

This project is not likely to jeopardize the continued existence of the North American wolverine (*Gulo gulo luscus*), a distinct population segment (DPS) which is a proposed listed species under ESA. This site specific analysis is included in the project file and that information is also included in the BA. We received a concurrence letter from the FWS on June 9, 2022, that states " Pursuant to the requirements of 7(a)(4) of the Act and 50 C.F.R. § 402.10, the Forest assessed the effects of their proposed action and determined that the Project will not likely jeopardize the continued existence of the proposed wolverine. We reviewed your biological assessment, and we concur with your determination."

### Whitebark pine

The proposed action may affect, but is not likely to jeopardize the continued existence of whitebark pine. This determination is based upon the following rationale: whitebark pine has not been detected during project unit surveys. It is possible that undetected trees may be impacted; however, such individual trees are likely few in number and not in large stands. Therefore, the chance of loss is negligible. The proposed action may beneficially affect whitebark pine habitat conditions by reversing a negative trend of vegetation encroachment created by the absence of fire and reducing the risk of a stand-replacing fire in the units. The potential, albeit unlikely, impact to a few individuals would be offset by the benefits of returning controlled fire to the project area and thus creating higher-quality habitat conditions for whitebark pine.

### Other Species

The project will have no effect to the Threatened Spalding's catchfly (*Silene spaldingii*), the Endangered white sturgeon (*Acipenser transmontanus*), Endangered bull trout (*Salvelinus confluentus*) or bull trout critical habitat. See EA pages 39, 54-55, and 185.

## 10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

Alternative 2 will not violate Federal, State, and local laws or requirements for the protection of the environment. This action will not have significant impacts on air quality, aquatics and water quality, forest vegetation, cultural resources, inventoried roadless areas, invasive plants, proposed, threatened and endangered species, sensitive wildlife species, migratory birds, or soil resources. See the Summary section and Compliance with Land Management Plan and Other Relevant Laws, Regulations, Policies and Plans section for each resource. This decision is in compliance with the applicable Federal, State, and local laws, and requirements:

FS-002171

Black Ram Project Decision Notice and FONSI

## Conclusion

After considering the environmental effects described in the EA and specialist reports, I have determined that Alternative 2 will not have significant effects on the quality of the human environment considering the context and intensity of impacts (40 CFR 1508.27). Thus, an environmental impact statement will not be prepared.

7-ER-1657

Black Ram Project Decision Notice and FONSI

# Changes that were made after the pre-decisional objection process resulting in the final June 2022 EA

Minor changes, in addition to the following changes listed below, have been made to the Black Ram EA.

Pages 39, 43, 44 and 56 include an updated discussion of Coeur D'Alene salamander and information on northern leopard frog.

Pages 33, 47, 51, 54, 62-63, 76, 83, 97, 167, 172, 177, 179, 184, 204, 223, 272-273, 290-291, 296, and 426 include discussions on climate change for the air quality, aquatic, cultural, economics, fire and fuels, noxious weeds, PTES, recreation, water and wildlife resources.

On page 147 under Methodology of the IRA section, we added the criteria that identified how we determined the unroaded lands contiguous to IRAs. On page 50, watershed language has been updated to be consistent with the language in the Water Resources section.

On pages 164 and 165 additions were made to the noxious weed sections.

On pages 297, 344, and 357 updated information of the North American wolverine was added to the EA.

## Correspondence received after the Objection period:

The District Ranger and Forest Supervisor received correspondence in regard to literature, roads, gates and barriers on the District and other comments and concerns. These have been reviewed and addressed by the IDT and are documented in the project record, EA and DN. This information sent by the public did not change the effects of the proposed action to resources or change the decision.

## Pre-decisional Administrative Review (Objection) Process

This project was subject to review and objection pursuant to 36 CFR 218 regulations (Subparts A and B). Eleven written objections were submitted to the reviewing officer within the 45-day calendar period following publication of the legal notice of the objection period in the *Missoulian*, which is the newspaper of record.

There was an objection resolution meeting held on January 22, 2021, using Microsoft Teams. The objectors that participated in this meeting included the Center for Biological Diversity, American Forest Resource Council, Montana Department of Natural Resources and Conservation, Yaak Valley Forest Council, Pam Fuqua, and Mary Campbell. The Kootenai Tribe of Idaho participated as a cooperator. The Forest Service staff included the Reviewing Officer, Deputy Regional Forester; Responsible Official, Forest Supervisor; IDT Leader, District Ranger, Forest Environmental Coordinator, Meeting Facilitator and Note Taker.

The Objection Reviewing Officer (ORO) responded to the objections with the above meeting and corresponding official letters dated January 27, 2021.

An objection resolution meeting was also held on May 11, 2021, with Matt Holloway who's original objection email was not transmitted to the regional office inbox due to unknown reasons with our computer system. Kootenai National Forest Supervisor, the District Ranger, Forest Staff and IDT leader conducted a call with Matt Holloway to discuss any possible remedies or resolutions to the project. A follow up email with directions to access the Black Ram EA was sent on May 11, 2021, and a corresponding official letter dated May 14, 2021, was sent, as included in the project file.

FS-002173

Black Ram Project Decision Notice and FONSI

## Implementation

Implementation of the decision may occur on, but not before, the fifth business day following the end of the objection filing period, depending upon the availability of funding.

Objections were filed and the pre-decisional review process is complete. In accordance with 36 CFR 218, the objection process is now complete, and the project may begin immediately.

## Contact Information

For further information on this decision, contact Kirsten Kaiser, District Ranger, kirsten.a.kaiser@usda.gov, or Lisa Osborn, Project Leader, lisa.osborn@usda.gov, Three Rivers Ranger District, 12858 US Hwy 2, Troy, MT 59935, (406) 295-4693 during normal business hours.

Approved By:

_____     6/21/2027
Chad W. Benson                        Date
Forest Supervisor
Kootenai National Forest

27

7-ER-1659

Black Ram Project Decision Notice and FONSI

# Appendix A - Harvest and Non-harvest Treatment Tables

**Table 10. Alternative 2 Harvest Treatments**

| Unit | Alt. 2 Harvest Treatment | Silvicultural Prescription | Harvesting Method | Acres by MA | MA, WUI[1] | OG RPOG[1] |
|---|---|---|---|---|---|---|
| 2 | Regeneration | Clearcut w/ Reserves | Tractor | 27 | 6, Yes | No |
| 5 | Regeneration | Clearcut w/ Reserves | Tractor | 11 | 6, Yes | No |
| 6 | Regeneration | Overstory Removal Cut | Tractor | 27 | 6, Yes | No |
| 7 | Regeneration | Clearcut w/ Reserves | Tractor | 22 | 6, Yes | No |
| 10* | Regeneration | Clearcut w/ Reserves | Tractor | 22 | 6, Yes | No |
| 13* | Regeneration | Seed-tree | Tractor | 36 | 6, Yes | No |
| 15* | Regeneration | Clearcut w/ Reserves | Tractor | 27 | 6, Yes | No |
| 17* | Regeneration | Clearcut w/ Reserves | Tractor | 23 | 6, Yes | No |
| 20* | Regeneration | Clearcut w/ Reserves | Skyline | 30 | 6, No | No |
| 22 | Regeneration | Clearcut w/ Reserves | Tractor | 33 | 6, No | No |
| 23* | Regeneration | Clearcut w/ Reserves | Tractor | 86 | 6, No | No |
| 24* | Regeneration | Clearcut w/ Reserves | Skyline | 66 | 6, No | No |
| 25 | Regeneration | Clearcut w/ Reserves | Tractor | 29 | 6, No | No |
| 26* | Regeneration | Clearcut w/ Reserves | Tractor | 53 | 6, No | No |
| 28 | Regeneration | Shelterwood | Tractor | 13 &10 | 2 & 6,Yes | No |
| 29A* | Regeneration | Seedtree | Tractor | 25 & 50 | 2 & 6, Yes | No |
| 29B* | Regeneration | Seedtree | Tractor | 11 & 33 | 2 & 6, Yes | No |
| 30* | Regeneration | Seedtree | Tractor | 47 & 34 | 2 & 6, Yes | No |
| 31* | Regeneration | Clearcut w/ Reserves | Tractor | 41 | 6, Yes | No |
| 33* | Regeneration | Clearcut w/ Reserves | Tractor | 42 & 95 | 2 & 6, No | No |
| 34* | Regeneration | Clearcut w/ Reserves | Tractor | 25 & 28 | 2 & 6, No | No |
| 35* | Regeneration | Clearcut w/ Reserves | Tractor | 19 | 6, No | No |
| 36* | Regeneration | Clearcut w/ Reserves | Tractor | 84 | 6, No | No |

Black Ram Project Decision Notice and FONSI

| Unit | Alt. 2 Harvest Treatment | Silvicultural Prescription | Harvesting Method | Acres by MA | MA, WUI[1] | OG RPOG[1] |
|---|---|---|---|---|---|---|
| 38 | Regeneration | Seedtree | Tractor | 30 | 6, No | No |
| 40* | Regeneration | Seedtree | Tractor | 68 | 6, No | No |
| 41* | Regeneration | Clearcut w/ Reserves | Tractor | 101 | 6, No | No |
| 43* | Regeneration | Seedtree | Tractor | 11 | 6, No | No |
| 44* | Regeneration | Seedtree | Tractor | 49 | 6, No | No |
| 45 | Regeneration | Shelterwood | Tractor | 15 | 6, Yes | No |
| 46 | Regeneration | Clearcut w/ Reserves | Tractor | 36 | 6, Yes | No |
| 50 | Regeneration | Seedtree | Tractor | 18 & 65 | 2 & 6, Yes | No |
| 54 | Regeneration | Clearcut w/ Reserves | Tractor | 33 | 6, Yes | No |
| 56* | Regeneration | Clearcut w/ Reserves | Tractor | 48 | 6, Yes | No |
| 58 | Regeneration | Clearcut w/ Reserves | Tractor | 37 | 6, No | No |
| 61 | Regeneration | Clearcut w/ Reserves | Tractor | 12 | 6, No | No |
| 62* | Regeneration | Clearcut w/ Reserves | Tractor | 53 | 6, No | No |
| 63* | Regeneration | Seedtree | Tractor | 51 | 6, No | No |
| 65* | Regeneration | Clearcut w/ Reserves | Tractor | 66 | 6, No | No |
| 66 | Regeneration | Clearcut w/ Reserves | Tractor | 29 | 6, No | No |
| 67 | Regeneration | Clearcut w/ Reserves | Tractor | 27 | 6, No | No |
| 68 | Regeneration | Clearcut w/ Reserves | Tractor | 47 | 6, No | No |
| 69* | Regeneration | Clearcut w/ Reserves | Tractor | 94 | 6, No | No |
| 71* | Regeneration | Clearcut w/ Reserves | Tractor | 8 | 6, No | No |
| 72* | Regeneration | Clearcut w/ Reserves | Tractor | 63 | 6, No | No |
| 72A* | Regeneration | Clearcut w/ Reserves | Tractor | 95 | 6, No | No |
| 72B* | Regeneration | Clearcut w/ Reserves | Tractor | 35 | 6, No | No |
| 73* | Regeneration | Seedtree | Tractor | 44 | 6, No | No |
| 74 | Regeneration | Seedtree | Tractor | 30 | 6, No | No |
| 76B | Regeneration | Clearcut w/ Reserves | Tractor | 11 | 6, No | No |
| 77 | Regeneration | Clearcut w/ Reserves | Tractor | 27 | 6, No | No |
| 79 | Regeneration | Clearcut w/ Reserves | Tractor | 21 | 6, No | No |

Appendix page 2

7-ER-1661

Black Ram Project Decision Notice and FONSI

| Unit | Alt. 2 Harvest Treatment | Silvicultural Prescription | Harvesting Method | Acres by MA | MA, WUI[1] | OG RPOG[1] |
|---|---|---|---|---|---|---|
| 80 | Regeneration | Seedtree | Tractor | 19 | 6, No | No |
| 81 | Regeneration | Clearcut w/ Reserves | Tractor | 17 | 6, No | No |
| 82* | Regeneration | Clearcut w/ Reserves | Tractor | 65 | 6, No | No |
| 83* | Regeneration | Clearcut w/ Reserves | Tractor | 58 | 6, No | No |
| 84 | Regeneration | Clearcut w/ Reserves | Tractor | 10 | 6, No | No |
| **Total** | **Regeneration** | | | **2,442** | | |
| 1A | Intermediate | Improvement | Tractor | 14 | 6, Yes | OG |
| 1B | Intermediate | Improvement | Tractor | 13 | 6, Yes | RPOG |
| 4 | Intermediate | Improvement | Tractor | 27 | 6, Yes | OG |
| 8 | Intermediate | Improvement | Tractor | 20 | 6, Yes | OG |
| 9 | Intermediate | Improvement | Tractor | 94 | 6, Yes | OG |
| 11 | Intermediate | Improvement | Tractor | 18 | 6, Yes | OG |
| 12 | Intermediate | Improvement | Tractor | 27 | 6, Yes | No |
| 16 | Intermediate | Improvement | Tractor | 6 | 6, Yes | RPOG |
| 18 | Intermediate | Improvement | Tractor | 37 & 21 | 2 & 6, Yes | OG |
| 19 | Intermediate | Improvement | Tractor | 74 | 6, No | No |
| 21 | Intermediate | Improvement | Skyline | 66 | 6, No | No |
| 27 | Intermediate | Improvement | Tractor | 24 | 6, Yes | OG |
| 32 | Intermediate | Improvement | Tractor | 21 | 2, No | No |
| 37 | Intermediate | Improvement | Tractor | 8 & 37 | 2 & 6, No | No |
| 39 | Intermediate | Improvement | Tractor | 37 | 6, No | No |
| 42 | Intermediate | Improvement | Tractor | 20 | 6, No | RPOG |
| 47 | Intermediate | Commercial Thin | Tractor | 104 | 6, No | No |
| 48 | Intermediate | Improvement | Tractor | 18 & 2 | 2 & 6, Yes | RPOG |
| 49 | Intermediate | Improvement | Tractor | 8 | 6, Yes | OG |
| 51 | Intermediate | Improvement | Tractor | 33 | 6, Yes | RPOG |
| 53A | Intermediate | Improvement | Tractor | 1 & 8 | 2 & 6, Yes | OG |
| 53B | Intermediate | Improvement | Tractor | 17 | 6, Yes | OG |
| 55A | Intermediate | Improvement | Tractor | 39 | 6, Yes | No |
| 55B | Intermediate | Improvement | Tractor | 112 | 6, Yes | No |
| 55C | Intermediate | Improvement | Tractor | 122 | 6, Yes | OG |
| 57 | Intermediate | Improvement | Tractor | 85 | 6, No | No |
| 59 | Intermediate | Improvement | Tractor | 70 | 6, No | No |
| 60 | Intermediate | Improvement | Tractor | 37 | 6, No | No |
| 64 | Intermediate | Improvement | Tractor | 40 | 6, No | OG |
| 75 | Intermediate | Improvement | Tractor | 34 | 6, No | RPOG |
| 76A | Intermediate | Improvement | Tractor | 127 | 6, No | OG |
| 78A | Intermediate | Improvement | Tractor | 20 | 6, No | OG |
| 78B | Intermediate | Improvement | Tractor | 19 | 6, No | OG |

Appendix page 3

FS-002177

Black Ram Project Decision Notice and FONSI

| Unit | Alt. 2 Harvest Treatment | Silvicultural Prescription | Harvesting Method | Acres by MA | MA, WUI[1] | OG RPOG[1] |
|---|---|---|---|---|---|---|
| Total | Intermediate Added Unit 12 and 21 | | | 1,460 | | |

*Units that result in openings greater than 40 acres

[1]MA= management area, WUI= Wildland Urban Interface, OG= old growth, RPOG= recruitment potential old growth

Note: some units with the designation of OG or RPOG, may have only a portion of the unit in old growth, see tables below for more information.

