Nos. 23-2882, 23-2886, 23-3146

———————————————

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————————

CENTER FOR BIOLOGICAL DIVERSITY, et al.,
*Plaintiffs-Appellees/Plaintiffs-Appellants*,

and

ALLIANCE FOR THE WILD ROCKIES, et al.,
*Plaintiffs-Appellees/Plaintiffs*,

v.

UNITED STATES FOREST SERVICE, et al.,
*Defendants-Appellants/Defendants/Defendants-Appellees*,

and

KOOTENAI TRIBE OF IDAHO,
*Intervenor-Defendant/Intervenor-Defendant-Appellant/
Intervenor Defendant-Appellee.*

———————————————

Appeal from the United States District Court for the District of Montana
No. 9:22-cv-114 (Hon. Donald W. Molloy)

———————————————

**JOINT EXCERPTS OF RECORD
VOLUME 9 OF 10**

———————————————

Of Counsel:                          TODD KIM
                                     *Assistant Attorney General*

ELISE FOSTER
*Attorney*                           THEKLA HANSEN-YOUNG
U.S. Dep't of Agriculture            HAYLEY A. CARPENTER
                                     ERIKA A. FURLONG
KATHRYN L. WILLIAMS-SHUCK            JOHN P. TUSTIN
SARAH E. MCLAIN                      JACOB D. ECKER
*Attorneys*                          *Attorneys*
U.S. Dep't of the Interior           Environment and Natural Resources Division
                                     U.S. Department of Justice
                                     Post Office Box 7415
                                     Washington, D.C. 20044
                                     (202) 305-0466

jacob.ecker@usdoj.gov

*Attorneys for Federal Defendants-Appellants*

Julie A. Weis
HAGLUND KELLEY LLP

Kris A. McLean
Tyson A. McLean
Kris A. McLean Law Firm

*Attorneys for Defendant-Intervenor-Appellant Kootenai Tribe of Idaho*

# CABINET-YAAK GRIZZLY BEAR RECOVERY AREA 2019 RESEARCH AND MONITORING PROGRESS REPORT



**PREPARED BY**
**WAYNE F. KASWORM, THOMAS G. RADANDT, JUSTIN E. TEISBERG, TYLER VENT, ALEX WELANDER, MICHAEL PROCTOR, HILARY COOLEY, AND JENNIFER FORTIN-NOREUS**
**2020**

**UNITED STATES FISH AND WILDLIFE SERVICE**
**GRIZZLY BEAR RECOVERY COORDINATOR'S OFFICE**
**UNIVERSITY OF MONTANA, MAIN HALL ROOM 309**
**MISSOULA, MONTANA  59812**
**(406) 243-4903**

1

FS-005933

produced from this data would appear to be applicable to the entire population of native bears in the absence of population augmentation. We have no data to suggest that mortality or reproductive rates are different between the Yaak River and the Cabinet Mountains. The Cabinet Mountains portion of the population was estimated to be <15 in 1988 (Kasworm and Manley 1988) and subsequent lack of identification of resident bears through genetic techniques would suggest the population was possibly 5–10. Population augmentation has added 22 bears into this population since 1990 and a mark recapture population estimate from 2012 indicated the population was 22–24 individuals (Kendall *et al.* 2016). These data indicate the Cabinet Mountains population has increased by 2–4 times since 1988, but this increase is largely a product of the augmentation effort with reproduction from that segment.

The estimated finite rate of increase ($\lambda$) for 1983–2019 using Booter software with the unpaired litter size and birth interval data option was 1.009 (95% CI=0.931–1.073, Table 15). Finite rate of change over the same period was an annual 0.9% (Caughley 1977). Subadult female survival and adult female survival accounted for most of the uncertainty in $\lambda$, with reproductive rate, yearling survival, cub survival, and age at first parturition contributing much smaller amounts. The sample sizes available to calculate population trend are small and yielded wide confidence intervals around our estimate of trend (i.e., $\lambda$). The probability that the population was stable or increasing was 60%. Utilizing the entire survival and reproductive data set from 1983–2019 is partially the product of small sample sizes but also produces the effect of smoothing the data over time and results in a more conservative estimate of population trend.

Finite rates of increase calculated for the period 1983–1998 ($\lambda$ = 1.067) suggested an increasing population (Wakkinen and Kasworm 2004). Lack of mortality in specific sex-age classes limited calculations for many time periods other than those shown here (Fig. 12). Annual survival rates for adult and subadult females were 0.948 and 0.901 respectively, during 1983–1998, and then declined to 0.926 and 0.740 for the period of 1983–2006, respectively. Cumulative lambda calculations reached the lowest point in 2006 (Fig. 12). Human-caused mortality has accounted for much of this decline in annual survival rate and population trend. During 2019, adult female survival and subadult female survival had increased to 0.940 and 0.847 respectively and resulted in an improving population trend estimate since 2006. Improving survival by reducing human-caused mortality is crucial for recovery of this population (Proctor *et al.* 2004).

Table 15. Booter unpaired method estimated annual survival rates, age at first parturition, reproductive rates, and population trend of native grizzly bears in the Cabinet–Yaak recovery zone, 1983–2019.

| Parameter | Sample size | Estimate (95% CI) | SE | Variance (%)[a] |
|---|---|---|---|---|
| Adult female survival[b] ($S_a$) | 16 / 48.5[c] | 0.940 (0.856–1.0) | 0.036 | 33.4 |
| Subadult female survival[b] ($S_s$) | 20 / 25.6[c] | 0.847 (0.692–0.965) | 0.072 | 51.0 |
| Yearling survival[b] ($S_y$) | 33 / 1632[c] | 0.885 (0.723–1.0) | 0.076 | 2.9 |
| Cub survival[b] ($S_c$)[d] | 44/44 | 0.591 (0.455–0.727) | 0.074 | 6.2 |
| Age first parturition (a) | 14 | 6.3 (5.9–6.6) | 0.188 | 0.5 |
| Maximum age (w) | Fixed | 27 | | |
| Unpaired Reproductive rate (m)[e] | 12/24/27[f] | 0.360 (0.291–0.467) | 0.045 | 6.1 |
| Unpaired Lambda ($\lambda$) | 5000 bootstrap runs | 1.009 (0.931–1.073) | 0.037 | |

[a] Percent of lambda explained by each parameter
[b] Booter survival calculation which may differ from Kaplan-Meier estimates in Table 13.
[c] individuals / bear-years
[d] Cub survival based on counts of individuals alive and dead
[e] Number of female cubs produced/year/adult female. Sex ratio assumed to be 1:1.
[f] Sample size for individual reproductive adult females / sample size for birth interval / sample size for litter size from Table 14.

39

FS-005971

Population Estimate

During 2012, USGS used mark-recapture techniques to estimate the CYE grizzly bear population at 48–50 (95% CI = 44–62) (Kendall *et al*. 2016). Using the midpoint of this estimate (49), the calculated rate of increase (0.9%), results in a gain of 3 bears through 2019 to a population of 52. The augmentation program added 8 bears since 2012 but two of those are known dead. Based on this information, a population estimate of 55–60 bears would seem reasonable.



Figure 12. Point estimate and 95% confidence intervals for cumulative annual calculation of population rate of change for native grizzly bears in the Cabinet-Yaak recovery area, 1983–2019. Each entry represents the annual rate of change from 1983 to that date.

## Capture and Marking

Five grizzly bears were captured within the Cabinet and Yaak study area (1 adult female, 2 adult males, and 2 subadult males) during 2019. Four grizzly bears (1 female and 3 males) were captured for research monitoring and one male was captured for management purposes. Ninety-five individual grizzly bears have been captured 144 times as part of this monitoring program since 1983 (Tables 16 and 17). One-hundred twenty captures occurred for research purposes and 24 captures occurred for management purposes.

Cabinet Mountains

Research trapping was conducted in the Cabinet Mountains portion of the CYE from 1983–87. Three adult grizzly bears were captured during this effort (1 female and 2 males). No trapping occurred from 1988–1994 as effort was directed toward the Yaak River. In 1995 an effort was initiated to recapture relocated bears in order to determine success of the population augmentation program and capture any native bears in the Cabinet Mountains. During 1983–2019, 7,667 research trap-nights were expended to capture 13 known individual grizzly bears and 317 individual black bears (Table 16 and 17, Fig. 13). Rates of capture by individual were 1

40



# Kootenai Tribe of Idaho

P.O. Box 1269
100 Circle Drive
Bonners Ferry, ID 83805
Ph# (208) 267-3519
Fax (208) 267-2960

08 October 2021

Ms. Stephenne S. Harding
Senior Director for Lands
White House Council on Environmental Quality
Executive Office of the President
Stephenne.S.Harding@ceq.eop.gov

Mr. Matt Lee-Ashley
Chief of Staff
Council on Environmental Quality
Executive Office of the President
Matthew.G.Lee-Ashley@ceq.eop.gov

Re: Black Ram Project: Ktunaxa Territory, Kootenai National Forest

Dear Senior Director Harding and Chief of Staff Lee-Ashley:

Kootenai (Ktunaxa) Tribe elders pass down the history of the beginning of time, which tells that the Ktunaxa people were created by Quilxka Nupika, the Supreme Being, and placed on earth to keep the Creator-Spirit's Covenant – to guard and keep the land forever. The Kootenai have never lost sight of their original purpose as guardians of the land.

The Kootenai Tribe and the United States Forest Service enjoy an exceptionally close working relationship and collaborate often on issues of common concern to protect the National Forest System lands within Ktunaxa Territory, which includes the Idaho Panhandle and Kootenai National Forests. Management of the National Forests within the Territory is important to fulfill our Covenant with the Creator.

The Black Ram Project ("Project") is located in Ktunaxa Territory and includes traditional use areas, sacred sites, and areas where Kootenai citizens exercise Treaty-reserved hunting, fishing and gathering rights. The area is critical to the culture and religion of the Kootenai Tribe and greater Ktunaxa Nation.

Forest management over the last century through fire suppression policies, overharvest and other policies has led to Forests in poor health, including the Project area. The Kootenai Tribal Council heeds the words of its elders, who say the forests in the Territory do not look like they are supposed to look based on Ktunaxa oral histories, and the forests do not support the Territory and the Ktunaxa in the manner they should. The Covenant must be honored to make the forests healthy once again.

FS-032834

Black Ram Project
Page 2

The Kootenai Tribe, the Three Rivers Ranger District and the Kootenai National Forest have been in continuous government-to-government consultation since before scoping on the Project. The Tribe agreed and continues to agree with the Project's purpose and need, which are consistent with the Tribe's mandates under the Covenant.

The Tribe provided extensive and critical comments to the District and Forest during scoping and early iterations of the environmental assessment. The Tribe, District and Forest worked together to address the Tribe's concerns. The recent biological opinion issued by the U.S. Fish and Wildlife Service also contains a number of mitigation measures that improve the Project.

Based on the extensive government-to-government discussions, Ktunaxa traditional knowledge and western science from our Fish and Wildlife Department and the Forest Service, the Tribe fully supports the Project and asks that the White House and Council on Environmental Quality allow the Project to move forward. Doing so will not only allow the Forest Service to fulfill its federal responsibilities, it will allow the Tribe to continue to fulfill its Covenant and its collaborative work toward restoring forest health in the Territory.

The Tribe is aware certain individuals and nongovernmental organizations have lobbied you and the Council on Environmental Quality to terminate the Project. We cannot express enough our frustration that one of the tactics they have used as part of their lobbying is to claim the Forest Service has not consulted with Indigenous Nations. Those individuals and nongovernmental organizations do not represent Indigenous Nations and should not speak on behalf of Indigenous Nations. Shame on them for attempting to do so.

The Tribe appreciates your listening to the message of this letter. We would be very happy to meet government-to-government with your agency on this important Project. Please contact Attorney General William Barquin at wbarquin@kootenai.org to arrange such a meeting.

Sincerely yours,

Jennifer Porter
Chairperson

cc: The Hon. Shelly Fyant, Chairwoman, Confederated Salish & Kootenai Tribes
  (constituent government of the Ktunaxa Nation)
  Mr. Vernon Finley, Director, Kootenai Culture Committee, CSKT

FS-032835

**August 7, 2019**

**Chad Benson, Forest Supervisor,**
**Ranger Kirsten Kaiser**
**Three Rivers Ranger District,**
**12858 US Highway 2**
**Troy, Montana 59935.**

**RE: Black Ram Project EA**

**Dear Supervisor Benson and Ranger Kaiser,**

**Please accept these comments from me on behalf of the Alliance for the Wild Rockies and Native Ecosystems Council.**

**The Alliance for the Wild Rockies and Native Ecosystems Council (collectively "Alliance") submit the following comments to guide the development of the environmental analysis for the proposal. The Forest Service must complete a full environmental impact statement (EIS) for this Project because the scope of the Project will likely have a significant individual and cumulative impact on the environment. Alliance has reviewed the statutory and regulatory requirements governing National Forest Management projects, as well as the relevant case law, and compiled a check-list of issues that must be included in the EIS for the Project in order for the Forest Service's analysis to comply with the law. Following the list of necessary elements, Alliance has also included a general narrative discussion on possible impacts of the Project, with accompanying citations to the relevant scientific literature. These references should be disclosed and discussed in the EIS for the Project.**

**I. NECESSARY ELEMENTS FOR PROJECT EIS or that need to be answered in an EA:**

- **Disclose all Kootenai National Forest Plan requirements for logging/ burning projects and explain how the Project complies with them;**

- **Disclose the acreages of past, current, and reasonably foreseeable logging, grazing, and road-building activities within the Project area;**

FS-034673

- **Solicit and disclose comments from the Montana Department of Fish, Wildlife, and Parks regarding the impact of the Project on wildlife habitat;**

- **Solicit and disclose comments from the Montana Department of Environmental Quality regarding the impact of the Project on water quality;**

- **Disclose the biological assessment for the candidate, threatened, or endangered species with potential and/or actual habitat in the Project area;**

- **Disclose the biological evaluation for the sensitive and management indicator species with potential and/or actual habitat in the Project area;**

- **Disclose the snag densities in the Project area, and the method used to determine those densities;**

- **Disclose the current, during-project, and post-project road densities in the Project area;**

- **Disclose the Kootenai National Forest's record of compliance with state best management practices regarding stream sedimentation from ground-disturbing management activities;**

- **Disclose the Kootenai National Forest's record of compliance with its monitoring requirements as set forth in its Forest Plan;**

- **Disclose the Kootenai National Forest's record of compliance with the additional monitoring requirements set forth in previous DN/FONSIs and RODs on the Kootenai National Forest;**

FS-034674

- **Disclose the results of the field surveys for threatened, endangered, sensitive, and rare plants in each of the proposed units;**

- **Disclose the level of current noxious weed infestations in the Project area and the cause of those infestations;**

- **Disclose the impact of the Project on noxious weed infestations and native plant communities;**

- **Disclose the amount of detrimental soil disturbance that currently exists in each proposed unit from previous logging and grazing activities;**

- **Disclose the expected amount of detrimental soil disturbance in each unit after ground disturbance and prior to any proposed mitigation/remediation;**

- **Disclose the expected amount of detrimental soil disturbance in each unit after proposed mitigation/remediation;**

- **Disclose the analytical data that supports proposed soil mitigation/remediation measures;**

- **Disclose the timeline for implementation;**

- **Disclose the funding source for non-commercial activities proposed;**

- **Disclose the current level of old growth forest in each third order drainage in the Project area;**

FS-034675

- **Disclose the method used to quantify old growth forest acreages and its rate of error based upon field review of its predictions;**

- **Disclose the historic levels of mature and old growth forest in the Project area;**

- **Disclose the level of mature and old growth forest necessary to sustain viable populations of dependent wildlife species in the area;**

- **Disclose the amount of mature and old growth forest that will remain after implementation;**

- **Disclose the amount of current habitat for old growth and mature forest dependent species in the Project area;**

**AA. Disclose the amount of habitat for old growth and mature forest dependent species that will remain after Project implementation;**

**BB. Disclose the method used to model old growth and mature forest dependent wildlife habitat acreages and its rate of error based upon field review of its predictions;**

**CC. Disclose the amount of big game (moose and elk) hiding cover, winter range, and security currently available in the area;**

**DD. Disclose the amount of big game (moose and elk) hiding cover, winter range, and security during Project implementation;**

**EE. Disclose the amount of big game (moose and elk) hiding cover, winter range, and security after implementation;**

FS-034676

**FF.** Disclose the method used to determine big game hiding cover, winter range, and security, and its rate of error as determined by field review;

**GG.** Disclose and address the concerns expressed by the ID Team in the draft Five-Year Review of the Forest Plan regarding the failure to monitor population trends of MIS, the inadequacy of the Forest Plan old growth standard, and the failure to compile data to establish a reliable inventory of sensitive species on the Forest;

**HH.** Disclose the actions being taken to reduce fuels on private lands adjacent to the Project area and how those activities/or lack thereof will impact the efficacy of the activities proposed for this Project;

**II.** Disclose the efficacy of the proposed activities at reducing wildfire risk and severity in the Project area in the future, including a two-year, five-year, ten-year, and 20-year projection;

**JJ.** Disclose when and how the Kootenai National Forest made the decision to suppress natural wildfire in the Project area and replace natural fire with logging and prescribed burning;

**KK.** Disclose the cumulative impacts on the Forest-wide level of the Beaverhead- Deerlodge National Forest's policy decision to replace natural fire with logging and prescribed burning;

**LL.** Disclose how Project complies with the Roadless Rule;

**MM.** Disclose the impact of climate change on the efficacy of the proposed treatments;

**NN.** Disclose the impact of the proposed project on the carbon storage potential of the area;

**OO.** Disclose the baseline condition, and expected sedimentation during and after activities, for all streams in the area;

FS-034677

Disclose maps of the area that show the following elements:

Past, current, and reasonably foreseeable logging units in the Project area;

Past, current, and reasonably foreseeable grazing allotments in the Project area; Density of human residences within 1.5 miles from the Project unit boundaries; Hiding cover in the Project area according to the Forest Plan definition;

Old growth forest in the Project area;

Big game security areas;

Moose winter range;

## SOIL PRODUCTIVITY

The Kootenai National Forest (KNF) adopted the Region 1 Soil Quality Standards, FSM 2500-99-1 (SQS), to assure compliance with the Forest Plan and NFMA. The SQS limit the areal extent of detrimental soil disturbance within logging units to no more than 15%.

Soil Quality Standards "provide benchmark values that indicate when changes in soil properties and soil conditions would result in significant change or impairment of soil quality based on available research and Regional experience" (Forest Service Manual 2500, Region 1 Supplement 2500-99-1, Chapter 2550 – Soil Management, Section 2554.1).

The intent of the Regional Soil Quality Standards is that the FS must, in each case, consider the cumulative effects of both past and proposed soil disturbances to assure the desired soil conditions are met. This includes impacts from activities that include logging, firewood gathering, livestock grazing, and motorized recreation impacts.

Please disclose percent detrimental disturbance estimates provided by watershed. What is the relevance of the areal extent of management-induced soil damage over such a geographic area?

Alexander and Poff (1985) reviewed literature and found that the amount of soil damage varies even with the same logging system, depending on many factors. For example, as much as 10% to 40% of a logged area can be disturbed by skyline logging. They state:

FS-034678

There are many more data on ground disturbance in logging, but these are enough to indicate the wide diversity of results obtained with different equipment operators, and logging techniques in timber stands of different composition in different types of terrain with different soils. Added to all these variables are different methods of investigating and reporting disturbance.

The Sheep Creek Salvage FEIS (USDA Forest Service, 2005a) states at p. 173:

Noxious weed presence may lead to physical and biological changes in soil. Organic matter distribution and nutrient flux may change dramatically with noxious weed invasion. Spotted knapweed (Centaurea biebersteinii D.C.) impacts phosphorus levels at sites (LeJeune and Seastedt, 2001) and can hinder growth of other species with allelopathic mechanism. Specific to spotted knapweed, these traits can ultimately limit native species' ability to compete and can have direct impacts on species diversity (Tyser and Key 1988, Ridenour and Callaway 2001).

Please disclose how the productivity of the land and soils been affected in the project area and forest wide due to noxious weed infestations, and how that situation is expected to change in the coming years and decades.

From Grier et al., (1989):
The potential productivity of a site can be raised or lowered by management activities causing a permanent or long-term increase or decrease in the availability of nutrients essential for plant growth. (P. 27.)

...Any time organic matter is removed from a site, a net loss of nutrients from that site also occurs. In timber harvesting or thinning, nutrient losses tend to be proportional to the volume removed. (P. 27.)

...Slash burning is a common site preparation method that can affect soil chemical properties tremendously. A great deal of controversy is often associated with using fire because of

FS-034679

the wide variety of effects, some of which are definitely detrimental to site quality and some of which are beneficial. (P. 30.)

The KNF has never attempted to put in place a scientifically sound definition of "soil productivity" that can be measured and compared to baseline conditions. Harvey et al., 1994 state:

The ...descriptions of microbial structures and processes suggest that they are likely to provide highly critical conduits for the input and movement of materials within soil and between the soil and the plant. Nitrogen and carbon have been mentioned and are probably the most important. Although the movement and cycling of many others are mediated by microbes, sulfur phosphorus, and iron compounds are important examples.

The relation between forest soil microbes and N is striking. Virtually all N in eastside forest ecosystems is biologically fixed by microbes... Most forests, particularly in the inland West, are likely to be limited at some time during their development by supplies of plant-available N. Thus, to manage forest growth, we must manage the microbes that add most of the N and that make N available for subsequent plant uptake.

(Internal citations omitted.)

The proposal to log in areas of low soil productivity due to impacts of wildland fires and past logging activities flies in the face of NFMA's requirements to assure regeneration, sustained yield, and maintain soil productivity. Sec. 6. of the National Forest Management Act states:

(g) As soon as practicable, but not later than two years after enactment of this subsection, the Secretary shall in accordance with the procedures set forth in section 553 of title 5, United States Code, promulgate regulations, under the principles of the Multiple-Use, Sustained-Yield Act of 1960, that set out the process for the development and revision of the land management plans, and the guidelines and standards prescribed by this subsection. The regulations shall include, but not be limited to-

FS-034680

**(3) specifying guidelines for land management plans developed to achieve the goals of the Program which-**

**(E) insure that timber will be harvested from National Forest System lands only where-**

**(i) soil, slope, or other watershed conditions will not be irreversibly damaged;**

**NFMA regulations at 36 C.F.R. § 219.27 (Management requirements) state: (a) Resource protection. All management prescriptions shall--**

**(1) Conserve soil and water resources and not allow significant or permanent impairment of the productivity of the land;**
**(b) Vegetative manipulation. Management prescriptions that involve vegetative manipulation of tree cover for any purpose shall--**

**(5) Avoid permanent impairment of site productivity and ensure conservation of soil and water resources;**

**The scoping comments note that the project calls for 7.6 miles of new roads. Previous roadless inventories, both RARE II and during preparation of the Beaverhead Forest Plan and revised Forest Plan, omitted unroaded areas adjacent to the IRAs. Please include maps showing the location of unroaded areas—the boundaries of these areas. With the controversy—both social and scientific—surrounding the roadless issue, the failure to disclose with a map in an EIS all inventoried and uninventoried roadless lands makes no sense and constitutes a violation of NEPA.**

**What is a scientifically sound forest-wide standard for the KNF to insure the viability of the black-backed woodpecker? How much black-backed woodpecker habitat is currently available in the KNF, how is it distributed, and how much will be available after this latest timber sale?**

## ECONOMICS

**NFMA and the Forest and Rangeland Renewable Resources Planning Act (RPA) require management of national forest system lands in a manner that maximizes long term net public benefits based on the best available science. Please comply with the monitoring requirements of the Forest Plan or NFMA. Please include a complete cost benefit analysis for the project.**

FS-034681

Please consult with the Montana State Historic Preservation Office to ensure the project complies with the National Historic Preservation Act.

**CANADA LYNX VIABILITY**

On page 325 of the EA, it discusses "Correlates of Canada Lynx Reproductive Success in Northwestern Montana" by Megan K. Kosterman.

And "Understanding and predicting habitat for wildlife conservation: the case of Canada lynx at the range periphery" by HOLBROOK et al that confirms Kosterman's findings.

The EA claims that it is hard to compare the EA to the Losterman and Holbrook but it does not say if the action alternatives are complying with Kosterman and Holbrook which are the best available science. Do the action alternative comply with Kosterman and Holbrook's recommendations?

Kosterman. Holbrook and the Forest Service all base their lynx analysis on V map. They can be compared and we contend the project is not following the best available science, Kosterman and Holbrook.

Kosterman finds that 50% of lynx habitat must be mature undisturbed forest for it to be optimal lynx habitat where lynx can have reproductive success and no more than 15% of lynx habitat should be young clearcuts, i.e. trees under 4 inched dbh. This contradicts the agency's assumption in the Lynx Amendment that 30% of lynx habitat can be clearcut, and that no specific amount of mature forest needs to be conserved.

Kosterman also finds that lynx do not use clearcuts in the winter which is the time when they are at most risk of starvation.

FS-034682

It is now the best available science out there that describes lynx habitat in the Northern Rockies related to lynx viability and recovery. Kosterman's study demonstrates that the Lynx Amendment standards are not adequate for lynx viability and recovery, as previously assumed by the Forest Service.

Since this is now the best available science we are hereby formally requesting that the Forest Service write a supplemental EIS for the Northern Rockies Lynx Management Direction and reinitiate consultation with the FWS for the Lynx Amendment to publicly disclose and address the findings of this study, and to allow for further public comment on this important issue of lynx recovery.

1) USFS needs to take a hard look at impacts to lynx under NEPA, apply the lynx conservation measures and standards of the NRLMD, and consult on lynx via section 7 of the ESA b/c the best available science -- including recent tracking surveys conducted by WTU -- confirm lynx's presence and use of the area;

(3) USFS has failed to survey for lynx as required by the Biological Opinion on the Northern Rockies Lynx Management Direction (NRLMD).

In order to meet the requirements of the FS/USFWS Conservation Agreement, the FS agreed to insure that all project activities are consistent with the Lynx Conservation Assessment and Strategy (LCAS).

LCAS requirements include:

Project planning—standards.
1. Within each LAU, map lynx habitat. Identify potential denning habitat and foraging habitat (primarily snowshoe hare habitat, but also habitat for important alternate prey such as red squirrels), and topographic features that may be important for lynx movement (major ridge systems, prominent saddles, and riparian corridors). Also identify non-forest vegetation (meadows), shrub-grassland communities, etc.) adjacent to and intermixed with forested lynx habitat that may provide habitat for alternate lynx prey species.

2. Within a LAU, maintain denning habitat in patches generally larger than 5 acres, comprising at least 10 percent of lynx habitat. Where less than 10 percent denning habitat is

FS-034683

currently present within a LAU, defer any management actions that would delay development of denning habitat structure.

3. Maintain habitat connectivity within and between LAUs.

Programmatic planning-standards.

1. Conservation measures will generally apply only to lynx habitat on federal lands within LAUs.

2. Lynx habitat will be mapped using criteria specific to each geographic area to identify appropriate vegetation and environmental conditions. Primary vegetation includes those types necessary to support lynx reproduction and survival. It is recognized that other vegetation types that are intermixed with the primary vegetation will be used by lynx, but are considered to contribute to lynx habitat only where associated with the primary vegetation. Refer to glossary and description for each geographic area.

3. To facilitate project planning, delineate LAUs. To allow for assessment of the potential effects on an individual lynx, LAUs should be at least the size of area used by a resident lynx and contain sufficient year-round habitat.
4. To be effective for the intended purposes of planning and monitoring, LAU boundaries will not be adjusted for individual projects, but must remain constant.
5. Prepare a broad-scale assessment of landscape patterns that compares historical and current ecological processes and vegetation patterns, such as age-class distributions and patch size characteristics. In the absence of guidance developed from such an assessment, limit disturbance within each as follows: if more than 30 percent of lynx habitat within an LAU is currently in unsuitable condition, no further reduction of suitable conditions shall occur as a result o vegetation management activities by federal agencies.

Project planning-standards.
1. Management actions (e.g., timber sales, salvage sales) shall not change more than 15 percent of lynx habitat within a LAU to an unsuitable condition within a 10- year period.

Programmatic planning-standards.
1. Identify key linkage areas that may be important in providing landscape connectivity within and between geographic areas, across all ownerships.

FS-034684

**2. Develop and implement a plan to protect key linkage areas on federal lands from activities that would create barriers to movement. Barriers could result from an accumulation of incremental projects, as opposed to any one project.**

_____

**Please demonstrate that project activities are consistent with above and all other applicable programmatic and project requirements.**

**The U.S. Court of Appeals for the Ninth Circuit hold that "[o]nce an agency is aware that an endangered species may be present in the area of its proposed action, the ESA requires it to prepare a biological assessment . . . ." Thomas v. Peterson, 753 F. 2d 754, 763 (9thCir. 1985). If the biological assessment concludes that the proposed action "may affect" but will "not adversely affect" a threatened or endangered species, the action agency must consult informally with the appropriate expert agency. 50 C.F.R. §§ 402.14 (b)(1), 402.12(k)(1).**

**Canada lynx are listed under the ESA.**

**Canada lynx may be present in the project area and the proposed project may affect lynx by temporarily increasing road density, removing vegetative cover, and engaging in mechanized activities that could displace lynx.**

**Please complete a biological assessment for lynx and formally consult with USFWS regarding the project's potential impacts on lynx.**

### Grizzly Bears

In May, the United Nations released a report finding that the current rate of species extinction "is already at least tens to hundreds of times higher than it has averaged over the past 10 million years."[1] The mountain caribou in the lower 48 states went extinct just a few months ago. Like the Cabinet-Yaak grizzly bear, the mountain caribou lived primarily on National Forest land, had a population of less than 50 individuals, and was threatened by logging and roads.

Alliance reiterates this point here because the agencies issued similar assurances regarding the mountain caribou that they now issue for the Cabinet-Yaak grizzly bear. For example, in litigation to protect the mountain caribou in this Court, the agencies represented that they would "meet caribou needs" by using the best available science and applying forest plan protections, and not

approving logging projects unless they concluded that the project was "not likely to adversely affect" the mountain caribou. Jayne v. Sherman, 706 F.3d 994, 1001 (9th Cir.2013)(quoting FWS Biological Opinion).

In Jayne, these statements were accepted as adequate protections for the mountain caribou. Now the mountain caribou is extinct. It is not too late to avoid the same fate for the Cabinet-Yaak grizzly bear. As members of Congress stated when

[1] https://www.ipbes.net/sites/default/files/downloads/spm_unedited_advance_f or_posting_htn.pdf

they passed the ESA: "The agencies of Government can no longer plead that they can do nothing about [the grizzly bear]. They can, and they must. The law is clear." Tennessee Valley Auth. v. Hill, 437 U.S. 153, 184 (1978) (quoting Congressional Record).

The preservation of endangered species takes "priority over the 'primary missions' of federal agencies." Accordingly, courts must "afford[] endangered species the highest of priorities," and act with "institutionalized caution" when reviewing ESA cases. Cottonwood Envtl. Law Ctr. v. USFS, 789 F.3d 1075, 1091 (9th Cir.2015). This Court holds that the "fundamental principle [of institutionalized caution] remains intact and will continue to guide district courts when confronted with requests for injunctive relief in ESA cases." Id. Although the district court did not apply this fundamental principle in this case, this Court may now remedy that error by issuing a temporary injunction pending appeal to preserve the status quo until a final decision is issued on the merits.

Page 23 of the EA states:

*Measures implemented beginning in the 1990s for protection of the threatened grizzly bear have decreased the amount of road available for motorized public travel and management activities, while increasing security for grizzly bears as well as other wildlife species. The creation of grizzly bear core security areas has resulted in roughly 66 percent of the NFS lands on the District being unavailable to motorized travel during the active bear year.*

FS-034686

The Access Amendment is the product of years of public interest litigation on behalf of the imperiled Cabinet-Yaak grizzly bear. The well-established scientific consensus is that roads pose the most imminent risk to this grizzly population. Ninety percent of this population's Recovery Zone habitat islocated on public National Forest lands. Thus, the federal government has the power to limit road density for grizzly bear protection on the vast majority of its habitat and thereby prevent the extinction of this grizzly population. Ostensibly, this is the purpose of the Access Amendment.

However, since the Access Amendment was approved in 2011, the U.S. Forest Service has prepared multiple years of monitoring reports regarding its implementation of road closures in grizzly habitat. These monitoring reports establish that these road closures are routinely violated and therefore ineffective: members of the public regularly ignore signs, drive around gates or earthen berms, remove obstructions such as boulders or logs, or simply create their own new motorized routes.

Although these monitoring reports are only required for the Recovery Zone, there are incidental observations in these reports regarding closure violations found in grizzly habitat outside of the Recovery Zone, in the government-designated "Bears Outside Recovery Zone" or "BORZ" areas.

In 2017, Alliance hired its own investigators to determine whether there were road closure violations in these areas.

Due to time and funding constraints, this initial investigation was limited in scope to the Tobacco and Clark Fork "Bears Outside Recovery Zone" areas. As a result of one visit to each required closure device in these two areas, the investigatorsdiscovered numerous failed closure devices, roads that were categorized as closed but were open upon inspection, and illegal user-created

FS-034687

roads that were simply unaccounted for in the Forest Service road databases. Thus, the independent investigation confirms the fact that these road closures are routinely violated both inside and outside the Recovery Zone.

The recurring problem of road closure failures undermines the foundation of the Access Amendment management regime, which relies on these road closures to achieve certain densities of open and total roads both inside and outside the Recovery Zone. The agencies must address this problem and its impacts in an updated ESA consultation for the Access Amendment. The agencies must also address this problem and its impact in an updated ESA consultation and in the Black Ram project and is another reason that an EIS should be written for the Black Ram Project.

The majority of the Cabinet-Yaak Grizzly Bear Ecosystem – 90% – is National Forest land, managed by the Forest Service. 64 Fed. Reg. 26725, 26728 (May 17,1999). In terms of all of the human uses that affect grizzly bears, "[r]oads probablypose the most imminent threat to grizzly habitat today []. The management of roads is one of the most powerful tools available to balance the needs of people with the needs of bears." Accordingly, the U.S. Fish & Wildlife Service (FWS) states: "It is strongly recommended that road management be given the highest priority within all recovery zones." Roads pose a threat to grizzly bears because roads provide humans with access into grizzly bear habitat, which leads to direct bear mortality from accidental shootings and intentional poachings.

Human access also leads to indirect bear mortality by creating circumstances in which bears become habituated to human food and are later killed by wildlife managers. Human access also results in indirect mortality by displacing grizzly bears from good habitat into areas that provide sub-optimal habitat conditions.

Displacement may have long term effects: "Females who have learned to avoid roads may also teach their cubs to avoid roads. In this way, learned avoidance behavior can persist for several generations of bears before they again utilize habitatassociated with closed roads." Both open and closed roadsdisplace grizzly bears: "grizzlies avoided roaded areas even where existing

FS-034688

roads were officially closed to public use []. Females with cubs remained primarily in high, rocky, marginal habitat far from roads. Avoidance behavior by bears of illegal vehicular traffic, foot traffic, and/or authorized use behind road closures may account for the lack of use of areas near roads by female grizzly bears in this area.

This research demonstrated that a significant portion of the habitat in the study area apparently remained unused by female grizzlies for several years. Since adult females are the most important segment of the population, this lack of use of both open-roaded and closed-roaded areas is significant to the population." In addition to having a significant impact on female grizzly bears, displacement may also negatively impact the survival rates of grizzly cubs: "survivorship of the offspring of females that lived in unroaded, high elevation habitat was lower than that recorded in other study areas in the [Northern Continental Divide Ecosystem].

The majority of this mortality was due to natural factors related to the dangers of living in steep, rocky habitats. This is important in that the effects of road avoidance may result not only in higher mortality along roads and in avoidance of and lack of use of the resources along roads, but in the survival of young when their mothers are forced to live in less favorable areas away from roads."

Current peer-reviewed science still finds that roads have the most significant impact on grizzly bear survival: "[o]f all the covariates we examined, the amount of secure habitat and the density of roads in nonsecure habitat on public lands had the greatest effect on grizzly bear survival."

In 1999, FWS found that the Cabinet-Yaak grizzly population was "in danger of extinction" due in part to the habitat alteration and human intrusion related to the cumulative impacts of timber harvest and its associated road construction. 64 Fed. Reg. 26732. Today, twenty years later, the Cabinet-Yaak grizzly population is still facing the same threats and still warranted for uplisting from "threatened" to "endangered." All. for the Wild Rockies v. Zinke, 265 F.Supp.3d 1161, 1182 (D. Mont. 2017).

FS-034689

Roads, even if nominally "temporary," can still have long-lasting generational displacement effects on grizzly bears because females teach their cubs to avoid these areas.

These roads can therefore result in direct mortality, indirect mortality, and reduced cub survival. When applied to an extremely small, endangered[2] population of fewer than 50 individuals that is already experiencing high mortality rates, failing recovery targets, and hovering at less than half the numbers needed for viability, these harms are amplified and create a great cause for concern for Alliance's members. Neither the "imminent harm" posed by roads nor the dire status of this population are acknowledged by the agencies.

It is misleading to state that this population is merely "threatened." The District of Montana vacated FWS's rule finding that endangered status was not warranted and "reinstate[d] the FWS's November 2013 warranted but precluded finding." All. for the Wild Rockies v. Zinke, 265 F. Supp. 3d 1161, 1181 (D. Mont. 2017). Thus, the population is currently warranted for listing as an endangered species, but it is still on the waiting list.

Page 303 of the EA states: *On NFS lands, the objectives of land management within grizzly bear habitat "are to maintain and enhance habitat and to minimize potential for grizzly-human conflicts" (Interagency Grizzly Bear Committee Taskforce, Mealey, U.S. Department of Interior, U.S. National park Service, & U.S. Bureau of land Management, 1986). Nearly all of BMU 14, over 99 percent, is classified as MS-1. The Garver BMU is about 86 percent MS-1 and 14 percent MS-3. The MS-3 portion reflects human settlement and occupation in and around the community of Yaak.*

The project will not maintaining and enhancing grizzly habitat and will increase the potential for grizzly-human conflicts in violation of NFMA, NEPA, the APA and the ESA.

Page 305 of the EA states: *In general, gated roads opened for project use would return to the existing condition following completion of activities.*

The Forest does not have a good track record of keeping closed roads closed. Please see the attached pictures of ineffective road closures in the Black Ram Project Area.

FS-034690

The Forest Service does not disclose the road mileage behind these ineffective closures; therefore it is unclear how many miles of additional open and total roads must be added to the existing condition calculations as a result of these ineffective closures.

In a recent Ninth Circuit Opinion, the court found that the Forest Service had failed to establish whether similar "undetermined" roads of unknown origin caused an increase above the Tobacco BORZ baseline:

The error cannot be treated as harmless in light of the ambiguity in the record as to whether the "undetermined" roads at issue were, in fact, included in the Access Amendments baseline calculation.

There are at least three problems with the EA's record of mount of roads. First, because "undetermined" is a sub-category of "unauthorized" roads, it is possible that the particular undetermined roads at issue in this case were created—without authorization from the Forest Service—in the interim between the measurement of the Access Amendments baseline and the Forest Service's survey of existing roads for the Project.

All. for the Wild Rockies v. Savage, 897 F.3d 1025, 1036, n.18 (9th Cir. 2018). In light of these circumstances that (1) road closures/barriers are regularly breached but the Forest Service conducts no systematic monitoring to determine how many miles of illegal road use are occurring behind barriers each year, and (2) the Forest Service simply ignores illegal "undetermined" roads and does not include them in its calculations for open or total roads in the annual monitoring reports, the open and total road numbers in the monitoring reports are not accurately reflecting the conditions on the ground. It is therefore reasonable to assume that the baselines in the project area regularly exceeded because the reported conditions hover at or near the baseline.

Chronic recurring road closure breaches cannot reasonably be construed as "temporary;" and illegal road use does not fall within the scope of Access Amendment "temporary" roads.

The Forest Service and FWS have acknowledge that road closure breaches (and resulting illegal road use) are not addressed in the Access Amendment. Nonetheless, the agencies argue that all

FS-034691

road closure breaches regardless of whether they are chronically recurring and regardless of how long they last on the landscape must be construed as "temporary" road increases. Onto this premise, the agencies then bootstrap an additional argument that because certain specific types of temporary roads were addressed in the Access Amendment, that discussion must also apply to "temporary" road increases from illegal road use.

First, it is not reasonable to construe recurring illegal road use as "temporary" road density increases. The monitoring reports indicate that public users may repeatedly breach the same closure year after year. See, e.g., AR42:000059-62 (noting that boulders placed in 2015 have been removed and unauthorized users are

11

Case 9:18-cv-00067-DWM Document 44 Filed 07/11/19 Page 20 of 37

again circumventing gate on Road 2236). Moreover, the Forest Service may take years to act on known violations. See, e.g., AR42:000061 ("The Clatter Creek gate (268) was included on the 2015 gate repair contract but after the bids came in the Clatter Creek gate was dropped due to repair costs for all gate repairs exceeding available funding. In BY2016 the gate remained damaged and ineffective."); see also AR43:000081-82 (note 2)(during planning for the Hanna Flats logging project, the Forest Service found illegal motorized use on 15.7 miles of road that were not included in the baseline but the agency postponed remedial action until implementation of the logging project; in the 2018 monitoring report, the agency concedes it has still not yet eliminated this illegal use); see also AR232:000767 (finding that four barriers did not effectively prevent motorized use but deferring any action to fix the problems).

Thus, while the Forest Service insists that all breaches are temporary, those same breaches may be recurring or may have lasted for many years prior to discovery and remedial action, resulting in a chronic situation. The situation with the BORZ is a good illustration of this problem S although the Forest Service insists that it fixes all breaches as soon as possible, nonetheless at least four out of seven BORZ areas chronically fail to meet both the open and total road baseline conditions from the Access Amendment, as shown above in the table in Section B.

FS-034692

12

Second, even assuming that illegal road use could be construed as "temporary," it still does not have the same effect as lawful temporary road use. A breach of a closure device that results in public motorized use in effect results in an open road. The Access Amendment severely restricts temporary increases in open roads: "immediately following completion of all mechanized harvest and post- harvest slash activities requiring use of the road, to allow motorized public use during the bear summer season prior to the fall bear hunt (i.e., June 16 - August 31) for activities such as personal firewood collection. This public access would only be provided in cases where the mechanized harvest and/or post-harvest slash activities occurred during the same active bear year."

Thus, temporary increases in open roads are limited to a June 16-August 31 window, and may only occur in the same year in which logging activities have already occurred and used that particular road, presumably because grizzlies would have already been displaced from those areas. In contrast, illegal motorized use behind road closure breaches is not limited to a June 16-August 31 window, and is not limited to a single year entry on a road along and on which logging activities have already been occurring.

Moreover, illegal road use would also constitute an increase in total roads. However, temporary increases in total roads are only permitted if the roads are "effectively" gated to prevent public use during a project, (2) after project use, the roads are treated so as to "effectively prevent[] motorized access" and require no motorized access for maintenance for at least 10 years, and (3) upon project completion, the area is "returned to or below the baseline levels contained in Table 16" of the Access Amendment ROD. Obviously a road that has illegal road use is not "effectively" gated to prevent public use.

Thus, illegal road use does not comply with the restrictions set for lawful increases in temporary roads neither open nor closed in the Access Amendment and therefore cannot possibly have the same effects. It is simply implausible that unlimited illegal road use occurring at any time in any

FS-034693

location would have the same effect on grizzly bears as Access Amendment temporary roads that are significantly restricted in both timing and location. Indeed, illegal road use is illegal precisely because the Forest Service has already closed these specific roads to protect grizzly bears. If illegal motorized use occurs on these roads that were closed to protect grizzly bears, it may displace grizzly bears from areas that they would otherwise not be displaced from.

Although the EA states that the Cabinet-Yaak Ecosystem had an estimated population of 55-60 individuals in 2017, 2017 DNA sampling identified only 44 individual bears. 1 Specifically, the recent sampling identified 20 females and 24 males, with 23 bears in the Cabinets and 21 bears in the Yaak portion of the ecosystem. 2 This means the Yaak portion of the ecosystem may have as few as 21 bears, with perhaps approximately half of those bears being female bears. Citing the same report, the EA notes that the two Bear Management Unites ("BMUs") impacted by the project—BMU 14 (Northwest Peak) and BMU 15 (Garver)—likely contain a minimum of six individuals. Taking the EA's data at face value, this means that if there are a minimum of six individuals in the impacted BMUs out of an estimated population of 55-60 bears, then at least ten percent of the grizzly bear population in the Cabinet-Yaak Ecosytsem may be negatively

impacted by this project. Recognizing that the grizzly bear population in the Yaak portion of the ecosystem is likely much smaller than the estimated population for the entire ecosystem, we are likely looking at a much larger percentage of the population being seriously impacted during the life of this project.

The life-span of this intensive logging and burning project is up to 10 years. EA at 211, 266, 277. During this time, roads will be constructed and reconstructed, heavy machinery will be used for road work and to cut and remove trees, helicopters will be used to ignite prescribed fires, and road use and human presence will increase considerably – all of which threatens to negatively impact and displace grizzly bears. Moreover, the EA estimates that suitable hiding cover, important for grizzly bears, may not return for another 15 years after completion of the project. See EA at 297, 310. Thus, this project is likely to harm this small grizzly bear population long after the life of the project, for a total of up to 25 years.

FS-034694

Despite the serious impacts to grizzly bears, the Forest Service failed to demonstrate compliance with Forest Plan standards relevant to grizzly bears, and failed to adequately analyze the direct, indirect, and cumulative impacts to grizzly bears.

1 The EA cites "W.F. Kasworm et al., 2018" for its information on the population estimate and population trends for

the Cabinet-Yaak Ecosystem bears. However, the only 2018 Kasworm publication in the literature cited is the Selkirk Mountains grizzly bear recovery area report, which dioes not appear to contain this important information.

2 See "Selkirk/Cabinet-Yaak (SCY) Subcommittee of the Interagency Grizzly Bear Committee (IGBC)," May 9, 2019 meeting notes, at igbconline.org/wp-content/up-loads/2019/06/20190509_SCYMeetingMinutes.pdf (last visited 8-2-2019).

I. The Action Alternatives Do Not Comply with the Kootenai National Forest Plan

The Forest Service must comply with National Forest Management Act ("NFMA") and its implementing regulations. NFMA requires the Forest Service to ensure that site-specific management projects are consistent with the applicable forest plan. 16 U.S.C. § 1604(i). Thus, the Forest Service must ensure that all aspects of the proposed action comply with the Kootenai Panhandle National Forests Land Management Plan.

The Grizzly Bear Access Amendment set standards for open motorized route density ("OMRD"), total motorized route density ("TMRD"), and retention of core grizzly bear habitat within the Cabinet-Yaak and Selkirk Recovery Zones bear management units. This Amendment is incorporated as a standard (FW-STD-WL-02) in the Kootenai National Forest Plan at Appendix B. The Access Amendment adopted the following standards for the Northwest Peak and Garver BMUs:

Northwest Peak BMU (BMU 14):

9-ER-2043

1. OMRD of greater than 1 mile per square mile on no more than 31 percent of the BMU;

2. TMRD of greater than 2 miles per square mile on no more than 26 percent of the BMU;

3. Grizzly core area habitat comprising at least 55 percent of the BMU.

Garver BMU (BMU 15):

1. OMRD of greater than 1 mile per square mile on no more than 33 percent of the BMU;

2. TMRD of greater than 2 miles per square mile on no more than 26 percent of the BMU;

3. Grizzly core area habitat comprising at least 55 percent of the BMU. 3

3 United States Forest Service, Kootenai National Forest Land Management Plan (2015 Revision) (hereinafter, "Forest Plan") App. B, Table 25, at 147.

The EA states that currently, the Forest Service is in compliance with the Access Amendment standards. EA at 298, Table 84; but see EA at 308, Table 88 (showing the existing TMRD in BMU 15 as being 27 percent, and thus above the 26 percent limit). This is assuming that the road closures are effective, which they are not. Please demonstrate that the road closures are effective.

The EA reveals that during the life of the project—up to ten years—the Forest Service will not be in compliance with TMRD limitations in the Garver BMU. EA at 308, Table 88 (showing TMRD under both action alternatives would be 32 percent during the project). The Forest Service tries to justify its noncompliance with the Access Amendment standard by stating that the increase in TMRD percentage will just be "temporary" and the TMRD percentage would meet the standards again "upon completion." EA at 307-308. However, the Forest Service cannot point to anything in the Forest Plan that allows for even temporary noncompliance of Forest Plan standards. And here, we may be talking about noncompliance for up to ten years.

FS-034696

The Forest Service's failure to comply with the Access Amendment TMRD standards during project implementation directly violates NFMA.

Recognizing that this violation would be a problem, the Forest Service then tries to explain away its predicted numbers by noting that its own numbers don't take into account routes that would be barriered with in-kind replacement for core and therefore these numbers are not a real reflection of what will happen on the ground. EA at 308-308. While the Forest Service avers that the actual values for TMRD would be less than displayed in its own analysis, the agency falls short of ever stating that the project will not violate the TMRD limitations during project implementation, even if these maximum values are never reached. Thus, its explanation is unsatisfactory to demonstrate compliance with this mandatory standard.

Dr. David Mattson wrote the following section for our comments.

The assessment of prospective effects of the Black Ram Project on grizzly bears in the Environmental Assessment (EA) is premised on several critical assumptions. First, status of the Cabinet-Yaak grizzly bear population is assumed to have improved since 2012. Second, and related, the EA assumes that some erosion of security for grizzly bears is therefore permissible, conditioned on a related assumption that security and road access standards employed by the Kootenai National Forest (NF) are sufficient for recovery of grizzly bears in this ecosystem. Third, the EA assumes that abundance of huckleberries are demographically limiting for grizzly bears in this region. And, fourth, the EA further assumes that Project treatments will substantially enhance abundance of huckleberries to an extent sufficient to offset any losses of habitat security.

All of these assumptions are unwarranted and, as a result, the conclusions reached in the EA about Project effects on grizzly bears are likewise unwarranted. More problematic yet, all of the conclusions of relevance to grizzly bears likely under-estimate negative impacts and over-estimate prospective benefits. Briefly:

- The weight of available evidence does not support concluding that population status has improved. For one, the methods used to estimate trend and current population size are beset with a host of problems. For another, the information able to be distilled from demographic data suggests that any improvement has stalled since 2014.

FS-034697

- Variations in population size and trajectory between 1999 and 2010 are more likely attributable to variations in abundance of natural foods—berries in particular—that affect exposure of bears to humans rather than to any increased mitigations. During years of scant berries, bears likely forage more widely and more often end up in conflict situations or exposed to malicious killing.

- The population of grizzly bears in the Yaak/Yahk is far smaller than even the smallest size posited to be viable by any researcher. Related, the population remains acutely vulnerable to even the smallest increases in bear mortality that are predictably more likely to occur with any increase in road access and associated human activity.



1

- Malicious and other unjustified killing by humans remains the dominant cause of death for grizzly bears in the Cabinet-Yaak Ecosystem. These kinds of killings are predictably associated with roads. As a result, levels of road access need to be substantially reduced and related levels of habitat security substantially increased rather than the opposite, as is being proposed for the Black Ram Project.

- Road density and habitat security standards used by the Kootenai NF are patently deficient, partly because they are based on research that conflates behavioral phenomena such as avoidance and displacement with demographic phenomena, notably survival. The scale is wrong as well, given that exposure to mortality hazards logically accrues over

FS-034698

years as a consequence of cumulative annual movements of bears vis-à-vis hazardous environs. As a corollary, the fact that standards on the Kootenai NF are more lax than standards on the Flathead NF is self- evidently nonsensical given that grizzly bears in the Cabinet-Yaak Ecosystem remain in a much more precarious status compared to grizzly bears in the Northern Continental Divide Ecosystem.

- There is little or no evidence that food abundance is a significantly limiting factor for grizzly bears in the Cabinet-Yaak Ecosystem—especially as manifest in reproduction. On the other hand, there is ample evidence that human-caused mortality had governed and continues to govern the fate of this population, with food effects manifest primarily in the extent to which grizzly bears are exposed to human-related hazards during years when berries are in shorter supply.

- There is essentially no prospect of any increased berry production attributable to Project treatments offsetting increases in hazards associated with increased human access and activity. Moreover, enhancement of huckleberry production is more likely to occur as a result of wildfire rather than as a result of timber harvest. Given that the Davis fire recently burned substantial acreages in habitat conducive to huckleberry production, any need for ostensible berry- enhancing treatments has already been met naturally—and in an area that is likely to be more secure from humans.

- Compounding prospective problems with the Black Ram Project, proposed activities are concentrated in an area that is vital for facilitating movement of grizzly bears west-east between core habitats. Project activities will diminish rather than enhance security needed not only to facilitate transit of bears, but also increase odds that exposed bears will survive.
  In short, the Black Ram Project promises to harm grizzly bears in the Cabinet-Yaak Ecosystem. In what follows, I elaborate on most of the points outlined above, and substantiate my conclusion.

2

**A. Weight of Evidence Does Not Support Concluding that Status of the Cabinet-Yaak Population has Improved Since 2012**

FS-034699

**A.1. The 2.1% Per Annum Growth Rate for the Cabinet-Yaak Population is Not Justified or Applicable**

Use of a 2.1% per annum growth rate to project total size of the Cabinet-Yaak population from the Kendall et al. (2016) 2012 point estimate, as was done by Kasworm et al (2018), is not defensible. Such use is, moreover, guaranteed to produce spurious results that cannot legitimately be used to reach conclusions of management relevance. There are several unambiguous reasons.

*A.1.a. The growth rate is not representative of the total population*

First, the estimated 2.1% per annum growth rate only applies to an unknown fraction of the total Cabinet-Yaak grizzly bear population. Vital rates used to estimate this growth rate were based solely on "native" or "natural" research-trapped bears, and expressly excluded bears captured because of conflicts or part of the augmentation program (Kasworm et al. 2018: 10). The growth rate, moreover, applies almost exclusively to the Yaak portion of the population given that 95% of the data used to estimate survival rates and 85% of the data used to estimate reproductive rates came from this subpopulation (ibid: 36)—protestations by the authors notwithstanding (ibid: 36). On top of this, the 2.1% per annum rate was estimated only for the female portion of this high-grade (ibid: 10), which is of consequence even though female survival is disproportionately important in determining growth rate, as such.

In other words, the 2.1% per annum growth rate can only be legitimately applied to females residing in the Yaak subpopulation that were not trapped and marked as a result of conflicts nor part of the augmentation program. Put another way, management-trapped bears, augmentation bears, and males would need to be represented in a modeling framework if any estimated population growth rate were to be prima facie representative of the total population. Moreover, if the fates of all such bears were to be considered, estimated population growth rate would almost certainly be lower given that survival rates of males, augmentation bears, and management bears are substantially less than survival rates of the females used to estimate the 2.1% per annum growth rate (ibid: 33-35).

If a growth rate were to be used to project a *total* population estimate, comparable to the Kendall et al. 2012 point estimate of 49 bears (95% CI = 44-62), then such a growth rate would need to represent birth and death rates of the *total* population, and apply specifically to the period of interest (e.g., 2012-2017) rather than a longer period of time that masks the relevant trajectory (see my point below).

*A.1.b. The growth rate does not represent 2012-2017*

FS-034700

The 2.1% per annum growth rate used by Kasworm et al to project 2017 population size was calculated using data that span 1983-2017 and so, therefore, axiomatically represent a generalized growth rate for Yaak females during this lengthy 35-year period. Put another way, the 2.1% per annum growth *is not* an estimate of growth for the period 2012-2017. For it to be so, the rate would have necessarily been estimated only using data from the approximate 2012-2017 period.

3

More to the point, estimates of growth for the Yaak female population are increasing back-weighted by inclusion of data that are, on average, increasingly old. Figure 1 (herein) shows the approximate average age of data used to calculate vital rates with the passage of time (from ibid: Table 17, 40-42). Notice that average age has increased from around 6-7 years in 1998 to nearer 15 years in 2017. In other words, with the progression of time estimates of population growth for the female segment of the Yaak population have become increasingly irrelevant to judging current population trajectory.

The Government retort to these contentions would probably be that the data from such a short period of time would be so sparse as to preclude a usefully accurate estimate. That is almost certainly the case, and a commentary in its own right on the profound limitations imposed by intrinsically small sample sizes. Nonetheless, this does not negate the point that the 2.1% per annum growth rate for 1983-2017 is spurious when applied to the 2012-2017 period. As Figure 11 clearly suggests (ibid: 37), population growth rate has almost certainly varied over time, albeit in largely indeterminate ways (see my following point).

**Figure 1.** Trend in mean age of data used to calculate vital rates of Cabinet-Yaak grizzly bears with passage of years from 1998 to 2017. Mean age has more than doubled, with trend towards increased aging accelerating since deployment of a conflict management specialist in the ecosystem. Increasing age renders estimated vital rates increasingly irrelevant to current conditions.

*A.1.c. Uncertainty of the growth rate as currently (or even ideally) calculated debars use*

Small sample sizes impose very real constraints on the precision and accuracy of all demographic rates being used by Cabinet-Yaak researchers and managers. These constraints follow ineluctably from the small size of the Cabinet-Yaak grizzly bear population, which is a non-negotiable feature of this ecosystem.

FS-034701



4

As a practical upshot, all of the population growth rates calculated to date have uncertainty intervals (e.g., 95% confidence intervals) that not only substantially overlap zero (i.e., no growth) but also, over time, each other. More specifically, despite purporting to show trend in cumulative growth rate over time, the confidence intervals shown in Figure 10 (ibid: 37) all overlap—most almost completely (see also Figure 2A herein). Because of this, there is little or no basis for concluding that growth rate has varied with time. Likewise, taking a *precautionary* approach, there is little or no justifiable basis for concluding that growth rate is currently positive, despite statements in Kasworm el al. such as "The probability that the population was stable or increasing was 73%" (ibid: 36), especially in light of the fact that the point estimate of 2.1% per annum is a *cumulative rate* spanning 1983-2016 with little or no known relationship to *current rate* of population increase or decline.

Moreover, when the totality of point estimates and uncertainty is taken into consideration for the period 1998-2017, there is a cumulative 62% probability that the population was *declining* during these 19 years, consistent with the 2017 estimate of population size for Yaak females still being around 52% less than the estimate of population size for 1998 (Figure 2A and 2B herein).

FS-034702

The implications of uncertainty are thrown into relief by examining the specifics of projecting population size forward in time from 1983 to 2017 using the 1.021 (95% CI = 0.949-1.087) growth rate, noting up front that uncertainty in annual growth rate magnifies exponentially over time when manifest in population size. For example, after back-casting to obtain a plausible 1983 population starting point, deterministic projections of population size using the upper and lower confidence intervals of growth allow for a current population (2017) of anywhere between 3 and 256. Stochastic projections, e.g., using the software RISKMAN, generate a similar and not particularly useful range of 4 to 154 individuals.

The point here is that the raw cumulative uncertainty is huge, especially when dealing with a time period as long as 1983-2017. It is also important to note that this exercise takes the 1.021 estimate of lambda at face value, which, as per my previous points, is unwarranted.

Related to this last point, the current basis for modeling population growth rate using Booter (ibid: 10- 11) is egregiously simplistic given the self-evident structural complexity of grizzly bear population demography in the Cabinet-Yaak Ecosystem. For any estimate of growth rate to be realistic, explanatory, relevant, and accurate, all of the main structure needs to be accommodated. More specifically, a relevant demographic model would ideally include source-sink structures accounting for management- trapped versus research-trapped bears, bears in the Yaak area versus the Cabinet Mountains, augmentation bears versus in situ bears—in addition to accounting for the male segment as well as inter-annual variation attributable to variation in key food resources (see later). The model described in Kasworm et al. does none of this.

Again, the probable retort would be that sample sizes are too small to support estimating the many rates required for such a model. But that is, indeed, the point. And no amount of hand-waving or protest will make it otherwise nor redeem the deficiencies in current estimates of demographic rates. The uncertainty is real and unavoidable, and should be acknowledged in management decision-making.

5

## A.2. Even taking estimated growth rate at face value, current population status is problematic

Even taking the population growth rate estimated by Kasworm et al. at face value, the most defensible conclusions would be, first, that status of the population has worsened during 2014-2017 compared to 2006-2013, and, second, that numbers are still substantially less than the presumed peak reached around 1998. These conclusions are based on trend in *population growth rate* over time (as per ibid: 37), and trend in *population size* estimated by projections using year-specific

FS-034703

cumulative population growth rates (e.g., projecting population size for 1998 using the 1983-1998 growth rate estimate, and then doing the same for each successive year, with 1983 the starting year throughout).

Figure 2 (herein) shows seminal results. In Figure 2A I've identified three periods typified by trends in *population growth*: rapid decline of 2% per annum during 1998-2006, coincident with the berry famine (see below); a nearly as rapid 1.1% rate of improvement during 2006-2014; followed by stalling in the rate of improvement to around 0.2% per annum since 2014—an 82% decline in rate of change— coincident with population growth rate finally reaching positive territory. Importantly, this refers to the *per annum rate of deterioration or improvement* in *population trajectory*, which is perhaps the most relevant information to be gleaned from the estimates of population growth rate presented by Kasworm et al.

Finally, Figure 2B (herein) shows trend in estimated *size* of the Yaak female population, both as a central tendency (dark green line) as well as bounding uncertainty (light green band, based on projections using the upper and lower confidence intervals for each cumulative estimate of growth rate). Parenthetically, I transformed the values to a natural log scale in Figure 2B to visually emphasize trends given that the bounds of uncertainty explode with projections increasingly farther forward in time. The take-away point is that, according to these values, population size peaked during 1998, reached a nadir during the height of the berry famine in 2006, increased through 2014, and then stalled during 2015-2017 at a size that was still around 52% less than peak numbers reached during 1998.

The key points here are that improvement in status of the female segment of the Yaak population *stalled* beginning in 2014 at numbers that were still approximately 52% less than the peak reached during 1998. Having said this, both of these conclusions remain severely compromised by the intrinsic uncertainties, lack of relevance, and bias of methods used by Kasworm et al.

### A.3. Conclusion

The upshot of all this is that there is *no legitimate basis* for estimating current population size (e.g., 55- 60) by applying a biased 1983-2017 growth rate—based on high-graded data representing only a fraction of the population—to a point population estimate made during 2012. Moreover, even taken at face value, the current cumulative population growth rate shows stalled improvement in population status and a population still substantially less than peak numbers reached during 1998.

FS-034704

The best that can be perhaps be invoked is a contrast between the presumed minimum estimate of 35 bears during 2014-2017 (ibid: 27) and the 2012 estimate of 49 (44-62) bears reported by Kendall et al.

6

(2016). The estimate of 35 for 2014-2016 is self-evidently less than the lower bound of the 2012 confidence interval, more consistent with a *static or even declining population* than with an increasing one. Of greater relevance to the draft EIS, this general conclusion also holds for comparisons specific to the Cabinet population (a current minimum of 13 bears compared to lower confidence intervals of around 20 reported by Kendall et al. for 2012).

**Figure 2.** Trend in estimated population growth rate (A) and related estimated total population size (B) for Cabinet-Yaak grizzly bears, with the notable proviso that both sets of estimates are based almost wholly on data obtained from female grizzly bears in the Yaak population. Dark green dots or lines denote central tendencies, large green bands bounds of uncertainty. The horizontal dark red line in (A) denotes no growth, with any values above leading to increase and any values below leading to decline. The red line in (B) corresponds with estimated population size in 1998. In (A) I also show the cumulative weight of evidence for population declines versus increases for 1998-2017 along with average annual rates of change in lambda during three periods characterized by non-stationary shifts in dynamics. The numbers at right in (B) correspond to the range in estimated population size given uncertainties in growth rate (3-256), as well as the deviance in current estimated population size from the 1998 benchmark.

FS-034705



FS-034706

7

**B. Comparison of Pooled Survival Rates in Kasworm et al. (2018) is Not Legitimate**

As ancillary support for the proposition that size of the Cabinet-Yaak population has increased between 1999-2006 and 2007-2017, Kasworm et al state that "Grizzly bear survival of all sex and age classes decreased from 0.899 during 1983–1998 to 0.792 during 1999–2006 and then rose to 0.934" (ibid: 34), and then summarize these same numbers in Table 13 (ibid: 34).

Most of the problems and associated bias noted above applies to this comparison. Note, first, that the 95% confidence intervals reported in Table 13 for pooled estimates from all three time periods overlap, which precludes confidently concluding there is any difference in mean rates. Moreover, note the restriction to "native" bears, which excludes any consideration of conflict-trapped or augmentation bears, which were very much a component of the 2012 point estimate of population size.

The other problematic aspect of this comparison is that data from all bear sex and age-classes were pooled, without any apparent attempt to determine whether this collapse of data preserves representation of the population at large. Are males over- or under-represented?...likewise subadults versus adults? Some sort of weighting scheme reflective of current or even stable population structure could provide some remedy, but without compensating for other biases.

The other interesting aspect of this data-pooling is the extent to which it is at odds with other results and commentary in Kasworm et al. More specifically, this aggregation of data ignores the disproportionate importance of subadult females to population dynamics. This importance is evident in the near 85% variance in estimated population trend attributed to survival of subadult and adult female bears in Booter calculations (but with 60% attributable to subadult female survival, Table 15; ibid: 37), as well as the different contextual emphasis placed by the authors on female survival on Pages 32 ("...it is important to consider the rate of female mortality") and 37.

The implication of all this is that the comparison of survival rates estimated from pooled data presented by Kasworm et al on Pages 33 and 34 does not mitigate the many fatal problems with their estimates of population growth rate.

**C. Comparison of Annual Average Deaths in Kasworm et al. (2018) is Uninformative**

Kasworm et al. (2018) present information on grizzly bear deaths in the Cabinet-Yaak Ecosystem in terms of numerous contrasts and adjustments presumably designed to be of relevance to various management deliberations. On pages 15-16 a running average of annual mortalities is related to recovery criteria; on pages 16-18 a full list of deaths with ancillary details is provided;

FS-034707

and on pages 31- 33 mortality is summarized in multiple ways presumably relative to different management considerations. Throughout, the parsing, categories, and nomenclature are confusing, obfuscated, and confounded. As a result, I needed to reconstruct much of the analysis of mortalities presented by

8

Kasworm from the raw data on pages 16-18. The contrast among time periods presented in Table 11 (ibid: 33) was a particular focus.

## C.1. Table 11 in Kasworm et al. (2018) is a Tangled Mess

The totals in the column farthest right in Table 11 of Kasworm et al. (2018) include all mortalities— human-caused, natural, within 16-km of the Recovery Area boundary, in the US as well as Canada—plus the estimated unrecorded *human-caused* mortalities. For some inexplicable reason, and unlike in the NCDE and GYE, natural mortalities and mortalities of unknown cause were not accounted for in estimations of unrecorded mortalities.

The upshot is that the row totals in Table 11 represent a mishmash of natural, human-caused, and estimated unrecorded human-caused mortalities, without any straight-forward connection to judging overall population status. In fact, the inattention and even outright dismissal in this context of natural mortality as a factor in judging population status is mystifying given that a dead bear, for whatever reasons, matters in assessing the toll taken by mortality.

## C.2. Comparison of 'rates' between 1999-2006 and 2007-2017 is Uninformative

By contrast, the comparison of annually-averaged human-caused mortality between 1999-2006 and 2007-2017 on Page 32 of Kasworm et al. only considers human-caused mortality, but without including any of the estimated unrecorded human-caused mortality included in Table 11— and without any cogent explanation. The confusion implicit to this inexplicable parsing is compounded by use of the term 'rate' in reference to an annual average, in context of 'rate' being used elsewhere in reference to survival and reproductive rates referenced to fates of individual bears. On top of this, a typo was made in reference to the 2007-2017 'rate,' which should be 2.2, not 2.1. This error amplified the potential for confusion arising from comparing '2.1' with '2.25' and calling the first value an increase over the second.

Reducing this chaos to something comprehensible: the annually averaged number of known and probable human-caused deaths during 1999-2006 was 2.13. Using all currently available data, for 2007- 2018 the average was 2.08. When the estimate of unreported human-caused deaths is included, the average for 1999-2006 was 2.75 (95% CI 1.6-3.9). For 2007-2018 it was 3.2 (95%

FS-034708

CI 2.2-4.2). Considering total known-probable mortality plus estimated unreported human-caused mortality—but without any correction for unreported natural deaths—the annual averages for 1999-2006 and 2007-2018 were virtually identical: 3.9 and 3.8.

The important point is, here again, that rote statistical uncertainty debars any conclusion about increase, stasis, or decrease in numbers of human-caused deaths. The confidence intervals of annual averages overlap substantially, which is not surprising given the small sample of years and dead bears. This statistical uncertainty is amplified by uncertainty attached to detecting any bear death other than that of an actively radio-monitored animal. Considering only human-caused deaths, this certainly holds for poached bears, deaths 'under investigation,' and deaths from unknown (but human-related) causes. A back-of-the-envelope calculation suggests that such deaths need to be increased by around 70 to 120% in year-end tallies.

9

In the face of such irrefutable uncertainty, Kasworm et al resort to focusing on and then emphasizing female mortality, which reduces the absolute values of calculated averages even further. When an estimate of unreported human-caused female mortalities is added to known mortalities (using the long- term proportion of F:M deaths=0.4), the result is an annual average of 1.75 (95% CI 0.83-2.67) female deaths for 1999-2006 and 0.80 (95% CI 0.34-1.54) female deaths for 2007-2018. All of the reported differences in mean values are so far within the range of statistical uncertainty as to render these comparisons a bit absurd.

## C.3. Conclusion

Again, researchers and managers in this ecosystem might argue that small samples prevent any degree of certainty about conclusions, but this does not obviate the obligation to acknowledge uncertainty. Nor does it eliminate the practical consequences of small sample sizes and the compromising effects of chance processes—highlighted recently by a jump in recorded deaths from 1 in 2017 to 3 in 2018, a tripling in just one year. More certainly, it recommends humility and precaution in the face of such statistical ambiguities.

But all of this still leaves open the question of why natural mortalities as well as mortalities that cannot be definitively ascribed to human causes are not accounted for in assessing population status. This question is especially relevant given that Kasworm et al comment in several places on the extent to which variation in abundance of key natural foods likely drives population dynamics, often through the 'natural' death of dependent young (see below). Or, even, why, when considering only human-caused mortality, adjustments to account for unrecorded deaths were not included. This is all a bit mystifying as well as prima facie unjustified.

FS-034709

## D. Status of the Cabinet-Yaak Population Remains Highly Precarious

The current vulnerability of the Cabinet-Yaak population can be illustrated through a simple exercise, even without accounting for spatial structure of the Cabinet and Yaak subpopulations. I input vital rates into a commonly-used risk management program named RISKMAN (currently being proposed for management of grizzly bear mortality in the NCDE). Using the stochastic function, I was able to reconstruct the c. 2.1% growth rate reported by Kasworm et al (2018) for 1983-2017. More specifically, the cumulative geometric mean growth rate (lambda) varied from a maximum of 1.035 to a minimum of 1.008. Accounting for variation in vital rates, the median ending population size at year 34 was 43, although the upper and lower 95% percentiles of simulated trajectories produced ending populations as small as 4 and as large as 154.

I then simulated what would have happened if just one additional female died each year. In this scenario, the geometric cumulative mean growth rate dropped from 0.952 (already much less than 1) to an astounding 0.202 at year 34 of the simulation (Figure 3 herein). Median total population size had reached 0 by year 23, with an upper 95th percentile of only 11 animals at the end of simulations. Results were not much improved when an additional 1 female was lost only once every 2 or 3 years. This is not

10

presented as any definitive modeling result, but rather illustrative of how little the margin of error is, and how vulnerable this population is to even the smallest increased increments of mortality (e.g., Kendall et al. 2016). This point is especially germane given that *one adult female was killed by humans each of the last two years, during 2018 and 2019*. And this does not account for adult females that died and were not documented.

**Figure 3.** Results of RISKMAN projections for the Cabinet-Yaak population using vital rates reported by Kasworm et al. (2018), but introducing the death of an additional female grizzly bear once every 2 years. The thick green line represents the median trend of projections; the dusky green band above and below the variability of projections.

## E. Weight of Available Evidence Emphasizes the Continued Importance of Malicious Killing

The extent to which poaching, malicious killing, or other suspect circumstances are associated with human-caused deaths is also instructive regarding the overall effectiveness of conflict mitigation efforts during 1999-2017 to offset the problematic effects of road-access and poaching. By its nature, malicious killing/poaching is a criminal act undertaken by criminals. Such behav-

FS-034710

ior is rooted in attitudes and outlooks that are notoriously unresponsive to education and 'outreach'. The phenomenon is about willful malfeasance. As such, limitations on road access coupled with improved law enforcement and successful prosecutions are logically the most appropriate redress—not, for example, conflict mitigation by a specialist who is not tasked primarily with law enforcement.

Before pursuing this any farther, some clarification of obfuscations in the dead bear database is needed. During 1999-2017 a number of deaths were ascribed to 'Undetermined' human causes, 'Poaching' or listed as 'Under investigation'. The first and last categories are not explicit, but nonetheless strongly suggestive. Certainly, 'Under investigation' suggests that the death occurred under suspicious circumstances warranting investigation—with a strong likelihood of either poaching or other

11

unwarranted lethal action by the involved people. Such suspicions are rarely definitively resolved. 'Undetermined' is also more suggestive of malfeasance rather than innocence on the part

of the involved people. Given the alternatives, such deaths are more defensibly allocated to causes more resistant than not to mitigation.

With all of this as context, there were a total of 7 known-probable deaths during 1999-2006 attributed to either poaching or undetermined causes, representing 58% of total human-caused deaths. During 2007-2018 there were a total of 13 deaths either under investigation or ascribed to poaching, representing a nearly identical 59% of the total known-probable human-caused deaths. These are major fractions in their own right, but leave estimated numbers of unreported deaths unaccounted for. As Kasworm et al make clear (ibid: 33), their estimate of 'unreported' deaths did not apply to bears that were radio-collared or removed by managers, which leaves this unreported estimate levied almost entirely against malicious or otherwise suspect causes. When these unreported estimates are added to the known-probable toll taken by poaching, unknown causes, or suspicious circumstances, the percentage increases to around 70% during 1999-2006 and approximately 77% during 2007-2016.

Taken together, these figures support concluding that (1) malicious or otherwise suspect causes account for a large portion—if not majority—of grizzly bear deaths in the Cabinet-Yaak Ecosystem; (2) the fraction and even total numbers of deaths attributable to such causes did not decrease from 1999-2006 to 2007-2018; and (3) that aggressive limitations to road access by the USFS are needed, especially in areas with concentrations of productive habitat (Proctor et al. 2015, 2017).

## F. Access Management is Critical to Limiting Malicious & Other Unjustified Killing

The consensus of relevant research is unambiguous about the link between road access and grizzly bear mortality. The more access, the more dead bears there are, with disproportionate concentrations near roads (Brannon et al. 1988; Benn & Herrero 2002; Nielsen et al. 2004; Wakkinen & Kasworm 2004; Boulanger & Stenhouse 2014; McLellan 2015; Proctor et al. 2017, 2018). Dead bears tend to be concentrated within 100 to 500 m of roads, averaging around 300 m (± 195 m) among studies where distance was noted.

Unfortunately, there is a common conflation of the extent to which radio-marked grizzly bears spatially avoid roads with the geospatial configuration of mortality risk and, even more important, decrements in survival and population growth. These parameters are not synonymous. Even though a bear might underuse habitats within a certain distance of roads, this does not translate into a 1:1 correlation with exposure to risk of human-related mortality during a bear's lifetime. Conflation of avoidance with mortality risk has led to the unstated assumption that the former can be used to set standards for the latter. Such is the case for road density and habitat security standards set by the Kootenai National Forest based on the results of Wakkinen & Kasworm (1997).

FS-034712

Taking 300 m as a ballpark figure, road densities of roughly 0.6 km/km$^2$ translate into areas remote from where human-caused mortality is concentrated that amount to only 84 ha (208 acres), which is trivially

12

small for a grizzly bear. This sort of geospatial buffer still means that grizzly bears are frequently exposed to hazards of human-caused death to the predictable extent that they must and will move from one presumably secure area to another—even assuming that these bears exhibit "average" avoidance of human features such as roads. In other words, the level of buffering from human-caused mortality offered by road density and related security standards invoked in the Black Ram EA is guaranteed to be inadequate.

The inadequacy and inappropriateness of road density and security standards used by the Kootenai National Forest in application to the Black Ram Project are highlighted in contrast to standards applied in the Northern Continental Divide Ecosystem (NCDE), as well as in contrast to trajectories of populations in the NCDE and Greater Yellowstone Ecosystem. The populations of already relatively numerous grizzly bears in the NCDE and GYE have increased substantially since the early 1990s to 2000s, in contrast to in the Cabinet-Yaak where precariously few bears have fared poorly (see my Points A-D, herein). Tellingly, Wilderness Areas and Inventoried Roadless Areas where road access is not allowed comprise around 56% of the NCDE and GYE. In the Cabinet-Yaak Ecosystem this figure is less than half as much, nearer 21%. This difference alone can explain much of the corresponding difference in fates of grizzly bear populations.

Despite these telling differences in fates and trajectories of grizzly bear populations, the road density and habitat security standards applied by the Kootenai National Forest are more lax, not less, than those applied on the Flathead National Forest. On the Kootenai, areas allowed with >1 mile/mile2 of roads are 1.7-times greater; areas with >2 miles/mile2 of roads are 1.4-times greater; and extents of secure habitat nearly 20% less compared to what is ostensibly allowed on the Flathead NF. These disparities are perverse and not able to be explained on the basis of differences in the extent of movements by grizzly bears. If anything, bears range more widely in the Cabinet-Yaak Ecosystem compared to the NCDE (Kasworm et al. 2018).

As a bottom line, existing and proposed access management in the Black Ram Project Areas has jeopardized and will continue to jeopardize grizzly bears.

**G. More Grizzly Bear Deaths Are Occurring On USFS Jurisdictions Now Compared to During 1999-2006**

FS-034713

The argument for more aggressive management to prevent human-caused grizzly bear mortality on USFS jurisdictions is given greater weight by differences in locations of bear deaths between 1999-2006 and 2007-2018. Data from Kasworm et al. (2018) and Kasworm (2018)show an increase in the proportion of grizzly bear deaths on USFS lands from 25% (95% CI = 0.5-49.5%) during 1999-2006 to 56.5% (36.3-76.8%) during 2007-2018. Although sample sizes are small, confidence intervals large, and overlap of the intervals non-trivial (17%), these results *do not* support concluding that hazards for grizzly bears have remained constant or declined on USFS lands. Rather, by weight of evidence, the better supported conclusion is that hazards have *increased* and, because of that, imperatives to control

13

mortality on public lands have likewise increased, including on lands part of the proposed Black Ram Project. As per my point F, above, the most efficacious means available to the USFS for addressing this imperative is through providing increased rather than diminished habitat security, axiomatically through *reducing* road access in the Project area.

## H. The Proposed Black Ram Project is Inconsistent with the Best Available Science

Although I could invoke a large corpus of relevant science that has been neglected in the Black Ram EA, I focus here to one piece of research—Proctor et al. (2017). This paper is highly relevant to judging the trade-off between proposed forest treatments and habitat security for grizzlies, especially vis-à-vis any prospective increase in huckleberry production and hazards associated with road access. Some relevant recommendations from Proctor et al. (2017) include:

- That 25% of the landscape, particularly portions with important huckleberry fields, have no roads.

- That 60% of the landscape be >500 m from an open road in patches >5-10 $km^2$ and those secure habitat patches encompass higher quality habitats.

- That some portion (roughly 25%) of the landscape not have any roads.

- That areas be mapped where wildfires will not be extinguished unless conditions are too risky
  for private property.

Some of the more germane quotes from Proctor et al. (2017) include:

"While managing the landscape for huckleberry forage is sometimes a medium to long term option, managing for mortality risk through road density has potential to be implemented over shorter time scales."

"We found that 74% of huckleberry patches were not in cut blocks."

"We also found that planted cut blocks were less likely to have huckleberry patches. Slash burning didn't increase the probability of a cut block yielding a huckleberry patch—it was reduced. Fires (not slash burns) were ~3x more likely to yield a huckleberry patch than a cut block."

The results of Proctor et al. (2017) are consistent with other research showing that naturally-occurring shrub-fields are positively selected by grizzly bears, presumably to consume berries (Waller & Mace 1997, McLellan & Hovey 2001, Apps et al. 2004), whereas recently harvested (<40-years) stands tend to be avoided, partly because of associated human activity (Apps et al. 2004). Parenthetically, descriptions of habitat use given by Kasworm et al. (2018: 48-50) are of limited applicability simply because the analysis did not consider use in relation to availability.

Given all of these considerations, the Davis Fire has almost certainly yielded as many benefits as might be needed for grizzly bears insofar as enhancements of habitats for huckleberry production. No further

14

forest treatments are likely needed, even of the sort recommended by Proctor et al. (2017). More certainly, any (if any) gains in enhanced huckleberry habitats will almost certainly be negated by maintenance of existing road access, much less any of the local increases proposed under terms of the Black Ram Project.

## I. Activities of the Black Ram Project Are Problematic in a Larger Geospatial Context

The Black Ram EA failed to evaluate the impacts of proposed activities on grizzly bears in a larger geospatial context. Mattson & Merrill (2004) and Proctor et al. (2015) are perhaps most relevant to such an evaluation. The former research mapped existing core habitat as well as higher-probability source habitats in the Cabinet-Yaak Ecosystem (shades of green; Fig. 4A), whereas the latter mapped core habitat (green) along with prospective corridors (yellow; Fig. 4B). Importantly, Proctor et al. (2015) modeled habitat at a finer grain that approximated daily movements, whereas Mattson & Merrill (2004) modeled habitat at the scale of grizzly bear life ranges, which is more relevant to judging overall odds of survival reckoned over a span of years.

As has been repeatedly emphasized by researchers in the Transboundary region, connectivity is essential to long-term prospects for recovery (Proctor et al. 2012, 2015, 2018; Kasworm et al. 2018). And, as also emphasized by these authors, connectivity is inextricably rooted in habitat security. However, Figure 4 highlights a fundamental problem for grizzly bears residing in the Yaak/Yahk region: core habitat to the west is comparatively isolated from core habitat to the east by a zone that is less secure. Ideally, aggressive restoration efforts would be undertaken in this problematic area to reestablish free exchange of bears likely to survive the transit. Logically, this restoration would emphasize road closure and permanent decommission (as per my points F and H). Instead, the Black Ram Project proposes to not only maintain an extensive road infrastructure in this potential west-east connector, but more egregiously ramp up human activities, with the prospect of both displacing bears and also exposing bears venturing into the Project Area to even greater risk of mortality.

The results of Mattson & Merrill (2004) and Proctor et al. (2015) allow for the identification of proposed Project Activities that are especially problematic and should be cancelled altogether if there is serious intent of meaningfully recovering grizzly bears in the Yaak/Yahk region. As a priority, regeneration and intermediate harvests planned for Units 77-83 should be eliminated from the Project, as should activities proposed for Blocks 1-17, 66-76, and 84. Ideally, activities in Blocks 18-44 would also be removed from the proposal to promote reestablishment of west-east connectivity in an area with broadly the greatest potential.

Adding weight to this recommendation, the under-construction Pacific Northwest Trail is located such that it will amplify the impacts of proposed activities in the Black Ram Project (Fig. 4). Parenthetically, this consideration highlights the additional fact that the Black Ram EA did not consider the prospective cumulative impacts of all on-going, proposed, and foreseeable human activities—including increases in

15

human activity along the Pacific Northwest Trial and foreseeable activities associated with the proposed Rock Creek and Montanore Mines.

**Figure 4.** *Maps of (A) potential core and source habitat and (B) cores and corridors for grizzly bears (green and yellow, respectively) in the Yaak region. The boundary of the Black Ram Project Area is shown in burgundy juxtaposed with the Pacific Northwest Trail in yellow. Units proposed for regeneration and intermediate harvest in areas that promise maximum impacts to currently relative secure habitat are shown in red. Units that promise harm in habitats important to connectivity are shown in orange. The remainder of proposed harvest units are shown in white.*

FS-034716



FS-034717

16

## J. Impacts of Black Ram will be Synergistically Amplified by the Pacific Northwest Trail

The Pacific Northwest Trail (PNT), currently under construction, will prospectively introduce an additional 100-150 people into the heart of previously secure habitat in the Yaak region each year, with almost all of that increase during July-September, the critical hyperphagic period for grizzly bears. Importantly, the PNT creates a linear disturbance that is contiguous with and extending beyond disturbances proposed during the Black Ram Project (Fig. 5). This attenuation of distrubances insures that there will be minimal areas free of human impacts anywhere in the Black Ram Project Area. An ample corpus of relevant research unambiguously shows that hikers using a trail such as the PNT will displace grizzly bears, with impacts predictably greatest on reproductive females (Mattson 2019a). Moreover, these impacts will almost certainly be greater in and near the lineated high-elevation habitats in the Yaak (Mattson 2019a), with displaced bears having few places to go that will not also be impacted by human activities associated with the Black Ram Project.

**Figure 5.** *Location of the Black Ram Project and associated intermediate and regeneration harvest treatments (in red) juxtaposed with the Pacific Northwest Trail (in yellow) and high-elevation open habitats (in green).*

Impacts from the PNT highlight the patent failure of the Black Ram EA to assess the cumulative effects of other current, foreseeable, and proposed human activities. Moreover, with the Cabinet-Yaak Recovery Area as a logical unit of analysis, any assessment of cumulative effects needs to account for other on- going and planned human activities associated with forest treatments and harvest in this Ecosystem, as well as foreseeable impacts associated with the proposed Rock Creek and Montanore Mines; as well as on-going and foreseeable impacts associated with the human transportation infrastructure (e.g., railways and associated highways that already fragment grizzly bear distribution in this Ecosystem, Mattson et al. [2019b]), all with the potential to amplify impacts arising from the Black Ram Project.



17

## K. A Devil's Bargain Will Not Rescue This Small Population

## K.1. The Yaak Population is Not Viable and Remains Acutely Vulnerable to Increased Mortality

The Cabinet-Yaak grizzly bear population is smaller than the smallest census population size ever posited as being viable. The Yaak/Yahk subpopulation has limited connectivity with grizzly bear populations elsewhere, and the Cabinet Mountains subpopulation is more isolated yet (Apps et al. 2016; Kendall et al. 2016; Proctor et al. 2012, 2015). Such isolation is well-known to magnify risk. The degree of this risk is evident in the fact that fates of populations as small of that of the Cabinet-Yaak grizzlies can be dictated solely by chance variation in birth and death rates, known as demographic variation. Yet demographic variation is a relatively minor stressor compared to environmental variation, catastrophes, negative deterministic trends, and loss of genetic diversity—all of which are documented or potential factors in the Cabinet-Yaak. The contemporary consensus of researchers is that populations of large mammals such as grizzly bears need to

consist of thousands of animals to withstand all of these stochastic and deterministic threats over meaningful periods of time.

More to the point, as I emphasize in Point D, above, the Yaak and Cabinet grizzly bear populations remain acutely vulnerable to even small changes in levels of mortality. Under such circumstances, a precautionary approach to managing spatial hazards and habitat security is not only advisable, but mandatory. Unfortunately, there is no evidence of caution or even meaningful recognition of threats to the Yaak population in the Black Ram EA.

**K.2. Variation in Population Trajectory Has Likely Been Driven by Exposure to Humans**

As a hypothetical, it is worth taking claims regarding an improvement in status of the Cabinet-Yaak grizzly bear population between 1999-2006 and 2007-2018 at face value. Again, the emphasis here is on the hypothetical given all of the compromising or even fatal flaws in analyses and conclusions reported in Kasworm et al. More specifically, if an improvement did occur, what was (were) the likely driver(s)?

Causation is notoriously hard to establish with any reliability or confidence. Nonetheless, even taking comments in Kasworm et al (again) at face value, one can establish how these authors ascribed causation based on the balance of their comments. The relevant quotes include:

"The increase in total known mortality beginning in 1999 may be linked to poor food production during 1998-2004 (Fig. 9). Huckleberry production during these years was about half the long term average...Poor nutrition may not allow females to produce cubs in the following year and cause females to travel further for food, exposing young to greater risk of mortality from conflicts with humans, predators, or accidental deaths." (emphasized in Figure 10; ibid: 32; see Fig. 6, herein).

"Some of this decrease [in survival] in the 1999-2006 period could be attributed to an increase in natural mortality probably related to poor berry production during 1998-2004. Mortalities on private lands within the U.S. increased during this period, suggesting that bears were searching more widely for foods to replace the low berry crop." (ibid: 34).

18

In reference to a probable increase in size of the Cabinet Mountains subpopulation from around <15 (possibly 5-10) in 1988 to around 22-24 in 2012: "These data indicate the Cabinet Mountains population has increased 2-4 times since 1988, but this increase is largely a product of the augmentation effort with reproduction from that segment." (ibid: 36).

FS-034720

**Figure 6.** *Trends in size of huckleberry crops (A) and in numbers of known and probable grizzly bear deaths (B) in the Cabinet-Yaak Ecosystem. Annual data are shown as dots and 3-year moving averages as solid lines. The negative relations between berry crop size and numbers of deaths is clearly evident, largely driven by related variation in exposure to humans.*

On balance, Kasworm et al ascribe more weight to variation in natural foods and the augmentation program than to any mitigation measures as drivers of decline for the Cabinet-Yaak grizzly bear population during 1999-2006 and the subsequent presumed improvement in status during 2007-2017. This conclusion is consistent with that reached by McLellan (2015) from research in the nearby North Fork of the Flathead River and by McCall et al. (2013) from the Purcell Mountains showing a major influence of huckleberry fruit crops on demography of the local grizzly and black bear populations.

Importantly, though, Kasworm et al clearly associate the increase of deaths on during 1999-2006 and subsequent decline during 2007-2016 to bears foraging more widely—including into conflict situations— during times of dearth in late-season fruit crops. In other words, variation in population trajectory as a result of variation in size of huckleberry crops is not linked to changes in female reproductive success, but rather to effects on exposure of bears to humans.



19

### K.3. Any Prospective Increase in Huckleberries Will Not Offset Impaired Habitat Security

The consensus of available research is unequivocal about survival of especially female grizzly bears being more important than any likely increase in reproductive rates, in this case prospectively from enhanced berry production (Eberhardt et al. 1994, Hovey & McLellan 1996, Garshelis et al. 2005, Harris et al. 2006, Mace et al. 2012), especially if huckleberry patches are not meaningfully secured from human access and protected from human harvest (Proctor et al. 2017; see also https://news.gov.bc.ca/releases/2019FLNR0186-001439). And, moreover, reiterating my points under H, above, harvest treatments as part of Black Ram will not likely provide substantial increases in huckleberry production, especially relative to the benefits already imparted by

FS-034722

the Davis fire. Rather than planning more timber harvest, the Forest Service would provide more certain benefits for grizzly bears by prescribing a more widespread natural fire regime combined with aggressive closure and retirement of roads in portions of the Black Ram Project Area highlighted in Figure 4.

## L. Conclusion

Reiterating my conclusion in the Introduction to these comments, the Black Ram Project as described in the EA promises to harm grizzly bears in the Cabinet-Yaak Ecosystem, with bears occupying the transboundary region of the Yaak bearing the brunt of harm. In contrast to the current proposed actions entailing widespread timber harvest and maintenance and even construction of supporting roads, the Forest Service could unequivocally benefit grizzly bears in this area by instead emphasizing the promotion of natural fire regimes and closure and retirement of roads.

Please contact me at davidjmattson@gmail.com or 406-222-4702 if you have any questions. My somewhat dated resume is attached, current only up through my retirement shortly after 2011.

David Mattson, PhD

## M. References

Apps, C. D., McLellan, B. N., Woods, J. G., & Proctor, M. F. (2004). Estimating grizzly bear distribution and abundance relative to habitat and human influence. The Journal of Wildlife Management, 68(1), 138- 152.

Apps, C. D., McLellan, B. N., Proctor, M. F., Stenhouse, G. B., & Servheen, C. (2016). Predicting spatial variation in grizzly bear abundance to inform conservation. The Journal of Wildlife Management, 80(3), 396-413.

20

FS-034723

Benn, B., & Herrero, S. (2002). Grizzly bear mortality and human access in Banff and Yoho National Parks, 1971-98. Ursus, 13, 213-221.

Boulanger, J., & Stenhouse, G. B. (2014). The impact of roads on the demography of grizzly bears in Alberta. PloS One, 9(12), e115535.

Brannon, R. D., Mace, R. D., & Dood, A. R. (1988). Grizzly bear mortality in the northern Continental Divide ecosystem, Montana. Wildlife Society Bulletin, 16(3), 262-269.

Eberhardt, L. L., Blanchard, B. M., & Knight, R. R. (1994). Population trend of the Yellowstone grizzly bear as estimated from reproductive and survival rates. Canadian Journal of Zoology, 72(2), 360-363.

Garshelis, D. L., Gibeau, M. L., & Herrero, S. (2005). Grizzly bear demographics in and around Banff National Park and Kananaskis country, Alberta. The Journal of Wildlife Management, 69(1), 277-297.

Harris, R. B., Schwartz, C. C., Haroldson, M. A., & White, G. C. (2006). Trajectory of the Yellowstone grizzly bear population under alternative survival rates. Wildlife Monographs, (161), 44-55.

Hovey, F. W., & McLellan, B. N. (1996). Estimating population growth of grizzly bears from the Flathead River drainage using computer simulations of reproduction and survival rates. Canadian Journal of Zoology, 74(8), 1409-1416.

Kasworm , W. F., Radant, T. G., Tesiberg, J. E., Welander, A., Proctor, M., & Cooley, H. (2018). Cabinet- Yaak Recovery Area 2017 research and monitoring progress report. US Fish & Wildlife Service, Missoula, Montana.

Kasworm, W. (2018). Selkirk/Cabinet-Yaak IGBC Subcommittee, meeting notes: 2018 research/monitoring update. http://igbconline.org/wp- content/uploads/2018/11/181108_SCYE_Mtg_Summary.pdf

Kendall, K. C., Macleod, A. C., Boyd, K. L., Boulanger, J., Royle, J. A., Kasworm, W. F., ... & Graves, T. A. (2016). Density, distribution, and genetic structure of grizzly bears in the Cabinet-Yaak Ecosystem. The Journal of Wildlife Management, 80(2), 314-331.

Ladle, A., Avgar, T., Wheatley, M., Stenhouse, G. B., Nielsen, S. E., & Boyce, M. S. (2018). Grizzly bear response to spatio-temporal variability in human recreational activity. Journal of Applied Ecology.

FS-034724

Mace, R. D., Carney, D. W., Chilton-Radandt, T., Courville, S. A., Haroldson, M. A., Harris, R. B., ... & Schwartz, C. C. (2012). Grizzly bear population vital rates and trend in the Northern Continental Divide Ecosystem, Montana. The Journal of Wildlife Management, 76(1), 119-128.

21

Mattson, D. J. (2019a). Effects of pedestrians on grizzly bears: An evaluation of the effects of hikers, hunters, photographers, campers, and watchers with reference to the proposed Pacific Northwest Trail. Grizzly Bear Recovery Project, Report GBRP-2019-3.

Mattson, D. J. (2019b). Effects of trains and railways on grizzly bears: An evaluation of the effects of increased train traffic on the Burlington Northern Santa Fe and Montana Rail-Link Railways, Montana- Idaho. Grizzly Bear Recovery Project, Report GBRP-2019-1.

Mattson, D. J., & Merrill, T. (2004). A model-based appraisal of habitat conditions for grizzly bears in the Cabinet–Yaak region of Montana and Idaho. Ursus, 15(1), 76-90.

McCall, B. S., Mitchell, M. S., Schwartz, M. K., Hayden, J., Cushman, S. A., Zager, P., & Kasworm, W. F. (2013). Combined use of mark-recapture and genetic analyses reveals response of a black bear population to changes in food productivity. The Journal of Wildlife Management, 77(8), 1572-1582.

McLellan, B. N., & Hovey, F. W. (2001). Habitats selected by grizzly bears in a multiple use landscape. The Journal of Wildlife Management, 65(1), 92-99.

McLellan, B. N. (2015). Some mechanisms underlying variation in vital rates of grizzly bears on a multiple use landscape. The Journal of Wildlife Management, 79(5), 749-765.

Proctor, M. F., Paetkau, D., Mclellan, B. N., Stenhouse, G. B., Kendall, K. C., Mace, R. D., ... & Wakkinen, W. L. (2012). Population fragmentation and inter-ecosystem movements of grizzly bears in western Canada and the northern United States. Wildlife Monographs, 180(1), 1-46.

Proctor, M. F., Nielsen, S. E., Kasworm, W. F., Servheen, C., Radandt, T. G., Machutchon, A. G., & Boyce, M. S. (2015). Grizzly bear connectivity mapping in the Canada–United States trans-border region. The Journal of Wildlife Management, 79(4), 544-558.

Proctor, M. F., Lamb, C. T., & MacHutchon, A. G. (2017). The grizzly dance between berries and bullets: relationships among bottom-up food resources and top-down mortality risk on grizzly bear populations in southeast British Columbia. Trans-border Grizzly Bear Project, Kaslo, British Columbia, Canada, http://transbordergrizzlybearproject.ca/research/publications.html.

Proctor, M. F., McLellan, B. N., Stenhouse, G. B., Mowat, G., Lamb, C. T., & Boyce, M. S. (2018). Resources roads and grizzly be4ars in British Columbia and Alberta, Canada. Trans-border Grizzly Bear Project, Kaslo, British Columbia, Canada, http://transbordergrizzlybearproject.ca/research/publications.html.

Wakkinen, W. L., & Kasworm, W. (1997). Grizzly bear and road density relationships in the Selkirk and Cabinet-Yaak recovery zones. US Fish and Wildlife Service, Kalispell, Montana.

22

Wakkinen, W. L., & Kasworm, W. F. (2004). Demographics and population trends of grizzly bears in the Cabinet–Yaak and Selkirk Ecosystems of British Columbia, Idaho, Montana, and Washington. Ursus, 15(1), 65-76.

Waller, J. S., & Mace, R. D. (1997). Grizzly bear habitat selection in the Swan Mountains, Montana. The Journal of Wildlife Management, 61(4), 1032-1039.

1. Will the Forest Service be considering binding legal standards for noxious weeds in its Land Management Plan?

2. Has the State Historic Preservation Office signed off that this project complies with the Historic Preservation Act? The project is involution of the National Historic Preservation Act if this is not done.

5. How effective has the Forest Service been at stopping (i.e. preventing) new weed infestations from starting during logging and road building operations?

6. Is it true that new roads and mechanical treatments are the main cause of new noxious weed infestations?

7. Why will restoration be better than what is there now?

8. Is it true that noxious weeds are one of the top threats to biodiversity on public lands?

FS-034726

9.  How can the Forest Service be complying with NFMA's requirement to maintain biodiversity if it has no legal standards that address noxious weeds?

10. Please show that there is not an undue unnecessary degradation to the landscape.

11. Please provide all data and maps that describe where, when and how field examinations related to landscape health assessments occurred. Please include tabulated results of write-ups that summarize the conditions and include the members and list the qualifications of the interdisciplinary team and which completed the assessment.

12. Which data sets were used to characterize the landscape and prioritize land health assessments?

13. What process was used to prioritize the landscape and determine if an area should be assessed or not?

14. Were "walk-through" examinations completed across the landscape of the project to identify the cumulative impacts and characterize sites and current condition as well as disturbance - provide supporting records that prove this activity occurred on all assessments. If walk-throughs were not done please explain as why?

15. Were walk through examinations completed the landscape of uplands to identify and characterize sites and current conditions and disturbances and if not please explain why?

16. Please include all copies of photos taken for land health assessments, proper function and condition of riparian areas and all other riparian assessements, e.g. green line surveys.

17.  Please provide copies of riparian monitoring data, associated photos and upland trend data.

21. How will the decreased elk security and thermal cover affect wolverines and have you formally consulted with the FWS on the effects of this project on wolverines? The wolverine was recently determined to be warranted for listing under the ESA. 75 Fed.

Reg.78030 (Dec. 14, 2010). It is currently a candidate species, proposed for listing.. The USFWS found that "[s]ources of human disturbance to wolverines include . . . road corridors, and extractive industry such as logging . . .." . The BLM must go through ESA formal consultation for the wolverine for this project.

Please prepare a Biological Assessment and formally consult with the USFWS as required by law.

THE AGENCIES MUST COMPLETE A BIOLOGICAL ASSESSMENT, BIOLOGICAL OPINION, INCIDENTAL TAKE STATEMENT, AND MANAGEMENT DIRECTION AMENDMENT FOR THE
RMP FOR THE WOLVERINE.

The agencies do not have in place any forest plan biological assessment, biological opinion, incidental take statement, and management direction amendment for wolverines.

THE AGENCIES MUST CONDUCT ESA CONSULTATION FOR THE
WOLVERINE.
Wolverines may be present in the Project area. The Forest Service concedes that the Project "may affect" wolverines. The agencies' failure to conduct ESA consultation for a species that may be present and may be affected by the Project violates the ESA. Wolverines are currently warranted for listing under the ESA. As the agencies are well aware, the scheduled, court ordered listing date for the wolverine is this year. In fact, FWS has recently filed the a document in federal court committing to a listing date for the wolverine. Accordingly, the wolverine will be listed under the ESA before the final decision is made to authorize and implement this Project, and long before any project activities commence. Regardless, even candidate species must be included in a biological assessment.

Page 345 of the EA states:

*North American Wolverine The analysis for the North American Wolverine is consistent with the Programmatic Biological Assessment for North American Wolverine (McGowan, 2014)*

FS-034728

*and available in the project file. The project activities include those analyzed within the programmatic biological assessment. The biological assessment determined the included actions will not jeopardize the continued existence of the distinct population segment of the North American wolverine. Project activities may cause temporary behavioral impacts, but not to the extent that any life history requirements would be adversely impacted. The U.S. Fish and Wildlife Service concurred with this assessment (McGowan, 2014 in project file ). This species will not be discussed further.*

The above analysis is not adequate. Did the Forest Service survey for wolverines in the project area. The Forest Service's failure to ensure the viability of management indicator, sensitive, snag associated, and old growth associated wildlife species violates NFMA and NEPA.

Fish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area. For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area. In order to insure that viable populations will be maintained, habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area. Ruggierio et al 2000;

Wolverines generally scavenge for ungulates along valley bottoms and forage and den in remote, high-elevation areas (Hornocker and Hash 1981; Morgan and Copeland 1998). Thus if mangers wished to provide habitat for wolverines, they could pay particular attention in the planning process to ungulates winter range and other aspects of habitat quality for ungulates to provide a consistent supply of carcasses for wolverine to scavenge. In addition, wolverines generally avoid areas of human activity. To limit the threat of human-caused disturbance or mortality, managers could restrict access to portions of the landscape where wolverines are most likely to occur.

In order to meet this viability mandate, the 1982 NFMA planning regulations require that the Forest Service select "management indicator species" whose "population changes are believed to indicate the effects of management activities." 36 C.F.R. § 219.19 (1) (2000). 253.

The 1982 NFMA planning regulations require the Forest Service to monitor the population trends of these species and to state and evaluate land management alternatives

FS-034729

"in terms of both amount and quality of habitat and of animal population trends of the management indicator species." 36 C.F.R. § 219.19 (2),(6) (2000).

The wolverine was recently determined to be warranted for listing under the ESA. 75 Fed. Reg.78030 (Dec. 14, 2010). It is currently a candidate species, waiting for work to be completed on other species before it is officially listed. The USFWS found that "[s]ources of human disturbance to wolverines include . . . road corridors, and extractive industry such as logging . . .." .The Forest Service admits that the wolverine and/or its habitat are present within the project area and would be impacted by the project. The Forest Service must go through ESA consultation for the wolverine for this project.

Please disclose the impact of climate change on the efficacy of the proposed treatments.

Please disclose the impact of the proposed project on the carbon storage potential of the area.

Page 420 of the EA states: *A recent report issued by several organizations and Federal agencies summarized the general condition of birds across the US (The North American Bird Conservation Initiative, 2016). It painted a picture of declines in multiple species across a variety of habitats. Climate change was one of the contributing factors to these declines and is likely to continue impacting birds into the future.*

Page 101 of the EA states: *The pattern of successional stages across the landscape is diverse and resilient to fire, insects, disease, climate change, and increasing human uses (2015 Forest Plan pp. 17-18).*

The District Court of Montana ruled in Case 4:17-cv-00030-BMM that the Federal government did have to evaluate the climate change impacts of the federal government coal program. Please find the order attached.

In March 2019, U.S. District Judge Rudolph Contreras in Washington, D.C., ruled that when the U.S. Bureau of Land Management (BLM) auctions public lands for oil and gas leasing, officials must consider emissions from past, present and foreseeable future oil and gas leases nationwide. The case was brought by WildEarth Guardians and Physicians for Social Responsibility.

In March of 2018 the Federal District Court of Montana found the Miles City (Montana) and Buffalo (Wyoming) Field Office's Resource Management Plans unlawfully overlooked climate impacts of coal mining and oil and gas drilling. The case was brought by Western Organization of Resource Councils, Montana Environmental Information Center, Powder River Basin Resource Council, Northern Plains Resource Council, the Sierra Club, and the Natural Resources Defense Council.

FS-034730

The project is in violation of NEPA, NFMA, the APA, the ESA for not examining the impacts of the project on climate change. The project will eliminate much of the forest in the project area. Forests absorb carbon. The project will destroy soils in the project area. Soils are carbon sinks.

The lack of detailed scientific discussions in the EA concerning climate change is far more troubling than the document's failures on other topics, because the consequences of unchecked climate change will be disastrous for food production, sea level rise, and water supplies, resulting in complete turmoil for all human societies. This is an issue as serious a nuclear annihilation (although at least with the latter we're not already pressing the button).

The EA provided a pittance of information on climate change effects on project area vegetation. The EA provides no analysis as to the veracity of the project's Purpose and Need, the project's objectives, goals, or desired conditions. The FS has the responsibility to inform the public that climate change is and will be bringing forest change. For the Galton project, this did not happen, in violation of NEPA.

The EA fails to consider that the effects of climate change on the project area, including that the "desired" vegetation conditions will likely not be achievable or sustainable. The EA fails to provide any credible analysis as to how realistic and achievable its desired conditions are in the context of a rapidly changing climate, along an unpredictable but changing trajectory.

The Forest Plan does not provide meaningful direction on climate change. Nor does the EA acknowledge pertinent and highly relevant best available science on climate change. This project is in violation of NEPA. Please consider amending the Forest Plan to provide meaningful direction on climate change.

The EA does not analyze or disclose the body of science that implicates logging activities as a contributor to reduced carbon stocks in forests and increases in greenhouse gas emissions. The EA fails to provide estimates of the total amount of carbon dioxide ($CO_2$) or other greenhouse gas emissions caused by FS management actions and policies—forest-wide, regionally, or nationally. Agency policymakers seem comfortable maintaining a position that they need not take any leadership on this issue, and obfuscate via this EA to justify their failures.

The best scientific information strongly suggests that management that involves removal of trees and other biomass increases atmospheric $CO_2$. Unsurprisingly the EA doesn't state that simple fact.

FS-034731

The EA fails to present any modeling of forest stands under different management scenarios. The FS should model the carbon flux over time for its proposed stand management scenarios and for the various types of vegetation cover found on the GNF.

The EA also ignores $CO_2$ and other greenhouse gas emissions from other common human activities related to forest management and recreational uses. These include emissions associated with machines used for logging and associated activities, vehicle use for administrative actions, and recreational motor vehicles. The FS is simply ignoring the climate impacts of these management and other authorized activities.

The Committee of Scientists, 1999 recognize the importance of forests for their contribution to global climate regulation. Also, the 2012 Planning Rule recognizes, in its definition of Ecosystem services, the "Benefits people obtain from ecosystems, including: (2) Regulating services, such as long term storage of carbon; climate regulation..."

The NFMA requires in the face of increasing climate risk, growing impacts of wildfire and insect activity, plus scientific research findings, the FS must disclose the significant trend in post-fire regeneration failure. The forest has already experienced considerable difficulty restocking on areas that have been subjected to prescribed fire, clear-cut logging, post- fire salvage logging and other even-aged management "systems."

NFMA (1982) regulation 36CFR 219.27(C)(3) implements the NFMA statute, which requires restocking in five years.

Can the Kootenai National Forest "insure that timber will be harvested from the National Forest system lands only where…there is assurance that such lands can be restocked within five years of harvest?" (NFMA§6(g)(3)(E)(ii)).

The project goals and expectations are not consistent with NFMA's "adequate restocking" requirement. Scientific research can no longer be ignored.

FS-034732

*"At dry sites across our study region, seasonal to annual climate conditions over the past 20 years have crossed these thresholds, such that conditions have become increasingly unsuitable for regeneration. High fire severity and low seed availability further reduced the probability of post-fire regeneration. Together, our results demonstrate that climate change combined with high severity fire is leading to increasingly fewer opportunities for seedlings to establish after wildfires and may lead to ecosystem transitions in low-elevation ponderosa pine and Douglas-fir forests across the western United States."* Wildfires and climate change push low-elevation forests across a critical climate threshold for tree regeneration, PNAS (2018), Kimberley T. Davis, et al. (Please, find attached)

Where is the reference to restocking? Monitoring data and analysis? If monitoring has been done there is no disclosure documenting the scope and probability of post-fire regeneration failures in the project area. NFMA requires documentation and analysis that accurately estimates climate risks driving regeneration failure and deforestation – all characteristic of a less "resilient" forest.

The Forest Plan is based on assumptions largely drawn from our past that no longer hold true. These assumptions, made decades ago, must be challenged, and amended, where overwhelming evidence demonstrates a change of course is critical. It is time to take a step back, assess the present and future and make the necessary adjustments, all in full public disclosure to the Congress and the American people. Many acres of (conifers) In many areas, conifers haven't shown "resilience" enough to spring back from disturbance. Regeneration is already a big problem. (Emphasis added).

Both RPA and NFMA mandate long-range planning which impose numerous limitations on commodity production, including grazing, timber harvesting practices and the amount of timber sold annually. These long-range plans are based on assumptions, which are based on data, expert opinion, public participation and other factors that all, well almost all, view from a historical perspective. Assumptions that drove forest planning guidance decades ago, when climate risk was not known as it is today, are obsolete today.

Present and future climate risk realities demand new assumptions and new guidance.

A proper reexamination of the assumptions relating to resilience and sustainability contained in the Forest Plan is necessary. Scientific research supporting our comments focus on important data and analysis. A full discussion and disclosure of the following is required: 1) trends in wildfires, insect activity and tree mortality, 2) past regeneration success/failure in the project area, and 3) climate-risk science – some of which is cited below. Our comments, and supporting scientific research clearly "demonstrates connection between prior specific written comments on the particular proposed project or activity and the content of the objection…"

Disclose the impact of climate change on the efficacy of the proposed treatments;"

Hayward, 1994 essentially calls into question the entire manipulate and control regime, as represented in the EA. The managed portion of the Kootenai National Forest has been fundamentally changed, as has the climate, so the Forest Service must analyze how much land has been fundamentally changed forest wide compared to historic conditions, and disclose such information to the public in the context of an EIS by completing the Forest Plan Revision process."

FS-034734

PLEASE TAKE A HARD LOOK AT HOW CLIMATE CHANGE AFFECTS AND IS AF-
FECTED BY THIS PROJECT IN VIOLATION OF NEPA, NFMA, THE FOREST PAN AND
THE APA.

Published scientific reports indicate that climate change will be exacerbated by logging, and that
climate change will lead to increased wildfire severity (including drier and warmer conditions
that may render obsolete the proposed effects of the Project). The former indicates that the Black
Ram Project may have a significant adverse effect on the environment, and the latter undermines
the central underlying purpose of the Project. Therefore, the Forest Service must candidly dis-
close, consider, and fully discuss the published scientific papers discussing climate change in
these two contexts. At least the Forest Service should discuss the following studies:"

Depro, Brooks M., Brian C. Murray, Ralph J. Alig, and Alyssa Shanks. 2008.

Public land, timber harvests, and climate mitigation: quantifying carbon sequestration potential
on U.S. public timberlands. Forest Ecology and Management 255: 1122-1134.

Harmon, Mark E. 2001. Carbon sequestration in forests: addressing the scale question. Journal of
Forestry 99:4: 24-29.

Harmon, Mark E, William K. Ferrell, and Jerry F. Franklin. 1990. Effects of carbon storage of
conversion of old-growth forest to young forests. Science 247: 4943: 699-702

Harmon, Mark E, and Barbara Marks. 2002. Effects of silvicultural practices on carbon stores in
Douglas-fir – western hemlock forests in the Pacific Northwest, USA: results from a simulation
model. Canadian Journal of Forest Research 32: 863-877.

FS-034735

Homann, Peter S., Mark Harmon, Suzanne Remillard, and Erica A.H. Smithwick.2005. What the soil reveals: potential total ecosystem C stores of the Pacific Northwest region, USA. Forest Ecology and Management 220: 270-283.

McKenzie, Donald, Ze'ev Gedalof, David L. Peterson, and Philip Mote. 2004. Climatic change, wildfire, and conservation. Conservation Biology 18:4: 890 -902.

Please considers the long-term cumulative impacts of the KNF's industrial logging on climate change.

This important consideration could lead land managers and policy makers to the conclusion that National Forest lands are more valuable to the national and global community as carbon sinks than as commercial tree farms.

The Forest Service must analyze all of the cumulative the impacts of the Black Ram project in an EIS.

The project is in violation of NEPA, NFMA, the Forest Plan and the APA.

Sec. 6. of the National Forest Management Act states:

(g) As soon as practicable, … the Secretary shall … promulgate regulations, under the principles of the Multiple-Use, Sustained-Yield Act of 1960…

The regulations shall include, but not be limited to-

FS-034736

(3) specifying guidelines for land management plans developed to achieve the goals of the Program which-

(E) insure that timber will be harvested from National Forest System lands only where-

(i) soil, slope, or other watershed conditions will not be irreversibly damaged;

NFMA regulations at 36 C.F.R. § 219.27 (Management requirements) state:

(a) Resource protection. All management prescriptions shall—

(1) Conserve soil and water resources and not allow significant or permanent impairment of the productivity of the land;

(b) Vegetative manipulation. Management prescriptions that involve vegetative manipulation of tree cover for any purpose shall--

(5) Avoid permanent impairment of site productivity and ensure conservation of soil and water resources;

The project-level, and programmatic-level (Forest Plan) fail to publicly disclose the current and future impacts of climate risk to our national forests. NEPA requires cumulative effects analysis at the programmatic level, and at the project-level. The failure to assess and disclose all risks associated with vegetative-manipulation (slash and burn) units in the project area in the proper climate-risk context/scenario violates the NFMA, NEPA and the APA.

In the face of increasing climate risk, growing impacts of wildfire and insect activity, plus scientific research findings, NEPA analysis and disclosure must address the well-documented trend in

post-fire regeneration failure. The project has already experienced difficulty restocking on areas that burned in the 1988 wildfire. NFMA (1982) regulation 36 CFR 219.27(c)(3) implements the NFMA statute, which requires adequate restocking in five years.

Given the forest's poor history of restocking success and its failure to employ the best available science, the adequacy of the site-specific and programmatic NEPA/NFMA process begs for further analysis and disclosure of the reality of worsening climate conditions which threaten – directly and cumulatively – to turn forest into non-forested vegetation, or worse. The desired future condition described in the Purpose and Need, or in the Forest Plan is not deforestation.

The Forest Plan is based on assumptions largely drawn from our past. These assumptions must be challenged, and amended, where overwhelming evidence demonstrates a change of course is critically important. It is time to take a step back, assess the future and make the necessary adjustments, all in full public disclosure to the Congress and the American people.

The EA fails to acknowledge the likelihood that "…high seedling and sapling mortality rates due to water stress, competing vegetation, and repeat fires that burn young stands," which will likely lead to a dramatic increase in non-forest land acres. Many acres of (conifers) trees already fail to regenerate. (Emphasis added). A map of these areas is required. In many areas, conifers haven't shown "resilience" enough to spring back from disturbance.

Please not only analyze forest-wide impacts, but the regional, national and global scope of expected environmental changes. Based on scientific research, the existing and projected irretrievable losses must be estimated. Impacts caused by gathering climate risk (heat, drought, wind) and its symptoms, including wildfire, insect activity, and regeneration failure and mature tree mortality must be analyzed cumulatively.

The selected scientific research presented above is only a sampling of the growing body of evidence that supports the need to disclose the consequences of the proposed action in a proper context – a hotter forest environment, with more frequent drought cycles. This evidence brings into question the Purpose and Need for the project. It also requires the FS to reconsider the assumptions, goals and expected desired future condition expressed in the existing Forest Plan. Plan expectations must be amended at the programmatic level before proceeding with proposed project-level action(s). According to best available science, implementing the project will most likely accomplish the opposite of the desired future condition. We can adjust as we monitor and find

FS-034738

out more. However, to willfully ignore what we do know and fail to disclose it to the public is a serious breach of public trust and an unconscionable act. Climate risk is upon us. A viable alternative to the proposal is not only reasonable and prudent, but it is the right thing to do.

Global warming and its consequences may also be effectively irreversible which implicates certain legal consequences under NEPA and NFMA and ESA (e.g., 40 CFR § 1502.16; 16 USC §1604(g); 36 CFR §219.12; ESA Section 7; 50 CFR §§402.9, 402.14). All net carbon emissions from logging represent "irretrievable and irreversible commitments of resources."

The EA states on page 102:

*Fire exclusion since the 1920s has disrupted annual occurrence, spatial extent, and cumulative area burned by wildfires. As a result, there has been an increase in surface fuel loads, tree densities, and ladder fuels (Halofsky et al., 2018). Additionally, it has created landscapes with large contiguous patches of dense stands with high surface and canopy fuel accumulations (R. E. Keane et al., 2002) as well as a decline in the representation of early seral tree species. Large wildfires in more recent years have helped to re-establish some of the large-expanses of regeneration and snag patches in areas.*

Page 23 of the EA states:

*The policy-driven suppression of wildland fire has contributed to a vegetative pattern in the forest different from conditions that were present prior to fire suppression. Fuels that would have been consumed by numerous non-lethal or mixed-lethal fires have accumulated and remained on site. Fire exclusion has also allowed trees with low fire resistance to become more prevalent on sites where they would have had lower representation than tree species adapted to fire over the millennia.It can be assumed that had the smaller, naturally occurring, fires in the Project Area not been suppressed, fire would have played a more active role in the ecological process across the landscape.*

FS-034739

The paragraph above is not a reflection of the best available science. Please see the attached paper by Dr. William Baker titled:

"Are High-Severity Fires Burning at Much Higher Rates

Recently than Historically in Dry-Forest Landscapes of the

Western USA?"

Dr. Baker writes: *"Programs to generally reduce fire*

*severity in dry forests are not supported and have*

*significant adverse ecological impacts, including reducing*

*habitat for native species dependent on early-successional burned patches and decreasing landscape heterogeneity that confers resilience to climatic change."*

Dr. Baker concluded: *"Dry forests were historically*

*renewed, and will continue to be renewed, by sudden,*

*dramatic, high-intensity fires after centuries of stability and lower-intensity fires."*

Please explain why the EA is in violation of NEPA and is not following the best available science on wildfires.

Page 1-2 of the EA states:

*Purpose and Need for the Proposal*
*The focus of the Black Ram project is to manage the forest stands in the Project Area to maintain or improve their resilience to disturbances such as drought, insect and diseases outbreaks, and wildfires. Based on field review of the area and the 2015 Forest Plan by the District's resource specialists, the following purpose and need for treatment has been identified to help move the landscape toward the desired condition:*

*Black Ram Environmental Assessment 2 •Promote resilient vegetation conditions by managing for landscape-level vegetation patterns, structure, patch size, fuel loading, and species composition. ♦Promote early seral tree species including western larch, ponderosa pine, and western white pine♦Maintain or improve old growth character within existing old growth♦Encourage*

*fire's ecological function on the landscape ♦Improve resilience and resistance to insects, disease and fire♦Design size of treatments to be consistent with the patch size and pattern of the respective biophysical setting♦Diversify successional stages•Maintain or improve watershed conditions in order to provide water quantity, water quality, stream channel conditions, and native aquatic species habitat that support ecological functions and beneficial uses.♦Aquatic Resource - Reduce sediment delivery to aquatic systems by implementing Best Management Practices (BMP) on Forest Service Roads ♦Improving and stabilize road/stream crossings and improve drainage distribution on Project Area roads.•Improve big game winter range conditions and promote forage opportunities. ♦Maintain or increase the forage component of forested stands in the Project Area, including an increase of seedling/sapling age class and early seral species, through timber harvest and prescribed fire; ♦Improve vigor, extent, and long-term productivity of huckleberry and other native plants to increase forage availability.•Maintain and improve the recreation opportunities in the Project Area. ♦Maintain public access to national forest land ♦Create new recreational opportunities •Reduce the potential for high intensity wildfire while promoting desirable fire behavior characteristics and fuel conditions in the Wildland Urban Interface and other areas with values at risk. •Provide forest products that contribute to the sustainable supply of timber products from National Forest System Lands.*

Baker writes: "*Programs to generally reduce fire severity in dry forests are not supported and have significant adverse ecological impacts, including reducing habitat for native species dependent on early-successional burned patches and decreasing landscape heterogeneity that confers resilience to climatic change.*"

Please explain why the Black Rim Project will have different results that what William Baker found. Baker has found that what you are proposing will not maintain or improve the forest resilience to disturbances such as drought, insect and diseases outbreaks, and wildfires.

In "Fire Ecology in Rocky Mountain Landscapes" by William Baker, Dr. Baker writes on page 435, " *…a prescribed fire regime that is too frequent can reduce species diversity (Laughlin and Grace 2006) and favor invasive species (M.A. Moritz and Odion 2004). Fire that is entirely low severity in ecosystems that historically experience some high-severity fire may not favor germination of fire-dependent species (M.A. Moritz and Odion 2004) or provide habitat key animals (Smucker, Hutto, and Steele 2005).*"  Baker continues on page 436: "*Fire rotations equal the average mean fire interval across a landscape and are appropriate intervals at which individual points or the whole landscape is burned. Composite fire intervals underestimate*

*mean fire interval and fire rotation (chap 5) and should not be used as prescribed burning intervals as this would lead to too much fire and would likely lead to adversely affect biological diversity (Laughlin and Grace 2006)."*

Thank you for your time.

Sincerely yours,

Mike Garrity

Executive Director

Alliance for the Wild Rockies

P.O. Box 505

Helena, MT 59624

406 586-4421

And for

Sara Johnson

Native Ecosystems Council

P.O. Box 125

Willow Creek, MT 59760

and for

Steve Kelly
Montana Ecosystems Defense Council

P.O. Box 4641
Bozeman, MT 59772

FS-034742

FS-034743



FS-034744



FS-034745

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| CITIZENS FOR CLEAN ENERGY, et al., <br><br> and <br><br> THE NORTHERN CHEYENNE TRIBE, <br><br>      Plaintiffs, <br><br>   v. <br><br> U.S. DEPARTMENT OF THE INTERIOR, et al., <br><br>      Federal Defendants, <br><br>   and <br><br> STATE OF WYOMING, et al., <br><br>      Defendant-Intervenors. | **CV-17-30-GF-BMM** <br><br><br><br> **ORDER** |
| STATE OF CALIFORNIA, et al., <br><br>      Plaintiffs, <br><br>   v. <br><br> U.S. DEPARTMENT OF THE INTERIOR, et al., <br><br>      Federal Defendants, <br><br>   and <br><br> STATE OF WYOMING, et al., <br><br>      Defendant-Intervenors. | **CV-17-42-GF-BMM** <br>(Consolidated case) |

1

FS-034746

# INTRODUCTION

The Court held a hearing on December 13, 2018, on cross-motions for summary judgment filed in this consolidated action brought by the Center for Biological Diversity, Citizens for Clean Energy, Defenders of Wildlife, EcoCheyene, Montana Environmental Information Center, Sierra Club, the Northern Cheyenne Tribe, and WildEarth Guardians (collectively "Organizational Plaintiffs"), State of California, State of Washington, and the State of New Mexico (collectively "State Plaintiffs"), and by Defendants Secretary of Interior Ryan Zinke, the U.S. Department of Interior, the U.S. Bureau of Land Management (collectively "Federal Defendants"), the State of Wyoming, the State of Montana (collectively "State Defendants"), and the National Mining Association (collectively "Defendants"). For ease of reference the Court will use the generic terms Plaintiffs and Defendants unless an issue requires the Court to identify a specific party.

## A.  PROCEDURAL HISTORY

Plaintiffs filed their Complaint in CV-17-30-GF-BMM on March 29, 2017. (Doc. 1.) The Court granted the State of Wyoming's Motion to Intervene (Doc. 25) on May 30, 2017. (Doc. 30.) The Court granted the parties Joint Motion to Consolidate Cases (Doc. 33) on June 2, 2017. (Doc. 34.) The Court granted National Mining Association's Motion to Intervene (Doc. 37) on July 10, 2017. (Doc. 41.)

2

FS-034747

The Court granted the State of Montana's Motion to Intervene (Doc. 39) on July 10, 2017. (Doc. 42.)

State Plaintiffs filed their Motion for Summary Judgement on July 27, 2018. (Doc. 115.) Organizational Plaintiffs filed their Motion for Summary Judgment on July 27, 2018. (Doc. 117.)  Federal Defendants filed their Cross Motion for Summary Judgment on September 7, 2018. (Doc. 123.) State Defendants filed their Cross Motion for Summary Judgment on September 19, 2018. (Doc. 125.) National Mining Association filed its Cross Motion for Summary Judgment on September 18, 2018. (Doc. 127.)

## B. FACTUAL BACKGROUND

The United States Government owns an approximately 570-million-acre coal mineral estate. (Doc. 118 at 12.) The Bureau of Land Management ("BLM") administers federal coal leases on the Government's estate. (Doc. 118 at 12.) The BLM possess broad discretion to lease public land for coal mining. (Doc. 118 at 12.) The BLM remains constrained, however, by the Federal Lands Policy and Management Act ("FLMPA") and the Mineral Leasing Act of 1920 ("MLA") (as amended by the Federal Coal Leasing Amendment Act). (Doc. 118 at 13.)

BLM currently manages 306 active federal coal leases in ten states. (Doc. 118 at 13.) The BLM managed leases account for an estimated 7.4 billion tons of recoverable coal. (Doc. 118 at 13.) Over forty percent of the coal produced in the

3

FS-034748

United States comes from federal land. AR-00004. Over eighty-five percent of coal production on federal land in the United States occurs in the Powder River Basin shared by Montana and Wyoming. *Id.* BLM possessed forty-four pending lease and lease-modification applications in February of 2017. (Doc. 118 at 14.) BLM last commenced a comprehensive environmental review for the federal coal program in 1979. (Doc. 118 at 14.)

### 1. Secretarial Order 3338

Former Secretary of the Interior Sally Jewell issued Secretarial Order 3338 (hereafter "the Jewell Order") on January 15, 2016. (Doc. 118 at 16.) The Jewell Order directed BLM to prepare a programmatic environment impact statement ("PEIS") that addressed at a minimum the following issues:

(a) how, when, and where to lease coal; (b) fair return to the American public for federal coal; (c) the climate change impacts of the federal coal program, and how best to protect the public lands from climate change impacts; (d) the externalities related to federal coal production, including environmental and social impacts; (e) whether lease decision should consider whether the coal would be for export; and (f) the degree to which federal coal fulfills the energy needs of the United States.

(Doc. 118 at 17.) the Jewell Order imposed a moratorium on new coal leasing until completion of the PEIS. (Doc. 118 at 16.)

### 2. Secretarial Order 3348

President Trump issued an executive order on March 28, 2017, commanding Secretary of the Interior Ryan Zinke to "take all steps necessary and appropriate to

4

FS-034749

amend or withdraw" the Jewell Order. (Doc. 118 at 20.) Secretary Zinke

subsequently issued Secretarial Order 3348 (hereafter "the Zinke Order") on

March 29, 2017. AR-00001-2 The Zinke Order determined that "the public interest

is not served by halting the Federal coal program for an extended time[.]" *Id.* The

Zinke Order further reasoned that Federal Defendant's consideration of potential

improvements to the coal leasing program did not require a PEIS. *Id.* The Zinke

Order lifted the moratorium and directed BLM to "process coal lease applications

and modifications expeditiously in accordance with regulations and guidance

existing before the issuance of" the Jewell Order. *Id.*

## C. LEGAL BACKGROUND

A series of federal statutes governs resolution of these motions.

### 1.  National Environmental Policy Act

The National Environmental Policy Act ("NEPA") requires federal agencies

to "take a hard look" at the "environmental consequences" of their decision-

making. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)

(internal citations omitted). The statute "does not mandate particular results." *Id*.

NEPA instead "prescribes the necessary process" that agencies must follow to

identify and evaluate "adverse environmental effects of the proposed action." *Id*.

Such effects may be direct, "indirect," or "cumulative." 40 C.F.R. § 1502.16.

5

## 2. Mineral Leasing Act

The MLA governs the leasing of public land for coal production. The MLA authorizes the Secretary of the Interior ("Secretary") to divide lands that "have been classified for coal leasing into leasing tracts of such a size as [the Secretary] finds appropriate and in the public interest and which will permit the mining of coal." 30 U.S.C. § 201(a)(1). The MLA requires the Secretary, "in his discretion, upon the request of any qualified application or his own motion" to "offer such lands for leasing." *Id*. The MLA requires the Secretary to "award leases thereon by competitive bidding." *Id*. The MLA bars the Secretary from awarding a lease to a less than fair market value bid. *Id*. "No lease shall be held unless the lands containing the coal deposits have been included in a comprehensive land-use plan and such sale is compatible with such plan." 30 U.S.C. § 201(3)(A)(i).

## 3. Federal Land Policy and Management Act

The Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701, et seq., dictates the framework under which BLM manages public lands. It is the policy of the United States, pursuant to FLPMA, that "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8). FLPMA further states that the policy of the

6

FS-034751

United States requires that the "United States receive fair market value of the use of the public lands and their resources." 43 U.S.C. § 1701(a)(8).

BLM accomplishes this directive by developing, maintaining, and revising RMPs. 43 U.S.C. § 1712(a); 43 C.F.R. § 1601.0–5(n). RMPs "guide and control future management actions." 43 C.F.R. § 1601.0–2. RMPs establish "[l]and areas for limited, restricted or exclusive use" and determine "[a]llowable resource uses (either singly or in combination) and related levels of production or use to be maintained." 43 C.F.R. § 1601.0-5(n)(1)–(2).

## DISCUSSION

A court should grant summary judgment where the movant demonstrates that no genuine dispute exists "as to any material fact" and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment remains appropriate for resolving a challenge to a federal agency's actions when review will be based primarily on the administrative record. *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006).

The Administrative Procedure Act ("APA") standard of review governs Plaintiffs' claims. *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481, 496 (9th Cir. 2011); *Bennett v. Spear*, 520 U.S. 154, 174 (1997). The APA instructs a reviewing court to "hold unlawful and set aside" agency action deemed "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5

7

FS-034752

U.S.C. § 706(2)(A). A rational connection must exist between the facts found and the conclusions made in support of the agency's action. *Kraayenbrink*, 632 F.3d at 481. The Court reviews the Department's compliance with NEPA, the MLA, and FLPMA under the arbitrary and capricious standard pursuant to the APA. *See Center for Biological Diversity v. Nat'l. Highway Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008). Federal courts shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Agency action "includes the whole or part of an agency rule, order, license, sanction, relief or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Courts have interpreted claims under 5 U.S.C. § 706(1) to compel "discrete agency action that [the agency] is required to take." *Norton v. Southern Utah Wilderness Alliance (SUWA)*, 542 U.S. 55, 65 (2004).

## I.    ARTICLE III STANDING

Defendants assert that Plaintiffs allege conjectural harm, rather than any imminent threat, and thereby lack standing to bring their claims. (Doc. 124 at 27.) Defendants assert that a series of four events must occur to establish imminent harm: (1) an operator applies to lease land or to modify a lease where Plaintiffs' members recreate; (2) a BLM office completes an environmental assessment ("EA") or EIS and determines the fair market value of the coal and approves the

8

lease modification; (3) a surface mining permit is issued; and (4) the mining plan is approved. *Id.* at 28.

Defendants argue that none of these events can be characterized as imminent or impending. *Id.* Defendants argue further that Plaintiffs lack standing due to broad-ranging nature of the alleged harm that cannot be traced to the challenged action. *Id.* Defendants further argue that Plaintiffs have failed to demonstrate injury-in-fact because BLM has approved no leasing decisions since Secretary Zinke lifted the moratorium. *Id.*

Article III standing requires a plaintiff, or in the case of an organization, one of its members, to demonstrate: (1) injury-in-fact that is "concrete and particularized" and either "actual or imminent" and not "conjectural or hypothetical;" (2) a "causal connection" between the alleged injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision." *Defenders*, 504 U.S. 555, 560-61 (1992); *Summers v. Earth Island Inst.*, 555 U.S. 488, 493-94 (2009); *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

As an initial matter, Defendants' argument that Plaintiffs lack standing to pursue their NEPA claims until after individual leases have been processed and coal has been leased and mined proves unavailing. (Doc. 124 at 28.) Plaintiffs allege that Federal Defendants' conduct in failing to comply with NEPA before

ending the coal-leasing moratorium has inflicted a procedural injury. Plaintiffs'

alleged procedural injury stems from the risk that takes place "when governmental

decisionmakers make up their minds without having before them an analysis of the

likely effects of their decision on the environment." *Citizens for Better Forestry v.*

*U.S. Dep't of Agric.*, 341 F.3d 961, 971 (9th Cir. 2003). A programmatic analysis

that may predetermine future decisionmaking "represents a concrete injury that

plaintiffs must, at some point, have standing to challenge." *Res. Ltd., Inc. v.*

*Robertson*, 35 F.3d 1300, 1303 (9th Cir. 1994). Plaintiffs do not need to wait until

after coal has been leased and mining has been approved in order to challenge an

alleged procedural injury. *See Sierra Forest Legacy v. Sherman*, 646 F.3d 1161,

1179 (9th Cir. 2011).

## A. Injury-In-Fact

A plaintiff must show that the procedures at issue are designed to protect

some "threatened concrete interest" to satisfy the injury-in-fact requirement.

*WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015).

Plaintiffs' Complaint establishes the injury-in-fact requirement of standing. To

demonstrate a concrete interest, a plaintiff must show "a geographical nexus

between the individual asserting the claim and the location suffering an

environmental impact." *Id.*

10

### 1. State Plaintiffs

State Plaintiffs consist of the states of Washington, California, New Mexico, and New York. Federal coal production occurs in New Mexico. AR-1550. Federal coal is transported via railways through California and Washington. Emissions of pollutants from power plants that burn federal coal inhabit New York's air. Coal production, transportation, and consumption affects adversely, in relevant part, air quality and water quality. AR-1584. The federal coal program, as of 2014, stands responsible for an estimated eleven percent of total United States greenhouse gas emissions. AR-1569. State Plaintiffs possess an interest in how the production, transportation, and/or consumption of coal affects the earth and air in their respective domains. *See State of Ga. v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907). State Plaintiffs' interest proves concrete—the harms of which State Plaintiffs complain occur within each of the state's geographical boundaries. *W. Watersheds Project*, 632 F.3d at 485.

### 2. Organizational Plaintiffs

Organizational Plaintiffs likewise possess a concrete interest. The Western Energy (Rosebud), Decker, and Spring Creek mines surround the Northern Cheyenne Reservation. (Doc. 117-6 at ¶ 9.) Pending lease applications existed for the Decker and Spring Creek mines when the Jewell Order imposed a moratorium on new coal leasing. *Id*. at ¶ 12. Organizational Plaintiffs allege that coal mining at

11

FS-034756

the Decker and Spring Creek mines impacts the air and water quality on the reservation, destroys the habitats of sensitive species, and "destroys important cultural sites, including sites used for Cheyenne ceremonies." *Id*. at ¶ 10. Organizational Plaintiffs allege that pollution from coal mining at the Decker and Spring Creek mines equally affects a member-rancher's use of the Tongue River for irrigation and other agricultural purposes. (Doc. 117-2 at ¶ 4.)

Members further highlight that issuance of pending leases, that previously had been paused pursuant to the Jewell Order, will affect several members' use of areas in Montana, Wyoming, and Utah. (Docs. 117-1 at ¶ 14, 117-3 at ¶¶ 23-24, 38-39, 117-4 at ¶ 14, 117-5 at ¶ 12.) The members attest that the issuance of pending coal leases will increase the noise, air pollution, and visual impacts of coal mining adjacent to the areas in which members use the land. (Docs. 117-1 at ¶¶ 5-11, 14-15, 117-3 at ¶¶ 32-39, 117-4 at ¶¶ 8-15, 117-5 at ¶¶ 3-10, 12.). The Northern Cheyenne Tribe and Conservation Plaintiffs, through each of their members, allege an injury to its members' recreational and aesthetic interests. *See Friends of the Earth*, 528 U.S. at 183; *Cottonwood Environmental Law Center*, 789 F.3d at 1079.

## B. CAUSAL CONNECTION AND REDRESSABILITY

To establish a causal connection, a plaintiff must establish a "more than attenuated" line of causation between the challenged action and the alleged harm.

12

FS-034757

*Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011). "Once a plaintiff has established an injury in fact under NEPA the causation and redressability requirements are relaxed." *W. Watersheds Project*, 632 F.3d at 485. Plaintiffs must demonstrate "only that they have a procedural right that, if exercised, could protect their concrete interests." *Id.*

Plaintiffs have alleged a procedural right under NEPA. Plaintiffs allege that preparation of an EIS before ending the moratorium would require formal consultation with the Northern Cheyenne Tribe regarding coal-leasing impacts. *See* 40 C.F.R. § 1501.7(a)(1). Plaintiffs assert that Federal Defendants deprived the Northern Cheyenne Tribe of its right to participate in the scoping process. Plaintiffs assert that Defendants' failure to comply with NEPA deprived Plaintiffs of a meaningful opportunity to influence the disposition of coal-lease applications. The NEPA process proves sufficient to redress the procedural injuries that Plaintiffs allege. *See W. Watersheds Project*, 632 F.3d at 485. Plaintiffs have satisfied the causation and redressability requirements.

## II.   RIPENESS

Ripeness prevents the Court, "through avoidance of premature adjudication, from entangling [itself] in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the

FS-034758

challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967). A party that possesses standing and asserts an alleged injury by an agency's failure to comply with NEPA "may complain of that failure at the time the failure takes place, for the claim can never get riper." *Ohio Forestry Ass'n*, 523 U.S. at 737.

The Court has determined that Plaintiffs have alleged a procedural injury related to Federal Defendants' failure to comply with the NEPA process in revoking the Jewell Order. Plaintiffs allege that the procedural injury occurred when Federal Defendants lifted the moratorium without preparing an EIS, or supplementing the PEIS. These events and the accompanying alleged procedural injury have occurred. Plaintiffs' challenge to the Zinke Order "may be their only opportunity to challenge [the coal-leasing program] on a nationwide, programmatic basis." *Cal. ex rel. Lockyer v. U.S. Dept. of Agriculture*, 575 F.3d 999 (9th Cir. 2009). Plaintiffs' NEPA claims are ripe for review.

## III.   NEPA AND THE APA

Plaintiffs argue that Federal Defendants' decision to lift the moratorium constituted a major federal action that remains subject to NEPA review. (Docs. 116 at 25; 118 at 24.) Plaintiffs argue further that Federal Defendants' decision not to prepare an EIS proves reviewable under the APA. (Docs. 129 at 16; 130 at 19.) The United States Supreme Court in *SUWA*, 542 U.S. 55, evaluated the same steps

14

FS-034759

at issue in this case: (1) whether NEPA imposed a duty to prepare an EIS, and (2) whether the agency's failure to prepare the EIS was actionable under the APA. 542 U.S. at 72-73 (determining that "[b]efore addressing whether a NEPA-required duty is actionable under the APA, [the court] must decide whether NEPA creates an obligation in the first place.") *Id.* at 72. The Court will follow the United States Supreme Court's approach in *SUWA*. The Court will first determine whether NEPA imposed a duty upon Federal Defendants to prepare or supplement the PEIS before analyzing whether the action is reviewable under the APA.

### A. NEPA

NEPA serves as "our basic national charter for protection of the environment." *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008) (*quoting Ctr. For Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008)). "NEPA requires that federal agencies perform environmental analysis before taking 'any major Federal actions significantly affecting the quality of the human environment.'" *Center for Biological Diversity v. Salazar*, 706 F.3d 1085, 1094 (*quoting* 42 U.S.C. § 4332(2)(C)).

The existence of a NEPA triggering event "depends on whether there is a new proposed major Federal action." *Salazar*, 706 F.3d at 1094. The threshold to trigger NEPA remains "relatively low." *Lockyer*, 575 F.3d at 1018. A NEPA

15

FS-034760

triggering event requires merely that a plaintiff "raise substantial questions whether a project may have a significant effect on the environment." *Id.* (*quoting Blue Mtns. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998)).

NEPA does not always require an EIS to ensure that an agency has taken a "hard look" at potential environmental impacts. *Lockyer*, 575 F.3d at 1012. An agency may comply with NEPA through the preparation of the following documents and accompanying analysis: (1) an EIS; (2) a less extensive EA and a finding of no significant impact on the environment ("FONSI"); or (3) a categorical exclusion and finding that the action does not individually or cumulatively have a significant effect on the human environment. *Id.*; 40 C.F.R. § 1508.4.

Defendants argue that the Zinke Order constituted merely an agency policy to proceed with lease applications. (Docs. 124 at 35, 126 at 21.) Defendants assert that no NEPA triggering event occurred because no major federal action or final agency action existed. *Id.* Plaintiffs assert that NEPA required Federal Defendants to prepare a PEIS before lifting the moratorium. (Doc. 118 at 25.) Plaintiffs argue alternatively that NEPA required Federal Defendants to supplement the PEIS to address the new information related to the impacts of coal leasing since 1979. *Id.*

## 1.  The 2017 Lifting of the Moratorium

16

FS-034761

President Trump directed Secretary Zinke to "take all steps necessary and appropriate to amend or withdraw [the Jewell Order] . . . and to lift any and all moratoria on Federal land coal leasing activities related to [the Jewell Order]." AR-15904. Secretary Zinke issued the Zinke Order to end the federal coal-leasing moratorium and the PEIS process on March 29, 2017. AR-00001-2. The Zinke Order directed BLM to "process coal lease applications and modifications expeditiously in accordance with regulations and guidance existing before the issuance of [the Jewell Order]." AR-00002. Federal Defendants determined that a NEPA analysis related to the lifting of the moratorium proved unnecessary. *See* AR-00013. Defendants maintain that the Zinke Order did not constitute a major federal action that triggered NEPA. (Doc. 124 at 39.)

Defendants assert that the analysis in *Western Organization of Resource Councils (WORC) v. Zinke*, 892 F.3d 1234 (D.C. Cir. 2018), proves dispositive. (Docs. 124 at 40; 126 at 16; 128 at 23.) *WORC* involved a similar NEPA challenge at issue in the instant case. The plaintiffs in WORC claimed that the 1979 PEIS issued by the Secretary of Interior had grown outdated. *Id.* at 1237. The plaintiffs asserted that NEPA obligated the Secretary of the Interior to revise and update the PEIS when its conclusions become stale. *Id.* The plaintiffs argued that NEPA mandated the Secretary of the Interior to supplement the PEIS to account for the impacts of coal combustion on greenhouse gases in the atmosphere. *Id.*

17

FS-034762

The plaintiffs in *WORC* brought their cause of action in 2014. The district court determined that then-Secretary of the Interior Sally Jewell had not proposed any new action regarding the coal-leasing program. *Id.* (*citing W. Org. of Res. Councils v. Jewell*, 124 F. Supp. 3d 7 (D.D.C. 2015). Secretary Jewell issued the Jewell Order during the pendency of the plaintiffs' appeal. The D.C. Circuit initially held the case in abeyance. *WORC*, 892 F.3d at 1240. The plaintiffs moved to rescind the order holding the appeal in abeyance after the issuance of the Zinke Order. *Id.* The D.C. Circuit lifted the stay and set a briefing schedule. *Id.* The D.C. Circuit limited its review, however, to the issue of whether the Interior Department possessed a duty to update the PEIS due to its reliance on outdated information. *Id.*, at 1241.

The D.C. Circuit determined that "neither NEPA nor the [Interior] Department's own documents create a legal duty for the Secretary to update the . . . PEIS." *Id.* at 1246-47. The D.C. Circuit reasoned that no major federal action could be identified regarding the plaintiff's challenge. *Id.* at 1243. The Interior Department's approval of the 1979 PEIS constituted the major federal action at issue in *WORC*. *Id.* The plaintiff's argument that the continued reliance on the outdated coal-leasing program constituted a major federal action proved unavailing. *Id.* No pending action existed beyond the coal-leasing programs

18

FS-034763

continued existence. *Id.* NEPA did not require the Interior Department to update the PEIS after the major federal action had been completed in 1979. *Id.* at 1245.

The Jewell Order, and subsequent lifting of the moratorium through the Zinke Order, distinguish the D.C. Circuit's analysis in *WORC*. The D.C. Circuit did not address a challenge to the Zinke Order. The D.C. Circuit instead limited its analysis to determining whether the continued reliance on outdated information in the 1979 PEIS required the Interior Department to supplement the PEIS with new information. *See WORC*, 892 F.3d at 1246.

The circumstances of Plaintiffs' challenge to the Zinke Order differ from the circumstances that the D.C. Circuit analyzed and reviewed in *WORC*. Plaintiffs challenge the Zinke Order as the major federal action. The absence of any agency action beyond the Interior Department's continued reliance on the 1979 PEIS represented the fatal flaw in the plaintiff's argument in *WORC*. *Id.* The Zinke Order changed the status quo. The Zinke Order lifted the Jewell Order's moratorium and directed BLM to expedite coal leases. AR-00001. This action provides the agency action that proved missing from *WORC*.

Plaintiffs rely on *Lockyer*, 575 F.3d 999, to assert that the Zinke Order constituted a major federal action. *Lockyer* involved a nationwide plan directed by President Clinton to protect roadless areas in national forests. *Id.* at 1006. The Forest Service established the Roadless Area Conservation Rule ("Roadless

19

Rule"). *Id.* The Forest Service promulgated the Roadless Rule on January 5, 2001.
*Id.* The Roadless Rule constituted a programmatic approach to roadless area
management in the United States. *Id.* The Roadless Rule prohibited road
construction, reconstruction, and timber harvest in roadless areas. *Id.* (*citing* 66
Fed. Reg. 3244 (Jan. 12, 2001).

The Roadless Rule's effective date was March 13, 2001. *Id.* A change in
presidential administration delayed the effective date. *Id.* The Bush administration
began working on a new rule know as the "State Petitions Rule" to replace the
Roadless Rule in July of 2001. *Id.* at 1007. The Forest Service issued the final
State Petitions Rule in 2005 following a period of public comment. *Id.* (*citing* 70
Fed. Reg. 25,654 (May 13, 2005)).

The Forest Service explained that it had designated the State Petitions Rule
for a categorical exclusion under NEPA. *Lockyer*, 575 F.3d at 1008 (*citing* 70 Fed.
Reg. 25,654, 25,660)). The Forest Service reasoned that the State Petitions Rule
was "merely procedural in nature and scope and, as such, has no direct, indirect, or
cumulative effect on the environment." *Lockyer*, 575 F.3d at 1008. The Forest
Service never fully implemented the Roadless Rule and it had been legally valid
only for seven months before being replaced by the State Petitions Rule. *Id.* at
1014.

20

FS-034765

The Ninth Circuit analyzed whether the Forest Service's action in replacing the Roadless Rule with the State Petitions Rule required an environmental analysis under NEPA. The Forest Service's argument that the seven-month period that the Roadless Rule had been in effect was "insufficient to make any meaningful difference in forest planning" failed to persuade the Ninth Circuit. *Id.* (emphasis omitted). The Ninth Circuit reasoned that the Roadless Rule's seven-month effective period resulted in benefits to roadless areas and their ecosystems. *Id.* The Forest Service had implemented the State Petitions Rule for the "primary purpose" of "taking substantive environmental protections off the books." *Id.* at 1015. The repeal of the Roadless Rule's substantive protections could not be characterized as "merely procedural." *Id.* at 1018. The Ninth Circuit concluded that the plaintiffs had raised a substantial question as to whether the repeal of the Roadless Rule would have significant effect on the environment. *Id.*

The analysis in *Lockyer* applies to the replacement of the Jewell Order with the Zinke Order. *Lockyer* involved a programmatic nationwide plan to address roadless areas. *Id.* at 1006. The Jewell Order involved a nationwide programmatic plan to reevaluate the coal-leasing program. AR-00008. The Bush administration repealed the Roadless Rule after it had been in effect for seven months. *Lockyer.* 575 F.3d at 1014. The Trump administration revoked the Jewell Order after the

21

FS-034766

coal-leasing moratorium had been in effect for nearly fifteen months and fourteen days. AR-00001-2.

The State Petitions Rule replaced the Roadless Rule. *Lockyer*, 575 F.3d at 1014. A plan to "process coal lease applications and modifications expeditiously" replaced the moratorium and PEIS process. AR-00002. The State Petitions Rule served to lift environmental protections in *Lockyer*. 575 F.3d at 1015. The Zinke Order served to re-open public land to coal leasing and to expedite lease applications. AR-00002. The Ninth Circuit reasoned in *Lockyer* that the seven-month period of forest protection resulted in benefits to roadless areas and their ecosystems. *Lockyer*, 575 F.3d at 1015. The moratorium similarly resulted in increased protection for nearly fifteen months of approximately 65,000 acres of public land that were subject to pending lease applications. *See* AR-15995-96.

One characteristic distinguishes *Lockyer* and the Zinke Order: the Forest Service in fact did initiate the NEPA process in relation to the State Petitions Rule at issue in *Lockyer*. The Ninth Circuit determined that the Forest Service's fault lay in designating the State Petitions Rule for a categorical exclusion from NEPA. *Lockyer*, 575 F.3d at 1018. Federal Defendants failed to initiate a single step of the NEPA process in relation to the Zinke Order. The process undertaken with regard to the Zinke Order failed to reach even the minimum level of environmental analysis performed in *Lockyer*.

22

FS-034767

Plaintiffs have identified potential environmental harm that could result from lifting the moratorium. Plaintiffs allege that the Zinke Order removed constraints that provided beneficial effects on public lands and the environment. (Doc. 118 at 27-28.) Plaintiffs allege that the current coal-leasing program remains outdated. *Id.* Plaintiffs allege that the moratorium provided an opportunity to examine the impacts of coal leasing on a programmatic basis. *Id.* Plaintiffs allege that the moratorium protected public lands of historical, cultural, spiritual, recreational, and vocational significance from development. (Doc. 1 at 7-8.) Plaintiffs argue that the Zinke Order immediately lifted those protections without any environmental review. *Id.*

Similar to the Forest Service's decision to repeal of the Roadless Rule as "merely procedural" in order to avoid environmental review, Federal Defendants in the present action circumvented any environmental analysis by characterizing the Zinke Order as a mere a policy shift and return to the status quo. Plaintiffs have raised a substantial question that the lifting of the moratorium could cause environmental impacts from expedited coal mining on public lands. *See Lockyer*, 575 F.3d at 1012. Plaintiffs need not show at this point that any significant effect actually will occur. *See Blackwood*, 161 F.3d at 1212. NEPA requires only that Plaintiffs raise a substantial question as to whether the project may cause significant environmental impacts. *Id.* (*citing Idaho Sporting Congress v. Thomas*,

23

FS-034768

137 F.3d 1146, 1149 (9th Cir. 1998). Plaintiffs have demonstrated that the lifting of the moratorium meets the "relatively low" threshold standard for a NEPA triggering event. *See Lockyer*, 575 F.3d at 1018. The Zinke Order constitutes a major federal action sufficient to trigger NEPA.

## B. FINAL AGENCY ACTION

The Court next must determine whether a final agency action exists to be reviewed under the APA. *SUWA*, 542 U.S. 55 (2004). NEPA provides no private right of action and thus Plaintiffs' claims must be brought under the APA. *Earth Island Inst. v. U.S. Forest Serv.,* 351 F.3d 1291, 1300 (9th Cir. 2003). The APA authorizes suit by a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. "Where no other statute provides a private right of action, the agency action complained of must be '*final* agency action.'" *SUWA*, 542 U.S. 55, 61-62 (*quoting* 5 U.S.C. § 704) (emphasis in original). "Agency action" refers to "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. 551(13).

Agency action proves final upon satisfaction of the following two conditions: (1) "the action must mark the 'consummation' of the agency's decisionmaking process . . . it must not be of a merely tentative or interlocutory nature;" and (2) "the action must be one by which 'rights or obligations have been

24

FS-034769

determined,' from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted).

The Zinke Order meets the requirements for final agency action under *Bennett*. The Zinke Order explained that Secretary Zinke had revoked the Jewell Order "[b]ased upon the Department's review of [the Jewell Order], the scoping report for the [PEIS], and other information provided by the BLM[.]" AR-00001. Secretary Zinke relied on Federal Defendants' review in determining that halting the federal coal program did not serve the public interest. *Id.* Secretary Zinke further determined that the PEIS's completion proved unnecessary based upon Federal Defendants' review. *Id.* The decision to revoke the Jewell Order and expedite coal lease applications constitutes the consummation of Federal Defendants' decisionmaking on the moratorium and coal-leasing program. *See Bennett*, 520 U.S. at 177-78.

The Zinke Order additionally implicates legal consequences. The Jewell Order determined that over forty percent of coal production in the United States came from federal land. AR-00004. The Jewell Order provided a blanket moratorium on BLM administered coal development for the purpose of preparing a PEIS. AR-00003. The moratorium attempted to avoid the risk of "locking in for decades the future development of large quantities of coal under current rates and terms that the PEIS may ultimately determine to be less than optimal." *Id.* at 10.

FS-034770

The PEIS would evaluate concerns over outdated information within the coal-leasing program. *Id.* Plaintiffs have demonstrated that the moratorium provided protections on public lands for more than fourteen months.

The Zinke Order articulated its purpose as to "process coal lease applications and modifications expeditiously in accordance with regulations and guidance existing before the issuance of [the Jewell Order]." AR-00002. In other words, the Zinke Order served to lift the environmental protections that the Jewell Order had provided during the pendency of the preparation of a new PEIS. The legal consequences that flow from the Zinke Order are evident. With the Zinke Order's implementation, all BLM land became subject to lease applications with terms of twenty years. *See* AR-00010. The Zinke Order directed new lease applications to be "expedit[ed.]" *Id.* at 2. The PEIS process immediately stopped without full review of the concerns raised in the Jewell Order. The Zinke Order satisfies the legal consequences requirement under *Bennett*.

Federal Defendants further initiated a final agency action in their decision not to begin the NEPA process. Failure to act may constitute final agency action. 5 U.S.C. § 706(1). A "decision not to prepare an EIS or consult NEPA can itself be final agency action." *Forest Serv. Emps. for Envt'l Ethics v. U.S. Forest Serv.*, 397 F. Supp. 2d 1241, 1252 (*citing Hall v. Norton*, 266 F.3d 969, 975 (9th Cir. 2001)) (quotations omitted). Federal Defendants made a conscious decision not to initiate

26

FS-034771

the NEPA process. The record demonstrates that Federal Defendants rejected any NEPA review. AR-00001. Federal Defendants further reasoned that any environmental concerns raised by Plaintiffs could be addressed through BLM review outside the EIS process. AR-00014. Federal Defendants characterize the Zinke Order as a mere policy shift.

The Court has concluded that the Zinke Order constituted a major federal action. The Zinke Order constituted a NEPA triggering event. Federal Defendants' decision not to initiate the NEPA process pursuant to the Zinke Order satisfies the final agency action requirement. *See Forest Serv. Emps.*, 397 F. Supp. 2d at 1252 (*citing Hall v. Norton*, 266 F.3d at 975) (quotations omitted). The initiation of the NEPA process proves to be a "discrete agency action that it is required to take." *SUWA*, 542 U.S. at 64. Federal Defendants' decision not to initiate the NEPA process proves arbitrary and capricious.

## IV.   WHETHER DEFENDANTS MUST PREPARE A PEIS

Plaintiffs request that the Court order Federal Defendants to complete the preparation of the PEIS that began under the Jewell Order. (Doc. 1 at 31.) Plaintiffs request alternatively that the Court order Federal Defendants to prepare a supplement to the PEIS. *Id.* NEPA represents a purely procedural statute. *Lockyer*, 575 F.3d at 1012 (9th Cir. 2009). NEPA's purpose constitutes the intent to "protect the environment by fostering informed agency decision-making." *Id.* NEPA "does

27

FS-034772

not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *High Sierra Hikers Ass'n. v. Blackwell*, 390 F.3d 630, 639 (9th Cir. 2004) (*citing Neighbors of Cuddy Mtn. v. Alexander*, 303 F.3d 1059, 1070 (9th Cir. 2002)) (quotations omitted).

Federal courts cannot compel an agency to take specific actions. *See Gardner v. U.S. Bureau of Land Mgmt.*, 638 F.3d 1217, 1221 (9th Cir. 2011) (*citing Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010)). Federal courts only can compel an agency to act upon its legislative command. *Id.* The decision of whether an EIS proves necessary pursuant to the agency's action "is a manner of action left to the agency's discretion." *Forest Serv. Emps.*, 397 F. Supp. 2d at 1254 (*citing SUWA*, 542 U.S. at 65).

Plaintiffs in *Forest Serv. Emps.* sought an order from the court to direct the Forest Service to prepare an EIS regarding its use of fire retardant to fight wildfires on Forest Service land. The court agreed with the plaintiffs that the Forest Service's use of fire retardant raised a substantial question as to the dumping of millions of gallons of fire retardant on national forests. *Forest Serv. Emps.*, 397 F. Supp. 2d at 1254. The court declined, however, to order the Forest Service to prepare an EIS as opposed to an EA. *Id.* The court recognized that the decision of

28

FS-034773

whether an EIS proves necessary pursuant to the agency's act represents a "manner of action left to the agency's discretion[.]" *Id.* (*citing SUWA*, 542 U.S. at 65).

The Zinke Order triggered NEPA. Federal Defendants must comply with the requirements of NEPA. The Court cannot compel Federal Defendants at this time to prepare a PEIS, or supplemental PEIS, as Plaintiffs request. This matter remains left to the agency to determine in the first instance. *See Gardner*, 638 F.3d at 1217; *Hells Canyon*, 593 F.3d at 932; *Forest Serv. Emps.*, 397 F. Supp. 2d at 1254.

As discussed previously, Federal Defendants may comply with their NEPA obligations in a manner of ways. 40 C.F.R. § 1508.4. Federal Defendants may determine that the preparation of an EA would satisfy their NEPA obligations. *See Blue Mountains Biodiversity*, 161 F.3d at 1212 (*citing* 40 C.F.R. § 1508.9). In the alternative, Federal Defendants may determine that the potential environmental impacts from the Zinke Order warrant the preparation of an EIS. *See id.* If Federal Defendants determine that an EIS would not be necessary, however, Federal Defendants must supply a "convincing statement of reasons" to explain why the Zinke Order's impacts would be insignificant. *See id.* (*quoting Save the Yaak*, 840 F.2d at 717). Federal Defendants have failed to take even the initial step of determining the extent of environmental analysis that the Zinke Order requires. The Court defers to Federal Defendants in the first instance to conduct its required

29

FS-034774

NEPA analysis. The Court stands in no position at this time to evaluate the sufficiency of that analysis. Federal Defendants must take this initial step.

## V.    PLAINTIFFS' REMAINING CLAIMS

Plaintiffs claim that the Zinke Order violated the Federal Government's trust obligation to the Northern Cheyenne Tribe. (Doc. 118 at 46.) Plaintiffs ground this claim in Federal Defendants' failure to prepare an EIS. *Id.* The Court has determined that the Zinke Order triggered the NEPA process. The Court also has determined that it lacks the authority to compel Federal Defendants to prepare an EIS at this point. Plaintiffs' claim based on the Federal Government's trust obligation proves contingent upon Federal Defendants' conclusions related to the NEPA review that the Court has ordered. The Court remains unable to evaluate this claim until Federal Defendants have completed their NEPA analysis.

Plaintiffs next assert that Federal Defendants failed to provide a reasoned explanation for replacing the Jewell Order with the Zinke Order. (Docs. 116 at 28 & 130 at 33.) State Plaintiffs allege that the MLA and FLPMA mandated Federal Defendants to ensure that leasing proved to be in the "public interest." (Doc. 116 at 28.) State Plaintiffs further assert that Federal Defendants failed to account for Secretary Jewell's preliminary findings that the public was not receiving fair market value from the sale of federal coal resources. *Id.* at 30.

FS-034775

Federal Defendants grounded their reasoning for reversing course in their conclusion that no NEPA triggering event had occurred pursuant to the Zinke Order. Federal Defendants assert that the mere policy-shift prompted by the Zinke Order did not trigger an environmental analysis. The Court's determination that the Zinke Order constituted a NEPA triggering event further prevents the Court from reviewing these claims at this time. Plaintiffs grounded their Complaint related to FLPMA and the MLA in "[Federal] Defendants' [failure] to complete an environmental review." (Doc. 1 at 23-24.) The Court has ordered Federal Defendants to initiate the NEPA process. The Court cannot reach these claims until Federal Defendants have completed their environmental review.

## CONCLUSION

Plaintiffs have demonstrated that they possess standing to challenge the Zinke Order. Plaintiffs have further demonstrated that their claims are ripe for review. The Zinke Order constituted a major federal action triggering NEPA review. The Zinke Order further meets the requirements for final agency action under the APA. The Court lacks the authority to compel Federal Defendants to prepare a PEIS, or supplement to the PEIS, at this time. Plaintiffs' remaining claims prove contingent upon Federal Defendants' initiation of the NEPA process and subsequent conclusions.

31

FS-034776

**REMEDIES**

Defendants assert that Plaintiffs fail to address the factors for permanent injunctive relief set forth in *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010). (Doc. 124 at 36.) Defendants request time to negotiate a proposed remedy briefing schedule and submit a joint proposal. *Id.* Permanent injunction is not an automatic remedy in a NEPA case. *Monsanto*, 561 U.S. at 157. An entry of a permanent injunction requires the Court to address the four equitable factors set forth in *Monsanto*.

Plaintiffs represent in their Complaint that BLM suspended pending lease applications during PEIS process. (Doc. 1 at    52.) Plaintiffs allege that a number of lease applications were pending in February of 2016 while the Jewell Order's moratorium was in effect. *Id.* Plaintiffs allege that the pending lease applications in 2016 encompassed at least 1.86 billion tons of coal in nine states. *Id.* Plaintiffs contend that this quantity represents roughly the equivalent to a four or five-year supply of federal coal. *Id.* at    53.

The Court directs counsel for all parties to confer in good faith to attempt to reach agreement as to potential remedies. The Court directs the parties to submit a joint proposal no later than thirty days from today's date if the parties reach an agreement regarding remedies. The Court directs the parties to submit additional briefing concerning *Monsanto* factors and remedies if the parties are unable to

FS-034777

reach an agreement. This additional briefing and proposed remedies shall address the current status of coal leasing, including the leases cited by Plaintiffs in their Complaint that had been affected by the moratorium. This information could impact the balancing of the four equitable factors under the analysis in *Monsanto*.

This briefing shall consist of one brief for Plaintiffs not to exceed 7,500 words. Federal Defendants shall be allowed one brief not to exceed 7,500 words. Intervenor Defendants shall be allowed collectively one brief not to exceed 5,000 words. The word limit shall include everything from the caption to the certificate of service.

## ORDER

It is hereby **ORDERED** that Plaintiffs' Motions for Summary Judgment (Docs. 97 & 99 in CV-17-42-GF-BMM; and Docs. 115 & 117 in CV-17-30-GF-BMM) are **GRANTED IN PART** and **DENIED IN PART**.

It is further **ORDERED** that Defendants' and Defendant-Intervenors' Cross-Motions for Summary Judgment (Docs. 105, 107, 109 in CV-17-42-GF-BMM; and Docs. 123, 125, 127 in CV-17-30-GF-BMM) are **GRANTED IN PART** and **DENIED IN PART**.

The parties shall meet and confer in good faith to attempt to reach an agreement as to remedies. The parties shall file a joint proposal regarding remedies within thirty days of today's date if the parties reach an agreement regarding

33

FS-034778

remedies. The parties shall submit additional briefing on the *Monsanto* factors and remedies no later than sixty days form today's date if the parties are unable to reach an agreement, in accordance with the above Order.

Entry of judgment will follow the imposition of a remedy in accordance with the above Order.

DATED this 19th day of April, 2018.

Brian Morris
United States District Court Judge



# Wildfires and climate change push low-elevation forests across a critical climate threshold for tree regeneration

Kimberley T. Davis[a,1], Solomon Z. Dobrowski[b], Philip E. Higuera[a], Zachary A. Holden[c], Thomas T. Veblen[d], Monica T. Rother[d,e], Sean A. Parks[f], Anna Sala[g], and Marco P. Maneta[h]

[a]Department of Ecosystem and Conservation Sciences, University of Montana, Missoula, MT 59812; [b]Department of Forest Management, University of Montana, Missoula, MT 59812; [c]US Forest Service Region 1, Missoula, MT 59807; [d]Department of Geography, University of Colorado, Boulder, CO 80309; [e]Department of Environmental Sciences, University of North Carolina, Wilmington, NC 28403; [f]Aldo Leopold Wilderness Research Institute, Rocky Mountain Research Station, US Forest Service, Missoula, MT 59801; [g]Division of Biological Sciences, University of Montana, Missoula, MT 59812; and [h]Department of Geosciences, University of Montana, Missoula, MT 59812

Edited by Christelle Hély, Ecole Pratique des Hautes Etudes, Montpellier, France, and accepted by Editorial Board Member Robert J. Scholes January 31, 2019 (received for review August 31, 2018)

Climate change is increasing fire activity in the western United States, which has the potential to accelerate climate-induced shifts in vegetation communities. Wildfire can catalyze vegetation change by killing adult trees that could otherwise persist in climate conditions no longer suitable for seedling establishment and survival. Recently documented declines in postfire conifer recruitment in the western United States may be an example of this phenomenon. However, the role of annual climate variation and its interaction with long-term climate trends in driving these changes is poorly resolved. Here we examine the relationship between annual climate and postfire tree regeneration of two dominant, low-elevation conifers (ponderosa pine and Douglas-fir) using annually resolved establishment dates from 2,935 destructively sampled trees from 33 wildfires across four regions in the western United States. We show that regeneration had a nonlinear response to annual climate conditions, with distinct thresholds for recruitment based on vapor pressure deficit, soil moisture, and maximum surface temperature. At dry sites across our study region, seasonal to annual climate conditions over the past 20 years have crossed these thresholds, such that conditions have become increasingly unsuitable for regeneration. High fire severity and low seed availability further reduced the probability of postfire regeneration. Together, our results demonstrate that climate change combined with high severity fire is leading to increasingly fewer opportunities for seedlings to establish after wildfires and may lead to ecosystem transitions in low-elevation ponderosa pine and Douglas-fir forests across the western United States.

ecosystem transition | climate change | wildfire | ponderosa pine | Douglas-fir

**A**s climate and disturbance regimes change, abrupt transitions are increasingly recognized and predicted in ecological systems (1, 2). Abrupt transitions between different ecosystem states can occur when gradually changing environmental conditions cross critical thresholds beyond which small changes produce large ecosystem responses (1, 2). Before reaching a critical threshold or "tipping point," gradual changes in environmental conditions may cause increased variance but do not necessarily lead to distinct changes in ecosystem states (1, 3, 4). In stochastic environments, systems may oscillate between two states before a transition (3, 5). For example, tree species that have climatic thresholds for regeneration may experience episodic recruitment as climate temporally varies between conditions that are suitable and unsuitable for regeneration (refs. 6 and 7, Fig. 1). Despite widespread interest in understanding ecological thresholds in an era of rapid global change (8–10), quantifying abrupt climate-induced vegetation shifts remains a substantial and important scientific challenge.

Stand-replacing fires can catalyze vegetation shifts during periods of directional climate change, accelerating changes that would otherwise take decades to centuries to play out (11–13). This is particularly true in forest ecosystems, where adult trees can live for centuries and tolerate a broader range of climate conditions than

juveniles of the same species (6, 14, 15). Disturbance-catalyzed change at lower treeline, where trees grow at the warm, dry margin of their climatic tolerances, may be one of the first visible signs of forest ecosystems adjusting to new climate conditions. Recent evidence suggests that wildfires may already be catalyzing vegetation shifts in forests across the western United States (16), with limited tree regeneration following fires in recent decades (e.g., refs. 17–19). This is particularly acute in low-elevation forests (17, 20–23), implicating climate change as an important driver of regeneration failures. However, the annual climate conditions which limit tree regeneration are poorly resolved, and potential thresholds to regeneration have not been identified. Understanding if recent reductions in postfire tree regeneration signal an ecosystem transition (e.g., to a nonforested state) requires a quantitative understanding of how seasonal to interannual variations in climate impact tree seedling germination and establishment.

Here we demonstrate that dry low-elevation *Pinus ponderosa* (ponderosa pine) and *Pseudotsuga menziesii* (Douglas-fir) forests of the western United States have crossed a critical climate threshold for postfire tree regeneration. We focused on ponderosa pine and Douglas-fir because they are widespread ecologically and

## Significance

Changes in climate and disturbance regimes may cause abrupt shifts in vegetation communities. Identifying climatic conditions that can limit tree regeneration is important for understanding when and where wildfires may catalyze such changes. This study quantified relationships between annual climate conditions and regeneration of *Pinus ponderosa* (ponderosa pine) and *Pseudotsuga menziesii* (Douglas-fir), two ecologically and economically important conifer species in low-elevation forests of western North America. We found that regeneration exhibited a threshold response to annual climate conditions and the forests we sampled crossed these climate thresholds in the past 20 years, resulting in fewer recruitment opportunities through time. In areas that have crossed climatic thresholds for regeneration, stand-replacing fires may result in abrupt ecosystem transitions to nonforest states.

Author contributions: K.T.D., S.Z.D., P.E.H., Z.A.H., T.T.V., M.T.R., S.A.P., A.S., and M.P.M. designed research; K.T.D., S.Z.D., P.E.H., and M.T.R. performed research; Z.A.H. and M.P.M. contributed new reagents/analytic tools; K.T.D. and Z.A.H. analyzed data; K.T.D., S.Z.D., P.E.H., and Z.A.H. wrote the paper; and T.T.V. and M.T.R. contributed data.

The authors declare no conflict of interest.

This article is a PNAS Direct Submission. C.H. is a guest editor invited by the Editorial Board.

Published under the PNAS license.

Data deposition: The data and code used in this study have been deposited in the Dryad Data Repository, https://doi.org/10.5061/dryad.pc3f9d8.

[1]To whom correspondence should be addressed. Email: kimberley.davis@umontana.edu.

This article contains supporting information online at www.pnas.org/lookup/suppl/doi:10.1073/pnas.1815107116/-/DCSupplemental.

**ECOLOGY**



**Fig. 1.** Conceptual diagram depicting a simulated hypothetical annual climate variable (e.g., mean summer temperature or vapor pressure deficit; solid line) and the corresponding expected changes to the frequency of years suitable for regeneration (dots), as mean climate conditions increase and cross a threshold for regeneration (dashed line) (A). When climate conditions are suitable for regeneration every year, other factors such as cone production may still cause episodic establishment. As climatic thresholds are approached, the SD of climate suitability for regeneration increases, shown here using a moving 10-y window and summarized with a locally weighted polynomial regression smoothing (LOESS) (B). Once a critical threshold is crossed, variability declines again, as fewer years are suitable for regeneration.

economically important conifers in low-elevation forests of western North America. We sampled across climate gradients in space and time (1988–2015) using annually resolved establishment dates from 2,935 trees that established after 33 wildfires in four regions across the western United States (Fig. 2) to (i) quantify the relationship between seasonal to annual climate and regeneration, (ii) identify critical climate thresholds for regeneration, and (iii) assess how climate suitability for postfire regeneration has changed over recent decades. To isolate the effect of annual climate, we accounted for the effect of other drivers of postfire regeneration, including fire severity and distance to seed source. Our results demonstrate threshold responses of annual tree recruitment to vapor pressure deficit (VPD), surface temperature, and soil moisture. Climate conditions in the low-elevation forests we sampled have repeatedly crossed these thresholds over the past 20 y, revealing a decline in the climate suitability for postfire tree regeneration across broad regions of the western United States. These findings imply that increased frequency of stand-replacing fires could initiate abrupt ecosystem transitions in low-elevation ponderosa pine and Douglas-fir forests.

## Results and Discussion

Annual rates of tree regeneration exhibited strongly nonlinear relationships with annual climate conditions, with distinct threshold responses to summer VPD, soil moisture, and maximum surface temperatures (Figs. 3 and 4). Across the study region, seasonal to annual climate conditions from the early 1990s through 2015 have crossed these climate thresholds at the majority of sites (SI Appendix, Fig. S8), indicating conditions that are increasingly unsuitable for tree regeneration, particularly for ponderosa pine. We assessed changes in the climate suitability for postfire regeneration by projecting our boosted regression tree models [mean area under the curve (AUC) 0.81; SI Appendix, Table S4] with climate time series

for each site from 1980 to 2015, while holding nonclimatic factors constant (Figs. 3F and 4F). We found abrupt declines in modeled annual recruitment probability in the 1990s for both species and across all regions, with the exception of Douglas-fir in California and Colorado. The cumulative probability of postfire recruitment calculated on a 5- and 10-y basis also declined in the Southwest and Northern Rockies for both species, and in Colorado and California for ponderosa pine (SI Appendix, Figs. S9 and S10). Change-point detection analysis identified significant changes in modeled recruitment probability in the early to mid-1990s (SI Appendix, Table S5). These declines in annual and cumulative recruitment probability correspond directly to years when mean climate conditions approached threshold values for recruitment (Figs. 3 and 4), making it increasingly unlikely that future climate conditions will be favorable (i.e., a cool or wet year) for subsequent regeneration pulses.

Theory predicts that variance in state variables will increase as critical transitions are approached (3, 4), and then decrease once thresholds are crossed (ref. 2, Fig. 1). Consistent with this, in most regions we found that the variability in the modeled annual recruitment probability increased initially and then declined over time, once climate thresholds were crossed (Figs. 3E and 4E). There were two exceptions to this pattern, which highlight important complexities in how climate change may impact postfire tree regeneration. First, the annual recruitment probability of ponderosa pine in Colorado varied little over time (Fig. 3E), because as mean VPD increased, so too did interannual variability in VPD, such that some years were still suitable for recruitment (Fig. 3B). Increased variability in climate metrics was not seen in other regions. Second, the probability of Douglas-fir regeneration in California sites likewise varied little over time, reflecting little change in the mean and variability of the climate predictors of Douglas-fir recruitment (Fig. 4 B and D). Across our study regions, we also observed higher variability in observed recruitment at sites closer to the dry margins of tree distributions. By analyzing the annual patterns of observed recruitment across sites, we



**Fig. 2.** Map of study site locations in the western United States (A), 30-y (1981–2010) mean climatic water deficit for sample sites within each region (B), and cumulative recruitment following fires for each site (C). Overall, 90 sites were sampled (see SI Appendix, Tables S1 and S2 for details). Ponderosa pine (PIPO) and Douglas-fir (PSME) ranges are shown in blue in A (72).

Davis et al.

FS-034781



**Fig. 3.** Threshold response of recruitment to annual climate and modeled annual recruitment probability for ponderosa pine. Partial dependency plots from a boosted regression tree model show the marginal effect of the two most important climate variables on annual recruitment probability, after accounting for the average effects of all other variables in the model (*A* and *C*). Annual time series of climate variables at each site averaged by region (*B* and *D*). Climate thresholds are identified with vertical (*A* and *C*) and horizontal (*B* and *D*) dashed lines. Dots below the lines in *B* and *D* represent years when that specific climate variable was suitable for regeneration. The influence of both climate variables on regeneration are summarized by the modeled annual recruitment probability (*F*), while holding constant time since fire (1 y), distance to seed source (50 m), and fire severity (dNBR 412). Variability in annual recruitment probability (*E*) is shown as the SD of recruitment probability values from *F*, calculated in 10-y moving windows and plotted with a LOESS. The metric vwc indicates the ratio of water volume to soil volume.

showed that sites with drier 30-y mean climate conditions exhibited more episodic recruitment than wetter sites (*SI Appendix*, Fig. S13; *t* = −2.9, df = 69, *P* = 0.005), highlighting the prevalence of episodic recruitment at sites near climatic thresholds (24, 25).

Differences between the sensitivity of ponderosa pine and Douglas-fir to annual climate have important implications for species-specific responses to climate change (26, 27). Both species were sensitive to soil moisture; first-year conifer seedlings have shallow root systems and frequently succumb to desiccation (28–31). However, Douglas-fir regeneration was more strongly related to spring soil moisture, which has not declined in recent decades, so to soil moisture of the driest month, which has recently crossed threshold values. This pattern explains the larger declines in annual recruitment probability for ponderosa pine relative to Douglas-fir (Figs. 3 and 4). Ponderosa pine was additionally sensitive to high summer VPD, which leads to increased transpiration rates and increased plant water stress. VPD, which has increased over the past several decades (ref. 32, Fig. 3), is recognized as an important factor determining tree mortality, growth rates, and seedling survival (31, 33–36). VPD is predicted to increase in the future (32). Consequently, the probability of ponderosa pine regeneration at low-elevation sites will likely decline. Douglas-fir recruitment was sensitive to high maximum surface temperatures, which kill seedlings by damaging vascular tissue (37–39). The threshold response we observed is consistent with previous experiments that show threshold mortality responses to soil surface temperatures at or near 55 °C (37, 40). This mechanism of mortality is especially important in disturbed areas where there is no remaining canopy cover to ameliorate high maximum temperatures near the soil surface (41, 42). Intraspecific differences in climatic tolerances are also likely to exist (43–45). For example, across the study area, ponderosa pine recruitment was more strongly related to site-specific VPD anomalies than raw VPD

values, suggesting that ecotypic variation or local adaptation among populations in part influences how annual climate impacts germination and survival (36). However, in our models, geographic region had a negligible effect on annual recruitment probability and no strong interactions with annual climate variables. Thus, our results suggest that consistent threshold relationships with annual climate were identifiable across the entire range of both species.

While annual climate was an important driver of postfire regeneration, our findings also highlight that the nature of a fire event strongly influences postfire regeneration. For example, the combined relative influence of annual climate variables on tree recruitment in our boosted regression tree (BRT) models was 24% for ponderosa pine and 34% for Douglas-fir (*SI Appendix*, Fig. S3), while the relative influence of distance to seed source, which is largely determined by fire severity, was 32% for ponderosa pine and 21% for Douglas-fir (*SI Appendix*, Fig. S3). The importance of seed tree availability in determining postfire regeneration has been demonstrated across forest types in the western United States (e.g., refs. 17, 20, and 46), suggesting that increases in high severity burned patch sizes (e.g., ref. 47) will significantly reduce tree regeneration. Beyond affecting seed availability, fire severity can also affect regeneration by altering microclimate (41, 42, 48) or soil properties and biota (49). Furthermore, high severity fire is correlated with high postfire shrub dominance in some regions, which can limit ponderosa pine regeneration (19). Accordingly, we found that ponderosa pine regeneration was lower at sites that experienced higher fire severity (*SI Appendix*, Fig. S3). High shrub cover also corresponded with more episodic establishment of ponderosa pine (*SI Appendix*, Fig. S13; *t* = −3.2, df = 69, *P* = 0.002), with pronounced peaks of regeneration immediately following fire at sites with high shrub cover. Fire severity was much less influential for Douglas-fir regeneration (*SI Appendix*, Fig. S3). Overall, our results indicate that

FS-034782



**Fig. 4.** Threshold response of recruitment to annual climate and modeled annual recruitment probability for Douglas-fir. Partial dependency plots from a boosted regression tree model show the marginal effect of the two most important climate variables on annual recruitment probability, after accounting for the average effects of all other variables in the model (*A* and *C*). Annual time series of climate variables at each site averaged by region (*B* and *D*). Climate thresholds are identified with vertical (*A* and *C*) and horizontal (*B* and *D*) dashed lines. Dots below the lines in *B* and *D* represent years when that specific climate variable was suitable for regeneration. The influence of both climate variables on regeneration are summarized by the modeled annual recruitment probability (*F*), while holding constant time since fire (1 y), distance to seed source (50 m), and fire severity (dNBR 412). Variability in annual recruitment probability (*E*) is shown as the SD of recruitment probability values from *F*, calculated in 10-y moving windows and plotted with a LOESS. The metric vwc indicates the ratio of water volume to soil volume.

the impacts of annual climate conditions on tree regeneration are strongly mediated by multiple biotic and abiotic factors.

While our results reveal clear relationships between annual climate and the probability of tree regeneration, they are constrained by two limitations. First, our statistical models focus on climate conditions during the year of seedling germination. Theory and observations highlight that mortality during the year of germination is a key bottleneck affecting conifer demography (28, 30, 31, 39, 50). Our results are consistent with this perspective: climate during the year of germination was a significant predictor of tree demography at sites sampled years to decades after germination. However, annual climate conditions in the years following germination through the year of sampling, may also affect seedling survival. Second, our statistical models did not account for cone or seed production, an important determinant of tree regeneration that also varies with annual climate conditions (51, 52). As years with suitable conditions for regeneration become increasingly rare, the episodic nature of cone production will likely further limit regeneration, particularly if years with high cone production do not align with years suitable for germination and survival.

Our results reveal an important pathway linking climate change and interannual climate variability to recently observed reductions in postfire tree regeneration. Our findings suggest that many low-elevation mixed conifer forests in the western United States have already crossed climatic thresholds beyond which the climate is unsuitable for regeneration. Once climate exceeds climatic thresholds for regeneration and fire results in adult mortality, sites that currently experience episodic recruitment may lose local tree populations (6). We sampled dry ponderosa pine and Douglas-fir sites within each region, but as climate continues to get warmer and drier (32, 53), more areas will cross climatic thresholds that limit conifer recruitment. Increasing frequency of extreme fire weather could lead to more high

severity fire (54), while decreases in summer precipitation (55) coupled with changes in fuel aridity and timing of spring snowmelt, have led to more area burned across the western United States in the past several decades (56, 57). The combination of more area burned, potentially at high severity, with decreasing climate suitability for postfire regeneration could lead to rapid transitions from ponderosa pine and Douglas-fir forests to nonforest vegetation. Our results highlight the potential for ecological processes to exhibit rapid transitions, and we expect that fire will increasingly catalyze vegetation shifts at lower treeline in the future. The nonlinear relationships between annual climate and regeneration observed in this study are likely not unique to these two species (e.g., ref. 30). Thus, the combination of fire and climate change may lead to abrupt ecosystem changes where other tree species exhibit similar threshold responses to climate.

## Materials and Methods

Our study was designed to understand the relationship between annual climate conditions and postfire tree regeneration in dry conifer forests dominated by *P. ponderosa* (ponderosa pine) and/or *P. menziesii* (Douglas-fir). We used dendrochronology to determine the germination year of trees established after 33 fires in 90 sites across four regions in the western United States: the Northern Rockies (NR), Colorado Front Range (CO), Southwest (SW), and Northern California (CA) (Fig. 2). Within each region, we sampled sites near the warm/dry limits of regional forest extent, to bracket the climatic conditions suitable for recruitment; further, these areas are where we would expect tree regeneration to be most sensitive to climate change. We constructed a statistical model predicting the annual recruitment probability at each site as a function of biophysical variables. The model results provide insights into the nature of climatic and nonclimatic controls of postfire tree regeneration, and through hindcasting, the model allowed us to assess how climate suitability for tree regeneration has varied over the past several decades across our study regions. The data and code used in this study are publicly available via the Dryad Data Repository: https://doi.org/10.5061/dryad.pc3f9d8 (58).

9-ER-2131

FS-034783

**Field Sampling.** In each region, we selected sites that burned at moderate to high severity between 1988 and 2007 [based on Monitoring Trends in Burn Severity (MTBS) data (59) and later field verified], had no postfire planting and had 30-y (1980–2009) mean climatic water deficits within the top (i.e., driest) 50th percentile for each species within each region (*SI Appendix, Supplemental Methods*). From a random set of sites that fit these criteria, we sampled a total of 19 sites in CA (from six fires), 10 in CO (from five fires), 40 in NR (from 18 fires), and 21 in SW (from four fires) (*SI Appendix*, Tables S1 and S2). Historically, forests in these regions experienced mixed severity fire regimes, with SW and some CA sites characterized by low-severity surface fire regimes (60–62).

In NR, SW, and CA, sampling occurred in 20-m long belt transects with variable width (2–40 m), with the goal of destructively sampling ~30 trees per transect. All trees that established following fire in each transect were sampled; as all sampled trees were less than 25 y old, we use the term "juvenile" hereafter to refer to sampled individuals. We destructively sampled juveniles to obtain precise germination dates, because field-based methods for estimating tree ages are not accurate with annual precision (63). If no juveniles were present at initial randomly identified sample points, site data were recorded and the zero density was retained in the dataset; this occurred at 30% of sites. Where none of the preselected random sample points within a fire yielded at least 30 juveniles for sampling, new plots were located in areas with more regeneration. Thus, field sampling was designed to accurately reconstruct tree age structures (which inherently requires trees to be present), not the probability of juvenile presence/absence at each site.

To destructively sample juveniles, soil was excavated and a segment of the stem from at least 10 cm below and 10 cm above the root–shoot boundary was removed. At three points along each transect, shrub cover was estimated in 2 × 3 m plots. Distance to the nearest seed source (i.e., live reproductive tree) of each species was recorded from the center of the transect with a laser range finder. Data collection in CO followed similar protocols, although not enough Douglas-fir juveniles were sampled to be included in this analysis. Additionally, juveniles in CO were defined as trees <150 cm in height, which excluded three trees at two sites from sampling (25).

**Dendrochronology.** To identify the germination year of juvenile trees with annual accuracy, sample stems were cut into 2.5-cm-long segments; the bottom of each segment was progressively sanded with finer-grit sandpaper (up to 600–1,500 grit; ref. 64) to reveal ring boundaries. Tree rings on each segment were counted at 10–40× with a Nikon SMZ stereomicroscope, and the segment with the most rings, which also corresponded with the first appearance of pith, was used to age the sample (24, 25, 65). We recorded visual marker years, but the young age of the trees precluded more formal cross-dating methods. To test the precision of our aging methods, 555 random samples were recounted by three technicians. The mean (SD) difference in ring-count-based ages among the technicians was 0.298 (0.461) y. If ring boundaries were indistinct or pith dates were otherwise ambiguous, then the sample was not included in the final dataset. In total, we used 2,935 aged juveniles in our analyses (*SI Appendix*, Table S1).

**Climate and Biophysical Data.** We chose a suite of biophysical variables as potential predictors of tree recruitment, based on their direct effects on seed availability and plant–water relations impacting germination and survival. As potential predictors of seed availability and site conditions suitable for germination, we used the MTBS-calculated fire severity value for the 30 × 30 m pixel including each site [differenced normalized burn ratio (dNBR)] and the field-measured distance to seed source.

Bioclimatic variables included mean summer (June–August) VPD (in kilopascals), maximum surface temperature (in Celsius), mean spring (March–May) soil moisture [volumetric water content (vwc), ratio of water volume to soil volume], mean soil moisture of the driest month (vwc), and climatic water deficit (in millimeters). Bioclimatic variables were calculated from gridded climate data from 1979 to 2015 (55) with a resolution of 250 m at daily or subdaily timescales and then summarized to seasonal or annual values (*SI Appendix, Supplemental Methods*). Soil moisture and maximum land surface temperature (LST) were modeled using the ECH$_2$O ecohydrology model (66) following methods described by Simeone et al. (31). Soil moisture was characterized at 0–10 cm, the depths reached by young conifer seedling roots.

**Data Analysis.** We constructed BRT models for each species separately to predict annual recruitment as a function of annual climate during the year of germination

and other biophysical variables (67). Annual recruitment was modeled as a binomial process, with "success" defined by annual recruitment rates (no. juveniles ha$^{-1}$·yr$^{-1}$) exceeding a region-specific threshold: the 25th percentile of annual recruitment rates from among all years with recruitment for a given species in a given region. This threshold accounts for varying forest density among regions (*SI Appendix*, Table S1), and we use this value to represent the annual recruitment rate needed for successful "regeneration" at each site. We also conducted our analysis using a 50th percentile threshold and juvenile presence/absence alone, which produced similar results to those reported in the main text (*SI Appendix*, Figs. S4–S7).

Predictors used for the BRT models included both static and dynamic, time-varying variables. Static variables, specific to each site, included distance to seed source and fire severity. Time-varying variables, specific to each year and site combination, included time since fire, mean summer VPD (calculated as a site-specific z score), maximum surface temperature, annual climatic water deficit (calculated as a site-specific z score), mean soil moisture of the driest month, and mean spring soil moisture. We developed an initial BRT model using all of the above predictor variables, and then used the relative influence of each bioclimatic variable to select the most influential moisture-related (i.e., deficit or soil moisture) and energy-related (i.e., VPD or maximum surface temperature) variables; this resulted in a final BRT model with five predictor variables: distance to seed source, fire severity, time since fire, a moisture-related annual bioclimatic variable, and an energy-related annual bioclimatic variable. We used R version 3.3.3 (68), the package "dismo" (69), and the function "gbm.step" to fit BRT models. To account for lack of spatial independence in our observations, each fold in the k-fold cross-validation used by gbm.step included data from one fire (70), resulting in 25 folds for the ponderosa pine model and 23 folds for the Douglas-fir model. We tested predictive performance by leaving out each site, fitting a BRT model with the same settings as above, predicting the holdout site, and then calculating accuracy (defined as the proportion of years with correct prediction) and the AUC statistic.

To examine how climate suitability for recruitment has changed with shifts in annual climate over the past 35 y, we used the species-specific BRT models to hindcast annual recruitment probability at each site based on the site-specific annual climate time series (1981–2015; *SI Appendix*, Fig. S8) assuming a constant distance to seed source (50 m), time since fire (1 y), and dNBR value (412, the median across all sites). This median dNBR value loosely corresponds to the mean observed fire-related tree mortality of 90%; such high mortality likely resulted from torching of individual trees, active crown fire, or smoldering at the base of trees, given the thick bark of both study species. A range of distance-to-seed-source and dNBR values were initially tested when hindcasting models; while the mean annual recruitment probability differed based on these initial values, the temporal patterns were consistent among different initial values (*SI Appendix*, Figs. S11 and S12). Thus, because distance to seed source, time since fire, and fire severity were held constant, the modeled annual recruitment probability at each site is a measure of climate suitability for recruitment in the first year after a hypothetical fire. Modeled annual recruitment probabilities for sites within each region were averaged to create a single time series for each region and species combination (Figs. 3F and 4F). We characterized the temporal variability in the regional annual recruitment probability values by calculating the SD of recruitment probability in consecutive 10-y windows (Figs. 3E and 4E). We identified significant shifts in the regional time series of annual (year 1 postfire) and cumulative (years 1–5 or 1–10 postfire) recruitment probabilities using a change-point detection algorithm [Sup(F)] in the "strucchange" package in R (9, 71).

**ACKNOWLEDGMENTS.** We thank L. Hankin, S. Pracht, E. Berglund, and L. Crofutt for assistance with field and lab work; E. Burke and E. Heyerdahl for helpful insights about counting tree rings; K. Kemp for sharing data and information from sites in the Northern Rockies; and the many US Forest Service employees who assisted with obtaining permits and provided information about local fires and management history. K.T.D., S.Z.D., and P.E.H. were funded by the Joint Fire Science Program, project 16-1-01-15. K.T.D., S.Z.D., A.S., and M.P.M. were also funded by National Science Foundation Grant BCS-1461576. S.Z.D. received further support from the USDA National Institute of Food and Agriculture, McIntire Stennis program, project 1012438. Support for Z.A.H. was provided by National Aeronautics and Space Administration Applied Sciences Grant NNH12ZDA001N-FIRES. T.T.V. and M.T.R. were funded by National Science Foundation Grants BCS-1232997 and OISE-0966472.

1. Scheffer M, Carpenter S, Foley JA, Folke C, Walker B (2001) Catastrophic shifts in ecosystems. *Nature* 413:591–596.
2. Bestelmeyer BT, et al. (2011) Analysis of abrupt transitions in ecological systems. *Ecosphere* 2:1–26.
3. Scheffer M, et al. (2009) Early-warning signals for critical transitions. *Nature* 461: 53–59.
4. Carpenter SR, Brock WA (2006) Rising variance: A leading indicator of ecological transition. *Ecol Lett* 9:311–318.

9-ER-2132

FS-034784

5. Dakos V, van Nes EH, Scheffer M (2013) Flickering as an early warning signal. *Theor Ecol* 6:309–317.

6. Jackson ST, Betancourt JL, Booth RK, Gray ST (2009) Ecology and the ratchet of events: Climate variability, niche dimensions, and species distributions. *Proc Natl Acad Sci USA* 106:19685–19692.

7. Andrus RA, Harvey BJ, Rodman KC, Hart SJ, Veblen TT (2018) Moisture availability limits subalpine tree establishment. *Ecology* 99:567–575.

8. Groffman P, et al. (2006) Ecological thresholds: The key to successful environmental management or an important concept with no practical application? *Ecosystems (NY)* 9:1–13.

9. Andersen T, Carstensen J, Hernández-García E, Duarte CM (2009) Ecological thresholds and regime shifts: Approaches to identification. *Trends Ecol Evol* 24:49–57.

10. Cavanaugh KC, et al. (2014) Poleward expansion of mangroves is a threshold response to decreased frequency of extreme cold events. *Proc Natl Acad Sci USA* 111:723–727.

11. Svenning JC, Sandel B (2013) Disequilibrium vegetation dynamics under future climate change. *Am J Bot* 100:1266–1286.

12. Crausbay SD, Higuera PE, Sprugel DG, Brubaker LB (2017) Fire catalyzed rapid ecological change in lowland coniferous forests of the Pacific Northwest over the past 14,000 years. *Ecology* 98:2356–2369.

13. Gavin D, Brubaker L, Greenwald D (2013) Postglacial climate and fire-mediated vegetation change on the western Olympic Peninsula, Washington (USA). *Ecol Monogr* 83:471–489.

14. Bell DM, Bradford JB, Lauenroth WK (2014) Early indicators of change: Divergent climate envelopes between tree life stages imply range shifts in the western United States. *Glob Ecol Biogeogr* 23:168–180.

15. Dobrowski SZ, et al. (2015) Forest structure and species traits mediate projected recruitment declines in western US tree species. *Glob Ecol Biogeogr* 24:917–927.

16. Davis KT, Higuera PE, Sala A (2018) Anticipating fire-mediated impacts of climate change using a demographic framework. *Funct Ecol* 32:1729–1745.

17. Stevens-Rumann CS, et al. (2018) Evidence for declining forest resilience to wildfires under climate change. *Ecol Lett* 21:243–252.

18. Roccaforte JP, Fulé PZ, Chancellor WW, Laughlin DC (2012) Woody debris and tree regeneration dynamics following severe wildfires in Arizona ponderosa pine forests. *Can J For Res* 42:593–604.

19. Welch KR, Safford HD, Young TP (2016) Predicting conifer establishment post wildfire in mixed conifer forests of the North American Mediterranean-climate zone. *Ecosphere* 7:e01609.

20. Tepley AJ, Thompson JR, Epstein HE, Anderson-Teixeira KJ (2017) Vulnerability to forest loss through altered postfire recovery dynamics in a warming climate in the Klamath Mountains. *Glob Change Biol* 23:4117–4132.

21. Donato DC, Harvey BJ, Turner MG (2016) Regeneration of montane forests 24 years after the 1988 yellowstone fires: A fire-catalyzed shift in lower treelines? *Ecosphere* 7: e01410.

22. Rother MT, Veblen TT (2016) Limited conifer regeneration following wildfires in dry ponderosa pine forests of the Colorado Front Range. *Ecosphere* 7:e01594.

23. Kemp KB, Higuera PE, Morgan P, Abatzoglou JT (2019) Climate will increasingly determine post-fire tree regeneration success in low-elevation forests, Northern Rockies, USA. *Ecosphere* 10:e02568.

24. League K, Veblen T (2006) Climatic variability and episodic *Pinus ponderosa* establishment along the forest-grassland ecotones of Colorado. *For Ecol Manage* 228: 98–107.

25. Rother MT, Veblen TT (2017) Climate drives episodic conifer establishment after fire in dry ponderosa pine forests of the Colorado Front Range, USA. *Forests* 8:159.

26. Williams JW, Shuman BN, Webb T, Bartlein PJ, Leduc PL (2004) Late-quaternary vegetation dynamics in North America: Scaling from taxa to biomes. *Ecol Monogr* 74:309–334.

27. Fisichelli N, et al. (2014) First-year seedlings and climate change: Species-specific responses of 15 North American tree species. *Oikos* 123:1331–1340.

28. Johnson DM, McCulloh KA, Reinhardt K (2011) The earliest stages of tree growth: Development, physiology and impacts of microclimate. *Size- and Age-Related Changes in Tree Structure and Function, Tree Physiology*, eds Meinzer FC, Lachenbruch B, Dawson TE (Springer, Dordrecht, The Netherlands), Vol 4, pp 65–87.

29. Rother MT, Veblen TT, Furman LG (2015) A field experiment informs expected patterns of conifer regeneration after disturbance under changing climate conditions. *Can J For Res* 45:1607–1616.

30. Reinhardt K, Germino MJ, Kueppers LM, Domec JC, Mitton J (2015) Linking carbon and water relations to drought-induced mortality in *Pinus flexilis* seedlings. *Tree Physiol* 35:771–782.

31. Simeone C, et al. (September 27, 2018) Coupled ecohydrology and plant hydraulics modeling predicts ponderosa pine seedling mortality and lower treeline in the US Northern Rocky Mountains. *New Phytol*, 10.1111/nph.15499.

32. Ficklin DL, Novick KA (2017) Historic and projected changes in vapor pressure deficit suggest a continental-scale drying of the United States atmosphere. *J Geophys Res D Atmospheres* 122:2061–2079.

33. Restaino CM, Peterson DL, Littell J (2016) Increased water deficit decreases Douglas fir growth throughout western US forests. *Proc Natl Acad Sci USA* 113:9557–9562.

34. Eamus D, Boulain N, Cleverly J, Breshears DD (2013) Global change-type drought-induced tree mortality: Vapor pressure deficit is more important than temperature per se in causing decline in tree health. *Ecol Evol* 3:2711–2729.

35. Will RE, Wilson SM, Zou CB, Hennessey TC (2013) Increased vapor pressure deficit due to higher temperature leads to greater transpiration and faster mortality during drought for tree seedlings common to the forest-grassland ecotone. *New Phytol* 200: 366–374.

36. McCullough IM, Davis FW, Williams AP (2017) A range of possibilities: Assessing geographic variation in climate sensitivity of ponderosa pine using tree rings. *For Ecol Manage* 402:223–233.

37. Daubenmire RF (1943) Soil temperature versus drought as a factor determining lower altitudinal limits of trees in the Rocky Mountains. *Bot Gaz* 105:1–13.

38. Kolb PF, Robberecht R (1996) High temperature and drought stress effects on survival of *Pinus ponderosa* seedlings. *Tree Physiol* 16:665–672.

39. Hermann RK, Chilcote WW (1965) *Effect of Seedbeds on Germination and Survival of Douglas-Fir* (Forest Research Laboratory, Oregon State University, Corvallis, OR).

40. Seidel KW (1986) Tolerance of seedlings of ponderosa pine, Douglas-fir, grand fir, and Englemann spruce for high temperatures. *Northwest Sci* 60:1–7.

41. Davis KT, Dobrowski SZ, Holden ZA, Higuera PE, Abatzoglou JT (2018) Microclimatic buffering in forests of the future: The role of local water balance. *Ecography* 41:1–11.

42. Feddema JJ, Mast JN, Savage M (2013) Modeling high-severity fire, drought and climate change impacts on ponderosa pine regeneration. *Ecol Modell* 253:56–69.

43. St Clair JB, Mandel NL, Vance-Borland KW (2005) Genecology of Douglas fir in western Oregon and Washington. *Ann Bot* 96:1199–1214.

44. Bansal S, Harrington CA, Gould PJ, St Clair JB (2015) Climate-related genetic variation in drought-resistance of Douglas-fir (*Pseudotsuga menziesii*). *Glob Change Biol* 21: 947–958.

45. Shinneman DJ, Means RE, Potter KM, Hipkins VD (2016) Exploring climate niches of ponderosa pine (*Pinus ponderosa* Douglas ex Lawson) haplotypes in the Western United States: Implications for evolutionary history and conservation. *PLoS One* 11: e0151811.

46. Kemp KB, Higuera PE, Morgan P (2016) Fire legacies impact conifer regeneration across environmental gradients in the U.S. Northern Rockies. *Landsc Ecol* 31:619–636.

47. Stevens JT, Collins BM, Miller JD, North MP, Stephens SL (2017) Changing spatial patterns of stand-replacing fire in California conifer forests. *For Ecol Manage* 406: 28–36.

48. Montes-Helu MC, et al. (2009) Persistent effects of fire-induced vegetation change on energy partitioning and evapotranspiration in ponderosa pine ecosystems. *Agric For Meteorol* 149:491–500.

49. Certini G (2005) Effects of fire on properties of forest soils: A review. *Oecologia* 143: 1–10.

50. Moyes AB, Castanha C, Germino MJ, Kueppers LM (2013) Warming and the dependence of limber pine (*Pinus flexilis*) establishment on summer soil moisture within and above its current elevation range. *Oecologia* 171:271–282.

51. Moreira X, Abdala-Roberts L, Linhart YB, Mooney KA (2015) Effects of climate on reproductive investment in a masting species: Assessment of climatic predictors and underlying mechanisms. *J Ecol* 103:1317–1324.

52. Eis S (1973) Cone production of Douglas fir and Grand fir and its climatic requirements. *Can J For Res* 3:61–70.

53. IPCC (2014) Climate change 2014: AR5 synthesis report. Contribution of working groups I, II and III to the fifth assessment report of the intergovernmental panel on climate change, eds Pachauri RK, Meyer LA (IPCC, Geneva), p 151.

54. Parks SA, et al. (2018) High-severity fire: Evaluating its key drivers and mapping its probability across western US forests. *Environ Res Lett* 13:044037.

55. Holden ZA, et al. (2018) Decreasing fire season precipitation increased recent western US forest wildfire activity. *Proc Natl Acad Sci USA* 115:E8349–E8357.

56. Westerling AL (2016) Increasing western US forest wildfire activity: Sensitivity to changes in the timing of spring. *Philos Trans R Soc Lond B Biol Sci* 371:20150178, and erratum (2016) 371:20160373.

57. Abatzoglou JT, Williams AP (2016) Impact of anthropogenic climate change on wildfire across western US forests. *Proc Natl Acad Sci USA* 113:11770–11775.

58. Davis KT, et al. (2019) Data from "Wildfires and climate change push low-elevation forests across a critical climate threshold for tree regeneration." Dryad. Available at https://doi.org/10.5061/dryad.pc3f9d8. Deposited February 5, 2019.

59. Eidenshink J, et al. (2007) A project for monitoring trends in burn severity. *Fire Ecol* 3: 3–21.

60. Baker WL (2009) *Fire Ecology in Rocky Mountain Landscapes* (Island Press, Washington, DC), p 544.

61. Sugihara NG, Van Wagtendonk JW, Fites-Kaufman J, Shaffer KE, Thode AE (2006) *Fire in California's Ecosystems* (Univ California Press, Berkeley, CA), p 596.

62. Agee JK (1993) *Fire Ecology of Pacific Northwest Forests* (Island Press, Washington, DC), p 493.

63. Hankin LE, Higuera PE, Davis KT, Dobrowski SZ (2018) Accuracy of node and bud-scar counts for aging two dominant conifers in Western North America. *For Ecol Manage* 427:365–371.

64. Speer JH (2010) *Fundamentals of Tree-Ring Research* (Univ. Arizona Press, Tucson, AZ), p 333.

65. Telewski FW (1993) Determining the germination date of woody plants: A proposed method for locating the root/shoot interface. *Tree Ring Bull* 53:13–16.

66. Maneta MP, Silverman NL (2013) A spatially distributed model to simulate water, energy, and vegetation dynamics using information from regional climate models. *Earth Interact* 17:1–44.

67. Elith J, Leathwick JR, Hastie T (2008) A working guide to boosted regression trees. *J Anim Ecol* 77:802–813.

68. R Core Team (2017) R: A Language and Environment for Statistical Computing Version 3.3.3 (R Foundation for Statistical Computing, Vienna).

69. Hijmans RJ, Phillips S, Leathwick J, Elith J (2017) dismo: Species Distribution Modeling. R Package Version 1.1-4. Available at https://CRAN.R-project.org/package=dismo. Accessed February 26, 2019.

70. De'ath G (2007) Boosted trees for ecological modeling and prediction. *Ecology* 88: 243–251.

71. Zeileis A, Leisch F, Hornik K, Kleiber C (2002) strucchange: An R package for testing for structural change in linear regression models. *J Stat Softw* 7:1–38.

72. Little EL (1971) *Atlas of United States Trees* (US Department of Agriculture, Forest Service, Washington, DC).

9-ER-2133

FS-034785

OIKOS 114: 60–70, 2006

# A multivariate model of plant species richness in forested systems: old-growth montane forests with a long history of fire

**Daniel C. Laughlin and James B. Grace**

Laughlin, D. C. and Grace, J. B. 2006. A multivariate model of plant species richness in forested systems: old-growth montane forests with a long history of fire. – Oikos 114: 60–70.

Recently, efforts to develop multivariate models of plant species richness have been extended to include systems where trees play important roles as overstory elements mediating the influences of environment and disturbance on understory richness. We used structural equation modeling to examine the relationship of understory vascular plant species richness to understory abundance, forest structure, topographic slope, and surface fire history in lower montane forests on the North Rim of Grand Canyon National Park, USA based on data from eighty-two 0.1 ha plots. The questions of primary interest in this analysis were: (1) to what degree are influences of trees on understory richness mediated by effects on understory abundance? (2) To what degree are influences of fire history on richness mediated by effects on trees and/or understory abundance? (3) Can the influences of fire history on this system be related simply to time-since-fire or are there unique influences associated with long-term fire frequency? The results we obtained are consistent with the following inferences. First, it appears that pine trees had a strong inhibitory effect on the abundance of understory plants, which in turn led to lower understory species richness. Second, richness declined over time since the last fire. This pattern appears to result from several processes, including (1) a post-fire stimulation of germination, (2) a decline in understory abundance, and (3) an increase over time in pine abundance (which indirectly leads to reduced richness). Finally, once time-since-fire was statistically controlled, it was seen that areas with higher fire frequency have lower richness than expected, which appears to result from negative effects on understory abundance, possibly by depletions of soil nutrients from repeated surface fire. Overall, it appears that at large temporal and spatial scales, surface fire plays an important and complex role in structuring understory plant communities in old-growth montane forests. These results show how multivariate models of herbaceous richness can be expanded to apply to forested systems.

*D. C. Laughlin, Ecological Restoration Institute, Northern Arizona University, P.O. Box 15017, Flagstaff, AZ 86011, USA (daniel.laughlin@nau.edu). – J. B. Grace, U.S. Geological Survey, National Wetlands Research Center, 700 Cajundome Boulevard, Lafayette, LA 70506, USA.*

A profusion of hypotheses exist concerning specific factors that control plant species richness (reviewed by Grace 1999). A few of the most important factors include primary production and competitive exclusion, disturbance history, and the species pool. However, there has been no resolution of the question of the relative importance of each factor nor an adequate synthesis of the subject (Palmer 1994, Waide et al. 1999, Gross et al. 2000, Mittlebach et al. 2001). Methods that allow for multivariate hypothesis development and testing, specifically structural equation modeling, have, in the past few years, inspired efforts to evaluate hypotheses about interacting networks of controlling factors (Grace and Pugesek 1997, Gough and Grace 1999, Weiher 2003).

Accepted 15 November 2005
*Subject Editor: Heikki Setälä*

Copyright © OIKOS 2006
ISSN 0030-1299

9-ER-2134

FS-034786

Such methods depend on the use of theoretically-specified models of plausible relationships and seek to determine which models, if any, are consistent or inconsistent with the multivariate relations in the data (Bollen 1989, Grace 2006). When acceptable models are obtained, the results have the potential to indicate the roles that different factors play in a system and the strengths of different pathways. Such models have provided evidence for a rich array of processes acting to regulate species richness in herbaceous plant communities. While only a limited number of such studies have been conducted to date, the results thus far indicate strong influences of abiotic factors, disturbance history, colonization, and in productive communities, competitive interactions (Grace and Pugesek 1997, Gough and Grace 1999, Grace and Jutila 1999, Grace et al. 2000).

More recently, there has been an interest in expanding the range of factors considered in multivariate investigations of richness patterns. Grace and Guntenspergen (1999) evaluated hypotheses about the residual influences of past disturbances (specifically, hurricanes and tropical storms) in wetlands. Non-equilibrial processes, such as fire, have been shown to exhibit both direct (Weiher 2003) and indirect (Grace and Keeley 2006) effects on diversity. Disturbance can directly affect plant species composition through opening niches for fire-tolerant species (Watson and Wardell-Johnson 2004) and can indirectly affect richness through direct effects on light availability and plant structure (Grace and Pugesek 1997). In addition, landscape influences can affect post-fire richness patterns in chapparal (Grace and Keeley 2006). Hypotheses about the roles of historic, geographic, regional, and local factors on patterns of endemic richness have been considered by Harrison et al. (2006) and exemplify the capacity of multivariate hypothesis testing to aid in the interpretation of complex intercorrelated relationships at multiple scales.

The variety of community types considered has also recently expanded. Weiher (2003) evaluated the multivariate model developed by Grace and Pugesek (1997) in oak savannas and concluded that the inclusion of trees creates a new set of relationships to consider in models of richness. Further studies by Weiher et al. (2004) in prairie containing scattered red cedar trees have provided additional support for the idea that trees can act to both mediate and alter influences of abiotic factors on herbaceous richness. It would seem based on the limited information currently available that the factors influencing understory richness in woodlands and forests potentially include all those occurring in grasslands plus the moderating and interacting effects of trees. In this study, we extend the range of communities considered using multivariate modeling to include old-growth montane forests and we seek to evaluate multivariate hypotheses that consider the ability of trees to

moderate influences from fire history on understory richness.

## Methods

### The study system

This study was conducted in old-growth montane ponderosa pine (*Pinus ponderosa* P. & C. Lawson) forests (at 2200–2350 m elevation) on the North Rim of Grand Canyon National Park (GCNP), USA. Interspersed throughout the pine forest are clumps of Gambel oak (*Quercus gambelii* Nutt.), a deciduous species that resprouts following fire. Montane plant communities in the southwestern United States have evolved in an environment that experienced low-intensity surface fires every 2–20 years (Swetnam and Baisan 1996, Moore et al. 1999). However, the vast majority of montane forests in the western United States have been affected by commercial logging, by over-grazing from domestic livestock (Belsky and Blumenthal 1997), and by the exclusion of surface fires (Agee 1993). As a result, many western montane landscapes have grown into overly dense forests of small trees with subsequent low understory productivity and diversity. In contrast, Grand Canyon National Park (GCNP) contains the largest never-harvested, minimally grazed, and naturally burned (Fulé et al. 2003) forest ecosystem in Arizona. As a result, these relict sites are rare examples of western forest landscapes close to the historic range of natural variability (Fulé et al. 2002). As such, they offer a place to consider how plant community structure is related to abiotic and biotic factors under conditions of minimal anthropogenic disturbance.

Laughlin et al. (2005) used model selection to determine the best fitting multiple regression model to explain variation in species richness in a broad span of montane forests. Understory abundance and species richness were negatively correlated with the number of years since the last surface fire (hereafter, 'time-since-fire') and pine abundance (Laughlin et al. 2005). Fire is known to affect forest structure (Agee 1993), and pine abundance is well known to negatively impact understory production (Moore and Deiter 1992) through competition for light, water and soil nutrients (McLaughlin 1978, Riegel et al. 1995). However, multiple regression does not allow the researcher to interpret why predictor variables, such as pine abundance and time-since-fire, were correlated (Grace and Bollen 2005). It is likely that time-since-fire directly affects pine abundance, which in turn directly affects understory plant abundance; hence, in this study we use a structural equation modeling approach to test a variety of theoretically-specified multivariate models having compound pathways.

9-ER-2135

FS-034787

## Sampling methods

We sampled understory and overstory characteristics on eighty-two 0.1 ha plots. The plots were separated by at least 300 m and arranged on a grid across the landscape (i.e. plots were located at intersections of lines on a grid; see Fulé et al. (2002) and Laughlin et al. (2005) for study site figures). Plots were oriented uphill-downhill and percent slope for each plot was determined using clinometer readings. Understory plant communities were sampled using belt and point intercept transects that were 50 m in length with points every 30 cm (Laughlin et al. 2005). Understory vegetation was dominated by $C_3$ graminoids and annual and perennial forbs; few shrubs were detected (Laughlin et al. 2005). Species richness was determined as the number of vascular plant species below breast height that occurred within the 0.1 ha plot. Percent foliar cover was calculated by dividing the number of points containing a plant along the point intercept transect divided by the total number of points ( =332). Trees greater than 15 cm diameter at breast height (dbh) were measured on the entire plot and trees between 2.5 and 15 cm dbh were measured on one quarter-plot; all diameters and species of trees were recorded (Fulé et al. 2002).

Previous studies of fire effects on understory vegetation have noted potential confounding effects of time-since-fire and fire frequency, and have therefore held one variable constant to study the effects of the other (Fox and Fox 1986) or have taken a multivariate approach (Weiher et al. 2004, Watson and Wardell-Johnson 2004). We estimated time-since-fire for each plot in the montane forests with two complimentary sources: fire perimeter maps and interpolation of fire scar data (Farris et al. 2004, Laughlin et al. 2005). We also estimated fire frequency since 1880, which is the date of region-wide fire exclusion corresponding to the arrival of Euroamericans (Fulé et al. 2003), by counting the number of fires that overlaid each plot. This method was quite conservative since we only included fires that scarred at least 10% of the recording trees and fire maps derived from fire scars can underestimate fire size.

## Multivariate hypotheses

The general hypotheses of interest in this paper are presented in Fig. 1. This model represents an expansion of the one presented by Grace and Pugesek (1997) with the inclusion of overstory abundance as an important element. All of the hypotheses represented are based on what we believe to be a plausible set of assumptions that include, (1) that current forest overstory abundance may be influenced by past disturbance events and abiotic gradients, (2) that the abundance of understory plants may be influenced by overstory abundance, disturbance events, and abiotic gradients, and (3) that understory



Fig. 1. General conceptual (construct) model that expands on the model in Grace and Pugesek (1997, Fig. 1) by including overstory abundance. Dashed rounded rectangles represent general constructs and arrows denoted by 'a' and 'b' represent pathways of a priori interest. Thus, this diagram represents a set of alternative models, all of which contain the solid arrows, but which differ in the inclusion of direct paths from a) disturbance history and b) abiotic gradients to understory richness.

richness may respond to all four of the other system properties. We recognize that it cannot be guaranteed that the causal relations implied by these assumptions fully represent all the processes operating in this system. Indeed, potentially important abiotic gradients, such as soil properties (which were not measured), are missing from the model. Rather, through the analyses in this paper we seek to determine whether the relations in the data are consistent with expectations from any of the multivariate hypotheses considered (Bollen 1989).

All the hypotheses represented by Fig. 1 seek to determine if understory richness relates in some way to disturbance (specifically, fire) history in this system. There is also interest in seeing what role gradients in topographic slope play in this system. Further, we have an interest in evaluating hypotheses about moderating or altering effects of trees and understory abundance on understory richness. By 'moderating' we refer to the degree to which a presumed effect of fire history or topographic slope on understory richness can be explained by an intervening effect on either forest overstory or understory abundance. For example, if understory abundance completely moderates the effects of disturbance history and forest overstory on richness, all compound pathways would go through understory abundance and no other pathways would go directly to richness. By 'altering' we refer to the situation where the presence of information about intervening variables (in this case, overstory and understory abundance) alters our view of the effects of an influencing factor (fire history or slope) on a response (understory richness). Both kinds of relations are of interest in models that imply a cascading chain of influences, as in Fig. 1.

A number of initial expectations are represented in Fig. 1 and are based on previous studies of this system (Crawford et al. 2001, Gildar et al. 2004, Laughlin et al. 2004, 2005, Huisinga et al. in press). First, it is expected that forest overstory density varies as a function of fire

62

9-ER-2136

FS-034788

history. The relations can be potentially complex depending on the effects of fires on seedlings and saplings, the effects on canopy tree growth, and the absolute frequency of fires. Generally, fires in this system, though frequent prior to 1880, occurred only 0–5 times per plot since 1880, and none were stand-replacing. This means that relations of tree abundance to components of fire history (time-since-fire or fire frequency) might be either positive or negative. Second, it is strongly expected that low understory abundance will be associated with high abundance of ponderosa pine, the dominant tree in this system. Finally, it is expected that where conditions are unfavorable for abundant understory growth, there will be a low level of species richness due to a lack of opportunities for establishment. It is also possible that richness is reduced somewhat where understory growth is very high, though it is not clear whether understory abundance in this system is sufficient to drive a loss of species.

What is less certain for this system is whether overstory and understory abundance completely moderate effects of fire history. It is quite possible that there are influences of forest overstory on richness that either intensify or ameliorate the influences of fire history. It is also possible that fire history has had influences on understory richness that are unrelated to overstory or understory abundance. The same questions can be asked about topographic slope. These less certain pathways, arrows denoted by the letters a and b, represent alternative models of a priori interest. These alternatives will be considered in both specific models (presented later in the paper) representing relations among the measured properties of the system and in general models of the form in Fig. 1.

## Data analyses

Prior to evaluations of multivariate hypotheses, bivariate examinations of relationships among variables were examined. All relationships were considered for the presence of outliers, evidence of skewness or kurtosis, and nonlinear relations. A log transform of understory plant cover was used to linearize relations with richness; all other variables were analyzed in their native scale. Spatial autocorrelation in richness was also examined to determine whether there might be contagion in the data (Laughlin et al. 2005). Results found no evidence of autocorrelation; therefore, the data were analyzed as independent samples without modeling proximity.

## Structural equation modeling

Two types of structural equation models were analyzed in this study: 'specific' and 'general' models. 'Specific' models were evaluated to give a detailed perspective of

relationships. Figure 2 represents the a priori specific model evaluated. In this model, the abundance of Gambel oak was separated from the abundance of ponderosa pine because of the potential unique effects each species may have on understory vegetation (Laughlin et al. 2005). In addition, two components of fire history were represented separately, time-since-fire and the frequency of fires during the past 118 years. Time-since-fire and fire frequency covary in the model since plots that burned recently tended to have burned frequently as well (Fulé et al. 2003, Laughlin et al. 2005). Because oak abundance varied with topographic slope, this landscape feature was included in the specific model.

The models in this paper were formulated using latent variables (in circles) and single indicators (observed variables represented by rectangles). Two possible indicators were considered for both oak abundance and pine abundance, total basal area ($m^2 ha^{-1}$) and tree density (trees $ha^{-1}$). Ponderosa pine, which was the dominant canopy species in the great majority of plots, showed much stronger relationships to all other variables when expressed as total basal area compared to when expressed as tree density. This is understandable given the fact that these trees grow to a large size in low-density stands in these forests. Gambel oak, in contrast, showed stronger relationships to other variables when expressed as tree density. This species is one that resprouts, often forming dense thickets, but which does not often grow into stands of large trees in these forests. Another reason for using oak density rather than oak basal area as an indicator of oak abundance is because we have observed that understory plants can be abundant beneath single large oaks, but not beneath dense oak thickets; in contrast, plant abundance is often low beneath single large pines and beneath dense pine thickets.



Fig. 2. A priori 'indirect effects' (specific) structural equation model representing hypothesized relations between species richness and fire history, slope, forest structure, and understory abundance. Latent variables are represented by circles and the single-indicator observed variables are not shown here for simplicity. Model structure follows from earlier work in grasslands and woodlands.

We considered whether estimates of indicator reliability (repeatability) should be used to specify the degree of measurement error in the model. This was done because appropriate assignments of measurement error can reduce bias in path coefficients (Bollen 1989, Grace 2006), and because we were fairly confident that some of the indicators were not measured perfectly (and, therefore, without error). Indications of the degree of repeatability (reliability) were obtained by correlating readings taken in different years. Such readings provided an underestimate of reliability because they incorporated both measurement error and temporal variation. Still, reliabilities estimated in this way were generally high (up to 90%). Because only approximate measures of reliability could be obtained, conservative estimates of percent error were used in the analyses. Based on our scientific judgement, experience, and available data, we assigned values of 10% error to the indicators of fire frequency and understory richness, 5% to understory abundance and time-since-fire, and 0% to pine abundance, oak abundance, and slope. The effects of reliability estimates on the stability of model results were explored by rerunning the final model using higher or lower reliabilities. For comparison, runs were made using zero estimates for measurement error (equivalent to an observed variable model analysis) and using values double those specified.

We used a competing models approach to compare models of initial interest. The structural relationships (pathways involving latent variables) shown in Fig. 2 describe one of the hypotheses of initial interest, which we refer to as the 'indirect effects' hypothesis. In this hypothesis, all effects of slope, fire, and trees on understory richness can be explained by their effects on understory abundance. The model included both first- and second-order polynomial terms for oak density to allow for nonlinear relations between this and other variables (initial examination of the data indicated that the bivariate relation between oak density and both richness and plant cover fit a second-order polynomial). Though included in the model, we do not illustrate these non-linear relations in the final model for simplicity.

Alternative models to the one shown in Fig. 2 that were investigated were those with direct paths to understory richness from variables other than understory abundance. Analyses proceeded by comparing competing models using chi-square difference tests, without reference to modification indices. The best model selected using this procedure was further examined for indications of lack of fit using residual covariances and modification indices, as well as by examining the significance of pathways. Analyses were performed using the program Mplus (Muthén and Muthén 2005) and normal theory maximum likelihood estimation.

The second type of structural equation model examined in this study was a 'general' model. These models are of the form in Fig. 1 and include composite variables in which combinations of effects are aggregated so we can address more general hypotheses. The effects of time-since-fire and fire frequency were combined into effects of disturbance. Also, the effects of oak and pine were combined into an estimate of the effects of overstory abundance. Composite variable modeling was performed based on the principles in Heise (1972) using the procedures developed by Grace and Bollen (described in Grace 2006, Ch. 6). These procedures use a two-stage approach in which models are estimated without composites in the first stage. In the second stage, composites are included with zero error variance and with one incoming path fixed to a value of 1 so as to set the scale for the composites.

## Results

Understory richness was significantly correlated ($P < 0.01$) with all six of the observed variables in the model (Fig. 3). Richness fit a curvilinear relation to total understory cover (Fig. 3a). Visual examination indicated that richness leveled off when total cover was approximately 50–60%. A clear drop in richness at the highest values of cover was not observed in these data, however. For the purposes of modeling a linear relation with richness, a log transformation of cover yielded a linear graph and a correlation of 0.70. Richness declined linearly with increasing pine basal area (Fig. 3b). Oak density fit a second-order polynomial relation with richness, with richness declining where oak density exceeded approximately 1500 trees ha$^{-1}$ (Fig. 3c). Positive linear relations to richness were found for slope and fire frequency, and a negative linear relation to richness was found for time-since-fire (Fig. 3d–e). Correlations among all variables are given in Table 1.

Analysis of specific structural equation models found that the indirect effects model, which includes only those paths shown in Fig. 2, was not consistent with the data ($\chi^2 = 21.8$, 9 df, $P = 0.01$; indicating significant differences between model and data). The first alternative model (developed from theoretical justifications) included a direct path from time-since-fire to understory richness and yielded a chi-square of 8.80 (8 df, $P = 0.36$). The drop in chi-square of 13.0 was highly significant ($P < 0.01$), indicating this model was more appropriate. The second alternative model included a direct path from fire frequency to understory richness and yielded a chi-square of 6.6 (7 df, $P = 0.47$). This decline in chi-square was not significant, indicating this path should not be included in the model. Inclusion of a direct path from slope to understory richness likewise failed to improve model fit significantly. Thus, the first alternative

Fig. 3. Bivariate relations between richness and all other observed variables in the model. All relationships were significant (P <0.01).



model was deemed the best of those initially considered. Examination of residuals and modification indices did not reveal substantial discrepancies. However, significance tests for pathways revealed that the paths from the fire variables to oak abundance were not significant, therefore, we decided to delete these from the final model. These deletions permitted estimates of separate effects between oak abundance and pine abundance (instead of a single net relationship) because the resulting model could be 'identified' (i.e. unique estimates of all parameters were possible).

The final model (Fig. 4) fit the data well ($\chi^2 = 11.7$, 9 df, P =0.23), indicating that the covariance structure of the data did not significantly deviate from the covariance structure implied by the model. The final model explained the majority of total variance in understory richness ($R^2 = 0.64$) and understory abundance ($R^2 = 0.72$), but explained less of the total variance of oak abundance ($R^2 = 0.21$) and pine abundance ($R^2 = 0.22$). Standardized path coefficients for this model are shown in Fig. 4 and the prediction equations that include unstandardized coefficients are provided in Table 2.

The results of our sensitivity analyses showed that model fit was not significantly affected by varying the amount of measurement error (Table 3). Both the model without measurement error and the model with double the estimated measurement error fit the data. Also,

Table 1. Correlations among observed variables. Significant correlations are in bold.

|  | Rich | LogCov | PineBA | Oakden | Oakden$^2$ | Pctslope | Firetime | Firefreq |
|---|---|---|---|---|---|---|---|---|
| Rich | 1.0 |  |  |  |  |  |  |  |
| LogCov | **0.67** | 1.0 |  |  |  |  |  |  |
| PineBA | **−0.38** | **−0.58** | 1.0 |  |  |  |  |  |
| Oakden | **0.29** | **0.44** | **−0.26** | 1.0 |  |  |  |  |
| Oakden$^2$ | **0.14** | **0.29** | −0.14 | **0.94** | 1.0 |  |  |  |
| Pctslope | **0.31** | **0.39** | −0.21 | **0.44** | **0.33** | 1.0 |  |  |
| Firetime | **−0.66** | **−0.63** | **0.32** | **−0.25** | −0.18 | −0.17 | 1.0 |  |
| Firefreq | **0.44** | **0.23** | −0.02 | 0.15 | 0.12 | −0.06 | **−0.66** | 1.0 |

9-ER-2139



Fig. 4. Specific model results ($\chi^2 = 11.7$, 9 df, P =0.23) with standardized path coefficients. The size of the arrow is proportional to the strength of the path.

results supported retention of all the same pathways, thus, model structure was stable. As expected, the magnitude of certain pathways was found to be sensitive to variations in specified measurement error. Most responsive were the paths from time-since-fire to understory abundance and to pine abundance. The paths from fire frequency to pine abundance and to understory abundance were also moderately responsive. All other path coefficients were relatively unresponsive to variations in measurement error.

Indirect relations contribute to the so-called 'total effects', which represent the sum of direct and indirect pathways (Table 4). Results indicate that for most variables, their relationships with understory richness were entirely indirect. The one exception was time-since-fire, which contributed directly to the explanation of variation in understory richness. Even for time-since-fire, though, the majority of its total effect on understory richness ($-0.84$) was indirect ($-0.46$), through relationships with pine and understory abundance.

The analysis of the general model in which some effects were composited produced a broader perspective

of relationships (Fig. 5). The general model had a chi-square of 13.0 (10 df, P =0.23). The structure of this model fit with the findings for specific models, in that there was evidence for a direct path from disturbance history to understory richness and no support for a direct path from overstory abundance.

## Discussion

Partitioning direct and indirect effects on community structure has advanced the understanding of patterns of diversity across landscapes. In old-growth montane forests that are evolutionarily adapted to a surface fire regime, the evidence from this analysis suggests that understory richness is influenced by direct and indirect effects of fire history. Indirect effects of fire history on understory richness are apparently mediated through direct effects on pine abundance and understory abundance. Therefore, over large temporal and spatial scales, surface fire plays an important role in structuring understory plant communities in old-growth montane forests.

Understory plant abundance was not found to be unimodally related to understory richness in this study, though a leveling off of richness did occur where plant cover was high. This may indicate that competitive exclusion limits seedling establishment and persistence at high levels of understory plant abundance (Grime 1979).

The observation that understory richness was lower where overstory abundance was higher can be explained entirely by the fact that understory abundance was low where overstory abundance was high. Thus, we found no evidence of unique effects of forest structure on richness. This contrasts with Weiher's (2003) finding that tree

Table 2. Prediction equations with unstandardized coefficients.

Prediction equations*

RICH $= 25.66 + 28.52*$ABUN $-0.0731*$FIRETIME
ABUN $= 0.480 - 0.003*$PINE $+ 0.00015*$OAK $- 5.07e^{-8}*$
    OAK$^2$ $- 0.000244*$FIRETIME $-0.035*$FIREFREQ
PINE $= 11.98 + 0.1715*$FIRETIME $+ 4.2*$FIREFREQ
OAK $= 153.546 + 18.526*$SLOPE $- 4.71*$PINE

*Where, RICH =understory richness =number of species per 0.1 ha; ABUN =understory abundance =Ln(%cover/ 100+1); FIRETIME =time-since-fire =years since last burn; PINE =pine abundance =ponderosa pine basal area per hectare; OAK =oak abundance =Gambel oak trees per hectare; OAK$^2$ =square of OAK; FIREFREQ =number of fires since 1880/118 years; SLOPE =% slope

9-ER-2140

FS-034792

Table 3. Sensitivity analysis of model parameters and model fit with respect to changes in estimated measurement error.

| Model pathways | Measurement error | | |
|---|---|---|---|
| | Zero | Used in model (Fig. 4) | Double |
| Understory abundance to understory richness | 0.46 | 0.49 | 0.52 |
| Time-since-fire to understory richness | −0.36 | −0.38 | −0.42 |
| Oak abundance to understory abundance | 0.28 | 0.28 | 0.27 |
| Pine abundance to understory abundance | −0.29 | −0.26 | −0.19 |
| Time-since-fire to understory abundance | −0.62 | −0.75 | −1.0 |
| Fire frequency to understory abundance | −0.20 | −0.31 | −0.53 |
| Slope to oak abundance | 0.42 | 0.42 | 0.42 |
| Pine abundance to oak abundance | −0.09 | −0.09 | −0.10 |
| Oak abundance to pine abundance | ns | ns | ns |
| Time-since-fire to pine abundance | 0.51 | 0.62 | 0.80 |
| Fire frequency to pine abundance | 0.33 | 0.44 | 0.61 |
| Time-since-fire with fire frequency | −0.72 | −0.72 | −0.72 |
| Model fit | | | |
|   Chi-square | 14.0 | 11.7 | 9.8 |
|   df | 9 | 9 | 9 |
|   P | 0.12 | 0.23 | 0.37 |

canopy had a direct effect on richness, yet virtually no effect on herbaceous biomass. In this system, pine trees intercept light (Naumburg and DeWald 1999), intercept precipitation (McLaughlin 1978), produce abundant needle-fall, and can compete for soil nutrients, all of which can negatively impact herbaceous productivity. Riegel et al. (1995) concluded that limiting resources such as light, water, and nutrients affected understory species composition in ponderosa pine forests based on individual species responses' to resource manipulation. It would seem that ponderosa pine has a strong influence on the understory plant community. Furthermore, our evidence implies that pine abundance may have a slight negative effect on oak abundance, likely due to resource competition, but oak abundance had no detectable reciprocal effect on pine abundance in this case.

Oak abundance was positively related to topographic slope in this system. This result may be specific to North Rim forests, as Gambel oak can readily grow on flat terrain in other pine forests in northern Arizona. Oak abundance was unimodally related to understory abundance (data not shown). Low to moderate densities of oak trees had a positive association with understory production, which may be mediated by oak litter, as oak positively influences soil fertility (Klemmedson 1987, 1991). Soil nutrient content, which was not measured in this study, may have contributed to unexplained variance in the model (Grace et al. 2000, Weiher 2003, Weiher

Table 4. Standardized direct, indirect, and total effects on understory richness (ns refers to a nonsignificant effect).

| Factors | Direct | Indirect | Total |
|---|---|---|---|
| Understory abundance | 0.49 | | 0.49 |
| Oak abundance | | 0.14 | 0.14 |
| Pine abundance | | −0.13 | −0.13 |
| Time-since-fire | −0.38 | −0.46 | −0.84 |
| Fire frequency | | −0.21 | −0.21 |
| Slope | | 0.06 ns | 0.06 ns |

et al. 2004). However, understory abundance began to decline as oak densities surpassed 1500 trees ha$^{-1}$. Therefore, the positive path (0.28) should be interpreted as showing that intermediate levels of oak are associated with maximum understory abundance. This result clarifies the relationship found in Laughlin et al. (2005), where pine-oak forests had much greater plant cover and slightly greater plant species richness than pure ponderosa pine forests, and agrees with Weiher (2003) who found weak positive effects on a variety of plant species when oak canopy was moderate.

Time-since-fire appears to have a strong negative total effect on understory richness (−0.84) in this system, with some of the influence mediated by positive influences on overstory abundance, some mediated by negative influences on understory abundance, and some of the influence represented by a negative direct path. Several different processes would seem to be operating here. The strong positive association between time-since-fire and pine abundance exists because pine abundance increases during long, fire-free intervals (>100 years in some cases). Long-term absence of fire allowed pine seedlings and saplings to develop into



Fig. 5. General model results ($\chi^2 = 13.0$, 10 df, P = 0.23) with standardized path coefficients. Constructs variously represent individual or collections of latent variables. The size of the arrow is proportional to the strength of the path.

FS-034793

mature trees and thereby contribute to larger stand volumes. In contrast, the strong negative direct path from time-since-fire to understory abundance may represent post-fire stimulation of herbaceous primary production, either through the release of nutrients into the soil (Covington and Sackett 1992), or a reduction of built-up plant litter on the soil surface. Thus, forests without fire show a decline in understory abundance above and beyond what can be explained simply by increases in pine abundance. These processes ultimately resulted in a loss of approximately one plant species per 0.1 ha per decade (Fig. 3) when fire is excluded from these forests.

The direct path from time-since-fire to understory richness implies an effect that is independent of overstory or understory abundance. We think it is possible that this represents post-fire stimulation of richness, either by creating previously unavailable habitat, or by stimulating fire-tolerant and fire-dependent species. Low intensity fires can produce high amounts of small-scale heterogeneity, since slight variability in fuel load and moisture can determine whether an area will burn or not (Huston 1994, Bond and van Wilgen 1996). This heterogeneity can potentially create opportunities for fire-tolerant species (Watson and Wardell-Johnson 2004), allowing for the coexistence of numerous species. Heat and smoke from fires can also stimulate germination of understory species (Keeley 1991). For example, germination of *Penstemon barbatus*, a native forb, increased dramatically after exposure to smoke (Abella 2005). This may be another important mechanism of post-fire stimulation of plant richness that has been little studied in this system. Furthermore, the increased availability of light to the soil surface following a burn allows for the germination of annual species (Grime 1977, Gibson 1988). Pine forests that have not burned for over 70 years had significantly fewer annual species than forests that burned recently (Laughlin et al. 2005), and annual species responded positively to a low-intensity fire on the North Rim of GCNP (Laughlin et al. 2004).

The implied effects of fire frequency are perhaps the most counterintuitive results in the model. The bivariate relationships between fire frequency and understory abundance and richness (Table 1) were significant and positive ($r = 0.23$, $0.44$, respectively). However, once time-since-fire was statistically controlled, model results implied that areas with more frequent fires have lower richness than otherwise expected. In other words, these results suggest that if we could hold time-since-fire constant for all plots, we would see that those plots with high fire frequencies have comparatively low richness. This appears to result primarily from a positive association between frequent fires and pine abundance and negative association between frequent fires and understory abundance. We interpret the positive

association with pine abundance as an indication that multiple fires have a thinning effect on pine seedlings and saplings, thereby allowing the old-growth pine trees to grow larger faster and contribute to greater stand volumes (Feeney et al. 1998). We interpret the negative association of frequent fires with understory abundance as an indication that multiple fires can harm understory production, possibly by depletion of soil N after repeated exposure to surface fire (Binkley et al. 1992, Wright and Hart 1997). Because of the counterintuitive nature of the results and the fact that fire frequency was very conservatively measured, we consider paths from fire frequency as tentative until later confirmed in subsequent multivariate studies. However, these results exemplify the strength of structural equation modeling as a tool for analyzing complex relationships among many variables, since traditional univariate techniques could not have detected these residual effects (Grace and Pugesek 1997, 1998). In other studies, herbaceous species richness has been found to be negatively related to fire frequency in tallgrass prairie (Collins et al. 1995), but positively related to fire frequency in loblolly pine forests (Lewis and Harshbarger 1976, Waldrop et al. 1987). Based on the limited data available at present, it appears that fire frequency may not have a consistent relationship to richness across systems.

General theories about disturbance and species diversity are well supported in surface fire-adapted montane forests. Moderate disturbance frequencies increase diversity by reducing rates of competitive displacement, but high frequencies can reduce diversity through direct species loss. In montane systems, fire history is clearly a strong influence on plant species richness, but the structural equation model results suggests that there is a delicate balance between time-since-fire and fire frequency and that some of these effects are mediated through overstory–understory interactions.

These data and analyses also suggest that multivariate models of richness, such as those used to understand patterns in herbaceous communities (Grace and Pugesek 1997, Gough and Grace 1999, Grace and Jutila 1999, Grace et al. 2000), can be expanded to incorporate the mediating effects of the forest overstory (Fig. 5). It would seem that in general, forest overstories can, among other things, reduce understory abundance and the importance of competition among herbaceous species in regulating richness. At the same time, while not found in this study, there are other cases where the overstory has been found to have unique influences on understory richness (Weiher 2003), which remain to be explored fully. In this case, the overstory completely moderated the effects of abiotic gradients on understory abundance. Disturbance, on the other hand, had unique influences on both understory abundance and richness, representing cumulative effects of fire history.

OIKOS 114:1 (2006)

9-ER-2142

FS-034794

This example contributes to a growing body of literature indicating that abiotic and biotic factors and their complex interactions are important in regulating spatial and temporal variation in plant species richness across landscapes. Structural equation models, while often reflecting specific influences in each system studied, appear to be consistent with a general multivariate model in which variations in disturbance, abiotic conditions, overstory, and understory conditions combine to explain broad patterns of plant species richness. Further studies, including both a greater range of conditions and those that seek to test model predictions, either experimentally or with additional observational data, should provide additional insight into the adequacy of this model to represent diversity regulation in fire-adapted forest systems.

*Acknowledgements* – We thank P. Fulé, E. Weiher and M. Bowker for their insight early on in the development of this paper, and we are grateful to the National Park Service, the Bureau of Land Management, and the Joint Fire Science Program for support.

# References

Abella, S. R. 2005. Environmental and vegetational gradients on an Arizona ponderosa pine landscape: implications for ecological restoration. PhD thesis. – Northern Arizona Univ., Flagstaff, AZ.

Agee, J. K. 1993. Fire ecology of Pacific Northwest forests. – Island Press.

Belsky, A. J. and Blumenthal, D. M. 1997. Effects of livestock grazing on stand dynamics and soils in upland forests of the Interior West. – Conserv. Biol. 11: 315–327.

Binkley, D., Richter, D., David, M. B. et al. 1992. Soil chemistry in a loblolly pine forest with interval burning. – Ecol. Appl. 2: 157–164.

Bollen, K. A. 1989. Structural equations with latent variables. – John Wiley & Sons.

Bond, W. J. and van Wilgen, B. 1996. Fire and plants. – Chapman & Sons.

Collins, S. L., Glenn, S. M. and Gibson, D. J. 1995. Experimental analysis of intermediate disturbance and initial floristic composition: decoupling cause and effect. – Ecology 76: 486–492.

Covington, W. W. and Sackett, S. S. 1992. Soil mineral nitrogen changes following prescribed burning in ponderosa pine. – For. Ecol. Manage. 54: 175–191.

Crawford, J. A., Wahren, C.-H. A., Kyle, S. et al. 2001. Responses of exotic plant species to fires in *Pinus ponderosa* forests in northern Arizona. – J. Veg. Sci. 12: 261–268.

Farris, C., Baisan, C. H. and Swetnam, T. W. 2004. A comparison of fire histories derived from fire scars and mapped perimeters in a frequently burned Arizona wilderness area. – 89th Annu. Meeting Ecol. Soc. Am., Portland, OR.

Feeney, S. R., Kolb, T. E., Covington, W. W. et al. 1998. Influence of thinning and burning restoration treatments on presettlement ponderosa pines at the Gus Pearson Natural Area. – Can. J. For. Res. 28: 1295–1306.

Fox, M. D. and Fox, B. J. 1986. The effect of fire frequency on the structure and floristic composition of a woodland understorey. – Aust. J. Ecol. 11: 77–85.

Fulé, P. Z., Covington, W. W., Moore, M. M. et al. 2002. Natural variability in forests of the Grand Canyon, USA. – J. Biogeogr. 29: 31–47.

Fulé, P. Z., Heinlein, T. A., Covington, W. W. et al. 2003. Assessing fire regimes on Grand Canyon landscapes with fire-scar and fire-record data. – Int. J. Wildland Fire 12: 129–145.

Gibson, D. J. 1988. Regeneration and fluctuation of tallgrass prairie vegetation in response to burning frequency. – Bull. Torrey Bot. Club 115: 1–12.

Gildar, C. N., Fulé, P. Z. and Covington, W. W. 2004. Plant community variability in ponderosa pine forest has implications for reference conditions. – Nat. Areas J. 24: 101–111.

Gough, L. and Grace, J. B. 1999. Predicting effects of environmental change on plant species density: experimental evaluations in a coastal wetland. – Ecology 80: 882–890.

Grace, J. B. 1999. The factors controlling species density in herbaceous plant communities: an assessment. – Persp. Plant Ecol. Evol. Syst. 2: 1–28.

Grace, J. B. 2006. Structural equation modeling and the study of natural systems. – Cambridge Univ. Press.

Grace, J. B. and Pugesek, B. H. 1997. A structural equation model of plant species richness and its application to a coastal wetland. – Am. Nat. 149: 436–460.

Grace, J. B. and Pugesek, B. H. 1998. On the use of path analysis and related procedures for the investigation of ecological problems. – Am. Nat. 152: 151–159.

Grace, J. B. and Jutila, H. 1999. The relationship between species density and community biomass in grazed and ungrazed coastal meadows. – Oikos 85: 398–408.

Grace, J. B. and Guntenspergen, G. R. 1999. The effects of landscape position on plant species density: evidence of past environmental effects in a coastal wetland. – Ecoscience 6: 381–391.

Grace, J. B. and Bollen, K. A. 2005. Interpreting the results from multiple regression and structural equation models. – Bull. Ecol. Soc. Am. 86: 283–295.

Grace, J. B. and Keeley, J. E. 2006. Structural equation model of factors affecting postfire plant diversity of Mediterranean-climate shrublands in California. – Ecol. Appl., in press.

Grace, J. B., Allain, L. and Allen, C. 2000. Factors associated with plant species richness in a coastal tall-grass prairie. – J. Veg. Sci. 11: 443–452.

Grime, J. P. 1977. Evidence for the existence of three primary strategies in plants and its relevance to ecological and evolutionary theory. – Am. Nat. 111: 1169–1194.

Grime, J. P. 1979. Plant strategies and vegetation processes. – John Wiley & Sons.

Gross, K. L., Willig, M. R. and Gough, L. 2000. Patterns of species density and productivity at different spatial scales in herbaceous plant communities. – Oikos 89: 417–427.

Harrison, S., Safford, H. D., Grace, J. B. et al. 2006. Regional and local species richness in an insular environment: serpentine plants in California. – Ecol. Monogr., in press.

Heise, D. R. 1972. Employing nominal variables, induced variables, and block variables in path analysis. – Sociol. Methods Res. 1: 147–173.

Huisinga, K. D., Laughlin, D. C., Fulé, P. Z. et al. 2005. Effects of an intense prescribed fire on understory vegetation in a mixed conifer forest. – J. Torrey Bot. Soc. 132: 590–601.

Huston, M.A. 1994. Biological diversity. – Cambridge Univ. Press.

Keeley, J.B. 1991. Seed germination and life history syndromes in the California chaparral. – Bot. Rev. 57: 81–116.

Klemmedson, J. O. 1987. Influence of oak in pine forests of central Arizona on selected nutrients of forest floor and soil. – Soil Sci. Soc. Am. J. 51: 1623–1628.

Klemmedson, J. O. 1991. Oak influence on nutrient availability in pine forests of central Arizona. – Soil Sci. Soc. Am. J. 55: 248–253.

Laughlin, D. C., Bakker, J. D., Stoddard, M. T. et al. 2004. Toward reference conditions: wildfire effects on flora in an old-growth ponderosa pine forest. – For. Ecol. Manage. 199: 137–152.

9-ER-2143

FS-034795

Laughlin, D. C., Bakker, J. D. and Fulé, P. Z. 2005. Understory plant community structure in lower montane and subalpine forests, Grand Canyon National Park, USA, – J. Biogeogr. 32: 2083– 2102.

Lewis, C. E. and Harshbarger, T. J. 1976. Shrub and herbaceous vegetation after 20 years of prescribed burning in the South Carolina coastal plain. – J. Range Manage. 29: 13– 18.

McLaughlin, S. P. 1978. Overstory attributes, light, throughfall, and the interpretation of overstory-understory relationships. – For. Sci. 24: 550–553.

Mittelbach, G. G., Steiner, C. F., Scheiner, S. M. et al. 2001. What is the observed relationship between species richness and productivity? – Ecology 82: 2381–2396.

Moore, M. M. and Deiter, D. A. 1992. Stand density index as a predictor of foreage production in northern Arizona pine forests. – J. Range Manage. 45: 267–271.

Moore, M. M., Covington, W. W. and Fulé, P. Z. 1999. Reference conditions and ecological restoration: a Southwestern ponderosa pine perspective. – Ecol. Appl. 9: 1266–1277.

Muthén, L. K. and Muthén, B. O. 2005. Mplus user's guide (second edition). – Muthén and Muthén.

Naumburg, E. and DeWald, L. E. 1999. Relationships between *Pinus ponderosa* forest structure, light characteristics, and understory graminoid species presence and abundance. – For. Ecol. Manage. 124: 205–215.

Palmer, M. W. 1994. Variation in species richness: toward a unification of hypotheses. – Folia Geobot. Phytotaxon. 29: 511–530.

Riegel, G. M., Miller, R. F. and Krueger, W. C. 1995. The effects of aboveground and belowground competition on understory species composition in a *Pinus ponderosa* forest. – For. Sci. 41: 864–889.

Swetnam, T. W. and Baisan, C. H. 1996. Historical fire regime patterns in the southwestern United States since AD 1700. – In: Allen C. D. (ed.), Fire effects in southwestern forests. Proc. 2nd La Mesa Fire Symp. USDA For. Service General Tech. Rep. RM-GTR-286, pp. 11–32.

Waide, R. B., Willig, M. R., Steiner, C. F. et al. 1999. The relationship between productivity and species richness. – Annu. Rev. Ecol. Syst. 30: 257–300.

Waldrop, T. A., van Lear, D. H., Lloyd, F. T. et al. 1987. Long-term studies of prescribed burning in loblolly pine forests of the southeastern United States. – USDA For. Service General Tech. Rep. SE-45.

Watson, P. and Wardell-Johnson, G. 2004. Fire frequency and time-since-fire effects on the open-forest and woodland flora of Girraween National Park, south-east Queensland, Australia. – Aust. Ecol. 29: 225–236.

Weiher, E. 2003. Species richness along multiple gradients: testing a general multivariate model in oak savannas. – Oikos 101: 311–316.

Weiher, E., Forbes, S., Schauwecker, T. et al. 2004. Multivariate control of plant species richness in a blackland prairie. – Oikos 106: 151–157.

Wright, R. J. and Hart, S. C. 1997. Nitrogen and phosphorus status in a ponderosa pine forest after 20 years of interval burning. – Ecoscience 4: 526–533.

9-ER-2144

FS-034796



Mark E. Harmon

# Carbon Sequestration in Forests

## Addressing the Scale Question

**■ Mark E. Harmon**

**ABSTRACT** Forests may have an important role to play in removing carbon dioxide from the atmosphere. However, the extent of their role depends not only on the area available but also the management system that is applied and whether it is based on sound scientific principles, including those of basic ecosystem science. One aspect of ecosystem science that generally has been overlooked in forestry-related carbon projects is that of scale. By paying closer attention to scale, seemingly contradictory statements concerning forest management and carbon sequestration can be resolved, which can lead to the development of a viable carbon sequestration policy.

**Keywords:** carbon sequestration; ecosystem management; policy; scale

Forests have the potential to store a great deal more carbon than they do. Exploiting this potential is one of several proposed strategies to temporarily slow the increase of atmospheric carbon dioxide concentrations. However, before such a policy is generally accepted several major issues involving forests need to be reconciled.

Not all forestry-related projects are equally likely to sequester carbon; some may actually release carbon to the atmosphere. The carbon sequestration implications of afforestation and reforestation projects are relatively simple and have received a great deal of attention (Sedjo et al. 1997). In contrast, the role of more traditional forestry practices for increasing carbon sequestration are less clear, with a great deal of confusion about which practices run counter to the goal of increased carbon sequestration. On one hand, many forestry professionals believe that young forests are optimum

*Above:* **Old-growth forests, such as Valley of the Giants in the Oregon Coast Range, store some of the greatest amounts of carbon.**

9-ER-2145

FS-034797

for sequestering carbon because they are growing faster than older forests. Moreover, older forests have more dead trees and decomposition, and hence they should release more carbon than younger forests. Together these two observations suggest that replacement of older forests should enhance carbon sequestration. On the other hand, many published, peer-reviewed studies on this subject have concluded that the replacement of older forests by younger ones will result in a net release of carbon into the atmosphere (Cooper 1983; Harmon et al. 1990; Dewar 1991; Schulze et al. 2000). Before a sensible policy on forest practices and carbon sequestration can be developed, we must understand the basis of these two contrasting views.

The interesting thing about this debate, aside from its heated nature, is the fact that there are elements of truth in both views. This is probably why each side views their argument as convincing. The resolution of these contrasting views lies in understanding the scale (which, unfortunately, often is not stated) the statements address. By specifying the scale issue specifically, one can understand not only which statements are true versus false, but also the scale most relevant to setting forest carbon sequestration policy.

This article reviews the issue of scale and carbon sequestration in forests. It draws primarily from ecosystem science, which is logical given that carbon sequestration is primarily an ecosystem process. The article reviews the concept of scale, illustrates its use in resolving seemingly divergent views, and concludes by suggesting the scale that is most appropriate to the question of how forest management can be used to increase the sequestration of carbon from the atmosphere.

## What Is Scale?

Although one can view the world from the smallest increment of time or space or from the most elemental of processes, it is often helpful to view the world through larger "windows." These windows that define (often arbitrarily) the spatial, temporal, and

process resolution, are the scales used by an observer. Although some argue that scales are not natural phenomena, there is no debate about their utility. For example, forest growth is often best measured from year to year or in some cases decade to decade rather than from one instant to the next, despite the fact that trees actually grow from one instant to the next. The same is true for spatial extent. In theory we could measure the amount of carbon stored in an infinitesimally small volume of soil, but we usually measure it in a profile of 1 cubic meter or so, and often average it over even larger extents. We may also choose to examine processes at a level above the most fundamental ones, in part because there are so many intermediate processes that the propagation of errors becomes potentially excessive.

Even though using scales has a clear benefit, it also has a cost in the sense that a measurement may only be relevant at the scale at which it was taken. That is, certain measurements and observations may directly apply to broader or coarser levels, while others may not. To avoid this pitfall the process of defining a problem should

always include specifying a spatial, temporal, and process level. A lesson from ecosystem science over the past 25 years is that when this is not done (or when the dimensions of scale are tacitly assumed), one can develop seemingly irresolvable conflicts (Allen and Starr 1982; O'Neill et al. 1986). This lesson will now be applied to the question of forest practices and carbon sequestration.

## What Is the Sequestration System?

An issue related to process resolution involves the definition of the forest carbon sequestration system. This includes not only the parts, but also the processes involved. Given that trees and forest products are the focus of forestry, it is only natural for the practicing forester to assume that these are the only relevant pools to consider. In fact, for many reforestation projects these are the only pools considered. However, they are only part of the forest carbon sequestration system, and for a full accounting one must also include detritus and soil. The processes that need to be considered include not only tree growth, but also photosynthesis and plant respira-



Figure 1. The loss of carbon from an individual tree versus the accumulation of carbon in a collection of trees. In this example, dead trees are being added to the ecosystem. Each dead tree loses carbon as it decomposes; however, as a collection (shown by the upper line) the dead trees can increase carbon stores over time.



***Figure 2.*** **The theoretical trend in net primary production (NPP, or gross growth) and change in live biomass stores (Δ biomass, or net growth) for a forest system that has been disturbed by clearcut timber harvest.**

tion, tree death and litter production, decomposition and the formation of stable organic matter in the forest floor and soil (including charcoal), disturbances such as timber harvest and fire, as well as the manufacture, use, and disposal of forest products. Substitution of fossil fuels may also be considered in a forest sector analysis; however, this is often done at a level of resolution larger than the forest sector per se, one that includes all carbon processes such as fossil fuel use, cement production, and others.

An important criterion to use in defining the forest carbon system is to create a "closed" system, or one in which all carbon is accounted for and conserved. This is important because the flux to the atmosphere is usually not directly measured. Rather it is solved by the difference of all the other terms. Therefore, by excluding some pools it is possible to create a misleading impression of the impact of some forest practices. For example, confining the system to just trees inevitably leads to the conclusion that young forests sequester carbon faster than older forests. However, young forests are often associated with large amounts of slash from the previous harvest, and when the decomposition of this material is considered, it may turn out that the complete system is actually losing carbon to the atmosphere even though the younger trees are growing at a rapid rate. In some cases, such as afforestation pro-

jects, only trees and forest products are considered, but it turns out this is a special case in which excluding the other pools will systematically underestimate carbon sequestration rates. In far more situations overestimation of sequestration occurs when certain pools are excluded, which has led to the notion of the minimum number of pools that need to be considered for different types of projects.

## How Is Carbon Sequestered?

The traditional explanation of carbon dynamics in forests starts with photosynthesis and considers losses via respiration of the plants and the decomposers. There is nothing inherently wrong with this explanation, but it leaves the distinct impression that anything associated with decomposition leads to a loss of carbon from the forest. This explanation also is used to support the conclusion that developing younger, healthier forests should remove carbon faster than older, decadent forests with high rates of mortality and decomposition. However, because of scaling considerations this not necessarily true at the scale of an ecosystem.

At the scale of individual pools, the tendency is to focus on living plants as the only long-term store of carbon. As stated above, the rationale is that because respiration represents a carbon loss, any pool that only has respiration without accompanying photosynthesis cannot accumulate carbon. Although this is true at the scale of an individual dead leaf or tree, pools such as detritus, soil, and forest products can also store carbon over the long term.

The latter three pools cannot take carbon directly out of the atmosphere via photosynthesis; they can, however, accumulate and permanently store carbon if the inputs to these pools are maintained through time (Olson 1963). It is true, for example, that once a tree dies it begins to decompose and thus lose carbon. It is equally true, however, that if trees die at a steady rate, then as a collection the mass of carbon stored in the dead tree pool can grow and thus store carbon *(fig. 1)*. Conversely, when analyzed at the individual level it is clear that living plants

9-ER-2147

are not permanent stores—individuals and parts of those individuals are always dying. They are replaced by other individuals and parts that allow this live pool to permanently store carbon. The confusion concerning which pools can permanently store carbon is therefore largely a confusion over scale, that is, between transience at the level of individuals and permanence at the level of a collection of individuals.

**Influence of Temporal Scale**

In comparing the rates of carbon uptake of forests, one has to be careful about the time period being considered (i.e., the temporal scale). Let us take the statement that young forests remove carbon from the atmosphere faster than older forests. Consider the net rate that living plants remove carbon from the atmosphere—the rate of net primary production, or NPP (this is equivalent to gross growth in forestry terms). If one is considering the periodic NPP (i.e., the average value over a specific interval), then it is true that some young forests are more productive than older forests. However, there are also periods when young forests are less productive than older forests.

In the example shown in *figure 2,* the periodic NPP increases immediately after disturbance, reaches a peak, and then declines. The reason for the increase is well known: Trees take time to create the foliage, roots, and branches required to capture the light, water, and nutrients required for maximum photosynthesis. Because no disturbed forest starts with this level of production infrastructure, it follows logically that no young forest can start at the maximum. The reason for the decline with age is less well known and is an active area of ecological research (Ryan et al. 1997). The decline is due in part to increases in the respiration required to maintain the trees, but other factors including hydrologic limitations and nutrient availability may be involved. Regardless of the cause, NPP does not decline to zero in old forests. Therefore, there are many old forests just as productive as some young forests. Perhaps they are not as productive in terms of net biomass or volume accumulation, but this is a



*Figure 3.* Temporal changes in total carbon stores for primary versus secondary succession (in this case, a windthrow). For illustration purposes the time dynamics of all live and dead components is assumed to be equal for the two, although in primary succession the increase in stores is usually slower than in secondary succession.

matter of where the carbon is allocated, not of ecosystem production per se.

If one considers the average production over the length of a rotation, then older forests may be just as productive as younger ones. This is because no forest can be X years old without having been X–1 years old. Foresters have acknowledged this scaling effect when they use terms such as mean annual increment. The same temporal adjustment can be used to look at the mean NPP or carbon sequestration over the rotation. This indicates young forests can be less productive than older forests both in terms of NPP and the net accumulation of carbon in live biomass (fig. 2b).

**Uptake–Release Variations**

From much of the popular discussion of carbon sequestration one gets the impression that forests can remove carbon from the atmosphere in perpetuity. Actually, this is not the case. To understand the reason, one needs to examine the pattern of carbon accumulation during succession. Recall that there are two basic types of succession: primary and secondary. In primary succession the initial organic carbon stores of all forms are essentially zero. As plants grow they add carbon not only in their live parts, but also as litter, detritus, and soil *(fig. 3).* Given enough time, the ability of the ecosystem to accumulate additional carbon



*Figure 4. Temporal changes in mass and net carbon sequestration rates for two different disturbance regimes: complete windthrow with a return interval of 300 years and timber harvest with a mean rotation of 50 years. For the timber harvest regime it was assumed that 65 percent of the live biomass was harvested (i.e., the entire bole) and that harvest was all converted to forest products with an average lifespan of 50 years. The horizontal lines in A indicate the mean landscape store of carbon for the two disturbance regimes. When averaged over the 300-year period, the net change in carbon stores for both disturbance regimes is zero, indicating both systems are balanced with regard to carbon sequestration at the landscape scale. The difference in the two disturbance regimes at the landscape scale is therefore one of stores, not net change. The arrow on A indicates the potential net change in stores caused by moving from one disturbance regime to another.*

theoretically approaches zero because the rate that new material can be added is equal to the rate it is lost through mortality and ultimately decomposition or consumption by fire. This relatively straightforward temporal pattern has been documented in much of the classic literature on succession (Olson 1958).

The temporal pattern for secondary succession is far more complex, in part because the disturbance that initiates the succession also leaves carbon behind in the form of detritus and soil

carbon (Bormann and Likens 1979). This legacy of carbon begins to decompose, and in most cases this loss exceeds that of the growth of the establishing vegetation (*fig. 3*). Of course, in some cases growth can exceed decomposition losses even early during secondary succession, most notably old-field succession. This is because of the extensive loss of soil and detritus carbon associated with the cultivation of some crops. However, succession after forest disturbance usually leaves enough residual material that a period

of loss starts the succession. As the legacy carbon decreases and the ability of the vegetation to photosynthesize increases, the ecosystem comes to a temporary balance. This is followed by a period of net uptake as growth of the live pools exceeds decomposition losses. With enough time, however, the amount of production of the live parts is offset by losses via decomposition. This final balance is never exactly achieved. For one thing, periodic variations in fine-scale disturbances (e.g., individual tree death) and climate variables cause this balance to shift slightly from time to time. Furthermore, long-term trends in these controlling factors may cause the ecosystem to seek a new balance. However, the idea that if variation in these "driving" variables ceased the ecosystem would come to a balance is still theoretically valid.

Let us now revisit the statement that young forests remove more carbon from the atmosphere than older forests. For primary succession and secondary successions with little carbon legacy, that statement is true for the periodic net carbon accumulation of the forest ecosystem as long as the forest is not too young to have developed its production infrastructure. The statement is definitely not true for secondary successions that leave a substantial carbon legacy. In fact, because of this legacy, many young forests lose far more carbon than old-growth forests when viewed on a periodic basis. Although old forests have a substantial amount of dead and dying material, these losses are roughly offset by the production of this material. Ironically, it is the very production of all that dead and dying material that prevents the older forest ecosystem from being a net carbon source to the atmosphere.

## Storage with Disturbances

Given the temporal patterns presented in *figure 4*, we can imagine viewing the forest carbon system at the scale of one location or stand over a long time period. Over time we would see that carbon is removed from or added to the atmosphere depending on the time since the last disturbance. It would therefore appear at the stand scale that when forests are

9-ER-2149

disturbed (and they all eventually are) carbon is not stored permanently. However, viewing at a larger spatial extent, one in which many age classes are present, would reveal that although some stands are releasing carbon, others are removing it and still others may be in a balance.

To assess the net carbon sequestration implications at the landscape scale, one needs to average the net carbon sequestration of all the stands in that landscape. It follows that if all forests in a landscape are eventually disturbed, then all landscapes must have areas that are increasing in carbon stores while others are decreasing. Furthermore, if the disturbance process is constant through time, creating a constant age structure, then each landscape is in balance not only in terms of age structure but also in terms of carbon stores, despite the fact that individual stands are being disturbed. This new landscape-level behavior of the system is analogous to the previous argument about carbon sequestration in an individual tree versus a collection of trees.

Now let us again revisit the statement that young forest systems remove more carbon than older forest systems. This statement is actually false at the landscape scale if we are talking about relatively constant disturbance regimes *(fig. 4)* because, given a large enough area and enough time, both systems will be in balance with the atmosphere.

There are three possible reasons that carbon sequestration at the landscape scale is not in balance. First, no disturbance regime is perfectly constant in terms of frequency and severity. For example, in some years more area is disturbed than in other years, which causes the landscape to release carbon to the atmosphere in some years and remove it in others. Second, and more importantly, when there is a shift from one disturbance regime to another, the landscape-level stores adjust to a different balance. If the disturbance regime becomes less severe or less frequent, then the landscape will store more carbon and hence remove carbon from the atmosphere. If the disturbance becomes more severe or the mean interval between disturbances decreases, then

the landscape will store less carbon and hence add carbon to the atmosphere. This is the reason that the conversion of older forests to younger forests releases carbon to the atmosphere—increasing the frequency of disturbance to create a young forest system leads to a loss of carbon at the landscape scale. Third, landscapes may release or remove carbon if the underlying factors controlling NPP, growth, mortality, and decomposition change. For example, increasing atmospheric carbon dioxide may increase NPP, which in turn increase the store of live trees, detritus, soils, and forest products derived from that landscape.

Although the balance between the second and third set of processes currently is a matter of scientific debate, it is probably safe to conclude that the changes in land-use-related disturbance have dominated until recently and that future landscape dynamics will be dominated by a combination of the two. It is also probably safe to conclude that the projected increases in NPP associated with increases in carbon dioxide concentrations and increased temperatures are far too small to completely offset the losses associated with conversion of older forests to younger forests.

## Searching for the "Correct" Scale

One conclusion from the preceding discussion is that there is no single correct scale to assess the effect of forestry practices on carbon sequestration. To judge the effectiveness of a practice it is best to examine it over a range of scales. The mechanisms explaining a behavior often lie at a finer level of resolution, whereas the consequences of a behavior are generally found at a broader level of resolution. Another general conclusion is that just because a behavior occurs at a finer scale (i.e., shorter time, smaller space, more fundamental process) does not mean this behavior translates directly into a broader level of scale. This is because other processes may alter or limit that behavior. Despite these caveats the long-term, landscape scale is a particularly useful one to examine forest carbon policy. Policies are likely to be carried out at this scale, and it is at this

level that many seemingly contradictory behaviors are resolved. Although assessments of "leakage" effects will require one to move beyond the landscape level to see if changes in one landscape have unintended negative consequences on another, an assessment at the landscape level will usually reveal whether a policy has the potential to increase or decrease the carbon stores of forests.

### Literature Cited

ALLEN, T.F.H., and T.B. STARR. 1982. *Hierarchy: Perspectives of ecological complexity.* Chicago: University of Chicago Press.

BORMANN, F.H., and G.E. LIKENS. 1979. *Pattern and process in a forested ecosystem.* New York: Springer-Verlag.

COOPER, C.F. 1983. Carbon storage in managed forests. *Canadian Journal of Forest Research* 13(1):155–66.

DEWAR, R.C. 1991. Analytical model of carbon storage in trees, soils and wood products of managed forests. *Tree Physiology* 8(3):239–58.

HARMON, M.E., W.K. FERRELL, and J.F. FRANKLIN. 1990. Effects on carbon storage of conversion of old-growth to young forests. *Science* 247:699–702.

OLSON, J.S. 1958. Rates of succession and soil changes on southern Lake Michigan sand dunes. *Botanical Gazette* 119(3):125–70.

———. 1963. Energy storage and the balance of producers and decomposers in ecological systems. *Ecology* 44(2):322–31.

O'NEILL, R.V., D.L. DEANGELIS, D.L. WADE, and T.F.H. ALLEN. 1986. *A hierarchical concept of ecosystems.* Princeton, NJ: Princeton University Press.

RYAN, M.G., D. BINKLEY, and J.H. FOWNES. 1997. Age-related decline in forest productivity: Patterns and process. *Advances in Ecological Research* 27:213–62.

SCHULZE, E.-D., C. WIRTH, and M. HEIMANN. 2000. Managing forests after Kyoto. *Science* 289:2058–2059.

SEDJO, R.A., R.N. SAMPSON, and J. WISNIEWSKI. 1997. *Economics of carbon sequestration in forestry.* New York: CRC Press.

*Mark E. Harmon (mark.harmon@orst. edu) is Richardson Professor in Forest Science, Department of Forest Science, Oregon State University, Corvallis, OR 97331-5752.*



RESEARCH ARTICLE

# Are High-Severity Fires Burning at Much Higher Rates Recently than Historically in Dry-Forest Landscapes of the Western USA?

**William L. Baker***

Program in Ecology/Department of Geography, Dept. 3371, 1000 E. University Ave., University of Wyoming, Laramie, Wyoming, United States of America

* bakerwl@uwyo.edu




## Abstract

Dry forests at low elevations in temperate-zone mountains are commonly hypothesized to be at risk of exceptional rates of severe fire from climatic change and land-use effects. Their setting is fire-prone, they have been altered by land-uses, and fire severity may be increasing. However, where fires were excluded, increased fire could also be hypothesized as restorative of historical fire. These competing hypotheses are not well tested, as reference data prior to widespread land-use expansion were insufficient. Moreover, fire-climate projections were lacking for these forests. Here, I used new reference data and records of high-severity fire from 1984–2012 across all dry forests (25.5 million ha) of the western USA to test these hypotheses. I also approximated projected effects of climatic change on high-severity fire in dry forests by applying existing projections. This analysis showed the rate of recent high-severity fire in dry forests is within the range of historical rates, or is too low, overall across dry forests and individually in 42 of 43 analysis regions. Significant upward trends were lacking overall from 1984–2012 for area burned and fraction burned at high severity. Upward trends in area burned at high severity were found in only 4 of 43 analysis regions. Projections for A.D. 2046–2065 showed high-severity fire would generally be still operating at, or have been restored to historical rates, although high projections suggest high-severity fire rotations that are too short could ensue in 6 of 43 regions. Programs to generally reduce fire severity in dry forests are not supported and have significant adverse ecological impacts, including reducing habitat for native species dependent on early-successional burned patches and decreasing landscape heterogeneity that confers resilience to climatic change. Some adverse ecological effects of high-severity fires are concerns. Managers and communities can improve our ability to live with high-severity fire in dry forests.

**OPEN ACCESS**

**Citation:** Baker WL (2015) Are High-Severity Fires Burning at Much Higher Rates Recently than Historically in Dry-Forest Landscapes of the Western USA? PLoS ONE 10(9): e0136147. doi:10.1371/journal.pone.0136147

**Editor:** Christopher Carcaillet, Ecole Pratique des Hautes Etudes, FRANCE

**Received:** January 8, 2015

**Accepted:** July 31, 2015

**Published:** September 9, 2015

**Copyright:** © 2015 William L. Baker. This is an open access article distributed under the terms of the Creative Commons Attribution License, which permits unrestricted use, distribution, and reproduction in any medium, provided the original author and source are credited.

**Data Availability Statement:** All data used in the paper are available from publically accessible sources. The Biophysical settings map is from Landfire, http://www.landfire.gov. The map of Bailey's ecoregions is available from the U.S. Forest Service, http://www.fs.fed.us/rm/ecoregions/products. The fire data are available from the Monitoring Trends in Burn Severity Program, http://www.mtbs.gov.

**Funding:** The authors have no support or funding to report.

**Competing Interests:** The authors have declared that no competing interests exist.

9-ER-2151

FS-034803

 **PLOS** | ONE

## Introduction

Wildfires have increased since the 1980s in some parts of the world [1], including parts of the western USA [2–5], but are recent and projected rates of severe fire, that kill most trees, well above historical rates and a threat to forest landscapes? Some dry forests of the temperate zone, which are prone to wildfires, are thought to be experiencing exceptionally high rates or sizes of severe fire relative to historical fires [6]. Earlier springs, warmer temperatures, decreased precipitation, and increased drought consistent with global warming, are contributing to increased fire since the 1980s over substantial area [2, 4]. Increased severe fire in dry forests is also attributed to past land-uses (e.g., logging, livestock grazing), that led to unnatural fuel buildup [7]. However, analysis of fire responses to warming and drying and land-use legacies across multiple regions shows effects can be heterogeneous and even divergent [8–9].

Moreover, upward trends alone do not indicate whether recent rates of severe wildfires are below, near, or above historical rates. The first hypothesis, stated above, is that fire has already reached unprecedented rates in dry forests. An alternative hypothesis is that fires were reduced over the last 1–2 centuries by intentional fire suppression and indirect effects of land uses (e.g., reduction in fine fuels that facilitate fire spread). Thus, increased fire now could be restorative of the rate component of the historical fire process, which is commonly considered an essential part of restoring western dry forests [10]. Managers are allowing more wildfires to burn under controlled conditions to restore fire across dry-forest landscapes [11]. If wildfire is operating within, or being restored to its historical range of variability, then many aspects of the ecology of affected forest landscapes will likely also be functioning as they did historically [12]. However, there are some ecological responses to high-severity fire (e.g., post-fire tree recruitment) that could be hampered by increasing drought and rising temperatures [13]. Whether upward-trending high-severity fire is hypothesized to be restorative of the rate component of the historical fire process or leading to too much high-severity fire depends on the frame of reference and how rates compare. Here I use new evidence from dry forests in the western USA to test these competing hypotheses. I also approximate rates of future severe fire in these dry forests.

## Background on the hypotheses and projected future fire

Support for the hypothesis that rates of recent high-severity fire are exceptionally high relative to historical rates comes in part from recent trends in high-severity fire, traditionally defined as severe fire that kills 75% or more of the basal area in a forest stand [14]. A statistically significant upward trend in area burned at high severity was found over the last few decades in the southern Rockies, on the Colorado Plateau, and in mountainous parts of central and southern Arizona and New Mexico, but not in the northern Rockies or Pacific Northwest [3–4] or in Yosemite National Park in California [15]. Fraction of fire that burned at high severity also increased significantly in the southern Rockies, but not elsewhere [3]. These studies, however, were not specific to dry forests.

In dry forests, a statistically significant upward trend in area burned at high severity was not found in the Eastern Cascades of Oregon and Washington, but was in the Klamath province [14]. Upward trends in area burned at high severity and fraction burned at high severity were initially found for dry forests of the Sierra Nevada, Modoc Plateau, and Southern Cascades [16] and for fraction burned at high severity in northwestern California [5]. Analysis with a more complete dataset for the Sierra Nevada found no trend in area burned or fraction burned at high severity [17]. No significant upward trend was found in fraction burned at high severity in dry provinces in the Pacific Northwest [14]. However, these studies did not generally aim to resolve whether trends have led to historically unprecedented high-severity fire.

FS-034804



Studies over longer periods appear to support the restorative hypothesis, but do not address fire severity, and have incomplete evidence. Area-burned data for the 11 western states qualitatively suggest the 1980s increase could be restorative and a return to the higher rates of burning of the 1910s-1930s [18]. Estimates of pre-1900 area burned, derived using an assumption that composite fire intervals from tree-ring fire histories are equal to fire rotation, suggest so much historical fire that recent trends would definitely be restorative, as almost an order of magnitude more fire would be needed to match historical area burned [19–20]. However, the assumption that composite fire intervals represent fire rotation is not supported [21]. Charcoal data over the last 3,000 years suggest fire closely tracked climate until a peak in the middle-1800s, when a fire deficit began, which may link to landscape fragmentation and fire suppression, but data for the last few decades are unfortunately unresolved in these records [22].

Reconstructions of historical fire with the needed rate estimates for severe fire are rare. The key rate parameter is the fire rotation, the expected time for high-severity fire to burn an area equal to a study area of interest [21]. Most early tree-ring studies assumed severe fire was rare in dry forests, and did not study it [23]. Some recent tree-ring studies reconstructed fire severity and found evidence of historical high-severity fire in dry forests [24], but did not estimate fire rotations. Historical high-severity fire is also documented in dry forests by early maps, photographs, and records [25], but these, too, have not been used to estimate fire rotations. Data from early aerial-photographic research [26] have been used [27]. Recently, we used new methods, based on survey data from the U.S. General Land Office (GLO), to reconstruct historical fire severity and fire rotation in dry forests across large land areas [28]. These data sources [28–30] show high-severity fire occurred historically in all studied dry-forest landscapes, and rates of high-severity fire were modest to low, with fire rotations of centuries (Table 1). These rates for high-severity fire are corroborated by sedimentary charcoal records [31–38], which

**Table 1. Reconstructions of fire rotation (FR) for high-severity fire in historical dry forests of the western USA, with corroborating evidence from sedimentary charcoal studies.**

| Author(s) | Location | Method[1] | High-severity FR (years) and severe fire-episode intervals[2] |
|---|---|---|---|
| **DRY PINE FORESTS** | | | |
| Baker [29] | E. Cascades, E Oregon | GLO tree data | *705* |
| **DRY MIXED-CONIFER FORESTS** | | | |
| Baker [30] | W. Sierra Nevada Mts., W California | GLO tree data and line data | *281–354* |
| Long et al. [31] | E. Cascades, E Oregon | Charcoal in sediment deposits | 333[2,3] |
| Odion et al. [27] | N. Sierra Nevada Mts., W California | Early historical | *488* |
| Baker [29] | E. Cascades, E Oregon | GLO tree data | *496* |
| Fitch [32] | Jemez Mts., N New Mexico | Charcoal in sediment deposits | 500? (400–667)[2,4] |
| **COMBINED DRY PINE AND MIXED-CONIFER FORESTS** | | | |
| Pierce and Meyer, [33] and Pierce et al., [34] | Central Idaho | Charcoal in sediment deposits | (154–286)[2,5] |
| Williams and Baker, [28] | Black Mesa, N Arizona | GLO tree data | *217* |
| Jenkins et al., [35] | Mogollon Plateau, N Arizona | Charcoal in sediment deposits | 250 (200–400)[2] |
| Williams and Baker, [28] | Front Range, C Colorado | GLO tree data | *271* |
| Odion et al., [27] | E Cascades, E Washington | Aerial photos | *379–505* |
| Baker, [29] | E Cascades, E Oregon | GLO tree data | *435* |
| Bigio, [36] | San Juan Mts., SW Colorado | Charcoal in sediment deposits | > 471 (> 667)[2,6] |

*(Continued)*

9-ER-2153

FS-034805



**Table 1.** (*Continued*)

| Author(s) | Location | Method[1] | High-severity FR (years) and severe fire-episode intervals[2] |
|---|---|---|---|
| Colombaroli and Gavin, [37] | Siskiyou Mts, SW Oregon | Charcoal in sediment deposits | 500 (142)[2] |
| Frechette and Meyer, [38] | Sacramento Mts., SE New Mexico | Charcoal in sediment deposits | 500 (667)[2,7] |
| Williams and Baker, [28] | Mogollon Plateau and Black Mesa, N Arizona combined | GLO tree data | *522* |
| Williams and Baker, [28] | Mogollon Plateau, N Arizona | GLO tree data | *828* |
| Williams and Baker, [28] | Blue Mts., NE Oregon | GLO tree data | *849* |

Studies are arranged by length of the fire rotation. Estimates from GLO data, FIA data, and early aerial photographs are shown in bold italics to emphasize their higher precision, while corroborative, less certain estimates from charcoal records are shown in regular type. The range of estimates in bold is used as the reference in this study.

[1] Methods for reconstruction included using charcoal data from sediment, using early aerial photographs or historical records, using the GLO tree data and a calibrated model [28]. I did not use the GLO line data's direct records of entry and exit in burned areas, as these records represent moderate- to high-severity fires, not exclusively high-severity fires [40].

[2] These are intervals between severe fire episodes evident in alluvial deposits, that could approximate high-severity fire rotations, but are uncertain since area burned is not known and fire severity is more approximately reconstructed than with other methods. I considered data for the last 500 years from each paleo-environmental study, but also included in parentheses the interval between episodes in the last 2000 years, where this is available.

[3] These authors indicate that it is difficult to determine fire severity from their methods, and only identify the recent fire frequency as 3 per 1000 years, but they indicate that the documented fire episodes were followed by up to 100 years of recovery, which does suggest severe fires, although this is my interpretation.

[4] Fitch [32] suggested that low-severity fire dominated from 870 cal yr BP, but explains the possibility, but uncertainty, of a severe fire around 400 cal yr BP (p. 40), thus I include this single event, with a question mark, for the 500-year estimate. More certain is evidence of 3–5 severe fires in the last 2000 years (p. 42), but those all preceded 870 cal yr BP.

[5] These authors were not focused on counting the number of fire-episodes over the last 2000 years, thus I roughly estimated this from Fig 5B in Pierce and Meyer [33] as between 7–13, as there are 7 broad peaks in this figure, but they also report 9 major debris flows between about 950 and 1150 AD, thus the total could reach as many as 13. No severe fires occurred in the last 500 years.

[6] This author provided data on the number of watersheds, out of six sampled, that burned in high-severity events [36]. I used these data to approximate a high-severity fire rotation using the standard formula: period of observation / fraction of area burned. Thus, for the last 550 years, a total of 7 watersheds burned, thus the fire rotation is 550 / (7/6) = 471 years. And for the last 2000 years, a total of 18 watersheds burned, thus a fire rotation of 667 years. However, Bigio indicates that sample locations may be high in a watershed, thus it is not known that the whole watershed burned. This leaves these estimates as minima, which I have indicated by using ">" before the estimate.

[7] These authors identify periods of severe-fire activity after c. 1800 cal, yr BP, a peak in 800–500 cal yr BP, and at least one large, severe fire in the last 400 years, thus perhaps 3 episodes in the last 2000 years and one in the last 500 years. However, this is my approximation from their data, as they do not report recurrence intervals for severe fire.

doi:10.1371/journal.pone.0136147.t001

document episodes of high-severity fire at similar rates (Table 1). The charcoal data are from debris-flow sediments mobilized after heavy precipitation on severe burns.

These sources show evidence of historical high-severity fire across a wide spectrum of biophysical settings in dry-forest landscapes, but high-severity fire may have been favored in particular settings, allowing for at least temporary persistence of some dry forests with only low-moderate severity fire [e.g., 28]. Recent high-severity fire in the western USA, not specific to dry forests, often shows preference for higher elevations, steeper topography, and northerly-facing aspects [39]. Similar topographic effects occurred historically in dry forests, but with only modest influence, as higher-severity fires (mixed- and high-severity fire) spanned diverse biophysical settings across 624,000 ha of historical dry forests in the

9-ER-2154

FS-034806



Colorado Front Range [40]. Similarly, extensive reconstructions (303,000 ha) of historical dry forests in the Pacific Northwest suggest open, old-growth forests favored at lower elevations, on shallower slopes, and on more southerly-facing aspects, but even in these settings "were perhaps ephemeral in nature, lasting one or more centuries at a location, and then switching concordant with regional climate forcing to non-equilibrium states" [26]. Further research is needed about spatial variation in high-severity fire in historical dry forests.

Area burned by wildfire is expected to increase with global warming, adding to unprecedented rates of severe fire, or, alternatively, enhancing restoration of the historical fire process. Global projections showed annual area burned at any severity may reach about 2.8 times current area burned in some regions by A.D. 2100, depending on emissions scenario, but large areas of fire declines may also occur [8]. In the western United States, McKenzie *et al.* [41] projected, using one climate model, that by A.D. 2100, ratios of future to recent area burned could range from < 1.0 in California and Nevada up to about 1.4–2.5 in Arizona, Colorado, Idaho, Montana, and Oregon, about 3 in Washington and Wyoming, and near 5 in New Mexico and Utah. The most recent projections for the western United States used a large ensemble of climate models and a moderate emissions scenario to project fire in A.D. 2046–2065 [42]. They projected ratios of future-to-recent area burned of 1.63–2.24 in the Southwest, 1.71–2.69 in Rocky Mountain Forests, 1.62–2.00 in the Eastern Rocky Mountains/Great Plains, 1.56 times in the Nevada Mountains/Semi-desert, and 1.24 times in a California Coastal Shrub aggregated ecoregion [42]. Models did not agree well for the Pacific Northwest, but ratios were 1.42–2.54. Ranges represent outcomes from two modeling approaches.

## Methods

### Dry forests

Dry forests are the primary mid-elevation forests of the western USA that include dry pine forests and dry mixed-conifer forests. These are roughly sequentially arrayed along an elevation and moisture gradient extending from just above semi-arid woodlands (e.g., piñon-juniper) to just below moist mixed-conifer forests that typically occur near the ecotone with subalpine forests [43]. To define the geographical location and extent of historical dry forests, I used Biophysical Settings (BpS) maps from Landfire [44], a government program to map vegetation, fuels, and related data about fire across the United States [45]. The BpS maps have 30-m resolution pixels from Landsat satellite data, and use biophysical variables to predict vegetation, defined by NatureServe Ecological Systems [46] before widespread expansion of EuroAmerican land uses. BpS maps may avoid the problem of a phantom trend in fire from using maps of vegetation after the beginning of a trend analysis period [17]. This is a concern I will revisit in the discussion. However, the BpS maps have accuracy, as do other Landsat-derived maps, of only about 64–67% for Ecological Systems in forests [47]. A test in Utah found generally lower, but some higher accuracies [48].

I thus used only two categories, not detailed Ecological Systems, for analysis: dry pine forests and dry mixed-conifer forests (Table 2). Dry pine forests cover 12.6 million ha (Fig 1, Table 3) and include nine Ecological Systems (Table 2). Although *Pinus ponderosa* often dominates, dry pine forests also include *Pinus jeffreyi* forests, which in places intermix with, and are similar to *P. ponderosa* forests, and Madrean pine-oak forests with a diversity of pines. Dry mixed-conifer forests cover 12.9 million ha (Fig 2, Table 4) and include eight Ecological Systems (Table 2). They have the pines with associated firs (*Abies*, *Pseudotsuga*). I omitted minor types that did not fit these categories. Total analysis area is about 25.5 million ha.

FS-034807



**Table 2. Two categories of vegetation used in the analysis and their constituent Landfire biophysical settings and Ecological Systems.**

| Landfire Biophysical Code | Ecological System |
|---|---|
| *Dry Pine Forests* | |
| 10310 | California Montane Jeffrey Pine-(Ponderosa Pine) Woodland |
| 10600 | East Cascades Oak-Ponderosa Pine Forest and Woodland |
| 10240 | Madrean Lower Montane Pine-Oak Forest and Woodland |
| 10300 | Mediterranean California Lower Montane Black Oak-Conifer Forest & Woodland |
| 11650 | Northern Rocky Mountain Foothill Conifer Wooded Steppe |
| 10530–10532 | Northern Rocky Mountain Ponderosa Pine Woodland and Savanna |
| 10790–10792 | Northwestern Great Plains-Black Hills Ponderosa Pine Woodland and Savanna |
| 11170–11172 | Southern Rocky Mountain Ponderosa Pine Savanna |
| 10540–10542 | Southern Rocky Mountain Ponderosa Pine Woodland |
| *Dry Mixed-Conifer Forests* | |
| 10210 | Klamath-Siskiyou Lower Montane Serpentine Mixed Conifer Woodland |
| 10260 | Madrean Upper Montane Conifer-Oak Forest and Woodland |
| 10270 | Mediterranean California Dry-Mesic Mixed Conifer Forest and Woodland |
| 10450 | Northern Rocky Mountain Dry-Mesic Montane Mixed Conifer Forest |
| 10451 | Northern Rocky Mountain Dry-Mesic Montane Mixed Conifer Forest-Ponderosa |
| 10452 | Northern Rocky Mountain Dry-Mesic Montane Mixed Conifer Forest-Larch |
| 10453 | Northern Rocky Mountain Dry-Mesic Montane Mixed Conifer Forest-Grand fir |
| 10510 | Southern Rocky Mountain Dry-Mesic Montane Mixed Conifer Forest & Woodland |

doi:10.1371/journal.pone.0136147.t002

## Analysis regions and data on high-severity fire

I modified Bailey's Ecoregions [49–50] to analyze geographical variation across dry forests. I clipped the Ecoregion map to the eleven western states, plus the Black Hills, which together contained 20 provinces and 80 sections. Provinces are based on vegetation types and finer sections are based on terrain [49]. I combined adjacent sections, with similar physiographic setting, to create "analysis regions" that are generally each > 250,000 ha (Figs 1 and 2), so they would be several times larger than expected maximum fire sizes. I could not always achieve this, as a similar adjoining section was not always available. I did this separately for dry pine forests and dry mixed-conifer forests, as their contiguous areas > 250,000 ha were not congruent.

Area-burned data are from the Monitoring Trends in Burn Severity (MTBS) program [51], a government program that compares Landsat satellite data before and after fires, supplemented by plot data, to classify and map burn severity [52]. Although fire severity may be species-dependent [21], MTBS uses a standard protocol, based on pre-fire and post-fire satellite data and both the differenced normalized burn ratio (dNBR) and a relativized version of this ratio (RdNBR), to define fire-severity classes in relation to canopy tree mortality [52]. Burn severity is mapped as background data (not part of the fire), non-mappable areas (e.g., due to clouds), increased vegetation response or greenness not likely to indicate fire, plus four burn-severity classes: 1 = unburned to low severity, 2 = low severity, 3 = moderate severity, 4 = high severity. Here, I focused on class 4, but used classes 1–3 to analyze fraction of high-severity fire. I used MTBS data for actual area burned, not just burn perimeters, as perimeters contain

9-ER-2156

FS-034808



**Fig 1. Dry pine analysis regions and dry pine forest area.**

doi:10.1371/journal.pone.0136147.g001

9-ER-2157

FS-034809



PLOS ONE

Recent High-Severity Fire Rates in Dry Forests

**Table 3. Dry pine forests, high-severity fire rotations (FR), trends, and differences between recent or projected high-severity fire rotation and the range of historical high-severity fire rotations.**

| Analysis region | Dry pine area (ha) | High-severity area (ha) | High-severity FR (years) | Trend in area burned z | Trend in area burned p[1] | Trend in fraction burned z | Trend in fraction burned p1 | Recent (1984–2012) Difference & Trend[2] | Low Projection (2046–2065) Fire[3] | Low Projection (2046–2065) Difference & Trend | High Projection (2046–2065) Fire[3] | High Projection (2046–2065) Difference & Trend |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 299,559 | 9,166 | 948 | 1.804 | 0.1509 | 0.254 | 0.5177 | Too long-N | 1.71 | In range-N | 2.69 | In range-N |
| 2 | 428,511 | 11,618 | 1,070 | 2.010 | 0.1112 | 1.585 | 0.1791 | Too long-N | 1.56 | In range-N | - | - |
| 3 | 414,399 | 3,838 | 3,131 | 1.145 | 0.2520 | -0.338 | 0.5077 | Too long-N | 1.56 | Too long-N | - | - |
| 4 | 774,589 | 12,328 | 1,822 | 0.282 | 0.5109 | -0.830 | 0.8350 | Too long-N | 1.71 | Too long-N | 2.69 | In range-N |
| 5 | 986,479 | 16,779 | 1,705 | 2.013 | 0.1116 | 0.772 | 0.4005 | Too long-N | 1.42 | Too long-N | 2.54 | In range-N |
| 6 | 446,322 | 6,591 | 1,964 | 2.123 | 0.1069 | -0.117 | 0.6322 | Too long-N | 1.63 | Too long-N | 2.24 | Too long-N |
| 7 | 465,262 | 25,365 | 532 | 1.182 | 0.2520 | 1.626 | 0.1760 | In range-N | 1.71 | In range-N | 2.69 | Too short-N |
| 8 | 355,088 | 4,494 | 2,292 | 0.528 | 0.4537 | 0.654 | 0.4240 | Too long-N | 1.42 | Too long-N | 2.54 | Too long-N |
| 9 | 418,756 | 6,655 | 1,825 | 1.747 | 0.1600 | 0.677 | 0.4240 | Too long-N | 1.42 | Too long-N | 2.54 | Too long-N |
| 10 | 968,322 | 59,773 | 470 | 0.807 | 0.3932 | 0.094 | 0.5833 | In range-N | 1.42 | In range-N | 2.54 | Too short-N |
| 11 | 463,235 | 9,834 | 1,366 | 2.594 | 0.0550 ■ | 1.667 | 0.1690 | Too long-N | 1.71 | In range-N | 2.69 | In range-N |
| 12 | 392,914 | 23,394 | 487 | 2.687 | 0.0503 ■ | 0.021 | 0.5931 | In range-N | 1.63 | In range-N | 2.24 | In range-N |
| 13 | 208,323 | 10,965 | 551 | 0.676 | 0.7962 | -1.042 | 0.8810 | In range-N | 1.56 | In range-N | - | - |
| 14 | 749,365 | 36,485 | 596 | 2.987 | 0.0411 * | 1.981 | 0.1116 | In range-Y | 1.62 | In range-Y | 2.00 | In range-Y |
| 15 | 95,560 | 0 | - | - | - | - | - | Too long-N | - | - | - | - |
| 16 | 451,768 | 7,216 | 1,816 | 2.332 | 0.0800 | 0.542 | 0.4537 | Too long-N | 1.71 | Too long-N | 2.69 | Too long-N |
| 17 | 349,208 | 3,405 | 2,974 | 1.163 | 0.2520 | -0.417 | 0.7469 | Too long-N | 1.42 | Too long-N | 2.54 | Too long-N |
| 18 | 223,819 | 4,519 | 1,436 | 3.300 | 0.0220 * | 0.762 | 0.4005 | Too long-Y | 1.63 | Too long-Y | 2.24 | In range-Y |
| 19 | 330,118 | 4,299 | 2,227 | 1.523 | 0.1817 | -0.677 | 0.7962 | Too long-N | 1.56 | Too long-N | - | - |
| 20 | 460,167 | 9,440 | 1,414 | 2.425 | 0.0704 | 1.420 | 0.2133 | Too long-N | 1.62 | In range-N | 2.00 | In range-N |
| 21 | 1,101,877 | 2,124 | 15,043 | 1.424 | 0.2118 | -0.613 | 0.7962 | Too long-N | 1.63 | Too long-N | 2.24 | Too long-N |
| 22 | 469,395 | 6,021 | 2,261 | 1.321 | 0.2269 | 1.336 | 0.2269 | Too long-N | 1.62 | Too long-N | 2.00 | Too long-N |
| 23 | 1,855,620 | 78,455 | 686 | 3.264 | 0.0220 * | 1.336 | 0.2269 | In range-Y | 1.62 | In range-Y | 2.24 | Too long-N |
| Total[4] | 12,603,579 | 349,959 | 1,045 | 2.682 | 0.0503 ■ | 0.319 | 0.5077 | Too long-N | 1.59[5] | In range-N | 2.41[4] | In range-N |

Analysis regions are in Fig 1. All burn areas are corrected for missing small fires by dividing initial estimates by 0.95.

[1] Trends significant at α < 0.05 are starred (*), trends that are close to significant (p < 0.06) have a dark square (■). The p-values are from the Mann-Kendall trend test after the Benjamini-Hochberg correction for n = 88 trend tests.

[2] Differences between recent or projected high-severity fire rotations and the range of historical high-severity fire rotations are categorized as: (1) In range, if recent or projected high-severity fire rotation was within the range of available historical estimates, (2) too short, if recent or projected high-severity fire rotation was outside and shorter than the range of historical estimates, and (3) too long, if recent or projected high-severity fire rotation was outside and longer than the range of historical estimates. "Y" indicates there was a significant upward trend in area burned at high severity, and "N" indicates there was not.

[3] The ratio of future area burned to recent area burned from the low and high projections by Yue et al. [42]

[4] The total excludes 105,077 ha of dry pine forests not in the 23 analysis regions and not included in the analysis

[5] This is the mean across the regions for which there is a projection

doi:10.1371/journal.pone.0136147.t003

substantial unburned area [53]. I used MTBS national "burn-severity mosaics," which are just maps of all fires in a particular year (30 m resolution), as it was infeasible to process data for individual fires across 25.5 million ha. The dataset is defined by the April 16, 2014 MTBS data release, which provides full coverage of the 29 years from 1984–2012. Fires are nearly all

9-ER-2158

FS-034810



**Fig 2. Dry mixed-conifer analysis regions and dry mixed-conifer forest area.**

doi:10.1371/journal.pone.0136147.g002

9-ER-2159

FS-034811

 **PLOS** | ONE

**Table 4.  Dry mixed-conifer forests, high-severity fire rotations (FR), trends, and differences between recent or projected high-severity fire rotation and the range of historical high-severity fire rotations.**

| Analysis region | Dry mixed conifer area (ha) | High-severity area (ha) | High-severity FR (yrs) | Trend in area burned z | p[1] | Trend in fraction burned z | p[1] | Recent (1984–2012) Threat & Trend[2] | Low Projection (2046–2065) Fire[3] | Threat & Trend | High Projection (2046–2065) Fire[3] | Threat & Trend |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 389,489 | 11,287 | 1,001 | 2.087 | 0.1112 | -0.665 | 0.7962 | Too long-N | 1.71 | In range-N | 2.69 | In range-N |
| 2 | 341,577 | 9,593 | 1,033 | 0.324 | 0.5077 | 0.025 | 0.5931 | Too long-N | 1.62 | In range-N | 2.00 | In range-N |
| 3 | 1,258,666 | 7,130 | 5,119 | 2.002 | 0.1112 | -0.050 | 0.6184 | Too long-N | 1.71 | Too long-N | 2.69 | Too long-N |
| 4 | 423,653 | 23,451 | 524 | 1.580 | 0.1791 | -1.136 | 0.8891 | In range-N | 1.71 | In range-N | 2.69 | Too short-N |
| 5 | 1,510,344 | 31,397 | 1,395 | 0.302 | 0.5093 | -1.169 | 0.8891 | Too long-N | 1.71 | In range-N | 2.69 | In range-N |
| 6 | 374,905 | 9,802 | 1,109 | 2.664 | 0.0503 ■ | 0.415 | 0.4890 | Too long-N | 1.56 | In range-N | - | - |
| 7 | 298,545 | 40,867 | 212 | 1.144 | 0.2520 | 1.369 | 0.2200 | Too short-N | 1.24 | Too short-N | - | - |
| 8 | 478,717 | 8,334 | 1,666 | 0.667 | 0.4240 | 0.688 | 0.4240 | Too long-N | 1.56 | Too long-N | - | - |
| 9 | 799,591 | 49,730 | 467 | 2.201 | 0.0948 | -0.257 | 0.6869 | In range-N | 1.42 | In range-N | 2.54 | Too short-N |
| 10 | 845,686 | 11,313 | 2,168 | 0.446 | 0.4811 | -0.109 | 0.6322 | Too long-N | 1.71 | Too long-N | 2.69 | In range-N |
| 11 | 430,935 | 6,246 | 2,001 | 0.638 | 0.4240 | -0.573 | 0.7962 | Too long-N | 1.56 | Too long-N | - | - |
| 12 | 909,493 | 70,987 | 372 | 0.844 | 0.3807 | 1.205 | 0.2508 | In range-N | 1.71 | In range-N | 2.56 | Too short-N |
| 13 | 1,204,586 | 48,025 | 727 | 1.678 | 0.1690 | 0.374 | 0.5025 | In range-N | 1.42 | In range-N | 2.54 | In range-N |
| 14 | 373,118 | 22,132 | 489 | 2.210 | 0.0948 | 0.090 | 0.5833 | In range-N | 1.71 | In range-N | 2.69 | Too short-N |
| 15 | 419,845 | 17,881 | 681 | 0.629 | 0.4240 | 1.552 | 0.1817 | In range-N | 1.42 | In range-N | 2.54 | In range-N |
| 16 | 1,356,500 | 4,974 | 7,909 | 0.191 | 0.5931 | -1.713 | 0.9570 | Too long-N | 1.71 | Too long-N | 2.69 | Too long-N |
| 17 | 420,709 | 14,228 | 858 | 1.276 | 0.2302 | 0.600 | 0.4306 | Too long-N | 1.42 | In range-N | 2.54 | In range-N |
| 18 | 509,264 | 15,943 | 926 | 2.878 | 0.0440* | 1.006 | 0.3070 | Too long-Y | 1.71 | In range-Y | 2.69 | In range-Y |
| 19 | 270,897 | 9,328 | 842 | 1.538 | 0.1817 | 1.664 | 0.1690 | In range-N | 1.42 | In range-N | 2.54 | In range-N |
| 20 | 302,471 | 14,823 | 592 | 2.515 | 0.0587 ■ | 1.304 | 0.2269 | In range-N | 1.63 | In range-N | 2.24 | In range-N |

(Continued)

9-ER-2160

FS-034812



**Table 4.** *(Continued)*

| Analysis region | Dry mixed conifer area (ha) | High-severity area (ha) | High-severity FR (yrs) | Trend in area burned | | Trend in fraction burned | | Recent (1984–2012) | Low Projection (2046–2065) | | High Projection (2046–2065) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | z | p[1] | z | p[1] | Threat & Trend[2] | Fire[3] | Threat & Trend | Fire[3] | Threat & Trend |
| Total[4] | 12,918,991 | 427,471 | 875 | 1.895 | 0.1276 | 0.506 | 0.4564 | In range-N | 1.58[5] | In range-N | 2.56[5] | In range-N |

Analysis regions are in Fig 2. All burn areas are corrected for missing small fires by dividing initial estimates by 0.95.

[1] Trends significant at α < 0.05 are starred (*), trends that are close to significant (p < 0.06) have a dark square (■). The p-values are from the Mann-Kendall trend test after the Benjamini-Hochberg correction for *n* = 88 trend tests.

[2] Differences between recent or projected high-severity fire rotation and the range of historical high-severity fire rotations are categorized as: (1) In range, if recent or projected high-severity fire rotation was within the range of available historical estimates, (2) Too short, if recent or projected high-severity fire rotation was outside and shorter than the range of historical estimates, and (3) Too long, if recent or projected high-severity fire rotation was outside and longer than the range of historical estimates. "Y" indicates there was a significant upward trend in area burned at high severity, and "N" indicates there was not.

[3] The ratio of future area burned to recent area burned from the low and high projections by Yue *et al.* [42]

[4] The total excludes 68,530 ha of dry mixed-conifer forests not in the 20 analysis regions and not included in the analysis

[5] This is the mean across the regions for which there is a projection

doi:10.1371/journal.pone.0136147.t004

wildfires, only about 2% prescribed fires, few of which likely burned at high severity. MTBS data cover fires greater than about 405 ha, which MTBS suggests account for about 95% of total burned area [51]. I divided initial area-burned totals by 0.95 to roughly correct for missing fires < 405 ha in area.

I completed GIS analyses in ArcGIS 10.2, where I projected all maps to NAD 1983, Albers Conic Equal Area Projection, if they did not have this projection, and to rasters with 30-m resolution pixels. I first intersected the map of the two categories of forests with the map of analysis regions. Then, I calculated the area of each analysis region in each category. Next, I used the area of each category in each region individually as a "mask," which restricts all analysis and area reporting to the mask area. Finally, I extracted each year's MTBS map of area burned within that category, and reported area burned at high severity.

## Statistical analysis

I used the Mann-Kendall non-parametric statistic, widely used to analyze trend in non-normal time-series data [54], to test the null hypothesis of no upward trend (a one-tailed test) in area burned at high severity and fraction of total area burned that burned at high severity in each analysis region, based on α = 0.05. However, there are 88 trend tests, and the probability of finding at least one to be significant by chance is high, thus the tests must be corrected to avoid false positives from multiple tests. The false positive is that a trend is found that did not exist, and the false negative is that a trend is not found that did exist. Bonferroni correction reduces false positives, but increases false negatives, thus I used Benjamini-Hochberg correction, with the p.adjust program in R, to control false positives for the 88 trend tests and also control false negatives [55]. Unlike Bonferroni correction, which adjusts alpha, this method corrects the p-value for the chosen alpha. Prior to completing the trend analyses I tested the null hypothesis of no temporal autocorrelation (α = 0.05), for up to 7-year lags, in the 29-year time series for

FS-034813



each of the 88 cases using Minitab 16.0. None of the series had significant autocorrelation after Benjamini-Hochberg correction of p-values from the Ljung-Box Q test statistic.

I did two other tests to gain further understanding of fraction burned at high severity. First, I compared, using two one-sample *t*-tests, recent mean fraction of high-severity fire to mean fractions of high severity from GLO and early aerial-photo reconstructions (Table 1), which showed the percentage of each historical landscape with evidence of low-, mixed- and high-severity fire evident in the late-1800s from fires that burned in the preceding 100–140 years [28]. These tested whether the recent fraction of high-severity fire was historically unprecedented, was near, or was deficient relative to historical fractions. For dry pine, there is one estimate each from eastern Oregon [29], the Mogollon Plateau [28], and the Coconino Plateau [56], which are mostly dry pine. For dry mixed conifer, there is one from eastern Oregon [29], two from the western Sierra Nevada [30], three from Colorado, Arizona, and Oregon [28], and one from eastern Washington [26]. These have some limited dry pine. I also compared, using a two-sample *t*-test, recent mean fractions of total area burned that burned at high severity, across the 29-year period, between dry pine and dry mixed-conifer forests. This clarified whether more high-severity fire was occurring recently in dry mixed-conifer than dry pine forests.

## Comparing fire rotations in recent and historical periods

To calculate recent high-severity fire rotation for each analysis region, I summed area burned at high severity across the 29 years for each forest type in each region. I used the formula for fire rotation [21]: Period of analysis / fraction of analysis region burned. Fraction of area burned is area burned (ha) at high severity in the category and region over the 29-year period / total area in the category in the analysis region (Tables 3 and 4).

To evaluate recent rates of high-severity fire relative to historical rates, I compared recent high-severity fire rotations to historical rotations. I compiled reconstructions of historical high-severity fire rotations in dry forests in the study area (Table 1). These provided insufficient data for region-by-region comparison across the study area. Thus, as a first approximation, I used the range of available estimates from GLO data, FIA data, and aerial photographs, which is 217–849 years (Table 1), as the standard to compare with recent rates in each region. Estimates from charcoal in sediments are provided only as corroborative evidence for historical rates (Table 1). Charcoal study sites may not be random samples, but likely were selected without bias.

I did not include studies of fire severity from early timber inventories [57–62] in Table 1, because these inventories have too many limitations. First, timber inventories were done in areas unrepresentative of larger landscapes [58], primarily where timber sales were likely [63] and inventory tree data are unrepresentative even within these inventory areas. This is because tree data were usually only recorded for merchantable forests that typically had large trees at low density associated with low-severity fires; data were often not recorded for younger, denser forests or recovering burned areas within an overall inventory area [62, 63]. For example, about 70% of one inventory area had no recorded tree data [58]. Recent authors [57–61] did not adjust estimates for these unsampled areas, although adjustments were standard inventory protocol before 1917 [63]. These published data [57–61] thus do not provide valid statistical samples of even the overall inventory area, much less the larger surrounding landscape. Second, inventories typically included written records of fire severity for the section in which inventory transects occurred [62], including reports of severe fires, but these key records were not used in past studies [57–61]. When these fire-severity records were found and included in a new study, abundant high-severity fire was found, with estimated high-severity fire rotations

FS-034814



congruent with earlier GLO reconstructions over larger areas [62]. Finally, by 1910, understory fuels and small trees had been reduced by livestock grazing, early miners and herders had set fires, and logging and other human disturbances had altered forests [64]. Thus, data from early timber inventories [57–61] are not valid samples of historical forests and studies that omit or lack records of high-severity fire [57–61] do not provide valid estimates of rates and patterns of high-severity fire.

GLO-based reconstructions of fire severity, the main historical source of rates of high-severity fire (Table 1), have been calibrated, validated, and corroborated [27–29, 40, 56, 65], but some critiques missed this testing. Fulé et al. [66] suggested structure-based models we used to reconstruct fire severity were not validated or corroborated. However, they missed our methods section that explains how we calibrated and validated our models with tree-ring reconstructions [28] and they missed a summary of evidence corroborating our findings with independent reconstructions and multiple lines of evidence [28, 65]. We added further corroboration of our reconstructions in our reply [65], subsequent studies [29–30, 40, 56], and here (Table 1). Another example of missing our testing is from Maxwell et al. [67] and Collins et al. [58], who said our fire-severity reconstructions used data from bearing trees selected by surveyors in a biased manner. Neither set of authors cited our study of surveyor bias and error, done specifically in the dry forests where our GLO reconstructions were done, in which we found low levels of bias and error [68]. Finally, several recent studies, using the early timber inventories, discussed above, in areas partially overlapping or near our GLO-reconstruction areas, found low tree densities and little or no high-severity fire, and suggested this shows that our GLO reconstructions were in error [57–61]. However, as discussed above, it is timber-inventory studies that omitted fire-severity records [57–61], and that were not validated or corroborated, that likely are in error.

Using the best available data on historical rates of high-severity fire, which included estimates from GLO reconstructions, analysis of early aerial photography, and FIA data (Table 1), I classified recent high-severity fire rotations, relative to the range of historical fire rotations, which is 217–849 years (Table 1). The classes are: (1) within range, if the recent high-severity fire rotation was within the historical range, (2) too short, if the recent high-severity fire rotation was outside and shorter than the historical range, and (3) too long, if the recent high-severity fire rotation was outside and longer than the historical range.

To evaluate future projected increases in high-severity fire, I compared projected high-severity fire rotations to the historical high-severity fire rotations estimated by GLO, aerial photo, and FIA data, and classified the outcomes as above (e.g., too long). To estimate future high-severity fire rotations, I separately applied both the low and high regional projections of Yue *et al.* [42] reported in the introduction. I used the Yue *et al.* projections, as others do not report expected changes in area burned or do not provide detail for the western United States (e.g., [69–71]). To use Yue *et al.* by region, I divided recent high-severity fire rotations by the projected ratio of future area burned to recent area burned at any severity after cross-walking ecoregions in Yue *et al.* with my analysis regions. I show later there was no statistically significant upward trend in fraction of fire that burned at high severity recently, thus I assumed future fire will not have an increased fraction of high-severity fire.

## Results

### Recent versus historical fire rotations

High-severity fire rotations from 1984–2012 were within the historical range or were too long, relative to historical high-severity fire rotations, overall across the western USA in both dry pine and mixed-conifer forests and individually in 41 of 42 analysis regions (Fig 3, Tables 3

9-ER-2163

FS-034815



**Fig 3. Differences between recent (A.D. 1984–2012) high-severity fire rotation and historical range of high-severity fire rotations, recent trends, and recent fire rotations for high-severity fire in (a) dry pine forests and (b) dry mixed-conifer forests by analysis region.** High-severity fire rotation (years), from Tables 3 and 4, is printed over each region, and represents the expected time to burn, at high severity, an area equal to the region. Colors correspond with data in Table 3 for dry pine and Table 4 for dry mixed conifer forests. Differences are: (1) "In range," if recent high-severity fire rotation was within the range of historical estimates, (2) "Too short," if outside and shorter than historical estimates, and (3) "Too long," if outside and longer than historical estimates. "Trend" indicates that a statistically significant upward trend in area burned at high severity was found in a region, and "No trend" indicates one was not found, with data shown in Tables 3 and 4. Regions that lacked a statistically significant upward trend in area burned at high severity (Tables 3, 4) have lighter shading. Several Bailey sections were merged or split to create the analysis regions.

doi:10.1371/journal.pone.0136147.g003

and 4). Fire rotation was not calculated in Region 15 in dry pine, as no high-severity fire occurred (Table 3). Overall, recent high-severity fire rotations of 1,045 years in dry pine and 875 years in dry mixed-conifer forests were a little too long, relative to the range of historical fire rotations of 217–849 years, meaning too little recent high-severity fire relative to historical high-severity fire (Tables 1, 3 and 4). In dry pine forests, recent high-severity fire rotations were within the range of historical fire rotations in 6 of 22 regions and were too long, meaning a deficiency of high-severity fire, in 16 of 22 regions (Fig 3A, Table 3). In dry mixed-conifer forests, recent high-severity fire rotations were within the range of historical rotations in 8 of 20 regions, were too long in 11 of 20 regions, but too short, producing too much high-severity fire relative to historical fire, in one region in southern California (Fig 3B, Table 4).

9-ER-2164

FS-034816



**Fig 4. Trends between 1984–2012 in area burned at high severity (bottom) and fraction burned at high severity (top).** Results are shown for both dry pine and dry mixed conifer forests.

doi:10.1371/journal.pone.0136147.g004

### Recent trends

Statistically significant upward trends were lacking overall for area burned at high severity from 1984–2012 in both dry pine ($z = 2.682$, $p = 0.0503$) and in dry mixed-conifer forests ($z = 1.895$, $p = 0.1276$). The dry-pine trend was very close to significant. Across analysis regions, statistically significant upward trends in area burned were found in only 3 of 23 dry pine regions (Fig 3A, Table 3) and 1 of 20 dry mixed-conifer regions (Fig 3B, Table 4) in parts of the Southwest and Rocky Mountains. Two regions were close to significant in dry pine and two in dry mixed conifer, also in the Southwest and Rocky Mountains (Tables 3 and 4). Inter-annual fluctuations in area burned closely matched in dry pine and mixed-conifer forests ($r = 0.856$, $p < 0.001$), and area burned was concentrated in known major fire years (A.D. 1994, 1996, 2000, 2002, 2006–2007, 2011–2012), particularly since A.D. 2000 (Fig 4).

Statistically significant upward trends were also lacking overall for fraction of high-severity fire from 1984–2012 in both dry pine ($z = 0.319$, $p = 0.508$) and in dry mixed conifer forests ($z = 0.506$, $p = 0.456$) (Fig 4, Tables 3 and 4). Statistically significant upward trends in fraction burned at high severity were also lacking in all 23 dry-pine regions and all 20 dry mixed-conifer

FS-034817



**Fig 5. Low projection (to A.D. 2046–2065) of differences relative to the historical range of high-severity fire rotations, given 1984–2012 trends, and projected fire rotations for high-severity fire in (a) dry pine forests and (b) dry mixed-conifer forests by analysis region.** See Fig 3 for an explanation of figure contents.

doi:10.1371/journal.pone.0136147.g005

regions (Tables 3 and 4). Interannual fluctuations in fraction burned at high severity also significantly matched in dry pine and mixed-conifer forests, but not as closely ($r = 0.520$, $p = 0.004$) as for area burned (Fig 4). Fraction burned at high severity was higher in major fire years, as was area burned, but not more so since A.D. 2000 (Fig 4).

For dry pine, the recent mean fraction of high-severity fire for the whole study area (0.117) was not significantly ($\alpha = 0.05$) different from the mean (0.111) of historical reconstructions ($t$ (2) = -0.15, $p = 0.897$). However, for dry mixed conifer, the recent mean fraction for the whole study area (0.194) was significantly lower than the mean (0.356) of the seven reconstructions ($t$ (6) = 6.18, $p = 0.001$). Thus, these comparisons suggest that the recent mean fraction of high-severity fire is not unprecedented, but instead congruent with historical mean fraction of high-severity fire in dry pine and too low relative to historical mean fraction of high-severity fire in dry mixed conifer.

A $t$-test showed a significant difference, in mean fraction of high-severity fire across the 29 years in the analysis period (Fig 4), between dry pine (Mean = 0.117, s.d. = 0.063) and mixed-

FS-034818



conifer forests (Mean = 0.194, s.d. = 0.070); $t$ (55) = -4.51, $p < 0.001$. This shows that a higher fraction of high-severity fire (1.66 times) occurred recently in mixed conifer as in pine.

## Projections

Low projections [42] in dry-pine regions for 2046–2065 would be restorative of the high-severity fire process or provide ongoing maintenance of high-severity fire at historical rates, with no region having a fire rotation too short relative to historical high-severity fire rotations (Fig 5A, Table 3). Of 22 dry-pine regions (region 15 excluded since no high-severity fire recently), 13 that had high-severity fire rotations that were too long up to 2012 still had rotations too long by 2046–2065, but were closer to historical high-severity rotations, thus partially restored, while 3 of the 22 regions changed from too long to within range, indicating restoration of high-severity fire to historical rates. The remaining six regions that were within range by 2012 stayed in this category, thus had ongoing maintenance of high-severity fire at historical rates.

Low projections in dry mixed-conifer regions would also be restorative or provide ongoing maintenance of high-severity fire at historical rates, except in one region (Fig 5B, Table 4). Five of 20 dry mixed-conifer regions with high-severity fire rotations that were too long up to 2012 would still have fire rotations too long, but would be closer to historical rates, thus would have high-severity fire rates partially restored. Six of 20 mixed-conifer regions with high-severity fire rotations that were too long up to 2012 would change to within range, indicating restoration of high-severity fire to historical rates. Eight of 20 mixed-conifer regions with high-severity fire rates within range in 2012 would remain within range, indicating maintenance of high-severity fire at historical rates. One region, however, that already had a too short high-severity fire rotation by 2012, was projected to have an even shorter high-severity fire rotation.

High projections in dry-pine regions still would be predominantly restorative of high-severity fire or provide ongoing maintenance of high-severity fire at historical rates in 15 regions, but two regions would have high-severity fire rotations too short, relative to historical high-severity fire rotations (Fig 6A, Table 3). High projections in dry mixed-conifer regions would also be predominantly restorative of historical high-severity fire rates or provide ongoing maintenance of high-severity fire at historical rates in 12 regions, but four regions would have fire rotations too short relative to historical high-severity fire rotations (Fig 6B, Table 4). High projections are missing for four of 22 pine regions and four of 20 mixed-conifer regions (Fig 6, Tables 3 and 4), because fire-climate relationships were not found that allowed projections [42].

## Discussion

Comparison of recent and historical high-severity fire rotations shows that high-severity fire is not occurring in dry forests at rates that are exceptionally high relative to the range of historical rates. Recent high-severity fire instead is deficient (too long) overall across dry pine and dry mixed-conifer forests relative to historical rates. Recent high-severity fire rotations are quite long, averaging 1,045 years in dry pine and 875 years in dry mixed conifer, more than ample time for forests to recover and reach very old age before the next high-severity fire. High-severity fire rotations in dry forests are also within the historical range or are too long relative to historical fire rotations in all but one of 43 regions of the western USA up to A.D. 2012. Absence of significant overall recent upward trends in area burned and in fraction burned at high-severity suggests high-severity fire is not significantly increasing or becoming more severe. The trend is quite close to significance for area burned in dry pine forests, which I discuss below. These findings do not support the hypothesis that high-severity fire is occurring at exceptionally high rates in dry forests or is generally increasing or becoming more severe [6–7].

FS-034819



ONE                                                                                    Recent High-Severity Fire Rates in Dry Forests

**Fig 6. High projection (to A.D. 2046–2065) of differences relative to the historical range of high-severity fire rotations, given 1984–2012 trends, and projected fire rotations for high-severity fire in (a) dry pine forests and (b) dry mixed-conifer forests by analysis region.** Several analysis regions are omitted, because the high projections by Yue *et al*. [42] were not possible for those areas. See Fig 3 for an explanation of figure contents.

doi:10.1371/journal.pone.0136147.g006

The location of the few regions (4 of 43) with a statistically significant upward trend in area burned at high severity over the 1984–2012 period, in parts of the Southwest and Rocky Mountains, is consistent with previous studies in broader forest types [3–4]. This consistency suggests stronger climatic than fuel influences [2–4]. A strong climatic role in upward trends is also supported by the high correlation of interannual fluctuations in area burned at high severity between dry pine and dry mixed conifer and by concentration of area burned at high severity in major fire years. However, part of the explanation of trends in these particular regions and the nearly significant trend overall in dry pine forests may not be climate, but human-set fires. Two of the dry pine regions with statistically significant upward trends, in central Arizona (Fig 3A), experienced very large human-set fires, the 2002 Rodeo-Chediski fire and the 2011 Wallow fire. In contrast, the upward trend in dry pine forests in eastern Montana is likely not related to human-set fires, but instead to three exceptional lightning-ignited fires (Ash Creek, Rosebud Creek, Chalky) in 2012 as well as earlier natural fires. Disentangling the contributions

9-ER-2168                                                                                                                    FS-034820



of human-set fires and climatic change to trends is beyond the scope of this study, but is needed.

Projections to 2046–2065 suggest high-severity fire would be predominantly restorative of the high-severity fire process or provide ongoing maintenance of high-severity fire at historical rates, except in a few regions. Low projections indicate fire rotations too short only in one region of 42 total, and that region already had a fire rotation too short by 2012. Thus, dry forests generally have the capacity to absorb up to 1.71 times as much high-severity fire (the maximum increase in the low projections), beyond what was occurring up to 2012, without exceeding historical rates. The six regions, under the high projections, that would have fire rotations too short by 2046–2065, would not be able to absorb 2.54–2.69 times as much high-severity fire as in 1984–2012, but 19 other regions that received this level of increase were not pushed beyond historical rates. This suggests most dry-forest landscapes have the capacity to absorb substantial increased high-severity fire, but if high-severity fire increases above about 2 1/2 to 3 times as much as in 1984–2012, that capacity will begin to be reached. Thus, it may be at least several decades before dry-forest landscapes may generally begin to be affected by exceptional high-severity fire rates because of projected climatic change. Projections based on Yue *et al*. [42] could also be tempered by lack of actual trend in regions up to 2012, which is 35–46% of the duration from 1984 to 2046–2065. Perhaps the projection will not fully emerge and the high projections, with the greatest increase in future fire, may be less concerning. Of course, lack of recent trend does not clearly mean the Yue *et al*. [42] projections will not eventually occur.

If high-severity fire rotations that are too short do begin to appear, entire landscapes will not be affected at once, but instead effects will be lagged and heterogeneous, likely requiring centuries after onset to fully affect dry-forest landscapes. Long delays occur because fire effects accrue over time from separate ignition and spread events. If a historical fire rotation of 400 years experiences a doubling of annual area burned, and the new rotation is 200 years, then on average it will be 200 years before landscapes are fully affected by this change [72]. Lagged responses of landscapes, to changes in fire, affect both increased fire that is restorative or that leads to too-short fire rotations. The heterogeneity and lagged effects of fire contrast with those of droughts and insect outbreaks, which can alter large land areas nearly synchronously without the long delays inherent with fire. This is supported by a study that showed that major projected changes in vegetation in western North America with global warming occur mainly from direct climate effects (e.g., drought), with < 1% from wildfire [73].

## Limitations

These trend analyses and fire rotations have some inherent limitations. The Landfire Biophysical Settings maps aim to predict historical vegetation predating the trend analyses, but could still exclude non-forested area that was burned in dry forests at high-severity early in the 1984–2012 period, leading to false upward trends [17]. Fully reliable trend analysis across large land areas requires a nationally consistent and detailed vegetation map based on imagery that predates MTBS data coverage in 1984. Because I cannot definitely exclude a possible false upward trend, the four significant upward trends, and other trends close to significant, are particularly clouded by this uncertainty.

The MTBS program has provided a remarkable dataset, but 29 years is still a limitation. Estimated fire rotations are hundreds of years, and nearly a full fire rotation of data is needed to accurately estimate the rotation [72]. Trends over the 29-year period hinge on the timing and magnitude of only a few major fire peaks (Fig 4). Thus, estimated rotations are valid for the 29-year period, but subject to change as more data accrue. Data from 25.7 million ha temper

9-ER-2169

FS-034821



this concern, but fire can be synchronized over large land areas by teleconnections with periods > 29 years [74], thus 29 years are also insufficient from the standpoint of potential climate cycles. Also, high-severity fire rotations may not be homogeneous across landscapes; high-severity fire could be favored in certain biophysical settings and dis-favored in others (e.g., 5, 39). Thus, recent fire-rotation estimates in this study represent averages for analysis regions that warrant use with caution in smaller subareas of these regions.

MTBS data, which are for fires generally > 400 ha in area, may or may not contain 95% of total burned area, as estimated by the MTBS program. One estimate for part of the Sierra Nevada was 92.8% [17]. If the actual percentage was not 95%, then fire rotations could be somewhat too low or too high. Some caution is thus warranted from this standpoint in the use of estimates, although this concern is buffered by the use of a large historical range for comparison.

The GLO-based reconstructions may be one of the few available ways to reconstruct historical severe fires in the spatially extensive manner that is needed to provide data about fire rotation, patch size, and other attributes. These reconstructions are calibrated, validated, and corroborated [27–29, 40, 56, 65], but would benefit from additional calibration and validation to improve the linkage of forest structure with fire severity and to help estimate the precision of estimates of fire rotation. Precision is not known very well, except that there is calibration and validation with tree-ring reconstructions, there is corroboration by early historical records and maps, and there is congruence between the findings of GLO-based, aerial-photo-based, and paleo-fire based methods (Table 1). GLO-based methods are typically based on 100–140 year periods before the surveys, thus less than a full historical fire rotation. These methods also cannot provide fine detail about high-severity fire patterns, since they are based on data pooled across 259–1,036-ha areas. It would be beneficial to combine GLO-based methods with tree-ring reconstructions and compare paleo-fire and GLO-based reconstructions in the same areas. More landscape-scale fire history is needed and may lead to further refinements in understanding of rates and patterns of historical high-severity fire.

The projections are first approximations. The Yue *et al.* [42] projections are not specific to dry forests or high-severity fires, are not based on dynamic vegetation models, and use only a moderate emissions scenario. Potential vegetation changes may be large [73], particularly for *P. ponderosa* in the Rocky Mountains and Southwest [75]. Although the projections here may appear simplistic, the Yue *et al.* projections are sophisticated. It is just that their direct transfer here to dry forests provides only first approximations and context for thinking about future fire in dry forests until projections specific to dry forests appear. The projections also assume similar continuing fire management and no non-linear responses. For example, a landscape trap [76] could arise if high-severity fire created more fire-prone landscapes that then burn increasingly at high severity, possibly increasing area burned at high severity beyond projections.

## Management issues

The evidence presented here shows that efforts to generally lower fire severity in dry forests for ecological restoration are not supported. Reducing fire severity in dry forests is a goal of the 2003 Healthy Forests Restoration Act (HFRA), the Collaborative Forest Landscape Restoration Program (CFLRP) of the 2009 Omnibus Public Land Management Act, and other government policies and programs. These laws, policies, and programs were developed before sufficient quantitative analysis of rates of recent high-severity fire was available, and with very limited information about rates of historical high-severity fire. Historical evidence, now available from multiple sources across large land areas (Table 1), combined with comprehensive recent fire-

9-ER-2170

FS-034822



severity data, together show that high-severity fire is generally operating at or below historical rates. Thus, reducing fire-severity is fire suppression rather than restoration, as was commonly thought before these new data and analysis were available. Fire suppression is incompatible with laws and programs that mandate or encourage restoration of historical fire regimes and forest structure (e.g., Collaborative Forest Landscape Restoration Program).

In dry forests, suppressing high-severity fire that is operating at or below historical rates also has adverse ecological impacts. These adverse impacts include: (1) declining and potentially threatened native animals dependent on severely burned patches [77–78], (2) loss of biologically diverse early-successional habitat [79–80], reduction in fire-stimulated native shrubs and trees that were historically abundant [30, 64], and simplification of the landscape heterogeneity that is key to landscape resilience to future climate-change effects [81]. High-severity fires, for example, produce patches of younger forest that are less vulnerable to mortality in insect outbreaks and droughts [82]. Removing or reducing small trees in dry forests to reduce fire severity may significantly reduce the resilience of these forests to insect outbreaks and droughts by reducing advance recruitment that enables recovery [82].

Some potentially important ecological concerns have been expressed about high-severity fires even though these fires are not generally occurring at exceptional rates. First, many scientists worry that the size of high-severity fire patches in dry forests is currently exceptional relative to historical patch sizes, possibly hampering post-fire tree recruitment and other processes (e.g., 6). However, large comparisons of historical and modern patch sizes in dry forests, from GLO-based reconstructions in the Colorado Front Range [40] and western Sierra [30] show that high-severity patch sizes in both historical and modern fires ranged up to 8,000–9,400 ha, and recent and historical patch-size distributions had only minor differences.

Second, increasing drought and higher temperatures can alter the ecological effects of high-severity fires and modify recovery processes after these fires. Higher temperatures and drought stress may increase tree mortality after fire, effectively increasing fire severity, independent of fire intensity [83], although here I show that these forests have the capacity to absorb some increased fire severity. Historical and recent high-severity fire rotations are generally long enough to allow post-fire tree recruitment and natural recovery of dry forests between fires, but recruitment that may have historically been poor and episodic [84], could possibly worsen because of increased drought and high temperatures, so that forests have more difficulty recovering after fires [85].

Finally, local analysis might uncover ecologically valuable sites where high-severity fire has recently occurred at apparently exceptional rates [86–87], even though it is not in the larger region. For example, in the Big Oak Flats area of Yosemite National Park, tree-ring [87] and GLO reconstructions [30] both showed low- to mixed-severity fire occurred historically, with no high-severity fire over the preceding few hundred years, and reconstructions also agreed on low historical tree densities [30], yet the 2013 Rim Fire burned 24% of tree-ring plots at high severity [87]. Harris and Taylor viewed the 24% high-severity component of the Rim fire in Big Oak Flats as historically anomalous due to buildup of fuel from fire exclusion [87]. However, high-severity fire is fully expected after more than 400 years of predominantly low- to mixed-severity fire, given the historical high-severity fire rotation of 412 years reconstructed for southern Sierran mixed conifer [30]. High-severity fires in dry forests with moderate to long historical rotations are always locally surprising, occurring suddenly after centuries of stability [14]. Other studies have suggested old dry forests with long periods of low-severity fire are expected to suddenly burn at high severity [26]. Better evidence of concern in the Sierran mixed conifer forest is the recent high-severity fire rotation of 212 years in the analysis region (Fig 3B), but this region is dominated by more coastal forests where human-set fires may explain this fire rotation. A study specifically in the lower montane of the western Sierra found a recent fire

FS-034823



rotation of 461 years [17], somewhat longer than the 412 year historical rotation, suggesting high-severity fire is not occurring at historically unprecedented rates, but needs updating to include the 2013 Rim fire and other recent fires. Regional scales, not the Big Oak Flat scale, are the scales that are essential to detect significant departures from historical rates of high-severity fires [14]. Nonetheless, high local ecological values, such as special species [86] could trump regional trends and warrant specific local management actions.

High-severity fires are infrequent powerful events, not unlike volcanic eruptions, tornadoes, or large floods that are almost beyond control or management. Yet, the ecological importance of large, infrequent, and often severe natural disturbances in structuring historical landscapes and maintaining their biological diversity is well established (e.g., [21, 77–80, 88–89]). Increasing appreciation of the role of large, seemingly destructive floods in maintaining the geomorphology and habitat diversity of rivers, suggests people may decide to accept and even restore infrequent large, severe natural disturbances in ecosystems for ecological reasons [90]. The best approach for high-severity fire is likely through wildland fire use [11], which is now wildland fire for resource benefit, managed by professional fire personnel, with restoration and maintenance of high-severity fire within historical rates and patterns as a goal. Land managers and the public can reduce fire risk near housing, infrastructure, and valuable resources to maximize area available for wildland fire use across adjoining lands. Communities can also facilitate wildland fire use by adopting growth boundaries to limit community expansion into dry forests and by rearranging land uses to favor fire-resistant land uses on their outskirts [21].

Recent rates of high-severity fire, although they are not generally exceeding historical rates, are leading to some intense fires burning into communities and damaging infrastructure. Projected increases in severe fire from climate change shown here could become even more serious for people. Fortunately, the inherently lagged response of landscapes to changes in fire does typically allow some time to prepare further. Based on the findings of this study, the public should be informed that infrequent high-severity fires in dry forests are not a consequence of poor forest management over the last century that can be fixed. Dry forests were historically renewed, and will continue to be renewed, by sudden, dramatic, high-intensity fires after centuries of stability and lower-intensity fires. Living in or near dry forests is inherently very dangerous, not unlike living beside a volcano or on a fault line with earthquakes. The people-fire problem is complex [21, 91–92], but if expansion of housing and infrastructure into dangerous dry forests [21, 93] were redirected into safer settings, both people and nature would benefit.

## Acknowledgments

This project could not have been completed without prior support by the National Science Foundation, extensive prior work of the MTBS program, and previous work of many scientists. I appreciate the helpful comments of peer reviewers and the comments and guidance of Dr. Christopher Carcaillet.

## Author Contributions

Conceived and designed the experiments: WLB. Performed the experiments: WLB. Analyzed the data: WLB. Wrote the paper: WLB.

## References

1. Stephens SL, Burrows N, Buyantuyev A, Gray RW, Keane RE, Kubian R, et al. Temperate and boreal forest mega-fires: characteristics and challenges. Frontiers in Ecology and Environment. 2014; 12: 115–122.

2. Westerling AL, Hidalgo HG, Cayan DR, Swetnam TW. Warming and earlier spring increase western U. S. forest wildfire activity. Science. 2006; 313: 940–943. PMID: 16825536

9-ER-2172

FS-034824



3. Dillon GK, Holden ZA, Morgan P, Crimmins MA, Heyerdahl EK, Luce CH. Both topography and climate affected forest and woodland burn severity in two regions of the western US, 1984 to 2006. Ecosphere. 2011; 2(12): article 130.

4. Dennison PE, Brewer SC, Arnold JD, Moritz MA. Large wildfire trends in the western United States, 1984–2011. Geophysical Research Letters. 2014; 41: 2928–2933.

5. Miller JD, Skinner CN, Safford HD, Knapp EE, Ramirez CM. Trends and causes of severity, size, and number of fires in northwestern California, USA. Ecological Applications. 2012; 22: 184–203. PMID: 22471083

6. Stephens SL, Agee JK, Fulé PZ, North MP, Romme WH, Swetnam TW, et al. Managing forests and fire in changing climates. Science. 2013; 342: 41–42. doi: 10.1126/science.1240294 PMID: 24092714

7. Agee JK, Skinner CN. Basic principles of forest fuel reduction treatments. Forest Ecology and Management. 2005; 211: 83–96.

8. Krawchuk MA, Moritz MA, Perisien M, Van Dorn J, Hayhoe K. Global pyrogeography: the current and future distribution of wildfire. PloS One. 2009; 4: e5102. doi: 10.1371/journal.pone.0005102 PMID: 19352494

9. Bradstock R, Penman T, Boer M, Price O, Clarke H. Divergent responses of fire to recent warming and drying across south-eastern Australia. Global Change Biology. 2014; 20: 1412–1428. doi: 10.1111/gcb.12449 PMID: 24151212

10. Kaufmann JB. Death rides the forest: perceptions of fire, land use, and ecological restoration of western forests. Conservation Biology. 2004; 18: 878–882.

11. van Wagtendonk JW. The history and evolution of wildland fire use. Fire Ecology. 2007; Special Issue 3(2): 3–17.

12. Keane RE, Hessburg PF, Landres PB, Swanson FJ. The use of historical range and variability (HRV) in landscape management. Forest Ecology and Management. 2009; 258: 1025–1037.

13. Anderson-Teixeira K, Miller AD, Mohansk JE, Hudiburg TW, Duval BD, DeLucia EH. Altered dynamics of forest recovery under a changing climate. Global Change Biology. 2013; 19: 2001–2021. doi: 10.1111/gcb.12194 PMID: 23529980

14. Hanson CT, Odion DC, DellaSala DA, Baker WL. Overestimation of fire risk in the Northern spotted owl recovery plan. Conservation Biology. 2009; 23: 1314–1319. doi: 10.1111/j.1523-1739.2009.01265.x PMID: 19549218

15. Lutz JA, Key CH, Kolden CA, Kane JT, van Wagtendonk JW. Fire frequency, area burned, and severity: a quantitative approach to defining a normal fire year. Fire Ecology. 2011; 7: 51–65.

16. Miller JD, Safford H. Trends in wildfire severity: 1984 to 2010 in the Sierra Nevada, Modoc Plateau, and Southern Cascades, California, USA. Fire Ecology. 2012; 8: 41–57.

17. Hanson CT, Odion DC. Is fire severity increasing in the Sierra Nevada, California, USA? International Journal of Wildland Fire. 2014; 23: 1–8.

18. Littell JS, McKenzie D, Peterson DL, Westerling AL. Climate and wildfire area burned in western U.S. ecoprovinces, 1916–2003. Ecological Applications. 2009; 19: 1003–1021. PMID: 19544740

19. Barrett SW, Arno SF, Menakis JP. Fire episodes in the inland Northwest (1540–1940) based on fire history data. USDA Forest Service General Technical Report INT-GTR-370, Ogden, Utah: Intermountain Research Station; 1997.

20. Stephens SL, Martin RE, Clinton NE. Prehistoric fire area and emissions from California's forests, woodlands, shrublands, and grasslands. Forest Ecology and Management. 2007; 251: 205–216.

21. Baker WL. Fire ecology in Rocky Mountain landscapes. Washington, DC: Island Press; 2009.

22. Marlon JR, Bartlein PJ, Gavin DG, Long CJ, Anderson RS, Anderson RS, et al. Long-term perspective on wildfires in the western USA. Proceedings of the National Academy of Sciences, USA. 2012; 109: E535–E543.

23. Baker WL, Ehle D. Uncertainty in fire history and restoration of ponderosa pine forests in the western United States. In: Omi PN, Joyce LA, editors. Proceedings of the conference on fire, fuel treatments, and ecological restoration. USDA Forest Service Proceedings RMRS-P-29, Fort Collins, Colorado: Rocky Mountain Research Station, pp. 319–333; 2003.

24. Sherriff RL, Platt RV, Veblen TT, Schoennagel TL, Gartner MH. Historical, observed, and modeled wildfire severity in montane forests of the Colorado Front Range. PloS One. 2014; 9(9): e106971. doi: 10.1371/journal.pone.0106971 PMID: 25251103

25. Baker WL, Veblen TT, Sherriff RL. Fire, fuels and restoration of ponderosa pine-Douglas-fir forests in the Rocky Mountains, USA. Journal of Biogeography. 2007; 34: 251–269.

9-ER-2173

FS-034825

 **PLOS** ONE

26. Hessburg PF, Salter RB, James KM. Re-examining fire severity relations in pre-management era mixed-conifer forests: inferences from landscape patterns of forest structure. Landscape Ecology. 2007; 22: 5–24.

27. Odion DC, Hanson CT, Arsenault A, Baker WL, DellaSala DA, Hutto RL, et al. Examining historical and current mixed-severity fire regimes in ponderosa pine and mixed-conifer forests of western North America. PloS One. 2014; 9(2): e87852. doi: 10.1371/journal.pone.0087852 PMID: 24498383

28. Williams MA, Baker WL. Spatially extensive reconstructions show variable-severity fire and heterogeneous structure in historical western United States dry forests. Global Ecology and Biogeography. 2012; 21: 1042–1052.

29. Baker WL. Implications of spatially extensive historical data from surveys for restoring dry forests of Oregon's eastern Cascades. Ecosphere. 2012; 3(3): article 23.

30. Baker WL. Historical forest structure and fire in Sierran mixed-conifer forests reconstructed from General Land Office survey data. Ecosphere. 2014; 5(7): article 79.

31. Long CJ, Power MJ, Bartlein PJ. The effects of fire and tephra deposition on forest vegetation in the central Cascades, Oregon. Quaternary Research. 2011; 75: 151–158.

32. Fitch EP. Holocene fire-related alluvial chronology and geomorphic implications in the Jemez Mountains, New Mexico. M. Sc. Thesis, University of New Mexico, Albuquerque; 2013.

33. Pierce JL, Meyer GA. Long-term fire history from alluvial fan sediments: the role of drought and climate variability, and implications for management of Rocky Mountain forests. International Journal of Wildland Fire. 2008; 17: 84–95.

34. Pierce JL, Meyer GA, Jull AJT. Fire-induced erosion and millennial-scale climate change in northern ponderosa pine forests. Nature. 2004; 432: 87–90. PMID: 15525985

35. Jenkins SE, Sieg CH, Anderson DE, Kaufman DS, Pearthree PA. Late Holocene geomorphic record of fire in ponderosa pine and mixed-conifer forests, Kendrick Mountain, northern Arizona, USA. International Journal of Wildland Fire. 2011; 20: 125–141.

36. Bigio ER. Late Holocene fire and climate history of the western San Juan Mountains, Colorado: results from alluvial stratigraphy and tree-ring methods. PhD dissertation, University of Arizona, Tucson; 2013.

37. Colombaroli D, Gavin DG. Highly episodic fire and erosion regime over the past 2,000 y in the Siskiyou Mountains, Oregon. Proceeding of the National Academy of Sciences, USA. 2010; 107: 18909–18914.

38. Frechette JD, Meyer GA. Holocene fire-related alluvial-fan deposition and climate in ponderosa pine and mixed-conifer forests, Sacramento Mountains, New Mexico, USA. The Holocene. 2009; 19: 639–651.

39. Holden ZA, Morgan P, Evans JS. A predictive model of burn severity based on 20-year satellite-inferred burn severity data in a large southwestern US wilderness area. Forest Ecology and Management. 2009; 258: 2399–2406.

40. Williams MA, Baker WL. Comparison of the *higher*-severity fire regime in historical (A.D. 1800s) and modern (A.D. 1984–2009) montane forests across 624,156 ha of the Colorado Front Range. Ecosystems. 2012; 15: 832–847.

41. McKenzie D, Gedalof Z, Peterson DL, Mote P. Climatic change, wildfire, and conservation. Conservation Biology. 2004; 18: 890–902.

42. Yue X, Mickley LJ, Logan JA, Kaplan JO. Ensemble projections of wildfire activity and carbonaceous aerosol concentrations over the western United States in the mid-21st century. Atmospheric Environment. 2013; 77: 767–780. PMID: 24015109

43. Barbour MG, Billings WD. North American terrestrial vegetation. Cambridge, UK: Cambridge University Press, 2nd Ed; 2000.

44. Landfire. U S Department of Agriculture, Forest Service, U.S. Department of Interior. Available: http://www.landfire.gov/index.php. Accessed 7 December 2014.

45. Rollins MG. LANDFIRE: a nationally consistent vegetation, wildland fire, and fuel assessment. International Journal of Wildland Fire. 2009; 18: 235–249.

46. Comer P, Faber-Langendoen D, Evans R, Gawler S, Josse C, Kittel G, et al. Ecological systems of the United States: a working classification of U.S. terrestrial systems. NatureServe, Arlington, Virginia; 2003.

47. Zhu Z, Vogelmann J, Ohlen D, Kost J, Chen X, Tolk B. Mapping existing vegetation composition and structure for the LANDFIRE prototype project. In: Rollins MB, Frame CK, editors. The LANDFIRE Prototype Project: nationally consistent and locally relevant geospatial data for wildland fire management. USDA Forest Service General Technical Report RMRS-GTR-175, Fort Collins, Colorado: Rocky Mountain Research Station, USA. pp. 197–215; 2006.

9-ER-2174

FS-034826



48. Swetnam TL, Brown PM. Comparing selected fire regime condition class (FRCC) and LANDFIRE vegetation model results with tree-ring data. International Journal of Wildland Fire. 2010; 19: 1–13.

49. Bailey RG. Ecosystem geography, from ecoregions to sites. New York: Springer. 2nd Ed.; 2009.

50. Bailey ecoregions GIS maps. Available: http://www.fs.fed.us/rm/ecoregions/products, Accessed 7 December 2014.

51. Monitoring Trends in Burn Severity Program, U.S. Geological Survey, U.S.D.A. Forest Service. Available: http://www.mtbs.gov. Accessed 7 December 2014.

52. Eidenshink J, Schwind B, Brewer K, Zhu Z-L, Quayle B, Howard S. A project for monitoring trends in burn severity. Fire Ecology. 2007; 3 (Special Issue): 3–21.

53. Kolden CA, Lutz JA, Key CH, Kane JT, van Wagtendonk J. Mapped versus actual burned area within wildfire perimeters: characterizing the unburned. Forest Ecology and Management. 2012; 286: 38–47.

54. Yue S, Pilon P, Cavadias G. Power of the Mann-Kendall and Spearman's rho tests for detecting monotonic trends in hydrologic series. Journal of Hydrology. 2002; 259: 254–271.

55. Benjamini Y, Hochberg Y. Controlling the false discovery rate: a practical and powerful approach to multiple testing. Journal of the Royal Statistical Society B. 1995; 57: 289–300.

56. Williams MA, Baker WL. Variability of historical forest structure and fire across ponderosa pine landscapes of the Coconino Plateau and south rim of Grand Canyon National Park, Arizona, USA. Landscape Ecology. 2013; 28: 297–310.

57. Collins BM, Everett RG, Stephens SL. Impacts of fire exclusion and recent managed fire on forest structure in old growth Sierra Nevada mixed-conifer forests. Ecosphere. 2011; 2(4), article 51.

58. Collins BM, Lydersen JM, Everett RG, Fry DL, Stephens SL. Novel characterization of landscape-level variability in historical vegetation structure. Ecological Applications. 2015; 25: 1167–1174.

59. Hagmann RK, Franklin JF, Johnson KN. Historical structure and composition of ponderosa pine and mixed-conifer forests in south-central Oregon. Forest Ecology and Management. 2013; 304: 492–504.

60. Hagmann RK, Franklin JF, Johnson KN. Historical conditions in mixed-conifer forests on the eastern slopes of the northern Oregon Cascade Range, USA. Forest Ecology and Management. 2014; 330: 158–170.

61. Stephens SL, Lydersen JM, Collins BM, Fry DL, Meyer MD. Historical and current landscape-scale ponderosa pine and mixed conifer forest structure in the southern Sierra Nevada. Ecosphere. 2015; 6 (5), article 79.

62. Hanson CT, Odion DC. Historical forest conditions within the range of the Pacific Fisher and Spotted Owl in the central and southern Sierra Nevada, California. Natural Areas Journal. 2015; in press.

63. Graves HS. Instructions for making timber surveys in the National Forests, including standard classification of forest types. USDA Forest Service, U.S. Government Printing Office, Washington, D.C.; 1917.

64. Vankat JL, Major J. Vegetation changes in Sequoia National Park, California. Journal of Biogeography, 1978; 5: 377–402.

65. Williams MA, Baker WL. High-severity fire corroborated in historical dry forests of the western United States: response to Fulé et al. Global Ecology and Biogeography. 2014; 23: 831–835.

66. Fulé PZ, Swetnam TW, Brown PM, Falk DA, Peterson DL, Allen CD, et al. Unsupported inferences of high-severity fire in historical dry forests of the western United States: response to Williams and Baker. Global Ecology and Biogeography. 2014; 23: 825–830.

67. Maxwell RS, Taylor AH, Skinner CN, Safford HD, Isaacs RE, Airey C, et al. Landscape-scale modeling of reference period forest conditions and fire behavior on heavily logged lands. Ecosphere. 2014; 5(3), article 32.

68. Williams MA, Baker WL. Bias and error in using survey records for ponderosa pine landscape restoration. Journal of Biogeography. 2010; 37: 707–721.

69. Liu Y, Stanturf J, Goodrick S. Trends in global wildfire potential in a changing climate. Forest Ecology and Management. 2010; 259: 685–697.

70. Moritz MA, Parisien M-A, Batllori E, Krawchuk MA, Van Dorn J, Ganz DJ, et al. Climate change and disruptions to global fire activity. Ecosphere. 2012; 3(6), article 49.

71. Stavros EN, Abatzoglou JT, McKenzie D, Larkin NK. Regional projections of the likelihood of very large wildland fires under a changing climate in the contiguous western United States. Climatic Change. 2014; 126: 455–468.

72. Baker WL. Longterm response of disturbance landscapes to human intervention and global change. Landscape Ecology. 1995; 10: 143–159.

9-ER-2175

FS-034827



73. Jiang X, Rauscher SA, Ringler TD, Lawrence DM, Williams AP, Allen CD, et al. Projected future changes in vegetation in western North America in the twenty-first century. Journal of Climate. 2013; 26: 3671–3687.

74. Collins BM, Omi PN, Chapman PL. Regional relationships between climate and wildfire-burned area in the Interior West, USA. Canadian Journal of Forest Research. 2006; 36: 699–709.

75. Rehfeldt GE, Jaquish BC, López-Upton J, Saenz-Romero C, St Clair JB, Leites LP, et al. Comparative genetic responses to climate for the varieties of *Pinus ponderosa* and *Pseudotsuga menziesii*: realized climate niches. Forest Ecology and Management. 2014; 324: 126–137.

76. Lindenmayer DB, Hobbs RJ, Likens GE, Krebs CJ, Banks SC. Newly discovered landscape traps produce regime shifts in wet forests. Proceedings of the National Academy of Sciences, USA. 2011; 108: 15887–15891.

77. Hutto RL. The ecological importance of severe wildfires: some like it hot. Ecological Applications. 2008; 18: 1827–1834. PMID: 19263880

78. Hanson CT. Conservation concerns for Sierra Nevada birds associated with high-severity fire. Western Birds. 2014; 45: 204–212.

79. Swanson ME, Franklin JF, Beschta RL, Crisafulli CM, DellaSala DA, Hutto RL, et al. The forgotten stage of forest succession: early-successional ecosystems on forest sites. Frontiers in Ecology & Environment. 2011; 9: 117–125.

80. DellaSala D, Bond ML, Hanson CT, Hutto RL, Odion DC. Complex early seral forests of the Sierra Nevada: what are they and how can they be managed for ecological integrity? Natural Areas Journal. 2014; 34: 310–324.

81. Millar CI, Stephenson NL, Stephens SL. Climate change and forests of the future: managing in the face of uncertainty. Ecological Applications. 2007; 17: 2145–2151. PMID: 18213958

82. Baker WL, Williams MA. Bet-hedging dry-forest resilience to climate-change threats in the western USA based on historical forest structure. Frontiers in Ecology and Evolution. 2014; 2: article 88.

83. van Mantgem PJ, Nesmith JCB, Keifer M, Knapp EE, Flint A, Flint L. Climatic stress increases forest fire severity across the western United States. Ecology Letters. 2013; 16: 1151–1156. doi: 10.1111/ele.12151 PMID: 23869626

84. Dugan AJ, Baker WL. Sequentially contingent fires, droughts and pluvials structured a historical dry-forest landscape and suggest future contingencies. Journal of Vegetation Science. 2015; 26: 697–710.

85. Savage M, Mast JN. How resilient are southwestern ponderosa pine forests after crown fires? Canadian Journal of Forest Research. 2005; 35: 967–977.

86. O'Connor CD, Falk DA, Lynch AM, Swetnam TW. Fire severity, size, and climate associations diverge from historical precedent along an ecological gradient in the Pinaleño Mountains, Arizona, USA. Forest Ecology and Management. 2014; 329: 264–278.

87. Harris L, Taylor AH. Topography, fuels, and fire exclusion drive fire severity of the Rim Fire in an old-growth mixed-conifer forest, Yosemite National Park, USA. Ecosystems. 2015; in press.

88. Foster DR, Knight DH, Franklin JF. Landscape patterns and legacies resulting from large, infrequent forest disturbances. Ecosystems. 1998; 1: 497–510.

89. DellaSala DA, Hanson CT, editors. The ecological importance of mixed-severity fires. Amsterdam, Elsevier; 2015.

90. Collier MP, Webb RH, Andrews ED. Experimental flooding in Grand Canyon. Scientific American. 1997; 276: 82–89.

91. Moritz MA, Batllori E, Bradstock RA, Gill AM, Handmer J, Hessburg PF, et al. Learning to coexist with wildfire. Nature. 2015; 515: 58–66.

92. Calkin DE, Cohen JD, Finney MA, Thompson MP. How risk management can prevent future wildfire disasters in the wildland-urban interface. Proceedings of the National Academy of Sciences, USA. 2014; 111: 746–751.

93. Kennedy RG. Wildfire and Americans: how to save lives, property, and your tax dollars. New York: Hill and Wang; 2006.

FS-034828

See the Forest Service response to this document, it is located in the Black Ram Project File document, 20211221DocFS_RspToHollowayPhotos0025.pdf. This document is located in the Public Involvement folder in the Black Ram Project File.

Author: Lisa Osborn 5/10/2022

FS-044261

To: Kirsten Kaiser, Three Rivers District Ranger, Kootenai National Forest
Chad Benson, Supervisor, Kootenai National Forest

From: John Matthew Holloway

Re: New information for the Black Ram Project to be included in the Black Ram Project file regarding gates, berms, and road closures in the Three Rivers Ranger District of the Kootenai National Forest.

Date: November 12, 2021

Pursuant to 28 U.S.C. §1746, I, John Matthew Holloway, declare under penalty of perjury that the following is true and correct.

1. I am over 18 years of age and competent to provide this declaration. Please include this information as a legal submission in the Black Ram Project file.

2. On September 30, 2021, and October 1, 2021, I surveyed the Three Rivers Ranger District of the Kootenai National Forest, including the Black Ram Project area, examining road closures for effectiveness at preventing motorized use. I used the current USFS Motor Vehicle Use Maps (MVUM) provided by the Three Rivers Ranger District of the Kootenai National Forest, which displays National Forest System routes including roads, trails, and areas designated open to motorized use. If the route or area is not shown on the MVUM, the route or area is closed to motor vehicles.
https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd674582.pdf

3. I examined road closure berms in the Three Rivers District of the Kootenai National Forest, including the area in the proposed Black Ram Project, on September 30, 2021, and October 1, 2021, and documented the following ineffective berms:

a. Road#276          N48°56'16.932" W115°43'38.670
Large opening around left side of berm. See photos 276-A – 276-D.

b. Road #276A          N48°56'10.056" W115°41'19.326"
Light trail around right side of berm. See photos 276A-A – 276A-E.

c. Road #747          N48°58'15" W115°50'18"
Established trail around right side of berm. See photos 747-A – 747-E.

1

FS-044262

d. Road #748          N48°54'09" W115°50'43"
Opening and light path around the right side of berm. See photos 748-A – 748-D.

e. Road #757          N48°59'33.3" W115°41'7.878"
Opening and light path around left side of first berm. See photos 757-A – 757-D.

f. Road #3101          N48°52'52.638" W115°39'54.282"
Light path around right side of berm. See photos 3101-A – 3101-C.

g. Road #3380          N48°57'18" W115°54'50"
Opening and light path around left side of berm. See photos 3380-A – 3380-E.

h. Road #5839          N48°56'17" W115°40'10"
Opening and light path around left side of berm. See photos 5839-A – 5839-B.

i. Road #5846          N48°56'16.506" W115°43'41.520"
Opening and established path around right side of berm. See photos 5846-A – 5846-D.

j. Road #5852          N48°53'13.674" W115°44'52.080"
Large opening around left side of berm. See photos 5852-A – 5852-B.

k. Road #5858          N48°51'8.304" W115°45'14.562"
Light path around right side of berm. See photos 5858-A – 5858-D.

l. Road #5860          N48°56'4.428" W115°46'24.444"
Opening and established path around right side of berm. See photos 5860-A – 5860-D.

m. Road #5886A          N48°50'42.216" W115°44'19.278"
Light path around right side of berm. See photos 5886A-A – 5886-A-C.

n. Road #5886E          N48°50'23.982" W115°41'47.994"
Opening around left side of berm. See photos 5886-E-A – 5886-E-C.

o. Road #5930          N48°47'44.172" W115°40'56.010"
 Opening around left side of first berm and right side of second berm. See photos 5930-A – 5930-D.

4. I examined gated road closures in the Three Rivers District of the Kootenai National Forest, including the area  in the proposed Black Ram Project, on September 30, 2021, and October 1, 2021, and I documented the following ineffective gated road closures:

a. Road #523          N48°58'20" W115°50'24"

2

FS-044263

Opening around left and right sides of gate. See photos 523-A – 523-D.

b. Road #595          N48°49'0.102" W115°45'12.108"
Openings around left and right sides of gate. See photos 595-A – 595-E.

c. Road #902          N48°46'37.698" W115°48'4.614"
Opening around left side of gate. See photos 902-A – 902-D.

d. Road #5821          N48°57'10" W115°32'57"
Left of brushy hole, opening with tire tracks. See photos 5821-A – 5821-D.

e. Road #5835          N48°57'21" W115°37'57"
Opening and light path around left side of gate. See photos 5835-A – 5835-B.

f. Road #5841          N48°59'37.572" W115°41'11.916"
Opening and light path around left side of gate. See photos 5841-A – 5841-B.

g. Road #5856          N48°53'13.482" W115°44'52.020"
Large opening and path around right side of gate. Small opening and path around left side of gate. See photos 5856-A – 5856-F.

h. Road #5857          N48°56'9.252" W115°47'11.766"
Opening and path around left side of gate. See photos 5857-A – 5857-C.

i. Road #5873          N48°55'31.164" W115°40'20.196"
Opening around left side and right sides of gate. See photos 5873-A – 5873-C.

j. Road #5874          N48°51'17.604" W115°46'14.268"
Opening around left side and right sides of gate. See photos 5874-A – 5874-C.

k. Road #5894          N48°58'46" W115°50'11"
Opening around left side and right sides of gate. Light path around right side of gate. See photos 5894-A – 5894-D.

l. Road #5919          N48°54'44" W115°50'22"
Opening around right side of gate. See photos 5919-A – 5919-C.

m. Road #6084          N48°48'39" W115°41'57"
Gate broken from hinges and totally removed. Automobile tracks present beyond the gate. See photos 6084-A – 6084-K.

n. Road #6134 (south entrance)          N48°51'42.612" W115°46'57.984"
Opening around left side and right side of gate. Signage for new gate, but no new gate. See photos 6134-South-A – 6134-South-E.

o. Road #6134 (north entrance)          N48°53'52.560" W115°48'36.570"

3

Opening around right side of gate. See photos 6134-North-A – 6134-North-E.

p. Road #6708        N48°51'28.836" W115°46'48.528"
Opening around left side of gate. See photos 5874-A – 5874-C.

q. Road #6715        N48°48'56.508" W115°51'24.486"
Opening around right side of gate. See photos 6715-A – 6715-C.

5. I examined road closures in the Three Rivers District of the Kootenai National Forest, including the area in the proposed Black Ram Project, on September 30, 2021, and October 1, 2021, and documented the following lack of berms and/or gates:

a. Road #338K        N48°57'26" W115°50'34"
No gate or berm. See photos 338K-A – 338K-D.

b. Road #338N        N48°56'56" W115°54'53"
No gate or berm. See photos 338K-A – 338N-E.

c. Road #338P        N48°57'48" W115°54'46"
No gate or berm. See photos 338P-A – 338P-D.

d. Road #338R        N48°57'19" W115°54'46"
No gate or berm. See photos 338R-A – 338R-C.

e. Road #757A        N48°57'23.034" W115°39'31.632"
No gate or berm. See photos 757A-A – 757A-B.

f. Road #902A        N48°48'50.892" W115°49'10.596"
No gate or berm. See photos 902A-A – 902A-C.

g. Road #5857 Offshoot        N48°55'48.630" W115°44'11.922"
No gate or berm. Offshoot road. See photos 5857-A – 5857-C.

h. Road #5886 Offshoot        N48°50'19.872" W115°42'42.786"
No gate or berm. Offshoot road goes several hundred yards to what appears to be an undesignated camping area. See photos 5886-A – 5886-C.

i. Road #5892 Offshoot A        N48°50'34.356" W115°42'47.934"
No gate or berm. Offshoot road. See photos 5892-A-A – 5892-A-D.

j. Road #5892 Offshoot B        N48°51'1.200" W115°43'1.410"
No gate or berm. Offshoot road. See photos 5892-B-A.

4

FS-044265

k. Road #5895          N48°58'43" W115°50'43"
No gate or berm. See photos 5895-A – 5895-C.

l. Road #14125          N48°53'32.478" W115°48'32.802"
No gate or berm. See photos 14125-A – 14125-C.

m. Road #14126          N48°59'3.594" W115°40'41.370"
No gate or berm. See photos 14126-A – 14126-C.

6. I examined road closures in the Three Rivers District of the Kootenai National Forest, including the area  in the proposed Black Ram Project, on September 30, 2021, and October 1, 2021, and documented the following berms and gates:

a. Road #2355          N48°49'22.740" W115°48'48.180"
See photos 2355-A – 2355-B.

b. Road #5856A          N48°52'1.014" W115°44'51.684"
See photos 5856A-A – 5856-A-D.

c. Road #5856C          N48°52'25.242" W115°44'38.016"
See photos 5856C-A – 5856C-B.

d. Road #5857C          N48°55'59.106" W115°44'41.142"
See photos 5857C-A – 5857C-C.

e. Road #5857G          N48°55'42.900" W115°43'33.732"
See photos 5857G-A – 5857G-C.

f. Road #5886B          N48°50'41.466" W115°44'12.018"
See photos 5886B-A – 5886B-D.

g. Road #5886C          N48°50'48.090" W115°44'49.740"
See photos 5886C-A – 5886C-C.

h. Road #902A          N48°48'11.190" W115°48'42.858"
See photos 9028. (Incorrectly written as 9028 in photo.)

i. Road #14118          N48°50'22.926" W115°45'35.598"
See photos 14118-A – 14118-C.

5

FS-044266

Holloway Photo Comparisons With Monitoring

## Comparison of Holloway photographs with those from the Kootenai National Forest Closure Monitoring

Mr. Holloway submitted several folders with photographs of road closure devices, and several old, unknown routes that maybe used by ATVs. Sites identified in column one, with an dentification number of three, four, or five, are those in which he claims to have documented ineffective closure devices, either gates or berms. Our corresponding photograph(s) showing the image from our closure monitoring surveys are in the column labeled 'KNF photograph.' It appears that all of Mr. Holloways photographs were taken from the vantage point of the adjacent open road. In some instances, this provides a sufficient view of the restriction device. However, in the KNF photographs, the restrictions are absolutely evident.

**Table 1. Comparison of photographs submitted by Mr. Holloway with those from the Kootenai National Forest Closure Monitoring program, 2021.**

| Holloway site ID | NFSR ID | Holloway photographs | KNF photograph | Closure monitor-ing date | Closure status | KNF comment |
|---|---|---|---|---|---|---|
| 3a | 276 | | | 20210728 | Functional | None |
| 3b | 276A | | | | Functional | None |

1

9-ER-2183

FS-044664

Resource Report for Title of Project

| Holloway site ID | NFSR ID | Holloway photographs | KNF photograph | Closure monitor-ing date | Closure status | KNF comment |
|---|---|---|---|---|---|---|
|  |  | |  |  |  |  |
| 3c | 747 | | | 20210822 | Functional | None |

FS-044665

Holloway Photo Comparisons With Monitoring

| Holloway site ID | NFSR ID | Holloway photographs | | | | KNF photograph | Closure monitor-ing date | Closure status | KNF comment |
|---|---|---|---|---|---|---|---|---|---|
| 3d | 748 | | | | | | 20210923 | Functional | None |
| 3e | 757 | | | | | | 20210922 | Functional | None |

FS-044666

Resource Report for Title of Project

| Holloway site ID | NFSR ID | Holloway photographs | KNF photograph | Closure monitor-ing date | Closure status | KNF comment |
|---|---|---|---|---|---|---|
| 3f | 3101 | | | 20210922 | Functional | None |
| 3g | 3380 | | | 20210802 | Functional | NFSR 338Q |

4

9-ER-2186

FS-044667

Holloway Photo Comparisons With Monitoring

| Holloway site ID | NFSR ID | Holloway photographs | | | | KNF photograph | Closure monitor-ing date | Closure status | KNF comment |
|---|---|---|---|---|---|---|---|---|---|
| 3h | 5839 | | | | | | 20210728; 20210921 | Uncertain; functional | Possible motorized use; functional. Barrier was improved in 2021 |
| 3i | 5846 | | | | | | 20211130 | Functional | No picture taken, on personal time. |
| 3j | 5852 | | | | | | 20211202 | Functional | None |

5

FS-044668

Resource Report for Title of Project

| Holloway site ID | NFSR ID | Holloway photographs | | | | KNF photograph | Closure monitor-ing date | Closure status | KNF comment |
|---|---|---|---|---|---|---|---|---|---|
| 3k | 5858 | | | | | | 20210923 | Functional | None |
| 3l | 5860 | | | | | | 20210728 | Functional | None |

6

9-ER-2188

FS-044669

Holloway Photo Comparisons With Monitoring

| Holloway site ID | NFSR ID | Holloway photographs | | | | KNF photograph | Closure monitor-ing date | Closure status | KNF comment |
|---|---|---|---|---|---|---|---|---|---|
| 3m | 5886A | | | | | | 20210728 | Functional | None |
| 3n | 5886E | | | | | | 20210922 | Functional | None |

7

9-ER-2189

FS-044670

Resource Report for Title of Project

| Holloway site ID | NFSR ID | Holloway photographs | KNF photograph | Closure monitor-ing date | Closure status | KNF comment |
|---|---|---|---|---|---|---|
| 3o | 5930 | | | 20210723 | Functional | None |
| 4a | 523 | | | 20210818 | Functional | Note NFSR ID is 5894, not 523. |

8

9-ER-2190

Holloway Photo Comparisons With Monitoring

| Holloway site ID | NFSR ID | Holloway photographs | | KNF photograph | Closure monitor-ing date | Closure status | KNF comment |
|---|---|---|---|---|---|---|---|
| 4b | 595 | | | | 20210820 | Functional | Not in Black Ram project area |
| 4c | 902 | | | | 20210820 | Functional | Not in Black Ram project area |

9

FS-044672

Resource Report for Title of Project

| Holloway site ID | NFSR ID | Holloway photographs | KNF photograph | Closure monitor-ing date | Closure status | KNF comment |
|---|---|---|---|---|---|---|
| 4d | 5821 | | | 20210728; 20210921 | Functional | Not in Black Ram project area |
| 4e | 5835 | | | 20210728 | Functional | None |

10

9-ER-2192

Holloway Photo Comparisons With Monitoring

| Holloway site ID | NFSR ID | Holloway photographs | | | | KNF photograph | Closure monitor-ing date | Closure status | KNF comment |
|---|---|---|---|---|---|---|---|---|---|
| 4f | 5841 | | | | | | 20210922 | Functional | None |
| 4g | 5856 | | | | | | 20210728; 20211202 | Functional | Extensive tree blowdown across road since 2020 |
| | | | | | | | | | |

11

FS-044674

Resource Report for Title of Project

| Holloway site ID | NFSR ID | Holloway photographs | | | KNF photograph | Closure monitor-ing date | Closure status | KNF comment |
|---|---|---|---|---|---|---|---|---|
| 4h | 5857 | | | | | 20210922 | Functional | Garver LO gate; not applicable to BMU metrics |
| 4i | 5873 | | | | | 20210922 | Functional | None |

FS-044675

Holloway Photo Comparisons With Monitoring

| Holloway site ID | NFSR ID | Holloway photographs | | | | KNF photograph | Closure monitor-ing date | Closure status | KNF comment |
|---|---|---|---|---|---|---|---|---|---|
| 4j | 5874 | | | | | | 20210802 | Functional | None |
| 4k | 5894 | | | | | | 20210802 | Functional | None |
| 4l | 5919 | | | | | | 20210803 | Functional | None |

13

FS-044676

Resource Report for Title of Project

| Holloway site ID | NFSR ID | Holloway photographs | KNF photograph | Closure monitor-ing date | Closure status | KNF comment |
|---|---|---|---|---|---|---|
| 4m | 6084 | | Photograph unavailable at the moment. | 20211004; 20211020 (repaired) | Not functional; Functional (repaired) | Not in Black Ram project area. Repaired 20211020 |

FS-044677

Holloway Photo Comparisons With Monitoring

| Holloway site ID | NFSR ID | Holloway photographs | | | | | KNF photograph | Closure monitor-ing date | Closure status | KNF comment |
|---|---|---|---|---|---|---|---|---|---|---|
| 4n | 6134 | | | | | | | 20210802 | Functional | South access point off NFSR 338 |
| 4o | 6134 | | | | | | | 20210802 | Functional | North access point off NFSR 338 |

15

FS-044678

Resource Report for Title of Project

| Holloway site ID | NFSR ID | Holloway photographs | | | KNF photograph | Closure monitor-ing date | Closure status | KNF comment |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| 4p | 6708 | | | | | 20210802 | Functional | None |
| 4q | 6715 | | | | | 20210820 | Functional | None |

FS-044679

Holloway Photo Comparisons With Monitoring

| Holloway site ID | NFSR ID | Holloway photographs | | | | KNF photograph | Closure monitor-ing date | Closure status | KNF comment |
|---|---|---|---|---|---|---|---|---|---|
| 5a | 338K | | | | | | 20210802 | Functional | None |
| 5b | 338N | | | | | | 20210802 | Functional | This is also identified as NFSR 5914A |
| | | | | | | | | | |

17

9-ER-2199

FS-044680

Resource Report for Title of Project

| Holloway site ID | NFSR ID | Holloway photographs | | | | KNF photograph | Closure monitor-ing date | Closure status | KNF comment |
|---|---|---|---|---|---|---|---|---|---|
| 5c | 338P | | | | | | 20210802 | Functional | Note KNF picture clearly shows impassable vegetation, which also hides a berm. Mr. Holloway' photograph is taken from NFSR 338. |
| 5d | 338R | | | | | | 20210802 | Functional | NFSR 3389 (called 338R in the past). Note KNF picture clearly shows a berm. |
| 5e | 757A | | | | | | 20210922 | Functional | None |

18

FS-044681

Holloway Photo Comparisons With Monitoring

| Holloway site ID | NFSR ID | Holloway photographs | | | | KNF photograph | Closure monitor-ing date | Closure status | KNF comment |
|---|---|---|---|---|---|---|---|---|---|
| 5f | 902A | | | | | | 20210820 | Functional | Not in Black Ram project area. |
| 5g | 5857 | | | | | | 20210728; 20210805 | Functional | 20210728:Old landing location, about 200 feet long. Not passable by motor vehicle, but atv/utv could go to the end (200 feet). No evidence of use. 20210805: Functional; no evidence of use. |

FS-044682

Resource Report for Title of Project

| Holloway site ID | NFSR ID | Holloway photographs | | | | KNF photograph | Closure monitor-ing date | Closure status | KNF comment |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| 5h | 5886 | | | | | No photograph | Not applicable | Functional | NFSR 5890 (Gun Club Road) is considered open for monitoring and BMU metrics |
| 5i | 5892 | | | | | | 20211202 | Not applicable. May be an undetermined, old route. Challenging to functionally prevent off route travel due to naturally flat, open terrain. | At 0.3 mile: not passable by reasonable, prudent user; shows possible off-route ATV use. At 0.9 mile: not passable by reasonable, prudent user. At 2.4 mile: impassable (brush). Holloway photograph of tire tracks appear to be those of a vehhicle that may have turned around at that location, but did not travel off route. |

20

9-ER-2202

Holloway Photo Comparisons With Monitoring

| Holloway site ID | NFSR ID | Holloway photographs | | KNF photograph | Closure monitor-ing date | Closure status | KNF comment |
|---|---|---|---|---|---|---|---|
| 5j | 5892 | | | | 20211202 | Functional | Brushed in and narrow old jammer road. Impassable to prudent driver in current condition, and would take extensive unauthorized tre cutting to access this approximately 250m long prism. No evidence of use. |
| 5k | 5895 | | | | 20210802 | Functional | Vegetation prevents passage and is not obvious from the open road location from which the Holloway photograph was taken. |
| 5l | 14125 | | | | 20210802 | Functional | Vegetation prevents passage and is not obvious from the open road location from which the Holloway photograph was taken. |

FS-044684

Resource Report for Title of Project

| Holloway site ID | NFSR ID | Holloway photographs | KNF photograph | Closure monitor-ing date | Closure status | KNF comment |
|---|---|---|---|---|---|---|
| 5m | 14126 | | | 20210922 | Functional | At about 150 meters, vegetation (and gate) prevent passage Not obvious from the open road location from which the Holloway photograph was taken. |
| 6a | 2335 | | | 20210820 | Functional | Not in Black Ram project area |
| 6b | 5856A | | | 20210923 | Functional | None |

22

9-ER-2204

Holloway Photo Comparisons With Monitoring

| Holloway site ID | NFSR ID | Holloway photographs | | | KNF photograph | Closure monitor-ing date | Closure status | KNF comment |
|---|---|---|---|---|---|---|---|---|
| 6c | 5856C | | | | | 20210923 | Functional | None |
| 6d | 5857C | | | | | 20210922 | Functional | None |
| 6e | 5857G | | | | | 20210922 | Functional | None |

FS-044686

Resource Report for Title of Project

| Holloway site ID | NFSR ID | Holloway photographs | KNF photograph | Closure monitor-ing date | Closure status | KNF comment |
|---|---|---|---|---|---|---|
| Not indicated in letter | 5859 | | | 20210922 | Functional | None |
| 6f | 5886B | | | 20210922 | Functional | None |
| 6g | 5886C | | | 20210922 | Functional | None |

24

FS-044687

Holloway Photo Comparisons With Monitoring

| Holloway site ID | NFSR ID | Holloway photographs | | | | KNF photograph | Closure monitor-ing date | Closure status | KNF comment |
|---|---|---|---|---|---|---|---|---|---|
| 6h | 902B | | | | | | 20210820 | Functional | In the letter this was identified as 902A. Not in Black Ram project area. |
| 6i | 14118 | | | | | | 20210922 | Functional | None |

25

9-ER-2207

FS-044688

Ronni M. Flannery (MT Bar No. 5890)
LAW OFFICE OF RONNI M. FLANNERY
936 South 2nd Street, West
Missoula, MT 59801
(406) 214-5700
rflannery@bresnan.net

Edward B. Zukoski (*Admitted Pro Hac Vice*)
CENTER FOR BIOLOGICAL DIVERSITY
1536 Wynkoop Street, Suite 421
Denver, CO  80202
(303) 641-3149
tzukoski@biologicaldiversity.org

Andrea Zaccardi (*Admitted Pro Hac Vice*)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 469
Victor, ID  83455
(303) 854-7748
azaccardi@biologicaldiversity.org

*Counsel for Plaintiffs*

Marla Fox (*Admitted Pro Hac Vice*)
WILDEARTH GUARDIANS
P.O. Box 13086
Portland, OR 97213
(651) 434-7737
mfox@wildearthguardians.org

*Counsel for Plaintiff WildEarth Guardians*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

CENTER FOR BIOLOGICAL
DIVERSITY, YAAK VALLEY FOREST
COUNCIL, and WILDEARTH
GUARDIANS,

        Plaintiffs,

vs.

UNITED STATES FOREST SERVICE;
LEANNE MARTEN, in her official
capacity as Regional Forester for the
Northern Region of the U.S. Forest
Service; CHAD BENSON, in his official
capacity as Supervisor of the Kootenai
National Forest; UNITED STATES FISH
AND WILDLIFE SERVICE; DEB
HAALAND, in her official capacity as
Secretary of the U.S. Department of the
Interior; MARTHA WILLIAMS, in her
official capacity as Director of the U.S.
Fish and Wildlife Service; and ADAM
ZERRENNER, in his official capacity as
Field Supervisor for the U.S. Fish and
Wildlife Service's Montana Ecological
Services Office,

        Federal Defendants.

Case No. 9:22-cv-00114-DWM

**FIRST AMENDED
COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

Yaak area is in decline—not increasing as the 2022 Biological Opinion alleges.

Third, the agency improperly ignored the impacts on reproductive female grizzly

bears in the area to reach its conclusion that the Project will not jeopardize grizzly

bears. For these reasons, the 2022 Biological Opinion and Incidental Take

Statement are arbitrary and capricious and violate requirements of the ESA.

10.     Because the Forest Service's approval of the Black Ram Project and

the Fish and Wildlife Service's 2022 Biological Opinion in connection with the

Project violate federal law, this Court should vacate the Forest Service's approval,

vacate the 2022 Biological Opinion, and enjoin logging activities and construction

or re-construction of roads in connection with the Project.

11.     The Forest Service approved the Project on June 21, 2022. The Forest

Service stated in its media release that no harvest will occur until calendar year

2023 and only after additional core habitat is secured for grizzly bears. Other

activities authorized by the decision have already begun.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331 (federal question jurisdiction), 1346 (United States as a defendant),

5 U.S.C. §§ 701-706 (Administrative Procedure Act's judicial review provisions),

and 16 U.S.C. §§ 1540(c), (g)(1)(C) (action arising under the ESA and citizen suit

5

provision). This Court may order relief pursuant to 28 U.S.C. § 2201 (declaratory judgment) and § 2202 (further relief), and 5 U.S.C. §§ 702 and 706.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because: plaintiff Yaak Valley Forest Council is based in Lincoln County, Montana; the lands at issue in this suit are located in Lincoln County, Montana; Federal Defendant Kootenai National Forest is located in Lincoln County, Montana; the office of Federal Defendant Chad Benson is located in Lincoln County, Montana; and a substantial part of the events giving rise to Plaintiffs' legal claims occurred in Lincoln County, Montana. See 28 U.S.C. § 1391(e)(1); D. Mont. L.R. 1.2(c)(5), 3.2(b).

14.     Plaintiffs provided Defendants with 60 days' written notice of Plaintiffs' intent to sue on June 30, 2022 and on September 23, 2022, as required by 16 U.S.C. § 1540(g)(2)(C).

## PARTIES

15.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the Center) is a non-profit environmental organization dedicated to the preservation, protection, and restoration of biodiversity, native species, and ecosystems. The Center is headquartered in Tucson, Arizona, with offices in a number of states, including Montana. The Center uses science, policy, and law to advocate for the conservation

117.   By only assessing impacts against the entirety of the grizzly bear population in the Cabinet-Yaak Ecosystem while ignoring impacts to the small disjunct population of grizzly bears residing in the Yaak, Fish and Wildlife Service's analysis superficially underestimates the impacts that the Black Ram Project could have on the Yaak Valley grizzly bear population.

118.   Even without these crucial analyses, however, Fish and Wildlife Service concludes that the Black Ram Project will not jeopardize grizzly bears.

### FIRST CAUSE OF ACTION
(NEPA & APA Violations: Failure to Take a Hard Look)

119.   The allegations in all preceding paragraphs are incorporated herein by reference.

120.   NEPA and its implementing regulations require federal agencies, including the Forest Service, to take a "hard look" at the environmental consequences of proposed actions and the reasonable alternatives that would avoid or minimize such impacts or enhance the quality of the human environment. See 42 U.S.C. § 4332(2)(C)(i); 40 C.F.R. Parts 1502 and 1508 (1978). Agencies must take a hard look at the direct, indirect, and cumulative impacts of a proposed agency action and all alternatives in an EA. 40 C.F.R. §§ 1508.7, 1508.8 (1978). The information presented in the EA must be of high quality and include "accurate

scientific analysis, and disclose that information and analysis, and its limitations, to the public. 40 C.F.R. § 1500.1(b)–(c) (1978).

121.  NEPA also requires environmental analysis to disclose existing conditions in the project area to provide a baseline against which the impacts of alternative courses of action can be compared. Id.

122.  The Forest Service failed to take the required "hard look" to consider and disclose the Black Ram Project's direct, indirect, and cumulative impacts, including impacts to the imperiled grizzly bear and impacts to–and from–climate change.

123.  For example, the Forest Service failed to disclose baseline conditions of grizzly bears in the project area, including, inter alia, basing the agency's analysis on the grizzly bear population in the combined Cabinet-Yaak ecosystem, when the Yaak ecosystem population is effectively isolated from the Cabinet ecosystem population. Given that the tiny population in both the Yaak and Cabinet-Yaak are so small that they are subject to extirpation with the loss of even one or two reproducing females, or harm to their reproductive success, the Forest Service was required to consider the risk of permanently harming the recovery of grizzly bears in the Yaak Valley.

124.   Further, the Forest Service failed to take a hard look at the cumulative impacts of the Black Ram Project together with other projects likely to impact grizzlies in the area. For example, the Forest Service inappropriately limited its cumulative impacts analysis to impacts within the Black Ram Project area, despite the fact that: (1) grizzlies have large home ranges and so bears there will likely travel in and out of the project area, and so actions beyond the project area may cumulatively impact bears; and (2) actions in Canada, which is directly adjacent to the project area and part of the Yaak ecosystem, are likely to impact grizzlies in the Yaak ecosystem together with the Black Ram Project.

125.   Regarding actions near and adjacent to the Black Ram Project area, and that will impact grizzly bears and other values within and beyond that project area, the Forest Service also inappropriately omitted from its cumulative impacts analysis two logging projects (the Knotty Pine Project and the Lower Yaak Project), and improperly discounted the cumulative impacts from the Buckhorn Project. These three projects, together with the Black Ram Project, impact a contiguous landscape of 240,000 acres of the Kootenai National Forest in the Cabinet-Yaak grizzly bear recovery zone.

126.   The Buckhorn Project area abuts the southern boundary of the Black Ram Project area. Buckhorn approved the removal of more than 15 million board

feet of commercial timber, and project implementation is ongoing. The Knotty

Pine Project area is located adjacent to and south of the Buckhorn Project, and is

less than 10 miles south of the southern boundary of the Black Ram Project.

Knotty Pine involves more than 5,000 acres of logging, including 2,900 acres of

commercial logging. The Forest Service is currently implementing Knotty Pine.

Conservation groups have challenged Knotty Pine in litigation before this court.

See Center for Biological Diversity v. Forest Service (D. Montana 22-CV-91-

DLC-KLD). The Lower Yaak Project area abuts the south end of the Knotty Pine

Project and is about 12 miles south of the southern boundary of the Black Ram

Project area. Implementation of the Lower Yaak Project is ongoing, and involves

road construction and removal of 38 million board feet of commercial timber.

Together with the Black Ram Project, these three ongoing projects are likely to

cumulatively impact grizzly bears and a variety of other values.

127. Climate impacts are among the impacts NEPA requires agencies to

consider and disclose. See, e.g., Center for Biological Diversity v. NHTSA, 538

F.3d 1172 (9th Cir. 2008); Mont. Envtl. Info. Ctr. v. United States Office of

Surface Mining, 274 F. Supp. 3d 1074 (D. Mont. 2017) (vacating and setting aside

mine plan modification in part due to agency's failure to quantify coal mine

climate pollution).

128.   The Black Ram EA fails to disclose adequately the climate change impacts of the Black Ram Project. Specifically, the Final EA fails to disclose the impacts of the proposed action alternatives on carbon storage compared to the no action alternative. Further, the EA fails to disclose the climate pollution impacts of project implementation – the use of fossil fuel engines to build roads, cut trees, and remove and transport cut logs to mills – compared to the no action alternative. The EA thus failed to take a "hard look" at the Black Ram Project's climate pollution impacts, in violation of NEPA.

129.   The Forest Service's failure to take the required "hard look" at the Project's direct, indirect, and cumulative impacts and the agency's failure to accurately disclose the baseline conditions violates NEPA. By relying on the defective EA and Finding of No Significant Impact for its decision, the Forest Service's action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, which has substantially prejudiced Plaintiffs and accordingly must be held unlawful and set aside. 5 U.S.C. § 706(2)(A).

## SECOND CAUSE OF ACTION
(NEPA & APA Violations:  Failure to Prepare an Environmental Impact Statement)

130.   The allegations in all preceding paragraphs are incorporated herein by reference.

131.   NEPA requires federal agencies to prepare a full environmental impact statement (EIS) before undertaking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The Ninth Circuit has held that "that an EIS must be prepared if 'substantial questions are raised as to whether a project . . . may cause significant degradation to some human environmental factor.'" <u>Idaho Sporting Cong. v. Thomas</u>, 137 F.3d 1146, 1149-50 (9th Cir. 1998) (citations omitted) (emphasis original).

132.   In evaluating whether to prepare an EIS, agencies address whether impacts may be "significant" by considering the "context" and "intensity" of a proposal's impact. 40 C.F.R. § 1508.27 (1978). Determining "intensity" requires the evaluation of numerous "significance" factors, including: (a) the "unique characteristics of the geographic area," including Wild and Scenic Rivers; (b) the degree to which the effects on the quality of the human environment are likely to be highly controversial; (c) the "degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks;" (d) "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts;" (e) "[t]he degree to which the action may adversely affect an endangered or threatened species;" and (f) whether the action

threatens a violation of Federal, State, or local law or requirements imposed for the

protection of the environment. 40 C.F.R. § 1508.27(b) (1978).

133.   To avoid preparing an EIS, an agency must set forth a "convincing

statement of reasons" explaining why the action will have no significant

environmental impact. 40 C.F.R. § 1508.13 (1978). If the agency's action may be

environmentally significant according to any of the criteria, the agency must

prepare an EIS.

134.   The Forest Service failed to prepare an EIS to analyze the Project's

impacts, despite the fact that, among other things: (1) the Black Ram Project may

significantly harm unique characteristics of the area, including lands eligible for

wild and scenic river designation, inventoried roadless areas, the Pacific Northwest

National Scenic Trail, threatened and endangered species (including the grizzly

bear), and their habitat, old growth and mature forest stands; (2) the Black Ram

Project's effects on the environment are highly uncertain because the impacts the

project seeks to forestall (beetle infestation and wildfire) may never occur; (3)

logging mature and old growth forest that is already properly functioning habitat in

an attempt to maintain or improve resilience to drought, insect and disease

outbreaks, and wildfire is highly controversial and involves a high degree of

scientific uncertainty; (4) the Black Ram Project, when combined with past and

reasonably foreseeable future neighboring timber sales may result in cumulatively significant impacts on the environment; (5) the Black Ram Project will adversely affect the grizzly bear, a threatened species; and (6) the Black Ram Project is inconsistent with the Kootenai's Forest Plan components imposed for the protection of the environment, threatening a violation of NFMA.

135.   The Forest Service's Finding of No Significant Impact and its failure to complete an EIS, despite the fact that the Black Ram Project may significantly affect the quality of the environment, violates NEPA and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

### THIRD CAUSE OF ACTION
(NFMA & APA Violations: Project is Inconsistent with Kootenai Forest Plan)

136.   The allegations in all preceding paragraphs are incorporated herein by reference.

137.   NFMA requires the Forest Service to ensure that its site-specific actions comply with the requirements of the governing Forest Plan. 16 U.S.C. § 1604(i). The Kootenai Forest Plan includes plan components for timber harvesting and vegetation management. It also contains management-area plan components, including components specific to river segments identified for inclusion as part of the Wild and Scenic Rivers System.

138.   The Forest Service failed to ensure the Black Ram Project complies with the Kootenai Forest Plan's desired conditions, standards, and guidelines, in violation of NFMA, including the following failures:

    a.   Authorizing timber harvest in eligible wild river segments, as prohibited by Forest Plan standard MA2-STD-TBR-01.

    b.   Authorizing logging within 579 acres of old growth stands and 0.8 miles of new road construction through old growth forest, contrary to Forest Plan standard FW-STD-VEG-01.

139.   By failing to ensure compliance with the Kootenai Forest Plan, the Forest's action approving the Black Ram Project through the EA and Finding of No Significant Impact and Decision Notice is arbitrary, capricious, an abuse of discretion, and not in accordance with the law, which has substantially prejudiced Plaintiffs, and accordingly must be held unlawful and set aside. 5 U.S.C. § 706(2).

## FOURTH CAUSE OF ACTION
(ESA Violation: Failure to Use the Best Available Science and Accurate Baseline)

140.   During consultation, Fish and Wildlife Service must review all relevant information available, and in doing so must evaluate the current status and environmental baseline of the listed species. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. §§ 402.14(g)(1), (2).

141.   Further, in analyzing impacts from a project on listed species in a biological opinion, the ESA requires that Fish and Wildlife Service utilize the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d).

142.   In the Black Ram Biological Opinion, Fish and Wildlife Service used an estimated population of 60 grizzly bears in the Cabinet-Yaak Ecosystem to assess impacts from the Project. See 2022 Biological Opinion at 9 (citing Kasworm et al. (2021)). This 60 population estimate relies upon a 2.1% growth rate to the midpoint of the population range estimate reported in Kendall et al. (2016) (in which the authors reported a 2012 population estimate of 48-50 bears). This 2.1% growth rate is seriously flawed because it excludes survival and morality data for adult and sub-adult males, management-trapped bears, and augmentation bears. See Kasworm et al. (2021) at 10-12 (calculating the population growth rate based on adult and subadult female survival, yearling and cub survival, age at first parturition, reproductive rate, and maximum age of reproduction). By excluding survival and mortality rates for segments of the bear population that are likely to suffer the highest mortality rates, Fish and Wildlife Service relied on a flawed growth rate that is likely to cause an inflated population estimate. Thus, the

population estimate of 60 bears is not only outdated but is also based upon flawed assumptions that do not reflect the best available science.

143.   Fish and Wildlife Service also ignores recent information from 2018-2020 indicating a likely declining population in the Cabinet-Yaak Ecosystem

144.   Even while relying on an inflated population estimate, Fish and Wildlife Service acknowledges that there is a 33 percent probability that the population is decreasing. Despite this recognition, Fish and Wildlife Service uses the 60 grizzly bear estimate that is derived from a 2.1% growth rate from 2012 numbers to assess impacts from the Project.

145.   Also, despite its own data showing there is a 33 percent probability that the Cabinet-Yaak Ecosystem grizzly bear population is decreasing, Fish and Wildlife Service relies upon the unsupported assumption that the population trend is increasing in its no-jeopardy determination.

146.   Because Fish and Wildlife Service ignores flaws in the methodology used to derive the population estimate and ignores new data showing that the grizzly bear population in the Cabinet-Yaak is likely decreasing, Fish and Wildlife Service has failed to use the best available science and has not produced an accurate baseline against which to assess the Project's impacts, in violation of the

ESA. See 16 U.S.C. § 1536(a)(2); id. § 1536(b)(3)(A); 50 C.F.R. §§ 402.14(d); id.

§§ 402.14(g)(1), (2).

## FIFTH CAUSE OF ACTION
(ESA and APA Violation: Failure to Consider an Important Factor)

147.   The best available science shows that grizzly bears in the Yaak Valley

and grizzly bears in the Cabinet-Mountains are completely isolated from each other

with no genetic exchange, and thus they function as two disjunct populations.

148.   The Black Ram Project area lies only within the Yaak Valley portion

of the Cabinet-Yaak Recovery Zone and thus will disproportionately impact

grizzly bears in the Yaak.

149.   Fish and Wildlife Service never analyzes the lack of connectivity

between grizzly bears in the Yaak and grizzly bears in the Cabinets, and how the

Project is likely to disproportionately impact grizzly bears in the Yaak.

150.   Fish and Wildlife Service only looked at impacts of the Project on the

entire population of grizzly bears in the Cabinet-Yaak Recovery Zone, never

considering the impacts on the small and isolated population of grizzly bears in the

Yaak Valley.

151.   Fish and Wildlife Service never analyzed whether the Black Ram

Project could lead to or increase the chances of extirpation of grizzly bears in the

Yaak Valley.

152.   Fish and Wildlife Service never analyzed what a significant reduction of grizzly bears in the Yaak Valley could mean for recovery of grizzly bears in the Cabinet-Yaak Recovery Zone as a whole.

153.   Because Fish and Wildlife Service failed to acknowledge the disproportionate impacts that the Black Ram Project will have on the isolated Yaak Valley population, or analyze what that could mean for the future of this small grizzly bear population, Fish and Wildlife Service has entirely failed to consider an important aspect of the problem, rendering the Biological Opinion arbitrary and capricious and contrary to law. 5 U.S.C. § 706(2)(A); State Farm, 463 U.S. at 43.

## SIXTH CAUSE OF ACTION
### (ESA Violation: Fish and Wildlife Service Fails to Support Its No-Jeopardy Finding)

154.   Section 7 of the ESA requires each federal agency, in consultation with a federal wildlife agency, (Fish and Wildlife Service for the grizzly bear), to insure that any proposed action is not likely to jeopardize the continued existence of a listed species, or result in the destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(a)(2). To "jeopardize the continued existence of" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both survival and recovery of a listed species

in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

155.   The Ninth Circuit has made clear that a species may be jeopardized even "if there is no appreciable reduction of survival odds" because "a species can often cling to survival even when recovery is far out of reach." Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 524 F.3d 917, 931 (9th Cir. 2008), superseded by statute on other grounds, as stated in Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt., 21-CR-20290, 2021 U.S. Dist. LEXIS 1555471, at *75 (D. Alaska Aug. 18, 2021). Thus, Fish and Wildlife Service "must analyze effects on recovery as well as effects on survival." Id. at 932.

156.   Under the ESA, "[r]ecovery means improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in section 4(a)(1) of the Act." 50 C.F.R. § 402.02. Moreover, the regulations make clear that "reducing the reproduction" of a species may constitute jeopardizing the survival or recovery of that species. Id.

157.   As Fish and Wildlife Service recognizes in the Biological Opinion, "[p]ursuant to Service policy, when an action impairs or precludes the capacity of a recovery unit from providing both the survival and recovery function assigned to it, that action may represent jeopardy to the species (U.S. Fish and Wildlife Service

memo, March 6, 2006)." 2022 Biological Opinion at 7. Thus, an agency action that

negatively impacts the survival or recovery or grizzly bears in the Cabinet-Yaak

Recovery Zone may be sufficient to lead to a positive jeopardy finding, even if the

action does not cause jeopardy across the grizzly bear's entire range in the lower

48 States.

158.   There are currently two known reproducing females that use the

action area. Fish and Wildlife Service noted that during project implementation,

administrative use limits on restricted roads will increase Open Motorized Route

Density and Total Motorized Route Density, and "female grizzly bears are

expected to experience significant effects to feeding, breeding, or sheltering." 2022

Biological Opinion at 51. Further, Fish and Wildlife Service acknowledged that

female grizzly bears may be displaced as a consequence of the Project and that

reproductive success for females may be negatively affected for at least 3-5 bear

years, potentially affecting reproductive cycles for adult female grizzly bears. Id. at

52-53.

159.   These impacts are of especially significant import for grizzly bears

because they have one of the slowest reproductive rates among terrestrial

mammals, as a result of a late age of first reproduction, small average litter sizes,

and a long inter-birth interval. Given these factors it may take a female grizzly bear ten or more years to replace herself in a population.

160.   In the Cabinet-Yaak Recovery Zone, several recovery goals set in the 1993 Recovery Plan have not been met including criterial related to occupancy and reproduction by female grizzly bears. Thus, the impact to 1-2 reproductive cycles for at least two currently reproductive adult females using the project area could seriously impair meeting recovery goals.

161.   Despite this information, Fish and Wildlife Service arbitrarily concluded that because impacts will be temporary, the Black Ram Project will not reduce the reproduction of grizzly bears in the recover zone, and therefore, the Project will not lead to jeopardy. See id. at 55 ("Because the Black Ram Project will not reduce the reproduction, numbers, or distribution of grizzly bears throughout the [Cabinet-Yaak Ecosystem] population as well as other grizzly bear populations in the lower 48, we conclude that the level of adverse effects is not reasonably expected to reduce appreciably the likelihood of both the survival and recovery of the listed entity of grizzly bears as a whole."). In reaching this conclusion, not only did Fish and Wildlife Service gloss over the impacts on reproductive females in the project area, but Fish and Wildlife Service ignored its own policy that requires the agency to determine whether project impacts would

impact the survival and recovery of grizzly bears in the Cabinet-Yaak Recovery Zone alone, not just "the listed entity of grizzly bears as a whole."

162.   Fish and Wildlife Service failed to rationally determine, based on a consideration of all relevant factors, whether the Black Ram Project will jeopardize the survival of the grizzly bear population in the Cabinet-Yaak Recovery Zone. See Ctr. for Biological Diversity v. BLM, 698 F.3d 1101, 1121 (9th Cir. 2012). By applying the incorrect standard to reach its jeopardy conclusion in failing to consider the survival and recovery impacts to the grizzly bear population in the Cabinet-Yaak Recovery Zone and by ignoring how impacts to reproductivity will impair recovery in this recovery zone, Fish and Wildlife Service reached a jeopardy conclusion that is arbitrary and capricious, in violation of the ESA and APA. 16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706(2)(A).

163.   Moreover, as described more fully above, Fish and Wildlife Service failed to rely on the best available science and data in its jeopardy analysis, relying on the unsupported conclusion that the Cabinet-Yaak grizzly bear population is increasing. The difference between an increasing population trend, decreasing population trend, or stagnant level is a key and relevant factor to Fish and Wildlife Service's no-jeopardy determination. Because Fish and Wildlife Service failed to consider the best available science in analyzing the Cabinet-Yaak grizzly bear

population trend, Fish and Wildlife Service's no-jeopardy determination is

arbitrary. The facts found do not rationally support Fish and Wildlife Service's

conclusion. 16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706(2)(A); 50 C.F.R. § 402.14(d).

## SEVENTH CAUSE OF ACTION
(ESA and APA Violation: The Forest Service May Not Lawfully Rely on the Flawed Biological Opinion)

164.   The Forest Service cannot rely on a faulty biological opinion to fulfill

its substantive Section 7 duties to insure it does not jeopardize the continued

existence of a listed species. See Defs. of Wildlife v. Envtl. Prot. Agency, 420 F.3d

946, 976 (9th Cir. 2005) (rev'd on other grounds, Nat'l Ass'n of Home Builders v.

Defs. of Wildlife, 551 U.S. 664 (2007)); Resources Ltd. Inc. v. Robertson, 35 F.3d

1300, 1304 (9th Cir. 1994) ("Consulting with the Fish and Wildlife Service alone

does not satisfy an agency's duty under the Endangered Species Act."). The Forest

Service violates the ESA if it approves or implements an action in reliance on a

legally flawed biological opinion or fails in its approval or implementation

decision "to discuss information that would undercut the [biological] opinion's

conclusion." Ctr. for Biological Diversity v. BLM, 698 F.3d at 1127-28; accord

WildEarth Guardians v. Steele, 545 F.Supp.3d 855, 880 (D. Mont. 2021).

165.   Because the 2022 Biological Opinion was arbitrary and unlawful for

the reasons stated above, the Forest Service's reliance on this inadequate

Biological Opinion in authorizing the Black Ram Project was likewise unlawful.

See Ctr. for Biological Diversity v. BLM, 698 F.3d at 1127-28.

166.   The Black Ram Project Decision Notice and Finding of No

Significant Impact relying on the unlawful Biological Opinion are therefore

arbitrary, capricious, and not in accordance with law and should be set aside

pursuant to the ESA and APA. 16 U.S.C. § 1540(g); 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment in their favor

and against Defendants and provide the following relief:

1.     Declare that Defendants U.S. Forest Service, Regional Forester

Marten in her official capacity, and Forest Supervisor Chad Benson in his official

capacity violated NEPA, regulations implementing NEPA, NFMA, the ESA, and

the APA in approving the Black Ram Project;

2.     Declare that Defendants U.S. Fish and Wildlife Service, Secretary

Deb Haaland in her official capacity, Director Martha Williams in her official

capacity, and Supervisor Adam Zerrenner in his official capacity violated the ESA

and APA in approving the Black Ram Biological Opinion;

3.     Declare unlawful, set aside, and vacate the Defendant U.S. Fish and

Wildlife Service's Biological Opinion;

Kris A. McLean
Tyson A. McLean
Kris A. McLean Law Firm, PLLC
2315 McDonald Ave., Suite 106
Missoula, MT 59801
kris@krismcleanlaw.com
tyson@krismcleanlaw.com

Julie Weis
HAGLUND KELLEY LLP
2177 SW Broadway
Portland, OR  97201
jweis@hk-law.com
(Motion for admission *pro hac vice* pending)

*Attorneys for Proposed Defendant-Intervenor*
*Kootenai Tribe of Idaho*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*, | Case No: 9:22-cv-00114-DWM |
| Plaintiffs, | |
| vs. | **DECLARATION OF SCOTT SOULTS** |
| U.S. FOREST SERVICE, *et al.*, | |
| Defendants. | |
| KOOTENAI TRIBE OF IDAHO, | |
| Proposed Defendant-Intervenor. | |

**DECLARATION OF SCOTT SOULTS**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

I, Scott Soults, being sworn, declare as follows:

1.      I am the Fish and Wildlife Department Wildlife Division Manager for the Kootenai Tribe of Idaho (the Kootenai Tribe or the Tribe).  I make this declaration based on personal knowledge and in support of the Tribe's motion to intervene in this lawsuit challenging the Forest Service's Black Ram Project (the Project) on the Kootenai National Forest (the Forest).  I am over the age of 18, and if called as a witness would testify competently as follows.

2.      I am a wildlife biologist who holds a Bachelors of Science degree in wildlife biology (with a minor in botany and zoology) from the University of Montana, obtained in 1991.  From 1995-97, I also studied raptor biology at Boise State University and undertook post-graduate course work.  Prior to that (1985), I obtained an associate's degree in business administration from Scott Community College.

3.      I have been working as a wildlife biologist in various capacities since 1989, when I started working on northern spotted owl issues with the Forest Service on the Mt. Hood National Forest.  Until 1993, I worked with the Forest Service on interdisciplinary teams in timber sale planning and with the Washington, D.C. Spotted Owl Supplemental Environmental Impact Statement

Page 1 – **DECLARATION OF SCOTT SOULTS**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

Team based in the Region 6 regional office. Among other responsibilities, I planned, organized and implemented a regional spotted owl surveying and monitoring program on 150,000 acres of wilderness.

4.    From 1993-96, I became certified as an Environmental Site Assessor and worked for a private environmental consulting company where, among other things, I completed Phase I and Phase II Environmental Site Assessments. From 1996-97, I ran my own private consulting company where I conducted biological and environmental assessments and offered wetland delineations, Idaho threatened and endangered species consultations and various evaluations, among other tasks.

5.    From 1997-99, I was employed with the United States Department of Agriculture Natural Resources Conservation Service (NRCS) in Missouri where I provided wildlife habitat program assistance to not only the NRCS but also to the Missouri Department of Conservation, Missouri Department of Natural Resources, landowners and other entities, including the U.S. Fish and Wildlife Service (FWS). My responsibilities included quail, pheasant, rabbit and turkey habitat enhancements, agricultural production methods and economics for conservation practices related to the State of Missouri NRCS open lands program on the restoration of 1.1 million acres of public and private lands.

Page 2 – **DECLARATION OF SCOTT SOULTS**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

6.      I joined the Kootenai Tribal Fish and Wildlife Department in 1999 and have been here ever since.  Originally, my job responsibilities focused on developing a wildlife program to enhance Tribal subsistence gathering and hunting opportunities, increasing hydroelectric mitigation participation, and recovering, protecting and managing sustainable native wildlife populations and habitats.  In many respects, those job responsibilities were interrelated due to the operational impacts of Libby Dam, which became fully operational in 1975.

7.      Libby Dam, located on the Kootenai River, was built for hydroelectric power production, flood control and recreation.  Its operations altered historic flow patterns in the lower Kootenai River, caused a loss in biological productivity and dewatered previously inundated riparian areas, among other detrimental environmental impacts.  Prior to Libby Dam's construction, the floodplains had been highly productive and functional wetlands that supported Tribal hunting, fishing and gathering.  Species like Kootenai River white sturgeon and burbot were primary food sources for the Kootenai people, who also fished and hunted for kokanee, westslope cutthroat trout, deer, elk and moose, all of which were supported by the Kootenai River in one way or another.

Page 3 – **DECLARATION OF SCOTT SOULTS**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

8.     I continue to do mitigation work for the Tribe as a wildlife biologist, and the Tribe has hired two more biologists and two wildlife technicians to help with this important effort. We currently are preparing to build a conservation nursery to grow native plants historically associated with floodplain and riparian habitats for use in our restoration efforts.

9.     As the Kootenai Tribe's Wildlife Division Manager, I oversee the policy and programmatic aspects of Tribal wildlife and related habitat issues. I also provide subject matter and policy development briefings to the Kootenai Tribal Council on a regular basis and provide representation on Tribal policy positions in multiple regional and local forums involving stakeholders from the state, county, Kootenai Valley Resource Initiative, FWS, Forest Service and other entities.

10.    The Kootenai Valley Resource Initiative (KVRI) formed in 2001 at the urging of the Tribe, whose belief in collaborative approaches and community involvement led it to approach the City of Bonners Ferry and Boundary County, Idaho about forming an organization that would foster citizen participation in protecting and restoring natural resources in the Kootenai River Valley. KVRI membership includes the Tribe, local governments, federal and state agencies,

Page 4 – **DECLARATION OF SCOTT SOULTS**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

environmental advocacy groups, representatives of business and industry, and private citizens and landowners.  KVRI subcommittees focus on different natural resource areas – the Forestry Subcommittee focuses on addressing forest issues using a landscape approach, for example, whereas the Grizzly Bear Subcommittee focuses on educating community members about grizzly bear management, recovery, the prevention of human/bear conflict, bear attractants and related matters.

11.    The Tribe and its KVRI partners engage in real, hands-on efforts aimed at promoting a more holistic, ecosystem-oriented approach to restoring healthy ecosystem functions for the benefit of natural resources.  For example, the Tribe and its KVRI partners are active proponents of forest restoration work on the Idaho Panhandle National Forest, including through the Collaborative Forest Landscape Restoration Program, which was established by Congress in 2009 to "encourage the collaborative, science-based ecosystem restoration of priority forest landscapes." 16 U.S.C. § 7301.  The Tribe also participated actively in the most recent Forest Plan revision process for both the Kootenai and Idaho Panhandle National Forests – I personally participated in the ecological review process for the Forest Plans.

Page 5 – **DECLARATION OF SCOTT SOULTS**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

12.     As the Kootenai Tribe's Wildlife Division Manager, I work closely with Gary Aitken, Jr., the Tribal Council Vice-Chairman who is responsible for Tribal Council oversight of natural resource matters.  He also serves as the Tribe's official representative on the Interagency Grizzly Bear Committee's (IGBC) Selkirk/Cabinet-Yaak Subcommittee and has tasked me with attending Subcommittee meetings as his delegate.

13.     After the grizzly bear was listed under the Endangered Species Act in 1975 as a threatened species, FWS developed a recovery plan that identified six recovery ecosystems, including the Selkirk and Cabinet-Yaak ecosystems.  The IGBC's Selkirk/Cabinet-Yaak Subcommittee is responsible for overseeing those two ecosystems – the Subcommittee's detailed role is available at this link: https://igbconline.org/committees/selkirk/#1628200502176-fc1d4348-7ae7.  The Selkirk/Cabinet-Yaak Subcommittee meets two times per year, and I report back to the Vice-Chairman on whether the Subcommittee is following Tribal desires and needs with respect to the bear.  Tribes originally were not represented on the IGBC Subcommittees but pushed for and obtained representation because of the Tribal importance of the species.

Page 6 – **DECLARATION OF SCOTT SOULTS**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

14.    One thing I am advocating for on the Subcommittee is for FWS to help fund a permanent Northern Idaho conflict biologist for the bears.  Conflicts between humans and bears may end poorly for the bear but often can be avoided.  This past summer, for example, two grizzly bears were killed for management purposes (i.e., assessed as habituated after bears repeatedly killed/fed on livestock) in the Kootenai River Valley.  I believe humans and bears could better coexist if we further educated the community on the benefits of doing such things as reducing bear attractants and improving security measures by installing electric fences.

15.    To follow the Kootenai Tribe's holistic approach to natural resources conservation and restoration, I try to understand the Tribe's historical uses of natural resources as best I can (much of the Tribe's sacred history cannot be shared with non-Kootenai like myself).  Through my conversations with Tribal elders, many of whom have passed, I have learned much about the relationship between natural resources restoration and Tribal needs.  Tribal elders have taught me that the Forest looks wrong, not like it looked when they were young and the Forest was healthy and resilient.  Historically, the Kootenai people actively managed the forest landscape, including through the use of fire, to meet Tribal and natural

Page 7 – **DECLARATION OF SCOTT SOULTS**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

resource needs based on traditional knowledge.  But under federal management, fire was restricted on the forest landscape, which decreased forest resiliency to disturbance and resulted in an unhealthy forest ecosystem that today endangers Kootenai resources.

16.    I am familiar with the Black Ram Project area because I have and will continue to recreate in the area.  My property in Moyie Springs, Idaho is located to the southwest of the Project area, and adjacent to the northwest corner of Montana. The Project area encompasses a diverse landscape within the Northwestern Montana Forest Region.  The forests within the Project area include those where the mountain range climate is cool temperate with some inland maritime influence, along with forested habitats that are lower elevation and characterized by dry forest types.  The management of high elevation, moist forested habitat where the fire return interval historically was on the order of hundreds of years differs from that of warm/dry forested habitat where fire was an integral part of the landscape and kept ladder fuels in check.  Forest Service professionals apply this knowledge and employ landscape/biological assessments, habitat typing characteristics and site-specific silvicultural prescriptions to each treatment unit.

Page 8 – **DECLARATION OF SCOTT SOULTS**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

17.     From a professional perspective, because the Black Ram Project is in Kootenai Territory and involves Kootenai resources, the Tribe engaged with the Forest Service both at the staff level and through government-to-government consultation during Project development.  Tribal staff like myself meet regularly with Forest Service specialists to discuss land management projects and the Kootenai Tribe's perspective on those projects.  Once or twice a year, Tribal Council meets with the Forest Supervisor in government-to-government consultation.

18.     On Black Ram, Tribal staff (including myself) met with the Forest Service, beginning during pre-scoping and continuing through Project development and approval, to discuss potential impacts on cultural resources, hunting, recreation, huckleberries, aquatic resources, old-growth management, fire management, ungulate winter range, and grizzly bears, among other things.  From the outset, I was pleased to see that the Forest Service was proposing a significant number of acres for fuels reduction and a significant number of miles for road storage – the Project Decision Notice allows for 3,581 acres of fuels treatment with timber harvest and 7,553 acres of fuels treatment without timber harvest, for a total of more than 11,000 acres of fuels treatments, along with the storage of 32 miles of

Page 9 – **DECLARATION OF SCOTT SOULTS**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

roads, plus the decommissioning of about 23 miles of roads. These activities continue to be based on sound professional review and will be beneficial to the forest ecosystem and Kootenai resources.

19.     Regarding the grizzly bear itself, since the Project is located in two Bear Management Units, Bear Management Unit 14 (Northwest Peaks) and Bear Management Unit 15 (Garver), we talked with the Forest Service about potential proposed action and alternatives impacts and related activities on the bear and ways to avoid such impacts. Grizzly bear core areas on the Forest are those portions of a bear management unit greater than 500 meters from a motorized route. The Forest Plan requires that projects either insure no net loss of core or provide for in-kind replacement of core habitat. The Project will do the latter – the in-kind replacement of core habitat would maintain the existing core in the Northwest Peaks Bear Management Unit and slightly exceeds the Forest Plan requirement for a 1:1 in-kind exchange in the Garver Bear Management Unit. In addition, approximately 34 miles of Kootenai National Forest roads will be stored for in-kind replacement of Core lost by road-related Project activities. (The August 2022 Biological Opinion for the Project states that both Bear Management Units will have slightly more core habitat compared with the existing condition,

Page 10 – **DECLARATION OF SCOTT SOULTS**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

but conservatively states that core habitat within each will basically remain constant.) Ultimately, the Tribe determined the Forest Service's approach was reasonable and appropriate with respect to the Kootenai National Forest Plan and this species of Tribal importance.

20.     We took our own hard look at other potential issues, and continue to do so.  The Tribe was pleased with the combined aces of ecosystem burning and other land management activities that should help move the Forest towards desired tree species, age, composition and habitat function, and reduce the risk of high intensity wildfire both inside of and outside of wildland urban interface areas.  By reducing the risk of high intensity wildfire, desirable fire behavior can be returned to the Forest.  We ultimately concluded the Project was consistent with the Tribe's holistic and proactive approach towards ecosystem-based land management within Kootenai Territory, which is not founded on excluding humans from the landscape. The Tribe has always interacted with the forest landscape and views the exclusion of humans as an impediment to forest restoration.  The Tribe also understands that the Project area is not managed for the benefit of any one species exclusively but rather is managed to meet the habitat needs of diverse species of importance to the Tribe, including moose, deer and elk, just to name a few.

Page 11 – **DECLARATION OF SCOTT SOULTS**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

21.    I mentioned above that the Tribe continues to take a hard look at the Project. We are aware that some people continue to criticize the Project publicly, and when they do, we assess their comments on our own. For example, when Wild Heritage criticized the proposed treatments in the Project's Unit 72, we took our own hard look at their comments. Wild Heritage seemed not to know that in response to comments from the Yaak Valley Forest Council and Kootenai Forest Stakeholders Coalition, the Forest Service interdisciplinary team modified Unit 72 by dividing it into three separate units and adding more leave areas. Wild Heritage's comments also were based on zero data – to our knowledge, no data was measured, recorded or documented, with the comments based solely on observations/eye-estimations, which was frustrating since old growth habitat types, structural characteristics and metrics were clearly defined by Green (et al.) in 1992. Green, P., J. Joy, D. Sirucek, W. Hann, A. Zack, and B. Naumann. 1992. Old-growth forest types of the Northern Region. Report R-1 SES 4/92. The absence of GPS information on stated observations makes it difficult (or impossible) to know where in Black Ram the observations were made, which is particularly troubling since the Forest Service interdisciplinary team redrew the Unit 72 boundaries in response to public comment.

Page 12 – **DECLARATION OF SCOTT SOULTS**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

22.    Finally, this case implicates the Forest Service's Access Amendments, adopted via the agency's Record of Decision for Forest Plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones.  The decision amended the Forest Plans for the Kootenai, Lolo, and Idaho Panhandle National Forests to better control motorized access in grizzly bear habitat for the benefit of the bear.  Later-adopted Forest Plans, like the 2015 Kootenai National Forest Plan, incorporated the Access Amendments directly. The Kootenai Tribe believes the Grizzly Bear Access Amendments reasonably balance the need to protect natural resources with the need for human access to National Forests for ecological restoration and exercise of Treaty and religious rights.  I and others in the Tribal Fish and Wildlife Department worked extensively on the Grizzly Bear Access Amendments, and I believe the process and the end results were sound for both human and non-human species on the Forest.  We continue to study and learn from grizzly bear distribution and movements, suitable bear seasonal habitat data and DNA hair corral/rub-tree surveys.  I hope we can continue to do so going forward without disruption for the benefit of the Kootenai Tribe and Kootenai resources that are at the heart of the Tribe's existence and culture.

Page 13 – **DECLARATION OF SCOTT SOULTS**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

I declare under penalty of perjury that the foregoing is true and correct
to the best of my knowledge.

Dated this ___19ᵗʰ___ day of October, 2022.

Scott Soults

Page 14 – **DECLARATION OF SCOTT SOULTS**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

# CERTIFICATE OF SERVICE

I hereby certify that on the ___ day of October, 2022, I served a true and correct copy of the foregoing document, via CM/ECF on:

Clerk of U.S. District Court

Ronni M. Flannery
LAW OFFICE OF RONNI M. FLANNERY
936 South 2nd Street, West
Missoula, MT  59801
rflannery@bresnan.net

Andrea Zaccardi
CENTER FOR BIOLOGICAL DIVERSITY
PO Box 469
Victor, MT 83455
azaccardi@biologicaldiversity.org

Edward B. Zukoski
CENTER FOR BIOLOGICAL DIVERSITY
1536 Wynkoop Steet, Suite 421
Denver, CO  80202
tzukoski@biologicaldiversity.org

Marla Fox
WILDEARTH GUARDIANS – PORTLAND
P.O. Box 13086
Portland, OR  97213
mfox@wildearthguardians.org

Sara K. McMillan
WILDEARTH GUARDIANS – MISSOULA
117 W. Broadway
P.O. Box 7516
Missoula, MT  59801
smcmillan@wildearthguardians.org

**CERTIFICATE OF SERVICE**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

*Attorneys for Plaintiffs Center for Biological Diversity, Yaak Valley Forest Council and WildEarth Guardians*

Erika Furlong
U.S. DEPARTMENT OF JUSTICE –
E.N.R.D. WILDLIFE & MARINE SECTION
150 M Street NE
Washington, DC 20002
erika.furlong@usdoj.gov

Hayley A. Carpenter
U.S. DEPARTMENT OF JUSTICE –
E.N.R.D.
150 M Street NE
Washington, DC 20002
hayley.carpenter@usdoj.gov

*Attorneys for Defendants*

By:    /s/ Kris A. McLean

**CERTIFICATE OF SERVICE**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

Kris A. McLean
Tyson A. McLean
Kris A. McLean Law Firm, PLLC
2315 McDonald Ave., Suite 106
Missoula, MT 59801
kris@krismcleanlaw.com
tyson@krismcleanlaw.com

Julie Weis
HAGLUND KELLEY LLP
2177 SW Broadway
Portland, OR  97201
weis@hk-law.com
(Motion for admission *pro hac vice* pending)

*Attorneys for Proposed Defendant-Intervenor*
*Kootenai Tribe of Idaho*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*, | Case No: 9:22-cv-00114-DWM |
| Plaintiffs, | |
| vs. | **DECLARATION OF GARY AITKEN, JR.** |
| U.S. FOREST SERVICE, *et al.*, | |
| Defendants. | |
| KOOTENAI TRIBE OF IDAHO, | |
| Proposed Defendant-Intervenor. | |

**DECLARATION OF GARY AITKEN, JR.**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

I, Gary Aitken, Jr., being sworn, declare as follows:

1.    I am a citizen of the Kootenai Tribe of Idaho (the Kootenai Tribe or Tribe) and the Vice-Chairman of the Kootenai Tribal Council.  I make this declaration based on personal knowledge and in support of the Tribe's motion to intervene on the side of federal defendants in this lawsuit challenging the Forest Service's Black Ram Project (the Project) on the Kootenai National Forest (the Forest).  I am over the age of 18, and if called as a witness would testify competently as follows.

2.    The Kootenai Tribe of Idaho is a federally recognized sovereign nation that has existed since time immemorial.  The Tribe is governed by a nine-person Tribal Council that includes six Tribal Council members, a Chairperson and two alternates.  I am a third generation Tribal Council member and am currently serving my fifth term on Tribal Council.  I have served as Tribal Council Chairman on two prior occasions.

3.    The Kootenai Tribe is headquartered near the town of Bonners Ferry in Idaho's Kootenai River Valley.  The Kootenai (Ktunaxa) Nation as a whole consists of seven modern bands, two in the United States (the Kootenai Tribe and the Confederated Salish and Kootenai Tribes of the Flathead Reservation) and five

Page 1 – **DECLARATION OF GARY AITKEN, JR.**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

in Canada. These bands have inhabited portions of Idaho, Montana, Washington, British Columbia and Alberta since time immemorial and are divided into Lower and Upper Kootenai groups. The Tribe belongs to the Lower Kootenai group, which historically inhabited the area along the Kootenai River from above Kootenai Falls in present-day Montana to Kootenay Lake in present-day British Columbia. The Kootenai Tribe possesses federally reserved fishing, hunting and gathering rights within Kootenai Territory, as reserved in the Treaty of Hellgate of 1855.

4.      Kootenai Tribe elders pass down the history of the beginning of time, which tells that the Kootenai people were created by Quilxka Nupika (Kwiⱡqa Nupika in the Ktunaxa language), the Supreme Being, and placed on earth to keep the Creator-Spirit's Covenant, which is to guard and keep the land forever. The Kootenai people have never lost sight of their original purpose as guardians of the land.

5.      Because I have extensive knowledge of natural resource issues of importance to the Tribe, the Kootenai Tribal Council assigned me the responsibility to provide Council oversight of natural resource matters like Black Ram. I come by this knowledge naturally, both because I spend a lot of time in the

Page 2 – **DECLARATION OF GARY AITKEN, JR.**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

woods and because my father was the Tribe's first Kootenai River white sturgeon hatchery manager – the conservation hatchery became a big part of my life starting when I was only around 10 years old.

6.     In 1989, the Kootenai Tribe became involved in the study of the declining Kootenai River white sturgeon, a species of great cultural and religious importance to the Tribe.  My father assisted in opening the Tribe's sturgeon hatchery and then operated it from 1991 to 1994 with a goal of preserving the genetic variability of the declining sturgeon population while steps were being taken to restore suitable habitat conditions in the Kootenai River ecosystem.  I worked in the hatchery as an employee of the Kootenai Tribe's Fish and Wildlife Department from about 2002 to 2008, first on biomonitoring, then on aquaculture. The Kootenai River white sturgeon was listed as an endangered species in 1994, but our efforts continue – the white sturgeon does not reach spawning maturity until the age of about 30 years, so the Tribe is hopeful its efforts will help restore this important species.

7.     I also serve as the official representative of the Tribe on the Interagency Grizzly Bear Committee's Selkirk/Cabinet-Yaak subcommittee.  The Tribe's Fish and Wildlife Department Wildlife Division Manager Scott Soults,

Page 3 – **DECLARATION OF GARY AITKEN, JR.**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

who is an alternate member of the Selkirk/Cabinet-Yaak Subcommittee, often attends the Subcommittee meetings as my delegate.  The Tribe's participation on the Selkirk/Cabinet-Yaak Subcommittee helps us ensure that the needs of the grizzly bear, another Ktunaxa resource of important to the Tribe, are being taken care of until the bear can take care of itself.

8.      The Forest's Black Ram Project is located in Kootenai Territory, squarely within the Tribe's primary area of responsibility.  The Tribe therefore engaged in government-to-government consultation with the Forest Service regarding the Project.  The Kootenai Tribe works closely and collaboratively with the Forest Service on land management projects within Kootenai Territory with a goal of protecting the National Forest System lands within our Territory.  Doing so is essential to fulfilling our Covenant with the Creator to keep and guard the land forever.

9.      Because the Black Ram Project is located in an area of importance to the Tribe for exercise of its reserved rights and religious practice, we met with the Forest Service during pre-scoping to discuss potential Project impacts on cultural resources, hunting, recreation, huckleberries, aquatic resources, old-growth management, fire management, ungulate winter range, and grizzly bears, among

Page 4 – **DECLARATION OF GARY AITKEN, JR.**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

other things.  The Tribe was particularly pleased to see the Forest Service recognizing the ill effects of historical fire suppression and proposing steps to restore forest resiliency in the Project area.  Additional government-to-government meetings with the Forest Service followed, with our goal being to make sure the Forest Service had done its due diligence and developed a sound land management project that will help and not harm Ktunaxa resources.

10.    Ultimately, the Kootenai Tribe supported Black Ram Project implementation because it is consistent with the Tribe's holistic and proactive approach towards land management within Kootenai Territory.  The Tribe's approach to forest management is and always has been – since before contact – based on stewardship and active management of the land.  We do not believe in a hands-off approach nor support excluding humans from the Forest, which we believe impedes restoration efforts.

11.    In March 2021, the Tribe learned that a man named Rick Bass, who is affiliated with plaintiff Yaak Valley Forest Council, had published a guest opinion in Native News Online stating that the Forest Service had not complied with its tribal consultation obligation for the Black Ram Project.  In response, the Tribe sent a letter to the Editor of Native News Online explaining that the Tribe had been

Page 5 – **DECLARATION OF GARY AITKEN, JR.**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

consulted on the Project and that Mr. Bass had no business speaking on our behalf. A copy of the letter is attached as Exhibit A.

12.    Additional misinformation about the Black Ram Project followed, causing the Tribe in October 2021 to send a letter to the Council on Environmental Quality (CEQ) stating that we were aware certain entities were lobbying CEQ to terminate the Project and expressing

> our frustration that one of the tactics they have used as part of their lobbying is to claim the Forest Service has not consulted with Indigenous Nations. Those individuals and nongovernmental organizations do not represent Indigenous Nations and should not speak on behalf of Indigenous Nations. Shame on them for attempting to do so.

Exhibit B.

13.    The Kootenai Tribe is a strong and active sovereign that focuses its energies and determination on remaining true to its creation story by keeping the Creator-Spirit's Covenant to guard and keep the land forever. The Tribe believes that by following this fundamental law, the land in turn will provide for the Tribe. We know that over the years, National Forest System lands within Ktunaxa Territory were subjected to misguided land management that removed fire from the landscape and decreased forest resiliency. The result was an unhealthy forest ecosystem, decreased game and endangerment of Kootenai Treaty resources, all to

Page 6 – **DECLARATION OF GARY AITKEN, JR.**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

the detriment of Tribal members.  The Tribe is committed to restoring the forests in
Ktunaxa Territory and believes the Black Ram Project is a step in the right
direction.  The Tribe continues to support the Black Ram Project because it is
protective of Ktunaxa resources and will further the restoration of Ktunaxa
Territory forests.

14.     This case implicates the Forest Service's Access Amendments, which
were adopted via the agency's Record of Decision for Forest Plan Amendments for
Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear
Recovery Zones.  The decision amended the Forest Plans for the Kootenai, Lolo,
and Idaho Panhandle National Forests to better control motorized access in grizzly
bear habitat for the benefit of the bear.  Later-adopted Forest Plans, like the 2015
Kootenai National Forest Plan, incorporated the Access Amendments directly.
The Kootenai Tribe believes the Grizzly Bear Access Amendments reasonably
balance the need to protect natural resources with the need for human access to
National Forests for ecological restoration and exercise of Treaty and religious
rights.  The Kootenai people's use of the Forest is not an affront to natural
resources – Ktunaxa resources are part of us, and we should have that freedom.

Page 7 – **DECLARATION OF GARY AITKEN, JR.**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

The Tribe thus desires to preserve the carefully struck balance embodied in the Access Amendments.

15.     Finally, the federal defendants do not (and I believe cannot) adequately represent the Kootenai Tribe in this litigation, even though the Tribe and the federal defendants both support the Project.  The Tribe is a sovereign nation whose interests cannot be represented by another sovereign.  The Tribe engages with the Forest Service on a government-to-government basis, sovereign to sovereign.  The Forest Service defendants do not represent the non-overlapping interests of the Kootenai people.

**I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.**

Dated this _19 th_ day of October, 2022.

_____

Gary Aitken, Jr.

Page 8 – **DECLARATION OF GARY AITKEN, JR.**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201



# Kootenai Tribe of Idaho

P.O. Box 1269
100 Circle Drive
Bonners Ferry, ID 83805
Ph# (208) 267-3519
Fax (208) 267-2960

To the Editor, Native News Online:

The Kootenai Tribe of Idaho would like to set the record straight in response to the opinion piece "Ancient Forest on Ancestral Land Poses Biden's Biggest Test Yet on Indigenous Rights, Climate Change and the Environment" published on March 27, 2021.

Mr. Bass is not Indigenous, does not represent Indigenous interests, and has no business speaking on our behalf.

The Black Ram Project is located in Kootenai Territory.

The Kootenai Tribe has not only been consulted on the Black Ram Project numerous times, the Tribe agrees with the purpose, need and goals of the Project and has worked closely with the Kootenai National Forest to restore forests in Ktunaxa Territory to healthy, resilient ecosystems.

Respectfully,

Gary Aitken, Jr.
Chairman

**Exhibit A**
**Page 1 of 1**



# Kootenai Tribe of Idaho

P.O. Box 1269
100 Circle Drive
Bonners Ferry, ID 83805
Ph# (208) 267-3519
Fax (208) 267-2960

08 October 2021

Ms. Stephenne S. Harding
Senior Director for Lands
White House Council on Environmental Quality
Executive Office of the President
Stephenne.S.Harding@ceq.eop.gov

Mr. Matt Lee-Ashley
Chief of Staff
Council on Environmental Quality
Executive Office of the President
Matthew.G.Lee-Ashley@ceq.eop.gov

Re: Black Ram Project: Ktunaxa Territory, Kootenai National Forest

Dear Senior Director Harding and Chief of Staff Lee-Ashley:

Kootenai (Ktunaxa) Tribe elders pass down the history of the beginning of time, which tells that the Ktunaxa people were created by Quilxka Nupika, the Supreme Being, and placed on earth to keep the Creator-Spirit's Covenant – to guard and keep the land forever. The Kootenai have never lost sight of their original purpose as guardians of the land.

The Kootenai Tribe and the United States Forest Service enjoy an exceptionally close working relationship and collaborate often on issues of common concern to protect the National Forest System lands within Ktunaxa Territory, which includes the Idaho Panhandle and Kootenai National Forests. Management of the National Forests within the Territory is important to fulfill our Covenant with the Creator.

The Black Ram Project ("Project") is located in Ktunaxa Territory and includes traditional use areas, sacred sites, and areas where Kootenai citizens exercise Treaty-reserved hunting, fishing and gathering rights. The area is critical to the culture and religion of the Kootenai Tribe and greater Ktunaxa Nation.

Forest management over the last century through fire suppression policies, overharvest and other policies has led to Forests in poor health, including the Project area. The Kootenai Tribal Council heeds the words of its elders, who say the forests in the Territory do not look like they are supposed to look based on Ktunaxa oral histories, and the forests do not support the Territory and the Ktunaxa in the manner they should. The Covenant must be honored to make the forests healthy once again.

**Exhibit B**
**Page 1 of 2**

Black Ram Project
Page 2

The Kootenai Tribe, the Three Rivers Ranger District and the Kootenai National Forest have been in continuous government-to-government consultation since before scoping on the Project. The Tribe agreed and continues to agree with the Project's purpose and need, which are consistent with the Tribe's mandates under the Covenant.

The Tribe provided extensive and critical comments to the District and Forest during scoping and early iterations of the environmental assessment. The Tribe, District and Forest worked together to address the Tribe's concerns. The recent biological opinion issued by the U.S. Fish and Wildlife Service also contains a number of mitigation measures that improve the Project.

Based on the extensive government-to-government discussions, Ktunaxa traditional knowledge and western science from our Fish and Wildlife Department and the Forest Service, the Tribe fully supports the Project and asks that the White House and Council on Environmental Quality allow the Project to move forward. Doing so will not only allow the Forest Service to fulfill its federal responsibilities, it will allow the Tribe to continue to fulfill its Covenant and its collaborative work toward restoring forest health in the Territory.

The Tribe is aware certain individuals and nongovernmental organizations have lobbied you and the Council on Environmental Quality to terminate the Project. We cannot express enough our frustration that one of the tactics they have used as part of their lobbying is to claim the Forest Service has not consulted with Indigenous Nations. Those individuals and nongovernmental organizations do not represent Indigenous Nations and should not speak on behalf of Indigenous Nations. Shame on them for attempting to do so.

The Tribe appreciates your listening to the message of this letter. We would be very happy to meet government-to-government with your agency on this important Project. Please contact Attorney General William Barquin at wbarquin@kootenai.org to arrange such a meeting.

Sincerely yours,

Jennifer Porter
Chairperson

cc:   The Hon. Shelly Fyant, Chairwoman, Confederated Salish & Kootenai Tribes
      (constituent government of the Ktunaxa Nation)
      Mr. Vernon Finley, Director, Kootenai Culture Committee, CSKT

**Exhibit B**
**Page 2 of 2**

# CERTIFICATE OF SERVICE

I hereby certify that on the ___ day of October, 2022, I served a true and correct copy of the foregoing document, via CM/ECF on:

Clerk of U.S. District Court

Ronni M. Flannery
LAW OFFICE OF RONNI M. FLANNERY
936 South 2nd Street, West
Missoula, MT 59801
rflannery@bresnan.net

Andrea Zaccardi
CENTER FOR BIOLOGICAL DIVERSITY
PO Box 469
Victor, MT 83455
azaccardi@biologicaldiversity.org

Edward B. Zukoski
CENTER FOR BIOLOGICAL DIVERSITY
1536 Wynkoop Steet, Suite 421
Denver, CO 80202
tzukoski@biologicaldiversity.org

Marla Fox
WILDEARTH GUARDIANS – PORTLAND
P.O. Box 13086
Portland, OR 97213
mfox@wildearthguardians.org

Sara K. McMillan
WILDEARTH GUARDIANS – MISSOULA
117 W. Broadway
P.O. Box 7516
Missoula, MT 59801
smcmillan@wildearthguardians.org

**CERTIFICATE OF SERVICE**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

*Attorneys for Plaintiffs Center for Biological Diversity, Yaak Valley Forest Council and WildEarth Guardians*

Erika Furlong
U.S. DEPARTMENT OF JUSTICE –
E.N.R.D. WILDLIFE & MARINE SECTION
150 M Street NE
Washington, DC 20002
erika.furlong@usdoj.gov

Hayley A. Carpenter
U.S. DEPARTMENT OF JUSTICE –
E.N.R.D.
150 M Street NE
Washington, DC 20002
hayley.carpenter@usdoj.gov

*Attorneys for Defendants*

By:    /s/ Kris A. McLean

**CERTIFICATE OF SERVICE**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201