Nos. 23-2882, 23-2886, 23-3146

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

**CENTER FOR BIOLOGICAL DIVERSITY, et al.**,
Plaintiffs-Appellees/Plaintiffs-Appellants,

and

**ALLIANCE FOR THE WILD ROCKIES, et al.**,
Plaintiffs-Appellees/Plaintiffs

v.

**UNITED STATES FOREST SERVICE, et al.,**
Defendants-Appellants/Defendants/Defendants-Appellees,

and

**KOOTENAI TRIBE OF IDAHO**,
Defendant-Intervenor/Intervenor-Appellant/Intervenor-Appellee.

Appeal from the United States District Court for Montana,
Nos. CV 22-114-M-DWM (Lead), CV 23-3-M-DWM (Hon. Donald W. Molloy)

**INTERVENOR'S FIRST BRIEF ON CROSS-APPEAL**

Julie A. Weis, OSB No. 974320
HAGLUND KELLEY LLP
2177 SW Broadway
Portland OR 97201
503-225-0777
weis@hk-law.com

Kris A. McLean, Tyson A. McLean
Kris A. McLean Law Firm, PLLC
2315 McDonald Ave., Suite 106
Missoula, MT 59801
406-396-9367
kris@krismcleanlaw.com,
tyson@krismcleanlaw.com

Attorneys for Kootenai Tribe of Idaho

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................1

II.     STATEMENT OF JURISDICTION ..................................3

        A.     Basis for Jurisdiction in the District Court............3

        B.     Basis for Jurisdiction in this Court .......................4

III.    ISSUES PRESENTED FOR REVIEW ........................4

IV.     STATEMENT REGARDING ADDENDUM ...............5

V.      STATEMENT OF THE CASE ....................................5

VI.     STATEMENT OF FACTS .........................................7

        A.     Overview of the Black Ram Project ......................8

        B.     Overview of the Grizzly Bear Access Amendments..........11

        C.     Grizzly Bear Habitat Measures Before, During and After Project
               Implementation ..................................................14

        D.     Project Implementation Will Not Jeopardize the Grizzly Bear ..........17

VII.    SUMMARY OF ARGUMENT .................................20

VIII.   LEGAL STANDARDS .............................................23

        A.     The Court's Review is De Novo ..........................23

        B.     The Arbitrary and Capricious Standard Governs the Court's
               Review ...............................................................23

        C.     Deference to Agency Scientific Decision-Making.............24

i

IX.   ARGUMENT ........................................................................24

    A.   The Biological Opinion's Environmental Baseline for the Bear Satisfies the ESA.................................................................25

    B.   The EA's Existing Condition Disclosures for the Bear Satisfy NEPA.................................................................................35

    C.   The Forest Service Complied with Its Statutory Obligations When Calculating the Existing Permanent Motorized Route Density in the Project Area .......................................................................39

        1.   Overview of the Agencies' Thorough Evaluation of the Temporary Unauthorized Road Use Issue ..............................40

        2.   The Forest Service Satisfied NEPA by Reasonably Disclosing Its Methodology for Complying with Forest Plan Standard FW-STD-WL-02........................................................47

        3.   The Forest Service Provided a Reasoned Explanation for Excluding Temporary Unauthorized Road Use When Calculating the Existing Permanent Motorized Route Density in the Project Area ..............................................................50

        4.   The Forest Service Took a NEPA "Hard Look" at the Issue of Temporary Unauthorized Road Use in the Project Area..........54

X.    CONCLUSION ........................................................................60

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alliance for the Wild Rockies v. Gassman,*
    No. CV 21-105-M-DLC, 2023 WL 4172930 (D. Mont. June 26,
    2023) ....................................................................................................56, 59

*Alliance for the Wild Rockies v. Marten,*
    464 F. Supp. 3d 1169 (D. Mont. 2020) (*Marten I*) ...............................54-55, 56

*Alliance for the Wild Rockies v. Marten,*
    No. CV 21-05-M-DLC, 2023 WL 4977712 (D. Mont. Aug. 3,
    2023) (*Marten II*) ..................................................................................52, 53

*Alliance for the Wild Rockies v. Probert,*
    412 F.Supp.3d 1188 (D. Mont. 2019)...................................... 35, 44, 54, 55, 56

*Am. Rivers v. FERC,*
    201 F.3d 1186 (9th Cir. 1999)...............................................................37

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,*
    462 U.S. 87 (1983)...............................................................................25, 34

*Ctr. for Biological Diversity v. U.S. Forest Service,*
    No. CV 22-91-M-DLC, 2023 WL 3052299 (D. Mont. Apr. 24,
    2023) ............................................................................................. 55, 56, 58

*Ctr. for Biological Diversity v. Ilano,*
    928 F.3d 774 (9th Cir. 2019).................................................................23

*Ecology Ctr. v. Castaneda,*
    574 F.3d 652 (9th Cir. 2009).................................................................48

*Lands Council v. McNair,*
    537 F.3d 981 (9th Cir. 2008), *overruled in part on other grounds
    by Am. Trucking Ass'ns, Inc. v. City of Los Angeles,* 559 F.3d 1046
    (9th Cir. 2009) ...........................................................................23-24, 37, 40

iii

*Marsh v. Oregon Natural Res. Council*,
    490 U.S. 360 (1989)...............................................................24, 38

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
    551 U.S. 644 (2007)..........................................................................23

*Native Ecosystems Council v. U.S. Forest Serv.*,
    418 F.3d 953 (9th Cir. 2005)..........................................................23, 41

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989)..........................................................................36

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
    747 F.3d 581 (9th Cir. 2014)..........................................................23, 34

**Statutes**

5 U.S.C. §§ 701 et seq.........................................................................3

5 U.S.C. § 706 ...........................................................................23, 35

16 U.S.C. §§ 1531 et seq.......................................................................3

16 U.S.C. § 1536(a)(2).....................................................................18, 26

16 U.S.C. § 1536(b)(3)(A)......................................................................25

16 U.S.C. § 1540...............................................................................3

16 U.S.C. §§ 1600 et seq.......................................................................3

16 U.S.C. § 1604(i).......................................................................40, 48

28 U.S.C. § 1291...............................................................................4

28 U.S.C. § 1331............................................................................3, 4

28 U.S.C. § 1346............................................................................3, 4

42 U.S.C. §§ 4321 et seq.......................................................................3

42 U.S.C. § 4332(2)(C)........................................................................36

iv

**Other Authorities**

40 C.F.R. § 1502.2(b) (2019) ............................................................. 36

40 C.F.R. § 1502.21 (2019) ............................................................... 49

40 C.F.R. § 1502.24 (2019) ............................................................... 49

40 C.F.R. § 1508.9 (2019) ................................................................. 36

50 C.F.R. § 402.02 ............................................................................ 17

50 C.F.R. § 402.04 ............................................................................ 25

50 C.F.R. § 402.14(g)(2) ................................................................... 25

NINTH Circuit R. 28-2.7 ...................................................................... 5

FED. R. APP. P. 28(f) ........................................................................... 5

Cabinet-Yaak Grizzly Bear Recovery Area 2022 Research and
    Monitoring Progress Report, https://www.fws.gov/media/cabinet-
    yaak-grizzly-bear-recovery-area-2022-research-and-monitoring-
    progress-report ............................................................................ 33

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure (FRAP) 26.1(a), the

Kootenai Tribe of Idaho is a federally-recognized sovereign Indian Tribe, a

governmental entity to which the FRAP 26.1 disclosure requirement is

inapplicable.

DATED this 22nd day of March, 2024.

/s/Julie A. Weis
Julie A. Weis
HAGLUND KELLEY LLP

Kris A. McLean
Tyson A. McLean
Kris A. McLean Law Firm

Attorneys for Defendant-Intervenor-
Appellant Kootenai Tribe of Idaho

## I.  **INTRODUCTION.**

At issue in this case is the Black Ram Project (Black Ram, or the Project), an important forest health and fuels reduction project designed to increase forest resiliency and reduce the risk of high intensity wildfire on the Kootenai National Forest in Montana.  The Project was developed by the U.S. Forest Service (Forest Service) in consultation with the U.S. Fish and Wildlife Service (FWS).

The Kootenai Tribe of Idaho's (the Kootenai Tribe, or the Tribe) interest in and support for Black Ram stems from the Tribe's relationship since time immemorial with the land and natural resources in the Project area.  The Project is located in the Tribe's ancestral territory, called Kootenai, or Ktunaxa, Territory, "an area of importance to the Tribe for the exercise of its reserved rights and religious practice . . . ."  9-ER-2252 (Declaration of Kootenai Tribal Council Vice-Chairman Gary Aitken, Jr. (Aitken Decl.) ¶ 9).

The Tribe is committed to restoring forests in and around Ktunaxa Territory, including on the Kootenai National Forest, and works collaboratively with the Forest Service on projects like Black Ram that implicate the Tribe's ancestral homelands.  9-ER-2252 (Aitken Decl. ¶ 8).  A fundamental reason for the Tribe's commitment to forest restoration is its covenant with the Creator – Quilxka Nupika, or Kwiⱡqa Nupika in the Ktunaxa language – to keep and guard the land forever.  9-ER-2250 (Aitken Decl. ¶ 4).  The Tribe believes that by honoring that

1

commitment, "the land in turn will provide for the Tribe." 9-ER-2254 (Aitken Decl. ¶ 13). The Tribe's very identity depends on caring for the native fish and wildlife species in Ktunaxa Territory. 9-ER-2250, 2252, 2254-55 (Aitken Decl. ¶¶ 4, 8, 13).

The Kootenai Tribe supports the Black Ram Project because it is consistent with the Tribe's "approach to forest management," which "is and always has been – since before contact – based on stewardship and active management of the land." 9-ER-2253 (Aitken Decl. ¶ 10). As the Tribe explained to the Council on Environmental Quality (CEQ) after Project opponents shared misinformation with CEQ regarding an alleged lack of Tribal support for Black Ram, the Project is protective of Ktunaxa resources and will further the much-needed restoration of forest health in Ktunaxa Territory. 9-ER-2019-20 (FS32834-35). The Montana Department of Natural Resources and Conservation likewise supports the Project. 2-ER-69-70.

Two separate groups of non-governmental organizations challenged the Project primarily because of alleged impacts on the grizzly bear, a species of importance to the Tribe. 9-ER-2251-52 (Aitken Decl. ¶ 7) (discussing the Tribe's advocacy for the bear); 9-ER-2237-38 (Declaration of Tribe's Wildlife Division Manager Scott Soults (Soults Decl.) ¶¶ 12-14) (discussing same). In the underlying consolidated cases, the Center for Biological Diversity et al. (CBD) and

2

the Alliance for the Wild Rockies et al. (AWR) brought claims under the National

Environmental Policy Act (NEPA), the Endangered Species Act (ESA) and the

National Forest Management Act (NFMA) to prevent the implementation of

restorative land management activities in the Black Ram Project area.  The district

court held in favor of some of the claims brought by CBD and AWR and remanded

the Project to the agencies, despite the compelling need for forest restoration in

Ktunaxa Territory.  The Tribe seeks reversal on certain discrete issues.

