Nos. 23-2882, 23-2886, 23-3146

─────────────────────────────────

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

─────────────────────────────────

**CENTER FOR BIOLOGICAL DIVERSITY, et al.,**
*Plaintiffs-Appellees/Plaintiffs-Cross-Appellants*,

and

**ALLIANCE FOR THE WILD ROCKIES, et al.,**
*Plaintiffs-Appellees,*

v.

**UNITED STATES FOREST SERVICE, et al.,**
*Defendants-Appellants/Defendants-Cross-Appellees*,

and

**KOOTENAI TRIBE OF IDAHO,**
*Intervenor-Defendant-Appellant/*
*Intervenor-Defendant-Cross-Appellee.*

─────────────────────────────────

Appeal from the United States District Court for the District of Montana
No. 9:22-cv-114 (Hon. Donald W. Molloy)

─────────────────────────────────

**PLAINTIFFS-APPELLEES/CROSS-APPELLANTS CENTER FOR
BIOLOGICAL DIVERSITY, YAAK VALLEY FOREST COUNCIL AND
WILDEARTH GUARDIANS' BRIEF ON CROSS-APPEAL**

─────────────────────────────────

Edward B. Zukoski
Center for Biological Diversity
1536 Wynkoop Street, Ste. 421
Denver, CO 80202
Telephone: (303) 641-3149
tzukoski@biologicaldiversity.org

Andrea Zaccardi
Center for Biological Diversity
P.O. Box 469
Victor, ID
Telephone: (303) 854-7748
azaccardi@biologicaldiversity.org

*Attorneys for Plaintiffs-Appellees/Cross-Appellants Center for Biological
Diversity, Yaak Valley Forest Council and WildEarth Guardians*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1, Plaintiffs-Appellees-Cross-Appellants Center for Biological Diversity, Yaak Valley Forest Council, and WildEarth Guardians state that they are not-for-profit, nongovernmental corporate entities that have not issued shares to the public and have no affiliates, parent companies, or subsidiaries issuing shares to the public.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

TABLE OF AUTHORITIES ....................................................................... v

TABLE OF ACRONYMS ........................................................................ ix

INTRODUCTION .................................................................................. 1

JURISDICTIONAL STATEMENT ........................................................... 2

ISSUES PRESENTED ........................................................................... 3

PERTINENT STATUTES AND REGULATIONS ....................................... 4

STATEMENT OF THE CASE ................................................................. 5

    I.    LEGAL BACKGROUND ............................................................... 5

        A.    The Endangered Species Act .................................................. 5

        B.    The National Environmental Policy Act .................................. 7

    II.    FACTUAL BACKGROUND ......................................................... 8

        A.    Grizzly Bears in the Cabinet-Yaak Ecosystem ....................... 8

        B.    The Black Ram Project ........................................................ 13

        C.    The Proceedings Below ....................................................... 16

SUMMARY OF ARGUMENT ............................................................... 17

STANDARD OF REVIEW .................................................................... 20

ARGUMENT ...................................................................................... 22

    I.    THE BIOLOGICAL OPINION IGNORED RECENT GRIZZLY BEAR DATA, VIOLATING THE ESA'S BEST AVAILABLE SCIENCE REQUIREMENT. .................................................................... 22

        A.    The ESA Requires the Service to Provide an Accurate Baseline. ......... 22

B.  The Biological Opinion Relied on Imprecise Data While Ignoring Data Undermining Its Conclusions. ...............................................................23

C.  Appellants' Defenses of the Biological Opinion Lack Merit. ...............30

II.  THE FISH AND WILDLIFE SERVICE'S NO-JEOPARDY CONCLUSION IS ARBITRARY AND CAPRICIOUS BECAUSE IT RUNS CONTRARY TO THE DATA. ............................................................................................35

III.  THE FOREST SERVICE'S RELIANCE ON THE FLAWED BIOLOGICAL OPINION WAS ARBITRARY. .....................................................................42

IV.  THE FOREST SERVICE'S NEPA ANALYSIS ARBITRARILY RELIED ON STALE DATA CONCERNING GRIZZLY BEARS. ............................44

CONCLUSION ......................................................................................................49

ADDENDUM .........................................................................................................A1

# TABLE OF AUTHORITIES

## Cases

*Am. Rivers & Ala. Rivers All. v. FERC*,
  895 F.3d 32 (D.C. Cir. 2018) ...............................................22

*Am. Rivers v. FERC*,
  201 F.3d 1186 (9th Cir. 1999) ..............................................46

*Anaheim Mem'l Hosp. v. Shalala*,
  130 F.3d 845 (9th Cir. 1997) ...............................................21

*Bair v. Cal. DOT*,
  982 F.3d 569 (9th Cir. 2020) .................................................8

*Bennett v. Spear*,
  520 U.S. 154 (1997) ............................................................23

*Cal. Wilderness Coal. v. U.S. DOE*,
  631 F.3d 1072 (9th Cir. 2011) ..............................................48

*Conner v. Burford*,
  848 F.2d 1441 (9th Cir. 1988) ..............................................23

*Ctr. for Biological Diversity v. BLM*,
  698 F.3d 1101 (9th Cir. 2012) ........................................ 40, 42

*Ctr. for Biological Diversity v. Zinke*,
  868 F.3d 1054 (9th Cir. 2017) ..............................................21

*Defs. of Wildlife v. EPA*,
  420 F.3d 946 (9th Cir. 2005) ........................................19-20, 42

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,
  378 F.3d 1059 (9th Cir. 2004) ..............................................48

*Great Basin Res. Watch v. BLM*,
  844 F.3d 1095 (9th Cir. 2016) ......................................... 8, 44

*Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*,
  857 F.2d 505 (9th Cir. 1988) ......................................... 44, 45, 46

*Idaho Sporting Cong. v. Rittenhouse*,
  305 F.3d 957 (9th Cir. 2002) .................................................8

*Kern Cnty. Farm Bureau v. Allen*,
  450 F.3d 1072 (9th Cir. 2006) ..............................................23

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) ................................................................47

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ...............................................................................3

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................ 18, 19, 21, 29, 35, 39, 40

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
    668 F.3d 1067 (9th Cir. 2011) ...............................................................7

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007) ........................................................................ 20, 42

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    422 F.3d 782 (9th Cir. 2005) ...............................................................35

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    524 F.3d 917 (9th Cir. 2008) ......................................................... 22, 36

*NRDC v. U.S. Forest Serv.*,
    421 F.3d 797 (9th Cir. 2005) ...............................................................48

*Or. Nat. Desert Ass'n v. Jewell*,
    840 F.3d 562 (9th Cir. 2016) .................................................. 44, 47, 49

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
    795 F.3d 956 (9th Cir. 2015) ...............................................................21

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*,
    265 F.3d 1028 (9th Cir. 2001) .............................................................21

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*,
    898 F.2d 1410 (9th Cir. 1990) .............................................................43

*Res. Ltd. v. Robertson*,
    35 F.3d 1300 (9th Cir. 1994) ........................................................ 20, 42

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
    747 F.3d 581 (9th Cir. 2014) ...............................................................34

*Selkirk Conservation All. v. Forsgren*,
    336 F.3d 944 (9th Cir. 2003) ...............................................................23

*Sovereign Iñupiat for a Living Arctic v. BLM*,
    555 F. Supp. 3d 739 (D. Alaska 2021) ................................................36

*Sw. Ctr. for Biological Diversity v. Babbitt*,
    215 F.3d 58 (D.C. Cir. 2000) ...............................................................23

*Tenn. Valley Auth. v. Hill*,
   437 U.S. 153 (1978) ........................................................................ 5

*United States v. Sec. Indus. Bank*,
   459 U.S. 70 (1982) .......................................................................... 7

*Wild Fish Conservancy v. Salazar*,
   628 F.3d 513 (9th Cir. 2010) ...................................................... 39

*Williams v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
   792 F.3d 1136 (9th Cir. 2015) .................................................... 20

## Statutes

5 U.S.C. § 702 ................................................................................... 3

5 U.S.C. § 706(2)(A) ............................................ 18, 19, 20, 29, 35, 40

16 U.S.C. § 1531(b) ......................................................................... 5

16 U.S.C. § 1532(3) ......................................................................... 5

16 U.S.C. § 1533(f)(1) ..................................................................... 7

16 U.S.C. § 1533(f)(1)(B)(ii) ......................................................... 7

16 U.S.C. § 1536(a)(2) .................................... 5, 6, 7, 18, 20, 23, 29, 35

16 U.S.C. § 1536(b)(3)(A) .................................................... 6, 7, 22

16 U.S.C. § 1536(c)(1) ..................................................................... 6

16 U.S.C. § 1540(c) .......................................................................... 3

16 U.S.C. § 1540(g)(1)(C) ............................................................... 3

28 U.S.C. § 1291 .............................................................................. 3

28 U.S.C. § 1331 .............................................................................. 2

28 U.S.C. § 2202 .............................................................................. 2

28 U.S.C. §§ 2201 ............................................................................ 2

42 U.S.C. § 4332 .............................................................................. 3

42 U.S.C. § 4332(2)(C) ...................................................... 7, 8, 47

## Regulations

40 C.F.R. § 1501.4 ................................................................ 8, 47

40 C.F.R. § 1508.7 ...................................................... 8, 20, 44, 47

40 C.F.R. § 1508.8 ...................................................................... 8, 20, 44, 47

40 C.F.R. § 1508.9 ........................................................................................8

40 C.F.R. § 1508.9(b) ............................................................... 8, 20, 44, 47

50 C.F.R. § 402.02 ................................................................................ 6, 22

50 C.F.R. § 402.14(a) ...................................................................................6

50 C.F.R. § 402.14(b) ...................................................................................6

50 C.F.R. § 402.14(d) ................................................. 6, 7, 18, 23, 29, 35

50 C.F.R. § 402.14(g)(1) ...................................................................... 6, 22

50 C.F.R. § 402.14(g)(2) ...................................................................... 6, 22

50 C.F.R. § 402.14(g)(3) ...............................................................................6

50 C.F.R. § 402.14(g)(4) ...............................................................................7

## Rules

9th Cir. R. 28-2.7 ..........................................................................................4

Fed. R. App. P. 28(f) .....................................................................................4

## Other Authorities

40 Fed. Reg. 31734 (July 28, 1975) .............................................................9

Pub. L. No. 118-5 (2023) .............................................................................7

