Nos. 23-2882, 23-2886, 23-3146

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

CENTER FOR BIOLOGICAL DIVERSITY, et al.,
*Plaintiffs-Appellees/Plaintiffs-Appellants*,

and

ALLIANCE FOR THE WILD ROCKIES, et al.,
*Plaintiffs-Appellees/Plaintiffs*,

v.

UNITED STATES FOREST SERVICE, et al.,
*Defendants-Appellants/Defendants/Defendants-Appellees*,

and

KOOTENAI TRIBE OF IDAHO,
*Intervenor-Defendant/Intervenor-Defendant-Appellant/
Intervenor Defendant-Appellee.*

Appeal from the United States District Court for the District of Montana
No. 9:22-cv-114 (Hon. Donald W. Molloy)

**FEDERAL DEFENDANTS-APPELLANTS' THIRD CROSS-APPEAL BRIEF**

Of Counsel:

ELISE FOSTER
*Attorney*
U.S. Dep't of Agriculture

KATHRYN L. WILLIAMS-SHUCK
SARAH E. MCLAIN
*Attorneys*
U.S. Dep't of the Interior

TODD KIM
*Assistant Attorney General*

THEKLA HANSEN-YOUNG
HAYLEY A. CARPENTER
ERIKA A. FURLONG
JOHN P. TUSTIN
JACOB D. ECKER
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 305-0466
jacob.ecker@usdoj.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS...............................................................................i

TABLE OF AUTHORITIES.....................................................................iii

INTRODUCTION AND SUMMARY OF ARGUMENT..............................1

ARGUMENT...............................................................................................5

I.      The Court has jurisdiction over this appeal..................................5

II.     The biological opinion's population estimate satisfies the ESA's
        best available science requirement. ............................................9

        A.      Fish and Wildlife used a sound method to estimate the
                baseline population. ..........................................................9

        B.      CBD fails to show its proposed interpretation of data that
                Fish and Wildlife considered renders the agency's
                interpretation arbitrary. .................................................15

                1.      Relying on minimum counts to estimate population
                        size is scientifically inappropriate.........................16

                2.      Known mortality data provides an incomplete
                        picture and is thus not a reliable way to estimate
                        population size.........................................................18

III.    The Forest Service's determination that the project is consistent
        with Access Standard 2 satisfies NFMA and the APA.................19

        A.      The Forest Service's interpretation of Access Standard 2
                and its application to the facts here was reasonable..........20

                1.      The Forest Service reasonably explained its approach
                        to unauthorized motorized use.................................20

                2.      The Forest Service's approach is consistent with
                        Ninth Circuit law....................................................25

3.      The Forest Service reasonably explained why unauthorized use was temporary and disparate, and was unlikely to harm grizzlies................................................27

B.      The Forest Service reasonably concluded that the evidence Alliance points to does not show uncounted unauthorized use....................................................................................30

C.      The Forest Service's method for calculating compliance with Access Standard 2 is entitled to deference. ........................35

IV.    The environmental assessment's discussion of unauthorized motorized use satisfies NEPA and the APA.........................................37

A.      The Forest Service reasonably complied with the requirement to identify methodologies in the environmental assessment. ...............................................37

B.      The environmental assessment's discussion of unauthorized motorized use is sufficient under NEPA. ..........................39

V.     Fish and Wildlife's jeopardy determination was reasonable. ...............................43

A.      The agency's no-jeopardy conclusion is well supported...........................43

B.      CBD's counter arguments incorrectly focus on recovery of the Cabinet-Yaak ecosystem. ................................................47

1.      The Cabinet-Yaak ecosystem need not meet all recovery goals to avoid jeopardy. ......................................47

2.      Fish and Wildlife reasonably concluded that the project would not appreciably reduce the likelihood of survival and recovery. ........................................48

3.      Impacts limited to the Cabinet-Yaak ecosystem are not dispositive of the jeopardy question. .........................52

CONCLUSION ...................................................................................55

Form 8. Certificate of Compliance for Briefs ....................................................56

# TABLE OF AUTHORITIES

## Cases

*Alaska Oil & Gas Ass'n v. Pritzker*,
840 F.3d 671 (9th Cir. 2016) .................................................................36

*Alliance for the Wild Rockies v. Bradford*,
856 F.3d 1238 (9th Cir. 2017) ......................................................... 25, 26

*Alliance for the Wild Rockies v. Marten, (Marten I)*,
464 F. Supp. 3d 1169 (D. Montana 2020) ...........................................30

*Alliance for the Wild Rockies v. Petrick*,
68 F.4th 475 (9th Cir. 2023) ........................................................5, 6, 7, 8

*Alliance for Wild Rockies v. Probert*,
412 F. Supp. 3d 1188 (D. Mont. 2019) ......................... 23, 35, 42, 43

*Alliance for the Wild Rockies v. Savage*,
897 F.3d 1025, (9th Cir. 2018) ......................................................... 26, 27

*Amalgamated Sugar Co. LLC v. Vilsack*,
563 F.3d 822 (9th Cir. 2009) .................................................................36

*Conservation Cong. v. Finley*,
774 F.3d 611 (9th Cir. 2014) .................................................................53

*Crow Indian Tribe v. United States*,
965 F.3d 662 (9th Cir. 2020) ...................................................................8

*Earth Island Inst. v. Muldoon*,
82 F.4th 624 (9th Cir. 2023) .................................................................52

*Ecology Ctr. v. Castaneda*,
574 F.3d 652 (9th Cir. 2009) .................................................................17

*Great Basin Res. Watch v. Bureau of Land Mgmt.*,
844 F.3d 1095 (9th Cir. 2016) ...............................................................39

*Hollingsworth v. Perry,*
570 U.S. 693 (2013) ..................................................................................5

*Idaho Farm Bureau Fed'n v. Babbitt,*
58 F.3d 1392 (9th Cir. 1995) ................................................................38

*Idaho Wool Growers Ass'n v. Vilsack,*
816 F.3d 1095 (9th Cir. 2016) ..............................................................38

*Kern Cnty. Farm Bureau v. Allen,*
450 F.3d 1072 (9th Cir. 2006) ...................................................9, 13, 19

*Loper Bright Enterprises v. Raimondo,*
144 S. Ct. 2244 (2024) ....................................................................23, 51

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.,*
463 U.S. 29 (1983) ................................................................................16

*Native Ecosystems Council v. Weldon,*
697 F.3d 1043 (9th Cir. 2012) ..............................................................22

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
524 F.3d 917 (9th Cir. 2008) ..........................................................47, 48

*Natural Resource Defense Council v. Gutierrez,*
457 F.3d 904 (9th Cir. 2006) ..................................................................7

*Oregon Nat. Desert Ass'n v. United States Forest Serv.,*
957 F.3d 1024 (9th Cir. 2020) ........................................................29, 40

*Redd v. Guerrero,*
84 F.4th 874 (9th Cir. 2023) ..................................................................7

*Reed v. Goertz,*
598 U.S. 230 (2023) ................................................................................7

*Rock Creek All. v. U.S. Fish & Wildlife Serv.,*
663 F.3d 439 (9th Cir. 2011) ................................................................48

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
747 F.3d 581 (9th Cir. 2014) ..........................2, 8, 9, 12, 32, 33, 50

*San Luis & Delta-Mendota Water Auth. v. Locke,*
  776 F.3d 971 (9th Cir. 2014) ................................................................15

*Sierra Club v. Bosworth,*
  510 F.3d 1016 (9th Cir. 2007) ........................................................ 21, 50

*Turtle Island Restoration Network v. United States Dep't of Com.,*
  878 F.3d 725 (9th Cir. 2017) ................................................................47

*United States v. Johnson,*
  256 F.3d 895 (9th Cir. 2001) ................................................................26

*Ursack Inc. v. Sierra Interagency Black Bear Grp.,*
  639 F.3d 949 (9th Cir. 2011) ................................................25, 32, 34

*Defs. of Wildlife v. United States Forest Serv.,*
  94 F.4th 1210 (10th Cir. 2024) ............................................................54

## Statutes

16 U.S.C. § 1533(c)(2) ................................................................................53

16 U.S.C. § 1536(a)(2) ................................................................43, 47, 54

## Rules

Fed. R. App. P. 29(a)(5) ............................................................................56

Fed. R. App. P. 32(a)(5) ............................................................................56

Fed. R. App. P. 32(f) ................................................................................56

## Regulations

36 C.F.R. § 219.15(d) ................................................................................20

40 C.F.R. § 1502.24 ............................................................................ 37, 38

50 C.F.R. § 402.02 ............................................................ 44, 47, 48, 54

50 C.F.R. § 402.14(g)...................................................................................... 44, 54

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Black Ram project involves vegetation management in two specific bear management units in the Cabinet-Yaak ecosystem, one of six grizzly bear recovery zones in the lower 48 states. Among its purposes, the project will promote grizzly bear forage habitat and reduce the potential for high intensity wildfires. It will result in additional high-quality grizzly bear habitat in the Cabinet-Yaak ecosystem. The Forest Service and the Fish and Wildlife Service thoroughly analyzed the environmental impacts of the project, including impacts to grizzlies, before the Forest Service approved the project. The district court's overarching error across all three issues that we appeal was its failure to accord the agencies the deference to which their expert technical and scientific decisions were entitled. The district court did not make this same mistake on the issue that CBD cross-appeals; there, it correctly deferred to Fish and Wildlife's informed judgment.

1. Alliance's threshold argument that this Court lacks jurisdiction over the government's appeal under Article III is easily dispensed. The district court held that the agencies acted unlawfully on several distinct grounds, remanded for them to correct the purported legal violations underlying each ground, and held that project activities cannot proceed until the agencies correct each of the purported violations. Because the agencies' basis for each of the grounds we appeal is distinct, correcting them on remand would require analysis that is different from and additional to the analysis needed to correct violations that the agencies have not challenged. Reversing

1

the district court on the issues we appeal would therefore redress the agencies' injuries from the district court's order, even though the agency actions themselves will remain vacated. Alliance's contrary argument deviates from this Court's case law and would create perverse incentives—requiring the United States to take an all-or-nothing approach to appellate litigation instead of the more tailored approach that our narrower appeal reflects.

2. The district court erred in determining that Fish and Wildlife violated the ESA's best available science requirement in estimating the Cabinet-Yaak ecosystem's grizzly bear population. The agency relied on a peer-reviewed statistical method that the district court recognized was scientifically valid. And the agency explained why it was scientifically unsound to rely on the data CBD proffers. That satisfies the agency's obligation under the ESA and APA, because "[t]he determination of what constitutes the 'best scientific data available' belongs to the agency's special expertise." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014).

