Nos. 23-2882, 23-2886, 23-3146

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

**CENTER FOR BIOLOGICAL DIVERSITY, et al.**,
Plaintiffs-Appellees/Plaintiffs-Appellants,

and

**ALLIANCE FOR THE WILD ROCKIES, et al.**,
Plaintiffs-Appellees/Plaintiffs

v.

**UNITED STATES FOREST SERVICE, et al.,**
Defendants-Appellants/Defendants/Defendants-Appellees,

and

**KOOTENAI TRIBE OF IDAHO**,
Defendant-Intervenor/Intervenor-Appellant/Intervenor-Appellee.

---

Appeal from the United States District Court for Montana,
Nos. CV 22-114-M-DWM (Lead), CV 23-3-M-DWM (Hon. Donald W. Molloy)

---

**INTERVENOR'S THIRD BRIEF ON CROSS-APPEAL**

---

Julie A. Weis, OSB No. 974320
HAGLUND KELLEY LLP
2177 SW Broadway
Portland OR 97201
503-225-0777
weis@hk-law.com

Kris A. McLean, Tyson A. McLean
Kris A. McLean Law Firm, PLLC
2315 McDonald Ave., Suite 106
Missoula, MT 59801
406-396-9367
kris@krismcleanlaw.com,
tyson@krismcleanlaw.com

Attorneys for Kootenai Tribe of Idaho

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................1

II.    ISSUE PRESENTED FOR REVIEW BY CBD ...........................3

III.   SUMMARY OF ARGUMENT ...................................................3

IV.   ARGUMENT ......................................................................8

     A.    The Court has Jurisdiction Over the Forest Service's Appeal ..............8

     B.    The District Court Properly Upheld FWS's ESA "No Jeopardy" Determination ................................................11

     C.    The District Court Erred with Respect to the Grizzly Bear Baseline Under the ESA ................................................17

     D.    The District Court Erred with Respect to the Grizzly Bear Existing Condition Disclosures Under NEPA ..................................27

     E.    The Forest Service Complied with Its Statutory Obligations When Calculating the Existing Permanent Motorized Route Metrics in the Project Area ................................................34

          1.   AWR's NFMA Assertions are Meritless ................................36

          2.   The Forest Service Satisfied NEPA by Reasonably Disclosing Its Road Metrics Methodology ..............................48

          3.   The Forest Service Took a NEPA "Hard Look" at the Issue of Temporary Unauthorized Road Use in the Project Area .....51

V.    CONCLUSION ................................................................57

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*All. for the Wild Rockies v. Bradford*,
  856 F.3d 1238 (9th Cir. 2017)........................................................43

*All. for the Wild Rockies v. Gassman*,
  678 F.Supp.3d 1249 (D. Mont. 2023)........................................46, 47

*All. for the Wild Rockies v. Marten*,
  464 F.Supp.3d 1169 (D. Mont. 2020)..............................................47

*All. for the Wild Rockies v. Probert*,
  412 F.Supp.3d 1188 (D. Mont. 2019)......................................*passim*

*All. for the Wild Rockies v. Savage*,
  897 F.3d 1025 (9th Cir. 2018)........................................................44

*All. for the Wild Rockies v. United States Forest Serv.*,
  907 F.3d 1105 (9th Cir. 2018) (*Alliance*) ....................................41

*Alsea Valley Alliance v. Department of Commerce*,
  358 F.3d 1181 (9th Cir. 2004)..................................................... 8-9

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*,
  462 U.S. 87 (1983)........................................................................18

*Connor v. Burford*,
  848 F.2d 1441 (9th Cir. 1988).......................................................19

*Crow Indian Tribe v. United States*,
  965 F.3d 662 (9th Cir. 2020)..................................................4, 8, 10

*Ctr. for Biological Diversity v. EPA*,
  847 F.3d 1075 (9th Cir. 2017)........................................................12

*Earth Island Inst. v. United States Forest Serv.*,
  697 F.3d 1010 (9th Cir. 2012)........................................................50

ii

*Epic Sys. Corp. v. Lewis*,
    584 U.S. 497 (2018)................................................................. 19-20

*Hapner v. Tidwell*,
    621 F.3d 1239 (9th Cir. 2010)......................................................41, 42

*Idaho Farm Bureau Fed'n v. Babbitt*,
    58 F.3d 1392 (9th Cir. 1995)...............................................................28

*Idaho Sporting Cong., Inc. v. Rittenhouse*,
    305 F.3d 957 (9th Cir. 2002)....................................................41, 42

*Idaho Wool Growers Ass'n v. Vilsack*,
    816 F.3d 1095 (9th Cir. 2016)...........................................................32

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008), *overruled in part on other grounds*
    *by Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046
    (9th Cir. 2009) .......................................................................3, 26, 36

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)...........................................................................11

*Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
    70 F.4th 582 (D.C. Cir. 2023) ...................................................19, 20

*Marsh v. Oregon Natural Res. Council*,
    490 U.S. 360 (1989)...........................................................................2

*Nat. Res. Def. Council v. Gutierrez*,
    457 F.3d 904 (9th Cir. 2006) (per curiam) ....................................10

*Nat. Res. Def. Council v. United States Forest Serv.*,
    421 F.3d 797 (9th Cir. 2005).............................................31, 33, 34

*Native Ecosystems Council v. Weldon*,
    697 F.3d 1043 (9th Cir. 2012).........................................36, 43, 56

*Oregon Nat. Desert Ass'n v. United States Forest Serv.*,
    957 F.3d 1024 (9th Cir. 2020)...............................................36, 43

*TVA v. Hill*,
   437 U.S. 153 (1978)............................................................................20


**Statutes**

5 U.S.C. § 706 ..................................................................................28

16 U.S.C. § 1536(a)(2)..............................................................5, 11, 21

16 U.S.C. § 1604(i)...........................................................................35, 49


**Other Authorities**

40 C.F.R. Part 1502 ..........................................................................50

40 C.F.R. § 1502.23 ..........................................................................50

40 C.F.R. § 1502.24 .....................................................................49, 50

40 C.F.R. § 1508.9(a) .......................................................................49

40 C.F.R. § 1508.9(a)(1)....................................................................51

50 C.F.R. § 402.02.......................................................................11, 12

88 Fed. Reg. 7,658 (Feb. 6, 2023)......................................................17

Cabinet-Yaak Grizzly Bear Recovery Area 2022 Research and
   Monitoring Progress Report, https://www.fws.gov/media/cabinet-
   yaak-grizzly-bear-recovery-area-2022-research-and-monitoring-
   progress-report ............................................................................25

iv

## I.    __INTRODUCTION__.

Before the Court is the Black Ram Project (Black Ram, or the Project), a forest health and fuels reduction project located on the Kootenai National Forest within the aboriginal territory of the Kootenai Tribe of Idaho (Kootenai Tribe, or the Tribe).  The Kootenai Tribe desires to see the Project implemented for the benefit of natural resources, including the grizzly bear, in and around the Project area.  The Tribe therefore has appealed certain discrete aspects of the district court's remand order which otherwise would unduly constrain the U.S. Forest Service (Forest Service) and the U.S. Fish and Wildlife Service (FWS) on remand.

Two separate groups of non-governmental organizations – the Center for Biological Diversity et al. (CBD) and the Alliance for the Wild Rockies et al. (AWR) – challenged Black Ram in two separate lawsuits largely because of misconceptions about how Project implementation might impact the grizzly bear, a species of importance to the Tribe.  The district court held in favor of some but not all of the claims brought by CBD and AWR.  AWR did not appeal the district court's decision, but CBD appealed the district court's decision upholding the FWS's "no jeopardy" determination for the grizzly bear under the Endangered Species Act (ESA).  CBD's appeal is not well taken.

In this third brief on cross-appeal (Kootenai Tribe Br.), the Kootenai Tribe responds to CBD's brief on cross-appeal (CBD Br.) and AWR's second brief on

1

cross-appeal (AWR Br.) while also answering the arguments of CBD and AWR on the district court's points of error raised by the Tribe. Whereas the district court's errors flowed from its non-deferential evaluation of scientific matters on which the Forest Service and FWS should have been afforded substantial deference, CBD and AWR go even further by asking this Court to substitute their non-expert and misguided opinions for those of the federal agencies entrusted by Congress with management and protection of the Kootenai National Forest (Forest Service) and the grizzly bear (FWS).

The Court should decline to substitute CBD's and AWR's misguided land and natural resource management opinions for those of the expert agencies. The Kootenai Tribe also desires to protect and restore the grizzly bear, but it does not resort to presenting erroneous arguments belied by the record to accomplish its goal. Science is real. It is not something that can be concocted by a litigant to support its erroneous theory of the case.

The Kootenai Tribe respectfully asks the Court to review the issues before it with an appreciation and respect for the substantial deference owed federal agencies acting within their special areas of expertise, particularly where, as here, scientific methodology and technical expertise are at the heart of the challenged action. *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 376-77 (1989). This Court has held that review should be at its *most* deferential where, as in this case,

an agency is addressing difficult issues within its area of special expertise. *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008), *overruled in part on other grounds by Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009). Viewed in that proper light, the district court's errors appealed by the Kootenai Tribe should be reversed, thereby lessening the federal agencies' burden on remand and hastening the restoration of natural resources in the Project area for the benefit of human and non-human species alike.

## II.    ISSUE PRESENTED FOR REVIEW BY CBD.

Whether the district court properly upheld FWS's "no jeopardy" determination for the grizzly bear under the ESA, where FWS demonstrated that Black Ram Project implementation would not appreciably reduce the likelihood of the survival and recovery of the species, and where CBD's challenge to the "no jeopardy" determination focused solely on potential effects to individual grizzly bears in the action area rather than to the species as a whole.

## III.    SUMMARY OF ARGUMENT.

The Black Ram Project is an important forest health and fuels reduction project on the Kootenai National Forest in the Kootenai Tribe's aboriginal territory. After the district court found errors with the Project and remanded it to the agencies, the Tribe sought review on three discrete issues, including the court's erroneous holdings that: (1) FWS disregarded recent grizzly bear mortality when

3

establishing the ESA baseline for the bear in the Black Ram biological opinion; (2) the Forest Service violated the National Environmental Policy Act (NEPA) when disclosing the existing condition for the bear; and (3) the Forest Service failed to comply with its statutory obligations with respect to unauthorized road use when calculating and disclosing motorized route metrics in the Black Ram Project area. The Court should reverse the district court on these three discrete issues raised by the Tribe on appeal.

