Nos. 23-2882, 23-2886, 23-3146

———————————————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————————————————

**CENTER FOR BIOLOGICAL DIVERSITY, et al.,**
*Plaintiffs-Appellees/Plaintiffs-Cross-Appellants*,

and

**ALLIANCE FOR THE WILD ROCKIES, et al.,**
*Plaintiffs-Appellees,*

v.

**UNITED STATES FOREST SERVICE, et al.,**
*Defendants-Appellants/Defendants-Cross-Appellees*,

and

**KOOTENAI TRIBE OF IDAHO,**
*Intervenor-Defendant-Appellant/*
*Intervenor-Defendant-Cross-Appellee.*

———————————————————————

Appeal from the United States District Court for the District of Montana
No. 9:22-cv-114 (Hon. Donald W. Molloy)

———————————————————————

**PLAINTIFFS-APPELLEES/CROSS-APPELLANTS CENTER FOR
BIOLOGICAL DIVERSITY, YAAK VALLEY FOREST COUNCIL AND
WILDEARTH GUARDIANS' FOURTH BRIEF ON CROSS-APPEAL**

———————————————————————

Edward B. Zukoski
Center for Biological Diversity
1536 Wynkoop Street, Ste. 421
Denver, CO 80202
Telephone: (303) 641-3149
tzukoski@biologicaldiversity.org

Andrea Zaccardi
Center for Biological Diversity
P.O. Box 469
Victor, ID
Telephone: (303) 854-7748
azaccardi@biologicaldiversity.org

*Attorneys for Plaintiffs-Appellees-Cross-Appellants Center for Biological
Diversity, Yaak Valley Forest Council and WildEarth Guardians*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES........................................................................ iii

TABLE OF ACRONYMS ............................................................................v

INTRODUCTION ........................................................................................1

ARGUMENT ...............................................................................................3

  I.   FWS VIOLATED THE ESA BY IGNORING CRITICAL GRIZZLY BEAR DATA. ....................................................................................................3

  II.  FWS VIOLATED THE ESA BY FAILING TO SUPPORT ITS NO-JEOPARDY CONCLUSION. ..................................................................13

      A.   FWS's Jeopardy Analysis Relies on an Arbitrary Baseline and an Erroneous Conclusion. ...........................................................13

      B.   Impacts at the Level of the Grizzly Bear Recovery Zone are Crucial to the Jeopardy Analysis. .......................................................16

  III.  THE FOREST SERVICE VIOLATED NEPA'S MANDATE TO TAKE A HARD LOOK AT THE ENVIRONMENTAL BASELINE. .........................21

CONCLUSION ..........................................................................................25

ii

# TABLE OF AUTHORITIES

## Cases

*Am. Rivers & Ala. Rivers All. v. FERC*,
  895 F.3d 32 (D.C. Cir. 2018) ...............................................................3

*Appalachian Voices v. U.S. DOI*,
  25 F.4th 259 (D.C. Cir. 2022) ......................................................11, 16

*Blue Mts. Biodiversity Project v. Blackwood*,
  161 F.3d 1208, 1214 (9th Cir. 1998)............................................ 24-25

*City of Sausalito v. O'Neill*,
  386 F.3d 1186 (9th Cir. 2004) ...........................................................23

*Conner v. Burford*,
  848 F.2d 1441 (9th Cir. 1988) .............................................................9

*Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*,
  707 F.3d 462 (4th Cir. 2013) ...............................................................9

*Drakes Bay Oyster Co. v. Jewell*,
  729 F.3d 967 (9th Cir. 2013)..............................................................23

*EDF v. FERC*,
  2 F.4th 953 (D.C. Cir. 2021) ..............................................................11

*Friends of the Clearwater v. U.S. Forest Serv.*,
  No. 3:20-cv-00322-BLW, 2021 U.S. Dist. LEXIS 146733
  (D. Idaho. Aug. 4, 2021) .....................................................................7

*Idaho Sporting Cong. v. Rittenhouse*,
  305 F.3d 957 (9th Cir. 2002).............................................................21

*Idaho Wool Growers Ass'n v. Vilsack*,
  816 F.3d 1095 (9th Cir. 2016)...........................................................24

*Lands Council v. Powell*,
  395 F.3d 1019 (9th Cir. 2004)...........................................................23

*Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
  70 F.4th 582 (D.C. Cir. 2023) .............................................................9

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)........................................................ 9, 12, 15, 20, 25

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
  668 F.3d 1067 (9th Cir. 2011) ...........................................................24

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   422 F.3d 782 (9th Cir. 2005) ...................................................12

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   524 F.3d 917 (9th Cir. 2008) ................................ 3, 16, 19

*NRDC v. U.S. Forest Serv.*,
   421 F.3d 797 (9th Cir. 2005) ...................................................22

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*,
   426 F.3d 1082 (9th Cir. 2005) .................................................15

*Rock Creek All. v. U.S. Fish and Wildlife Serv.*,
   663 F.3d 439 (9th Cir. 2011) ...................................................20

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
   747 F.3d 581 (9th Cir. 2014) ............................................ 6, 10

*Sierra Club v. EPA*,
   671 F.3d 955 (9th Cir. 2012) .....................................................7