**Table 11. Proposed Harvest Treatments in Old Growth in Alternative 2**

| Harvest Unit | Unit Acres | Acres of old Growth | Proposed Harvest Treatment | Fuels Treatment |
|---|---|---|---|---|
| 1A | 14 | 14 | Thin - Improvement cut | Slash and Underburn |
| 4 | 27 | 19 | Thin - Improvement cut | Slash and Excavator Pile |
| 8 | 20 | 20 | Thin - Improvement cut | Slash and Underburn |
| 9 | 94 | 94 | Thin - Improvement cut | Slash and Excavator Pile |
| 11 | 18 | 16 | Thin - Improvement cut | Slash and Excavator Pile |
| 18 | 58 | 58 | Thin - Improvement cut | Slash and Underburn |
| 27 | 24 | 24 | Thin - Improvement cut | Yard Tops |
| 49 | 8 | 8 | Thin - Improvement cut | Slash and Excavator Pile |
| 53A | 9 | 9 | Thin - Improvement cut | Slash and Excavator Pile |
| 53B | 17 | 17 | Thin - Improvement cut | Slash and Excavator Pile |
| 55C | 122 | 120 | Thin - Improvement cut | Slash and Excavator Pile |
| 64 | 40 | 17 | Thin - Improvement cut | Slash and Excavator Pile |
| 76A | 127 | 125 | Thin - Improvement cut | Yard Tops |
| 78A | 20 | 20 | Thin - Improvement cut | Slash and Excavator Pile |
| 78B | 19 | 18 | Thin - Improvement cut | Slash and Excavator Pile |
| **Total Acres** | **617** | **579** | | |

**Table 12. Proposed Harvest Treatments in Recruitment Potential Old Growth in Alternative 2**

| Harvest Unit | Unit Acres | Acres of Recruitment Potential Old Growth | Proposed Harvest Treatment | Fuels Treatment |
|---|---|---|---|---|
| 1B | 13 | 13 | Thin - Improvement cut | Slash and Underburn |
| 16 | 6 | 6 | Thin - Improvement cut | Slash and Excavator Pile |
| 42 | 20 | 20 | Thin - Improvement cut | Slash and Excavator Pile |
| 48 | 20 | 18 | Thin - Improvement cut | Slash and Excavator Pile |
| 51 | 33 | 33 | Thin - Improvement cut | Slash and Excavator Pile |
| 75 | 34 | 33 | Thin - Improvement cut | Yard Tops |
| **Total Acres** | **126** | **123** | | |

**Table 13. Proposed Non-harvest Treatments in Old Growth in Alternative 2**

| Fuels Unit # | Unit Acres | Acres of Old Growth within Unit | Proposed Fuels Treatment |
|---|---|---|---|
| K | 300 | 66 | Ecosystem Burn |

Appendix page 4

7-ER-1663

Black Ram Project Decision Notice and FONSI

| Fuels Unit # | Unit Acres | Acres of Old Growth within Unit | Proposed Fuels Treatment |
|---|---|---|---|
| L | 677 | 16 | Ecosystem Burn |
| O | 172 | 102 | Ecosystem Burn |
| F-3 | 60 | 10 | Slash and Excavator pile |
| F-8 | 14 | 14 | Slash and Excavator pile |
| F-13 | 26 | 23 | Slash and Excavator pile |
| F-14 | 116 | 112 | Slash and Hand pile |
| **Total Acres** | **1,365** | **343** | |

**Table 14. Proposed Non-harvest Treatments in Recruitment Potential Old Growth in Alternative 2**

| Fuels Unit | Unit Acres | Acres of Recruitment Potential Old Growth | Proposed Fuels Treatment |
|---|---|---|---|
| H | 340 | 241 | Ecosystem Burn |
| K | 300 | 18 | Ecosystem Burn |
| O | 172 | 2 | Ecosystem Burn |
| F-4 | 63 | 20 | Slash and Excavator pile |
| F-5 | 20 | 7 | Slash and Excavator pile |
| F-6 | 16 | 16 | Slash and Excavator pile |
| F-12 | 6 | 6 | Slash and Excavator pile |
| F-13 | 26 | 3 | Slash and Excavator pile |
| 86 | 28 | 2 | Fuel break |
| 88 | 8 | 2 | Fuel break |
| 88A | 4 | 1 | Fuel break |
| **Total Acres** | **983** | **318** | |

**Table 15. Harvest Fuel Break Treatments for Alternative 2**

| Unit | Treatment | Acres | MA* | Acres in OG or RPOG* |
|---|---|---|---|---|
| 85 | Fuel break | 3 & 7 | 2 & 3 | None |
| 86 | Fuel break | 28 | 6 | 2 in RPOG |
| 86A | Fuel break | 4 | 6 | None |
| 86B | Fuel break | 2 | 6 | None |
| 87 | Fuel break | 3 | 6 | None |
| 88 | Fuel break | 8 | 6 | 2 in RPOG |
| 88A | Fuel break | 6 | 6 | 1 in RPOG |
| 89 | Fuel break | 15 | 6 | None |
| **Total** | | **76** | | |

*MA = management area, OG = old growth, RPOG = recruitment potential old growth

Black Ram Project Decision Notice and FONSI

**Table 16. Non-harvest Fuel Treatment Units for Alternative 2**

| Unit | Non-harvest Treatment | Current Condition | Objective | Fuels Treatment | MA/WUI[1] | Acres by MA | Acres in OG or RPOG |
|------|----------------------|-------------------|-----------|-----------------|-----------|-------------|---------------------|
| A | Ecosystem Burn | High elevation site. Burned in 1931. Forage and huckleberry production stagnant due to canopy closure, tree encroachment into brush fields, and/or lack of fire. | Apply fire to a fire adapted ecosystem and capture ecosystem benefits of emulated fire. Enhance natural openings, create new openings, and stimulate the growth and production of fire-adapted forage/browse species for a variety of wildlife, including conditions suitable for huckleberry production within Core habitat to benefit grizzly bear recovery efforts. | Fuels Augmentation, outside of IRA, involving selective slashing of understory less than 7"DBH may precede aerial and/or hand ignition to create a mixed severity fire. | 6 No | 274 | None |
| B | Ecosystem Burn | High elevation site. Burned in 1931. Forage and huckleberry production stagnant due to canopy closure, tree encroachment into brush fields, and/or lack of fire. | Apply fire to a fire adapted ecosystem and capture ecosystem benefits of emulated fire. Enhance natural openings, create new openings, and stimulate the growth and production of fire-adapted forage/browse species for a variety of wildlife, including conditions suitable for huckleberry production within Core habitat to benefit grizzly bear recovery efforts. | Fuels Augmentation in scattered pockets up to a total of 200 acres, involving selective slashing of understory less than 7"DBH may precede aerial and/or hand ignition to create a mixed severity fire.[2] | 5a No | 364 | None |
| C | Ecosystem Burn | Mid to high elevation site. Burned in 1931. Forage and huckleberry production stagnant due to canopy closure, tree encroachment into brush fields, and/or lack of fire. | Apply fire to a fire adapted ecosystem and capture ecosystem benefits of emulated fire. Enhance natural openings, create new openings, and stimulate the growth and production of fire-adapted forage/browse species for a variety of wildlife, including conditions suitable for huckleberry production within Core habitat to benefit grizzly bear recovery efforts. | Fuels Augmentation in scattered pockets up to a total of 200 acres, involving selective slashing of understory less than 7"DBH may precede aerial and/or hand ignition to create a mixed severity fire.[2] | 5a & 6 No | 609 & 119 | None |

Black Ram Project Decision Notice and FONSI

| Unit | Non-harvest Treatment | Current Condition | Objective | Fuels Treatment | MA/ WUI[1] | Acres by MA | Acres in OG or RPOG |
|---|---|---|---|---|---|---|---|
| D | Ecosystem Burn | Mid to high elevation site. Burned in 1931. Forage and huckleberry production stagnant due to canopy closure, tree encroachment into brush fields, and/or lack of fire. | Apply fire to a fire adapted ecosystem and capture ecosystem benefits of emulated fire. Enhance natural openings, create new openings, and stimulate the growth and production of fire-adapted forage/browse species for a variety of wildlife, including conditions suitable for huckleberry production within Core habitat to benefit grizzly bear recovery efforts. | Fuels Augmentation in scattered pockets up to a total of 200 acres, involving selective slashing of understory less than 7"DBH may precede aerial and/or hand ignition to create a mixed severity fire.[2] | 5a & 6 No | 450 & 14 | None |
| E | Ecosystem Burn | High elevation site. Burned in 1931. Forage and huckleberry production stagnant due to canopy closure, tree encroachment into brush fields, and/or lack of fire. | Apply fire to a fire adapted ecosystem and capture ecosystem benefits of emulated fire. Enhance natural openings, create new openings, and stimulate the growth and production of fire-adapted forage/browse species for a variety of wildlife, including conditions suitable for huckleberry production within Core habitat to benefit grizzly bear recovery efforts. | Fuels Augmentation, outside of IRA, involving selective slashing of understory less than 7"DBH may precede aerial and/or hand ignition to create a mixed severity fire | 5a & 6 No | 100 & 127 | None |
| G | Ecosystem Burn | Mid elevation site with dry habitat species. Burned in 1889. Forage and huckleberry production stagnant due to canopy closure, tree encroachment, and/or lack of fire. Increased fire risk due to ladder/fuel loads. | Apply fire to maintain fire-adapted species and capture ecosystem benefits of emulated fire while reducing fuel loadings in WUI. Fire would thin encroaching conifers and enhance natural openings which would improve browse and forage availability in potential big game winter range as well as improve spring foraging opportunities and conditions suitable for huckleberry production. Maintain and enhance open western larch/Douglas-fir/ponderosa pine stands. | Fuels Augmentation involving selective slashing of understory less than 7"DBH may precede aerial and/or hand ignition to create a mixed severity fire. | 6 Yes | 408 | None |

FS-002181

Black Ram Project Decision Notice and FONSI

| Unit | Non-harvest Treatment | Current Condition | Objective | Fuels Treatment | MA/WUI[1] | Acres by MA | Acres in OG or RPOG |
|------|----------------------|-------------------|-----------|-----------------|-----------|-------------|---------------------|
| H | Ecosystem Burn | Low to mid elevation site with dry habitat species. Burned in 1889. Forage and huckleberry production stagnant due to canopy closure, tree encroachment, and/or lack of fire. Increased fire risk due to ladder/fuel loads. | Apply fire to maintain fire-adapted species and capture ecosystem benefits of emulated fire while reducing fuel loadings in WUI. Fire would thin encroaching conifers and enhance/maintain openings which would improve browse and forage availability in potential big game winter range as well as improve spring foraging opportunities and conditions suitable for huckleberry production. Maintain and enhance open western larch/Douglas-fir/ponderosa pine stands. | Fuels Augmentation involving selective slashing of understory less than 7"DBH may precede aerial and/or hand ignition to create a mixed severity fire. | 6 Yes | 340 | 241 in RPOG |
| I | Ecosystem Burn | Mid elevation site with dry habitat species. Harvest unit from the Garver Timber Sale. | Maintain open canopy, low fuel loadings in the WUI. | Fuels Augmentation involving selective slashing of understory less than 7"DBH may precede aerial and/or hand ignition to create a low severity fire. | 6 Yes | 58 | None |
| J | Ecosystem Burn | Low to mid elevation site with dry habitat species. Harvest unit from the Garver Timber Sale. | Maintain open canopy, low fuel loadings in the WUI. | Fuels Augmentation involving selective slashing of understory less than 7"DBH may precede aerial and/or hand ignition to create a low severity fire. | 6 Yes | 72 | None |

Black Ram Project Decision Notice and FONSI

| Unit | Non-harvest Treatment | Current Condition | Objective | Fuels Treatment | MA/ WUI[1] | Acres by MA | Acres in OG or RPOG |
|---|---|---|---|---|---|---|---|
| K | Ecosystem Burn | Low to mid elevation site with dry habitat species. Burned in 1889. Contains some previous harvest treatment units from Garver timber sale and some Old Growth. | Apply fire to maintain fire-adapted species and capture ecosystem benefits of emulated fire while reducing fuel loadings in WUI. Thin encroaching conifers and enhance openings which would improve browse and forage availability in potential big game winter range as well as improve spring foraging opportunities and conditions suitable for huckleberry production. Maintain Old Growth characteristics and enhance open western larch/Douglas-fir/ponderosa pine stands. | Fuels Augmentation involving selective slashing of understory less than 7"DBH may precede aerial and/or hand ignition to create a low severity fire. | 2 & 6 Yes | 2 & 298 | 66 in OG 18 in RPOG |
| L | Ecosystem Burn | Low to mid elevation site with dry habitat species. Portion burned in 1924 and another portion in 1931. Contains some previous harvest and underburn treatment units from Gator Copter Timber Sale and some Old Growth. | Apply fire to maintain fire-adapted species and capture ecosystem benefits of emulated fire while reducing fuel loadings in WUI. Fire would thin encroaching conifers and enhance openings which would improve browse and forage availability in potential big game winter range as well as improve spring foraging opportunities and including conditions suitable for huckleberry production within Core habitat to benefit grizzly bear recovery efforts. Maintain Old Growth characteristics and enhance open western larch/ Douglas-fir/ponderosa pine stands. | Fuels Augmentation involving selective slashing of understory less than 7"DBH may precede aerial and/or hand ignition to create a mixed severity fire. | 2 & 6 Yes | 20 & 657 | 16 in OG |

FS-002183

Black Ram Project Decision Notice and FONSI

| Unit | Non-harvest Treatment | Current Condition | Objective | Fuels Treatment | MA/ WUI[1] | Acres by MA | Acres in OG or RPOG |
|---|---|---|---|---|---|---|---|
| M | Ecosystem Burn | Mid to high elevation site. Part burned in 1931, and another part in 1889. Forage and huckleberry production stagnant due to canopy closure, tree encroachment into brush fields, and/or lack of fire. | Apply fire to a fire adapted ecosystem and capture ecosystem benefits of emulated fire. Enhance natural openings, create new openings, and stimulate the growth and production of fire-adapted forage/browse species for a variety of wildlife, including conditions suitable for huckleberry production within Core habitat to benefit grizzly bear recovery efforts. | Fuels Augmentation, outside of IRA, involving selective slashing of understory less than 7"DBH may precede aerial and/or hand ignition to create a mixed severity fire. | 2, 5a, & 6 No | 108, 676, & 1,060 | None |
| N | Ecosystem Burn | Mid elevation site with dry habitat species. Portion burned in 1860, and a portion with previous harvest history from the Garver Timber Sale. Forage and huckleberry production stagnant due to canopy closure, tree encroachment, and/or lack of fire. | Apply fire to maintain fire-adapted species and capture ecosystem benefits of emulated fire while reducing fuel loadings in WUI. Thin encroaching conifers and enhance openings which would improve browse and forage availability in potential big game winter range as well as improve spring foraging opportunities. Maintain and enhance open western larch/Douglas-fir/ponderosa pine stands. | Fuels Augmentation involving selective slashing of understory less than 7"DBH may precede aerial and/or hand ignition to create a mixed severity fire. | 2 & 6 WUI | 70 & 267 | None |
| O | Ecosystem Burn | Low to mid elevation site with dry habitat species. Contains a previous harvest treatment unit from Wood Garden Timber Sale and contains Old Growth. | Apply fire to maintain fire-adapted species and capture ecosystem benefits of emulated fire while reducing fuel loadings in WUI. Thin encroaching conifers and enhance openings which would improve browse and forage availability in potential big game winter range as well as improve spring foraging opportunities. Maintain Old Growth characteristics and enhance open western larch/Douglas-fir/ponderosa pine stands. | Fuels Augmentation involving selective slashing of understory less than 7"DBH may precede aerial and/or hand ignition to create a mixed severity fire. | 3 & 6 Yes | 23 & 149 | 102 in OG 12 in RPOG |