## II.    STATEMENT OF JURISDICTION.

### A.    Basis for Jurisdiction in the District Court.

CBD's claims against the Forest Service arose under the ESA, 16 U.S.C. §§

1531 et seq., NEPA, 42 U.S.C. §§ 4321 et seq., and the Administrative Procedure

Act (APA), 5 U.S.C. §§ 701 et seq.  9-ER-2212-19 (CBD First Am. Compl. ¶¶

119-35 (NEPA claims)); 9-ER-2220-30 (CBD First Am. Compl. ¶¶ 140-66 (ESA

claims)).

AWR's claims against the Forest Service arose under NEPA, the APA and

NFMA, 16 U.S.C. §§ 1600 et seq.  2-ER-217-20 (AWR Compl. ¶¶ 154-65 (NFMA

and NEPA claim)); 2-ER-220-25 (AWR Compl. ¶¶ 166-88 (NEPA claims)).

CBD invoked the jurisdiction of the district court pursuant to 28 U.S.C. §§

1331, 1346 and 16 U.S.C. § 1540.  9-ER-2210-11 (CBD First Am. Compl. ¶ 12).

3

AWR invoked the jurisdiction of the district court pursuant to 28 U.S.C. §§ 1331, 1346.  2-ER-215 (AWR Compl. ¶ 5).

**B.    <u>Basis for Jurisdiction in this Court</u>.**

The Tribe's appeal is from the district court's August 17, 2023 Opinion and Order, 1-ER-5-66, on which judgment was entered the same day.  1-ER-3-4.  The Tribe filed a timely notice of appeal on October 13, 2023, 10-ER-2267-77, and this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

**III.   <u>ISSUES PRESENTED FOR REVIEW</u>.**

Did the district court err in holding:

(1)    That FWS's biological opinion for the Project overlooked grizzly bear mortality data in establishing the ESA environmental baseline for the bear, where bear mortality data was an intrinsic component of the agency's baseline methodology, on which FWS was due substantial deference as the expert agency acting in its area of special expertise;

(2)    That the Forest Service's NEPA analysis for the Project relied on stale data in establishing the environmental baseline for potential impacts on the grizzly bear, where the Project's environmental documents reasonably disclosed the bear's existing condition; and

(3)    That the Forest Service's NEPA analysis of potential Project impacts on the grizzly bear was inadequate because the agency excluded temporary

4

unauthorized road use when calculating baseline road density metrics and insufficiently disclosed its methodology for complying with the forest plan road density standard, where the agency reasonably concluded unauthorized road use did not render a road per se open for purposes of calculating the baseline road density metrics, and where the agency reasonably disclosed its methodology?

IV.   **STATEMENT REGARDING ADDENDUM.**

Pursuant to Federal Rule of Appellate Procedure 28(f) and Ninth Circuit Rule 28-2.7, the Tribe agrees with and adopts the pertinent legal authorities in federal defendants' opening brief addendum.  Additional pertinent legal authorities are reproduced in an addendum to this brief.

V.   **STATEMENT OF THE CASE.**

In June 2022, CBD sued the Forest Service to halt implementation of the Black Ram Project.  10-ER-2295 (Court Record (CR) 1, No. CV 22-114-M-DWM).  The Kootenai Tribe moved to intervene in the lawsuit in October 2022, 10-ER-2297 (CRs 23, 24), and was granted intervention one week later.  10-ER-2297 (CR 26).

In December 2022, CBD amended its complaint to add FWS representatives as defendants.  10-ER-2298 (CR 31).

In January 2023, AWR sued the Forest Service in a separate lawsuit challenging the Black Ram Project.  10-ER-2309 (CR 1, No. CV 23-3-M-DWM).

5

Six days later, the district court consolidated the CBD and AWR lawsuits,
designating the CBD lawsuit as the lead case and the AWR lawsuit as the member
case.  10-ER-2298, 2310 (CR 36 in lead case, CR 4 in member case).  The
Kootenai Tribe moved for and was granted intervention in the member case later
that same month.  10-ER-2299, 2311 (CR 44 in lead case, CR 12 in member case).

CBD pursued claims that FWS violated the ESA when it issued the Black
Ram biological opinion and that the Forest Service violated the ESA by relying on
FWS's biological opinion.  CBD also pursued its claim that the Forest Service
violated NEPA when it authorized the Black Ram Project.  *See generally* 1-ER-14-
25, 26-34 (Op. at 10-21, 22-30).  AWR pursued claims against the Forest Service
under NFMA with respect to the Project's compliance with the governing forest
plan and under NEPA with respect to the agency's authorization of the Project.
*See generally* 1-ER-43-61 (Op. at 39-57).

In July 2023, the district court heard argument on the parties' respective
motions for summary judgment.  10-ER-2304 (CR 88).  In August 2023, the
district court issued an opinion finding in favor of CBD and AWR on some but not
all of their claims, see 1-ER-66 (Op. at 62), and remanding the matter "to the
agencies for further review consistent with this Order."  *Id.*

The federal defendants and the Tribe appealed the district court's decision,
10-ER-2305 (CR 102, CR 103), as did CBD.  10-ER-2306 (CR 105).  AWR did

6

not appeal the district court's decision.  In January 2024, this Court consolidated the appeals of the federal defendants and Tribe.

## VI.  STATEMENT OF FACTS.

Black Ram is a federal forest health and fuels reduction project located on the Kootenai National Forest in the Kootenai Tribe's ancestral territory.  7-ER-1507 (FS723) (Final Environmental Impact Statement (EIS) for Revised Forest Plan at 508) (explaining that the "entire Forest is within aboriginal territory for . . . the Kootenai Tribe of Idaho").  The Tribe supports the Project, on which it engaged with the Forest Service in government-to-government consultation throughout Project development.  9-ER-2252-53 (Aitken Decl. ¶¶ 8-9).  *See also* 9-ER-2240-42 (Soults Decl. ¶¶ 17-20); 8-ER-1732, 1754, 1783 (FS2245, FS2307, FS2676) (Black Ram Environmental Assessment (EA) at 4, 66, 435) (acknowledging government-to-government consultation with the Tribe).

During the consultation process, the Tribe "provided extensive and critical comments" to the Forest Service and worked with the agency "to address the Tribe's concerns."  9-ER-2020 (FS32835) (Tribe's Letter to CEQ at 2).  *See also* 9-ER-2252-53 (Aitken Decl. ¶¶ 9-10) (discussing sharing the Tribe's Indigenous Knowledge with the Forest Service).  The Tribe supports the final Project based on its consistency "with the Tribe's holistic and proactive approach towards land management within Kootenai Territory."  9-ER-2253 (Aitken Decl. ¶ 10).  The

7

Tribe shares its perspective here because the Project is protective of Ktunaxa

resources, including the grizzly bear, and will further the much-needed restoration

of forest health in Ktunaxa Territory.  9-ER-2020 (FS32835) (Tribe's Letter to

CEQ at 2).  Project implementation thus will benefit Tribal and non-Tribal citizens

alike.  Inaction will not.

      A.     __Overview of the Black Ram Project__.

The Black Ram Project area comprises 95,412 acres, 91,647 acres of which

are national forest lands.  8-ER-1729 (FS2242) (EA at 1).  But the modest Project

authorizes commercial timber harvest on only 3,902 of those acres, or about 4% of

the Project area.  7-ER-1638-39 (FS2153-54) (Decision Notice and Finding of No

Significant Impact (FONSI) at 6-7, Table 1).

Of the 3,902 acres where commercial timber harvest is authorized, 1,485

acres are in the Wildland Urban Interface where people and property are in

particularly close contact with wildland areas in need of fuels reductions.  7-ER-

1639 (FS2154) (Decision Notice and FONSI at 7, Table 3).  *See also* 8-ER-1756

(FS2328) (EA at 87) (noting that "several concentrations of homes along Yaak

River Road, including the Community of Yaak," are within the Wildland Urban

Interface).  In addition to benefiting from harvest-related fuels reductions,

Wildland Urban Interface in the Project area also will benefit from 2,883 acres of

non-harvest fuels reduction treatment.  7-ER-1639 (FS2154) (Decision Notice and

8

FONSI at 7, Table 3).  Reducing fuels in the Wildland Urban Interface is especially important because over the last three-plus decades, the Project area "has had 142 fire starts," 38 percent of which erupted in the Wildland Urban Interface. 8-ER-1755 (FS2324) (EA at 83).  *See also* 1-ER-8 (Op. at 4) (acknowledging the threat of fire in the Project area).

The Project seeks to increase forest resiliency and reduce the risk of high intensity wildfire.  8-ER-1729-30 (FS2242-43) (EA at 1-2).  Project implementation will provide these benefits while protecting important environmental resources, including the grizzly bear.  *See, e.g.*, 8-ER-1773-74 (FS2555-56) (EA at 314-15) (discussing beneficial effects to habitat suitability). The need to improve forest resiliency is pressing.  "Historically, the Kootenai people actively managed the forest landscape, including through the use of fire, to meet Tribal and natural resource needs based on traditional knowledge.  But under federal management, fire was restricted on the landscape, which decreased forest resiliency to disturbance and resulted in an unhealthy forest ecosystem . . . ."  9-ER-2238-39 (Soults Decl. ¶ 15).  The Forest Service recognizes the problem, 8-ER-1753 (FS2266) (EA at 25), and designed Black Ram in response.  8-ER-1731 (FS2244) (EA at 3).

Consistent with the governing 2015 Land Management Plan for the Kootenai National Forest (Forest Plan), Project implementation will "move the

landscape toward the desired condition," 8-ER-1729 (FS2242) (EA at 1), by doing things like:

- promoting a more resilient forest landscape, *id.*;

- promoting healthy watershed conditions, 8-ER-1730 (FS2243) (EA at 2);

- promoting "big game winter range conditions and . . . forage opportunities," including by working to improve the productivity of native plants like huckleberry, *id.*, an important grizzly bear food source.  2-ER-268 (FWS29) (Project Biological Opinion at 27); and

- decreasing "the potential for high intensity wildfire while promoting desirable fire behavior characteristics and fuel conditions in the Wildland Urban Interface," 8-ER-1730.[1]

Through the selected alternative 2, the Project will meet these purposes and needs by employing a variety of forest health treatments, including commercial and non-commercial harvest and fuels treatments along with prescribed fire.  *See generally* 7-ER-1638-41 (FS2153-56) (Decision Notice and FONSI at 6-9).

---

[1]  The agency cannot eliminate fire risk but can actively modify "stand structures, fuel loadings, and continuity of the forested areas" to responsibly protect people, property and natural resources in the event of wildfire.  8-ER-1730 (FS2243) (EA at 2).  The Tribe supports the responsible reintroduction of fire in the Project area, which cannot be accomplished via passive land management where historical fire exclusion has resulted in unnaturally heavy fuel loadings on the forest landscape. *See* 9-ER-2242 (Soults Decl. ¶ 20).

10

**B.**     **Overview of the Grizzly Bear Access Amendments.**

The Forest Plan governs motorized access on the Forest through standard

FW-STD-WL-02, which embodies the 2011 grizzly bear Access Amendments.  6-

ER-1329 (FS15) (Forest Plan at 5).  The Tribe was involved in development of the

Access Amendments and believes the approach "reasonably balance[d] the need to

protect natural resources with the need for human access to National Forests for

ecological restoration and exercise of Treaty and religious rights."  9-ER-2244

(Soults Decl. ¶ 22).  A brief history of the Access Amendments, which again are

now embodied in Forest Plan standard FW-STD-WL-02, is provided below.