Council on Environmental Quality, *Considering Cumulative Effects Under the National Environmental Policy Act* (Jan. 1997) ...................................................46

## TABLE OF ACRONYMS

**APA**    Administrative Procedure Act

**BMU**    Bear Management Unit

**BiOp**    Biological Opinion

**ESA**    Endangered Species Act

**EA**    Environmental Assessment

**EIS**    Environmental Impact Statement

**FWS**    U.S. Fish and Wildlife Service

**NEPA**    National Environmental Policy Act

**SSA**    Species Status Assessment

**WUI**    Wildland-Urban Interface

## INTRODUCTION

With its massive clearcuts of remote habitats, roadbuilding through old growth forest, and years of noise and activity across thousands of acres, the Black Ram Project ("the Project") on the Kootenai National Forest would significantly harm the small and struggling grizzly bear population in the Cabinet-Yaak Ecosystem. Yet in analyzing impacts of the decade-long Project, Federal Defendants-Appellants violated the Endangered Species Act ("ESA"), the National Environmental Policy Act ("NEPA"), and the Administrative Procedure Act ("APA"). Contrary to the agencies' assertions, they relied on stale population data and disregarded the documented decrease in the minimum number of grizzlies detected and the simultaneous increase in bear mortalities over the past several years. In so doing, the agencies failed to provide an accurate baseline for assessing Project impacts, as mandated by the ESA's "best available science" requirement, and mistakenly concluded that the Project would not jeopardize grizzly bear conservation. Defendants' argument that they considered this data in establishing the baseline is not supported by the record, and they fail to provide any rationale or scientific justification for disregarding this significant information.

The Fish and Wildlife Service's ("FWS") "no jeopardy" conclusion is also arbitrary because the Project threatens to reduce grizzly bear reproduction for nearly 20% of the Cabinet-Yaak Ecosystem's female bears for years. Recovery of

1

bears to the Cabinet-Yaak Recovery Zone is essential to conservation of the species, and this Recovery Zone already falls below recovery targets for female bear occupancy and reproduction. By harming the bears' reproductive capacity, the Black Ram Project jeopardizes the species' conservation and recovery.

The Forest Service's reliance on FWS's flawed Biological Opinion ("BiOp") violated the Forest Service's independent duty to comply with the ESA, and its similar reliance on stale data in its own environmental analysis violated NEPA's "hard look" mandate.

We ask that this Court affirm the district court's findings that FWS violated the ESA and APA by disregarding important data in setting its environmental baseline and that the Forest Service violated the ESA by relying on FWS's flawed analysis, and violated NEPA by failing to take a hard look at the Project's impacts to grizzly bears. We further ask that this Court reverse the district court's finding that FWS complied with the ESA when it found the data supported the agency's no-jeopardy conclusion.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction to hear the claims of Plaintiffs-Appellees-Cross Appellants Center for Biological Diversity, Yaak Valley Forest Council, and WildEarth Guardians (collectively, "the Center") pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. §§ 2201-2202 (declaratory judgments and further

2

relief), 16 U.S.C. §§ 1540(c), (g)(1)(C) (action arising under the ESA and its citizen suit provision), 42 U.S.C. § 4332 *et seq.* (2022) (NEPA), and 5 U.S.C. § 702 (APA).

The district court entered its opinion (1-ER-4) and judgment (1-ER-2) on August 17, 2023.

Federal Defendants and Intervenors filed appeals on October 11, 2023, and October 13, 2023, respectively. 10-ER-2262–2277. Pursuant to Federal Rule of Appellate Procedure 4(a)(3), the Center timely filed a cross-appeal on October 25, 2023. 10-ER-2278–2281. This Court has jurisdiction to review the district court's final order pursuant to 28 U.S.C. § 1291.[1]

## ISSUES PRESENTED

1.　　Whether the Fish and Wildlife Service violated the ESA's best available science requirement when it arbitrarily disregarded data showing recent increases in grizzly bear mortalities and simultaneous decreases in grizzly bear detections in establishing the baseline against which the Black Ram Project's impacts on grizzly bears would be evaluated.

---

[1] The Center has Article III standing to bring this case because it shows: (1) an injury in fact that is (2) fairly traceable to the challenged action and is (3) likely to be redressed by judicial intervention. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Center Plaintiff organizations' members have concrete interests in the wildlife and values the Black Ram Project will impair. *See* CenterSER-3–112. "CenterSER" indicates the Center's Supplemental Excerpts of Record, filed contemporaneously.

2.      Whether the Fish and Wildlife Service arbitrarily failed to explain how jeopardy could be avoided when the Project may harm a substantial percentage of reproductive female grizzly bears in the Cabinet-Yaak Recovery Zone for three to five years and will likely impede recovery well beyond those five years.

3.      Whether the Forest Service acted arbitrarily in relying on the flawed Biological Opinion in approving the Project.

4.      Whether the Forest Service failed to take the "hard look" that NEPA requires when the agency ignored recent data showing increasing bear deaths and falling grizzly detections.

## PERTINENT STATUTES AND REGULATIONS

Pursuant to Fed. R. App. P. 28(f) and 9th Cir. R. 28-2.7, all pertinent statutes and regulations are set forth in the Addendum following this brief, except for those statutes and regulations contained in the addenda of Federal Defendants or Intervenor. Case No. 23-2882, Dkt. 29.1, Dkt. 32.2.

## STATEMENT OF THE CASE

## I.    LEGAL BACKGROUND

### A.    The Endangered Species Act

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). It is designed to conserve ecosystems upon which endangered and threatened species depend and to provide a program to conserve listed species. 16 U.S.C. § 1531(b). To "conserve" means "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary," *id.* § 1532(3), *i.e.*, to bring about the recovery of a species listed as endangered or threatened.

ESA Section 7 requires each federal agency, in consultation with a federal wildlife agency (the Fish and Wildlife Service for the grizzly bear), to insure that any proposed action is not likely to jeopardize the continued existence of a listed species. *Id.* § 1536(a)(2). To "jeopardize the continued existence of" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed

species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02 (2018).[2]

If any agency action "may affect" a listed species, "formal consultation" is required unless the Fish and Wildlife Service concurs in writing that the action is "not likely to adversely affect" the species. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.14(a), (b). During formal consultation, the Fish and Wildlife Service must review all relevant information, evaluate the current status and environmental baseline of the species, and evaluate the effects and cumulative effects of the proposed action on the species. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(1)–(3). The "'[e]ffects of the action' refers to the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline." 50 C.F.R. § 402.02. Throughout its analysis, the Fish and Wildlife Service must utilize the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d).

At the conclusion of consultation, the Fish and Wildlife Service must issue a "biological opinion as to whether the action, taken together with cumulative

---

[2] All citations are to the ESA regulations in effect prior to the recent adoption of new regulations. The Biological Opinion states that the Fish and Wildlife Service relied on the 2018 regulations and notes that "the analysis and conclusions would have been the same, irrespective of which regulations applied." 2-ER-244–45.

effects, is likely to jeopardize the continued existence of listed species" 50 C.F.R. § 402.14(g)(4); *see also* 16 U.S.C. § 1536(a)(2), 50 C.F.R. § 402.14(d). If the Fish and Wildlife Service concludes that the proposed action "will jeopardize the continued existence of" a listed species, the biological opinion must outline "reasonable and prudent alternatives" to the action. 16 U.S.C. § 1536(b)(3)(A).

The ESA also requires the Fish and Wildlife Service to develop and implement "[recovery] plans … for the conservation and survival of endangered species and threatened species." *Id*. § 1533(f)(1). Recovery plans must include "objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list." *Id*. § 1533(f)(1)(B)(ii).

## B.    The National Environmental Policy Act

"NEPA's purpose is twofold: (1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *N. Plains Res. Council, Inc. v. Surface Transp. Bd*., 668 F.3d 1067, 1072 (9th Cir. 2011); *see also* 42 U.S.C. § 4332(2)(C) (2022).[3] NEPA imposes procedural requirements directing agencies to take a "hard

---

[3] While Congress amended NEPA in 2023, *see* Pub. L. No. 118-5, § 321 (2023), this Court reviews the Forest Service's compliance with the law at the time of the agency's decision because, in general, "statutes operate only prospectively." *United States v. Sec. Indus. Bank*, 459 U.S. 70, 79 (1982). The Decision Notice approving the Project was finalized in June 2022. 7-ER-1631–1715. Similarly,

look" at environmental consequences, including direct, indirect, and cumulative impacts. *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002).

NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4 (2019). When an agency is uncertain whether it must prepare an EIS, it may first prepare an environmental assessment ("EA") to determine whether the action may have significant impacts requiring preparation of an EIS. 40 C.F.R. § 1508.9.

An EA or EIS must identify the direct, indirect, and cumulative impacts of proposed projects. 40 C.F.R. §§ 1508.7, 1508.8, 1508.9(b). The agency assesses project impacts against a baseline detailing the current nature and extent of resources in the area. *See Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1101 (9th Cir. 2016).

## II.    FACTUAL BACKGROUND

### A.    Grizzly Bears in the Cabinet-Yaak Ecosystem

Grizzly bears once ranged throughout western North America, with approximately 50,000 grizzly bears in the lower 48 states. CenterSER-116. By the

---

although the Council on Environmental Quality amended its NEPA regulations in 2020 and several times since, the Forest Service "applied the 2019 version here." 1-ER-025. Thus, the 1978 regulations apply. *Bair v. Cal. DOT*, 982 F.3d 569, 577 n.20 (9th Cir. 2020).

1930s, grizzlies had been extirpated from 98% of their former range. CenterSER-151, 161. Due to the bears' near-eradication in the lower-48 United States, the Fish and Wildlife Service listed these grizzlies as a threatened species nearly 50 years ago. 40 Fed. Reg. 31734 (July 28, 1975).

FWS issued an updated Grizzly Bear Recovery Plan in 1993 that designated distinct "recovery zones," one of which is the Cabinet-Yaak Ecosystem. CenterSER-171–188. The Recovery Plan states that conserving and recovering grizzly bears in each of the recovery zones, including the Cabinet-Yaak Ecosystem, is essential to the species' conservation. CenterSER-167 (specific Recovery Plan objectives include: "Establish recovered populations in each of the ecosystems where habitat is available to sustain a grizzly bear population.").