3. The district court erred in concluding that the Forest Service's discussion of unauthorized motorized use was "vague and indecisive," failing the agency's obligations under NFMA. As part of its broader analysis of road density metrics, the Forest Service's analysis made clear that it did not count sporadic unauthorized use in calculating road-density metrics under the Forest Plan's Access Standard 2. This discussion satisfies NFMA's procedural and substantive requirements, because it explains how the project is consistent with the Forest Plan's Access Standard 2, and

that explanation is reasonable. The agency generally does not count sporadic unauthorized use in its road density metrics because that use does not change permanent road density conditions. Alliance asserts that various Forest Plan definitions require a different approach, but marshals nothing that precludes the Forest Service's method. In the face of competing interpretations of the Forest Plan, the Forest Service's view prevails. And though Alliance repeatedly asserts that actual unauthorized use is occurring in the project area that the agency declined to consider, the agency investigated, and rebutted, Alliance's evidence.

4. The Forest Service's environmental assessment complies with NEPA. The Forest Service specifically cited, and reproduced portions of, its analysis of road density metrics under Access Standard 2. That satisfies NEPA's requirement to identify methodology. NEPA requires nothing more on this front. Even if it did not, the harmless error rule—an argument to which Alliance does not respond—applies because of the extensive publicly available discussion of unauthorized motorized use in other agency documents.

Likewise, the Forest Service's discussion of road-density metrics, including unauthorized use, satisfies NEPA's requirement for setting a reasonable baseline for evaluating the project's effects. That analysis did not assume, as the district court and Alliance assert, that the Forest Service could prevent all unauthorized motorized use. For its contrary argument, Alliance points again to what it characterizes as evidence of unauthorized use and ineffective barriers. But the Forest Service evaluated this

evidence and rebutted it site-by-site. The agency, not Alliance, is responsible for finding facts and drawing conclusions from the evidence. The agency did so here, and reasonably concluded that unauthorized motorized use on the scale Alliance asserts is simply not happening. The district court erred in crediting Alliance's interpretation of the evidence over the agency's to conclude that the Forest Service violated NEPA.

5. CBD cross appeals on a single issue: whether the district court correctly deferred to the agency's determination that short-term effects to the reproductive success of a few female grizzly bears would not jeopardize the entire listed species of grizzly bear in the lower-48 states. Fish and Wildlife accurately assessed the effects of the Forest Service's action and reasonably determined that these temporary impacts would not prevent continuing increases in the population of grizzly bears in the Cabinet-Yaak ecosystem, much less jeopardize the species as a whole. Female grizzlies will continue to occupy even the bear management units affected by the project, and the increased risk of reduced reproduction would not offset the steady gains the grizzly population has made in that ecosystem in recent years. CBD's contrary arguments ask this Court to second-guess the agency's thorough, reasoned decisionmaking.

This Court should affirm the district court's judgment on CBD's claim six, reverse on CBD's claims four and seven, and reverse on Alliance's claims one and three.

# ARGUMENT

## I.    The Court has jurisdiction over this appeal.

Alliance argues that this Court lacks Article III jurisdiction because the federal agency defendants appealed some, but not all, of the district court's adverse holdings. All 2d Br. 36-38. Even if we succeed on appeal, Alliance's argument goes, the district court's ultimate remedy of vacating the Forest Service's environmental assessment and finding of no significant impact, and Fish and Wildlife's biological opinion, would remain in place. *Id.* In Alliance's view, this means the Court cannot grant effective relief, thus failing Article III's redressability requirement. *Id.* 38.

Article III requires that "a concrete and particularized injury that is fairly traceable to the challenged conduct [is] likely to be redressed by a favorable judicial decision." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013). On appeal, it is sufficient for redressability that the relief the appellate court may grant will remove restrictions imposed by the district court on agency conduct, or otherwise "undo the effects of . . . compliance" with the district court's order. *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 487 (9th Cir. 2023).

As outlined in our opening brief, pp.16-18, the court identified several errors in the agencies' analyses. Among these are the issues that we have appealed, in particular, the issues involving Fish and Wildlife's baseline population estimate for its biological opinion and the sufficiency of Forest Service's analysis of unauthorized motorized

use. The district court concluded that the appropriate remedy for the legal violations it identified was remand to the agency and vacatur of the environmental assessment, finding of no significant impact, and biological opinion. 1-ER-65. In response to the agency's arguments that "the Project should be able to proceed while the agencies fix the errors described" in the court's order, the district court determined that "[t]he Project may not continue while the agencies remedy these issues." *Id.* Finally, in the conclusion section, the court ordered "that this matter is remanded to the agencies for further review consistent with this Order." 1-ER-66.

This Court can redress the agencies' injury from the district court's ruling. Without the district court's order, the agencies would perform no additional analysis on the issues subject to this appeal before proceeding with the project, even if they are still required to perform some work on other legal issues that we do not appeal here. For example, if successful on appeal, the Forest Service would not be required to "fix" its analysis on unauthorized road use, 1-ER-65, 45-50, even though it must still consider whether to prepare an environmental impact statement and reevaluate its consideration of the project's climate impacts, 1-ER-27-36, 38-43. The claims on appeal in which the district court ruled against the agencies would no longer keep the project from moving forward under the district court's determination that "[t]he Project may not continue while the agencies remedy" the legal violations the district court identified. *Id.*

Alliance asserts that the sole "tangible harm to the agency" is vacatur of the project decisions. All. 2d Br. 37. But the district court remanded to the agency to conduct additional work to fix each separate legal violation. 1-ER-66. And it determined that project activities could not go forward in the meantime. 1-ER-65. Alliance's view of redressability, focusing exclusively on the formal judgment rendered, ignores that redressability considers "the practical consequence" of the relief a court can grant, and whether that relief "would amount to a significant increase in the likelihood" of effective redress. *Redd v. Guerrero*, 84 F.4th 874, 884 (9th Cir. 2023) (cleaned up) (quoting *Reed v. Goertz*, 598 U.S. 230, 234 (2023)). Each distinct ground on which the district court found against the agencies represents a restriction on their activities on remand, requires the agencies to dedicate additional resources to remedy, and must be fixed before the project can proceed. Redressability is satisfied on these facts.

Alliance cites *Natural Resource Defense Council v. Gutierrez*, 457 F.3d 904 (9th Cir. 2006), for its contrary argument. All. 2d Br. 37-38. This Court has already distinguished *Gutierrez* in rejecting Alliance's similar jurisdictional arguments in *Petrick*, 68 F.4th at 487. In *Petrick*, this Court concluded the Forest Service had standing to appeal because the district court's decision "render[ed] the Forest Service unable to withdraw" a supplemental decision document, and because the Forest Service "remains injured by the final judgment" and the appellate court has "the power to undo the effects of" the Forest Service's need to comply with that judgment. *Petrick*,

7

68 F.4th at 487. *Gutierrez*, unlike *Petrick* and this case, "involved a unique set of facts where an agency did 'not challenge' the only relief granted (a permanent injunction) and instead sought only to excise a portion of the district court's ruling stating that the agency had violated a statute." *Id.* In *Petrick* and here, by contrast, "the Forest Service seeks to reverse the relief granted by the district court," *id.*; here, by proceeding with the project without additional consideration of the distinct violations the district court found that we appeal.

Alliance also cites *Crow Indian Tribe v. United States*, 965 F.3d 662 (9th Cir. 2020). All. 2d Br. 38. In *Crow Indian Tribe*, this Court concluded it had jurisdiction because Fish and Wildlife "challenge[d] what the district court ordered it to do on remand" and "contend[ed] it should not be required to consider" some of the "distinct issues" the district court ordered it to consider. 965 F.3d at 676. So too here. Indeed, this Court already concluded as much in *Petrick* when confronted with this argument, where it was enough that the Forest Service "challenge[d] what the district court ordered it to do on remand." 68 F.4th at 487.

This Court has Article III jurisdiction over the agencies' appeal.[1] Dismissing this appeal is unwarranted.

---

[1] For similar reasons, this Court has jurisdiction over CBD's cross-appeal, which seeks to add to the list of issues the government must address on remand.

## II. The biological opinion's population estimate satisfies the ESA's best available science requirement.

"The determination of what constitutes the 'best scientific data available' belongs to the agency's special expertise." *San Luis*, 747 F.3d at 602. As explained in the agencies' first brief on cross appeal, Fish and Wildlife reasonably extrapolated, using a well-established statistical method, grizzly population levels to present day from a comprehensive study of 2012 population levels that CBD acknowledges as the best available population estimate for that year. Op. Br. 24-32; 2-ER-249-54; CBD 2d Br. 30. In doing so, Fish and Wildlife avoided the shortcomings of the minimum annual count and known mortality data that CBD contends is the best available indication of population size and trend. CBD identifies uncertainties in the data underlying Fish and Wildlife's statistical approach and extols the virtues of its own preferred data, but presents nothing demonstrating that its proffered data is "in some way better than the evidence [the agency] relies on," such that it was arbitrary for the agency to find other evidence more credible. *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080-81 (9th Cir. 2006) (cleaned up). The district court erred in failing to defer to the agency's informed choice.

### A. Fish and Wildlife used a sound method to estimate the baseline population.

Fish and Wildlife's method was sound, and although there is inherent uncertainty in the statistical model Fish and Wildlife used to estimate grizzly populations, the agency adequately explained its choice. *San Luis*, 747 F.3d at 633.

The biological opinion explains that Kasworm et al. (2021), which estimated 60 bears in the Cabinet-Yaak ecosystem, was "[t]he best estimate of population size." 2-ER-251. As the agency explains, Kasworm "use[d] a method of estimating population change that has been published in at least three different peer-reviewed journals and is a scientifically based technique to estimate population trend . . . ." 2-ER-250. The biological opinion sets out Kasworm's basic three-step approach. First, Kasworm pegged the population in 2012 at 48 to 50 based on Kendall, et al. (2016), a "rigorous" five-year study that CBD agrees is best-available science for the 2012 population size. 2-ER-250; 2-ER-165-66; *see* CBD 2d Br. 30. Second, Kasworm multiplied the 2012 population size by the population growth rate. 2-ER-250-51. This growth rate was based on a conservative, peer-reviewed method that takes data on the ecosystem's radio-collared bears from as far back as data exists and runs it through specialized software under 5,000 scenarios to account for annual variations in survival and reproduction. 2-ER-251; 4-ER-771-72. Third, Kasworm accounts for bears that are added to the population through augmentation programs. 2-ER-251. This method resulted in a population estimate of 60 bears. *Id.*

To be sure, as CBD points out, CBD 2d Br. 25-26, Fish and Wildlife itself recognized the uncertainty inherent in the population growth rate, explaining that "the exact number of individual[] [bears in the ecosystem] is unknown, and is a dynamic number that is difficult to pinpoint." 2-ER-249-50. Though Fish and Wildlife determined that Kasworm's method produced "[t]he best estimate of population

size," the agency examined other evidence, because "other sources of data can also inform and add or subtract certainty" where "statistical uncertainty exists." 2-ER-251. That evidence included "the reduction in mortality rates" over time "and the stable to increasing known reproduction and occupancy" by female bears. 2-ER-251. Fish and Wildlife also examined survival rates from its own species status assessment, which shows that "[s]urvival of adult female grizzly bears has improved over the years, and is currently ranked as 'High.'" 2-ER-253.