One group of non-governmental organizations (collectively CBD) appealed the district court's decision upholding FWS's "no jeopardy" determination for the grizzly bear under the ESA. The Court should affirm the district court on that issue. A second group of non-governmental organizations (collectively AWR) did not appeal the district court's mixed decision but is challenging this Court's jurisdiction over the Forest Service's appeal on standing grounds.

AWR's challenge to the Court's jurisdiction over the Forest Service's appeal is meritless. AWR asserts that the Court lacks jurisdiction over the Forest Service's appeal because the agency is challenging some, but not all, of the district court's adverse determinations. But settled caselaw firmly establishes the right of a federal agency to challenge "what the district court ordered it to do on remand." *Crow Indian Tribe v. United States*, 965 F.3d 662, 676 (9th Cir. 2020).

4

Also without merit is CBD's challenge to the district court's upholding of FWS's "no jeopardy" determination for the grizzly bear. In criticizing the Project biological opinion's "no jeopardy" determination, CBD focuses solely on potential effects to the grizzly bear in the action area, which is not the level at which the jeopardy inquiry operates. The jeopardy inquiry concerns itself not with individual bears in the Project area but rather asks whether the Project is "likely to jeopardize the continued existence of any [ESA-listed] *species*," of which the grizzly bear is one. 16 U.S.C. § 1536(a)(2) (emphasis added). Unlike CBD, FWS did not focus myopically on potential effects on individual bears in the action area. Rather, in addition to evaluating potential effects in the action area, FWS considered potential effects at the level of the recovery zone (the Cabinet-Yaak Ecosystem) and ultimately at the level of the species, where the jeopardy determination properly rests. FWS concluded that Project implementation "is not reasonably expected to reduce appreciably the likelihood of both the survival and recovery of the listed entity of grizzly bears as a whole." 2-ER-296 (FWS57) (Project Biological Opinion at 55). Thus, FWS reasonably reached a "no jeopardy" decision for the bear, which the district court properly upheld.

In contrast with the arguments offered by AWR and CBD, the issues raised by the Tribe have merit and counsel in favor of reversal.

5

First, the district court erred in concluding that FWS disregarded grizzly bear mortality when establishing the ESA baseline for the bear in the Black Ram biological opinion. The court erred both factually and by failing to afford deference to the expert agency's scientific decision-making. The court erred as a factual matter because FWS *did* consider bear mortality when establishing the ESA baseline for the bear. On the issue of deference, the district court, which is not an expert in the field of bear population biology, disagreed with the way FWS evaluated the grizzly bear data and held that FWS did not use the best available science because the agency did not rely on the court's (and CBD's) preferred methodology. The court's holding regarding the grizzly bear ESA baseline thus was legal error. CBD's assertions to the contrary do not show otherwise.

Second, the district court erred in concluding the Forest Service violated NEPA when disclosing the existing condition for the bear. The court found that because more recent data was available to the Forest Service than what was disclosed in the EA, the agency had improperly relied on stale data. But the court ignored the fact that the newer data did not materially change the bear's existing condition. The Forest Service's use of the older data hence was harmless. The Administrative Procedure Act (APA) explicitly instructs reviewing courts to employ the harmless error rule when evaluating a claim under the arbitrary and capricious standard. But the court did not do so and reached an erroneous

6

conclusion as a result. CBD's efforts to undermine the application of the harmless error rule to the facts of this case are without merit and do not warrant affirmance.

Third, the district court erred in concluding the Forest Service failed to comply with its statutory obligations with respect to unauthorized road use when calculating and disclosing motorized route metrics in the Black Ram Project area. Contrary to the court's decision, the Forest Service satisfied its statutory obligations by thoroughly considering, disclosing and taking a NEPA "hard look" at the issue of unauthorized motorized access and by explaining the reasonable basis for its decision not to include temporary unauthorized road use when calculating the existing permanent motorized route metrics in the Project area. The district court reached its erroneous conclusions by affording no deference to, and instead improperly second guessing, expert agency technical determinations on this complex issue, and by applying holdings from prior decisions despite those decisions being factually distinguishable. This warrants reversal.

Although the district court appeared to have construed and decided the unauthorized road use claims as arising under procedural NEPA, rather than as a substantive challenge to the Project's compliance with the relevant Forest Plan standard under NFMA, the Tribe joins in the NFMA argument of federal defendants, which soundly demonstrate Project consistency with the Forest Plan standard. AWR's NFMA arguments to the contrary do not show otherwise.

7

This Court should reverse the district court on the three discrete issues raised by the Tribe and affirm the district court on the issue of FWS's grizzly bear "no jeopardy" determination.

## IV.  ARGUMENT.

The district court made a number of erroneous determinations, on certain of which the Tribe seeks reversal.  The district court did not err, however, in upholding FWS's "no jeopardy" determination for the bear, a holding challenged by CBD.  But before turning to the merits of the issues before the Court, the Tribe first addresses AWR's frivolous argument that the Court lacks appellate jurisdiction over the Forest Service's appeal.

### A.  The Court has Jurisdiction Over the Forest Service's Appeal.

AWR's challenge to this Court's jurisdiction over the Forest Service's appeal, which rests on an alleged lack of standing, is readily dispatched.  AWR Br. at 36-38.  Although AWR would have the Court hold that it lacks jurisdiction over the Forest Service's appeal because the agency is challenging some, but not all, of the district court's determinations, settled caselaw holds otherwise and firmly establishes the right of a federal agency to challenge "what the district court ordered it to do on remand."  *Crow Indian Tribe*, 965 F.3d at 676.

In *Alsea Valley Alliance v. Department of Commerce*, 358 F.3d 1181 (9th Cir. 2004), this Court recognized that "*agencies* compelled to refashion their own

8

rules [on remand] face the unique prospect of being deprived of review altogether" absent the ability to appeal such an order. *Id.* at 1184 (explaining that post-remand, an agency could not "appeal the result of its own decision," such that an agency deprived of the right to bring an immediate appeal would forever be foreclosed from challenging the district court's remand order) (italics in original). In AWR's opinion, "the tangible harm to the agency" here is "vacatur of the Project decision." AWR Br. at 37. But the reality is that the district court broadly remanded the Project to the Forest Service "for further review consistent with this Order." 1-ER-66 (Order at 62). This means that for the Forest Service, the only federal agency sued by AWR, the agency has been ordered on remand to revise its approach to developing land management projects "consistent with Access Standard 2," and to revise its approach to "discussing unauthorized motorized use as part of the baseline in the project area." Federal Defendants-Appellants' First Cross-Appeal Br. (Fed. Br.) at 18.

The Forest Service, the expert agency tasked with managing these forest lands, brought this appeal because it does not agree with the district court's determinations on those issues. If this Court were to reverse the district court on those issues, the Forest Service would not have to revise its methodologies based on the district court's preferred approach to Forest Service land management. The

Forest Service's injuries thus are redressable by this Court, despite AWR's assertion to the contrary. AWR Br. at 36, 38.

AWR analogizes this case to *Natural Resources Defense Council v. Gutierrez*, 457 F.3d 904 (9th Cir. 2006) (per curiam), but the analogy is inapt. This Court since has explained that the appeal in *Gutierrez*, "even if legally successful, would not have altered what the agency had been ordered to do." *Crow Indian Tribe*, 965 F.3d at 675-76. Here, in contrast, the Forest Service "does challenge what the district court ordered it to do on remand. The district court required the agency to consider several distinct issues. The [Forest Service] contends it should not be required to consider some of them. If successful, the [Forest Service] would have to do considerably less." *Id.* at 676. This appeal thus is not an intellectual exercise without real world implications. Far from it. Rather, like the agency in *Crow Indian Tribe*, the Forest Service's injury here – being required to revise its approach to land management in two particular respects that run contrary to the agency's scientific and technical expertise – "is redressable by a favorable decision." *Id.*

AWR's challenge to the Forest Service's standing on appeal, and to this Court's appellate jurisdiction, is baseless.

///

///

10

**B.**    **The District Court Properly Upheld FWS's ESA "No Jeopardy" Determination.**

CBD's challenge to the district court's affirmance of FWS's "no jeopardy" determination for the grizzly bear is meritless. CBD Br. at 35-42. *See also* 1-ER-21-24 (Op. at 17-20). The district court correctly upheld FWS's "no jeopardy" determination for the grizzly bear and should be affirmed. In criticizing the Project biological opinion's "no jeopardy" determination, CBD focuses solely on potential effects to the grizzly bear in the action area, which is not the level at which the jeopardy inquiry operates. CBD also misrepresents language in the Project biological opinion in an effort to convince the Court that FWS made contradictory findings, which is untrue.

Under the ESA, "jeopardize the continued existence of" means to "engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. The jeopardy inquiry concerns itself not with individual bears in the Project area but rather asks whether the Project is "likely to jeopardize the continued existence of any [ESA-listed] *species*," of which the grizzly bear is one. 16 U.S.C. § 1536(a)(2) (emphasis added). *Accord Lujan v. Defenders of Wildlife*, 504 U.S. 555, 558 (1992) ("The ESA . . . seeks to protect species of animals . . .

11

."); *Ctr. for Biological Diversity v. EPA*, 847 F.3d 1075, 1084 (9th Cir. 2017) (same). Properly applying the jeopardy standard set forth in 50 C.F.R. § 402.02, FWS reasonably reached a "no jeopardy" determination for the species. 2-ER-292 (FWS53) (Project Biological Opinion at 51). The district court rightly upheld that determination and should be affirmed.

The Cabinet-Yaak Ecosystem, which is one of four occupied grizzly bear recovery zones "in the lower-48 states," 2-ER-249 (FWS10) (Project Biological Opinion at 8), includes 22 Bear Management Units. 2-ER-251 (FWS12) (Project Biological Opinion at 10). Of those 22 Units, Project implementation will occur only in Units 14 and 15, with motorized access metrics in Unit 14 "remain[ing] at or better than benchmarks at all times" and hence not an anticipated source of potential adverse effects. 2-ER-274 (FWS35) (Project Biological Opinion at 33). In Unit 15, the agency acknowledged that Project implementation "may result in adverse effects to a few individual female grizzly bears as a consequence of the potential disturbance and/or displacement related to the temporary increases in motorized access in the action area that could displace grizzly bears from otherwise suitable habitats." 2-ER-292 (FWS53) (Project Biological Opinion at 51). The agency reasonably concluded that any other potential effects from Project implementation would be "insignificant and/or discountable." 2-ER-293 (FWS54) (Project Biological Opinion at 52).