**Statutes**

5 U.S.C. § 706(2)(A) .......................................................... 12, 20

16 U.S.C. § 1536(a)(2) .................................................. 3, 12, 13

16 U.S.C. § 1536(b)(3)(A) .......................................................3

42 U.S.C. § 4332(2)(C) ...........................................................24

**Regulations**

50 C.F.R. § 402.02 ............................................................ 3, 13

50 C.F.R. § 402.12(d) ...............................................................12

50 C.F.R. § 402.14(d) .................................................................3

50 C.F.R. § 402.14(g)(1) ............................................................3

50 C.F.R. § 402.14(g)(2) ............................................................3

**Other Authorities**

H.R. Rep. No. 96-967, 96th Cong., 1st Sess. (1979) (Conf. Rep.),
   *as reprinted in* 1979 U.S.C.C.A.N. 2572 ..............................9

## TABLE OF ACRONYMS

**APA**    Administrative Procedure Act

**BMU**    Bear Management Unit

**BiOp**    Biological Opinion

**CYE**    Cabinet-Yaak Ecosystem

**ESA**    Endangered Species Act

**EA**    Environmental Assessment

**FWS**    U.S. Fish and Wildlife Service

**NEPA**    National Environmental Policy Act

**NMFS**    National Marine Fisheries Service

## INTRODUCTION

The Black Ram Project ("Project") area is indisputably important habitat for grizzly bears, especially female grizzly bears, in the Cabinet-Yaak Ecosystem ("CYE"). In analyzing impacts of the Project on this small and fragile grizzly bear population, the U.S. Fish and Wildlife Service's ("FWS") Biological Opinion ("BiOp") disregarded critical information showing that for the past several years, grizzly bear mortalities have been on the rise while grizzly bear detections are dropping. FWS's fundamental disregard of recent data does not comply with the Endangered Species Act's ("ESA") mandate to use the best available science in assessing a baseline for the species. In an effort to justify FWS's analysis, Defendants argue that FWS did consider the recent increase in female mortality and the recent decline in detections, but fail to cite to anything in the BiOp to support this assertion.

Moreover, FWS's no-jeopardy conclusion is assessed against this arbitrary and misleading baseline, resulting in an underinformed jeopardy analysis. Defendants argue that the no-jeopardy conclusion is supported by the record, but FWS rests its conclusion on the agency's faulty assertion that the Project will not impact grizzly bear reproduction, despite its own findings to the contrary. The BiOp's no-jeopardy conclusion thus fails to accurately consider the impacts on recovery of grizzly bears in the CYE and, in turn, the species as a whole. In doing

so, FWS fails to articulate a connection between the facts and its no-jeopardy conclusion, in violation of the ESA and the Administrative Procedure Act ("APA").

The Forest Service violated the National Environmental Policy Act ("NEPA") in preparing the Environmental Assessment ("EA") by failing to take the required hard look at the Project's impacts on grizzly bears, relying on stale data from 2017 while simultaneously failing to consider the same data that FWS ignored—the recent rise in grizzly bear mortalities and the decline of grizzly bear detections in the CYE. The Forest Service does not appeal the district court's holding that the EA's grizzly bear analysis was arbitrary and fails NEPA's hard look requirement, but Intervenor argues that the omission of updated and relevant data was harmless error. Omitting crucial data on the current status of grizzly bears when assessing a Project's impacts to a protected species, however, is anything but harmless because it violates NEPA's core requirements.

Plaintiffs therefore ask that this Court affirm the district court's holdings that FWS violated the ESA by disregarding important data in setting its environmental baseline, and that the Forest Service violated the ESA by relying on FWS's flawed analysis and violated NEPA by failing to take a hard look at the Project's impacts to grizzly bears. We further ask that this Court reverse the district court's finding

2

that FWS complied with the ESA and APA when it upheld FWS's no-jeopardy conclusion.

## ARGUMENT

## I. FWS VIOLATED THE ESA BY IGNORING CRITICAL GRIZZLY BEAR DATA.

FWS's BiOp is invalid because it fails to provide an accurate environmental baseline using the "best scientific and commercial data available" as required by the ESA. *See* 16 U.S.C. § 1536(a)(2), (b)(3)(A); 50 C.F.R. §§ 402.14(g)(1), (2); 402.02; 402.14(d).[1] This Court has previously found that establishing an environmental baseline that fails to consider factors presently harming the species or degrading the species' habitat violates the ESA. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 929 (9th Cir. 2008) (finding that a biological opinion violated the ESA where it did not "incorporate degraded baseline conditions into its jeopardy analysis."); *see also Am. Rivers & Ala. Rivers All. v. FERC*, 895 F.3d 32, 46-47 (D.C. Cir. 2018) (holding that FWS acted arbitrarily in establishing a baseline that failed to consider degradation caused by power plant).

---

[1] As explained in Plaintiffs-Appellees/Cross-Appellants Center for Biological Diversity, Yaak Valley Forest Council and WildEarth Guardians' Brief on Cross-Appeal ("CBD 2d Br."), all citations are to the ESA regulations in effect prior to the recent adoption of new regulations, per the BiOp's reliance on the 2018 regulations.