Appendix page 10

7-ER-1669

Black Ram Project Decision Notice and FONSI

| Unit | Non-harvest Treatment | Current Condition | Objective | Fuels Treatment | MA/ WUI[1] | Acres by MA | Acres in OG or RPOG |
|---|---|---|---|---|---|---|---|
| P | Ecosystem Burn | Mid elevation site with dry habitat species. Burned in 1889. Forage and huckleberry production stagnant due to canopy closure, tree encroachment, and/or lack of fire. | Apply fire to a fire adapted ecosystem and capture ecosystem benefits of emulated fire. Enhance natural openings, create new openings, and stimulate the growth and production of fire-adapted forage/browse species for a variety of wildlife, including conditions suitable for huckleberry production within Core habitat to benefit grizzly bear recovery efforts. | Fuels Augmentation involving selective slashing of understory less than 7"DBH may precede aerial and/or hand ignition to create a mixed severity fire. | 6 No | 341 | None |
| Q | Ecosystem Burn | Mid to high elevation site. Part burned in 1889, and another part in 1860. Forage and huckleberry production stagnant due to canopy closure, tree encroachment into brush fields, and/or lack of fire. | Apply fire to a fire adapted ecosystem and capture ecosystem benefits of emulated fire. Enhance natural openings, create new openings, and stimulate the growth and production of fire-adapted forage/browse species for a variety of wildlife, including conditions suitable for huckleberry production within Core habitat to benefit grizzly bear recovery efforts. | Fuels Augmentation involving selective slashing of understory less than 7"DBH may precede aerial and/or hand ignition to create a mixed severity fire. | 6 No | 428 | None |
| Total | Ecosystem Burns | | | | | 7,034 | |
| F1 | Ladder Fuels Reduction | Low elevation site with dry habitat species. Burned in 1889. Increased fire risk due to ladder/fuel loads. | Increase canopy base heights, reduce and/or maintain low fuel conditions in the WUI. Increase defensible space around private property and improve accessibility for firefighters and public in the event of a wildfire. | Selective slashing of understory less than 7" DBH. Slash will be excavator or hand piled and then burn piles. | 6 Yes | 72 | None |
| F2 | Ladder Fuels Reduction | Low elevation site with dry habitat species. Burned in 1889. Increased fire risk due to ladder/fuel loads. | Increase canopy base heights, reduce and/or maintain low fuel conditions in the WUI. Increase defensible space around private property and improve accessibility for firefighters and public in the event of a wildfire. | Selective slashing of understory less than 7"DBH. Slash will be excavator or hand piled and then burn piles. | 2 & 6 Yes | 38 & 11 | None |

Appendix page 11

7-ER-1670

Black Ram Project Decision Notice and FONSI

| Unit | Non-harvest Treatment | Current Condition | Objective | Fuels Treatment | MA/WUI[1] | Acres by MA | Acres in OG or RPOG |
|------|----------------------|-------------------|-----------|-----------------|-----------|-------------|---------------------|
| F3 | Ladder Fuels Reduction | Low elevation site with dry habitat species. Increased fire risk due to ladder/fuel loads. | Increase canopy base heights, reduce and/or maintain low fuel conditions in the WUI. Increase defensible space around private property and improve accessibility for firefighters and public in the event of a wildfire. | Selective slashing of understory less than 7"DBH. Slash will be excavator or hand piled and then burn piles. | 2 & 6 Yes | 47 & 13 | 10 in OG |
| F4 | Ladder Fuels Reduction | Low elevation site with dry habitat species. Burned in 1889. Increased fire risk due to ladder/fuel loads. | Increase canopy base heights, reduce and/or maintain low fuel conditions in the WUI. Increase defensible space around private property and improve accessibility for firefighters and public in the event of a wildfire. | Selective slashing of understory less than 7"DBH. Slash will be excavator or hand piled and then burn piles. | 6 Yes | 63 | 20 in RPOG |
| F5 | Ladder Fuels Reduction | Low elevation site with dry habitat species. Burned in 1889. Increased fire risk due to ladder/fuel loads. | Increase canopy base heights, reduce and/or maintain low fuel conditions in the WUI. Increase defensible space around private property and improve accessibility for firefighters and public in the event of a wildfire. | Selective slashing of understory less than 7"DBH. Slash will be excavator or hand piled and then burn piles. | 2 & 6 Yes | 1 & 19 | 7 in RPOG |
| F6 | Ladder Fuels Reduction | Low elevation site with dry habitat species. Burned in 1889. Increased fire risk due to ladder/fuel loads. | Increase canopy base heights, reduce and/or maintain low fuel conditions in the WUI. Increase defensible space around private property and improve accessibility for firefighters and public in the event of a wildfire. | Selective slashing of understory less than 7"DBH. Slash will be excavator or hand piled and then burn piles. | 2 Yes | 16 | 16 in RPOG |
| F7 | Ladder Fuels Reduction | Low elevation site with dry habitat species. Burned in 1889. Increased fire risk due to ladder/fuel loads. | Increase canopy base heights, reduce and/or maintain low fuel conditions in the WUI. Increase defensible space around private property and improve accessibility for firefighters and public in the event of a wildfire. | Selective slashing of understory less than 7"DBH. Slash will be excavator or hand piled and then burn piles. | 6 Yes | 31 | None |

Black Ram Project Decision Notice and FONSI

| Unit | Non-harvest Treatment | Current Condition | Objective | Fuels Treatment | MA/ WUI[1] | Acres by MA | Acres in OG or RPOG |
|------|----------------------|-------------------|-----------|-----------------|-----------|-------------|---------------------|
| F8 | Ladder Fuels Reduction | Low elevation site with dry habitat species. Burned in 1889. Increased fire risk due to ladder/fuel loads. | Increase canopy base heights, reduce and/or maintain low fuel conditions in the WUI. Increase defensible space around private property and improve accessibility for firefighters and public in the event of a wildfire. | Selective slashing of understory less than 7"DBH. Slash will be excavator or hand piled and then burn piles. | 6 Yes | 14 | 14 in OG |
| F9 | Ladder Fuels Reduction | Low elevation site with dry habitat species. Increased fire risk due to ladder/fuel loads. | Increase canopy base heights, reduce and/or maintain low fuel conditions in the WUI. Increase defensible space around private property and improve accessibility for firefighters and public in the event of a wildfire. | Selective slashing of understory less than 7" DBH. Slash will be excavator or hand piled and then burn piles. | 2 Yes | 6 | None |
| F10 | Ladder Fuels Reduction | Low elevation site with dry habitat species. Increased fire risk due to ladder/fuel loads. | Increase canopy base heights, reduce and/or maintain low fuel conditions in the WUI. Increase defensible space around private property and improve accessibility for firefighters and public in the event of a wildfire. | Selective slashing of understory less than 7" DBH. Slash will be excavator or hand piled and then burn piles. | 2 Yes | 7 | None |
| F11 | Ladder Fuels Reduction | Low elevation site with dry habitat species. Increased fire risk due to ladder/fuel loads. | Increase canopy base heights, reduce and/or maintain low fuel conditions in the WUI. Increase defensible space around private property and improve accessibility for firefighters and public in the event of a wildfire. | Selective slashing of understory less than 7" DBH. Slash will be excavator or hand piled and then burn piles. | 2 Yes | 31 | None |
| F12 | Ladder Fuels Reduction | Low elevation site with dry habitat species. Burned in 1889. Increased fire risk due to ladder/fuel loads. | Increase canopy base heights, reduce and/or maintain low fuel conditions in the WUI. Increase defensible space around private property and improve accessibility for firefighters and public in the event of a wildfire. | Selective slashing of understory less than 7" DBH. Slash will be excavator or hand piled and then burn piles. | 2 & 6 Yes | 5 & 1 | 6 in RPOG |

Appendix page 13

FS-002187

Black Ram Project Decision Notice and FONSI

| Unit | Non-harvest Treatment | Current Condition | Objective | Fuels Treatment | MA/ WUI[1] | Acres by MA | Acres in OG or RPOG |
|------|----------------------|-------------------|-----------|-----------------|-----------|-------------|---------------------|
| F13 | Ladder Fuels Reduction | Low elevation site with dry habitat species. Burned in 1889. Increased fire risk due to ladder/fuel loads. | Increase canopy base heights, reduce and/or maintain low fuel conditions in the WUI. Increase defensible space around private property and improve accessibility for firefighters and public in the event of a wildfire. | Selective slashing of understory less than 7" DBH. Slash will be excavator or hand piled and then burn piles. | 2 Yes | 26 | 23 in OG 3 in RPOG |
| F14 | Ladder Fuels Reduction | Low elevation site with dry habitat species. Increased fire risk due to ladder/fuel loads. | Increase canopy base heights, reduce and/or maintain low fuel conditions in the WUI. Increase defensible space around private property and improve accessibility for firefighters and public in the event of a wildfire. Improve scenic quality in the Wood Creek Larch Scenic Area. | Selective slashing of understory less than 7" DBH. Slash will be excavator or hand piled and then burn piles. | 3 & 6 Yes | 114 & 2 | 112 in OG |
| F16 | Ladder Fuels Reduction | Regeneration Unit from previous harvest. Low elevation site with dry habitat species. Increased fire risk due to ladder/fuel loads. | Increase spacing between trees, reduce and/or maintain low fuel conditions in the WUI. Increase defensible space around private property and improve accessibility for firefighters and public in the event of a wildfire. Complete fuel break along Hensley face road. | Selective slashing or mastication of trees less than 7" DBH. Slash will be excavator or hand piled and then burn piles. | 6 Yes | 2 | None |
| Total | Ladder Fuels Reduction | | | | | 519 | |

[1]MA – management area, WUI = Wildland Urban Interface, OG= old growth, RPOG = recruitment potential old growth

[2]This proposed activity is consistent with 36 CFR 294.13(b)(2); which states that the cutting (slashing) of timber is incidental to the implantation of a management activity not otherwise prohibited.

Appendix page 14

7-ER-1673

Black Ram Project Decision Notice and FONSI

**Table 17. Precommercial Thinning Treatments and occurrence within Lynx Habitat for Alternative 2**

| PCT Unit | MA | Acres | Proposed Treatment | Within LAU | Lynx Habitat |
|---|---|---|---|---|---|
| 1 | 6 | 21 | Prune white pine | Yes | Yes |
| 2 | 3 & 6 | 38 | PCT, Prune white pine | No | NA |
| 3 | 6 | 6 | PCT, Prune white pine | No | NA |
| 4 | 6 | 31 | Prune white pine | Yes | Yes |
| 5 | 6 | 27 | Prune white pine | Yes | Yes |
| 6 | 6 | 25 | Prune white pine | Yes | Yes |
| 7 | 3 & 6 | 23 | Below 4000'- PCT, Above 4000'- prune western white pine | Yes | Yes |
| 8 | 6 | 25 | PCT, Prune white pine | Yes | Yes |
| 9 | 2 & 6 | 34 | Below 4000'- PCT, Above 4000'- prune western white pine | Yes | Yes |
| 10 | 6 | 5 | PCT, Prune white pine | No | NA |
| 11 | 6 | 25 | Prune white pine | Yes | Yes |
| 12 | 6 | 10 | Prune white pine | Yes | Yes |
| 13 | 6 | 18 | Prune white pine | Yes | Yes |
| 14 | 6 | 65 | PCT, Prune white pine | No | NA |
| 15 | 6 | 46 | Below 4000'- PCT, Above 4000'- prune western white pine | Yes | No: warm and dry site, western larch |
| 16 | 6 | 12 | Prune white pine | Yes | No: warm and dry site, western larch, Douglas-fir lacks high stem density |
| 17 | 6 | 25 | Below 4000'- PCT, Above 4000'- prune western white pine | Yes | No: warm and dry site, western larch, Douglas-fir, lacks high stem density |
| 18 | 6 | 13 | PCT, Prune white pine | No | NA |
| 19 | 6 | 27 | PCT, Prune white pine | No | NA |
| 20 | 6 | 103 | Below 4000'- PCT, Above 4000'- prune western white pine | Yes | No: warm and dry site, western larch, Douglas-fir, and grand fir |
| 21 | 6 | 8 | PCT, Prune white pine | No | NA |
| 22 | 6 | 25 | PCT, Prune white pine | No | NA |
| 23 | 6 | 6 | PCT, Prune white pine | No | NA |

PCT= Precommercial thinning treatment to reduce competition among younger trees.

Prune white pine= Limb the trees up to one-third overall height starting at ground level

Appendix page 15

7-ER-1674

Black Ram Project Decision Notice and FONSI

# Appendix B – Road Work Tables

**Table 18. National Forest System Roads Proposed for Storage for Alternative 2**

| Road # | Road Name | Length of Road Segment | Level of Road Work* |
|--------|-----------|------------------------|---------------------|
| 523 | Middle West Fork Yaak | 0.6 | 1 |
| 5821 | Grubstake | 1.2 | 1 |
| 5821D | Grubstake D | 3.6 | 1 |
| 5821E | Grubstake E | 1.8 | 1 |
| 5856 | Hensley Creek | 2.1 | 1 |
| 5873 | Waper Ridge | 4.4 | 1 |
| 5873B | Waper Ridge B | 0.6 | 1 |
| 5873E | Waper Ridge E | 0.6 | 1 |
| 5874 | Slim Creek | 0.7 | 1 |
| 5877 | Lower Slim | 2.3 | 2-3 |
| 5879 | Rausch Point | 0.9 | 1 |
| 5879C | Rausch Point C | 0.2 | 1 |
| 5879G | Rausch Point G | 0.4 | 1 |
| 5921 | Beetle | 2.5 | 2-3 |
| 5921A | Beetle A | 0.7 | 1 |
| 5921B | Beetle B | 1.4 | 1 |
| 6134 | Lower Pete Creek Loop milepost 0.9 – 3.38 | 2.48 | 1 |
| 6134 | Lower Pete Creek Loop milepost 3.38 – 5.0 | 1.6 | 2-3 |
| 6134A | Lower Pete Creek Loop A | 1.4 | 1 |
| 6840 | White Pete | 2.5 | 1 |
| **Total Miles Level 1 Road Storage** | | **25.6** | |
| **Total Miles Level 2-3 Road Storage** | | **6.4** | |
| **Total Miles Road Storage – these roads provide for in-kind replacement of Core:** | | **32.0** | |

*Level 1: block road, water bar and seed; Level 2: block road, water bar, pull pipes and seed; Level 3: block road, water bar, pull pipes, pull unstable side cast and seed. Not all the activities may occur for each level. For example, under Level 2, waterbars would not be installed if not needed. Level 1 roads could be stored with no work needed to stabilize them.