The FWS listed the grizzly bear as an ESA-threatened species in 1975.  5-

ER-1044 (FWS5288) (Grizzly Bear Recovery Plan at ii).  After that listing, the

Forest Service and FWS developed measures to protect grizzly bears on federal

lands, with FWS ultimately adopting the Grizzly Bear Recovery Plan in 1993.  The

Forest Service, in conjunction with FWS, administers the Recovery Plan, which

governs the agency's land management as it relates to protections for grizzly bear

populations in the lower-48 States.

In 1998, a subcommittee of the Interagency Grizzly Bear Committee

proposed protective interim rules for motorized access in areas used by grizzly

bears.  5-ER-1034 (FWS4581) (Access Amendments Biological Opinion at 8).

The Forest Service began implementing the interim rules and initiated the process

11

of incorporating them into the relevant forest plans, including for the Idaho

Panhandle, Lolo and Kootenai National Forests.  *Id.*  The agencies, joined by the

Tribe, then spent a decade analyzing the science to develop appropriate access

guidelines, with the Forest Service adopting the grizzly bear Access Amendments

in 2011 through issuance of the Record of Decision for Forest Plan Amendments

for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly

Bear Recovery Zones.  *See* 5-ER-1029 (FWS4498).

   The Access Amendments established protective route density standards

(Open Motorized Route Density, or OMRD, and Total Motorized Route Density,

or TMRD) for Bear Management Units within the Cabinet-Yaak Recovery Zone

where the Project is located.  5-ER-1030-32 (FWS4512-14) (Access Amendments

Record of Decision at 9-11).  A Bear Management Unit is an analysis area that

"approximates the size of a female grizzly home range," 8-ER-1801 (FS4217)

(Project Biological Assessment at 15), making it "an appropriate scale to use for

assessing the effects" of a proposed action on the bear.  2-ER-245 (FWS6) (Project

Biological Opinion at 4).  The Access Amendments also established standards for

Core areas, comprised of "secure habitat within a [Bear Management Unit] that

contains no motorized travel routes or high use non-motorized trails during the

non-denning season . . . and is more than 0.3 miles (500 meters) from a drivable

road."  5-ER-1031 (FWS4513) (Access Amendments Record of Decision at 10).

The Core, Open Motorized Route Density and Total Motorized Route Density

standards were established for each of the 22 Bear Management Units in the

Cabinet-Yaak Recovery Zone, including the two involved in Black Ram, Units 14

(Northwest Peaks) and 15 (Garver).[2]  5-ER-1032 (FWS4514) (Access

Amendments Record of Decision at 11 (Table 2)).

The Access Amendments were a major advancement in the protection of the

bear.  Thus, when the Forest Service subsequently adopted the current Forest Plan,

it prudently included the Access Amendments' protective route density

requirements in standard FW-STD-WL-02.  6-ER-1329 (FS15) (Forest Plan at 5).

*See also* 7-ER-1473 (FS157) (Forest Plan at 147) (displaying the Bear

Management Unit standards in Table 25 of Appendix B).

Before adopting the Forest Plan in 2015, the Forest Service consulted with

FWS to ensure the plan revision would not jeopardize the grizzly bear, resulting in

a 2013 biological opinion.  The Forest Service did so again in 2020 after it

reinitiated consultation with FWS.  *See generally* 5-ER-880-1028 (FWS1912-

2060) (2020 Biological Opinion for Forest Plan).  The FWS determined that

implementation of the Forest Plan through site-specific projects like Black Ram is

---

[2]  Open Motorized Route Density includes "open roads, other roads not meeting all restricted or obliterated criteria, and open motorized trails," whereas Total Motorized Route Density includes both open and restricted routes.  5-ER-1031 (FWS4513) (Access Amendments Record of Decision at 10).

not likely to jeopardize the grizzly bear's continued existence. *See, e.g.*, 5-ER-983

(FWS2015) (2020 Biological Opinion for Forest Plan at 100).

C. **Grizzly Bear Habitat Measures Before, During and After Project Implementation.**

Grizzly bear "habitat measures have been improving steadily" in the Forest's

portion of the Cabinet-Yaak Recovery Zone. 8-ER-1802 (FS4218) (Project

Biological Assessment at 16). The bear population is monitored annually, with the

grizzly bear database updated every year on a cumulative basis, meaning that any

given year's data (including bear mortality data) are added to the body of data

rather than being evaluated in isolation. *See, e.g.*, 4-ER-739 (FWS1453) (2020

Progress Report at 9). As of 2021, FWS estimated the Cabinet-Yaak Ecosystem

grizzly bear population at about 60-65 bears, 8-ER-1941 (FS5730) (2021 Progress

Report at 42), with a 70% "probability that the population was stable or increasing

. . . ." 8-ER-1940 (FS5729) (2021 Progress Report at 41). The EA likewise

disclosed that in 2017, the population was estimated at 55-60 bears "with a 73

percent probability that the population was stable or increasing." 8-ER-1759

(FS2541) (EA at 300).

The existing percentages of Open Motorized Route Density, Total

Motorized Route Density and Core in Bear Management Units 14 (Northwest

14

Peaks) and 15 (Garver) meet or exceed the Forest Plan standards.[3]  8-ER-1760

(FS2542) (EA at 301, Table 84).  For Unit 14, Open Motorized Route Density is

28%, better than the standard of equal to or less than 31%; Total Motorized Route

Density is 24%, better than the standard of equal to or less than 26%; and Core is

56%, better than the standard of at least 55%.  *Id.*  For Unit 15, Open Motorized

Route Density is 30%, better than the standard of equal to or less than 33%; Total

Motorized Route Density is 26%, which meets the standard of equal to or less than

26%; and Core is 55%, which meets the standard of at least 55%.  *Id.*

Open Motorized Route Density is expected to increase in Units 14 and 15

during Project implementation but then "return to the current condition upon

completion."[4]  8-ER-1770 (FS2552) (EA at 311) (showing in Table 87 that this

metric is projected to increase temporarily to approximately 31% in Unit 14, which

---

[3]  The Open Motorized Route Density metric represents "the percent of the [Bear Management Unit] where the open motorized route density is greater than one mile per square mile."  8-ER-1761 (FS2543) (EA at 302).  Total Motorized Route Density is the percent of the Bear Management Unit "where the total . . . route density is at least two miles per square mile."  *Id.*  Adding a length of road in a Bear Management Unit may or may not affect compliance with either metric, depending on whether such addition causes a Bear Management Unit that is at or better than a standard to not meet the standard.

[4]  The Forest Service may authorize such project-specific temporary increases in Bear Management Units.  *See, e.g.*, 7-ER-1540 (FS965) (Forest Plan Biological Assessment at 33); 2-ER-255 (FWS16) (Project Biological Opinion at 14).

15

does not exceed the existing standard, before returning to 28%, and that the metric is projected to increase temporarily to approximately 36% in Unit 15, which is above the existing standard, before returning to 30%). Regarding Unit 15, FWS conservatively estimated during the ESA consultation process that Open Motorized Route Density might increase to 40% during Project implementation, but then included a mandatory term and condition in the Project's Incidental Take Statement that requires the Forest Service to limit operations so as not to exceed 37% Open Motorized Route Density during Project implementation. 2-ER-304 (FWS65) (Project Biological Opinion at 63). *See also* 2-ER-315-16 (FWS76-77) (Project Biological Opinion at 74-75) (describing the agencies' consultation dialogue regarding Open Motorized Route Density in Unit 15).

Total Motorized Route Density also is expected to increase during Project implementation but then return to or exceed the current condition upon completion. 8-ER-1770-71 (FS2552-53) (EA at 311-12). The Forest Service based this projection on the conservative assumption that "all potential routes were open concurrently." 8-ER-1770 (FS2552) (EA at 311). Total Motorized Route Density in Bear Management Unit 14 is projected to increase temporarily to approximately 26%, which does not exceed the existing standard, before returning to 23%, which is better than the existing condition. 8-ER-1771 (FS2553) (EA at 312, Table 88). Total Motorized Route Density in Bear Management Unit 15 is projected to

16

increase temporarily to about 32%, which is above the existing standard, before returning to 26%. *Id.*

The percentage of Core habitat will not decrease in either Bear Management Unit during Project implementation due to the Forest Service's in-kind replacement of Core. 8-ER-1771 (FS2553) (EA at 312) (explaining that before existing Core is entered, "replacement core must be secured; this is called in-kind replacement"). Each Unit will have more Core habitat after in-kind replacement, but not enough to change the percentage of Core. 2-ER-276 (FWS37) (Project Biological Opinion at 35). Core therefore will remain at 56% for Unit 14 and 55% for Unit 15 during and after Project implementation. 2-ER-273 (FWS34) (Project Biological Opinion at 32).

### D.      <u>Project Implementation Will Not Jeopardize the Grizzly Bear.</u>

Project implementation will not jeopardize the continued existence of the grizzly bear.[5] 2-ER-296 (FWS57) (Project Biological Opinion at 55). *See also* 1-ER-21-24 (Op. at 17-20) (upholding FWS's expert "no jeopardy" determination). The jeopardy inquiry concerns itself not with individual bears in the Project area

---

[5]  Under the ESA, "jeopardize the continued existence of" means to "engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

but rather asks whether the Project is "likely to jeopardize the continued existence of any [ESA-listed] *species*." 16 U.S.C. § 1536(a)(2) (emphasis added). In reaching its scientific "no jeopardy" decision for the bear at the level of the species, FWS also evaluated potential adverse effects of Project implementation at the Project area level and at the level of the Cabinet-Yaak Ecosystem.

The Cabinet-Yaak Ecosystem is one of four occupied grizzly bear recovery zones. 2-ER-249 (FWS10) (Project Biological Opinion at 8). Of this recovery zone's 22 Bear Management Units, 2-ER-251 (FWS12) (Project Biological Opinion at 10), Project implementation will occur only in Units 14 and 15, with motorized access metrics in Unit 14 "remain[ing] at or better than benchmarks at all times . . . ." 2-ER-274 (FWS35) (Project Biological Opinion at 33). Project activities in Unit 14 thus are not a source of potential adverse effects to the bear. *Id.*

In Unit 15, Project implementation "may result in adverse effects to a few individual female grizzly bears as a consequence of the potential disturbance and/or displacement related to the temporary increases in motorized access in the action area that could displace grizzly bears from otherwise suitable habitats." 2-ER-292 (FWS53) (Project Biological Opinion at 51). But "[a]t most, reproduction may be slowed for the affected females during" Project implementation. 2-ER-293 (FWS54) (Project Biological Opinion at 52). *See also* 2-ER-280-81 (FWS41-42)

18

(Project Biological Opinion at 39-40) (explaining that potential effects will vary based on a variety of factors, including non-Project factors like "the wariness of the individual bear, the size of and habitat quality within her home range, the number of other grizzly bears using the particular area, climate conditions, [and] annual food resources").  Project implementation in the action area will not prevent bears from using the area or "form a barrier to dispersal and movement" either within the recovery zone or between recovery zones.  2-ER-293 (FWS54) (Project Biological Opinion at 52).  And Project implementation is expected to benefit bear forage in the action area, including huckleberry production.  *Id.*

At the larger level of the Cabinet-Yaak Ecosystem, Project implementation will affect only "a few adult female grizzly bears . . . for a portion of their life."  2-ER-296 (FWS57) (Project Biological Opinion at 55).  Thus, Project implementation "will not appreciably impair or preclude the capacity of the [Cabinet-Yaak Ecosystem] recovery unit from providing both the survival and recovery function assigned to it."  *Id.*  In reaching that conclusion, FWS "considered the overall favorable land management within the recovery zone, the presumably and likely stable or growing population and improved survival and distribution of grizzly bears in the [Cabinet-Yaak Ecosystem] population, and the improving trends in survival rates."  *Id.*  In the long-term, the Project "is projected to result in increased resiliency of the [Cabinet-Yaak Ecosystem] population," 2-

19

ER-294 (FWS55) (Project Biological Opinion at 53), which will benefit the species as a whole.