The Cabinet-Yaak is a roughly 2,600-square-mile area of primarily federal public lands that includes the Yaak Valley in the northwest corner of Montana and the Cabinet Mountains to the south. CenterSER-173. The Recovery Plan established a population size of 100 individuals as a minimum recovery goal for the Cabinet-Yaak grizzly population. *Id*. It also established subgoals, *inter alia*, of six females with cubs over a six-year running average (both inside the Cabinet-Yaak Recovery Zone and within ten-mile area surrounding the Recovery Zone,

excluding Canada) and that females with young occupy at least 18 of 22 designated Bear Management Units ("BMUs").[4] *Id.*

As of 2022, the population of grizzlies in the Cabinet-Yaak Ecosystem fell far short of the Recovery Plan's 100-bear target. The Fish and Wildlife Service estimated that 60 grizzly bears inhabit the Cabinet-Yaak Ecosystem. 2-ER-250. Unfortunately, the agency's annual progress reports on the ecosystem's grizzly population demonstrate that the population is likely even smaller than that. For example, the agency monitoring report published in 2022 indicates that as of 2020, monitoring detected only 42 grizzly bears that survived to the year's end. 8-ER-1901. The number of grizzlies detected fell approximately 22% from 2017 to 2020, decreasing every year during that period. *See* CenterSER-143 (54 surviving bears detected at end of 2017); CenterSER-141 (50 surviving bears detected at end of 2018); 4-ER-732 (45 surviving bears detected at end of 2019); 8-ER-1901 (42 surviving bears detected at end of 2020). Researchers have found that "populations fewer than 50-100 [individual adult grizzly bears] are at higher risk of extirpation." CenterSER-192. Indeed, the Cabinet-Yaak Ecosystem grizzly population persists only due to augmentation; that is, the translocation of bears from elsewhere. CenterSER-121–122.

---

[4] BMUs are areas "used for habitat evaluation and population monitoring." CenterSER-169.

The 1993 Recovery Plan's subgoals for female occupancy and reproduction are also not being met. Females with cubs varied from two to five per year and averaged 3.3 per year from 2015-2020, lower than the six-female target. 2-ER-251. Moreover, between 2015-2020, only 13 of 22 BMUs in the Recovery Zone had sightings of females with young, lower than the target of 18 occupied BMUs. *Id.*

The precarious state of grizzlies in the Cabinet-Yaak Ecosystem was underscored by the Fish and Wildlife Service's 2021 five-year status review evaluating the bear's progress towards recovery in the lower-48 states. CenterSER-113–139 (excerpts). The review concluded that the Cabinet-Yaak population of grizzlies is the most vulnerable of the four populations in the lower-48 states, with a "low" level of resiliency due to "very low" population numbers, "low" genetic diversity, and "low" fecundity of females. CenterSER-120–122. The review found that in almost every future scenario evaluated, threats to the Cabinet-Yaak Ecosystem will inhibit overall grizzly bear recovery. CenterSER-134 (the Cabinet-Yaak Ecosystem "only contribute[s] moderate, to low, to very low levels of resiliency under four out of the five future scenarios").

The situation for bears in the Yaak Valley is especially concerning because the population of bears there is genetically isolated from those to the south in the Cabinet Mountains. A 2016 study concluded: "Our results indicated the grizzly bears in the Cabinet and Yaak regions were separate populations split along the

11

Hwy 2 corridor" and "suggest[ed] complete spatial and reproductive isolation between these 2 populations, at least in recent generations." CenterSER-190.

The greatest threat to grizzly survival and population growth in the Cabinet-Yaak Ecosystem is human-caused mortality. 2-ER-253. Increased human presence in grizzly habitat causes proportionate increases in human-caused mortality, such as shootings and vehicle strikes. From 2007-2021, 76% of known grizzly deaths in the Cabinet-Yaak Ecosystem were human-caused, and most such deaths over the last 40 years occurred less than 500 meters (less than a third of a mile) from an open road. 8-ER-1934.

The survival of female grizzly bears and their cubs has the biggest influence on whether a bear population grows or declines. 2-ER-270. Thus, the Fish and Wildlife Service recognizes that "providing maximum protection for females is essential to recovery." CenterSER-157. For the small Cabinet-Yaak population, the agency stresses that "the survival and reproduction of each individual female grizzly bear is very important." 2-ER-252.

The survival of female grizzlies is critical to recovery because grizzly bears have one of the lowest reproductive rates of all terrestrial mammals in North America. CenterSER-156. This results primarily from the late age of females at the first production of cubs (5.5 years on average), small average litter size (two cubs), and the long interval between litters (a three-year average). *Id.* Because of the slow

rate of reproduction, it takes a breeding female approximately ten years to replace herself in the wild. *Id.*

Recent trends regarding female mortalities in the Cabinet-Yaak Ecosystem are troublesome. In the period between 2018-2020, four known females died, a significant increase in comparison to the previous three years (2015-2017), when only one known female died. 4-ER-749. This upward trend in female deaths coincides with the 22% drop in grizzly detections. *See supra* at 10.

## B. The Black Ram Project

Within the Cabinet-Yaak Ecosystem, which harbors this fragile population of grizzlies, the Forest Service in June 2022 approved the Black Ram Project, authorizing 1,783 acres of clearcuts, including 17 clearcuts larger than 40 acres and one over 100 acres. 8-ER-1741; 7-ER-1660–1662. The Project authorizes more than 11,000 acres of logging and burning, including 3,902 acres (nearly 3,000 football fields) of commercial logging and 7,553 acres of burning and removing small trees, known as "fuel treatments." 7-ER-1639. More than 62% of the burning and logging will take place deep in the backcountry, outside the wildland-urban interface ("WUI"); that is, more than two miles from private non-corporate property. 7-ER-1660–01662 (acreage of project within the WUI); CenterSER-194 (defining WUI). The Project approves 3.3 miles of new permanent road construction and the reconstruction or maintenance of 90.3 miles of road. 7-ER-

1640. Nearly a mile of new road will be bulldozed through old growth forest. *Id.* The Project will require up to ten years' worth of noise, activity, motor vehicle use, and other intrusions by workers and mechanized equipment engaged in logging and related activities. 7-ER-1637; 2-ER-275.

The Project will degrade grizzly "core habitat"—secure habitat offering minimal disturbance that is considered important for daily feeding and female grizzly bear reproductive success and survival.[5] *See* 2-ER-260; 8-ER-1761. For example, 36 road segments, affecting approximately 4,952 acres of core habitat, will allow motorized access for the timber sale and associated activities. 2-ER-275. Additionally, ten large landscape burns are substantially within core habitat, impacting a total of approximately 5,700 acres. 8-ER-1774.[6]

The Black Ram Project, with its road construction, decade of noise and activity, and invasion of core habitat, is likely to further inhibit the recovery of Cabinet-Yaak's grizzly bear population. To understand the Project's impacts on grizzlies, the Forest Service consulted with the Fish and Wildlife Service pursuant

---

[5] Grizzly bear core habitat generally consists of areas greater than 500 meters from a motorized route or a high-use non-motorized trail. 2-ER-259.

[6] The Project proposes to create areas of in-kind replacement core by installing gates or barriers to close roads currently open to administrative use. 2-ER-275. However, grizzly bears are already using some of these areas because they are overgrown with vegetation and receive little motorized use, and it may take grizzlies several years to inhabit any newly-created core habitat. 2-ER-278.

to ESA Section 7, resulting in FWS's preparation of a biological opinion. 2-ER-241.

The August 2022 Biological Opinion notes that the Black Ram Project area "has been an important area for female grizzly bears over the past several decades and has supported multiple reproductive females that have contributed to the [Cabinet-Yaak Ecosystem] population," including two adult female grizzly bears with young observed in May 2021. 2-ER-256. However, the Fish and Wildlife Service has predicted that the Black Ram Project will likely harm reproducing female grizzlies. The Biological Opinion concluded that the Project will cause "significant effects to [grizzly bear] feeding, breeding, or sheltering" and will likely displace female grizzly bears from core habitat that is important for bears to thrive. 2-ER-292–93; *see also* 2-ER-280 ("it is reasonable to anticipate adverse effects to a few adult female grizzly bears at any given time during the proposed action."). Multiple adult female grizzlies "may be displaced to levels that impair their normal ability to readily find food resources needed to sustain fitness necessary for breeding and raising offspring and finding shelter." 2-ER-280. For these and other reasons, the Fish and Wildlife Service found that the Project is "likely to adversely affect" grizzly bears. 2-ER-244.

Despite finding such impacts to the tiny and struggling population of Cabinet-Yaak grizzlies, whose recovery is necessary to restore grizzly populations

15

in the lower-48 states, the Biological Opinion concluded that the Project will not jeopardize the grizzly bear's continued existence. 2-ER-292, 2-ER-296.

The Forest Service also prepared an EA pursuant to NEPA to assess the Project's direct, indirect and cumulative impacts. 8-ER-1718. Despite the Project's impacts to grizzlies and other forest resources, and its long duration and vast scope, the Forest Service prepared only the EA and issued a "finding of no significant impact," instead of completing a more robust EIS. 7-ER-1631, 7-ER-1657.

### C.    The Proceedings Below

The Center challenged the Black Ram Project in 2022, alleging that Federal Defendants violated the ESA, NEPA, and the APA. With respect to the Center's ESA claims, the district court found that the Center prevailed on two. First, the court found that the Biological Opinion failed to use the best available science to establish an accurate environmental baseline against which to evaluate the Project's impacts on grizzly bears. 9-ER-2220–2223; 2-ER-14–19. Second, the court held that the Forest Service's reliance on that flawed Biological Opinion was arbitrary and capricious, and violated the ESA. 9-ER-2229–2230; 2-ER-24–25. On appeal, Federal Defendants and Intervenors challenge both of these holdings.

The district court rejected a third Center ESA claim: that the Fish and Wildlife Service failed to support its conclusion that the Project would not

16

jeopardize the grizzly bear's recovery. 9-ER-2224–2229; 2-ER-21–25. The Center cross-appeals this holding.