Notably, this conglomerate of data includes the mortality data that CBD relies on. *See* CBD 2d Br. 27-29. Fish and Wildlife's biological opinion catalogues "known and probable grizzly bear mortality" back to 1982. 2-ER-253. The opinion breaks down those known mortalities by cause, including human causes, natural mortalities, and other causes. *Id.* And it explains where in relation to open roads and core habitat known human-caused mortalities occurred. *Id.* The biological opinion also incorporates mortality rates into its consideration of data sources to "inform and add or subtract certainty" to its determination that the population in the ecosystem is increasing. 2-ER-251. But rather than use known mortality data standing alone, Fish and Wildlife considered mortality with "a correction factor to account for unreported mortalities." 2-ER-253. Thus, as Fish and Wildlife explained, "while the number of unreported human-caused mortalities is not precisely known, its influence is captured in population estimates" alongside known mortalities. 2-ER-253.

CBD and the district court both fault Fish and Wildlife for giving insufficient attention to mortality data. 1-ER-18; CBD 2d Br. 27. That Fish and Wildlife considered both known and unknown mortality rebuts that conclusion. Given that the district court otherwise correctly noted that the statistical method Fish and Wildlife relied on "is scientifically accurate," 1-ER-18, its failure to account for the full breadth of discussion of grizzly bear mortality in the biological opinion is legal error. That discussion reflects consideration of all relevant factors, entitling the agency to deference. *San Luis*, 747 F.3d at 601.

CBD is also incorrect that Kasworm and Fish and Wildlife's discussion of known and unknown mortality data merely "recycle[s] [the agency's] consideration of the [species status assessment]," a separate assessment of grizzly bears' status. CBD 2d Br. 32-33. As just discussed, p.11, the biological opinion treats mortality data in detail. That discussion is separate from its discussion of survival rankings in the species status assessment. *See* 2-ER-253.

Fish and Wildlife also cited its species status assessment, which confirms a positive population trend. 2-ER-252-54. The species status assessment deals with not only survival, but also "occupancy of [bear management units] by reproductive females" and "sightings of females with young." 2-ER-253. Fish and Wildlife considered "known reproduction and occupancy of [bear management units] by females" as one part of "the conglomerate of the best available science suggest[ing] an improving trend in the population." 2-ER-251. It is true, as CBD points out, that the

species status assessment relies on Kasworm's data regarding radio-collared bears, which are one subset of the population. CBD 2d Br. 31-32. But using that data over longer time periods is nonetheless valid evidence of trends. 2-ER-253; 2-ER-167-68.

Fish and Wildlife also considered the annual minimum count data that CBD and the district court rely on, but did not include it in the "conglomerate of best available science" when analyzing population trends. *See* CBD 2d Br. 26. The minimum count data reflects "a minimum 50 individual grizzly bears alive and in the [Cabinet-Yaak Ecosystem] grizzly bear population at some point during 2019." 4-ER-732. But minimum count data does not indicate an increase in grizzly bear mortality or a decrease in population size. 2-ER-251. As the biological opinion explains, "[t]o rely solely upon a count of the known detected individuals is an over-simplification of population biology," because "minimum counts are influenced by the level of effort available each year" by the agency and its partners. 2-ER-251. The agency's decision not to rely on minimum count data for population trends is thus reasonably explained. And, as discussed in the next section, pp.15-19, the problems with this data and CBD's reliance on known mortalities means that this science is not "in some way better than the evidence [the agency] relies on." *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080-81 (9th Cir. 2006) (cleaned up).

Though CBD's primary concern is with the rate-of-increase multiplier and the conclusion underlying it that the Cabinet-Yaak population of grizzlies is increasing, CBD attempts to cast doubt on two other aspects of Fish and Wildlife's population

estimate. CBD says that, together with the uncertain growth-rate multiplier, these elements of Fish and Wildlife's analysis create "layer upon layer of assumptions." CBD 2d Br. 25. First, CBD says that using data from 1983 to 2020 "to predict the population's *current* growth rate is dubious at best." CBD 2d Br. 25. CBD cites nothing for this proposition. In contrast, the agency provided good reasons for using this long time-horizon: it "smooth[s] the data over time" given the small sample size for the ecosystem, creating "a more conservative estimate of population trend," 4-ER-771. Indeed, using data that includes "years when the population was so small that it was believed to be 'declining toward extinction'" (CBD 2d Br. 24)—as the agency did here—results in a *conservative* population estimate, 4-ER-771, not a "best-case scenario," CBD 2d Br. 26.

Second, CBD complains that Kasworm "adds an additional four bears to [its] estimate" by "assuming the survival of four of the eight bears that were augmented . . . since 2012." CBD 2d Br. 25. The record explains this as well. Bears captured elsewhere were added to the ecosystem in the 1990s and 2000s. 4-ER-757. Since the comprehensive 2012 population estimate, the "program added 8 bears . . . but four of those have either left the target area or are known dead." 4-ER-772. The agency thus reasonably assumes that the remaining four bears should be included in the population total for 2020. CBD fails to demonstrate otherwise.

The district court correctly noted that "[s]tatistical modeling is scientifically accurate," but then erred in finding the agency's analysis arbitrary because "documented deaths of female bears cannot be ignored." 1-ER-18. As discussed above, the agency did not ignore documented bear deaths; it incorporated them into its analysis. And, as discussed in the next section, the agency reasonably concluded that the data the district court credited and CBD relies on was not the best available for population estimates, even if worthy of consideration (which the agency gave it). The agency acted well within its "discretion to choose among scientific models." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014).

### B. CBD fails to show its proposed interpretation of data that Fish and Wildlife considered renders the agency's interpretation arbitrary.

The district court acknowledged that Fish and Wildlife's statistical approach was reasonable. 1-ER-18. It also acknowledged that Fish and Wildlife "considered using minimum counts for bear population determinations, as Plaintiffs argue is necessary." 1-ER-17. And though the district court did not directly address Plaintiffs' arguments about known mortality data, the agency considered that information as well. 2-ER-253. Those facts combined should have resulted in deference to the agency's ultimate choice. After all, "[a]n agency complies with the best available science standard so long as it does not ignore available studies, even if it disagrees with or discredits them." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014).

15

### 1. Relying on minimum counts to estimate population size is scientifically inappropriate.

Take minimum count data first. It is true that, across all detection methods, including tree rubs, capture, collaring, other DNA sample sources, photos, and credible observations, 2-ER-251, fewer bears were detected in the Cabinet-Yaak ecosystem in more recent years than in the period between 2015 to 2017. CBD 2d Br. 27. But the biological opinion explains that minimum counts are only "a *minimum*" that "do[] not account for individuals that were not detected," 2-ER-251. In other words, minimum population counts reflect not just the population, but also the level of effort that is made during the count. 2-ER-251. Thus, "[t]o rely solely upon a count of the known detected individuals is an over-simplification of population biology." *Id.* The agency concluded that relying on them would be "biologically inappropriate." 2-ER-251. By contrast, Kasworm's statistical method does not contain the significant fluctuations that the annual minimum counts do because of fluctuating levels of effort and detection. 2-ER-251.

The district court declined to defer to the agency's reasoned explanation for why minimum counts were not best available science for a population estimate. The court reasoned that the agency "failed to explain how the amount of resources going into minimum counts correlates with the actual numbers of bears found each year." 1-ER-17-18. But the agency's path to that conclusion was reasonably discernable. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). The

biological opinion specifically noted that "minimum counts are influenced by the level of effort," which, in turn, "is influenced by funding, number of personnel, area of emphasis, and most recently COVID-19 work restrictions." 2-ER-251. This stands to reason. For example, if personnel take samples from areas where bears happen to be in a particular year, they will yield more results; if their "area of emphasis" is elsewhere, however, the results could skew lower. *Id.* That is why is it is "biologically inappropriate" to rely on minimum count data in the way both the district court and CBD do. 2-ER-251. It is not the courts' role to second-guess this judgment call. *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 659 (9th Cir. 2009).

CBD also asserts that minimum count data is reliable because it "us[es] consistent methodologies over time" and "consistent efforts have been made over time for at least some monitoring elements" included in annual minimum counts. CBD 2d Br. 26, 34. It is true that minimum counts use the same basic approach to detect bears every year, but that has nothing to do with whether the results are a reliable indication of population size. After all, the fundamental shortcoming of this data remains constituent over time too—that it "does not account for individuals that were not detected." 2-ER-251. And, contrary to CBD's assertion, the level of monitoring has not been consistent over time. Even though the number of tree rub samples collected in recent years has been more or less consistent (CBD 2d Br. 34), those efforts have varied widely since 2012. Tree rub samples were as low as 344 in 2020 and 488 in 2013, half the amount in more recent years. 8-ER-1929. And annual

minimum counts also include detection methods like capture, collaring, other DNA sample sources, photos, and credible observations. 2-ER-251. These other inputs varied widely year-to-year. *See, e.g.*, 4-ER-754 (8 credible sightings in 2017 and 20 in 2018), 4-ER-759 (reflecting single digit hair snag samples in earlier years, 39 hair snags in 2018, and 92 in 2019). The agency thus reasonably rejected minimum counts as a reliable population metric based on variable levels of effort and it was reversible error for the district court to conclude otherwise.

### 2. Known mortality data provides an incomplete picture and is thus not a reliable way to estimate population size.

Take CBD's proffered mortality data next. As the biological opinion explains, known mortality data "probably results in under-estimates of total human-caused mortality." 2-ER-253. For that reason, the statistical method Fish and Wildlife selected "use[s] a correction factor to account for unreported mortalities when calculating survival rates that influence population growth rate estimates."[2] *Id.*; *see supra* pp.11-12. As Wayne Kasworm, lead author of the various monitoring reports and co-author of the Kendall study estimating the ecosystem's grizzly population as of 2012, explains, detecting additional mortalities "does not equate to a declining grizzly bear population." 2-ER-167. Rather, the pertinent inquiry is what years-long trends

---

[2] It is unclear what CBD means when it says that mortality data is "not acknowledged in the [biological opinion]." CBD 2d Br. 27. The data is discussed in detail. 2-ER-253.

suggest. 2-ER-167-68. For example, "[i]f two adult female grizzly bears die annually for multiple years in a row, without commensurate immigration, augmentation, and/or natural recruitment, then the population could begin to see a declining trend again." 2-ER-167. But "one year of higher mortality does not necessarily equate to a decreasing trend." *Id.* Indeed, relying as CBD does on detected mortalities alone overlooks increases from reproduction, immigration, and augmentation programs. 2-ER-167. That is why Fish and Wildlife chose a statistical method that accounts for longer term trends in population size and incorporates the full picture of increases and decreases in population size, including both known and unknown mortalities (*see supra* pp.9-12), to estimate population size. That choice is entitled to deference.