12

CBD focuses on the Project's potential grizzly bear recovery effects in the action area, specifically in Bear Management Unit 15 (since Unit 14 is not a likely source of potential adverse effects). CBD Br. at 36-40. But in the action area, which is not the level at which a jeopardy determination is made, Project implementation will not prevent bears from using the area or "form a barrier to dispersal and movement," either within the Cabinet-Yaak Ecosystem or between the Cabinet-Yaak Ecosystem and other recovery zones. 2-ER-293 (FWS54) (Project Biological Opinion at 52). Project implementation also is expected to benefit bear forage, including huckleberry production. *Id.* Improving bear forage in the action area is important because the Cabinet-Yaak Ecosystem "has a less diverse assortment of foods" than other recovery zones. 2-ER-252 (FWS13) (Project Biological Opinion at 11).

CBD ignores this information and instead focuses on the fact that Project implementation may "adversely affect a few adult female grizzly bears" in the action area, *i.e.*, Unit 15, with effects ranging "from slight disturbance to significant underuse of otherwise suitable habitat such that feeding and reproduction are negatively affected," though not to the level of "direct mortality." 2-ER-293 (FWS54) (Project Biological Opinion at 52). *See also* 2-ER-280-81 (FWS41-42) (Project Biological Opinion at 39-40) (explaining that potential effects will vary based on a variety of factors, including factors unrelated to the

Project like "the wariness of the individual bear, the size of and habitat quality within her home range, the number of other grizzly bears using the particular area, climate conditions, [and] annual food resources"). The possible effects to the few adult female grizzly bears impacted by Project operations in Unit 15 "will likely last 3-5 bear years, affecting 1-2 reproductive cycles." 2-ER-294 (FWS55) (Project Biological Opinion at 53). *See also* 4-ER-770 (FWS1484) (2020 Progress Report at 40) (stating that the grizzly bear "inter-birth interval" is a little less than three years).

FWS took all that information into consideration. But unlike CBD, FWS did not focus myopically on potential effects on the grizzly bear in the action area. Rather, in addition to evaluating potential effects in the action area, FWS considered potential effects at the level of the recovery zone (the Cabinet-Yaak Ecosystem) and ultimately at the level of the species, where the jeopardy determination properly rests.

Regarding potential bear impacts in the Cabinet-Yaak Ecosystem, "[o]nly a small proportion" of the bears in this recovery zone use the action area. 2-ER-294 (FWS55) (Project Biological Opinion at 53). Of those bears, Project implementation will affect only "a few adult female grizzly bears . . . for a portion of their life." 2-ER-296 (FWS57) (Project Biological Opinion at 55). Thus, Project implementation "will not appreciably impair or preclude the capacity of the

14

[Cabinet-Yaak Ecosystem] recovery unit from providing both the survival and recovery function assigned to it." 2-ER-296 (FWS57) (Project Biological Opinion at 55). In reaching that conclusion, FWS reasonably "considered the overall favorable land management within the recovery zone, the presumably and likely stable or growing population and improved survival and distribution of grizzly bears in the [Cabinet-Yaak Ecosystem] population, and the improving trends in survival rates." *Id. See also* 2-ER-53 (FWS55) (Project Biological Opinion at 53) (also considering evidence of increased genetic connectivity between the Cabinet-Yaak Ecosystem bear population "and other grizzly bear populations"). In the long-term, the Project "is projected to result in increased resiliency of the [Cabinet-Yaak Ecosystem] population over the next" three to four-plus decades. 2-ER-294 (FWS55) (Project Biological Opinion at 53).

At the species level, Project implementation "is not reasonably expected to reduce appreciably the likelihood of both the survival and recovery of the listed entity of grizzly bears as a whole."[1] 2-ER-296 (FWS57) (Project Biological Opinion at 55). FWS reached this conclusion because the Project is not anticipated to "affect grizzly bears within, or connectivity with, the surrounding grizzly bear ecosystems (Selkirk, North Continental Divide) nor the ecosystems further away

---

[1] The Project biological opinion plainly considered potential effects on grizzly bear recovery, as CBD states it must. CBD Br. at 36.

(Yellowstone, North Cascades, Bitterroot)." *Id.* Thus, FWS reasonably concluded that implementation of Black Ram is "not likely to jeopardize the continued existence of the grizzly bear." *Id.*

CBD would have the Court believe that FWS's "no jeopardy" determination rests on conflicting findings. CBD Br. at 38. Not so. According to CBD, despite having recognized potential adverse reproductive effects to a few adult female grizzly bears in the action area, the Project biological opinion contradicts itself by stating that Project implementation "'*will not reduce the reproduction* . . . of grizzly bears.'" CBD Br. at 38 (quoting 2-ER-296 (FWS57) (Project Biological Opinion at 55)) (italics CBD's). But the Project biological opinion was not discussing bears in the action area at that point – the discussion had moved from the level of the action area to the level of the recovery zone, and beyond the recovery zone "to grizzly bear populations outside of the [Cabinet-Yaak Ecosystem]." 2-ER-296 (FWS57) (Project Biological Opinion at 55). There is nothing contradictory about acknowledging potential adverse reproductive effects to a few adult female grizzly bears in the action area yet concluding that at the level of the species, Project implementation would not affect grizzly bear reproduction. Assuming CBD is genuinely confused on this point, CBD's error likely flows from its refusal to acknowledge that the jeopardy inquiry operates at the level of the species, not at the level of the action area.

16

Finally, CBD floats the notion that the bear population in "each and every designated recovery zone" must "achieve[] recovery" before the grizzly bear can be delisted, CBD Br. at 41, an assertion immaterial to this Court's review of FWS's sound "no jeopardy" determination.  Still, CBD is mistaken.  CBD overlooks the fact that FWS currently is evaluating petitions to designate as distinct population segments, and then delist, the grizzly bear population in two of the other recovery zones.  *See generally* 88 Fed. Reg. 7,658 (Feb. 6, 2023).  The Tribe does not offer this observation because it supports those petitions.  Rather, the Tribe offers the observation to illustrate that in the case of a distinct population segment of a species, a consulting agency may make the jeopardy determination at the level of the distinct population segment rather than at the species level.

In sum, contrary to CBD's assertions, the agency's ESA "no jeopardy" conclusion for the bear was sound, is supported by the record and was properly upheld by the district court.  This Court should affirm.

## C. <u>The District Court Erred with Respect to the Grizzly Bear Baseline Under the ESA.</u>

Also contrary to CBD's assertions, CBD Br. at 22-35, the Black Ram biological opinion did not ignore recent grizzly bear mortality data when establishing the ESA baseline for the bear.  Rather, FWS established the grizzly bear baseline in conformance with the ESA's best available science requirement.

17

The district court thus erred in holding otherwise based on its mistaken conclusion that "FWS disregarded biological information indicating an increase in grizzly bear mortality" when establishing the ESA baseline for the bear. 1-ER-15 (Op. at 11).

The record shows that FWS did not ignore grizzly bear mortality – it collects bear mortality data every year and incorporates the data into the running estimates of bear population size reported annually for the Cabinet-Yaak Ecosystem. The 2020 Progress Report, for example, incorporated bear mortality data through and including 2020. *See, e.g.*, 4-ER-765-69 (FWS1479-83) (2020 Progress Report at 35-39). The district court thus erred factually. A review of the court's decision shows it also erred by affording no deference to the expert consulting agency – FWS – with respect to FWS's technical determinations regarding the ESA baseline for the bear. *See, e.g.*, 1-ER-18 (Op. at 14) (stating that "[s]tatistical modeling is scientifically accurate, but documented deaths of female bears cannot be ignored," which they were not). The Supreme Court instructed decades ago that when an agency "is making predictions, within its area of special expertise, at the frontiers of science," judicial review "must generally be at its most deferential." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983). The district court did not heed the Supreme Court's admonition and instead credited CBD's theory of the case over the expert determinations of FWS. The district court's combined errors warrant reversal on the ESA baseline issue, which

18

implicates FWS's longstanding methodology for annually evaluating the grizzly bear population in the Cabinet-Yaak Ecosystem.

The Kootenai Tribe and CBD start from the same ESA baseline foundation, namely that FWS was required to use the best available scientific data when preparing the Black Ram biological opinion, including when evaluating the environmental baseline for the bear. *Compare* Kootenai Tribe Br. at 25-26 *with* CBD Br. at 23. But from there, the Tribe and CBD diverge, with CBD refusing to accept the fact that the biological opinion's environmental baseline *was* grounded in the best available science. The district court failed to see the error in CBD's litigation strategy. The Tribe urges this Court not to do likewise.

As an initial matter, the Tribe offers a cautionary note about CBD's reference (and that of AWR) to the dictum from *Connor v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988), regarding giving "'the benefit of the doubt'" to a listed species. CBD Br. at 23 (quoting *Connor*, 848 F.2d at 1454). *See also* AWR Br. at 2 ("If there is any doubt . . . the benefit of the doubt must be resolved in favor of the grizzly bear . . . .") (quoting *Connor*, 848 F.2d at 1454; AWR Br. at 33 (same). That "benefit of the doubt" language comes from the ESA's legislative history, more specifically from a "single sentence in a 1979 conference report . . . ." *Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 590 (D.C. Cir. 2023). The Supreme Court has instructed that "legislative history is not the law."

19

*Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018). The "benefit of the doubt" recitations proffered by CBD and AWR thus attribute more heft to the ESA's legislative history than due.

*Maine Lobstermen's* explained that prior to "1979, the ESA provided that agencies must 'not jeopardize' a protected species.'" 70 F.4th at 596 (quoting the statute). But after the Supreme Court's snail darter case, *TVA v. Hill*, 437 U.S. 153 (1978), Congress

> lightened the load to avoid paralysis. Among other changes, the Congress replaced "do not jeopardize" with the tentative "is not likely to jeopardize," and required "each agency" to rely only upon "the best scientific and commercial data available," not the best data possible. . . . After all, "[d]ecisions regarding endangered species are often characterized by . . . "considerable uncertainty."