In assessing the current status of grizzly bears for the Black Ram Project, FWS relied heavily upon a model that used outdated data from 2012 and an unsupported growth rate to project a baseline population of 60 grizzly bears in the CYE. FWS's method starts by using the 2012 estimated population of 48 to 50 bears based on Kendall et al. (2016) (Center SER-189-90), and then multiplies that population size by an estimated growth rate of 1.7%. 2-ER-250–51; 4-ER-771–72. This step leads to a population of 56 bears. Kasworm et al. (2021) finally adds an additional four bears to that estimate, assuming the survival of four of the eight bears that were augmented into the Cabinet Mountains since 2012. 4-ER-772. Kasworm et al. (2021) concludes that "[b]ased on this information, a population estimate of about 60 bears would seem reasonable."

The current population growth rate of 1.7% in Kasworm et al. (2021), relied upon to estimate the current population, is derived from the population change of radio-collared grizzly bears from 1983 through 2020—a period of nearly 40 years. 4-ER-771–72. The number of radio-collared grizzly bears used to estimate the growth rate throughout this time period has been low. For example, in the Cabinet Mountains three individual grizzly bears were radio-collared from 1983-1987, and in the Yaak River drainage five grizzlies were radio-collared in 1986 and 1987. 4-ER-735–36. The number of radio-collared grizzlies has not significantly increased

since that time. During 2020, FWS reports that it monitored just 11 radio-collared grizzly bears.[2] 4-ER-732.

Thus, as FWS admits, the "small" sample sizes relied upon to estimate the growth rate "yield a wide confidence interval." 2-ER-250-51; *see also* 4-ER-771 ("The sample sizes available to calculate population trend are small and yielded wide confidence intervals around our estimate of trend (i.e., λ)"). As FWS further acknowledges in the BiOp, "the confidence intervals indicate that statistically there is a 67 percent probability that the population is stable or increasing. . . . [and] a 33 percent probability that the population is decreasing." *See* 2-ER-251 (citing Kasworm et al. (2021) at 41, 4-ER-771).

At the same time, Defendants admit that there is "uncertainty inherent in the population growth rate," Federal Defendants'-Appellants' Third Cross-Appeal Brief ("Def. 3d Br.") 10, and for that reason, FWS found it necessary to consider other evidence. 2-ER-251. For example, FWS considered the reduction in mortality rates *over time*, the stable to increasing known reproduction and occupancy of females, and survival rates from its species status assessment showing improved

---

[2] Intervenor argues that radio-collaring bears is invasive and could cause stress or harm to bears. Intervenor's Third Brief on Cross-Appeal ("Int. 3d Br.") 21 n.2. But Plaintiffs criticize the small number of bears monitored solely to point out the limitations of the model as a reason why, as FWS admits, other data should be considered. *See* 2-ER-251 (the BiOp stating that "when statistical uncertain exists, other sources of data can also inform" population estimates).

female survival *over the years*. Def. 3d Br. 11 (citing 2-ER-251 and 2-ER-253). However, despite recognizing the need to consider other relevant data, FWS in the BiOp failed to consider and account for the recent data showing an increase in grizzly bear mortalities, and especially the recent high rates of female grizzly bear deaths.

The data shows that from 2018 to 2020, FWS identified 10 grizzly bear mortalities, which alarmingly included four females and two cubs of an unknown sex. *See* 4-ER-749.[3] By comparison, for the previous three years, from 2015 to 2017, FWS identified seven mortalities, including just one confirmed female and one of an unknown sex.[4] 4-ER-749. By failing to consider this data, FWS did not base the BiOp on the "best scientific and commercial data available," in violation

---

[3] In 2021, FWS reported the death of two additional bears, both males. 8-ER-1918. And in 2022, at least three female bears died, which Kasworm described as "*the highest number of known female mortalities in any year since we began monitoring in 1983*." 2-ER-166 (emphasis added).

[4] To the extent that the Declaration of Wayne Kasworm contains additional rationales not contained in the BiOp as to how Kendall et al. (2016) should be interpreted and what an increase in mortalities might mean for grizzlies in the CYE, 2-ER-167 ¶10, that information should be stricken from the record as post-hoc rationalization. *See, e.g., San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 603 (9th Cir. 2014) ("[W]e will not allow the agency to supply post-hoc rationalizations for its actions, so post-decision information may not be advanced as a new rationalization either for sustaining or attacking an agency's decision.") (citation and quotation omitted). However, should the Court choose to consider this information, Kasworm states in his declaration that "one year of higher mortality does not necessarily equate to a decreasing trend." 2-ER-167 ¶10. Unfortunately, the data shows more than one year of increasing mortalities.

of the ESA. *See Sierra Club v. EPA*, 671 F.3d 955, 968 (9th Cir. 2012) (holding

"we should not silently rubber stamp agency action that is arbitrary and capricious

in its reliance on old data without meaningful comment on the significance of the

more current compiled data"); *Friends of the Clearwater v. U.S. Forest Serv.*, No.

3:20-cv-00322-BLW, 2021 U.S. Dist. LEXIS 146733, at *23-24 (D. Idaho. Aug. 4,

2021) (NMFS's consideration of general fluctuations in population numbers over

time and the general decline in steelhead abundance is insufficient to comply with

the ESA where "Defendants fail to provide any citation to the BiOp showing that

NMFS actually considered the *recent data* showing significant declines in returns")

(emphasis added).