**Table 19. National Forest System Roads (NFSR) Proposed for Decommissioning for Alternative 2**

| Road # | Road Name | Length of Road Segment | Level of Road Work* |
|--------|-----------|------------------------|---------------------|
| 14305 | Unnamed Road | 0.14 | 1 |
| 14310 | Unnamed Road | 0.16 | 1 |
| 1520A | Unnamed Road | 0.14 | 1 |
| 276D | West Fork Yaak D | 0.52 | 1 |
| 276P | West Fork Yaak P | 0.59 | 1 |
| 3102 | Unnamed Road | 0.08 | 1 |
| 3386 | Unnamed Road | 0.96 | 3-4 |

7-ER-1675

FS-002190

Black Ram Project Decision Notice and FONSI

| Road # | Road Name | Length of Road Segment | Level of Road Work* |
|---|---|---|---|
| 3388A | Unnamed Road | 0.22 | 3-4 |
| 338J | Pete Cr/Hawkins J | 0.51 | 1 |
| 338K | Pete Creek K | 0.87 | 3-4 |
| 338Q | Pete Cr/Hawkins Q | 1.42 | 1 |
| 338R | Pete Cr/Hawkins R | 1.24 | 1 |
| 338T | Pete Cr/Hawkins T | 0.14 | 1 |
| 338X | Pete Cr/Hawkins X | 0.20 | 1 |
| 338Y | Pete Cr/Hawkins Y | 0.15 | 1 |
| 5834A | Unnamed Road | 0.18 | 1 |
| 5835I | Unnamed Road | 0.67 | 1 |
| 5842A | Looby A | 0.74 | 1 |
| 5848A | Unnamed Road | 0.46 | 1 |
| 5856L | Hensley Creek L | 0.45 | 1 |
| 5859A | Woodchuck A | 0.50 | 3-4 |
| 5872 | Unnamed Road | 0.24 | 1 |
| 5872A | Unnamed Road | 0.15 | 1 |
| 5874C | Slim Creek C | 0.13 | 1 |
| 5887A | Unnamed Road | 0.19 | 1 |
| 5888B | Orb B | 0.49 | 1 |
| 5900A | Jungle Creek A | 0.60 | 1 |
| 5902 | West Fork Yaak Basin | 2.37 | 3-4 |
| 5903A | Grubstake Summit A | 0.24 | 1 |
| 5907 | Unnamed Road | 0.18 | 3-4 |
| 5907A | Unnamed Road | 0.10 | 1 |
| 5908 | Upper West Fork Yaak | 0.36 | 3-4 |
| 5913D | Unnamed Road | 0.39 | 1 |
| 5914A | Davis Creek A | 0.49 | 1 |
| 5919D | West Side Pete Creek D | 0.50 | 3-4 |
| 5919D | West Side Pete Creek D | 0.70 | 1 |
| 7485A | Unnamed Road | 0.24 | 1 |
| 7488A | Unnamed Road | 1.51 | 1 |
| 7489A | Unnamed Road | 0.23 | 1 |
| 748E | Beetle Creek North Creek E | 0.43 | 1 |
| **Total Miles of Level 1 Decommissioning** | | **13.92** | |
| **Total Miles of Level 3 or 4 Decommissioning** | | **5.96** | |
| **Total NFSRs Removed from the system** | | **19.88** | |

*Level 1: Blocking the entrance and restoring vegetation. Culverts, if existing, remain in place; Level 2: Blocking the entrance, restoring vegetation, scarifying, installing waterbars. Culverts, if existing, remain in place; Level 3: Reestablishing drainage-ways, installing waterbars, shallow ripping, removing unstable fills, pulling back road shoulders, scattering slash on roadbed. Culverts removed; Level 4: Reestablishing drainage-ways, installing waterbars, deep ripping, removing unstable fills, pulling back road shoulders, scattering slash on roadbed, partial recontouring. Culverts removed. Not all the activities may occur for each level. For example, under Level 2, waterbars would not be installed if not needed.

Black Ram Project Decision Notice and FONSI

**Table 20. Undetermined Roads to be Decommissioned for Alternative 2**

| Road Number | Length of Road Segment (miles) | Level of Road Work |
|---|---|---|
| 926A | 0.1 | 1 |
| 5826C | 0.22 | 1 |
| 5902A | 0.64 | 3-4 |
| 5902B | 0.93 | 3-4 |
| 5926A | 0.76 | 1 |
| 16134 | 0.23 | 1 |
| 92xx | 0.17 | 1 |
| **Total Miles** | **3.05** | |

**Table 21. Undetermined Roads to be added to the National Forest System for Alternative 2**

| Road Number | Length of Road Segment |
|---|---|
| 508-28.8 | 0.02 |
| 5919E | 0.47 |
| 6134B | 1.13 |
| 926A | 0.2 |
| **Total Miles of Undetermined Road to be added to NFS** | **1.82** |

**Table 22. Construction of New Forest System Roads for Alternative 2**

| Road Type[1] | Road Length in miles | Provides access to |
|---|---|---|
| NFSR | 0.9 | Rampike area to access Unit 72, 72A, and 72B off roads 5895 and 523A |
| NFSR | 0.5 | Rampike area to access Unit 76 off road 5895[2] |
| NFSR | 0.3 | Access to Units 15, 16, and 17 off road 5826 A |
| NFSR | 1.6 | Lower Hensley Face area to access Units 54, 55 A, 55 B, and 55C[2] off road 5890 |
| **Total Miles** | **3.3** | **Unit 14 was dropped but some specialists analyzed for road construction in that unit, so total road construction could say 3.8 miles in the specialist sections.** |

[1]NFSR = National Forest System Road
[2]These new roads will be built through old growth.

Appendix page 18

FS-002192

Black Ram Project Decision Notice and FONSI

# Appendix C – Design Features

To avoid or minimize potential adverse impacts to resources from this project, the following design features would be incorporated into the Selected Alternative for the Black Ram Project.

## Coarse Woody Debris (CWD) Retention Recommendations for Soils and Wildlife

CWD retention shall follow the guidelines below except within 200 feet of non-Forest Service property. Within 200 feet of non-Forest Service property, unsound decomposing woody material and woody material 7 inches DBH or greater would be the only material left on site;

The largest diameter material is desired, however material larger than 3 inches in diameter at the small end is considered CWD.

Table 23. Coarse Woody Debris Retention by Biophysical Settings by Unit

| Biophysical Setting | Tons per Acre | Unit(s)* |
|---|---|---|
| Warm/Dry (VRUs 1-3) | Drier Sites: 5 - 12 | 4, 36, **54** |
| | Moister Sites: 10 - 20 | 28, 29B, 55A, 55B, 55C |
| Warm/Moist (VRUs 4-6) | 12 - 33 | 8, 10, 11, 12, 13, 16, 17, 18, 20, 21, 22, 23, 24, 25, 27, 29A, 30, 31, 32, **33, 34**, 37, 38, 39, 40, 41, 45, **46**, 47, 48, 49, 50, 51, **53A**, 53B, **56**, 57, 58, **59**, 60, 61, 62, 63, 64, 65, 66, 71, 77, 78A, 78B |
| | 17-33 | 19, 26, 35, 42, 67, 68, 69, 72, 73, 74, 75, 76A, 76B |
| Subalpine (VRUs 7-10) | Moister Sites: 12-25 | 1A, 1B, **2, 5**, 6, **7**, 9, 14, 15 |
| | Drier Sites: 7-15 | 43, 44, **79, 80**, 81, 82, 83, **84** |

*Units in **Bold** are known to be deficient in CWD by at least 1 ton per acre.

## Historic Resources

- ♦ If an inadvertent discovery occurs of historic resources during any ground disturbing activities, work in the area shall stop and KNF heritage personnel and district ranger would be notified immediately. Project work in the area of inadvertent discovery may resume once KNF heritage personnel have assessed the discovery and appropriate resource protection measures have been implemented.

- ♦ Known and identified intact portions of eligible or unevaluated historic resources would be flagged and avoided during project implementation.

- ♦ Protect cultural feature in Non-harvest Fuels Unit K.

## Noxious Weeds

Measures would be taken to reduce the potential noxious weed introduction and spread; see Appendix A in the KNF Invasive Plant Management FEIS (U.S. Department of Agriculture, Forest Service, 2007a). Weed management in the Project Area would be conducted in accordance with the April 2007 KNF Invasive Plant Management Record of Decision. Any work requiring reseeding would use the KNF

FS-002193

approved seed mix and comply with FSM 2070 and Region One Native Plan Material Strategic Plan (see R1Native Plant Strategy document in the project file)

- ♦ All "Off-Road Equipment" would be cleaned prior to entry on the sale area. This requirement also applies to equipment used in fuels reduction and recreation trail construction activities.

- ♦ Following operations in harvest units 5, 10, 28, 29A, 29B, 33, 34, 54, and 56, equipment would be cleaned prior to entry into any unit not listed here to minimize introduction of new weed populations.

- ♦ To minimize transport of weeds between units, units 7, 8, 45, 46, and 47 will be logged on frozen ground or over 12" of settled snow.

- ♦ Where feasible, herbicide would be used to treat all roads prior to reconstruction activities. If not feasible due to lack of access, herbicide would be used to treat cut-slopes and fill-slopes following reconstruction activities.

- ♦ Accessible roads and pullouts open to public use or gated for administrative use would be treated with herbicide once harvest operations are complete.

- ♦ To minimize the transport of noxious weeds via machinery, reconditioning/ reconstruction of existing roads needed for timber haul would be held to the minimum necessary standard to protect and maintain the road surface and drainage structures and provide for public safety.

- ♦ Prior to work during decommissioning and storing of roads, weeds would be treated with herbicide where applicable and accessible.

- ♦ Surveys for weeds would be conducted before new recreation trail construction and monitoring would occur after construction. Pre and post activity spraying would occur as needed.

- ♦ Continue to pursue new hawkweed biocontrol agents for use within the Project Area.

- ♦ West Fork Yaak River Pit A #207 is an active new invader (Rush skeletonweed) site. Avoid use of this pit for project activities.

## Public Safety/ Access Management

- ♦ During prescribed burning operations for Non-harvest Fuels Units A, B, E, M, and O, the following trails, Midge/Rock Candy 177, Mount Obermayer 33, French Creek 32, West Fork Yaak River 318, and Wood Mountain/ Grubstake 175 may be closed for public safety; public notification would occur before and during the burn operations.

- ♦ Garver Mountain Trail 8 and Bonnet Top Trail 583 would be closed when burning Non-harvest Fuels Units D and Q; public notification would occur before and during the burn operations.

- ♦ The Bonnet Top Trail 583 and Wood Mountain/Grubstake Trail 175 may be closed for public safety during harvest operations in Units 7, 8 and 23.

- ♦ The Forest Service would provide public notification prior to ground disturbing activities near the Boyd Cemetery.

- ♦ Snow plowing and/or log haul is not allowed on Pete Creek road north of the junction with Hensley Creek road 5856 from December 1 to April 30.

- ♦ Hauling would be prohibited from Friday at 3:00 pm to Monday at 6:00 am and on federal holidays on Pete Creek road, NFSR 338 north of the junction with Hensley Creek road, NFSR 5856.

- ♦ Public road access would be restricted from Monday at 6:00 am to Friday at 3:00 pm on Pete Creek road, NFSR 338 north of the junction with Hensley Creek road, NFSR 5856 to allow for log hauling. Hikers would be allowed to walk NFSR 338 and to trailheads during hauling operations.

- ♦ Road reconstruction on the West Fork Yaak and Garver Mountain roads (NFSRs 276 and 5857) would require several road closures to allow for culvert replacement work during the month of August through October of the calendar year that road construction work occurs. Road reconstruction on the Yaak 92 road will require a road closure to allow for a culvert replacement. A detour will be provided during construction on NFSR 5812 and 746 to allow access around Yaak 92. This work will be accomplished between the dates of July 16 and September 1 of the calendar year that road construction work occurs. The District would notify the public when road closure and log hauling occurs using methods such as social media, Recreation.gov, Kootenai Forest Facebook page and website and with a sign located at the junction of Yaak Highway 92 and NFSR 276.

- ♦ See the PNNST section below for additional safety measures.

## Recreation

- ♦ During harvest operations in Harvest Unit 23 the blazed trees would be retained, where feasible.

- ♦ When Garver Mountain Lookout is rented a notification would be placed on the www.recreation.gov website or a phone call would be made to inform the renters about harvest and burning activities along NFSRs 276 and 5857 and in the area.

- ♦ The Garver Mountain Lookout would be removed from the National Reservation System from August 1 to October 31 of the calendar year that road closure for reconstruction work occurs on the West Fork Yaak and Garver Mountain roads. The District would notify the public in advance prior to road reconstruction activities. This information would be shared with the public using methods such as posting on Recreation.gov, the PNTA blog and Kootenai Forest Facebook page and website.

## Riparian Habitat Conservation Areas (RHCAs)

RHCAs would be established around any new water features, fish bearing stream and landslide prone areas that are inadvertently discovered during implementation within or adjacent to harvest units per 2015 Forest Plan direction.

## Pacific Northwest National Scenic Trail (PNNST)

The Pacific Northwest National Scenic Trail (PNNST) is one of eleven designated national scenic trails in the United States. The PNNST was congressionally designated in 2009. Approximately 28.1 miles of the PNNST trail is located within the Project Area, 18.5 miles are on open roads and all of the roads existed in this area before it was designated as the PNNST.

- ♦ In Units F-9 and F-11 slash would be treated within 100' of the designated route to minimize visual impacts.

- ♦ In Harvest Units 30, 32, 38, 41 and 43 trees would be painted on the opposite side of the primary view. This tree marking method would be dependent on topography and visibility from the road and would occur approximately 100 to 200 feet from the edge of the road.

Black Ram Project Decision Notice and FONSI

- In Harvest Units 30, 32, 37, 38, 39, 40, 41, 42, 43, 44, and 66 the following would occur:

  - Tree marking paint on leave trees in these units would be assessed post-harvest, if needed the District may use brown paint to cover the tree marking paint to reduce the potential visual effects along the PNNST.

  - Within 50' of the road, stumps would be cut 8 inches or less in height, this does not apply to snags as per the snag retention design feature below. Following monitoring efforts stumps may be cut up to 300' off the road, if needed.

  - Project design and unit prescriptions would help soften edges to harvest boundaries and would leave single trees and groups of trees of varying ages within units and near unit edges; additional post-harvest activities such as slashing and planting may be implemented where needed.

  - Project design for unit openings would not be symmetrical in shape, would avoid straight lines and right angles and follow natural topographic breaks and changes in vegetation, where feasible.

  - Slash within 100' of the designated route would be treated to minimize visual impacts. Following monitoring efforts slash may be treated up to 300' off the road, if needed.

  - Post-harvest landing pile clean up would include scarification, seeding, weed spraying and planting trees, where feasible.

  - Where new access roads and skid trails meet a primary travel route, they should intersect at a right angle, and where feasible, curve after the junction to minimize the length of route seen from the primary travel route.

  - When treatment activities occur along the PNNST, the District would notify the public when road closure and log hauling occurs using methods such as social media, Recreation.gov, and with a sign located at the junction of Yaak highway 92 and NFSR 276.

- When existing ground conditions and operational feasibility provide the opportunity in Harvest Units 28, 30, 37, 39, 40, 45, 48, and 64 retain small diameter residual trees (hardwoods or conifers) or retain large diameter trees in clumps near or adjacent to roadways to break up and soften the view of harvest and fuel treatment activities for visuals.

- Retain one or more leave islands of 1-2 acres in size in Harvest Units 29A, 32, 38, 40, and 41 for structure and visuals, including natural features such as rocky outcroppings, hardwood patches, and riparian areas.

- In Harvest Units 30 (western edge), 42 (northern draw), and 66 (northern edge) retain more trees where possible for structural stability and visuals.