At the species level, Project implementation "is not reasonably expected to reduce appreciably the likelihood of both the survival and recovery of the listed entity of grizzly bears as a whole." 2-ER-296 (FWS57) (Project Biological Opinion at 55). This is because the Project is not anticipated to "affect grizzly bears within, or connectivity with, the surrounding grizzly bear ecosystems (Selkirk, North Continental Divide) nor the ecosystems further away (Yellowstone, North Cascades, Bitterroot)." *Id.* FWS thus reached a "no jeopardy" determination for Black Ram, *id.*, which the district court upheld. 1-ER-21-24 (Op. at 17-20).

## VII.  <u>SUMMARY OF ARGUMENT</u>.

The Black Ram Project is an important forest health and fuels reduction project on the Kootenai National Forest in the Kootenai Tribe of Idaho's aboriginal territory. Despite Black Ram having been developed and authorized by two expert federal agencies – with the participation of the Tribe and incorporation of the Tribe's Indigenous Knowledge – the district court took a highly non-deferential approach to reviewing the Project and substituted its opinion for that of the Forest Service and FWS. As a result of its non-deferential review, the district court

20

erroneously held in favor of some of the claims brought by CBD and AWR against the Black Ram Project. The Tribe seeks reversal on certain discrete issues.

First, the district court erred in concluding that FWS disregarded grizzly bear mortality when establishing the ESA baseline for the bear in the Black Ram biological opinion. When adjudicating whether FWS used the best available science to establish the bear baseline, the court erred both as a factual matter and by failing to afford deference to agency scientific decision-making. The court erred as a factual matter because FWS *did* consider bear mortality when establishing the ESA baseline for the bear, contrary to the district court's conclusion. The record is replete with evidence that bear mortality is evaluated every year and is an integral component of FWS's annual calculations of bear population size and trend, along with other metrics. The court also erred by failing to afford FWS the deference it was due when establishing the grizzly bear baseline under the ESA. FWS evaluates the status of the bear based on multiple lines of evidence in a highly complex technical undertaking that requires a scientific understanding of data limitations. The district court, which is not an expert in the field of bear population biology, disagreed with the way FWS evaluated the bear data and held that FWS did not use the best available science because the agency did not rely on the court's preferred methodology. The court's holding regarding the grizzly bear ESA baseline thus was legal error.

21

Second, the district court erred in concluding the Forest Service violated NEPA when disclosing the existing condition for the bear. The court found that because more recent data was available to the Forest Service than what was disclosed in the EA, the agency had improperly relied on stale data under procedural NEPA. But the court ignored the fact that the newer data did not materially change the bear's existing condition. The APA explicitly instructs reviewing courts to employ the harmless error rule when evaluating a claim under the APA's arbitrary and capricious standard, but the court did not do so and reached an erroneous conclusion as a result.

Third, the district court erred in concluding the Forest Service failed to comply with its statutory obligations with respect to unauthorized road use when calculating and disclosing motorized route density in the Black Ram Project area. Contrary to the court's decision, the Forest Service satisfied its statutory obligations by thoroughly considering, disclosing and taking a NEPA "hard look" at the issue of unauthorized motorized access and by explaining the reasonable basis for its decision not to include temporary unauthorized road use when calculating the existing permanent motorized route density in the Project area. The district court reached its erroneous conclusion by affording no deference to, and instead improperly second guessing, expert agency technical determinations on this

22

complex issue, and by applying holdings from prior decisions despite those decisions being factually distinguishable.  This warrants reversal.

This Court should reverse the district court on the foregoing issues.

## VIII. <u>LEGAL STANDARDS</u>.

### A. <u>The Court's Review is De Novo</u>.

The Court reviews the merits of CBD's and AWR's claims de novo.  *See, e.g.*, *Ctr. for Biological Diversity v. Ilano*, 928 F.3d 774, 779 (9th Cir. 2019) (so stating for NEPA); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (same for ESA); *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) (same for NFMA).

### B. <u>The Arbitrary and Capricious Standard Governs the Court's Review</u>.

In conducting its de novo review, the Court assesses the claims of CBD and AWR under the APA's arbitrary and capricious standard of review.  *See* 5 U.S.C. § 706(2)(A) (providing that an agency decision may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").  The APA's arbitrary and capricious standard is a narrow one that precludes a reviewing court from substituting its own judgment for that of the agency.  *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007); *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008), *overruled in part on other*

*grounds by Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th

Cir. 2009). Under this standard, an agency's decision should be upheld unless the

agency "relied on factors Congress did not intend it to consider, 'entirely failed to

consider an important aspect of the problem,' . . . offered an explanation 'that runs

counter to the evidence before the agency, or is so implausible that it could not be

ascribed to a difference in view or the product of agency expertise.'" *McNair*, 537

F.3d at 987 (citation omitted).

### C.  <u>Deference to Agency Scientific Decision-Making</u>.

Federal agencies are owed substantial deference by courts reviewing agency

action, particularly agency action involving scientific matters. *McNair*, 537 F.3d at

988. *See also Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 376-77 (1989)

(deference to an agency's decision is particularly appropriate where questions of

scientific methodology or technical expertise are involved). Review should be at

its *most* deferential where, as here, an agency is addressing difficult issues within

its area of special expertise. *McNair*, 537 F.3d at 993.

## IX.  <u>ARGUMENT</u>.

The district court erred in declining to uphold the Black Ram Project in all

respects. The Tribe seeks reversal on the following issues.

///

24

**A.** **The Biological Opinion's Environmental Baseline for the Bear Satisfies the ESA.**

Contrary to the district court's determination, FWS did not disregard grizzly bear mortality data when establishing the ESA baseline for the bear in the Black Ram Project's biological opinion. 1-ER-15 (Op. at 11). The district court thus erred in concluding FWS violated the ESA by failing to use the best available science when establishing the grizzly bear baseline. *See generally* 1-ER-14-19 (Op. at 10-15). The court erred both factually and by failing to give deference to the expert consulting agency's technical determination regarding the baseline for the bear. *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983) (when an agency "is making predictions, within its area of special expertise, at the frontiers of science," judicial review "must generally be at its most deferential").

To comply with the ESA, a consulting agency like FWS prepares a biological opinion that analyzes the proposed action and explains any potential effects in the action area on a listed species like the bear. 16 U.S.C. § 1536(b)(3)(A). As part of its analysis, FWS evaluates the "environmental baseline of the listed species," 50 C.F.R. § 402.14(g)(2), defined as "the condition of the listed species . . . without the consequences to the listed species . . . caused by the proposed action." *Id.* § 402.04. FWS did so for Black Ram based on the best

25

available science, 16 U.S.C. § 1536(a)(2), including up-to-date bear mortality data found in the Cabinet-Yaak Grizzly Bear Recovery Area 2020 Research and Monitoring Progress Report (2020 Progress Report, referred to as "Kasworm et al. (2021)" in the biological opinion). 2-ER-249 (FWS10) (Project Biological Opinion at 8). The 2020 Progress Report was among "the best available science regarding the life history, population dynamics, status and distribution of grizzly bears . . . ." *Id.* (incorporating the 2020 Progress Report by reference).

Population biology is a highly technical field of science. It is grounded in far more than simply counting the number of observed individuals in the field, although that is one piece of the scientific puzzle. In the field of grizzly bear population biology, "[i]t is biologically inappropriate to infer changes in the minimum number of bears detected from year to year as changes in total population size." 2-ER-251 (FWS12) (Project Biological Opinion at 10) (explaining that reliance on "a count of the known detected individuals is an over-simplification of population biology"). Yet here, the court did just that.

The district court found fault with the agency for allegedly ignoring "documented bear mortalities in the Cabinet-Yaak Ecosystem" when establishing the grizzly bear environmental baseline. 1-ER-18 (Op. at 14). While purporting to acknowledge that "FWS is not required to use the minimum counts method to create an environmental baseline," the court faulted the agency for failing to do so,

26

which in the court's opinion could be accomplished by simply subtracting known bear mortalities from the minimum detected number of bears. *Id.* (stating that "[s]tatistical modeling is scientifically accurate, but documented deaths of female bears cannot be ignored"). The court thus relied on a simple count of live bears despite the longstanding admonition dating back to the grizzly bear Recovery Plan that it is improper to do so. 4-ER-747 (FWS1461) (2020 Progress Report at 17) (quoting the Recovery Plan's admonition that "'any attempt to use this parameter [a simple count of living bears] to indicate trends or precise population size would be an invalid use of these data'").

In addition to erring by non-deferentially substituting its scientific opinion for that of the expert consulting agency, the district court also erred as a factual matter. The district court's holding is factually erroneous because the record makes clear that FWS *did* consider documented deaths of grizzly bears, female or otherwise, in its analysis. *See, e.g.*, 4-ER-747-49 (FWS1461-63) (2020 Progress Report at 17-19) (reporting on known and probable bear mortality in Table 1); 4-ER-751 (FWS1465) (2020 Progress Report at 21, Figure 3) (displaying location-specific data on grizzly bear mortality); 4-ER-768 (FWS1482) (2020 Progress Report at 38) ("Kaplan-Meier survival and cause-specific mortality rates were calculated for 6 sex and age classes of native grizzly bears from 1983-2019 (Table 12)"). FWS specifically acknowledged the importance of considering "the rate of

27

female mortality" and reported on such calculated mortality rates over multiple time periods, including 2007-2020.  4-ER-766 (FWS1480) (2020 Progress Report at 36).

For decades, researchers have been studying all aspects of grizzly bear population biology, including mortality, in the Cabinet-Yaak Ecosystem.  4-ER-736 (FWS1450) (2020 Progress Report at 6) (field work on the "long-term study" began in the 1980s).  Scientists report annually on the cumulative evidence gathered over the years rather than on individual years in isolation, 4-ER-739 (FWS1453) (2020 Progress Report at 9), which methodology "results in a more conservative estimate of population trend."  4-ER-771 (FWS1485) (2020 Progress Report at 41).  *See also* 4-ER-746 (FWS1460) (2020 Progress Report at 16) ("All tables and calculations are updated when new information becomes available."). Researchers employ a consistent scientific protocol for developing population estimates because such estimates "are most useful when conducted the same way year after year, leading to evidence of trend."  2-ER-251 (FWS12) (Project Biological Opinion at 10).  The protocol is grounded in "a method of estimating population change that has been published in at least three different peer-reviewed journals and is a scientifically based technique to estimate population trend . . . ." 2-ER-250 (FWS11) (Project Biological Opinion at 9).