The Center also challenged the Forest Service's compliance with NEPA, alleging in part that the Forest Service failed to disclose baseline conditions for grizzlies. 9-ER-2212–2213. The district court ruled for the Center on this claim. 2-ER-36–38. Intervenors alone, and not Federal Defendants, appeal this holding.[7]

## SUMMARY OF ARGUMENT

In its Biological Opinion evaluating the Black Ram Project's impacts on grizzly bears, the Fish and Wildlife Service made two critical legal errors. First, in establishing a baseline for the Black Ram Project, FWS projected a baseline population of 60 grizzly bears in the Cabinet-Yaak Ecosystem, ignoring currently available data. This population estimate is based upon an imprecise model with significant limitations that uses outdated data from 2012 and an unsupported growth rate. Given the limitations of the model, FWS agreed that it needed to

---

[7] Neither the Federal Defendants nor the Intervenors challenge the district court's ruling vacating the Forest Service's EA and Decision Notice on two grounds. The court held that the agency violated NEPA, first, by failing to prepare a more robust environmental impact statement, and second, by failing to take a hard look at the Project's climate impacts. 2-ER-27–36, 38–43. This means that regardless of this Court's ruling on these appeals, the Forest Service cannot implement the Black Ram Project unless and until the agency completes an EIS and issues a new decision, which, as a new agency action, will likely require the Fish and Wildlife Service and Forest Service to engage in renewed ESA consultation on the Project's impacts to grizzlies.

consider other data to assess the population size and trend, but in doing so completely disregarded significant data showing that for several recent years, bear mortalities have been rising (especially female bear mortalities) as bear detections have been falling. As the district court found, by ignoring the spike in mortality rates—especially female mortalities—and the decline in grizzly bear detections, the Service failed to consider both the best available data and failed to consider an important aspect of the problem, violating the ESA and the APA. 16 U.S.C. § 1536(a)(2) (ESA's requirement to use best available science in biological opinions); 50 C.F.R. § 402.14(d) (same); 5 U.S.C. § 706(2)(A) (APA's requirement that courts set aside arbitrary and capricious or unlawful agency action); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) holding that an agency is arbitrary and capricious if it "offered an explanation for its decision that runs counter to the evidence before the agency").

On appeal, Defendants argue that their population model considers mortality data and that they disregarded the recent simultaneous increase in mortalities and decrease in grizzly bear detections as unreliable to assess population estimates and trends. However, as the district court held, FWS's decision to completely discount this significant data is arbitrary because it ignores an important aspect of the problem. Therefore, the court concluded that the baseline does not rely upon the best available science as the ESA requires.

Second, the Fish and Wildlife Service's no-jeopardy conclusion is based on the erroneous conclusion that the Project will not reduce the reproduction of grizzly bears in the Cabinet-Yaak Ecosystem. FWS's BiOp found that the Project may harm three reproductive female grizzly bears for up to five bear years, affecting one to two reproductive cycles. This means the Project could impact nearly 20% of adult female grizzly bears in the whole Cabinet-Yaak Ecosystem, harming reproduction of an already small and struggling population that is still not meeting the Recovery Plan's population objective or female occupancy and reproduction goals. Nevertheless, the Biological Opinion concluded the Project would not jeopardize grizzly bears, relying in part on its assertion that "the Black Ram Project will not reduce the reproduction" of grizzly bears in the Cabinet-Yaak Ecosystem. 2-ER-296. This statement and jeopardy conclusion is contrary to the facts laid out in the Fish and Wildlife Service's own Biological Opinion. Thus, the no-jeopardy conclusion is arbitrary and capricious because it fails to "articulate[] a rational connection between the facts found and the conclusion made," in violation of the APA. *State Farm*, 463 U.S. at 43; 5 U.S.C. § 706(2)(A).

Because the Biological Opinion's baseline and jeopardy conclusion are arbitrary and capricious, the Forest Service cannot rely upon the BiOp to fulfill its consultation duties under the ESA. *See Defs. of Wildlife v. EPA*, 420 F.3d 946, 976 (9th Cir. 2005), *rev'd on other grounds*, *Nat'l Ass'n of Home Builders v. Defs. of*

*Wildlife*, 551 U.S. 644 (2007). "Consulting with the [Fish and Wildlife Service] alone does not satisfy an agency's duty under the Endangered Species Act." *Res. Ltd. v. Robertson*, 35 F.3d 1300, 1304 (9th Cir. 1994). The Forest Service's reliance on the BiOp was arbitrary and capricious and violated the ESA and the APA. 16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706(2)(A).

Finally, the Forest Service's EA, like FWS's BiOp, relied on outdated data to establish the baseline population and trend for grizzly bears, and ignored significant data showing that for the past several years, grizzly bear mortalities have risen as grizzly bear detections have fallen. By establishing the baseline without considering current data, the Forest Service's EA was arbitrary and capricious and violated NEPA and the APA. 40 C.F.R. §§ 1508.7, 1508.8, 1508.9(b); 5 U.S.C. § 706(2)(A).

For these reasons, we ask that this Court vacate and set aside the Fish and Wildlife Service's Biological Opinion and the Forest Service's Decision Notice, and enjoin the Black Ram Project.

## STANDARD OF REVIEW

This Court reviews de novo the grant or denial of summary judgment by the district court. *Williams v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 792 F.3d 1136, 1139 (9th Cir. 2015). Federal agency decisions are reviewed pursuant to the APA, which "requires a court to hold unlawful and set aside agency action, findings, and

conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc).

In evaluating agency decisions, courts must ensure that the agency has articulated a "rational connection between the facts found and the choice made." *State Farm,* 463 U.S. at 43. An agency's action is arbitrary and capricious and must be reversed if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ctr. for Biological Diversity v. Zinke*, 868 F.3d 1054, 1057 (9th Cir. 2017) (citing *Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv*., 265 F.3d 1028, 1034 (9th Cir. 2001) (quoting *State Farm*, 463 U.S. at 43))*.* "Further, an agency's decision can be upheld only on the basis of the reasoning in that decision." *Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845, 849 (9th Cir. 1997).

# ARGUMENT

## I. THE BIOLOGICAL OPINION IGNORED RECENT GRIZZLY BEAR DATA, VIOLATING THE ESA'S BEST AVAILABLE SCIENCE REQUIREMENT.

### A. The ESA Requires the Service to Provide an Accurate Baseline.

The ESA requires that the Fish and Wildlife Service provide an accurate environmental baseline in its biological opinions. During consultation, the agency must review all relevant information available, which includes evaluating the current status and environmental baseline of the listed species. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(1), (2). The baseline shall include "the past and present impacts of all Federal, State or private actions and other human activities in the action area." 50 C.F.R. § 402.02. This baseline functions as a starting point against which the Service analyzes a project's impact on the listed species.

Establishing an environmental baseline that fails to consider factors presently harming the species or degrading the species' habitat violates the ESA. *See, e.g., Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 929 (9th Cir. 2008) (finding that a biological opinion violated ESA where it did not "incorporate degraded baseline conditions into its jeopardy analysis."); *Am. Rivers & Ala. Rivers All. v. FERC*, 895 F.3d 32, 46-47 (D.C. Cir. 2018) (holding that Fish

and Wildlife Service acted arbitrarily in establishing a baseline that failed to consider degradation caused by power plant).

In generating the baseline and throughout the consultation, the ESA requires that all involved federal agencies "use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d). This requirement ensures that the "FWS cannot ignore available biological information," because doing so may "eviscerate Congress' intent to give the benefit of the doubt to the species." *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988) (citation and quotation omitted). Using the best data also prevents the haphazard implementation of the Act "on the basis of speculation or surmise[.]" *Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 954 (9th Cir. 2003) (quoting *Bennett v. Spear*, 520 U.S. 154, 176 (1997)). The best available data requirement "prohibits [an agency] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on." *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006) (quoting *Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000)).

### B. The Biological Opinion Relied on Imprecise Data While Ignoring Data Undermining Its Conclusions.

The Fish and Wildlife Service's BiOp assumes, despite evidence to the contrary, that the Cabinet-Yaak grizzly bear population is growing. It does so despite acknowledging the underlying significant limitations of the agency's

23

population model and while arbitrarily discounting critical evidence that bear deaths have been increasing as numbers of detected bears have been plummeting. The BiOp's rosy assertion that "the conglomerate of the best available science suggests an improving trend in the population of grizzly bears in the [Cabinet-Yaak Ecosystem]," 2-ER-251, is contrary to the evidence in the record. Because FWS derived its population baseline from unsupported assumptions, the agency's shaky conclusions about the Project's impacts cannot be relied upon.

The BiOp used an estimated population of 60 grizzly bears in the Cabinet-Yaak Ecosystem to assess the Project's impacts. 2-ER-250 (citing Kasworm et al. (2021), 4-ER-731–838). The BiOp admits that this population estimate may be inaccurate, and for good reason, as it relied on outdated data and small sample sizes.

To reach that population estimate, FWS relied on the agency's "2020 Research and Monitoring Progress Report" for the Cabinet-Yaak Ecosystem—one of an annually-prepared study—known as Kasworm et al. (2021). 4-ER-731–838. The population growth rate in Kasworm et al. (2021) used to estimate the population is derived from the estimated population change from 1983 through 2020, a time span that includes years when the bear population was so small that it was believed to be "declining toward extinction." 4-ER-735. As an initial matter,

using nearly 40 years of data to predict the population's *current* growth rate is dubious at best.

Moreover, Kasworm et al. (2021) makes clear that uncertain rates of subadult and adult female survival and small samples sizes yielded wide "confidence intervals" for its model's growth rate estimates. Based on such uncertain data and small sample sizes, Kasworm et al. (2021) estimates that the population is increasing at an annual rate of 1.7%. 4-ER-771. FWS then takes that unsupported growth rate and applies it to a decade-old population estimate of 48-50 bears from 2012, resulting in a population estimate of 56 bears. 4-ER-772 (citing Kendall et al. (2016), CenterSER-189–190); *see also* 2-ER-250 (same). FWS finally adds an additional four bears to that estimate, assuming the survival of four of the eight bears that were augmented into the Cabinet Mountains portion of the Cabinet-Yaak Ecosystem since 2012. 4-ER-772. Based on layer upon layer of assumptions, FWS declares that "a population estimate of about 60 bears would seem reasonable," *id.*, and adopts this estimate in its BiOp. 2-ER-250–51.

To be fair, the BiOp acknowledges that FWS's population estimates "are not true annual minimums and lack measures of precision" and that, here, "small sample sizes yield a wide confidence interval." 2-ER-250, 251.[8] Given these

---

[8] The sample size referenced is small indeed. The Service reports that it monitored only 11 radio-collared grizzly bears during 2020. 4-ER-732.

limitations, the BiOp admits that "the confidence intervals indicate that statistically there is a 67 percent probability that the population is stable or increasing…. [and] a 33 percent probability that the population is decreasing." *See* 2-ER-251 (citing Kasworm et al. (2021) at 41, 4-ER-771). In other words, the model that FWS relied upon concludes that the bear population is most likely growing or stable—but could even be decreasing—and yet the BiOp simply adopts the best-case scenario that the population is growing.