* * *

In sum, the agency explained its choice to use a statistical method for its population estimate and explained the shortcomings of CBD's preferred data. The district court erred in failing to defer to the agency's informed choice, and CBD fails to demonstrate that its data is "in some way better" than the method Fish and Wildlife chose. *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080-81 (9th Cir. 2006) (cleaned up).

## III. The Forest Service's determination that the project is consistent with Access Standard 2 satisfies NFMA and the APA.

The agencies' first brief demonstrates that the district court erred in concluding that "the [Forest Service] has failed to demonstrate how it has complied with" Access

Standard 2, the Forest Plan's set of limits on motorized use within the Cabinet-Yaak ecosystem, in violation of NFMA. Op. Br. 32-42; 1-ER-45. The Forest Service satisfied both its own regulations' procedural requirement to explain how the project complies with Access Standard 2 and NFMA's substantive requirement that the project be consistent with the Forest Plan. *See* Op. Br. 32-42. Alliance has not shown otherwise.

### A. The Forest Service's interpretation of Access Standard 2 and its application to the facts here was reasonable.

The Forest Service's discussion complies with both the procedural and substantive requirements of NFMA, and Alliance's contrary arguments fail.

#### 1. The Forest Service reasonably explained its approach to unauthorized motorized use.

Access Standard 2 sets out a maximum density level for open and total roads, and a minimum level of "core area" for each bear management unit. 5-ER-993; 7-ER-1472-54; 8-ER-1859. To explain its compliance with these metrics, the Forest Service's decision document catalogues all roads that the project will affect. 7-ER-1686-92. For each change to a route associated with the project, the Forest Service describes the change, its timing, and the reason for it. *Id.* The Forest Service also documents "[i]n-kind [r]eplacement of Core [habitat] to meet Forest Plan [Access Standard 2]," 7-ER-1692; 7-ER-1686-92, as well as new gates, other restrictions on motorized access, and other actions aimed at habitat security. 7-ER-1686-92. Based

on its analysis of resulting road density totals, the Forest Service concluded that "proposed activities would be compliant with [Access Standard 2]." 7-ER-1655.

This discussion reflects compliance with the procedural requirement that the Forest Service explain the project's consistency with the Forest Plan. *See* Op. Br. 32-36; 36 C.F.R. § 219.15(d). And, because the Forest Service's explanation shows "a rational connection between the facts found and the conclusions reached," *Sierra Club v. Bosworth*, 510 F.3d 1016, 1023 (9th Cir. 2007), it satisfies NFMA's substantive requirement that the project be consistent with the Forest Plan. Op. Br. 37-42. The additional discussion in the environmental assessment for the project reinforces this conclusion. There, the Forest Service describes existing road density conditions, provides charts reflecting all project effects on those density metrics, and concludes, following nearly 10 pages of discussion, that "[b]oth action alternatives would meet [Access Standard 2]." 8-ER-1770; *see also* 8-ER-1757-62, 1767-72.

Ignoring these extensive discussions, Alliance maintains that it is "impossible to determine whether the [p]roject complies with [Access Standard 2], which violates NFMA and NEPA," because the Forest Service does not include "known user-created roads and roads with known breached closures" in its density metrics.[3] All. 2d

---

[3] In the section of Alliance's brief from which this quote is drawn, Alliance cites no NEPA regulation. All. 2d Br. 42-54. Alliance thus conflates, as the district court did, NFMA's requirement that the project be consistent with the Forest Plan with NEPA's separate, procedural requirements. The Forest Service's compliance with NEPA is discussed below, *see* pp.37-55.

Br. 42. Alliance acknowledges that the Forest Service *does not* include temporary and sporadic unauthorized use in its road density calculations. All. 2d Br. 42. Alliance thus makes the same error as the district court, which determined that the Forest Service's analysis was "vague and indecisive," because "the [Forest Service] does not include illegal motorized road use that it knows occurs into its calculations," 1-ER-48. If it is clear (indeed, it is undisputed) what the Forest Service includes in its road density metrics, it cannot simultaneously be impossible to determine the Forest Service's approach. The Forest Service's discussion is thus not unlawfully vague.

Properly considered, the district court's and Alliance's disagreement is with the substance of the Forest Service's explanation, not its clarity: they disagree with the Forest Service's decision not to include non-chronic and temporary unauthorized use in Access Standard 2's "total," "open," and "core" metrics. *See* 1-ER-48 (faulting the Forest Service's conclusion because it "does not include illegal motorized road use that it knows occurs into its calculations"); All. 2d Br. 53 ("[B]y excluding known user-created roads and known breached roads from Access [Standard 2] calculations . . ., the Forest Service is impermissibly excluding roads with actual motorized use from Access [Standard 2] calculations"). The question, then, is whether the Forest Service's approach was reasonable.[4] As the Forest Service explained, "unauthorized

---

[4] Under binding circuit law, courts must defer to the Forest Service's reasonable interpretation and implementation of a forest plan. *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012). Deference to the Forest Service's expert determination of what specific steps are needed to satisfy a plan's scientific standards

use on any given route is *not* chronic from year to year" and thus "does not contribute to a long term or permanent change to the routes database." 8-ER-1806. Moreover, because "[i]llegal motorized access is expected to be spatially disparate and temporary," it "is not likely to collectively cause an adverse effect" on grizzlies. 2-ER-291. Underscoring the reasonableness of the Forest Service's approach, the agency *does* count chronic unauthorized use in the sole instance of "strong patterns of use" and "historic unauthorized use" in the action area. 5-ER-1130; *see* Op. Br. 38-40. Access Standard 2 does not speak directly to this point, but, in other contexts, it embraces temporary deviations from density and core standards.[5] *See* 7-ER-1540. The Forest Service's interpretation of Access Standard 2 as focusing on permanent conditions was reasonable and thus entitled to deference.

For the first time on appeal, Alliance asserts that "any road with actual motorized use must be included in road density calculations and excluded from core blocks" based on the Forest Plan's definitions. All. 2d Br. 43. It is not that simple.

_____

is consistent with APA Section 706. *See Loper Bright v. Raimondo*, 144 S. Ct. 2244, 2261 (2024) (recognizing that the APA "mandate[s] that judicial review of agency policymaking and factfinding be deferential").

[5] It is true, as Alliance points out, that the District of Montana in *Alliance for Wild Rockies v. Probert*, concluded "that the nature and impact of the temporary use considered in the Access Amendments is different from illegal use precipitated by ineffective closures." 412 F. Supp. 3d 1188, 1204 (D. Mont. 2019). We agree that temporary increases contemplated by the Access Amendments are not the same as those here. But that is the point—the Access Amendments do not speak directly to this issue.

Roads include "[a]ll created or evolved routes that are greater than 500 feet long . . . [and] are reasonably and prudently drivable with a conventional passenger car or pickup." AllianceSER-130. Under this definition, not every route "with actual motorized use" counts. *See* All. 2d Br. 43. Only those of a certain length and those that, under an objective standard of reasonableness and prudence, are "drivable," count. AllianceSER-130. Other definitions Alliance cites afford more nuance than Alliance allows—a restricted road may still receive motorized administrative use "at low intensity levels," AllianceSER-130; a reclaimed or obliterated road is "managed with the long-term intent for no motorized use," AllianceSER-130-31; and a barriered road is one with a barrier designed to "prohibit all motorized use," *id.*, but may not prevent occasional illegal use by an unreasonable or imprudent driver.[6] These definitions do not speak to the issue of disparate and temporary use, and thus do not preclude the Forest Service's approach on that front.

In any event, the record reflects the agencies' informed judgment that disparate and temporary unauthorized uses, though inherently uncertain in frequency, are "anticipated to be low" and are "not likely to collectively cause an adverse effect [on grizzly bears] because most Forest users follow travel regulations and when illegal use is observed, or when user-created roads become apparent, the Forest corrects the

---

[6] Though not materially different from the recovery plan definitions Alliance cites, the Forest Service uses the definitions developed by the Interagency Grizzly Bear Committee, which combines barriered roads with reclaimed and obliterated roads in one category. 7-ER-1530-1531; *see* 7-ER-1523.

situation as soon as they are able." 5-ER-921; *see also* 8-ER-1762. Moreover, "illegal motorized access would most likely result in temporary effects to grizzly bears as opposed to a permanent change in motorized access conditions." 5-ER-921-22; *see also infra* pp.27-30. The Forest Service's expert determination that limited unauthorized uses do not affect bears the same way as chronic uses supports its view, and that factual determination is entitled to deference. *Ursack Inc. v. Sierra Interagency Black Bear Grp.*, 639 F.3d 949, 958 (9th Cir. 2011).

## 2. The Forest Service's approach is consistent with Ninth Circuit law.

Relying on *Alliance for the Wild Rockies v. Bradford*, 856 F.3d 1238 (9th Cir. 2017), Alliance contends "that illegal roads must be considered in [Access Standard 2] calculations," and a remand is required because they "are not included in the calculations [here]." All. 2d Br. 47-48. The Court in *Bradford* made its holding clear: "[w]e hold that it was not arbitrary and capricious for the Forest Service to conclude that roads closed to motorized access by berms or barriers do not count toward 'linear miles of total roads.'" 856 F.3d at 1243. Though "Alliance . . . proffered arguments that support a different reading" of the Forest Plan's access standards, "none render[ed] the Forest Service's interpretation unreasonable." *Id.* The same is true here—the Forest Service reasonably concluded that only chronic unauthorized use that is not "spatially disparate and temporary" needs to be counted against road density metrics. 2-ER-291.

Alliance says that *Bradford* also held that "if a closure is ineffective, then the road does count." All. 2d Br. 46. For this proposition, Alliance cites not to the paragraph that begins with "[w]e hold," but to a paragraph discussing an argument raised for the first time at oral argument. There, the Court in *Bradford* explains that Alliance provided no evidence to support its suggestion at oral argument that berms "will not effectively prevent motorized use." 856 F.3d at 1243. For that reason, the Court "t[ook] the Forest Service at its word, with the understanding that any closure that fails to effectively prevent motorized access also fails to comply with [access standards]." *Id.* As discussed in the next section, Alliance here, as in *Bradford*, fails to support its claim that closures are ineffective. *See infra* pp.30-35. But, in any event, this portion of the *Bradford* opinion is dicta, as it addresses a hypothetical situation not before the Court there. *See United States v. Johnson*, 256 F.3d 895, 915-16 (9th Cir. 2001) (holdings are only those "specifically ruled on").