*Maine Lobstermen's*, 70 F.4th at 596. The ESA thus does not compel a presumption in favor of a listed species. The Tribe, however, seeks to protect and restore species like the grizzly bear not because of a federal statute, but rather because of its fundamental "Covenant with the creator to keep and guard the land forever." 9-ER-2252 (Declaration of Gary Aitken, Jr. ¶ 8). Regardless, this is not a case involving doubtful evidence. The district court was simply mistaken – and improperly non-deferential – in concluding that FWS had ignored "critical data" regarding recent grizzly bear mortality. 1-ER-19 (Op. at 15).

20

Turning to CBD's merits argument, CBD first criticizes "the underlying significant limitations of the agency's population model . . . ."[2] CBD Br. at 23-24. Again, the ESA requires FWS to "use the best scientific and commercial data available," 16 U.S.C. § 1536(a)(2), not the best data possible. And CBD's unsupported assertion that in its non-expert opinion, "it is dubious at best" to use decades of Cabinet-Yaak Ecosystem grizzly bear data "to predict the population's *current* growth rate" carries no weight. CBD Br. at 25 (italics in original). To the contrary, FWS – the expert agency to which deference is due – explained that using "the entire survival and reproductive data set from 1983-2020 . . . produces the effect of smoothing the data over time and results in a more conservative estimate of population trend." 4-ER-771 (FWS1485) (2020 Progress Report at 41). In fact, science "indicates that intensive, long-term monitoring can acquire knowledge of general population status useful in planning conservation actions." AllianceSER-43 (FS36973) (Kendall et al. 2016 at 326).

Equally without merit is CBD's criticism of the current starting point for the agency's bear population size methodology, CBD Br. at 25 (referring to it as a

---

[2] CBD also criticizes the "small" number of radio-collared bears monitored by FWS in 2020. CBD Br. at 25 n.8. But radio-collaring a bear is an invasive process that is not without risk and "could cause unnecessary additional stress or harm" to the animal. 2-ER-257 (FWS18) (Project Biological Opinion at 16). *See also* 4-ER-742 (FWS1456) (2020 Progress Report at 12) (describing the invasive process).

21

"decade-old population estimate"), which actually is a robust historical grizzly bear population estimate based on a rigorous collection of 2012 field data. 2-ER-250 (FWS11) (Project Biological Opinion at 9) (referring to Kendall et al. 2016). Scientists annually use "demographic data and reasonable methods to determine changes in population size since that time," resulting in current Cabinet-Yaak Ecosystem grizzly bear population estimates. *Id.* CBD criticizes the agency's methodology not because Kendall et al. 2016's bear population estimate is wrong but rather because it is a "decade-old population estimate." CBD Br. at 25. *See also* CBD Br. at 30-31 (same). But the age of the starting point is irrelevant – the robust nature of the point-in-time population estimate, which is brought current annually, is unchanged by the passage of years.

CBD further misses the mark by demonstrating its lack of facility with probabilities in the context of FWS's determination that the bear population is likely stable or growing. CBD Br. at 26. CBD points to the Project biological opinion's statement that "statistically there is a 67 percent probability that the population is stable or increasing. Which means there is statistically a 33 percent probability that the population is decreasing." 2-ER-251 (FWS12) (Project Biological Opinion at 10) (discussing the 2020 population estimate). Citing those probabilities, CBD jumps to the illogical conclusion that the Project biological opinion wrongly "adopt[ed] the best-case scenario that the population is growing."

22

CBD Br. at 26.  Not so.  That there is a 67 percent chance the bear population is stable or increasing is not the best-case scenario.  It is a factual technical statement that it is more likely than not that the bear population is "stable or growing."  2-ER-296 (FWS57) (Project Biological Opinion at 55).

CBD finally addresses the issue of purportedly ignored grizzly bear mortality data, CBD Br. at 26-30, which at its core rests on CBD's unfounded belief that the expert agency should have assessed the grizzly bear's existing condition based solely on the minimum number of bears detected each year, despite the longstanding admonition of agency experts that it is improper to do so.  4-ER-747 (FWS1461) (2020 Progress Report at 17) (quoting the Recovery Plan's admonition that "'any attempt to use this parameter [a simple count of living bears] to indicate trends or precise population size would be an invalid use of these data'").

According to CBD, FWS ignored recent (since 2018) "information indicating an increase in grizzly bear mortality (especially that of female grizzlies)," CBD Br. at 26, an assertion unsupported by the record.  Consider, for example, FWS's 2018 Progress Report, which discussed (in a section titled "Known Grizzly Bear Mortality") that "[t]here were five instances of known or probable grizzly bear mortality" in 2018, including one adult female bear.  FER-8 (FS5513) (2018 Progress Report at 31).  In Table 10, FWS reported the "[c]ause,

23

timing, and location of known and probable grizzly bear mortality" from 1982 through 2018. *Id.* And in Table 12, FWS reported demographic data showing sex-specific mortality data through 2018, along with other demographic parameters. FER-11 (FS5516) (2018 Progress Report at 34). The record thus shows that FWS did not ignore 2018 grizzly bear mortalities, female or otherwise, in the Cabinet-Yaak Ecosystem.

The same is true for 2019. FWS's 2019 Progress Report discussed "four instances of known or probable grizzly bear mortality" in 2019, including one adult female bear. FER-14 (FS5965) (2019 Progress Report at 33). In Table 10, FWS reported the "[c]ause, timing, and location of known and probable grizzly bear mortality" from 1982 through 2019. *Id.* In Table 12, FWS reported demographic data showing sex-specific mortality data through 2019, along with other demographic parameters. FER-17 (FS5968) (2019 Progress Report at 36). FWS plainly did not ignore 2019 grizzly bear mortalities, female or otherwise, in the Cabinet-Yaak Ecosystem.

Nor did FWS ignore 2020 grizzly bear mortalities. For example, the 2020 Progress Report discussed "three instances of known or probable grizzly bear mortality . . . during 2020 (one subadult male and two adult females)." 4-ER-765 (FWS1479) (2020 Progress Report at 35). It also explained that two bear cubs, which previously had been "classified as mortalities in 2018" after their mother's

24

death, "were removed from the mortality list after" they were found alive. *Id. See also id.* (reporting in Table 10 the "[c]ause, timing, and location of known and probable grizzly bear morality" from 1982 through 2020); 4-ER-768 (FWS1482) (2020 Progress Report at 38) (reporting in Table 12 demographic data showing sex-specific mortality data through 2020, along with other demographic parameters).

CBD ignores the foregoing data, except to deny that it shows "FWS accounted for the recent rise in mortalities." CBD Br. at 33. That assertion makes no sense given that the data encompass all bear mortalities up through the date of the best available science on which the biological opinion was based.[3] See 2-ER-249 (FWS10) (Project Biological Opinion at 8) (describing the best available science available to and considered by FWS). CBD instead relies on its argument that FWS should have assessed the grizzly bear's existing condition based solely

---

[3] The Tribe's opening brief (at 32-33 n.7) discussed the separate issue of subsequent bear mortalities which led the court to hold in favor of AWR on its NEPA supplementation claim. 1-ER-60-66 (Op. at 56-62). That claim is not at issue on appeal. Independent of the court's ruling, grizzly bear researchers report annually on the bear's population biology, with the 2022 report (which issued in mid-August 2023) available online. See https://www.fws.gov/media/cabinet-yaak-grizzly-bear-recovery-area-2022-research-and-monitoring-progress-report (reporting on the recovery zone's 2022 estimated likelihood of a stable or increasing population (67%) at page 41, and its estimated population size (60-65 bears) at page 43). As of the date of this brief, the 2023 report had not yet issued.

on the minimum number of bears detected, including the minimum number of female bears detected. CBD Br. at 26-30, 31, 33. The district court erroneously adopted CBD's misguided argument. 1-ER-18-19 (Op. at 14-15). And it did so despite FWS, the expert agency entitled to deference on scientific matters, having explained why such an approach was inappropriate:

> It is biologically inappropriate to infer changes in the minimum number of bears detected from year to year as changes in total population size. These minimum counts are influenced by the level of effort available each year. Effort is influenced by funding, number of personnel, area of emphasis, and most recently COVID-19 work restrictions. All these factors have varied in recent years and have contributed to variable minimum counts.

2-ER-251 (FWS12) (Project Biological Opinion at 10). CBD attempts to minimize the foregoing caution by asserting that COVID only impacted one year, 2020. CBD Br. at 33. But the record shows that detection efforts are influenced each year by a variety of factors, like "funding, number of personnel, area of emphasis," in addition to the familiar restrictions associated with the pandemic.

In reality, FWS's evaluation of the grizzly bear baseline did not ignore recent grizzly bear mortality, including that of female bears. That the agency employed a scientific methodology other than the one preferred by CBD and the district court should have been immaterial. *See, e.g.*, *McNair*, 537 F.3d at 993 (review should be at its *most* deferential where an expert agency is addressing difficult issues within its area of special expertise). But instead, the district court

26

afforded the expert agency no deference as to its scientific methodology and substituted its non-expert opinion, and that of CBD, for that of FWS. Doing so was reversible error. The Kootenai Tribe asks the Court to so hold, and to reverse the district court on the issue of the ESA baseline for the Cabinet-Yaak Ecosystem grizzly bear population.

### D. The District Court Erred with Respect to the Grizzly Bear Existing Condition Disclosures Under NEPA.

The Kootenai Tribe explained in its opening brief that the district court erred in concluding the Forest Service violated NEPA by relying on stale data when disclosing the grizzly bear existing condition in the Project environmental assessment (EA). *See generally* Kootenai Tribe Br. at 35-39. *See also* 1-ER-38 (Op. at 34) (concluding cursorily that by "relying on data from a 2018 study, rather than data from more recent studies, the USFS's determination of baseline conditions was arbitrary and capricious"). The district court erred because grizzly bear data that became available between issuance of the draft EA in 2019 and the final EA in 2022 did not reflect a different existing condition for the bear, including because the grizzly bear population data is evaluated on a cumulative basis with no one year's data being evaluated in isolation.[4] *See, e.g.*, 4-ER-739

---

[4] The Tribe explained in its opening brief (at page 35) that the draft EA disclosed the grizzly bear existing condition based on 2017 data published in 2018, 8-ER-1797 (FS3806) (Draft EA at 297), and that the final EA, which issued in 2022,

27

(FWS1453) (2020 Progress Report at 9). The court therefore should have, but did not, employ the rule of harmless error. 5 U.S.C. § 706 (stating that a court "shall" employ the harmless error rule when reviewing a claim under the APA); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) ("The APA requires courts to take 'due account' of harmless error.") (cleaned up). The district court's failure to do so was legal error.