That FWS cannot ignore current mortality data that could significantly

impact the population and population trend is highlighted further by the fact that

while mortalities in the CYE were recently increasing, detections of grizzly bears

were in decline. Annual reports show that detections of bears fell each year from

2017 to 2019 by a total of approximately 22%, with detections of female grizzlies

dropping by approximately 33%. In 2017, for example, FWS detected a minimum

54 grizzlies including 21 females and four of unknown sex, compared to 2019

when FWS detected 45 grizzlies including 14 females and four of unknown sex. *Compare* CenterSER-143 to 4-ER-732.[5]

In justifying FWS's failure to consider this data, Defendants cite the BiOp for the proposition that "[t]o rely *solely* upon a count of the known detected individuals is an over-simplification of population biology" because "minimum counts are influenced by the level of effort available each year." Def. 3d Br. 13 (emphasis added). *See also* Def. 3d Br. 19 (stating Plaintiffs rely on detected mortalities "alone"); Int. 3d Br. 23 (stating Plaintiffs argue the bear's current status should be "based solely" on minimum detections); Int. 3d Br. 25-26 (same). But Defendants and Intervenor repeatedly mischaracterize Plaintiffs' argument. Plaintiffs have never suggested that FWS should rely "solely" on minimum detection data or "solely" on the recent mortality data to estimate the population or population trend. Rather, Plaintiffs contend—and the district court agreed—that these are highly relevant factors that must be given consideration, not ignored or dismissed without explanation. 1-ER-018 (district court holding FWS cannot ignore documented female deaths "because to do so ignores an important aspect of the problem that the agency itself acknowledges"). Thus, although FWS explained why it didn't "solely" rely upon minimum grizzly bear detections to estimate the

---

[5] The subsequent annual report shows a further decline, with 42 grizzlies detected including 14 females and four of unknown sex in 2020. 8-ER-1901.

population (without mentioning the recent decline in detections), 2-ER-251, FWS's critical failure is that it never presents the minimum count data in the BiOp or explains why it didn't consider it as a relevant factor. This failure to consider the most recent, clearly relevant data is arbitrary and capricious. *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (an agency must "*examine the relevant data* and articulate a satisfactory explanation for its action") (emphasis added); *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 473 (4th Cir. 2013) (finding NMFS's BiOp violated the ESA where the agency was presented with more recent data but still relied on outdated data without explaining why); *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988) (holding that in preparing a biological opinion, "FWS cannot ignore available biological information . . . .").[6]

Defendants also assert that minimum detections are unreliable because they may fluctuate based on the level of effort for monitoring. Def. 3d Br. 16-17 (citing

---

[6] Intervenor also assert that this Court need not give the benefit of the doubt to grizzly bears in its analysis, relying on *Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 590 (D.C. Cir. 2023). Int. 3d Br. 19-20. In the *Maine Lobstermen's* case, the court determined that the biological opinion completed by NMFS was arbitrary and capricious for "indulg[ing] in worst-case scenarios" to give "'the benefit of the doubt' to the species." *Id.* at 599-600. Even though clear congressional intent as well as case law in the Ninth Circuit require that the benefit of the doubt goes to the species, *see Conner v. Burford*, 848 F.2d at 1454; H.R. Rep. No. 96-967, 96th Cong., 1st Sess., at 12 (1979) (Conf. Rep.), *as reprinted in* 1979 U.S.C.C.A.N. 2572, 2576, this Court need not reach this issue given the BiOp's failure to address the best available mortality data.

2-ER-251). In doing so, Defendants for the first time add a post-hoc explanation to describe how personnel taking samples from different areas year to year could skew results. Def. 3d Br. 17. Defendants cite the BiOp for this explanation though this new rationale to debunk the importance of minimum detection data is not contained in the BiOp. Thus, the Court should not consider this new argument. *See, e.g., San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 603. In any event, even Defendants' post hoc explanation does not contend that the level of monitoring effort skewed results over the past several years. Accordingly, Defendants have no compelling argument as to why minimum detection data should not be considered as one relevant factor in assessing the baseline status of grizzly bears in the CYE.[7]

Defendants next argue that they did consider mortality data, citing data in the BiOp that shows improvement in survival rates "over the years" since 1982 and listing known and probable mortalities since that time. Def. 3d Br. 11-12. Defendants argue that this data is useful because it "smooth[s] the data over time," thus creating "a more conservative estimate of population trend." Def. 3d Br. 14; *see also* Int. 3d Br. 21 (same). What Defendants do not explain is that "smooth[ing]

---

[7] Indeed, one may reasonably question why FWS spends such a great deal of agency resources annually collecting minimum detection information if it considers the information gathered essentially meaningless. *See* 4-ER-732 (explaining FWS uses a variety of measures to detect grizzlies alive in the CYE, including capture, collared individuals, rub tree DNA, corral DNA, opportune DNA sampling, photos, and credible observations).

the data" over a period of approximately thirty years may also diminish the import of the most recent data, which is likely impacting the *current* population trend. Simply put, even if general discussions of mortality rates over many years may have some relevance, that cannot substitute for the missing analysis on the most recent and current mortality data.