# Proposed, Threatened, Endangered, and Sensitive Plant Species (PTES)

To provide for the protection of PTES inadvertently discovered during implementation, protection measures will be included in the timber sale contract.

## Snag Retention

All snags felled for safety reasons would be left on site and would be cut as high as possible, to retain some value for wildlife use (foraging opportunities or other habitat), where it is safe and reasonable to do so.

## Soils

- Use equipment with a bucket and thumb or other approved equipment for mechanized slash piling and mechanized fire line construction.

- Locate skid trails a minimum of 75 feet apart except where converging in order to reduce soil disturbance.

- Use the appropriate KNF approved seed mix for revegetation of disturbed areas with exposed mineral soil resulting from project activities except for areas scarified for site preparation and on constructed firelines or recreation trails.

- Reuse existing skid trails and other disturbed areas during harvest and machine piling operations where feasible in order to minimize new soil disturbance.

- Scarify or recontour excavated skid trails, temporary roads and compacted landings constructed for the project following harvest activities. Place slash and duff on the recontoured slopes.

- Post activity soil monitoring would be required in units where post activity soil detrimental disturbance (DSD) is predicted to be close to 15 percent DSD (Units 5, 13, 19, 28, 29A, 33, 39, 46, 48, 55B, 64, 74, and 84).

  - If post activity monitoring results DSD exceeds 15 percent, soil restoration efforts would be conducted to the extent necessary to reduce DSD to 15 percent or less.

  - Soil restoration efforts would be limited to dry soil condition and may vary by unit as approved by the hydrologist or soils specialist. Restoration may include soil decompaction, recontouring of excavated trails, and/or spreading adjacent top soil, duff and slash over disturbed areas. Decompaction of soils will not mix soil horizons.

- To help protect soils in units 67 through 76B (Rampike area):

  - Harvest when soils are dry as determined by the Forest Service;

  - Known wet areas would be identified and exclude equipment use. An equipment exclusion or RHCA, as appropriate, would be established around any new water features or wet areas that are inadvertently discovered within harvest units during implementation.

- To help protect soils in Harvest Units 6 and 7 limit harvest operations to frozen or dry soil conditions as determined by the Forest Service.

- For Harvest fuel break Unit 85 equipment must stay on existing road surface.

## Vegetation

- In all units, pacific yew would be retained, where feasible.

- When existing ground conditions and operational feasibility provide the opportunity in Harvest Units 28, 30, 37, 39, 40, 45, 48, and 64 retain small diameter residual trees (hardwoods or conifers) or retain large diameter trees in clumps near or adjacent to roadways to break up and soften the view of harvest and fuel treatment activities;

Black Ram Project Decision Notice and FONSI

- ◆ Retain one or more leave islands of 1-2 acres in size in Harvest Units 29A, 32, 38, 40, 41, 64, 65, 69, 72, 73, and 74 for structure and visuals, including natural features such as rocky outcroppings, hardwood patches, and riparian areas*;

- ◆ In Harvest Units 67, 68, 69, 71, 72, 73, 74, and 76B all western larch, western white pine, Douglas-fir, and western redcedar greater than 7 inches in diameter would be retained for species diversity, structure and visuals.

- ◆ In Harvest Units 30 (western edge), 42 (northern draw), 63 (northwestern edge), 55B (northern edge), and 66 (northern edge) retain more trees where possible for structural stability and visuals*;

- ◆ Timber harvest is proposed in old growth in Harvest Units 1A, 4, 8, 9, 11, 18, 27, 49, 53A, 53B, 55C, 64, 76A, 78A, and 78B. Prescribed burning in old growth is proposed for Non-harvest Fuels Units K, L, O, F-3, F-8, F-13, and F-14. All treatments would maintain or improve old growth characteristics as defined by Green et al. (1992).

- ◆ Road construction in Harvest Units 55C and 76A would be designed to the narrowest road width and pullout locations would result in the fewest large diameter trees cut where feasible. All new road construction through old growth would be restricted to the public during activities and gated after project activities.

*These design features also apply along the PNNST, see the units listed above under PNNST.

## Water Quality and Aquatic Species

Management activities, such as culvert removal, installation, or replacement, that may disturb native salmonids, or have the potential to directly deliver sediment to their habitats, would be limited to times outside of spawning and incubation season, on or after July 15 for Westslope cutthroat trout and Interior redband trout.

## Wildlife: General

Protection measures needed for endangered, threatened, proposed, and sensitive wildlife species as well as other species listed in the 2015 Forest Plan will be included in the timber sale contract to provide for the protection of these animals found during implementation .

## Wildlife: Lynx

Thinning of rust-resistant western white pine plantations shall retain a minimum of eighty (80) percent of winter snowshoe hare habitat in Precommercial Thin Units 1, 4, 5, 6, 7, 8, 9, 11, 12, 13 that occur in suitable hare habitat within a lynx analysis unit which is consistent with FW-STD-WL-01.

## Wildlife: Grizzly Bear

- ◆ Within each Bear Management Unit, the use of helicopters to ignite prescribed burns would not last more than 2 days per burn season (spring and fall) and not exceed a total of 4 days per bear year (4/1 – 11/30). The use of a helicopter for burning Buckhorn units H, I J, K, M, N, O, and O-1 and Black Ram units A, B, C, and D would be coordinated by the district fuels specialist and wildlife biologist.

- ◆ Mechanized equipment operation would be avoided from April 1 through May 1 in Harvest Units 42, 43, 44 (Garver Mountain area) and Harvest Units 77, 78A, 78B (upper Pete Creek

Black Ram Project Decision Notice and FONSI

Road); to avoid or minimize disturbance in areas of predicted denning habitat during spring emergence (FW-GDL-WL-01).

♦   In the first year of project activity all motorized use is prohibited from April 1 through May 1 on barriered roads.

♦   The following activities are allowed on gated roads from April 1 through May 1, annually:

♦   Burning,

♦   Hand slashing and fireline construction, includes use of chainsaws,

♦   Planting and seeding

♦   Access management activities as displayed in Appendix D, the Access Management Plan, would be implemented to ensure that changes to grizzly bear habitat parameters are consistent with FW-STD-WL-02 design elements.

♦   Place restriction device (gate or barrier) at or within 500 feet of desired location. Select location that would best meet the desired purpose of the device. For example, a gate or barrier may be more effective if placed where there are steep, rocky cut and fill slopes. If further than 500 feet from the desired location, discuss with the district wildlife biologist. See also access management plan (Appendix D).

**Additional Design Features from the Biological Opinion:**

♦   Berm or barrier all roads that will contribute to new Core areas as soon as possible after the Black Ram record of decision is signed authorizing the project, and before existing Core areas are entered. This includes all roads listed in Appendix D, Access Management Plan for which the "Reason for Action" includes "IKRC" (meaning in-kind replacement of Core). Any work to stabilize hydrology on these roads should be completed within this same timeframe, such that no further disturbance is needed in the new Core areas for at least 10 years.

♦   In BMU 15, subdivide project implementation such that OMRD does not exceed 37% at any time, for the 10 years of the project. Use of restricted roads during grizzly bear denning season do not count towards increases in OMRD. Acceptable subdividing could involve working on one area for part of a bear year, then moving to another area the rest of the bear year, as long as OMRD does not exceed 37% at any given time.

♦   In both BMUs, once timber harvest and haul is complete on a gated road, the Forest shall resume abiding by administrative use levels, as dictated by the Forest Plan, for the remainder of project implementation. An exception will be allowed for exceeding administrative use levels in one bear year per BMU, if needed to implement prescribed burning activities, granted the exception still meets Term & Condition 3.

# Wildlife: Raptors

♦   In the event a nest site is discovered in a vegetation management unit, the Forest Plan guideline, FW-GDL-WL-16, provides direction to follow.

♦   Unit 29A: Avoid mechanized activity from April 15 to August 15 to minimize disturbance near an osprey nest. If the nest is determined to be unoccupied during this period, no restriction would apply.

## Resource Improvement Work

♦ The following activities are not required design features or mitigation for project activities. These activities improve existing resource conditions in the project area and respond to the projects purpose and need. Implementation and timing of some of these activities may be dependent upon available funding. Some of the activities listed are appropriate to fund with Knutsen-Vanderberg (KV) funds collected in association with timber sales in the project area, if KV funds are available. Other funding sources may include Forest Health Protection funds, various grant or partnership funds, and funding through current initiatives such as GAOA, all of which require application and competition for funding. Activities identified with an asterisk will occur as identified in the analysis but are included here to highlight the need to secure funding sources into the future, such as funding for future biocontrol agent collection and release.

♦ Inter-plant rust resistant western white pine;

♦ Precommercial Thinning or Timber Stand Improvement work;

♦ Landing rehabilitation including decompaction, seeding and spreading duff and slash;

♦ Thinning, piling and burning of hazardous fuels in the WUI;

♦ Road work to improve watershed conditions as identified in Table 7;

♦ Road decommissioning work in the Project Area as identified in Table 19;

♦ Additional spraying of noxious weeds or use of biocontrol agents in areas where their concentrations occur;

♦ Road signs, mile markers and gate signs installed or replaced;

♦ Enhance productivity through restoration activities;

♦ Design work and construction of the Wood Mountain Stock Loop, North Fork River, West Fork Falls, and Northwest Peak to Rock Candy Trails;

♦ Interpretive signs describing the Wood Creek Scenic Larch Area and Pete Creek Meadow.

♦ Parking area improvements for the Wood Mountain Stock Loop Trail and Hawkins Lake Trails.

♦ *Prescribed burning to enhance wildlife habitat;

♦ *Monitor effects of KV funded site preparation activities;

Black Ram Project Decision Notice and FONSI

# Appendix D – Access Management Plan and Map

| MAP INDEX | ROAD | LOCATION Milepost (MP) | PROPOSED ACTION | TIMING | REASON FOR ACTION |
|---|---|---|---|---|---|
| 1 | 5873 | MP 0 | Remove gate & Install Barrier- This barrier also berms 5873B and 5873E | As needed | IKRC in BMU15 for 945 acres |
| 2 | 5882* | MP 0 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access |
| 2 | 5882 | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 3 | 3101* | MP 0 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access |
| 3 | 3101 | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 4 | 921* | MP 0 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access |
| 4 | 921 | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 5 | 5879G | MP 0 | Install Barrier | As needed | IKRC in BMU15 for 355 acres |
| 6 | 5879C | MP 0 | Install Barrier | As needed | |
| 7 | 5879 | MP 1.66 (at switchback right after jct with D spur | Install Barrier | As needed | |
| 8 | 5890 | MP 0.85 (at jct with 5886) | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access |
| 9 | 5890 | MP 0.68 (South of jct with new construction 5890A) | Install Barrier | During Road Reconstruction | Wildlife Habitat Security |
| 10 | 5890A | MP 0 | New Permanent Construction | During Road Construction | Harvest Access |
| 10 | 5890A | MP 0 | Public motorized use restricted via gate on 5890, MP 0 (index item 9) | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 11 | 5887 | MP 0 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access |
| 11 | 5887 | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 12 | 5856D* | MP 0 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access |

7-ER-1686

FS-002201

Black Ram Project Decision Notice and FONSI

| MAP INDEX | ROAD | LOCATION Milepost (MP) | PROPOSED ACTION | TIMING | REASON FOR ACTION |
|---|---|---|---|---|---|
| 12 | 5856D | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 13 | 5856 | MP 4.5 | Public motorized use restricted; lock gate nights and weekends | During Road Reconstruction and Harvest Activities | Wildlife Habitat Security |
| 14 | 5854* | MP 0 | Remove Barrier | During Road Reconstruction | Harvest Access |
| 14 | 5854 | MP 0 | Public motorized use restricted via gate on 5856 MP 4.5 (index item 13); lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 15 | 5856 | MP 6.8 | Install Barrier (at Unit 63 boundary) | As needed for IKRC | IKRC in BMU 14 for 141 acres and BMU 15 for 369 acres |
| 16 | 6708 | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 17 | 6134 | MP 0.9 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 18 | 14125* | MP 2.6 | Remove Barrier | During Road Reconstruction | Harvest Access |
| 18 | 14125 | MP 2.6 | Public motorized use restricted via gate on 6134, MP 0 (index item17) | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 19 | 6134A | MP 0 | Public motorized use restricted via gate on 6134, MP 0 (index item 17) | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 20 | 6134A | MP 0.35 | Install Barrier | As needed | IKRC in BMU 14 for 1,381 acres and BMU15 for 458 acres- Map index 20, 21, 22 and 22a barriers must be installed to create the IKRC acres |
| 21 | 6840 | MP 0 | Install Barrier | As needed | |
| 22 | 6134 | MP 0.9 | Install Barrier | As needed after storage work is complete | |
| 22a | 6134 | MP 5.0 | Remove Gate & Install Barrie. This barrier also barried 5921 | As needed after storage work is complete | |
| 23 | 5874 | MP 6.2 | Install Barrier | As needed | IKRC in BMU14 for 394 acres |
| 24 | 5877 | MP 0 | Install Barrier | After Storage work is completed | |
| 25 | 748* | MP 10.83 (near jct of 5932) | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access |

Appendix page 28

Black Ram Project Decision Notice and FONSI

| MAP INDEX | ROAD | LOCATION Milepost (MP) | PROPOSED ACTION | TIMING | REASON FOR ACTION |
|---|---|---|---|---|---|
| 25 | 748 | MP 10.83 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 26 | 7488* | MP 0 | Remove Barrier | During Road Reconstruction | Harvest Access |
| 26 | 7488 | MP 0 | Public motorized use restricted via gate on 748, MP 10.83 (index item 25) | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 27 | 748D* | MP 0 | Remove Barrier | During Road Reconstruction | Harvest Access |
| 27 | 748D | MP 0 | Public motorized use restricted via gate on 748, MP 10.83 (index item 25) | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 28 | 748A* | MP 0 | Remove Barrier | During Road Reconstruction | Harvest Access |
| 28 | 748A | MP 0 | Public motorized use restricted via gate on 748, MP 10.83(index item 25) | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 29 | 7486* | MP 0 | Remove Barrier | During Road Reconstruction | Harvest Access |
| 29 | 7486 | MP 0 | Public motorized use restricted via gate on 748, MP10.83 (index item 25) | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 30 | 7485* | MP 0 | Remove Barrier | During Road Reconstruction | Harvest Access |
| 30 | 7485 | MP 0 | Public motorized use restricted via gate on 748, MP 10.83(index item 25) | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 31 | 5894 | MP 1.7, (northern gate) | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 31a | 5894 | MP 2.3 (southern gate) | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 32 | 5895* | MP 0 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access |
| 32 | 5895 | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 33 | 5895B | MP 0 | New Permanent Construction | During Road Construction | Harvest Access |
| 33 | 5895B | MP 0 | Public motorized use restricted via gate on 5895, MP 0 (index item 32) | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 34 | 5895A* | MP 0 | Remove Barrier | During Road Reconstruction | Harvest Access |