28

Inputs to the estimate of population size and trend are complex. Consider, for example, the bear survival rate, which is "calculated by use of the Kaplan-Meier procedure as modified for staggered entry of animals (Pollock et al. 1989, Wakkinen and Kasworm 2004)" and involves a variety of methodological assumptions for evaluating bear survival and its antithesis *mortality*. 4-ER-739 (FWS1453) (2020 Progress Report at 9). Bear reproduction data is more intuitive, as it is "gathered through observations of radio-collared females with offspring and genetics data analyzed for maternity relationships," albeit with its own set of methodological assumptions. 4-ER-740 (FWS1454) (2020 Progress Report at 10). Even detecting bears in the woods relies on a variety of methodologies, including things like capture and marking, 4-ER-742 (FWS1456) (2020 Progress Report at 12); hair sampling for DNA analysis, 4-ER-743-44 (FWS1457-58) (2020 Progress Report at 13-14); and radio monitoring, 4-ER-744 (FWS1458) (2020 Progress Report at 14), each with its strengths and weaknesses. Multiple methodologies are necessary because grizzly bears can be elusive – the Recovery Plan conservatively assumed a 60% "reporting efficiency for females with cubs" but acknowledged the detection rate likely was lower due to the Cabinet-Yaak Ecosystem's "forested nature," which means the number of bears is underestimated. 5-ER-1045 (FWS5380) (Grizzly Bear Recovery Plan at 84). Monitoring efforts also vary

29

among years – for example, "Covid-19 protocols reduced the monitoring effort substantially during 2020."[6]  4-ER-746 (FWS1460) (2020 Progress Report at 16).

All of this information informs researchers' annual estimates of the trend and size of the Cabinet-Yaak Ecosystem grizzly bear population.  Regarding population trend, which is informed by whether bears are living or not, the methodology is best left to the researchers' own words:

> We used the software program Booter 1.0 (© F. Hovey, Simon Fraser University, Burnaby, B.C.) to estimate the finite rate of increase ($\lambda$, or lambda) for the study area's grizzly bear populations. The estimate of $\lambda$ was based on adult and subadult female <u>survival</u>, yearling and cub <u>survival</u>, age at first parturition, reproductive rate, and maximum age of reproduction.
>
> Booter uses the following revised Lotka equation (Hovey and McLellan 1996), which assumes a stable age distribution:
>
> $$(1)\ 0 = \lambda^a - S_a\, \lambda^{\,a-1} - S_c S_y S_s^{\,a-2}\, m[1 - (S_a\,/\,\lambda)^{w-a+1}],$$
>
> where $S_a$, $S_s$, $S_y$, and $S_c$ are adult female, subadult female, yearling, and cub <u>survival rates</u>, respectively, a = age of first parturition, m = rate of reproduction, and w = maximum age.

---

[6]  In a particularly non-deferential statement, the district court criticized FWS for "fail[ing] to explain how the amount of resources going into minimum counts correlates with the actual numbers of bears found each year."  1-ER-17-18 (Op. at 13-14).  Nothing in the ESA so requires, however, and it is unclear why such information might be relevant to the reasonableness of the agency's scientific methodology when any attempt to use minimum counts "'to indicate trends or precise population size would be . . . invalid.'"  4-ER-747 (FWS1461) (2020 Progress Report at 17) (quoting the Recovery Plan).

4-ER-740 (FWS1454) (2020 Progress Report at 10) (emphases on survival, the opposite of mortality, added). Ultimately, researchers calculated the "estimated finite rate of increase (λ) for 1983-2020 . . . at 1.017," with the likelihood of a stable or increasing population estimated at 67%. 4-ER-771 (FWS1485) (2020 Progress Report at 41). The bear population size for this recovery zone was estimated in 2020 at about 60 bears. 4-ER-772 (FWS1486) (2020 Progress Report at 42).

The FWS incorporated this information into the Project Biological Opinion. *See, e.g.*, 2-ER-250 (FWS11) (Project Biological Opinion at 9) (citing to the 2020 Progress Report in support of a likely increasing population of grizzly bears in the Cabinet-Yaak Ecosystem, one having a "finite rate of increase of 1.027 for the period 1983-2020"); 2-ER-251 (FWS12) (Project Biological Opinion at 10) (citing to same in support of an estimated population size of 60 bears). The Service also employed a totality of the evidence approach before concluding that "the conglomerate of the best available science suggests an improving trend" in the Cabinet-Yaak Ecosystem grizzly bear population. 2-ER-251 (FWS12) (Project Biological Opinion at 10).

Again, the district court reached its erroneous result by doing exactly what the Project Biological Opinion said *not* to do. The court simplistically equated the minimum number of live bears detected in a given year with annual total

31

population size and then inferred that a decrease in population size from year to year was attributable to bear mortality ignored by the expert agency. 1-ER-18 (Op. at 14). The court focused particularly on female grizzly bear mortality that FWS supposedly had ignored, *id.*, a conclusion belied by the record.

FWS acknowledged the importance of assessing the female grizzly bear mortality rate given that it is the female of the species that can make a "reproductive contribution" to grow the population. 4-ER-766 (FWS1480) (2020 Progress Report at 36). To evaluate bear mortality, including that of female bears, researchers break the aggregate dataset into periods of increasing and decreasing population trends. *Id.* Looking just at female data, researchers found that the "[t]otal known female mortality rate decreased from 1.88 during 1999-2006 to 0.79 during 2007-2020 and known human-caused female mortality rate decreased from 1.5 to 0.57."[7] *Id.* Evaluating the female mortality rate is in fact key to one of the

---

[7] Based on the mortality of three female bears in 2022, the district court held in favor of AWR on its NEPA supplementation claim. 1-ER-60-66 (Op. at 56-62). But the three female bear deaths in 2022 (one subadult and two adults) did not invalidate the Forest Service's earlier conclusion regarding the stable or increasing status of the Cabinet-Yaak Ecosystem bear population. One of the bears was about 25 years old when she died of natural causes, 2-ER-166 (Declaration of Wayne Kasworm (Kasworm Decl.) ¶ 9.a), so likely at the end of her reproductive years. 3-ER-444 (FWS1110) (2021 Species Status Assessment at 45). Regardless, because researchers do not rely on one year's mortality data in a vacuum to assess population trends, the 2022 data did "not equate to a declining grizzly bear population in the Cabinet-Yaak Ecosystem." 2-ER-167 (Kasworm Decl. ¶ 10). And because researchers report annually on the bear's population biology, the

32

recovery targets of the Recovery Plan, namely Recovery Target 3 which states that "[t]he running 6-year average of known, human-caused mortality should not exceed 4 percent of the population estimate based on the most recent 3-year sum of females with cubs. No more than 30 percent shall be females." 4-ER-747 (FWS1461) (2020 Progress Report at 17) (underlining in original omitted). During the requisite running 6-year period for the 2020 Progress Report, *i.e.*, 2015-2020, both "total and female mortality met the target." *Id*. *See also* 2-ER-252 (FWS13) (Project Biological Opinion at 11) (confirming "the target had been met as of bear year 2020").[8] The same was true for the 2016-2021 period. 8-ER-1916 (FS5705) (2021 Progress Report at 17). Researchers continually assess this metric on an annual basis, as required by the Recovery Plan.

Based on the above, the record shows that FWS did not ignore bear mortality, female or otherwise, in its analysis of the ESA environmental baseline for the bear. The grizzly bear dataset is updated every year, and every year the

---

supplemental analysis ordered by the court already was occurring. See https://www.fws.gov/media/cabinet-yaak-grizzly-bear-recovery-area-2022-research-and-monitoring-progress-report (reporting on the recovery zone's 2022 estimated rate of bear population increase (1.6%) and likelihood of a stable or increasing population (67%) at page 41, and its estimated population size (60-65 bears) at page 43).

[8] Bear year means "the non-denning season within a given calendar year; in the CYE, this is defined as April 1 – November 30 (U.S. Forest Service 2020, p. 27)." 5-ER-901 (FWS1933) (2020 Biological Opinion for Forest Plan at 18 n.5).

33

grizzly bear metrics are recalculated in light of the new information, including bear mortality.  The biological opinion for the Project relied on the body of best available science, which included the data from the 2020 Progress Report.  The court disagreed with the way FWS evaluated the data, but the expert agency was due substantial deference in its area of special expertise, which the district court did not afford it.  *Baltimore Gas & Elec. Co.*, 462 U.S. at 103 (deference is particularly appropriate where questions of scientific methodology or technical expertise are involved); *Jewell*, 747 F.3d at 601-02 (agency scientific decision-making under the ESA is afforded highly deferential review).

In sum, FWS did not err in determining the environmental baseline for the bear, which determination is due substantial deference.  Properly applying the APA standard of review and giving proper regard to the facts in the record, this Court should reverse the district court's decision with respect to the grizzly bear environmental baseline under the ESA.  The Court also should reverse the district court's decision that the Forest Service erred by relying on a flawed biological opinion for the Project, a holding premised entirely on the court's erroneous conclusion that FWS ignored the best available science when establishing the grizzly bear environmental baseline.

*///*

34

**B.**     **The EA's Existing Condition Disclosures for the Bear Satisfy NEPA.**

The district court also erred in concluding the Forest Service violated NEPA by relying on stale data when disclosing the grizzly bear baseline condition in the EA. 1-ER-36-38 (Op. at 32-34). At most, the EA's disclosure of 2017 grizzly bear population data published in 2018 constituted harmless error. The APA explicitly instructs reviewing courts that they "shall" employ the harmless error rule in evaluating a claim under the APA's arbitrary and capricious standard, 5 U.S.C. § 706, which the district court did not do.

The draft EA, which issued in 2019, disclosed the grizzly bear existing condition based on 2017 data published in 2018. 8-ER-1797 (FS3806) (Draft EA at 297). Subsequently, the Project was delayed while the Forest Service reinitiated consultation with FWS over the biological opinion for the governing Forest Plan in light of the ruling in *Alliance for the Wild Rockies v. Probert,* 412 F.Supp.3d 1188 (D. Mont. 2019). 7-ER-1514 (FS939) (Forest Plan Biological Assessment at 7). The biological opinion for the Forest Plan issued in October 2020, 5-ER-880-1028 (FWS1912-2060), after which the final EA, which issued in June 2022, continued to disclose the bear's existing condition based on 2017 grizzly bear data published in 2018. 8-ER-1759 (FS2541) (EA at 300). But the grizzly bear data that became available between issuance of the draft and final EAs did not reflect a different

35

existing condition for the bear, including because the grizzly bear population data is evaluated on a cumulative basis with no one year's data being evaluated in isolation. *See, e.g.*, 4-ER-739 (FWS1453) (2020 Progress Report at 9).

NEPA requires a federal agency to examine the potential environmental effects of a proposed federal action and inform the public about those effects. 42 U.S.C. § 4332(2)(C). The statute is purely procedural and mandates process without dictating any substantive environmental result. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). The Forest Service's disclosures regarding the grizzly bear existing condition satisfied NEPA. Even in the EIS context, which is not the posture of this case, potential project impacts are to be analyzed "in proportion to their significance." 40 C.F.R. § 1502.2(b) (2019).[9] Here, in the context of an EA – which is intended to be a *concise* public document, *id.* § 1508.9(a), that includes a "brief" discussion of potential environmental impacts, *id.* § 1508.9(b) – a proportionality approach is even more reasonable. The Tribe does not support an encyclopedic look at an issue that did not rise to the level of significance, particularly where such additional process would only delay forest health treatments developed to protect and restore Ktunaxa resources of importance to the Tribe.