Acknowledging the model's limitations, the BiOp explains that FWS turned to other data to support its population estimate. "When statistical uncertainty exists, other sources of data can also inform" population estimates, the BiOp states. 2-ER-251. Remarkably, however, even after expressing the need to consider other data sources, FWS still *ignores* troubling on-the-ground data that undermines its assumptions. Specifically, FWS disregards biological information indicating an increase in grizzly bear mortality (especially that of female grizzlies) since 2018 and a decrease in verified bear detections since 2017.

FWS's annual reports compile data on grizzlies detected in the Cabinet-Yaak Ecosystem using consistent methodologies over time. These reports show that detections of all bears fell each year from 2017-2020 by a total of approximately 22%, with detections of female grizzlies dropping during that same period by approximately 33%. For 2017, the report published in 2019 states: "Using all

26

methods (capture, collared individuals, rub tree DNA, corral DNA, opportune DNA sampling, photos, credible observations), we detected a minimum <u>54</u> individual grizzly bears alive and within the [Cabinet-Yaak Ecosystem] grizzly bear population at some point during 2017," including 21 females, and 4 of unknown sex. CenterSER-143 (emphasis added). Subsequent annual reports using identical methodologies found <u>50</u> surviving bears at the end of 2018 (20 of which were females, 3 unknown), <u>45</u> surviving bears at the end of 2019 (14 of which were females, 4 unknown), and just <u>42</u> surviving grizzly bears by the end of 2020 (14 of which were females, and 4 unknown). CenterSER-141; 4-ER-732; 8-ER-1901.

In addition to this recent data showing detected bear numbers, and particularly female numbers, falling, additional data—not acknowledged in the BiOp—shows bear deaths, and particularly female deaths, increasing in the Cabinet-Yaak Ecosystem at the same time. Monitoring shows that mortalities increased in the past three years (2018-2020) compared to mortalities recorded in the previous three years (2015-2017), with a significant uptick in the number of female grizzly bears killed. For the most recent three years, from 2018 to 2020, FWS identified 10 grizzly bear mortalities. 4-ER-749. Four of these grizzly bears were females and two were cubs of an unknown sex. *Id.* By comparison, for the

previous three years, from 2015 to 2017, FWS identified 7 mortalities, with one

mortality was confirmed female and one was of an unknown sex. *Id.*[9]

Thus, FWS's own data shows a decrease in detections of female grizzly

bears and an increase in female mortalities over roughly the same time period in

the Cabinet-Yaak Ecosystem. The Service has not and cannot explain why it has

ignored such information.

The decrease in detected females and increase in known female mortalities is

important because "[g]rizzly bear population growth and persistence relies on

female grizzly bears that successfully reproduce and rear young." 2-ER-270. Thus,

the 1993 Grizzly Bear Recovery Plan states that "providing maximum protection

for females is essential to recovery." CenterSER-157. The Biological Opinion

similarly acknowledges that because the Cabinet-Yaak population is small, "the

survival and reproduction of each individual female grizzly bear is very

important." 2-ER-252. In fact, there are likely only 17 or so adult female grizzlies

in the entire Ecosystem, even using the Fish and Wildlife Service's optimistic

population estimate of 60 grizzly bears.[10] Thus, harm to even a small number of

---

[9] In 2021, the Service reported the death of two additional bears, both males. 8-ER-1918. And in 2022, at least three female bears died, which Kasworm et al. described as "the highest number of known female mortalities in any year since we began monitoring in 1983." 2-ER-166.

[10] FWS's 1993 Grizzly Bear Recovery Plan stated that the Cabinet-Yaak Ecosystem's grizzly population is assumed to be 50% adults and 50% subadults,

female bears could have significant and damaging impacts to the Ecosystem's population and the species overall.

A biological opinion violates the ESA if it fails to consider the relevant factors and fails to articulate "a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. Here, FWS failed to explain how monitoring that shows a recent and steady decline in grizzly bear detections and an increase in known grizzly bear mortalities, including and especially female grizzly bear mortalities, supports a growth rate of approximately 1.7% and an estimated population of 60 grizzly bears. By ignoring the spike in mortality rates and especially female mortalities, and the decline in grizzly bear detections, FWS failed to consider the best available data and failed to consider an important aspect of the problem, violating the ESA and the APA. 16 U.S.C. § 1536(a)(2) (ESA's requirement to use best available science in biological opinions); 50 C.F.R. § 402.14(d) (same); 5 U.S.C. § 706(2)(A) (APA's requirement that courts set aside arbitrary and capricious or unlawful agency action); *State Farm*, 463 U.S. at 43 (holding that an agency is arbitrary and capricious if it "offered an explanation for its decision that runs counter to the evidence before the agency").

---

and found that after discounting cubs, adult females constituted 28.4% of the population. 5-ER-1045. 28.4% of 60 is 17.04.

The district court agreed. It found that the BiOp's population projection methods "ignore the reality of documented bear mortalities in the Cabinet-Yaak Ecosystem," and noted that the increase in mortalities corresponded with falling numbers of bears observed, including the 33% decrease in the number of observed females from 2017 to 2021. 1-ER-018. The court found that FWS violated the ESA because it "ignore[d] the issue of female bear mortality," and in so doing "ignore[d] an important aspect of the problem that the agency itself acknowledges." *Id*.

### C. Appellants' Defenses of the Biological Opinion Lack Merit.

Federal Defendants and Intervenor Kootenai Tribe of Idaho mount several defenses in an attempt to explain that the BiOp's disregard of the recent detection and mortality data does not violate the law. None are persuasive.

First, Federal Defendants assert that the starting point for their analysis—the 2012 estimate of the Cabinet-Yaak Ecosystem's grizzly bear population—reflects the "best available data" despite the data being more than ten years old and subsequent data showing the population may be decreasing. *See* Fed. Br. 26 (citing Kendall et al.'s population estimate for the Cabinet-Yaak Ecosystem for bear year 2012). The Center does not dispute that the Kendall publication represented the best available data for the Cabinet-Yaak population estimate for *2012*. But this

does not allow FWS to ignore or arbitrarily discount data acquired through detections and mortality records since then.

Second, Federal Defendants defend the 1.7% "rate-of-increase" multiplier, arguing that it accounts for "survival and reproduction data from the ecosystem's radio-collared bears." Fed. Br. 27; *see also* Int. Br. 25–33. But the BiOp itself confessed the limits of its population modeling. Again, because of the small sample size (e.g., monitoring only 11 radio-collared bears in 2020) and other uncertainties, the model "lack[s] … precision" and cannot confidently predict whether the grizzly population is growing or declining. 2-ER-251. The BiOp further admitted that it should, and did, rely on "other sources of data" beyond the model. It failed, however, to address recent pertinent data revealing rises in mortalities coupled with a concurrent dip in grizzly bear detections.

Federal Defendants argue that the BiOp considered grizzly mortality in other ways, such as by referencing FWS's 2021 Species Status Assessment ("SSA"). The SSA used a simple metric that ranked adult female grizzly bear survival in the Cabinet-Yaak Ecosystem as "High." Fed. Br. 30 (citing 2-ER-253; 3-ER-614, 619). Similar to the limitations of the model used in the Kasworm et al. annual reports, the SSA notes that adult female survival rates are solely based on radio-collared individuals, which, as noted above, is a small sample size that does not provide a

complete picture of bear mortalities in the Cabinet-Yaak Ecosystem.[11] 3-ER-614.

Relying on a basic metric that utilizes a small sample size and outdated data, and

provides only a partial picture of recent female mortalities, while ignoring a known

increase in female mortalities, is not the "best available science."

Federal Defendants and Intervenors next point to the agency's consideration

of the Recovery Plan's mortality limits for bears. Fed. Br. 30 (citing 2-ER-251–52);

Int. Br. 32–33 (citing 4-ER-747). While assessing the Cabinet-Yaak Ecosystem's

progress toward the Recovery Plan's subgoals is important, this information has

nothing to do with whether the Service properly projected the population baseline.

Defendants create a strawman by misconstruing the Center's argument. The Center

is not arguing that the BiOp ignores all bear mortality data. The problem is that the

BiOp ignored the recent increase in mortalities—especially female mortalities—in

estimating the baseline population, which likely leads to an overestimate of the

population against which FWS assessed the Project's impacts.

Defendants assert that FWS's population model directly incorporates both

reported and unreported bear mortality. Fed. Br. 30 (citing 2-ER-253); Int. Br. 32

---

[11] Moreover, FWS's conclusion in the SSA that the female adult survival was "high" almost certainly failed to account for known female mortalities in 2020, because the most recent Kasworm et al. report cited in the SSA only includes data up through 2019. 4-ER-718 (citing Kasworm et al. (2020), containing records of mortalities only through 2019); 4-ER-749 (showing additional bear deaths in 2020).

(citing 4-ER-747). In doing so, they seem to recycle their consideration of the SSA, which as explained above is not a sufficient substitute for assessing the impact of recent mortalities. Intervenors cite to the Service's annual reports' estimation of mortality rates in the Cabinet-Yaak Ecosystem since 1983, but nothing here shows that in assessing the baseline population, FWS accounted for the recent rise in mortalities coupled with the drop in grizzly bear detections and what that might mean in terms of whether the population is growing or declining. While FWS could, and should, have considered the rise in bear mortalities and drop in detections when it considered "other sources of data," it chose not to do so.

Defendants further aver that the use of bear detections is "inappropriate" because "minimum counts are influenced by the level of effort available each year." Fed. Br. 28, 30 (citing 2-ER-251); Int. Br. 26 (same). But as the district court found, FWS "failed to explain how the amount of resources going into minimum counts correlates with the actual numbers of bears found each year." 2-ER-017–18. Moreover, Federal Defendants and Intervenors only point to one year—2020— where COVID constrained detection efforts. Fed. Br. 28 (citing 2-ER-251); Int. Br. 28–29 (citing 4-ER-746). This singular irregularity does not justify discounting data over several other years. Nothing in the record suggests that varied funding or effort could have impacted the decrease of bears detected from 2017-2019 *prior* to the pandemic.