Alliance also relies on *Alliance for the Wild Rockies v. Savage*, 897 F.3d 1025, 1035-37, n.16, n.18 (9th Cir. 2018). All. 2d Br. 48. The Court in *Savage* held that the Forest Service violated the APA because it was impossible to discern from the record in that case whether the "undetermined roads" that the Forest Service planned to decommission were included in the baseline. 897 F.3d at 1035-36. In other words, it was not clear that decommissioning these undetermined roads would result in a net equivalence or decrease in total roads in the relevant area, as required by the Access Amendment metrics applicable in that case. *Id.* Here, unlike in *Savage*, there is no

ambiguity about what the Forest Service included in its baseline. As both the district court and Alliance recognize, the Forest Service does not include temporary and sporadic unauthorized motorized use in its road density calculations. 1-ER-48; All. 2d Br. 42. The question here, which was not presented in *Savage*, is whether this interpretation and application of Access Standard 2 was reasonable. For the reasons already discussed, it was, and nothing in *Savage* counsels a different result.

### 3. The Forest Service reasonably explained why unauthorized use was temporary and disparate, and was unlikely to harm grizzlies.

Alliance's final argument on how Access Standard 2 applies here is that the record contradicts the conclusions that (1) most unauthorized use in the project area is temporary and disparate, and (2) these unauthorized uses do not harm grizzlies. All. 2d Br. 50-52. That is incorrect.

Alliance says that "the recurring nature of illegal use is chronic, even if any one particular road is not permanent." All. 2d Br. 51. The agencies do not dispute that illegal use continues to occur across the landscape. As Fish and Wildlife recognizes, "some Forest users have, and will likely continue to break the law and drive motorized vehicles where such use is illegal." 2-ER-263. But that determination does not conflict with the separate conclusion that "illegal use was not concentrated in any given area," "was not chronic," and "when road breaches have occurred in the past," the Forest Service promptly makes repairs. 2-ER-263; *see also* 8-ER-1762. Both can be true: unauthorized use itself can be recurring yet remain "spatially disparate and

temporary." 2-ER-291. It is the latter that makes it unlikely that these uses will "collectively cause an adverse effect" on grizzlies. *Id.*

In any event, Alliance does not suggest what the Forest Service should do with the fact that unauthorized use itself—though spatially disparate—is a consistent problem. That fact itself does not provide the Forest Service with enough information to make a reasoned decision about what roads to count toward density metrics and what closed routes can be deemed effective. The Forest Service instead took the more reasonable approach, supported by the evidence, of counting only chronic uses against its road density metrics, while recognizing that other sporadic unauthorized use is inevitable.

Alliance similarly argues that "the record . . . disproves the assertion that the Forest Service promptly remedies illegal use." All. Br. 52. For this argument, Alliance points to the Forest Service's 2020 Forest-wide monitoring report. There, the Forest Service acknowledged that Covid-19 resulted in deferred maintenance. 5-ER-1069. But that work was scheduled for the next year, and other reports confirm the Forest Service's statement that illegal use is remedied—in 2019, for example, the Forest Service made repairs across the Cabinet-Yaak ecosystem "as soon as possible." 4-ER-853; *see also* 4-ER-841-48 (chart summarizing bear management unit road density, noting several repairs).

Alliance's related assertion that "sporadic, unpredictable motorized use can be more harmful to grizzly bears than permanent use," All. Br. 51, oversimplifies the

problem. It is true that bears that already have negative associations with roads may be more disturbed by isolated uses than consistent uses. AllianceSER-206. But as the Forest Plan biological opinion explains, the scientific literature on this topic is far more mixed than Alliance's argument allows: some studies found that grizzlies did not avoid restricted roads or used those areas similarly "to unroaded habitat." 5-ER-931. Limitations on trips—not complete elimination of road use—"may be able to reduce or eliminate displacement that results from grizzly bears avoiding restricted roads." *Id.* And the Grizzly Bear Recovery Plan that Alliance cites ultimately recommends closing roads "to public motorized use by gates or other methods" and limiting "administrative use by motorized vehicles . . . to one or two periods that together [do] not exceed 14 days during the time bears are out of the den."[7] AllianceSER-208. The Recovery Plan thus contemplates that some limited motorized use would continue even under its recommendations despite the risk of disturbance to some bears that have existing negative associations with roads. AllianceSER-208.

In any event, the question under NFMA is whether the Forest Service complied with the Forest Plan's Access Standard 2 in approving the project, not whether it remains possible that some unauthorized motorized use in the project area

---

[7] This 1993 document uses a proposed definition of closed roads that includes administrative roads, so when that document recommends roads be "closed," that does not necessarily mean those roads would see zero authorized use. AllianceSER-208 (noting that "[a]dministrative use often continues behind gates on roads although such roads are considered 'closed' in road density calculations").

may cause some bears with negative associations with roads to continue to avoid them. *Oregon Nat. Desert Ass'n v. United States Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020).[8] The Forest Service's analysis reflects no "clear error of judgment," *id.* (cleaned up), in its determination that the Black Ram project is consistent with Access Standard 2.

### B. The Forest Service reasonably concluded that the evidence Alliance points to does not show uncounted unauthorized use.

The Forest Service's interpretation of Access Standard 2, under which it counts chronic unauthorized motorized use, but not temporary and sporadic use, was reasonable. But even if Alliance is correct that even temporary and sporadic uses should count, Alliance has not actually provided evidence of unauthorized use that would change road density metrics if the Forest Service counted it. The premise of Alliance's argument—that "this case supplies . . . factual evidence" of ineffective motorized use prevention, All. 2d Br. 47—is thus incorrect.

Alliance asserts that "the record in this case is replete with evidence of dozens of ineffective closures and user-created routes, from both public monitoring done by

---

[8] We did not ask this Court to "apply *Marten I*" as Alliance contends. *Id.* 52. Rather, we pointed out that *Marten I* correctly noted that "the mere possibility that planned road closures will be ineffective" does not render the agency's analysis arbitrary, *All. for the Wild Rockies v. Marten* (*Marten I*), 464 F. Supp. 3d 1169, 1176 (D. Montana 2020), while more recent District of Montana cases, inconsistent with fundamental APA review principles, require that the agencies must in some way account for unauthorized use despite their explanations for why they need not do so. Op. Br. 40-41.

Yaak Valley . . . as well as the Forest Service's own monitoring report." All. 2d Br. 47-48. Following Yaak Valley's "public monitoring," it submitted photos to the Forest Service in July and November 2021. 8-ER-1835; 9-ER-2178. Alliance characterizes these photos in its brief as showing "ineffective barriers and instances of illegal motorized use," areas "with established trails," "ineffective gates," and "roads with no gate or berm." All. 2d Br. 20, 26, 27, 28; *see* 8-ER-1810-30; 9-ER-2183-2207.[9] Alliance includes the Forest Service's response only for some photos, but the Forest Service specifically responded to each photo with existing closure monitoring data, along with photos Forest officials took when investigating and a factual finding about the status of the area. 8-ER-1810-30; 9-ER-2183-2207.

Indeed, despite Alliance's characterizations, the Forest Service found that only four of the 20 sites included in Alliance's July 2021 submission reflected motorized use at all. 8-ER-1818-19, 1821. Of those, one was already "consider[ed] . . . open . . . due to use," 8-ER-1818; two were documented as user-created routes as of 2021, 8-ER-1818-19; and the fourth route was an "unauthorized, user-created route" as of

---

[9] The photographs and accompanying text that Alliance includes in its brief is modified from what was submitted to the agency. *Compare* All. 2d Br. 20, 26, 27, 28 *with* 8-ER-1810-30; 9-ER-2183-2207. Most accompanying notations included in the brief differ from what was submitted and included in the record. *Id.* For example, the notes accompanying the original submission for the first picture on page 20 of Alliance's brief made note of grizzly bear tracks in the snow; that note is excluded in Alliance's brief. 8-ER-1810; All. 2d Br. 20.

August 2020 that was repaired with an earthen berm in spring 2021, 8-ER-1821.[10]

Likewise, Alliance's November 2021 submission included 55 purported routes, each with multiple photos (Alliance excerpts some of these, omitting the Forest Service's responses, on pages 26-28 of its brief). *See* 9-ER-2183-2207. The Forest Service concluded that 52 of the 55 closures included in this submission had fully functional closures and found no evidence of unauthorized motorized use. 9-ER-2187, 2196, 2202. One site reflected "[p]ossible motorized use," but the barrier "was improved in 2021." 9-ER-2187. Another site—outside the Black Ram project area—was initially listed as not functional, but relisted as functional after a repair in November 2021. 9-ER-2196. The third site is a flat area that "[m]ay be an undetermined, old route," but is impassable at various points by a reasonable, prudent user. 9-ER-2202. For this area, the Forest Service acknowledged tire tracks in the Yaak Valley photo, but noted that they "appear to be those of a vehicle that may have turned around at that location, but did not travel off route." *Id.* (typographical error corrected).

Alliance relies on its own interpretation of this evidence for the premise of its argument that "actual motorized use" is occurring but is not being counted. All. 2d Br. 45, 53. Yet "[e]ven if the evidence is susceptible of more than one rational interpretation, the court must uphold the agency's findings." *San Luis*, 747 F.3d at 601

---

[10] User-created routes are "not included in a forest transportation atlas." 7-ER-1448. And they are generally not counted in road density metrics because they reflect temporary deviations given that they are quickly repaired. 8-ER-1762

(cleaned up). Indeed, as an explicit factual finding, the agency's determination about the existence and extent of actual motorized use is subject to the substantial evidence standard, and must be upheld "unless the evidence in the record would *compel* a reasonable finder of fact to reach a contrary result." *Ursack Inc. v. Sierra Interagency Black Bear Grp.*, 639 F.3d 949, 958 (9th Cir. 2011) (cleaned up). Alliance's photographs are, at best, inconclusive, and hardly compel a different result.

There is also reason to doubt Alliance's interpretation beyond the Forest Service's contrary view. Even assuming Alliance's evidence reflects some unauthorized motorized use, Alliance fails to show that it should affect road density metrics. Alliance's photographs are taken from existing open, public routes. 9-ER-2183 ("It appears that all of Mr. Holloway['s] photographs were taken from the vantage point of the adjacent open road."). Even assuming unauthorized use or user-created routes in those areas (which the Forest Service did not find evidence of), routes within 500 meters of existing open routes are already included in "open" and "total" road metrics, and do not count toward core grizzly habitat. 5-ER-1039-40; 7-ER-1436, 1440, 1448. To credit Alliance's premise would also require assuming that all ruts and paths are created by motor vehicles rather than bicycles, foot traffic, or equestrians, which are permitted on closed routes and would not affect the agency's core habitat calculations. *See* 8-ER-1817 (Yaak Valley comment on its own photo noting existence of "[s]ingle track rutting from [motor vehicle] or fat-tire bike" (cleaned up)). Finally, several sites included in the photo submissions are not in the

33

Black Ram project area at all, 9-ER-2191, 2192, 2196, 2204, 2207, and thus are irrelevant to whether the project is consistent with Access Standard 2. In short, there is no good reason to credit Alliance's evidence over the Forest Service's informed factual determinations. *Ursack*, 639 F.3d at 958; *San Luis*, 747 F.3d at 601.