CBD offers two arguments in response, neither well taken and both resting on CBD's non-expert belief that grizzly bear population data should be based solely on the minimum number of bears detected from year to year. CBD Br. at 45-46, 48. *Cf.* 2-ER-251 (FWS12) (Project Biological Opinion at 10) (explaining it is "biologically inappropriate to infer changes in the minimum number of bears detected from year to year as changes in total population size").

First, CBD repackages its erroneous ESA baseline argument discussed above, to which the Court is respectfully referred, for purposes of its NEPA existing condition argument. CBD Br. at 45-46. As with its criticism of FWS's scientific methodology for establishing the ESA baseline for bears, CBD asserts the Forest Service erred under NEPA because the agency should have assessed the grizzly bear's existing condition based solely on the minimum number of bears

---

continued to disclose the bear's existing condition based on that data. 8-ER-1759 (FS2541) (EA at 300).

detected, despite the longstanding admonition of agency experts that it is improper to do so.  4-ER-747 (FWS1461) (2020 Progress Report at 17) (quoting the Recovery Plan's warning that "'any attempt to use this parameter [a simple count of living bears] to indicate trends or precise population size would be an invalid use of these data'").

According to CBD, because the minimum number of bears detected has been trending downward since 2017, whereas the best available science relied on by the agencies has not shown such a trend for the grizzly bear population size, the Forest Service must be ignoring grizzly bear "mortality . . . reveal[ing] a much darker picture of the status of grizzlies in the Cabinet-Yaak Ecosystem since 2017," again in CBD's non-expert opinion.  CBD Br. at 45.  CBD misses the mark because the scientific methodology relied on by the agencies did not (and does not) ignore grizzly bear mortality.

Scientists report annually on the cumulative grizzly bear evidence gathered over the years – through and including the most recent year – rather than on individual years in isolation.  4-ER-739 (FWS1453) (2020 Progress Report at 9).  They do so because this scientific methodology "results in a more conservative estimate of population trend."  4-ER-771 (FWS1485) (2020 Progress Report at 41).  *See also* 4-ER-746 (FWS1460) (2020 Progress Report at 16) ("All tables and calculations are updated when new information becomes available.").  Thus, each

29

year, FWS recalculates the estimated size of the grizzly bear population based on the best available and most up-to-date science, including grizzly bear mortality data. The 2020 Progress Report, for example, which issued in 2021 and was reviewed by the Forest Service prior to the agency issuing the final EA, 8-ER-1806-09 (FS4530-33) (Black Ram Process Review at 2-4), incorporated bear mortality data through and including 2020. *See, e.g.*, 4-ER-765-69 (FWS1479-83) (2020 Progress Report at 35-39).

To illustrate, in a section titled "Known Grizzly Bear Mortality," FWS in the 2020 Progress Report discussed "three instances of known or probable grizzly bear mortality . . . during 2020 (one subadult male and two adult females)." 4-ER-765 (FWS1479) (2020 Progress Report at 35). FWS also explained that two bear cubs, which previously had been "classified as mortalities in 2018" after their mother's death, "were removed from the mortality list after" they were found alive. *Id.* In Table 10, FWS reported the "[c]ause, timing, and location of known and probable grizzly bear mortality" from 1982 through 2020. *Id.* In Table 11, FWS reported grizzly bear mortality caused by humans over the same time period, up to and including 2020. 4-ER-767 (FWS1481) (2020 Progress Report at 37). And in Table 12, FWS reported demographic data showing sex-specific mortality data through 2020, along with other demographic parameters. 4-ER-768 (FWS1482) (2020 Progress Report at 38).

30

These examples for 2020 bear mortality data are not exhaustive. And as was discussed in the preceding section discussing the ESA baseline for the bear, similar mortality data is included in prior years' reports, including those for 2018 and 2019. Thus, the record shows the falsity of CBD's assertion that FWS has been ignoring recent grizzly bear mortality. CBD Br. at 48. There is no basis in fact for CBD's continued assertion that the expert agency's scientific methodology ignores recent bear mortality data. Repeatedly making a false assertion does not make it so.

Second, CBD asserts the final EA's continued use of 2017 grizzly bear data published in 2018 was not harmless. CBD Br. at 47-49. Describing the harmless error rule as a "strict test" requiring the Court to determine that the error had "no bearing on . . . the substance of the decision reached," CBD Br. at 48 (quoting *Nat. Res. Def. Council v. United States Forest Serv.*, 421 F.3d 797, 807 (9th Cir. 2005) (cleaned up)), CBD alleges the agency's use of older grizzly bear data did have a bearing on the Forest Service's decision. CBD Br. at 48 (alleging the use of 2017 grizzly bear data published in 2018 "deprived the Forest Service of an understanding of the grizzly's . . . potentially worsening situation in the Cabinet-Yaak Ecosystem," based on CBD's erroneous belief that grizzly bear population estimates should be based solely on the minimum number of bears detected each year).

31

CBD is wrong. In the NEPA context, a reviewing court employing the harmless error rule asks whether the error – here, the 2022 final EA's continued use of 2017 grizzly bear data published in 2018 – "materially impeded NEPA's goals—that is, whether the error caused the agency not to be fully aware of the environmental "consequences of the proposed action, thereby precluding informed decisionmaking and public participation, or otherwise materially affected the substance of the agency's decision." *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1104 (9th Cir. 2016).

On the facts of this case, the substance of the agency's decision was not materially affected, because the grizzly bear data that became available between issuance of the draft EA in 2019 and the final EA in 2022 did not reflect a materially different existing condition for the bear in the Cabinet-Yaak Ecosystem. In 2017, the grizzly bear population in the Cabinet-Yaak Ecosystem was estimated at 55-60 bears with a 73% likelihood that the population was stable or increasing. 8-ER-1895-96 (FS5371-72) (2017 Progress Report at 36-37) (reporting on data from 1983-2017). Similarly, the 2021 population size was estimated at 60-65 bears with a 70% chance the population was stable or increasing. 8-ER-1940-41 (FS5729-30) (2021 Progress Report at 41-42) (reporting on data from 1983-2021). An estimation of 55-60 bears in the population is not materially different than 60-

32

65 bears.  Nor is there a material difference between a 73% versus a 70%

likelihood that the population was stable or increasing.

Nor was the Forest Service deprived of updated information.  Prior to

issuing the final EA in 2022, the Forest Service confirmed it had considered

grizzly bear population data from a more recent report, the 2020 Progress Report

which issued in late 2021.  8-ER-1806-09 (FS4530-33) (Black Ram Process

Review at 2-4).  *See also* 4-ER-771-72 (FWS1485-86) (2020 Progress Report at

41-42) (reporting on data from 1983-2020, which estimated the population at

"about 60 bears" with a 67% chance of a stable or increasing population).  The

Forest Service's error thus was harmless.

In support of its assertion that the agency's use of older data was not

harmless, CBD points to *Natural Resources Defense Council v. United States

Forest Serv*ice, 421 F.3d 797, 807 (9th Cir. 2005) (*NRDC*), which is factually

distinguishable.  In *NRDC*, the Forest Service was held to have violated the APA

when it based a revision to the Tongass Forest Plan on a grossly overstated

projection of market demand for timber.  *Id.* at 802 (explaining that when revising

the Tongass Forest Plan, the Forest Service "misinterpreted the . . . market demand

projection," as a result of which the agency nearly doubled the actual projected

demand for timber).  Given that the Forest Service was compelled under a separate

statute – the Tongass Timber Reform Act – to seek to meet the annual and decadal

33

market demand for timber, the agency's gross overestimate of timber demand fatally infected the land management direction in the Tongass Forest Plan. *Id.* at 808. The error was not harmless because the agency's overstatement of market demand misinformed the agency's "determination . . . of how much timber is allowed to be cut," *id.*, the repercussions of which would have been realized for many years under the programmatic land management decision at issue.

This case is not like *NRDC*. Here, as discussed above, newer data would not have materially altered the Forest Service's NEPA analysis of the grizzly bear's existing condition with respect to the site-specific Black Ram Project. The agency's harmless omission thus had no bearing on its ultimate decision for Black Ram, and the district court should have applied the harmless error rule in its analysis. Because it did not, the Court should reverse the district court's adverse determination on the Forest Service's NEPA existing condition disclosures for the bear.

### E. The Forest Service Complied with Its Statutory Obligations When Calculating the Existing Permanent Motorized Route Metrics in the Project Area.

The district court erred in concluding the Forest Service failed to comply with its statutory obligations with respect to unauthorized road use when calculating and disclosing motorized route metrics in the Project area under Forest Plan standard FW-STD-WL-02. The Tribe's opening brief focused on AWR's

34

NEPA claims, explaining that contrary to the court's decision, the Forest Service satisfied its statutory obligations by thoroughly considering, disclosing and taking a NEPA "hard look" at the issue of unauthorized motorized access and by explaining the reasonable basis for its decision not to include temporary unauthorized road use when calculating the existing permanent motorized route density in the Project area. *See generally* Kootenai Tribe Br. at 39-60.

Because the district court appeared to have construed and decided AWR's claims as arising under procedural NEPA, 1-ER-43 (Op. at 39), rather than as a substantive challenge to the Project's compliance with Forest Plan standard FW-STD-WL-02 arising under NFMA, the Tribe focused on the district court's erroneous NEPA rulings regarding an alleged failure to disclose "the actual motorized use, including unauthorized use, as required by" the Forest Plan, 1-ER-47 (Op. at 43); an alleged failure to disclose the agency's methodology, 1-ER-49, 50 (Op. at 45-46); and an alleged failure to take a NEPA "hard look" at the unauthorized use issue. 1-ER-53-58 (Op. at 49-54). At the same time, the Tribe joined in federal defendants' NFMA arguments, which soundly demonstrate Project consistency with Forest Plan standard FW-STD-WL-02, as required by the statute. 16 U.S.C. § 1604(i) (site-specific projects must comply with the governing forest plan). *See generally* Fed. Br. at 32-42.