Similarly, Intervenor can point to nothing in the BiOp showing FWS *considered* the rising mortality rates but nonetheless seems to suggest that FWS must have considered the information because it is embodied in other record documents. Int. 3d Br. 23-25. But the existence of data in the record, not incorporated into or discussed in the BiOp, is insufficient to show that FWS considered and analyzed the data. *See, e.g., Appalachian Voices v. U.S. DOI*, 25 F.4th 259, 274 (D.C. Cir. 2022) (FWS could not rely on models to supply missing analysis because the BiOp "never says that it is relying on these models"); *EDF v. FERC*, 2 F.4th 953, 975 (D.C. Cir. 2021) ("it is not enough that [supporting] evidence may exist within the record; the question is whether the [agency's] decisionmaking . . . has sufficiently evaluated the evidence."). Here, because FWS never discusses the recent decrease in minimum detections or the rise in mortalities in the BiOp, the Court should reject Intervenor's attempt to rely on the evidence elsewhere in the record to fill these considerable gaps in FWS's own analysis.

After pointing to general discussions of mortality that do not include this critical data, Defendants plead for deference. Def. 3d Br. 12; *see also* Int. 3d Br. 18. But here, where FWS arbitrarily failed to consider relevant data without explanation, deference is not warranted. As this Court has previously held, "[d]eference is not owed when the agency has completely failed to address some factor consideration of which was essential to making an informed decision." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798-99 (9th Cir. 2005) (the district court did not abuse discretion where it invalidated a biological opinion omitting factors essential to the analysis) (alterations and citation omitted).

In sum, because FWS ignored the most current data that shows a recent increase in female mortalities and decline in minimum detections, FWS failed to incorporate the "best scientific and commercial data available" in violation of the ESA and failed to consider relevant factors in violation of the APA. 16 U.S.C. § 1536(a)(2) (ESA's requirement to use best available science in biological opinions); 50 C.F.R. § 402.12(d) (same); 5 U.S.C. § 706(2)(A) (APA's requirement that courts set aside arbitrary and capricious or unlawful agency action); *State Farm*, 463 U.S. at 43 (holding that an agency is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem"). This Court should affirm the district court's decision that the BiOp ignored an important aspect of the problem and thus is arbitrary and capricious. *See* 1-ER-018.

12

## II.    FWS VIOLATED THE ESA BY FAILING TO SUPPORT ITS NO-JEOPARDY CONCLUSION.

### A.    FWS's Jeopardy Analysis Relies on an Arbitrary Baseline and an Erroneous Conclusion.

In accordance with the ESA, the Forest Service was required to consult with FWS to insure that the Black Ram Project is not likely to jeopardize the continued existence of the grizzly bear. 16 U.S.C. § 1536(a)(2). To "jeopardize the continued existence of" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild *by reducing the reproduction*, numbers, or distribution of that species." 50 C.F.R. § 402.02 (emphasis added).

FWS found in the BiOp that "[t]he adverse effects associated with the Black Ram Project may significantly impact an adult female grizzly bear's ability to find food resources, breed and raise young, and find adequate shelter at some time." 2-ER-288. Adult females "may not breed at their potential frequency or may fail to complete gestation due to decreased fitness." 2-ER-296. FWS estimates that the Project is likely to reduce the reproduction of up to three females for 1-2 reproductive cycles. 2-ER-293–94; 296.

Because so few female grizzly bears inhabit the CYE, interfering with the reproduction of three females represents a substantial portion of the female population—approximately 18% of females in the entire Recovery Zone, to be

exact.[8] *See* CBD 2d Br. 28-29 n.10; 37-38. And, of course, the impacts may extend well beyond the life of the Project because if impacted females are not successfully reproducing, they are also failing to add females to the population who may have reproduced upon reaching sexual maturity. Thus, FWS's assessment that impacts are "short-term" and will only last "3-5 bear years" is disingenuous and ignores the potential long-term effects on the population's path to recovery. 2-ER-288; 2-ER-294.[9]

Despite finding that the Black Ram Project may impact grizzly bear reproduction, the BiOp concludes that "the Black Ram Project *will not reduce the reproduction*, numbers, or distribution of grizzly bears throughout the CYE . . . ." 2-ER-296 (emphasis added). This statement contradicts FWS's own findings in the BiOp and certainly does not square up with the potential reduction of the reproductive capacity of nearly 20% of the CYE population. To explain this unsupported conclusion, FWS curiously asserts that this sentence is just meant to make a "general point . . . that the project will not affect the ecosystem's continued improvement through reproduction and increased rates of survival." Def. 3d Br. 52.

---

[8] Defendants, while taking issue with the fact that Plaintiffs did not assess the number of adult females in the ecosystem in district court, do not dispute these estimates. Def. 3d Br. 50 n.14.

[9] Intervenor complains that Plaintiffs ignore statements that implementation of the Project is likely to benefit bears by increasing huckleberry production. Int. 3d Br. 13. *See also* Def. 3d Br. 45 (also discussing increased forage opportunities). But there is no evidence that grizzly bears in the CYE are suffering from starvation.