Appendix page 29

7-ER-1688

Black Ram Project Decision Notice and FONSI

| MAP INDEX | ROAD | LOCATION Milepost (MP) | PROPOSED ACTION | TIMING | REASON FOR ACTION |
|---|---|---|---|---|---|
| 34 | 5895A | MP 0 | Public motorized use restricted via gate on 5895, MP 0 (index item 32) | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 35 | 5895 | MP 0.88 | New Permanent Construction | During Road Construction | Harvest Access |
| 35 | 5895 | MP 0.88 | Public motorized use restricted via gate on 5895, MP 0 (index item 32) | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 36 | 5897* | MP 0 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access |
| 36 | 5897 | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 37 | 523C | MP 0 | New Permanent Construction | During Road Construction | Harvest Access |
| 37 | 523C | MP 0 | Public motorized use restricted via gates on 5894(index items 31 & 31a) | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 38 | 523A* | MP 0 | Remove Barrier | During Road Reconstruction | Harvest Access |
| 38 | 523A | MP 0 | Public motorized use restricted via gates on 5894, (index items 31 & 31a) | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 39 | 523A | 0.16 | New Permanent Construction | During Road Construction | Harvest Access |
| 39 | 523A | 0.16 | Public motorized use restricted via gates on 5894(index items 31 & 31a) | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 40 | 523B* | MP 0 | Remove Barrier | During Road Reconstruction | Harvest Access |
| 40 | 523B | MP 0 | Public motorized use restricted via gates on 5894(index items 31 & 31a) | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 41 | 523 | MP 1.4 (just past jct with 523B) | Install Barrier | As needed | IKRC for 35 acres in BMU 14 and 70 acres in BMU 15 |
| 42 | 5839* | MP 0 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access |
| 42 | 5839 | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 43 | 276A* | MP 0 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access |
| 43 | 276A | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security |

Appendix page 30

7-ER-1689

Black Ram Project Decision Notice and FONSI

| MAP INDEX | ROAD | LOCATION Milepost (MP) | PROPOSED ACTION | TIMING | REASON FOR ACTION |
|---|---|---|---|---|---|
| 44 | 5844A* | MP 0.6 (this road mile posting begins at the 5844, not at the 276) | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access |
| 44 | 5844A | MP 0.6 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 45 | 276* | MP 2.96 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access |
| 45 | 276 | MP 2.96 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 46 | 276B* | MP 0 | Remove Barrier | During Road Reconstruction | Harvest Access |
| 46 | 276B | MP 0 | Public motorized use restricted via gate on 276, MP 2.96 (index item 45) | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 47 | 5844* | MP1.2 (northern end) | Remove Barrier | During Road Reconstruction | Harvest Access |
| 47 | 5844 | MP 1.2 | Public motorized use restricted via gate on 276, MP 2.96 (index item 45) | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 48 | 5840* | MP 0 | Remove Barrier | During Road Reconstruction | Harvest Access |
| 48 | 5840 | MP 0 | Public motorized use restricted via gate on 276, MP 2.96 (index item 45) | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 49 | 5840B* | MP 0 | Remove Barrier | During Road Reconstruction | Harvest Access |
| 49 | 5840B | MP 0 | Public motorized use restricted via gate on 276, MP 2.96 (index item 45) | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 50 | 5857F* | MP 0 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access |
| 50 | 5857F | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 50a | 5857G | MP 0 | Remove Barrier & Install temporary gate, then barrier after completion of harvest activities | During Road work and Harvest Activities | Harvest Access |
| 51 | 5859* | MP 0 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access |
| 51 | 5859 | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security |

Appendix page 31

FS-002205

Black Ram Project Decision Notice and FONSI

| MAP INDEX | ROAD | LOCATION Milepost (MP) | PROPOSED ACTION | TIMING | REASON FOR ACTION |
|---|---|---|---|---|---|
| 52 | 5857L* | MP 0 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access |
| 52 | 5857L | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 53 | 5841* | MP 0 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access |
| 53 | 5841 | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 54 | 757* | MP 4.3 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access |
| 54 | 757 | MP 4.3 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 55 | 757N* | MP 0 | Remove Barrier | During Road Reconstruction | Harvest Access |
| 55 | 757N | MP 0 | Public motorized use restricted via gate on 757, MP 4.3 (index item 54) | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 56 | 757P* | MP 0 | Remove Barrier | During Road Reconstruction | Harvest Access |
| 56 | 757P | MP 0 | Public motorized use restricted via gate on 757, MP 4.3 (index item 54) | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 57 | 5835* | MP 0 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access |
| 57 | 5835 | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 58 | 5826A* | MP 0 | Remove Barrier & Install Gate | During Road Reconstruction | Harvest Access |
| 58 | 5826A | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 59 | 14736 | MP 0 | New Permanent Construction | During Road Construction | Harvest Access |
| 59 | 14736 | MP 0 | Public motorized use restricted via gate on 5826A, MP 0 (index item 58) | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 60 | 14746 | MP 0 | New Permanent Construction | During Road Construction | Harvest Access |
| 60 | 14746 | MP 0 | Public motorized use restricted via gate on 5826A, MP 0 (index item 58) | During Road Work and Harvest Activities | Wildlife Habitat Security |

Appendix page 32

7-ER-1691

Black Ram Project Decision Notice and FONSI

| MAP INDEX | ROAD | LOCATION Milepost (MP) | PROPOSED ACTION | TIMING | REASON FOR ACTION |
|---|---|---|---|---|---|
| 61 | 926A | MP 0 | Install gate | During Road Reconstruction and Harvest Activities | Wildlife Habitat Security |
| 61 | 926A | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 62 | 5825 | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 63 | 5825A* | MP 0 | Remove Barrier | During Road Reconstruction | Harvest Access |
| 63 | 5825A | MP 0 | Public motorized use restricted via gate on 5825, MP 0 (index item 62) | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 64 | 5825B* | MP 0 | Remove Barrier | During Road Reconstruction | Harvest Access |
| 64 | 5825B | MP 0 | Public motorized use restricted via gate on 5825, MP 0 (index item 62) | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 65 | 5824 | MP 0 | Public motorized use restricted; lock gate nights and weekends | During Road Work and Harvest Activities | Wildlife Habitat Security |
| 66 | 5821 | MP 10.6 (south of jct with 5821D, therefore also berms 5821D & 5821E) | Install Barrier | As needed | IKRC for 1,179 acres in BMU 15 |

IKRC= In-kind Replacement of Core to meet Forest Plan standard FW-STD-WL-02
*Where barriers are removed for harvest access, only length of road needed for haul will be cleared and changed to gated/administrative access allowed (during and post project.) Any road beyond unit/haul road is to remain barriered; if existing vegetative barrier is not sufficient to prevent access, a barrier is to be installed by purchaser.

Appendix page 33

Black Ram Project Decision Notice and FONSI



**Black Ram EA**
**Access Management Plan**

**Legend**

| | |
|---|---|
| ▭▭▭ | Major Hwys |
| ▭▭▭ | County Roads |
| —— | Private/Other Roads |
| —— | Proposed New Construction-Alt 2 Only |

Existing FS Roads:

| | |
|---|---|
| —— | Existing Open Roads |
| —— | Existing Gated Roads |
| —— | Existing Barriered Roads |
| —— | Alt 2 Haul Route on Existing FS Roads |
| ◯ | Project Area Boundary |
| ▨ | Alternative 2 Units |
| ▨ | Non-Federal Land |
| #▯ | Map Index Number* |

*See Table in Appendix D - Access Management Plan

No Scale
sja - 9 May 2019

7-ER-1693

FS-002208

# Appendix E – Best Management Practices

**Introduction**

Federal agency compliance with pollution control is addressed through Section 313 of the Clean Water Act, Executive Order 12580 (January 23, 1987), National Nonpoint Source Policy (December 12, 1984), USDA Nonpoint Source Water Quality Policy (December 5, 1986) and the Environmental Protection Agency in their guidance "Nonpoint Source Controls and Water Quality Standards" (August 19, 1987). To comply with State and local non-point pollution controls the Forest Service will apply Best Management Practices (BMPs) to all possible non-point sources which may result from proposed management activities as described in the Soil and Water Conservation Practices, Forest Service Handbook (FSH) 2509.22.

BMPs are the primary mechanism for achievement of water quality standards (EPA, 1987). This appendix describes the Forest Service's BMP process in detail and lists the key Soil and Water Conservation Practices that have been selected to be used in the action alternatives. BMPs are site specific and can be applied before, during, or after pollution-producing activities to reduce or eliminate the introduction of pollutants into the receiving watershed (40 CFR 130.2, EPA Water Quality Standards Regulation).

The 2015 Forest Plan states that Best Management Practices will be incorporated into all land use project plans as a principal mechanism for controlling non-point pollution sources, meeting soil and water quality goals, and protecting beneficial uses. To the extent practicable, ditch and surface runoff should be disconnected from streams and other water bodies. Montana State Water Quality Standards require the use of reasonable land, soil, and water conservation practices (analogous to BMPs) as the controlling mechanism for non-point pollution. The use of BMPs is required in the Memorandum of Understanding between the Forest Service and the State of Montana as part of the agency's responsibility as the designated water quality management agency on National Forest System lands. Activities found not to comply with the BMPs or State standards will be brought into compliance, modified, or stopped.

**BMP Implementation Process**

The Forest Service non-point source management system consists of the following steps:

1. BMP Selection and Design - The appropriate BMPs are selected for each project by an interdisciplinary team. BMPs are site specific, and selection and design are dictated by the proposed activity, water quality objectives, and beneficial uses in the watershed. Environmental impacts and water quality protection options are evaluated, and final BMPs are selected that not only protect water quality but meet other resource needs.

BMP Application - The BMPs are translated into contract provisions, special use permit requirements, project plan specifications, and so forth and applied with oversight from resource specialists during layout or implementation.

BMP Monitoring - BMP implementation monitoring is done before, during, and after implementation of proposed activities. Further monitoring is done to evaluate if the BMPs are effective in meeting management objectives and protecting beneficial uses. If monitoring indicates that water quality standards are not being met or beneficial uses are not being protected, corrective action will consider the following:

> Is the BMP technically sound? Is there a better practice that is technically sound and feasible to implement?

Was the BMP applied entirely as designated? Was it only partially implemented? Were personnel, equipment, funds, or training lacking which resulted in inadequate or incomplete implementation?

Do the parameters and criteria that constitute water quality standards adequately reflect human-induced changes to water quality and beneficial uses?

Feedback - Feedback on the results of BMP evaluation is both short- and long-term in nature. Where corrective action is needed, immediate response will be undertaken. This action may include: modification of the BMP, modification of the activity, ceasing the activity, or possibly modification of the State water quality standard. Cumulative effects over the long-term may also lead to the need for corrective actions.

## KNF BMP SELECTION AND DESIGN FORM (KNF-BMP-1)

SITE-SPECIFIC BEST MANAGEMENT PRACTICES

Soil and water conservation practices from the Forest Service Soil and Water Conservation Handbook (FSH 2509.22) will be applied in all alternatives as specified in Table 24. Abbreviations used in this table can be found below.

COR – Contracting Officer's Representative, ER - Engineering Representative, FP - Kootenai Forest Plan, IDT - Interdisciplinary Team, INFISH - Inland Native Fish Strategy; KNF - Kootenai National Forest, PSF - Pre-sale Forester, RHCA - Riparian Habitat Conservation Area, SAM - Sale Area Map, SMZ - Streamside Management Zone, SPS – Special Project Specification, SWCP - Soil and Water Conservation Practice, TSA - Timber Sale Administrator, TSC - Timber Sale Contract

FS-002210

Black Ram Project Decision Notice and FONSI

**Table 24. Kootenai National Forest BMP Table**

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 14.01 | TIMBER SALE PLANNING - To incorporate soil and water resource considerations into Timber Sale Planning | 94% | 1. Unit design, mitigation, and effects analysis was done by IDT. 2. TSC will be prepared by PSF that includes Design Criteria. 3. Use standard RHCA widths unless site specific adjustment is appropriate (requires documentation of rationale). 4. Use existing skid trails where feasible. | IDT has evaluated watershed characteristics and estimated response to proposed activities. EA identifies design criteria to protect soil and water resources. Timber sale contracts will include provisions to meet water quality, soils, and other resource requirements. | IDT; PSF | N/A |
| 14.02 | TIMBER HARVEST UNIT DESIGN - To ensure that timber harvest unit design will secure favorable conditions of water flow, maintain water quality and soil productivity, and reduce soil erosion and sedimentation. | 95% | 1. Effects analysis and unit design were performed by IDT. 2. Prescriptions and unit design are consistent with BMP direction. 3. Use standard RHCA widths unless site specific adjustment is appropriate (requires documentation of rationale). 4. Use existing skid trails where feasible. 5. Use suitable logging system for topography, soil type, and season of operation. | Proposed activities were evaluated to estimate the potential watershed response. Prescriptions will be designed to assure an acceptable level of protection for soil and water resources. Management will protect soil/water values by avoiding sensitive areas, adjusting unit boundaries, adding specific BMPs to meet specific SWCPs, applying mitigation, and applying implementation/effectiveness monitoring to trend toward desired conditions. | IDT; PSF | N/A |

Black Ram Project Decision Notice and FONSI

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 14.03 | USE OF SALE AREA MAPS (SAMs) FOR DESIGNATING SOIL AND WATER PROTECTION NEEDS - To delineate the location of protected areas and available water sources and ensure their recognition, proper consideration, and protection on the ground. | 93% | 1. Water courses identified and protected using appropriate RHCA/SMZ widths as a minimum.<br>2. Skidding on dry, frozen, or snow-covered soil conditions.<br>3. Designated skid trails in units with previous harvest. | The IDT will identify water courses to be protected, unit boundaries, and other features required by other means such as "C" provisions. Ground verification and preparation of SAMs to be included in TSC will be done by PSF. TSA reviews areas of concern with purchaser before operations. | IDT; PSF; TSA | B(T)1.1<br>B(T)6.5<br>C(T)6.50# |
| 14.04 | LIMITING THE OPERATION PERIOD OF TIMBER SALE ACTIVITIES - To minimize soil erosion, sedimentation, and a loss in soil productivity by insuring that the purchaser conducts his/her operations in a timely manner. | 99% | 1. Identify units located on soils sensitive to compaction and/or displacement.<br>2. Designate units needing harvest on frozen or snow-covered ground.<br>3. All other ground disturbing activities will occur during dry, frozen, or snow-covered conditions to minimize soil compaction and displacement. | If limited operating periods are identified and recommended during the analysis by the IDT, the PSF will prepare a contract that includes provision C(T)6.316 and/or C(T)6.4#. | IDT; PSF; TSA | B(T)6.31<br>B(T)6.311<br>B(T)6.6<br>C(T)6.6<br>C(T)6.316#<br>C(T)6.4# |
| 14.05 | PROTECTION OF UNSTABLE AREAS - To protect unstable areas and avoid triggering mass movements of the soil mantle and resultant erosion and sedimentation. | 96% | 1. Identify unstable landtypes in the planning process.<br>2. Units that need further protection will use alternative yarding techniques, seasonal restrictions, and/or unit boundary adjustments. | If the NEPA analysis concluded that soils/geology in the area were unstable, then BMPs are designed to prevent irreversible soil and water damage. | IDT; PSF; TSA | C(T)6.4# |