---

[9] All NEPA citations refer to the NEPA regulations in effect in 2019. 1-ER-25 (Op. at 21 n.3).

36

Establishing an environmental baseline, more commonly referred to under

NEPA as the existing condition, "is not an independent legal requirement, but

rather, a practical requirement in environmental analysis often employed to

identify the environmental consequences of a proposed agency action." *Am. Rivers*

*v. FERC*, 201 F.3d 1186, 1195 n.15 (9th Cir. 1999). The Tribe points this out

because under procedural NEPA, it is impermissible to impose an obligation on an

agency where such obligation is not found in NEPA. For example, in *McNair*, an

en banc panel held that a requirement – affirmatively addressing uncertainties in a

project's EIS – could not be engrafted onto NEPA's purely procedural "hard look"

requirement where neither the statute nor its implementing regulations imposed

such an obligation. 537 F.3d at 1001.

Regardless, the agency did not insufficiently disclose the existing grizzly

bear condition in the action area. *See, e.g.*, 8-ER-1757-67 (FS2539-49) (EA at

298-308) (discussing the grizzly bear existing condition). Rather, the Forest

Service's disclosures regarding the size of the Cabinet-Yaak Ecosystem population

were wholly adequate, particularly considering that an agency preparing a NEPA

document cannot wait continually for the publication of new data. The Supreme

Court recognized this principle long ago in the context of NEPA supplementation,

holding that new information (there postdating a NEPA decision) does not

automatically warrant supplementing the decision because such a requirement

37

would "render agency decisionmaking intractable, always awaiting updated
information only to find the new information outdated by the time a decision is
made." *Marsh*, 490 U.S. at 373.

Here, new data would not have made any difference to the NEPA analysis
such that the court should have applied the harmless error rule. Again, the Black
Ram EA disclosed the size of the Cabinet-Yaak Ecosystem grizzly bear population
and the likelihood the population size was stable or increasing based on 2017 data
published in 2018. 8-ER-1759 (FS2541) (EA at 300). The existing grizzly bear
condition in 2017 did not differ meaningfully from that in June 2022 when the
Black Ram Decision Notice issued.

The record shows that from 2017-2021, the estimate of the Cabinet-Yaak
Ecosystem grizzly bear population ranged consistently from 55 to 65 bears with a
commensurate 60-73% probability that the population was stable or increasing
(and a calculated rate of increase ranging from 0.9%-2.1%). In 2017, for example,
the population size was estimated at 55-60 bears with a 73% likelihood that the
population was stable or increasing, 8-ER-1895-96 (FS5371-72) (2017 Progress
Report at 36-37) (reporting on data from 1983-2017), whereas in 2021, the
population size was estimated at 60-65 bears with a 70% chance that the
population was stable or increasing. 8-ER-1940-41 (FS5729-30) (2021 Progress
Report at 41-42) (reporting on data from 1983-2021). *See also* 8-ER-1898-99

38

(FS5519-20) (2018 Progress Report at 37-38) (reporting on data from 1983-2018); 9-ER-2017-18 (FS5971-72) (2019 Progress Report at 39-40) (reporting on data from 1983-2019); 4-ER-771-72 (FWS1485-86) (2020 Progress Report at 41-42) (reporting on data from 1983-2020).  Prior to issuance of the final EA, the Forest Service confirmed it had considered the bear population data in the 2020 Progress Report, *see generally* 8-ER-1806-09 (FS4530-33), which estimated the population at "about 60 bears" with a 67% chance of a stable or increasing population.  8-ER-1807 (FS4531) (Black Ram Process Review at 3).

On these facts, and properly applying the APA's harmless error rule as the district court failed to do, the Project's disclosures regarding the grizzly bear existing condition satisfied NEPA.  The district court thus erred and should be reversed on this issue.

## C.  The Forest Service Complied with Its Statutory Obligations When Calculating the Existing Permanent Motorized Route Density in the Project Area.

The district court erred in concluding the Forest Service failed to comply with its statutory obligations with respect to unauthorized road use when calculating and disclosing motorized route density in the Project area under Forest Plan standard FW-STD-WL-02.[10]  Contrary to the court's decision, the Forest

---

[10]  The district court appeared to construe AWR's claims as NEPA claims, 1-ER-43 (Op. at 39), while acknowledging AWR's related NFMA assertions regarding

39

Service satisfied its statutory obligations by thoroughly considering, disclosing and taking a NEPA "hard look" at the issue of unauthorized motorized access and explaining the reasonable basis for its decision not to include temporary unauthorized road use when calculating the existing permanent motorized route density in the Project area. The district court reached its erroneous conclusion by affording no deference to, and instead improperly second guessing, expert agency technical determinations on this complex issue. *McNair*, 537 F.3d at 993 (judicial review should be at its most deferential where agencies are addressing difficult technical issues within their areas of expertise). This warrants reversal.

1.    <u>**Overview of the Agencies' Thorough Evaluation of the Temporary Unauthorized Road Use Issue.**</u>

The crux of the temporary unauthorized road use issue is whether temporary unauthorized road use should be included in the Forest Service's calculations of

---

compliance with Forest Plan standard FW-STD-WL-02. 1-ER-45, 47 (Op. at 41, 43). NFMA requires that site-specific projects comply with the governing forest plan, 16 U.S.C. § 1604(i), which the Project does. But the court's analysis focused on claims sounding in NEPA, including an alleged failure to disclose "the actual motorized use, including unauthorized use, as required by" the Forest Plan, 1-ER-47 (Op. at 43); an alleged failure to disclose the agency's methodology, 1-ER-49, 50 (Op. at 45-46); and an alleged failure to take a NEPA "hard look" at the unauthorized use issue. 1-ER-53-58 (Op. at 49-54). The Tribe focuses on the court's NEPA determinations while also joining in federal defendants' NFMA arguments, which show that in addition to complying with NEPA, the Project is consistent with Forest Plan standard FW-STD-WL-02 and hence complies with NFMA.

40

the existing permanent motorized route density in the Project area, against which the potential impacts of Project implementation are assessed. The issue of temporary unauthorized road use thus implicates the technical meaning of a road that is "open" for purposes of Open Motorized Route Density and Total Motorized Route Density in Forest Plan standard FW-STD-WL-02. The issue also necessarily implicates the technical meaning of a road that is "effectively restricted" and hence not "open" for the same purpose.[11] The Forest Plan does not define either term, leaving it to the Forest Service to interpret the Forest Plan, with the agency's interpretation due deference on review. *Native Ecosystems Council*, 418 F.3d at 960. The district court did not afford the agency such deference when evaluating its NEPA disclosures on this topic.

The roots of this issue go back three decades. In 1994, the Interagency Grizzly Bear Committee recognized a need for consistent terminology with respect to motorized access in grizzly bear territory. 8-ER-1891 (FS5140) (1994 Taskforce Report at 3). Its resulting definition for a restricted road explained that the "road requires physical obstruction (generally gated) and motorized vehicle use

---

[11] Because Total Motorized Route Density already includes both open and restricted routes, *see supra* note 2, even if a restricted route were recategorized as an open route because of unauthorized use, such recategorization would not change the Total Motorized Route Density metric because the route already would have been accounted for in the calculations.

41

is legally restricted." *Id.* In 1998, the Committee added (without definition) the term "effective" such that a restricted road "requires *effective* physical obstruction (generally gated)." 5-ER-1038 (FWS5022) (1998 Taskforce Report at 3) (emphasis in original). That same year, the interim access management rule set for the Cabinet-Yaak Ecosystem issued, with the definition of a restricted road likewise requiring "effective physical obstruction (generally gated)." 8-ER-1893 (FS5152) (1998 Interim Access Management Rule Set at 5). Since then, the term "effective" has gone undefined, including in the Forest Plan.

Nothing in the Forest Plan requires the Forest Service to completely prevent temporary unauthorized motorized use or include a road with such unauthorized access as per se permanently open for purposes of the road density metrics. Nor does the Forest Plan or any other relevant agency document equate the term "effective" with 100% effectiveness. The Project biological assessment did not do so, as it included a Project Design Feature for the grizzly bear that addressed how to make road closure devices "*more* effective." 8-ER-1799 (FS4215) (Project Biological Assessment at 13) (stating that "a gate or barrier may be more effective if placed where there are steep, rocky cut and fill slopes") (emphasis added). There would be no need for the adjective "more" if "effective" were equated with 100% effectiveness. The biological opinion for the Project also did not equate "effective" with 100% effectiveness. 2-ER-303 (FWS64) (Project Biological

42

Opinion at 62) (stating in the context of road closure devices for in-kind replacement of Core that the restriction devices must be monitored "to ensure effectiveness of closures at *reasonably deterring* motorized access") (emphasis added). Likewise, the Forest Service's 2020 Bear Year Monitoring Report included statements such as, "currently no gate . . . will be effectively restricted when gate . . . installed," "replaced lock . . . effectively restricting" the road, and "[b]ermed . . . effectively closing this road." 5-ER-1121, 1122, 1123 (FWS6235, FWS6236, FWS6237) (2020 Bear Year Monitoring Report Appendix C at 2, 3, 4). That the agency equated the installation of a gate, replacement of a lock or addition of a berm with effective road restriction or closure again shows that the agency does not equate "effective" with 100% effectiveness. See 1-ER-50 (Op. at 46) (observing that road closures can be "illegally evaded").

The district court acknowledged that the Forest Service does not equate an effective road closure with 100% effectiveness at preventing unauthorized road use. *Id.* Still, the court faulted the Forest Service for supposedly ignoring unauthorized road use by not including it in calculations of the existing permanent motorized route density in the Project area, 1-ER-46 (Op. at 42), and for supposedly basing its assessment of potential Project impacts on the assumption that "public use would be effectively restricted" on roads that are not open. 1-ER-58 (Op. at 54) (cleaned up). The court's criticism was unwarranted.

43

The Forest Service does not ignore unauthorized motorized use when calculating motorized access metrics for projects in Bear Management Units. In fact, the Forest Service reinitiated consultation with FWS over the Forest Plan partly in response to an unauthorized motorized use case involving management restrictions on motorized use (for a "bears outside of recovery zone" area, not for Bear Management Units like those at issue here). *Probert,* 412 F.Supp.3d 1188. *Probert* found that eight years of forest monitoring data demonstrated ineffective closures and illegal road use that conflicted with the Forest Service's assumptions for linear road miles in a different project area located outside of recovery zone boundaries. The biological opinion resulting from the reinitiated consultation thus evaluated whether unauthorized motorized use posed a previously overlooked threat to the grizzly bear. Based on years of monitoring data, FWS concluded it did not:

> Illegal motorized access could occur anywhere on the Forest. While illegal motorized access has the potential to affect individual grizzly bears, the amount, location, duration, and timing of effects resulting from such illegal use is not known. The probability of long-term illegal motorized access and probability of illegal access coinciding with the presence of grizzly bears is anticipated to be low but is unknown. As such, the potential consequences to grizzly bears are uncertain. Illegal motorized access is expected to be spatially disparate and temporary and is not likely to collectively cause an adverse effect because most Forest users follow travel regulations and when illegal use is observed, or when user-created roads become apparent, the Forest Service corrects the situation as soon as they are able. . . . Also, illegal motorized access would most likely result in

44

temporary effects to grizzly bears as opposed to a permanent change in motorized access conditions because the Forest Service corrects the situation as soon as they are able.