In fact, record evidence indicates consistent efforts have been made over time for at least some monitoring elements. For example, the numbers of tree rub samples analyzed appear similar between 2016 and 2021, not including the COVID-disrupted 2020 field season.[12] In addition, FWS itself represents that efforts to detect mortality have been "similar" when comparing the time periods 1996-2006 and 2007-2021. 8-ER-1935; *see also* 4-ER-766 (similar statement comparing periods 1996-2006 and 2007-2020). Thus, nothing in the BiOp or administrative record "explain[s] how the amount of resources going into minimum counts correlates with the actual number of bears found each year." 1-ER-0017–18.[13]

For these reasons, the district court properly concluded that the BiOp "ignore[s] the reality of documented bear mortalities in the Cabinet-Yaak Ecosystem," in violation of the ESA and APA. 1-ER-018. As is the case here,

---

[12] Compared to checking just 344 rub trees in COVID-year 2020, the monitoring team checked similar numbers of trees in the other years between 2016 and 2021 (780 trees in 2016, 828 trees in 2017, 775 trees in 2018, 839 trees in 2019, and 763 trees in 2021). *See* 8-ER-1929; 4-ER-759.

[13] Contrary to Federal Defendants' assertion, the agency's path may not be reasonably discerned, *see* Fed. Br. 28-29, because nothing in the record supports their argument that the amount of funding or resources impacted bear detections. Any additional explanation now would constitute a post-hoc rationalization. *See, e.g., San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 603 (9th Cir. 2014) ("[W]e will not allow the agency to supply post-hoc rationalizations for its actions, so post decision information may not be advanced as new rationalization either for sustaining or attacking an agency's decision.") (citation and quotation omitted).

deference "is not owed when the agency has completely failed to address some

factor consideration of which was essential to [making an] informed decision."

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798 (9th Cir.

2005) (alterations in original). Because the Service arbitrarily afforded key, recent

data *no weight*, and provided no rational explanation for doing so, the Service

failed to consider the best available data and failed to consider an important aspect

of the problem, violating the ESA and the APA. 16 U.S.C. § 1536(a)(2); 50 C.F.R.

§ 402.14(d); 5 U.S.C. § 706(2)(A); *State Farm*, 463 U.S. at 43 (1983).

## II. THE FISH AND WILDLIFE SERVICE'S NO-JEOPARDY CONCLUSION IS ARBITRARY AND CAPRICIOUS BECAUSE IT RUNS CONTRARY TO THE DATA.

Recovery of grizzly bears in the Cabinet-Yaak remains far out of reach, with

the population failing to meet even the initial "subgoals" of the Grizzly Bear

Recovery Plan. 2-ER-251 (noting both the number and distribution of female

grizzly bears with cubs are lower than recovery targets, as is the number of bear

management units with young). The Cabinet-Yaak population also falls short of the

Recovery Plan's population objective of 100 bears. CenterSER-173 (stating

objective of 100 bears); 2-ER-251 (the Service's population estimate). As noted,

researchers have found that "populations fewer than 50-100 [individual adult

grizzly bears] are at higher risk of extirpation." CenterSER-192.

The BiOp must address the Project's impact on bear recovery because, as the Ninth Circuit has held, consultation "must analyze effects on recovery as well as effects on survival." *Nat'l Wildlife Fed'n*, 524 F.3d at 932, superseded by statutes on other grounds, as stated in *Sovereign Iñupiat for a Living Arctic v. BLM*, 555 F. Supp. 3d 739, 798-99 (D. Alaska 2021).

As such, FWS was correct to emphasize in its BiOp that "the survival and reproduction of *each individual female grizzly bear is very important*." 2-ER-252 (emphasis added). This is especially true in the area impacted by the Black Ram Project, which the Service deems "an important area for female grizzly bears over the past several decades." 2-ER-256. Data from collared female grizzly bears reveal that up to three adult females have used the action area "at the same time in past years." *Id*. The area has supported "multiple reproductive females that have contributed to the [Cabinet-Yaak Ecosystem] population" and, as recently as 2021, two known reproducing females were observed using the action area. 2-ER-256; 2-ER-292. Because only 13 of 22 BMUs in the Cabinet-Yaak Recovery Zone had sightings of females with young during 2015-2020, 2-ER-251, impacting the reproductivity of females in the action area is likely to further stall the recovery of this struggling population.

The BiOp "anticipate[s] adverse effects to female grizzly bears," 2-ER-297, including to "one to three adult female grizzly bears at any given time during the

proposed action." 2-ER-298. Project activities, including increased motorized use, may displace female grizzly bears from key habitats. *See supra* at 14–15. In addition to direct displacement, due to Project activities, "female grizzly bears are expected to experience significant effects to feeding, breeding, or sheltering," 2-ER-292. Increased road density during Project implementation "may displace individual grizzly bears from key habitat to the extent that significant under-use of habitat by grizzly bears occurs…. [which] could result in a female bear's failure to obtain adequate food resources and reduce fitness, impairing its normal reproductive potential." 2-ER-296. Up to three females "may not breed at their potential frequency or may fail to complete gestation due to decreased fitness." 2-ER-293, 296. In sum, the Service found that the Project may negatively impact three female grizzly bears for up to three to five bear years, affecting one to two reproductive cycles for each bear impacted. 2-ER-293–294.

These harms will have a magnified impact to grizzlies of the Cabinet-Yaak Ecosystem as a whole because of the small number of total females there. Using the FWS's optimistic population estimate of 60 bears, *see* 2-ER-294, only about 17 adult females live in the entire Ecosystem. *See supra* at 28–29, n.10. And because, as the Service has noted, grizzly bears generally do not reproduce until they are about 4.5 years of age, CenterSER-156, the number of adult *reproductive* females

37

is likely even smaller. Either way, the Project would impact up to 18% of females in the recovery area, a fact the BiOp fails to acknowledge or address.[14]

At odds with these facts, the BiOp concludes that the Project will have *zero* impacts to grizzly reproduction.

> Because the Black Ram Project *will not reduce the reproduction*, numbers, or distribution of grizzly bears throughout the CYE, and considering the status of the CYE population as well as other grizzly bear populations in the lower 48 (particularly the NCDE [Northern Continental Divide Ecosystem] and GYE [Greater Yellowstone Ecosystem] that have exceeded recovery targets and are experiencing continued growth), we conclude that the level of adverse effects is not reasonably expected to reduce appreciably the likelihood of both the survival and recovery of the listed entity of grizzly bears as a whole. Thus, it is the Service's opinion that the effects of the Black Ram Project on grizzly bears are not likely to jeopardize the continued existence of the grizzly bear.

2-ER-296 (emphasis added).

The BiOp's conclusion that the Black Ram Project will not jeopardize the bear's recovery because it "*will not reduce the reproduction … of grizzly bears throughout the [Cabinet-Yaak Ecosystem],*" *id.*, is not rational and is contradicted by the facts in the BiOp itself predicting harm to female grizzly reproduction. The

---

[14] As noted above, sustaining reproductive success is especially significant for grizzlies because even without negative impacts from harmful project activities, "[g]rizzly bears have one of the lowest reproductive rates among terrestrial mammals" and it takes a female grizzly bear ten or more years to replace herself in the population, due primarily to the late age of first reproduction, small average litter size, and the long interval between litters. CenterSER-156. Thus, grizzly bears' limited reproductive capacity already presents a challenge to recovery. *Id.*

BiOp's no-jeopardy conclusion is thus arbitrary and capricious because it fails to "articulate[] a rational connection between the facts found and the conclusion made." *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 527 (9th Cir. 2010) (internal quotation marks omitted); *State Farm*, 463 U.S. at 43.

Although the district court upheld the rationality of the BiOp's conclusions, its holding here misses the mark. The district court did not address the disconnect at the heart of the BiOp. The BiOp found that the Project would likely interfere with female reproduction but also asserted that the Project "will not reduce reproduction." Both cannot be true.

The BiOp is arbitrary for two additional reasons. First, even if FWS is correct that "very few adult females will be affected" by the Project, the agency still fails to confront the fact that "very few" reproductive females live in the Cabinet-Yaak Ecosystem. Interfering with the reproduction of up to three females, as the BiOp predicts, will interfere with a substantial portion of that small, fragile population. The failure to discuss or address the Project's impacts in the context of the Cabinet-Yaak Ecosystem's tiny population of reproductive females is arbitrary and capricious.

Second, the BiOp misleadingly states that the impacts within the Cabinet-Yaak Ecosystem will be "temporary" and thus "will not appreciably impair or preclude the capacity of the [Ecosystem's] recovery unit from providing both the

survival and recovery function assigned to it." 2-ER-296. The impact of "decreas[ing the] reproduction" of up to three grizzly bears "for 1-2 reproductive cycles" will have long-lasting repercussions. It is likely to suppress population growth of this already struggling bear population, and fewer female cubs will reach adulthood and reproduce in later years. CenterSER-156 ("during the first 10 years of her life, a female grizzly bear is capable of adding only two litters to the total population."). Thus, while the Project may only impact individual females' reproductive cycle for three to five bear years, 2-ER-294, the impact on the population is likely to last far beyond that timeframe.

"A Biological Opinion is arbitrary and capricious if it fails to consider the relevant factors and articulate a rationale connection between the facts found and the choice made." *Ctr. for Biological Diversity v. BLM*, 698 F.3d 1101, 1121 (9th Cir. 2012) (citation and internal alterations omitted). By failing to explain how impacting a substantial percentage of reproductive females for three to five years, which could impact recovery well beyond those five years, will not jeopardize grizzly bears, FWS failed to articulate a rational connection between the facts found and the no-jeopardy determination, in violation of the APA. 5 U.S.C. § 706(2)(A); *State Farm*, 463 U.S. at 43.