Alliance also points to "the Forest Service's own monitoring report" to support its argument that the Forest Service is ignoring unauthorized motorized use. All. 2d Br. 48. The district court likewise relied on the Forest Service's monitoring report to conclude that it acted unlawfully. 1-ER-56-57. It is true, as the district court pointed out, the Forest Service's monitoring revealed unauthorized motorized use in three years between 2012 and 2020. *See* 1-ER-57. But this data catalogues breaches across the Cabinet-Yaak Ecosystem, not just units 14 and 15, where the project is located. *See* 5-ER-1068. The report reflects *no unauthorized motorized use* on existing routes for the year in the project area (bear management units 14 and 15) and only one instance of unauthorized use on a user-created route that year. 5-ER-1111-17. That user-created route was scheduled for work in 2021. 5-ER-1117.

The upshot of all this data is that the Forest Service reasonably made factual findings that there are extremely low levels of unauthorized use in the project area and considered all of it in assessing road density metrics for the area. It is the Forest Service, not Alliance or the courts, that is charged with applying the Forest Plan to the facts on the ground in the Kootenai National Forest. The Forest Service's approach to that task was thorough and reasonable. And it is the Forest Service's view of the

evidence, not Alliance's, that controls. Under that view of Yaak Valley's submissions and the Forest Service's own monitoring and investigation, Alliance fails to demonstrate that "actual motorized use" would affect road density metrics for the project area.

## C. The Forest Service's method for calculating compliance with Access Standard 2 is entitled to deference.

Alliance argues that the Forest Service changed positions in 2020 by excluding "short-term temporary unauthorized motorized access" from its road density calculations, 2-ER-317, undermining its entitlement to deference, All. 2d Br. 48-49. It is true, as we acknowledge in our opening brief, that before the Forest Service and Fish and Wildlife reinitiated consultation in 2020 over the Forest Plan, the Forest Service's annual monitoring reports treated all detected unauthorized use as altering open route density and total route density metrics for that bear year (April 1 through November 30). *See, e.g.*, 4-ER-847. From 2020 forward, the Forest Service "removed inclusion of short-term temporary unauthorized motorized access in the bear year metric calculations." 2-ER-317.

That change followed an order from the District of Montana in *Probert* to reinitiate consultation under the ESA on the Forest Plan to consider unauthorized motorized use. *All. for Wild Rockies v. Probert*, 412 F. Supp. 3d 1188, 1205 (D. Mont. 2019). The district court in *Probert* noted that "[t]he Forest Service is not required to reinitiate consultation in 'each isolated instance in which' there was an ineffective

35

barrier," but must nonetheless consult on "chronic deviations from the effective closures envisioned in the Biological Opinion." *Id.* Consistent with this discussion, the Forest Service's updated approach includes permanent, rather than short-term, temporary unauthorized motorized use in its road density metrics.

Alliance asserts that the Forest Service's updated methodology based on this court-ordered reinitiation of ESA consultation entitles it to "considerably less deference, if any" for its interpretation of the Forest Plan, because it "conflicts with [the Forest Service's] prior methodology." All. 2d Br. 49 (quoting *Amalgamated Sugar Co. LLC v. Vilsack*, 563 F.3d 822, 831 (9th Cir. 2009)). But an agency is permitted to reconsider determinations of policy, provided that it recognizes its change and provides a rationale. *Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 682 (9th Cir. 2016). The Forest Service did so here by acknowledging that it was making a change in its annual monitoring report for 2020, 2-ER-317, and explaining that there were good reasons for the change: sporadic unauthorized use "does not contribute to a long term or permanent change" of Forest conditions. 8-ER-1806. And, as already discussed, the updated methodology does not conflict with NFMA or Access Standard 2, whose definitions do not preclude this approach and whose metrics are tied to the *permanent* condition on the Forest. *See supra* pp.20-30.

\* \* \*

The Forest Service's approach was reasonable. That approach, including the details of its road density calculation method, is entitled to deference.

36

IV.     **The environmental assessment's discussion of unauthorized motorized use satisfies NEPA and the APA.**

A.      **The Forest Service reasonably complied with the requirement to identify methodologies in the environmental assessment.**

The district court erred in determining "that the [Forest Service] obscured its methodology for how it calculated compliance with the Access [Standard 2] in violation of NEPA." 1-ER-49; *see* Op. Br. 42-48. All NEPA requires is that the agency "identify" its methodology. 40 C.F.R. § 1502.24 (2018). The agency did this and more, reproducing much of its road density methodology directly. 8-ER-1760-62. The district court and Alliance apply a heightened standard that has no basis in the NEPA regulations.

Alliance contends that NEPA's methodology regulation required the Forest Service's environmental assessment "to disclose the fact that both user-created roads and breaches of existing road closures are excluded from Access [Standard 2] road density calculations and included in core calculations." All. 2d Br. 54-55. This contention has no basis in the text of NEPA's methodology regulation, which requires only that the agency "identify" its method, and Alliance cites no other authority for its argument. 40 C.F.R. § 1502.24; All. 2d Br. 54-55. In any event, the environmental assessment discusses unauthorized motorized use, explaining that the Forest Plan directs annual monitoring, and that "in this monitoring, [the Forest Service] report[s] motorized access effects against [road density] measures." 8-ER-

1762. Likewise, the environmental assessment explains that breaches are repaired as quickly as possible to "maintain [applicable] standards for core and motorize route densities." 8-ER-1762. Paired with the Forest Service's detailed explanation of how the project will affect Access Standard 2's metrics, this discussion satisfies NEPA's requirement that the agency "identify" its methodology.[11] 40 C.F.R. § 1502.24.

Any technical violation of NEPA's methodology regulation is also harmless. *See* Op. Br. 46-47. "The APA requires courts to take 'due account' of harmless error." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) (cleaned up). In the NEPA context, "[t]he harmless-error analysis asks whether the failure . . . materially impeded NEPA's goals—that is, whether the error caused the agency not to be fully aware of the environmental "consequences of the proposed action, thereby precluding informed decisionmaking and public participation, or otherwise materially affected the substance of the agency's decision." *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1104 (9th Cir. 2016). The publicly available biological opinion was even more explicit that, in general, "[t]he routes used to establish the permanent condition are those that are authorized routes." 8-ER-1806. Alliance's brief does not address the harmless error rule even though we raised it in our opening brief. All. 2d Br. 54-56.

---

[11] We also argued in our opening brief that "the district court erred in concluding that the incorporation-by-reference rule was implicated at all," because the agency identified its methodology in the environmental assessment directly. Op. Br. 44-46. Alliance does not respond to this argument. *See* All. 2d Br. 56.

**B.    The environmental assessment's discussion of unauthorized motorized use is sufficient under NEPA.**

The district court also erred in concluding that the Forest Service failed NEPA's hard look standard by assuming that illegal motorized use would be effectively restricted by the Forest Service's monitoring and maintenance measures. 1-ER-58; *see* Op. Br. 48-56. But the Forest Service made no such assumption, and otherwise satisfies NEPA.

Because unauthorized motorized use is part of background, or baseline, conditions rather than an effect of the action, the Forest Service complies with NEPA on this issue if its discussion is reasonable and does not "frustrate[] the [agency's] ability to take a hard look" at project effects. *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1104 (9th Cir. 2016); *see* Op. Br. 49-51. The environmental assessment satisfies this standard by recognizing past occasional unauthorized use and user-created routes, while explaining that monitoring and repairs ensure bear management units continue to meet road density standards. 8-ER-1762; *see* Op. Br. 49-55.

The district court concluded, and Alliance maintains, that this discussion is based on the incorrect assumption that the Forest Service can effectively restrict public use. 1-ER-53; All. 2d Br. 57-58; *see also* All. 2d Br. 56 (asserting that the Forest Service failed to take a hard look "at known ineffective barriers and illegal user-created roads"). But, as the district court recognized elsewhere in its opinion, the

Forest Service "acknowledges the history of breaches." 1-ER-57; *see also* 8-ER-1762.
Indeed, the environmental assessment itself says that the Forest Service can maintain
road density standards through road and barrier repairs upon discovery, not that it can
effectively restrict every instance of potential unauthorized use. 8-ER-1762. To the
extent that the district court's and Alliance's argument is based on the possibility that
the Forest Service's monitoring and repair efforts are not in fact sufficient to maintain
road density standards, that is, if anything, a NFMA issue, not a NEPA violation. And
substantive compliance with NFMA considers the entire administrative record, not
just the text of the environmental assessment. *See Oregon Nat. Desert Ass'n*, 957 F.3d at
1034 ("In our substantive review, we consider the administrative record and decide
whether" the Forest Service satisfied the APA's deferential review standard). As
discussed above, pp.19-36, the Forest Service reasonably concluded its approach
complies with its Forest Plan, and thus NFMA.

      In asserting a NEPA violation, Alliance argues that the environmental
assessment's explanation that occasional unauthorized use and user-created routes are
repaired as quickly as possible "provides the public with a broad, general
representation that is incorrect and inaccurate." All. 2d Br. 57. To support this
assertion, Alliance points to the monitoring data from 2020 that the district court
relied on for the same conclusion. All. Br. 57-58; 1-ER-57. But, as discussed, that
monitoring report explains that "covid-19 and other work limitations" prevented
normal repairs that year. 5-ER-1069, 1111. The 2019 monitoring report is more

representative: the Forest Service monitored 75% of gates and 63% of barriers across the Forest's recovery zones, well above the minimum of monitoring "at least 30 percent of all gates and barriers within the recovery zones." 4-ER-853. That same report notes several repairs or new berms or other obstructions in its breakdown of density standard metrics in each bear management unit. 4-ER-841-47.[12] That the Forest Service had to defer certain work because of the pandemic does not mean its overall observation that it makes repairs as quickly as possible is incorrect.