35

The Tribe continues to join in federal defendants' NFMA arguments, including those in their third cross-appeal brief. But before turning to AWR's efforts to defend the district court's NEPA holdings, the Tribe first points out fundamental flaws in AWR's arguments that arguably are dressed in NFMA clothing.

### 1.     <u>AWR's NFMA Assertions are Meritless.</u>

AWR asks this Court to affirm the district court's decision that the Forest Service's compliance with Forest Plan standard FW-STD-WL-02 was unascertainable on the record before the court. 1-ER-47-48 (Op. at 43-44); AWR Br. at 39-54. The Court should not do so. The district court reached its erroneous conclusion by failing to heed this Court's teachings that "we give the Forest Service ample latitude in ensuring the consistency of its actions with Forest Plans," *Oregon Nat. Desert Ass'n v. United States Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020), and that the "Forest Service's interpretation and implementation of its own Forest Plan is entitled to substantial deference." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012). The district court's decision also was flawed as a result of the court's failure to afford deference to, and second guessing of, expert agency technical determinations on this complex issue. *McNair*, 537 F.3d at 993. This warrants reversal, not affirmance.

36

AWR begins with the unremarkable assertion that the Project must comply with Forest Plan standard FW-STD-WL-02. AWR Br. at 39. AWR then quickly segues into the heart of its argument, which is that *any* amount of "illegal road use and roads with known ineffective closures" must be treated as permanent and hence included as open roads in the Forest Service's road metrics calculations. AWR Br. at 40. This is so, according to AWR, because the Forest Service "knows that closure breaches and illegal roads are commonplace in this area," *id.*, a factual assertion unsupported by the record.

Beginning in 2020, the Forest Service's Bear Management Unit reporting obligations to FWS required an annual "list of any gates, barriers, or other devices or methods that were found to be ineffective at managing motorized access, and any unauthorized creation of additional routes that were discovered, and the Forest's response to remedy the situation." 5-ER-1002 (FWS2034) (2020 Biological Opinion for Forest Plan at 119). The first such report – the 2020 Bear Year Monitoring Report – showed *no* unauthorized motorized use on existing routes in Bear Management Units 14 or 15, the Units involved in Black Ram. 5-ER-1115 (FWS6229) (2020 Bear Year Monitoring Report Appendix B at 5). And it showed only one instance of unauthorized motorized use on a user-created route in the Project area, in Unit 15. 5-ER-1117 (FWS6231) (Appendix B at 7). *See also* 5-ER-1130 (FWS6581) (email correspondence between FWS and the Forest

37

Service confirming that Bear Management Unit 14 "has historically experienced very few instances of illegal motorized use" due to its location and difficult terrain, and that the instances of illegal motorized use in Bear Management Unit 15 have been promptly remedied, except perhaps for those involving road 5890, which is treated as permanently open due to chronic unauthorized use). The record therefore shows that unauthorized road use in the Project area is uncommon, not commonplace.

AWR attempts to buttress its "commonplace" unauthorized road use assertion by pointing to alleged instances of breaches and illegal roads proffered by the Yaak Valley Forest Council. AWR Br. at 40-41. The district court similarly relied on such allegations, stating that the "Yaak Valley Forest Council . . . documented 45 instances of ineffective barriers and gates in 2020 and 2021 that the EA did not disclose," 1-ER-57 (Op. at 53) (citing FS44262-66), which was untrue.

The cited record document, a letter discussing *allegedly* ineffective closures for 45 berms, gates and roads, is found at 9-ER-2178-82. The Forest Service responded to the letter – with photos – to show the falsity of the Yaak Valley Forest Council assertions. 5-ER-2183-2207 (FS44664-88). Out of the alleged 15 breached berms, the Forest Service determined all 15 berms were functional, 2-ER-72-74 (Tribe's Statement of Disputed Facts ¶ 106); out of the alleged 17 ineffective gates, the only gate identified by the agency as nonfunctional (though repaired in

38

2021) was not in the Black Ram Project area, 2-ER-74-76 (Tribe's Statement of Disputed Facts ¶ 108); and regarding the alleged 13 roads lacking a gate or berm, only one – Road 5892 (shown twice) – was passable, though only for a short distance (0.3 miles). 2-ER-77-79 (Tribe's Statement of Disputed Facts ¶ 110).

AWR next asks this Court to believe that one of the two Bear Management Units involved in the Project – Unit 15 (Garver) – could experience Open Motorized Route Density of 42% during Project implementation. AWR Br. at 41. Not so.

As the Tribe explained in its opening brief (at page 16), FWS conservatively estimated during the ESA consultation process that Open Motorized Route Density might increase to 40% in Unit 15 during Project implementation, but it then included a mandatory term and condition in the Project's Incidental Take Statement requiring the Forest Service to limit operations so as not to exceed 37% Open Motorized Route Density while the Project is being implemented. 2-ER-304 (FWS65) (Project Biological Opinion at 63). *See also* 2-ER-315-16 (FWS76-77) (Project Biological Opinion at 74-75) (describing the agencies' consultation dialogue regarding Open Motorized Route Density in Unit 15). After Project implementation, this metric is expected to return to the current condition of 30%, which is better than the Open Motorized Route Density standard of equal to or less than 33% of the Unit having greater than one mile of open road per square mile. 8-

39

ER-1761 (FS2543) (EA at 302). Such temporary increases in Bear Management

Units are wholly permissible. *See, e.g.*, 2-ER-255 (FWS16) (Project Biological

Opinion at 14); 5-ER-918 (FWS1950) (2020 Biological Opinion for Forest Plan at

35); 7-ER-1540 (FWS965) (Forest Plan Biological Assessment at 33).

      Similarly meritless is AWR's criticism of the Forest Service's in-kind

replacement of Core habitat. AWR suggests the Forest Service relied on a false

presumption that road barriers for Core habitat will be 100% effective, AWR Br. at

41-42, but the district court recognized the falsity of AWR's assertion. 1-ER-50

(Op. at 46) (stating "there is no assumption that the closures are 100% effective").

This Court should do likewise.

      Before Core habitat can be entered, "replacement core must be secured; this

is called in-kind replacement." 8-ER-1771 (FS2553) (EA at 312). The goal for the

in-kind replacement barriers is to "reasonably deter[] motorized access during the

first few years," not to ensure 100% effectiveness. 2-ER-303 (FWS64) (Project

Biological Opinion at 62). Still, the Forest Service monitors closure devices used

for in-kind replacement at least two times each bear year for the first three years.

2-ER-303 (FWS64) (Project Biological Opinion at 62). This is in addition to the

Forest Plan requirement that the Forest Service annually monitor "at least 30

percent of all gates and barriers within" the Cabinet-Yaak Ecosystem to prevent

40

chronic unauthorized road use. 4-ER-853 (FWS1755) (2019 Bear Year Monitoring Report at 15).

The percentage of Core habitat will not decrease in either Bear Management Unit during Project implementation due to the Forest Service's in-kind replacement of Core. Each Unit actually will have more Core habitat after in-kind replacement, but not enough to change the percentage. 8-ER-1771 (FWS37) (Project Biological Opinion at 35). AWR's speculative pessimism about this habitat metric in the Project area is not grounded in fact and in no way supports a NFMA claim.

Also without merit is AWR's effort to analogize this case to those where courts found a NFMA violation based on the agency's failure to comply with "definitions" in a Forest Plan. AWR Br. at 43 (citing three Ninth Circuit cases for alleged support). The cited cases – *Alliance for the Wild Rockies v. United States Forest Service*, 907 F.3d 1105 (9th Cir. 2018) (*Alliance*), *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957 (9th Cir. 2002), and *Hapner v. Tidwell*, 621 F.3d 1239 (9th Cir. 2010) – are not on point. *Alliance* and *Rittenhouse* both involved site-specific projects developed using definitions of old growth other than the definitions in the governing forest plans. *Alliance*, 305 F.3d at 970 (project's old growth definition came from a draft EIS for proposed but never adopted forest plan amendments); *Rittenhouse*, 305 F.3d at 970 (projects' old growth definition came

41

from a post-forest plan "Region 4 Task Force" definition "not recognized by the Forest Plan"). And in *Hapner*, the agency "relied on two separate measurements of elk cover," neither of which mirrored the elk cover definition in the relevant forest plan. 621 F.3d at 1250.

Here, in contrast, the Forest Plan standard – FW-STD-WL-02, which embodies the grizzly bear Access Amendments, 7-ER-1472-76 (FS156-60) (Forest Plan at 146-50) – is silent on the issue of whether to include temporary unauthorized road use in the metrics for open roads in Bear Management Units. The standard refers to "effective" road closures in the context of Core habitat, 7-ER-1474 (FS158) (Forest Plan at 148), but the term "effective" is nowhere defined. The Tribe's opening brief (pages 41-43) discussed the 1998 origin of the term "effective" in the context of motorized access in grizzly bear territory, explaining that the term was added without definition more than 25 years ago and remains undefined to this day. *Cf.* AWR Br. at 43-45 (trying without success to point the Court to a "binding" Forest Plan definition that supports its position). In the context of road use for agency administrative activities in the Cabinet-Yaak Ecosystem, the standard also refers to the point at which such road use would flip a road to "'open' for analysis and reporting purposes," 7-ER-1475 (FS159) (Forest Plan at 149), which indicates that temporary, non-chronic use of a road does not transform the road into a per se open one. But Forest Plan standard FW-STD-WL-

42

02 does not explicitly define whether the Forest Service must treat a road having

temporary, non-chronic unauthorized use as open for purposes of the road density

metrics. And because the Forest Plan is silent, judicial review of the agency's

"interpretation and implementation of its own Forest Plan is entitled to substantial

deference." *Weldon*, 697 F.3d at 1056. *See also Oregon Nat. Desert Ass'n*, 957

F.3d at 1035 ("[O]ur circuit's caselaw establishes that we give the Forest Service

ample latitude in ensuring the consistency of its actions with Forest Plans[.]").