As an initial matter, this Court should give this new explanation as to the meaning of FWS's conclusion no weight because "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *State Farm*, 463 U.S. at 50 (citation omitted). Indeed, "when reviewing a biological opinion," this Court shall "rely only on what the agency *actually said* in the BiOp to determine whether the agency considered the appropriate factors." *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1091 (9th Cir. 2005) (citation and internal quotations omitted) (emphasis in original). But even if this Court were to consider FWS's post-hoc rationalization, it is not supported by the facts. As FWS itself recognized in the BiOp, this Project will not support continued improvement through reproduction, but rather will do the exact opposite by slowing or precluding reproduction of nearly 20% of adult females in the CYE. Thus, Defendants' novel explanation cannot save FWS's erroneous conclusion in the BiOp.

For Intervenor's part, they argue that FWS's conclusion refers to reproduction in the CYE "and beyond." Int. 3d Br. 16. Although the paragraph referenced goes on to discuss other grizzly bear populations, this pertinent statement is clearly discussing only the CYE: the Project "will not reduce the reproduction . . . of grizzly bears *throughout the CYE* . . . ." 2-ER-296 (emphasis added). Thus, Intervenor's argument has no merit.

15

As Defendants correctly note in their brief, the jeopardy determination is made "by analyzing the effects on the listed species and add[ing] those effects to the environmental baseline . . . ." Def. 3d Br. 43. This is the proper approach to determine jeopardy under the ESA regulations. The problem here is that FWS is adding effects to an arbitrary and unsupported environmental baseline, as explained above. *See supra* 3-12. Thus, because FWS's jeopardy determination relies upon an improper baseline, the jeopardy conclusion itself is also necessarily arbitrary. *See, e.g., Appalachian Voices*, 25 F.4th at 278 (holding that where FWS failed to properly analyze the environmental baseline, "its no-jeopardy conclusions . . . are necessarily arbitrary").

This Court need not find that applying a proper baseline analysis and disregarding FWS's erroneous conclusion that the Project will not impact reproduction would in fact result in a jeopardy finding. It is enough to set aside the jeopardy finding as arbitrary based on these fundamental flaws, and we urge this Court to do so here. *See Nat'l Wildlife Fed'n*, 524 F.3d at 933 (finding a biological opinion's jeopardy analysis arbitrary because fixing flaws "*could* change the jeopardy analysis.") (emphasis added).

## B. Impacts at the Level of the Grizzly Bear Recovery Zone are Crucial to the Jeopardy Analysis.

The no-jeopardy determination in the BiOp is also arbitrary because it is not supported either by the facts in the record or FWS's own determination as to the

critical importance of recovering grizzly bears in the CYE. As a factual matter, the Cabinet-Yaak grizzly bear population falls short of reaching many of the initial subgoals of the Grizzly Bear Recovery Plan, including the population objective of 100 bears, the number and distribution of female bears with cubs, and the number of bear management units with young. CenterSER-173 (Recovery Plan subgoals); 2-ER-251. The Project area has been "an important area for female grizzly bears over the past several decades," supporting "multiple reproductive females that have contributed to the CYE population." 2-ER-256. However, the Project will slow or impede the reproductive capacity of up to three female bears for several years, potentially slowing progress toward reaching recovery. Impacts to recovery are likely to extend beyond the action area to the Cabinet-Yaak Recovery Zone level, given, as noted above, that this Project threatens to halt the reproduction of nearly 20% of the ecosystem's adult female bears.

Defendants and Intervenor first argue that, contrary to the evidence, FWS properly determined that the Project will not jeopardize grizzly bears in the CYE. Def. 3d Br. 45-46; Int. 3d Br. 13-15. But in reaching its no-jeopardy conclusion, FWS never considered the significant percentage of females that may be harmed by this Project and how slowing or impeding their reproductive capacity may

impede recovery now and in the future.[10] Nearly 20% is not "a small proportion," as FWS declares in the BiOp. 2-ER-294. This failure alone undermines FWS's jeopardy conclusion.

Defendants and Intervenor next note that jeopardy is determined at the level of the listed species—i.e., grizzly bears in the lower 48 states. Def. 2d Br. 52-55; Int. 2d Br. 14-17. The implication here is that a project could theoretically wipe out the entire population of grizzly bears in the Cabinet-Yaak Recovery Zone with no impacts to jeopardy. *See, e.g.,* Def. 3d Br. 46 (asserting more resilient grizzly populations in other ecosystems "will be unaffected by the project"); Int. 3d Br. (same). But FWS has been clear that grizzly bears in the lower 48 states cannot reach recovered status without full recovery of grizzly bears in the six identified recovery zones, including the Cabinet-Yaak Recovery Zone. *See* CBD 2d Br. 40-42. To the extent that Defendants and Intervenor attempt to minimize the importance of recovering bears in the CYE, this is not in line with FWS's stated needs to achieve recovery of the listed species. *See, e.g.,* 5-ER-1044 ("[t]he species throughout the lower 48 States can be delisted when the population in all established recovery zones have been delisted.").

---

[10] It is worth noting that although this Project may impact nearly 20% of adult females, there are other projects underway or under proposal in the CYE that may also negatively impact grizzly bears. See 2-ER-255 (mentioning the Knotty Pine Project in BMU 12 and the Montanore Mine Project in BMU 5).