Appendix page 38

7-ER-1697

Black Ram Project Decision Notice and FONSI

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 14.06 | RIPARIAN AREA DESIGNATION - To minimize the adverse effects on riparian areas with prescriptions that manage nearby logging and related land disturbance activities. | 90% | 1. Identify areas with or adjacent to wet areas. 2. Use standard RHCA widths unless site specific adjustment is appropriate (requires documentation of rationale). 3. SMZ widths will be used as a minimum if modification is proposed. 4. Areas found during sale layout will be reported to the Hydrologist and afforded the same protections as those identified during the planning process. | All activities near streams and wetlands in the decision area will comply with the 2015 KNF Forest Plan and the SMZ law (HB-731). These widths will be included on the sale area map and marked on the ground. | IDT; PSF; TSA | B(T)1.1 B(T)6.5, C(T)6.4# C(T)6.41# C(T)6.50# |
| 14.07 | DETERMINING TRACTOR-LOGGABLE GROUND - To protect water quality from degradation caused by tractor logging ground disturbance. | 97% | 1. Avoid tractor logging on unstable slopes and sustained slopes greater than 40% (small areas of the unit may have slopes > 40%). 2. Areas unsuitable for tractor logging were designated as skyline, forwarder, or winter harvest units; or were dropped from the unit. | IDT (in conjunction with personnel from timber operations) identified tractor-loggable ground during transportation and timber sale planning. The results have been used to determine intensity of and restrictions for land disturbance activities. PSF will prepare a TSC that includes provisions stating areas and conditions under which tractors may operate. | IDT; PSF | C(T)6.4# SAM |
| 14.08 | TRACTOR SKIDDING DESIGN - To minimize erosion and sedimentation and protect soil productivity by designing skidding patterns to best fit the terrain. | 97% | 1. Identify units with designated or dispersed skid trails. 2. TSA and purchaser agree on proposed locations before operation. 3. Skidding operation minimizes soil displacement and compaction. | IDT has identified sensitive areas during the planning process. The TSA will execute the plan on the ground by locating the skid trails with the timber purchaser or by agreeing to the purchaser's proposed locations prior to operation. | IDT; PSF; TSA | B(T)6.422 C(T)6.4# |

Appendix page 39

7-ER-1698

Black Ram Project Decision Notice and FONSI

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 14.09 | SUSPENDED LOG YARDING IN TIMBER HARVESTING - To protect the soil from excessive disturbance and accelerated erosion and maintain the integrity of the riparian areas and other sensitive areas. | 95%. | 1. Units that have slopes that are unsuitable for or sensitive to ground base skidding will be identified during analysis and listed in the Design Criteria. 2. Units with sustained slopes >40% will be designated skyline harvest units. | IDT recognizes the hazards associated with operating on steep and/or rocky slopes. Areas found to be of concern will use appropriate harvest systems that provide for a safe work environment and protect natural resources. | IDT; PSF | B(T)6.42 C(T)6.4# C(T)6.50# |
| 14.10 | LOG LANDING LOCATION AND DESIGN - To locate in such a way as to avoid soil erosion and water quality degradation. | 99% | 1. TSA and purchaser agree on landing locations before operation. 2. Use suitable number, size, and location of landings. 3. Use least excavation needed. 4. Do not side-cast material into sensitive areas or waterways. 5. Install proper drainage. | TSA must agree to landing locations proposed by the purchaser. Approved landing locations will meet the criteria of: minimal size, least excavation needed, minimum skid roads necessary, no side-cast of material into sensitive areas, and have proper drainage. | PSF; TSA | B(T)6.422 C(T)6.422 |
| 14.11 | LOG LANDING EROSION PREVENTION AND CONTROL- To reduce erosion and subsequent sedimentation from log landing through the use of mitigating measures. | 98% | 1. Proper drainage will be installed and maintained during operation. 2. Landings will be scarified and seeded upon completion of harvest activities. 3. TSA will assess conditions and take necessary steps to ensure soil and water protection. | PSF and TSA assess what is necessary to prevent erosion from landing and to ensure stabilization. It is up to the TSA to request technical assistance as needed. | PSF; TSA | C(T)6.6 BT6.64 B(T)6.6 C(T)6.633# |

Appendix page 40

FS-002214

Black Ram Project Decision Notice and FONSI

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 14.12 | EROSION PREVENTION AND CONTROL MEASURES DURING THE TIMBER SALE OPERATION - To ensure that the purchaser's operations shall be conducted reasonably to minimize soil erosion. | 91% | 1. Designate units with seasonal restrictions. 2. Do not operate during wet periods including spring-snowmelt and/or intense or long-duration rain storms. 3. TSA ensures that erosion control is kept current and prevents operation when excessive impacts are possible. | PSF and TSA sets purchaser's responsibility to prevent soil/water resource damage in TSC. TSA ensures that erosion control is kept current and prevents operation when excessive impacts are possible. | PSF; TSA | A13 B(T)6.6 B(T)6.64 C(T)6.6 C(T)6.601# C(T)6.633# |
| 14.13 | SPECIAL EROSION PREVENTION MEASURES ON AREAS DISTURBED BY HARVEST ACTIVITIES - To prevent erosion and sedimentation on disturbed areas. | 93% | 1. Use waterbars, KNF approved seed, and placed woody debris to stabilize soils on skid trails, landings. 2. Scarify or recontour excavated skid trails, temporary roads and compacted landings constructed for the project. Place slash and duff on disturbed areas. 3. Scarify previously existing excavated skid trails, temporary roads and compacted landings used for the project. 4. BMPs may be adjusted by the TSA to meet operational requirements. | IDT identifies locations needing special stabilization measures. If any such areas are identified, BMPs may be adjusted by the TSA to meet operational requirements. | IDT; PSF; TSA | C(T)6.601# C(T)6.32# C(T)6.633# |

Appendix page 41

Black Ram Project Decision Notice and FONSI

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 14.14 | REVEGETATION OF AREAS DISTURBED BY HARVEST ACTIVITIES - To establish a vegetative cover on disturbed areas to prevent erosion and sedimentation. | 95% | 1. Seed areas of exposed soil with KNF approved seed mix.<br>2. Cover disturbed areas with slash and/or mulch as necessary. | The KNF has established seed mix to be used in the Project Area. TSA is responsible for seeing that revegetation work required by purchaser is done correctly and in a timely manner. The purchaser will be responsible for revegetation immediately after the completion of harvest. Funds will be collected for the district to do follow-up seeding in years two and three after harvest. | IDT; TSA | C(T)6.01#<br>C(T)6.633# |
| 14.15 | EROSION CONTROL ON SKID TRAILS - To protect water quality by minimizing erosion and sedimentation derived from skid trails. | 89% | 1. Ensure proper skid trail location.<br>2. Ensure proper drainage on skid trails; avoid concentrating runoff.<br>3. Recontour, seed, and place woody debris on constructed skid trails and temporary roads.<br>4. Ensure maintenance of erosion control structures by purchaser.<br>5. Ensure adequate erosion control on temporary roads, skid trails, and harvest-disturbed areas within the unit. | Erosion control measures may be recommended by the IDT, but site-specifically adjusted by the TSA. TSA will ensure erosion control measures are applied prior to expected hydrologic events. Maintenance of erosion control structures by the purchaser may be necessary and requested by the TSA. | TSA | C(T)6.6<br>C(T)6.633#<br>B(T)6.6<br>B(T)6.65<br>B(T)6.66 |
| 14.16 | WET MEADOW PROTECTION DURING TIMBER HARVESTING - To avoid damage to the ground cover, soil, and water in meadows. | 87% | 1. Units with, or adjacent to, wet meadows, wetlands, and/or ponds will have buffers clearly identified in the sale map and on the ground.<br>2. Units with unmapped wet areas will be reported to a Hydrologist and afforded the same protection as those identified during the planning process.<br>3. Standard RHCA widths will be adhered to unless modification is in place.<br>4. The SMZ law will be met or exceeded. | IDT has identified areas needing special protection. PSF will verify the areas needing protection and prepare the contract to prevent damage to meadows. The TSA will be responsible for on-the-ground protection of meadows. If meadows are found by the TSA during operations, it is their responsibility to either afford them the proper protection or pursue a contract modification. | IDT; PSF; TSA | B(T)1.1<br>B(T)5.1<br>B(T)6.422<br>B(T)6.61<br>C(T)6.4#<br>C(T)6.62# |

FS-002216

Black Ram Project Decision Notice and FONSI

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|------|----------------|-------------------------|--------------------------------------------------|----------------------------------------------|------------------------|---------------------|
| 14.17 | STREAM CHANNEL PROTECTION (IMPLEMENTATION AND ENFORCEMENT) - Protect natural stream flows; provide unobstructed passage of flows; reduce sediment input; and restore flow if diverted by timber sale activity. | 92% | 1. Use standard RHCA widths unless site specific adjustment is appropriate (requires documentation of rationale).<br><br>2. SMZ widths will be met or exceeded regardless of RHCA adjustment. | IDT has identified the location of stream channels. PSF will prepare a SAM locating the channels needing protection. Layout crew marks boundaries and trees according to HB-731. TSA will see that TSC items are carried out on the ground. Technical assistance will be consulted as needed. | IDT; PSF; TSA | B(T)1.1<br>B(T)6.5<br>B(T)6.6<br>C(T)6.50#<br>C(T)6.6 |
| 14.18 | EROSION CONTROL STRUCTURE MAINTENANCE - To ensure that constructed erosion control structures are stabilized and working effectively. | 92% | 1. During the period of the TSC, the purchaser is responsible for maintaining their erosion control features. | If work is needed beyond the period of the TSC, the District will pursue other sources of funding. | IDT; PSF; TSA | B(T)6.66<br>B(T)6.67 |
| 14.19 | ACCEPTANCE OF TIMBER SALE EROSION CONTROL MEASURES BEFORE SALE CLOSURE - To assure the adequacy of required erosion control work on timber sales. | 97% | 1. TSA reviews erosion prevention work before each harvest unit is considered complete.<br>2. The inspection will determine if the work is acceptable and will meet the objective of the erosion control feature. | A careful review of erosion prevention work will be made by the TSA before each harvest unit is considered complete. The inspection will determine if the work is acceptable and will meet the objective of the erosion control feature. A feature is considered not acceptable if it does not meet standards or is not expected to protect soil/water resources. Technical assistance will be used as necessary. | TSA | B(T)6.36 |

Appendix page 43

7-ER-1702

Black Ram Project Decision Notice and FONSI

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 14.20 | SLASH TREATMENT IN SENSITIVE AREAS - To protect water quality by protecting sensitive tributary areas from degradation that would result from using mechanized equipment for slash disposal. | 93% | 1. Where harvest is proposed within riparian areas, slash should be removed with the tree or scattered and not treated. 2. Limit mechanical fuels treatment to slopes < 40%. 3. Mechanical slash piling should not excessively disturb soil surface. 4. Scarification is limited to extent necessary to meet management objectives. | All activities will comply with the 2015 KNF Forest Plan. | TSA; FMO | B(T)6.5 C(T)6.50# B(T)6.7 C(T)6.7 C(T)6.71 C(T)6.753 |
| 14.22 | MODIFICATION OF THE TSC - To modify the TSC if new circumstances or conditions indicate the timber sale will cause irreversible damage to soil, water, or watershed values. | 100% | 1. Environmental modification procedure. | If TSC is not adequate to protect soil and water resources, the TSA and Contracting Officer are responsible for recommending modification of the TSC. | TSA | B(T)8.33 |
| 15.01 | GENERAL GUIDELINES FOR TRANSPORTATION PLANNING - To introduce soil and water resource considerations into transportation planning. | 100% | 1. Complete a roads analysis. 2. Transportation plans include proper drainage installation and maintenance. | A roads Analysis has been completed. The IDT has evaluated watershed characteristics and estimated the response of soil and water resources to proposed transportation alternatives and activities. | IDT; ER | N/A |

FS-002218

Black Ram Project Decision Notice and FONSI

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 15.02 | GENERAL GUIDELINES FOR THE LOCATION AND DESIGN OF ROADS AND TRAILS - To locate and design roads and trails with minimal soil and water impact while considering all design criteria. | 95% | 1. Avoid sensitive landtypes, riparian areas, and wetlands during planning. 2. Minimize amount of roads and trails necessary to accomplish work. 3. Design roads for drainage efficiency. 4. Route road drainage through adequate filtration before entering streams. 5. Ensure proper size of stream crossings structures. New or replacement structures should pass the 100-year flow event. 6. Ensure culverts conform to natural streambed and slope. 7. Ensure ditch relief culverts have stable catch basins, inflow end protected from plugging, and appropriate skew. | The IDT has ensured that the location and design of roads and trails are based on multiple resource objectives. Mitigation measures have been designed to protect the soil and water resources identified in the NEPA process. Contract provisions will be prepared by the ER that meets the soil and water resource protection requirements. | IDT; ER | N/A |
| 15.03 | ROAD AND TRAIL EROSION CONTROL PLAN - To prevent, limit, and mitigate erosion, sedimentation, and resulting water quality degradation prior to the initiation of construction by timely implementation of erosion control practices. | 96% | 1. Seed disturbed areas. 2. Install proper ditching and road slope. 3. Install proper drainage. 4. Incorporate road grade breaks. 5. Use minimum road or trail length/width necessary. 6. Avoid wet areas or areas of sensitive soil types. 7. Slash filter windrows used where needed and feasible. | IDT has established soil/water conservation objectives and mitigation measures. ER will prepare a contract that reflects the objectives. ER will see that erosion control measures are approved and completed in a timely manner. IDT reviews projects to check effectiveness of erosion control features. | IDT; ER | B(T)6.31 B(T)6.6 B(T)6.312 |

Appendix page 45

7-ER-1704

FS-002219

Black Ram Project Decision Notice and FONSI

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 15.04 | TIMING OF CONSTRUCTION ACTIVITIES - To minimize erosion by conducting operations during minimal runoff periods. | 98% | 1. Avoid construction during wet periods.<br>2. Follow timing restrictions for aquatic species if applicable. | If limited operating periods are identified and recommended during the analysis by the IDT, the ER will put these measures into contract provisions. Compliance is assured by Contracting Officer or ER. | IDT; ER | B(T)6.31<br>B(T)6.312<br>B(T)6.6<br>SPS 204 |
| 15.05 | SLOPE STABILIZATION AND PREVENTION OF MASS FAILURES - To reduce sedimentation by minimizing the chances for road-related mass failures, including landslides and embankment slumps. | 99% | 1. Avoid construction across unstable areas.<br>2. Construct embankments following approved engineering practices.<br>3. Use minimum road or trail length/width necessary.<br>4. Do not incorporate woody debris incorporated into road-fill. | Road and trail construction in mountainous terrain requires cutting and loading natural slopes which may lead to landslides and/or embankment failures. In areas with intrinsic slope stability problems, appropriate technical resource personnel must be involved in an interdisciplinary approach to route location. | IDT; ER | N/A |
| 15.06 | MITIGATION OF SURFACE EROSION AND STABILIZATION OF SLOPES - To minimize soil erosion from road cutslopes, fill slopes, and travel ways. | 95% | 1. Seed cut and fill slopes.<br>2. Install proper ditching and road slope.<br>3. Install proper drainage.<br>4. Incorporate road grade breaks.<br>5. Install ditch relief culverts before/after stream crossings.<br>6. Construct cut and fill slopes at stable angles. | If the IDT has outlined erosion control measures outside the normal BMPs they will be described in the Design Criteria. Stabilization techniques are included in contract provisions. Compliance is assured by Contracting Officer or ER. | IDT; ER | SPS 203, 204, 206A 210, 412 619, 625, 626 630<br>B(T)5.3,<br>B(T)6.31<br>B(T)6.6,<br>B(T)6.62<br>B(T)6.66<br>B(T)6.312,<br>C(T)6.6<br>C(T)6.601# |