5-ER-921-22 (FWS1953-54) (2020 Biological Opinion for Forest Plan at 38-39).

*See also* 5-ER-922 (FWS1954) (2020 Biological Opinion for Forest Plan at 39) (noting that the Forest Service generally corrects any identified situations "in the same bear year, or early the next bear year").

Notably, some level of unauthorized use is built into the Open Motorized Route Density and Total Motorized Route Density metrics. 2-ER-259 (FWS20) (Project Biological Opinion at 18). When the methodology for the metrics was developed decades ago, it was an "approximation of on-the-ground conditions" with "some unknown subset of closed roads probably receiv[ing] illegal use during the study (based on subsequent Forest-wide monitoring of closures)." *Id.* Because the subsequent Forest-wide monitoring data shows no "clear trend, increasing or decreasing, in the amount of illegal use" documented over the years, FWS assumes the level of unauthorized use is essentially static. 5-ER-982 (FWS2014) (2020 Biological Opinion for Forest Plan at 99).

Based on its expert analysis of the data, FWS concluded "persistent or chronic illegal motorized use is rare" on the Forest. 5-ER-922 (FWS1954) (2020 Biological Opinion for Forest Plan at 39). The Forest Service likewise reported for Black Ram that "because we address discovered or reported unauthorized use

45

promptly . . . and because in our experience unauthorized use on any given route is *not* chronic from year to year, such use does not contribute to a long term or 'permanent' change to the routes database." 8-ER-1806 (FS4530) (Black Ram Process Review at 2) (emphasis in original). Thus, temporary unauthorized use is not included in the Forest Service's calculation of the existing permanent motorized route density in the Project area, consistent with the requirements in the Forest Plan biological opinion that road density calculations be based on "up-to-date" data that "describe the permanent condition" in the Cabinet-Yaak Ecosystem Bear Management Units. 5-ER-1001 (FWS2033) (2020 Biological Opinion for Forest Plan at 118).

The reinitiated consultation on the Forest Plan added another bear protection requirement. Starting in 2020, the Forest's Bear Management Unit reporting obligations now require an annual "list of any gates, barriers, or other devices or methods that were found to be ineffective at managing motorized access, and any unauthorized creation of additional routes that were discovered, and the Forest's response to remedy the situation." 5-ER-1002 (FWS2034) (2020 Biological Opinion for Forest Plan at 119). The first such report – the 2020 Bear Year Monitoring Report – showed *no* unauthorized motorized use on existing routes in Bear Management Units 14 or 15, the Units involved in Black Ram. 5-ER-1115 (FWS6229) (2020 Bear Year Monitoring Report Appendix B at 5). And it showed

46

only one instance of unauthorized motorized use on a user-created route in the

Project area, in Unit 15.  5-ER-1117 (FWS6231) (Appendix B at 7).  These data

are wholly consistent with the expert agencies' conclusion that unauthorized road

use is spatially disparate and temporary, not chronic, such that it is reasonably

excluded from the Forest Service's calculations of the existing permanent

motorized route density in the Project area.

This is the unauthorized road use context within which the district court's

errors should be reversed.

> ### 2.    The Forest Service Satisfied NEPA by Reasonably Disclosing Its Methodology for Complying with Forest Plan Standard FW-STD-WL-02.

The district court erred in concluding that the Black Ram EA "obscured [the

Forest Service's] methodology for how it calculated compliance with the Access

Amendment in violation of NEPA."  1-ER-49 (Op. at 45).  The court criticized the

agency for indicating without explanation "that the Access Amendment was

considered as the 'source' for measuring road density for the Project . . . ."  *Id.*

(describing the Project as having incorporated the road density metrics by

reference).  This makes no sense because the road density metrics are found in a

Forest Plan standard, FW-STD-WL-02.  *See, e.g.*, 6-ER-1329 (FS15) (Forest Plan

at 5) (explaining that the Forest Service was retaining the Access Amendments

methodology in the Forest Plan); 6-ER-1354 (FS40) (Forest Plan at 30) (setting

47

forth standard FW-STD-WL-02 and referring the reader to Forest Plan Appendix B for the methodology details); 7-ER-1472-77 (FS156-61) (Forest Plan at 146-51) (setting forth the retained methodology in Appendix B). Site-specific projects like Black Ram are *required* to comply with standards in the governing Forest Plan. 16 U.S.C. § 1604(i). And the EA fully disclosed that the "source" for the standard is the Forest Plan. *See, e.g.*, 8-ER-1757-58, 1760 (FS2539-40, FS2542) (EA at 298-99, 301).

AWR brought no challenge to Forest Plan Standard FW-STD-WL-02. Nor did the district court adjudicate such a challenge to the Forest Plan. Rather, AWR alleged, and the court adjudicated, a Project-specific challenge to the Black Ram EA's disclosures regarding compliance with FW-STD-WL-02. Ninth Circuit case law is clear regarding the distinction between challenges to site-specific projects versus challenges to management direction in a governing forest plan, although the issue more typically arises in the context of a litigant bringing a freestanding challenge to forest plan management direction. *See, e.g.*, *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 658 (9th Cir. 2009). Given the lack of a challenge to the Forest Plan in this case, the court's criticism of the agency for supposedly failing to explain the source of its methodology for calculating road density metrics is erroneous. The agency simply complied with the Forest Plan consistent with 16 U.S.C. § 1604(i).

48

The district court's decision also is inherently inconsistent with respect to the NEPA regulations governing an EA versus an EIS. The district court mischaracterized the Black Ram EA's compliance with Forest Plan Standard FW-STD-WL-02 as being based on incorporation by reference under 40 C.F.R. § 1502.21, which the court held applies to an EIS, not to an EA like that prepared for the Black Ram Project. But the court then faulted the agency for an alleged failure "to state its methodology as required by § 1502.24," 1-ER-49 (Op. at 45), despite 40 C.F.R. § 1502.24 applying to EIS's and not to an EA. The district court cannot have it both ways. More fundamentally, the EA did not incorporate the "Access Amendment" road density metrics methodology by reference but rather complied with Forest Plan Standard FW-STD-WL-02 and disclosed that it was doing so in conformance with NEPA.

If this case had involved a direct challenge to the Forest Plan standard, which it did not, the challenge would have failed given the Forest Service's reasonable disclosures regarding its methodology for determining Open Motorized Route Density and Total Motorized Route Density. *See supra* parts VI.B-C, IX.C.1. Where, as here, no such challenge was brought, and where the Project properly complied with Forest Plan Standard FW-STD-WL-02, the district court erred in finding a NEPA violation based on the Forest Service's purported failure

49

to explain the source of its methodology for calculating road density metrics.

Thus, this Court should reverse.

**3.** **The Forest Service Provided a Reasoned Explanation for Excluding Temporary Unauthorized Road Use When Calculating the Existing Permanent Motorized Route Density in the Project Area.**

Also erroneous is the district court's determination that the Forest Service

failed to adequately explain why temporary unauthorized road use was excluded

from the calculations for Open Motorized Route Density and Total Motorized

Route Density.  1-ER-47 (Op. at 43).  The Forest Service *did* explain why

temporary unauthorized road use was excluded from the road density calculations.

The district court simply disagreed with the Forest Service's explanation and non-

deferentially substituted its opinion for that of the expert agency.

The district court acknowledged that the agency had explained its reasoning.

In fact, it quoted the agency as follows:

> "The routes used to establish the 'permanent' condition are those that
> are *authorized* routes. Unauthorized use features are not. That is, any
> user-created routes or access, as well as breaches (e.g., dismantling or
> damaging gates and then proceeding to drive the route) are not
> considered part of the existing condition. Importantly, because we
> address discovered or reported unauthorized use promptly, . . . and
> because in our experience unauthorized use on any give route is *not*
> chronic from year to year, such use does not contribute to a long term
> or 'permanent' change to the routes database."

50

*Id.* (quoting 8-ER-1806 (FS4530) (Black Ram Process Review at 2)) (underlining added by court). *See also* 8-ER-1794-95 (FS2777-78) (EA Appendix G at 101-02) (further explaining that "[u]nauthorized use of all roads . . . is illegal. Monitoring of illegal use is ongoing and is conducted by local and Forest Service (FS) law enforcement as well as FS employees. Additionally, we appreciate and act upon the reports we receive from the recreating public."). But the court then cited prior Montana District Court case law for the proposition that the agency's explanation was *wrong*. 1-ER-47-48 (Op. at 43-44). Based on its litany of prior decisions, the court concluded the Forest Service had repeated its earlier sins. 1-ER-48 (Op. at 44) ("That is exactly what happened here."). Incorporating the holding from one of its earlier decisions, the district court held that the Forest Service's "decision" – not its lack of explanation – was:

> "arbitrary and capricious insofar as it assumes the effectiveness of closure devices; claims inability to account for the effects of unauthorized motorized access despite [the USFS's] monitoring and databases, which demonstrate capacity to account for fluctuating conditions and new information; and fails to account for inaccuracies in how roads are classified in the USFS's database despite data showing differing on-the-ground conditions."

*Id.* (quoting *Alliance for the Wild Rockies v. Marten*, No. CV 21-05-M-DLC, 2023 WL 4977712, at *11 (D. Mont. Aug. 3, 2023) (*Marten II*)).

But *Marten II* is not on all fours with the facts of this case. The decision did not involve a site-specific project like Black Ram. Rather, it involved (in relevant

51

part) a challenge brought by AWR to a biological opinion for a forest plan

involving a forest where the Access Amendments have never applied, the Helena-

Lewis & Clark National Forest.  In *Marten II*, AWR focused on forest-wide

unauthorized road use and the consideration of such road use by FWS and the

Forest Service, along with "the effectiveness of efforts to curtail" unauthorized

road use, 2023 WL 4977712, at *2, both inside and outside of a different grizzly

bear recovery zone (the Northern Continental Divide Ecosystem).  AWR's claims

asserted that the biological opinion was flawed for failure "to disclose and

meaningfully analyze" three things:

> (1) Hundreds of law enforcement records of illegal motorized use
> across the Forest, (2) the 57% failure rate of Forest Service road
> closures according to the Forest Service's own monitoring, and (3)
> hundreds of miles of roads that were closed on paper by Travel Plans,
> including illegal roads, but are still physically open to motorized use.

*Id.* at *9 (cleaned up).  On the third point, AWR had identified "hundreds of miles

of roads that remain[ed] open despite their required restriction or decommissioning

under existing Travel Plan decisions."  *Id.* at *11.

   Black Ram does not involve roads closed on paper yet still open to

motorized use, let alone hundreds of miles of such roads – no such claim was

brought in this case.  Thus, it was incorrect for the district court to hold the Project

arbitrary and capricious for failure to account for inaccuracies in road

classifications "'in the USFS's database despite data showing different on-the-

52

ground conditions.'"  1-ER-48 (Op. at 44) (quoting *Marten II*, 2023 WL 4977712, at *11).  Nor, as discussed further in the next section, does this case involve a similar magnitude of unauthorized road use or failed road closures.  Again, the 2020 Bear Year Monitoring Report – the first report required by FWS to include an annual "list of any gates, barriers, or other devices or methods that were found to be ineffective at managing motorized access, and any unauthorized creation of additional routes that were discovered, and the Forest's response to remedy the situation," 5-ER-1002 (FWS2034) (2020 Biological Opinion for Forest Plan at 119) – showed *no* unauthorized motorized use on existing routes in the two Bear Management Units involved in Black Ram (14 and 15).  5-ER-1115 (FWS6229) (2020 Bear Year Monitoring Report Appendix B at 5).  And it showed only one instance of unauthorized motorized use on a user-created route in the Project area (in Unit 15).  5-ER-1117 (FWS6231) (Appendix B at 7).  *Marten II* thus is not determinative, particularly on the issue of whether the Forest Service reasonably explained the exclusion of temporary unauthorized road use from the calculations for Open Motorized Route Density and Total Motorized Route Density in the Black Ram Project area.