The Cabinet-Yaak population is essential to grizzly recovery, and thus impeding the reproduction of grizzly bears in this Recovery Zone will jeopardize

grizzly bear recovery in the lower-48 states. FWS's Recovery Plan makes clear the importance of ensuring each and every designated recovery zone achieves recovery, declaring that "[t]he species throughout the lower 48 States can be delisted when the populations in *all established recovery zones*," including the Cabinet-Yaak Ecosystem, "have been delisted." 5-ER-1044 (emphasis added); *see also* CenterSER-169 ("[r]ecovery zones have been established to identify the *areas needed for recovery* of the species within the 48 conterminous States." (emphasis added)). The Plan also lays out specific objectives to "provide for the conservation and recovery of the grizzly bear in selected areas of the conterminous 48 States." CenterSER-167. These objectives include "[i]dentify[ing] grizzly bear population goals that represent species recovery in measurable and quantifiable terms for the … ecosystems where the grizzly bear has suitable habitat" and "[e]stablish[ing] recovered populations *in each of the ecosystems* where habitat is available to sustain a grizzly bear population." *Id.* (emphasis added). FWS recently reaffirmed the necessity of achieving recovery in all designated recovery zones, including the Cabinet-Yaak, in its 2021 SSA, noting that "[g]rizzly bears in the lower-48 States need *multiple, resilient ecosystems distributed across a broad geographic range* in order to be redundant and withstand catastrophic events." 3-ER-406 (emphasis added).

In declaring that recovery is needed in all recovery zones, FWS has established that jeopardizing the Cabinet-Yaak grizzly bear population also jeopardizes the species as a whole. This means that where a recovery unit, such as the Cabinet-Yaak Ecosystem, is essential to recovery, FWS must address the harms to that recovery unit. Here, despite the necessity of undertaking analysis at the recovery unit level, FWS did so in an arbitrary and capricious manner. The BiOp's jeopardy determination therefore must be set aside and vacated.

## III.   THE FOREST SERVICE'S RELIANCE ON THE FLAWED BIOLOGICAL OPINION WAS ARBITRARY.

The Forest Service cannot rely on a faulty biological opinion to fulfill its ESA Section 7 duties to insure it does not jeopardize a listed species' continued existence. *See Defs. of Wildlife v. EPA*, 420 F.3d at 976, *rev'd on other grounds*, *Nat'l Ass'n of Home Builders*, 551 U.S. 644. "Consulting with the [Fish and Wildlife Service] alone does not satisfy an agency's duty under the Endangered Species Act." *Robertson*, 35 F.3d at 1304. The Forest Service violates the ESA if it approves or implements an action in reliance on a legally flawed biological opinion or fails in its approval or implementation decision "to discuss information that would undercut the [biological] opinion's conclusion." *Ctr. for Biological Diversity v. BLM*, 698 F.3d at 1127-28.

Here, the Forest Service had access to data that runs contrary to the baseline population estimate set forth by FWS, including the years of Fish and Wildlife

Service monitoring reports that demonstrate decreasing grizzly bear detections and increasing bear mortalities. The Forest Service also had access to data that runs contrary to FWS's no-jeopardy conclusion, including information regarding the presence of reproducing female grizzly bears with cubs in the Project area that the Black Ram Project will harm. Nevertheless, the Forest Service did not consider the information that undercuts FWS's no-jeopardy conclusion. The district court properly concluded that the Forest Service's approval of the project pursuant to a legally flawed biological opinion was arbitrary and capricious. 1-ER-024–25.

Defendants' citation to *Pyramid Lake Paiute Tribe of Indians v. U.S. Department of Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990), is irrelevant. *See* Fed. Br. 31. There, FWS was not a named defendant or party to the action and the plaintiff did not directly challenge the biological opinion. *Id*. The Court found that the Navy's reliance on the biological opinion was not arbitrary because the Tribe did not put forth new information that the agencies failed to consider and because "the record contain[ed] no other data which undermines seriously [the Fish and Wildlife Service's] opinions." *Id*. at 1416. Here, the Center highlighted record data demonstrating the arbitrary nature of FWS's analyses in the BiOp. The Forest Service had an independent duty to consider this information and failed to do so, violating the ESA.

## IV. THE FOREST SERVICE'S NEPA ANALYSIS ARBITRARILY RELIED ON STALE DATA CONCERNING GRIZZLY BEARS.

The district court held that by relying on stale data regarding the population estimate and population trends, the Forest Service violated NEPA's "hard look" mandate that requires an accurate evaluation of the environmental baseline. 1-ER-037–38. Intervenors alone, and not Federal Defendants, challenge the district court's holding. Intervenor's argument lacks merit.

An environmental assessment must identify the direct, indirect, and cumulative impacts from a proposed project. *See* 40 C.F.R. §§ 1508.7; 1508.8; 1508.9(b) (2019). To that end, NEPA requires that agencies set an appropriate baseline detailing the nature and extent of the resources in the area the project will impact. "Without establishing the baseline conditions which exist before a project begins, there is simply no way to determine what effect [an action] will have on the environment and consequently, no way to comply with NEPA." *Great Basin Res. Watch*, 844 F.3d at 1101 (quoting *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988)).[15]

---

[15] *See also Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 568 (9th Cir. 2016) (holding that the environmental review document at issue was faulty because it failed to meet a "duty to assess … the actual baseline conditions" relevant in that case, and concluding that while the "establishment of a baseline is not an independent legal requirement," it is a "practical" one that ensures an accurate consideration of the environmental consequences of a proposed action).

Here, the Forest Service relied on outdated data and ignored important factors in establishing the baseline for the grizzly bear population and trajectory in the Cabinet-Yaak Ecosystem. The Forest Service relied on Kasworm et al. (2018) in its EA to set the baseline against which Project impacts are assessed. But mortality and detection data has revealed a much darker picture of the status of grizzlies in the Cabinet-Yaak Ecosystem since 2017 compared to prior years, facts that the Forest Service's EA failed to address in 2022, *five years later*. *See supra* at 10, 26-27 (describing fall in grizzlies detected from 54 to 42 in the years 2017 to 2021); *supra* at 13 (showing known mortalities, especially among females, have increased in the past three years compared to mortalities in the previous three years).

And similar to the FWS's BiOp, the Forest Service's June 2022 EA relied on outdated baseline data extrapolated from 2012 estimates to assess the population while ignoring more recent information regarding the decrease in grizzly bear detections and increased female mortality in the Cabinet-Yaak Ecosystem. *See* 8-ER-1759; 8-ER-1896. The Forest Service cannot arbitrarily pinpoint the 2017 population data to describe the status of grizzly bears in the Cabinet-Yaak Ecosystem because this baseline ignores important subsequent information necessary to "determine what effect [the Black Ram Project] will have on the environment." *Half Moon Bay*, 857 F.2d at 510. Because the baseline arbitrarily

45

inflated population growth and relied on stale data, the district court properly
determined that the Forest Service's reliance on outdated data in setting the
environmental baseline for grizzly bear population was arbitrary and capricious
and violated NEPA. 1-ER-034.

Intervenors are wrong to assert that NEPA does not require disclosure of the
environmental baseline. Int. Br. 37. In *American Rivers v. FERC*, this Court
recognized that establishing a baseline *was* necessary to determine a project's
environmental impacts. 201 F.3d 1186, 1195 n.15 (9th Cir. 1999). The Court noted
prior decisions reasoning that "'without establishing … baseline conditions …
there is simply no way to determine what effect [an action] will have on the
environment and, consequently, no way to comply with NEPA.'" *Id*. (quoting *Half
Moon Bay*, 857 F.2d at 510).

The *American Rivers* panel also cited Council on Environmental Quality
guidance for the proposition that "[t]he concept of a baseline against which to
compare predictions of the effects of the proposed action and reasonable
alternatives is critical to the NEPA process." *Id.* (citing Council on Environmental
Quality, *Considering Cumulative Effects Under the National Environmental Policy
Act* 41 (Jan. 1997)). The Court ultimately determined the baseline set by the
Federal Energy Regulatory Commission complied with NEPA. *Id.* at 1195-99.
Contrary to Intervenors' implication, *American Rivers* thus demonstrates that

agencies *must* establish an accurate baseline to take the hard look NEPA requires.[16] Other decisions of this Court reach the same conclusion. *Or. Nat. Desert Ass'n*, 840 F.3d at 568.

Intervenors' argument that the Forest Service's failure to consider recent data about declining detections of live grizzlies and increased observed grizzly deaths was "harmless error" ignores the fact that small miscalculations about impacts to grizzlies in this small, struggling population may have significant consequences. Intervenors allege any error regarding the baseline number of bears is harmless because agency consideration of the new evidence "would not have made any difference" to the agency's evaluation of the Project, as the bears' condition "did not differ meaningfully" from 2017 until the date the agency made its decision in 2022. Int. Br. 38.

A claim of harmless error must meet this Court's strict test, namely that "the 'doctrine may be employed only when a mistake of the administrative body is one

---

[16] Intervenor's citation to *Lands Council v. McNair* for the proposition that a requirement could not be engrafted onto NEPA's "hard look" requirement is inapposite. Int. Br. 37 (citing *Lands Council v. McNair*, 537 F.3d 981, 1001 (9th Cir. 2008)). In that case, this Court found that requiring agencies to affirmatively address every uncertainty in an EIS would be too onerous, but held that the Forest Service must still acknowledge and respond to comments that raise significant scientific uncertainties. 537 F.3d at 1001. Far from being onerous, establishing an environmental baseline is *necessary* for an agency to assess project impacts, as NEPA explicitly requires. *See* 42 U.S.C. § 4332(2)(C) (2022); 40 C.F.R. §§ 1501.4, 1508.7, 1508.8, 1508.9(b) (2019).

that clearly had no bearing on the procedure used or the substance of decision reached.'" *NRDC v. U.S. Forest Serv.*, 421 F.3d 797, 807 (9th Cir. 2005) (quoting *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1071 (9th Cir. 2004)).[17] The agency bears the burden of demonstrating harmlessness. *NRDC*, 421 F.3d at 807.

Here, the Forest Service has declined to make any such argument, leaving it to the Intervenor, which fails to demonstrate that the error is harmless. The Forest Service's failure to consider or address data showing grizzly detections dropping and mortalities rising in the Cabinet-Yaak Ecosystem since 2017 cannot be said to have "no bearing" on the substance of the agency's decision made. Ignoring the most recent data deprived the Forest Service of an understanding of the grizzly's precarious and potentially worsening situation in the Cabinet-Yaak Ecosystem. This prevented the agency from effectively evaluating whether additional mitigation measures might be necessary, or even if the "no action" alternative might be preferable to the proposed Project's massive clearcuts and years of motorized intrusion into grizzly habitat.

---

[17] *See also Cal. Wilderness Coal. v. U.S. DOE*, 631 F.3d 1072, 1090 (9th Cir. 2011) ("We have applied this definition of harmless error—'clearly had no bearing on the procedure used or the substance of decision reached'—in a number of cases over the last eighteen years," rejecting an argument that a Supreme Court ruling required modifying the standard.)