Alliance also points, as in its NFMA arguments, to Yaak Valley's photo submissions. All. 2d Br. 58. But, as discussed above, pp.30-35, the Forest Service investigated the sites Yaak Valley photographed and found scant evidence of unauthorized use or user-created routes, and made repairs in the few instances where these issues were discovered. In any event, the Forest Service's responses to Yaak Valley's photo submissions is consistent with the environmental assessment's explanation. Both recognize that unauthorized use sometimes occurs, but that the Forest Service takes the issue seriously and makes repairs when needed. 8-ER-1762, 1804; *see also* 5-ER-922 (noting that the Forest Service responds to illegal use "as soon as possible," which is sometimes "as simple as replacing a broken lock" but "[o]ther

---

[12] Alliance relies on the 2020 monitoring report, included in Fish and Wildlife's but not the Forest Service's record, to argue that the Forest Service's statements about repairs were "incorrect and inaccurate." All. Br. 57. At the same time, Alliance implies that the Forest Service's conclusions were arbitrary because it did not include the monitoring reports in its administrative record, and thus, apparently, did not consider them. *Id.* 58. Their exclusion from the Forest Service's record was inadvertent.

times may take a few days to a few weeks to replace a broken gate or device, or it may take longer to address the issue by adding boulders or taking other measures to attempt to block illegal motorized access"); 4-ER-853 ("Where road closures have been driven around, steps are taken to block this illegal access as soon as possible using boulders, earthen berms, cement posts, plantings, root wads, or other means.").

Alliance accuses the Forest Service of "refus[ing] to take any response action" in the face of known "illegal, user-created roads in the Black Ram Project area." All. 2d Br. 58-59. This is a reference to the Forest Service's response to 2 of the 20 photos submitted in July 2021. 8-ER-1818-19. It is true that the Forest Service noted that "[u]nauthorized use is illegal regardless of terrain," but, in the preceding sentence, the Forest Service notes that it "documented th[ese] routes" in 2021. *Id.* Elsewhere in this same document, the Forest Service notes repairs and other corrective actions it took in response to its investigation. *See supra* pp.31-32. Nothing here conflicts with the Forest Service's general statement that it makes repairs as soon as possible, because the open, flat terrain reflected in the two pictures Alliance singles out does not lend itself to effective closures. That the Forest Service recognized this fact by documenting the route only confirms the reasonableness of the agency's approach.

Finally, Alliance points to the District of Montana's decision on the NEPA claims in *Probert* for support. All. 2d Br. 59-61. As Alliance recognizes, however, the record there "assumed that all road closures would be effective following project implementation." *Id.* 59 (citing *Probert*, 412 F. Supp. 3d at 1207). That is not true here.

42

As discussed, the environmental assessment and biological opinion both recognize that unauthorized use has been discovered in the past, and monitoring and repairs will remain necessary. 8-ER-1762; 2-ER-263; *see supra* pp.27-28; Op. Br. 51. Given the differing administrative record here, *Probert*'s NEPA discussion is unpersuasive.

In sum, the district court erred in concluding that the Forest Service's NEPA analysis included a faulty assumption that road closures would be 100% effective, and that this assumption, combined with uncertainty surrounding the amount of unauthorized use, amounts to a NEPA violation.

## V.    Fish and Wildlife's jeopardy determination was reasonable.

The district court correctly upheld Fish and Wildlife's conclusion that the project was not likely to jeopardize the continued existence of the grizzly bear in the contiguous United States. 1-ER-21-24. In the sole issue in its cross-appeal, CBD asserts this was error. CBD 2d Br. 16-17, 35-42. The record shows otherwise. Fish and Wildlife thoroughly considered the project's potential impacts on the grizzly and reasonably concluded that the project was not likely to jeopardize the species.

### A.    The agency's no-jeopardy conclusion is well supported.

Section 7 requires that the Forest Service, in consultation with Fish and Wildlife, ensure that the project "is not likely to jeopardize the continued existence of any [listed] species." 16 U.S.C. § 1536(a)(2). Fish and Wildlife makes this jeopardy determination in its biological opinion by analyzing the effects on the listed species and adds those effects to the environmental baseline to "formulate [its] opinion as to

whether the action is likely to jeopardize the continued existence of [the] listed species." 50 C.F.R. § 402.14(g)(2)-(4); *see* 50 C.F.R. § 402.02.

Fish and Wildlife's biological opinion catalogues the possible effects on grizzly bears from the Black Ram project and compares them to baseline conditions for the grizzly bear. 2-ER-270-96. The opinion analyzes various sources of potential effects, including motorized use resulting from project activities; non-motorized access and improvement of recreation; vegetation and fire management; tree cover and forage habitat, denning habitat, connectivity with the rest of the ecosystem and other areas; and possible bear attractants and risks of human-bear conflict. 2-ER-270-87.

For the action area—bear management units 14 and 15—the agency notes that the area is already favorable for grizzlies and "two female grizzly bears are known to currently reside [there] and have successfully reproduced multiple cubs." 2-ER-292. Motorized access management is expected to result in adverse effects to female grizzly bears in the action area, including in-kind Core replacement and temporary changes to open and total motorized route densities. 2-ER-279-80. Considering all disturbance effects and even considering a separate prescribed burn project in the action area, "the amount of habitat to be affected is small in relation to a female grizzly bear's home range." 2-ER-293. "The most intensive" aspects of the project "will likely last 3-5 bear years, affecting 1-2 reproductive cycles." 2-ER-294. Still, Fish and Wildlife "expect[s] female grizzly bears will continue to use both [bear management units] during the Black Ram Project." 2-ER-280.

For the Cabinet-Yaak ecosystem more broadly, the biological opinion explains that "[o]nly a small proportion of the grizzly bears in the [ecosystem] are known to use [the action area] at any particular time," such that the project's "non-lethal effects are not likely to reduce the ecosystem's grizzly bear population." 2-ER-294. These effects "may range from disturbance that leads to shifting behavior and use patterns, to decreased reproduction from 1-2 reproductive cycles." 2-ER-296. The project's activities could result in temporary "under-use of habitat," which could impair female bear's "normal reproductive potential" by decreasing their fitness. 2-ER-296. But given the small area of impacts and their short duration, the agency "reasonably assume[s] that very few adult females will be affected," 2-ER-296, and the project "will not appreciably impair or preclude the capacity of the [Cabinet-Yaak ecosystem] . . . from providing both the survival and recovery function assigned to it." 2-ER-296.

"[C]onservatively consider[ing] effects . . . if the maximum increases [in road density] did occur," 2-ER-274, the agency thus determined that the project could have "short-term" effects on "a few adult female grizzly bears[']" breeding patterns. 2-ER-287-88. Other possible effects "will be insignificant and/or discountable," 2-ER-288, and the project's vegetation management work is expected to "create thousands of acres of improved habitat conditions in areas where bears can securely access them." 2-ER-285. At the ecosystem level, effects within the two bear management units affected by the project will not prevent continued recovery in the ecosystem's population, 2-ER-294, and will have no broader effect on the ecosystem's

45

contribution to "to redundancy and representation for grizzly bears in the lower-48." 2-ER-296. And, placed in the context of the listed entity as a whole, "and considering the status of the [Cabinet-Yaak] population as well as other grizzly bear populations in the lower 48 . . . ," the project is "not likely to jeopardize the continued existence of the grizzly bear." 2-ER-296.

Fish and Wildlife's conclusion is hardly surprising. Population trends in the Cabinet-Yaak ecosystem have been improving since 2006 after a period of decline. 2-ER-250-51. As the record reflects, the Forest Service has implemented several other vegetation management projects in the Kootenai National Forest since 2014, and the population has continued to increase. *E.g.*, FER-6 (reflecting five projects across seven bear management units, including unit 14); 2-ER-250-51. More broadly, grizzly populations are expanding in several other ecosystems in the lower-48, "and are robust and have high resiliency in the" Northern Continental Divide and Greater Yellowstone ecosystems. 2-ER-295. These populations will be unaffected by the project. 2-ER-296. The agency thus reasonably concluded the Black Ram project would not result in jeopardy. The district court correctly deferred to the thorough expert analysis supporting this conclusion. 1-ER-21-24.

46

### B. CBD's counter arguments incorrectly focus on recovery of the Cabinet-Yaak ecosystem.

#### 1. The Cabinet-Yaak ecosystem need not meet all recovery goals to avoid jeopardy.

CBD's lead argument is that, based on the Grizzly Bear Recovery Plan's goals and subgoals, "[r]ecovery of grizzly bears in the Cabinet-Yaak remains far out of reach," that the biological opinion "must address the Project's impacts on bear recovery," and that "impacting the reproductivity of females in the action area is likely to further stall th[at] recovery." CBD 2d Br. 35-37; *see also id.* 40-41. The Cabinet-Yaak ecosystem is one of six recovery zones established as part of the Grizzly Bear Recovery Plan. 5-ER-1044; 2-ER-295. "Recovery zones were established to identify areas necessary for the recovery of" the species. 2-ER-295. Once all zones are recovered, the species will be considered recovered. 2-ER-295. CBD is correct that the Cabinet-Yaak ecosystem does not yet meet the Recovery Plan's population goals. 2-ER-252. But that is not the standard for jeopardy.

Rather, the question is whether the action will "jeopardize the continued existence" of the grizzly bear by "reduc[ing] appreciably the likelihood of both the survival and recovery" of the species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02. An action causes jeopardy if it "will cause an active change of status for the worse." *Turtle Island Restoration Network v. United States Dep't of Com.*, 878 F.3d 725, 735 (9th Cir. 2017); *cf. Nat'l Wildlife Fed'n*, 524 F.3d 917, 933 (9th Cir. 2008) (noting that, though recovery must be considered, "recovery impacts alone may not often prompt a

jeopardy finding" (emphasis omitted)). Even if the project would "further stall" grizzly bear recovery in the Cabinet-Yaak ecosystem (CBD 2d Br. 36), delaying recovery is not the same as "reduc[ing] appreciably [its] likelihood." 50 C.F.R. § 402.02; *cf. Rock Creek All. v. U.S. Fish & Wildlife Serv.*, 663 F.3d 439, 443 (9th Cir. 2011) (upholding no-jeopardy determination for bull trout where agency found that rate of recovery may be slowed by agency action). Though this Court has held that the agency must evaluate recovery as part of its jeopardy analysis, *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 932 (9th Cir. 2008), this Court has recognized that the two standards are distinct.

### 2. Fish and Wildlife reasonably concluded that the project would not appreciably reduce the likelihood of survival and recovery.

In evaluating the project's impacts, Fish and Wildlife reasonably concluded that the temporary reduction to normal reproductive patterns for a few bears would not be likely to cause jeopardy. The agency also explicitly considered that reduction's effect on recovery. The biological opinion recognizes that "demographic recovery criteria have not yet been met, but progress is being made." 2-ER-295. While occupancy and reproduction metrics have not been met, "[m]ortality rates are low." *Id.* These are "slow processes," but the agency "expect[s] that over time, if the population trend and adult female survival rates remain high in the [ecosystem], the population in this ecosystem will likely expand," which will have the follow-on effect of increased resiliency. 2-ER-295. The ecosystem's "[r]esiliency is expected to increase in the next

30-45 year timeframe if current conservation is maintained," 2-ER-295, as a result of expected continuing population increases, 2-ER-296. And, importantly, the project "represents the type of continued conservation that is projected to" help meet this goal. 2-ER-294; *see also* 2-ER-296. All things considered, Fish and Wildlife determined that the project "will not appreciably impair or preclude the capacity of the [Cabinet-Yaak ecosystem's] recovery unit from providing both the survival and recovery function assigned to it." 2-ER-296.