The road use caselaw discussed by AWR does not counsel otherwise. AWR

Br. at 46-49. For example, in *Alliance for the Wild Rockies v. Bradford*, 856 F.3d

1238 (9th Cir. 2017), a case involving a project area located outside of grizzly bear

recovery zone boundaries where the Open Motorized Route Density and Total

Motorized Route Density metrics did not apply, the court held that "roads closed to

motorized access by berms or barriers do not count toward" relevant road metrics.

*Id.* at 1243. In response to argument of counsel that all-terrain vehicles might

illegally circumvent such berms or barriers, the court quoted the relevant standard

for that project area (not applicable here), which referred to road closures that

"*effectively* prevent motorized access." *Id.* (cleaned up, emphasis in original).

Again, however, the term "effective" is undefined in the context of motorized

access in grizzly bear territory. Thus, contrary to AWR's assertion, AWR Br. at

47, *Bradford* does not support a NFMA claim in this case.

43

Nor is *Alliance for the Wild Rockies v. Savage*, 897 F.3d 1025 (9th Cir. 2018), helpful to AWR. *Savage* involved undetermined roads, which are "road prisms that exist on the landscape from previous management activities or were illegally created." AllianceSER-9 (FS2496) (EA at 255). In *Savage*, the Court held that supplemental NEPA analysis was required because the Forest Service did not disclose whether "undetermined roads were included in the Access Amendments baseline calculation . . . ." *Id.* at 1036. The Black Ram Project analysis does not suffer from the same defect. *See, e.g.*, AllianceSER-9 (FS2496) (EA at 255) (discussing the treatment of these roads). Nor did AWR in this case make the argument presented in *Savage*. Rather, AWR's argument here is that the Forest Service failed to account for unauthorized motorized access in the road metric calculations. *Savage* therefore is uninstructive.

AWR also misses the mark by criticizing the Forest Service for complying with the 2020 Biological Opinion for the Forest Plan in the aftermath of *Alliance for the Wild Rockies v. Probert*, 412 F.Supp.3d 1188 (D. Mont. 2019). AWR Br. at 48-49. In *Probert*, the plaintiff challenged a land management project located outside of grizzly bear recovery zone boundaries (where the Open Motorized Route Density and Total Motorized Route Density metrics did not apply) "[b]ased

44

on allegations of illegal use precipitated by ineffective closures" of roads.[5]  412

F.Supp.3d at 1194.  The plaintiff argued the agencies had failed to consider

evidence showing eight years of ineffective road closures in the project's NEPA

and ESA analyses which invalidated the Access Amendments' static baseline for

road use (a metric not applicable here).  *Id.* at 1201.  The district court agreed,

finding that the unauthorized road use rendered inaccurate the Access

Amendments' static baseline calculations for road use in the area located outside of

grizzly bear recovery zone boundaries, requiring reinitiation of consultation under

the ESA.  *Id.* at 1202-08.

    In response to *Probert,* the agencies thoroughly revisited unauthorized

motorized access on the Kootenai National Forest, leading to the 2020 Biological

Opinion for the Forest Plan.  *See generally* 5-ER-880-1028 (FWS1912-2060).

Acknowledging that unauthorized access is a background feature on the Forest,

though neither "persistent or chronic" based on the data, 5-ER-922 (FWS1954)

(2020 Biological Opinion for the Forest Plan at 922), FWS considered the

influence of unauthorized motorized access as part of the environmental baseline

---

[5]  Compared with Bear Management Units, the so-called "Bear Outside Recovery Zone" areas are likely to "experience more extensive illegal use because these areas are generally more densely roaded and have more human use" than Bear Management Units.  5-ER-922 (FS1246) (2020 Biological Opinion for Forest Plan at 39).

45

rather than as part of the road metrics.  5-ER-921 (FWS1953) (2020 Biological

Opinion for the Forest Plan at 38).

 *Probert* instructed the agencies to reassess the potential impacts of

unauthorized motorized access on the bear, and the agencies did just that.  And as a

result of the further analysis and reinitiation of consultation, the Forest Service

does not treat an instance of temporary unauthorized access as rendering a road

open for purposes of the road density calculations.  Starting with bear year 2020,

"short-term temporary unauthorized motorized access [is not included] in the bear

year metric calculations . . . ."[6]  2-ER-317 (FWS985) (2020 Bear Year Monitoring

Report at 1).  Although AWR criticizes the Forest Service for following the

science, AWR Br. at 49, to have done otherwise would run afoul of the Montana

District Court's recent admonition that agencies must follow "the evidence before

them," not employ false assumptions that they believe to be conservative and

hence beneficial to the bear.  *All. for the Wild Rockies v. Gassman*, 678 F.Supp.3d

1249, 1282-83 (D. Mont. 2023).  And again, because of the 2020 reinitiated

consultation, the Forest Service's Bear Management Unit reporting obligations

now require "that annually a list shall be provided of any gates, barriers, or other

---

[6]  *Chronic* unauthorized motorized access is treated differently.  *See, e.g.*, 5-ER-1130 (FWS6581) (explaining that in Bear Management Unit 15, road 5890 is treated as permanently open due to chronic unauthorized use).

46

closure devices that were found to be ineffective at managing wheeled motorized access, any unauthorized creation of additional (motorized) routes that were discovered within the [Bear Management Units] and the [Forest Service's] response to remedy the situation."[7] 5-ER-1002 (FWS2034) (2020 Biological Opinion for Forest Plan at 119).

The Montana District Court subsequently clarified that *Probert*'s holding applies only when road closure failure occurs in such a way that the road is effectively open. *All. for the Wild Rockies v. Marten,* 464 F.Supp.3d 1169, 1176 (D. Mont. 2020). *Marten* declined to apply the holding in *Probert* "based on the mere possibility that planned road closures will be ineffective." *Id.* AWR's attempt in this case to exaggerate alleged instances of unauthorized motorized use is likewise unduly speculative.[8] *See, e.g.*, AWR Br. at 40-41, 53. The record also demonstrates that the Forest Service is acting to identify, investigate, and fix

---

[7] This is in addition to the preexisting "30% monitoring" requirement for Bear Management Units. 4-ER-853 (FWS1755) (2019 Bear Year Monitoring Report at 15).

[8] In *Gassman*, a NEPA unauthorized road use claim for a project on the Kootenai National Forest was held more analogous to the situation in *Marten* than *Probert*. *Gassman* found that an earthen berm failure rate of about 35% did not support the "contention that earthen berms in the Project area are ineffective at restricting public access to roads." 678 F.Supp.3d at 1279. In reaching that determination, the court also found it probative that the Forest Service promptly addresses instances of unauthorized use "to try to prevent illegal access." *Id.*

problems with road closure devices, not allowing the roads to remain effectively open. *See, e.g.*, 8-ER-1762 (FS2544) (EA at 303). *See also* Kootenai Tribe Br. at 56-59 (refuting the district court's non-deferential and unwarranted cynicism of the Forest Service's efforts).

For all of these reasons, AWR's allegations that arguably sound in NFMA (though appear to have been decided by the district court under NEPA) are without merit and do not support affirmance.

**2.   The Forest Service Satisfied NEPA by Reasonably Disclosing Its Road Metrics Methodology.**

As the Tribe explained in its opening brief, Kootenai Tribe Br. at 47-50, the district court erred in concluding the Black Ram EA "obscured [the Forest Service's] methodology for how it calculated compliance with the Access Amendment in violation of NEPA." 1-ER-49 (Op. at 45). According to the court, the Forest Service erred because the road metrics were incorporated into the EA by reference without any explanation. *Id.* (stating that the incorporated by reference "Access Amendment was . . . the 'source' for" the metrics). The court further attributed to the Tribe (and to federal defendants) the position that the Forest Service had "intentionally omitted" its methodology from the EA because of the incorporation by reference, *id.*, an argument never asserted by the Tribe.

48

Nor would the Tribe have made such an argument. This is because the source of the road metrics was Forest Plan standard FW-STD-WL-02. *See, e.g.*, 6-ER-1329 (FS15) (Forest Plan at 5) (explaining that the Forest Service was retaining the Access Amendments methodology in the Forest Plan, in standard FW-STD-WL-02); 6-ER-1354 (FS40) (Forest Plan at 30) (setting forth standard FW-STD-WL-02 and referring the reader to Forest Plan Appendix B for the methodology details); 7-ER-1472-77 (FS156-61) (Forest Plan at 146-51) (setting forth the retained methodology in Appendix B). By law (NFMA), the site-specific Project was required to conform to the Forest Plan standard. 16 U.S.C. § 1604(i). The EA thus fully disclosed that the road metrics direction against which it was measuring Project compliance was that in standard FW-STD-WL-02, not a separate, non-Forest Plan metric incorporated into the EA by reference. *See, e.g.*, 8-ER-1757-58, 1760 (FS2539-40, FS2542) (EA at 298-99, 301). Nothing more was required of the agency in the context of an EA, which by regulation is intended to be a *concise* public document. 40 C.F.R. § 1508.9(a).[9]

Confusingly, the district court faulted the Forest Service for an alleged failure "to state its methodology as required by § 1502.24," 1-ER-49 (Op. at 45),

---

[9] All NEPA citations refer to the NEPA regulations in effect in 2019. 1-ER-25 (Op. at 21 n.3).

despite 40 C.F.R. § 1502.24 applying to environmental impact statements (EIS's), not to an EA like that prepared for Black Ram.  As this Court stated in the context of another EIS NEPA regulation found in 40 C.F.R. Part 1502, "the regulation by its own terms only applies" to EIS's, not EA's.  *Earth Island Inst. v. United States Forest Serv.*, 697 F.3d 1010, 1020 (9th Cir. 2012).  Thus, as in *Earth Island*, where the Forest Service had prepared an EA and not an EIS and hence was not required to comply with the NEPA regulation at issue, *id.*, here the Forest Service was not required to comply with 40 C.F.R. § 1502.24.  *See also Earth Island*, 697 F.3d at 1020 (citing Supreme Court authority for the principle that "[a]s a general rule, courts should not impose new requirements on agencies not imposed by the APA or a substantive statute").

Adding to the confusion, AWR defends the district court by asserting the Forest Service was required to comply with 40 C.F.R. § 1502.23, a NEPA regulation governing cost-benefit analyses in the context of EIS's.  AWR Br. at 54, 56.  Regardless of whether AWR cited to 40 C.F.R. § 1502.23 intentionally or through a (repeated) scrivener's error, a NEPA regulation governing the content of an EIS has no place in this case involving the Black Ram EA.