Defendants argue that recovery may be impeded without causing jeopardy while admitting that, under Circuit precedent (as well as the ESA's implementing regulations), impacts to recovery must be considered in assessing jeopardy. Def. 3d Br. 47-48. Defendants cite *National Wildlife Federation v. National Marine Fisheries Service*, 524 F.3d at 933, which supports Plaintiffs' position here. Def. 3d Br. 47-48. In that case, plaintiffs challenged a biological opinion that addressed effects of dam operations on listed endangered fish in the lower Columbia and Snake Rivers. *Id.* at 922-23. The Court held that the biological opinion's jeopardy analysis was flawed because, among other reasons, it failed to incorporate degraded baseline conditions into its jeopardy analysis and did not consider recovery impacts on the listed species. *Id.* at 928-33. In so holding, the Court emphasized that the agency need not find appreciable reduction of survival odds *and* recovery to reach a jeopardy conclusion. *Id.* at 931. In other words, an appreciable reduction of recovery alone may be enough to conclude a project will cause jeopardy. *Id.* at 932 (quoting legislative history stating that "significant impairment of recovery efforts" may cause jeopardy). Here, harming the reproductive success of approximately 17% of adult females in the Cabinet-Yaak Recovery Zone threatens to appreciably reduce recovery of grizzly bears in this ecosystem and thus to the listed species.

Defendants also argue that in *Rock Creek Alliance v. U.S. Fish and Wildlife Service*, 663 F.3d 439, 443 (9th Cir. 2011), the Court upheld a no-jeopardy determination where the agency found that the rate of recovery may be slowed by the agency action. Def. 3d. Br. 48. In that case, FWS found that the rate of bull trout recovery "may slow slightly, if at all," and that if current recovery efforts remain successful, "the *recovery rate* of the core area may not be affected." *Id.* at 443 (emphasis in original). But the facts of that case are not analogous because, unlike fish, grizzly bears have an extremely slow rate of reproduction, so impacts to reproductive success may have long-lasting impacts.[11] *See* CBD 2d Br. 38 n.14 (discussing slow reproductive rate of grizzly bears).

Because FWS failed to articulate a rational connection between the facts found and the no-jeopardy determination, the determination is arbitrary and must be set aside. 5 U.S.C. § 706(2)(A); *State Farm*, 463 U.S. at 43. And because the BiOp is arbitrary and unlawful for all the reasons described above, the Forest Service's reliance on the BiOp was also arbitrary and failed to fulfill the Forest Service's Section 7 duties under the ESA. *See* CBD 2d Br. 42-43.

---

[11] Notably, in *Rock Creek Alliance*, FWS proposed an "extensive package" of "robust" mitigation measures to offset any potential finding of jeopardy to grizzly bears. 663 F.3d at 444.

### III.   THE FOREST SERVICE VIOLATED NEPA'S MANDATE TO TAKE A HARD LOOK AT THE ENVIRONMENTAL BASELINE.

As the district court held, the Forest Service's EA relied on stale data and ignored relevant information in establishing the baseline for the grizzly bear population in the Project area. 1-ER-037–38. In fact, the Forest Service relied on even older data than FWS, using data from Kasworm et al.'s 2018 annual report (Kasworm et al. 2018) that only contained data about the state of the population estimate and trend from 2017. 8-ER-1759. The Forest Service used this study despite not finalizing and issuing the EA until June 2022, 8-ER-1718, at which time several more updated annual reports were available. 4-ER-731 (2021 Kasworm et al. report); CenterSER-140 (2020 Kasworm et al. report); CenterSER-142 (2019 Kasworm et al. report). And similar to FWS, the Forest Service also ignored the recent rise in female mortalities and decline in minimum grizzly bear detections. *See supra* 3-12. This fails to comply with NEPA's "hard look" requirement. *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002).

Federal Defendants do not appeal the district court's holding that "[i]n relying on data from a 2018 study, rather than data from more recent studies, the USFS's determination of baseline conditions was arbitrary and capricious." *See* 1-ER-038. Intervenor, as the sole appealing party, argues primarily that the Forest

Service's reliance on stale data was harmless error for various reasons.[12] Int. 3d Br. 27-34.

The agency typically bears the burden of demonstrating harmless error. *NRDC v. U.S. Forest Serv.*, 421 F.3d 797, 807 (9th Cir. 2005) (citation omitted). Here, whereas the Forest Service has not claimed it made a harmless error, Intervenor carries the formidable burden to show that *the agency's error* was harmless. The doctrine of harmless error "may be employed only when a mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of decision reached." *Id.* at 807 (citation omitted). It is unclear how Intervenor can claim *the Forest Service's* failure to consider relevant data "had no bearing on the procedure used or the substance of decision reached" when the agency itself is not making the same argument. For this reason alone, the Court should reject Intervenor's harmless error defense.

In any case, it is apparent why the agency itself has not maintained its error is harmless. In attempting to prove harmless error, Intervenor first points to a document entitled "Process review for assessing BMU metrics for the project-specific grizzly bear analysis in the Black Ram Project," dated June 1, 2022. Int.

---

[12] Intervenor repeats its assertion that Plaintiffs argue that grizzly bear population should be based "solely" on the minimum number of bears detected. Int. 3d Br. 28-30. As explained above, *see supra* 8-9, Plaintiffs have never made this argument and this blatant mischaracterization repeated throughout Intervenor's brief does not do Intervenor any favors to support its arguments.