Black Ram Project Decision Notice and FONSI

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 15.07 | CONTROL OF PERMANENT ROAD DRAINAGE - To minimize the erosive effects of concentrated water and degradation of water quality by proper design and construction of road drainage systems and drainage control structures. | 94% | 1. Avoid long sustained steep grades. 2. Install/maintain adequate surface drainage and ditch relief culverts (inlet clean, skewed). 3. Prevent erosion of culvert and bridge fills. 4. Maintain ditches. 5. New roads/temp roads should be constructed outside SMZs/RHCAs. 6. Energy dissipaters place at structure outlets. | If the IDT has outlined erosion control measures outside the normal BMPs they will be described in the Design Criteria. Compliance will be assured by the ER/Contracting Officer. | ER | B(T)5.3 C(T)5.31# B(T)6.311 B(T)6.6 C(T)6.6 |
| 15.08 | PIONEER ROAD CONSTRUCTION - To minimize sediment production and mass wasting associated with pioneer road construction. | 100% | 1. Ensure stable slopes during construction. 2. Seed exposed soil. 3. Avoid construction during wet periods. 4. Use slash filter windrows. | ER/CO will be responsible for enforcing contract specifications. The purchaser is responsible for submitting an operating plan that includes erosion control measures. | ER | B(T)6.6 B(T)5.23 B(T)6.31 B(T)6.312 B(T)6.311 SPS 204 |
| 15.09 | TIMELY EROSION CONTROL MEASURES ON INCOMPLETE ROADS AND STREAM CROSSING PROJECTS - To minimize erosion of and sedimentation from disturbed ground on incomplete projects. | 96% | 1. Avoid construction during wet periods. 2. Use slash filter windrows or silt fence. 3. Seed disturbed areas. | IDT has identified project location and mitigation measures in NEPA process. Protective measures will be kept current on all areas of disturbed, erosion-prone areas. ER/CO ensures contract compliance. | IDT; ER | B(T)6.31 B(T)6.6 B(T)5.23 B(T)6.66 C(T)6.6 |

Appendix page 47

7-ER-1706

Black Ram Project Decision Notice and FONSI

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 15.10 | CONTROL OF ROAD CONSTRUCTION, EXCAVATION, AND SIDE-CAST MATERIAL - To reduce sedimentation from unconsolidated excavated and side-cast material caused by road construction, reconstruction, or maintenance. | 96% | 1. Do not side-cast into waterways or sensitive areas. 2. Waste material from activities not place in a problem location. 3. Use slash-filter windrows or silt fence. | IDT has identified project location and mitigation measures in NEPA process. Protective measures will be kept current on all areas of disturbed, erosion-prone areas. ER/CO ensures contract compliance. | IDT; ER | B(T)5.3 C(T)5.31# SPS 203 SPS 204 |
| 15.11 | SERVICING AND REFUELING EQUIPMENT - To prevent contamination of waters from accidental spills of fuels, lubricants, asphalt, or other harmful materials. | 99% | 1. Ensure proper fuel storage and transportation. 2. Keep fuel, shop debris, and waste oil from streams, wetlands, ponds, and lakes. | ER/TSA/CO will designate the location, size, and uses of service refueling areas. All projects will adhere to the KNF Hazardous Substance Spill Plan in case of accidents. | ER; TSA | B(T)6.222 B(T)6.34 B(T)6.341 |
| 15.12 | CONTROL OF CONSTRUCTION IN RIPARIAN AREAS - To minimize the adverse effects on riparian areas from roads. | 98% | 1. Follow the 2015 KNF Forest Plan for construction within riparian areas. 2. Use slash filter windrows or silt fence. 3. Install/maintain adequate surface drainage and ditch relief culverts. 4. Number of stream crossings minimized on new and temp road construction. | Proposed new and temporary roads will adhere to guidelines in the Montana Streamside Management Zone Law (HB-731). All road activities will follow 2015 KNF Forest Plan. All required permits would be obtained. | ER; TSA | B(T)6.5 B(T)6.62 C(T)6.50# SPS 206 SPS 206A |

Appendix page 48

7-ER-1707

Black Ram Project Decision Notice and FONSI

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 15.13 | CONTROLLING IN-CHANNEL EXCAVATION - To minimize stream channel disturbances and related sediment production. | 96% | 1. Use silt fence to minimize introduced sediment.<br>2. Use minimum amount of road.<br>3. Construct minimum number of crossings.<br>4. Stream channel disturbance minimized, on-site erosion prevented, and sedimentation prevented. | BMP improvements at stream crossings would adhere to the guidelines in Montana Streamside Management Zone Law (HB-731) and the 2015 KNF Forest Plan. All required permits would be obtained. | ER; TSA | B(T)6.5 SPS 204 SPS 206 206A |
| 15.14 | DIVERSION OF FLOWS AROUND CONSTRUCTION SITES - To minimize downstream sedimentation by insuring all stream diversions are carefully planned. | 93% | 1. Divert stream flow around construction.<br>2. Use silt fence to minimize introduced sediment.<br>3. Construct during low-flow. | All required permits would be obtained. Compliance with contract provisions would be done by the ER. | HYD; FB; ER | B(T)6.5 B(T)6.31 C(T)6.50# C(T)6.6 |
| 15.15 | STREAM CROSSINGS ON TEMPORARY ROADS - To keep temporary roads from unduly damaging streams, disturbing channels, or obstructing fish passage. | 97% | 1. Consult Watershed Personnel on placement.<br>2. Use minimum number of stream crossings.<br>3. Construct during low-flow.<br>4. Follow the 2015 KNF Forest Plan guidelines for construction within riparian areas.<br>5. Stream crossings are installed at right angles, if practical.<br>6. Ensure temporary stream crossings are adequately removed and channel cross-section is restored. | The IDT identifies areas in need of a temporary road during the NEPA process. Proposed stream crossings would adhere to the guidelines in Montana Streamside Management Zone Law (HB-731). All required permits would be obtained. | PSF; TSA | N/A |
| 15.16 | BRIDGE AND CULVERT INSTALLATION - To minimize sedimentation and turbidity resulting from excavation for in-channel structures. | 97% | 1. Install during periods of low flow.<br>2. Use instream sediment retention devices throughout implementation. | IDT has identified project location and mitigation measures in NEPA process. Protective measures will be kept current on all areas of disturbed, erosion-prone areas. TSA ensures contract compliance. All required permits would be obtained. | IDT; TSA; ER | C(T)6.5# |

FS-002223

Black Ram Project Decision Notice and FONSI

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 15.17 | REGULATION OF BORROW PITS, GRAVEL SOURCES, AND QUARRIES - To minimize sediment production from borrow pits, gravel sources, and quarries and limit channel disturbance in those gravel sources suitable for development in floodplains. | 98% | 1. Permit sand and gravel removal in RHCAs only if no alternative exists and adverse effects to water resources are minimized or avoided. 2. Borrow and gravel pits located and left in a condition to prevent sediment delivery. 3. Limit the area of operation to a minimum while providing sufficient area for material processing and stockpiling. 4. Phase development where practicable. | Construct and operate borrow pits, gravel sources, and quarries in a manner that minimizes effects to soil and water resources. | ER | B(T)6.5 C(T)6.50# |
| 15.18 | DISPOSAL OF RIGHT-OF-WAY AND ROADSIDE DEBRIS - To ensure that debris generated during road construction is kept out of streams and prevent slash and debris from subsequently obstructing channels. | 98% | 1. Debris and slash generated during road construction should not be side-cast into streams. | Proposed road construction will adhere to the guidelines in the Montana Streamside Management Zone Law (HB-731). | ER | Std Spec 201 SPS 201 |
| 15.19 | STREAM BANK PROTECTION – To minimize sediment production from stream banks and structural abutments in natural waterways. | 98% | 1. Take precautions to minimize or eliminate disturbance to stream banks. 2. Maintain instream structures. | IDT has identified project location and mitigation measures during NEPA process. Protective measures will be kept current on all areas of disturbed soils. TSA and ER ensure contract compliance. | IDT; ER; TSA | Std Spec 619 |

Black Ram Project Decision Notice and FONSI

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 15.20 | WATER SOURCE DEVELOPMENT CONSISTENT WITH WATER QUALITY PROTECTION - To supply water for road construction and maintenance and fire protection while maintaining water quality. | 93% | 1. Clean equipment before drafting and when changing between water sources to prevent the spread of aquatic invasive species. 2. When drafting water, pumps should be screened to prevent entrainment of fish or other aquatic organisms. | Conduct water drafting at suitable locations and in a manner that avoids or minimizes adverse effects to water quality, fisheries, and other aquatic organisms. | ER; FMO | Std Spec 207 |
| 15.21 | MAINTENANCE OF ROADS - To maintain all roads in a manner that provides for soil and water protection by minimizing rutting, failures, side-cast, and blockage of drainage facilities. | 96% | 1. Road grading sufficient to maintain road surface where necessary. 2. Erosion control features maintained in an operational condition. 3. Road grading avoids cutting toe of cut-slope. 4. Road and/or culvert maintenance did not side-cast sediment into or near a water body. | Road maintenance associated with a timber sale is the responsibility of purchaser. The ER/SA will ensure that the purchaser maintains roads according to the appropriate maintenance level. | ER; TSA | B(T)5.12 B(T)5.3 B(T)6.6 C(T)6.6 C(T)5.31# C(T)5.32# B(T)6.31 |
| 15.22 | ROAD SURFACE TREATMENT TO PREVENT LOSS OF MATERIALS - To minimize the erosion of road surface materials and, consequently, reduce the likelihood of sediment production. | 98% | 1. Maintenance of road surface should include proper blading and/or dust abatement. 2. Use crush-gravel where necessary. | Protective measures will be kept current on all areas of disturbed, erosion-prone areas. ER ensures contract compliance. | IDT; ER | B(T)5.3 C(T)5.31# C(T)5.314# |

Appendix page 51

7-ER-1710

Black Ram Project Decision Notice and FONSI

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 15.23 | TRAFFIC CONTROL DURING WET PERIODS - To reduce the potential for road surface disturbance during wet weather and reduce sedimentation. | 97% | 1. Road use avoided during wet periods. | Road restrictions and traffic control measures will be implemented on all haul roads during spring break up or considerably wet periods. The decision to restrict a road is made by the ER. Hauling restrictions would be controlled by the TSA. | ER; TSA | B(T)6.6 C(T)6.6 C(T5).316# C(T)5.41# |
| 15.24 | SNOW REMOVAL CONTROLS - To minimize the impact of snow melt on road surfaces and embankments and reduce the probability of sediment production resulting from snow removal operations. | 97% | 1. Be careful not to leave snow berm at edge of road where possible. 2. Where a berm cannot be avoided, ensure proper drainage by opening sections of berm to allow water to leave road surface. | Snow removal will be kept current on all roads associated with winter logging operations. The TSA ensures compliance with contract provisions. | IDT; TSA | C(T)5.316# Std Spec 203.09 |
| 15.25 | OBLITERATION OF TEMPORARY ROADS - To reduce sediment generated from temporary roads by obliterating them at the completion of their intended use. | 97% | 1. Re-contour road fully where feasible. 2. Seed exposed soil. 3. Pull slash and woody debris back onto rehabilitated road. | This work will be done on all new temporary roads in the decision area. The work will be done by the purchaser with compliance by the TSA. Roads will be left in a condition to provide adequate drainage without further maintenance. | TSA | B(T)6.63 C(T)6.6 C(T)6.632# C(T)6.633# |

Appendix page 52

7-ER-1711

Black Ram Project Decision Notice and FONSI

| SWCP | SWCP Objective | Monitored Effectiveness | Recommended Best Management Practices by IDT/TSA | Considerations for Best Management Practices | Person(s) Responsible | Contract Provisions |
|---|---|---|---|---|---|---|
| 18.03 | PROTECTION OF SOIL AND WATER FROM PRESCRIBED BURNING EFFECTS - To maintain soil productivity, minimize erosion, and prevent ash, sediment, nutrients, and debris from entering surface water. | 100% | 1. Follow 2015 KNF Forest Plan Riparian Guidelines for burning in RHCAs.<br>2. Adhere to SMZ Law.<br>3. Where harvest within riparian areas is proposed, either the slash should be removed with the tree or scattered and not treated.<br>4. Limit soil and water quality impact of prescribed fire.<br>5. Adequate erosion protection on fire lines, sufficient until stabilized by vegetation. | Broadcast burning adjacent to riparian areas will adhere to guidelines in the Montana Streamside Management Zone Law (HB-731). Prescribed burn plans identify the conditions necessary to prevent soil damage and meet site preparation objectives. | FMO | N/A |

Appendix page 53

7-ER-1712

Black Ram Project Decision Notice and FONSI

# Appendix F – Monitoring Plan

| Item # | Resource | Objective | Timing | Methodology | Responsible Resource |
|---|---|---|---|---|---|
| 1 | Botany | Identify sensitive plants in units | Pre and Post Treatment | Walk through Sensitive plant surveys | Vegetation |
| 2 | Cultural Resources | Ensure effectiveness of historic properties protection measures. | Pre and Post Fuels Treatment | Pedestrian survey will be conducted over newly disturbed or exposed surfaces within specified units. Fire line construction will be actively monitored in specified units. | Heritage |
| 3 | Noxious Weeds | Monitor noxious weed infestations | Pre and Post Treatment | Monitor Project Area to determine effectiveness of weed spraying. Photo monitoring surveys will be completed over the life of the project in some units | Vegetation (Weeds) |
| 4 | Silviculture | Track insect and diseases | Post Treatment | Annual insect and disease mortality surveys; ongoing program accomplished by Forest Health Protection (FHP). | R-1 Forest Health Protection |
| 5 | Silviculture | Assure regeneration harvest units are stocked with trees in 5 years | Post Treatment | Reforestation surveys the 1st, 3rd and 5th year after planting. | Vegetation |
| 6 | Silviculture/ Botany | Monitor old growth characteristics and effectiveness of harvest and fuels treatments | Pre and Post Treatment | Walk through transects or old growth plots | Vegetation |
| 7 | Silviculture/ Fuels/ Wildlife | Determine whether fuels treatment objectives were accomplished | Post Treatment | Review selected treatment areas. Evaluate silvicultural objectives and prescribed burn objectives. | Fuels/Vegetation// IDT |
| 8 | Soils | Monitor detrimental soil disturbance and effectiveness of project specific design features. | Post Treatment | Randomly sample timber sale units and associated temporary roads, skid trails and landings using approved methodology. | Soils |
| 9 | Soils/ Silviculture | Monitor coarse woody debris (CWD) for retention | Post Treatment | Measure tons per acre of CWD within a representative sample of both burned and piled units. | Soils/Vegetation |
| 10 | Watershed | Monitor implementation and effectiveness of Best Management Practices (BMPs) used for project activities (includes monitoring RHCAs) | During and post project activities | Review a representative sample of timber sale units, road reconstruction, road storage and road decommissioning and complete BMP monitoring reports. | Sale Admin/ Engineering /IDT/District Staff |

Appendix page 54

7-ER-1713

FS-002228

Black Ram Project Decision Notice and FONSI

| Item # | Resource | Objective | Timing | Methodology | Responsible Resource |
|---|---|---|---|---|---|
| 11 | Wildlife | Determine effectiveness of burning to increase browse. | 1-3 years after burning | Survey selected underburn treatments to determine the species of browse and to what extend burning has stimulated browse. | Wildlife / Fuels |
| 12 | Scenery | Determine effectiveness of the design features to meet the scenic integrity objective along the roaded PNNST | 2 to 5 years post Project activities | Visual surveys with photo documentation | Recreation |
| 13 | Recreation | Monitor the use of the Pacific Northwest National Scenic Trail | Ongoing | Trail cameras are used to count the number of hikers | Forest Service Region 6 and the University of Montana |
| 14* | Wildlife | Monitor all new closures on roads that were created with in-kind replacement of core (IKRC), See Appendix D for road list | Spring or early summer and Fall for 3 years | Check berms or gates on these roads using district monitoring protocols | Wildlife |
| | | | | | |

*This is a requirement from the Black Ram Biological Opinion.

Appendix page 55

7-ER-1714

Black Ram Project Decision Notice and FONSI

## Appendix G- Alternative 2 Map



FS-002230