In short, the district court found a NEPA violation – based on a purported failure to provide a reasoned explanation – because the court non-deferentially disagreed with the substance of the agency's explanation based on the court's prior

53

case law, particularly a decision differing materially from the facts of this case. The district court's highly non-deferential decision on this issue is thus erroneous and should be reversed.

4. **The Forest Service Took a NEPA "Hard Look" at the Issue of Temporary Unauthorized Road Use in the Project Area.**

The district court erred in concluding the Forest Service failed to take a NEPA "hard look" at the issue of "unauthorized or illegal road use." 1-ER-54 (Op. at 50). The record shows the contrary in the Project area.

The district court began its analysis on this issue by discussing prior Montana District Court unauthorized road use decisions, including *Probert* and *Alliance for the Wild Rockies v. Marten*, 464 F. Supp. 3d 1169 (D. Mont. 2020) (*Marten I*), which bookend the issue. In *Probert*, *see supra* part IX.C.1, eight years of forest monitoring data was held to demonstrate ineffective closures and illegal road use that conflicted with the Forest Service's assumptions for linear road miles in a different project area located outside of grizzly bear recovery zone boundaries where the Open Motorized Route Density and Total Motorized Route Density metrics did not apply. That evidence conflicted with the Forest Service's assumptions regarding linear road miles in the "bears outside of recovery zone area" at issue because it indicated "ineffective closures have contributed to increases in linear road miles and potentially impacted grizzly bears in ways not

54

previously considered." 412 F. Supp. 3d at 1195. *Marten I* subsequently limited *Probert*'s holding to cases dealing "with documented historic [ineffective] road closures." 464 F. Supp. 3d at 1176. *Marten I* declined to apply *Probert* "based on the mere possibility that planned road closures will be ineffective." *Id.*

The district court then jumped to the preliminary injunction decision in *Center for Biological Diversity v. U.S. Forest Service*, No. CV 22-91-M-DLC, 2023 WL 3052299 (D. Mont. Apr. 24, 2023), where the court enjoined the Knotty Pine project on the Forest after finding a likelihood of success on the plaintiffs' unauthorized road use ESA challenge to that project's biological opinion. In finding a likelihood of success on the merits under the ESA, *Center for Biological Diversity* concluded that unauthorized road use in the Knotty Pine project area rendered such road use more akin to permanent than temporary because:

> (1) illegal motorized use was observed in the Project area in two of the eight years for which USFS provided monitoring reports; (2) the Yaak Valley Forest Council's survey of roads in the Project area highlighted multiple gated or bermed roads that may have been bypassed by all-terrain vehicles or motorcycles at some time in the past and documented a few user-created motor vehicle routes; and (3) some Forest users have, and will likely continue to break the law and drive motorized vehicles where such use is illegal.

1-ER-56 (Op. at 52) (cleaned up) (quoting *Ctr. for Biological Diversity*, 2023 WL 3052299, at *10).

55

The district court's litany of prior unauthorized road use decisions omitted *Alliance for the Wild Rockies v. Gassman*, No. CV 21-105-M-DLC, 2023 WL 4172930 (D. Mont. June 26, 2023), a subsequent merits decision involving *failed* allegations of unauthorized road use in the context of NEPA, like here.  In *Gassman*, a NEPA unauthorized road use claim for the Ripley project on the Forest was held to be more analogous to the situation in *Marten I* than *Probert*.  *Gassman* found that an earthen berm failure rate of about 35% did not support the "contention that earthen berms in the Project area are ineffective at restricting public access to roads."  2023 WL 4172930, at *17.  In reaching that determination, the court found it probative that the Forest Service promptly addresses instances of unauthorized use "to try to prevent illegal access."  2023 WL 4172930, at *17.  Notably, *Center for Biological Diversity* also credited the Forest Service with monitoring road closures and promptly fixing unauthorized road use problems.  2023 WL 3052299, at *10.

Here, in contrast, the court non-deferentially rejected the record evidence that the Forest Service repairs road closure breaches "'as quickly as possible after discovery.'"  1-ER-56-57 (Op. at 52-53) (quoting FS2544 (EA at 303, found at 8-ER-1762)).  *See also* 5-ER-922 (FWS1954) (2020 Biological Opinion for Forest Plan at 39) (noting that the Forest Service generally corrects any identified situations "in the same bear year, or early the next bear year").  Pointing to the

56

2020 Bear Year Monitoring Report (at page 23), the court criticized the Forest

Service because the agency "found 32 breached barriers and repaired none of them

and found 40 breached gates and repaired about a quarter of them." 1-ER-57 (Op.

at 53) (citing FWS6182 (2020 Bear Year Monitoring Report at 23, found at 5-ER-

1068)).

But the very next page of the 2020 Bear Year Monitoring Report explained

that "due to covid-19 and other work limitations, no barriers were repaired or gates

reinforced with rocks on the side [in the 2020 bear year], but locks were replaced

on existing gates, often numerous times." 5-ER-1069 (FWS6183) (2020 Bear Year

Monitoring Report at 24). And a closer look at the data disclosed in the report

shows that the Forest Service in bear year 2020 exercised diligence despite covid-

19 work limitations – it monitored 232 out of 268 gates in the Cabinet-Yaak

Ecosystem (86% of the total) and found only 40 breaches (17% of the total), then

repaired 24% of them in the same year. 5-ER-1068 (FWS6182) (2020 Bear Year

Monitoring Report at 23). The data also shows that the Forest Service in bear year

2020 monitored 683 of the 683 barriers in the Cabinet-Yaak Ecosystem – 100% of

the total – and found only 32 of the barriers breached, 5% of the total. *Id.* The fact

that the agency was unable to repair those barriers in bear year 2020 due to covid-

19 work limitations does not support the court's outright rejection of the record

evidence that the agency diligently monitors road closures and fixes unauthorized

57

road use problems as quickly as possible. Nor does the evidence pointed to by the court speak to agency monitoring in Bear Management Units 14 and 15 at issue in this case.

Equally problematic is the fact that the district court cursorily analogized Black Ram and its procedural NEPA claim to the Knotty Pine project at issue in *Center for Biological Diversity*, despite that case involving a likelihood of success determination on a substantive ESA claim in the context of a motion for a preliminary injunction. 1-ER-56 (Op. at 52). The district court also further analogized Black Ram to *Center for Biological Diversity* by stating that the "Yaak Valley Forest Council . . . documented 45 instances of ineffective barriers and gates in 2020 and 2021 that the EA did not disclose," 1-ER-57 (Op. at 53) (citing FS44262-66), which is untrue. The cited record document, which is a letter discussing *allegedly* ineffective closures for 45 berms, gates and roads, is found at 9-ER-2178-82. The Forest Service responded to the letter – with photos – to show the falsity of the Yaak Valley Forest Council assertions. See 5-ER-2183-2207 (FS44664-88). Out of the alleged 15 breached berms, the Forest Service determined all 15 berms were functional, 2-ER-72-74 (Tribe's Statement of Disputed Facts ¶ 106); out of the alleged 17 ineffective gates, the only gate identified by the agency as nonfunctional (though repaired in 2021) was not in the Black Ram Project area, 2-ER-74-76 (Tribe's Statement of Disputed Facts ¶ 108);

and regarding the alleged 13 roads lacking a gate or berm, only one – Road 5892 (shown twice) – was passable, though only for a short distance (0.3 miles).  2-ER-77-79 (Tribe's Statement of Disputed Facts ¶ 110).

The district court quickly backtracked from its Yaak Valley Forest Council statement, pointing instead to a Project biological opinion statement regarding unauthorized motorized use having been observed in 3 of 8 years, 1-ER-57 (Op. at 53) (citing FWS24) (Project Biological Opinion at 22), without mentioning that such use was not chronic or concentrated in any given area.  The court also did not acknowledge that the 2020 Bear Year Monitoring Report showed *no* unauthorized motorized use on existing routes in Bear Management Units 14 or 15, the only Units involved in Black Ram, 5-ER-1115 (FWS6229) (Appendix B at 5), which evidence again is consistent with the expert conclusion that unauthorized road use is spatially disparate and temporary, not chronic in the Project area.  Nor did the court acknowledge that, similar to *Gassman*, 2023 WL 4172930, at *17-*18, the EA contemplated road closure effectiveness by, for example, including a Project Design Feature to benefit the bear that requires the placement of road closure devices "at or within 500 feet of desired location," where they "would best meet the desired purpose of the device. For example, a gate or barrier may be more effective if placed where there are steep, rocky cut and fill slopes."  8-ER-1751 (FS2264) (EA at 23).

On this record, the district court's non-deferential conclusion that the Forest Service failed to take a NEPA "hard look" at unauthorized road use in the Project area was erroneous. The Forest Service's NEPA analysis for Black Ram did not ignore the issue of potential unauthorized road use in the Project area. The agency took a hard look at the evidence and disclosed that evidence consistent with NEPA. The district court thus erred in finding a NEPA "hard look" procedural violation and should be reversed.

## X.  **CONCLUSION**.

The Court should reverse the district court on the foregoing issues.

DATED this 22nd day of March, 2024.

/s/Julie A. Weis
Julie A. Weis
HAGLUND KELLEY LLP

Kris A. McLean
Tyson A. McLean
Kris A. McLean Law Firm

Attorneys for Defendant-Intervenor-
Appellant Kootenai Tribe of Idaho

60

## STATEMENT OF RELATED CASES

The Kootenai Tribe of Idaho is not aware of any cases related to Case Nos.

23-2882, 23-3146 and 23-2886 as defined in Ninth Circuit Rule 28-2.6.

DATED this 22nd day of March, 2024.

/s/Julie A. Weis
Julie A. Weis
HAGLUND KELLEY LLP

Kris A. McLean
Tyson A. McLean
Kris A. McLean Law Firm

Attorneys for Defendant-Intervenor-
Appellant Kootenai Tribe of Idaho

61

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 13,857 words, excluding the parts of the brief exempted by Fed R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word Version 1808, font size 14 and Times New Roman type style.

DATED this 22nd day of March, 2024.

/s/Julie A. Weis
Julie A. Weis
HAGLUND KELLEY LLP

Kris A. McLean
Tyson A. McLean
Kris A. McLean Law Firm

Attorneys for Defendant-Intervenor-
Appellant Kootenai Tribe of Idaho

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of March, 2024, I caused the foregoing

**INTERVENOR'S FIRST BRIEF ON CROSS APEAL** to be electronically filed

with the Clerk of the Court for the United States Court of Appeals for the Ninth

Circuit using the appellate CM/ECF system.  Participants in the case who are

registered CM/ECF users will be served by the appellate CM/ECF system. I further

certify that I have caused the foregoing document to be sent by electronic mail to

the following non-CM/ECF participant:

      None

      /s/ Julie A. Weis
      Julie A. Weis