Thus, it cannot be said that the data ignored by the Forest Service had "no bearing" on the substance of the agency's decision. The Forest Service certainly has not carried its burden to prove otherwise. *See Or. Nat. Desert Ass'n*, 840 F.3d at 570 (inaccurate information and unsupported assumptions contained in FEIS materially impeded informed decisionmaking and public participation, and therefore did not constitute harmless error). In ignoring this data in its environmental analysis, the Forest Service violates NEPA and the APA.

## CONCLUSION

The Fish and Wildlife Service violated the ESA and APA by disregarding important information in estimating the baseline population and by reaching a no-jeopardy conclusion that was not supported by the facts. Additionally, the Forest Service violated NEPA and the APA in relying on outdated data and failing to consider important information in setting the baseline against which Project impacts are assessed.

As such, we respectfully request that this Court:

(1) affirm the district court's finding that the Fish and Wildlife Service's baseline failed to consider the best available science and was arbitrary and capricious in violation of the ESA;

(2) affirm the district court's finding that the Forest Service's reliance on the faulty Biological Opinion violated the ESA;

49

(3) affirm the district court's finding that the Forest Service's baseline was arbitrary and capricious in violation of NEPA; and

(4) reverse the district court's decision that the Fish and Wildlife Service's data supported its no-jeopardy determination.

Respectfully submitted May 31, 2024,

*/s Edward B. Zukoski*
Edward B. Zukoski                           Andrea Zaccardi
Center for Biological Diversity             Center for Biological Diversity
1536 Wynkoop Street, Suite 421              P.O. Box 469
Denver, CO 80202                            Victor, ID 83455
(303) 641-3149                              (303) 854-7748
tzukoski@biologicaldiversity.org           azaccardi@biologicaldiversity.org

*Attorneys for Plaintiffs-Appellees-Cross-Appellants*
*Center for Biological Diversity et al.*

# ADDENDUM

## Table of Contents

Endangered Species Act and Implementing Regulations

16 U.S.C. § 1531(b) .................................................................A2

16 U.S.C. § 1532(3) .................................................................A3

16 U.S.C. § 1533(f) .................................................................A4

16 U.S.C. § 1536(a)(2), (b)(3), (c)(1) ....................................A5

50 C.F.R. § 402.02 (2018) (excerpts) ....................................A7

50 C.F.R. § 402.14(a), (b), (d), (g) (2018) ...........................A8

National Environmental Policy Act (2022) and Council on Environmental Quality Implementing Regulations (2019)

42 U.S.C. § 4332(2)(C) (2022) ..............................................A10

40 C.F.R. § 1501.4 (2019)......................................................A11

40 C.F.R. § 1508.7 (2019)......................................................A13

40 C.F.R. § 1508.8 (2019)......................................................A14

**Endangered Species Act**

**16 U.S.C. § 1531 – Congressional Findings and
Declaration of Purposes and Policy**

…

**(b) Purposes.**   The purposes of this Act are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section.

…

**Endangered Species Act**
**16 U.S.C. § 1532 – Definitions**

For the purposes of this Act—

**…**

**(3)** The terms "conserve", "conserving", and "conservation" mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.

**…**

**Endangered Species Act**

**16 U.S.C. § 1533 - Determination of Endangered Species
and Threatened Species**

**(f) Recovery plans.**

**(1)** The Secretary shall develop and implement plans (hereinafter in this subsection referred to as "recovery plans") for the conservation and survival of endangered species and threatened species listed pursuant to this section, unless he finds that such a plan will not promote the conservation of the species. The Secretary, in developing and implementing recovery plans, shall, to the maximum extent practicable—

**(A)** give priority to those endangered species or threatened species, without regard to taxonomic classification, that are most likely to benefit from such plans, particularly those species that are, or may be, in conflict with construction or other development projects or other forms of economic activity;

**(B)** incorporate in each plan—

**(i)** a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;

**(ii)** objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list; and

**(iii)** estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal.

...

## Endangered Species Act

## 16 U.S.C. § 1536 – Interagency Cooperation

**(a) Federal agency actions and consultations.**

**…**

**(2)**  Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

**(b) Opinion of Secretary.**

**…**

**(3)**

**(A)**  Promptly after conclusion of consultation under paragraph (2) or (3) of subsection (a), the Secretary shall provide to the Federal agency and the applicant, if any, a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat. If jeopardy or adverse modification is found, the Secretary shall suggest those reasonable and prudent alternatives which he believes would not violate subsection (a)(2) and can be taken by the Federal agency or applicant in implementing the agency action.

**…**

**(c) Biological assessment.**

**(1)** To facilitate compliance with the requirements of subsection (a)(2), each Federal agency shall, with respect to any agency action of such agency for which no contract for construction has been entered into and for which no construction has begun on the date of enactment of the Endangered Species Act Amendments of 1978 [enacted Nov. 10, 1978], request of the Secretary information whether any species which is listed or proposed to be listed may be present in the area of such proposed action. If the Secretary advises, based on the best scientific and commercial data available, that such species may be present, such agency shall conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action. Such assessment shall be completed within 180 days after the date on which initiated (or within such other period as is mutually agreed to by the Secretary and such agency, except that if a permit or license applicant is involved, the 180-day period may not be extended unless such agency provides the applicant, before the close of such period, with a written statement setting forth the estimated length of the proposed extension and the reasons therefor) and, before any contract for construction is entered into and before construction is begun with respect to such action. Such assessment may be undertaken as part of a Federal agency's compliance with the requirements of section 102 of the National Environmental Policy Act of 1969 (42 U.S.C. 4332).

...

**Endangered Species Act Implementing Regulations**

**50 C.F.R. § 402.02 (2018) – Definitions**

...

Effects of the action refers to the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline. The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. Indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur. Interrelated actions are those that are part of a larger action and depend on the larger action for their justification. Interdependent actions are those that have no independent utility apart from the action under consideration.

...

Jeopardize the continued existence of means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species.

...

**Endangered Species Act Implementing Regulations**

**50 C.F.R. § 402.14 (2018) – Formal Consultation**

**(a) Requirement for formal consultation**. Each Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat. If such a determination is made, formal consultation is required, except as noted in paragraph (b) of this section. The Director may request a Federal agency to enter into consultation if he identifies any action of that agency that may affect listed species or critical habitat and for which there has been no consultation. When such a request is made, the Director shall forward to the Federal agency a written explanation of the basis for the request.

**(b) Exceptions.**

    **(1)** A Federal agency need not initiate formal consultation if, as a result of the preparation of a biological assessment under § 402.12 or as a result of informal consultation with the Service under § 402.13, the Federal agency determines, with the written concurrence of the Director, that the proposed action is not likely to adversely affect any listed species or critical habitat.

    **(2)** A Federal agency need not initiate formal consultation if a preliminary biological opinion, issued after early consultation under § 402.11, is confirmed as the final biological opinion.

    …

**(d) Responsibility to provide best scientific and commercial data available**. The Federal agency requesting formal consultation shall provide the Service with the best scientific and commercial data available or which can be obtained during the consultation for an adequate review of the effects that an action may have upon listed species or critical habitat. This information may include the results of studies or surveys conducted by the Federal agency or the designated non-Federal representative. The Federal agency shall provide any applicant with the opportunity to submit information for consideration during the consultation.

    …

**(g)** Service responsibilities. Service responsibilities during formal consultation are as follows:

**(1)** Review all relevant information provided by the Federal agency or otherwise available. Such review may include an on-site inspection of the action area with representatives of the Federal agency and the applicant.

**(2)** Evaluate the current status of the listed species or critical habitat.

**(3)** Evaluate the effects of the action and cumulative effects on the listed species or critical habitat.

**(4)** Formulate its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.

**...**

### National Environmental Policy Act

### 42 U.S.C. § 4332 (2022) – Cooperation of Agencies; Reports; Availability of Information; Recommendations; International and National Coordination of Efforts

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this Act [42 USCS §§ 4321 et seq.], and (2) all agencies of the Federal Government shall—

> **…**

**(C)** include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

> **(i)** the environmental impact of the proposed action,

> **(ii)** any adverse environmental effects which cannot be avoided should the proposal be implemented,

> **(iii)** alternatives to the proposed action,

> **(iv)** the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

> **(v)** any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, United States Code, and shall accompany the proposal through the existing agency review processes;

> **…**

A10

**Council on Environmental Quality Regulations Implementing NEPA**

**40 C.F.R. § 1501.4 (2019) – Whether to Prepare an Environmental Impact Statement.**

In determining whether to prepare an environmental impact statement the Federal agency shall:

**(a)** Determine under its procedures supplementing these regulations (described in § 1507.3) whether the proposal is one which:

**(1)** Normally requires an environmental impact statement, or

**(2)** Normally does not require either an environmental impact statement or an environmental assessment (categorical exclusion).

**(b)** If the proposed action is not covered by paragraph (a) of this section, prepare an environmental assessment (§ 1508.9). The agency shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments required by § 1508.9(a)(1).

**(c)** Based on the environmental assessment make its determination whether to prepare an environmental impact statement.

**(d)** Commence the scoping process (§ 1501.7), if the agency will prepare an environmental impact statement.

**(e)** Prepare a finding of no significant impact (§ 1508.13), if the agency determines on the basis of the environmental assessment not to prepare a statement.

**(1)** The agency shall make the finding of no significant impact available to the affected public as specified in § 1506.6.

**(2)** In certain limited circumstances, which the agency may cover in its procedures under § 1507.3, the agency shall make the finding of no significant impact available for public review (including State and areawide clearinghouses) for 30 days before the agency makes its final determination whether to prepare an environmental impact statement and before the action may begin. The circumstances are:

**(i)** The proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement under the procedures adopted by the agency pursuant to § 1507.3, or

**(ii)** The nature of the proposed action is one without precedent.

**Council on Environmental Quality Regulations Implementing NEPA**

**40 C.F.R. § 1508.7 (2019) – Cumulative Impact**

"Cumulative impact" is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

**Council on Environmental Quality Regulations Implementing NEPA**

**40 C.F.R. § 1508.8 (2019) – Effects**

"Effects" include:

**(a)** Direct effects, which are caused by the action and occur at the same time and place.

**(b)** Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems. Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-2882, 23-2886, 23-3146

I am the attorney or self-represented party.

**This brief contains** | 11,302 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

⦿ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [ ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s Edward B. Zukoski | **Date** | 5/31/2024
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*