Nor does jeopardy follow from Fish and Wildlife's finding that "the survival and reproduction of each individual female grizzly bear is very important." 2-ER-252; *see* CBD 2d Br. 36. The project's impacts are non-lethal, so individual survival is not an issue here. 2-ER-296. "At most, reproduction may be slowed for the affected females during implementation of the Black Ram Project." 2-ER-293. That is, the project may cause "decreased reproduction from 1-2 reproductive cycles" for a few female bears. 2-ER-296. Decreased reproduction is not the same as precluding it entirely. 2-ER-293 ("reproduction may be slowed for the affected females during implementation"). And though CBD is right that the project area has been "an important area for female grizzly bears," CBD 2d Br. 36 (quoting 2-ER-256), Fish and Wildlife "expect[s] female grizzly bears will continue to use both [bear management units] during the Black Ram Project." 2-ER-280.

CBD does not dispute that the agency correctly identified the scope of impacts to individual bears.[13] CBD nevertheless contends that temporary effects to 1-2 reproductive cycles for a few bears will have an outsized impact due to the ecosystem's small population size of approximately 60 bears. CBD 2d. Br. 37, 39, 40.[14] But Fish and Wildlife considered the relatively small population size in the Cabinet-Yaak ecosystem, and the robust populations elsewhere in the United States, and concluded that the temporary impacts caused by the project were unlikely to jeopardize the species where the population has been increasing and the project would lead to improvements in habitat. *See supra* pp.43-46. CBD's preference for a finding of jeopardy based on these impacts does not make Fish and Wildlife's conclusion arbitrary, as it reflects "a rational connection between the facts found and the conclusions reached." *Sierra Club v. Bosworth*, 510 F.3d 1016, 1023 (9th Cir. 2007). And of course, courts owe deference to these kinds of factual determinations that are within the agency's area of expertise. *See San Luis & Delta-Mendota Water Auth. v. Jewell*,

---

[13] Contrary to CBD's assertions, Fish and Wildlife did not predict that "each bear impacted" would have reduced reproductive outcomes for 1-2 cycles (CBD 2d Br. 37), because "adult female grizzly bears may move in or out of the action area due to factors unrelated to the proposed action." 2-ER-280. Instead, the biological opinion notes that the length of time for intense activities that could affect reproduction—3-5 years—equals "1-2 reproductive cycles." 2-ER-280.

[14] For the first time on appeal, CBD asserts that "only about 17 adult females live in the entire ecosystem." CBD 2d Br. 37; *see also* CBD 2d Br. 28-29, n.10, 37. Regardless of the exact number of adult females in the ecosystem, the discussion above demonstrates that the agency articulated a rational basis for its conclusions and evaluated all relevant factors.

747 F.3d 581, 633 (9th Cir. 2014); *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2261 (2024) ("Section 706 [of the APA] *does* mandate that judicial review of agency policymaking and factfinding be deferential." (emphasis in original)).

CBD relatedly asserts that the agency violated the APA by failing "to explain how impacting a substantial percentage of reproductive females for three to five years, which could impact recovery well beyond those five years, will not jeopardize grizzly bears." CBD 2d Br. 40. But the agency *did* explain how impacting this number of bears aligned with continued conservation and increasing population sizes over time. *See supra* pp.44-46. For its argument that "the impact on the population is likely to last far beyond" three to five years, CBD asserts that the action will "suppress population growth" in the Cabinet-Yaak ecosystem, "and fewer female cubs will reach adulthood and reproduce in later years." CBD 2d Br. 40. But Fish and Wildlife determined that the project's relatively minor effects would not alter the current trajectory of "increased resiliency of grizzly bears . . . in the [ecosystem] in the coming years." 2-ER-296; *see supra* pp.45-46. The agency took an unvarnished look at the possible impacts from the Black Ram project's effects on female grizzly reproduction in the ecosystem, and determined that the impacts were not severe enough to prevent continued population growth there or jeopardize the species as a whole. 2-ER-270-96.

CBD next makes much of a single instance in which the biological opinion states that the project "will not reduce the reproduction, numbers or distribution of grizzly bears throughout the" Cabinet-Yaak ecosystem. 2-ER-296; CBD 2d Br. 38.

This statement references the ecosystem rather than bear management units 14 and 15 where the project will take place, and makes the more general point, consistent with the extensive, well-supported analysis preceding this single statement, that the project will not affect the ecosystem's continued improvement through reproduction and increased rates of survival. *See supra* pp.43-46; 2-ER-294, 296. The statement does not, as CBD asserts, represent a conclusion in the biological opinion that reproduction will not be affected at all. The biological opinion recognizes as much earlier on the same page, noting, as it repeatedly did in the preceding pages of analysis, that female grizzlies in the area "may not breed at their potential frequency or may fail to complete gestation due to decreased fitness." 2-ER-296. But, again, the few females that may be affected "will not appreciably impair or preclude" continued survival and recovery in the ecosystem, much less grizzly bears in the lower-48. 2-ER-296. The biological opinion "could have been more precise . . . . [b]ut the arbitrary and capricious standard does not demand perfection." *Earth Island Inst. v. Muldoon*, 82 F.4th 624, 637 (9th Cir. 2023).

### 3. Impacts limited to the Cabinet-Yaak ecosystem are not dispositive of the jeopardy question.

Finally, taking language from the 1993 Grizzly Bear Recovery Plan and 2021 species status report out of context, CBD asserts that any potential impacts to the Cabinet-Yaak recovery unit resulting from the project will necessarily result in jeopardy to the grizzly bear species throughout the lower 48 states. The 1993 Grizzly

Bear Recovery Plan notes that, for the species as a whole to be considered recovered and thus delisted, "the populations in all established recovery zones have been delisted." 5-ER-1044; CBD 2d Br. 41. Fish and Wildlife's 2021 species status report also emphasizes that "grizzly bears in the lower-48 States need multiple, resilient ecosystems." 3-ER-406; CBD 2d Br. 41. Extrapolating from these two documents, CBD asserts that Fish and Wildlife must ensure that any project does not affect the "recovery" of the Cabinet-Yaak recovery unit, as opposed to ensuring there will be no jeopardy to the listed species.

As explained above, recovery and jeopardy are different standards, and the statute requires that the agency ensure against jeopardy. Recovery plans "provide guidance for the conservation of [listed] species," but "are not binding authorities." *Conservation Cong. v. Finley*, 774 F.3d 611, 614 (9th Cir. 2014). Likewise, species status assessments are designed to satisfy Fish and Wildlife's separate obligation under the ESA to evaluate the status of listed species every five years. 16 U.S.C. § 1533(c)(2); 3-ER-402. The assessment compiles information on the species, describes current conditions, and "forecasts the species' response to probable future scenarios." 3-ER-402. It does not define jeopardy. That the assessment points out that multiple resilient ecosystems is important for grizzly bear recovery does not alter the statutory and regulatory text setting jeopardy determinations at the listed-species level. Nor does its statement that the recovery of individual units is important to the species automatically mean that any impacts at the recovery unit level will result in jeopardy.

To the extent CBD is arguing that impacts to bears in the Cabinet-Yaak ecosystem automatically results in jeopardy to the species as a statutory matter, that argument is wrong. As the district court correctly explained, "the plain language of the ESA and its implementing regulations state that the no jeopardy determination is made on a *species* level," 1-ER-24 (emphasis added), not at the recovery unit level. After all, the ESA and its implementing regulations refer to the "species" and the "listed species," not individual recovery zones. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(h)(1)(iv); *id.* § 402.02. Recovery zones like the Cabinet-Yaak ecosystem "do[] not create a new listed entity," (or change the scope of the jeopardy analysis) and jeopardy to an individual recovery unit "would only result in a jeopardy determination if . . . adverse consequences reduce appreciably the likelihood of both survival and recovery of *the listed entity*." FER-4-5 (emphasis added). Any contrary argument lacks support in the plain statutory language. CBD 2d Br. 41-42.[15] And, as already discussed (pp.44-46), Fish and Wildlife evaluated effects at the recovery unit level, and CBD's arguments do not demonstrate jeopardy even to this narrower population.

---

[15] CBD cites *Wild Fish Conservancy* for an unrelated proposition but does not rely on it for this argument. CBD 2d Br. 39, 41-42. In *Wild Fish*, Fish and Wildlife made a jeopardy determination for bull trout "at the recovery unit level scale" because the final rule listing the bull trout required that approach. 628 F.3d at 519, 528. With no comparable requirement in the governing rule here, the ultimate question is jeopardy to the listed species as a whole. *See Defs. of Wildlife v. United States Forest Serv.*, 94 F.4th 1210 (10th Cir. 2024) (distinguishing *Wild Fish* on this basis).

The district court correctly concluded that Fish and Wildlife acted reasonably in finding that the project was not likely to jeopardize the continued existence of the grizzly bear in the lower-48.

## CONCLUSION

For these reasons, this Court should reverse the judgment of the district court as to CBD's claims four and seven, and Alliance's claims one and three, and enter judgment for Federal Defendants on these counts. The Court should affirm on CBD's claim six.

Of Counsel:

ELISE FOSTER
*Attorney*
U.S. Department of Agriculture

KATHRYN L. WILLIAMS-SHUCK
SARAH E. MCLAIN
*Attorneys*
U.S. Department of the Interior

August 1, 2024
DJ # 90-1-4-16616/1

TODD KIM
*Assistant Attorney General*

*/s/ Jacob D. Ecker*

THEKLA HANSEN-YOUNG
HAYLEY A. CARPENTER
ERIKA A. FURLONG
JOHN P. TUSTIN
JACOB D. ECKER
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 305-0466
jacob.ecker@usdoj.gov

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)**          23-2882, 23-2886, 23-3146

I am the attorney or self-represented party.

**This brief contains 13,896 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ]  complies with the word limit of Cir. R. 32-1.

[X] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ]  is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ]  is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ]  complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ]  it is a joint brief submitted by separately represented parties;
    [ ]  a party or parties are filing a single brief in response to multiple briefs; or
    [ ]  a party or parties are filing a single brief in response to a longer joint brief.

[ ]  complies with the length limit designated by court order dated _____.

[ ]  is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature**      s/ *Jacob D. Ecker*

**Date**          August 1, 2024