Nor was the Forest Service required to include in the Black Ram EA the level of detail demanded by AWR regarding the agency's road metric methodology.  *See, e.g.*, AWR Br. at 54 (demanding a discussion of the difference

50

between permanent roads included in the metrics and temporary road use excluded therefrom); *id.* at 55 (insisting that a certain administrative record document should have been discussed in the EA). Again, in the context of an EA, which by regulation is a concise public document intended to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact," 40 C.F.R. § 1508.9(a)(1), no such level of detail was required.

In short, the Forest Service satisfied NEPA's procedural requirements by identifying the source of its road metric methodology as Forest Plan standard FW-STD-WL-02. NEPA required nothing more, although as federal defendants point out, the Forest Service did far more. *See, e.g.*, Fed. Br. at 44. The district court thus erred in finding a NEPA violation based on the Forest Service's purported "failure to explicitly disclose its methodology," and to do so "in the EA section titled 'Methodology'" no less. 1-ER-50 (Op. at 46). This Court should reverse.

### 3. The Forest Service Took a NEPA "Hard Look" at the Issue of Temporary Unauthorized Road Use in the Project Area.

Contrary to AWR's contentions, AWR Br. at 56-62, the district court erred in concluding the Forest Service failed to take a NEPA "hard look" at the issue of "unauthorized or illegal road use." 1-ER-54 (Op. at 50). The Kootenai Tribe's opening brief showed (at pages 54-60) that the court's conclusion ran counter to

the evidence. AWR failed to respond to the Tribe's argument, relying instead on three assertions that do not support affirmance.

First, AWR asserts that the district court correctly concluded the Forest Service does not respond promptly to road closure breaches. AWR Br. at 57-58. AWR goes a step further by criticizing the Forest Service for concealing its alleged dilatoriness from the public. *Id.* AWR's argument is not well taken.

The Tribe addressed this issue head-on in its opening brief, Kootenai Tribe Br. at 56-58, observing that the court non-deferentially rejected the record evidence that the Forest Service repairs road closure breaches "'as quickly as possible after discovery.'" 1-ER-56-57 (Op. at 52-53) (quoting EA at 303). The district court particularly relied on the 2020 Bear Year Monitoring Report, which it characterized as demonstrating that the agency did a poor job in 2020 of responding to and repairing breaches. 1-ER-57 (Op. at 53) (citing page 23 of the 2020 Bear Year Monitoring Report). Not so.

The very next page of the 2020 Bear Year Monitoring Report explained that "due to covid-19 and other work limitations, no barriers were repaired or gates reinforced with rocks on the side [in the 2020 bear year], but locks were replaced on existing gates, often numerous times." 5-ER-1069 (FWS6183) (2020 Bear Year Monitoring Report at 24). The district court ignored that reasonable explanation.

52

In fact, a more thorough look at the data shows that the Forest Service in bear year 2020 exercised diligence despite covid-19 work limitations. Out of 268 gates in the Cabinet-Yaak Ecosystem, the agency monitored 232 gates (86% of the total) and found only 40 breaches (17% of the total), then repaired 24% of them in the same year. 5-ER-1068 (FWS6182) (2020 Bear Year Monitoring Report at 23). The agency also monitored all 683 barriers in the Cabinet-Yaak Ecosystem and found only 32 of them breached, 5% of the total. *Id.* That the agency was unable to make all repairs in bear year 2020 due to covid-19 work limitations does not support the court's non-deferential rejection of the evidence showing that the agency diligently monitors road closures and fixes unauthorized road use problems as quickly as possible.

Nor does the evidence pointed to by the court speak to agency monitoring in Bear Management Units 14 and 15, the only two Units at issue in this case. Rather, the referenced page in the 2020 Bear Year Monitoring Report addressed the entire portion of the Cabinet-Yaak Ecosystem on the Kootenai National Forest. 5-ER-1068 (FWS6182) (2020 Bear Year Monitoring Report at 23, Table 9). In contrast, Appendix B to the 2020 Bear Year Monitoring Report, which the district court ignored, showed no unauthorized motorized use on existing routes in Bear Management Units 14 or 15. 5-ER-1115 (FWS6229) (Appendix B at 5).

Second, AWR criticizes the Forest Service by again pointing to alleged instances of breaches and illegal roads proffered by the Yaak Valley Forest Council, and by complaining that the agency did not disclose the Yaak Valley Forest Council's allegations to the public. AWR Br. at 58. But the Forest Service took a hard look at the Yaak Valley Forest Council's alleged evidence of ineffective closures for 45 berms, gates and roads, see 9-ER-2178-82, and found it without basis. 5-ER-2183-2207 (FS44664-88). As the Tribe pointed out in its opening brief (at pages 58-59), out of the alleged 15 breached berms, the Forest Service determined all 15 berms were functional, 2-ER-72-74 (Tribe's Statement of Disputed Facts ¶ 106); out of the alleged 17 ineffective gates, the only gate identified by the agency as nonfunctional (though repaired in 2021) was not in the Black Ram Project area, 2-ER-74-76 (Tribe's Statement of Disputed Facts ¶ 108); and regarding the alleged 13 roads lacking a gate or berm, only one – Road 5892 (shown twice) – was passable, though only for a short distance (0.3 miles). 2-ER-77-79 (Tribe's Statement of Disputed Facts ¶ 110). AWR makes no effort to refute this evidence. NEPA certainly does not require an action agency to disclose false allegations to the public.

Finally, AWR returns to *Probert*, AWR Br. at 59-60, which it apparently views as dispositive on the issue of whether the Forest Service took a hard look at potential Black Ram Project impacts on the grizzly bear. The Tribe discussed

*Probert* above, *see supra* part IV.E.1, and respectfully refers the Court to that earlier discussion.

Fundamentally, the district court's effort to analogize this case to prior unauthorized road use caselaw in three specific ways, and AWR's reliance on same, AWR Br. at 61, is flawed. First, in the Project area, unauthorized road use has not been documented "'in three of eight years reported.'" *Id.* (quoting 1-ER-56 (Op. at 52)).[10] See 5-ER-1115 (FWS6229) (Appendix B at 5) (showing no documented unauthorized motorized use on existing routes in the Project area (Units 14 and 15) in the 2020 Bear Year Monitoring Report). Second, as was discussed above, the Yaak Valley Forest Council's photos, which allegedly documented unauthorized road use, AWR Br. at 61 (citing 1-ER-56 (Op. at 52)), were demonstrated to be false. Third, the fact that "'some forest users have and will continue to break the law by bypassing road closures'" does not support a NEPA hard look violation. *Id.* A background level of unauthorized road use is inherent in the Open Motorized Route Density and Total Motorized Route Density metrics – it was occurring decades ago when the Access Amendments were developed, and it continues to happen today. 2-ER-259 (FWS20) (Project Biological Opinion at 18).

---

[10] AWR quoted the published version of the district court's decision.

The biological opinion resulting from the reinitiated consultation ordered by *Probert* evaluated whether unauthorized motorized use posed a previously overlooked threat to the grizzly bear. Based on years of monitoring data, FWS concluded it did not:

> Illegal motorized access could occur anywhere on the Forest. While illegal motorized access has the potential to affect individual grizzly bears, the amount, location, duration, and timing of effects resulting from such illegal use is not known. The probability of long-term illegal motorized access and probability of illegal access coinciding with the presence of grizzly bears is anticipated to be low but is unknown. As such, the potential consequences to grizzly bears are uncertain. Illegal motorized access is expected to be spatially disparate and temporary and is not likely to collectively cause an adverse effect because most Forest users follow travel regulations and when illegal use is observed, or when user-created roads become apparent, the Forest Service corrects the situation as soon as they are able. . . . Also, illegal motorized access would most likely result in temporary effects to grizzly bears as opposed to a permanent change in motorized access conditions because the Forest Service corrects the situation as soon as they are able.

5-ER-921-22 (FWS1953-54) (2020 Biological Opinion for Forest Plan at 38-39). Temporary, non-chronic use of a road thus does not transform the road into a per se open one. The Kootenai Forest Plan is silent on this issue, and the "Forest Service's interpretation and implementation of its own Forest Plan is entitled to substantial deference." *Weldon*, 697 F.3d at 1056. This Court should afford the Forest Service such deference and reverse the district court's non-deferential decision on the NEPA "hard look" issue.

56

## V.    <u>CONCLUSION</u>.

The district court properly upheld FWS's determination that Black Ram Project implementation would not jeopardize the grizzly bear under the ESA.  The Court should affirm the district court on that issue.  But the court erred in concluding FWS disregarded recent grizzly bear mortality when establishing the ESA baseline for the bear in the Black Ram biological opinion.  It also erred in concluding the Forest Service violated NEPA when disclosing the existing condition for the bear.  And it erred in concluding the Forest Service failed to comply with its statutory obligations with respect to unauthorized road use when calculating and disclosing motorized route metrics in the Black Ram Project area. The Court therefore should reverse the district court on the three discrete issues raised by the Kootenai Tribe on appeal.

DATED this 1st day of August, 2024.

/s/Julie A. Weis
Julie A. Weis
HAGLUND KELLEY LLP

Kris A. McLean
Tyson A. McLean
Kris A. McLean Law Firm

Attorneys for Defendant-Intervenor-
Appellant Kootenai Tribe of Idaho

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 13,325 words, excluding the parts of the brief exempted by Fed R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word Version 1808, font size 14 and Times New Roman type style.

DATED this 1st day of August, 2024.

/s/Julie A. Weis
Julie A. Weis
HAGLUND KELLEY LLP

Kris A. McLean
Tyson A. McLean
Kris A. McLean Law Firm

Attorneys for Defendant-Intervenor-
Appellant Kootenai Tribe of Idaho

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of August, 2024, I caused the foregoing

**INTERVENOR'S THIRD BRIEF ON CROSS APEAL** to be electronically

filed with the Clerk of the Court for the United States Court of Appeals for the

Ninth Circuit using the appellate CM/ECF system. Participants in the case who are

registered CM/ECF users will be served by the appellate CM/ECF system. I further

certify that I have caused the foregoing document to be sent by electronic mail to

the following non-CM/ECF participant:

   None

       /s/ Julie A. Weis
       Julie A. Weis