3d Br. 30 (citing 8-ER-1806–09). This "[p]rocess review" includes a brief review of Kasworm et al. (2021), mostly pulling quotes from the report. The review was not incorporated into the EA and provides no analysis as to how any of this information impacts the Black Ram EA's grizzly bear analysis. This cursory review certainly does not constitute a "hard look" as NEPA requires.

A NEPA violation cannot be considered harmless when it "prevent[s] a proper, thorough, and public evaluation of the environmental impact of the Project." *Lands Council v. Powell*, 395 F.3d 1019, 1037 n.25 (9th Cir. 2004). Here, where the Forest Service failed to incorporate any post-2017 grizzly bear data into the EA (which was released five years later), the public certainly didn't have an opportunity to thoroughly review the highly relevant and important data. This is particularly troubling where, as explained above, trends in female mortality and minimum detections changed dramatically during this time period.

Moreover, this is not the type of "technical" NEPA violation for which this Court has previously found harmless error. *See, e.g., Drakes Bay Oyster Co. v. Jewell*, 729 F.3d 967, 985 (9th Cir. 2013) (finding harmless error where there was an error in the timing of publishing the EIS and framing the extension denial in the wrong format) (citation omitted); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1220 (9th Cir. 2004) (declining to reverse finding of harmless error where no harm was shown for violation of deadline for ESA biological assessment). Here, the Forest

Service's failure to consider recent and relevant data has a bearing on the agency's analysis and likewise harmed Plaintiffs' and the public's ability to thoroughly review and comment on recent data and its application to the Black Ram Project. This failure thus frustrates the two fundamental purposes of NEPA: "(1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011); *see also* 42 U.S.C. § 4332(2)(C) (2022).[13] In other words, the Forest Service's failure to include and analyze recent and relevant data in the EA "materially impeded NEPA's goals." *See Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1104 (9th Cir. 2016).

Second, Intervenor doubles down on its argument that because mortality data is in FWS's annual reports in the record, the Forest Service must have considered the data. Int. 3d Br. 29-31 (describing mortality data contained in Kasworm et al. 2021). Intervenor ignores the fact that none of this data was analyzed or even included in the Forest Service's EA. *Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998) (rejecting Forest Service's references to the record containing data where it was not found in the

---

[13] This Court reviews the Forest's compliance with the laws in place at the time of the agency's decision. *See* CBD 2d Br. 7, n.3.

EA). As we already noted, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *State Farm*, 463 U.S. at 50 (citation omitted). Here, the Forest Service does not include data from these annual reports in the EA. Nor does the agency ever discuss the rising rate of female mortalities or the decline in the minimum number of bears detected.

In sum, the Forest Service relied on stale data in its EA, failing to include or disclose the recent relevant data to properly analyze the Project's impacts to grizzly bears. This error was not a harmless technical error but a fundamental failure to comply with NEPA's hard look mandate. Thus, this Court should affirm the district court's finding that the Forest Service's grizzly bear analysis in the EA is arbitrary and capricious.

## CONCLUSION

The Fish and Wildlife Service violated the ESA and APA by disregarding the most current information in estimating the baseline population and by reaching a no-jeopardy conclusion that was based on a faulty baseline, a mischaracterization of the impacts to reproduction and recovery, and not supported by the facts. Additionally, the Forest Service violated NEPA and the APA in relying on outdated data and failing to consider important information in setting the baseline against which Project impacts are assessed.

As such, we respectfully request that this Court:

(1) affirm the district court's finding that the Fish and Wildlife Service's baseline failed to consider the best available science and was arbitrary and capricious in violation of the ESA;

(2) affirm the district court's finding that the Forest Service's reliance on the faulty Biological Opinion violated the ESA;

(3) affirm the district court's finding that the Forest Service's baseline was arbitrary and capricious in violation of NEPA; and

(4) reverse the district court's finding that the Fish and Wildlife Service's no-jeopardy determination was not arbitrary.

Respectfully submitted August 22, 2024,

 /s/ Andrea Zaccardi

<table>
<tr><td>Andrea Zaccardi</td><td>Edward B. Zukoski</td></tr>
<tr><td>Center for Biological Diversity</td><td>Center for Biological Diversity</td></tr>
<tr><td>P.O. Box 469</td><td>1536 Wynkoop Street, Suite 421</td></tr>
<tr><td>Victor, ID 83455</td><td>Denver, CO 80202</td></tr>
<tr><td>(303) 854-7748</td><td>(303) 641-2149</td></tr>
<tr><td>azaccardi@biologicaldiversity.org</td><td>tzukoski@biologicaldiversity.org</td></tr>
</table>

*Attorneys for Plaintiffs-Appellees-Cross-Appellants*
*Center for Biological Diversity et al.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-2882, 23-2886, 23-3146

I am the attorney or self-represented party.

**This brief contains** 6,219 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

🔘 complies with the word limit of Cir. R. 32-1.

⚪ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⚪ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

⚪ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

⚪ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

⚪ complies with the length limit designated by court order dated _____.

⚪ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Andrea Zaccardi **Date** 8/22/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*